# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**LATOYA BROWN; LAWRENCE BLACKMON**
**HERBERT ANTHONY GREEN; KHADAFY MANNING;**
**QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS**
**SINGLETON; STEVEN SMITH; BESSIE THOMAS; and**
**BETTY JEAN WILLIAMS TUCKER, individually and on**
**behalf of a class of all other similarly situated,**                **PLAINTIFFS**

**v.**                              **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF**
**RANDALL C. TUCKER, in his official capacity; and**
**MADISON COUNTY SHERIFF'S DEPUTIES JOHN**
**DOES #1 through #6, in their individual capacities,**              **DEFENDANTS**

---

### DEFENDANTS' MEMORANDUM OF AUTHORITIES IN
### OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

---

Defendant Sheriff Randall Tucker, the sole law enforcement policy-maker for defendant Madison County, has already provided plaintiffs with the location of every roadblock conducted in the county since he took office at the beginning of 2012, and he is in the process of providing the locations of traffic stops during that period of time. Plaintiffs have brought their motion to compel [Dkt. #64] to secure the addresses of each of the more than 118,000 incidents called to the attention of the Sheriff's Department during that time. A huge proportion of the addresses not already produced by Sheriff Tucker are residences, which would undisputedly reveal the identities of innocent victims and witnesses of crime at those addresses. Because Sheriff Tucker is sworn to protect those innocent victims and witnesses, he asks this Court to overrule the motion.

### STATEMENT OF FACTS

Plaintiffs assert that their request for documents defined that term to include "computer-aided dispatch ('CAD') reports." [Dkt. #65 at 3.] However, Sheriff Tucker's CAD system

produces many different types of reports, depending upon the inquiry directed to it.  What plaintiffs are asking this Court to compel is the production of a report which contains every address of every incident called to the attention of the Sheriff's Department since 2012.

Whenever an incident is brought to the attention of a dispatcher in the Sheriff's Department, that information goes into the CAD database and is assigned an incident number.[1] Incidents initiated by Sheriff's Department personnel have already been produced to plaintiffs. Sheriff Tucker has produced a document called a CAD statistical report which lists every incident categorized as a roadblock, showing, among other things, the date and the address of each roadblock.  He is in the process of producing a similar report concerning traffic stops, which will reveal the dates and locations of substantially all such stops in Madison County since 2012.  Any time a deputy initiates a contact for law enforcement purposes, that incident is reported to the dispatcher and an incident number assigned.

The remainder of the incidents in the CAD database originated from contacts made by private individuals, most often through the 911 system.  The system does not necessarily contain the name of the reporting party, but it does contain the address, because a deputy is ordinarily dispatched to that address to investigate.  Some of those addresses may be businesses, schools or churches, but the great majority are private residences.  Knowledge of those addresses would very likely lead to the identification of innocent crime victims and witnesses located there.  The CAD computer system, however, cannot distinguish between residence addresses and other addresses. If asked to produce addresses, it will produce everything falling into that category.

Plaintiffs' expressed desire for "certain documents Defendants refuse to produce in unredacted form" [Dkt. #65 at 1] is an inaccurate description of how the CAD system works.  The

---

[1] The characteristics of the CAD system, as well as a description of the information in the CAD database already produced to plaintiffs, are explained in the declaration of Charles Cowan, attached hereto as Exhibit 1.

CAD database is not a document, as that word has been understood for centuries, but an electronic repository of information.  If it is asked to produce a document that includes addresses, it will do so; if it is asked to produce a document that does not include addresses, it will do that.  What it will not do is distinguish among the types of addresses stored in the database.  If it produces a document containing the more than 118,000 addresses stored since the beginning of 2012, as plaintiffs request, it will not be able to identify and redact the residences of innocent victims and witnesses.  Human beings will have to do that by hand, after investigating each address to determine whether it constitutes a residence or something else.

