# EXHIBIT 24

1                       RANDALL TUCKER
2               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                        NORTHERN DIVISION
4    LATOYA BROWN; LAWRENCE
     BLACKMON; HERBERT ANTHONY
5    GREEN; KHADAFY MANNING;
     QUINNETTA MANNING; MARVIN
6    McFIELD; NICHOLAS SINGLETON;
     STEVEN SMITH; BESSIE THOMAS; and
7    BETTY JEAN WILLIAMS TUCKER,
     individually and on behalf of a class
8    of all others similarly situated,        PLAINTIFFS
9
10   V.            CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER in his
12   official capacity; and MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1
13   through #6, in their individual capacities,
14                                       DEFENDANTS
15
16      ********************************************
17       VIDEOTAPED DEPOSITION OF SHERIFF RANDALL TUCKER
18      ********************************************
19              APPEARANCES NOTED HEREIN
20
            DATE: THURSDAY, DECEMBER 21, 2017
21              PLACE: HILTON GARDEN INN
                WEST CAPITOL STREET
22                  Jackson, MS
                 TIME:  9:00 A.M.
23
24          REPORTED BY: DEBORAH H. NELSON
                  CSR #1256
25   JOB NO. 133425

## Page 6

RANDALL TUCKER

1
2    VIDEOGRAPHER:  This is the start of
3    DVD Label Number 1 of the videotaped
4    deposition of Sheriff Randall Tucker in
5    the matter of Latoya Brown, et. al. vs.
6    Madison County Mississippi, et. al.
7        In the United States District Court,
8    Southern District of Mississippi, Jackson
9    Division, Number 317-CV-347WHB-LRA.  This
10   deposition is being held at the Hilton
11   Garden Inn, 235 West Capitol Street,
12   Jackson, Mississippi, on December 21st.
13   The time on the monitor is nine o'clock.
14       My name is Eddie Nabors.  I'm the
15   legal video specialist for TSG Reporting,
16   Inc, headquartered at 747 Third Avenue,
17   New York, New York.
18       The court reporter is Debbie Nelson,
19   also in association with TSG Reporting.
20       We'd ask for attorney introductions
21   on the audio portion.
22       MR. YOUNGWOOD:  Jonathan Youngwood,
23   Simpson, Thacher & Bartlett for the
24   plaintiffs in the proposed class.
25       MS. GOCHMAN:  Janet Gochman, Simpson,

## Page 7

RANDALL TUCKER

1
2    Thacher & Bartlett for the plaintiffs in
3    the proposed class.
4        MR. TOM:  Joshua Tom, ACLU of
5    Mississippi, for the plaintiffs in the
6    proposed class.
7        MS. COLLINS:  Jennifer Riley-Collins,
8    attorney and Executive Director for the
9    ACLU of Mississippi.
10       MR. ROSS:  Charlie Ross with Wise
11   Carter on behalf of the defendants.
12       MS. COWAN:  Becky Cowan with Currie
13   Johnson and Myers on behalf of the
14   defendants.
15       MR. WALLACE:  Mike Wallace with Wise
16   Caraway, with Wise Carter Child & Caraway
17   for the defendants.
18       VIDEOGRAPHER:  The court reporter may
19   administer the oath, please.
20       SHERIFF RANDALL TUCKER
21   after having first been duly sworn by the court
22   reporter, was examined and testified under oath as
23   follows:
24   EXAMINATION BY MR. YOUNGWOOD:
25       Q   Good morning, Sheriff Tucker.

## Page 8

RANDALL TUCKER

1
2    A   Good morning.
3    Q   You became sheriff in 2012; am I correct?
4    A   That's correct.
5    Q   And at that time, is it correct, sir, that
6    you were of the view that race relations in Madison
7    County needed improvement?
8    A   I think there is always room for
9    improvement.  I don't know that there was a need at
10   the time, specifically, to address that, but that
11   was one of our missions, yes.
12       Q   Okay.  In fact, improving race relations
13   you considered to be one of your main objectives as
14   sheriff; is that correct?
15       A   Yes.
16       Q   What have you done to improve race
17   relations since becoming the sheriff?
18       A   Uh -- one of the main things that the
19   department did or that I did through the department
20   was create a community advisory group, wherein we
21   took members or representatives from each
22   municipality in the county, as well as members from
23   the county jurisdiction, to bring those into a
24   setting within the department to discuss the
25   procedures of the sheriff's department and to have

## Page 9

RANDALL TUCKER

1
2    those members go back out into the public and have a
3    venue to be able to bring their concerns and have a
4    discussion.
5        Q   Is there anything else you have done to
6    improve race relations in Madison County since
7    becoming sheriff?
8        A   We have strengthened our DARE program
9    within our county schools.  That's a
10   fifth-grade-geared program, wherein we go into the
11   schools and teach the kids about law enforcement,
12   about -- uh -- well, about law enforcement as a
13   whole and drug resistance and alcohol resistance
14   through that program.
15       We implemented an Explorer program wherein we
16   involved all 14 to 18-year-olds within our school
17   system, encouraged them to join the Explorer
18   program, where they are basically, they give up, it
19   was a period of eight weeks during their summer
20   vacation to come in and participate in, basically, a
21   mini-police academy to see what the profession of
22   law enforcement entails to educate them on the
23   day-to-day operations of being a police officer.
24       There is any manner of things.  We have held
25   general meetings with our staff and encouraged them

RANDALL TUCKER

1
2  to be professional, to treat people fairly, just to
3  smile and say "hi."
4      Q   You mentioned a fifth-grade program, and I
5  don't know if you said DARE or There.  What did you
6  call it?
7      A   DARE.
8      Q   D-A-R?
9      A   D-A-R-E.
10     Q   And what are those?  Do those letters
11 stand for something?
12     A   Drug Awareness Resistance Education.
13     Q   Okay.  Other than the items you have just
14 listed, is there anything else you have done since
15 being elected to the office of sheriff to improve
16 race relations in Madison County?
17     A   I can't cite specific instances.  I'm sure
18 along the way there's been other things.  Those are
19 the highlights.
20     Q   Let me go, perhaps, backwards of the list
21 you just gave me.  You mentioned general meetings of
22 the staff.
23     A   That's correct.
24     Q   Is race discussed at those meetings?
25     A   I don't know race, per se, but the equal

RANDALL TUCKER

1
2  treatment of all citizens, yes.
3      Q   In what way is equal treatment of all
4  citizens discussed at those meetings?
5      A   Uh -- I think it's a general term,
6  basically, to treat everybody with respect.  I think
7  race would fall under everybody.
8      Q   And who gives this instruction "treat
9  everybody with respect"?
10     A   Either the chief or myself.
11     Q   Okay.  And how often are these meetings
12 held?
13     A   We have at least one annually.
14 Occasionally, there's more than one.  Two or three.
15 If the need arises, we will have a meeting.
16     Q   And can you recall race being mentioned,
17 specifically, at any of these meetings since you
18 have become sheriff?
19     A   No, that's what I was just stating.  Not
20 race, specifically.  Just in general terms to treat
21 everyone fairly professionally, courteously.
22     Q   Have you -- and we'll leave this lawsuit
23 aside, any conversations in connection with it, have
24 you, in your years of sheriff, had any conversations
25 explicitly regarding race in connection with the

RANDALL TUCKER

1
2  performance of your professional duties?
3      A   With my professional duties?  No, not that
4  I recall.
5      Q   Let's talk about the Community Advocacy
6  Group, if I have that correct?
7      A   Community Advisory Group.
8      Q   Advisory Group.
9      A   Yes, sir.
10     Q   I wrote it down wrong.  Thank you.  When
11 was that created?
12     A   I believe it was the first year I was in
13 office.  I believe it was in -- uh -- I want to say
14 around April of that year.  April of 2012, I think.
15     Q   And what is the composition of that group?
16     A   There are two members of each municipality
17 or two residents that reside within each
18 municipality of the county.  There's four
19 municipalities.  There were two representatives from
20 county jurisdiction or jurisdiction outside of those
21 municipalities, and then one at-large
22 representative.
23     Q   So if I count correctly that's -- uh --
24     A   Eleven.
25     Q   -- 11 people?

RANDALL TUCKER

1
2      A   Yes.
3      Q   Okay.  And the four municipalities, those
4  are the towns or the cities within?
5      A   Correct.
6      Q   And so can you list those for me?
7      A   Flora.
8      Q   Uh-huh.
9      A   Canton, Madison, and Ridgeland.
10     Q   And then the two on top of that are from
11 unincorporated portions of the county?  Is that how
12 I understand your testimony?
13     A   Correct.  Possibly three.  The one
14 at-large could be from a municipality or county
15 jurisdiction.
16     Q   And how were these 11 people selected?
17     A   They were selected by -- well, I can't
18 give you the exact criteria.  Mark Sandridge
19 assisted me in that, so I don't want to give you
20 inaccurate information.
21     Q   Okay.  Has the membership changed in the,
22 I guess, nearly six years you have been sheriff?
23     A   It's rotated annually where those members
24 nominate other members within the community.
25     Q   And how often does the group meet?

Page 22

RANDALL TUCKER

1  
2  toward their future, to get involved, to see what
3  police work is about -- uh -- possibly as a future
4  or to certainly encourage them in an environmental
5  structure.
6      Q   So how many kids, if you know, right now,
7  approximately, are in the Madison County Explorer
8  Program?
9      A   I don't know how many are active right
10 this minute.  I don't have that figure, but there
11 is -- you know, once they're 18, they're out of the
12 program.  We've got some -- uh -- some of the
13 graduates that actually work for the sheriff's
14 department ran through that program.  One is a
15 dispatcher, one is a jailer.  I can't give you an
16 exact number, how many are actually active right
17 now.
18     Q   Okay, and is it the one entrance at 14 and
19 graduates at 18, or can you come in at any time?
20     A   You can come in at any time between those
21 numbers of years.  Any time between the age of 14 to
22 18.
23     Q   Okay, and is discussion or addressing
24 issues of race part of the Explorer program?
25     A   I don't know that an actual discussion is

Page 23

RANDALL TUCKER

1  
2  held about race.  There's a discussion about how to
3  treat people of all races equally and fairly -- just
4  as an officer would receive that same type of
5  instruction.
6      Q   Okay, but just to be specific, because I
7  think you previously testified that, at least with
8  your officers, race is not explicitly discussed.  In
9  the Explorer Program, do you believe race is
10 discussed, you should treat all races the same
11 or equally or whatever?
12     A   I think you asked me at the general
13 meeting if race was discussed, generally.
14     Q   Why don't we go back to -- let's focus on
15 the Explorer program, and then we'll go back.
16     A   I just don't want you to mischaracterize
17 what I said.  But go ahead.
18     Q   Let's stick with the Explorer Program for
19 a moment.
20     A   Okay.
21     Q   Is race explicitly discussed as part of
22 the Explorer program?
23         MR. ROSS:  Objection.  He's asked and
24         answered it.
25     A   I don't know that the term "race," itself,

Page 24

RANDALL TUCKER

1  
2  is used.  Equal treatment of all races is taught and
3  encouraged.
4      Q   (Mr. Youngwood)  And so my question is, is
5  it taught and encouraged by saying "equal treatment
6  of all people," or is it taught and encouraged by
7  saying "equal treatment of all races," or a synonym
8  for the word "race"?
9      A   You know, I can't sit here and tell you
10 that I have attended every session of an Explorer
11 class.  Equal treatment of all persons, human race,
12 whatever race you want to, however you want to label
13 it, equal treatment of all people is encouraged.
14     Q   Okay.  We discussed the general meetings.
15 I do believe you gave testimony already regarding
16 other aspects of your work as sheriff, but let's go
17 back to it because you have raised it.
18     Putting aside the general meetings, in
19 connection with your work as sheriff over the last
20 almost six years, have you had explicit discussions
21 concerning race unrelated to this lawsuit?
22     A   Yes.
23         MR. ROSS:  I object to the form.  You
24         can answer to the best of your ability.
25     Q   (Mr. Youngwood)  Tell me in what context

Page 25

RANDALL TUCKER

1  
2  those have taken place, please?
3      A   Anytime we have a new employee that goes
4  through orientation, the chief and I generally have
5  a meeting with them -- uh -- whether it be one or a
6  dozen new employees at a time, and I tell them that
7  I want them to treat everybody with professionalism,
8  with courtesy, with respect.  I don't care if
9  they're black, white, Hispanic, male, female,
10 Indian, green, yellow, brown.  I don't know if I say
11 those exact words in every time, but, yes, I do say
12 that.
13     Q   Okay, and whether you say those exact
14 words every time or not, you explicitly raise race?
15     A   Yes, I do.
16     Q   Okay.  And any other ways in which you
17 discuss race as part of your professional duties?
18     A   As part of my professional what?
19     Q   Duties.  As your job as sheriff?
20     A   I'm sure the term comes up all of the
21 time, yeah.
22     Q   But do you discuss problems with race
23 relations in Madison County?
24     A   I'm sure I have at some point, yeah.
25     Q   Can you remember any specific instances?

## Page 26

RANDALL TUCKER

1
2       A   I can't cite a specific instance, but if
3   it's brought up, I'm sure that it's addressed.
4       Q   Have you had discussions regarding
5   disparate treatment of the races in Madison County
6   by your officers since you became sheriff?
7           MR. ROSS:  Object to the form.  Do
8       you understand the question?
9       A   I do not.  Would you rephrase it or repeat
10  it?
11          MR. YOUNGWOOD:  Would you read back
12      the question, please?
13          (COURT REPORTER READS BACK WITH
14      DIFFICULTY WITH WORD)
15          MR. YOUNGWOOD:  Disparate.
16      A   I'm ignorant to that word.
17      Q   (Mr. Youngwood)  Treating races
18  differently by your officers?
19      A   I can say that since I've taken office I
20  haven't had it brought to my attention.
21      Q   You track the -- uh -- race of the people
22  who are involved in incident reports; correct?  Let
23  me say that differently.
24      A   I do not.
25      Q   Let me say that differently.  Incident

## Page 27

RANDALL TUCKER

1
2   reports record the race of people who are mentioned
3   in incident reports?
4       A   There is a block where you, it asks for
5   race, yes, yes.
6       Q   And so you have data available to you that
7   tells you the race of people who are involved in
8   incident reports dating back to before you maybe
9   became sheriff?
10      A   Yes.
11      Q   That's available to you?
12      A   Yes.
13      Q   Have you ever made any observations about
14  the different way in which race, the people of their
15  various races are treated by your officers by going
16  through incident reports and looking at the races of
17  the people involved?
18      A   I don't know that an incident report would
19  indicate the different treatment, but no.
20      Q   Have you ever, and we'll leave this
21  lawsuit aside, observed whether or not the races are
22  arrested at rates proportionate to their
23  representation in the county?
24          MR. ROSS:  Object to the form.
25      A   I don't differentiate in the race.  We

## Page 28

RANDALL TUCKER

1
2   arrest people who violate the law, regardless of
3   their race.
4       Q   (Mr. Youngwood)  Are you aware that your
5   officers arrest black people at a rate five times
6   that that they arrest white people?
7           MR. ROSS:  I object to the form.
8       A   I don't know whose figure those are.  I
9   haven't done any figures though.
10      Q   (Mr. Youngwood)  You have read the
11  complaint in this case?
12      A   I have.
13      Q   We'll get to the complaint in a bit.
14  Going back to the beginning question:  You noted
15  that -- uh -- and, again, I'm not trying to put
16  words in your mouth so you can correct me, but I
17  believe your testimony was that race relations can
18  always be improved, and that was your observation at
19  the time you became sheriff?
20      A   Absolutely!
21      Q   What needed improvement in Madison County
22  race relations at the time you became sheriff?
23          MR. ROSS:  I object to the form.
24      He's the sheriff.  He's not involved in
25      every aspect of the county.  Answer to the

## Page 29

RANDALL TUCKER

1
2   best of your ability.
3       A   Can you repeat the question?
4           MR. YOUNGWOOD:  Please read it back.
5           (COURT REPORTER READS BACK)
6       Q   (Mr. Youngwood)  Let me ask it clean and
7   the court reporter is correct, and I'm going to
8   be -- I'm going to be, I'm sure part of the problem
9   here is we both need to try not to talk over each
10  other or we'll have a mess of a record.  What was
11  your understanding at the time you became sheriff of
12  what aspect of race relations needed improvement in
13  Madison County?
14          MR. ROSS:  Object to the form.  Broad
15      and vague.  You can answer.
16      A   It was my opinion at the time that all
17  races needed to be involved more, and there needed
18  to be more transparency within the department to the
19  community that we involve everyone in what we were
20  doing and have involvement from the community that
21  we serve.  I felt like that was one of our biggest
22  missions coming into office.
23      Q   (Mr. Youngwood)  And anything else that
24  was your observation regarding the need to improve
25  race relations in Madison County at the time you

## Page 38

RANDALL TUCKER

1
2     Q   Okay, and if you'd look at page 19 of the
3  document?
4     A   (Witness adheres).
5     Q   Is that your signature, sir, under
6  "respectfully submitted"?
7     A   Yes.
8     Q   Okay.  And you believe the responses
9  within this document above your signature to be
10 accurate?
11        MR. ROSS:  I object to the form.  You
12        haven't given him time to read it right
13        now, but answer to the best of your
14        ability.
15    A   Yes.
16    Q   (Mr. Youngwood)  You wouldn't have signed
17 it if you didn't believe it to be accurate; correct,
18 sir?
19    A   Yes.
20        (Exhibit 4 marked for the record)
21    Q   Okay.  I'll give you what's been marked
22 Exhibit 4.  These are Defendants' Response to
23 Plaintiff's First Set of Requests for Admission.  Is
24 this a document you recognize, sir?
25    A   Yes.

## Page 39

RANDALL TUCKER

1
2     Q   Okay.  And were you -- is it a document
3  you reviewed prior to it being filed?
4     A   I think so, yes.
5     Q   Okay.  Do you believe it to be accurate,
6  sir?
7        MR. ROSS:  Object to the form.
8        Request for Admissions are answered by
9        attorneys, not by the party.  And,
10       Sheriff, take your time to read it if you
11       need to.
12    A   I've read it, yes.
13    Q   (Mr. Youngwood)  Yes, you believe it to be
14 accurate?
15    A   Yes.
16    Q   Sir, you have sat through a number of the
17 depositions in this case; correct?
18    A   Yes.
19    Q   So by my record, you were here for
20 Deputy Thompson's deposition, Lieutenant Sandridge's
21 deposition, Lieutenant Waldrop's deposition,
22 Lieutenant Wilson's deposition, Sergeant Flax's
23 deposition, and Chief Williams' deposition.  Do you
24 recall being at all of those depositions?
25    A   Yes.

## Page 40

RANDALL TUCKER

1
2     Q   And during any of those depositions, did
3  you hear testimony you believed to be inaccurate?
4        MR. ROSS:  I object to the form.
5        That's several days of deposition asking
6        him to recall.
7     A   I --
8        MR. ROSS:  You can answer.
9     A   I recall a couple of instances where I
10 believe I disagreed with what was said, yes.
11    Q   (Mr. Youngwood)  Could you, based on your
12 memory, specify those instances for me?
13    A   Without reading back through it, I can't
14 cite them.  I just recall that I thought
15 that "Well, I don't agree with that," but that was
16 that person's testimony at the time.
17    Q   Do you remember any of those instances,
18 specifically?
19    A   One, yes.
20    Q   What was that?
21    A   The e-mail that Jeremy characterized as
22 unethical.
23    Q   Okay.  That's the e-mail with the subject
24 "White Pride"?
25    A   Yes.

