**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON
HERBERT ANTHONY GREEN; KHADAFY MANNING;
QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS
SINGLETON; STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER, individually and on
behalf of a class of all other similarly situated**         **PLAINTIFFS**

**v.**         **CIVIL ACTION NO. 3:17-cv-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL C. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities**         **DEFENDANTS**

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON
THE CLAIMS OF PLAINTIFF LAWRENCE BLACKMON**

---

Defendants Madison County, Mississippi, and Sheriff Randall C. Tucker, by and through

counsel, file the following Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 on the

individual and class-based claims of Plaintiff Lawrence Blackmon:

1.     Lawrence Blackmon filed this action along with nine other plaintiffs alleging that

the Madison County Sheriff's Department ("MCSD") has a top-down policy of intentional race

discrimination.  Blackmon's claims are based on two primary allegations: (1) that the MCSD

entered and searched his home on December 8, 2015, to arrest his cousin, Herbert Anthony Green;[1]

and (2) that Blackmon has been stopped by MCSD deputies at safety checkpoints (or roadblocks)

in Madison County.  *See* Complaint [Dkt. # 1 ¶¶ 191-204].  Blackmon alleges that these alleged

---

[1] Green is also a named as plaintiff in this lawsuit but has indicated that he no longer wants to participate.
A motion to dismiss his claims for failure to prosecute is currently pending.  [Dkt. # 182].  Green was not
at the home on December 8, 2015, and his claims are not related to the events that day.

acts constitute Fourth Amendment violations intentionally committed against him because he is Black, and he further alleges that the MCSD's purported policy of intentional race discrimination violates 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  He seeks injunctive and declaratory relief on behalf of himself and a purported class of individuals he defines as:

> People who (1) are, or who appear to be, Black and those in their company, and (2) were, are, or will be in Madison County, and (3) were, are, or will be, subject to the MCSD's policy, custom, and/or practice of systematically executing unreasonable searches and seizures of person, homes, cars, and property on the basis of race."

[Dkt. # 1 ¶ 300].

2.      Summary judgment should be granted on both Blackmon's § 1983 and Title VI claims.  It is undisputed that the officers who entered his home had a valid arrest warrant listing Blackmon's home as the residence where Green might be found.  This authorized the deputies to enter the home to conduct a search for Green.[2]  Further, Blackmon offers no evidence whatsoever to support his claim that the alleged entry into his home was the result of a top-down policy of intentional race discrimination.  He likewise offers no evidence to support his allegation that the checkpoints where he was stopped constituted a Fourth Amendment violation, much less that they were established as part of a top-down policy of intentional race discrimination.[3]

## **EXHIBITS**

3.  In support of this Motion, Defendants rely in part on the following exhibits:

---

[2] Although Blackmon alleged in ¶ 197 of his unsworn complaint [Dkt. # 1] that the officer searched areas too small to hold a person, there is no evidence to support this allegation, and Blackmon did not testify that they conducted such a search in his deposition.

[3] Blackmon has abandoned his claim that the MCSD only sets up checkpoints in predominantly Black neighborhoods, which he first asserted in ¶¶ 4 and 203 of his complaint [Dkt. # 1], but did not include in the list of MCSD policies he claims sanction or encourage" unreasonable searches and seizures or racial discrimination" when supplementing his responses to an interrogatory inquiring about these policies.  *See* Blackmon's Third Supplemental Response to Interrogatory No. 8 of Defendants' First Set of Interrogatories, (Exhibit A).

Exhibit 1    Blackmon's Third Supplemental Responses to Defendants' First Set of Interrogatories; and

Exhibit 2    Affidavit of Scott McDonald;

Exhibit 3    Excerpts from Blackmon's deposition.

Defendants also rely on the Memorandum of Authorities submitted herewith.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that this Court dismiss all of Plaintiff Lawrence Blackmon's claims with prejudice pursuant to Fed. R. Civ. P. 56(a).

Respectfully submitted this 14th day of March, 2018.

> **MADISON COUNTY, MISSISSIPPI, and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**
>
> BY:    *s/ James E. Graves, III*
> Michael B. Wallace (MSB #6904)
> Charles E. Ross (MSB #5683)
> James E. Graves, III (MSB #102252)
> Charles E. Cowan (MSB #104478)
> WISE CARTER CHILD & CARAWAY, P.A.
> Post Office Box 651
> Jackson, Mississippi  39205-0651
> Telephone: 601-968-5534
> Facsimile: 601- 944-7738
> mbw@wisecarter.com
> cer@wisecarter.com
> jeg@wisecarter.com
> cec@wisecarter.com
>
> and
>
> T. Russell Nobile (MSB #100682)
> WISE CARTER CHILD & CARAWAY, P.A.
> 2510 14th Street, Suite 1125
> Gulfport, Mississippi  39501
> Telephone: 228-867-7141
> Facsimile: 228-867-7142
> trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi  39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi  39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
Telephone: 601-987-5300
lhester@pbhfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Graves, III, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 14th day of March, 2018.

*s/ James E. Graves, III*
JAMES E. GRAVES, III

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFF LAWRENCE
BLACKMON'S THIRD
SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF
INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Lawrence

Blackmon ("Plaintiff"), by and through his attorneys, hereby submits the following supplemental

responses and objections to Interrogatories Nos. 8 and 14 of Defendants' First Set of

Interrogatories served by Defendants on Plaintiffs on September 22, 2017 (collectively, the

"Interrogatories," and each an "Interrogatory").  The Third Supplemental Responses and

Objections set forth below are made in further response to the Interrogatories and supplement the

Responses and Objections previously served by Plaintiff.