That process of redaction by hand has already been undertaken, with plaintiffs' consent, with regard to tens of thousands of incident reports generated by the CAD system.  An incident report contains most, although not necessarily all, of the information placed into the system in connection with a particular incident number.  Sheriff Tucker has been producing incident reports arguably relevant to plaintiffs' claims in this case.  Because each of the more than 118,000 incidents in the CAD database is categorized in a particular fashion, it was possible to eliminate at the outset 33,043 obviously irrelevant incidents.  The remaining 86,688 incident reports are being reviewed by lawyers to determine relevance, and the relevant reports are being redacted by hand by paralegals to exclude information, including addresses, which would tend to identify innocent victims and witnesses.  As of November 2, 2017, Defendants have completed review of 66,154 incident reports, which amounts to approximately seventy-seven (77) percent of potentially responsive reports.  Sheriff Tucker has already produced to plaintiffs 36,633 of these incident reports, many with addresses of victims and witnesses redacted. The process has required approximately six hundred (600) hours of effort by twelve different lawyers and over one hundred (100) hours of paralegal time.

Sheriff Tucker's declaration explains his refusal to produce residence addresses, whether in incident reports or statistical reports or any other form.[2]  In order to protect Madison County citizens, Sheriff Tucker must rely on their willingness to inform him of potential criminal activity. Many people will be deterred from doing so if they believe that their identities will be released. As explained hereafter, courts have regularly recognized the need to protect innocent victims and witnesses in similar circumstances.  This Court should do the same.

## ARGUMENT

## I.   PLAINTIFFS CANNOT EXPLAIN WHY ADDRESSES OF CRIME VICTIMS AND WITNESSES ARE RELEVANT, MUCH LESS IMPORTANT.

Plaintiffs have acknowledged that Sheriff Tucker has refused to produce all addresses of incidents recorded in the CAD system "because many of those addresses could be used to identify innocent victims and witnesses."  [Dkt. #65 at 3.]  Plaintiffs take no issue with that representation. They simply claim that the addresses are relevant to their case, without making any effort to explain why that supposed relevance outweighs the interests of crime victims and witnesses in their privacy.

Plaintiffs make a single claim of relevance, that "the street addresses at which particular law enforcement encounters took place" tends to prove their claim that Sheriff Tucker has been "targeting Black neighborhoods and majority-Black apartment complexes within Madison County." [Dkt. #65 at 5.]  Proof of such targeting might arguably be relevant to plaintiffs' claim that Sheriff Tucker is intentionally discriminating on the basis of race, although it cannot by itself be sufficient.  *See, e.g., Kelley v. City of Wake Village*, 264 Fed. Appx. 437, 443 (5th Cir. 2008), citing *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997).  Plaintiffs, however, offer no defense of their assertion that street addresses are relevant to prove targeting.

---

[2] His declaration is attached hereto as Exhibit 2.

4

Sheriff Tucker has already produced a CAD statistical report listing all roadblocks conducted since he took office at the beginning of 2012, including their locations.  He has agreed to produce a similar list of all traffic stops and is in the process of doing so.  The locations of traffic stops and roadblocks may give some indication of the areas to which Sheriff Tucker gives priority in deciding to investigate or patrol, whether or not that activity might be accurately described as targeting.

However, other addresses in the CAD system provide no insight whatsoever into Sheriff Tucker's priorities.  When a victim or witness chooses to telephone the Sheriff's Department for help, the record of his address in the CAD system proves nothing at all about targeting.  It simply proves that Sheriff Tucker responds to requests for help.  If a disproportionate number of calls come from Black neighborhoods, it may or may not prove that those neighborhoods suffer disproportionately from crime; it certainly does not prove that Sheriff Tucker targets those neighborhoods for any reason, much less an unconstitutional one.