## Page 41

RANDALL TUCKER

1
2     Q   Okay.  And you disagreed with Chief
3  Williams' testimony regarding the unethical nature
4  of that e-mail?
5     A   Correct.
6     Q   And did you disagree with his statements
7  regarding the violation of department policies
8  associated with sending that e-mail?
9     A   Yes.
10    Q   So you believe sending that e-mail is
11 consistent with your department's policies?
12    A   I didn't say that.
13    Q   Okay.  You believe sending that e-mail is
14 not unethical?
15    A   I believe it's inappropriate.
16    Q   Okay.  What would be inappropriate about
17 sending that e-mail?
18    A   In a professional setting, I don't feel
19 like that's -- sharing someone else's opinion on a
20 topic like that is not appropriate in a professional
21 setting, I wouldn't think.
22    Q   Okay, and in what way?
23    A   Because there is some derogatory language
24 in there.
25    Q   It's a racist e-mail, right, sir?

Page 42

RANDALL TUCKER

1
2       MR. ROSS: Object to the form.
3       A   You would have to ask the gentleman who
4   wrote it what his view was at the time.  It's
5   certainly not my opinion.
6       Q   (Mr. Youngwood)  And when you forwarded
7   that e-mail, did you tell anyone that you disagreed
8   with the contents?
9       A   I don't even recall the e-mail, to be
10  honest with you.  I don't recall receiving it or
11  sending it.
12      Q   Okay.
13          MR. YOUNGWOOD: I'll mark this tab,
14      I'm sorry, Exhibit 5.
15          Exhibit 5 marked for the record)
16      Q   (Mr. Youngwood)  This is the e-mail you're
17  referring to, sir?
18      A   Yes.
19      Q   Okay.  Have you had occasion to read this
20  e-mail since Chief Williams's testimony last week?
21      A   To be honest with you, no, I haven't read
22  it in its entirety.
23      Q   Okay.  Who is Joe Butler?
24      A   What do you mean, "who is he?"  He's Joe
25  Butler, Joey Butler.

Page 43

RANDALL TUCKER

1
2       Q   Okay.  How do you know him?
3       A   He's an employee at the sheriff's
4   department.
5       Q   Okay.  And he forwarded this e-mail to you
6   and to a number of other people; correct?
7       A   Yes, it appears.
8       Q   Okay, he sent it to you at your Madison
9   County Sheriff's Department e-mail address; correct?
10      A   Yes.
11      Q   Okay.  And then you sent it on to one,
12  two, three, four, five, six, seven people, if I
13  count correctly?
14      A   It would appear.
15      Q   Can you tell me who each of these people
16  are?
17      A   Brad Harbour was a deputy with the
18  sheriff's department.  MSO 18, I believe.  I believe
19  it's Tommy Jones.  Don't quote me on that, but I
20  believe that's who that was.
21      Betty Tucker --
22      Q   And let me just interrupt you.  Tommy
23  Jones a sheriff department employee?
24      A   Yes.
25      Q   Okay.

Page 44

RANDALL TUCKER

1
2       A   Betty Tucker is my mother.  Trey Curtis
3   was a deputy.  Taylor Chastain is a deputy.  Tommy
4   Jones -- so that MSO 18, that may or may not -- I'm
5   not sure who the MSO 18 is, to be honest with you.
6       Q   Okay.
7       A   Tommy Jones -- uh -- and John Martin
8   Harris.
9       Q   And are Jones and Harris also department
10  employees?
11      A   Yes.
12      Q   Okay.  And I went through this with Chief
13  Williams, but he didn't know the answer to all.
14  Could you go through the people that Mr. Butler sent
15  the e-mail to and tell me, if you can, whether or
16  not they work, worked for the Madison County
17  Sheriff's Department at the time this was sent?  And
18  if not, if you could tell me if you know who they
19  are, please?
20      A   Kevin Akins.  I don't know him.  Brian
21  Albin, I know the name, but I don't know from where.
22   Trip Bailey, I don't know.  Doug Barneski, I don't
23  know.  Chief Belvedresi (sic) was, that's Eddie
24  Belvadressi.  He was a department employee.  LeeBo
25  Brock was a department employee.  Mike Brown is a

Page 45

RANDALL TUCKER

1
2   constable, duly elected constable in Madison County,
3   as well as a police officer in the City of Madison.
4   Bryan Burnside I know just in my personal life.
5   He's not a police officer, not affiliated.  Brad
6   Butler, I do not know.  Jim Butler -- uh -- Joey
7   Butler's father's name is Jim Butler.  I don't that
8   that's the same person, but probably so.  Taylor
9   Chastain was a deputy.  Sean Dodds is a business
10  owner in Gluckstadt.  Amanda Dodds is his wife.  Lee
11  Drake, I believe, is with the attorney general's
12  office for Mississippi.  I believe.  He was with
13  Ridgeland, but I believe he's now at the attorney
14  general's office.
15      Robby Gray, I do not know.  Brad Harbour is a
16  constable in Madison County.  Josh/Andrea Harkins, I
17  do not know.  Wait, yes, I do.  Josh Harkins is a, I
18  think he's either a representative or congressman of
19  some type.  Jay Houston is an investigator with the
20  attorney general's office.  Bee Hudson is a Madison
21  County employee.  Taco Johnson, I know a Taco and
22  Richard Johnson.  I can't say that that's the same
23  person, so I'll withhold comment on him.  Chad Joy,
24  I do not know.  Jason King, I don't know.  Russell
25  Kirby is a current employee of the sheriff's

Page 62

RANDALL TUCKER

2  black drug dealer running from the law and posing a
3  threat to society, you call him a racist."  Do you
4  see that?
5      A   I do see that.
6      Q   Well, would you agree that if a white
7  police officer should say "black gang member or at
8  least beats up a black drug dealer running from the
9  law," that that is a racist act, sir?
10         MR. ROSS:  Object to the form.  No
11      context.
12      A   If he's running away?  Is that your
13  question?
14      Q   (Mr. Youngwood)  Let me ask the question
15  differently.  You have read this paragraph, and
16  you've read the e-mail.  In the context of this
17  e-mail, would you agree with me that this paragraph
18  expresses racist sentiment, sir?
19         MR. ROSS:  Object to the form.  You
20      can answer.
21      A   I think each incident would be unique.  I
22  don't know if he's running shooting, or if it's just
23  a flight, no, I wouldn't agree that the officer
24  should shoot him, and I wouldn't agree that if he
25  did, it would necessarily be a racist act.  It would

Page 63

RANDALL TUCKER

2  be a criminal act.
3      Q   (Mr. Youngwood)  Do you have an opinion,
4  sir, as to whether or not this paragraph, in the
5  context of this e-mail expresses racist sentiment?
6         MR. ROSS:  Same objection.
7      A   I think this, as well as the rest of the
8  text, is inappropriate, yes.
9      Q   (Mr. Youngwood)  Okay.  You think it's
10  inappropriate.  Do you think it's racist?
11      A   The whole context of the e-mail can be
12  considered that from any point of view, yeah.
13      Q   Do you believe it to be racist?  This
14  e-mail?
15      A   It's not an e-mail that I would send, if
16  that's what you're asking me.
17      Q   It's not what I'm asking you.  I'm asking
18  you if you think it's racist?
19      A   The context of this e-mail?  Yes.
20      Q   This is a racist e-mail?
21      A   This man's opinion is a racist opinion.
22      Q   Okay.  If you'd go to the front of the
23  e-mail, please?  You sent it, as we went through, to
24  seven people?
25      A   Let me see.  1, 2, 3 -- yes.

Page 64

RANDALL TUCKER

2      Q   Are all of them white?
3      A   Yes.
4      Q   And you went through the list of people
5  that Mr. Butler sent it to.  I recognize you don't
6  know all of them, but for those that you earlier
7  testified to that you are able to identify, were all
8  of them white?
9      A   I think you said the ones I don't know?
10      Q   Right.  I can't ask you about the ones you
11  don't know.
12      A   I don't know about the ones that I have no
13  affiliation with, but the others, yes, they're
14  white.
15      Q   Okay.  You can put the e-mail aside for
16  now.  We got to this e-mail because you have
17  identified it as related to one aspect of
18  Chief Williams' testimony that you didn't agree
19  with.  Were there any other specific instances of
20  testimony, of the six depositions that you sat
21  through, that you thought was wrong or you didn't
22  agree with?
23         MR. ROSS:  Object to the form.  You
24      can answer to the extent you can recall.
25      A   I recall at some points in some of the

Page 65

RANDALL TUCKER

2  testimony that I thought to my head, I don't know
3  that that's right or that I don't agree with it, but
4  I can't sit here and tell you what those were.
5      Q   (Mr. Youngwood)  Okay.  There were --
6  there have been approximately 10 other depositions
7  in the case that you did not attend.  Have you been
8  apprized as to the contents of those depositions?
9      A   No.
10      Q   You have not seen the transcripts for
11  those depositions?
12      A   No.
13      Q   While on the topic of other depositions,
14  sir, what role, if any, have you played in
15  connection with the depositions that have taken
16  place in this case of your deputies and officers?
17      A   You mean the actual depositions?
18      Q   Let me ask a better question.  You
19  attended some, we know that.  You didn't attend
20  others.  Did you discuss testimony with any of the
21  officers or deputies who have testified prior to
22  their testimony?
23      A   I sat in meetings with my attorneys with
24  them, yes.
25      Q   Did you have any conversations with any of

RANDALL TUCKER

1
2  Ohio" or "Jeff from Ohio"?
3      MR. YOUNGWOOD:  Jeff Ohio.  And he
4  may also be from Ohio.  I don't know.
5      Q   (Mr. Youngwood)  Let me give you two
6  documents at once, sir.  One is Exhibit 7 and one is
7  going to be Exhibit 8.
8      (Exhibits 7 and 8 marked for the record)
9      Q   Exhibit 7 has Bates Number 1182, and
10  Exhibit 8 has Bates Number 955.  And the reason I
11  asked about Mr. Ohio, if, in fact, that's his name,
12  released these e-mails, does this refresh your
13  recollection as to Mr. Ohio?
14      A   I vaguely recall this e-mail, yes.
15      Q   Okay.  Do you know who this person is?
16      A   I have no idea.
17      Q   Did you respond to these e-mails in any
18  way?
19      A   No.
20      Q   Did you review them when they came in?
21      A   I'm sure I read it.
22      Q   Okay.  Did you take any action with
23  respect to receiving them?
24      A   No.
25      Q   Okay.  The first one, Exhibit 7, it says

RANDALL TUCKER

1
2  "In your statements to the press, you stated your
3  deputies are professional law enforcement officers."
4  Well your deputies did not appear very professional
5  when they were forcing Mr. Manning to sign the
6  documents that he did not want to sign.  A
7  professional law enforcement officer would know that
8  Mr. Manning has a Fifth Amendment right to remain
9  silent.  Professional is a strong word.  How about
10  Thug or Criminal?   Sincerely, Jeff."
11      Do you see that?
12      A   I do.
13      Q   Okay.  I take it you don't agree with
14  Mr. Ohio's sentiments in this e-mail?
15      A   Absolutely not.
16      Q   Okay.  We'll talk about Mr. Manning later.
17  The second e-mail says, "Mr. Tucker, I would like to
18  request to know if any of the officers in the video
19  featuring Mr. Manning have been disciplined or fired
20  because as I'm sure you know, it is a violation of
21  the Constitution to force citizens to sign
22  documents.  If you would get back to me as soon as
23  possible, I would appreciate it."
24      Do you see that?
25      A   I do see that.

RANDALL TUCKER

1
2      Q   Okay.  You did not respond to this e-mail
3  either; is that correct?
4      A   No.
5      Q   And his question, "if any of the officers
6  featured in the video of Mr. Manning" -- well, let
7  me take a step back.  Have you seen that video?
8      A   Yes.
9      Q   Okay.  And have you identified the
10  officers that are in that video at any time?
11      A   Yes.
12      Q   Okay.  Have any of them been disciplined
13  in connection with that incident with Mr. Manning?
14      A   No.
15      Q   Okay.  We'll discuss that later, as well.
16  You can put this one aside.  Today in your job, what
17  e-mail account do you use?
18      A   Excuse me?
19      Q   What e-mail account do you use to perform
20  your work?
21      A   Rtucker@madison-co.com.
22      Q   And has that -- how long have you used
23  that account in connection with your work?
24      A   I guess since I started.
25      Q   Which was when, sir?

RANDALL TUCKER

1
2      A   I started with the sheriff's department in
3  2000.
4      Q   Okay.  And you believe you have used that
5  account consistently since 2000?
6      A   Yeah, I think so.
7      Q   Have you ever used a personal account or
8  another account in connection with any of your
9  official duties?
10      A   No.
11      Q   Okay.  How about texts?  Have you used
12  texts on your phone?
13      A   Yes.
14      Q   In connection with your official duties?
15      A   Yes.
16      Q   And other officers within the sheriff's
17  department, am I correct that up until a year or two
18  ago many of them used personal accounts
19  in connection with the performance of their official
20  duties because they did not have -- well, strike
21  that.  Other officers, up until a few years ago, had
22  used personal accounts in connection with their
23  official duties; is that correct?
24      MR. ROSS:  Object to the form.
25      Asking him about things that may not be

Page 78

RANDALL TUCKER

1
2 three years.  I don't recall a date that they
3 replaced that computer.
4     Q   Do you use a laptop?
5     A   I do not.
6     Q   Do you use any computer for your work,
7 other than the computer you just referenced, in your
8 office?
9     A   I have an iPad, but it has nothing on it.
10 All I do is look at the board agenda on it.
11     Q   You don't, otherwise, use it for your
12 work?
13     A   No, sir.
14     Q   Okay.  Do you maintain files in your
15 office at work?
16     A   No.
17     Q   You don't have any files?
18     A   No.
19     Q   Do you have files at home?
20     A   No.
21     Q   Do you have a county-issued car in some
22 way?
23     A   Yes.
24     Q   Do you maintain any files in that car?
25     A   No.

Page 79

RANDALL TUCKER

1
2     Q   So you personally maintain no paper files?
3     A   Any file that I have is maintained at the
4 sheriff's department in our records department.
5     Q   Not in your office?
6     A   Right.
7     Q   And not in files assigned, file drawers
8 assigned to you or something like that?
9     A   Right.
10     Q   Okay.  Let's go back in time, sir.  Can
11 you briefly tell me your educational history?
12     A   A twelfth-grade education with, dropped
13 out after one, or during one semester of college to
14 raise my son.
15     Q   Where did you graduate from high school,
16 sir?
17     A   Madison-Ridgeland Academy in Madison,
18 Mississippi.
19     Q   So you've lived in Madison County your
20 whole life; is that right?
21     A   No.
22     Q   No?  Have you lived in Madison County
23 since graduating from high school?
24     A   Yes.  Well, no.  Let me back up.
25     Q   Certainly.

Page 80

RANDALL TUCKER

1
2     A   I went and lived with my mother for a
3 short period of time in Dale City, Virginia, I
4 think.  Just out -- or Woodbridge.  I don't remember
5 the exact name of the county or what-have-you, but
6 it was very short.  And, yes, I went and lived with
7 my father in 1988 or '89, for about a year in Holly
8 Springs, Mississippi.  Other than that, I have been
9 here.
10     Q   Okay.  And you said you did one year of
11 college, approximately?
12     A   No, I started and during my first semester
13 I dropped out.
14     Q   Okay, where was that?
15     A   Mississippi State.
16     Q   Okay.  And upon leaving college, did you
17 secure employment?
18     A   Yes.
19     Q   Where did you work?
20     A   I believe Lake -- and I don't have an
21 order.  I don't remember.  Lake Harbor Marine, I
22 believe, is where I went right after that.
23     Q   Let me abbreviate this.  When did you get
24 your first law enforcement-related job?
25     A   In 1994.

Page 81

RANDALL TUCKER

1
2     Q   Okay.  And prior to that, had you had law
3 enforcement training?
4     A   Prior to 1994?
5     Q   Yes.
6     A   No.
7     Q   Okay.  So where did you get a -- what job
8 did you secure in 1994?
9     A   I was a detention officer for then Sheriff
10 Jessie Hopkins at the Sheriff's Department in
11 Madison.
12     Q   Have you been employed by Madison County
13 Sheriff's Department continuously since 1994?
14     A   No.
15     Q   Okay.  How long did you serve as a
16 detention officer?
17     A   Until, let's see.  I think I was hired in
18 March or April and left in July to go to the Canton
19 Police Department.
20     Q   Okay.  July of '94?
21     A   Yes, sir.
22     Q   How long were you with the Canton Police
23 Department?
24     A   Until from July of '94 until the -- uh --
25 until 2000.

Page 82

RANDALL TUCKER

Q   And at that point, you re-joined the
Madison County Sheriff's Department?

A   That's correct.

Q   What positions did you have with the
Canton Police Department?

A   I started off as a patrolman.  After a
year or 16 months or so, I was promoted to narcotics
investigator.  And, ultimately, sometime in '98, I
believe, to narcotics supervisor.

Q   Okay.  And upon joining the Madison County
Sheriff's Department, what position did you have?

A   I was the narcotics investigator.

Q   Okay.  How long did you hold that
position?

A   Until -- well, actually, until I was
elected sheriff.

Q   In 2012?

A   Correct.

Q   Or elected in 2011?  Is that -- will you
tell me when you were elected?

A   I was elected in November of 2011, to
begin the term in January 2012.  But let me back up
just a minute.

Q   Yes, sir.

Page 83

RANDALL TUCKER

A   During that period, I was promoted within
the narcotics division.

Q   Do you remember when that was?

A   I want to say I was promoted from master
sergeant to lieutenant, and I want to say it was
July 2002.  And then sometime around 2007 or '8, I
was promoted to a captain, which I held, ultimately,
that position until I was elected sheriff in
November of 2011.

Q   Going back to 1994, when you secured your
first law enforcement-related job, did you receive
any training in connection with assuming that job?
Detention officer?

A   At that time, it was just in-house
training or on-the-job training, I guess you would
say.  Just training about proper procedure to do
things within the department.

Q   Did you later receive more formal
training?

A   No, I actually left there before I was
sent to any detention officer school.

Q   And how about when you were with Canton,
did you receive training?

A   After I was hired in July, I attended the

Page 84

RANDALL TUCKER

Mississippi Law Enforcement Officers Training
Academy in Pearl, Mississippi.  I don't remember the
exact start date, but I graduated on, I think it was
November 18th of that same year.

Q   Okay.  Did -- and I understand it was a
while ago -- did that training include any
instruction regarding issues related to race?

A   Uh -- I don't want to sit here and try to
cite the curriculum because it has been much too
long, but I think the curriculum is pretty well the
same today that it was back then.  So I would say, I
don't know that it said the word "race," but it
definitely addressed the treatment of all
individuals.

Q   Okay.  And since obtaining that -- I'm
sorry, attending that program, have you received
further training, further formal training?

A   Yes.

Q   And it may be quite a bit --

A   Ooh!

Q   -- but why don't you list for me what you
recall?

A   First line supervisor one and two.  Basic
narcotics investigation, undercover surveillance.

Page 85

RANDALL TUCKER

Gang violence.  Wow!  Uh -- I'm trying to -- T Kat
and criminal patrol.  Shoot, I don't know.  It's
extensive.