## GENERAL OBJECTIONS

Plaintiff hereby incorporates by reference the General Objections set forth in his Responses and Objections to Defendants' First Set of Interrogatories dated October 20, 2017, his Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated November 10, 2017, and his Second Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated January 10, 2018.  Plaintiff asserts those General Objections as to each Interrogatory, whether or not such objections are repeated below in response to each individual Interrogatory.

### SPECIFIC THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO INTERROGATORIES NOS. 8 AND 14

**Interrogatory No. 8:**

Please identify and describe in detail the form and substance of any policy or procedure of the Defendants or the Madison County Sheriff's Department you contend constitutes a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination. For each such policy, please state:

(a)     the name of the policy;

(b)     the terms of the policy;

(c)     the date it went into effect;

(d)     the means by which it went into effect;

(e)     how you learned of such policy; and

(f)     the name, address, and telephone number of the person who provided it to you.

**Supplemental Response to Interrogatory No. 8:**

In addition to the General Objections incorporated herein by reference, Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information already in the possession, custody, or control of or that is known to, equally available to, or solely available to Defendants.  Plaintiff further objects to this Interrogatory on the grounds that it seeks information that is protected

2

from disclosure by, or disclosure of which is prohibited or restricted under, any privilege or

immunity, including the attorney-client privilege, the work product doctrine, the joint defense

privilege, the common interest privilege or any other applicable privilege, immunity or limitation

on discovery.  Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly

burdensome.  Plaintiff further objects to this Interrogatory because class certification-related

discovery is ongoing and incomplete, and to the extent that this Interrogatory purports to require

Plaintiffs to marshal evidence in support of any right or claim.  Plaintiff also objects to this

Interrogatory as vague, overbroad, and unduly burdensome.  Plaintiff further objects to this

Interrogatory on the grounds that it requests information regarding counsel's preparation of the

case on behalf of the named Plaintiffs and the proposed class, rather than information that is

within the personal knowledge of Plaintiff.  Any information provided by Plaintiff in response to

this Interrogatory is provided subject to and without waiver of these objections and

qualifications.

Subject to and without waiver of the foregoing objections, and in addition to the

information previously provided by Plaintiff in response to this Interrogatory, Plaintiff states that

policies and procedures of Defendants or the Madison County Sheriff's Department that

constitute a policy sanctioning or encouraging unreasonable searches and seizures or racial

discrimination include, but are not limited to:

- The Madison County Sheriff's Department's policy, custom, and/or practice of

  conducting vehicular roadblocks without appropriate procedural safeguards, including (i)

  roadblocks conducted using unmarked cars, (ii) roadblocks conducted using cars without

  emergency lighting engaged and/or using flashlights as a primary light source, (iii)

  roadblocks conducted by plainclothes or undercover officers, including narcotics officers

and members of the "NET Team," "Jump Out Detail," and/or "Apartment Detail," (iv) roadblocks conducted in inadequately lit areas, (v) "roving" roadblocks, and (vi) roadblocks at which officers do not stop every car, but instead use their discretion to only stop certain vehicles.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which officers require persons other than the driver to produce identification or provide other information, or otherwise search or detain persons without reasonable suspicion or probable cause.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which Madison County Sheriff's Department personnel stop, question, detain, and/or search pedestrians in the vicinity of the roadblock without reasonable suspicion or probable cause and/or on the basis of race.

- The Madison County Sheriff's Department's policy, custom, and/or practice of stopping, questioning, detaining, and/or searching pedestrians travelling through majority-Black areas of Madison County without reasonable suspicion or probable cause and/or on the basis of race, including as implemented by narcotics officers and members of the "NET Team," "Jump Out Detail," and/or "Apartment Detail."

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks for the purpose of checking for outstanding warrants, including but not limited to as described in the Notices produced at (i) MC T. CHASTAIN LAPTOP 17, (ii) MC MAD. COUNTY MAIN SERVER 1, and (iii) MC – SANDRIDGE DESKTOP 23, as well as the Notice annexed to the Complaint and the incident report produced at Bates numbers MC-RFP-Inc. Rep. 010886-010887.

- The Madison County Sheriff's Department's policy, custom, and/or practice of disproportionately conducting traffic stops in majority-Black areas, conducting pretextual traffic stops on the basis of race, and disproportionately issuing citations to and making arrests of Black individuals during traffic stops.

- The Madison County Sheriff's Department's policy, custom, and/or practice of discriminatorily arresting, citing, and/or charging Black individuals at higher rates, and/or with greater severity, than white persons engaged in the same or similar conduct.

- The Madison County Sheriff's Department's policy, custom, and/or practice of entering the homes of Black residents of Madison County without warrants or other valid legal justification in the course of serving warrants and/or conducting investigations, and of conducting unreasonable and warrantless searches of such premises in connection therewith.

- The Madison County Sheriff's Department's deliberate indifference to violations of the Fourth and Fourteenth Amendments by its personnel, as demonstrated by (i) the Madison County Sheriff's Department's failure to adequately train, supervise, and/or discipline officers with respect to unconstitutional policing practices and with respect to officers' exercise of discretion in conducting law enforcement activities, (ii) the Madison County Sheriff's Department's failure to adequately investigate or otherwise respond to citizen complaints, (iii) the Madison County Sheriff's Department's failure to maintain data and/or statistics regarding incidents involving the use of force and the racial composition of persons subject to the Madison County Sheriff's Department's policing activities, and (iv) the Madison County Sheriff's Department's culture of racial discrimination and of explicitly or implicitly condoning, authorizing, and/or acquiescing to racially

5

discriminatory attitudes, statements, and actions by Madison County Sheriff's

Department personnel.