Indeed, a disproportionate number of telephone calls to the Sheriff's Department come from Black areas because of the very nature of the 911 system, as Chief Deputy Jeremy Williams explained in his deposition.[3]  All 911 calls from unincorporated areas of Madison County are automatically routed to the Sheriff's Department, but calls from within the four incorporated municipalities in the County are ordinarily routed to local police departments.[4]  As plaintiffs themselves allege in their complaint, "The County's two largest cities [Madison and Ridgeland] are majority-white."  [Dkt. #1 at ¶ 48.]  911 calls from Madison and Ridgeland automatically go

---

[3] Chief Williams's deposition has not yet been transcribed.  The relevant portions will be filed with the Court as soon as they are received.

[4] The Flora Police Department does not have its own dispatcher after hours or on weekends; during those time periods, calls from Flora are routed to the Sheriff's Department.  Calls from any of the municipalities may roll over to the Sheriff's Department if, for some reason, the local police cannot take the call.

to those local police departments, not to the Sheriff's Department.  On the other hand, calls from the majority-Black town of Flora automatically go to the Sheriff's Department on weekends and late at night.  It would hardly be a surprise if a substantial portion of the 911 calls that reach the Sheriff's Department come from Black callers in Black neighborhoods.

Because plaintiffs offer nothing but their bare assertion of relevance, their contention that "statistics often tell much" [Dkt. #65 at 5, quoting *Burns v. Thiokol Chem. Corp*., 483 F.2d 300, 305 (5th Cir. 1973), quoting *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.), aff'd, 371 U.S. 37 (1962)], makes no difference.  On the very next page, the Fifth Circuit described the sorts of statistics that tell the most.  "Certainly, however, an employer's failure to hire or promote all or the great majority of Blacks *while he concurrently hires or promotes Whites* may well indicate racial discrimination."  483 F.2d at 306, quoting *United States v. Jacksonville Terminal Co*., 451 F.2d at 418, 441 (5th Cir. 1971) (emphasis added by *Burns* Court).  Plaintiffs offer no suggestion of how addresses of victims and witnesses will help them prove such stark racial disparities in this case.  Maybe such an explanation is possible, but plaintiffs have not offered it, so Sheriff Tucker can hardly be expected to rebut it.

Sheriff Tucker does not dispute the importance of "broad discovery in civil rights actions." *Dunn v. Dunn*, 2016 WL 4127769 at *5 (M.D. Ala. Aug. 2, 2016).  That is why he is providing plaintiffs with tens of thousands of incident reports, in addition to the CAD statistical reports on roadblocks and traffic stops mentioned above.  The *Dunn* case goes on to say, "A most important fact to be considered in the determination as to whether particular evidence should be discovered is the importance of the evidence to the plaintiffs' case." *Id*.  Plaintiffs simply have not established that the addresses of victims and witnesses are important to their effort to prove the intentional racial discrimination they allege.  Indeed, if they cannot prove their claims from the massive

6

amount of material they are already receiving, there is no reason to believe that it will emerge from any sort of statistical analysis of the addresses of innocent people.

Plaintiffs' request for discovery falls at the first hurdle for lack of relevance.  Their motion to compel must be overruled.

## II.    FEDERAL CASE LAW PROTECTS FROM DISCOVERY INFORMATION WHICH IDENTIFIES CRIME VICTIMS AND WITNESSES.

In addition to the lack of relevance, the production of victim and witness information also fails the proportionality consideration under Fed. R. Civ. P. 26(b)(1).  Rule 26(b)(1) sets forth six considerations in evaluating proportionality: 1) the importance of the issues at stake in the action; 2) the amount in controversy; 3) the parties' relative access to relevant information; 4) the parties' resources; 5) the importance of the discovery in resolving the issues; and 6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

Unquestionably, the burden on defendants and third-party victims and witnesses outweighs its likely benefit to plaintiffs' case, particularly since plaintiffs have failed to establish its importance.  The likely burden on individual third-party victims and witnesses is substantial.  As Sheriff Tucker's declaration establishes, individual victims and witnesses will likely be reluctant to provide information to law enforcement officials out of fear of appearing to cooperate with law enforcement, reprisals, or because they are victims of domestic abuse or sexual assault.  Whatever their reasons, the willingness of victims and witnesses to report crimes to the Madison County Sheriff's Department will suffer if it becomes known that defendants have produced such information in this litigation.  Any erosion in the willingness of victims and witnesses to report to the Madison County Sheriff's Department will burden Sheriff Tucker's and his Department's efforts to carry out their responsibility to protect the safety and well-being of Madison County residents.