Q   Can you recall any of those later
programs, either the ones you've listed, or the ones
you haven't listed, concerning training,
specifically regarding race or race relations?

A   I don't know that specific, that it was
addressed specifically to that topic, no.

Q   Okay.  In terms of the training that you
currently give your officers, does any of it cover
race or race relations?

A   Uh -- we've recently, and I say "recent,"
I don't remember the exact dates in the last couple
of years, have had -- uh -- the FBI come in and do
civil rights training for our detention officers and
our deputies.  That was specific to civil rights
stuff.

I don't know that any other, anything else we
do.  You know, we have sent some officers to Spanish
classes to be able to speak with the Hispanic
population that speaks that language solely within
our community.  I don't know that there are any
specific classes geared toward race or geared toward

RANDALL TUCKER

1
2  everyone, I think.
3      Q   Let's take a look at Exhibit 3, which is
4  in your stack, sir. It's the interrogatory
5  responses. And I'd like to refer you to, sir, it's
6  about halfway through the document. After the
7  signature pages that we looked at earlier, there's
8  some pages with Bates numbers that say MC-INT. It
9  begins 1-1, but I want to refer you to 1-2.
10     A   Okay. I believe I have it.
11     Q   Okay. There's a description here in these
12 responses of job descriptions. If you can see, they
13 start on 1-1 and they continue to 1-2?
14     A   Yes, sir.
15     Q   And sheriff is listed toward the
16 middle-ish of the page on 1-2. Do you see that?
17     A   Yes.
18     Q   And it says, "Senior executive position.
19 Serves as the point and authority for the entire
20 department. It develops policy and procedure and
21 directs all activities of the department." Do you
22 see that?
23     A   Yes.
24     Q   Is that a correct description of your job
25 responsibilities, sir?

RANDALL TUCKER

1
2      A   Among others, yes.
3      Q   We'll come back to this, but what are the
4  others?
5      A   Well, I think, basically, I oversee
6  personnel for the department. Now, a lot of that I
7  delegate, but, ultimately, I'm responsible for
8  everything in the department.
9      Q   Okay. And being responsible for
10 everything means you're responsible for the policies
11 of the department; correct?
12     A   Yes.
13     Q   You're responsible for the procedures
14 undertaken by the officers and the deputies within
15 your department; correct?
16     A   Yes.
17     Q   You're responsible for the acts of your
18 officers and deputies; correct?
19     A   No.
20     Q   Okay, why not?
21     A   Well, I'm certainly not responsible for
22 any criminal act they commit or anything of that
23 nature.
24     Q   Okay. Are you aware of any criminal acts
25 that your deputies have committed since you became

RANDALL TUCKER

1
2  sheriff?
3      A   Yes.
4      Q   And what are those?
5      A   I had a narcotics officer that committed
6  fraud that, ultimately, confessed to his crime and
7  was terminated.
8      Q   Okay. Any others?
9      A   I had an officer that, basically, was
10 found to be in possession of a firearm that he did
11 not turn in as evidence, and it was located at his
12 residence. He was terminated.
13     Q   Okay. Any others?
14     A   Uh -- not that I can think of off the top
15 of my head. I'm not saying there aren't, but I --
16     Q   I understand.
17     A   Yeah.
18     Q   Other than those two incidents and
19 recognizing there may be others that come to you,
20 are there any other acts of your officers or
21 deputies that you're aware they have committed in
22 connection with their professional responsibilities
23 that you do not believe you're responsible for?
24     MR. ROSS: Object to the form.
25     Answer if you can if you're responsible

RANDALL TUCKER

1
2      for the policies and the procedures, and then
3      if you follow them on every patrol.
4          (COURT REPORTER ASKS FOR
5      CLARIFICATION)
6          MR. ROSS: He doesn't follow them on
7      every patrol.
8      A   While they are on duty, I would say that
9  outside of a criminal act or a violation of the law
10 or someone's rights, I would say that I oversee
11 their activities or probably am responsible for
12 their activities.
13     Q   (Mr. Youngwood) Okay. And we had covered
14 violation of the law a moment ago. You also then
15 listed violation of rights. Other than, perhaps,
16 the two incidents you listed that were criminal
17 violations, are you aware of any of your officers,
18 since you have been sheriff, violating anyone's
19 rights?
20     A   No, I'm not.
21         (Exhibit 10 marked for the record)
22     Q   I'm giving you Tab 10, sir. I'm sorry,
23 Exhibit 10. Sir, this is a collection of material
24 that I believe you're probably more familiar with as
25 sitting in a binder, but it's titled "Policies and

Page 102

RANDALL TUCKER

1
2     Q   And you were employed by the Madison
3  County Sheriff's Department in 2006; correct?
4     A   Yes.
5     Q   Were you aware that a group of Canton
6  residents had presented certain grievances to the
7  Madison County Board of Supervisors?
8     A   I wasn't aware of any petition or anything
9  to the Board of Supervisors.  I was aware of David
10  Archie, who is a good friend of mine, who was, I
11  guess a liaison for some residents in the City of
12  Canton.
13     Q   I'm sorry, what about Mr. Archie were you
14  aware of?
15     A   I think he -- I think they -- uh -- if
16  this is what I'm thinking of, I think they,
17  ultimately, marched from Canton towards the
18  sheriff's department and went to ultimately
19  arrest -- he was ultimately arrested, I think by
20  then Chief Robert Wynn of the Canton Police
21  Department.
22     Q   Did you have an understanding as to what
23  prompted their march?
24     A   No, I was not privy to any administrative
25  proceedings back then.

Page 103

RANDALL TUCKER

1
2     Q   Did you have an understanding as to what
3  message they were seeking to convey by making this
4  march?
5     A   No, I didn't participate in that.  I was
6  over the narcotics unit.
7     Q   Were you aware that there were complaints
8  raised in 2006 regarding frequent roadblocks in
9  predominantly black neighborhoods?
10     A   I'm aware that there were complaints of
11  roadblocks all over Madison County.
12     Q   In 2006?
13     A   Yes.
14     Q   What was the nature of the complaints that
15  you were aware of in 2006?
16     A   They're always going to have somebody
17  unhappy if they have to sit at a roadblock.  I don't
18  know the nature of any complaint.  I know there were
19  some complaints made about roadblocks back then, but
20  I couldn't tell you who made them or where they were
21  generated from.
22     Q   Were you aware of complaints regarding
23  racial profiling?
24     A   No, I was not.
25     Q   The Clarion-Ledger, is that a newspaper

Page 104

RANDALL TUCKER

1
2  you read?
3     A   No.  I do not read it.
4     Q   What newspapers do you read?
5     A   I don't read newspapers.
6     Q   Okay.  How do you get your news?
7     A   Occasionally, I watch it on the
8  television, but I generally try to form my own
9  opinion.  I don't base it off of what the news
10  opinion is.
11     Q   Well, how do you get your facts that serve
12  as the basis for your opinion?
13     A   I investigate if I want to know something
14  before I give an opinion.  I don't just blurt it
15  out.
16     Q   Okay.  How do you learn about news and
17  facts within Madison County?
18         MR. ROSS:  Object to the form.
19     Broad.
20     A   Can you be more specific?  I don't know
21  what news or facts you're referring to.
22     Q   (Mr. Youngwood)  Well, we can focus on
23  what we have been discussing, paragraph 118 of the
24  complaint.  You said you were aware of a march.  You
25  said you were aware of complaints about roadblocks.

Page 105

RANDALL TUCKER

1
2  What was your source of that awareness?
3     A   I had heard from other deputies about the
4  complaints of the roadblocks.  I, actually, saw
5  Mr. Archie when he was arrested, with my own eyes.
6  That's not an investigation, if that's what you're
7  asking, but that's how I gave you the information.
8     Q   But you were unaware of the reason for
9  Mr. Archie's march?
10     A   I didn't know what the reasons were.
11     Q   If you'd go to paragraph 121, sir?  This
12  references an article in The Clarion-Ledger in July,
13  2007, regarding District 5 Supervisor, Paul Griffin.
14  Do you know District Supervisor Paul Griffin?
15     A   I do know him.
16     Q   Okay.  And were you aware of concerns
17  raised by him about there were people in Madison
18  County who believed that the Madison County
19  Sheriff's Department was perceived as targeting
20  black community members?
21     A   Back then or now?
22     Q   Well, back then.
23     A   I didn't talk to him back then.
24     Q   So you were -- well, what if I change the
25  question to now?

RANDALL TUCKER

1
2     A   Well, he and I sit next to each other at
3  every board meeting, and are good friends and
4  discuss issues, and he doesn't understand why I'm
5  being sued either.
6     Q   Tell me about your conversations with him
7  regarding this lawsuit.
8     A   That was the only remark he made.
9     Q   Tell me how long of a conversation.
10    A   I just told you that's the only remark he
11 made.
12    Q   He didn't understand why you were being
13 sued?
14    A   That's what he said.
15    Q   Okay.  How about The Madison County
16 Journal, is that something that you read?
17    A   I don't read the newspaper.
18    Q   Okay.  Paragraph 123, there's a discussion
19 of a January 2008 article in that publication.  The
20 article notes that "Sheriff Trowbridge has been the
21 subject of complaints from African-Americans living
22 in Canton, Flora, who say he practices racial
23 profiling."  Do you see that?
24    A   Yes.
25    Q   Were you aware that Sheriff Trowbridge had

RANDALL TUCKER

1
2  been the subject of complaints from
3  African-Americans regarding racial profiling?
4     A   I think I have already testified I didn't
5  know about any racial profiling complaints.  I knew
6  there was a complaint about roadblocks, but I don't
7  know where that was generated from.
8     Q   And to your knowledge, did that complaint
9  about roadblocks relate to race?
10    A   I do not know.  I don't know where they
11 were generated from.
12    Q   Okay.  When you took over as sheriff, you
13 had access to any written complaints that existed
14 regarding Sheriff Trowbridge; correct?
15    A   I don't know that I had access or not, to
16 be honest with you.  I had never seen any.
17    Q   Okay.  Put that document to the side for
18 now.  Let's return to what we previously marked as
19 Exhibit 10, please, sir.  This is the collection of
20 policies.  And to that letter that or memo dated
21 January 3, 2012, do you see that?
22    A   You're referring to the back of the --
23    Q   Yes.
24    A   Yes.
25    Q   It's the second, it's the second cited

RANDALL TUCKER

1
2  piece of paper in the document.  The sentence you
3  pointed me toward earlier, "Variations of these
4  policies and procedures may be made at the
5  discretion of the sheriff," do you see that?
6     A   Yes.
7     Q   What does that mean?
8     A   That means if I decide to change a policy,
9  update a policy, add a policy, delete a policy, that
10 I have that discretion to do that.
11    Q   And how would -- if I were employed in the
12 Madison County Sheriff's Department, how would I
13 know if you had done so?
14    A   If it was a written policy, you would be
15 advised to place it in your binder.  If it was a
16 verbal change in policy, it may be something that
17 was addressed at a general meeting or a verbatim
18 with each division.
19    Q   Okay.  And so if it was a written policy,
20 it should be in a current version of the manual;
21 fair to say?
22    A   Yes.
23    Q   Okay.  And if it was -- what's a non-
24 written policy?
25    A   A non-written policy would be a five guys

RANDALL TUCKER

1
2  don't go to the same restaurant at eleven o'clock
3  for dinner.
4     Q   Okay.
5     A   It's not written, but they know I don't
6  want five people in the same location for lunch.  It
7  looks, gives the appearance to the citizens that,
8  "Hey, who is protecting Madison County?"
9     Q   I understand.
10    A   Okay.
11    Q   And such unwritten policies, you're
12 saying, would be conveyed either at these periodic
13 staff meetings that you testified about earlier this
14 morning; correct?
15    A   Possibly.
16    Q   Okay.  Well, how else would they -- if I
17 worked there, how would I know how to follow your
18 unwritten policies?
19    A   Uh -- if it was division-specific, I may
20 call the division head in, or the chief may call the
21 division head in and address something with them
22 personally.  That's not written, but if I tell you
23 don't fill out a report in blue ink, fill it out in
24 black ink, and they -- you know, that's the way I
25 want it filled out.  Does that answer your question?

RANDALL TUCKER

1
2    Q   Are you aware of any unwritten policies --
3 strike that.  Are there any unwritten policies in
4 Madison County Sheriff's Department regarding race?
5    A   I don't know if they are unwritten or not.
6 I mean, like I said, I address it with every new
7 employee that we get in an orientation-type setting,
8 but I think there is some, some language within the
9 policy and procedure manual, itself, that says to
10 treat all citizens the same or with respect
11 regardless of race, gender.  I can't quote it
12 word-for-word.
13    Q   Why don't we take a look at that?
14    A   Okay.
15    Q   And you were here, I believe, when
16 Chief Williams went through Exhibit 10 with me and
17 identified a number of policies in response to my
18 questions regarding race; correct?
19    A   Yes.
20    Q   Okay.  Uh -- if we go to page -- well,
21 they're not page numbered, but Section 34?  Is this
22 the policy you were just thinking of, sir?  Ethics?
23    A   I wasn't thinking of one specific there.
24 I think there is probably more than one area.  But
25 -- uh --

RANDALL TUCKER

1
2    MR. ROSS:  Take the time to read that
3 if you need to, Sheriff.
4    Q   (Mr. Youngwood)  Read it as much as you
5 wish, sir, but if it would assist you, I think Chief
6 Williams refers to section or Paragraph C of this.
7    A   Yes.
8    Q   Do officers receive any training
9 specifically on this paragraph?
10    A   I'm not sure I follow you.  Are you
11 talking about as written in this policy and
12 procedure manual?
13    Q   Yes.
14    A   They're given this manual when they're
15 employed.  They are to study and know this manual,
16 and they're not tested on it, I wouldn't say, but I
17 don't know that there's any specific training toward
18 Paragraph C of Policy 34.1, no.
19    Q   You said they weren't tested on this.
20 What steps, if any, do you take to ensure that they
21 actually have absorbed the substance of the policy
22 manual, including Section 34.1?
23    A   Just a verbal questioning.  "Have you read
24 and understanding any questions."
25    Q   Anything further?

RANDALL TUCKER

1
2    A   No, there's no other verification, no.
3 They are instructed that they are to know it.
4    Q   Okay.  When Chief Williams and I discussed
5 this manual and issues or policies that related to
6 race within it, he also referenced Section 15.1
7 earlier in the document.  Do you see that?
8    A   I see page 15.1, yes, sir.
9    Q   And he referred me to Section A,
10 "Prohibited Activity," Paragraph 2, "Employee shall
11 not make offensive or derogatory comments based on
12 race, color, sex, religion, or national origin,
13 either directly or indirectly to another person."
14 Do you see that?
15    A   Yes.
16    Q   Okay.  What if any training or what if any
17 training do your officers receive to ensure they
18 comply with Section 15.1 A, Subparagraph 2?
19    A   I don't know that there's a specific test
20 or training curriculum for 15.1, Subsection 2, but,
21 again, they're instructed to know the policies and
22 procedures, and this is an actual workplace -- uh --
23 harassment workplace policy.  I don't know if
24 there's any specific training.  It's pretty much
25 common sense.

RANDALL TUCKER

1
2    Q   Go to Section 24.1.  This is another page
3 of the manual that Sheriff, I'm sorry, Chief
4 Williams referred me to.  Its title is "Conduct
5 Unbecoming to An Employee."  24.1.
6    A   Okay.
7    Q   And he referred me, I believe, to Section
8 A, Section B, but, generally, to this page.  Do you
9 see it?
10    A   I'm on page 24.  Are you talking about A
11 under procedures here?
12    Q   Yes, sir.
13    A   Yes, I see it.
14    Q   And then he also referenced me to the next
15 page, "The Law Enforcement Code of Ethics."  Do you
16 see that?
17    A   I do.
18    Q   What training or steps are taken to ensure
19 that employees comply with this section of the
20 manual?
21    MR. ROSS:  Object to the form.  It's
22 two whole pages.  You can answer to the
23 best of your ability.
24    A   Again, they are instructed and sign for
25 this when they're employed and questioned to whether

RANDALL TUCKER

1 or not they have read it and understand it.  There's
2 no specific training after it's been issued and the
3 employee acknowledges that they have read it and
4 understand it.  There's no specific training to
5 these topics therein.  Is that what you're asking
6 me?
7     Q    That is what I'm asking you, yes, sir.
8     A    Okay.
9     Q    And is there any ongoing monitoring to
10 ensure compliance with the sections of the manual
11 that we've discussed in the last five minutes?
12     A    Through supervisors, observations, or the
13 chief deputy's observations, or mine.  I mean these
14 are professional men and women.  I don't follow them
15 around.  But I think if there's a violation of
16 those, it's the duty of those supervisors to bring
17 it to our attention.
18     Q    Okay.  And are you aware of, of any
19 violations of the sections of the manual that we
20 have just looked at in the last five or ten minutes
21 being brought to your attention since you have been
22 sheriff?
23         MR. ROSS:  I object to the form.  You
24         have brought several to his attention.  A

RANDALL TUCKER

1 compound question.
2     A    I don't think he or I have done anything
3 in the last five or ten minutes that would violate
4 that.
5     Q    (Mr. Youngwood)  That was -- that was not
6 my question.  My question is are you aware, since
7 you have been sheriff, of supervisors bringing to
8 your attention violations of these sections?
9         MR. ROSS:  Same objection.
10     A    I can't cite one.  I'm sorry.
11         MR. ROSS:  Same objection.
12     A    I can't cite one.
13     Q    (Mr. Youngwood)  Are you aware of any
14 improper behavior tied to race being brought to your
15 attention since you have been sheriff?
16     A    No.
17     Q    Let's go to 37.1, please.  It's called
18 "Impartiality."  Do you see this?
19     A    Yes.
20     Q    And Subsection A, "No employee will be
21 given or denied any assignment based only upon age,
22 sex, race, religion, politics, or physical handicap
23 unless such action will create a hazardous condition
24 for the individual of others."  Do you see that?

RANDALL TUCKER

1     A    Yes.
2     Q    Can you tell me how assigning something,
3 assigning somebody, based on race, could create a
4 hazardous condition to the individual or others?
5         MR. ROSS:  Object to the form.  It's
6         not what the policy necessarily says.
7     A    Do you mind if I take a second and read
8 it?
9     Q    (Mr. Youngwood)  No.
10     A    I don't understand your question, so I
11 want to be sure and read.
12     Q    Yes, sir, take your time.
13     A    (PAUSE WHILE WITNESS EXAMINES DOCUMENT)
14 Okay, now what's your question again?
15     Q    This rule says that an employee can be
16 denied an assignment if such action will create a
17 hazardous condition for the individual or officer.
18 Is that a fair reading of the rule?
19     A    Yes.
20     Q    And it says "that such denial could be
21 based on age, sex, race, religion, politics, or  a
22 physical handicap, again, if such hazard, if it
23 would create a hazardous condition."  Is that
24 correct?