The policies, customs, and/or practices described above have been identified through

analysis of deposition testimony taken in this Action, documents produced by the parties, and

documents received in response to requests made under the Mississippi Public Records Act.

Plaintiff's investigation, discovery, and preparation of his case and his legal theories, through

counsel, are ongoing, and Plaintiff reserves all rights to identify other policies and/or procedures,

to clarify or refine Plaintiff's characterizations of the above-mentioned policies and/or

procedures, and/or to rely on other or additional evidence concerning any such policies and/or

procedures, including as a result of documentary or testimonial evidence that may be adduced in

this Action after the date hereof.

**Interrogatory No. 14:**

Please state the questions of law and fact you contend are common to the class your Complaint
alleges, and identify any documents related to the common questions of law and fact.

**Supplemental Response to Interrogatory No. 14:**

In addition to the General Objections incorporated herein by reference, Plaintiff objects

to Interrogatory No. 14 on the grounds that it seeks information that is protected from disclosure

by, or disclosure of which is prohibited or restricted under, the attorney-client privilege, the work

product doctrine, the joint defense privilege, the common interest privilege or any other

applicable privilege, immunity, or limitation on discovery.  Plaintiff further objects to this

Interrogatory because class certification-related discovery is ongoing and incomplete, and to the

extent that this Interrogatory purports to require Plaintiffs to marshal evidence in support of any

right or claim.  Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly

burdensome.  Plaintiff further objects to this Interrogatory on the grounds that it requests

violates the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution constitute common questions that are appropriately resolved on a class-wide basis.

The common questions of fact and/or law described above have been identified through

analysis of deposition testimony taken in this Action, documents produced by the parties, and

documents received in response to requests made under the Mississippi Public Records Act.

Plaintiff's investigation, discovery, and preparation of his case and his legal theories, through

counsel, are ongoing, and Plaintiff reserves all rights to identify other common questions of law

and/or fact, to clarify or refine Plaintiff's characterizations of the above-mentioned common

questions of law and/or fact, and/or to rely on other or additional evidence concerning any such

common questions of law and/or fact, including as a result of documentary or testimonial

evidence that may be adduced in this Action after the date hereof.

Dated: January 16, 2018

By: _/s/ Joshua Tom_
       Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Jumin Lee (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopherjumin.lee@stblaw.com
bonnie.jarrett@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiff*

10

## Verification

I hereby declare under penalty of perjury that the responses contained in the foregoing Supplemental Responses and Objections to Interrogatories propounded by Defendants, which were prepared with the assistance of counsel, are true and correct to the best of my knowledge, information, and belief.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

LATOYA BROWN, et al.                                    **PLAINTIFFS**

v.                                          **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

MADISON COUNTY, MISSISSIPPI; et al.                      **DEFENDANTS**

### AFFIDAVIT OF SCOTT MCDONALD

STATE OF MISSISSIPPI

COUNTY OF MADISON

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the jurisdiction aforesaid, the within named Scott McDonald, who after being by me first duly sworn stated on oath that he has personal knowledge and is competent to testify on the following:

1.      I am a deputy with the Madison County Sheriff's Department and in charge of serving arrest warrants issued by various courts in Madison County, Mississippi.  I held that position on December 8, 2015.

2.      On this date, I, along with Lieutenant Jeff Waldrop, attempted to serve a Chancery Court arrest warrant on Herbert Anthony Green for failure to pay child support at his known address of 320 Martin Luther King Drive, Canton, Mississippi at around 9:20 a.m.

3.      I had never met Herbert Green prior to this date, but I had confirmed that his known address was 320 Martin Luther King Drive, Canton, Mississippi.

4.      Once we arrived at the address, which was a house, I knocked on the door and heard a man inside the house ask "who is it?"  I responded to his question by telling him to come to the front door.



5.     A man came to the front door, opened the door and, after seeing that we were Sheriff's Department officers, immediately slammed the door.

6.     I told the man again to open the door and explained to him that I had a warrant for his arrest.

7.     When the man told me from inside the house that he wanted to see the warrant, I placed the warrant up against a window on the side of the front door so that he could see it.

8.     A copy of the warrant I had with me on the morning in question is attached to my affidavit as Exhibit A.

9.     The man never asked me to tell him whose name was on the warrant and never told me that he was not Herbert Green.

10.    After the man still refused to open the front door, I proceeded to make a forced entry into the house because I believed that the man I had been speaking with was Herbert Green.

12.    After I entered the house, the man continued to refuse to identify himself to me and Lieutenant Waldrop.

13.    After obtaining the man's identification, I learned that he was Lawrence Blackmon, not Herbert Green.

14.    After the incident, I prepared an incident report detailing the events.  A copy of my incident report is attached to my affidavit as Exhibit B.

15     Herbert Green was arrested on the same warrant at the same address approximately one month later by City of Canton Police officers.