Federal courts applying these principles have regularly refused to require discovery of information that could be used to identify crime victims and witnesses.  Indeed, that was the holding of *Gwerder v. Besner*, 2007 WL 2916513 (D. Ore. Oct. 5, 2007), one of the handful of cases cited by plaintiffs.  [Dkt. #65 at 7.]  In that action against the City of Portland and one of its police officers, the Court required the production of Internal Affairs documents from the police department, but issued a protective order under Rule 26(c), redacting identifying information.  In the face of "concerns about chilling the degree of cooperation from witnesses and subjects of investigation," the Court entered "a protective order that protects private and sensitive information such as social security numbers, home addresses, and telephone numbers."  *Id*., at *3.  Likewise, the Court ordered production of documents "regarding citizen complaints," because the "concerns as presently stated are addressed in the proposed protective order."  *Id*.

Controlling authority on the protection of information concerning informants who voluntarily come forward to government agencies was recently provided by *Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F. 3d 540 (5th Cir. 2016).  This Court had ordered plaintiffs in an employment discrimination suit to reveal whether they had applied for a U visa.  The Fifth Circuit explained:

> For a victim to receive a U visa, a law enforcement agency such as the Equal Employment Opportunity Commission (EEOC) must certify that he or she is aiding an investigation into the alleged offenses, and the U.S. Customs and Immigration Service (USCIS) must conduct its own *de novo* review of relevant evidence and confirm the victim's eligibility.

*Id*., at 545 (footnote omitted).  Even though any plaintiffs applying for a U visa could hardly be considered innocent, since "it is illegal to knowingly employ an undocumented worker," *id*., at 559, the Fifth Circuit reversed the discovery order because "the district court did not address how U visa litigation might intimidate individuals outside this litigation."  *Id*., at 563.  The Court continued, "Thousands apply for U visas each year, and they do so with the assurance that federal

authorities will keep their applications confidential." *Id.* (footnote omitted). The Court reversed the discovery order because "allowing discovery of U visa information may have a chilling effect extending well beyond this case, imperiling important public purposes." *Id.*, at 563.

Sheriff Tucker's affidavit plainly establishes the same concern in this case. Victims and witnesses voluntarily provide information to the Sheriff's Department with the expectation that their identities will be protected to the maximum extent possible. To identify them to anyone will have the same "chilling effect" recognized by the Fifth Circuit in *Cazorla*. Moreover, unlike the plaintiffs in that case, these victims and witnesses are not parties to this litigation and they are plainly innocent of any legal fault. Preservation of their privacy is important for their personal rights as well as for the general interests of law enforcement.

The special importance of protecting the interests of non-parties was recognized in *Mehl v. Blanas*, 241 F.R.D. 653 (E.D. Cal. 2007). That case involved a challenge to a California sheriff's policies concerning the issuance of permits to carry concealed weapons, and the Magistrate Judge required production of permit applications "without removal of the home address, social security number, and other sensitive information" of a substantial class of applicants. *Id.*, at 655. The District Judge reversed, giving significant weight to a California statute protecting the confidentiality of such information. *Id.*, at 657. The Court added, "It is of note that this harm is to numerous persons who are not even parties to this litigation." *Id.* The District Judge was not satisfied by a provision of the order restricting disclosure for "attorney's and expert's eyes only." *Id.*, at 658. "[R]ecent experience shows that documents produced in the course of litigation may well end up in the hands of the public." *Id.* The Court explained:

> The Court does not doubt Plaintiffs' counsel's sincerity. However, balancing the interests involved, the Court finds that a protective order is necessary. The applicants' interest in privacy and the security of their persons and families requires a more stringent safeguard than the assurance of any one litigant.