RANDALL TUCKER

1     A    That's what it says.
2     Q    Can you give me an example of how an
3 assignment based on, for example, race, would
4 create a hazardous condition for an individual or
5 others?
6     A    I don't know that it's specific that each
7 section addresses each criteria specifically.
8 There's -- I'm sure there's -- uh -- let me use
9 something other than race.  I mean like religion, I
10 wouldn't ask a, let's just say Pentecostal, for
11 instance.  They are known for not cutting their hair
12 and wearing skirts and things of that nature.  If
13 that's part of their religious belief, I wouldn't
14 ask them to go against that.  Does that make sense?
15     Q    I understand.
16     A    By requiring them to wear trousers.
17     Q    But you can't think of a similar example
18 that would apply to race?
19     A    Well, no, and I don't know that this, that
20 that -- I don't know that any subsection of that
21 would apply to every -- I can't think of one that
22 would necessarily apply to sex either, but --
23     Q    Okay.  Let's go to 38.1, just the next
24 page.  "Police Offenses: Disciplinary," and there's

RANDALL TUCKER

1
2 be on the driver's license being run.  I don't know
3 if that's maintained.  It's not on the CAD report,
4 so.
5    Q   Right.
6    A   -- I don't -- I don't think we maintain a
7 --
8    Q   Right.
9    A   -- a log of race on a driver's license.
10    Q   Now, the decision to run a license, that's
11 left to the discretion of the officer; fair to say?
12    A   Yes.  That -- the more information he
13 gives about that stop, in the event something
14 happens, yes, the dispatcher would be able to say
15 "we're looking for a vehicle with this tag number or
16 this color vehicle or -- a starting location," where
17 we need to start looking for an incident that may
18 happen, yes.
19    Q   I'm trying to keep with your example that
20 simply somebody stopped, ran a -- I'm sorry, ran a
21 stop sign.  So you're not looking for a vehicle.
22 You just stopped somebody.  Whether or not to run
23 that license is left to the --
24    A   I don't mean to cut you off.
25    Q   Yeah.

RANDALL TUCKER

1
2    A   But any stop, something can happen.
3    Q   I understand.
4    A   The more indicators he gives about the
5 vehicle, the tag information, the make of the
6 vehicle, the color of the vehicle, the location
7 where they are, that is all information -- the more
8 information they can give his dispatcher, the better
9 off he's going to be in the event that something
10 happens.  That's all I was trying to say.
11    Q   I appreciate that, but how much of that
12 information to give is left to the discretion of the
13 individual officer; fair to say?
14    A   Yes.
15    Q   And then whether or not to give a citation
16 for running a stop sign left to the discretion of
17 the  officer; fair to say?
18    A   Yes.
19    Q   Okay.  What, if anything, does the
20 sheriff's department do to ensure that officers, in
21 exercising their discretion, are not making
22 decisions based on race in the situation we have
23 just been discussing?
24    A   Well, I think it's a lengthy process, to
25 be honest with you.  I think it starts at the hiring

RANDALL TUCKER

1
2 process.  You hire good quality folks, good folks of
3 good moral character, you give them a policy and
4 procedure book, and you explain to them the rules
5 and regulations of the department, and you stress
6 that in meetings.  I don't know that there's a
7 specific curriculum addressing that.
8    Q   Okay.  Is there any monitoring of the
9 actual behavior of the officers that your department
10 performs to ensure that people are not exercising
11 the discretion in some manner, based on race?
12    A   Aside from the supervisors or the chief
13 deputy or myself watching or listening to the radio,
14 there's -- I don't keep my hand, my phone on them,
15 no.  I've got professional deputies.  I don't have
16 to do that.
17    Q   Okay.  So nothing is done, for example, to
18 determine whether or not certain deputies give
19 citations to flag people at a higher frequency than
20 they give them to white people for similar offenses?
21    A   If I received a complaint or information
22 that a certain deputy was being indifferent,
23 absolutely, I would monitor that more closely to
24 ensure it.
25    Q   Okay.  Have you ever received such a

RANDALL TUCKER

1
2 complaint?
3    A   I have not.
4    Q   Let's also discuss roadblocks.  My
5 understanding is that at roadblocks, cars are
6 stopped and that driver's licenses are requested.
7 Is that fair, initial summary of what happens at a
8 roadblock?
9    A   Yes.
10    Q   And is that discretionary?  If somebody is
11 driving through a roadblock, do the officers have
12 any discretion not to ask for that driver's license?
13    A   No, we stop every vehicle and ask for
14 those.  If that's the purpose of the roadblock, to
15 check driver's license.
16    Q   We'll get to the purposes of the
17 roadblocks in a bit, but you, I think you have been
18 in the room, sir, when there's been testimony from
19 officers, for example, that if the roadblock gets
20 backed up, cars get waved through; correct?
21    A   Yes.
22    Q   And so the determination of whether or not
23 the roadblock is backed up and which cars to wave
24 through, that's left to the discretion of the
25 officers; fair to say?

---

Page 130

RANDALL TUCKER

1
2     A   It's based on the circumstance, but yes.
3     Q   And once somebody is stopped at a
4  roadblock, it could be that the officer observes a
5  busted taillight or some other infraction of that
6  nature; correct?
7     A   Yes, that's possible.
8     Q   And they would be empowered to issue a
9  citation in that case, as well; correct?
10    A   They could issue a citation for any
11 infraction, yes.
12    Q   Okay.  And for some infractions, they
13 could arrest an individual; correct?
14    A   Under the law, you can arrest an
15 individual for any infraction.
16    Q   Okay.  So somebody has a busted taillight,
17 one could be arrested for that?
18    A   Yes, you could.
19    Q   Okay.  And so if somebody has a busted
20 taillight, am I correct there are at least three
21 broad categories of options:  Arrest, citation, or
22 wave the person through with a verbal warning; is
23 that fair to say?
24    A   Those are three options, yes.
25    Q   Okay.  And if the third option is taken,

Page 131

RANDALL TUCKER

1
2  the verbal warning, would there be any record of
3  that?
4     A   No.  Unless he calls it into dispatch and
5  says "verbal warning."  There would be no written
6  record, no.
7     Q   But there is no requirement that one calls
8  in a verbal warning?
9     A   No.
10    Q   Okay.  Citation, there would be a record;
11 correct?
12    A   Yes.
13    Q   Incident report or no incident report, in
14 case of a citation at a roadblock?
15    A   There is no incident report on the ticket.
16 There would be a general CAD report on the
17 roadblock, itself.
18    Q   Okay.  But the CAD report, and we have
19 discussed, probably does not indicate the race;
20 right?
21    A   Right.
22    Q   And, certainly, this is going back to the
23 other category, if there's no record of a warning,
24 there is going to be no record of what race it is of
25 the people who got the verbal warning; right?

Page 132

RANDALL TUCKER

1
2     A   Right.
3     Q   Okay.  Arrests would have to be an
4  incident report; correct?
5     A   It should be an incident report, yes.
6     Q   And then we would know race; right?
7     A   Yes, there's a block for race on an
8  incident report.
9     Q   And between the three options we have just
10 outlined at the roadblocks -- a verbal warning,
11 incident report, or arrest -- that is also left to
12 the discretion of the officers, depending on the
13 situation; correct?
14    A   Can you repeat that, because I -- my
15 inclination is to say no, but I want to make sure.
16        MR. ROSS:  Are you still talking
17     about the taillight example?
18        MR. YOUNGWOOD:  The taillight
19     example, yes.
20    A   Okay.
21    Q   (Mr. Youngwood)  So taillight example at a
22 roadblock, whether or not there's an arrest, a
23 citation, or a verbal warning without a record
24 created, that's left to the discretion of the
25 officer?

Page 133

RANDALL TUCKER

1
2     A   No.  Part no.  Part yes.
3     Q   Okay.  Explain, please.
4     A   The arrest is not -- there's no discretion
5  to the officer whether or not he writes the report.
6  There's a report due on every arrest.  The other
7  two, yes.
8     Q   Okay.  I'm sorry.  Thank you.  I
9  appreciate the elaboration.  I was asking a more
10 basic question which is which of those three
11 options -- arrest, citation, verbal
12 warning/nothing -- that decision is left to the
13 discretion of the officer?
14    A   Whether or not to issue a citation, the
15 officer doesn't have to arrest you for the busted --
16 he doesn't have to arrest you for any of them,
17 unless it's a warrant for a busted taillight from a
18 previous encounter.
19    Q   All right.  So whether or not to arrest is
20 left to the discretion of the officer?
21    A   Yes.
22    Q   Okay.  And whether or not to issue the
23 citation is left to the discretion of the officer?
24    A   Yes.
25    Q   Or whether or not to either give a verbal

RANDALL TUCKER

1
2  warning or no warning, left to the discretion of the
3  officer; correct?
4      A   Yes.
5      Q   And are there any written policies or
6  procedures that guide officers in exercising that
7  discretion?
8      A   No.
9      Q   And you just said, sir, that the decision
10 of whether or not to exercise a warrant and arrest
11 somebody, that is not discretionary?
12     A   I think there are instances where common
13 sense and good judgments has to be used, but the
14 warrant, itself, is commanding you to take the body
15 of.
16     Q   Okay.  So in certain circumstances,
17 officers may exercise their discretion not to
18 enforce a warrant on the spot?
19     A   Yes.
20     Q   Okay.  And that's a use of their
21 discretion again; correct?
22     A   I want to make sure you understand that
23 that's only under very limited circumstances.  If I
24 was to pull someone over and I recognize her and
25 know she's got a warrant and she's in labor,

RANDALL TUCKER

1
2  obviously, I'm going to let her go to the hospital
3  and have the baby.
4      Q   So you said if you recognize her?
5      A   Yeah, from a previous encounter, yeah.
6      Q   So if you didn't recognize her, you --
7      A   I would still let her go and have her
8  baby.
9      Q   Well, what is the relevance of the
10 recognize in your answer, sir?
11     A   It was trying to give you an example.
12     Q   Okay.  Going back to the overall taillight
13 at a roadblock situation, is there any monitoring
14 that you do of your officers to ensure that the
15 "exercise at their discretion" between those three
16 categories is not in some manner based on race?
17     A   No, I don't keep a thumb on the
18 supervisors on the shift or at the roadblock unless
19 I get a complaint of a certain officer that is
20 exhibiting that type of conduct, and then I would
21 look into it further.
22     Q   Okay.  And even in some serious situations
23 there is some discretion left to you and your
24 officers regarding whether or not to arrest people
25 for what might constitute a crime; is that fair to

RANDALL TUCKER

1
2  say?
3      A   Yes.
4      Q   And so I'm going to refer you -- I'm going
5  to refer you to an incident that I saw in the press
6  that, apparently, took place in May 2016, regarding
7  the unfortunate death of a child in a hot car.  Do
8  you recall that, sir?
9      A   I do.  It was my birthday.
10     Q   And what do you recall about that
11 incident, sir?
12     A   I know that my friend, David Archie's
13 grandson was killed.
14     Q   Okay.  And this was a two-year-old girl;
15 is that right?
16     A   No, it was a six-year-old boy.
17     Q   Okay.  We may be referring to different
18 incidents.  What's the incident regarding
19 Mr. Archie?
20     Q   Did you say in May of 2016?
21     Q   I did, but there, obviously, could be many
22 things that happened in May of 2016.
23     A   You just tell me which incident you're
24 talking about, and I'll answer it.
25     Q   Well, why don't you tell me about

RANDALL TUCKER

1
2  Mr. Archie first, and I'll get back to this one.
3      A   I just told you his grandson was killed,
4  and you asked me about that date.  I remember that
5  incident because it was my birthday.
6      Q   Okay, was he -- what were the
7  circumstances of the death?
8      A   He was kidnapped in Jackson as a toddler
9  in a vehicle.
10     Q   Are we referring to May '16 or May '17,
11 sir?  I'm wondering if we might be on different
12 years.  This past year or a year and a half ago?
13     A   He was actually kidnapped on the 17th,
14 and was found on the 18th.
15     Q   I was referring to year.  I think you're
16 referring to day.  I was referring to -- are you
17 referring to May 16, 2017?
18     A   No.
19     Q   What year are you referring to?
20     A   I think it was last year.
21     Q   Eighteen months ago?
22     A   I think that's correct.  I don't remember
23 the exact date.
24     Q   Okay.
25     A   I thought that's what you were

Page 138

RANDALL TUCKER

1
2  referencing.
3      Q   Okay.
4      A   That's my mistake.
5      Q   No, I'm referring to a different thing.
6  In that matter, there were arrests made; is that
7  correct?  In the matter you were just referring to?
8      A   Yes.
9      Q   Yes?  Okay.  No, that is not what I'm
10 referring to.  I'm referring to an incident reported
11 in the press in May 2016.  So, again, it is the same
12 time period where a two-year-old girl was found dead
13 in a vehicle at a daycare center.  Do you recall
14 that at all?
15     A   Yes.
16     Q   Okay.  No arrest was made of the mother in
17 that matter; is that correct?
18     A   The grand jury decided not to indict her.
19     Q   Okay.  Did your discretion or the
20 department's discretion play any role in that
21 incident?
22         MR. ROSS:  Object to the form.
23     Q   (Mr. Youngwood)  To your knowledge?
24         MR. ROSS:  Are you talking about the
25     grand jury's decision or what aspect?

Page 139

RANDALL TUCKER

1
2         MR. YOUNGWOOD:  Yes, the grand jury's
3     decision.
4      Q   (Mr. Youngwood)  To your knowledge?
5      A   Did my office have anything to do with
6  grand jury decision?  No.
7      Q   Okay.  Did you arrest the mother?
8      A   They didn't indict her.  No, sir, we
9  didn't.
10     Q   Well, sometimes you arrest people before
11 they're indicted; correct?
12     A   Oh, absolutely!
13     Q   Okay. and was it an exercise of your
14 discretion there not to indict, I'm sorry, not to
15 arrest the mother?
16     A   Based -- you know every situation is
17 unique, but based on the circumstances in that
18 particular case, and in discussions with the
19 district attorney, who would ultimately prosecute
20 the case, it was his decision that we should present
21 it to the grand jury and act on their actions.
22     Q   And I don't believe the name of the mother
23 is public, and if that's the case, I certainly don't
24 need to hear it, but do you know what the race of
25 the mother was?

Page 140

RANDALL TUCKER

1
2      A   I believe she was a white lady.
3      Q   Tell me, sir, based on your knowledge how
4  it is determined where roadblocks are set in Madison
5  County?
6      A   Uh -- there's a number of criteria,
7  actually, and I can't sit here and cite them all.
8  But you've got to consider the general safety of the
9  public and the officers in determining a location.
10 You don't want to sit up around a curve or over a
11 hill or anywhere of that manner.  You want to be
12 sure and set up where you can safely get the
13 vehicles out of the flow of traffic, off on the
14 shoulder of the road if you have to issue a citation
15 or conduct a further investigation.
16         You have, you know, in the best-case scenario,
17 you have marked vehicles with blue lights, officers
18 wear safety vests.  It's generally posted at the
19 justice court the location, the times, things of
20 that nature.
21     Q   Okay, you said, generally, you'd have
22 marked cars, blue lights.  What did you mean by
23 that?
24     A   We do have officers that don't have marked
25 cars, and they, obviously, are allowed under the law

Page 141

RANDALL TUCKER

1
2  to conduct a check-point as long as they've got the
3  identifying information -- vehicles have blue
4  Lights, what have you.
5      Q   But who determines where officers set up a
6  roadblock?
7      A   I guess that would be the discretion of
8  the supervisor at the time to approve that location.
9      Q   And the various factors that you outlined
10 a moment ago that might go into setting up the
11 location, are those written out somewhere?
12     A   Yeah, they're in the policy and procedure
13 manual.  I don't know that every single thing
14 outlined is, but the general guidelines are.
15     Q   Let's take a look at that.  This marked as
16 Exhibit 7, I'm sorry, 14.  Sorry.
17         (Exhibit 14 marked for the record)
18     Q   Is this the policy that you were just
19 referring to?
20     A   It appears to be.
21     Q   Okay.  And is this policy currently in
22 effect?
23     A   Yes.
24     Q   Is there any aspect of the policy that is
25 not contained within these four pages marked Bates

RANDALL TUCKER

1
2  Number MC-RFP 2-1 through 2-4?
3          MR. ROSS:  Object to the form.  Are
4      you talking about with regard to criteria
5      for the location of roadblocks?  Is that
6      what you are talking about?
7          MR. YOUNGWOOD:  Well, I'll broaden.
8      Q   (Mr. Youngwood)  Is there any aspect of
9  your roadblock policy that is not reflected in these
10 pages?
11     A   I don't think so.
12     Q   And the first several pages of this
13 document refers to sobriety checkpoint guidelines.
14 Do you see that?
15     A   Yes.
16     Q   Okay.  And then the end refers to general
17 roadblocks; do you see that?
18     A   Yes.
19     Q   Okay.  What is the difference between the
20 sobriety checkpoint and a general roadblock?
21     A   There is no difference.  They're conducted
22 the same way.
23     Q   Okay.  If I were your supervisor, your
24 deputy, where in here would I be able to determine
25 what my guidance is and where and when I can set up

RANDALL TUCKER

1
2  a roadblock?
3      A   I don't -- I don't know that there is on a
4  sobriety checkpoint that you're saying that there's
5  a guideline on when you can set one up?
6      Q   Or we'll go with the where.  Start with
7  the where.
8      A   Where would you go in this policy to get
9  instruction for that?  Was that your question?
10     Q   Where in this policy does it tell me where
11 I can set up a checkpoint or a roadblock?
12     A   It doesn't tell you where you can set it
13 up.
14     Q   Okay.  Does it tell me when I can set one
15 up?
16     A   I mean, it says that officers can set up a
17 roadblock in the event of escaped subjects.  I'm not
18 sure what your question is.
19     Q   Well, let's go into the general roadblock
20 section.
21     A   Okay.
22     Q   According to this section, where in
23 Madison County may I set up roadblocks?
24     A   A deputy has the authority to set up a
25 roadblock anywhere in Madison County with their

RANDALL TUCKER

1
2  supervisor's approval.
3      Q   Okay.  And both the -- and in doing so,
4  both the supervisor and the deputy are exercising
5  their discretion; is that fair to say?
6      A   To a degree, yes.
7      Q   Okay, to what degree?
8      A   Well, as I stated, they don't need to set
9  them up over around a curve or over a hill.  They
10 need to be where they're visible.  Those are the
11 things I outlined to you.
12     Q   Okay.  And those are all for the safety of
13 the officers and the safety of the drivers?
14     A   That's for the safety of everybody
15 involved.
16     Q   Okay, fair enough.  Other than guidance
17 on, I mean, you know, assuming you don't set it up
18 around a curve or something, what other direction is
19 given to officers and deputies about where it is
20 acceptable to set up a roadblock within Madison
21 County?
22     A   I don't know that they're given any
23 direction, specifically.
24     Q   Okay.  And you would agree with me that
25 the use of roadblocks and the personnel dedicated to

RANDALL TUCKER

1
2  them consumes the resources of your department;
3  correct?
4      A   No.
5      Q   Well, you can't be everywhere at all
6  times; right?
7      A   That's correct.  That's not what you asked
8  me.
9      Q   And I probably didn't ask it clear enough.
10 You have limited personnel and limited budget;
11 right?
12     A   I have adequate personnel and adequate
13 budget.
14     Q   But you do not have unlimited personnel or
15 budget; correct?
16     A   Of course not.  I wish I did, but, no, I
17 don't.
18     Q   Yeah.  You have to set priorities?
19     A   Absolutely!
20     Q   And where you set up a roadblock is a
21 reflection of some of those priorities; correct?
22         MR. ROSS:  Object to the form.
23     A   I'm not sure I understand what --
24     Q   (Mr. Youngwood)  You --
25     A   If --