2

SCOTT MCDONALD

SWORN TO AND SUBSCRIBED before me, this the ___9th___ day of March, 2018.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

LEEANN H. SANDERS
Commission Expires
March 8, 2020

3

## IN THE CHANCERY COURT OF MADISON COUNTY, MISSISSIPPI

**DEPARTMENT OF HUMAN SERVICES,**                          **PLAINTIFF**
**STATE OF MISSISSIPPI**

vs.                                                        CAUSE NO.  11-1174-C

Herbert Green                                              **DEFENDANT**
METSS # 615269131
Defendant's Date of Birth: 2-6-87

### ORDER FOR INCARCERATION                    F I L E D
                                                       MADISON COUNTY

THE STATE OF MISSISSIPPI                                   DEC 07 2015

TO ANY LAW ENFORCEMENT OFFICER                  RONNY LOTT, CHANCERY CLERK
                                                BY _____ D.C.

The Defendant, Herbert Green , was required by law to obey the Orders of the Madison County Chancery Court in the above styled cause regarding payment of child support. The Defendant has willfully failed to comply and is hereby adjudged to be in contempt of this Court.

You are hereby commanded to take the body of the Defendant, *if it be found in your county*, and incarcerate the Defendant in the Madison County Jail at Canton, Mississippi.

The Defendant may be found at the following address: 320 Martin Luther King Dr., Canton, MS 39046 .

The Defendant may be released by purging himself of contempt by paying $ 1,500 to the Department of Human Services.

SO ORDERED AND ADJUDGED on this the 4th day of December , 20 15 .

_____
CHANCELLOR

Presented to the Court by:

_____
Rutledge McMillin, Attorney for DHS

                                                F I L E D
                                                   MADISON COUNTY

                                                  JAN 08 2016

                                          RONNY LOTT, CHANCERY CLERK
                                          BY Rita Carpenter D.C.

**SHERIFF'S RETURN**
STATE OF MISSISSIPPI
COUNTY OF MADISON
I personally served the warrant
This the 5 day of January , 20 16 .
RANDALL TUCKER, SHERIFF
of Madison County, MS

_____
Deputy Sheriff

EXHIBIT
A

Complete Incident Report                                                    Page 1 of 2

 **MADISON COUNTY SO**
2941 U.S. Highway 51
Canton, MS 39046
Sheriff Randall Tucker
601-859-2345

### INCIDENT REPORT

| Incident Number | Report Date | Report Time | Day of Week | Primary Officer |
|---|---|---|---|---|
| SO15019504 | 12/08/15 | 08:59 | TUESDAY | ID# 3352  MCDONALD, SCOTT WARREN |

| Received | Dispatched | Arrived | Cleared | Occurred Between the Dates/Times Of: | |
|---|---|---|---|---|---|
| 08:59 | 08:59 | 08:59 | 09:11 | 12/08/15  08:59  and:  12/08/15  08:59 | |

| Address (House No, Dir, Street) | City | Address (Bldg, Unit, Apt) |
|---|---|---|
| 320   MARTIN LUTHER KING DR | CANTON, MS | Bldg:   Apt: |

| Premise Type | Zone/Beat | Grid/Tract | Subdivision |
|---|---|---|---|
| RESIDENCE/HOME | 10-6 AT THE SO | | ALL OTHER |

| Original Offense Description | Actual Offense Description | Weapons Involved |
|---|---|---|
| PAPER SERVICE | INFORMATION ONLY | UNKNOWN |

| UCR Description | Attempt/Completed | Forced Entry | Call Disposition |
|---|---|---|---|
| PENDING CLASSIFICATION | C | | HBO (HANDLED BY OFFICER) |

| Additional Offenses | UCR Descriptions |
|---|---|
| | |

| Additional Information/Comments |
|---|
| ATTEMPT TO SERVE // 04610Z |

| Investigator Assigned | Status of the Incident |
|---|---|
| | |

| Supervisor #1 | Supervisor #2 |
|---|---|
| WILSON, MICHAEL T | WILSON, MICHAEL T |

### PERSONS INVOLVED

| Person No 001 | Involvement INVOLVED | If Victim, Relationship to Offender (if applicable) | | | | Confidential |
|---|---|---|---|---|---|---|
| Name LAWRENCE   BLACKMON | | Race B | Gender M | HGT 999 | WGT 999 | Date of Birth |
| Age Then 30 | Age Today 031 | Hair BLACK | Eyes BROWN | Complexion BLACK | Build MEDIUM | Facial Hair UNSHAVEN |
| Social Security 000 - 00 - 0000 | Address 320 MLK DR  CANTON  MS | | | Telephone 00000 - 000 - 0000 | | |
| Employment | | Work Address | | Work Telephone 00000 - 000 - 0000 | | |
| Occupation | | Driver's License | | | | |

### NARRATIVE DATA

On 12-8-2015 at approximately 0920 hrs. Lt. Waldrop and I went to 320 MLK Dr. to serve an arrest warrant on Herbert Green for Failure to Pay Child Support from Madison County Chancery Court. Once on scene I knocked on the door and a male voice "Yelled who is it?" I stated come to the door and he stated "What did I want?" I advised him again to come to the door. A male subject opened the front door and immediately shut the door in my face. I believed that he was the subject I was looking for. I advised the subject to open the door again and he said he wanted to see the warrant. I put the warrant up against the window and he refused to open the door. I kicked the front door open and the male subject took off into another room and I pulled my firearm and told the subject the get on the ground. I placed handcuffs on the subject for our safety until we could figure out who he was. The subject refused to give

MC_REP.10 540


**EXHIBIT**
B
tabbies

me his name. While I was talking with that subject, another older male came around the corner with a loaded handgun. Lt. Waldrop took possession of the firearm until we were done.