*Id*.  Other District Courts have likewise refused to order discovery of identifying information of victims and witnesses.  *Garcia v. City of Garden Grove*, 2017 WL 2416207 at \*3 (C.D. Cal. Feb. 28, 2017) ("Plaintiff has not shown that the names and addresses of alleged victims and other officers are 'relevant to [Plaintiff's] claim or defense,'" as required by Rule 26(b)(1).); *Carnaby v. City of Houston*, 2008 WL 4546606 at \*3 (S.D. Tex. Oct. 10, 2008) ("all identifying information of complainants and witnesses will be redacted").

The two cases upon which plaintiffs rely involve, not the reporting of ordinary criminal conduct, but internal investigations of charges against police officers.  In *Tyner v. City of Jackson*, 105 F.R.D. 564 (S.D. Miss. 1985), this Court ruled that files of the Internal Affairs Division should be produced in discovery, but the question of whether identifying information of victims and witnesses should be redacted was not presented.  That issue was presented in *Coffie v. City of Chicago*, 2006 WL 1069132 (N.D. Ill. Apr. 21, 2006).  There, the Court found that disclosure of complainants and witnesses would not have a chilling effect on their willingness to come forward, observing that the "identities of those witnesses are already known to the Chicago Police Department, and the most troubling source of potential harassment of those witnesses would be police officers, not the attorneys who represent plaintiffs in police misconduct cases."  *Id*., at \*3 (citation omitted).  Here, by contrast, the threat comes from innumerable criminals who might wish to retaliate against those who had assisted law enforcement.  Nothing in *Tyner* or *Coffie* supports the disclosure of identifying information in these circumstances.

As in *Cazorla* and *Mehl*, a statute underscores the importance of confidentiality in this case. The Public Records Act, Miss. Code Ann. § 25-61-12(2)(d)(Supp. 2017), protects from disclosure "information that would reveal the identity of the victim."  Investigative reports, defined by Miss. Code Ann. § 25-61-3(f)(ii) (Supp. 2017) as containing information that would "reveal the identity

of informants and/or witnesses," are generally exempted from production by Miss. Code Ann. § 25-61-12(2)(2). As in *Mehl*, "the statute evidences [Mississippi's] recognition of the [person's] interest in maintaining the confidentiality of this information." 241 F.R.D. at 657.  In *Cazorla*, the Fifth Circuit recognized that the federal statute did not prohibit the Court from requiring litigants to disclose their own information, 838 F.3d at 552, but concluded that mandatory disclosure would "undermine the spirit, if not the letter, of those Congressionally sanctioned assurances and may sow confusion over when and how U visa information may be disclosed, deterring immigrant victims of abuse -- many of whom already distrust the government."  *Id*., at 562-63 (footnote omitted).  Similarly, requiring disclosure of information tending to identify victims and witnesses, contrary to the efforts of Mississippi law to protect them, would seriously undermine the efforts of Sheriff Tucker and his Department to build confidence in the community they serve.

Contrary to plaintiffs' contentions, Sheriff Tucker's argument does not rest upon "conclusory and speculative assertions regarding potential privacy issues that might exist."  [Dkt. #65 at 8.]  Sheriff Tucker has provided sworn evidence to establish the reality and importance of his concerns.  Just as important, the Mississippi Legislature has validated those concerns by taking steps to protect the identities of innocent people who assist law enforcement.  Plaintiffs have not made a case for breaking faith with those people.  Fifth Circuit authority and the relevant case law require that the motion be denied.