Page 174

RANDALL TUCKER

1
2      A   I can address the body camera one first
3  and then go to the next one.  However you want me to
4  do it.
5      Q   Well, let me make sure.  If you look back
6  on the first page of the exhibit, you received this
7  e-mail from Mr. Bob Bobinger at 4:35 P.M.; correct?
8      A   Yes, that's what it says.
9      Q   And you responded using your iPhone at
10  4:40 P.M., five minutes later.  Do I read that
11  correctly?
12      A   Yes.
13      Q   Okay.  So did you open the attachments?
14      A   Yes.
15      Q   Between 4:35 and 4:40?
16      A   Yes.
17      Q   And you spent up to five minutes reviewing
18  them; correct?
19      A   Yes.
20      Q   And you have now had them in front of you
21  for nine minutes, not on an iPhone but in hard copy.
22  So do you need more time today to review them than
23  you needed in 2016 to come to the conclusion that
24  they are utterly ridiculous?
25      A   I'm sorry, by my e-mail you probably

Page 175

RANDALL TUCKER

1
2  didn't understand that him sending them was not the
3  first time I had seen them.
4      Q   Okay.
5      A   So, no, I'm not a speed reader.  I didn't
6  read them in four or five minutes.
7      Q   Why don't we go with the first one.  Why
8  don't you tell me what about it you found to be
9  utterly ridiculous?
10      A   I think the body cameras are an extreme
11  burden to law enforcement in that they can cause an
12  officer to hesitate when action needs to be taken at
13  the scene of an incident or at the time of a
14  criminal offense.  I think it unduly burdens a
15  department to try to figure out a way to manage to
16  store data for that length of time.  That's an
17  exuberant cost I don't know if you're familiar with.
18  I'm not necessarily greatly familiar with it,
19  myself, but according to our IT Department, it would
20  be a significant expense.
21      And at the time this was being proposed, there
22  were some pilot programs up in the northern part of
23  the United States that we were waiting to get the
24  results of, some of which turned them back in saying
25  that they didn't want to participate.  And it opens

Page 176

RANDALL TUCKER

1
2  up, I mean it labels a department or it saddles a
3  department with all manner of new policy and
4  procedure and opens them up to extensive lawsuit
5  based on the fact that they suggests that every
6  department should wear body cameras, basically, was
7  the gist of the bill.
8      Q   Can you see any good that would come with
9  having officers wear body cameras, sir?
10      A   I don't know about body cameras, but
11  there's good comes from cameras.  Obviously, that's
12  the reason that my administration put them in every
13  vehicle that we patrol with.
14      Q   We'll get to the vehicles in a moment, but
15  would you agree with me that if the officers were
16  wearing body cameras, it would be easier to track
17  whether or not an officer behaved in any police
18  misconduct?
19      A   I can't answer that.  We haven't done
20  that.
21      Q   Okay, and, well, you haven't done it, but
22  you concluded the bill was ridiculous; right?
23      A   I think it is ridiculous.  That's my
24  opinion.
25      Q   All right.  And would you agree with me

Page 177

RANDALL TUCKER

1
2  that body cameras might assist in preventing
3  officers from acting in an impermissible racially
4  discriminatory manner?
5      MR. ROSS:  Object to the form.
6      Absolutely no context to your question.
7      A   I have professional officers.  They're
8  screened.  I don't believe they act inappropriately
9  in any rate.  I don't agree with your assessment.
10      Q   (Mr. Youngwood)  Okay.  Why don't we go,
11  skip the second of the bills and go to the third,
12  the one that's described in the PDF or in the first
13  page of the exhibits -- "oral advisement, written
14  consent part of search of a vehicle or person."
15  See if you can find that in the attachments.  Take a
16  review and --
17      MR. ROSS:  What page is that on?
18      MR. YOUNGWOOD:  Well, he's the one
19      who reviewed them a year ago or almost
20      two.
21      Q   (Mr. Youngwood)  I'm going to let you tell
22  me what you need to review to tell me why you found
23  the third of these three bills utterly ridiculous.
24      A   Can you tell me a page, or do you just
25  want me to just sit here and figure out what you're

RANDALL TUCKER

1 
2 talking about?
3       Q   Or we can look together.  I don't know
4 what you wish to review, sir.  This is what was sent
5 to you a year ago, two years ago.  I don't want to
6 limit your review.
7             MR. ROSS:  Well, you specified the
8       third bill.  Do you know where the third
9       bill starts so that we can move this
10      along?
11            MR. YOUNGWOOD:  It's not my e-mail.
12            MR. ROSS:  It's your question.  The
13      third bill.  Which bill are you talking
14      about?
15            MR. YOUNGWOOD:  Oral advisement and
16      written consent prior to search of the
17      vehicle or a person during this contact.
18      The witness concluded it was utterly
19      ridiculous, and I'd like to know the
20      basis.
21            MR. ROSS:  Let the record reflect
22      that counsel has refused to point the
23      pages out that he's referring to  in
24      Exhibit 21.  And I'll refer you to --
25      Q   (Mr. Youngwood)  I believe it starts at

RANDALL TUCKER

1 
2 1386, sir.
3             MR. ROSS:  Thank you.
4       Q   (Mr. Youngwood)  Third-to-last page.
5       A   (WITNESS EXAMINES DOCUMENT)  Yes, I recall
6 the bill.
7       Q   Why did you conclude that it was utterly
8 ridiculous?
9       A   Because it requires an officer to obtain a
10 written authorization, a written consent.  I think
11 it's ridiculous to require an officer to obtain
12 written consent -- uh -- an individual, on the First
13 Amendment freedom of speech, and an individual can
14 freely tell you you can search.  I don't think that
15 requires written consent.
16      Q   Well, how will we know if an individual
17 has provided consent, other than if it's in writing?
18      A   There are videos in our patrol cars now.
19 That was one of the reasons we did that, sir.
20      Q   Okay.  And let's discuss the video.  And
21 so, I'm sorry, what's the reason you believe this
22 bill to be utterly ridiculous?  I want to make sure
23 I know all of your reasons.
24      A   Let me make sure.  Utterly ridiculous.
25 You're right.  They're utterly ridiculous in that an

RANDALL TUCKER

1 
2 individual can't look you in the eye and tell you
3 that you can search his vehicle.
4       Q   So you referenced the cameras in your
5 patrol cars.  It's left to the discretion of the
6 officer whether or not to turn on that camera;
7 correct?
8       A   Not necessarily, no.
9       Q   Why do you say "not necessarily"?
10      A   If the officer activates the blue lights,
11 then the camera comes on.  I mean on the car the
12 camera comes on.
13      Q   Okay, and at whose discretion is it as to
14 whether or not the officer activates the blue
15 lights?
16      A   I guess the officer turns the blue lights
17 on.
18      Q   Acting within his or her discretion;
19 correct?
20      A   Well, yes.
21      Q   And if the officer wishes to turn on their
22 camera and the microphone, absent activation of the
23 blue lights, that would also be left to his or her
24 discretion; correct?
25      A   Yes.

RANDALL TUCKER

1 
2       Q   It's not left, for example, to the
3 discretion of the driver of the vehicle who has been
4 stopped?
5       A   No.
6       Q   And so, although the officer has the
7 discretion to record the conversation, the driver of
8 the vehicle has no say in that matter; correct?
9       A   They can record it.  There's a law says
10 they can record stops.
11      Q   I'm sorry, with what would they be
12 recording the stops?
13      A   I guess if they purchased a camera like we
14 did.
15      Q   Okay.  Any other way you think they might
16 record their stops?
17      A   Through an audio recording device or
18 whatever.
19      Q   So if they want to, if I drive around
20 Madison County and I want to make sure I get a
21 record of any stops by the police, I should purchase
22 a car camera or some other mechanism of recording my
23 interactions with the sheriff's department?
24      A   I didn't say that.
25      Q   Okay.  Well, you didn't give me any other

RANDALL TUCKER

1
2 ways that I might record my stops.
3    A   Okay, do I need to?
4    Q   Only if you know of other ways, sir.
5    A   You can take a ledger and write it.  You
6 can do whatever you want to do, within the confines
7 of the law.  We're not trying to restrict anybody.
8    Q   Okay.  But you leave it to within the
9 discretion of your officers as to whether or not to
10 record any interaction with the citizens in
11 Madison County; correct?
12    A   The cameras in our squad cars are set up
13 and installed such that they come on whenever the
14 blue lights are activated.  Yes, the officer has
15 discretion to stop somebody for running a stop sign
16 or whatever.  But when he cuts those lights on, the
17 camera is activated.
18    Q   But he determines when to turn on the
19 lights; correct?
20    A   He determines when to initiate a stop;
21 yes.
22    Q   And if the lights aren't on, he determines
23 whether or not he thinks it useful to have the
24 camera on; correct?
25    A   Yes.

RANDALL TUCKER

1
2    Q   Okay.  If -- I want to talk about other
3 uses of officer discretion.  Back to the roadblock
4 scenario.  If the officer stops somebody and asks to
5 see their license and the license looks valid on its
6 face, does the officer run the license back through
7 the central office?
8    A   As a general rule, no, but they could if
9 they desired to.
10    Q   And so it's within their discretion
11 whether or not to run those licenses, apparently,
12 valid licenses, through the state system; correct?
13    A   Yes.
14    Q   And what is that discretion supposed to be
15 based on?
16    A   You would have to ask the individual
17 officer.  I don't know what the cause would be at
18 the time.  I mean, I haven't been on every stop made
19 in Madison County.
20    Q   Do they receive any training as to when
21 they should exercise the discretion to run an
22 apparently valid license?
23    A   I think I've testified there is no
24 training about discretion.
25    Q   How about passengers who are in vehicles

RANDALL TUCKER

1
2 stopped at roadblocks?  Is an officer supposed to
3 check the ID of the passenger?
4    A   Supposed to?
5        MR. ROSS:  Object to the form.
6    Q   (Mr. Youngwood)  Is it policy or practice
7 of your department for officers to check the
8 identification of a passenger stopped at a roadblock
9 or a car stopped at a roadblock?
10    A   There is no policy that says they are to
11 do that, no.
12    Q   So is that within their discretion?
13    A   Certainly they can ask for an
14 identification, but if they're told no, that's not
15 any type of offense that they could take action on.
16    Q   Do they tell the passengers "I'd like to
17 see your identification, but you don't need to show
18 it to me"?
19    A   I haven't been on --
20        MR. ROSS:  I object to the form.
21        This is in the abstract, but you can
22        answer to the best of your ability.
23    A   I haven't been on individual stops.  I
24 couldn't tell you what the wording is.
25    Q   (Mr. Youngwood)  Well, do you instruct

RANDALL TUCKER

1
2 them to tell passengers that showing their license
3 is voluntary, or other forms of identification?
4    A   I do not.
5    Q   And so who is it up to whether or not they
6 ask the passenger for identification?
7    A   The officer on the scene.
8    Q   Again, no training on how to exercise
9 discretion in that situation; correct?
10    A   I'll say it again.  I've already told you
11 there is no training in discretion.
12    Q   How about the search of vehicles stopped
13 at roadblocks?  Is that left to the discretion of
14 the officer as to whether or not a search is
15 warranted?
16        MS. ROSS:  Object to the form.  No
17        context of what the stop consists of.
18    A   The officer would need to have probable
19 cause to conduct the search.
20    Q   (Mr. Youngwood)  Is there training in
21 probable cause?
22    A   Yes.
23    Q   What is that training?
24    A   There is all manner of training.  Depends
25 on which courses they have been through.  Our

Page 186

RANDALL TUCKER

1
2     district attorney's holds a search and seizure class
3     that officers go to.
4          Again, we send officers to all manner of
5     training throughout the year.  So, yes, they are --
6     in the Police Academy, they are taught about search
7     and seizure.  So, yes, there is training on that.
8          Q   Is there any review by you or your senior
9     supervisors as to whether or not individual officers
10    properly conduct the determination of whether or not
11    to search a vehicle at any given situation?
12         A   Not every situation, but some, yes.
13         Q   How would you determine which ones to
14    monitor?
15         A   I don't know about how to determine which
16    one to monitor.  I understood the question to be
17    "has there been any monitoring?"  And, yes, there
18    has been, whether it be the narcotics supervisors
19    watching or monitoring their guys do it, or me or
20    our chief watching our guys do it.  I have
21    personally watched guys do it, so, yes, there has
22    been some monitoring.
23         Q   So when you're on scene, there is
24    monitoring?
25         A   Yes.

Page 187

RANDALL TUCKER

1
2          Q   Okay.  And how do you determine when you
3     will be on the scene for the roadblock?
4          A   If I have time, I'll go.
5          Q   Okay.  Do you seek to randomly check
6     various officers?
7          A   No, I do not.
8          Q   Do you seek to randomly check, you know,
9     dependent on geographically where roadblocks are
10    located?
11         A   No, I do not.  I have supervisors that do
12    that.
13         Q   Do you know how the supervisors determine
14    when they are monitoring the search and seizure
15    activity of your deputies?
16         A   No.
17         Q   If an officer sees a driver going down the
18    street without a seatbelt, is the officer required
19    to stop that driver?
20         A   "Required"?
21         Q   Yes.
22         A   No.
23         Q   So it's left to the discretion of the
24    officer whether or not to stop the driver?
25         A   Any stop for traffic violation is left to

Page 188

RANDALL TUCKER

1
2     the discretion of the officer.
3          Q   And there's no training on how to exercise
4     that discretion; correct?
5          A   There is no training on discretion.
6          Q   And no checking as to whether or not that
7     discretion is being exercised in a racially
8     inappropriate manner; correct?
9          A   Wrong.  There are supervisors on some of
10    these things that, you know, I don't know how else
11    to tell you.  We don't ride around with our thumb on
12    individuals, but they have supervisors.  They
13    prepare reports.  The public has an open-door policy
14    at any point they want to come to my office and talk
15    to me.  I have stressed that from day one, they can
16    come and talk to me.  I don't know how else to be
17    more available.
18         Q   Do you think it possible, sir, that
19    members of certain racial groups in the county are
20    intimidated by your office?
21         A   I think the criminal element is, yeah.
22         Q   And do you think the criminal element
23    falls disproportionally within one race versus
24    another in your county?
25         A   I don't prepare statistics with races.

Page 189

RANDALL TUCKER

1
2          Q   You have been presented with statistics on
3     arrests in your county through this lawsuit;
4     correct?
5          A   Yes.
6          Q   And you're aware of them, they're in the
7     complaint.  I'd be glad to show you some of the
8     pages, if useful.  If we look at exhibit -- you are
9     probably better organized than I am, sir, but I'll
10    find it.  Seventeen, I believe.
11             MR. ROSS:  Exhibit 17 is the notice
12         of a roadblock.
13         A   I have 17 as a --
14         Q   (Mr. Youngwood)  Yeah, it's the wrong
15    exhibit.
16         A   Here, you're welcome to look at this stack
17    here.
18         Q   Yeah, I'll do that.  Thank you, sir.
19    Yeah, it's 13.  So this is the complaint we looked
20    at it -- uh -- statistics are given in various
21    places, but let's look, for example, at -- uh -- you
22    can look, for example, at page 17.  But you see 58
23    discusses percentages of roadblock arrests broken
24    down by race.  According to the allegation in the
25    complaint, 81 percent of roadblocks or less were

48

Page 190

RANDALL TUCKER

1
2    black people.  19 percent of white.  If you'd look
3    at page 26, paragraph 84, it talks about pedestrian
4    stops.  I'm sorry, arrests at pedestrian stops, 82
5    percent black.  Remaining 18 percent white.  You
6    have seen these statistics through this case;
7    correct?
8        A  I've seen what was prepared by the
9    plaintiff's side.  I don't know where they got these
10   statistics, but if you look at that, 81 and 19
11   percent, I guess you would suggest that there is
12   only two races in Madison County, which I guess that
13   would be racially biased toward Hispanics and
14   Indians and what have you, so.
15       Q  Sir, do you have any basis on which to
16   doubt the statistics in this complaint?
17       A  I have --
18           MS. ROSS: Object to the form.  I
19       mean object to the question.
20       A  I don't know where these were compiled,
21   but they're certainly not anything that I have
22   compiled, and, no, I do not agree with them.
23       Q  (Mr. Youngwood)  Okay.  Well, do you have
24   a basis for not agreeing with them?
25           MR. ROSS:  Object to the form.  This

Page 191

RANDALL TUCKER

1
2    is the complaint.  He says he don't know
3    where they came from, and I don't know
4    what more he can say.
5           MR. YOUNGWOOD:  Well, no, he said he
6       didn't agree with them.  Now, I'm asking
7       him his basis.
8       A  The basis is I don't know if they're
9    accurate.  I didn't prepare them, so I'm not going
10   to just --
11       Q  (Mr. Youngwood)  You don't know?
12       A  -- unilaterally agree to something like
13   that.
14       Q  Okay, you don't know if they're accurate?
15       A  Have no idea.
16       Q  Okay.  Do you believe that blacks in
17   Madison County commit crimes at a higher rate than
18   whites?
19       A  I haven't broken it down.  I couldn't tell
20   you.  We arrest criminals.
21       Q  Does, did in any way receiving this
22   complaint make you question whether or not there is
23   some inherent racial bias in the policing policies
24   and practices?
25       A  No, it doesn't.

Page 192

RANDALL TUCKER

1
2        Q  Do you continue to monitor legislation
3    that might affect police activity?
4        A  I haven't had a lot of time to monitor
5    anything since this lawsuit.  I've been monitoring
6    this.
7        Q  Okay.  Are you aware of any recent
8    legislature initiatives regarding body cameras for
9    police officers?
10       A  I haven't had an opportunity to --
11           MR. ROSS:  Object to the form.  I
12       don't know what "recent" means.
13       Q  (Mr. Youngwood)  Well, since the e-mail we
14   looked at, that was Exhibit 21, in 2016.
15       A  I haven't had a lot of time.  I have been
16   consumed with this lawsuit.
17       Q  Let's take a look at Exhibit 4, please,
18   sir?  I recognize you did not sign these.  I think
19   you testified earlier you had reviewed them before
20   they were finalized.  These are the Requests to
21   Admit.  I'm going to ask you about several of the
22   answers.  If you don't know the answer, then you can
23   tell me that.
24       Request Number 1 asks about whether or not
25   defendants maintain or possess any written policies

Page 193

RANDALL TUCKER

1
2    or procedures concerning the MCSD's jurisdiction.
3    Do you see that?
4        A  I do.
5        Q  Does the MCSD retain written policies or
6    procedures concerning its jurisdiction?
7        A  No.
8        Q  Number 2 concerns the maintenance of
9    written policies or procedures concerning traffic
10   stops.  Do you see that?
11       A  Yes.
12       Q  And the answer, in part, given is
13   "Defendants admit that MCSD has no written criteria
14   concerning when MCSD personnel should make a vehicle
15   stop, other than complying with existing state and
16   federal laws."  Do you see that?
17       A  Yes.
18       Q  Is that a correct statement?
19       A  Yes.
20       Q  Number 3 concerns the maintenance of
21   written policies or procedures concerning pedestrian
22   stops.  Is it correct that the MCSD has no written
23   policies or procedures concerning pedestrian stops?
24           MR. ROSS:  Object to the form.
25       A  Correct.