The subject detained was identified as Lawrence Blackmon. I removed the handcuffs after three attempts with different handcuff keys. Blackmon stated "He was going to sue my white cracker ass like he did my bitch ass boss Randy Tucker." Blackmon continued to use racial slurs towards us until his father arrived on scene, Rep. Ed Blackmon. Mr. Blackmon told his son to go back into the house and apologized for his son's behavior. I explained to Mr. Blackmon why we were there and told him I was going to do a report on the incident. Mr. Blackmon said there was no need for a report and I advised him I had to do one.

MCD-RFP.10-541

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3
     LATOYA BROWN; LAWRENCE BLACKMON;
 4   HERBERT ANTHONY GREEN; KHADAFY MANNING;
     QUINETTA MANNING; MARVIN MCFIELD;
 5   NICHOLAS SINGLETON; STEVEN SMITH;
     BESSIE THOMAS; and BETTY JEAN
 6   WILLIAMS TUCKER, individually and on
     behalf of a class of all others
 7   similarly situated              PLAINTIFFS

 8
     V.           CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 9

10   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER,
11   in his official capacity; and
     MADISON COUNTY SHERIFF'S DEPUTIES
12   JOHN DOES #1 through #6,
     in their individual capacities    DEFENDANTS
13

14
          ************************************************
15

16            DEPOSITION OF LAWRENCE BLACKMON

17
          ************************************************
18

19            DATE:  THURSDAY, JANUARY 11, 2018
           PLACE:  WISE, CARTER, CHILD & CARAWAY
20              401 EAST CAPITOL STREET
                  JACKSON, MISSISSIPPI
21               TIME:  9:30 a.m.

22

23

24                BETHANY CAMMACK
             Certified Shorthand Reporter
25             Mississippi CSR No. 1526
```





EXHIBIT
3

800.211.DEPO (3376)
EsquireSolutions.com

1   complaint, what date that happened.

2       A.   I don't recall the date.

3       Q.   All right.  Do you remember what year that

4   happened in?

5       A.   I believe it happened in 2016, I believe.

6       Q.   Was it fall or winter or summer or spring?

7       A.   It wasn't summer or fall.  It was

8   winterish maybe.

9       Q.   So tell me what happened.

10      A.   It was on a weekday morning, fairly early.

11  I was in bed.  There was a very aggressive knock on

12  my grandmother's door.  And the door is actually

13  located next to my room at my grandmother's house.

14              COURT REPORTER:  Next to -- I'm

15  sorry?

16              THE WITNESS:  My room, the room I was

17  sleeping in at my grandmother's house.  And I

18  asked, "Who is it?"

19          They said, "Open the door," or "Come to

20  the door," something like that.  Very aggressive,

21  again.  And I looked out of that window to my left,

22  which is where the door is, and I saw that it was

23  two Madison County Sheriff's Department officers.

24          I then went to the door -- well, actually,

25  because the door doesn't have -- it has like a



1   stained glass, so you can't see out the door.  So I

2   went to the next -- to the -- to the left of the

3   door, which is another window in the dining room

4   area.  And I asked if they had a warrant, or asked

5   them to let me see a warrant or something like

6   that.

7           And one of the officers kind of dangled a

8   piece of paper from where he was standing.  He

9   didn't hold it -- he just kind of flashed it, kind

10  of.  Kind of like this (holding up and waving

11  paper).  And I told him that I couldn't see that.

12  I said, "I can't see that."

13          And then he went back to the door and he

14  said, "Open it or we're going to kick it in."  And

15  then they started kicking the door.  At that time,

16  I decided to open the door because I didn't want

17  them to break the door, because it's an antique

18  door.  It's a door that's older than I am.  It's

19  been there a long time.

20          So I didn't want them to break the door.

21  It's not a very heavy door, and so it certainly

22  would have broke if they kicked it another time.

23  It's still damaged now from what they did.

24          And I opened the door.  The sheriff, one

25  of them or the other -- they both had their guns



1  drawn, pointed at me.  I backed up kind of at an

2  angle with my hands up, and they put me on the

3  ground.  They put me in handcuffs.  The other

4  officer who was not handcuffing me kept the gun on

5  me.

6          They either told -- I believe they told me

7  that I was Anthony Green or asked me was I Anthony

8  Green or Herbert Green.  I told them that I was

9  not.  They asked me who I was.  I told them my name.

10          At some point, my cousin once removed,

11  who's about 65 years old -- he was living at my

12  grandmother's house also at the time.  He -- I

13  guess he heard the commotion, and he came around

14  the corner into the foyer.  And he had a registered

15  handgun with him.

16          The officers confiscated that and asked

17  him was it loaded, asked him if he had a

18  registration for the gun.  He said that he did.

19  Asked him his name.  They asked him my name.  Asked

20  him was anybody else in the house.  He said that

21  there wasn't.  I believe they asked him to sit in

22  the living room.

23          And then they proceeded to searching the

24  home.  Then they came back and asked me where my ID

25  was.  I told them where the ID was, and I guess



1      Q.   And the one you wrote "Deputy" is the one

2    who you said had the gun pointed at you while the

3    second officer was handcuffing you?

4      A.   Uh-huh (affirmative response).

5      Q.   Put an X where -- or put a star where you

6    were when they were handcuffing you.

7      A.   I was laying on the ground in the dining

8    room right here.

9                MR. GRAVES:   Let's go ahead and mark

10   this as Exhibit 3.

11       (EXHIBIT 3 WAS MARKED FOR THE RECORD.)

12               MR. TOM:   For the record, Exhibit 3

13   is -- was drawn by Mr. Graves.   And there is an

14   arrow that says "Deputy," and then there's a star,

15   and that was written by Mr. Blackmon.   Otherwise,

16   everything else to the present was drawn by

17   Mr. Graves.

18   MR. GRAVES CONTINUED:

19     Q.   Now, you said a cousin first removed, I

20   want to say is what you said, at some point was

21   also -- was in the house at that point too?

22     A.   Right.

23     Q.   How many other people were in the house at

24   that point?

25     A.   That's it.   Just me and him.



1      Q.    Where was -- what's the name of the cousin

2   we're talking about?

3      A.    His name is Darrell Evans.

4      Q.    And when you say once removed, how are you

5   related?  I mean, what's the --

6      A.    He is my --

7      Q.    -- family?

8      A.    He is my grandmother's nephew.

9      Q.    So who is his mother or father?

10     A.    His father is my grandmother's brother.

11   And his name is Wesley, I think.

12     Q.    And how long had Darrell been living

13   there?

14     A.    I don't recall.

15     Q.    Where was your grandmother at the time?

16     A.    I don't know.  She wasn't home.

17     Q.    All right.  So what room was Darrell in

18   initially when they first came to the door?

19     A.    He was in the bedroom next to my room.

20     Q.    All right.  So there's another bedroom on

21   this side?

22     A.    Uh-huh (affirmative response).

23     Q.    Back here?

24     A.    Uh-huh (affirmative response).

25     Q.    And I'm going to write "Bedroom 2" right



1   here for where you're saying he was.

2       A.   Uh-huh (affirmative response).

3       Q.   And that's where he was initially?

4       A.   Uh-huh (affirmative response).

5            MS. COWAN:   Say yes or no.

6   MR. GRAVES CONTINUED:

7       Q.   Yeah, you have to say yes or no.

8       A.   Yes, yes.

9       Q.   All right.  So when did he come out of the

10  bedroom?

11      A.   At some point after I was handcuffed.

12      Q.   And he came out holding a gun?

13      A.   Yes.

14      Q.   What type of gun was it?

15      A.   A small one.  I don't know.

16      Q.   Did he say anything when he came out?

17      A.   I don't recall him saying anything.  I

18  mean, I'm sure he said something.  I don't know

19  what it was, though.  I don't recall what it was.

20      Q.   And what happened after that?  When he

21  came around the corner with the gun, what happened?

22      A.   They asked him who he was, if the gun was

23  registered, if it was a loaded.  They asked him who

24  I was.  They took the gun.  And that was it.  They

25  asked him to sit in the living room.