### III.   SHERIFF TUCKER HAS NOT WAIVED HIS RIGHT TO DEFEND THE INTERESTS OF MADISON COUNTY CITIZENS.

Sheriff Tucker received a request under the Public Records Act from the ACLU-MS for CAD statistical reports for the months of May 2016 through September 2016, and later received another request for CAD statistical reports for October 2006, 2008, 2010, 2012, 2014.  The first request for three months of CAD statistical reports led Sheriff Tucker reasonably to believe that

the ACLU was looking for a specific event about which it already had knowledge, without knowing when it had occurred. The same held true when Sheriff Tucker received the ACLU's second request. At no time could Sheriff Tucker have perceived that these two requests would result in an *en masse* request by plaintiffs for CAD statistical reports over a five-year period in a potential class action lawsuit. Sheriff Tucker's disclosure of a limited number of addresses of potential victims and witnesses in twelve months of CAD statistical reports, therefore, did not waive the privacy interests of these individuals whose identities are exempt from disclosure under §25-61-12(2)(d) and §25-61-3(f)(ii).

The cases cited by plaintiffs to support their waiver argument are inapplicable to the facts addressed in their motion to compel. The waiver issue in *Town of Grafton v. Pulte Homes of New England, LLC*, 2013 WL 5948000 (D. Mass. Nov. 4, 2013), involved a claim by the Office of the Massachusetts Inspector General that a report it had posted online was privileged and not subject to a deposition subpoena *duces tecum*. The Court held that, while the OIG had waived its claim of privilege as to the contents of the actual report, its witness could assert the investigatory privilege to questions asked about that report during the deposition. While the Court in *Delaware Dep't of National Resources & Environmental Control v. U.S. Army of Corps of Engineers*, 722 F.Supp.2d 535, 544-45 (D. Del. 2010), did recognize that a governmental agency may waive a privilege as to specific documents previously disclosed, it held that any waiver did not render the documents relevant. Here, plaintiffs seek addresses that Sheriff Tucker has never produced, without a sufficient demonstration of relevance.

Both cases cited by plaintiffs involve assertion of privilege, but Sheriff Tucker is not citing an evidentiary privilege under Mississippi or federal law. Instead, he argues that application of ordinary principles of discovery under Rule 26 preclude disclosing the addresses of potential

victims or witnesses in the five years of CAD statistical reports sought by plaintiffs.  The privacy interest these individuals expected when they called to report a crime being committed in Madison County is sufficient to outweigh any marginal claim of relevance.   Federal courts examining this same privacy interest under 5 U.S.C. §525(b)(7)(C) (part of the Freedom of Information Act ["FOIA"]), which contains very similar language to that found in §25-61-3(f)(ii), have held that a government agency cannot waive an individual's privacy interest under FOIA.  *See, e.g., Prison Legal News v. Executive Office for U.S. Attorneys*, 628 F.3d 1243, 1249 (10th Cir. 2011) (family of slain prisoner whose body was photographed in his cell did not waive their privacy interests in the photographs because government introduced them at killer's trial); *Billington v. Department of Justice*, 69 F.Supp.2d 128, 137 (D.D.C. 1999) (DOJ's inadvertently disclosing FBI interviews without redactions did "nothing to diminish the magnitude of the privacy interests of the individuals named in such reports"), aff'd in pertinent part and vacated in part on other grounds, 233 F.3d 581 (D.C. Cir. 2000).  Sheriff Tucker's previous release of the addresses of potential victims or witnesses to crimes committed in Madison County over a 12-month period, therefore, did not waive the privacy interest these individuals hold to prevent their identities from being disclosed to plaintiffs in this case.

Should this Court determine that Sheriff Tucker did waive their privacy interest, his waiver does not defeat his or these individuals' claims to protect the remaining reports plaintiffs now seek. Federal courts have consistently held that a discretionary disclosure of certain documents by a governmental agency under FOIA does not waive the agency's claimed exemptions to the disclosure of other similar documents.  *See, e.g., Cooper v. Department of Navy of U.S.*, 594 F.2d 484, 488-89 (5th Cir.) (although Navy waived its claimed privilege under FOIA to previously released portion of accident report regarding helicopter crash, it did not waive the confidentiality

of the remaining report or its endorsements through the release), cert. denied, 444 U.S. 926 (1979); *Mobil Oil Corp. v. U.S. E.P.A.*, 879 F.2d 698, 701 (9th Cir. 1989) (citing *Cooper*) (circuits addressing the issue whether release of certain documents waives exemption to other documents have found that initial release waives exemptions only for documents released); *NYC Apparel FZE v. U.S. Customs & Border Protection*, 484 F.Supp.2d 77, 90 (D.D.C. 2007), quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of *similar* information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.") (emphasis added by Court).  Plaintiffs' additional request for addresses previously not disclosed by Sheriff Tucker, therefore, should be denied.