Page 210

RANDALL TUCKER

you when he was hired, or what I would do
differently at that point.  At that point, I made a
decision to hire him, and I stand by that decision.
(Exhibit 24 marked for the record)
Q   Giving you Exhibit 24, sir.  Have you seen
this document before, sir?
A   I don't know that I have seen this
particular document.  It's possible that I saw it in
the deposition I referenced in response to the
previous question, but I don't recall reading this
document, no.
Q   At the time that you hired him, had
Mr. Moore told you -- and I'm reading from the
second sentence of the document -- that "there had
been approximately 30 internal affairs complaints
filed, including pending civil litigation
matters" -- I'm paraphrasing -- relating to his
conduct as an officer in the City of Jackson Police
Department.  Had he given you information regarding
these 30 internal affairs complaints?
A   I don't know about the number 30.  He did
guess us information that he had had some litigation
and complaints during this time with his previous
employers, and, again, that's the reason we could

Page 211

RANDALL TUCKER

call and verify about those employers what those --
uh -- were, and if they would recommend him for
employment, which they ultimately did, so he must
not have been much of a menace.
Q   Okay.  Recognizing that the City of
Jackson has determined him to be a menace; correct?
A   That's not a governing body I don't guess.
Q   The City of Jackson is not a governing --
A   That's not a court record.
Q   Right.
A   Anybody can make an allegation.  That
doesn't make it true.
Q   And the Court of Appeals had concluded
that his acts were more than negligent; correct?
A   In this document here?
MR. ROSS:  Object to the form.
A   No, I don't see a Court of Appeals ruling
with these 30 that you're referencing.
Q   (Mr. Youngwood)  Regarding these 30, what
are you telling me about them?
A   I don't recall any specific conversation.
That's been a number of years ago.  He did -- I can
tell you that he did indicate that he had had some
disciplinary actions, and we called and verified

Page 212

RANDALL TUCKER

those actions with the chief deputy at the time for
the Jackson Police Department, and he gave him a
good recommendation.
Q   There are also allegations of excessive
force lodged against Officer Thompson at the time
you hired him; is that correct?
A   I don't know about plural.  I knew of an
incident, and he openly told us about that when he
came for his interview.
Q   And what was the basis -- did you conclude
that the incident was without basis, without merit?
A   I did.  Yes.
Q   And what did you base that decision on?
A   Based on speaking with the Hinds County
Sheriff's Department's Chief Deputy and the accounts
from Deputy Thompson of the incident.  I felt like
he did what was necessary, in effect, for the
suspect in the case, as well as the preservation of
evidence.
Q   And you were aware of allegations that the
victim in that incident had been attacked, beaten,
choked, and tasered?
MR. ROSS:  Object to form.  Implying
that it was by Thompson.

Page 213

RANDALL TUCKER

A   I wasn't under the impression that
Deputy Thompson had done any of that.
Q   (Mr. Youngwood)  What did you do to
ascertain that Deputy Thompson had not attacked,
beaten, choked, and tasered the victim in that case?
A   I spoke with Chief Deputy William Pecu.
Q   Did you review the court file?
A   No, I did not.  Not that I recall.
Q   Would you hire an officer who had
attacked, beaten, choked, or tasered a citizen?
MR. ROSS:  Object to the form.  No
context.
A   If it was unprovoked, no, I wouldn't.
Q   (Mr. Youngwood) So a provoked beating
would be acceptable to you, sir?
MR. ROSS:  Object to the form.
Object to the form.  You can answer to the
best of your ability.
A   You know, you -- I don't know if beating
is a proper term or not, but, certainly, you have a
right to defend yourself, even if you're a police
officer, which some people don't believe, but I
wouldn't say "beat," but there is a way to defend
yourself that causes bodily injuries to others, but

Page 214

RANDALL TUCKER

1
2 that's dependent on the situation.
3     Q   (Mr. Youngwood) So you would agree with me
4 that beating a citizen is not acceptable?
5     A   I would agree with the beating, yes.
6     Q   How about choking?  Is that acceptable?
7         MR. ROSS:  Object to the form.  No
8     context, whatsoever.
9     A   I don't know what you are referring to.
10    Q   (Mr. Youngwood)  Well, I'm referring to
11 the allegations against Defendant Thompson.  I'm
12 sorry, Officer Thompson.
13    A   That was just an allegation.  I don't know
14 that there was any choking.
15    Q   So my question is, is it ever acceptable
16 for one of your officers to choke a citizen?
17    A   No.
18        VIDEOGRAPHER:  I need to change DVDs.
19        MR. YOUNGWOOD:  Why don't we take a
20    break?
21        VIDEOGRAPHER:  Off the record. 2:47.
22        (BRIEF RECESS)
23        VIDEOGRAPHER:  DVD 4.  Back on
24    record.  2:58.
25    Q   (Mr. Youngwood)  How do you review

Page 215

RANDALL TUCKER

1
2 performance of your officers and deputies?
3     A   It's daily observation.  There's no
4 written review.
5     Q   Is there an annual meeting with officers
6 or deputies to tell them how they're doing?
7     A   No.  That's done daily or monthly.
8     Q   Well, as in what manner is it done?
9     A   Just verbally just -- if there's an issue
10 that either the chief or myself will address it with
11 them and their supervisor.  There's no annual
12 review, per se.
13    Q   Do you review statistics associated with
14 the various deputies?
15    A   I don't, no.
16    Q   Do you know if anyone in the department
17 does?
18    A   There are monthly reports submitted to the
19 chief.
20    Q   And what is the purpose of the creation of
21 those statistics?
22    A   I guess to monitor the activities of the
23 individual officers.
24    Q   What are you looking for in reviewing, or
25 what is the department looking for in reviewing the

Page 216

RANDALL TUCKER

1
2 statistics?
3     A   Uh -- I guess it's just a -- it's review
4 to basically make sure people are patrolling, which
5 is indicated by mileage on their vehicle or whether
6 or not they're responding to calls and writing
7 reports.  And there's a block on there that
8 indicates how many citations they've written.
9 Again, I don't review it, so I can't sit here and
10 cite everything on it.
11    Q   One of the things that's kept are related
12 to arrests; correct?
13    A   Uh -- I think there's a block on there,
14 maybe two, maybe differentiating between misdemeanor
15 and felony arrests.  Again, I can't sit here and
16 tell you.  I don't look at it.
17    Q   Well, you do believe data is collected
18 regarding the arrests associated with each deputy;
19 correct?
20    A   Yes.
21    Q   Why track that?
22    A   To make sure that they're doing the job
23 they're supposed to be doing.
24    Q   How can you tell that, based on the number
25 of arrests that they make?

Page 217

RANDALL TUCKER

1
2     A   I don't necessarily know that by the
3 number of arrests they make.  They may work eight
4 hours and not arrest anybody.  I mean, I'm not
5 saying it's mandatory that you arrest somebody every
6 day.
7     Q   Well, do you do any study to see if their
8 arrests are valid?
9     A   Uh -- they go through the court system,
10 and, you know, it's either dismissed by the court or
11 prosecuted by the court.  I don't keep an individual
12 track of it.
13    Q   Well, no, you track it anyway, whether or
14 not one deputy versus another makes more arrests
15 that end up being dismissed?
16    A   No, I don't track it.  I'm sure you
17 probably could through -- the court could.  I can't
18 do that.
19    Q   Do you do any monitoring to ensure that
20 arrests aren't racially motivated?
21    A   No.
22    Q   Or that the issuance of citations aren't
23 racially motivated?
24    A   As long as there's probable cause for a
25 citation or there's a criminal affidavit, no, I

Page 218

RANDALL TUCKER

1
2 don't.  No, I don't.
3        Q    And you have no way of tracking, am I
4 correct, whether or not certain deputies are making
5 racially motivated decisions regarding which
6 citizens they allow to get off with a verbal
7 warning, as opposed to an arrest or a citation;
8 correct?
9            MR. ROSS:  Object to the form.  It
10           assumes things that haven't been proven.
11       A    Other than my supervisors' presence or
12 another officer's presence and lack of complaints,
13 no, I don't.
14       Q    (Mr. Youngwood)  How do you monitor your
15 supervisors to see whether or not they perform in a
16 racially discriminatory manner?
17       A    I don't monitor anybody to see if they're
18 performing in a racially discriminatory manner.  We
19 arrest criminals.  We don't discern by race.
20       Q    Well, how do you know you don't discern by
21 race?
22       A    Because I'm sitting here telling you I
23 don't know.
24       Q    How do you know your officers don't?
25       A    Because of what I have just told you.  I

Page 219

RANDALL TUCKER

1
2 mean, we track them through their supervisors
3 observing their activities, through our
4 observations, through radio traffic.  I haven't seen
5 anything to indicate anything along those lines.
6        Q    And the complaint filed in this case and
7 the statistics contained in it don't cause you to
8 question that assumption, sir?
9        A    I think the complaint is baseless, and
10 those statistics were made you or your firm.
11       Q    Well, you --
12       A    -- put together.  I haven't put together
13 any statistics.  Our legal team hasn't put together
14 any of those statistics.  I don't know that they're
15 true.
16       Q    Okay.  You have access to the same data we
17 have access to; correct?
18       A    I can't answer that.  I don't know what
19 you have access to.
20       Q    Well, you have access to your own incident
21 reports; correct?
22       A    Absolutely, I do.
23       Q    And, in fact, you have access to more
24 incident reports than I do; right?
25       A    I don't know that.  I don't know what you

Page 220

RANDALL TUCKER

1
2 have access to.
3        Q    You know what's been produced in this
4 case, don't you, sir?
5        A    Sure, I do.
6        Q    And you, in fact, submitted an affidavit
7 to the court concerning the need for privacy and
8 confidentiality regarding certain data; correct?
9        A    Absolutely!
10       Q    Okay.  And you are aware the court ruled
11 against you on the CAD data yesterday; correct?
12       A    I don't know what the court ruled, to be
13 honest with you.  I know we have got to produce CAD
14 reports.
15       Q    Right.  But you didn't want to produce to
16 us; right, sir?
17       A    No, I didn't.
18       Q    Why not?
19       A    Because it protects the integrity of the
20 victims, witnesses, other individuals that may not
21 be a party or subject to this action.
22       Q    Although you did produce unredacted CAD
23 reports in response to a Public Records Request;
24 correct?
25       A    Shame on me for trying to cooperate.

Page 221

RANDALL TUCKER

1
2        Q    Well, I'm not sure you should be shamed at
3 all, sir, for complying with the law.
4            MR. ROSS:  I object to your
5            gratuitous opinions.  You can ask him
6            questions.
7        Q    (Mr. Youngwood)  Okay, you did produce
8 those; reports correct?
9        A    Which reports?
10       Q    The unredacted CAD reports as part of the
11 Public Records Request; correct?
12       A    Yes.
13       Q    Okay.  You have access to incident reports
14 that you have not produced to us; correct?
15       A    Not that I'm aware of, no.
16       Q    You believe you produced every incident
17 report in the department's possession?
18       A    I don't know what's been produced to you,
19 every single incident report.
20       Q    Do you have any objections producing all
21 of the incident reports to us in the department's
22 possession?
23            MR. ROSS:  And I object.  It calls
24            for a legal conclusion.  We made it clear
25            that we produced relevant incident reports

Page 222

RANDALL TUCKER

1
2  and that we have redacted privileged and
3  victim and witness information.
4      MR. YOUNGWOOD:  I'm unaware if you
5  redacted any privileged information from
6  the incident reports.
7      MR. ROSS:  We will review them all
8  for privilege and for -- and it probably
9  wasn't any privilege in the incident
10  reports, you're right.  But we did redact
11  victim and witness information per
12  stipulation entered into with your firm,
13  and we did review them for relevancy, and
14  we did not produce incident reports that
15  were not relevant.
16  Q   (Mr. Youngwood)  Do you understand that
17  you have incident reports that we do not have access
18  to; correct?
19  A   No, I don't understand that.  But I will
20  consult with my counsel about it after this.
21  Q   Did you play any role, and you don't have
22  to tell me what role you played, but let's ask one
23  question at a time, in the determination of which
24  incident reports were relevant to this case?
25  A   Did I play a role in determining which

Page 223

RANDALL TUCKER

1
2  ones?
3  Q   Yes, sir.
4  A   I didn't play a determination in the court
5  proceeding, no.
6  Q   That wasn't my question.  Your attorneys
7  reviewed incident reports and produced to us those
8  deemed to be relevant.  You just heard your counsel
9  say that.
10  A   Right.
11  Q   Did you have any part in making the
12  determination as to which reports would be deemed
13  relevant?
14  A   I don't recall that, no.
15  Q   Do you know what methodology was used to
16  determine which reports were deemed to be relevant?
17  A   I do not.
18  Q   Okay.  So you have access to the incident
19  reports clearly; right?
20  A   I think I can access, yes.
21  Q   Okay, and you certainly have access to any
22  incident report that's been produced to us from your
23  department; correct?
24  A   Yes.
25  Q   Okay.  And race is an indicator, it's a

Page 224

RANDALL TUCKER

1
2  box on that report; right?
3  A   Right.
4  Q   And you could use those reports to
5  generate statistics regarding the race of people
6  arrested under your, by your department and under
7  your supervision; correct?
8  A   I think you could, yeah.
9  Q   So --
10  A   You can do it with a docket book, too.
11  Q   What does that mean, "with a docket book"?
12  A   There's a docket book at every jail
13  facility that when somebody is booked in, it goes
14  into a public document.
15  Q   Okay.  And have you ever done such an
16  analysis?
17  A   No, I have not.
18  Q   Given the context of this lawsuit, do you
19  have any curiosity as to what that analysis would
20  show?
21  A   None, whatsoever.
22      (Exhibit 25 marked for the record)
23  Q   I've marked this as 25, sir.  Do you
24  recall engaging in an interview with The Madison
25  County Journal in January 2015?

Page 225

RANDALL TUCKER

1
2  A   I don't dispute that I did.  I don't
3  necessarily recall, but I don't dispute it, no.
4  Q   Okay.  Have you seen this interview
5  before?
6  A   I don't know that I have read it, no.
7  Q   Would you go to the second page, sir?
8  There's a question about body cameras.  It says MS,
9  which is the reporter, I believe.  And then RT,
10  which is you.
11  The question is: "Does your department have
12  body cameras or plans to introduce them in the
13  future?"
14  "We do not.  We have recently as of late this
15  year sought a camera in every vehicle.  We have
16  cameras as well as back-seat cameras for detention
17  purposes.  We have talked about the body cams.
18  That's one of those deals where you're going to
19  scrutinize every little thing a guy does or a girl
20  does, based on a few bad apples.  If you've got to
21  stand there with your thumb on them constantly, I'd
22  rather not need them.  The people we hire go through
23  a rigorous process.  We don't hire anybody off the
24  street.  I put my faith and belief in them, or I
25  wouldn't hire them."  Do you see that?

RANDALL TUCKER

1
2    A   Yes.
3    Q   Do you believe those are the words you
4  gave in response to that question?
5    A   Again, I don't recall this.  This is the
6  first time I have read it, but I don't disagree with
7  it.
8    Q   Okay.  I want to just ask you about the
9  middle of it.  "Are you going to scrutinize every
10 little thing a guy does or a girl does based on a
11 few bad apples?"  What did you mean by that.
12   A   I mean, I think there's bad apples in the
13 every profession that there are, whether, you know,
14 they're in my department or other departments or
15 what have you.
16   I mean, if you're going to sit there and have
17 to worry about what every member of your department
18 is doing, you know, you need to hire quality people,
19 and that's what we do.  That's the reason we go
20 through the process we go through.  I don't want one
21 of those bad apples in my department.
22   Q   Are you aware of any bad apples in your
23 department?
24   A   No, I'm not.
25   Q   Sir, just going back briefly to the data

RANDALL TUCKER

1
2  that's in our complaint and the incident reports and
3  other methods you would have of tracking race, would
4  it be of concern to you if you were shown data that
5  demonstrated that your department was
6  disproportionately targeting black citizens for
7  arrest?
8        MR. ROSS:  Object to the form.
9        Abstract.  Doesn't say what type of data
10       or if they were all together.
11   A   I don't target anybody but criminals, sir.
12   Q   (Mr. Youngwood)  Okay.
13   A   And I don't decide who breaks the law.  We
14 arrest criminals based on criminal activity, not on
15 race.
16   Q   Okay.  And so you don't believe it
17 possible that there's data demonstrating that your
18 department targets blacks disproportionately over
19 whites?
20   A   I don't believe there's any targeting at
21 all.  I don't believe there's anything that you can
22 show me that says that my department is targeting
23 anybody.  We don't target.  I don't know what -- I
24 don't know what racial statistics are, because I
25 have no basis to even go look for that.

RANDALL TUCKER

1
2    Q   Would you agree, sir, that your department
3  arrests more blacks than whites?
4    A   I've already told you I haven't done any
5  statistics.  I couldn't tell you.
6    Q   You have no idea if your department
7  arrests more black people than white people?
8        MR. ROSS:  Objection.  Asked and
9        answered.
10   A   We arrest a lot of criminals.  I couldn't
11 tell you what color they are.
12   Q   (Mr. Youngwood)  But the data maintained
13 by your department tells me exactly what color they
14 are; correct?
15   A   I haven't done any statistical analysis.
16   Q   But the raw data is there; right?
17       MR. ROSS:  Objection.  Asked and
18       answered.  You can look at what has been
19       produced as well he can.
20   A   I think the data speaks for itself,
21 whatever that is.
22   Q   (Mr. Youngwood)  We agree on that, sir.
23   A   Good.
24   Q   Tell me about the process that's
25 undertaken by your department in the case of an

RANDALL TUCKER

1
2  allegation of improper policing behavior made by a
3  citizen in the county.
4    A   Again, I'll tell you every situation is
5  unique.  There is no two that come out the same.  It
6  would be based on the factors of that individual
7  complaint, the actions of the suspect, the actions
8  of the officers.  I can't sit here and give you that
9  without knowing what the situation is.
10   Q   Was there a change in the manner in which
11 you investigated complaints made since you have
12 become sheriff?
13   A   Yes.
14   Q   What was that change, sir?
15   A   All complaints are investigated by my
16 chief deputy.  He handles every one so that I can
17 ensure that they're all looked at from the same
18 point of view, same eyes.
19   Q   Okay.  And do you know, since you've
20 become sheriff, how many complaints have been
21 investigated by your chief deputy?
22   A   I do not, but it's not many.  We haven't
23 received many.
24   Q   Do you recall any that have resulted in
25 the discipline of an officer?  I know you testified

Page 234

RANDALL TUCKER

1
2     A   Right.
3     Q   What does that mean?  I don't know what
4  that means.
5     A   A party to.  Involved with.
6     Q   Whose burglary did they assist?
7     A   I don't remember the young man's name.
8     Q   Okay.  And how do you know -- what causes
9  you to believe that they were an accessory to
10  burglary?
11    A   The state statute on failure to report an
12  offense, and they didn't do that.  And they, I
13  believe, assisted with a mat or a towel or some type
14  to keep the man that was breaking into the house
15  from cutting his arm or -- to me that's helping.
16    Q   You believe they helped the perpetrator,
17  I'm sorry, do what with his arm?  I'm not
18  understanding what you're saying how they helped the
19  perpetrator.
20    A   Handed him something to lay across the
21  window to keep from cutting his arm.
22    Q   Okay.
23    A   Is that your question?
24    Q   That is my question, yes.
25    A   Okay.