```
 1        Q.   Did they ever say who they were looking

 2    for?

 3        A.   I don't remember if they ever told him who

 4    they were looking for.  They -- I assumed that they

 5    were looking for Herbert Green after they told me

 6    that I was Herbert Green.  And I explained to them

 7    that I wasn't.  So. . .

 8        Q.   And after they told you that you weren't

 9    -- after you told them you weren't Herbert Green is

10    when they were going to take the handcuffs off, but

11    they didn't have a key, is what you're saying?

12        A.   No, no.  They weren't going to take the

13    handcuffs off until after they had looked around

14    the house.

15        Q.   All right.  When you say they looked

16    around the house, what -- they were looking for --

17    they were looking for somebody?

18        A.   I don't know what they were looking for.

19        Q.   Where were they looking?

20        A.   They looked at least in the bedroom that I

21    was sleeping in.

22        Q.   And where were you at the time when they

23    went back to look?

24        A.   I was still in the dining room area.

25        Q.   Still where the X is on Exhibit 3?
```



 1      A.   Yes.  Well, I -- actually, I got up.  And

 2  in the foyer there's a bar.  I think that's what

 3  it's called.  And when I went to the door, I had my

 4  phone in my hand initially, and I had sat it down

 5  on the bar.  So while they were out disbursed into

 6  the home, I got up and I called my dad on my cell

 7  phone.

 8      Q.   Were you still in handcuffs at that point?

 9      A.   I was.

10      Q.   Were you handcuffed behind or in front?

11      A.   Behind.

12      Q.   So you were handcuffed behind, but you

13  were still able to use your phone?

14      A.   I was.  I mean, I didn't put it up to my

15  ear, but yeah, on speakerphone.

16      Q.   And so you called your dad on your cell

17  phone?

18      A.   I called him at his office.  Yeah, on my

19  cell phone, at his office.

20      Q.   And so both deputies went back --

21      A.   Correct.

22      Q.   -- to look in the bedrooms?

23      A.   Uh-huh (affirmative response).

24      Q.   And they left you basically handcuffed in

25  the front?



1      A.    Uh-huh (affirmative response).

2      Q.    And that's when you got the phone?

3      A.    Uh-huh (affirmative response).

4      Q.    And what did you say when you called your

5  father?

6      A.    I spoke to his assistant, and I told him

7  the sheriff's deputies had come into my

8  grandmother's home, they had put guns in my face,

9  and that they had handcuffed me, and that they were

10  in the house now.

11      Q.    Did you tell him then that they were

12  looking for Herbert?

13      A.    No.  I mean, I -- you know, I know what

14  they said -- I didn't know what they were looking

15  for, again.  So, no, I didn't -- I didn't explain

16  away their presence in the house, because they had

17  never adequately explained their presence in the

18  house to me at that point.

19      Q.    I'm not asking if you were trying to

20  explain them away.  I'm saying, when you were on

21  the phone --

22      A.    No, I didn't know.

23      Q.    -- with your father's assistant, did you

24  tell her that they were looking for Herbert?

25      A.    I didn't tell them anything other than



1    they had put guns in my face, that they had come

2    into the home, that I had not seen a warrant, that

3    they had handcuffed me, and that they were out in

4    the home at that point.

5        Q.   Where was your dad at the time?

6        A.   He was at his office.  Or maybe he was on

7    the way.  But he came to my -- to the house.

8        Q.   So when you were on the phone call, you

9    didn't actually speak to him?

10       A.   No.

11       Q.   But he actually showed up?

12       A.   Correct.

13       Q.   How much longer was it -- how long was it

14   after that call that he got there?

15       A.   Hmm.  Not more than ten minutes.

16       Q.   All right.  So how long were they looking

17   in the back bedroom?

18       A.   I would say the entire incident was about

19   20 minutes, maybe 15.

20       Q.   Okay.  How long were you on the phone

21   call?

22       A.   It was brief.  Maybe 30 seconds.

23       Q.   Were you still on the phone when they came

24   from out in the back rooms?

25       A.   I was not.



1      Q.   Did you ever go back there while they were

2    back there?

3      A.   To the back?  No, I didn't.

4      Q.   So when they came back into the front room

5    where you were, what happened?

6      A.   They asked -- I believe they asked my

7    cousin if I was related to Ed Blackmon.  And he was

8    like, "Yeah.  That's his son."  And then after that

9    is when they first tried to take the handcuffs off

10   me.  I was still in the dining room.  I was sitting

11   in a chair in the dining room area.  And they

12   didn't have the key.  And they went -- one officer

13   went back to the other.  He was like, "I don't have

14   the key."

15          At that point, I went into the living room

16   and sat.  Because I told them -- when he said they

17   didn't have the key, I said, "Okay.  Well, my

18   attorney's on the way, so everybody just stay here.

19   Don't leave.  Don't rush now."  Because they kind

20   of got in a hurry at that point.  I felt like they

21   were trying to like, you know, get me out of the