## IV.   RESTRICTIVE CONDITIONS ON DISCLOSURE WILL NOT OFFER SUFFICIENT PROTECTION OF PRIVACY.

Before the filing of plaintiffs' motion to compel, this Court held a telephonic conference with the parties in an attempt to narrow or resolve the issues.  During the course of that conference, the Court made two suggestions for restrictive conditions that might provide some protection for the interests asserted by Sheriff Tucker.

First, this Court suggested that any interest in privacy might be protected by an order limiting disclosure of addresses to the attorneys in the case.  Plaintiffs' explanation of their supposed need for the addresses establishes the insufficiency of that condition.  They claim that the addresses are "highly relevant to Plaintiffs' analysis of Defendants' overall patterns of policing in Madison County" [Dkt. #65 at 5] because "statistics often tell much" [*id*., quoting *Burns*, 483 F. 2d at 305].  Statistics, however, tell nothing without a statistician to compile them and present them to the Court.  Accordingly, to be of any help to plaintiffs, the addresses must be made available, not only to the attorneys, but to expert witnesses and such assistants as those experts may need.

14

This multiplies the problem identified in *Mehl* "that documents produced in the course of litigation may well end up in the hands of the public." 241 F.R.D. at 658. This Court constantly sees reports in the press of breaches of electronic security that demonstrate the truth of that observation. The addresses at issue in *Mehl* were those of "judges, district attorneys, peace officers, or other persons employed in the criminal justice system," *id*., at 656, and the Court recognized that their "interest in the privacy and security of their persons and families requires a more stringent safeguard," *id*., 658.

The innocent victims and witnesses whose addresses appear in Sheriff Tucker's records are entitled to no lesser degree of protection. There would be no criminal justice system worthy of the name without the willingness of members of the community to come forward and tell the truth. They should be able to do so without fear of retribution from the criminals they have helped to identify. Those victims and witnesses provided their addresses for purposes of enforcing the criminal law, and this Court should not divert that information to any other purpose.

Second, the Court raised the possibility of shifting certain costs to plaintiffs, as authorized by the advisory committee note to the 2006 amendment to Rule 26. Certainly, if this Court orders further discovery, plaintiffs should bear the costs. However, payment by plaintiffs would not afford any protection to innocent victims and witnesses. Addresses should remain confidential.

Should this Court nevertheless require production of addresses to plaintiffs, it should also forbid them from contacting any persons at those addresses. In *Mehl*, plaintiffs claimed they needed addresses "in order to locate and depose possible witnesses," 241 F.R.D. at 657, a claim these plaintiffs have not made. The Court withheld addresses, but ordered defendants "to receive and forward process from the Plaintiff to any persons whose sensitive information has been removed." *Id*., at 658. The Court also allowed plaintiffs to seek "disclosure of redacted

information on an applicant by applicant basis." *Id.* Similar protections must be afforded in this case.

Because neither of the restrictive conditions proposed by the Court satisfactorily protects the privacy of innocent victims and witnesses at reasonable expense, the production of addresses should not be ordered.

## CONCLUSION

For the reasons set forth herein, the motion to compel should be overruled.

This the 3rd day of November, 2017.

Respectfully submitted:

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY:   *s/Michael B. Wallace*
Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan #7735
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, MS   39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

17

## CERTIFICATE OF SERVICE

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Joshua Tom, Esq.
Paloma Wu, Esq. (*pro hac vice*)
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
PWu@aclu-ms.org
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Yukiu Chan, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
jyoungblood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 3rd day of November, 2017.

*s/Michael B. Wallace*
Michael B. Wallace