Page 235

RANDALL TUCKER

1
2     Q   Give me one minute.  (PAUSE)  And who told
3  you that they gave the suspect something with
4  respect to his arm?
5     A   I don't recall who told me or where I read
6  it, and it's possible I may have two incidents
7  confused.  I mean, he may -- maybe they watched for
8  him while he carried off glass or what-have-you.  I
9  don't have the offense report here in front of me.
10    Q   Okay.  And then you, also, believe that
11  they were an accessory to burglary because they did
12  not report the burglary?
13    A   Right.  In the state of Mississippi, it's
14  a law that if you witness a crime, you're supposed
15  to report it.
16    Q   So if one of your officers witnesses
17  somebody driving without a seatbelt and he fails to
18  report it, he or she is committing a crime?
19    A   No.
20    Q   Okay.  But the Khadafys, I'm sorry, the
21  Mannings, if they were to witness a crime and not
22  report it, they would be violating the law?
23    A   Yeah.
24    Q   Okay.  You're aware that there was an
25  altercation inside the apartment in which

Page 236

RANDALL TUCKER

1
2  Mr. Manning and his wife were located that night?
3     A   What do you mean by "altercation"?
4     Q   Officers went into their apartment?
5     A   Correct.
6     Q   Do you know why they went into the
7  apartment?
8     A   They were pursuing them for being involved
9  in what had transpired downstairs, yes.
10    Q   Okay, and, again, the involvement was
11  giving something to the person whose arm was used to
12  break into a house or an apartment and not reporting
13  it?
14    A   Anything they did to assist, whether it be
15  a lookout or hand him something or give him
16  guidance, they would be involved in that, yes.
17    Q   Which of those did Mr. Manning and his
18  wife do?
19    A   I don't have the report here in front of
20  me.
21       MR. ROSS:  I was going to say I
22       object.  He doesn't have the report and
23       doesn't have first-hand knowledge.
24    Q   (Mr. Youngwood)  Well, I'm asking what you
25  were told.  Did somebody tell you that they assisted

Page 237

RANDALL TUCKER

1
2  or gave them guidance or helped him plan an escape
3  route or any of the things you just listed?
4       MR. ROSS:  Counsel, why don't you
5       give him the incident report if you're
6       want him to --
7       MR. YOUNGWOOD:  Because I'm asking
8       his knowledge.  He is a named defendant in
9       this case.
10      MS. ROSS:  To the extent you know,
11      but if you don't know, you don't know.
12    A   I don't know without reviewing the report.
13    Q   (Mr. Youngwood)  One moment, please.  Did
14  anyone tell you, sir, independent of any written
15  report, and I will show you the reports in a moment,
16  did anyone tell you orally what happened that
17  evening?
18    A   I don't recall that, no.
19    Q   So you have never had any discussions with
20  anyone regarding, in your department regarding what
21  happened with Mr. Manning and his wife that evening?
22    A   I can't say that either.  It's very
23  possible I did.  I just told you I don't recall it.
24    Q   Okay.  You're aware that there are
25  allegations regarding that evening in the complaint

Page 238

RANDALL TUCKER

1
2 in this case; correct?
3      A   Yes.
4      Q   And you have read the complaint in this
5 case; correct?
6      A   Yes.
7      Q   And you have read that section of the
8 complaint?
9      A   Yes.
10      Q   Okay.  And prior to the complaint being
11 filed, you're aware that there was a, you learned
12 that there was a video of a portion of the events of
13 that evening?
14      A   I don't remember at what point, but I
15 became aware there was a video at some point, yes.
16      Q   Okay.  And that video and that -- uh --
17 the events of that night led to an inquiry led by
18 Chief Williams regarding that evening; correct?
19      A   I don't know that it was necessarily that
20 video or other, or circumstances, you could ask him
21 that, but I'm aware of a video.
22      Q   Okay, have you seen the video?
23      A   Yes, I have.
24      Q   Okay.  All the way through?
25      A   I have seen the whole one.  Not a clip.

Page 239

RANDALL TUCKER

1
2 Narrated.
3      Q   Okay.  So you have seen the whole video?
4      A   Yes.
5      Q   And you -- did you take any disciplinary
6 action regarding the officers involved in that
7 incident, based on that video?
8      A   No.
9      Q   Did you see any inappropriate behavior in
10 that video?
11      A   No.
12      Q   It's acceptable for your officers to call
13 people a cripple?
14           MR. ROSS:  Object to the form.
15      A   I don't know that he called anybody a
16 cripple.
17      Q   (Mr. Youngwood) Okay.  You've watched the
18 video though; correct?
19      A   I have.  Yeah.
20      Q   Okay.  And is it acceptable for your
21 officers to tell citizens that they have a choice of
22 being a witness or a suspect in connection with an
23 event?  Is that an acceptable thing for them to say?
24      A   They can explain the law to them.  I don't
25 know that anybody said that.

Page 240

RANDALL TUCKER

1
2      Q   Okay.  But you have watched the video?
3      A   I have.
4      Q   Okay.  And is it acceptable for your
5 officers to tell individuals that if they don't
6 cooperate, they'll have to sleep on concrete?
7      A   Well, I guess if there is no room in the
8 jail, they would sleep on concrete.  Ultimately,
9 everything down there is on concrete, so that would
10 be a true statement.
11      Q   So that is acceptable to you?
12      A   Yes.
13      Q   Is it acceptable for officers to use the
14 word "horseshit" when interviewing citizens?
15           MR. ROSS:  Objection.  No context.
16      Q   (Mr. Youngwood)  Is that an acceptable
17 term for your officers to use?
18      A   I would prefer they didn't cuss at all,
19 but, you know, each situation is unique.
20      Q   So that's not a violation of any of the
21 ethical or other policy provisions you and I
22 reviewed this morning?
23      A   Saying horseshit?
24      Q   Yes, sir.
25      A   No, it's not a violation.

Page 241

RANDALL TUCKER

1
2      Q   Okay.  How about calling people cripple.
3 Is that a violation?
4           MR. ROSS:  Objection.  No context.
5      Each situation is different.
6      A   I don't know that anybody called anybody
7 crippled.
8      Q   (Mr. Youngwood) Okay.  And is it
9 acceptable to you to tell a witness to an alleged
10 crime that they can either put it down on paper or
11 they're just as guilty as the perpetrator and the
12 person has to go to jail?
13      A   I think it's perfectly acceptable to
14 explain to someone their options.
15      Q   And a legitimate option is either you give
16 a witness statement or you go to jail?
17           MR. ROSS:  Object to the form.  No
18 context.
19      A   I don't know what you mean by a legitimate
20 option.  Options are options.  I don't know that
21 there's an illegitimate option.
22      Q   (Mr. Youngwood) In your view, under the
23 policies and practices of your department, it's
24 acceptable to give the citizen a choice of being
25 arrested and put in jail if they will not give a

Page 242

RANDALL TUCKER

1
2 witness statement?
3    A  I think each situation is unique.  Like I
4 have told you before, in this instance, I don't
5 think he did anything wrong.
6    Q  Who didn't do anything wrong?
7    A  I'm assuming you're referring to Slade
8 Moore.  He was the officer.  That's who we're
9 talking about; right?
10    Q  We're talking about any officers at the
11 scene, but --
12    A  Okay.
13    Q  -- if you -- so you don't think Slade
14 Moore did anything wrong?
15    A  I do not.
16    Q  And his actions that night were consistent
17 with the policies and practices of your department?
18    A  I didn't say that.
19    Q  Well, I'm asking you.  Were his actions
20 that night consistent with the policies and
21 practices of your department?
22    A  I didn't say that.  I don't think that his
23 actions necessarily reflect everybody in the
24 department.  I don't know that the policy and
25 procedure prevents him from what he said or did.

Page 243

RANDALL TUCKER

1
2    Q  Let me try again, sir.
3    A  Okay.
4    Q  Did anything he did that night, to your
5 knowledge, violate any policy and procedure of your
6 department?
7    A  No.
8    Q  And he has not been disciplined in any
9 way; correct?
10    A  No, sir.
11        (Exhibit 26 marked for the record)
12    Q  Let me give you what's been marked as
13 Exhibit 22.  I'm sorry, that's the wrong exhibit.
14 26.  Do you know if you have seen this before, sir?
15 Take a minute to look at it.
16    A  This appears to be a narrative prepared by
17 my Chief Deputy Jeremy Williams and an incident
18 report reflecting that, the incident with Mr.
19 Manning.
20    Q  Okay.  Have you seen these documents
21 before, sir?
22        MR. YOUNGWOOD:  Just for the record,
23      they're Bates stamped MC-RFP-8-182 through
24      193.
25    A  I'm sure I have at some point.  I mean, I

Page 244

RANDALL TUCKER

1
2 don't know at what point, but yeah.
3    Q  (Mr. Youngwood)  Did you then discuss this
4 incident with Mr. Williams?
5    A  Yes, I'm sure I did.  We discuss just
6 about everything.
7    Q  Tell me the nature of that discussion.
8    A  I don't recall the nature of it.
9    Q  Did you discuss this incident with
10 Slade Moore?
11    A  I don't think that I did.  I think
12 probably Chief Williams did that.
13    Q  Other than your attorneys, have you
14 discussed this incident with anyone other than
15 Mr. Williams?
16    A  Not that I recall, no, sir.
17    Q  Okay.  Do you believe that the
18 investigation Chief Williams conducted into this
19 matter was sufficient?
20    A  I have every confidence, and, yes, I would
21 say it was.
22    Q  I take it you had not seen the video at
23 the time that you first saw this report, which is
24 Exhibit 26?
25    A  I think I testified that I have seen it,

Page 245

RANDALL TUCKER

1
2 but I don't know at what point I saw it.
3    Q  Have you seen it more than once?
4    A  I don't know that I have.  It's possible,
5 yes, but I can't testify 100 percent to that.
6    Q  Okay.  And are you aware that the officers
7 choked Mr. Manning that night?
8        MR. ROSS:  Object to the form.
9    A  No, I'm not aware of that.
10    Q  (Mr. Youngwood)  Okay.  Are you aware that
11 they handcuffed him?
12    A  I think at some point they did.
13    Q  And do you know why they handcuffed him?
14    A  I think he was going to jail.
15    Q  What was he going to jail for?
16    A  Being an accessory to burglary.
17    Q  And the accessory to burglary was based on
18 what, to your knowledge?  You now have the report in
19 front of you.
20    A  I'll have to read the report.
21    Q  Go for it.
22    A  (PAUSE)  Okay.
23    Q  So why was he being brought to jail?
24    A  I don't know the officer's
25 train-of-thought, but, from the report, one thing

Page 246

RANDALL TUCKER

1
2  stands out to me, they were standing there with him
3  and discussing or talking with him while he was
4  breaking out the window and carting off the glass,
5  and then allowed him to go, run upstairs, he ran
6  upstairs with Quintetta (sic) and Kenyatta into the
7  apartment, so the first thing, when they saw the
8  deputy, so one of the first things that would come
9  to my mind that they would be aiding and abetting by
10 allowing or helping him or concealing his position
11 from authorities, for one.  Uh -- the fact that
12 they're there as lookouts would be another.  That's,
13 in my eyes, aiding in a way.
14     Q   Sir, where does it say that they were
15 lookouts?
16     A   I didn't say that they were there.  I said
17 if they were there and they ran with him.  I said I
18 don't know the officer's train of thought.
19     Q   So you don't know why they were taking him
20 to jail?
21     A   No, we'd have to ask Slade Moore that.
22     Q   Okay.  And nothing in this report tells
23 you why they were taking them to jail?
24     A   I didn't see anything as a reason he took
25 him into custody.

Page 247

RANDALL TUCKER

1
2     Q   You don't see any reason why he took him
3  into custody?
4     A   I said I don't see anything in here as to
5  why he took him into custody.
6     Q   Well, is there some report -- this
7  includes an incident report and a write-up by Chief
8  Williams and a three-page letter or memo by
9  Slade Moore.  Is there other material we should look
10 at to try and to determine why Mr. Manning was being
11 taken to jail?
12     A   Well, his confession right here.
13     Q   His confession?
14     A   Yeah.  He said he knocked on the door.  He
15 was -- uh -- I don't remember the young man's name
16 right now because it's on the other page.  He had
17 knowledge that the man was fixing to break in his
18 baby's girl's house to get a TV out, and he went
19 with him.  So he had knowledge of what was going to
20 happen when he went downstairs.  And that's his
21 words, not mine.
22     Q   I see.  And do you think it's possible
23 Mr. Manning was under some threats from your
24 officers at the time he wrote this?
25     A   No, I don't.

Page 248

RANDALL TUCKER

1
2     Q   Okay.  And you don't believe that, based
3  on the video that you have seen?
4     A   Absolutely not!
5     Q   Let's look at the video.
6     A   Let's do that.
7         (VIDEO PLAYED OFF RECORD)
8         (VIDEO STOPPED)
9     Q   (Mr. Youngwood)  Is that an inappropriate
10 statement by your officer, sir?
11     A   I don't know what the bond is, but it very
12 well could be.
13     Q   Well, do you think that's a fair threat to
14 impart on a witness, sir?
15     A   I don't know that that was a threat.
16     Q   Okay.  So you think telling them they come
17 clean or they can go down to jail is an acceptable
18 thing for your officer to say?
19     A   Well, that was his intention right there,
20 I believe.  He was going to take them to jail.
21     Q   So you have no problem with the tape up
22 until now?
23     A   Not until now, no.
24         (ATTORNEY CONTINUES TO PLAY VIDEO)
25     Q   (Mr. Youngwood)  How about the use of the

Page 249

RANDALL TUCKER

1
2  word "cripple" there, sir, is that acceptable?
3     A   No, it's probably not.  Probably not the
4  best term, but he's claiming that he's crippled or
5  has claimed that he's crippled.  I think he was
6  speaking off of prior knowledge.
7     Q   Well, they're not saying that he's
8  crippled.  They're calling Him "Cripple."  Right?
9     A   You would have to ask that officer that.
10    Q   Did you take any action against
11 Officer Moore for using the phrase "Cripple"?
12    A   He said I didn't take any disciplinary
13 action on this incident at all.
14         (ATTORNEY CONTINUES TO PLAY AUDIO)
15    Q   Is that acceptable to you, sir, to tell
16 somebody they can be a witness or a suspect?
17    A   Yes.
18    Q   And what law authorizes, you believe,
19 arresting somebody for not writing a witness
20 statement?
21         MR. ROSS:  Object to the form.
22    A   What law does what now?
23    Q   (Mr. Youngwood)  You've told me that it's
24 illegal under Mississippi law for citizens not to
25 report a crime.  I believe that's what you told me.

---

Page 250

RANDALL TUCKER

1  
2      A   Yes.
3      Q   What law is that?
4      A   I don't remember the code section.
5      Q   But it's acceptable for police officers to
6  allow people to commit violations or crimes and not
7  arrest them; correct?
8      A   Yes.
9          (ATTORNEY PLAYS VIDEO)
10     Q   Do you agree with that statement of your
11 officer?
12     A   Yes.
13         (COURT REPORTER DISCUSSES WITH ATTORNEY
14 REGARDING THE VIDEO)
15         (ATTORNEY PLAYS VIDEO -- BACKS UP VIDEO TO
16 MAKE SURE AUDIO PORTION IS APPLICABLE TO ANSWER)
17         MR. YOUNGWOOD:  Let the record
18         reflect I have restarted the tape.  I'm
19         going to pause it two or three times to
20         get us caught up, and I will read into the
21         record approximately, as best we can, what
22         the statements were on the tape that
23         prompt my questions.  Obviously, the tape
24         speaks for itself, and my reading of it
25         doesn't change the words on it.

---

Page 251

RANDALL TUCKER
(ATTORNEY PLAYS VIDEO)

1  
2  
3      Q   (Mr. Youngwood)  So I believe this was the
4  first time I paused it earlier, sir.  The officer on
5  the tape, who is addressing Mr. Manning and his
6  wife, Quinnetta, says, "Now, you all can come clean,
7  or he can go down to jail and about Tuesday, you can
8  see a judge and get you about a
9  fifty-thousand-dollar bond for burglary."
10         My question to you is that an acceptable
11 statement?
12         MR. ROSS:  I object to the form.  You
13         left out the fact that prior to that
14         statement also Moore informed him that he
15         had seen them committing a crime.  You can
16         answer.
17         MR. YOUNGWOOD:  I don't believe
18         Officer Moore said that at all.
19         MR. ROSS:  Well, you weren't
20         listening then.  I'm sorry.  I don't mean
21         to be argumentative, but he said what he
22         saw.
23         MR. YOUNGWOOD:  The tape says what it
24         says, but there's no word "crime" prior to
25         this point on -- so I really don't know

---

Page 252

RANDALL TUCKER

1  
2  what you're talking about.
3      Q   (Mr. Youngwood)  But my question to you,
4  sir, is is that statement acceptable to you?
5      A   I haven't heard him say anything wrong to
6  this point.
7          MR. YOUNGWOOD:  And I'll just note
8          for the record the incident report
9          associated with this is June 26, 2016,
10         and, obviously, the date is what it is,
11         but my calendar tells me that's a Sunday.
12     Q   (Mr. Youngwood)  Does it trouble you at
13 all, sir, that the officer suggests that they would
14 have to sit in jail from Sunday to Tuesday before
15 they could even appear for a bond hearing?
16     A   No, it doesn't trouble me.  I think the
17 law is 48 hours.
18     Q   Let's continue.
19         (ATTORNEY CONTINUES TO PLAY VIDEO)
20     Q   I'm pausing it again.  The officer just
21 used the word "Cripple."  Specifically, said "all
22 three of you have run right up the steps, and
23 Cripple here run right up the steps, too."
24     Is it a violation of your policies and
25 procedure, sir, for the officer to call Mr. Manning

---

Page 253

RANDALL TUCKER

1  
2  a cripple?
3      A   Not when he's characterized himself as
4  that, no.
5      Q   Okay, and where in the tape that we've
6  listened to has he characterized himself as a
7  cripple?
8      A   I don't know at what point this tape
9  started.  I mean, obviously, as soon as she hit
10 record, but it was my understanding, which, I mean,
11 I don't have anything in writing, which, I mean,
12 characterized himself by saying he couldn't run up
13 the stairs because he was crippled.  I think that
14 was more of a he's claiming he's cripple and he's
15 referring to his claim.
16     Q   Well, sir, you have looked through the
17 file, which is marked as Exhibit 26, and we've
18 listened to the tape from the beginning that we have
19 it, what do you base your belief that he had
20 previously identified himself to be a cripple?
21     A   Again, it's -- uh -- for some reason it's
22 in my memory that he made that statement.  I don't
23 know if -- I don't know at what point I heard it.
24 But I'm sure Deputy Moore can clear it up for you.
25     Q   But so far still nothing about this tape

---

Page 262

RANDALL TUCKER

1  question.
2
3     Q   Do you view any of the statements by the
4  officer coercive?
5     A   No.
6     Q   So these are acceptable ways to
7  interrogate a witness?
8     A   No, what he should have done was gone on
9  and taken him to jail and gotten a statement from
10  him there.
11    Q   Do you know if Mr. --
12    A   Due to his condition, he allowed him to
13  give a statement at the scene.
14    Q   I'm sorry, "due to his condition."  What
15  condition is that?
16    A   You sit here and listen to him talking
17  about being cripple.
18    Q   And why do you believe he allowed him to
19  do it at the scene because of his physical
20  condition?
21    A   He's sitting there explaining it to him.
22        (ATTORNEY CONTINUES TO PLAY TAPE)
23    Q   The officer just said, Mr. Manning just
24  said, "What do I do?"
25        And the officer responded, "You're going to

Page 263

RANDALL TUCKER

1  jail.  I'm tired of fooling with you.  I don't want
2  to fool with you no more.  You don't want to act
3  right."
4     Is that exchange a violation of the policies
5  and procedures of the Madison County Sheriff's
6  Department?
7     A   No.
8         MR. ROSS:  And I object because it's
9         indecipherable what came before that or
10        even after that or even if counsel is
11        repeating it correctly.  But subject to
12        that, you can answer it.
13    A   No.
14    Q   (Mr. Youngwood)  Not a violation?
15    A   No.
16        (ATTORNEY CONTINUES TO PLAY TAPE)
17    Q   The tape concluded.  At the end of it, the
18  scene shifts and it seems to be moving.  The officer
19  says to Mr. Manning's wife, "You going to finish
20  this or you gone go, too."
21    Mr. Manning responds, "Man, please, man, I have
22  been shot five times in the spinal cord, man,
23  please, please, ouch!"  Is there anything about that
24  exchange cause you to believe that the policies and

Page 264

RANDALL TUCKER

1  procedures of the Madison County Police Department
2  were violated in connection with this incident?
3     A   No.
4     Q   And I'll ask you one more time, sir, what
5  law do you believe Mr. Manning was violating by
6  failing to voluntarily give a witness statement?
7     A   By failing to give a witness statement?  I
8  don't know that he violated a law.
9     Q   Well, you said earlier that it was your
10  understanding that he became an accessory to
11  burglary by refusing to report the crime?
12    A   Okay.
13    Q   That was your testimony?
14    A   Yes.
15    Q   And what is that violation in the State of
16  Mississippi?
17    A   I told you don't know the State statute.
18    Q   And if you're wrong on that, sir, that
19  there's no law that requires such reporting, would
20  that change your analysis of this tape?
21    A   No, not a bit.
22    Q   So it's perfectly acceptable for an
23  officer to give somebody a choice between submitting
24  a statement or going to jail?