22   cuffs.  They wanted to make moves.

23          So I was like, you know, "Don't run now.

24   Stay.  And my attorney's on the way."  And they

25   called another officer.  Another officer arrived.



 1   He didn't have the key.  And then they called a
 2   third officer, and he had the key finally.
 3        Q.   Now, this time before you started telling
 4   them not to rush, how long had they been in there?
 5        A.   I don't know.  This had already been --
 6   well, probably about 15 minutes.
 7        Q.   And you said they called some other
 8   deputies to try to get a key.  Were they calling
 9   them on the radio or phone or something?
10        A.   I don't recall.  I don't even know if I
11   saw where they called them.
12        Q.   Well, where is the living room you went
13   and sat down in?
14        A.   Here is the foyer.  The foyer leads into
15   the living room.  There's a hallway here that goes
16   to the bedroom.  And bathroom here.
17        Q.   All right.  Write "Living Room" where you
18   just drew that square.
19        A.   (Complies.)
20        Q.   So you went and sat there, and you were
21   still handcuffed at that point because they didn't
22   have the key?
23        A.   Correct.
24        Q.   But they let you sit down on the couch
25   right there?



1      Q.   Now, this incident at the house, do you

2   believe that that resulted from racial

3   discrimination?

4      A.   I do.

5      Q.   Why is that?

6      A.   Because this is something that I have come

7   to know as something that only happens in the --

8   you know, of the jurisdiction that the Madison

9   County Sheriff's Department covers, that only

10  happens in the black areas, Flora, Canton, on that

11  side of Canton where I live.  Out in the county

12  also.

13     Q.   What is "this"?  When you say "this only

14  happens," what is "this"?

15     A.   Things like this, with sheriffs coming

16  into homes without warrants, and just generally

17  overpolicing in the community.

18     Q.   Let me back up.  You say without warrants.

19  They had paper, right?

20     A.   I don't know.  They had a piece of paper.

21     Q.   And you never saw what was on that paper,

22  right?

23     A.   No.  Because they wouldn't give me an

24  opportunity to see it.

25     Q.   So you can't say one way or the other



1   whether that was actually a warrant, can you?

2       A.   I'm saying that I did not see a warrant.

3   When I asked, they refused to provide me with an

4   opportunity to view a warrant, if there was one.

5       Q.   And, Mr. Blackmon, you're smart enough to

6   know what I'm asking you.  You never saw that paper

7   to say whether or not it was a warrant, did you?

8       A.   I never saw a warrant.

9       Q.   You never saw what was on that paper.

10              MR. TOM:  Objection.

11              MR. GRAVES:  He didn't -- he hasn't

12  answered my question.

13  MR. GRAVES CONTINUED:

14      Q.   You never saw what was on that paper, did

15  you?

16      A.   I never saw a warrant.

17      Q.   You never saw what was on that paper, did

18  you?

19      A.   I never saw a warrant.

20      Q.   You -- Mr. Blackmon, why -- I'm going to

21  -- you're going to have to answer my question.  I'm

22  not -- I'm going to keep asking.  It doesn't matter

23  if we stay here until 5:00.  You never saw what was

24  on that paper, did you?

25      A.   There was -- I never had an opportunity



1    to.

2         Q.    All right.  So you never saw it, right?

3         A.    I never had an opportunity to.

4              MR. TOM:  James --

5    MR. GRAVES CONTINUED:

6         Q.    You never saw what was on that paper, did

7    you?

8              MR. TOM:  James, you're badgering the

9    witness.

10             MR. GRAVES:  I'm not.

11             MR. TOM:  You've asked that question --

12             MR. GRAVES:  Because he --

13             MR. TOM:  -- six times.

14             MR. GRAVES:  -- won't answer the

15   question.  If you'll instruct him --

16             MR. TOM:  He's answered -- every time

17   that you have asked the question, he's given you a

18   response.

19             MR. GRAVES:  Josh --

20             MR. TOM:  You've -- we can read the

21   question back.  You've asked that same question six

22   straight times, and every --

23             MR. GRAVES:  Because he won't answer

24   it.

25             MR. TOM:  Every time, he's given a



 1   response.  He's not answering --

 2                   MR. GRAVES:  No, he --

 3                   MR. TOM:  -- that question again.

 4                   MR. GRAVES:  -- is answering that

 5   question.  You're saying "again."  He hasn't

 6   answered it yet.

 7                   MR. TOM:  Every time, he's given you

 8   a response.  I'm --

 9                   MR. GRAVES:  Well, he's given a

10   response, but --

11                   MR. TOM:  I'm instructing my client

12   not to answer because you're badgering the witness,

13   James.

14                   MR. GRAVES:  You're instructing him

15   not to answer the question?

16                   MR. TOM:  He's already answered it

17   six times.  Every time you've asked it, he's given

18   you --

19                   MR. GRAVES:  You're kidding me.

20                   MR. TOM:  -- an answer.

21                   MR. GRAVES:  We're going to call

22   Judge Anderson.

23                   MR. TOM:  Give her a call.

24                   MR. GRAVES:  Let's do that.  You're

25   kidding me.