Page 265

RANDALL TUCKER

1         MR. ROSS:  Object to the form.
2     A   Like I said, each situation is unique, but
3  the officer witnessed him and the other two
4  individuals.  It's admitted on the tape that they
5  went downstairs knowing what he was going to do, and
6  the officer said he was charging him as an
7  accomplice.  I think he even explained the after,
8  accessory-after-the-fact and the accomplice law to
9  burglary.  No, I don't have a problem with it.
10        MR. YOUNGWOOD:  Why don't we take a
11        break?
12        VIDEOGRAPHER:  Off record.  4:03.
13        (BRIEF RECESS)
14        VIDEOGRAPHER:  DVD 5.  Back on the
15        record.
16    Q   (Mr. Youngwood)  Sheriff Tucker, have
17  there been other incidents involving Slade Moore
18  that required investigation?
19    A   Not that I can think of off the top of my
20  head.
21    Q   Okay.  Do you know who Destiny Jones is?
22    A   I don't believe I know a Destiny Jones.
23    Q   Do you recall any investigation involving
24  Slade Moore involving Destiny Jones?

RANDALL TUCKER

1
2    A   I don't believe I know a Destiny Jones.
3    Q   And how about John Leach?  Do you recall
4  any accusations or investigations involving
5  John Leach?
6    A   I don't know a Joan Leach either.
7       (Exhibit 27 marked for the record)
8    Q   Let me give you Exhibit 27.  Let me hand
9  you what we've marked as Exhibit 27, sir.  It's MC
10  RFP 8 211 through 214.  Recover -- it's an e-mail
11  from Susan McCarty to Chief Williams and you,
12  copying others.  Do you see that?
13    A   Yes.
14    Q   And who is Ms. McCarty?
15    A   She's the former Justice Court Clerk for
16  Madison County.
17    Q   Okay.  Do you recall this e-mail?
18    A   I do not.  I see that I am copied or it
19  was sent to me.
20    Q   And you'll see it's a reference, and you
21  can turn to the second page to Jones, Destiny.  I
22  think it's last name first.  Destiny Jones?  Do you
23  see that?
24    A   I do.
25    Q   And if you look down toward the middle of

RANDALL TUCKER

1
2  the page, it says, "On or about November 27, 2016,
3  in Madison County, Mississippi," and it refers to
4  Deputy Slade Moore "did willfully and unlawfully in
5  violation of Section 99-3-28, and during the time
6  that he was acting in the scope of his official duty
7  as a sworn officer for the Madison County Sheriff
8  Department caused affiant to be put in fear of harm
9  by allowing the following to occur:  Grabbing the
10  affiant's arm, placing affiant in cuffs, and stated
11  to the affiant, 'I'm taking your ass to jail,' and
12  squeezing the affiant's arms, this occurring in
13  Madison County, Mississippi."  Do you see that?
14    A   Yes, I see.
15    Q   Do you recall any investigation into the
16  allegations contained in this affidavit?
17    A   I do not.  That would have been handled by
18  my chief deputy.
19       (Exhibit 28 marked for the record)
20    Q   I'm giving you what I'm marking as Exhibit
21  28.  It's a document with Bates Number MC RFP 8 29
22  through 8 31.
23    A   Uh-huh.
24    Q   I'll refer you to this first numbered
25  paragraph.  First of all, this is addressed to you,

RANDALL TUCKER

1
2  sir.  Do you recall receiving it?
3    A   Yes, I do.
4    Q   And it's dated March 16, 2015?
5    A   March 16, 2015, yes, sir.
6    Q   Okay.  And there are allegations in the
7  first paragraph.  This is not about Slade Moore.
8  It's about a different deputy, Brad Sullivan.  Do
9  you see that?
10    A   Yes, sir, I do.
11    Q   It says, "On October 12, 2014, Madison
12  County Sheriff Brad Sullivan, a white male police
13  officer, pointed his police-issued handgun at Daryl
14  Dozier, Ms. Domekia-Myers Dozier, wife, and Dishanta
15  -- Dishantia Dozer, daughter, age five, with the
16  intent to cause bodily harm, causing fear, stress,
17  and the family to be terrorized and that Sheriff
18  Brad stated, 'I got you niggers now,' and that
19  Sheriff Brad Sullivan used deadly force on the
20  unarmed and defenseless African-Americans.  Witness
21  written statements are available upon request."
22  Do you see that?
23    A   Yes, I see that.
24    Q   What did you do to look into the
25  allegations in this paragraph?

RANDALL TUCKER

1
2    A   I discussed it with my chief deputy.  I
3  think he, in turn, discussed it with Deputy
4  Sullivan.  I personally attempted to call Daryl
5  Dozier back at the number he provided under his
6  signature on page three of the document.  I got no
7  response.  I never did receive any type of affidavit
8  or statement.
9       There were no charges filed against the deputy.
10  The deputy denied using the terms that he's alleged
11  to have used in this allegation, and that was the
12  extent of it.
13    Q   Okay.  Have you heard the racial slur used
14  in this paragraph used at the Madison County
15  Sheriff's Department?
16    A   No, not at the sheriff's department, no.
17    Q   Have you heard it used by any of your
18  officers or deputies, even if not within the sheriff
19  department building?
20    A   No, not during my time at the sheriff's
21  office.
22    Q   Okay.  I'm not sure what you mean by
23  qualify or not during your time at the sheriff's
24  office.  So not since 2000?
25    A   Right.  Prior to 2000, I was with the

Page 270

RANDALL TUCKER

1
2   Canton Police Department, and I had an
3   African-American partner that was a good friend of
4   mine there, and I've heard him use it.
5      Q   I'm asking you about Madison County
6   Sheriff's Department, you have never heard this
7   racial slur used?
8      A   I said no.
9      Q   Have you heard other racial slurs used by
10  Madison County officers or deputies?
11     A   I'd have to know what you consider a
12  racial slur, and I'm not slighting you in any way.
13  I don't know what you would consider a racial slur.
14     Q   Well, have you heard anyone use any
15  language you would consider to be racially
16  offensive?
17     A   No, sir, not that I consider offensive,
18  no, sir.
19     Q   Go back to Exhibit 5, please, sir.  This
20  is the e-mail you forwarded on June 5th, 2009?
21     A   Yes, sir.
22     Q   If you'll go to the page, I mean Bates
23  number 460, a paragraph you and I have read earlier,
24  begins with the words, "But when I call you," do you
25  see that?

Page 271

RANDALL TUCKER

1
2      A   Yes.
3      Q   And you would agree with me all of those
4   words in that paragraph are racial slurs, sir?  I'm
5   sorry, all of the words that follow the word you,
6   down to the double dots, those are all racial slurs;
7   correct?
8      A   I'm not sure what a camel jockey is.  I
9   would agree most are, but there is some I've never
10  heard before, so I don't know what their meaning
11  are, but, in general, is.
12     Q   Have you ever heard any of these words
13  used as racial slurs by any Madison County officers
14  or deputies during your time?
15     A   No, sir, I have not.
16     Q   Okay.  Put that aside again.
17     A   Can I point something out for the record?
18     Q   Absolutely!
19     A   That was none of my employees said that.
20  That statement.
21     Q   So to help the record, the witness is
22  referring to Exhibit 5, which is an e-mail from
23  2009, we discussed this morning; correct?
24     A   Correct.
25     Q   Okay.  And I apologize forgetting

Page 272

RANDALL TUCKER

1
2   Mr. Butler, Joe Butler, is he a Madison County
3   employee?
4      A   Yes.
5      Q   So he forwarded an e-mail that said all of
6   these things; correct?
7      A   He forwarded a man's opinion.  The man's
8   opinion says those things.
9      Q   Okay, the man being Michael Richards?
10     A   I think he played Kramer.
11     Q   Right.
12     A   If I'm -- on a sit-com show.  I don't know
13  him personally.
14     Q   I don't either, but would it surprise you
15  to know, sir, that Mr. Richards didn't write this
16  e-mail and didn't say any of these things?
17     A   I don't know whether he did or not, but I
18  can tell you my employees didn't.
19     Q   Okay.  No, your employee forwarded the
20  e-mail that said these things; correct?
21     A   Correct.
22     Q   And forwarded it to numerous people, both
23  within and without the Madison County Sheriff's
24  Department; correct?
25     A   With all of those names, yes.

Page 273

RANDALL TUCKER

1
2      Q   And then you forwarded it to seven people,
3   including a number of people within the Madison
4   County Sheriff's Department?
5      A   Yes.
6         MR. ROSS:  I object to the form.
7      Let's set the record straight.  Mr. --
8      Sheriff Tucker was not the sheriff in
9      2009, so I don't think that Mr. Butler
10     would be his employee at that time.  His
11     employer at that time.
12     Q   (Mr. Youngwood)  What was Mr. Butler's
13  position at that time?
14     A   I don't know what his assignment was,
15  personally.  I mean, he was an employee of the
16  sheriff's department at that time.
17     Q   And did he report to you in any way?
18     A   No.
19     Q   Did any of the people that he sent this
20  e-mail to report to you in any way?  Do you want to
21  look at Exhibit 5 again?
22     A   There are two names on here that worked
23  for me at one point during my tenure in the
24  narcotics division, which would have been during
25  that time, but I'm not sure if they were in the

Page 274

RANDALL TUCKER

1
2  narcotics division at that time.
3      Q   Okay.
4      A   Does that answer your question?
5      Q   It does, and -- I'm sorry, sir, go ahead.
6      A   And those names are Jay Houston and
7  Taylor Chastain.
8      Q   Thank you.  And did you -- I'm sorry, any
9  of the people that you forwarded it to, were they
10 reporting to you?
11     A   Let me pull it back up.  I apologize.
12 Well, one of the ones is Taylor Chastain, and,
13 again, I don't know if it was during that period or
14 not.  And Trey Curtis is in narcotics.  Tommy Jones
15 was in narcotics.  And John Martin Harris was in
16 narcotics.  I don't have the relevant dates of their
17 tenure in narcotics, but at one point, all of those
18 did.
19     Q   Terry Barfield was one of your colleagues
20 that passed away recently; is that correct?
21     A   Yes, sir.
22     Q   Did you ever hear him use a racial slur,
23 sir?
24     A   No.
25     Q   Okay.  And was there a Kristy, who is a

Page 275

RANDALL TUCKER

1
2  dispatcher at some point in 2013, in the Madison
3  County Sheriff's Department?
4      A   I don't recall a Kristy.  I'm not saying
5  there wasn't.  I mean, if she was, she was.  I don't
6  recall her.
7      Q   There was a case, sir, a Robert Cooper
8  brought in the Southern District of Mississippi in
9  2013 against you in your official capacity.  Do you
10 recall that litigation?
11     A   No, sir I don't.
12         (Exhibit 29 marked for the record)
13     Q   I'll give you what we'll mark as Exhibit
14 27? I'm sorry, 29.  Thank you.  Does this refresh
15 your recollection of the existence of the Cooper
16 versus Tucker case from 2013?
17     A   Can I have just a moment to review it?
18     Q   Absolutely!
19     A   It doesn't ring a bell, but I've got it
20 here in front of me.
21     Q   Okay.  If you go to paragraph seven,
22 there's a reference to a Lieutenant, it's a little
23 hard for me to read, but it looks like -- uh --
24 Pot-scar-by?
25     A   Potskarby.

Page 276

RANDALL TUCKER

1
2      Q   Yes.  Is that somebody who works or used
3  to work at the Madison County Sheriff's Department?
4      A   Yes, he did.
5      Q   And you'll see there allegations regarding
6  the lieutenant, made by plaintiff, regarding racial
7  jokes, racial remarks; do you see that?
8      A   Yes, I see that.
9      Q   Are you aware of any such remarks being
10 made by the lieutenant?
11     A   No, I'm not.
12     Q   This may be a hard question to answer, but
13 it sounds like you don't recall the lawsuit.  Do you
14 recall any investigation into whether such remarks
15 were made?
16     A   Uh -- no, I personally don't know that,
17 no.
18     Q   Okay.  You can put that to the side, sir.
19 Do you recall allegations against Deputy
20 Weisenberger concerning excessive force made in
21 2014?
22     A   No, I don't.
23         (Exhibit 30 marked for the record)
24     Q   I'm going to give you what we're marking
25 as Exhibit 30.  Do you recognize this as an -- I'm

Page 277

RANDALL TUCKER

1
2  sorry -- an investigatorial report prepared by
3  Chief Williams?
4      A   This is a narrative with his -- yeah, it's
5  a narrative.  Yes, of his.
6      Q   And you see about four lines down to the
7  narrative, what regards Deputy Thames?
8      A   Deputy Tims (sic).
9      Q   Tims (sic)?
10     A   Yes.
11     Q   And you see allegations of excessive
12 force? I'm sorry, I completely bumbled this.  The
13 allegations, I believe, are being made by Deputy
14 Thames; is that right?
15     A   That's what this says, yes.
16     Q   And they concern Deputy Weisenberger;
17 correct?
18     A   Yes.
19     Q   Okay.  And a sentence down, "Deputy Thames
20 stated that the last name of Fyer as the possible
21 last name of the subject arrested and that he was
22 struck while in handcuffs by Deputy Weisenberger."
23 Do you see that?
24     A   That's what it says, yes.
25     Q   And do you recall this incident?

Page 278

RANDALL TUCKER

1
2    A   No, I do not.
3    Q   Okay.  Do you recall whether any action
4  was taken directed at Deputy Weisenberger as a
5  result of this incident?
6    A   It's possible, but I don't know.  I don't
7  recall the incident, itself.  If there is, it would
8  be reflected in his file.
9          (Exhibit 31 marked for the record)
10   Q   Going to give you what we're marking as
11  Exhibit 31, MC e-mails 264.  This is an e-mail from
12  March of 2014, from Susan McCarty to what appears to
13  be you and Chief Williams.  Do you see that?
14   A   Yes.
15       MR. ROSS:  Is this Exhibit 31?
16       MR. YOUNGWOOD:  Yes.
17   A   I think he said 32, but it is 31.
18   Q   (Mr. Youngwood)  It is 31.  I do
19  apologize.  Do you see the e-mail, sir, that is
20  marked as Exhibit 31, Bates Number MC e-mails 264?
21   A   Yes, I see this.
22   Q   Okay.  Do you recall receiving this?
23   A   Vaguely.  Yes.  I think this was a -- if
24  I'm not mistaken, and, again, I don't have a report
25  in front of me.  I think this was from an incident

Page 279

RANDALL TUCKER

1
2  at Velma Jackson High School, if I'm not mistaken.
3    Q   Okay.  And the individual being referenced
4  is Chuck McNeal?  Do I understand that correctly?
5    A   Yes.
6    Q   Okay, and that's one of your officers or
7  deputies?
8    A   He is the jail administrator.
9    Q   Do you know what came of this accusation,
10  sir?
11   A   I think it was dismissed.  And, again,
12  don't hold me to that because I don't recall.  But
13  had it been adjudicated guilty, there would have
14  been some action against the officer.
15   Q   Was any action taken against the officer?
16   A   Not that I recall, no, and that's the
17  reason I'm assuming it was dismissed.
18   Q   Was any investigation done of the officer?
19   A   If this is the incident that I'm thinking
20  about, yes, my chief deputy would have handled it.
21   Q   Okay.  And do you recall the results of
22  that investigation?
23   A   I'm assuming there was no action taken if
24  it was dismissed.  But, again, I don't have it in
25  front of me, and I'm not even sure that's the

Page 280

RANDALL TUCKER

1
2  incident.  I recall an incident with a Murray and
3  Chuck at Velma Jackson, but I can't swear that this
4  is in reference to that incident.
5    Q   Okay.  Prior to this lawsuit, have you
6  ever been made aware of racial discriminatory
7  practices within your department?
8        MS. ROSS:  Object to the form.  It
9        assumes he's been aware through this
10       lawsuit, but you can answer.
11   A   I'm sorry to both of you.  I didn't
12  understand either one of you.  (LAUGHTER)
13   Q   (Mr. Youngwood)  I'll ask it differently
14  which should address the objection and perhaps make
15  the question easier.  Prior to this lawsuit, sir,
16  have you ever been made aware of any allegations of
17  racially discriminatory practices within the
18  Madison County Sheriff's Department?
19   A   While I've been the sheriff?
20   Q   Many times since 2000?
21   A   I think I testified earlier that I think
22  there were some racial overtones toward roadblocks
23  when Toby was sheriff, that they marched about, but
24  other than that, no.
25   Q   Okay.  How about the Gibson complaint,

Page 281

RANDALL TUCKER

1
2  sir?
3    A   What about it?
4    Q   That contains allegations of racial
5  discriminatory practices.
6    A   Oh, that's part of this lawsuit.
7    Q   No, it's not, sir.
8    A   Well, he's mentioned in there, so.
9    Q   Well, I'm speaking of his lawsuit, sir.
10   A   Okay.  Well, I apologize.
11   A   Yeah.
12   A   What about it?
13   Q   Were you made aware through that lawsuit
14  of racially discriminatory practices?
15       MR. ROSS:  Object to the form.
16   Q   (Mr. Youngwood)  Within your department?
17   A   I was not, but he claims in his lawsuit he
18  did.
19   Q   He claims in his lawsuit he did what, sir?
20   A   He claims that he told me or me and chief
21  deputy, one of us, about the allegations, but that's
22  false.  He didn't ever tell me anything about any
23  racial profiling.
24   Q   Okay.  And how about Lieutenant Sandridge?
25  Do you understand that he told Lieutenant Sandridge