```
 1              THE WITNESS:  Couldn't we read from
 2    the transcript?
 3              MR. TOM:  Yeah, that's probably the
 4    best way to do it.  The court reporter can read the
 5    transcript.
 6              MR. GRAVES:  Yeah.  And we can show
 7    her what I've asked him six times, and she can read
 8    that he said that -- she can read what he said.
 9    And he never answered my question of whether or not
10    he saw it.  It's a yes or no question, and he never
11    has said yes or no.  That's the only thing I'm
12    asking, yes or no, have you seen it?  I'll ask it
13    one more time before we call the Court.
14    MR. GRAVES CONTINUED:
15       Q.   Yes or no, did you see what was on that
16    paper?  Yes or no?
17              THE WITNESS:  Can I answer that?
18              MR. TOM:  Go ahead.
19              THE WITNESS:  I did not see if there
20    was anything on the paper.
21    MR. GRAVES CONTINUED:
22       Q.   Did you ever ask to see the paper?
23       A.   I did.
24       Q.   What happened at that point?
25              MR. TOM:  Objection.
```



LAWRENCE BLACKMON
LATOYA BROWN V. MADISON COUNTY, MISSISSIPPI

January 11, 2018
120

1    THE WITNESS:  Well, I --

2    MR. TOM:  He's -- you -- he's already

3  testified that they waved the piece of paper in the

4  window, and he was unable to see it.

5    THE WITNESS:  And then I told them

6  that I was unable to see it.

7  MR. GRAVES CONTINUED:

8    Q.  Well, and after you told them you were

9  unable to see it, did you ask to see it again?

10   A.  That was implicit in my can't -- in "I

11  can't" -- whether it was "I can't see that" or "I

12  can't" -- you know, whatever I said, I made it

13  clear that I could not see the -- and even besides

14  that --

15   Q.  When they got inside, did you ask them to

16  see it?

17   A.  No, no.  By the time guns were in my face,

18  it was pretty much irrelevant, the warrant was,

19  because the purpose for verification was defeated.

20   Q.  All right.  Now, Mr. Green -- was

21  Mr. Green living at that house at that time?

22   A.  He had not been living there for several

23  months by that time.

24   Q.  He had lived there before?

25   A.  He has lived there before, yes.



 1        A.    I could maybe say between and 2013 and

 2   2016.

 3        Q.    Okay.   On the ones from Martin Luther

 4   King?

 5        A.    At least one.

 6        Q.    At least one of them, you think, was

 7   between 2013 and '16?

 8        A.    Uh-huh (affirmative response).

 9        Q.    All right.

10        A.    I mean, I know -- I know at least one.   I

11   know one was probably 2015.

12        Q.    So one you know was in 2015?

13        A.    Uh-huh (affirmative response).

14        Q.    The other one, you can't be more specific?

15        A.    Between 2013 and 2015.

16        Q.    Between 2013 and 2015?

17        A.    Uh-huh (affirmative response).

18        Q.    All right.   So tell me about the one --

19   tell me what happened at the one that wasn't Martin

20   Luther King.

21        A.    They were all pretty much the same.

22        Q.    What happened at all of them?

23        A.    I pass through.   An officer come to the

24   window, asked me for my license, maybe my

25   registration or my insurance or whatever.   Show it



```
 1    to them and pass through.
 2         Q.    Was anybody else riding with you at any of
 3    these three?
 4         A.    Yes.
 5         Q.    Who was?
 6         A.    Chris Brown was with me at at least one.
 7         Q.    Which one was that?
 8         A.    The last one.
 9         Q.    And which one was the last one?
10         A.    The one in 2015-ish.
11         Q.    On Martin Luther King?
12         A.    Yes.
13         Q.    And who is Chris Brown?
14         A.    He's a friend of mine from the
15    neighborhood.
16         Q.    And where does he live?
17         A.    On Martin Luther King.
18         Q.    How old is he?
19         A.    Probably about 30.
20         Q.    How do you know him?
21         A.    From the neighborhood.
22         Q.    Do you have his contact information?
23         A.    I do.
24         Q.    What's his phone number?
25         A.    Let me find it for you.   (Looking at cell
```

