## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE BLACKMON;
HERBERT ANTHONY GREEN; KHADAFY
MANNING; QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON; STEVEN
SMITH; BESSIE THOMAS; and BETTY JEAN
WILLIAMS TUCKER, individually and on behalf of a
class of all others similarly situated,

Plaintiffs,

v.

MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL S. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,

Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**ORAL ARGUMENT
REQUESTED**

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning,

Nicholas Singleton, Steven Smith, Bessie Thomas and Betty Jean Williams Tucker ("Plaintiffs")

ask the Court, pursuant to Federal Rule of Civil Procedure 23, to certify that they are proper

representatives of the class and subclasses of all persons similarly situated, and permit this

litigation to proceed as a class action pursuant to Rule 23(b)(2), and to appoint the undersigned

counsel as counsel for the class, pursuant to Rule 23(g).[1] Pursuant to L.U. Civ. R. 7(b)(6)(A),

---

[1] Plaintiffs do not seek certification of Herbert Anthony Green or Marvin McField as class
representatives.  Motions to dismiss the claims of Mr. Green and Mr. McField for lack of prosecution are
pending; Plaintiffs do not oppose dismissal of Mr. Green's and Mr. McField's claims, but contend that
dismissal should be without prejudice.  *See* ECF Nos. 180-183 (Defendants' Motions to Dismiss claims of
Marvin McField and Herbert Anthony Green), 203-206 (Plaintiffs' Responses); 207-208 (Defendants'
Rebuttals).

Plaintiffs respectfully request oral argument on this Motion.

Plaintiffs are Black persons who have suffered, and remain at risk of suffering, deprivations of their civil rights protected by the United States Constitution[2] as a result of the policies, and/or longstanding customs and practices of the defendants, Madison County, Mississippi and Sheriff Randall Tucker, sued herein in his official capacity ("Defendants").

As set forth in Plaintiffs' Memorandum of Law in Support of this Motion, Plaintiffs have developed substantial evidence of Defendants' policy of stopping and searching Madison County's Black citizens on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment (the "Policing Program"). The Policing Program is executed by the Madison County Sheriff's Department ("MCSD") at the direction of Sheriff Tucker.

One of the key components of the Policing Program is the disproportionate placement of roadblocks in predominantly Black neighborhoods (the "Roadblock Program"). Such roadblocks are established to further a primary purpose of general crime control in these communities. The Roadblock Program thus runs afoul of both the Fourth and Fourteenth Amendments. Another essential component of the Policing Program is Defendants' policy of suspicionless stops and searches in majority-Black neighborhoods, particularly in the vicinity of the majority-Black apartment complexes located in and around the city of Canton (the "Pedestrian Stop Program"). MCSD deputies routinely stop Black individuals and ask to see their identification when they are on their way to work, returning to their homes, or walking with friends. The Pedestrian Stop Program also violates both the Fourth and Fourteenth Amendments.

---

[2] In addition to their constitutional claims brought pursuant to 42 U.S.C. § 1983, Plaintiffs also assert a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Conduct that violates the Equal Protection Clause also violates Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.").

Pursuant to Rule 23(b)(2), the Named Plaintiffs seek to represent a class of all Black persons who presently or in the future will reside in or travel through Madison County (the "Targeting Class") in order to obtain injunctive and declaratory relief to remedy the constitutional violations caused by the Policing Program. Plaintiffs also seek to represent two subclasses in order to obtain declaratory and injunctive relief to remedy the constitutional violations caused by the Roadblock Program and the Pedestrian Stop Program.

The first subclass consists of all Black persons who travel or will travel by car through majority-Black areas of Madison County. These persons have been or are likely to be stopped at roadblocks established by the MCSD based on racially discriminatory criteria and/or for purposes of general crime control (the "Roadblock Subclass"). Named Plaintiffs Lawrence Blackmon, Latoya Brown, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker seek certification as representatives of the Roadblock Subclass.

The second subclass consists of all Black persons who travel or will travel by foot in Madison County's majority-Black neighborhoods. These persons have been or are likely to be subject to searches and/or seizures by the MCSD without reasonable suspicion or probable cause, and/or on the basis of their race (the "Pedestrian Stop Subclass"). Named Plaintiffs Latoya Brown, Khadafy Manning, and Steven Smith seek certification as representatives of the Pedestrian Stop Subclass.

As further described in their Memorandum of Law in Support, Plaintiffs meet all requirements for certifications pursuant to Rule 23. The class and the subclasses are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There are questions of law and fact common to the class and to the two subclasses, thus satisfying the commonality requirement of Fed. R. Civ. P. 23(a)(2). These central common questions include

whether (i) the MCSD has a policy of targeting Black communities and racially profiling Black individuals, and whether this policy violates the Equal Protection Clause; (ii) whether the MCSD has a policy, custom, or consistent practice of conducting roadblocks in majority-Black areas of Madison County for purposes of crime control, and whether the roadblocks carried out pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth Amendments; and (iii) whether the MCSD has a policy, custom, or consistent practice of engaging in searches and seizures of Black persons in Madison County in the absence of individualized reasonable suspicion, and if so, whether the searches and seizures carried out pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth Amendments.

In addition, the claims of the class representatives are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). So, too, are the claims of the class representatives who represent each of the two subclasses. The named representatives also will fairly and adequately represent the interests of the class and the subclasses. Fed. R. Civ. P. 23(a)(4). Finally, class certification should be authorized here because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs' counsel can and will "fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), and should be appointed class counsel, based on the factors enumerated in Rule 23(g)(1)(A).

For the foregoing reasons, as described in greater detail in Plaintiffs' Memorandum of Law in Support of this Motion, Plaintiffs therefore request that the Court:

(a)      Determine that Plaintiffs' proposed class and subclasses meet the requirements of Rule 23(a) and Rule 23(b)(2);

(b)     Certify the designated class and subclasses; and

(c)     Pursuant to Rule 23(g), appoint current counsel for Plaintiffs as counsel for the class and subclasses.

In support of this Motion, Plaintiffs submit the exhibits listed below and an accompanying Memorandum of Law in support.

1.  **Exhibit 1:**   Report of Bryan Ricchetti, Ph.D. (March 13, 2018)

2.  **Exhibit 2:**   Summary Declaration of Rahul Guha, Ph.D., Submitted Pursuant to Federal Rule of Evidence 1006 (March 13, 2018)

3.  **Exhibit 3:**   Excerpts from Transcript of Deposition of Lawrence Blackmon (filed publicly in redacted form)

4.  **Exhibit 4:**   Excerpts from Transcript of Deposition of Latoya Brown

5.  **Exhibit 5:**   Excerpts from Transcript of Deposition of Khadafy Manning

6.  **Exhibit 6:**   Excerpts from Transcript of Deposition of Quinnetta Manning

7.  **Exhibit 7:**   Excerpts from Transcript of Deposition of Nicholas Singleton

8.  **Exhibit 8:**   Excerpts from Transcript of Deposition of Steven Smith

9.  **Exhibit 9:**   Excerpts from Transcript of Deposition of Bessie Thomas

10.  **Exhibit 10:**   Excerpts from Transcript of Deposition of Betty Jean Williams Tucker (filed publicly in redacted form)

11.  **Exhibit 11:**   Excerpts from Transcript of Deposition of Josh Fish

12.  **Exhibit 12:**   Excerpts from Transcript of Deposition of Elton Flax

13.  **Exhibit 13:**   Excerpts from Transcript of Deposition of Paul Griffin

14.  **Exhibit 14:**   Excerpts from Transcript of Deposition of James Hall

15.  **Exhibit 15:**   Excerpts from Transcript of Deposition of Samuel Howard

16.  **Exhibit 16:**   Excerpts from Transcript of Deposition of Tommy Jones

17.  **Exhibit 17:**  Excerpts from Transcript of Deposition of Slade Moore

18.  **Exhibit 18:**  Excerpts from Transcript of Deposition of Mark Sandridge

19.  **Exhibit 19:**  Excerpts from Transcript of Deposition of Tommy Squires

20.  **Exhibit 20:**  Excerpts from Transcript of Deposition of Darian Smith

21.  **Exhibit 21:**  Excerpts from Transcript of Deposition of Bradley Sullivan

22.  **Exhibit 22:**  Excerpts from Transcript of Deposition of Rylon Thompson

23.  **Exhibit 23:**  Excerpts from Transcript of Deposition of Toby Trowbridge

24.  **Exhibit 24:**  Excerpts from Transcript of Deposition of Randal Tucker

25.  **Exhibit 25:**  Excerpts from Transcript of Deposition of Jeffrey Waldrop

26.  **Exhibit 26:**  Excerpts from Transcript of Deposition of William Weisenberger

27.  **Exhibit 27:**  Excerpts from Transcript of Deposition of Jeremy Williams

28.  **Exhibit 28:**  Excerpts from Transcript of Deposition of Todd Wilson

29.  **Exhibit 29:**  Declaration of Lawrence Blackmon (Mar. 6, 2018)

30.  **Exhibit 30:**  Declaration of Latoya Brown (Mar. 5, 2018)

31.  **Exhibit 31:**  Declaration of Khadafy Manning (Mar. 3, 2018)

32.  **Exhibit 32:**  Declaration of Quinnetta Manning (Mar. 3, 2018)

33.  **Exhibit 33:**  Declaration of Nicholas Singleton (Mar. 3, 2018)

34.  **Exhibit 34:**  Declaration of Steven Smith (Mar. 6, 2018)

35.  **Exhibit 35:**  Declaration of Bessie Thomas (Mar. 3, 2018)

36.  **Exhibit 36:**  Declaration of Betty Jean Williams Tucker (Mar. 5, 2018)

37.  **Exhibit 37:**  Declaration of James Bacon (Oct. 24, 2017)

38.  **Exhibit 38:**  Declaration of Michael Bracey (Oct. 21, 2017)

39. **Exhibit 39:** Declaration of Anthony Brown (Oct. 21, 2017)

40. **Exhibit 40:** Declaration of Bysheba Brown (Oct. 25, 2017)

41. **Exhibit 41:** Declaration of Willie Carter (Oct. 24, 2017)

42. **Exhibit 42:** Declaration of Rasheid Davis (Oct. 24, 2017)

43. **Exhibit 43:** Declaration of Veronica Davis (Oct. 22, 2017)

44. **Exhibit 44:** Declaration of Demario Day (Feb. 6, 2018)

45. **Exhibit 45:** Declaration of Domunique Doss (Oct. 25, 2017)

46. **Exhibit 46:** Declaration of Undrea Guise (Oct. 22, 2017)

47. **Exhibit 47:** Declaration of Kenneth Harris (Oct. 24, 2017)

48. **Exhibit 48:** Declaration of Lester Hollins (Oct. 21, 2017)

49. **Exhibit 49:** Declaration of Antonio Howard (Oct. 25, 2017)

50. **Exhibit 50:** Declaration of Destiny Jones (Feb. 7, 2018)

51. **Exhibit 51:** Declaration of Lisa Lewis Jones (Feb. 9, 2018)

52. **Exhibit 52:** Declaration of Archie McKay (Feb. 4, 2018)

53. **Exhibit 53:** Declaration of Antonio Mitchell (Feb. 5, 2018)

54. **Exhibit 54:** Declaration of Ernest Pate, Jr. (Feb. 5, 2018)

55. **Exhibit 55:** Declaration of Delores Smith (Feb. 4, 2018)

56. **Exhibit 56:** Declaration of Quincy Smith (Feb. 7, 2018)

57. **Exhibit 57:** Declaration of John Spann (Oct. 22, 2017)

58. **Exhibit 58:** Declaration of Terrance Thompson (Feb. 5, 2018)

59. **Exhibit 59:** Declaration of Montreal Tillman (Feb. 5, 2018)

60. **Exhibit 60:** Declaration of Earline Wilder (Oct. 22, 2017)

61.   **Exhibit 61:**   Declaration of Michelle Williams (Feb. 12, 2018)

62.   **Exhibit 62:**   Madison County Census Data (2010-2016)
- 62.1: QuickFacts, Madison County, Mississippi
- 62.2: Comparative Demographic Estimates for Canton, Mississippi, Madison, Mississippi, and Ridgeland, Mississippi
- 62.3: Demographic Estimates for Kearney Park, Mississippi
- 62.4: Demographic Estimates for Flora, Mississippi
- 62.5: QuickFacts, Median Household Income, Madison County, Mississippi

63.   **Exhibit 63:**   Excerpts from Mississippi Census (1990)

64.   **Exhibit 64:**   Defendants' Response to Plaintiffs' First Set of Requests For Admission (Oct. 20, 2017)

65.   **Exhibit 65:**   MC-INT 1-1, Narrative description of roles and responsibilities within the MCSD, attached to Defendants' Response to Plaintiffs' First Set of Interrogatories (Oct. 20, 2017)

66.   **Exhibit 66:**   Defendants' Response to Plaintiffs' First Set of Interrogatories (Oct. 20, 2017)

67.   **Exhibit 67:**   MCSD Roster (Jan. 11, 2018)

68.   **Exhibit 68:**   MCSD_Emails_Reproduced-01245, Email from Mark Sandridge to Randall Tucker and Jeremy Williams (Mar. 3, 2015)

69.   **Exhibit 69:**   *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008)

70.   **Exhibit 70:**   *Is system fair?*, THE CLARION-LEDGER (July 22, 2007)

71.   **Exhibit 71:**   *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006)

72.   **Exhibit 72:**   Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007)

73.   **Exhibit 73:**   Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, THE CLARION-LEDGER (Jan. 14, 2009)

74.   **Exhibit 74:**   MCSD_Emails_Reproduced-00281, Email from Randall Tucker to Brad Harbour, et al. (June 5, 2009)

75.   **Exhibit 75:**   Lacey McLaughlin, *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011)

76.   **Exhibit 76:**   *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011)

77.   **Exhibit 77:**   Memo from Sheriff Tucker to All Deputies/Employees (Jan. 3, 2012)

78.   **Exhibit 78:**   2011 MCSO Roster–1, MCSD Roster (2011)

79.   **Exhibit 79:**   MC 0037, Equal Employment Opportunity Commission Memo (May 9, 2013)

80.   **Exhibit 80:**   *Madison sheriff responds to Jackson councilman's remarks*, THE CLARION-LEDGER (Jan. 2, 2016), *available at* https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/

81.   **Exhibit 81:**   MCSD_Emails_Reproduced-01679, Email chain between Randall Tucker and Frank Halford (Jan. 18, 2016)

82.   **Exhibit 82:**   Memo from Shirlene Anderson, Jackson Chief of Police, to Slade Moore (June 15, 2006)

83.   **Exhibit 83:**   Complaint, *Moore v. City of Jackson*, No. 251-10-592CIV (Hinds Cnty. Circuit Ct., Aug. 16, 2010)

84.   **Exhibit 84:**   Plaintiff's Memorandum of Points and Authorities in Support of Her Response to Defendant's Motion for Summary Judgment, *Huggins v. Belk Dep't Stores*, No. 4:07-cv-134 (S.D. Miss. Aug. 3, 2008)

85.   **Exhibit 85:**   Modified Second Amended Complaint, *Fleming v. Hinds County*, No. 3:16-cv-554 (S.D. Miss. Nov. 30, 2016)

86.   **Exhibit 86:**   MC-Emails 213, Email from Joseph Mangino attaching "Case File Coversheet," (May 27, 2014)

87.   **Exhibit 87:**   MCSD-Officer Documents-01393, Narcotics Until Case File Cover Sheet

88.   **Exhibit 88:**   Letter from U.S. Department of Housing and Urban Development to City of Ridgeland (Dec. 3, 2015)

89.    **Exhibit 89:**   MC-RFP 2–1, Policy and Procedures, Sobriety Checkpoint Guidelines (filed publicly in redacted form)

90.    **Exhibit 90:**   MC-RFP 10-42(1), Letter from Angela Lyons to Jeremy Williams (Oct. 31, 2017)

91.    **Exhibit 91:**   MC-RFP-Inc. Rep. 010886, Incident Report (May 23, 2013)

92.    **Exhibit 92:**   MC B. Davis Laptop 4, Roadblock Notice

93.    **Exhibit 93:**   MC T. Chastain Laptop 17, Roadblock Notice

94.    **Exhibit 94:**   MC L. Sanders Main Server 93, Memo from Tommy Jones to All Narcotics Agents (Jan. 30, 2017)

95.    **Exhibit 95:**   Excerpt from Plaintiff Steven Smith's Responses and Objections to Defendants' First Set of Interrogatories (Oct. 23, 2017)

96.    **Exhibit 96:**   MC-RFP-Inc. Rep. 040697, Incident Report (Apr. 28, 2017); MC-RFP-Inc. Rep. 058887, Incident Report (Feb. 21, 2015); MC-RFP-Inc. Rep. 025721, Incident Report (June 5, 2014)

97.    **Exhibit 97:**   MC-RFP-Inc. Rep. 047927, Incident Report (Feb. 14, 2017)

98.    **Exhibit 98:**   MC-RFP-Inc. Rep. 032317, Incident Report (Nov. 18, 2015); MC-RFP-Inc. Rep. 007631, Incident Report (Dec. 1, 2012); MC-RFP-Inc. Rep. 007292, Incident Report (Nov. 16, 2012); MC-RFP-Inc. Rep. 004175, Incident Report (Aug. 15, 2012); MC-RFP-Inc. Rep. 025778, Incident Report (June 6, 2014)

99.    **Exhibit 99:**   MCSD_Emails_Reproduced-01682, Email chain between Randall Tucker and Trey Bobinger (Jan. 8, 2016)

100.   **Exhibit 100**: *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015)

101.   **Exhibit 101**: MC-RFP 8-211, Email to Randall Tucker and Jeremy Williams (Nov. 30, 2016)

102.   **Exhibit 102**: MC-RFP-Inc. Rep. 020907, Incident Report (June 9, 2015)

103.   **Exhibit 103**: MC-RFP-Inc. Rep. 020065, Incident Report (May 3, 2015)

104.   **Exhibit 104**: MC-RFP-8-182, Narrative prepared by Jeremy Williams re Manning incident (June 27, 2016)

105. **Exhibit 105**: Complaint, *Gibson v. Madison County*, No. 3:16-cv-633 HTW-LRA (S.D. Miss. Aug. 15, 2016)

106. **Exhibit 106**: Excerpt from Transcript of Deposition of Randall Tucker, *Gibson v. Madison County* (Sep. 9, 2017)

107. **Exhibit 107**: Complaint, *Cooper v. Tucker*, No. 3:13-cv-350 HTW-LRA (S.D. Miss. June 7, 2013)

108. **Exhibit 108**: MC-RFP-8-29, Complaint from Daryl Dozier and Domekia Myers-Dozier to MCSD, (Mar. 16, 2015)

109. **Exhibit 109**: Response by Defendants to Plaintiffs' First Set of Requests for Production of Documents

110. **Exhibit 110**: Email chain between Kavitha Sivashanker and Charles Cowan, et al. (Feb. 6, 2018)

111. **Exhibit 111**: Declaration of Jonathan K. Youngwood, Esq. (March 13, 2018)

112. **Exhibit 112**: Declaration of Joshua F. Tom, Esq. (March 13, 2018)

113. **Exhibit 113**: Declaration of Ezekiel R. Edwards, Esq. (March 13, 2018)

RESPECTFULLY SUBMITTED, this 14th day of March, 2018.

By:   /s/ Joshua Tom
Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Christopher Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, I caused the foregoing **MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com

/s/ Joshua Tom
Joshua Tom

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, | Civil Action No. 3:17-cv-00347-WHB-LRA |

*Plaintiffs*,

v.

MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,

*Defendants*.

# REPORT OF BRYAN RICCHETTI, Ph.D.

March 13, 2018

# Table of Contents

1. QUALIFICATIONS ................................................................................................. 2

2. ASSIGNMENT AND SUMMARY OF FINDINGS ............................................... 3
    *2.1. Assignment* ..................................................................................................... 3
    *2.2. Summary of Findings* ...................................................................................... 4

3. METHODOLOGY AND DATA ............................................................................. 6
    *3.1. The MCSD's stated roadblock policy* ............................................................. 6
    *3.2. Empirical methodology for assessing claims of discrimination* ..................... 7
    *3.3. Summary of available data and control variables for analysis* ...................... 9
        *3.3.1. Data on the date and location of roadblocks* ...................................... 10
        *3.3.2. Data on traffic violations by location* ................................................. 11
        *3.3.3. Race and socioeconomic information by census tract* ......................... 12

4. ANALYSIS OF THE LOCATION AND FREQUENCY OF ROADBLOCKS ....... 16
    *4.1. Patterns of roadblocks across census tracts* ................................................ 16
    *4.2. Regression analysis* ...................................................................................... 22
    *4.3. A note on the data sample* ............................................................................ 26

5. CONCLUSION .................................................................................................... 27

**1. QUALIFICATIONS**

1. I am a Vice President at Cornerstone Research and Co-Head of Cornerstone's antitrust practice. Cornerstone Research is an economic and financial consulting firm with offices in Boston, Chicago, Los Angeles, Menlo Park, New York, San Francisco, Washington, and London. I joined Cornerstone Research in 2007, after completing my Ph.D. in Economics from Cornell University. I have seventeen years of professional experience analyzing economic data related to socioeconomic and demographic characteristics (including race) and economic outcomes.

2. During my time at Cornell (2003–2007), I served as an economist at the U.S. Census Bureau analyzing government data on demographic characteristics (including race) and labor market outcomes for the U.S. population. Prior to attending Cornell, I worked at MDRC (1999–2002), a public policy think tank in New York, NY, analyzing labor market outcomes of welfare recipients, with a focus on the effect of different demographic and human capital characteristics on labor market outcomes.

3. In my work as an economic consultant at Cornerstone Research (2007 to present), I have developed particular expertise in the application of economic and statistical methods to questions that arise in the context of litigation. I have consulted on numerous discrimination matters involving statistical analysis and summary of data regarding differences between different demographic groups (including race, gender, and age) and outcomes of interest.

4. As an expert witness, I have filed two expert reports in federal court addressing issues of discrimination: one matter involving claims of age discrimination and another matter assessing the relationship between the racial distribution of entry-level police and firefighters in a given community and the racial distribution of the qualified labor pool in that community.

5. I have spoken at American Bar Association (ABA) conferences on issues related to expert testimony and statistical analysis, including serving as the testifying expert in the mock trial at both the ABA Antitrust Spring Meetings (Spring 2015) and the ABA Antitrust Law & Economics Institute for Judges (Fall 2015). I have also authored several articles that address the use of economic and statistical analysis in litigation contexts. For example, I was a co-author of the

chapter "Applying Econometrics to Assess Market Definition and Market Power" in the ABA Antitrust Section's handbook *Econometrics: Legal, Practical, and Technical Issues*.

6. My CV is attached as Appendix A to this report. My CV contains the list of my prior testimony for the last four years. I am providing my services in this matter on a pro bono basis.

## 2. ASSIGNMENT AND SUMMARY OF FINDINGS

### 2.1. Assignment

7. I have been asked by Simpson Thacher & Bartlett LLP, the American Civil Liberties Union of Mississippi Foundation, and the American Civil Liberties Union Foundation, Counsel for Plaintiffs in this action,[1] to review the available data on the locations and frequency of roadblocks implemented by the Madison County Sheriff's Department ("MCSD") in Madison County. Counsel for the Plaintiffs have also asked me to assess whether there is a relationship between the location and frequency of the roadblocks and the percentage of the population that is Black in communities where roadblocks are set up.

8. As part of my work in this matter, a team working under my supervision at Cornerstone Research has reviewed and analyzed a set of data sources produced by the MCSD in this matter that track relevant information related to roadblocks and traffic violations in Madison County. My team has also collected data from the U.S. Census Bureau that measures socioeconomic and demographic characteristics for each census tract within Madison County. I detail these data sources in Section 3 below.

9. I have also reviewed a set of relevant documents in this case, including the Complaint and the Defendants' Answer to the Complaint. Appendix B to this

---

[1] Class Action Complaint for Declaratory and Injunctive Relief and Individual Damages, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB-LRA, filed May 8, 2017 ("Complaint").

report provides a list of the data and documents that I considered in reaching the opinions summarized in this report.

### 2.2. Summary of Findings

10. Based on my review of the aforementioned data sources, I have reached the following conclusions:

- The available data indicate that the MCSD implemented roadblocks at a higher rate in census tracts with a higher percentage of Black residents in Madison County. For example, there are 21 different census tracts within Madison County, each of which had a different percentage of the population that was Black over the period for which I have roadblock data (2012–2017). These 21 different census tracts allow me to examine how the frequency of roadblocks varies with the percentage of the population that is Black. As I discuss below, the racial breakdown of the 21 census tracts is split fairly cleanly into two groups—in 11 of the 21 tracts 28% or less of the population was Black during the period 2012–2017, while in the other 10 tracts 46% or more of the population was Black during the period 2012–2017. On average, the first 11 tracts were 17.6% Black and the other 10 tracts were 66.0% Black from 2012–2017.

  As I show below in Section 4, from 2012–2017 there were 14 roadblocks implemented per 1,000 residents in the 11 census tracts with the lowest percentage of Black residents (17.6% Black on average) compared to 28 roadblocks implemented per 1,000 residents in the 10 census tracts with the highest percentage of Black residents (66.0% Black on average). In other words, the number of roadblocks per person in the census tracts with a substantially larger Black percentage of the population was twice the number of roadblocks per 1,000 residents in census tracts with a relatively low Black percentage of the population. As I also show below, geocoding analysis of the locations of roadblocks corroborates this fact, showing clustering of roadblocks in substantially Black communities.

- Additionally, the differences in the rates of roadblocks in communities with a higher percentage of Black residents are not fully explained by differences in the frequency of DUI arrests and traffic violations (arrests

and citations) issued by the MCSD. For example, Defendants contend that regulating drunken driving and traffic violations are relevant criteria used in deciding where to implement a roadblock. Although Defendants' data indicate that there are, on average, higher rates of DUI arrests and traffic violations in census tracts with a higher percentage of Black residents, I show below that such criteria do not fully explain the higher rates of roadblocks in these census tracts. For example, from 2012–2017 the rate of roadblocks per 100 DUI arrests in the 10 tracts with the highest Black percentage of the population was 41% higher than in the 11 census tracts with the lowest percentage of Black residents. In other words, even for a given level of DUI arrests, there were more roadblocks in census tracts with a higher Black percentage. Additionally the rate of roadblocks per 100 traffic violations (arrests and citations) in the 10 tracts with the highest Black percentage of the population was 40% higher than in the other 11 census tracts.

- More formal statistical analysis supports the conclusions above. Specifically, I use multiple regression analysis in order to control for differences in traffic behavior and socioeconomic factors across census tracts in Madison County (such as frequency of DUI arrests, traffic citations and arrests, vehicle ownership, income, unemployment, and age). When conducting this analysis, I continue to find a statistically significant and positive correlation between the rate of roadblocks and the percentage of the population that is Black. In other words, my analysis incorporates the fact that communities with a higher percentage of Black residents have, on average, other characteristics that are predictive of differences in traffic behavior, such as higher rates of DUI arrests and traffic arrests and citations, lower income, higher unemployment, and younger populations.  However, my analysis shows that even after accounting for these factors there remains an unexplained difference in the frequency of roadblocks in communities that have a higher percentage of Black residents relative to communities with a higher percentage of white residents.

## 3. METHODOLOGY AND DATA

11. In this section, I summarize the methodology I employ in my analysis of the available roadblock data. I first provide a brief overview of factors identified in the record that the MCSD contends it considers when implementing a roadblock. I then offer a description of common statistical methodology used in assessing claims of discrimination, and of how that methodology fits into the broader literature on statistical analysis of differences in policing activity across race. I also provide a detailed summary of the data I rely on in my analysis, and how I use that data to construct relevant control variables included in my regression model.

### 3.1. The MCSD's stated roadblock policy

12. In analyzing whether roadblocks in Madison County are more frequently placed in Black communities, it is relevant to assess the factors that MCSD contends it considers in placing roadblocks. In documents produced in this case, Defendants have identified factors that they claim are relevant in deciding where to place roadblocks.

13. In their response to the Complaint, Defendants state, "all roadblocks conducted by the Madison County Sheriff's Department are conducted pursuant to the Department's Sobriety Checkpoint Guidelines."[2] Additionally, when asked to "identify all criteria used for selecting locations for roadblocks/checkpoints" by the Plaintiffs, Defendants responded as follows:

> "Some of the criteria used while selecting roadblock/checkpoint locations are traffic complaints, requests by businesses or other entities for safety, and particular intersections where impaired drivers may be expected to travel. Another criteria is that the roadblocks/checkpoints

---

[2] Answer and Affirmative Defenses of Defendants, Madison County, Mississippi and Sheriff Randall C. Tucker, In His Official Capacity, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on Behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities*, CIVIL ACTION NO. 3:17-cv-347 WHB LRA, dated June 29, 2017 ("Defendants' Response to the Complaint"), ¶ 140.

locations be spread throughout Madison County and not concentrated in
certain areas. No formal system of weighting or priority is used."[3]

14. Defendants thus contend that DUI frequency and concerns for safety related
to traffic activity are relevant considerations for the MCSD in deciding where to
place roadblocks. As a result, I incorporate measures of DUI arrests and traffic
citations and arrests into my analysis of roadblocks.

### 3.2. Empirical methodology for assessing claims of discrimination

15. As noted above, my analysis in this report seeks to test whether the frequency
of roadblocks in communities with substantial percentages of Black residents
differs from the frequency of roadblocks in substantially white communities
during the time period for which data is available, controlling for non-race factors
that can affect the location of a roadblock. By controlling for such non-race
factors, my analysis can help assess whether any differences in roadblock
frequency can be explained by differences across communities in factors other
than race that are predictive of differences in traffic behavior.

16. My analysis in this report relies on a statistical technique called multiple
regression analysis. Multiple regression analysis is a widely accepted and
common statistical technique in both academia and litigation.[4] Courts have relied
on multiple regression analysis in a variety of discrimination matters. For
example, the Federal Judicial Center's *Reference Manual for Scientific Evidence*
(a document designed to aid federal judges in assessing scientific evidence)

---

[3] Response by Defendants, Madison County, Madison County, Mississippi and Sheriff Randall Tucker, in His official capacity, to Plaintiffs' First Set of Interrogatories, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on Behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA, dated October 20, 2017, ¶ 23.

[4] Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011, pp. 305–306 ("Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables…. Over the past several decades, the use of multiple regression analysis in court has grown widely."); Greene, William H., *Econometric Analysis*, 6th Edition, Pearson Prentice Hall, 2008, pp. 8–10 ("The linear regression model is the single most useful tool in the econometrician's toolkit. … The multiple linear regression model is used to study the relationship between a dependent variable and one or more independent variables. … One of the most useful aspects of the multiple regression model is its ability to identify the independent effects of a set of variables on a dependent variable.").

dedicates an entire chapter to multiple regression analysis, including applications to questions of discrimination.[5]

17. Regression analysis is a useful tool to assess claims of discrimination because it allows a researcher to control for relevant factors in the available data that affect the outcome of interest in order to more reliably isolate the effect of the variable on which there is alleged discrimination (e.g., race, gender, age). A large body of academic literature exploring concerns of potential discrimination in labor markets details these methods.[6] The *Reference Manual on Scientific Evidence* describes the importance of controlling for other factors as follows:

> "A correlation between two variables does not imply that one event causes the second. Therefore, in making causal inferences, it is important to avoid spurious correlation. Spurious correlation arises when two variables are closely related but bear no causal relationship because they are both caused by a third, unexamined variable. For example, there might be a negative correlation between the age of certain skilled employees of a computer company and their salaries. One should not conclude from this correlation that the employer has necessarily discriminated against the employees on the basis of their age. A third, unexamined variable, such as the level of the employees' technological skills, could explain differences in productivity and, consequently, differences in salary."[7]

18. There is also a body of research literature focused on the specific question of differential policing and policing outcomes across race. That literature also emphasizes the importance of controlling for relevant, non-race factors when

---

[5] Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence,* 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011, pp. 305–307 ("Regression analysis has been used most frequently in cases of sex and race discrimination, antitrust violations, and cases involving class certification.").

[6] See, for example, Altonji, Joseph G., and Rebecca M. Blank, "Race and Gender in the Labor Market," Ashenfelter, Orley David C., Card, (Eds.), *Handbook of Labor Economics,* 3, 1999; Blau, Francine D., and Lawrence M. Kahn, "Gender Differences in Pay," *The Journal of Economic Perspectives,* 14(4), 2000, pp. 75–99; Bertrand, Marianne, "New Perspectives on Gender," *Handbook of Labor Economics,* 4b, 2010.

[7] Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence,* 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011, p. 309.

assessing claims of racial profiling or bias by police. For example, one study funded by the U.S. Department of Justice to help law enforcement officials and researchers better understand how to analyze data on race and vehicle stops[8] notes "the strongest research methodologies will address the alternative hypothesis that racial/ethnic groups are not equivalent in the nature and extent of their traffic law-violating behavior."[9]

19. Another paper, which summarizes common statistical methods used for analyzing policing data, discusses the importance of controlling for "driving behavior that may be important sources for police decision-making, such as the likelihood of speeding, weaving through traffic, and driving slower than usual,"[10] when analyzing traffic violations across race.

20. As I explain in Section 3.3 below, I am able to account for such concerns in my analysis in this report because I have access to detailed data that tracks each individual traffic arrest and citation by location within Madison County. Using such information, I can construct control variables that measure the frequency of DUI arrests and other traffic violations (arrests and citations) in order to assess how such violations vary across geographic areas with large differences in the percentage of Black residents.

### 3.3. Summary of available data and control variables for analysis

21. I rely on a set of different data sources produced in this case that track roadblocks and traffic violations in Madison County, as well as publicly available U.S. Census data. Below is a detailed summary of the data sources analyzed, and how I use the data sources to develop the key inputs into my empirical analysis.

---

[8] Fridell, Lorie, "By The Numbers: A Guide for Analyzing Race Data from Vehicle Stops," Police Executive Research Forum, 2004, p. ix ("*By the Numbers* is a detailed 'how to' guide for analyzing race data from vehicle stops. It provides a social science framework for understanding the challenges of trying to measure racial bias in policing and presents an array of methods for law enforcement professionals, researchers and other stakeholders to consider when interpreting the vehicle-stop data.")

[9] Fridell, Lorie, "By The Numbers: A Guide for Analyzing Race Data from Vehicle Stops," Police Executive Research Forum, 2004, p. 22.

[10] Ridgeway, Greg, and John MacDonald, "Methods for Assessing Racially Biased Policing," *Race, Ethnicity, and Policing: New and Essential Readings, Infrastructure, Safety, and Environment*, NYU Press, 2010, p. 5.

*3.3.1. Data on the date and location of roadblocks*

22. Data on the dates and addresses of roadblocks set up by MCSD from January 1, 2012–December 20, 2017 come from three sources of data produced in this litigation by Defendants: computer-aided dispatch ("CAD") records, a handwritten list of roadblocks conducted by the MCSD, and incident reports.

- The CAD roadblock data are the subset of all dispatch data where the "Description" field contains the value "Road Block" ("CAD Roadblocks"). These data provide incident number, date, address, and city fields for each roadblock.[11]  I use these data as the primary source of roadblocks.

- I also run a sensitivity analysis that incorporates roadblocks reflected on a handwritten list of dates, start times, end times, and locations that I understand to be roadblocks ("Handwritten Roadblocks") that was produced by Defendants.[12] I have been informed by Counsel that these roadblocks were set up as part of a state program to monitor for DUI incidents.  As I discuss below, the Handwritten Roadblocks are incorporated as additional data points in sensitivities of my main results to the extent they do not appear in the list of CAD Roadblocks.

- For a second sensitivity analysis, roadblock data are also imputed from a manual review of incident reports for arrests made at roadblocks that I understand has been undertaken by Counsel for the Plaintiffs ("Additional Roadblocks"). The incident reports provide name, race, date, time, location, and deputy information for these arrests.[13] The dates and locations of Additional Roadblocks do not appear in either the list of CAD Roadblocks or the list of Handwritten Roadblocks.

---

[11] "Master CAD Report − To Be Produced.csv"
[12] "Roadblock Locations (Handwritten).xlsx"
[13] "Unlisted Roadblocks.xlsx"

- CAD Roadblocks account for 81.6% of the roadblock observations in the three data sources I analyze.

23. The data from these three sources are combined into a single dataset including date and address fields. Each roadblock is assigned to a census tract in Madison County based on its geographic coordinates.[14] I then define a unique roadblock as a roadblock in a given location on a given day, and then count the total roadblocks by year at the census tract level in order to create a dataset of the frequency of roadblocks at the census tract level by year for the years 2012–2017. I calculate this sum four ways: (1) with only CAD Roadblocks, (2) with CAD Roadblocks plus Handwritten Roadblocks, (3) with CAD Roadblocks plus Additional Roadblocks, and (4) with roadblocks from all three sources. The number of roadblocks per capita is then calculated for each of these approaches by dividing the total number of roadblocks in a given census tract and year by the population of the census tract.

*3.3.2. Data on traffic violations by location*

24. As discussed above, it is important to include control variables in my analysis that can directly measure differences in the underlying traffic behavior between different communities in Madison County for two reasons: (1) the research literature assessing the role of race in traffic stops emphasizes the importance of controlling for differential traffic behavior; and (2) the MCSD indicates that DUIs and traffic safety are factors in implementing roadblocks.

25. I understand that the CAD data produced by the Defendants includes all incidents in which MCSD officers are involved that are called into central dispatch, not only those relating to roadblocks.[15] As a result, these data may be

---

[14] I convert the addresses into longitude and latitude coordinates. Only roadblocks for which an accurate set of coordinates can be determined are used in my analysis. This removes 14.9% of the roadblocks listed in the three data sources from my analysis.

[15] Defendants' Memorandum of Authorities in Opposition to Plaintiffs' Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all other similarly situated, v. Madison County, Mississippi; Sheriff Randall C. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities*, CIVIL ACTION NO. 3:17-cv-347 WHB LRA, dated November 3, 2017 ("Memorandum of Authorities") broadly describes the contents of the CAD database. Defendants have represented that the CAD data include information on roadblocks, traffic stops, and other law enforcement encounters. Defendants have also represented that "[w]henever an incident is brought to the attention of a dispatcher in the Sheriff's Department, that information goes into the CAD database and is assigned an incident number." Memorandum of Authorities, p. 2.

used to construct control variables such as those described above. These data cover the period from January 1, 2012–December 20, 2017. They include date and address fields; times for when dispatch received a call regarding an incident; when an officer was dispatched; when an officer arrived and when a stop was cleared; a field containing a code signifying how the incident was resolved (e.g., in arrest, citation, etc.); and a field indicating the type of violation. These data do not include race information.

26. In order to include control variables for traffic behavior, I construct two variables from the CAD data. One accounts for the prevalence of DUI arrests per census tract,[16] and the other accounts for the prevalence of traffic violations per census tract, including arrests and citations issued.[17]

### 3.3.3. Race and socioeconomic information by census tract

27. The U.S. Census Bureau ("Census Bureau") provides detailed annual data at *the census tract level* for key demographic and socioeconomic factors in my analysis, including race, population, income, employment, age, and vehicle ownership. I collect data from the Census Bureau's five year estimates from 2012–2016, in order to construct year-by-year measures of the variables described above.[18] These data allow me to incorporate detailed information for each of the 21 census tracts in Madison County into my analysis.

28. I conduct my analysis at the census tract level for a few reasons. First, race data is not available for each individual police interaction in the CAD data, thus I cannot determine the race of the individuals stopped for any specific stop associated with a roadblock. Census tract data from the Census Bureau, on the other hand, does have race information.

---

[16] Incidents included in DUI arrests are those in the CAD data that: 1) have a value for the variable "DISPO" of "ARREST MADE"; and 2) have a value for the variable "DESCRIPTION" of "INTOXICATED DRIVER (D.U.I.)".

[17] Incidents included in traffic arrests and citations are those in the CAD data that: 1) have a value for the variable "DISPO" of "ARREST MADE" or "CITATION ISSUED"; and 2) have a value for the variable "DESCRIPTION" of "INTOXICATED DRIVER (D.U.I.)", "TRAFFIC STOP (V.T.O.)", "STOPPING SUSPICIOUS VEHICLE", "TRAFFIC OFFENSES", "TRAFFIC-RECKLESS DRIVING", "TRAFFIC-CARELESS DRIVING", "TRAFFIC-DRAG RACING", "TRAFFIC-OBSTRUCTING TRAFFIC", "TRAFFIC-PASSING SCHOOL BUS", or "TRAFFIC-OTHER TRAFFIC VIOLATIO".

[18] The estimate for each year is based on the preceding five years of data from the American Community Survey (ACS). For example, the estimate for 2012 is based on the ACS population estimates from 2008–2012. The five year estimate including 2017 has not yet been released, so I use the most recent five year estimate (2012–2016) for the census data in both 2016 and 2017.

29. Second, data on the traffic behavior of each individual citizen are not available. Therefore, it is not possible to perform an analysis that controls for traffic behavior at the individual level with the available data. On the other hand, using the crime data produced by the MCSD and available socioeconomic variables from the Census Bureau, I can construct measures of traffic behavior for each census tract.

30. Finally, because roadblocks are policing actions that should affect all motorists passing through a specific geographic area (rather than targeting a specific person), it is reasonable to analyze the placement of roadblocks within refined geographic sub-areas (like census tracts).

31. It is important to note that census tracts are a relatively fine categorization of geographic area. For example, there are 73,057 census tracts in the U.S., 664 in Mississippi and 21 in Madison County alone.[19] This relatively fine categorization of geography is important for my analysis because it allows me to analyze how the frequency of roadblocks changes across numerous geographic sub-areas of Madison County that have substantially different racial breakdowns.

32. For example, Exhibit 1 shows the percentage of the population that is Black in each of the 21 census tracts in Madison County over the period 2012–2017. As is clear, there is large variation across the tracts with respect to the percentage of population that is Black—ranging from less than 11% to almost 90%.

---

[19] "2010 Census – Census Tract Reference Map: Madison County, MS," available at *U.S. Census Bureau*, https://www2.census.gov/geo/maps/dc10map/tract/st28_ms/c28089_madison/DC10CT_C28089_001.pdf; "2010 Census Tallies of Census Tracts, Block Groups & Blocks," available at *U.S. Census Bureau*, https://www.census.gov/geo/maps-data/data/tallies/tractblock.html.

Exhibit 1
*Average Percentage of the Population That is Black by Census Tract within Madison County (2012–2017)*

| Census Tract | Average Black Population Percentage |
|---|---|
| 28089030101 | 10.7% |
| 28089030202 | 10.9% |
| 28089030203 | 11.6% |
| 28089030301 | 11.6% |
| 28089030206 | 13.0% |
| 28089030204 | 14.7% |
| 28089030104 | 16.5% |
| 28089030205 | 17.9% |
| 28089030107 | 18.0% |
| 28089030201 | 18.6% |
| 28089030400 | 28.0% |
| **Average of Census Tracts with Low Black Population Percentage** | 17.6% |
| 28089030105 | 46.2% |
| 28089030106 | 47.6% |
| 28089030302 | 49.3% |
| 28089030700 | 58.4% |
| 28089030800 | 59.6% |
| 28089030108 | 65.6% |
| 28089030900 | 69.5% |
| 28089030600 | 83.7% |
| 28089031000 | 84.0% |
| 28089030500 | 89.5% |
| **Average of Census Tracts with High Black Population Percentage** | 66.0% |

Source: American Community Survey Five Year Estimates, U.S. Census Bureau

33. It is notable that the 21 census tracts are divided cleanly into two groups. Of the 21 census tracts, 11 have a relatively low percentage of Black residents (28% or lower), while 10 have a relatively high percentage of Black residents (46% or higher). On average, the percentage of Black residents in the first set of tracts is 17.6%, while it is 66.0% in the second set. This large variation in the percentage of the population that is Black across census tracts is central to my research

design because it allows me to examine how the frequency of roadblocks (and other factors related to roadblocks) differs across areas with large differences in the Black population.[20]

34. As noted above, in addition to race, I also collect data from the Census Bureau on relevant socioeconomic and demographic variables, including population, median income, unemployment rate, percentage of population age 15–24, and vehicle ownership for each census tract. In Section 3 below, I include these variables in my regression model because they can help account for differences in relevant behavior that might not be fully accounted for by the direct measures of traffic behavior in the MCSD data. For example, vehicle ownership is a predictor of how frequently people drive. Age is also understood to be a direct correlate of traffic behavior—research indicates that younger drivers drive more recklessly on average.[21] Income and unemployment are indicators for general economic well-being, which are associated with DUIs and levels of crime.[22] As I discuss more below, income and unemployment can also serve as controls for the MCSD's allocation of policing resources. As a result, disparities among these indicators across census tracts also provide potential explanations for differences in the rates of roadblocks across census tracts.

---

[20] Without large differences in race across geographic areas, we would not be able to compare differences in predominately Black communities and predominantly white communities. The variation across census tracts in Madison County allows for such comparisons. This type of research design, in which a single variable cleanly delineates two groups of people with and without a characteristic of interest, is a widely used research design in economic research that allows for quantification of the effect of that characteristic on relevant outcomes. See, for example, Angrist, Joshua, and Jörn-Steffen Pischke, "Undergraduate Econometrics Instruction: Through Our Classes, Darkly," *Journal of Economic Perspectives,* 31(2), 2017, pp. 125–144.

[21] Fridell, Lorie, "By The Numbers: A Guide for Analyzing Race Data from Vehicle Stops," Police Executive Research Forum, 2004, pp. 19–22.

[22] Chalfin, Aaron, and Justin McCrary, "Criminal Deterrence: A Review of the Literature," *Journal of Economic Literature*, 55(1), 2017, pp 5–48; Impinen, Antti et al., "The Association between Social Determinants and Drunken Driving: A 15-Year Register-based Study of 81,125 Suspect," *Alcohol and Alcoholism*, 46(6), 2011, pp. 721–728; Perrine, M.W., Raymond C. Peck, and James C. Fell, "Epidemiologic Perspectives on Drunk Driving," *Surgeon General's Workshop on Drunk Driving, Background Papers*, U.S. Department of Health and Human Services, 1988, pp. 35–76.

## 4. ANALYSIS OF THE LOCATION AND FREQUENCY OF ROADBLOCKS

35. In this section, I present the findings of my analysis of roadblocks. I start my analysis in Section 4.1 with a set of descriptive analyses that highlight the general patterns in the location and frequency of roadblocks across the 21 different census tracts in Madison County. I show that the frequency of roadblocks is generally higher in census tracts with a substantially higher percentage of Black residents.

36. In Section 4.2, I then present the findings of my regression analysis, where I formally test whether the frequency of roadblocks is higher in census tracts with a higher percentage of Black residents, controlling for other factors that are predictive of differences in traffic behavior. I find that, even after controlling for these factors, roadblocks are more frequent in census tracts with a higher percentage of the population that is Black.

### *4.1. Patterns of roadblocks across census tracts*

37. As discussed above in Section 3, an important fact about Madison County is that the percentage of the population that is Black varies substantially across the 21 census tracts inside the county. This fact about Madison County allows me to examine whether the frequency of roadblocks is higher in areas within Madison County that have a substantially higher percentage of Black residents.

38. Exhibit 2 presents a map of the locations of the roadblocks in Madison County during the period 2012–2017, as well as the percentage of the population that is Black in each census tract. In total, there were 2,004 roadblocks established during this time period,[23] with at least one roadblock in each of the 21 different census tracts—ranging from as few as 7 in one census tract[24] to 275 in one of the census tracts in Canton in the center of the map.[25] Thus, the general geographic scope of the roadblocks extended to most areas of the county.

---

[23] These 2,004 unique roadblocks are composed of 1,697 CAD Roadblocks, 161 Handwritten Roadblocks, and 146 Additional Roadblocks, after removing duplicates based on date and location.

[24] Census tract 28089030202.

[25] Census tract 28089030600.

Exhibit 2

**Location of Roadblocks by Census Tract within Madison County (2012–2017)**



Source: American Community Survey Five Year Estimates, U.S. Census Bureau; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; Master CAD Report – To Be Produced.csv

39.  One thing that Exhibit 2 does not capture is the population of different census tracts. In Exhibit 3, I report the average number of roadblocks *per 1,000 citizens* for the 11 census tracts with the lowest percentage of Black residents (with an average of 17.6%) compared to the 10 census tracts with the highest percentage of Black residents (with an average of 66.0%). As seen in the exhibit, the number of roadblocks per 1,000 citizens in census tracts with a relatively low percentage of Black residents is 14, while for census tracts with a relatively high percentage of Black residents it is 28.[26] That is, the frequency of roadblocks is twice as high in census tracts with a relatively high percentage of Black residents as it is in census tracts with a relatively low percentage of Black residents.

---

[26] Total Population figures are from the 2012−2016 ACS Five Year Estimates.  The Total Population for each group of census tracts is a weighted average across 2012 to 2017.  Note that 2016 data is duplicated for 2017 because the 2017 ACS estimates have not yet been released.

Exhibit 3
**_Frequency of Roadblocks by Racial Breakdown_**



Source: Master CAD Report – To Be Produced.csv; Roadblock Locations(Handwritten).xlsx; Unlisted Roadblocks.xlsx; American Community Survey (ACS) Five Year Estimates, U.S. Census Bureau

40. Exhibit 4 presents a map that zooms in on Canton, a city that is approximately 70.8% Black, according to the American Community Survey Five Year Estimate from 2016.[27] As is clear, the roadblocks are particularly clustered in a relatively small area of Canton towards the north.

---

[27] American Community Survey Five Year Estimates for All Places in Madison County, Mississippi, Demographic and Housing Estimates, 2016.

Exhibit 4
***Roadblocks Located in Canton***



Source: American Community Survey Five Year Estimates, U.S. Census Bureau; Roadblock Locations (Handwritten).xlsx; Unlisted
Roadblocks.xlsx; Master CAD Report – To Be Produced.csv; Google Maps

41. An important question is whether the higher rate of roadblocks in the different
areas of Madison County might simply reflect different rates of unsafe traffic
behavior. More roadblocks would be expected in some areas if there were higher
rates of unsafe traffic behavior in those areas. Exhibit 5 presents two ways to
think about that question. First, it presents the number of roadblocks *per* 100 DUI
arrests for the 11 census tracts with the lowest percentage of Black residents (with
an average of 17.6%) compared to the 10 census tracts with the highest

percentage of Black residents (with an average of 66.0%). As seen in the exhibit the number of roadblocks per 100 DUI arrests in census tracts with a relatively low percentage of Black residents is 151, while for census tracts with a relatively high percentage of Black residents it is 213, which is 41% higher.

42. Second, Exhibit 5 also presents the number of roadblocks *per* 100 traffic arrests and citations in the same two sets of census tracts. As seen in the exhibit, the number of roadblocks per 100 traffic arrests and citations in census tracts with a relatively low percentage of Black residents is 40, while for census tracts with a relatively high percentage of Black residents it is 56, which is 40% higher.

Exhibit 5

*Roadblocks per 100 DUI and Traffic Violations by Racial Breakdown*





Source: Master CAD Report - To Be Produced.csv; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; American Community Survey Five Year Estimates, U.S. Census Bureau

43. In sum, the data indicate that: (a) roadblocks are more likely to be placed in census tracts with a higher percentage of Black residents, (b) roadblocks are sometimes clustered in large numbers in certain neighborhoods, and (c) the relatively higher frequency of roadblocks cannot be explained by a relatively higher number of DUI arrests or traffic arrests and citations.

*4.2. Regression analysis*

44. I now turn to my regression analysis, which uses multiple control variables to analyze the different frequency of roadblocks across census tracts. As detailed above in Section 3, regression analysis is a widely accepted method in both academic research and in litigation to analyze the effect of one variable (in this case, race) on another (in this case, frequency of roadblocks), while controlling for a set of control variables that also affect the variable of interest (frequency of roadblocks). In the current matter, I use regression analysis to better understand whether the relationship observed between the Black percentage of the population in Madison County and roadblocks across census tracts (discussed in Section 4.1 above) can be explained by differences between the census tracts in factors other than race that are predictive of differences in traffic behavior.

45. As discussed in Section 3 above, I include the following control variables in my regression model. The first four variables help control for differences in traffic behavior across the 21 census tracts, while the final two variables help control for economic status, which is correlated with DUIs, general crime/safety, and the allocation of police resources. The control variables I include are:

- DUI arrests per 1,000 people;
- Traffic arrests and citations per 1,000 people;
- Percentage of households with at least one vehicle;
- Percentage of population between ages 15-24;
- Median household income; and
- Unemployment rate.

46. Exhibit 6 presents the results of my regression analysis based on the CAD Roadblocks. It shows three different regressions. The first regression controls for DUI arrests and other factors from the census data, the second controls instead for traffic arrests and citations with other factors from the census data, and the third controls for both DUI arrests and traffic violations (arrests and citations) with

other factors from the census data. There are a few important things to note about the results.

- First, the effect of the percentage of Black residents is statistically significant and positive at less than the 5% level in all three models, which is the standard level of significance used in most academic research and in litigation.[28] These results indicate that, even after controlling for variables that are predictive of differences in traffic behavior, roadblocks are statistically significantly more likely to occur in areas with a higher percentage of Black residents.

- Second, DUI arrests are a very strong predictor of roadblocks. This can be seen by looking at the R-Squared of the three models. The R-squared is a statistic that tells us how well the control variables in the regression model explain the frequency of roadblocks across the different census tracts.[29] The model with DUI arrests and census variables as control variables has an R-squared of 0.646. What this means is that level of DUI arrests per 1,000 people in a given census tract explains 64.6% of the variation in roadblocks across census tracts, together with demographic controls. That is a relatively large R-squared,[30] and provides direct evidence that the model has significant explanatory power for roadblocks. The model with traffic arrests and citations and census variables, on the other hand, has an R-squared of less than half of the model with DUI arrests and census controls (0.293), which means that traffic arrests and citations with census controls explain roadblock frequency less than half as well as DUI arrests and census controls.

---

[28] Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., p. 251; Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011, pp. 320–321.

[29] Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C., 2011, p. 316 ("In general, the more complete the explained relationship between the included explanatory variables and the dependent variable, the more precise the results.").

[30] Greene, William H., *Econometric Analysis,* 6th Edition, Pearson Prentice Hall, 2008, p. 38.

Given this fact, the models with DUI arrests as a control are my preferred models.

- Third, the size of the coefficient on the percentage of Black residents (0.062) in my fullest model (the third column—including both DUI arrests and traffic arrests and citations as controls) is substantial. The following example helps explain what the coefficient signifies. Suppose that we compare an area that was 20% Black to one that was 80% Black. The coefficient means that there would be 3.73 more roadblocks per 1,000 citizens on average in the area that was 80% Black.[31] To put that into context, the average census tract in Madison County had about 5,000 people per year during the relevant period. For such an average census tract, if the percentage of Black residents is 80% instead of 20%, my model predicts that there will be over 18 more roadblocks per year (3.73 more roadblocks per 1,000 people is 18.65 total roadblocks), or about 112 more roadblocks in total over the 6 years of data I analyze.

---

[31] The effect of moving from an area that was 20% Black to one that was 80% Black in my model is equal to (80-20)*0.06218, which equals 3.7308.

Exhibit 6

**Regression Results: Effect of Race on Frequency of Roadblocks, Controlling for Other Factors (2012–2017)**

| Variable | (1)<br>With DUI Arrests | (2)<br>With Traffic<br>Citations/Arrests | (3)<br>With DUI Arrests<br>and Traffic<br>Citations/Arrests |
|---|---|---|---|
| Black Percentage of Population | 0.06492 | 0.05829 | 0.06218 |
| standard error | 0.01756 | 0.02486 | 0.01721 |
| p-value | 0.00033 | 0.02073 | 0.00044 |
| | | | |
| Number of DUI Arrests Per 1,000 People | 1.22070 | | 1.38900 |
| standard error | 0.10390 | | 0.12150 |
| p-value | 0.00000 | | 0.00000 |
| | | | |
| Number of Traffic Citations/Arrests Per 1,000 People | | 0.15220 | -0.10300 |
| standard error | | 0.04928 | 0.04075 |
| p-value | | 0.00251 | 0.01281 |
| | | | |
| Median Household Income (in Thousands) | 0.03166 | 0.01685 | 0.02669 |
| standard error | 0.01588 | 0.02260 | 0.01566 |
| p-value | 0.04851 | 0.45750 | 0.09094 |
| | | | |
| Unemployment Rate | -0.11910 | -0.36860 | -0.07771 |
| standard error | 0.07720 | 0.10540 | 0.07727 |
| p-value | 0.12550 | 0.00066 | 0.31660 |
| | | | |
| Percentage of Households with At Least One Vehicle | -0.05640 | -0.33580 | -0.09574 |
| standard error | 0.07273 | 0.10080 | 0.07282 |
| p-value | 0.43960 | 0.00115 | 0.19120 |
| | | | |
| Percentage of Population between Ages 15-24 | -0.03368 | -0.08256 | -0.04544 |
| standard error | 0.04824 | 0.06838 | 0.04742 |
| p-value | 0.48640 | 0.22970 | 0.33980 |
| | | | |
| Constant | 2.58350 | 33.99400 | 7.05080 |
| standard error | 7.80860 | 10.80700 | 7.83940 |
| p-value | 0.74130 | 0.00209 | 0.37030 |
| | | | |
| Observations | 126 | 126 | 126 |
| Adjusted R-Squared | 0.646 | 0.293 | 0.662 |

Source: Master CAD Report - To Be Produced.csv; American Community Survey Five Year Estimates, U.S. Census Bureau

47. I have also run a set of sensitivity analyses to test whether my results are robust to the inclusion of the two sources of roadblocks outside of the CAD data, Handwritten Roadblocks and Additional Roadblocks. When I run my regression model including roadblocks from each of these two sources, I continue to find a

statistically significant and positive effect of the percentage of the population that is Black on the frequency of roadblocks.[32]

48. I have also confirmed that my results are robust to restricting attention to subsets of the years for which data are available. At the request of Counsel, I specifically test whether my results are robust restricting attention to roadblocks that occurred in 2014 through 2017, and whether they are robust to restricting attention to roadblocks that occurred in only 2015 and 2016. I continue to find a statistically significant and positive effect of the percentage of the population that is Black on the number of roadblocks in these specifications.[33]

### 4.3. A note on the data sample

49. I understand that Defendants contend that the MCSD focuses its policing resources only on the unincorporated areas of Madison County, and, to the extent they police within the incorporated areas, they focus disproportionately in cities that need more resources.[34] The available data on roadblocks are not consistent with this claim, as roadblocks are conducted by the MCSD in incorporated areas of Madison County.

50. Even if the MCSD did focus its policing in lower income areas of Madison County, this would not undermine my regression analysis because my key control variables (DUI arrests and traffic arrests and citations) capture policing activities by the MCSD. Thus, to the extent the MCSD's roadblocks are concentrated in certain lower income areas, my control variables would account for that fact because they also measure the MCSD's policing activities. In other words, if one were concerned that the higher rate of roadblocks in census tracts with a higher percentage of Black residents reflected the fact that the MCSD polices more heavily in those tracts, my model indicates that—even after accounting for the heavier policing activity in those areas—roadblocks are significantly more common in tracts with a higher percentage of Black residents.

---

[32] See Appendix C.

[33] See Appendix C.

[34] Defendants' Response to the Complaint, ¶ 9.

51. Further, because my model includes controls for income and unemployment, it controls for the possibility that the MCSD's policing intensity varies with the income of a neighborhood.

## 5. CONCLUSION

52. In sum, available data show that (a) Madison County's 21 census tracts can be divided broadly into two geographic areas with substantially different racial populations—one area which is 17.6% Black and one area which is 66.0% Black, and (b) the frequency of roadblocks per 1,000 residents is higher in the areas of Madison County where a relatively higher percentage of the population is Black.

53. A multivariate regression analysis that controls for differences across each of the 21 census tracts that are predictive of traffic behavior—the rate of DUI arrests, traffic arrests and citations, average income, age, vehicle ownership, unemployment rate—finds a statistically significant and positive relationship between the number of roadblocks per year in census tracts in Madison County and the percentage of the population that is Black in those census tracts. In other words, even after accounting for the fact that census tracts with a higher percentage of Black residents have higher levels of DUI arrests, higher levels of traffic arrests and citations, and different socioeconomic characteristics, there remains an unexplained gap in the rate of roadblocks in those communities.

Bryan Ricchetti, Ph.D.



**Average Percentage of the
Population That is Black by Census
Tract within Madison County**
2012–2017

| Census Tract | Average Black Population Percentage |
|---|---|
| 28089030101 | 10.7% |
| 28089030202 | 10.9% |
| 28089030203 | 11.6% |
| 28089030301 | 11.6% |
| 28089030206 | 13.0% |
| 28089030204 | 14.7% |
| 28089030104 | 16.5% |
| 28089030205 | 17.9% |
| 28089030107 | 18.0% |
| 28089030201 | 18.6% |
| 28089030400 | 28.0% |
| **Average of Census Tracts with Low Black Population Percentage** | 17.6% |
| 28089030105 | 46.2% |
| 28089030106 | 47.6% |
| 28089030302 | 49.3% |
| 28089030700 | 58.4% |
| 28089030800 | 59.6% |
| 28089030108 | 65.6% |
| 28089030900 | 69.5% |
| 28089030600 | 83.7% |
| 28089031000 | 84.0% |
| 28089030500 | 89.5% |
| **Average of Census Tracts with High Black Population Percentage** | 66.0% |

Source: American Community Survey Five Year Estimates, U.S. Census Bureau

Note: Average Black population percentage figures are calculated from the 2012–2016 American Community Survey Five Year Estimates. The Census Bureau has yet to release 2013–2017 American Community Survey Five Year Estimates. Weighted average Black population percentages across 2012–2017 are reported, and 2016 data are used for 2017.

**EXHIBIT 2**

# Location of Roadblocks by Census Tract within Madison County
## 2012–2017



Black Population Percentage

- 17.6%
- 66.0%

Number of Roadblocks

- 1
- 10
- 25

Source:  American Community Survey Five Year Estimates – Geodatabase Format, U.S. Census Bureau; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; Master CAD Report – To Be Produced.csv

Note:  Census tracts that are 46% Black or more are shaded dark blue, and census tracts that are 28% Black or less are shaded light blue.  There are no census tracts with a Black population percentage between 29% and 45%.  Black population percentage and total population figures are from the ACS Five Year Estimates.  This map uses the weighted average across 2012–2017 for both of these values, and 2016 data is used for 2017.  This map includes roadblocks in Madison County for which accurate coordinates are available.  Dots are scaled by the number of roadblocks at a given longitude and latitude.

**EXHIBIT 3**

## Frequency of Roadblocks by Racial Breakdown



Source:  American Community Survey Five Year Estimates – Geodatabase Format, U.S. Census Bureau; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; Master CAD Report – To Be Produced.csv

Note:  Census tracts that are 46% Black or more are shaded dark blue, and census tracts that are 28% Black or less are shaded light blue.  There are no census tracts with a Black population percentage between 29% and 45%.  Black population percentage and total population figures are from the ACS Five Year Estimates.  This map uses the weighted average across 2012–2017 for both of these values, and 2016 data is used for 2017.  Roadblock counts include roadblocks from 2012 through 2017.

**EXHIBIT 4**

# Roadblocks Located in Canton



Source:  Tiger/Line Shapefiles: Places – Mississippi, U.S. Census Bureau; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; Master CAD Report – To Be Produced.csv; Google Maps
Note:  This map includes roadblocks for which accurate coordinates are available.  Dots are scaled by the number of roadblocks at a given longitude and latitude.

### Roadblocks per 100 DUI and Traffic Violations by Racial Breakdown



Source: Master CAD Report - To Be Produced.csv; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; American Community Survey Five Year Estimates, U.S. Census Bureau

Note: The Census Bureau has yet to release the 2013–2017 American Commiunity Survey Five Year Estimates.  Data from the 2012–2016 American Community Survey Five Year Estimates are used for observations in both 2016 and 2017.

# Roadblocks per 100 DUI and Traffic Violations by Racial Breakdown



Source: Master CAD Report - To Be Produced.csv; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; American Community Survey Five Year Estimates, U.S. Census Bureau

Note: The Census Bureau has yet to release the 2013–2017 American Commiunity Survey Five Year Estimates.  Data from the 2012–2016 American Community Survey Five Year Estimates are used for observations in both 2016 and 2017.

**EXHIBIT 6**

# Regression Results: Effect of Race on Frequency of Roadblocks, Controlling for Other Factors[1]
## 2012–2017

| Variable[2] | (1) With DUI Arrests[3] | (2) With Traffic Citations/Arrests[4] | (3) With DUI Arrests and Traffic Citations/Arrests[5] |
|---|---|---|---|
| Black Percentage of Population | 0.06492 | 0.05829 | 0.06218 |
|    standard error | 0.01756 | 0.02486 | 0.01721 |
|    p-value | 0.00033 | 0.02073 | 0.00044 |
| | | | |
| Number of DUI Arrests Per 1,000 People | 1.22070 | | 1.38900 |
|    standard error | 0.10390 | | 0.12150 |
|    p-value | 0.00000 | | 0.00000 |
| | | | |
| Number of Traffic Citations/Arrests Per 1,000 People | | 0.15220 | -0.10300 |
|    standard error | | 0.04928 | 0.04075 |
|    p-value | | 0.00251 | 0.01281 |
| | | | |
| Median Household Income (in Thousands) | 0.03166 | 0.01685 | 0.02669 |
|    standard error | 0.01588 | 0.02260 | 0.01566 |
|    p-value | 0.04851 | 0.45750 | 0.09094 |
| | | | |
| Unemployment Rate | -0.11910 | -0.36860 | -0.07771 |
|    standard error | 0.07720 | 0.10540 | 0.07727 |
|    p-value | 0.12550 | 0.00066 | 0.31660 |
| | | | |
| Percentage of Households with At Least One Vehicle | -0.05640 | -0.33580 | -0.09574 |
|    standard error | 0.07273 | 0.10080 | 0.07282 |
|    p-value | 0.43960 | 0.00115 | 0.19120 |
| | | | |
| Percentage of Population between Ages 15-24 | -0.03368 | -0.08256 | -0.04544 |
|    standard error | 0.04824 | 0.06838 | 0.04742 |
|    p-value | 0.48640 | 0.22970 | 0.33980 |
| | | | |
| Constant | 2.58350 | 33.99400 | 7.05080 |
|    standard error | 7.80860 | 10.80700 | 7.83940 |
|    p-value | 0.74130 | 0.00209 | 0.37030 |
| | | | |
| Observations | 126 | 126 | 126 |
| Adjusted R-Squared | 0.646 | 0.293 | 0.662 |

Source: Master CAD Report - To Be Produced.csv; American Community Survey Five Year Estimates, U.S. Census Bureau

Note:
[1] All Specifications include only CAD Roadblocks.
[2] The Census Bureau has yet to release the 2013–2017 American Commiunity Survey Five Year Estimates.  Data from the 2012–2016 American Community Survey Five Year Estimates are used for observations in both 2016 and 2017.
[3] Specification (1) uses number of DUI arrests per 1,000 people per year by census tract as a control variable.
[4] Specification (2) uses number of traffic citations and arrests per 1,000 people per year by census tract as a control variable.
[5] Specification (3) uses both number of DUI arrests and number of traffic citations and arrests as control variables.

**APPENDIX A**

# BRYAN RICCHETTI, Ph.D.
## Vice President

**Cornerstone Research**
181 West Madison Street, 43rd Floor • Chicago, IL 60602-4558
312.345.7320 • fax 312.345.7399
bricchetti@cornerstone.com

## ACADEMIC BACKGROUND

9/02 – 7/07   **Cornell University**                                                    Ithaca, New York

*Ph.D., Economics, Applied Econometrics, Labor Economics*

9/95 – 5/99   **Hamilton College**                                                    Clinton, New York

*B.A., Economics with Honors, Magna Cum Laude, Phi Beta Kappa*

## PROFESSIONAL EXPERIENCE

9/07 – Present   **Cornerstone Research, Inc.**                                      Chicago, Illinois

*Vice President*

- Manage and conduct economic analysis for complex business litigation and regulatory matters, with specialization in antitrust, labor, class action, market manipulation and product misrepresentation matters.

- Expertise applying a wide range of empirical and theoretical methods to complicated market settings, including the application of statistical methods to analysis of large, proprietary data sets.

- Industry focus includes: retail, food and agriculture, the economics of distribution, and sports economics.

*Selected Consulting Experience*

- *Wage Discrimination Matter* Analyzed claims of gender discrimination. Oversaw the statistical analysis of wage and promotion patterns in internal personnel records for one of the largest employers in the world.

- *Monopsony Wage Fixing Cartel in Sports Industry* Analyzed claims that wages were capped by a sports regulatory organization. Oversaw statistical analysis of key issues.

- *Monopsony Wage Fixing Cartel in Service Industry* Analyzed claims of monopsony wage suppression in service industry. Managed and implemented statistical analysis of complex payroll records. Conducted liability and damages analysis.

- *Wage Discrimination Consulting Matters* Analyzed wage and promotion patterns in internal personnel records for large private company.  Implemented econometric tests.

- *Wrongful Termination Gender Discrimination Matter* Analyzed wage and job history data to assess damage claims for employees who were allegedly wrongfully terminated by employer.

- *Alleged Cartels in Dairy Industry* (*Alice H. Allen et al. v. Dairy Farmers of America, Inc., et al. and Sweetwater Valley Farm, Inc., et al., v. Dean Foods Company, et al.*)  Analyzed liability, damages, and class certification issues in multiple cases alleging vertical and horizontal conspiracies, price-fixing and quantity restrictions in the dairy industry.  Analyzed pricing data at all levels of the industry, including issues of pass-trhough.  Oversaw implementation of econometric analysis.

- *Alleged Monopoly and Foreclosure in Home Recreation Industry* Assessed claims of attempted monopoly and foreclosure by large distributor of home recreation products.  Developed statistical model of damages to measure alleged impact of challenged conduct.

- *Merger in Food and Agriculture Industry* Analyzed potential economic impacts of a proposed merger between two large distributors.  Assessed industry structure, competitive landscape, and possible price effects.

- *Regulatory matters involving state-level alcohol laws* Analyzed the economic impact of changes to state-level laws related to the distribution of beer, wine, and liquor in one state, and retail sale of liquor in another state.  Assessed the potential effect of law change on alcohol consumption, tax revenue, and relevant social and economic outcomes.

- *LIBOR Manipulation Matters* Conceptualized and managed econometric analysis to understand the effect of the alleged conduct on rate trends. Prepared findings for regulatory investigation.

| | | |
|---|---|---|
| 9/03 – 9/07 | **US Census Bureau, LEHD** | Ithaca, New York |

*Labor Economist*

- Conducted econometric analysis related to research program on data confidentiality.  Performed complex statistical modeling of key labor market outcomes.  Authored internal papers and presentations.

| | | |
|---|---|---|
| 7/99 – 7/2002 | **MDRC** | New York, New York |

*Research Assistant*

- Conducted economic and statistical analyses of the effect of welfare-to-work programs on labor market outcomes.

**BRYAN RICCHETTI, Ph.D.**
Vice President, Cornerstone Research

---

**TESTIMONY**

*Wal-Mart Puerto Rico, Inc. v. Juan C. Zaragoza-Gomez* U.S. District Court, District of Puerto Rico. Retained by counsel for Plaintiff. Analyzed statistics issue. Filed affidavit on 1/19/16, deposed, and testified at trial.

*Dunmars v. Board of Trustees of Community College District No. 510 and Jorie Menclewicz* U.S. District Court, Northern District of Illinois, Eastern Division. Retained by counsel for Plaintiff. Damages analysis in lost wages matter. Report filed on 3/18/16.

*Scott Swanson v. Epic Systems Corporation* U.S. District Court, Western District of Wisconsin. Retained by counsel for Defendant. Rebuttal of Plaintiff expert regression analysis in age discrimination matter.  Report filed on 9/5/17.

*Boston Chapter, NAACP, Inc., et al. v. Nancy B. Beecher et al.,* and *Pedro Castro er al., v. Nancy B. Beecher et al.*, U.S. District Court, District of Massachusetts. Retained jointly by Plaintiffs and Defendants. Analysis of qualified labor pool for entry-level police and firefighers.  Report filed on 10/11/17.

*Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC v. Southeast Milk, Inc., et. Al*, U.S. District Court, Middle District of Florida, Jacksonville Division. Retained by counsel for Defendants. Analyzed liability and damages in alleged horizontal quantity restriction conspiracy. Report filed on 2/20/18.

Data Breach matter. Retained as statistics expert to analyze patterns of alleged data breach. Case resolved before report or testimony.

Antitrust matter.  Retained to analyze procompetitive aspects of allegedly anticompetitive horizontal agreement.  Case resolved before report or testimony.

**ARTICLES AND PRESENTATIONS**

Moderator, "The Capper Volstead Act - Lessons from the Trenches," ABA Teleconference Panel, December 9, 2016.

Panelist, 43rd Annual Fordham Conference on Antitrust Law and Policy, Economic Workshop – "Preparing for Deposition and Dealing with *Daubert* Challenges"

Expert Witness, ABA Antitrust Spring Meetings Mock Trial, Spring 2015 (Case involved antitrust issues raised by a hypothetical college athletic association's restrictions on amateur player compensation)

Expert Witness, Antitrust Law & Economics Institute for Federal Judges Mock Trial, October 2015 (Case involved antitrust issues raised by a hypothetical college athletic association's restrictions on amateur player compensation)

Co-author, "Applying Econometrics to Assess Market Definition and Market Power," *Econometrics: Legal, Practical, and Technical Issues*, American Bar Association Section of Antitrust Law.

**BRYAN RICCHETTI, Ph.D.**
Vice President, Cornerstone Research

___

Co-author, "Antitrust Impact in Indirect Purchaser Class Actions: The Need for Rigorous Analysis of Pass-Through," in the forthcoming Spring 2015 ABA Antitrust Distribution and Franchising Committee Newsletter

"Interpreting Comcast:  Judge Koh's Decision in Brazil v. Dole Foods," in the Winter 2015 ABA Agriculture and Food Committee Newsletter.

Contributor, "How Effective Are Different Welfare-to-Work Approaches? Five-Year Adult and Child Impacts for Eleven Programs." December 2001, New York: MDRC.

Co-Author, ABA Handbook, Chapter on Pricing Regulations in the Dairy Industry, *Forthcoming.*

"Testing Disclosure Risk in the proposed SIPP-IRS-SSA Public Use Files," *Cornell University Dissertation,* August 2007 (and submitted to U.S. Census Bureau Disclosure Review Board, November 2016).

 "Turnover as a Gateway to Symmetric Information: Testing Patterns of Entry into Personnel Records," *Cornell University Dissertation*, August 2007.

"Piece-Rates, Salary, Performance and Job Level," *Cornell University Dissertation*, August 2007.

## ACADEMIC HONORS AND AWARDS

Walter Galenson Fellowship in Labor Economics, Cornell University        Spring 2005

Scholarship Prize in Economics, Hamilton College        Spring 1998

# Documents Considered by Bryan Ricchetti, Ph.D.

## Legal Pleadings

Answer and Affirmative Defenses of Defendants, Madison County, Mississippi and Sheriff Randall C. Tucker, In His Official Capacity, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA.                                                                                              June 29, 2017

Class Action Complaint for Declaratory and Injunctive Relief and Individual Damages, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA.                                                                                              May 8, 2017

Defendants' Memorandum of Authorities in Opposition to Plaintiffs' Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA.                                                                                              November 3, 2017

Order Granting Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,C* IVIL ACTION NO. 3:17-cv-347 WHB LRA.                                                                                              December 27, 2017

Response by Defendants, Madison County, Madison County, Mississippi and Sherriff Randall Tucker, in his official capacity to Plaintiffs' First Set of Interrogatories, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA.                                                                                              October 20, 2017

## Academic Literature

Altonji, Joseph G., and Rebecca M. Blank, "Race and Gender in the Labor Market," Ashenfelter, Orley David C., Card, (Eds.), *Handbook of Labor Economics,* 3.                                                                                              1999

Angrist, Joshua, and Jörn-Steffen Pischke, "Undergraduate Econometrics Instruction: Through Our Classes, Darkly," *Journal of Economic Perspectives,* 31(2), pp. 125–144.                                                                                              2017

Bertrand, Marianne, "New Perspectives on Gender," *Handbook of Labor Economics,* 4b.                                                                                              2010

Blau, Francine D., and Lawrence M. Kahn, "Gender Differences in Pay," *The Journal of Economic Perspectives,* 14(4), pp. 75–99.                                                                                              2000

Chalfin, Aaron, and Justin McCrary, "Criminal Deterrence: A Review of the Literature," *Journal of Economic Literature,* 55(1), pp 5–48.                                                                                              2017

Fridell, Lorie, "By The Numbers: A Guide for Analyzing Race Data from Vehicle Stops," Police Executive Research Forum.                                                                                              2004

Greene, William H., *Econometric Analysis,* 6th Edition, Pearson Prentice Hall.                                                                                              2008

Impinen, Antti et al., "The Association between Social Determinants and Drunken Driving: A 15-Year Register-based Study of 81,125 Suspect," *Alcohol and Alcoholism,* 46(6), pp. 721–728.                                                                                              2011

# APPENDIX B

## Documents Considered by Bryan Ricchetti, Ph.D.

Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* , 3rd Edition, Federal Judicial Center, The National Academies Press, Washington, D.C.                2011

Perrine, M.W., Raymond C. Peck, and James C. Fell, "Epidemiologic Perspectives on Drunk Driving," Surgeon General's Workshop on Drunk Driving, Background Papers, *U.S. Department of Health and Human Services*, pp. 35–76.                1988

Ridgeway, Greg, and John MacDonald, "Methods for Assessing Racially Biased Policing," *Race, Ethnicity, and Policing: New and Essential Readings, Infrastructure, Safety, and Environment,* NYU Press, pp. 180–204.                2010

Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence,* 3rd Edition,  Federal Judicial Center, The National Academies Press, Washington, D.C.                2011

## Data

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi, Age and Sex                2012–2016

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi, Employment Status                2012–2016

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi, Housing Characteristics                2012–2016

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi, Median Household Income                2012–2016

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi, Race                2012–2016

American Community Survey Five Year Estimates for All Places in Madison County, Mississippi, Demographic and Housing Estimates                2016

American Community Survey Five Year Estimates for All Census Tracts in Madison County, Mississippi - Geodatabase Format, Shapefiles, available at *U.S. Census Bureau,*  https://www.census.gov/geo/maps-data/data/tiger-data.html.                2015

Tiger/Line Shapefiles: Places - Mississippi, available at *U.S. Census Bureau* , https://www.census.gov/cgi-bin/geo/shapefiles/index.php?year=2017&layergroup=Places.                2017

"Master CAD Report − To Be Produced.csv."                2012–2017

"Roadblock Locations (Handwritten).xlsx."                2012–2017

"Unlisted Roadblocks.xlsx."                2012–2017

"2010 Census Tallies of Census Tracts, Block Groups & Blocks," available at *U.S. Census Bureau,* https://www.census.gov/geo/maps-data/data/tallies/tractblock.html.                2010

"2010 Census – Census Tract Reference Map: Madison County, MS," available at *U.S. Census Bureau,* https://www2.census.gov/geo/maps/dc10map/tract/st28_ms/c28089_madison/DC10CT_C28089_001.pdf                2010

## Other

Sobriety Checkpoint Guidelines, Policy and Procedure, MC-RFP 2-1–MC-RFP 2-4

# APPENDIX C

## Regression Sensitivity of Number of Roadblocks Per 1,000 People by Census Tract

| Variable[1] | (1) Incl. Handwritten Roadblocks[2] | (2) Incl. Additional Roadblocks[3] | (3) Including All Roadblocks[4] | (4) 2014–2017[5] | (5) 2015–2016[6] |
|---|---|---|---|---|---|
| Black Percentage of Population | 0.06133 | 0.06200 | 0.06115 | 0.08651 | 0.11160 |
| standard error | 0.01859 | 0.01750 | 0.01925 | 0.02308 | 0.03285 |
| p-value | 0.00128 | 0.00057 | 0.00190 | 0.00035 | 0.00176 |
| | | | | | |
| Number of DUI Arrests Per 1,000 People | 1.61590 | 1.54120 | 1.76810 | 1.41100 | 1.50490 |
| standard error | 0.13130 | 0.12360 | 0.13600 | 0.15040 | 0.19820 |
| p-value | 0.00000 | 0.00000 | 0.00000 | 0.00000 | 0.00000 |
| | | | | | |
| Number of Traffic Citations/Arrests Per 1,000 People | -0.12270 | -0.11190 | -0.13170 | -0.11260 | -0.15470 |
| standard error | 0.04402 | 0.04146 | 0.04560 | 0.05176 | 0.07730 |
| p-value | 0.00618 | 0.00795 | 0.00461 | 0.03268 | 0.05332 |
| | | | | | |
| Median Household Income (in Thousands) | 0.02594 | 0.02261 | 0.02187 | 0.04232 | 0.05838 |
| standard error | 0.01692 | 0.01593 | 0.01752 | 0.02104 | 0.03049 |
| p-value | 0.12780 | 0.15840 | 0.21450 | 0.04782 | 0.06394 |
| | | | | | |
| Unemployment Rate | -0.09300 | -0.09165 | -0.10690 | -0.08406 | 0.01836 |
| standard error | 0.08346 | 0.07860 | 0.08645 | 0.11340 | 0.16420 |
| p-value | 0.26740 | 0.24600 | 0.21850 | 0.46080 | 0.91160 |
| | | | | | |
| Percentage of Households with At Least One Vehicle | -0.09488 | -0.08740 | -0.08654 | -0.09099 | -0.21380 |
| standard error | 0.07866 | 0.07408 | 0.08148 | 0.10020 | 0.15200 |
| p-value | 0.23020 | 0.24040 | 0.29030 | 0.36680 | 0.16860 |
| | | | | | |
| Percentage of Population between Ages 15-24 | -0.04124 | -0.05159 | -0.04739 | -0.01959 | -0.09472 |
| standard error | 0.05122 | 0.04823 | 0.05305 | 0.05941 | 0.08334 |
| p-value | 0.42230 | 0.28690 | 0.37350 | 0.74240 | 0.26370 |
| | | | | | |
| Constant | 7.11280 | 6.74560 | 6.80770 | 4.18290 | 15.08500 |
| standard error | 8.46820 | 7.97440 | 8.77090 | 10.62100 | 16.21300 |
| p-value | 0.40260 | 0.39930 | 0.43920 | 0.69480 | 0.35870 |
| | | | | | |
| Observations | 126 | 126 | 126 | 84 | 42 |
| Adjusted R-Squared | 0.683 | 0.695 | 0.704 | 0.666 | 0.741 |

Source: Master CAD Report - To Be Produced.csv; Roadblock Locations (Handwritten).xlsx; Unlisted Roadblocks.xlsx; American Community Survey Five Year Estimates, U.S. Census Bureau

Note:
[1] The Census Bureau has yet to release the 2013–2017 American Community Survey Five Year Estimates.  Data from the 2012–2016 American Community Survey Five Year Estimates are used for observations in both 2016 and 2017.
[2] Specification (1) includes only CAD Roadblocks and Handwritten Roadblocks.
[3] Specification (2) includes only CAD Roadblocks and Additional Roadblocks
[4] Specification (3) includes all CAD Roadblocks, Handwritten Roadblocks, and Additional Roadblocks.
[5] Specification (4) includes only CAD Roadblocks that occurred between 2014–2017.
[6] Specification (5) includes only CAD Roadblocks that occurred between 2015–2016.

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, | Civil Action No. 3:17-cv-00347-WHB-LRA |

*Plaintiffs*,

     v.

MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,

*Defendants*.

## SUMMARY DECLARATION OF RAHUL GUHA, PH.D.

## SUBMITTED PURSUANT TO FEDERAL RULE OF EVIDENCE 1006

March 13, 2018

# Table of Contents

I.      Qualifications ......................................................................................................... 1

II.     Assignment ............................................................................................................ 1

III.    Methodology ......................................................................................................... 3

    A.      Data summary 1:  Arrests made by the MCSD ............................................... 3

    B.      Data summary 2:  Citations issued by the MCSD .......................................... 6

    C.      Data summary 3:  Incident reports ................................................................. 8

        1.      Arrests from Stops at Roadblocks ............................................................ 9

        2.      Apartment Walkthroughs ........................................................................ 10

        3.      Arrests from Traffic Stops ...................................................................... 10

## I.     Qualifications

1.      I am a Senior Vice President at Cornerstone Research, a financial and economic consulting firm.  I hold Ph.D. and M.S. degrees from Cornell University, an M.B.A. from the Indian Institute of Management, and a B.E. degree in Electronics and Telecommunications Engineering from Jadavpur University.  I have over 20 years of experience advising clients in litigation matters.

2.      I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  Cornerstone Research and I are providing our services in this matter pro bono.

## II.    Assignment

3.      I have been asked by Simpson Thacher & Bartlett LLP, the American Civil Liberties Union of Mississippi Foundation, and the American Civil Liberties Union Foundation, Counsel for Plaintiffs in this action,[1] to perform the following calculations and to provide the following summaries based on data and documents produced by the Madison County Sheriff's Department ("MCSD"), and the Madison County Justice Court:

    a.   Data summary 1:  Tabulate and summarize the data in ACLU12TO17.CSV ("Arrest Data") by offense and race.  I understand that these data represent all individuals arrested by the MCSD and booked into the Madison County Detention Center from January 1, 2012 through September 20, 2017.[2]

    b.   Data summary 2:  Tabulate and summarize the data in "ACLU FOIA Request 02052018 V1.xlsx" ("Citations Data") by violation and race.

---

[1] Class Action Complaint for Declaratory and Injunctive Relief and Individual Damages, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities*, CIVIL ACTION NO. 3:17-cv-347 WHB-LRA, filed May 8, 2017 ("Complaint").

[2] I have been informed by Counsel that in an email dated November 29, 2017 from Charles Cowan to Isaac Rethy, Mr. Cowan confirmed that the Arrest Data on which this data summary is based "is a copy of the Madison County Detention Center jail docket for 01/10/2012 through 09/20/2017 and that it reflects only arrests made by the Madison County Sheriff's Department and not those made by other arresting agencies."  *See* Charles Cowan, email message to Isaac Rethy, November 29, 2017.

I understand that these data represent all citations issued to individuals in Madison County for the period from January 1, 2012 December 31, 2017.[3]  These data include citations issued by the MCSD, as well as citations issued by other agencies operating within Madison County.[4] The summary data I present are limited to citations issued by the MCSD.[5]

c. Data summary 3:  Summarize selected categories of data in the subset of incident reports produced by the MCSD.  I understand that incident reports are filled out and filed by the MCSD officers after certain types of incidents take place, such as those involving arrests.[6]

4.      A list of materials I used in performing my calculations and creating my data summaries is included as Appendix A.

5.      The data and document sets on which these summaries and calculations are based are voluminous. Without the benefit of summaries and calculations, it may be inconvenient for the Court to examine the contents of these data and document sets.

6.      Because of the volume of the documents and data I was asked to summarize, I required the assistance of staff of Cornerstone Research, who worked under my direction.

---

[3] I have been informed by Counsel that the Citations Data was produced by the Madison County Justice Court in response to a records request pursuant to the Mississippi Public Records Act of 1983, Miss. Code Ann. § 25-61-1, *et seq.* dated November 17, 2017 seeking "[a]ll citations issued to individuals in Madison County for the period January 1, 2012 to the present." In response to this request, the Madison County Justice Court produced a spreadsheet of citations comprising the time period from January 1, 2012 to December 31, 2017, "ACLU FOIA Request 02052018 V1.xlsx."

[4] I have been informed by Counsel that the Citations Data includes citations issued by the following law enforcement agencies, as identified by the corresponding acronyms in parentheses:  Madison County Sheriff's Office (MSO); Mississippi Highway Patrol (MHP); Madison County Constable (CON); Pearl River Reservoir Patrol (PRV); Public Service Commission (PSC); and Department of Wildlife Fisheries and Park (WCD).

[5] I identified citations issued by the MCSD by selecting for citations issued by "MSO," which I understand indicates citations issued by the MCSD.

[6] I have been informed by Counsel that Defendants' response to Interrogatory Number 15 describes the MCSD's process for creating incident reports, as well as the circumstances under which an MCSD officer must prepare an incident report with a narrative. Defendants' response to Interrogatory Number 15 states "an incident report with a narrative is not prepared as a result of every encounter experienced by a MCSD officer, but if an arrest is made, an incident report is prepared." *See* Response by Defendants, Madison County, Madison County, Mississippi and Sherriff Randall Tucker, in His official capacity to Plaintiffs' First Set of Interrogatories, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on Behalf of a class of all other similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347-WHB-LRA, dated October 20, 2017 ("Interrogatory Responses") at p. 13.

7.      My calculations and data summaries are based on data that was available to me as of the date of this declaration ("Declaration").  This Declaration is limited to presenting the results of these calculations and summaries.  I reserve the right to supplement this Declaration if additional data were to be made available to me or if I am asked to perform additional calculations or provide additional data summaries.

## III.    Methodology

### A.      Data summary 1:  Arrests made by the MCSD

8.      It is my understanding that the Arrest Data include all individuals arrested by MCSD and booked into the Madison County Detention Center from January 1, 2012 through September 20, 2017.  The data include information regarding the date of each arrest, the name, gender and race of the individual arrested, the offense for which the individual was arrested, and the corresponding offense code.  I understand that it is possible for an individual to be arrested and booked for more than one offense at the same time.

9.      My calculation is based on the Arrest Data after duplicates have been removed based on the combination of name, race, sex, date, and offense code.  I assume that such duplicates indicate that an individual was charged with multiple counts of the same offense, rather than such duplicates indicating two different arrest and booking incidents in a single day.  Removing these duplicates removes 2,559 observations, 10% of the total observations in the Arrest Data.

10.     I first tabulate the percentage of all arrests that are associated with Black individuals in the Arrest Data.  Exhibit 1 shows that 77% of all arrests are associated with Black individuals, compared with 20% of all arrests associated with white individuals, and 3% associated with individuals of other races.  Note that this calculation is conducted on a per-offense, rather than a per-individual basis (except for the removal of duplicates set forth above).  Thus, if an individual is arrested and charged with three unique offenses on one day, I count those arrests as three separate arrests.

11.     Next, I calculate the percentage of Black arrestees among all arrestees for each offense code.  Exhibit 2 shows the percentage of arrestees who are Black for each

offense code with more than 100 total arrests.  For example, this exhibit shows that Black individuals accounted for:

- 94% of arrests for no child restraint;[7]
- 88% of arrests for no seatbelt;[8]
- 87% of arrests for driving with a suspended or revoked license;[9]
- 85% of arrests for speeding on local highways; [10]
- 83% of arrests for no proof of liability insurance; [11]
- 83% of arrests for driving without a license;[12]
- 83% of arrests for driving without paying a license tax;[13]
- 80% of arrests for disobedience of a traffic control device;[14]
- 81% of arrests for driving without an up-to-date certificate of inspection;[15]
- 80% of arrests for improper vehicle equipment; [16]
- 77% of arrests for an improper turn (turning without a turn signal);[17] and
- 68% of arrests for careless driving.[18]

---

[7] This calculation is based on offense code 63-7-301.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-7-301, entitled *Requirement; failure as negligence.*

[8] This calculation is based on offense code 63-2-1.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-2-1, entitled *Seat belts required; definition; exemptions.*

[9] This calculation is based on offense code 63-1-57.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-1-57, entitled *Driving after suspension or revocation.*

[10] This calculation is based on offense code 63-3-511.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-3-511, entitled *Reduced speed limits, other officials.*

[11] This calculation is based on offense code 63-15-4.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-15-4, entitled *Proof of insurance; insurance card; violations and penalties.*

[12] This calculation is based on offense code 63-1-5.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-1-5, entitled *Operating vehicle without license; offense; penalty.*

[13] This calculation is based on offense code 27-19-131.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 27-19-131, entitled *Consequences of violations.*

[14] This calculation is based on offense code 63-3-313.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-3-313, entitled *Only police officer directive overrides signal.*

[15] This calculation is based on offense code 63-13-7.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-13-7 (repealed in 2015), entitled *Requirement of periodic inspection and approval of motor vehicles, trailers, and school buses; display of certificate of inspection and approval; exemption of certain motor vehicles.*

[16] This calculation is based on offense code 63-7-7.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-7-7, entitled *Breach as misdemeanor.* I also understand from Counsel that this statutory section is part of Chapter 7, entitled *Equipment and Identification General Provisions*, of Title 63, entitled *Motor Vehicles and Traffic Regulations.*

[17] This calculation is based on offense code 63-3-707.  I understand from Counsel that this offense code corresponds to arrests under Miss. Code § 63-3-707, entitled *Signaling turns and stops.*

[18] This calculation is based on offense code 63-3-1213.  I understand from counsel that this offense code corresponds to arrests under Miss. Code § 63-3-1213, entitled *Careless or imprudent driving.*

12.     Exhibit 2 also indicates the number of arrests of Black individuals for each offense code at the top of the bar.  For example, 193 Black individuals were arrested for no child restraint, while 548 Black individuals were arrested for no seatbelt.

13.     I have also marked the population percentage of Black individuals in Madison County as a dotted line on Exhibit 2.  According to data from the U.S. Census Bureau, 38.4% of the population of Madison County was Black as of July 1, 2016.[19]  All offense codes in the Arrest Data that have more than 100 arrests have a higher percentage of Black arrestees than the percentage of Black residents in Madison County.

14.     A full set of my tabulations for each offense code can be found in Appendix B. This Appendix shows that arrests corresponding to 251 out of 282 offense codes in the Arrest Data have a higher percentage of Black arrestees than the percentage of Black residents in Madison County.[20]

15.     I also calculate the racial profile of the arrested population as a ratio of the residential population of Madison County.  To do so, I first calculate the number of Black individuals arrested per offense code in the Arrest Data.  I then divide that number by the population of Black residents in Madison County as of July 1, 2016. This figure is the number of Black arrests per capita in Madison County for each offense code.  I calculate the same figure for non-Black residents of Madison County. The ratio between these two figures represents how much more frequently Black individuals are arrested for a particular offense code compared with non-Black individuals, accounting for the difference in the population between Black and non-Black individuals.  If Black and non-Black individuals were arrested under an offense code at equal rates, then this ratio would be 1, since the per capita number of Black arrestees would be the same as the per capita number of non-Black arrestees.

16.     The results of this calculation are presented in Appendix B.  The ratio between the number of per capita Black arrestees and non-Black arrestees for each offense is higher than 1 for 251 out of 282 offense codes.  For example, the value of this ratio is

---

[19] The variable "Black or African American alone, percent, July 1, 2016" is used as the Black percentage of the population in Madison County.  *See* "QuickFacts:  Madison County, Mississippi," *United States Census Bureau*, available at https://www.census.gov/quickfacts/fact/table/madisoncountymississippi,MS/PST045217, accessed 12/26/2017.

[20] There are six observations in "ACLU12TO17.CSV" that have no offense code and no offense description. These are displayed in the table as "Missing Code" and "Missing Offense."

11.72 for the no seatbelt offense code (Miss. Code § 63-2-1), indicating that the per capita number of Black arrestees under this offense code is over 11 times higher than the per capita number of non-Black arrestees under this offense code.

**B.      Data summary 2:  Citations issued by the MCSD**

17.     It is my understanding that the Citations Data represent all citations issued to individuals in Madison County for the period from January 1, 2012 through December 31, 2017.  These data include information such as the date of the ticket, the violation,[21] and the name, sex,  and race of the individual cited.  I understand that it is possible for an individual to receive a citation for multiple violations on the same day. I limit my calculations to citations issued by the MCSD only.[22]

18.     My calculations are based on the Citations Data after duplicates have been removed based on date, name, sex, race and violation.  I assume that such duplicates indicate a record-keeping discrepancy, or an instance in which an individual was issued multiple citations for the same violation in one incident, rather than such duplicates indicating two different encounters in which citations for the same violation were issued to the same person in a single day.   Removing duplicates as described removes 122 observations, which is 0.5% of the total Citations Data for the MCSD.

19.     I first tabulate the percentage of all citations that are associated with Black individuals in the Citations Data.[23]  Exhibit 3 shows that 72% of all citations are issued to Black individuals, compared with 23% of all citations issued to white individuals, and 5% issued to individuals of other races.

20.     Next, I calculate the percentage of citations issued to Black individuals relative to the total number of citations recorded in the dataset, within each violation

---

[21] The description of the violations in the Citations Data includes values that appear to refer to the same violation, but have minor differences.  For example, there are instances in which the same description appears as both proper case and upper case.  There are also many instances in which descriptions are similar, such as "CHILD RESTRAINT VIOLATION 3YRS" and "CHILD RESTRAINT VIOLATION 4YRS."  Some violations have slightly different spellings such as "DISREGARD FOR TRAFFIC DEVICE" and "DISREGARD FOR TRFC DEV."  Finally, some violations have strong similarities or word overlap, such as "EXPIRED TAG," "EXPIRED TAG/NO TAG," and "IMPROPER / EXP TAG."  For the purpose of this data summary, I have grouped violations into categories as a data cleaning measure.

[22] It is my understanding that citations for which the ticketing agency is "MSO" are citations issued by the MCSD.

[23] Note that this summary is conducted at the person-date-offense level, rather than at the individual level.  If an individual is issued three citations for different violations by the MCSD in one day, that is counted as three citations in this summary.

category.  Exhibit 4 shows the percentage of citations issued to Black individuals for each violation category.[24]  For example, this exhibit shows that Black individuals were issued:

- 94% of citations for a child restraint violation;
- 84% of citations for driving with a suspended license;
- 77% of citations for no proof of liability insurance;
- 76% of citations for following another vehicle too closely;
- 74% of citations issued for a seatbelt violation;
- 73% of citations for failure to yield;
- 71% of citations for improper equipment;
- 71% of citations for an improper turn;
- 63% of citations for an improper tag or no tag; and
- 62% of citations for reckless driving;

21.     Exhibit 4 also indicates the number of citations issued to Black individuals for each violation category at the top of the bar.  For example, 599 Black individuals were issued a citation for a child restraint violation, while 1412 Black individuals were issued citations for a seatbelt violation.

22.     I have also marked the population percentage of Black individuals in Madison County as a dotted line on this Exhibit.  According to data from the U.S. Census Bureau, 38.4% of the population of Madison County was Black as of July 1, 2016.[25] All violation categories in the Citations Data presented in Exhibit 4 have a higher percentage of Black individuals cited than the percentage of Black residents in Madison County.

23.     A full set of my tabulations for all violation categories can be found in Appendix C.  This Appendix shows that, for 23 out of 24 violation categories in the Citations Data, the percentage of Black individuals cited for the violation category is higher than the percentage of Black residents in Madison County.[26]

---

[24] I exclude the category "Speeding," which contained only one observation, from this exhibit.

[25] The variable "Black or African American alone, percent, July 1, 2016" is used as the Black percentage of the population in Madison County.  "QuickFacts:  Madison County, Mississippi," *United States Census Bureau*, available at https://www.census.gov/quickfacts/fact/table/madisoncountymississippi,MS/PST045217, accessed on 12/26/2017.

[26] There are 1,066 observations in "ACLU FOIA Request 02052018 V1.xlsx" that were not grouped into a violation category. These are displayed in the Appendix as "No Category Assigned."

24.     I also calculate the racial profile of the population issued citations as a ratio of the residential population of Madison County.  To do so, I first calculate the number of citations issued to Black individuals per violation category in the Citations Data.  I then divide that number by the population of Black residents in Madison County as of July 1, 2016.  This figure is the per capita number of citations issued to Black individuals for each violation category.  I calculate the same figure for non-Black residents of Madison County.  The ratio between these two figures represents how much more frequently citations are issued to Black individuals for each violation category compared to non-Black individuals, accounting for the difference in the population between Black and non-Black individuals.  If Black and non-Black individuals were issued citations for a particular violation at equal rates, then this ratio would be 1, since the per capita number of citations issued to Black individuals would be the same as the per capita number of citations issued to non-Black individuals.

25.     The results of these calculations are presented in Appendix C for each violation category.  The ratio between the number of citations issued per capita to Black individuals and non-Black individuals for each violation category is higher than 1 for all violation categories except speeding.  For example, the value of this ratio is 4.62 for the citations for a seatbelt violation, indicating that the per capita number of citations issued to Black individuals for this violation is more than four times higher than the per capita number of citations issued to non-Black individuals for this violation.

26.     I was also asked to calculate the racial distribution of citations issued for a seatbelt violation only.  In other words, I limit the Citations Data to individuals (as defined by unique name, race, and gender) who only have a citation issued for a seatbelt violation listed on a given day in the Citations Data.  Exhibit 5 shows that 67% of these individuals are Black, while 32% are white.  1% of these individuals are of some other race.

**C.     Data summary 3:  Incident reports**

27.     I understand that a number of incident reports from the time period 2012–2017 have also been produced in this matter.  I understand that incident reports are filled out and filed by MCSD officers after certain types of incidents take place, such as those involving arrests.

28.     It is my understanding that the incident reports produced by Defendants represent a subset of all incident reports filed during this time period.[27]  At the direction of Counsel, I have limited my summaries of these incident reports to the following categories of law enforcement activity:  arrests related to stops at roadblocks, apartment walkthroughs, and arrests related to traffic stops.

29.     The following methodology was followed in order to convert the PDF files produced by Defendants into data that could be summarized.  First, the PDF files of the incident reports were processed by text recognition software.  Next, keyword searches of the processed files were used in order to identify incident reports related to each topic of interest, the details of which are described below.  From the files identified by each keyword search, I further limited to the incident reports that also mentioned an arrest.  Finally, the status and race of individuals mentioned in the incident reports were parsed from the processed incident reports.

30.     At my direction, a team at Cornerstone Research has implemented this methodology and checked the results to ensure that the data have been objectively collected. [28]

1.     **Arrests from Stops at Roadblocks**

31.     Incident reports relating to arrests resulting from stops at roadblocks were identified by searching for the terms "road block," "roadblock," "check point," "checkpoint," or "safety check" within the set of PDF incident reports produced by Defendants (the "Roadblock Incident Reports").

---

[27] I have been informed by Counsel that Defendants' Memorandum of Authorities in Opposition to Plaintiffs' Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA, dated November 3, 2017 ("Memorandum of Authorities") broadly describes the selection process Defendants undertook to produce incident reports in this action. Defendants represented that they have produced "incident reports arguably relevant to plaintiffs' claims in this case." Memorandum of Authorities at p. 3.

[28] Due to the quality of the files produced by Defendants, there may be files that are not identified by the methodology described above, but would have been identified as relevant by a manual review.  However, because I have defined an objective methodology for selecting the incident reports to include in this summary, I have no reason to believe that the incident reports represented here are a biased sample of the incident reports produced by Defendants in this matter.

32.     Exhibit 6 tabulates the number of arrests identified from the Roadblock Incident Reports, grouped by race.[29]  Exhibit 6 also shows the percentage of arrests by race out of the total number of arrests identified in the Roadblock Incident Reports. The total number of identified arrests is 1,265, with arrests of Black individuals representing 76% of total arrests.

### 2.     Apartment Walkthroughs

33.     Incident reports relating to apartment walkthroughs were identified by searching for the terms "walk through," "walkthrough," "walk thru," "walk-thru," "walk-through," or "apartment_walk_thru" (the "Apartment Walkthrough Incident Reports").

34.     A total of 418 Apartment Walkthrough Incident Reports were identified as relating to apartment walkthroughs by the keyword search methodology described above.  Exhibit 7 shows that of those, 41 were identified as reporting the arrest of an individual.  This represents 10% of the Apartment Walkthrough Incident Reports.  Of the arrested individuals identified from the Apartment Walkthrough Incident Reports, 90% are Black individuals.

### 3.     Arrests from Traffic Stops

35.     Incident reports relating to arrests made at traffic stops were identified by searching for the terms "stop," "V.T.O.," "D.U.I." or "traffic offenses," together with the term "arrest" (the "Traffic Stop Incident Reports").

36.     Exhibit 8 tabulates the number of arrests identified from the Traffic Stop Incident Reports, grouped by race.  Exhibit 8 also shows the percentage of arrests per race out of the total arrests identified from the Traffic Stop Incident Reports.  The total number of identified arrests is 3,227, with arrests of Black individuals representing 74% of total arrests.

37.     I was also asked to summarize incident reports documenting arrests resulting from traffic stops initiated because of seatbelt violations only.  Such incident reports were identified by searching for "seat belt," "seatbelt," "safety belt," or "buckl".

---

[29] An individual is considered an arrestee if the parsing methodology identifies the "Status" on the incident report for the individual as "ARREST".

Incident reports identified were then manually reviewed to evaluate whether the narrative of the incident report noted that the traffic stop was initially made because of a seatbelt violation and for no other reason.  Only incident reports for which the narrative of the incident report could be extracted by text parsing were manually reviewed.

38.     Exhibit 9 tabulates the number of arrests resulting from traffic stops initiated for seatbelt violations only from the set of incident reports identified by the keyword search methodology described above.  These identified arrests are presented grouped by race, with the number of arrests per race as a percentage of total arrests.  The total number of identified arrests is 102, with arrests of Black individuals representing 90% of total arrests.

Executed this 13th day of March, 2018

_____
     Rahul Guha



# Summary of Total Arrests
## Madison County Sheriff's Department 2012–2017

| Race | Number of Arrests | Percentage |
|------|------------------|-----------|
| Black | 17,631 | 77% |
| White | 4,669 | 20% |
| Other | 717 | 3% |
| **Total** | **23,017** | **100%** |

Source:  ACLU12TO17.CSV

Note:
[1]  The tabulation was conducted under the assumption that an individual can only be arrested once a day for the same offense code. For this reason, the data is de-duplicated by first name, last name, gender, race, date, and offense code.
[2]  Individuals identified with race "B" are grouped as "Black," individuals identified with race "W" are grouped as "White," and individuals identified with any other race are grouped as "Other."



## Black Percentage of Arrests by Offense Code
### Madison County Sheriff's Department 2012–2017

Source: ACLU12TO17.CSV;  U.S. Census Bureau

Note:
[1]  Dashed line indicates that 38.4% of Madison County, MS was black as of July 1, 2016.
[2]  The number of arrests of Black individuals for an offense code is shown above the bar for the offense code.
[3]  Includes offense codes with more than 100 observations.
[4]  The descriptions of the offense codes correspond to the descriptions set forth in ACLU12TO17.CSV.  In certain instances, the descriptions appear to have been cut off in ACLU12TO17.CSV.

# Summary of Total Citations
## Madison County Sheriff's Department 2012–2017

| Race | Number of Citations | Percentage |
|---|---|---|
| Black | 18,285 | 72% |
| White | 5,829 | 23% |
| Other | 1,339 | 5% |
| **Total** | **25,453** | **100%** |

Source:  ACLU FOIA Request 02052018 V1.xlsx

Note:
[1]  The tabulation was conducted under the assumption that an individual can only be cited once a day for the same violation.  For this reason, the data is de-duplicated by ticketing agency, name, gender, race, date, and violation.  I assume that if two observations have the same name, gender, and race then they are the same person.
[2]  Individuals identified with race "B" are grouped as "Black," individuals identified with race "W" are grouped as "White," and individuals identified with any other race are grouped as "Other."
[3]  This tabulation reflects only citations issued by the MCSD.  It is my understanding that citations for which the ticketing agency is "MSO" are citations issued by the MCSD.



# Black Percentage of Citations by Violation Category
## Madison County Sheriff's Department 2012–2017

Source:  ACLU FOIA Request 02052018 V1.xlsx; U.S. Census Bureau

Note:
[1]  Dashed line indicates that 38.4% of Madison County, MS was black as of July 1, 2016.
[2]  The number of citations of Black individuals for a violation category is shown above the bar for the violation category.  Categories with 10 or more citations are shown.
[3]  This tabulation reflects only citations issued by the MCSD.  It is my understanding that citations for which the ticketing agency is "MSO" are citations issued by the MCSD.
[4]  Violations are grouped by violation categories.  These categories are created as a data cleaning measure to combine citation violations that are similar.

**EXHIBIT 5**

# Individuals Cited For A Seatbelt Violation Only
## Madison County Sheriff's Department 2012–2017

| Race | Number of Citations | Percentage of Total |
|------|---------------------|---------------------|
| Black | 666 | 67% |
| White | 315 | 32% |
| Other | 12 | 1% |
| **Total** | **993** | **100%** |

Source:  ACLU FOIA Request 02052018 V1.xlsx

Note:
[1]  Citations where Race does not equal "B" or "W" are included in the "Other" race category.  I assume that two citations were issued to the same person if the name, race, and gender are equal.  This tabulation includes all people who were cited for only a Seatbelt Violation on a given day.  If a person was cited for a Seatbelt Violation only on two different days, each of those citations is counted.  "Seatbelt Violation" refers to a violation that is in the Seatbelt Violation category.
[2]  This tabulation reflects only citations issued by the MCSD.  It is my understanding that citations for which the ticketing agency is "MSO" are citations issued by the MCSD.

**EXHIBIT 6**

# Arrests From Incident Reports
# Related to Stops at Roadblocks[1]
## Madison County Sheriff's Department 2012–2017

| Race | Number of Arrests | Percentage of Total |
|------|-------------------|---------------------|
| Black[2] | 956 | 76% |
| White[3] | 277 | 22% |
| Hispanic[4] | 27 | 2% |
| Other[5] | 5 | 0% |
| **Total** | **1,265** | **100%** |

Source:  Incident Reports Produced by Defendants, MC-RFP-Inc. Rep. 000001 – MC-RFP-Inc. Rep. 059053.

Note:
[1]  A keyword search identified incident reports related to stops at roadblocks using the search term "road block OR roadblock OR check point OR checkpoint OR safety check."  This search resulted in 1,702 incident reports.  The incident reports were then parsed programmatically.  The parsed results contain 2,396 observations corresponding to individuals or entities listed in the "Persons" section of the incident report.  This tabulation is based on observations for which the person status is identified as "ARREST".  Duplicates based on incident report filename, parsed name, and parsed race are removed.  Observations for which the name is "NA" or for which race is not parsed as described below are removed.
[2]  Any person whose parsed race contains "BLACK" is grouped as "Black."
[3]  Any person whose parsed race contains "WHITE" is grouped as "White."
[4]  Any person whose parsed race is "HISPANIC" or "HISPAN1C" is grouped as "Hispanic."
[5]  Any person whose parsed race is "ASIAN ISLANDER,"  "A5IAN ISLANDER,"  "AMERICANINDIAN," or "OTHER" is grouped as "Other."

 **EXHIBIT 7**

# Arrests From Incident Reports
# Related to Apartment Walkthroughs[1]
## Madison County Sheriff's Department 2012–2017

| Race | Number of Arrests | Percentage of Total |
|------|:-----------------:|:-------------------:|
| Black[2] | 37 | 90% |
| White[3] | 4 | 10% |
| Hispanic[4] | - | - |
| Other[5] | - | - |
| **Total** | **41** | **100%** |

Source:  Incident Reports Produced by Defendants, MC-RFP-Inc. Rep. 000001 – MC-RFP-Inc. Rep. 059053.

Note:
[1]  A keyword search identified incident reports related to apartment walkthroughs using the search term "walk through OR walkthrough OR walk thru OR walk-thru OR walk-through OR apartment_walk_thru." This search resulted in 418 incident reports.  The incident reports were then parsed programmatically. The parsed results contain 460 observations corresponding to individuals or entities listed in the "Persons" section of the incident report.  This tabulation is based on observations for which the person status is identified as "ARREST".  Duplicates based on incident report filename, parsed name, and parsed race are removed.  Observations for which the name is "NA" or for which race is not parsed as described below are removed.
[2]  Any person whose parsed race contains "BLACK" is grouped as "Black."
[3]  Any person whose parsed race contains "WHITE" is grouped as "White."
[4]  Any person whose parsed race is "HISPANIC" or "HISPAN1C" is grouped as "Hispanic."
[5]  Any person whose parsed race is "ASIAN ISLANDER,"  "A5IAN ISLANDER,"  "AMERICANINDIAN," or "OTHER" is grouped as "Other."

# Arrests From Incident Reports
# Related to Traffic Stops[1]
## Madison County Sheriff's Department 2012–2017

| Race | Number of Arrests | Percentage of Total |
|------|-------------------|---------------------|
| Black[2] | 2,393 | 74% |
| White[3] | 707 | 22% |
| Hispanic[4] | 108 | 3% |
| Other[5] | 19 | 1% |
| **Total** | **3,227** | **100%** |

Source:  Incident Reports Produced by Defendants, MC-RFP-Inc. Rep. 000001 – MC-RFP-Inc. Rep. 059053.

Note:
[1]  A keyword search identified incident reports related to traffic stops using the search term "(stop OR v.t.o. OR d.u.i OR traffic offenses) AND arrest."  This search resulted in 4,404 incident reports.  The incident reports were then parsed programmatically.  The parsed results contain 6,930 observations corresponding to individuals or entities listed in the "Persons" section of the incident report.  This tabulation is based on observations for which the person status is identified as "ARREST".  Duplicates based on incident report filename, parsed name, and parsed race are removed.  Observations for which the name is "NA" or for which the race is not parsed as described below are removed.
[2]  Any person whose parsed race contains "BLACK" is grouped as "Black."
[3]  Any person whose parsed race contains "WHITE" is grouped as "White."
[4]  Any person whose parsed race is "HISPANIC" or "HISPAN1C" is grouped as "Hispanic."
[5]  Any person whose parsed race is "ASIAN ISLANDER,"  "A5IAN ISLANDER,"  "AMERICANINDIAN," or "OTHER" is grouped as "Other."

# Arrests From Incident Reports Related to Traffic Stops Initiated For A Seatbelt Violation Only[1]

## Madison County Sheriff's Department 2012–2017

| Race | Number of Arrests | Percentage of Total |
|------|-------------------|---------------------|
| Black[2] | 92 | 90% |
| White[3] | 6 | 6% |
| Hispanic[4] | 4 | 4% |
| Other[5] | - | - |
| **Total** | **102** | **100%** |

Source:  Incident Reports Produced by Defendants, MC-RFP-Inc. Rep. 000001 – MC-RFP-Inc. Rep. 059053.

Note:
[1]  A keyword search identified incident reports relating to traffic stops initiated for seatbelt violations only using the search term "seat belt OR seatbelt OR safety belt OR buckl."  This search resulted in 574 incident reports.  The incident reports were then parsed programmatically.  The parsed results contain 856 observations corresponding to individuals or entities listed in the "Persons" section of the incident report.  This tabulation is based on observations for which the person status is identified as "ARREST" and for which a manual review identified a traffic stop that was initially made because of a seatbelt violation and for no other reason.  Duplicates based on filename, parsed name, and parsed race are removed.  Observations for which name is "NA" or for which race is not parsed as described below are removed.
[2]  Any person whose parsed race contains "BLACK" is grouped as "Black."
[3]  Any person whose parsed race contains "WHITE" is grouped as "White."
[4]  Any person whose parsed race is "HISPANIC" or "HISPAN1C" is grouped as "Hispanic."
[5]  Any person whose parsed race is "ASIAN ISLANDER,"  "A5IAN ISLANDER,"  "AMERICANINDIAN," or "OTHER" is grouped as "Other."

# APPENDIX A

## Documents Cited or Summarized by Rahul K. Guha

### Legal Pleadings

| | |
|---|---|
| Class Action Complaint for Declaratory and Injunctive Relief and Individual Damages, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA. | May 8, 2017 |
| Defendants' Memorandum of Authorities in Opposition to Plaintiffs' Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA. | November 3, 2017 |
| Order Granting Motion to Compel, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,C* IVIL ACTION NO. 3:17-cv-347 WHB LRA. | December 27, 2017 |
| Response by Defendants, Madison County, Madison County, Mississippi and Sherriff Randall Tucker, in his official capacity to Plaintiffs' First Set of Interrogatories, *Latoya Brown; Lawrence Blackmon; Herbert Anthony Green; Khadafy Manning; Quinnetta Manning; Marvin McField; Nicholas Singleton; Steven Smith; Bessie Thomas; and Betty Jean Williams Tucker, individually and on behalf of a class of all others similarly situated, v. Madison County, Mississippi; Sheriff Randall S. Tucker, in his official capacity; and Madison County Sheriff's Deputies John Does #1 through #6, in their individual capacities,* CIVIL ACTION NO. 3:17-cv-347 WHB LRA. | October 20, 2017 |

### Data

| | |
|---|---|
| "ACLU12TO17.CSV." | 2012–2017 |
| "ACLU FOIA Request 02052018 V1.xlsx." | 2012–2017 |
| Incident Reports Produced by Defendants, MC-RFP-Inc. Rep. 000001 – MC-RFP-Inc. Rep. 059053 | 2012–2017 |
| "QuickFacts: Madison County, Mississippi," *United States Census Bureau,* available at https://www.census.gov/quickfacts/fact/table/madisoncountymississippi, MS/PST045217, accessed on 12/26/2017. | |

### Miscellaneous

| | |
|---|---|
| Email from Charles Cowan Re: Latoya Brown, et al. v. Madison County, MS, et al., No. 3:17-cv-347 WHB LRA [EXT]. | November 29, 2017 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 63-15-4 | Failure of Owner or Operator o | 2,456 | 2,048 | 408 | 83% | 8.05 |
| 63-11-30(2)(A) | DUI - First Offense DUI | 2,129 | 1,425 | 704 | 67% | 3.25 |
| 41-29-139 | Controlled Substance Violation | 1,867 | 1,294 | 573 | 69% | 3.62 |
| 63-1-57 | Driving with Suspended/revoked | 1,820 | 1,588 | 232 | 87% | 10.98 |
| 63-1-5 | Motor Vehicle Violation - No/E | 1,293 | 1,074 | 219 | 83% | 7.87 |
| 63-3-1213 | Careless Driving | 789 | 535 | 254 | 68% | 3.38 |
| 63-2-1 | No Seatbelt | 623 | 548 | 75 | 88% | 11.72 |
| 41-29-139(c)(2)(B) | POSS OF MARIJUANA MOTOR VEHICLE | 610 | 479 | 131 | 79% | 5.87 |
| 27-19-131 | License plate: no tag, expired | 552 | 459 | 93 | 83% | 7.92 |
| 97-35-15 | Disturbing the Peace | 532 | 410 | 122 | 77% | 5.39 |
| 41-29-139(d)(1) | POSS OF PARAPHERNALIA | 520 | 318 | 202 | 61% | 2.53 |
| 63-7-7 | Improper Equipment on Vehicle | 477 | 380 | 97 | 80% | 6.28 |
| 97-1-1 | Conspiracy | 412 | 314 | 98 | 76% | 5.14 |
| 97-3-7(3) | Simple Domestic Violence;Simpl | 399 | 272 | 127 | 68% | 3.44 |
| 97-29-47 | Profanity/drunkenness in Publi | 383 | 272 | 111 | 71% | 3.93 |
| 13-5-34 | Contempt of Court for Failure | 372 | 220 | 152 | 59% | 2.32 |
| 63-3-313 | Disobedience of Traffic Contro | 357 | 287 | 70 | 80% | 6.58 |
| 97-9-73 | Fleeing LEA Vehicle / Resistin | 326 | 262 | 64 | 80% | 6.57 |
| 63-3-511 | Speeding on Local Highways | 313 | 265 | 48 | 85% | 8.86 |
| 97-35-7 | Failure to comply with request | 301 | 227 | 74 | 75% | 4.92 |
| 63-11-30(2)(B) | DUI - Second Conviction | 292 | 215 | 77 | 74% | 4.48 |
| 47-7-37 | Probation Violation | 240 | 188 | 52 | 78% | 5.80 |
| 63-7-301 | No Child Restraint | 205 | 193 | 12 | 94% | 25.80 |
| 97-9-79 | False Information or Identific | 204 | 185 | 19 | 91% | 15.62 |
| 41-29-139(a)(1) | C/S SELL, TRADE, BARTER DRUGS | 201 | 148 | 53 | 74% | 4.48 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 21-23-7 | Contempt of Court-Municipal Co | 200 | 172 | 28 | 86% | 9.85 |
| 97-17-33 | Burglary - All but Dwelling | 174 | 139 | 35 | 80% | 6.37 |
| 97-3-7(1) | Simple Assault-Bodily Injury | 166 | 135 | 31 | 81% | 6.99 |
| 97-37-5 | Felon Carrying Concealed Weapo | 152 | 125 | 27 | 82% | 7.43 |
| 63-3-1201 | Reckless Driving | 151 | 98 | 53 | 65% | 2.97 |
| 97-19-55 | Bad Checks - Penalties/Restitu | 150 | 121 | 29 | 81% | 6.69 |
| 97-19-39 | False Pretenses | 138 | 108 | 30 | 78% | 5.78 |
| 97-17-41 | Larceny - Grand | 120 | 74 | 46 | 62% | 2.58 |
| 97-3-7(2) | Aggravated Assault | 119 | 100 | 19 | 84% | 8.44 |
| 63-3-707 | Improper Turn (No Turn Signal) | 114 | 88 | 26 | 77% | 5.43 |
| 97-23-93 | Shoplifting | 112 | 93 | 19 | 83% | 7.85 |
| 99-21-1 | Foreign Warrant;Fugitive;Holdi | 111 | 68 | 43 | 61% | 2.54 |
| 97-37-35 | Possession of Stolen Firearm | 102 | 85 | 17 | 83% | 8.02 |
| 41-29-139(f) | Sale, Transfer, Manufacture, D | 101 | 64 | 37 | 63% | 2.77 |
| 97-21-33 | Forgery | 101 | 81 | 20 | 80% | 6.50 |
| 63-11-40 | Suspended Drivers License (Imp | 96 | 72 | 24 | 75% | 4.81 |
| 97-17-87 | Trespass, Willful | 96 | 62 | 34 | 65% | 2.93 |
| 97-17-23 | Burglary; Inhabited Dwelling H | 94 | 82 | 12 | 87% | 10.96 |
| 63-13-7 | Motor Vehicles;Requirement of | 93 | 75 | 18 | 81% | 6.68 |
| 63-11-30(2)(C) | DUI - Third or Subsequent Conv | 92 | 57 | 35 | 62% | 2.61 |
| 43-19-37 | Contempt of Court for Failure | 91 | 63 | 28 | 69% | 3.61 |
| 97-17-67 | Malicious Mischief | 85 | 60 | 25 | 71% | 3.85 |
| 67-1-81 (2) | Alcohol, Minor in possession of alcohol | 83 | 28 | 55 | 34% | 0.82 |
| 97-17-43 | Larceny - Petit | 81 | 47 | 34 | 58% | 2.22 |
| 97-23-19 | Embezzlement - Agents/trustees | 80 | 55 | 25 | 69% | 3.53 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| | | Number of Arrests | | | Black | Per Capita Ratio of |
|---|---|---|---|---|---|---|
| Offense Code | Offense | Total | Black | Non-Black | Percentage | Black to Non-Black[5] |
| 97-3-79 | Robbery - Armed | 76 | 72 | 4 | 95% | 28.88 |
| 97-17-70 | Receiving Stolen Property | 75 | 62 | 13 | 83% | 7.65 |
| 63-3-501 | Speeding on State Highway | 74 | 68 | 6 | 92% | 18.18 |
| 63-3-809 | Failure to Yield to Authorized | 70 | 54 | 16 | 77% | 5.41 |
| 97-3-7(1)(c) | Simple Assualt-Attempt By Phyi | 67 | 57 | 10 | 85% | 9.14 |
| 97-5-39(1) | Contributing to the Neglect or | 64 | 35 | 29 | 55% | 1.94 |
| 97-5-3 | Descertion or non -support of | 62 | 53 | 9 | 85% | 9.45 |
| 63-11-21 | DUI - Refusal to Submit to Tes | 61 | 33 | 28 | 54% | 1.89 |
| 97-19-21 | Fraud - Credit Card | 59 | 47 | 12 | 80% | 6.28 |
| 41-29-152 | Enhancement of Penalty for Dru | 54 | 46 | 8 | 85% | 9.22 |
| 97-17-33(1) | Burglary; All but Dwelling | 52 | 42 | 10 | 81% | 6.74 |
| 63-7-11 | Driving Without Headlights | 51 | 39 | 12 | 76% | 5.21 |
| 97-3-95 | Sexual Battery | 51 | 35 | 16 | 69% | 3.51 |
| 63-11-30(4) | DUI - Refusal or Inability to | 50 | 34 | 16 | 68% | 3.41 |
| 97-37-1 | Carrying a Concealed Weapon/Fa | 49 | 45 | 4 | 92% | 18.05 |
| 63-3-609 | Improper Lane Passing | 47 | 40 | 7 | 85% | 9.17 |
| 63-3-801 | Failure to Yield | 46 | 37 | 9 | 80% | 6.59 |
| 63-3-619 | Motor Vehicles; Distance to be | 45 | 38 | 7 | 84% | 8.71 |
| 63-3-403 | Leaving The Scene Of An Accide | 40 | 14 | 26 | 35% | 0.86 |
| 97-3-7(4) | Aggravated Domestic Violence | 39 | 31 | 8 | 79% | 6.22 |
| 97-15-29 | Littering | 38 | 27 | 11 | 71% | 3.94 |
| 49-7-101(1) | General Violations | 36 | 28 | 8 | 78% | 5.61 |
| 77-3-603 | Telehpone Harassment | 35 | 21 | 14 | 60% | 2.41 |
| 97-17-42 | Taking Away of a Motor Vehicle | 35 | 32 | 3 | 91% | 17.11 |
| 95-3-19 | Contempt of Court(Nuisance) | 32 | 24 | 8 | 75% | 4.81 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 27-19-31 | Motor Vehicle; Expired Tag | 29 | 26 | 3 | 90% | 13.90 |
| 47-7-27 | Parole Violation | 29 | 21 | 8 | 72% | 4.21 |
| 63-7-33 | Multiple-Beam Road-Lighting; F | 29 | 24 | 5 | 83% | 7.70 |
| 97-17-41(1)(a) | Grand Larceny; Personal Proper | 29 | 18 | 11 | 62% | 2.63 |
| 97-17-43(1) | Petit Larceny; Personal Proper | 28 | 25 | 3 | 89% | 13.37 |
| 97-3-53 | Kidnaping | 27 | 23 | 4 | 85% | 9.22 |
| 97-35-23 | Obstructing Public Streets, et | 27 | 24 | 3 | 89% | 12.83 |
| 21-13-1 | General Ordinances; penalties | 26 | 19 | 7 | 73% | 4.35 |
| 97-3-107 | Stalking | 26 | 15 | 11 | 58% | 2.19 |
| 63-7-31 | Motor Vehicles; Multiple-Beam | 25 | 18 | 7 | 72% | 4.13 |
| 97-3-19(1) | Murder | 23 | 21 | 2 | 91% | 16.84 |
| 63-11-30(2) | DUI - First/subsequent Convict | 21 | 11 | 10 | 52% | 1.76 |
| 41-29-144 | C/S PRESCRIPTION FRAUD | 20 | 9 | 11 | 45% | 1.31 |
| 97-15-37 | Obstructing Public Highway | 20 | 17 | 3 | 85% | 9.09 |
| 97-19-85 | Fradulent Use of Identificatio | 20 | 14 | 6 | 70% | 3.74 |
| 97-9-125 | Tampering | 20 | 18 | 2 | 90% | 14.44 |
| 97-1-5 | Accessory After the Fact | 19 | 18 | 1 | 95% | 28.88 |
| 97-21-59 | Counterfeit Instrument: Forger | 18 | 14 | 4 | 78% | 5.61 |
| 97-3-73 | Robbery | 18 | 15 | 3 | 83% | 8.02 |
| 41-29-521 | Contempt of Court for Violatio | 17 | 6 | 11 | 35% | 0.88 |
| 97-29-31 | Indecent Exposure | 17 | 14 | 3 | 82% | 7.49 |
| 97-29-49 | Prostitution;Unlawful to Engag | 17 | 15 | 2 | 88% | 12.03 |
| 97-5-1 | Child, Abandonment of Child un | 16 | 13 | 3 | 81% | 6.95 |
| 97-9-72 | Motor Vehicle:failure to stop | 15 | 14 | 1 | 93% | 22.46 |
| 63-3-601 | Driving in more than one lane | 14 | 12 | 2 | 86% | 9.63 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-17-35 | Burglary - Possession of Burgl | 14 | 12 | 2 | 86% | 9.63 |
| HLD Other Agency | Hold for other Agency | 14 | 9 | 5 | 64% | 2.89 |
| 43-47-19(1) | Unlawful for any Person to Abu | 12 | 9 | 3 | 75% | 4.81 |
| 63-3-505 | Speeding: Failure to decrease | 11 | 8 | 3 | 73% | 4.28 |
| 97-1-7 | Attempted Crime | 11 | 10 | 1 | 91% | 16.04 |
| 97-3-19(2) | Capital Murder | 11 | 11 | 0 | 100% | - |
| 97-37-29 | Shoot into Dwelling | 11 | 11 | 0 | 100% | - |
| 97-45-19 | Computer: Identity Theft or At | 11 | 10 | 1 | 91% | 16.04 |
| 63-3-1003 | Failure to Yield Right-of-Way | 10 | 9 | 1 | 90% | 14.44 |
| 63-7-59 | Window Tint Law | 10 | 9 | 1 | 90% | 14.44 |
| 99-37-7 | Contempt; Default in Payment o | 10 | 8 | 2 | 80% | 6.42 |
| 45-33-33 | Failure to Register Under Sex | 9 | 7 | 2 | 78% | 5.61 |
| 97-5-23 | Touching Child for Lustful Pur | 9 | 4 | 5 | 44% | 1.28 |
| 97-9-127 | RETALIATION AGAINST A PUBLIC SERVANT OR WITNESS | 9 | 8 | 1 | 89% | 12.83 |
| 63-3-703 | Improper Turning at Intersecti | 8 | 6 | 2 | 75% | 4.81 |
| 97-35-13 | Disturbance in Public Place | 8 | 6 | 2 | 75% | 4.81 |
| 97-35-47 | False Reporting of a Crime | 8 | 7 | 1 | 88% | 11.23 |
| 97-5-40 | Child Abuse - Condoning | 8 | 7 | 1 | 88% | 11.23 |
| 97-7-42 | Fraud - Food Stamps | 8 | 5 | 3 | 63% | 2.67 |
| 97-9-55 | Obstructing Justice/intimidati | 8 | 8 | 0 | 100% | - |
| 97-33-1 | Gambling Illegally | 7 | 7 | 0 | 100% | - |
| 97-43-5 | Rico - Racketeering | 7 | 7 | 0 | 100% | - |
| 99-19-81 | Habitual Offenders Sentenced t | 7 | 5 | 2 | 71% | 4.01 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 37-13-91 | Compulsory School Attendance R | 6 | 5 | 1 | 83% | 8.02 |
| 41-29-139(c) | C/S ILLEGAL POSS PRESCRIPTION DRUGS | 6 | 3 | 3 | 50% | 1.60 |
| 41-29-139(g) | Trafficking in Controlled Subs | 6 | 6 | 0 | 100% | - |
| 63-1-69 | Motor Vehicle Violation - Spec | 6 | 2 | 4 | 33% | 0.80 |
| 63-1-77 | Driving Commercial M/Vehicle w | 6 | 6 | 0 | 100% | - |
| 63-5-49(4) | Failure to Stop and Submit Veh | 6 | 6 | 0 | 100% | - |
| 97-19-67 | Bad Checks - Penalties/Restitu | 6 | 2 | 4 | 33% | 0.80 |
| 97-23-103 | Home Repair Fraud | 6 | 0 | 6 | 0% | 0.00 |
| 97-23-27 | Embezzlement - Property Borrow | 6 | 2 | 4 | 33% | 0.80 |
| 97-35-37 | Vagrancy | 6 | 3 | 3 | 50% | 1.60 |
| Missing Code[6] | Missing Offense[6] | 6 | 3 | 3 | 50% | 1.60 |
| 63-1-41 | Possession and Display of Lice | 5 | 4 | 1 | 80% | 6.42 |
| 63-7-64 | Motorcycle or Motor Scooter Cr | 5 | 2 | 3 | 40% | 1.07 |
| 97-17-41(4) | Grand Larceny;Motor Vehicle,Se | 5 | 3 | 2 | 60% | 2.41 |
| 97-5-33 | Exploitation of Children | 5 | 3 | 2 | 60% | 2.41 |
| 97-5-49 | SOCIAL HOST | 5 | 0 | 5 | 0% | 0.00 |
| 97-9-65 | Intimidation of Witness to Com | 5 | 4 | 1 | 80% | 6.42 |
| 29-7-21 | Fishing Without a License | 4 | 3 | 1 | 75% | 4.81 |
| 49-7-31(1)(vi) | Hunting - unlawful to hunt dee | 4 | 2 | 2 | 50% | 1.60 |
| 49-7-57 | Possession of Illegal Game | 4 | 2 | 2 | 50% | 1.60 |
| 63-13-19 | Motor Vehicles;Inspections by | 4 | 3 | 1 | 75% | 4.81 |
| 63-3-605 | Driving Upon One-Way Roadways | 4 | 3 | 1 | 75% | 4.81 |
| 7-5-303 | Insurance Fraud | 4 | 3 | 1 | 75% | 4.81 |
| 97-19-17 | Credit Cards - Forgery | 4 | 3 | 1 | 75% | 4.81 |

APPENDIX B

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-19-71(2) | Fraud; Food Stamps | 4 | 2 | 2 | 50% | 1.60 |
| 97-25-55(2) | Assault with Intent to Commit | 4 | 2 | 2 | 50% | 1.60 |
| 97-3-109 | Drive-by Shooting | 4 | 4 | 0 | 100% | - |
| 97-3-54 | Human Trafficking | 4 | 4 | 0 | 100% | - |
| 97-41-1 | Animals, Cruelty to | 4 | 4 | 0 | 100% | - |
| 97-5-39(2) | Child,Abuse/Battery Causing Se | 4 | 4 | 0 | 100% | - |
| 27-19-59 | Motor Vehicle;Improper Registr | 3 | 2 | 1 | 67% | 3.21 |
| 33-13-471 | Military - Absent without leav | 3 | 2 | 1 | 67% | 3.21 |
| 45-35-13 | Identification Cards;Unlawful | 3 | 2 | 1 | 67% | 3.21 |
| 63-11-30(5) | DUI-Mutilation/Disfigurement/D | 3 | 2 | 1 | 67% | 3.21 |
| 63-25-5(3)(A) | Motor Vehicle: Possession W/al | 3 | 3 | 0 | 100% | - |
| 63-3-321 | Destruction,Removal, Etc. of D | 3 | 2 | 1 | 67% | 3.21 |
| 63-3-516 | Speed Limits Within Highway Wo | 3 | 2 | 1 | 67% | 3.21 |
| 63-3-603 | Motor Vehicles;Driving on Road | 3 | 2 | 1 | 67% | 3.21 |
| 63-3-909 | Parking of Unattended Motor Ve | 3 | 3 | 0 | 100% | - |
| 97-1-3 | Accessory Before the Fact | 3 | 2 | 1 | 67% | 3.21 |
| 97-1-6 | Directing/causing Felony by Pe | 3 | 3 | 0 | 100% | - |
| 97-17-61 | Larceny;Taking or Carrying Awa | 3 | 2 | 1 | 67% | 3.21 |
| 97-17-97 | Trespass after Notice of Non-p | 3 | 1 | 2 | 33% | 0.80 |
| 97-19-83 | Fraud - by Mail/phone/newspape | 3 | 2 | 1 | 67% | 3.21 |
| 97-21-29 | Making and Uttering Instrument | 3 | 3 | 0 | 100% | - |
| 97-3-65(4)(a) | Rape | 3 | 3 | 0 | 100% | - |
| 97-3-75 | Robbery - Simple | 3 | 3 | 0 | 100% | - |
| 97-31-21 | Manufacturing or Distilling Un | 3 | 1 | 2 | 33% | 0.80 |
| 97-45-17 | Computer: Posting of Email/Ele | 3 | 2 | 1 | 67% | 3.21 |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-7-43 | Impersonating an Officer | 3 | 2 | 1 | 67% | 3.21 |
| 97-9-45 | Escape - MDOC | 3 | 0 | 3 | 0% | 0.00 |
| 97-9-49(1) | Escape of Prisoners | 3 | 2 | 1 | 67% | 3.21 |
| 97-9-59 | Perjury Definitions | 3 | 3 | 0 | 100% | - |
| 41-29-146 | Controlled/counterfeit Substan | 2 | 1 | 1 | 50% | 1.60 |
| 43-13-213 | False/fraudulent claim for Med | 2 | 2 | 0 | 100% | - |
| 49-7-8 | Hunting and fishing w/o licens | 2 | 2 | 0 | 100% | - |
| 49-7-95 | Deer; Headlighting | 2 | 0 | 2 | 0% | 0.00 |
| 63-1-6 | Requirement of Motocycle Opera | 2 | 2 | 0 | 100% | - |
| 63-11-30(1) | Motor Vehicle:operation of mot | 2 | 2 | 0 | 100% | - |
| 63-13-9 | Motor Vehicles;Details of Insp | 2 | 2 | 0 | 100% | - |
| 63-25-5 | Motor Vehicle Chop Shop | 2 | 2 | 0 | 100% | - |
| 63-3-617 | Driving in Center of Highway/R | 2 | 1 | 1 | 50% | 1.60 |
| 63-5-7 | Vehicle:operation of oversized | 2 | 1 | 1 | 50% | 1.60 |
| 63-7-51 | Improper Equipment(Brakes) | 2 | 1 | 1 | 50% | 1.60 |
| 67-1-81 | Alcohol, Sale to Minors | 2 | 2 | 0 | 100% | - |
| 75-73-9 | Fraud - Innkeeper | 2 | 1 | 1 | 50% | 1.60 |
| 75-85-19 | Operation of Transient Busines | 2 | 2 | 0 | 100% | - |
| 97-15-13 | Hunting, Shooting on or Across | 2 | 0 | 2 | 0% | 0.00 |
| 97-17-29 | Burglary;Breaking Inner Door o | 2 | 1 | 1 | 50% | 1.60 |
| 97-17-41(1)(b) | Grand Larceny; Property of a C | 2 | 1 | 1 | 50% | 1.60 |
| 97-17-64 | Theft by Rental Agreement | 2 | 2 | 0 | 100% | - |
| 97-19-23 | Fraud - Credit Card | 2 | 2 | 0 | 100% | - |
| 97-19-33 | False Impersonation | 2 | 2 | 0 | 100% | - |
| 97-19-35 | False Personation | 2 | 1 | 1 | 50% | 1.60 |

APPENDIX B

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-21-37 | Counterfeit Instrument: Poss. | 2 | 2 | 0 | 100% | - |
| 97-21-49 | Counterfeit Instrument: Sale o | 2 | 2 | 0 | 100% | - |
| 97-23-23 | Embezzlement - Receiving Stole | 2 | 1 | 1 | 50% | 1.60 |
| 97-29-61 | Voyeurism (Peeping Tom) | 2 | 0 | 2 | 0% | 0.00 |
| 97-3-104 | Sexual Penetration of Incarcer | 2 | 2 | 0 | 100% | - |
| 97-3-117 | Carjacking/Attempted Carjackin | 2 | 2 | 0 | 100% | - |
| 97-3-117(2) | Armed Carjacking/Attempted Arm | 2 | 2 | 0 | 100% | - |
| 97-3-25 | Manslaughter | 2 | 2 | 0 | 100% | - |
| 97-3-65(1) | Statutory Rape | 2 | 2 | 0 | 100% | - |
| 97-33-9 | Gambling - unlawful to keep, e | 2 | 2 | 0 | 100% | - |
| 97-35-51 | Motor Vehicle; failure to stop | 2 | 2 | 0 | 100% | - |
| 97-45-15(1)(a) | Computer: Email/Electronic Com | 2 | 0 | 2 | 0% | 0.00 |
| 97-5-5 | Enticing child for concealment | 2 | 2 | 0 | 100% | - |
| 97-7-10 | Making Fraudulent Statements/r | 2 | 2 | 0 | 100% | - |
| 97-7-29 | Destroying,Injuring, etc Prope | 2 | 1 | 1 | 50% | 1.60 |
| 97-9-105 | Hindering prosecution in the First degree | 2 | 2 | 0 | 100% | - |
| 97-9-25 | Escape - Aid/abet | 2 | 1 | 1 | 50% | 1.60 |
| 97-9-29 | Escape - Aid-abed | 2 | 0 | 2 | 0% | 0.00 |
| 17-17-29 | Waste, Solid - Illegal Disposa | 1 | 1 | 0 | 100% | - |
| 19-5-317 | Abusive Calls to Emergency Tel | 1 | 1 | 0 | 100% | - |
| 23-15-17 | False Registration | 1 | 1 | 0 | 100% | - |
| 23-15-751 | Offenses by Registrar or Commi | 1 | 1 | 0 | 100% | - |
| 27-19-56(5) | Motor Vehicle;Handicapped, Ill | 1 | 1 | 0 | 100% | - |
| 27-3-79 | Tax Evasion | 1 | 0 | 1 | 0% | 0.00 |
| 37-41-2 | Interference with Operation of | 1 | 1 | 0 | 100% | - |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 41-29-139(a)(2) | Counterfeit Substance: Possess | 1 | 1 | 0 | 100% | - |
| 41-29-141(1) | Controlled Substance:(Pharmaci | 1 | 1 | 0 | 100% | - |
| 41-29-313(1) | POSS OF PRECURSOR | 1 | 0 | 1 | 0% | 0.00 |
| 41-53-11 | Dogs Running at Large | 1 | 0 | 1 | 0% | 0.00 |
| 47-5-193 | Unlawful for Officer to Furnis | 1 | 1 | 0 | 100% | - |
| 47-5-198 | Sale, Possession of Use of Con | 1 | 1 | 0 | 100% | - |
| 49-7-21 | Hunting,Trapping or Fishing Wi | 1 | 0 | 1 | 0% | 0.00 |
| 49-7-55 | Unlawful Possession,etc. of an | 1 | 0 | 1 | 0% | 0.00 |
| 59-21-83 | Boats&Other Vessels;Operation | 1 | 0 | 1 | 0% | 0.00 |
| 63-13-3 | Motor Vehicles; Operation of V | 1 | 1 | 0 | 100% | - |
| 63-3-319 | Interference with Official Tra | 1 | 1 | 0 | 100% | - |
| 63-3-407 | Accident, Vehicle Unattended | 1 | 1 | 0 | 100% | - |
| 63-3-411 | Drivers Involved In Accidents | 1 | 1 | 0 | 100% | - |
| 63-3-515 | Speed Limits Near Schools and | 1 | 1 | 0 | 100% | - |
| 63-3-613 | Overtaking&Passing Upon Right | 1 | 1 | 0 | 100% | - |
| 63-3-701 | Starting of Stopped,Standing, | 1 | 1 | 0 | 100% | - |
| 67-1-17 | Unlawful Possession of Alochol | 1 | 1 | 0 | 100% | - |
| 67-3-70 | Beer/wine, Furnishing to less | 1 | 0 | 1 | 0% | 0.00 |
| 75-85-5 | Transient vendor transact busi | 1 | 1 | 0 | 100% | - |
| 83-39-29 | Bond-jumping | 1 | 0 | 1 | 0% | 0.00 |
| 97-11-11 | Bribery - to Influence Action | 1 | 1 | 0 | 100% | - |
| 97-11-13 | Bribery;Acceptance by Officer, | 1 | 1 | 0 | 100% | - |
| 97-11-25 | Embezzlement - Officers/truste | 1 | 0 | 1 | 0% | 0.00 |
| 97-11-53 | Bribery | 1 | 1 | 0 | 100% | - |
| 97-13-19 | Corrupt Conduct by Election Of | 1 | 1 | 0 | 100% | - |

APPENDIX B

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-13-39 | Intimidating Elector to Preven | 1 | 1 | 0 | 100% | - |
| 97-15-30(2) | Unlawful to Throw,Scatter,Spil | 1 | 1 | 0 | 100% | - |
| 97-17-25 | Burglary; Breaking Out of Dwel | 1 | 1 | 0 | 100% | - |
| 97-17-33(2) | Burglary; Church, Synagogue, T | 1 | 1 | 0 | 100% | - |
| 97-17-39(B) | Public Property, Church Buildi | 1 | 1 | 0 | 100% | - |
| 97-17-43(2) | Petit Larceny;Property of a Ch | 1 | 1 | 0 | 100% | - |
| 97-17-43(3) | Petit Larceny;Motor Fuel | 1 | 1 | 0 | 100% | - |
| 97-17-5 | Arson - Structure: Not Dwellin | 1 | 1 | 0 | 100% | - |
| 97-17-85 | Trespass upon Enclosed Land of | 1 | 0 | 1 | 0% | 0.00 |
| 97-19-37 | False Personation; Masqueradin | 1 | 1 | 0 | 100% | - |
| 97-19-71(4) | Fraud; Filing for Services Not | 1 | 1 | 0 | 100% | - |
| 97-29-45 | Telephone or Electronic Commun | 1 | 0 | 1 | 0% | 0.00 |
| 97-29-51 | Prostitution;Procuring Females | 1 | 1 | 0 | 100% | - |
| 97-29-63 | Photographing or filming anoth | 1 | 0 | 1 | 0% | 0.00 |
| 97-3-47 | Manslaughter (Culpable Neglige | 1 | 1 | 0 | 100% | - |
| 97-3-65 | Rape; Carnal Knowledge of Chil | 1 | 1 | 0 | 100% | - |
| 97-3-71 | Rape - Assault with Intent to | 1 | 1 | 0 | 100% | - |
| 97-35-1 | Bus, Disorderly Conduct on | 1 | 1 | 0 | 100% | - |
| 97-35-25 | Street, Obstructing | 1 | 1 | 0 | 100% | - |
| 97-37-17(2) | 97-37-17(2)        Weapons, P | 1 | 1 | 0 | 100% | - |
| 97-37-19 | Discharging/Displaying firearm | 1 | 1 | 0 | 100% | - |
| 97-37-35(1) | Possess,Receive,Retain,Acquire | 1 | 0 | 1 | 0% | 0.00 |
| 97-5-23(1) | Touching Child for Lustful Pur | 1 | 0 | 1 | 0% | 0.00 |
| 97-5-23(3) | Computer luring of person unde | 1 | 1 | 0 | 100% | - |

**APPENDIX B**

# Summary of Arrests by Offense Code
## Madison County Sheriff's Department 2012–2017

| Offense Code | Offense | Number of Arrests | | | Black Percentage | Per Capita Ratio of Black to Non-Black[5] |
|---|---|---|---|---|---|---|
| | | Total | Black | Non-Black | | |
| 97-5-27 | Sexually-oriented Material: Di | 1 | 0 | 1 | 0% | 0.00 |
| 97-5-7 | Child, Enticing from Parents | 1 | 1 | 0 | 100% | - |
| 97-7-13 | Conspiracy to Defraud State;De | 1 | 1 | 0 | 100% | - |
| 97-9-41 | Harboring a Fugitive | 1 | 1 | 0 | 100% | - |
| 97-9-49(2) | Escape - Inmates/trusties | 1 | 1 | 0 | 100% | - |
| 97-9-9 | Bribery;Commercial Bribery | 1 | 1 | 0 | 100% | - |
| 99-19-83 | Habitual Offenders Sentenced t | 1 | 1 | 0 | 100% | - |
| 99-23-1 | Peace Bond: Issuance of Warran | 1 | 1 | 0 | 100% | - |
| B26 | UTT B26-DRV WHILE LIC SUSPEND | 1 | 1 | 0 | 100% | - |
| B53 | UTT B53-EXPIRED TAG/NO TAG | 1 | 1 | 0 | 100% | - |
| D36 | UTT D36-NO PROOF OF LIAB INS | 1 | 1 | 0 | 100% | - |
| M14 | UTT M14-DISREGARD TRF DEV | 1 | 1 | 0 | 100% | - |

Source:  ACLU12TO17.CSV

Note:
[1]  Offenses are grouped by offense code.
[2]  This tabulation was conducted under the assumption that an individual can only be arrested once a day for the same offense.  For this reason, the data is de-duplicated by first name, last name, gender, race, date, and offense code.
[3]  Individuals identified with race "B" are grouped as "Black," and individuals identified with any other race are grouped as "Non-Black."
[4]  The descriptions of the offense codes correspond to the descriptions set forth in ACLU12TO17.CSV.  In certain instances, the descriptions appear to have been cut off in ACLU12TO17.CSV.
[5]  To calculate the Per Capita Ratio, I first calculate the number of Black individuals arrested per offense code.  I then divide that number by the population of Black residents in Madison County as of July 1, 2016.  This is 38.4% of 105,114 (the total population of Madison County).  This figure is the number of Black arrests per capita for each offense code in Madison County.  I calculate the same figure for Non-Black residents of Madison County (61.6% of 105,114).  The Per Capita Ratio is the number of Black arrests per capita, divided by the number of Non-Black arrests per capita.
[6]  There are six observations in ACLU12TO17.CSV that have no offense code and no offense description.  These are displayed in the table as "Missing Code" and "Missing Offense."

**APPENDIX C**

## Summary of Citations by Violation Category
### Madison County Sheriff's Department 2012–2017

| Violation Category | Number of Citations | | | Black Percentage | Per Capita Ratio of Black to Non-Black[4] |
|---|---|---|---|---|---|
| | Total | Black | Non-Black | | |
| No Proof Of Liability Insurance | 7,148 | 5,511 | 1,637 | 77% | 5.40 |
| Improper / No Tag | 2,849 | 1,800 | 1,049 | 63% | 2.75 |
| Improper / No Driver's License | 2,523 | 1,788 | 735 | 71% | 3.90 |
| Driving With A Suspended License | 2,465 | 2,070 | 395 | 84% | 8.41 |
| Seatbelt Violation | 1,902 | 1,412 | 490 | 74% | 4.62 |
| Disregard for Traffic Device | 1,806 | 1,081 | 725 | 60% | 2.39 |
| DUI | 1,352 | 864 | 488 | 64% | 2.84 |
| Careless Driving | 1,285 | 769 | 516 | 60% | 2.39 |
| No Category Assigned | 1,066 | 724 | 342 | 68% | 3.40 |
| Improper Equipment | 991 | 703 | 288 | 71% | 3.92 |
| Child Restraint Violation | 639 | 599 | 40 | 94% | 24.02 |
| Improper Passing | 204 | 129 | 75 | 63% | 2.76 |
| Reckless Driving | 201 | 125 | 76 | 62% | 2.64 |
| Failure To Yield | 190 | 138 | 52 | 73% | 4.26 |
| DUI Second Offense | 173 | 121 | 52 | 70% | 3.73 |
| Improper Turn | 124 | 88 | 36 | 71% | 3.92 |
| Speeding 10 - 19 MPH | 119 | 72 | 47 | 61% | 2.46 |
| Speeding 20 MPH And Over | 115 | 77 | 38 | 67% | 3.25 |
| DUI First Offense | 101 | 70 | 31 | 69% | 3.62 |
| Following Too Closely | 100 | 76 | 24 | 76% | 5.08 |
| Speeding 1 - 9 MPH | 55 | 33 | 22 | 60% | 2.41 |
| Move Over Law | 32 | 27 | 5 | 84% | 8.66 |
| Improper / No Inspection Sticker | 12 | 8 | 4 | 67% | 3.21 |
| Speeding | 1 | 0 | 1 | 0% | 0.00 |

Source:  ACLU FOIA Request 02052018 V1.xlsx;  U.S. Census Bureau

Note:
[1]  Violations are grouped by violation categories.  These categories are created as a data cleaning measure to combine citation violations that are similar.
[2]  The tabulation was conducted under the assumption that an individual can only be cited once a day for the same violation. For this reason, the data is de-duplicated by name, gender, date, race, violation, and ticketing agency.
[3]  Individuals identified with race "B" are grouped as "Black," and individuals identified with any other race are grouped as "Non-Black."
[4]  To calculate the Per Capita Ratio, I first calculate the number of Black individuals cited per violation category.  I then divide that number by the population of Black residents in Madison County as of July 1, 2016.  This is 38.4% of 105,114 (the total population of Madison County).  This figure is the number of Black citations per capita for each violation category in Madison County.  I calculate the same figure for Non-Black residents of Madison County (61.6% of 105,114).  The Per Capita Ratio is the number of Black citations per capita, divided by the number of Non-Black citations per capita.

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       JACKSON DIVISION

 3
    LATOYA BROWN; LAWRENCE BLACKMON;
 4  HERBERT ANTHONY GREEN; KHADAFY MANNING;
    QUINETTA MANNING; MARVIN MCFIELD;
 5  NICHOLAS SINGLETON; STEVEN SMITH;
    BESSIE THOMAS; and BETTY JEAN
 6  WILLIAMS TUCKER, individually and on
    behalf of a class of all others
 7  similarly situated                    PLAINTIFFS

 8
    V.          CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 9

10  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER,
11  in his official capacity; and
    MADISON COUNTY SHERIFF'S DEPUTIES
12  JOHN DOES #1 through #6,
    in their individual capacities        DEFENDANTS
13

14
         ***************************************************
15

16             DEPOSITION OF LAWRENCE BLACKMON

17
         ***************************************************
18

19           DATE:  THURSDAY, JANUARY 11, 2018
           PLACE:  WISE, CARTER, CHILD & CARAWAY
20                  401 EAST CAPITOL STREET
                    JACKSON, MISSISSIPPI
21                   TIME:  9:30 a.m.

22

23

24               BETHANY CAMMACK
            Certified Shorthand Reporter
25            Mississippi CSR No. 1526
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1      Q.    ████████████████████████████
 2      A.    Uh-huh (affirmative response).
 3      Q.    ██████████████████████
 4      A.    I want to be hard to find.
 5      Q.    Okay.  Any of those private?
 6      A.    Nope.
 7      Q.    And so you've never posted anything on
 8 either Instagram, Facebook, Twitter about this
 9 lawsuit?
10      A.    No.
11      Q.    Have you ever gotten anybody to sign an
12 affidavit or a declaration?
13      A.    No.
14            MR. GRAVES:  Y'all want to take a
15 break?  I'm about to go into his incident.  I don't
16 know if you want to take a break before that, or if
17 you want to just go ahead and do it.
18            THE WITNESS:  No, I'm fine.
19 MR. GRAVES CONTINUED:
20      Q.    All right.  Let's move to your incident
21 that you allege in this complaint.
22      A.    Okay.
23      Q.    You remember what day that was?
24      A.    What day what was?
25      Q.    The incident you've alleged in the
```



```
 1   complaint, what date that happened.
 2       A.   I don't recall the date.
 3       Q.   All right.  Do you remember what year that
 4   happened in?
 5       A.   I believe it happened in 2016, I believe.
 6       Q.   Was it fall or winter or summer or spring?
 7       A.   It wasn't summer or fall.  It was
 8   winterish maybe.
 9       Q.   So tell me what happened.
10       A.   It was on a weekday morning, fairly early.
11   I was in bed.  There was a very aggressive knock on
12   my grandmother's door.  And the door is actually
13   located next to my room at my grandmother's house.
14                COURT REPORTER:  Next to -- I'm
15   sorry?
16                THE WITNESS:  My room, the room I was
17   sleeping in at my grandmother's house.  And I
18   asked, "Who is it?"
19           They said, "Open the door," or "Come to
20   the door," something like that.  Very aggressive,
21   again.  And I looked out of that window to my left,
22   which is where the door is, and I saw that it was
23   two Madison County Sheriff's Department officers.
24           I then went to the door -- well, actually,
25   because the door doesn't have -- it has like a
```



1  stained glass, so you can't see out the door.  So I

2  went to the next -- to the -- to the left of the

3  door, which is another window in the dining room

4  area.  And I asked if they had a warrant, or asked

5  them to let me see a warrant or something like

6  that.

7        And one of the officers kind of dangled a

8  piece of paper from where he was standing.  He

9  didn't hold it -- he just kind of flashed it, kind

10  of.  Kind of like this (holding up and waving

11  paper).  And I told him that I couldn't see that.

12  I said, "I can't see that."

13        And then he went back to the door and he

14  said, "Open it or we're going to kick it in."  And

15  then they started kicking the door.  At that time,

16  I decided to open the door because I didn't want

17  them to break the door, because it's an antique

18  door.  It's a door that's older than I am.  It's

19  been there a long time.

20        So I didn't want them to break the door.

21  It's not a very heavy door, and so it certainly

22  would have broke if they kicked it another time.

23  It's still damaged now from what they did.

24        And I opened the door.  The sheriff, one

25  of them or the other -- they both had their guns



1  drawn, pointed at me.  I backed up kind of at an

2  angle with my hands up, and they put me on the

3  ground.  They put me in handcuffs.  The other

4  officer who was not handcuffing me kept the gun on

5  me.

6          They either told -- I believe they told me

7  that I was Anthony Green or asked me was T Anthony

8  Green or Herbert Green.  I told them that I was

9  not.  They asked me who I was.  I told them my name.

10          At some point, my cousin once removed,

11  who's about 65 years old -- he was living at my

12  grandmother's house also at the time.  He -- I

13  guess he heard the commotion, and he came around

14  the corner into the foyer.  And he had a registered

15  handgun with him.

16          The officers confiscated that and asked

17  him was it loaded, asked him if he had a

18  registration for the gun.  He said that he did.

19  Asked him his name.  They asked him my name.  Asked

20  him was anybody else in the house.  He said that

21  there wasn't.  I believe they asked him to sit in

22  the living room.

23          And then they proceeded to searching the

24  home.  Then they came back and asked me where my ID

25  was.  I told them where the ID was, and I guess



1    they went and looked at it, got it.

2              At some point they tried to -- when they

3    got ready to take me out of the handcuffs, they

4    didn't have the handcuff key.  And so they started

5    calling around to get the handcuff key.  By this

6    point, I had called for my dad to come, and he was

7    on the way.

8              And so I told them that my -- that my

9    attorney was coming.  And they still -- one officer

10   came, and he didn't have the right key -- I mean,

11   another officer came.  He didn't have the right

12   key, so they called a third officer, who came and

13   finally had the key to take the handcuffs off.

14             That happened.  They left.  I believe my

15   dad pulled up when they were leaving the house, and

16   he spoke to them outside.  And that was -- that was

17   it in a nutshell.

18   MR. GRAVES CONTINUED:

19        Q.   All right.  First thing I want to do is

20   have you draw kind of a floor plan of that house

21   for me so I can figure out where you were.  Because

22   I know you were saying it's next -- your room was

23   next to the door, but it's hard for me to picture

24   it.

25        A.   I don't know if my drawing's going to --



 1      Q.    Now, this incident at the house, do you
 2    believe that that resulted from racial
 3    discrimination?
 4      A.    I do.
 5      Q.    Why is that?
 6      A.    Because this is something that I have come
 7    to know as something that only happens in the --
 8    you know, of the jurisdiction that the Madison
 9    County Sheriff's Department covers, that only
10    happens in the black areas, Flora, Canton, on that
11    side of Canton where I live.  Out in the county
12    also.
13      Q.    What is "this"?  When you say "this only
14    happens," what is "this"?
15      A.    Things like this, with sheriffs coming
16    into homes without warrants, and just generally
17    overpolicing in the community.
18      Q.    Let me back up.  You say without warrants.
19    They had paper, right?
20      A.    I don't know.  They had a piece of paper.
21      Q.    And you never saw what was on that paper,
22    right?
23      A.    No.  Because they wouldn't give me an
24    opportunity to see it.
25      Q.    So you can't say one way or the other



1       Q.   Well, let me ask it one more time, and

2    then you can tell me whether you're answering it or

3    you're not answering it.   What citizens are you

4    talking about that were involved in other searches

5    that you claim were warrantless searches?

6                MR. TOM:   Objection.

7                THE WITNESS:   Yeah, I don't have an

8    answer for that.

9    MR. GRAVES CONTINUED:

10      Q.   Jump-out boys is something else you

11   mentioned.

12      A.   Uh-huh (affirmative response).

13      Q.   What citizens are you saying were involved

14   in incidents with the quote, unquote, jump-out boys?

15      A.   Again, I -- I -- I don't have the specific

16   information for you right now, because I didn't

17   come prepared to offer testimony about other

18   people's experiences.   But it is something that

19   people in the community know happens pretty often.

20      Q.   And when you say they know it happens,

21   what is -- what happens?

22      A.   That the Madison County Sheriff's

23   Department, that they have unmarked cars, usually

24   Chargers.   I believe they have a red one and a

25   grayish-greenish type of color one.   And that they



1    will pull up on you and jump out of the car and

2    search you or -- or anything like that.

3            As a matter of fact, if you would like one

4    specific incident that I do feel comfortable

5    speaking about, I will tell you about the one that

6    I personally witnessed and was involved in, which

7    is one where I was in an apartment community in

8    Canton on a Sunday morning.

9            I was out there speaking with friends who

10   live in that community, in that apartment complex.

11   And two cars -- two -- there was no crimes.  No

12   crimes taking place.  Two cars, and these were

13   marked cars, they pulled up -- and we saw them

14   coming around the corner very fast -- into the

15   apartment complex and jumped out.

16           And people who were out there started

17   running for no reason.  We weren't doing anything.

18   But just the presence of the sheriff's department

19   made some of the persons who were out there uneasy

20   enough to run.

21           And I told the people, I said, "Don't run,

22   don't run, because we haven't done anything.  Ain't

23   nobody committed no crime."  And they immediately

24   handcuffed me.

25       Q.   Who handcuffed you?



```
1    A.   A sheriff department deputy.  So that's
2  what I mean when I say "jump-out boys."  They
3  handcuffed me.  They took me down to the Madison
4  County Sheriff's Department.
5        And while they were handcuffing me, I told
6  one of the people who were out there to call my
7  dad.  I gave them a number on the spot, and I said,
8  "Call my dad and tell my dad that the Madison
9  County Sheriff's Department is acting crazy with
10  me."
11        And they took me down to the -- to the --
12  to the headquarters or whatever.  Never charged me
13  with anything, because there was nothing to charge
14  me with.  And my dad came and got me.
15    Q.   Who -- where were you?
16    A.   I was in an apartment complex, and I don't
17  remember the name of it, in Canton.
18    Q.   Where is the apartment complex?
19    A.   In Canton.
20    Q.   I mean, like what street is it on?
21    A.   I don't know the name of the street.
22    Q.   And it's in the city of Canton?
23    A.   Uh-huh (affirmative response).
24    Q.   You don't remember what the street name
25  is?
```



1    a part of this class, then, you know, I'm not

2    telling their -- their narrative either, because

3    it's not mine to tell.

4        Q.    Well, do you plan on getting details?

5        A.    No, I don't.

6        Q.    All right.  Well, let me ask you about

7    roadblocks.  What roadblocks are you talking about?

8        A.    Roadblocks set up by the Madison County

9    Sheriff's Department in Canton and other places in

10   Madison County.  Flora.

11       Q.    And are you saying roadblocks are race

12   discrimination?

13       A.    Not in and of themselves.

14       Q.    What do you mean by that?

15       A.    Just that.

16       Q.    Well, then, what's your problem?

17       A.    I mean, a roadblock is not -- a roadblock

18   is not inherently discriminatory, no.

19       Q.    All right.  Well, what's your problem with

20   them in this lawsuit, then?

21              MR. TOM:  Objection.  Go ahead.

22              THE WITNESS:  My problem -- or the

23   issue with them is -- because this is not just my

24   problem.  But the issue with them is, is that they

25   are disproportionately set up in the predominantly



```
 1  | African-American areas of town.
 2  | MR. GRAVES CONTINUED:
 3  |     Q.   And what do you base that on?
 4  |     A.   I base it off of the research that was
 5  | done before --
 6  |              MR. TOM:  Don't talk about research
 7  | that's been --
 8  |              THE WITNESS:  Can't talk about any
 9  | research.  I base it off of information that I have
10  | -- that I have seen.
11  | MR. GRAVES CONTINUED:
12  |     Q.   If you did research, you can tell me about
13  | it.
14  |              MR. TOM:  If you did research as part
15  | of your internship or work with the ACLU, that's a
16  | work product.
17  |              THE WITNESS:  And I didn't do the
18  | research anyway.  The ACLU did the research.
19  | MR. GRAVES CONTINUED:
20  |     Q.   Yeah, but what I'm asking -- my question
21  | to you is, if you have -- you're saying it's race
22  | discrimination, and I'm asking you what you base
23  | that on.  If you did research, and that's what
24  | you're basing it on, you can tell me that.
25  |     A.   I'm basing it off of the numbers produced
```



```
 1              THE WITNESS:  -- I don't
 2   mischaracterize.
 3   MR. GRAVES CONTINUED:
 4       Q.   All right.  Have you ever been stopped at
 5   a roadblock?
 6       A.   I have.
 7       Q.   Where?
 8       A.   In Canton.
 9       Q.   Where in Canton?
10       A.   At least two times on Martin Luther King
11   Drive, and another time on another street.
12       Q.   On another street where?
13       A.   In Canton.
14       Q.   Where on Martin Luther King?  What
15   intersection?
16       A.   Around the bend across from the new
17   projects.  What's the name of that intersection
18   there?
19       Q.   Is that both times?
20       A.   That was two times.
21       Q.   Right.  I'm saying both times, it was at
22   that same location?
23       A.   Yes.
24       Q.   All right.  And then the other place in
25   Canton, what street was that?
```



```
 1    say stop.
 2         Q.    And stop -- you say stop overpolicing?
 3         A.    Stop with the overpolicing of the
 4    African-American communities --
 5         Q.    And what would be --
 6         A.    -- within Hinds County.  I mean Madison
 7    County, excuse me.
 8         Q.    What would be adequate policing?
 9         A.    What would be adequate policing?  I -- I
10    can't get into that because I'm not a -- I'm not in
11    that profession.
12         Q.    Well, you say overpolicing.  I'm saying
13    what needs to go away to make it not be
14    overpolicing?
15         A.    There should never, ever, ever, ever be
16    any incident -- and even if I was the only one,
17    which I'm not, but if I were the only person who
18    ever had my home invaded by the Madison County
19    Sheriff's Department, who ever had guns put in my
20    face and handcuffed for, you know, an indefinite
21    amount of time, and restrained in my own home, if I
22    were the only person who that had ever happened to
23    in the history of the Madison County Sheriff's
24    Department, which I absolutely am not, I'm one
25    person too many.
```



1          And so what I would like to happen is that

2    for them to never do that again, and for any

3    training that they have to have, to -- for that to

4    happen.  I think they need that training.

5          I think that they obviously could -- could

6    -- could use more -- I don't know if it's

7    sensitivity training or whatever type of training

8    that police officers go through to get them used to

9    dealing with the people that they have to deal with

10   in the communities that they protect, then I think

11   that they need that also.  So I would like the

12   injunction to say that, if it could.

13     Q.   Well, are you saying that what they did to

14   you would be okay if it happened to a white person?

15               MR. TOM:  Objection.

16               THE WITNESS:  No, I'm not saying that

17   it would be okay if it happened to a white person.

18   That's crazy.  I said if that happened to anybody.

19   But I'm saying that it would not have happened to

20   me if I were a white person.  That's what I'm

21   saying.

22   MR. GRAVES CONTINUED:

23     Q.   And how do you know that?

24     A.   Because I have never heard of it happening

25   in Madison County.  If this was something that they



```
 1   just did to everybody, then everybody would know,
 2   and so white and black people in Madison County
 3   alike would have the same reactions when the
 4   Charger is speeding up and down the street, or when
 5   they see the Madison County Sheriff's Department --
 6   or when they pull up, everybody would run, because
 7   they'd say, "There go those -- those unbiasly
 8   ruthless sheriff's department deputies."
 9        Q.   Have you ever lived in a white
10   neighborhood in Madison County?
11        A.   I have.  I told you I lived on Pear
12   Orchard.
13        Q.   How long did you live on Pear Orchard?
14        A.   I lived there for about a year.
15        Q.   All right.  And Pear Orchard is in the
16   city of Ridgeland, right?
17        A.   It is.
18        Q.   All right.  Latoya Brown.  How do you know
19   her?
20        A.   I would know her if I -- to the extent
21   that I do know her, I know her from the community.
22        Q.   Do you know what she's claiming in this
23   lawsuit?
24        A.   Some type of discrimination, I'm sure.
25        Q.   Do you know anything about it, though?
```



EXHIBIT 4

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                     JACKSON DIVISION

3   LATOYA BROWN; LAWRENCE BLACKMON;
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
4   QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
5   BESSIE THOMAS; and BETTY JEAN
    WILLIAMS TUCKER, individually and on
6   behalf of a class of all others
    similarly situated                        PLAINTIFFS
7
    VS.            CIVIL ACTION NO. 3:17-cv-347 WHB LRA
8

9   MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER,
10  in his official capacity; and
    MADISON COUNTY SHERIFF'S DEPUTIES
11  JOHN DOES #1 through #6,
    in their individual capacities          DEFENDANTS
12
    ********************************************************
13
                 DEPOSITION OF LATOYA BROWN
14
    ********************************************************
15
              (APPEARANCES NOTED HEREIN)
16
                TAKEN AT THE OFFICES OF:
17         WISE, CARTER, CHILD & CARAWAY
           401 EAST CAPITOL STREET
18             JACKSON, MISSISSIPPI

19
               TUESDAY, JANUARY 9, 2018
20         AT APPROXIMATELY 10:59 A.M.

21

22  REPORTED BY:

23         TAMMY MCDANIEL-BAGNATO, #1910

24

25



```
 1          Q.   Anywhere else?
 2          A.   Yes.   May Street, King Ranch, and
 3     Ricks Drive.
 4          Q.   You ever seen roadblocks in any
 5     other part of Madison County?
 6          A.   No.
 7          Q.   And as I understand it, you don't
 8     have a driver's license?
 9          A.   No.
10          Q.   So you wouldn't be driving a car
11     around encountering roadblocks anywhere?
12          A.   I went through a few, I mean two of
13     them without a license.
14          Q.   Without a license?
15          A.   Mm-hmm (affirmative response).
16          Q.   And did you get a citation?
17          A.   Yes.
18          Q.   And what two were those?
19          A.   2014 and 2013.
20          Q.   2018?
21          A.   '13.
22          Q.   '13.   Where did you get a citation
23     in 2013?
24          A.   I was coming home from work.   I
25     wasn't coming home from work, I was coming
```



1        Q.  -- and you called your mom to come

2   get the car?

3        A.  Yes, ma'am.

4        Q.  And they waited around, let your mom

5   come get it, rather than towing it?

6        A.  Yes.

7        Q.  Okay.  And in 2013, was that -- did

8   the same thing happened then?

9        A.  Yes.

10        Q.  Nothing else happened during the

11   roadblock?

12        A.  No.

13        Q.  They just gave you a ticket for it?

14        A.  Yes.

15        Q.  Okay.  Didn't arrest you?

16        A.  No, ma'am.

17        Q.  No?

18        A.  No, ma'am.

19        Q.  Okay.  That was the only two

20   roadblocks that you've been through?

21        A.  It could be more.  I'm not sure.

22        Q.  But you don't recall any other ones?

23        A.  No, ma'am.

24        Q.  That was driving and/or passenger?

25        A.  Passenger, yes.



```
 1        Q.   Okay.  Tell me about that -- those.

 2        A.   There was three occasions.  I was

 3   with my sister on one.  And they asked her

 4   for her driver's license and my ID.

 5        Q.   Okay.

 6        A.   The second one --

 7        Q.   Did anything happen?  Did she have a

 8   license?

 9        A.   Yeah, she had a license?

10        Q.   You had and ID?

11        A.   Yes.  They let us go.

12        Q.   They said, "Go away?"

13        A.   Yes.

14        Q.   All right.  Next?

15        A.   I was with my friend girl Amanda.

16        Q.   Who?

17        A.   Amanda.

18        Q.   Amanda?

19        A.   Yes.

20        Q.   You remember when this was and

21   where?

22        A.   This was in front of Brooklyn -- I

23   mean, Boyd -- no, not Boyd street.  Canton

24   Estates.  Canton Estates.

25        Q.   Okay.
```



```
 1          A.   She was taking me home.

 2          Q.   And anything significant happen

 3     there?  Did they just check and let you go?

 4          A.   She didn't have any license.

 5          Q.   Okay.

 6          A.   So they wrote her a ticket and I

 7     walked on to my apartment.  Her mom came and

 8     got her car.

 9          Q.   And they waited around and let her

10     mom come get the car?

11          A.   Yes.

12          Q.   Didn't tow it.

13          A.   No.

14          Q.   Anything else happen at that one

15     other than what you just told me?

16          A.   No.

17          Q.   Okay.  Okay.  You talked about

18     better policing and you talked about

19     roadblocks.  Is there anything else that you

20     want better policing in regard to Madison

21     County?

22          A.   Yes.  Pedestrian stops.

23          Q.   Okay.  Tell me about that.

24          A.   I was walking to the front of the

25     gate to meet my ride for work one night.  And
```



```
 1   there was two deputies on feet.  And they
 2   stopped and they asked me for my
 3   identification.  And I was already running
 4   late for work.
 5        Q.  You give it to them?
 6        A.  Yes.
 7        Q.  And nothing else happened?
 8        A.  Yes.  They ran my name and nothing
 9   else happened.
10        Q.  Okay.  Do you remember -- did you
11   work the night shift?
12        A.  Yes.
13        Q.  Okay.  What time were you walking in
14   Canton Estates?
15        A.  I had to be at work at 11:00.  So it
16   was about 11:10 because I was already running
17   late.
18        Q.  And your friend was going to pick
19   you up outside?
20        A.  Outside the gate.
21        Q.  Okay.
22        A.  At the front gate.
23        Q.  And the deputies were walking around
24   in Canton Estates?
25        A.  Yes.
```



```
 1          Q.   And -- but you'd seen them walking
 2     around before?
 3          A.   Yes.
 4          Q.   Did they walk around when you called
 5     about the gambling or did they drive around?
 6          A.   They drove.
 7          Q.   What about the guns?  Did they walk
 8     or --
 9          A.   Drove.
10          Q.   Okay.  Did you have any problems
11     with the officers patrolling Canton Estates?
12          A.   No.
13               MR. RETHY:  I'll object to the form
14          of the last question.
15               MS. COWAN:  What's the basis of your
16          objection?
17               MR. RETHY:  "Any problems", vague.
18               MS. COWAN:  Okay.
19     BY MS. COWAN:
20          Q.   Do you have any problems, at all,
21     about the officers walking around and
22     patrolling Canton Estates?
23               MR. RETHY:  At what time.
24     BY MS. COWAN:
25          Q.   At any time?
```



1        A.   No.

2        Q.   Okay.  Okay.  Was the time that the

3   deputies stopped you while you were walking

4   towards the gate going outside Canton

5   Estates, is that the only time you were ever

6   stopped by deputies patrolling Canton

7   Estates?

8        A.   No.

9        Q.   Tell me about that.

10       A.   Yes.  I was standing back of my

11  stepdad's truck and --

12       Q.   Who's your stepdad?

13       A.   Leroy McDonald.  Leroy McDonald.

14       Q.   Does he live in Canton Estates?

15       A.   No.  He stay with my mom on Walnut

16  now.

17       Q.   Was he visiting Canton Estates?

18       A.   Yes.

19       Q.   Okay.  He was visiting your mother?

20       A.   He was visiting me at the time in my

21  apartment.

22       Q.   Okay.  That was when you were living

23  with Mr. Smith?

24       A.   Yes.

25       Q.   What year was that?



```
 1        A.   That was in 2013.

 2        Q.   Okay.  Tell me about that.

 3        A.   Yes.  Him and my mom came over to my

 4   house and I was standing on the back of the

 5   truck outside on the phone and they walked up

 6   to me and asked me for my identification.

 7        Q.   Okay.  And you gave it to them.

 8   Anything else happen?

 9        A.   No.  They ran my name and they let

10   me go.

11        Q.   Okay.  And is that it?

12        A.   Yes.

13        Q.   Okay.  You referred to another

14   incident where something happened on

15   Halloween night in 2015.  Do you recall that

16   where deputies came and knocked on y'all's

17   door?

18        A.   Yes.

19        Q.   Mr. Smith's told me a little bit

20   about it.  Can you tell me -- tell me what

21   you remember about it.

22        A.   Yes.  It was before dawn.

23        Q.   Before dawn is pretty early in the

24   morning?

25        A.   Yes.  I heard a knocking at the
```



```
 1        Q.  8:00 at night?

 2        A.  Yes.

 3        Q.  And was it a birthday party?

 4        A.  Yes.

 5        Q.  Okay.  You mentioned better policing

 6   and warrantless searches.  Is that the only

 7   warrantless search that you can tell me about

 8   that's happened to you that you know

 9   personally about?

10        A.  No, there was this incident with

11   Steven.

12        Q.  Okay.

13        A.  Me and him both were sitting outside

14   our apartment, and it was two deputies walk

15   -- walk by.  It was night time.

16        Q.  What time?

17        A.  It was like 9:30 at night.  And we

18   was sitting out and they walked by.  We

19   thought it was the two security guards that

20   worked there.  So when they walked up, they

21   put they flashlight on us.  They told Steven

22   to stand up, and they asked him to walk

23   around the building with them.  And so I go

24   in the house, I check on my kids.

25             So with the way they walked it
```



```
 1    wasn't too far from my building.  So I walked

 2    around the front windows to around the

 3    apartment, and I seen Steven in handcuffs

 4    sitting on the ground.  They had his ID

 5    running his name in.

 6          Q.  Do you know what year this was?

 7          A.  2015.

 8          Q.  2015.  Do you know why they put him

 9    in handcuffs?

10          A.  No.

11          Q.  Did he ever talk to you about it?

12          A.  Yes, I said -- but no, he didn't

13    tell me why they had him in handcuffs.

14          Q.  He didn't tell you anything about

15    what -- the incident occurred?

16          A.  No.

17          Q.  Well, he didn't tell us either.

18    That's why I was asking.

19          A.  No.

20          Q.  Was he arrested?

21          A.  No.  They let him go after they ran

22    his name in.

23          Q.  Okay.  But he didn't tell you why

24    they asked him to walk around to the other

25    side of the apartment or anything?
```



```
 1              THE WITNESS:  Well, I can breathe.

 2              MS. COWAN:  I don't know.  Your

 3       attorneys might have some questions for you

 4       after.  We'll just have to wait.

 5              MR. RETHY:  Okay.  Give us a second.

 6              MS. COWAN:  Yeah.  You want us to

 7       leave?

 8              MR. RETHY:  We can leave.

 9              MS. COWAN:  Okay.

10                      -  -  -

11         (OFF THE RECORD AT 12:10 P.M.)

12        (BACK ON THE RECORD AT 12:15 P.M.)

13                      -  -  -

14              (CROSS-EXAMINATION)

15   BY MS. JARRETT:

16       Q.  Ms. Brown, I'm just going to ask you

17   a couple questions, okay?

18       A.  Yes, ma'am.

19       Q.  Have you ever been through a

20   pedestrian checkpoint?

21       A.  Yes.

22       Q.  When?

23       A.  When I was walking from the store.

24       Q.  And where was the checkpoint setup?

25       A.  In front of Canton Estates.
```



```
 1         Q.  Did the officers -- what happened at
 2   the checkpoint?  Did the officers ask for
 3   your identification?
 4         A.  Yes, but I didn't have it on me.
 5         Q.  So then what happened?
 6         A.  They asked for my Social Security
 7   Number and they wrote it down.
 8         Q.  And then?
 9         A.  They ran my name.
10         Q.  Have you been through a pedestrian
11   checkpoint another time?
12         A.  Possibly, I'm not sure.
13         Q.  Have you ever seen pedestrian
14   checkpoints outside of the park where you
15   take your children?
16         A.  Yes, that's on Ricks Drive.
17         Q.  Okay.  Have you been through a
18   pedestrian checkpoint there?
19         A.  Yes, I was with my cousin.
20         Q.  And what happened?
21         A.  They asked for me and his
22   identification.
23         Q.  Did you have it?
24         A.  Yes.  And I showed it to him, I
25   showed my ID to him and my cousin did also.
```



1        Q.   And what did the officer do with
2    your identification?
3        A.   They ran our names.
4        Q.   When you say they ran your names,
5    what do you mean?
6        A.   They did it on the walkie-talkie to
7    the dispatcher.
8        Q.   And then did you leave?
9        A.   Yes.
10       Q.   Have you ever been through any other
11   pedestrian checkpoints?
12       A.   Not that I can recall.
13       Q.   Do you ever come into pedestrian
14   checkpoints when you are -- where does your
15   mom live?
16       A.   She lives on Walnut.
17       Q.   Have you ever run into pedestrian
18   checkpoints going to or from your mom's
19   house?
20       A.   No.
21       Q.   And when you say pedestrian
22   checkpoint, what does that mean to you?
23       A.   That if I'm walking through a
24   roadblock and I get stopped, then asked for
25   identification.



```
1        A.  No, but I have seen them.

2        Q.  Okay.  When did you see them?

3        A.  Walking to the stores, walking to my

4    sister's house.  She stays on Boyd Street,

5    one of my sisters on my dad's side and on

6    MLK.

7        Q.  Okay.  As I understand it, your

8    testimony today about the Madison County

9    Sheriff's Department treating blacks

10   differently than whites is based on where

11   they set up roadblocks?

12       A.  Yes, I think they target blacks.

13       Q.  Okay.  As I understand it you don't

14   have a driver's license.

15       A.  Mm-hmm (affirmative response).  Yes,

16   ma'am.

17       Q.  And you have told me about four

18   roadblocks that you've seen, is that correct?

19       A.  Yes.

20           MS. JARRETT:  Object to form.

21           MS. COWAN:  What's your objection?

22           MS. JARRETT:  It's unclear whether

23       you mean four individual roadblocks or

24       roadblocks set up in four different

25       locations.
```



# EXHIBIT 5

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION

 3    LATOYA BROWN; LAWRENCE BLACKMON;
      HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4    QUINETTA MANNING; MARVIN MCFIELD;
      NICHOLAS SINGLETON; STEVEN SMITH;
 5    BESSIE THOMAS; and BETTY JEAN
      WILLIAMS TUCKER, individually and on
 6    behalf of a class of all others
      similarly situated                        PLAINTIFFS
 7
      VS.               CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 8

 9    MADISON COUNTY, MISSISSIPPI;
      SHERIFF RANDALL S. TUCKER,
10    in his official capacity; and
      MADISON COUNTY SHERIFF'S DEPUTIES
11    JOHN DOES #1 through #6,
      in their individual capacities            DEFENDANTS
12
      *********************************************************
13
              VIDEOTAPED DEPOSITION OF KHADAFY MANNING
14
      *********************************************************
15
                  (APPEARANCES NOTED HEREIN)
16
                   TAKEN AT THE OFFICES OF:
17                WISE, CARTER, CHILD & CARAWAY
                  401 EAST CAPITOL STREET
18                   JACKSON, MISSISSIPPI

19
                   MONDAY, JANUARY 8, 2018
20                AT APPROXIMATELY 8:57 A.M.

21

22    REPORTED BY:

23               TAMMY MCDANIEL-BAGNATO, #1910

24

25
```



1   vehicle?

2        A.   As I can remember right now, yes.

3        Q.   Okay.  And at the other roadblocks

4   where you were a passenger, did you feel like

5   you were treated unfairly?

6        A.   Yes.

7        Q.   Why?

8        A.   Because I was a passenger in -- in a

9   vehicle where I had to step outside the car,

10   while the driver had license and had

11   insurance, and I still was subject to being

12   searched.

13        Q.   Well, let's talk about that.  How

14   many times did that occur?

15        A.   As far as I can remember, all the

16   time because -- all the time.  Those times

17   there.

18        Q.   You're saying every single time you

19   were a passenger --

20        A.   Passenger, yes.

21        Q.   -- at a roadblock you were searched?

22        A.   I was -- I was -- I was searched and

23   obtained to get out the vehicle to be patted

24   down, yes.

25        Q.   Okay.



```
 1        A.  Yeah.

 2        Q.  But you were never arrested?

 3        A.  No.

 4        Q.  Okay.  Let's take them in

 5   chronological order.  When was the first time

 6   at a roadblock you were asked to get out of

 7   the vehicle and searched?

 8        A.  I don't know.

 9        Q.  When was the second time?

10        A.  I don't know.

11        Q.  Okay.  When was the third time?

12        A.  I don't know.

13        Q.  Okay.  Well, the first time, who was

14   driving the vehicle?

15        A.  I don't know.

16        Q.  The second time, who was driving the

17   vehicle?

18        A.  I don't know.

19        Q.  The third time, who was driving the

20   vehicle?

21        A.  I don't know.

22        Q.  How many times did this occur where

23   you contend that you were asked to get out of

24   the vehicle at a roadblock and you were

25   searched?
```



1      A.  I was searched at least three times

2   at -- during a roadblock, but I -- as far as

3   I can remember, I think it was four times.

4      Q.  Okay.  Can you tell me the driver of

5   the vehicle on any single occasion?

6      A.  It was women a -- a couple of times.

7   And one -- one -- one particular time it was

8   Tiara Parker.

9      Q.  Tiara Parker?

10     A.  Yes.  There was a -- they stopped

11  us -- they stopped us with -- one time they

12  -- so they blocked the road and stopped her.

13  We were coming out of Canton Estate.  They

14  stopped the road.  They literally stopped.

15  And there was a couple of Madison County

16  Sheriff Department that blocked the road off

17  and stopped that particular vehicle.  And I

18  was a back seat rider and they got -- I

19  went -- that time there, I went to jail.

20     Q.  Okay.  Well, that wasn't a

21  roadblock, was it?

22     A.  They blocked the road.  That's a

23  roadblock, right?

24     Q.  Okay.  When I say a "roadblock," I'm

25  talking about a traffic safety checkpoint.



1    Do you know what that is?

2         A.   Explain.

3              MR. RETHY:   Object to form.

4    BY MR. ROSS:

5         Q.   You can answer.

6         A.   Explain.

7         Q.   I'm sorry?

8         A.   Explain.

9         Q.   Traffic safety checkpoint is where

10   they're checking all cars.  Do you understand

11   what I mean by that?

12        A.   Yes.

13        Q.   Okay.  Now, when I was asking you

14   about the times that you were a passenger at

15   roadblocks or traffic safety checkpoints,

16   that's what I was referring to, where they

17   were checking all cars.  Were we talking

18   about the same thing?

19        A.   Not -- explain that again.  Repeat

20   the question.

21        Q.   I asked you how many times you had

22   gone through roadblocks, and I'm going to

23   clarify that I'm talking about traffic safety

24   checkpoints where they're stopping all cars.

25        A.   Okay.



1        Q.   How many times have you done that?

2        A.   I'd say at least three to four

3   times.

4        Q.   Okay.  And the locations, is it

5   still King Ranch Road, George Washington

6   Avenue and Canton Estates?

7        A.   Yes.

8        Q.   Okay.  And when you went through

9   those roadblocks, are you contending you were

10  searched every time as a passenger?

11       A.   Yes.

12       Q.   Okay.  And who was driving in

13  that -- those three or four times?

14       A.   I can't remember no name at this

15  time right now because I'm nervous.

16       Q.   Well, do you have any recollection

17  of who was driving those three or four times

18  when you contend that you were searched at a

19  traffic safety checkpoint?

20       A.   I'm thinking.  I don't want to give

21  no wrong name.  That's why I said I don't

22  know their name at this time.

23       Q.   Okay.  And you cannot give me a

24  date, can you?

25       A.   No.



1      Q.   Okay.  And on none of those

2   occasions were you arrested, were you?

3      A.   No.

4      Q.   And on none of those occasions were

5   you given a ticket, were you?

6      A.   No.

7      Q.   On any of those occasions were there

8   drugs in the car?

9      A.   No.  No one was arrested on any of

10   the -- the time that I was searched going

11   through a roadblock.

12      Q.   Okay.  And with each of those

13   roadblocks, traffic safety checkpoints, were

14   they checking all the cars?

15      A.   I'm not sure.

16      Q.   Okay.  Did they have blue lights on?

17      A.   On a couple of them, they just

18   flagged you down with their flashlight.

19      Q.   Okay.  But the others had blue

20   lights?

21      A.   They could possibly have had one.

22   But I know I've been through two or three

23   without where I was just flagged down with --

24   while they caught vehicles on the side of the

25   road flagged down with a flash- --



1    flashlight.

2         Q.  And when was that?

3         A.  It was during -- I know it was on

4    King Ranch Road one time, and George

5    Washington and Canton Estate.

6         Q.  And in those instances, you knew it

7    was law enforcement, right?

8         A.  Once I became -- once we drove up to

9    them, yes.

10        Q.  Okay.  Now, you indicated that you

11   felt like you have been verbally abused and

12   physically abused by the Madison County

13   Sheriff Department.  Other than the incident

14   in Quinnetta's apartment in June of 2016,

15   which we'll get to, are there any other

16   instances where you feel like you have been

17   verbally abused or physically abused?

18        A.  Just the roadblocks.

19        Q.  Okay.  And you've told me everything

20   you remember about the roadblocks already,

21   right?

22        A.  No, I didn't tell you what -- how

23   they verbally abused me.

24        Q.  How did they verbally abuse you?

25        A.  By -- by saying, "Get your



1       Q.  Right.

2       A.  Not that I know of, no.

3       Q.  Okay.  Do you think it's good for

4    the Madison County Sheriff's Department to

5    patrol Canton Estates, given the numerous

6    acts of criminal assaults and other criminal

7    acts against its tenants and invited guests?

8              MR. RETHY:  Object to form.  Vague.

9    BY MR. ROSS:

10      Q.  You can answer.

11      A.  I agree that -- not -- I agree that

12   they should patrol, but not the ones that

13   beat me.

14   BY MR. ROSS:

15      Q.  Okay.  When you say "beat you,"

16   you're talking about the incident in

17   Quinnetta's apartment?

18      A.  Yes.

19      Q.  Okay.  What is the status of your

20   lawsuit against Canton Estates?

21      A.  I haven't talked to the new lawyers

22   since they took the case.

23      Q.  Okay.  Let's talk about the incident

24   in June 2016, specifically June 26, 2016, in

25   Quinnetta's apartment.  Okay?



```
 1        A.  Okay.

 2        Q.  Tell me what you remember about that

 3   incident.

 4        A.  I remember being woken out my sleep

 5   to numerous -- a man talking -- a man talking

 6   in the front part of the house.  So I hobbled

 7   out of bed and went to the front and realized

 8   it was the Madison County Sheriff Department

 9   inside Quinnetta's apartment.

10            And I witnessed them telling --

11   talk -- telling her -- talking at her, and

12   I'm her husband.  So I had -- when I walked

13   up to the front to talk to her, I heard them

14   say, "You're going to either be a witness or

15   a suspect to a crime -- a burglary, a crime,"

16   whatever -- whichever one.  But -- and then

17   at that point -- "or unless you write --

18   write a statement," or something.  So I was

19   like, "You don't have to write a statement.

20   I know my rights."

21            And upon saying that, he was like,

22   "You got a smart A."  He cussed me out, said

23   I got a smart A-S-S mouth and proceeded to

24   put me in handcuffs.  And once in handcuffs,

25   I was -- he had grabbed me by the windpipe
```



1   and was talking at me.  And I remember

2   vaguely asking him why was he handling me

3   like that.  And he was like, because I ain't

4   cooperating.  And he was like -- and then he

5   went on explaining a story about some events

6   that took place prior.

7          And during that time -- he

8   eventually let go of choking me or whatever,

9   grabbing me by my windpipe, and said he was

10  going to take my butt to jail.  I remember

11  going down the stairs with my -- being drug

12  down the stairs, handled roughly going down

13  the stairs while I was in handcuffs.  My --

14  they -- they wouldn't allow me to get my

15  cane.  I was in my boxers.

16         They had my hands behind my back

17  with the -- with the handcuffs on me.  And

18  they had my arms in a position where I don't

19  think no man's arms should be while they're

20  handcuffed, like closely -- almost to my neck

21  backwards almost.  They -- they had my arm

22  hunched up, and I didn't see no need for

23  excessive force that way with a crippled man.

24         So they put me -- proceeded to put

25  me in the back seat of the police car.  And

1   while they were proceeding to put me in the

2   back of the police car -- when they first --

3   before we made it to the police car going

4   down the stairs, the neighbor, Ashley, which

5   is where the incident supposedly had

6   happened, Ashley Morment, which -- she was

7   like, "He didn't do nothing.  Why you taking

8   him?  He ain't -- why y'all handling him like

9   that?  He -- he been shot.  He can't be

10  handled like that."  And they were like,

11  "Mr. Cripple going to jail."

12          So he put me in the back seat of the

13  police car, and he asked me again.  When he

14  asked me, he hit me.  I mean -- yeah, when he

15  asked me about writing a statement, I don't

16  know what exactly I said, but he hit me

17  upside the head.  And then I finally realized

18  after that he'll ask me something else and

19  he'll hit me.  He hit me in my chest.  And I

20  finally realized that, you know, I wasn't

21  saying what he wanted me to say.  So I agreed

22  to write a statement.

23          And there was some more officers out

24  there or what have you.  And while I was

25  writing the statement, I remember another



1   officer.  I don't remember his name.  He was

2   like, "I was over here when he got shot.

3   Yeah, he -- he a cripple," whatever.

4          So upon opening the door, getting

5   the -- getting the -- the police report from

6   me or whatever I had wrote down, my

7   statement, given my statement, he said, "I

8   heard you did get shot.  Your wife -- you

9   should have did everybody a favor."  And he

10  said, "Well, you should have did everybody a

11  favor and did your wife a favor and just died

12  that night."

13         And then I started hobbling

14  towards -- when -- when he finally took the

15  handcuffs off me, I started making my way

16  toward Quinnetta's apartment.  Upon making

17  it -- upon going towards her apartment, she

18  started helping me up.  She met me with her

19  arm and my cane and started helping me up the

20  stairs, on my quad cane.

21     Q.  Okay.  Once you got to the police

22  vehicle, they un- -- they took the handcuffs

23  off and you wrote a statement; is that

24  correct?

25     A.  Not as soon as I went there, but



1    that where I got the handcuffs taken off.

2         Q.  And that's where you wrote the

3    statement; is that correct?

4         A.  That's where I wrote the statement

5    at, in the back seat of the police vehicle.

6         Q.  Okay.

7              MR. ROSS:  Let's mark that as an

8         exhibit.

9                   - - -

10             (EXHIBIT NUMBER 9 MARKED FOR

11        IDENTIFICATION.)

12   BY MR. ROSS:

13        Q.  I'm going to show you Exhibit 9.  Is

14   Exhibit 9 the statement you wrote that night?

15        A.  (Witness examines document.)

16   Finished reading.

17        Q.  Is that the statement you wrote that

18   night?

19        A.  Yes, this is the statement.  I

20   consider it a false statement.

21        Q.  Okay.  Well, let's talk about it.

22   Is that your signature on the bottom?

23        A.  Yes.

24        Q.  Okay.  It says, "I was awakened by

25   knocks at the door and it was my



EXHIBIT 6

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Quinnetta Manning - 12/22/2017

```
 1   IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
            DISTRICT OF MISSISSIPPI JACKSON DIVISION
 2
     LATOYA BROWN;
 3   LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN;
 4   KHADAFY MANNING;
     QUINETTA MANNING; MARVIN MCFIELD;
 5   NICHOLAS SINGLETON; STEVEN SMITH;
     BESSIE THOMAS; and
 6   BETTY JEAN WILLIAMS TUCKER,
     individually and on behalf of a class of all other
 7   similarly situated                       PLAINTIFFS
     v.               CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 8   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER,
 9   in his official capacity; and
     MADISON COUNTY SHERIFF'S DEPUTIES
10   JOHN DOES #1 through #6, in their individual
     capacities                              DEFENDANTS
11

12           ****************************************

13                      ORAL DEPOSITION OF

14                      QUINNETTA MANNING

15                      DECEMBER 22, 2017

16                        Volume 1 of 1

17           ****************************************

18           ORAL DEPOSITION OF QUINNETTA MANNING, produced
     as a witness at the instance of the Defendants, and
19   duly sworn, was taken in the above-styled and
     -numbered cause on the 22nd day of December, 2017,
20   before Melinda Bowers, CCR in and for the State of
     Mississippi, reported by machine shorthand, at the
21   offices of Wise, Carter, Child & Caraway, P.A.,  401
     East Capitol Street, in the City of Jackson, State
22   of Mississippi.

23

24

25
```

```
 1        Q     Okay.  And who lives at the address where
 2   you dropped her off?
 3        A     She does.
 4        Q     Okay.  So you pulled into the driveway to
 5   drop her off, and then tell me what happened.
 6        A     The officer assumed that I was dodging the
 7   roadblock and came down and pulled over and asked me
 8   why did I stop and pull over in this yard.  And I
 9   began to tell him that I was dropping her off at her
10   home, I wasn't dodging it, I was going through the
11   roadblock because I stay in Canton Estates, and he
12   asked for my license and registration.
13        Q     Okay.  Did you give him your license and
14   registration?
15        A     Yes.
16        Q     Did he give you a citation?
17        A     No.
18        Q     You had a good license and registration?
19        A     Yes.
20        Q     Okay.  Once you showed him your license
21   and registration, did he ask for anything else?
22        A     No.
23        Q     Was he a white officer or a black officer?
24        A     I can't remember.
25        Q     Okay.  Was he polite?
```

```
 1        A     No.

 2        Q     Okay.  Did he treat you unfairly?

 3              MS. GOCHMAN:  Objection to form.

 4              You can answer.

 5        A     Yes.

 6   BY MR. ROSS:

 7        Q     How did he treat you unfairly?

 8        A     The --

 9              MS. GOCHMAN:  Objection to form.

10        A     -- the way he was talking towards me.  The

11   way he was speaking to me.

12   BY MR. ROSS:

13        Q     What did he -- how did he talk in a way

14   that you thought was unfair?

15        A     He wasn't talking to me as if I was a

16   person.

17        Q     Okay.  How was he talking to you?

18        A     He asked me why in the hell did I pull

19   over in this driveway and where is my damn license

20   and registration.

21        Q     Okay.  Did he use the word "damn"?

22        A     Yes.

23        Q     Okay.  What else did he say, if you

24   remember?

25        A     Don't remember nothing else.
```

```
 1   deputies of the Madison County Sheriff's Department

 2   been in your home?

 3        A    I'm not sure.

 4        Q    Is it more than one?

 5        A    I'm not sure.

 6        Q    Okay.  Well, how many purported invasions

 7   of your home are you claiming in this lawsuit?

 8             MS. GOCHMAN:  Objection to form.

 9        A    One.

10   BY MR. ROSS:

11        Q    Okay.  Is that the incident in June of

12   2016?

13        A    Yes.

14        Q    Okay.

15             MR. ROSS:  Go off the record just a

16        moment.

17             (Off-the-record discussion.)

18             MR. ROSS:  Back on the record.

19   BY MR. ROSS:

20        Q    Okay.  Ms. Thomas, I think when we went

21   off the record, you had just testified that the only

22   home invasion you were claiming in this lawsuit is

23   the one that occurred back in June of 2016 at your

24   apartment in Canton Estates; is that correct?

25        A    Yes.
```

```
 1        Q     Okay.  Tell me what happened from your

 2   perspective.

 3        A     Several officers stormed into my home in

 4   the middle of the morning and demanded that me and

 5   Khadafy write a false witness statement against

 6   Ladarius Thompson and if we didn't that we would be

 7   fined -- would be jailed.

 8        Q     Okay.  Now, what time did this occur?

 9        A     I'm not sure.

10        Q     Was it daylight or night?

11        A     It was like early morning.

12        Q     Was this -- was it nighttime or was it

13   daytime?

14              MS. GOCHMAN:  Objection.  Asked and

15        answered.

16        A     Day.

17   BY MR. ROSS:

18        Q     Okay.  And how many officers were there?

19        A     I think six.

20        Q     Okay.  Did they knock on your door when

21   they came to your apartment?

22        A     Yes.

23        Q     Did they ask if they could come in?

24        A     No.

25        Q     They didn't ask at all?
```

```
 1        A     No.

 2        Q     Who answered the door?

 3        A     I did.

 4        Q     Okay.  Did you invite them in?

 5        A     No.

 6        Q     Did you tell them they could not come in?

 7        A     No.

 8        Q     Did you object to them coming in?

 9              MS. GOCHMAN:  Objection to form.

10        A     No.

11   BY MR. ROSS:

12        Q     Okay.  How many officers actually came

13   into your apartment?

14        A     I'm not sure.

15        Q     Okay.  And when they got into the

16   department [sic], what happened then?

17              MS. GOCHMAN:  Objection to form.

18        A     One of the officers began to ask us what

19   happened with Ladarius and I stated I didn't

20   understand what he was talking about.  And he said

21   he seen us run up the stairs.  And I told him we

22   didn't -- no, we couldn't have ran up the stairs

23   because Khadafy cannot run.  And he stated, "I seen

24   all three of you run up here."  And I was telling

25   him, no, sir, we did not run up the stairs.  And he
```

# EXHIBIT 7

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Nicholas Singleton - 12/29/2017

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3  LATOYA BROWN; LAWRENCE BLACKMON
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4  QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
 5  BESSIE THOMAS; and BETTY JEAN WILLIAMS
    TUCKER, individually and on behalf of a
 6  class of all other similarly situated,       PLAINTIFFS

 7  VERSUS              CIVIL ACTION NO. 3:17-cv-347 WHB LRA

 8  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, in his
 9  official capacity; and MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1 through #6,
10  in their individual capacities,              DEFENDANTS

11

12

13            DEPOSITION OF NICHOLAS SINGLETON

14             taken on December 29th, 2017,
          commencing at approximately 10:30 a.m.
15   at the Law Offices of Wise, Carter, Child & Caraway
                  401 East Capitol Street
16                      Suite 600
                   Jackson, Mississippi
17

18

19

20

21

22  REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
                     eDeposition Services
23                   Post Office Box 14148
                     Jackson, MS 39236
24                     (844) 533-DEPO
                      edeposition.com
25
```

844.533.DEPO

```
 1      Q.    Because you thought it was unusual that he
 2  would be getting a package at that house?
 3      A.    Not necessarily.  It's just normally when
 4  someone has a package delivered, they will let you know,
 5  "Okay, I have a delivery coming here."  Because at the
 6  time, I was unemployed, and I was at home, so a package
 7  -- I would get mail from other relatives so that it
 8  wouldn't be stolen or removed.
 9      Q.    I gotcha.  So it wasn't unusual for a relative
10  to ask you to receive a package for them because they
11  knew you would be at the house, correct?
12      A.    Yes.
13      Q.    But it was unusual because Bryan hadn't called
14  you beforehand in this case?
15      A.    Yes.
16      Q.    So you weren't expecting it?
17      A.    No, I was not.
18      Q.    And that's what you were calling about?
19      A.    Yes.
20      Q.    Now, do you think that that incident was based
21  on race discrimination?
22      A.    No.
23      Q.    Now let's move to the roadblocks.  You do think
24  those are based on race discrimination?
25      A.    Yes, I do.
```

1     Q.   Why is that?

2     A.   Because I live in black neighborhoods, and I've

3   traveled in white neighborhoods.

4     Q.   What white neighborhoods?

5     A.   When you cross the railroad tracks from -- Let

6   me see how do I put that.  What stores are right near

7   there?  What is the name of that street?  From the

8   railroad I would say going, what, west, is predominantly

9   black neighborhoods.  From the railroad tracks going

10  further east would be more white neighborhoods.  And it

11  would be more sporadic that it's both black and white,

12  but a majority of the black neighborhoods are on the

13  opposite side on the tracks.

14    Q.   You're talking about the opposite side of the

15  tracks in Canton?

16    A.   Yes.

17    Q.   So you're saying you have seen roadblocks on

18  the white side, but it's just more sporadic?

19    A.   No, I have not.  I've maybe seen one.

20    Q.   Where was that?

21    A.   Let me see -- Highway 51.

22    Q.   So on the other side how many have you seen?

23    A.   More than 20.

24    Q.   All right.  Tell me the locations you have seen

25  them.

 1      A.   Let me see -- At the entrance of Canton

 2   Estates, at the entrance of the new projects, McNeal

 3   Elementary.  Let me see where else -- on King Ranch

 4   Road.

 5      Q.   Okay, you said Canton Estates and you said the

 6   new projects.  What are the new projects?

 7      A.   It's like a housing complex.

 8      Q.   Do you know what the name of it is?

 9      A.   Not exactly at the moment.

10      Q.   When you say new projects, it's like a new

11   development you mean?  Why are you saying new projects?

12      A.   Because we have old projects and new projects.

13      Q.   And new projects is called new because it's

14   newer?

15      A.   Yes.

16      Q.   When was that developed?

17      A.   I don't know exactly.

18      Q.   What street is it on?

19      A.   Is it Martin Luther King, or does it turn into

20   -- I think it's Martin Luther King, if I'm not mistaken.

21           MR. TOM:  Only testify to what you know.  Don't

22   guess.

23           DEPONENT:  Okay.

24   BY MR. GRAVES:

25      Q.   So it may be?  Are you sure, or you don't know?

 1      A.   I don't know the exact street address.

 2      Q.   So Canton Estates, what you're calling the new

 3 projects, and where else?

 4      A.   Boyd Street, King Ranch, I can't think of the

 5 other locations at the moment.

 6      Q.   So you're saying more than 20 times, but you

 7 have only listed four different places right now?

 8           MR. TOM:  Objection.  He said he remembered

 9 four and doesn't remember more than that.  He didn't say

10 there was only four.

11           MR. GRAVES:  I know he didn't.

12 BY MR. GRAVES:

13      Q.   Here is my question though:  When you say you

14 have seen more than 20 on that side of the tracks --

15      A.   Yes.

16      Q.   -- how many different locations are you talking

17 about?

18      A.   I don't have an exact number of locations.

19      Q.   More than ten?

20      A.   Yes.

21      Q.   More than 15?

22      A.   Yes.

23      Q.   All right.  So it's more than 15 locations, but

24 so far you have only named four.  You can't think of any

25 more?

1      A.    Kingston Place, Highway 16 old and new, Highway

2  43, Highway 51, Highway 17, and that's all I can think

3  of at the moment.  I don't have a list at the moment.

4      Q.    Now, the next question is:  Of all these you

5  have just listed, are these ones you have actually seen,

6  or are these ones you have been stopped at?

7      A.    Ones I have been stopped at.

8      Q.    When were you stopped at the Canton Estates

9  checkpoint?

10      A.    When I went to see my cousin because they

11  stayed in that complex.

12      Q.    When was that?

13      A.    I don't have an exact date.

14      Q.    How long ago was it?

15      A.    I don't know exactly because it has been a

16  while.

17      Q.    Like more than four years ago?

18      A.    Less than that.

19      Q.    More than three years ago?

20      A.    I would say two years ago.

21      Q.    Were you given a citation?

22      A.    No.

23      Q.    Have you ever been issued a traffic citation,

24  other than the DUI we talked about in 2006?

25            MR. TOM:  Now are we talking about at

# EXHIBIT 8

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3   LATOYA BROWN; LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4   QUINETTA MANNING; MARVIN MCFIELD;
     NICHOLAS SINGLETON; STEVEN SMITH;
 5   BESSIE THOMAS; and BETTY JEAN
     WILLIAMS TUCKER, individually and on
 6   behalf of a class of all others
     similarly situated                         PLAINTIFFS
 7
     VS.              CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 8

 9   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER,
10   in his official capacity; and
     MADISON COUNTY SHERIFF'S DEPUTIES
11   JOHN DOES #1 through #6,
     in their individual capacities            DEFENDANTS
12
     ********************************************************
13
                    DEPOSITION OF STEVEN SMITH
14
     ********************************************************
15
                  (APPEARANCES NOTED HEREIN)
16
                   TAKEN AT THE OFFICES OF:
17            WISE, CARTER, CHILD & CARAWAY
                 401 EAST CAPITOL STREET
18                  JACKSON, MISSISSIPPI

19
                 TUESDAY, JANUARY 9, 2018
20              AT APPROXIMATELY 8:31 A.M.

21

22   REPORTED BY:

23            TAMMY MCDANIEL-BAGNATO, #1910

24

25
```



```
 1   Estates.
 2        A.  Yes.
 3        Q.  Tell me more specifically about
 4   that.  Like what time of day was it?
 5        A.  Okay.  January 23rd.  I remember.
 6   It's my daughter's birthday.  So I'm walking.
 7   I decided to walk to the store.  I had a
 8   vehicle, but I decided to walk to the store.
 9        Q.  What time?
10        A.  It's about 7:00, maybe later because
11   I'm not sure if it was daylight savings time.
12   I know it was dark.
13        Q.  It was dark?
14        A.  Yes.
15        Q.  Okay.  Was anybody with you?
16        A.  Yes.  Terrance Thompson.
17        Q.  Terrance Thompson?
18        A.  Yes.
19        Q.  How do you know Terrance Thompson?
20        A.  I've known him since we were in
21   school, so from Canton.  He stays on Boyd
22   Street.
23        Q.  He does not live in Canton Estates?
24        A.  No.
25        Q.  Okay.  How did you hook up with him
```



1   that night?

2      A.  I was walking past Boyd Street and

3   he was coming off the street.  Good friends

4   of ours stay on the side of the store, so he

5   was headed up there.  We bought -- we went to

6   the store and grabbed a few things.  And on

7   the way back, he asked, you know, what I was

8   doing.  I was like, "I was going back home.

9   You can come with me."  He decided to walk

10   with me.

11      Q.  Why did he decide to come to your

12   house -- to your apartment?

13      A.  I have no idea, no more than to hang

14   out, I would guess.

15      Q.  Okay.

16      A.  So we're walking home -- well, I'm

17   walking home, and I see police at the gate, a

18   red Charger and a squad car.  I see them.

19      Q.  You see the cars?

20      A.  Yes.

21      Q.  Okay.  Where are the officers?  Were

22   they walking inside the apartment complex?

23      A.  I think they were standing out near

24   the cars, I would say.  And by the time we

25   approached them -- which I was expecting to



1   just go ahead and walk past.  I'm not

2   driving, you know.  And while we was walking,

3   I was asked could I take my hands out of my

4   pocket, which I did.

5        Q.  Did the officer tell you why he

6   wanted you to take your hands out of your

7   pocket?

8        A.  No.

9        Q.  Okay.  Did he ask Mr. Thompson to do

10  the same?

11       A.  I think he did.  He -- when he said,

12  "Take your hands out of your pocket," we both

13  just automatically did it.

14       Q.  Okay.

15       A.  It was cold that night, so...

16       Q.  All right.

17       A.  And asked if we had ID, and I told

18  him, "Yes."  He asked could he see it, and I

19  did a gesture as this (indicating) because it

20  was in my back pocket.  I didn't want to

21  reach for it.  So I asked -- I told him,

22  "It's in my back pocket right there.  You can

23  look at the ID and tell that I'm going home.

24  My apartment number is on it."

25       Q.  And during this time, where is



STEVEN SMITH                                    January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                  36

1   Mr. Thompson?

2        A.  He's a few steps away from me.  It

3   was two officers.  So the other officer --

4        Q.  So he's talking to another

5   officer --

6        A.  Yes.

7        Q.  -- when you're talking to one?

8        A.  Yes.

9        Q.  Did you overhear what Mr. Thompson

10  and the other officer were talking about?

11       A.  A little bit of it.  I noticed that

12  the officer pulled a firearm out of his

13  jacket.

14       Q.  Did you hear the officer ask whether

15  or not he had a firearm?

16       A.  No.

17       Q.  Okay.  And so you did see the

18  officer that was dealing with Mr. Thompson to

19  your side?

20       A.  Uh-huh (affirmative response).

21       Q.  How far apart were y'all?

22       A.  I would say from -- say about 10

23  feet.

24       Q.  Ten feet?

25       A.  Yeah.



1      Q.  And when you first saw the officers,

2   did you have your hands in your pockets?  Did

3   you have a coat on?

4      A.  It was a coverall suit, like a

5   jumper.

6      Q.  Okay.  Did both you and Mr. Thompson

7   have your hands in your pockets?

8      A.  Yes.

9      Q.  It was cold that night?

10      A.  Yes.

11      Q.  Okay.  And so you're separated.  One

12   officer talks to Mr. Thompson and one officer

13   talks to you; is that correct?

14      A.  Yes.

15      Q.  Okay.  When you saw the officer

16   retrieve the weapon from Mr. Thompson, did

17   you hear anything else that was said between

18   that officer and Mr. Thompson?

19      A.  He asked him was this -- "Is this

20   yours?  Is it registered?"  He said, "Yes."

21   And he said that -- he ran it.  He said, "I'm

22   fixing to find out," and ran off.  I was --

23   back to me.  We were waiting on my callback

24   to see if I had any warrant.

25          Between that time, while I'm



```
 1   waiting, you know, he said, "It's
 2   registered."  I heard that.  And he -- I
 3   actually seen the officer put the gun back
 4   inside his pocket, inside his coat pocket.
 5   And that's when it came up that I did have
 6   one, and I was put in handcuffs.
 7            After that, the officer -- my
 8   arresting officer asked Terrance's arresting
 9   officer, "Why did you give him his gun back?
10   He doesn't have a permit to carry concealed."
11   So he took that weapon back out and arrested
12   him also.
13        Q.  Okay.  And what did you get arrested
14   for?
15        A.  Old fines, traffic, driving without
16   a license and no insurance.
17        Q.  Okay.  While you lived in Madison
18   County, can you tell me how many different
19   times you got citations or tickets?
20        A.  Not exactly, but it was quite a few.
21        Q.  Like more than 10?
22        A.  More than 10.
23        Q.  More than 20?
24        A.  More than 20.
25        Q.  Okay.  Do you recall where you
```



1   received those citations?  Were you driving

2   on streets or highways?

3        A.  Streets.

4        Q.  Okay.  And were they the result of

5   traffic stops?

6        A.  Yes.

7        Q.  Okay.  And you never got any of

8   those going through any kind of safety

9   checkpoint or roadblock, did you?

10       A.  No.

11       Q.  Okay.

12       A.  Well, yes.

13       Q.  Which one?

14       A.  The one that I was arrested on the

15  night that we were just talking about, that

16  was from a roadblock at Canton Estates, just

17  in a different car.

18       Q.  You were in a car that night?

19       A.  Not that night.  The reason I was

20  arrested --

21       Q.  Was because of an outstanding

22  warrant that you'd gotten at a roadblock?

23       A.  Yes, in a car.

24       Q.  While you were driving a car?

25       A.  Yes.



```
 1        Q.  Where was that roadblock?

 2        A.  In Canton Estates.

 3        Q.  Okay.  And what was the -- what kind

 4   of ticket did you get?

 5        A.  Driving without a license, but --

 6   yeah, and he gave me a ticket for it, and no

 7   insurance.

 8        Q.  And no insurance?

 9        A.  Yes.

10        Q.  So you just got a ticket for that

11   instance?

12        A.  Uh-huh (affirmative response).

13            THE REPORTER:  Remember to say "yes."

14        A.  Yes.

15            MS. COWAN:  I'm missing it too.

16   BY MS. COWAN:

17        Q.  All right.  So the night that you

18   encountered the officers in Canton Estates,

19   you had an outstanding warrant.  Was it one

20   warrant or two?

21        A.  They classify it as two because no

22   insurance and no driver's license.

23        Q.  No driver's license.  And you had

24   received that citation at a safety checkpoint

25   at Canton Estates -- outside of -- the street
```



```
 1          Q.  For what?

 2          A.  Outstanding --

 3          Q.  Tickets?

 4          A.  -- tickets.

 5          Q.  Okay.

 6          A.  But I luckily had the printouts from

 7   the Madison County Sheriff's Department in

 8   the car.

 9          Q.  Good.

10          A.  So I showed him that, and he was

11   like, "Oh, okay.  It's just still in the

12   system for now."  So that was --

13          Q.  That was it?

14          A.  Uh-huh (affirmative response).

15          Q.  Okay.  And I asked you about -- when

16   I use the term "jump out," do you know what

17   that means?

18          A.  Yes.

19          Q.  What does that mean?

20          A.  From my understanding, it's the

21   plainclothes, unmarked cars, but usually more

22   of a sort of drug enforcement task force.

23          Q.  Okay.  Narcotics agents?

24          A.  Yeah.

25          Q.  You said in 2015 you saw deputies
```



```
 1   stop and search a car at Brooklyn Mart in

 2   Canton.  Do you recall?

 3        A.  Yes.

 4        Q.  Do you know anything about that

 5   other than just seeing what you saw?

 6        A.  I just saw what I saw.

 7        Q.  And the same -- you said in 2016 you

 8   saw a parked vehicle around Rogers Park being

 9   stopped and searched.  Same deal?  You don't

10   know what that was about?

11        A.  No.

12            MS. COWAN:  I think we can take a

13        break.

14                    - - -

15        (OFF THE RECORD AT 9:25 A.M.)

16       (BACK ON THE RECORD AT 9:35 A.M.)

17   BY MS. COWAN:

18        Q.  Now, Mr. Smith, in the questions

19   that we sent to you, we asked you about any

20   crime that you'd been charged or arrested

21   for.  I want to go through some of these and

22   just ask you about them.

23            You said in 2012 you were charged

24   with possession of marijuana and improper

25   vehicle in Flowood.  Do you recall that?
```



# EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3  LATOYA BROWN; LAWRENCE BLACKMON
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4  QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
 5  BESSIE THOMAS; and BETTY JEAN WILLIAMS
    TUCKER, individually and on behalf of a
 6  class of all other similarly situated,       PLAINTIFFS

 7  VERSUS            CIVIL ACTION NO. 3:17-cv-347 WHB LRA

 8  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, in his
 9  official capacity; and MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1 through #6,
10  in their individual capacities,             DEFENDANTS

11

12

13                  DEPOSITION OF BESSIE THOMAS

14              taken on December 14th, 2017,
           commencing at approximately 9:00 a.m.
15   at the Law Offices of Wise, Carter, Child & Caraway
                  401 East Capitol Street
16                      Suite 600
                   Jackson, Mississippi
17

18

19

20

21

22  REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
                    eDeposition Services
23                  Post Office Box 14148
                    Jackson, MS 39236
24                    (844) 533-DEPO
                    edeposition.com
25
```

844.533.DEPO

```
 1  of the apartment complex.  I think it's Canton Estates.

 2      Q.   How long did she live there?

 3      A.   I'm not sure.

 4      Q.   Tell me why you filed this lawsuit.

 5      A.   Because I would like the discrimination between

 6  blacks and Madison County Sheriff's Department to be

 7  stopped.

 8      Q.   What discrimination are you talking about?

 9      A.   Illegal roadblocks, invasion of your home, and

10  vulgar language.

11      Q.   Let's go through these one at a time.  You said

12  the illegal roadblocks.  What roadblocks do you think

13  are illegal?

14      A.   All of them.

15      Q.   All roadblocks are illegal?  So any roadblock

16  anywhere is illegal?  Is that what you're saying?

17      A.   Any roadblock the Madison County Sheriff's

18  Department have executed in the last couple of years

19  have been illegal.

20      Q.   And why is that?

21      A.   Because of the -- Because they are not visible.

22      Q.   What do you mean not visible?

23      A.   They are off in the cut, if you call it, if

24  they -- if they use King Ranch where I live, they are

25  not parked on King Ranch.  They are parked in the
```

 1  apartments.  They are on foot on King Ranch.

 2      Q.   So when you say not visible, you mean they

 3  don't have their cars on the street?

 4           MS. SIVASHANKER:  Objection to form.

 5           MR. GRAVES:  I'm asking.

 6  BY MR. GRAVES:

 7      Q.   Do you understand what I'm asking?  I'm trying

 8  to understand, when you say not visible, you're saying

 9  that they -- they are standing in the street, right?

10           MS. SIVASHANKER:  Objection to form.

11  BY MR. GRAVES:

12      Q.   You can answer.

13      A.   Yes.

14      Q.   Okay.  So you can see them standing in the

15  street?

16      A.   Once you get up on them.

17      Q.   But what you're saying is that their cars are

18  parked on the side of the street, right?

19           MS. SIVASHANKER:  Objection to form.

20      A.   Their cars are not parked on the side on the

21  street.  They are parked -- Their car was parked inside

22  the apartment complex, the housing complex.

23  BY MR. GRAVES:

24      Q.   So my question is:  When you say not visible,

25  are you talking about the fact that the cars are parked

 1  off the street?

 2      A.   Yes.

 3      Q.   And you believe that is what makes them

 4  illegal?

 5           MS. SIVASHANKER:  Objection to form.

 6  BY MR. GRAVES:

 7      Q.   You can answer.

 8      A.   Yes.

 9      Q.   The cars that are parked on the side or in the

10  parking lot, do they have flashing lights on them?

11           MS. SIVASHANKER:  Objection to form.

12      A.   No.

13  BY MR. GRAVES:

14      Q.   Okay, let me ask you this:  How many roadblocks

15  have you been stopped at?

16           MS. SIVASHANKER:  Objection to form.  What time

17  period are you talking about?

18           MR. GRAVES:  Period.

19      A.   Repeat the question.

20  BY MR. GRAVES:

21      Q.   You said that Madison County conducts illegal

22  roadblocks.  I'm asking, how many roadblocks have you

23  been stopped at?

24      A.   Many.

25      Q.   How many is "many"?

```
 1      A.   Too many to count.

 2      Q.   Are you saying that none of those -- Okay, let

 3   me ask you this:  Where specifically?

 4      A.   Where?

 5      Q.   Yes.

 6      A.   The street right in front of Mt. Levi that runs

 7   through the trailer park.

 8      Q.   Where else?

 9      A.   Highway 22, King Ranch in front of Anderson

10   Lodge and Sims Church, Nichols Middle School, Brooklyn

11   Mart, Martin Luther King and Frey -- it runs into Frey

12   Lane, over the tracks at James Street.

13      Q.   Is that it?

14      A.   Those are the ones I've encountered.

15      Q.   All right, let me go through these one at a

16   time.  I think the first one you said was outside of Mt.

17   Levi, right?

18      A.   No.  I said the street in front of Mt. Levi.

19      Q.   The street?

20      A.   Yes.

21      Q.   Okay.  So where were the cars parked when you

22   went through that roadblock?

23           MS. SIVASHANKER:  Objection to form.  Are you

24   talking about all roadblocks at that location or a

25   specific roadblock?
```

```
 1              MR. GRAVES:  In general.

 2    BY MR. GRAVES:

 3        Q.   Where were the cars parked when you went

 4    through the roadblocks at that location?

 5        A.   On the side of the road.

 6        Q.   What about Highway 22?

 7        A.   On 22 they are in the street like.

 8        Q.   What about King Ranch?

 9        A.   In the cuts.

10        Q.   What do you mean in the cuts?

11        A.   In the apartment complex.

12        Q.   What about at Nichols Middle School, where were

13    cars parked?

14        A.   Side of the road.

15        Q.   Brooklyn Mart, where were the cars parked?

16        A.   On the side of the road.

17        Q.   Martin Luther King?

18        A.   Side of the road.

19        Q.   James Street?

20        A.   Side of the road.

21        Q.   And are you saying that at none of those

22    roadblocks were blue lights ever used?

23              MS. SIVASHANKER:  Objection to form.  She

24    didn't say that.

25              MR. GRAVES:  I'm asking that question.  I know
```

1  she didn't say it, but I'm asking her if that's what

2  she's saying.

3      A.   No, I'm not saying that.

4  BY MR. GRAVES:

5      Q.   Which ones of those are you saying where they

6  didn't use blue lights?

7          MS. SIVASHANKER:  Objection to form.

8      A.   I didn't see the blue lights on the street in

9  front of Mt. Levi that runs between the trailer parks.

10 I didn't see the lights on Martin Luther King -- not

11 Martin Luther King, King Ranch.

12 BY MR. GRAVES:

13     Q.   And when you're saying you didn't see them --

14     A.   The headlights are on; the flashing lights are

15 not, you know, the blue lights.

16     Q.   When you're saying you didn't see them, are you

17 saying they weren't flashing for sure, or are you saying

18 you just didn't see them?

19         MS. SIVASHANKER:  Objection to form.

20     A.   They couldn't have been on.  I didn't see them.

21 BY MR. GRAVES:

22     Q.   When you went through on Mt. Levi, was it --

23 how many times are we talking about you went through

24 roadblocks at Mt. Levi?

25     A.   I was stopped once over there.

 1      Q.    One time, okay.  Was it during the daytime or

 2  nighttime?

 3      A.    Night.

 4      Q.    What time do you know -- Do you remember what

 5  time it was?

 6      A.    I don't.

 7      Q.    Do you remember when it was?

 8      A.    Not specific dates.

 9      Q.    How long ago was it?

10      A.    Last year.

11      Q.    Did you get a citation issued?

12      A.    I did.

13      Q.    What was the citation for?

14      A.    No child restraint.

15      Q.    So you had a kid in the car with you?

16      A.    I did.

17      Q.    Who was that?

18      A.    Someone I was picking up to take home.

19      Q.    And who was that?

20      A.    Her name was Sherrill.

21      Q.    Sherrill?

22      A.    I'm not sure of Sherrill's last name.

23      Q.    Do you remember who the sheriff's deputy was

24  that wrote your citation?

25      A.    I don't.

```
 1              MS. SIVASHANKER:  Objection to form.

 2      A.   I'm saying I don't recall getting any other

 3  ticket.

 4  BY MR. GRAVES:

 5      Q.   So that incident when you got the citation and

 6  you said the officer used vulgar language, is that the

 7  only incident where you say a sheriff's deputy used

 8  vulgar language with you?

 9              MS. SIVASHANKER:  Objection to form.

10      A.   Yes.

11  BY MR. GRAVES:

12      Q.   Are you claiming that he used vulgar language

13  with you because you're black?

14              MS. SIVASHANKER:  Objection to form.

15      A.   Yes.

16  BY MR. GRAVES:

17      Q.   Why is that?

18      A.   Because of the way he was saying it.

19      Q.   What did he say?

20      A.   "I don't want to hear that damn" -- you know,

21  I'm not a curser, but, "I don't want to here that damn

22  stuff.  I've got too many other folks over here, all

23  these niggers over here."

24      Q.   So you don't think he would have said that if

25  you weren't black?
```

```
 1              MS. SIVASHANKER:  Objection to form.

 2       A.   No.

 3  BY MR. GRAVES:

 4       Q.   What do you base that on?

 5       A.   The way they treat you.

 6       Q.   Who is that?

 7       A.   The Madison County Sheriff's Department.

 8       Q.   And how do they treat you?

 9       A.   With no respect.

10       Q.   What do you mean by that?

11       A.   The way they talk to you, it's like they look

12  down on you.  They are unconcerned about what you tell

13  them.

14       Q.   Who has talked to you in a way that you felt

15  like they weren't concerned about you?

16              MS. SIVASHANKER:  Objection to form.  Are you

17  talking about officers?

18              MR. GRAVES:  Yes.

19       A.   I don't know their name.

20  BY MR. GRAVES:

21       Q.   When did this happen?

22       A.   Once when I called and reported about a break-

23  in.

24       Q.   A break-in where?

25       A.   In my store.
```

```
 1                MR. GRAVES:  Okay.

 2   BY MR. GRAVES:

 3        Q.   You said that during the roadblock, a deputy

 4   used vulgar language toward you during one of the

 5   roadblock stops, right?

 6        A.   Yes.

 7        Q.   Did he ever use racial slurs?

 8        A.   Yes.

 9        Q.   Which slur did he use?

10        A.   "I've got all these niggers off the side of

11   this road."

12        Q.   Who said that?

13        A.   The officer.

14        Q.   What officer?

15        A.   I don't know.

16        Q.   When was this?

17        A.   At the road stop on -- in front of Mt. Levi

18   through the trailer park.

19        Q.   He said, "I've got all these niggers on the

20   side of the road"?

21                MS. SIVASHANKER:  Objection to form.

22        A.   Yes.

23   BY MR. GRAVES:

24        Q.   Was he talking to you?

25        A.   I was talking to him.
```

```
 1      Q.   What did he mean by that?  What was he saying?

 2           MS. SIVASHANKER:  Objection to form.

 3      A.   I have no idea what he meant.

 4  BY MR. GRAVES:

 5      Q.   But did he actually call you -- Did he use a

 6  racial slur towards you, or was he just generally

 7  talking about people?

 8           MS. SIVASHANKER:  Objection to form.

 9      A.   He stated -- I was trying to explain, and he

10  stated, "I don't give a D.  I've got all these -- I'm

11  sitting all these niggers on the side of this road."

12  BY MR. GRAVES:

13      Q.   Why didn't you tell me that he said that before

14  when I asked you what he said?

15      A.   I did say that.

16      Q.   You told me that he said he didn't give a damn,

17  but you didn't tell me he said, "I've got all these

18  niggers on the side of the road."

19           MS. SIVASHANKER:  Objection.  Argumentative.  I

20  think she did say that.  But you can answer again.

21      A.   I did.

22  BY MR. GRAVES:

23      Q.   And you didn't report that to the sheriff's

24  department, did you?

25           MS. SIVASHANKER:  Objection to form.
```

# EXHIBIT 10

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Belly Williams - 12/19/2017

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       JACKSON DIVISION

 3   LATOYA BROWN; LAWRENCE BLACKMON
     HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4   QUINETTA MANNING; MARVIN MCFIELD;
     NICHOLAS SINGLETON; STEVEN SMITH;
 5   BESSIE THOMAS; and BETTY JEAN WILLIAMS
     TUCKER, individually and on behalf of a
 6   class of all other similarly situated,      PLAINTIFFS

 7   VERSUS               CIVIL ACTION NO. 3:17-cv-347 WHB LRA

 8   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER, in his
 9   official capacity; and MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1 through #6,
10   in their individual capacities,             DEFENDANTS

11

12

13         DEPOSITION OF BETTY JEAN WILLIAMS TUCKER

14             taken on December 19th, 2017,
            commencing at approximately 9:00 a.m.
15    at the Law Offices of Wise, Carter, Child & Caraway
                  401 East Capitol Street
16                      Suite 600
                   Jackson, Mississippi
17

18

19

20

21

22   REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
                    eDeposition Services
23                  Post Office Box 14148
                    Jackson, MS 39236
24                  (844) 533-DEPO
                    edeposition.com
25
```

```
1      Q.   You can answer.  Go ahead.

2      A.   Well, the roadblocks are always in the black

3 neighborhoods.

4      Q.   Are you saying that the sheriff's department

5 always has roadblocks in the black neighborhoods?

6      A.   That's what I said.

7      Q.   Do you know if they do roadblocks in other

8 neighborhoods also?

9      A.   What do you mean other?

10     Q.   Like white neighborhoods?

11     A.   No.

12     Q.   You don't know?

13     A.   I haven't seen any.

14     Q.   You say you haven't seen any, but do you know

15 that they don't, or you just haven't seen them?

16     A.   Say that again.

17     Q.   I'm asking you, are you sure that they don't,

18 or are you just saying you haven't seen them?

19     A.   I'm pretty sure that they don't.

20     Q.   Why do you say that?

21     A.   Because whatever roadblocks is at, most people

22 put it on Facebook or they're going to text you and let

23 you know.  They haven't texted one time to say it's a

24 roadblock over in the white neighborhood.  There's a lot

25 of blacks who live in the white neighborhoods.
```

```
 1      A.    I don't remember about that.

 2      Q.    Let me ask you this:  Where have you been

 3  stopped at a roadblock before?

 4      A.    King Ranch Road, Adeline.

 5      Q.    Adeline?

 6      A.    And Martin Luther King, yes.  On 22 and King

 7  Ranch Road.

 8      Q.    All right, let me go through those one at a

 9  time.  Adeline, Martin Luther King, King Ranch Road.

10  Anywhere else?

11      A.    22 and King Ranch Road.

12      Q.    Highway 22?

13      A.    Yes.

14      Q.    That's separate from -- When you say King Ranch

15  Road, that's a different --

16      A.    It runs into 22.

17      Q.    Where else?

18      A.    I don't know.  I don't remember.

19      Q.    So the only ones you remember right now are

20  Adeline, Martin Luther King, and Highway 22 and King

21  Ranch Road?

22      A.    That's the only ones I remember at this moment.

23      Q.    When was the last time you were stopped at

24  Adeline?

25      A.    Oh, that's been about a year ago.
```

```
 1      Q.    What about at Martin Luther King?

 2      A.    At Martin Luther King, that's been maybe six

 3 months ago, if not sooner.

 4      Q.    What about at Highway 22 and King Ranch Road?

 5      A.    That might have been about seven or eight

 6 months ago.

 7      Q.    Let me ask you this:  Have you ever gotten a

 8 citation at any of these roadblocks?

 9      A.    No.

10      Q.    The last time you were at a roadblock, what I

11 have down is you said about six months ago you were

12 stopped at Martin Luther King?

13      A.    Yes.

14      Q.    Do you remember what happened at that

15 roadblock?

16      A.    I passed my license.  I had my insurance card,

17 but they didn't ask for the insurance card.

18      Q.    So you showed them that, and they gave it back

19 to you and told you to keep going?

20      A.    No.  They got it and looked and walked to the

21 back of the car and checked my tag back there.  They

22 might have called it in because it took them a few

23 minutes for them to bring it back.  Then when they

24 brought it back, they gave it to me and flashed the

25 light in the car.  My grandchildren were in there, and
```

```
 1      A.     It was in Canton.

 2      Q.     How long ago was that?

 3      A.     That was a long time as well.

 4      Q.     Those are the only two traffic tickets you

 5   remember?

 6      A.     Those are the only two I've ever gotten that I

 7   remember.

 8      Q.     All right.  So back to the narcotics

 9   plainclothes, you said they jump out all the time?

10      A.     Sure, they do.

11      Q.     Well, let me ask you this:  They have never

12   jumped out or approached you, right?

13      A.     They approached my house outside.

14      Q.     When was that?

15      A.     That was a few years back.

16      Q.     Who was it?  Do you remember which deputies it

17   was?

18      A.     No.

19      Q.     Which house was it?

20      A.     It was 112 King Ranch Circle.

21      Q.     Tell me when that was.  You said it was a few

22   years ago, but do you remember --

23      A.     Some of the details I do.  We were barbecuing,

24   and they parked their truck.  And the next thing we

25   know, they had walked in the car.  They searched
```

```
 1   everybody that was sitting out there.  They searched the
 2   ground.  They didn't find anything, and they left.
 3       Q.   How many people was it?
 4       A.   It was about seven of them sitting out there.
 5   They asked if anybody had any illegal drugs out there,
 6   and everybody said no.
 7       Q.   You don't know any of the deputies' names?
 8       A.   No.
 9       Q.   Were they white or black?
10       A.   They were white, I know that much.
11       Q.   All seven of them?
12       A.   No.  The jump-out boys were white.
13       Q.   I'm sorry, so when you said seven people, you
14   were talking about there were seven people in your yard?
15       A.   Yes.
16       Q.   So I'm going to come back to that.  So seven
17   people were there with you barbecuing?
18       A.   Yes.
19       Q.   How many deputies were there?
20       A.   Two.
21       Q.   And you don't know either one of their names?
22       A.   No.
23       Q.   Would you recognize them if you saw them?
24       A.   No.
25       Q.   So tell me about this day.  What time of year
```

```
 1     A.    No.

 2     Q.    How long were they there?

 3     A.    They weren't there no more than about 5

 4   minutes.  If I had timed them, that's what I would say.

 5     Q.    Is that the only time plainclothes deputies

 6   have come to your house?

 7     A.    No.

 8     Q.    When else have they come to your house?

 9     A.    They came into my yard.  My grandson was

10   walking across the street.  He lives across the street.

11   And they were coming by, and as he made it from his

12   house over across the street to my yard, they came by

13   and jumped out of the truck.  And he didn't have a shirt

14   on, and they grabbed him by his hand and they searched

15   him.  And they asked him what he was doing.

16        I told them -- I jumped up off my porch, and I said,

17   "That's my grandson.  He was just coming over here to

18   fix his brother's bike."  And they let him go.  They

19   said, "Next time tell him to put a shirt on," and they

20   got in their truck and left.

21     Q.    What's your grandson's name?

22     A.    Kenderrick Williams.

23           MR. GRAVES:  Let's take a quick break.

24           (A short break was taken off the record at

25   9:31 a.m.)
```

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Betty Williams - 12/19/2017                                      Page 32



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13      Q.    I understand.
14      A.    Okay.
15      Q.    Now, the plainclothes officers jumping out of
16   their cars, are you saying that that somehow involves
17   race discrimination?
18      A.    I would say so.
19      Q.    Why is that?
20      A.    Because they are always in the black
21   neighborhoods jumping out.
22      Q.    Are you saying they don't patrol in the white
23   neighborhoods?
24      A.    I didn't say that.  I'm not going to say that.
25      Q.    Have you ever filed a complaint with the
```

# EXHIBIT 11

1

2              IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                    NORTHERN DIVISION

   _____

4  LATOYA BROWN; LAWRENCE

   BLACKMON; HERBERT ANTHONY

5  GREEN; KHADAFY MANNING;

   QUINNETTA MANNING; MARVIN

6  McFIELD; NICHOLAS SINGLETON;

   STEVEN SMITH; BESSIE THOMAS; and

7  BETTY JEAN WILLIAMS TUCKER,

   individually and on behalf of a class

8  of all others similarly situated,

9          PLAINTIFFS,

10 V.                                CIVIL ACTION NO.

                                     3:17-cv-00347-WHB-LRA

11 MADISON COUNTY, MISSISSIPPI;

   SHERIFF RANDALL S. TUCKER in his

12 official capacity; and MADISON COUNTY

   SHERIFF'S DEPUTIES JOHN DOES #1

13 through #6, in their individual capacities,

14         DEFENDANTS.

   _____

15

16

17              DEPOSITION OF JOSH FISH

18           WEDNESDAY, JANUARY 10, 2018

19               HILTON GARDEN INN

20            235 WEST CAPITOL STREET

21                 JACKSON, MS

22                  9:00 A.M.

23

24      REPORTED BY: DEBORAH H. NELSON, CSR #1256

25      JOB NO.: 136018

Page 50

JOSH FISH

1
2  Q   Take a look at this document.  It's pretty
3  short.  Do you see that it says "reporting officer,"
4  and it has your name on it?
5  A   I see that.
6  Q   And it says "Incident Type:  Traffic Stop
7  V.T.O."  And then it says, "Location, Joe Pritchard
8  Homes."
9  A   Okay.
10  Q   And it says "Date, January 22, 2016;"
11  right?
12  A   It does.
13  Q   Do you have any recollection of this
14  traffic stop?
15  A   No.
16  Q   So you're conducting a -- uh --
17      (BRIEF INTERRUPTION)
18      MR RETHY:  I think the door locks.
19  I'm sorry.  Go off the record.
20      (OFF RECORD BRIEFLY)
21  Q   (Mr. Rethy)  Back on.  So a traffic stop
22  at Joe Pritchard Homes.  What would that -- like
23  where would the traffic stop be?  Would it be in the
24  parking lot?
25      MR. GRAVES:  Object to the form.  Are

Page 51

JOSH FISH

1
2  you talking, specifically, about this
3  incident?
4      MR RETHY:  In general.
5  A   I don't know.
6  Q   (Mr. Rethy)  So if you're giving the
7  location of a traffic stop as Joe Pritchard Homes,
8  does that mean it's within the grounds of
9  Joe Pritchard Homes?
10  A   It could be on George Washington, it could
11  be on West North, or it could be on, I think it's
12  Boyd maybe.  Boyd Street.
13  Q   Have you ever conducted a roadblock or
14  safety checkpoint either inside or in the area of
15  the Joe Pritchard Homes?
16  A   Yes.
17  Q   When you conduct the safety checkpoint or
18  roadblock at Joe Pritchard Homes, where would you
19  park your car?
20  A   On Boyd Street.
21  Q   And where would you stand?
22  A   In the middle of Boyd Street.
23  Q   Have you ever done a -- so if you were
24  doing a roadblock, whether Joe Pritchard Homes or
25  otherwise, would you call in to dispatch to inform

Page 52

JOSH FISH

1
2  dispatch that you're doing a roadblock?
3  A   Yes.
4  Q   Would that always be the case?
5  A   For me?
6  Q   Yeah.
7  A   I don't know.
8  Q   Okay.  If you give a traffic ticket to
9  someone who passes through a roadblock you're
10  operating, would you make any kind of, would there
11  be a way to identify that traffic ticket as
12  resulting from a roadblock?
13  A   I don't know.
14  Q   So maybe not?
15  A   I don't know.
16  Q   Ever conducted a roadblock or safety
17  checkpoint inside or near Canton Estates, 388 Ricks
18  Drive?
19  A   Yes.
20  Q   Can you describe where -- uh -- where you
21  parked for that roadblock?  A roadblock in that
22  area?
23  A   It just depends.
24  Q   So it might be different places different
25  times?

Page 53

JOSH FISH

1
2  A   I'm trying to think of the name of the
3  street.  Right there at the end of West North.
4  Q   That's where you park your car, on the
5  side of the road there?
6  A   I have.
7  Q   Any other places?
8  A   Just right there at the end of the road.
9  Q   And where would you -- uh -- where would
10  you stand, conducting that sort of roadblock?
11  A   Right there at the end of the road.
12  Q   At the end of West North?
13  A   Yes.
14  Q   When you're at, conducting a roadblock or
15  safety checkpoint, whether Canton Estates or
16  anywhere else, would you stop every car that passes
17  by?
18  A   Not me, personally, and I can't stop every
19  vehicle.
20  Q   Would you or another officer who is
21  working the roadblock do that?
22  A   It depends.
23  Q   What does it depend on?
24  A   If -- you can't stop every vehicle if
25  you're talking to someone or that's on the side of

14  (Pages 50 to 53)

JOSH FISH

1
2 the road, they're just going to hold up traffic.
3     Q   Any other times when you've decided not to
4 stop every vehicle?
5     A   Plenty of times.
6     Q   Could you explain that?
7     A   If traffic is backed up -- uh -- just wave
8 people through.
9     Q   Other than traffic being backed up?
10     A   Waving people through just because.
11     Q   Yeah?
12     A   Yeah.
13     Q   How would you make that decision?
14     A   Just wave them through.  It doesn't
15 matter.
16     Q   You just use your judgment to decide who
17 to wave through?
18     A   No, I mean, it's at the moment, I mean,
19 like I said.
20     Q   So if you're -- do you generally
21 conduct -- strike that.  You've conducted roadblocks
22 when it's dark out; right?
23     A   Uh -- have I assisted in roadblocks when
24 it's dark out?  Is that what you're asking?
25     Q   Right, or participated in?

JOSH FISH

1
2     A   Participated in, yes.
3     Q   In that case, how would you flag down the
4 motorist to, you know, make sure they know to stop
5 at the roadblock?
6     A   Blue lights.
7     Q   Any other way?
8     A   Flashlight.
9     Q   How do you use the flashlight?
10     A   Wave it back and forth.
11     Q   Have you ever, when you're conducting or
12 participating in a roadblock, you would, typically,
13 ask for a driver's identification?
14     A   Driver's license and insurance.
15     Q   What about passengers?  Do you ask them
16 for anything?
17     A   It just depends.
18     Q   What does it depend on?
19     A   If the driver doesn't have a driver's
20 license, if the driver's driver's license is
21 suspended, if they don't have insurance.  If I smell
22 alcohol and need to make sure that the passenger can
23 drive the vehicle if they can.  If the driver has
24 got warrants, someone needs to take the vehicle, so
25 I would ask the passenger if they have a driver's

JOSH FISH

1
2 license.
3     Q   Any other reasons why you might ask for a
4 driver's license for a passenger?
5     A   If I smell marijuana in the vehicle.  If I
6 see paraphernalia in the vehicle, any other further
7 crime.
8     Q   If you're working a roadblock and a
9 pedestrian or a group of pedestrians was walking
10 down the street and passed through the roadblock, do
11 you ever interact with them, ask them for
12 identification or anything like that?
13     A   If they walk through the roadblock, talk
14 to them, say "hi."
15     Q   Would you ask them, maybe ask them for
16 identification?
17     A   Not necessarily.
18     Q   Not necessarily?  But could be?
19     A   I don't know.  It depends.
20     Q   And what would that depend on?
21     A   I wouldn't ask them for I.D., but ask them
22 if they live in the area.  Other than that, no.
23     Q   Why would you ask -- why would you ask
24 someone if they lived in the area?
25     A   It's just a question.  You have every

JOSH FISH

1
2 right to ask anybody any question.
3     Q   Sure, but you, presumably, have reason for
4 doing it; right?
5     A   It's just asking a question.
6     Q   Is that no reason, whatsoever, to ask
7 that question?
8     A   No.
9     Q   So if they give you the answer they don't
10 live in the area, would you ask any other questions?
11     A   It just depends.
12     Q   What does it depend on?
13     A   If they said they don't live in the area,
14 then I'll go "Where do you live?"  They go -- okay.
15     Q   So when you have done a, when you have
16 participated in roadblocks or safety checkpoints,
17 have you ever been the -- have you ever made the
18 decision as to where the roadblock gets set up?
19     A   Not that I remember.
20     Q   Well, who makes that decision?
21     A   It just depends.
22     Q   Are you assigned to go out and do a
23 roadblock at a particular location?
24     A   No.
25     Q   So you just -- so you or another officer

# EXHIBIT 12

1            ELTON FLAX, JR.
2         UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3              NORTHERN DIVISION
4

  LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
  GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
  McFIELD; NICHOLAS SINGLETON;
7  STEVEN SMITH; BESSIE THOMAS; and
  BETTY JEAN WILLIAMS TUCKER,
8  individually and on behalf of a class
  of all others similarly situated,        PLAINTIFFS
9
10  V.          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11  MADISON COUNTY, MISSISSIPPI;
  SHERIFF RANDALL S. TUCKER in his
12  official capacity; and MADISON COUNTY
  SHERIFF'S DEPUTIES JOHN DOES #1
13  through #6, in their individual capacities,
14                                DEFENDANTS
15    ***********************************************
16         DEPOSITION OF ELTON FLAX, JR.
17    ***********************************************
18         APPEARANCES NOTED HEREIN
19
20      DATE: WEDNESDAY, NOVEMBER 15, 2017
         PLACE: MARRIOTT HOTEL
21            Amite Street
            Jackson, MS
22         TIME:  1:15 P.M.
23
24      REPORTED BY: DEBORAH H. NELSON
            CSR #1256
25  Job No. 133402

Page 86

ELTON FLAX, JR.

1
2      Q    Are you aware of requests from businesses
3  asking that the sheriff's department conduct
4  roadblocks near their businesses?
5      A    No, I'm not aware of that either.
6      Q    Have you ever heard of a request from a
7  private citizen that a roadblock be set up?
8      A    Requesting one to be set up?
9      Q    Yeah.
10     A    No.
11     Q    And that's both during your time as
12 supervisor and then, also, during your time as a
13 patrol deputy?
14     A    Correct.
15     Q    Go to paragraph 89 of this, which is on
16 page 22.  You see the first sentence there states:
17 "Other than admitting that the Plaintiff, Steven
18 Smith, was arrested in January 2017, on outstanding
19 warrants for his arrest while walking inside Canton
20 Estates Apartments by deputies with the Madison
21 County Sheriff's Department who were performing a
22 footer walk through patrol at the request of its
23 manager.  Defendants deny the allegations in
24 paragraph eight and nine of the complaint."
25     So are you familiar with or have you ever

Page 87

ELTON FLAX, JR.

1
2  received requests from apartment managers regarding
3  conducting foot or walk-through patrols?
4      A    What -- repeat your question.
5      Q    Have you ever received a request from an
6  apartment manager to conduct a foot patrol or a
7  walk-through patrol of an apartment complex?
8      A    No, I haven't.
9      Q    Are you aware of any such request having
10 been made?
11     A    No, I'm not aware of it.
12     Q    Would the patrol division handle that sort
13 of request or would that be under a different unit?
14     A    Well, the patrol -- we patrol the
15 neighborhoods.  So that would fall under what we are
16 doing.  And then they also have -- uh -- we usually
17 have some guys that, normally, that's all they do is
18 walk, you know, walk through the neighborhoods and
19 be seen in the neighborhood.
20     Q    And so those people are with patrol or a
21 different unit?
22     A    No, they're a different unit.
23     Q    Do you know which unit?
24     A    That was the NET.
25     Q    And so that would just be the, those two

Page 88

ELTON FLAX, JR.

1
2  individuals that we discussed?
3      A    Yes.
4      Q    Have you ever sat up a roadblock in Canton
5  Estates?
6      A    No.
7      Q    How about a safety checkpoint?
8      A    No.
9      Q    Have, to the best of your knowledge, have
10 the policies around conducting roadblocks or safety
11 checkpoints changed since you became a supervisor?
12     A    I don't know.
13     Q    If the policies change, would someone
14 communicate that to you?
15     A    Yes.
16     Q    Who would communicate that to you?
17     A    I guess it would come from the chief down.
18     Q    So I think you testified before that when
19 you patrol, you're always in your vehicle?
20     A    Yes.  Yes, yes, yes.
21     Q    Are you familiar with the phrase "sobriety
22 checkpoint"?
23     A    No.
24     Q    Have the policies of the sheriff's
25 department changed between Sheriff Trowbridge's and

Page 89

ELTON FLAX, JR.

1
2  Sheriff Tucker's administrations?
3          MR. GRAVES:  Object to the form.  You
4      can answer if you can.
5      A    Repeat your question.
6      Q    (Mr. Rethy)  Are you aware of any policies
7  that have changed since Sheriff Tucker took office?
8      A    No, I'm not aware.
9      Q    Did the department change in any other way
10 between the administration of Sheriff Trowbridge and
11 Sheriff Tucker?
12     A    As far as morale, yes.
13     Q    You said "as far as morale"?
14     A    Yes.
15     Q    And how did morale change?
16     A    Less stress.
17     Q    And why was there more stress under
18 Trowbridge?
19     A    Well -- well, certain expectations.
20     Q    What were those expectations?
21     A    I knew you were going to ask that
22 question.  It basically -- uh -- dealing with the
23 chief.  The chief under Trowbridge and chief under
24 Sheriff Tucker.
25     Q    So there's a different chief under

## Page 90

ELTON FLAX, JR.

1
2  Trowbridge?
3      A   Under Sheriff Tucker, yes.
4      Q   Who was the chief then?
5      A   Jeremy Williams.  Chief Williams.
6      Q   Is the chief under Tucker?
7      A   Yes.
8      Q   And who was the chief under Trowbridge?
9      A   Eddie Trow -- I mean, Eddie Belvedresi.
10     Q   So that's the principal change you can
11 think of in terms of the Trowbridge administration
12 and the Tucker administration.
13     A   No, it's -- like I said, the morale is
14 more higher.  You know, you knows what to expect
15 when you come to work.  You know, you do your job,
16 you don't have anybody, you know, on you about one
17 minute why you do this, and the next minute why
18 you're not doing this.  So that's what I mean.  Less
19 stress.
20     Q   Right, and you're saying that came -- that
21 stress was largely a function of the prior chief?
22     A   Yes.  That's my point of view.
23     Q   Okay.
24         MR. RETHY:  All right, go off the
25     record.  I might not have anything more,

## Page 91

ELTON FLAX, JR.

1
2  but I want to caucus for a second to see.
3         MR. GRAVES:  Okay.
4         (Brief recess)
5      Q   (Mr. Rethy)  Are we back on the record?
6  Sir, I have no further questions.  Thank you very
7  much for your time.
8      A   Thank you.
9         MR. GRAVES:  No questions.  Read and
10 sign.
11        COURT REPORTER:  And you want a copy.
12        MR. GRAVES:  Yes, please.
13        ORIGINAL - MR. RETHY
14        COPY - MR. GRAVES
15        EXHIBITS - 7
16        READ AND SIGN - SEND TO MR. GRAVES
17 (Deposition concluded at approximately 3:49 p.m.)
18 ************************************
19
20
21
22
23
24
25

## Page 92

ELTON FLAX, JR.

1
2
3      CERTIFICATE OF COURT REPORTER
4      I, DEBORAH H. NELSON, Court Reporter and Notary
5  Public for the State of Mississippi, do hereby
6  certify that the above and foregoing pages
7  contain a full, true, and correct transcript of the
8  proceedings had in the forenamed cause at the time
9  and place indicated, which proceedings were recorded
10 by me to the best of my skill and ability.
11     I also certify that I placed the witness under
12 oath to tell the truth and that all answers were given
13 under that oath.
14     I certify that I have no interest, monetary or
15 otherwise, in the outcome of this case.
16     Witness my signature and seal this the 30th day
17 of November, 2017.
18
19
20
21
22
23     _____
         DEBORAH H. NELSON, CSR 1256
24 My Commission Expires:
25 March 6, 2018

## Page 93

ELTON FLAX, JR.

1
2
3      CERTIFICATE OF DEPONENT
4      I, ELTON FLAX, JR., certify that I have
5  examined the foregoing pages as to the correctness
6  thereof, and that after reading said pages, I find
7  them to contain a full and true transcript of the
8  testimony as given by me on WEDNESDAY, NOVEMBER 15,
9  2017, except for the list of corrections, if any,
10 attached on a separate sheet with the page number,
11 line number and the desired correction/change.
12     Witness my hand, this the        day of
13        , 2017.
14     _____
15        ELTON FLAX, JR.
16        CERTIFICATE
17 Subscribed and sworn to before me, this the
18 _____ day of _____, 2017.
19
20 MY COMMISSION EXPIRES:    _____
21 _____        NOTARY PUBLIC
22
23
24
25

24

# EXHIBIT 13

1

2            IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                    NORTHERN DIVISION

    _____

4   LATOYA BROWN; LAWRENCE

    BLACKMON; HERBERT ANTHONY

5   GREEN; KHADAFY MANNING;

    QUINNETTA MANNING; MARVIN

6   McFIELD; NICHOLAS SINGLETON;

    STEVEN SMITH; BESSIE THOMAS; and

7   BETTY JEAN WILLIAMS TUCKER,

    individually and on behalf of a class

8   of all others similarly situated,

9         PLAINTIFFS,

10  V.                                CIVIL ACTION NO.

                                      3:17-cv-00347-WHB-LRA

11  MADISON COUNTY, MISSISSIPPI;

    SHERIFF RANDALL S. TUCKER in his

12  official capacity; and MADISON COUNTY

    SHERIFF'S DEPUTIES JOHN DOES #1

13  through #6, in their individual capacities,

14        DEFENDANTS.

    _____

15

16

17           DEPOSITION OF PAUL GRIFFIN

18           WEDNESDAY, JANUARY 10, 2018

19     MADISON COUNTY BUSINESS LEAGUE & FOUNDATION

20           135 MISSISSIPPI PARKWAY

21                CANTON, MS

22                4:10 P.M.

23

24     REPORTED BY: DEBORAH H. NELSON, CSR #1256

25     JOB NO.: 136018

Page 78

PAUL GRIFFIN

1
2  got into an argument over the park; is that right?
3      A   Yeah, more likely, yes.
4      Q   So he says, "Mr. Jenkins was trying to
5  clarify confusion and mis-information."  What was
6  the confusion and mis-information?
7      A   I don't know.  He shouldn't have been
8  trying to clarify anything.  That was the Board of
9  Supervisors' meeting, not an Election Commission
10 meeting.
11     Q   The subject matter, according to
12 Frank Halford, is a very serious matter.  Any idea
13 what he's talking about?
14     A   I don't know at all.
15     Q   "The facts" -- this is continuing Frank
16 Halford -- "the facts need to be presented and
17 documented correctly since the matter is in
18 litigation."  Was it in litigation?  What you were
19 talking about with Mr. Jenkins at this Board of
20 Supervisors' meeting?
21     A   I don't know what he was talking about "in
22 litigation."  I don't recall.
23     Q   So Frank Halford continues, "I'm curious
24 if Mr. Griffin is related to Kenneth Stokes since
25 their language is similar -- dis, dat, dese, and

Page 79

PAUL GRIFFIN

1
2  does.  He's quick to use the race card, and most
3  times he speaks before he thinks and refuses to
4  listen to the opposing side."
5      What do you think he means you're quick to use
6  the race card?
7      A   Probably because I call him racist.
8      Q   You call Frank Halford racist?
9      A   Yes.
10     Q   And when have you called Frank Halford
11 racist?
12     A   Probably about every time we have a
13 conversation.
14     Q   Do you think by advocating for the four
15 parks in predominantly black neighborhoods that you
16 are perceived as using the race card?
17     A   By some people probably, but I was just --
18 uh -- asking for an answer why you would choose to
19 take the parks out of African-American communities.
20 And there wasn't no answer.
21     Q   And did you, when you were asking that at
22 the board meeting, did you explain that you thought
23 that this was racially motivated?  Did you say that
24 in public?
25     A   Yes.

Page 80

PAUL GRIFFIN

1
2      Q   And so I guess Frank Halford has taken
3  that for you using the race card?
4      A   Probably so.  Because if I can recall,
5  being on this board 18 years, that is probably the
6  first time that I used the race card.
7      Q   And this happened in 2016?
8      A   Yes.
9      Q   Have you used the -- have you -- what do
10 you mean by "using the race card"?
11     A   Uh -- saying that something is being done
12 by the majority of the Madison County Board of
13 Supervisors that I think is racist.
14     Q   Uh-huh.  And so you say that's the first
15 time you've ever had to say that?
16     A   If I can recall, yes.
17     Q   Have you had to say that since
18 January 5, 2016?
19     A   Not at the board meeting I don't think.
20     Q   Where have you had to say that outside of
21 the board meeting, in your role as supervisor?
22     A   To Frank.
23     Q   What is Frank's role in Madison County
24 government, if any?
25     A   Nothing but sending e-mails and getting

Page 81

PAUL GRIFFIN

1
2  into county government business.  He's just a
3  citizen.
4      Q   So he, Mr. Halford, Frank Halford
5  continues, "he constantly," he's talking about you,
6  Mr. Griffin.
7      A   Uh-huh.
8      Q   "He constantly shows lack of respect for
9  residents and now for elected officials calling
10 Mr. Jenkins, quote, 'boy' in a derogatory manner,
11 and I believe he did the same to the newly elected
12 supervisor and president of the BoS Trey Baxter."
13     A   Uh-huh.
14     Q   "And this confirms his lack of respect."
15 Do you agree with this statement?
16     A   I agree with part of it, of calling Frank,
17 I mean, Jenkins a boy, I did.  Trey, I called him a
18 boy, but later apologized to Trey.  I didn't
19 apologize to Jenkins.  I believe in that portion of
20 that statement.
21     Q   So how do you, if you -- what is your
22 opinion on him saying that you constantly show lack
23 of respect for residents?
24     A   I think the residents that don't know
25 me -- uh -- that come to the board meetings take the

21 (Pages 78 to 81)

PAUL GRIFFIN

1
2  tone of my voice the wrong way.
3      Q   Uh-huh.
4      A   And they think that I'm disrespecting
5  them, or Frank thinks that I'm disrespecting them.
6      Q   Do you think that Frank Halford when he
7  says "most times he speaks before he thinks and
8  refuses to listen to the opposing side," do you
9  think that that is based, he has these sentiments
10 based on your race?
11     A   Do he have that based on my race?  Do
12 Frank have that based on my race?
13     Q   Yeah.
14     A   I can't tell what Frank's thinking on
15 that.
16     Q   So when he says that your language is
17 similar to Kenneth Stokes, quote, "dis, dat, dese,
18 and does," is that based on the fact that you're
19 black.
20     A   That's based on the fact that I don't want
21 Frank's opinion.
22     Q   It's fair to say that this e-mail from
23 Frank Halford has racist sentiments in it about you?
24     A   Yes.
25     Q   And now, you know, Sheriff Tucker

PAUL GRIFFIN

1
2  responded to this e-mail.  And he says, "Thank you,
3  sir, and I wholeheartedly agree with you on
4  Mr. Griffin."
5      And do you think that Sheriff Tucker also has
6  these same racist sentiments about you?
7          MR. GRAVES:  Object to the form.
8      A   I think Sheriff Tucker is an elected
9  official and he might say and do things that he
10 don't really mean all of the time.
11     Q   (Mr. Tom)  So is that a yes or a no?
12     A   Uh -- I can't say what Sheriff Tucker was
13 thinking.
14     Q   Okay.  Do you know if Sheriff Tucker is
15 friends with Frank Halford?
16     A   I don't know.
17     Q   How often do you meet with Sheriff Tucker
18 at the sheriff's department?
19     A   That I can recall, never have.
20     Q   How often do you communicate with
21 Sheriff Tucker by e-mail?
22     A   Very, very little.
23     Q   How often do you communicate with anyone
24 at the sheriff's department by e-mail?
25     A   Very, very little.

PAUL GRIFFIN

1
2      Q   How often does the Board of Supervisors
3  receive updates about law enforcement activity in
4  Madison County?
5      A   Uh -- I don't think we receive it at all.
6      Q   This will be Griffin Exhibit 5.
7          (Exhibit 5 marked for the record)
8      Q   (Mr. Tom)  So this is an e-mail dated
9  February 25, 2016, from Tony Greer to Gerald Steen,
10 David Bishop, Trey Baxter, Sheila Jones, Paul
11 Griffin, Randall Tucker; cc'd Shelton Vance, Katie
12 Snell, and Ronny Lott.
13     Now, Tony Greer is the county administrator
14 at this time?
15     A   Uh-huh.
16     Q   And Gerald Steen -- I'm sorry, is that
17 right?
18     A   Yeah, Gerald Steen, yes, he's a
19 supervisor.
20     Q   Was Tony Greer the county administrator
21 on February 25, 2016?
22     A   I think so, yes.
23     Q   Are Gerald Steen, David Bishop, Trey
24 Baxter, Sheila Jones, and Paul Griffin the county
25 supervisors?

PAUL GRIFFIN

1
2      A   Supervisors, yes.
3      Q   Shelton Vance, what's his role at this
4  time?
5      A   The comptroller.
6      Q   And Katie Snell, she's the county
7  attorney?
8      A   Yes.
9      Q   And Ronny Lott is the clerk?
10     A   Clerk, yes.
11     Q   So, you know, have you had a chance to
12 look at this e-mail?
13     A   No, not all of the way through yet.
14     Q   Okay.  (PAUSE)
15         MR. TOM:  We can take a break after
16     this one.
17     A   All right.
18     Q   (Mr. Tom)  How often do you receive
19 e-mails about law enforcement activity like this in
20 your role as the Board of Supervisors?
21     A   If I'm thinking right, really, that was
22 the first time on something like this here.
23     Q   Do you have any idea why the board
24 received that?
25     A   Because Tony Greer was new, and he doesn't

# EXHIBIT 14

1                         JAMES HALL
2               UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                     NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED          PLAINTIFFS
9
10 V.            CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11

   MADISON COUNTY, MISSISSIPPI;
12 SHERIFF RANDALL S. TUCKER, IN HIS
   OFFICIAL CAPACITY; AND MADISON COUNTY
13 SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
   #6, IN THEIR INDIVIDUAL CAPACITIES        DEFENDANTS
14
15                 DEPOSITION OF JAMES HALL
16
        Taken at the instance of the Plaintiffs on
17               Monday, December 4, 2017,
                  Jackson, Mississippi,
18               beginning at 1:20 p.m.
19
20
21
22
23
24 JOB NO: 133423
25 REPORTED BY:  Tamara Hartwig Fulgham, CSR, BCR

Page 18

JAMES HALL

1
2    Q   Yeah.
3    A   -- a template?
4    Q   Yeah.  Yeah.
5    A   It's got a template of affidavits.
6    Q   Once you actually fill out this template,
7    are those saved on this USB drive?
8    A   I can't remember if I have any on there or
9    not, but usually it just -- you print one off and
10   stick it in a box for -- or take it to justice court
11   to get a justice court clerk to sign it.
12   Q   Uh-huh.  Do you have any other laptops
13   besides your in-vehicle laptop that you use to do work
14   on?
15   A   No.
16   Q   No?  So are there any documents that you
17   have that relate to your work that we haven't talked
18   about that you possess?
19   A   Like what are you talking about?
20   Q   I'm looking for work-related documents.  Are
21   there any that are in your possession.  Not at the
22   sheriff's department, but anywhere else --
23   A   Oh, no.
24   Q   -- that we haven't talked about?
25   A   No.

Page 19

JAMES HALL

1
2    Q   Do you use your -- do you have a personal
3    e-mail address?
4    A   Yeah.
5    Q   Do you ever use that to send work-related
6    e-mails?
7    A   No.
8    Q   Do you ever text work-related messages?
9    A   We text each other to see where we're going
10   to eat.
11   Q   Any -- any other reason why you text your
12   colleagues?
13   A   Yeah.
14   Q   As it relates to your work at the sheriff's
15   department?
16   A   Not work-related.  We -- we just text
17   because we're friends.
18   Q   Uh-huh.  Uh-huh.  So you don't send any
19   work-related texts to other sheriff department
20   employees?
21   A   No.
22   Q   Did you ever work with the NET Team?
23   A   No.
24   Q   Did you ever do apartment detail?
25   A   No.

Page 20

JAMES HALL

1
2    Q   You ever worked with narcotics?
3    A   I've backed them up on a call when they
4    asked.
5    Q   So tell me about that.
6    A   They called for somebody to take somebody to
7    jail, so I -- I showed up and I drove them to jail
8    because they don't have cages in their car.
9    Q   You ever work with narcotics besides that?
10   A   No.
11   Q   How often do you interact with Chief
12   Williams?
13   A   I come in a couple of times a week to the
14   sheriff's office and say hey.
15   Q   Uh-huh.
16   A   I don't -- whenever we get out at three
17   o'clock, I usually like to --
18   Q   Go home?
19   A   No.  That's when I start --
20   Q   Oh, like --
21   A   -- 3:00.  I usually like to make my rounds.
22   I don't usually get up there too often whenever
23   they're up there.
24   Q   I see.  What about Sheriff Tucker?
25   A   Are you asking how often --

Page 21

JAMES HALL

1
2    Q   You interact with Sheriff Tucker.
3    A   I might see him once a month or so just say
4    hey when I'm passing by.
5    Q   Now, do you work with either -- we'll start
6    with Chief Williams.  Do you ever have any discussions
7    with Chief Williams about work?  Like, you know, where
8    you're going to go patrol today or how -- how you're
9    doing in your duties with the sheriff's department?
10   A   Not that I recall.  We usually just talk
11   about how the -- how the little boy is doing.  I got a
12   little boy --
13   Q   Uh-huh.
14   A   -- so...
15   Q   Uh-huh.  Congrats.  So this is new -- new
16   boy, right?
17   A   Yeah.  4 months old.
18   Q   Congrats.  That's exciting.  What about
19   Sheriff Tucker?  Do you ever talk with him about
20   work-related stuff or is it...
21   A   No.  He just he -- just asks how I'm doing.
22   Q   Uh-huh.  So have you ever had your
23   performance evaluated by anyone at the sheriff's
24   department?
25   A   Not to my knowledge.

6  (Pages 18 to 21)

Page 22

JAMES HALL

1
2    Q   Do you know how you're evaluated at the
3 sheriff's department to determine whether you're doing
4 a good job or not?
5    A   No.
6    Q   Do you ever have to fill out a monthly
7 activity report?
8    A   Yes.
9    Q   Do you ever have to fill out a monthly
10 citation report?
11    A   Yes.
12    Q   What else do you have to fill out on a -- on
13 a whether monthly or otherwise basis that tracks your
14 activity with the sheriff's department?
15    A   You have to turn in fuel receipts.
16    Q   Uh-huh.
17    A   I guess that's -- I guess that would be the
18 monthly activity reports, though.
19    Q   Anything else?
20    A   If there is, I haven't been turning them in.
21 So...
22    Q   You have any idea what -- why you turn these
23 things in?
24    A   I guess so they can keep up with the -- how
25 much fuel everybody's buying so they can pay the bill.

Page 23

JAMES HALL

1
2    Q   What about the citation report?
3    A   I don't know.
4    Q   So when you went from the -- your -- the --
5 remind me, tell me if I'm wrong or not.  You're a
6 bailiff, right?  Is that what you said before?
7    A   Yeah.
8    Q   When you went from bailiff to patrol deputy,
9 was that considered a promotion?
10    A   I don't know if that's a promotion, because
11 there's different divisions.  I don't know if it's a
12 lateral change or not --
13    Q   Uh-huh.
14    A   -- but --
15    Q   So --
16    A   So I don't know.
17    Q   So like a patrol division position opened
18 and then you just put your name in?  Is that how it
19 worked?
20    A   I had a previous application on file as a --
21 as a patrol application.
22    Q   Uh-huh.
23    A   So...
24    Q   So who -- who called you up about that?
25 When they, you know they offered you the patrol

Page 24

JAMES HALL

1
2 division job, who offered you that?
3    A   Chief, he called me and --
4    Q   Chief Williams?
5    A   Yes.  Sorry.  Chief Williams called me and
6 asked me to come interview for it --
7    Q   Uh-huh.
8    A   -- so...
9    Q   I got you.  So who do you report to?
10    A   I'm sorry.
11    Q   Who -- who are your supervisors?
12    A   I have Sergeant Will Weisenberger.
13    Q   Uh-huh.
14    A   Master Sergeant Taylor Chastain and the
15 lieutenant, Albert Jones.
16    Q   Is there anybody else you report to?
17    A   Chief Williams, the sheriff.
18    Q   So what's your difference between how you
19 report to Sergeant Weisenberger versus how you report
20 to, say, Chief Williams?
21    A   I guess the -- I'm sorry.  The day-to-day,
22 like what I need to know for the shift, is going to be
23 Sergeant Weisenberger.
24    Q   So before you said that when you talk with,
25 you know, the chief or Sheriff Tucker, it's -- you

Page 25

JAMES HALL

1
2 just sort of talk about your kids and you say hello?
3    A   They just -- they just ask how -- how you're
4 doing so...
5    Q   So but then you just said that you also
6 report to the chief and the sheriff.  So I'm wondering
7 if there's other things that you report to the chief
8 or to the --
9    A   Well --
10    Q   -- sheriff --
11    A   -- no.
12    Q   -- besides the --
13    A   Sheriff or the chief are my bosses, so
14 naturally I would consider them a supervisor to me.
15    Q   Uh-huh.  I got you.  So you -- you report to
16 them because they're the top two people at the
17 sheriff's department, but -- is that right?
18    A   That's correct.
19    Q   But besides that, all your interactions with
20 them are more of just on a friendly, nonwork-related
21 basis; is that right?
22    A   That's correct.
23    Q   What are -- so since you've been on patrol,
24 have you always worked the middle shift?
25    A   No.

7 (Pages 22 to 25)

EXHIBIT 15

1           Samuel Howard
2        UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3              NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED      PLAINTIFFS
9

   VERSUS      CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10

11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER, IN HIS
12 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13 #6, IN THEIR INDIVIDUAL CAPACITIES      DEFENDANTS
   **************************************************
14      DEPOSITION OF DEPUTY SAMUEL HOWARD
15 **************************************************
16           APPEARANCES NOTED HEREIN
17
18           DATE: OCTOBER 25, 2017
      PLACE: HILTON GARDEN INN JACKSON DOWNTOWN
19            235 WEST CAPITOL STREET
              JACKSON, MISSISSIPPI
20              TIME: 1:25 P.M.
21
   REPORTED BY: TODD J. DAVIS
22            BCR, CSR #1406, RPR
23
24
25 JOB NO. 132678

Page 74

Samuel Howard

1
2  were suites?
3      A.  There's --
4      Q.  Yeah.
5      A.  To my knowledge, there's one area that
6  has a suite in it.
7      Q.  A suite.  What does that mean?  Yeah.  I
8  just -- I wasn't clear on what that meant.
9      A.  A flat.  It's just not -- a condo,
10 condominium.
11     Q.  So it has number of units?
12     A.  I've never actually seen it.
13     Q.  So you've never been called in to patrol
14 that?
15     A.  No, ma'am.  I've never responded to the
16 area.  I've never driven in the area where it is.
17     Q.  Let me just back up to when you were
18 first hired by the sheriff's department and then
19 throughout your time.  I'm going to ask you about
20 training you received.
21         Do you recall receiving training
22 when you were hired?
23     A.  Sure.
24     Q.  And can you tell me what that training
25 was about?

Page 75

Samuel Howard

1
2      A.  There's been a lot of it in a variety of
3  fields.
4      Q.  Can you tell me some of the fields you
5  were trained in?
6      A.  Land navigation, firearms training,
7  civil rights training.
8      Q.  Anything else you recall?
9      A.  No, ma'am.
10     Q.  And was the training that you just
11 referenced, was it a formal training program?
12     A.  Yes, ma'am.
13     Q.  And did that involve a class, or can you
14 tell me what -- how it was --
15     A.  Both.
16     Q.  And what does that mean?
17     A.  Some of it was practical applications;
18 some of it was conducted in a classroom
19 environment.
20     Q.  And the classrooms, were they -- the
21 classroom environment, was that at the sheriff's
22 department?
23     A.  No.
24     Q.  Where was that?
25     A.  Some was in other parts of the state.

Page 76

Samuel Howard

1
2  Some was in a training center that we use by the
3  Emergency Operation Center or a training facility
4  that has a -- more of a, like, auditorium that we
5  can fit a large number of people in.
6      Q.  Is that in --
7      A.  Canton.
8      Q.  That's in Canton?
9          And who ran the training?  Was it
10 run by the sheriff's department or an outside --
11     A.  It was --
12     Q.  -- group?
13     A.  It was put on -- which one are you
14 talking about?
15     Q.  Well, yeah.  Maybe we should break this
16 down.  So let's do -- you mentioned civil rights
17 training.
18         Why don't you tell me about that.
19     A.  So the sheriff required that all members
20 of his agency attend a civil rights training
21 seminar put on by an FBI agent out of the Jackson
22 field office.
23     Q.  And when did that occur?
24     A.  I don't recall.
25     Q.  Do you recall if it was in 2017?

Page 77

Samuel Howard

1
2      A.  Yes.
3      Q.  Okay.  Do you recall what you learned
4  during that training?
5      A.  No, ma'am.
6      Q.  Okay.  And do you recall if your
7  training included training on the Fourth
8  Amendment?
9      A.  No.
10     Q.  Do you know what the Fourth Amendment
11 provides?
12     A.  I believe so.
13     Q.  Can you tell me?
14     A.  Unreasonable search and seizure.
15     Q.  Do you recall if the training involved
16 training on the Fourteenth Amendment?
17     A.  I don't recall.
18     Q.  And do you know what the Fourteenth
19 Amendment is?
20     A.  No.  No.
21     Q.  Okay.  Do you recall receiving any
22 training on roadblocks or checkpoints?
23     A.  No, ma'am.
24     Q.  Are you familiar with the term "racial
25 profiling"?

Samuel Howard

1
2     A.  I've heard of it.
3     Q.  What does that mean to you?
4         MR. ROSS:  I object to the form.  This
5   is very abstract.  You can answer to the
6   extent of your knowledge.
7     A.  Will you please ask another way?
8   BY MS. GOCHMAN:
9     Q.  Well, you said you've heard of the term
10  "racial profiling."
11        Do you remember the context that
12  you heard it in?
13    A.  No, ma'am.  Other than what the media
14  portrays us to believe what racial profiling is.
15  Other than that.
16    Q.  And how is that portrayed?
17    A.  Law enforcement zeroing in on one
18  particular race, gender, ethnicity, or religious
19  belief.
20    Q.  Do you know, does the Madison County
21  Sheriff's Department have a policy against doing
22  that?
23    A.  I'm not sure about a policy, but it is
24  very clear by the sheriff and the chief deputy
25  that that is not to be conducted.

Samuel Howard

1
2     Q.  Do you consider race when you're
3   conducting policing activities?
4     A.  No, ma'am.
5     Q.  Do you know if other deputies consider
6   race when they're conducting police activities?
7     A.  No, ma'am.
8     Q.  When you joined the sheriff's
9   department, was Sheriff Tucker the sheriff at the
10  time?
11    A.  Yes, ma'am.
12    Q.  Okay.  And in the time -- and I believe
13  he had just become the sheriff --
14    A.  Yes, ma'am.
15    Q.  -- since you joined in 2012.
16        Are you aware of policies or
17  procedures that have changed since you joined the
18  sheriff's department?
19    A.  No, ma'am.
20    Q.  Let me just -- I'm going to mark the
21  first document as an exhibit.  So I'm -- actually,
22  I'm not going mark it as an exhibit.  I'm going to
23  use what was marked yesterday as Thompson 17.
24  We're going to use some of the --
25    A.  You want No. 17?

Samuel Howard

1
2     Q.  Let me -- I'll take it and hand it to
3   you so --
4         MS. GOCHMAN:  We have extra copies if
5     you don't have; but if you have, that's --
6     and for the record, I'll just say that
7     Thompson 17 is a copy of the responses by
8     Defendants in this lawsuit to the Plaintiffs'
9     first set of interrogatories.
10  BY MS. GOCHMAN:
11    Q.  And can you turn to Page 10, please.
12    A.  Yes, ma'am.
13    Q.  Actually, I'll start you on Page 8.
14    A.  Okay.
15    Q.  Yeah.  If you look at the subsection on
16  Page 8 that's labeled B.  Just take a minute to
17  read that.
18    A.  Is this -- first, is this your opinion
19  of the sheriff's office?  What am I reading?
20    Q.  Yeah.
21        MR. ROSS:  Sam.  Sam.  Just read the
22    question and down through B, and then she'll
23    ask you questions --
24  BY MS. GOCHMAN:
25    Q.  Yeah.  And I'll explain it to you.

Samuel Howard

1
2   That's a good point.
3     A.  (Witness reviewing document.)  Okay.
4     Q.  Okay.  Let me represent to you that
5   these are the responses that were prepared on
6   behalf of the sheriff's department and the other
7   defendants by counsel and provided to us.
8     A.  Okay.
9     Q.  Okay.  So -- so looking at this, are you
10  aware of changes to the Neighborhood Enhancement
11  Team?
12    A.  No, ma'am.
13    Q.  Okay.
14        MR. ROSS:  And I am going to object --
15    or I'm going to clarify.  The question that
16    was being responded to, Sam, was on Page 7 --
17        THE WITNESS:  Yes, sir.
18        MR. ROSS:  -- where the defendants were
19    asked -- it was on Page 8 where the
20    defendants were asked to identify and
21    describe all changes or variations, whether
22    formal or informal, written or unwritten,
23    made by Sheriff Tucker to the policies and
24    procedures in place under Sheriff Toby
25    Trowbridge.  And the response is the response

Page 106

Samuel Howard

1
2    Q.  And --
3    A.  That's not common, though, because it's
4  not safe.  It's better to have -- the more
5  vehicles you have, the more exposed you are with
6  the emergency lights and all.
7    Q.  And your car, you said, is an unmarked
8  car?
9    A.  Yes.
10   Q.  And have you always had an unmarked car?
11   A.  No, ma'am.
12   Q.  So I think you said you had a new car
13  beginning early this year?
14   A.  Yes, ma'am.
15   Q.  And that's unmarked.
16       Prior to that, was your car an
17  unmarked car?
18   A.  It was a marked car.
19   Q.  It was a marked car.
20       When you do a roadblock with an
21  unmarked car, are there lights on on your unmarked
22  car?
23   A.  Depends.
24   Q.  So you've done a roadblock where the
25  lights aren't on in the unmarked car?

Page 107

Samuel Howard

1
2    A.  Yeah.  But the -- if there's another
3  unit there, his lights may be on.
4    Q.  Okay.
5    A.  Somebody's lights are on at that vehicle
6  safety checkpoint, regardless.  It's policy, and
7  it's stressed.
8    Q.  Okay.  But it may be the lights of an
9  unmarked car.  It doesn't have to be a marked car?
10   A.  Yes.
11   Q.  Okay.  And when you do a roadblock, I
12  think you said you -- you ask people for
13  identification; is that correct?
14   A.  Driver's license.
15   Q.  Driver's license.
16       Do you ask passengers for a
17  driver's license?
18   A.  I do.
19   Q.  You do.  And why do you do that?
20   A.  Well, it's -- I'd like to know --
21  there's a variety of things that could happen.
22  But if they refuse, there's nothing that I can do.
23  If I have a passenger that I asked for their
24  driver's license or identification and they say, I
25  don't want to give it to you, that's it.

Page 108

Samuel Howard

1
2    Q.  I think you said the purpose of the
3  roadblock was traffic safety --
4    A.  Yes, ma'am.
5    Q.  -- something like that?  But why
6  would -- why would asking a passenger for their
7  license serve that purpose?
8    A.  I think it's man -- officer safety,
9  Ms. Gochman.  It's important.  The more occupants
10  you know their names in that vehicle, the safer it
11  is for you because things can happen quickly.
12   Q.  But how does it serve the purpose of the
13  roadblock, which is traffic safety?
14   A.  Ask me another way, please.
15   Q.  Yeah.  So the passenger isn't driving.
16       They're a passenger, right?
17   A.  Yes, ma'am.
18   Q.  So I think you said the purpose of the
19  roadblock is traffic safety.
20   A.  Yes, ma'am.
21   Q.  So what's the justification for asking a
22  passenger for their driver's license?
23   A.  Well, a lot of times it's just casual
24  conversation.  You know, while speaking with the
25  driver and the driver's pulling out their

Page 109

Samuel Howard

1
2  information, I'll ask the passenger, Do you have
3  identification, too?  Why would you need that?
4  Man, I just like to know who you are and identify
5  you.  No harm, no foul if you choose not to.
6    Q.  Do you ask every passenger?  Is it --
7  and I'm trying to just get to your general
8  practice.
9        Or do you sometimes ask passengers,
10  and sometimes you don't?
11   A.  My goal is to identify everybody in the
12  vehicle if possible when I'm -- when I initiate
13  contact with the public.
14   Q.  Do you run identification -- well, I
15  don't know -- I might be using the wrong
16  terminology.
17       Is it run through system?  When
18  someone gives you their license, the driver and
19  the passenger gives you identification, do you
20  then call that in?
21   A.  It depends.
22   Q.  And why don't you just explain to me.
23  When you do call it in, is it going through
24  dispatch?  Is it -- how does that work?  Do you --
25  is it --

Page 110

Samuel Howard

1
2      A.  For one, I would have a reason for why I
3  would call it in.
4      Q.  Okay.
5      A.  So if you were to approach me in your
6  vehicle as the driver and I review your driver's
7  license and it's current and your insurance is
8  valid and there's no open container; there's no
9  weapon; I have no odor of marijuana; there's no
10 unrestrained children; you have your seat belt on,
11 I would gladly tell you, Ma'am, thank you, drive
12 safely.  Have a good day.  And you go about your
13 business.
14     Q.  So you wouldn't call in the license?
15     A.  No, ma'am.
16     Q.  So -- and that license, in fact, could
17 be suspended, for instance --
18     A.  It could be.
19     Q.  -- and you wouldn't know?
20     A.  I would not know.
21     Q.  Okay.  And you use your discretion to
22 decide when to check licenses or identifications
23 for passengers?
24     A.  Yes, ma'am.
25     Q.  Is that right?  Okay.

Page 111

Samuel Howard

1
2      MR. ROSS:  And for clarification, you're
3  talking about traffic safety checkpoints?
4  BY MS. GOCHMAN:
5      Q.  I'm talking about at the checkpoints you
6  described, which I think you said the purpose of
7  every checkpoint is traffic safety; is that right?
8      A.  Yes, ma'am.
9      Q.  Are there any other -- your counsel just
10 clarified traffic safety.
11         Are there other --
12     MR. ROSS:  That was for me.  I just
13 wanted to -- I couldn't remember if you
14 talked about a traffic stop or a traffic
15 checkpoint.
16     MS. GOCHMAN:  Yeah.  We were talking
17 about checkpoints.  Right.
18     MR. ROSS:  Okay.
19  BY MS. GOCHMAN:
20     Q.  You mentioned that if someone didn't
21 have a seat belt on?  Is that a reason that you'd
22 call in a license?
23     A.  Well, I would -- it would just give
24 me -- I would maybe investigate further, you know.
25 If you pull a -- it's state law.  It's required by

Page 112

Samuel Howard

1
2  state law to wear a safety -- a seat belt.
3      Q.  Uh-huh (affirmative response).
4      A.  So if you come through the safety
5  checkpoint and you do not have your seat belt on,
6  out of respect for other motorists, I'm not going
7  to hold -- I'm not going to stop you right there
8  and issue you a citation for that seat belt.  I'm
9  going to request that you pull to the shoulder of
10 the roadway so that all the other motorists can --
11 you know, who are in line can continue with
12 their -- with their -- with their safe travels.
13 And then I would come and speak with you and
14 possibly issue a citation for that.
15     Q.  For the lack of seat belt?
16     A.  The seat belt.
17     Q.  Do you call in, though, the license?
18     A.  At times, I will at that time.
19     Q.  And what's the purpose of doing that?
20     A.  To --
21     Q.  The infraction is a seat belt, right?
22 So you could see that they're not wearing a seat
23 belt.
24     A.  Right.  So it could be just to check
25 your driver's license.

Page 113

Samuel Howard

1
2      Q.  And you're checking for what?
3      A.  To ensure it's valid or not.
4      Q.  And the reason you're doing that is
5  because one isn't wearing a seat belt, so it gives
6  you --
7      A.  Well, that's not the only reason,
8  Ms. Gochman.
9      Q.  Okay.
10     A.  There's --
11     Q.  I'm trying to understand the process.
12     A.  Yeah.  And I'm trying to explain it to
13 you.
14     Q.  Okay.
15     A.  I'm...
16     Q.  But that could be a reason?
17     A.  Yes, ma'am.
18     Q.  Okay.  And if someone isn't wearing a
19 seat belt, you said you could give a citation?
20     A.  It's my discretion whether I choose to
21 or not.
22     Q.  That was my question.
23         So you may give someone a citation;
24 you may not?
25     A.  Yes, ma'am.

Page 114

Samuel Howard

1
2    Q.   Do you ever arrest someone for not
3  wearing a seat belt?
4    A.   You can.  Not that I recall.
5    Q.   But you don't recall ever doing that?
6    A.   No, ma'am.
7    Q.   But someone does have the discretion to
8  arrest?
9    A.   Yes.
10   Q.   When you call in the -- you call in the
11 driver's license of the driver, but you also will
12 call in, you said, the identification of the
13 passenger --
14   A.   If they willingly provide it.
15   Q.   Okay.
16   A.   Absolutely.
17   Q.   And when you do that, do you ever then
18 arrest a passenger?  And I'll give you an example:
19 If you see that there are warrants --
20   A.   Yes, ma'am.
21   Q.   Okay.  And when someone has a warrant,
22 is it -- do you always arrest them, or is that
23 again --
24   A.   One, it's my legal duty to arrest that
25 individual if he's got an active warrant.

Page 115

Samuel Howard

1
2    With that said, there's times where
3  an occupant in the vehicle and/or the driver may
4  have a warrant.  And another unit or a shift unit
5  may have a call for service, and they're
6  requesting help.  So their demand takes priority
7  over a misdemeanor traffic warrant, for example.
8    So if you have a seat belt warrant
9  and an officer is screaming for help because he's
10 in a fight, I take that as a priority over
11 arresting you on that misdemeanor traffic
12 citation, warrant.  So I'll encourage you to go by
13 the Justice Court and pay your fine, ensure that
14 your license is -- becomes valid, and have a safe
15 day.
16   Q.   But you won't take the time to make the
17 arrest because you have other priorities?
18   A.   Yes, ma'am.
19   Q.   And, again, that's in your discretion --
20   A.   Yes, ma'am.
21   Q.   -- to decide what the priority is?
22   A.   Yes, ma'am.
23   Q.   Let me ask you about -- let's switch to
24 apartment walk-throughs --
25   A.   Yes.

Page 116

Samuel Howard

1
2    Q.   -- when you're in apartment complexes,
3  and you -- you stop someone.
4    What are the reasons that you might
5  stop someone and ask for identification in an
6  apartment complex?
7    A.   I see a gun, overwhelming odor of a
8  narcotic, if I recognize someone who has warrants,
9  if I suspect suspicious behavior, to list a few.
10   Q.   Okay.  And what would you -- what would
11 you say is suspicious behavior?
12   A.   I'll walk around the apartment; and as
13 I'm nearing the building, an individual sees me,
14 throws something on the ground, and then takes off
15 running.
16   Q.   Any other examples?
17   A.   Not that I can recall.
18   Q.   Okay.  So if you were doing a
19 walk-through in an apartment building and I was,
20 say, standing -- standing there, you know, outside
21 the apartment, would you stop me and ask me for my
22 ID?
23   A.   No, ma'am.  Ms. Gochman, like when we --
24   Q.   Yeah.
25   A.   -- when we do these -- when we do these

Page 117

Samuel Howard

1
2  walk-throughs --
3    Q.   Uh-huh (affirmative response).
4    A.   -- please let me remind you it's just
5  for the request of the apartments and the -- the
6  areas that are receiving, through our reports,
7  calls for service.  When we're going through
8  there, there is -- it's generally a consensual
9  interaction with the public.
10   MR. ROSS:  Sam, answer her question.
11   Would you repeat the question again,
12 please?
13 BY MS. GOCHMAN:
14   Q.   Yeah.  I said if I was standing in an
15 apartment complex that you would been called into,
16 say by the management of the apartment complex,
17 and I was hanging out, right, maybe with some
18 friends --
19   A.   Okay.
20   Q.   I'm changing my question.
21   But would you ask me or ask us, if
22 I was with other individuals, for identification?
23   A.   No.
24   Q.   Okay.  Let me -- I'm going to show you
25 an exhibit.  Okay.  It's tab 52, which we -- just

## Page 118

```
1              Samuel Howard
2    put those in a pile.
3        A.  Okay.
4        MR. ROSS:  Which one is it?
5        MS. GOCHMAN:  I'm going to mark it.  It
6    hasn't been marked yet.  Okay.  So I'll be
7    marking this as Howard Exhibit 1.
8        (Exhibit No. 1 marked for
9        identification.)
10   BY MS. GOCHMAN:
11       Q.  Do you recognize this document,
12   Mr. Howard?
13       A.  Yes, ma'am.
14       Q.  And can you tell me what it is?
15       A.  It's an incident report generated from
16   arresting two individuals.
17       Q.  And was this a document that you
18   reviewed in preparation for your deposition?
19       A.  Yes.
20       Q.  Okay.  So if you look on the front page
21   of the incident report, it says original offense
22   description.
23           Do you see that?
24       A.  Yes, ma'am.
25       Q.  And it says suspicious person; is that
```

## Page 119

```
1              Samuel Howard
2    right?
3        A.  Yes, ma'am.
4        Q.  Okay.  And then you have a narrative,
5    correct?
6        A.  Yes, ma'am.
7        Q.  And did you write this narrative?
8        A.  No, ma'am.
9        Q.  You didn't?  Okay.  Do you -- do you --
10   and I'm sorry.
11       A.  Look --
12       Q.  Oh, the primary officer, right?  Okay.
13   Okay.  So this is not your incident report.  Oh,
14   okay.  Sorry.  Thank you very much.
15           But you were involved in this
16   incident, correct?
17       A.  Yes, ma'am.
18       Q.  Okay.  Thank you.  And did you review
19   this report?
20       A.  I have, yes, ma'am.
21       Q.  I mean, did you review it at the time
22   that it was written?  Since you didn't write it,
23   did you review it?
24       A.  I don't recall.
25       Q.  And was it your partner that wrote the
```

## Page 120

```
1              Samuel Howard
2    report --
3        A.  Yes, ma'am.
4        Q.  -- at the time?  Okay.  And in this
5    report, you see that it says contact was made with
6    Steven Smith and Terrance Thompson near the
7    entrance?
8        A.  Yes, ma'am.
9        Q.  And that was the entrance of Canton
10   Estates, correct?
11       A.  Yes, ma'am.
12       Q.  And then it says, "For officer safety
13   both subjects were advised to take their hands out
14   of their pockets."
15           And can you tell me why contact was
16   made with these two individuals?
17       A.  Yeah, absolutely.  And it was very
18   cordial.  I remember this case.
19           We were conducting a walk-through
20   of the apartment complex.  And Master Sergeant
21   Smith actually clarifies right here, Ms. Lyons,
22   the apartment manager, who we have a really good
23   relationship with, reached out to us and said,
24   Man, Sam and Darren, I'm having a lot of problems.
25   Please assist us.
```

## Page 121

```
1              Samuel Howard
2           And Master Sergeant Smith documents
3    it in here.  He clearly states, "We're having
4    problems with narcotics consumption and sales,
5    gambling, loud music, public drunkenness, and gun
6    exchange, gun -- you know, displaying of
7    handguns."
8           So we're -- we -- at this time I
9    believe we parked at the front of the apartment
10   complex, and we were conducting our walk-through.
11   And during our return to our vehicles, these two
12   subjects were entering the apartment complex.  And
13   I remember the cordial contact.
14           Hey, gentlemen, if you will, would
15   you please take your hands out of your pockets
16   for -- you know, just for my safety.  I don't
17   think it's an unreasonable request.  And so -- and
18   I believe they both said, Sure.
19           And I followed that question with,
20   Is there any weapons on you?  And Mr. Thompson
21   says, Yes.  All right.  So for my safety -- okay.
22   I'm sorry.
23       Q.  Oh, no.  Keep --
24       A.  No.  Go ahead.
25       Q.  Keep going.  I didn't mean to --
```

Samuel Howard

1  Samuel Howard
2      A.  No.  Go ahead.  Ask your question.  I'm
3  sorry.
4      Q.  So for your -- you were -- you can
5  continue.  You were saying for your safety you
6  asked them to --
7      A.  Yes, ma'am.  For my safety, if someone
8  tells me they have gun on their person, I think
9  it's important -- I want to go home that night.  I
10  want to secure that weapon.  There's nothing -- in
11  all cases it's not wrong, necessarily, to have a
12  gun, but in this case it was.  He had a concealed
13  carry weapon.  He was -- I'm sorry.  He was
14  carrying a concealed weapon without a concealed
15  carry permit.
16          So during this conversation, I
17  asked him, Hey, is there any weapons on you, which
18  is normal.  It's -- it's not a demanding request.
19  It's not a voice being raised.  It's simple, Hey,
20  my man, do you have any weapons on you?  Yes, I
21  have one in my pocket, or wherever it was.  His
22  waistband.  And I secured him, retrieved the
23  weapon, unloaded it, and held onto it.
24          And during our conversation, I
25  asked, Do you have a concealed carry permit

1  Samuel Howard
2  because it's concealed?  And he says, Yes.  I've
3  been through a two-week class.
4          Well, that raised my suspicion that
5  he wasn't telling the truth because there's not a
6  two-week class in the state of Mississippi that
7  requires for you to get a concealed carry permit.
8  So I followed that up with identification.  He
9  identified himself.
10          I had our dispatch run his
11  information; and they confirmed that he did, in
12  fact, not have a concealed carry permit.  So he
13  was illegally carrying a firearm.
14      Q.  Let's just go back to --
15      A.  Yes, ma'am.
16      Q.  -- the beginning of your narrative.  You
17  said that they were -- I think you said they were
18  walking into the entrance --
19      A.  Yes, ma'am.
20      Q.  -- of the complex.  You've listed on the
21  front page suspicious person at the offense.
22  What -- before you had said if I was standing
23  outside an apartment, you wouldn't ask me for my
24  ID or stop me.
25          So what made these two gentlemen

1  Samuel Howard
2  suspicious by just walking into the entrance of
3  apartment --
4      A.  Yeah.
5      MR. ROSS:  And I object to the form.  It
6      assumes that that they were viewed as
7      suspicious before the incident.
8  BY MS. GOCHMAN:
9      Q.  Well, you spoke to them.  You stopped
10  them, and you said, Take your hands out of your
11  pockets.  So what were the --
12      MR. ROSS:  Object to the form.  He said
13      he requested them to take their hands out of
14      their pocket.
15  BY MS. GOCHMAN:
16      Q.  What was the reason that you stopped
17  them, and what is the reason that you've written
18  down "suspicious person"?
19      A.  Okay.  There's two things I need to
20  address there to answer your question.
21      MR. ROSS:  And I further object to the
22      form.  He didn't fill out this form.  You
23      said, What was the reason you -- he wrote
24      down "suspicious person."
25

1  Samuel Howard
2  BY MS. GOCHMAN:
3      Q.  Do you know why "suspicious person" was
4  written down and why you stopped -- you with your
5  partner stopped these two gentleman?
6      A.  Okay.  I don't know why "suspicious
7  person" is put in there.  And we -- it wasn't --
8  these two gentlemen were not stopped.  It was a
9  consensual encounter.  As they were walking by,
10  Hey, gentlemen, while you're passing us, just for
11  our safety, man, will you take your hands out of
12  your pockets?  Yeah, man, no problem.
13      Q.  What if they'd said no?
14      A.  Well, there's nothing I can do.
15      Q.  They just keep walking?
16      A.  And I pray that nothing happens as they
17  walk past me.
18      Q.  Did you have a firearm on you at the
19  time?
20      A.  I did.
21      Q.  And it was visible?
22      A.  Yes, ma'am.
23      Q.  Have you ever had an incident where
24  you've asked someone to do something like take
25  their hands out of their pockets or for ID, and

Samuel Howard

1  they said no -- and they've said no to you?
2
3      A.  Yes.
4      Q.  You have had -- and how many times has
5  that happened?
6      A.  Ma'am, I don't know, but that's --
7  that's a very vague question.  If I'm --
8      Q.  Do you recall a specific incident of you
9  asking someone -- and let's just take
10  identification -- for their identification and
11  they said no; and then they've go on their way?
12      A.  Conducted a traffic stop, got the driver
13  of the vehicle out of the car --
14      Q.  Well -- let's start with, like, the
15  walk-through where -- this is an example.  Why
16  don't we do a walk-through incident first when
17  you're in a -- if you're on a foot patrol or
18  stopping a pedestrian.
19      MR. ROSS:  And --
20      A.  That's not -- I don't understand --
21      MR. ROSS:  I object to the form and the
22  confusion.  Sam, listen to her question and
23  answer her question.
24      Would you repeat it for him?
25      MS. GOCHMAN:  Uh-huh (affirmative

Samuel Howard

1  response).
2
3  BY MS. GOCHMAN:
4      Q.  So let's start with a situation where
5  you're on foot --
6      A.  Uh-huh (affirmative response).
7      Q.  -- and you are -- you are in contact
8  with someone who's also on foot, so not in a car.
9      Have you ever -- do you recall any
10  specific time when you've asked someone for
11  identification, and they've said no; and then
12  they've just gone on their way and there's been no
13  other contact?
14      A.  I'm still not following you, ma'am.
15      Q.  You said to me, I requested -- in this
16  case it was taking their hands out of their
17  pockets.
18      A.  Yes, ma'am.
19      Q.  They could have said no.
20      A.  Yes.
21      Q.  And I'm trying to tease out whether, in
22  similar situations -- so you've asked someone for
23  ID, or you've maybe asked them to take their hands
24  out of their pockets -- you can recall someone
25  actually saying no and then --

Samuel Howard

1
2      A.  I have not detained someone -- I have
3  not detained an individual and required them to
4  provide me with information if I did not have
5  reasonable or probable cause to investigate them
6  for a crime.
7      In the case that I'm investigating
8  someone for reasonable suspicion or probable cause
9  and they refuse to provide me with identification
10  and/or take their hands out of their pockets,
11  there's been times where that's occurred.  But
12  this particular incident was a consensual
13  encounter, extremely cordial and very cooperative.
14  They were simply --
15      MR. ROSS:  Sam, the question is, have
16  there been others like that where they said
17  no, and you said you can go on.
18      A.  Yes.
19  BY MS. GOCHMAN:
20      Q.  Can you tell me what you recall about
21  such an instance?
22      A.  Sure.  I've known several guys in the
23  apartment complex who have a -- a previous
24  criminal history who I've had relationships with
25  and know of them, and they've seen me.  And I

Samuel Howard

1
2  didn't suspect any behavior, but they didn't want
3  to talk with me; and they walked away.
4      Q.  And did you --
5      A.  And I left it at that.
6      Q.  You didn't suspect behavior, but did you
7  ask them for something that they said no to?
8      A.  Not that I recall.
9      Q.  Okay.  Here was there reasonable
10  suspicion or probable cause to stop Mr. Smith and
11  Thompson and ask them to remove their hands from
12  their --
13      A.  Yes, ma'am.
14      Q.  -- pocket?
15      A.  We did not stop them.
16      Q.  You didn't stop them, but they were
17  stopped.  They were talking to you, so they were
18  not --
19      A.  They were walking by, and I asked,
20  Gentlemen, would you -- they were walking as we
21  were talking.  Gentlemen, will you please take
22  your hands out of your pockets.
23      Q.  Okay.  Which they did?
24      A.  Which they did.
25      Q.  And then Mr. Thompson told you he had a

**Page 130**

Samuel Howard

pistol, according to --
A. Yes.
Q. Now, Mr. Smith, he took his hands out of
his pockets. He didn't mention having a gun.
But you asked for his
identification?
A. Yes.
Q. Okay. And then what did you do with it?
A. Ran his -- ran that identification
through our dispatch. And they advised me he had
multiple warrants for his arrest.
Q. What was the justification for asking --
A. Yeah.
Q. -- him for identification --
A. That's one incident. They're both
together. Mr. Thompson told me he had a concealed
carry gun. He told me he had a weapon on his
person, but he just lied to me and told me he had
a concealed carry permit, which, in fact, he
didn't.
So for my safety and the fact that
I wanted to go home that night, I had to ensure
that Smith did or did not have a weapon on him.
And while identifying Thompson, I also identified

**Page 131**

Samuel Howard

Smith.
Q. How did you ensure that Smith didn't
have weapon?
A. I patted him down. I did a simple Terry
frisk of his person for officer safety.
Q. And what was the purpose of asking for
his identification?
A. So I can identify him. Because it's one
incident. They were both together. They were
both -- if one of them was lying to me, there was
a likelihood that Smith could be telling me
something that -- or telling me who he's not.
Q. And you took Smith, then, into custody
and arrested him because of the warrants?
A. Yes, ma'am.
Q. And this is an instance where you at
times may use discretion not to arrest someone.
You had mentioned before when someone has a
warrant, you might not arrest someone? I think
you said if there was another priority?
A. Yes, ma'am.
Q. But this was an instance where you did
arrest him.
A. Yes, ma'am.

**Page 132**

Samuel Howard

Q. You decided to.
All right. Let me just ask this
one -- a different way again. What was the reason
that you stopped at all to ask them to take their
hands out of their pockets?
MR. ROSS: I object. It's been asked
and answered two or three times.
BY MS. GOCHMAN:
Q. You said officer safety?
THE WITNESS: Am I answering?
MR. ROSS: Yes. But I agree you said
officer safety.
BY MS. GOCHMAN:
Q. What was the reason? Sorry. You
said --
A. Yes, ma'am.
Q. The reason you asked them -- they were
walking by you with hands in the pockets.
A. Yes, ma'am. Okay. So --
Q. I think that's what I'm trying to get
at.
A. So we -- the complaint came in of
juveniles displaying firearms. These guys are of
that age. All right. And so any reasonable

**Page 133**

Samuel Howard

person that received a complaint from the
apartment manager, who is there all day long,
every day, and responsible for all occupants in
it, calls you and says, Man, there are a lot of
people displaying firearms and showing them, and
then we encounter two people as we're walking back
to their car.
I only thought it made sense for me
to just simply and cordially ask, Man, will you
please remove your hands while you walk past us.
I don't remember having a jacket on. I don't
remember it being cold.
Q. So they had jackets on?
A. I don't recall.
Q. Were their hands in their pants pockets
or --
A. I don't recall.
Q. Just their hands in pockets.
If I were walking by you with my
hands in my pockets at that same exact moment,
would you have asked me to remove my hands?
A. Possibly.
Q. Okay.
A. There's no harm in that.

Page 138

Samuel Howard

Circuit Court for narcotics violations, one.  And,
two, he was -- he was shot a couple of years ago
in the apartment complex, and I was responsible --
or one of the units responsible for, you know,
arriving for that call for service.

Q.  When he was shot?

A.  Yes.

Q.  Okay.  At the time, were you aware that
he was working with lawyers, including the ACLU,
regarding the practices of the sheriff's
department?

A.  No, ma'am.

Q.  And did you say anything to him about
that at the time?

A.  No, ma'am.

Q.  And the reason that you -- can you tell
me the reason you approached the vehicle and asked
for his identification?

A.  Right.  Ms. Gochman, I thought I
explained.

       I was walking.  His driving
behavior was normal.  Then when I -- when I got to
the sidewalk or was walking on the sidewalk, it
appeared to me that he then observed me, quickly

Page 139

Samuel Howard

slammed on brakes, and pulled into a parking place
and started trying to exit the vehicle.  So that
alerted -- alarmed me.  No one else driving
through this apartment complex has done that.  Why
would this particular driver?

       So just a consensual encounter was
made.  I walk over there and ask Mr. Manning,
Mr. Manning, what's going on?  Why -- it appears
you're trying to avoid me.  And he clearly states,
which I document word for word, I am.  My driver's
license is suspended.  So he was aware that he did
not have current driver's license.

Q.  You said this was consensual, so if he
had -- I assume you asked him to identify himself.
You didn't --

A.  Right.

Q.  Did you recognize him, or did you ask
for --

A.  No, ma'am.  I recognized him after
reviewing his driver's license.

Q.  After reviewing.  So he gave you his
identification?

A.  Yes, ma'am.

Q.  Is this an instance where he could have

Page 140

Samuel Howard

said no and just gotten out of the car and walked
away?

A.  Sure.

Q.  So it was all consensual?

A.  I believe so.

Q.  So you wouldn't say that --

A.  And it was very cordial, too.

Q.  So you wouldn't say that you had --
would you say you had reasonable suspicion or
probable cause to stop --

A.  I had reasonable suspicion to believe
that a crime has or may be committed due to his
driving behavior and his -- the -- his mannerisms,
unlike the -- that were completely different than
all the other motorists that passed us in the
apartment complex.

Q.  But you wouldn't consider this a stop.
       You considered this a consensual
encounter, right?

A.  I don't know how I would define it.

Q.  Well, I guess it goes to -- you said
with consensual encounters, if someone wants to
say no, they can.

A.  Yes.

Page 141

Samuel Howard

Q.  But if it's a -- if you have probable
cause or reasonable suspicion to stop someone, can
they still say no?

A.  If I have probable cause to stop
someone --

Q.  Yeah.  If you have -- if you believe a
crime is being committed --

A.  Yes.

Q.  -- then they -- can they say no to you
then?

A.  No, ma'am.  They can.  Yes, they can.
Sure.  They can say no.

Q.  And walk away with no repercussions?

A.  No, ma'am.

Q.  All right.  It says you arrested Manning
and transported him back to MCDC.

A.  Yes, ma'am.

Q.  Correct?

       And is this an instance where
you -- you could have -- I don't believe that
there was a warrant.  There's no reference to a
warrant; is that right?

A.  Not that I recall.

Q.  Okay.  So is this an instance where you

Page 158

Samuel Howard

1
2    MR. ROSS:  Keep going.
3    MS. GOCHMAN:  You want to keep going?
4  Okay.
5    So I'll mark this as Howard 4, if that
6  works.  Yeah.  That is 4.
7    (Exhibit No. 4 marked for
8    identification.)
9    MS. GOCHMAN:  And for the record, it's
10  an incident report, and it's Bates stamped
11  MCRFP Inc. REP 007226 through 0227.
12    A.  (Witness reviewing document.)  Okay.
13  BY MS. GOCHMAN:
14    Q.  You're good?  Is this a -- this is an
15  incident report, correct?
16    A.  Yes, ma'am.
17    Q.  Okay.  And it's an incident report that
18  you completed; is that right?
19    A.  Yes, ma'am.
20    Q.  And are you -- do you recall doing
21  this --
22    A.  Vaguely.
23    Q.  Vaguely.  Okay.
24    A.  Five years ago.
25    Q.  Okay.  And can you tell me the time when

Page 159

Samuel Howard

1
2  this incident occurred?
3    A.  9:51 p.m.
4    Q.  Okay.  And that's where it says -- are
5  you looking where it says --
6    A.  Yes, ma'am.
7    Q.  -- begin time, 2151?
8    A.  Yes, ma'am.
9    Q.  Okay.  And in this incident, there was a
10  woman who was sitting in a car; is that correct?
11    A.  Yes, ma'am.
12    Q.  Okay.  And it says that you -- you
13  wanted to check on her welfare to see if she was
14  okay?
15    A.  Yeah.
16    Q.  Do you recall, was there any reason you
17  were concerned about her welfare?
18    A.  I don't.
19    Q.  So you don't recall if she was sleeping
20  or slumped over or --
21    A.  No, ma'am.
22    Q.  -- sick or -- she could have just --
23  from this it sounds like she was just sitting in
24  her car.
25    MR. ROSS:  Object to the form.  He said

Page 160

Samuel Howard

1
2  he -- he's saying he didn't recall.
3    A.  I don't recall.
4  BY MS. GOCHMAN:
5    Q.  Okay.  And it says you checked -- you
6  approached to check on her welfare, but then
7  you -- then you asked her to identify herself; is
8  that correct?
9    A.  Yes.  When she provided the false
10  information --
11    Q.  Right.  Well, let's get back to why you
12  even asked the question.
13    A.  Okay.
14    Q.  What would the purpose be?  She wasn't
15  driving.  She was sitting a car.  It wasn't 3:00
16  in morning --
17    A.  Yeah, and --
18    Q.  -- so what would be the purpose?
19    A.  Well, I don't know -- I don't remember
20  the context of the vehicle, if it was -- if it was
21  turned on or turned off or if the keys were in the
22  ignition or why -- what it was.  My report
23  unfortunately is vague, so I don't -- I can't
24  answer to why I asked for her identification.  I'm
25  sorry.

Page 161

Samuel Howard

1
2    Q.  And you don't recall independently --
3    A.  No, ma'am, I don't.
4    Q.  Okay.
5    A.  And I don't want to speculate.
6    Q.  Okay.  So you agree that from the face
7  of this report, it's a -- it's not apparent why
8  you would have asked for her identification?
9    A.  Yes, ma'am.
10    Q.  Is this something you typically would do
11  if you -- well, let me just back up.
12    You were on foot, it appears from
13  this; is that right?
14    A.  I don't recall.
15    Q.  You don't recall?  And is this something
16  that you might do, approach someone in a car?  If
17  they're sitting in a car not moving, is that
18  something that you've done other times?
19    A.  I'm sorry?
20    Q.  This type of instance where someone was
21  sitting in a car that wasn't moving --
22    A.  Yes, ma'am.
23    Q.  -- and you approached, is this something
24  you do typically?  Is this a common occurrence?
25    A.  I don't recall a -- I don't recall a

Page 178

Samuel Howard

1
2 you see -- well, let's take it it's nighttime.
3       How do you see that a seat belt is
4 not on?
5    A.  Yeah.  So without trying to be
6 disrespectful --
7    Q.  Uh-huh (affirmative response).
8    A.  -- a lot of the areas that you would
9 ride in in Madison County are well lit.
10    Q.  Uh-huh (affirmative response).
11    A.  They have street lights.
12    Q.  Uh-huh (affirmative response).
13    A.  And they would clearly provide enough
14 illumination inside that vehicle to notice if
15 anybody does or does not have a seat belt on.
16    Q.  Okay.  If you pull over someone for a
17 seat belt violation, in those instances, do you
18 ask for their license?
19    A.  Yes.
20    Q.  Okay.  And what do you do if they have a
21 violation and they give you a license and they --
22 it checks out?
23    A.  It just depends on my discretion --
24    Q.  Okay.
25    A.  -- whether I decide to issue a citation

Page 179

Samuel Howard

1
2 or not.
3    Q.  Okay.  And -- or it could be a warning?
4    A.  Sure.
5    Q.  Is there a record of warnings?  I don't
6 think I asked that question.
7    A.  No, ma'am.
8    Q.  No.  Okay.  So it would be a verbal
9 warning --
10    A.  Yeah.
11    Q.  -- and they'd go --
12    A.  Mr. Ross, may I please say something
13 real quick just to emphasize this?
14 BY MS. GOCHMAN:
15    Q.  Yes.
16    A.  When I stop somebody for a seat belt
17 violation or careless driving or a moving
18 violation, when I stop somebody for a moving
19 violation, there's really nothing you can do other
20 than try to argue that in court.  So if their
21 license is suspended for that matter, I will
22 generally try to write that offender the lesser
23 offense.  So a driver -- a suspended driver's
24 license or an insurance card, they can correct
25 themselves.  So I'll extend the court date --

Page 180

Samuel Howard

1
2    Q.  Okay.
3    A.  -- and let them -- issue them a citation
4 they can actually do something about, out of a
5 courtesy to that driver.
6    Q.  Okay.  Thank you.
7       When you -- you said you can see --
8 see if someone has a seat belt on or not.
9    A.  Uh-huh (affirmative response).
10    Q.  Can you also see the race of a person if
11 you're -- at night if you're driving in a well-lit
12 area?
13    A.  Their --
14    Q.  Their race?  Whether they're black or
15 white or Hispanic?  What their race --
16    A.  Maybe at times.
17    Q.  Okay.
18    MS. GOCHMAN:  You know, why don't we
19 take a few minutes, and I'll see if I can cut
20 through the outline and finish up.
21    MR. ROSS:  Okay.
22    (A short recess was taken.)
23    (Exhibit No. 8 marked for
24 identification.)
25    MS. GOCHMAN:  So this is an item just

Page 181

Samuel Howard

1
2 marked on the document -- Howard Exhibit 8.
3 And it is an incident report with ending
4 Bates number 017413.  I'll hand it to the
5 witness.
6 BY MS. GOCHMAN:
7    Q.  Take a second to review it.
8    A.  (Witness reviewing document.)  Okay.
9    Q.  You've looked at that.  Is this an
10 incident report that you -- no.  It's not one that
11 you filled out.
12       It is an incident report that
13 you're referenced in; is that right?
14    A.  Yes.
15    Q.  Okay.  And do you recall this incident?
16    A.  No, ma'am.
17    Q.  Okay.  And the reporting officer is --
18 is that Timothy -- who is the reporting officer?
19 I can't tell.
20    A.  I don't know.
21    Q.  Okay.
22    A.  Brandon -- his name is Timothy Brandon
23 Thames.  That's right.
24    Q.  Okay.  So it's just cut off?
25    A.  Yeah.

1    Samuel Howard
2        Q.  Okay.  So this incident report -- so do
3    you see this incident occurred at 5:08?
4        A.  Yes.
5        Q.  That's 1708, right?  Okay.  And in this
6    incident it says that you and the other officer
7    came into contact with Joseph Miller --
8        A.  Okay.
9        Q.  -- at the intersection of Holmes Avenue
10   and May Street.
11           Where is Holmes Avenue and May
12   Street?
13       A.  Canton.
14       Q.  And Mr. Miller was a black male; is that
15   right?
16       A.  Does it say it is?
17       Q.  Says race.
18       A.  What does it say next to race?
19       Q.  It says black.
20       A.  Okay.  So yes.
21       Q.  Yeah.  Can you answer me, why is race
22   included in these incident reports?  Do you know?
23       A.  I have no idea.
24       Q.  Okay.  So it says you came into contact
25   with Mr. Miller.

1    Samuel Howard
2        Q.  Do you know what coming into
3    contact with Mr. Miller means?
4        A.  No, ma'am.
5        Q.  Okay.  Do you know if he was in a car?
6        A.  I can't speak on anything about this
7    report.  I have no recollection of it whatsoever.
8        Q.  Okay.  But you can -- from reading it,
9    you see that there's no -- well, from reading it,
10   it shows that Mr. Miller's information was wrong.
11           So his identification was provided;
12   is that right?
13       A.  Sure.
14       Q.  But from the face of the report, does it
15   give you any reason why Mr. Miller was stopped?
16       A.  I don't know.
17       Q.  And does it give a reason why he was
18   asked for his identification?
19           MR. GRAVES:  I'm going to object.  I
20   don't think it says that he was stopped.  It
21   just says that he came into contact with him.
22   BY MS. GOCHMAN:
23       Q.  Okay.  But you --
24           MR. GRAVES:  But you can answer.  Go
25   ahead.

1    Samuel Howard
2    BY MS. GOCHMAN:
3        Q.  You don't know what come into contact
4    with him meant.  And it says -- but you did run
5    his information; is that right?
6        A.  I did not run his information.  I did
7    not write this report.
8        Q.  Right.  Okay.
9        A.  Did it say that I ran his information?
10       Q.  It doesn't say that.
11       A.  Okay.
12       Q.  Okay.  So you don't recall running his
13   information?
14       A.  No, ma'am.
15       Q.  But it's possible you were the one that
16   ran it?  You were there?
17       A.  Sure.
18       Q.  It does say you were there, right?
19       A.  Sure.
20       Q.  Okay.  And you don't -- from the face of
21   this, you don't know why his information was run,
22   whoever ran it?
23       A.  Right.
24       Q.  Okay.  Let me ask you:  Do you arrest
25   more black people than white people?

1    Samuel Howard
2        A.  I don't -- I have no idea.
3        Q.  Okay.  Have you tried to determine that?
4        A.  No, ma'am.
5        Q.  Okay.  And would it be possible to
6    determine?
7        A.  I'm not sure.  I don't review any of the
8    reports.  I don't have any control.
9        Q.  But you always -- when you arrest
10   someone, you fill out an incident report, and it
11   includes race; is that right?
12       A.  Okay.
13       Q.  That's right?
14       A.  Yes.
15       Q.  Okay.  So it would be possible to look
16   back at the reports?
17       A.  Sure.
18       Q.  Okay.  Have you taken steps to ensure
19   that roadblocks are set up equally in white and
20   black neighborhoods?
21       A.  Have I taken steps?
22       Q.  Yeah.  Have you done anything to assure,
23   so taken any precautions, steps, to ensure that
24   when you set up a roadblock, it's done equally in
25   white and black neighborhoods?

# EXHIBIT 16

1                    Tommy Jones
2            UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                  NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
9

   VERSUS      CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10

11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER, IN HIS
12 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13 #6, IN THEIR INDIVIDUAL CAPACITIES      DEFENDANTS
   **************************************************
14         DEPOSITION OF CAPTAIN TOMMY JONES
15 **************************************************
16              APPEARANCES NOTED HEREIN
17
18             DATE: NOVEMBER 1, 2017
                  PLACE: MARRIOTT
19             200 EAST AMITE STREET
                JACKSON, MISSISSIPPI
20               TIME: 8:59 a.m.
21
   REPORTED BY: TODD J. DAVIS
22             BCR, CSR #1406, RPR
23
24
25 Job No. 133052

Tommy Jones

1
2  roadblock or checkpoint in your role as captain of
3  narcotics?
4      A.  Every instance is different.
5      Q.  Can you tell me the last time that you
6  selected a particular location for a roadblock or
7  checkpoint setup?
8      A.  Not a specific date, no, ma'am.
9      Q.  And when you decide on a roadblock
10  location or a checkpoint location, do you, as
11  captain of narcotics, need to get approval from
12  anyone else to set up the roadblock in that area?
13      A.  No, ma'am.
14      Q.  And, generally, when you've selected a
15  location for a roadblock or checkpoint, as captain
16  of narcotics, do you then send out specific
17  deputies to man that checkpoint or roadblock in
18  your division?
19      A.  If I'm setting up a specific location,
20  me personally, I will be there myself.
21      Q.  And if you were there, would you ask any
22  other deputies within the narcotics division to
23  come with you, speaking of when you're captain of
24  narcotics?
25      A.  Yes, ma'am.

Tommy Jones

1
2      Q.  And, generally, who would you ask to
3  come with you?  Would it be other deputies in the
4  narcotics division?
5      A.  Yes, ma'am.
6      Q.  Would there be a situation where you ask
7  maybe a deputy in patrol to join you?
8      A.  Yes, ma'am.
9      Q.  And what would be a situation where you
10  would have to ask someone outside of narcotics to
11  assist you with a roadblock or checkpoint?
12      A.  If there's not enough people or I have
13  to have a marked unit.
14      Q.  And have there been times where you set
15  up a roadblock or a checkpoint because you suspect
16  drugs, for example, might be getting trafficked in
17  a particular area?
18      A.  No, ma'am.
19      Q.  And can you tell me, the last time that
20  you recall setting up a specific roadblock, what
21  reason you set it up for while you've been captain
22  of narcotics?
23      A.  Like I say, I can't give you a specific
24  date, but it was for a crime deterrent.
25      Q.  And do you recall for what kind of crime

Tommy Jones

1
2  deterrent?
3      A.  They was having several armed robberies
4  a night around the City of Ridgeland.
5      Q.  And do you recall what general location
6  you set up that roadblock or checkpoint in?
7      A.  I set up one at Wheatley Street and Town
8  Centre.
9      Q.  And did you set up the roadblock or
10  checkpoint at, like, an intersection or was it the
11  entrance of some sort of complex or business?
12      A.  It was an intersection.
13      Q.  And in terms of that intersection, was
14  there a particular reason that you thought that
15  might be a good location for setting up the
16  roadblock or checkpoint?
17      A.  Yes, ma'am.
18      Q.  And what was the reason you thought that
19  might be a good location?
20      A.  Because they was having armed robberies
21  around the mall, so I felt like we needed to be in
22  the mall area.
23      Q.  And at that particular roadblock, do you
24  recall if you stopped every vehicle that came
25  through?

Tommy Jones

1
2      A.  Yes, ma'am.
3      Q.  And do you recall how long the roadblock
4  lasted in total?
5      A.  45 minutes.
6      Q.  And when you were setting up the
7  roadblock, could you decide how long to set up the
8  roadblock for?
9      A.  Yes, ma'am.
10      Q.  And in this instance, why did you decide
11  to set it up for 45 minutes?
12      A.  It was not decided to set up for 45
13  minutes.
14      Q.  So what -- how did it become the case
15  that the roadblock lasted for 45 minutes?
16      A.  Traffic stopped.
17      Q.  And when you say traffic stop, did a
18  traffic stop make the roadblock end early?
19      A.  No, ma'am.
20      Q.  So in terms of a traffic stop, can you
21  just explain a little bit about what you mean in
22  terms of --
23      A.  The mall closed.
24      Q.  And when you were setting up the
25  roadblock, did you have an understanding that it

Page 230

Tommy Jones

1
2 would probably last under an hour?
3     A.  I did not.
4     Q.  And did you ever set up a roadblock in
5 that location again after you set it up that time?
6     A.  I have not.
7     Q.  And at that roadblock, did any of the
8 vehicles coming through relate to the robberies
9 that were being -- occurring in that area?
10     A.  Not to my knowledge.
11     Q.  And do you recall if you received any
12 information through the vehicles passing by or the
13 individual contained therein about the robberies
14 that were occurring?
15     A.  No, ma'am.
16     Q.  And have you ever, in your experience as
17 captain of narcotics, decided to set up a
18 roadblock or a checkpoint near a residential area?
19     A.  Me specifically, no, ma'am.
20     Q.  And, generally, in your experience, when
21 you specifically have decided to set up a
22 roadblock or a checkpoint as captain of narcotics,
23 have you ever set up a roadblock or checkpoint
24 near any apartment complexes?
25     A.  Me specifically, no, ma'am.

Page 231

Tommy Jones

1
2     Q.  And, again, talking about you
3 specifically as captain of narcotics, have you
4 ever set up a roadblock or a checkpoint in any
5 areas, like, in front of a business, for example?
6     A.  No, ma'am.
7     Q.  And are there any policies or procedures
8 of the Madison County Sheriff's Department that
9 prohibit roadblocks being in any specific
10 locations?
11     A.  Not that I'm aware of.
12     Q.  And have you ever been told by Sheriff
13 Tucker that you can't set up a roadblock in a
14 specific location since you've been captain of
15 narcotics?
16     A.  I have not.
17     Q.  And when you were a deputy in narcotics
18 prior to being captain, were you ever told by
19 anyone in the Madison County Sheriff's Department
20 that you couldn't set up roadblock locations in a
21 particular area?
22     A.  No, ma'am.
23     Q.  And were you ever informed by anyone at
24 the Madison County Sheriff's Department that you,
25 for example, couldn't set up a roadblock or

Page 232

Tommy Jones

1
2 checkpoint near a residential area?
3     A.  No, ma'am.
4     Q.  And in the narcotics division, does
5 anyone else have authority to set up a roadblock
6 or a checkpoint in any specific location, other
7 than yourself?
8     A.  What was the last part of the question?
9     Q.  Other than yourself in the narcotics
10 division, is there anyone else in the narcotics
11 division that has the authority to choose a
12 location for a roadblock or checkpoint setup?
13     A.  The agent that's setting it up.
14     Q.  So could a deputy, for example, in the
15 narcotics division -- would they have the ability
16 on their own to set up a roadblock or a checkpoint
17 at a particular location?
18     A.  They would.
19     Q.  And would they need your approval to do
20 that?
21     A.  No, ma'am.
22     Q.  And what would be -- would there be any
23 reasons why a deputy might want to set up a
24 roadblock or a checkpoint in a location and they
25 would be told no, they can't do that?

Page 233

Tommy Jones

1
2     A.  In my unit?
3     Q.  Correct.  In your unit.
4     A.  Not that I would know of.
5     Q.  And, again, to your knowledge, as
6 captain of narcotics, do you know if the
7 discretion that your deputies have in the
8 narcotics division to set up a roadblock location
9 is more than deputies might have in, for example,
10 patrol?
11     A.  I have no idea.
12     Q.  And if a deputy requested or decided to
13 set up a roadblock or a checkpoint in your
14 division at a particular location, as captain of
15 narcotics would you generally also go to staff the
16 roadblock or checkpoint?
17     A.  No, ma'am.
18     Q.  And have you ever, in your role as
19 captain of narcotics, received specific requests
20 from any municipal police departments in Madison
21 County to set up a roadblock or checkpoint?
22     A.  Me specifically, no.
23     Q.  And, again, since you've been captain of
24 narcotics, have you ever received any request for
25 from managers of housing complexes in Madison

Page 234

Tommy Jones

1
2  County to set up a roadblock or checkpoint?
3      A.  To set up a roadblock or a checkpoint,
4  no, ma'am.
5      Q.  And just to make it more general,
6  have -- in the time you've been captain of
7  narcotics, have you ever received a request from
8  anyone externally, outside of the Madison County
9  Sheriff's Department, requesting you, as captain
10 of narcotics, to set up a roadblock or a
11 checkpoint at any particular location?
12     A.  No, ma'am.
13         MS. SIVASHANKER:  We're just going to
14 take a -- I think a couple-minute break.  Go
15 off the record.
16         (A short recess was taken.)
17 BY MS. SIVASHANKER:
18     Q.  Captain Jones, are you ready?
19     A.  I'm ready.
20     Q.  Great.
21         MS. SIVASHANKER:  So I'm going to mark
22 as Exhibits, I think, 6 and 7, two notices.
23 The first is a notice of roadblock locations,
24 and the second is a notice of a safety
25 checkpoint.

Page 235

Tommy Jones

1
2         (Exhibit No. 6 marked for
3  identification.)
4         (Exhibit No. 7 marked for
5  identification.)
6  BY MS. SIVASHANKER:
7      Q.  Captain Jones, we're going to look at
8  these two documents together at the same time, so
9  I just want to have them in front of you.  If you
10 can first take a look at the document marked
11 Exhibit 6 there.
12         Do you recognize this document?
13     A.  This particular document?
14     Q.  Yes.
15     A.  I do not.
16     Q.  Have you seen any documents that look
17 similar to this in your experience?
18     A.  Yes, ma'am.
19     Q.  And based on your experience as deputy
20 in narcotics, what does this document look like to
21 you, the first one we're looking at?
22     A.  A notice for a safety checkpoint.
23     Q.  And turning to the second document you
24 have in front of you, that should be marked
25 Exhibit 7.

Page 236

Tommy Jones

1
2         Have you seen this particular
3  document before?
4      A.  Not this particular document, no, ma'am.
5      Q.  And in your experience as a deputy in
6  narcotics, does this document look familiar to you
7  at all in terms of similarity to documents you may
8  have seen?
9      A.  Yes, ma'am.
10     Q.  And what is it, based on your
11 experience?
12     A.  Where someone posted for a safety
13 checkpoint.
14     Q.  In your experience, narrowing first just
15 as being captain of narcotics, do you ever have
16 to, in your role, prepare notices of checkpoints?
17     A.  Since I've been captain?
18     Q.  Correct.  Since you've been captain.
19     A.  Do I prepare these myself?
20     Q.  Have you ever had to prepare a notice of
21 a checkpoint yourself?
22     A.  Not that I can recall that I was the
23 posting person.
24     Q.  And I'm sorry.  When you say you were
25 the posted person, what do you mean?

Page 237

Tommy Jones

1
2      A.  When I was -- if I was not posting the
3  safety checkpoint, then I would not have posted
4  this.
5      Q.  And when you would have to post a safety
6  checkpoint notice, would you have prepared the
7  notice in those instances?
8      A.  If I was, yes, ma'am.
9      Q.  I'm sorry?
10     A.  If I was the one posting it, yes, ma'am.
11     Q.  And so in the past have you ever had to
12 prepare a safety -- a notice of safety checkpoints
13 like this?
14     A.  Yes, ma'am.
15     Q.  And when you prepared a notice of safety
16 checkpoints in your experience, does the language
17 look similar to one or both of these notices?
18     A.  I can't recall because I've never read
19 mine compared to these.
20     Q.  So let's back up a little bit.
21         When you have prepared a notice of
22 safety checkpoints in your experience, do you
23 recall what your notices typically say when you
24 prepare them?
25     A.  Other than the sheriff's department is

# EXHIBIT 17

1                    SLADE MOORE
2

                UNITED STATES DISTRICT COURT
3          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                     NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   McFIELD; NICHOLAS SINGLETON;
7  STEVEN SMITH; BESSIE THOMAS; and
   BETTY JEAN WILLIAMS TUCKER,
8  individually and on behalf of a class
   of all others similarly situated,        PLAINTIFFS
9
10 V.              CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                                      DEFENDANTS
15
16     ********************************************
17            DEPOSITION OF SLADE MOORE
18     ********************************************
19            APPEARANCES NOTED HEREIN
20
            DATE: WEDNESDAY, NOVEMBER 29, 2017
21            PLACE: HILTON GARDEN INN
                 WEST CAPITOL STREET
22                  Jackson, MS
                  TIME:  8:00 A.M.
23
24      REPORTED BY: DEBORAH H. NELSON
                  CSR #1256
25 Job No: 133422

Page 46

SLADE MOORE

standing on the edge of a bridge or a building or a
ledge of some type high structure.
   Q   So beyond this taser training, you don't
recall any other training regarding use of force?
   A   No, I don't.
   Q   Are you aware of any complaints that have
been made against you by members of the public since
you have started work at the sheriff, Madison County
Sheriff's Department?
   A   Yes, I am.
   Q   Could you describe your understanding of
the complaints that have been made?
   A   The Khadafy Manning.  My understanding is
that he claimed use of excessive force.
   Q   And other than Mr. Manning's complaint, do
you recall any other complaints?
   A   No, I do not.
   Q   Was any investigation conducted with
respect to that complaint?
   A   Yes, it was.
   Q   What was the nature of that investigation?
   A   I don't guess I understand that question.
   Q   What did the -- what was involved in that
investigation?

Page 47

SLADE MOORE

   A   Are you asking what did I do?
   Q   What did you have to do?
   A   I prepared a memo to Chief Williams of my,
of what occurred.
   Q   And is that the only thing you did?
   A   Yes.
   Q   Did you speak with Chief Williams about
it?
   A   I guess.
   Q   And what was the nature of that
conversation?
   A   He called me in and told me there was a
complaint and to prepare my account on paper to him.
   Q   So after you prepared your account, you
didn't have another conversation with Chief Williams
about the incident with Mr. Manning?
   A   We have spoke of it since then, but I
don't think in the investigative sense, if that's
what you're asking.
   Q   Yeah, that's fair.  So in what other
context have you spoken of it with Chief Williams?
   A   Just that a lawsuit had been filed.  That
a video does exist of partial events of that
morning.  And I guess that's it.

Page 48

SLADE MOORE

   MR. ROSS:  Is now a good time for a
five-minute break?
   MR. RETHY:  Let me ask like two
questions and move on and take a break.
   Q   (Mr. Rethy)  Have you reviewed that video?
   A   Yes, I have.
   Q   And have you received any warning or
reprimand or anything of that nature in relation to
that incident?
   A   No, I have not.
   Q   Okay.
   MR. RETHY:  Okay.  Take a break now.
   (Exhibit 1 marked for the record)
   Q   The court reporter has handed you an
exhibit marked as Exhibit 1?
   A   Yes.
   Q   Take a moment to look at this document and
let me know if you recall the document.
   A   Yes, I do.
   Q   So this is an incident report that you
prepared?
   A   Yes, it is.
   Q   And do you recall the incident described
in this report?

Page 49

SLADE MOORE

   A   Yes, I do.
   Q   And you'll see down towards the middle of
the first page, it's a line that says:  "Report
Supervisors."  And it then lists "Flax, Elton P."
   A   Yes, sir.
   Q   What does that line indicate, in your
understanding?
   A   That is the supervisor that approved the
report.
   Q   And that would be Sergeant Flax?
   A   Master Sergeant Flax.
   Q   Master Sergeant Flax?
   A   Yes, sir.
   Q   Do you also approve for incident reports
in your role as sergeant?
   A   Yes, I do.
   Q   So it states in -- uh -- the second
page -- uh -- that there's a paragraph break and the
paragraph starts "at approximately" -- and in four
lines down, it states "one of the females involved
in the crash began yelling and became loud and
boisterous.  I asked Destiny Jones several times to
lower her voice and stop yelling.  She refused and
continued to yelling and using some profanities.

Page 54

SLADE MOORE

1
2      A   I asked her repeatedly to calm down.  I
3   told her I understand this may be traumatic, the
4   crash.  No one was hurt, nobody in her family, she
5   wasn't hurt.  Excuse me.  And that it had -- enough
6   time had elapsed for her to calm down, and that I
7   was ordering her to stop being loud and boisterous
8   and using the profanities.
9      Q   Do you recall how much time had passed?
10     A   Between when?
11     Q   Between -- you said "enough time had
12  passed that she should calm down," so I'm just
13  trying to understand what you thought was enough
14  time.
15     A   It was, I believe, almost an hour.  No,
16  correction.  Forty minutes.
17     Q   So do you have any recollection, in the
18  complaint being filed, in relation to this incident?
19     A   No, I do not.
20         (Exhibit 2 marked for the record)
21     Q   So this document has been marked as
22  Exhibit 2.  It's another document that was produced
23  to us by the defendants, by the Madison County
24  Sheriff's Department.
25     A   Yes.

Page 55

SLADE MOORE

1
2      Q   Have you ever seen this document?
3      A   Yes, I have.
4      Q   And so you said that you were not aware of
5   a complaint having been filed in relation to this
6   incident?
7      A   Yes.
8      Q   And do you -- and so does this make you
9   want to revise that answer, or is this something
10  other than a complaint in your view?
11     A   This is something other than a complaint.
12     Q   So what would a complaint be?
13     A   A complaint would be when someone comes to
14  anyone at the sheriff's department to report or
15  complain about an action that a deputy took,
16  something that the deputy did that they think would
17  be wrong.
18     Q   And this doesn't constitute that because
19  it's not directed to the sheriff's department?
20     A   That's correct.
21     Q   So when you -- if you look at the bottom
22  of the first page below the lines, the author, who
23  is listed as Destiny Jones, states, "I just wanted
24  to notify the department of this incident behavior
25  of Slade Moore."

Page 56

SLADE MOORE

1
2   But you're saying that this wasn't actually
3   sent to the department?
4      A   I don't know that it was.
5      Q   So how did you become aware of this
6   document?
7      A   Through my attorney.
8      Q   And who is your attorney?
9      A   For this was Kirksey.
10     Q   I'm sorry?
11     A   Kirksey.
12     Q   Can you give his full name?
13     A   William Kirksey.
14     Q   And how was this resolved?
15     A   How do you mean?
16     Q   What was the -- so you were informed of --
17  you were informed by a lawyer of this document?
18     A   Correct.
19     Q   And then did you or your lawyer take any
20  further action in relation to this document or the
21  allegations in this document?
22     A   To this document?
23     Q   Yeah.
24     A   No.
25     Q   Were any court proceedings brought in

Page 57

SLADE MOORE

1
2   connection with this document?
3      A   Yes.
4      Q   What was the nature of those proceedings?
5      A   The nature?
6      Q   Yes.
7      A   Are you asking the outcome?
8      Q   Well, what is your understanding of what
9   those court proceedings were about?
10     A   I don't guess I understand what you're
11  asking.
12     Q   Was it a charge that was filed against
13  you?
14     A   Yes.
15     Q   And do you know what the charge was?
16     A   No, I don't.  I don't recall.
17     Q   And do you know what the outcome of the
18  court proceeding was?
19     A   Yes.
20     Q   What was the outcome?
21     A   Dismissed.
22     Q   And why was it dismissed?
23     A   That, I don't know.
24     Q   How did you learn it had been dismissed?
25     A   I was in the courtroom.

Page 58

SLADE MOORE

Q   Did you ever discuss these court
proceedings with anyone at the sheriff's department?
A   Repeat the question?
Q   Did you ever discuss these court
proceedings with anyone at the sheriff's department?
A   Yes.
Q   Who did you discuss them with?
A   Deputies on the shift.
Q   Did you ever discuss them with Chief
Williams?
A   Yes.
Q   And what was the nature of that
discussion?
A   Just that the affidavit had been filed.
Q   And did Chief Williams ask you to take any
action in relation to it?
A   No.
Q   Did you discuss it with Sheriff Tucker?
A   No.
Q   Did you receive any warnings, reprimands,
or any similar -- uh -- just any warnings or
reprimands from anyone at the sheriff's department
in relation to this incident?
A   No.

Page 59

SLADE MOORE

Q   So earlier we talked about complaints that
have been made against you at the -- well, during
your tenure at the Madison County Sheriff's
Department, and, just for clarity, if I ever say
just "sheriff's department," I'm referring to the
Madison County Sheriff's Department.  If I'm talking
about "Hinds County," I will say Hinds County.
A   Okay.
Q   But so we spoke earlier about complaints
made against you, and you mentioned "Manning
incident."
A   Yes.
Q   And I think you said, otherwise, you
didn't have any recollection of any complaints?
A   Yes.
Q   So we talked about this, which you say is
something other than a complaint.  And so do you
recall any other instances in which a member of the
public made any sort of allegation regarding your
conduct as a sheriff's deputy whether that
allegation was made to the sheriff's department or
to another court or anywhere else?
A   In that question, are you including this?
Q   Sure.

Page 60

SLADE MOORE

A   Okay, so that was a long question.  Repeat
or kind of shorten the question.
MR. ROSS:  Are you asking if he's
aware of any other criminal affidavits
that's been filed against him?
MR. RETHY:  Well, I mean when I
using -- my original question was a
complaint.  I was intending to mean that
broadly, like if someone had alleged
mistreatment or misconduct.  And it seems
like he interpreted it narrowly.  So now
I'm trying to ask the question broadly.
MR. ROSS:  I don't think he
interpreted it narrowly.  I think he said
there had been none at the sheriff's
department that he was aware.
Now, are you asking if there were
complaints, other than criminal affidavits
to courts, or are you asking -- I mean,
just clarify your question.  I'm not
trying to obstruct, but he's already said
there were none to the sheriff's
department.
MR. RETHY:  Right.  So I'm asking

Page 61

SLADE MOORE

other than to the sheriff's department.
So we can do other criminal affidavits
first, if that is what your background
wants to do.
Q   (Mr. Rethy)  So were there other criminal
affidavits?
A   Other than Destiny Jones?
Q   Yeah.
A   No.
Q   And any other complaint or allegation of
any kind made to any person that you're aware of?
A   With the sheriff's department?
Q   In relation to your conduct at the Madison
County Sheriff's Department.
A   Other than Manning?
Q   Other than Manning, other than this?
A   No.
(Exhibit 3 marked for the record)
Q   So you've been handed a document marked as
Exhibit 3?
A   Yes.
Q   This looks different, but it's another
incident report.  Do you recognize it as such?
A   Yes.

Page 158

SLADE MOORE

1
2     A   Visibility.  The presence of officers in
3   flashing blue lights and marked vehicles.  Just
4   presence.
5     Q   Okay.  Does a patrol car driving through a
6   neighborhood or an apartment complex deter crime?
7     A   Yes, it does.
8     Q   How?
9     A   The same way.  Visibility.  Being seen.
10    Q   Do officers on horseback at an event with
11  lots of people deter crime?
12    A   Yes, they do.
13    Q   How does it?
14    A   Visibility.  Just the people see the
15  officer there.
16    Q   Do officers walking up and down the Square
17  in Canton in their uniforms deter crime?
18    A   Yes, it does.
19    Q   How is that?
20    A   Again, visibility.
21    Q   Okay.  Do officers at Time Square on New
22  Years Eve deter crime?
23    A   Yes, it does.
24    Q   How is that?
25    A   Visibility.

Page 159

SLADE MOORE

1
2     Q   Okay.  Now, with regard to roadblocks,
3   what's the purpose of a roadblock?
4     A   To prevent crime.
5     Q   Okay.  And what types of crimes with
6   regard to the vehicles, themselves?
7     A   Traffic violations.
8     Q   Okay.  And when you conduct a roadblock,
9   which you have done in the past; is that correct?
10    A   Yes, sir, it is.
11    Q   What do you check for?
12    A   Driver's license.  Valid driver's license.
13  Valid insurance on the vehicle.  And a valid license
14  plate or tag.
15    Q   And if all of those check out as being
16  proper, you look at the license, you look at the
17  insurance card, the tag is current, and there's no
18  other activity that would arise to reasonable
19  suspicion or probable cause, what do you do?
20        MR. RETHY:  Object to form.
21    A   I tell them have a nice day and wave them
22  on through.
23    Q   (Mr. Ross)  Okay.  And is that what you do
24  at every location where you participate in a
25  roadblock?

Page 160

SLADE MOORE

1
2     A   Yes, sir.
3     Q   Whether it's near or whether it's in the
4   vicinity of the apartment complex in the area of
5   Canton or whether it is down in Ridgeland or
6   Madison?
7         MR. RETHY:  Object to form.
8     A   I haven't conducted a checkpoint in
9   Ridgeland, but they would be conducted the same,
10  yes, sir.
11    Q   Regardless of location?
12    A   Yes, sir.  Correct.
13        MR. ROSS:  Give me just a second.  I
14  have no further questions.
15        MR. RETHY:  I just want to clear --
16        MR. ROSS:  Hold on.  Wait a minute.
17  I do.  I'm sorry.  I apologize.  I
18  apologize.
19    Q   (Mr. Ross)  Go to Exhibit 14.  This is the
20  last one.  In Exhibit 14 is a package of documents
21  concerning the incident with Khadafy Manning; is
22  that correct?
23    A   Yes, sir.
24    Q   Okay.  Go to the page that is marked 192,
25  Bates stamped 192 at the bottom?

Page 161

SLADE MOORE

1
2     A   Yes, sir.
3     Q   I want to read you a sentence here.  It's
4   in the second paragraph.  Referring to Quinnetta and
5   Khadafy Manning, it says, "I told both of them that
6   if they were suspects, they were going to jail, but
7   if they were witnesses, they would need to write a
8   statement as to what had happened."  End quote.
9         At this point, had you seen them engaging in
10  activity that would have given you probable cause to
11  arrest them?
12    A   Yes.
13    Q   Okay.  Could you have arrested them at
14  this point?
15    A   Yes.
16    Q   Okay.  Why did you say that if they were
17  witnesses they needed to write a statement as to
18  what had happened?
19    A   I wanted to give them a chance to write
20  out a statement as to what they saw.
21    Q   Okay.  And what was the purpose of giving
22  them that chance, rather than just arresting them?
23    A   Uh -- the -- pardon me.  Just one second.
24  I'm looking for the other name.  LeDarius Thomas was
25  the person that was breaking into the apartment.

EXHIBIT 18

1                    Mark Sandridge
2             UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4
5    LATOYA BROWN; LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN; KHADAFY
6    MANNING; QUINNETTA MANNING; MARVIN
     McFIELD; NICHOLAS SINGLETON;
7    STEVEN SMITH; BESSIE THOMAS; AND
     BETTY JEAN WILLIAMS TUCKER,
8    INDIVIDUALLY AND ON BEHALF OF A CLASS
     OF ALL OTHERS SIMILARLY SITUATED          PLAINTIFFS
9
10   v.             CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11
     MADISON COUNTY, MISSISSIPPI;
12   SHERIFF RANDALL S. TUCKER; IN HIS
     OFFICIAL CAPACITY; AND MADISON COUNTY
13   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
     #6, IN THEIR INDIVIDUAL CAPACITIES        DEFENDANTS
14
15
     ****************************************************
16              DEPOSITION OF MARK SANDRIDGE
     ****************************************************
17
18              APPEARANCES NOTED HEREIN
19
20          DATE:  TUESDAY, NOVEMBER 14, 2017
                 PLACE:  MARRIOTT
21              200 EAST AMITE STREET
                JACKSON, MISSISSIPPI
22                 TIME:  9:00 A.M.
23
24   REPORTED BY:  KELLYE S. SHOWS, BCR, CSR
                 CSR #1290
25   JOB NO. 133401

Page 42

Mark Sandridge

1
2     MR. ROSS:  I object to the form.  I think
3  your question was phrased in Canton Estates.  He did
4  not testify it was in Canton Estates.
5  BY MR. RETHY:
6     Q.   Well, I think you testified that you go in
7  the entrance, there's a little house with a post office
8  type structure.  I think that that's within the
9  property or at least sort of off the main road.  And
10  that's what -- when I'm saying within Canton Estates,
11  I'm just trying to paraphrase what -- paraphrase his
12  testimony.
13     MR. ROSS:  And you're incorrectly
14  paraphrasing what he said.  He was describing the area,
15  but if you want to ask if he was on a public street
16  or not that's fine, but he did not say he was on
17  private property where the roadblock was.
18     MR. RETHY:  I'm sorry.  Could you read
19  back the testimony about the location of the
20  roadblock.
21     THE COURT REPORTER:  It's when you pull
22  in, it goes left and straight, and there's like a
23  little small house with post office boxes in there.
24  We're kind of right there.
25  BY MR. RETHY:

Page 43

Mark Sandridge

1
2     Q.   So when you say, you know, pull in, pull
3  in to what?
4     A.   Well, we're standing in the street, a public
5  street.
6     Q.   So when you say pull in, what are you pulling
7  in to?
8     A.   Well, we're parking our vehicles but we're
9  standing in the street.
10     Q.   Where are you parking the vehicles?
11     A.   On either side where we're standing.
12     Q.   Which is, as you testified, by that post
13  office building?
14     A.   It's kind of up ahead of us to the right.
15     Q.   Okay.  So when you conduct roadblocks there,
16  would you use marked or unmarked cars?
17     A.   We're using marked cars.  That's the only
18  one I have.
19     Q.   Would you be accompanied by anyone in unmarked
20  cars?
21     A.   Sometimes.
22     Q.   And which division would those be from?
23     A.   It could be narcotics, it could be an
24  investigator, it could be the NET team, it could be
25  -- that would be the main three.  Or it could be

Page 44

Mark Sandridge

1
2  Sheriff Tucker or Chief Williams.
3     Q.   And those roadblocks, what's their purpose?
4     A.   The primary interest is to check for seat belt,
5  child restraints, impaired drivers, and vehicle equipment
6  violations.
7     Q.   Do you check identification at roadblocks?
8     A.   Of the driver, yes.
9     Q.   Is that also a purpose of the roadblock?
10     A.   Yes.  We're checking for driver's license, yes.
11     Q.   You talked several minutes ago about saturation
12  patrols.  Could you explain what those are.
13     A.   I can give you my definition.
14     Q.   Sure.
15     A.   Anything over and above patrol's
16  responsibilities.
17     Q.   I'm sorry, I didn't quite understand that.
18     A.   Let's just say, for example, there's eight
19  people assigned to that particular time or shift, and
20  we add anything over those eight would be my definition
21  of saturation patrol.
22     Q.   And when does MCSD use saturation patrols?
23     A.   My definition is when the DUI unit, the six
24  guys that are on this grant come out and work overtime.
25  That would be my definition of saturation patrol.

Page 45

Mark Sandridge

1
2     Q.   Do other units of MCSD also use saturation
3  patrols?
4     A.   Holidays.
5     Q.   What's the reason for using them on holidays?
6     A.   Just prior history of the calls for service.
7     Q.   I think you also mentioned the NET team.
8     A.   (Nodded head affirmatively.)
9     Q.   Could you explain what that is.
10     A.   It stands for Neighborhood Enforcement
11  Team, I guess.  I guess that's what the "T" stands
12  for.  That was a unit that Sheriff Tucker -- or I
13  think it was the former sheriff, Sheriff Trowbridge,
14  put together to combat some of the overwhelming
15  violent crimes that were happening in some of the
16  apartment complexes and was tying up shift deputies
17  who were unable to answer calls of service because
18  we were tied up with those, and it just took some of
19  the load and burden off the shift.
20     Q.   So you said that they were created
21  specifically in relation to policing apartment
22  complexes?
23     A.   Well, I left out there's another
24  responsibility is it's to thwart neighborhood crimes,
25  to thwart -- we're having a rash of burglaries in

# EXHIBIT 19

1                          TOMMY SQUIRES
2                    UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                        NORTHERN DIVISION
4

    LATOYA BROWN; LAWRENCE BLACKMON;
5   HERBERT ANTHONY GREEN; KHADAFY
    MANNING; QUINNETTA MANNING; MARVIN
6   MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; AND
7   BETTY JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON BEHALF OF A CLASS
8   OF ALL OTHERS SIMILARLY SIUTATTED          PLAINTIFFS
9
10  V.              CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11

    MADISON COUNTY, MISSISSIPPI;
12  SHERIFF RANDALL S. TUCKER, IN HIS
    OFFICIAL CAPACITY; AND MADISON COUNTY
13  SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
    #6, IN THEIR INDIVIDUAL CAPACITIES        DEFENDANTS
14
15                  DEPOSITION OF TOMMY SQUIRES
16

         Taken at the instance of the Plaintiffs on
17               Monday, December 4, 2017,
                   Jackson, Mississippi,
18                 beginning at 8 a.m.
19
20
21
22
23
24  JOB NO: 133423
25  REPORTED BY:  Tamara Hartwig Fulgham, CSR, BCR

---

Page 170

TOMMY SQUIRES

1
2    that.
3        Q    And --
4        A    I get off at 3:00.
5        Q    And I was going to ask you that.
6    Because -- because you work the day shift, have you
7    ever had to work at a sobriety checkpoint in your...
8        A    Just during the holidays.
9        Q    And during the holiday when -- are you still
10   working the day shift; you just have the checkpoint
11   set up in the morning?
12       A    No, ma'am.  We're -- current, the past, it
13   was mandatory to work holidays.  Nowadays, it's
14   deputy's discretion.  It's voluntary.
15       Q    And would you have to work -- well, it used
16   to be mandatory for deputies to work every holiday?
17       A    Past times, yes.
18       Q    And when you would work on a holiday, would
19   you still have, like, the daytime shift or your shift
20   might change in terms of the timing?
21       A    It was daytime plus -- plus whatever time.
22       Q    On those instances where you were at a
23   sobriety checkpoint on a holiday, do you recall what
24   time of day you were at the checkpoint for?
25       A    There again, probably from 8 p.m. at night

---

Page 171

TOMMY SQUIRES

1
2    till maybe 10:00.
3        Q    Other than working at a sobriety checkpoint
4    during the holidays, have you ever had to work a
5    sobriety checkpoint at any other period of time?
6        A    No, ma'am.
7        Q    And in your -- to your knowledge and
8    your experience, what would you say is the
9    general -- sorry.  Strike that.
10            When you're setting up a safety checkpoint,
11   and we went through some of the reasons why you would
12   set one up, would you say that one of the reasons that
13   you might set up safety checkpoint is for the general
14   safety of the residents?
15       A    General safety of the motoring public.
16       Q    And would you also say that one of the
17   purposes or rationales for setting up a safety
18   checkpoint is to help deter crime?
19       A    Oh, yeah, definitely.  Just my patrol
20   vehicle driving down the road is a deterrent for
21   crime.
22       Q    And would you say that that is the primary
23   reason that a safety checkpoint is set up, to deter
24   crime in the community?
25       A    That is one of -- like I say, checking for

---

Page 172

TOMMY SQUIRES

1
2    valid driver's license, safety issues with the
3    vehicle, being seen in that particular area.  It
4    deters crime.
5        Q    And when you set up a checkpoint -- I'm just
6    going to walk through some of the things that you
7    might have for a particular checkpoint in terms of
8    procedures.  How many deputies, in your experience,
9    usually are staffed at a checkpoint?
10       A    Three to five.  I mean, that -- but, I mean,
11   it could vary, but we -- we -- I don't like doing it
12   just two individuals.  Three or more.
13       Q    In your experience, why is it better to have
14   three or more at a checkpoint --
15       A    Just for safety purposes for the officer.
16       Q    Do you find that the checkpoint runs more
17   efficiently when there is three or more deputies
18   present?
19       A    Yes, ma'am.
20       MR. GRAVES:  Object to the form.
21   BY MS. SIVASHANKER:
22       Q    And when you're at a checkpoint and you set
23   it up, are there any kinds of warning signs that are
24   placed in advance of the checkpoint?
25       A    No, ma'am.

---

Page 173

TOMMY SQUIRES

1
2        Q    Are there any kinds of, for example, safety
3    cones that you might set up around a checkpoint?
4        A    No, ma'am.  Other than using my patrol blue
5    lights.  And -- and I'm going to set up in an area
6    that's visible.  I mean, I'm not going to set up right
7    around a curve and put us in danger.
8        Q    And in terms of having your blue lights on,
9    will usually all the deputies at the checkpoint have
10   their blue lights on?
11       A    Not every one, but several.
12       Q    And when you're at a safety checkpoint, are
13   you generally in your standard uniform?
14       A    I wear it every day.
15       Q    Do you wear anything else in addition to
16   that, for example --
17       A    No, ma'am.
18       Q    And do any of the other deputies where
19   anything additional in addition to the, you know,
20   standard uniform?
21       A    Well, we have plains clothes deputies that
22   could assist on a checkpoint.  But they will have a
23   vest showing sheriff's department.  They're identified
24   as police officers.
25       Q    The plains clothes officers that are at the

---

**44 (Pages 170 to 173)**

# EXHIBIT 20

1                    DARIAN SMITH
2              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   McFIELD; NICHOLAS SINGLETON;
7  STEVEN SMITH; BESSIE THOMAS; and
   BETTY JEAN WILLIAMS TUCKER,
8  individually and on behalf of a class
   of all others similarly situated,        PLAINTIFFS
9
10 V.          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                                  DEFENDANTS
15
16     **********************************************
17             DEPOSITION OF DARIAN SMITH
18     **********************************************
19             APPEARANCES NOTED HEREIN
20
21        DATE: WEDNESDAY, NOVEMBER 29, 2017
             PLACE: HILTON GARDEN INN
22              WEST CAPITOL Street
                  Jackson, MS
23              TIME:  1:52 P.M.
24 Job No: 133422
25       REPORTED BY: DEBORAH H. NELSON

Page 30

DARIAN SMITH

1
2      Q   And how is that determined?
3      A   I don't know how to answer that question.
4  If we're going on a high-risk warrant, usually,
5  we'll ride together.
6      Q   What kind of car do you drive?
7      A   A silver Chevy truck.
8      Q   Is it marked?
9      A   No.
10     Q   Does it have lights on it?
11     A   Yes, it has blue lights.
12     Q   And where are those?
13     A   It has blue lights in the grill.  Has blue
14  lights above the -- where the rear-view mirror is,
15  it has two sets.  Then it has blue lights in the
16  cargo lights, the reverse lights, and on the back
17  bumper.
18     Q   Is it -- would you consider it an
19  undercover car?
20     A   Yes.
21     Q   So there's no other decals --
22     A   No.
23     Q   -- on it?
24     A   No.
25     Q   So let's talk about your management duties

Page 31

DARIAN SMITH

1  on the NET.  So you -- there's only two people on --
2  you and Mr. Howard and Mr. Howard, Sr.  Like what
3  are your management duties?
4      Q
5      A   I basically decide what we're going to do
6  for the day or the evening; what shifts we work and
7  I have to do the schedule.  That sort of thing.
8      Q   And when you work, generally, the day
9  shift, does Mr. Howard work the same shift?
10     A   Sometimes.  Sometimes not.
11     Q   So how do you choose?  Does that vary,
12  that sometimes you work the night shift?
13     A   It does.
14     Q   And how does that get decided?
15     A   We decide it or we get requested.
16     Q   And do you make the work calendar for NET?
17     A   Yes.
18     Q   So it sounds like the work calendar, I
19  mean, you know how like a doctor can like be on
20  call?
21     A   Right.
22     Q   Would you also say that sometimes y'all
23  are like on call?
24     A   Yes.
25     Q   And how often does that happen?

Page 32

DARIAN SMITH

1
2      A   Every day.
3      Q   So this calendar that you set up is sort
4  of general guidelines?
5      A   Correct.
6      Q   Yeah.  So beyond what we've already talked
7  about that the NET team does, do you guys set up
8  roadblocks?
9      A   We do.
10     Q   And do y'all do traffic stops?
11     A   We do.
12     Q   Do you apartment walk-throughs?
13     A   We do.
14     Q   And not to say, not to cover anything we
15  have already talked about and not what I just
16  mentioned, but what other kind of things does the
17  NET team do?
18     A   We may assist other agencies that come
19  into our jurisdiction needing to serve a warrant.
20  We may go assist another agency that's having crime
21  problems in certain areas -- things like that.
22     Q   And how do they -- do they reach out to
23  you directly?
24     A   Sometimes they reach out to us directly,
25  and sometimes they reach out to the chief.

Page 33

DARIAN SMITH

1
2      Q   And how often do you assist other
3  agencies?
4      A   I'm going to say it's not a -- maybe once
5  every couple of months, three months.
6      Q   Now, are all of those other agencies that
7  you assist within Madison County?
8      A   Some are, some aren't.
9      Q   So who are some that are outside that you
10  assist?
11     A   Hinds County Sheriff's Department.  Yazoo
12  County Sheriff's Department.  Rankin County
13  Sheriff's Department.  Jackson Police Department.
14  Pretty much all of the surrounding agencies.
15     Q   Now, do y'all have any written agreements
16  with them to do this?
17     A   I'm not -- that's above my pay grade.
18     Q   So with these other agencies, do y'all do
19  patrol?
20     A   As far as?
21     Q   Like say you're helping out Hinds, like
22  would you go do patrol with Hinds?  Like what do you
23  do when you assist them?
24     A   No, we would assist them, say they have a
25  wanted fugitive that works at the Nissan plant --

Page 34

DARIAN SMITH

1
2    Q    Uh-huh.
3    A    -- they would fax us a copy of the
4    warrant, or they would come over to our county and
5    we'd go with them to pick up the subject on a
6    warrant.
7    Q    And so when we talked about, you know,
8    walk-throughs and roadblocks and traffic stops, you
9    are personally partaking in all of these things?
10   A    Yes.
11   Q    So when did the NET team, in its current
12   makeup, come into existence?
13   A    September of 2015, I think.
14   Q    And what was the NET team before that?
15   A    Prior to that, it was a voluntary basis
16   rotated through the people in patrol.
17   Q    Did you oversee the NET team then before
18   this 2000 -- before its current duration?  The prior
19   duration, did you ever see it then, as well?
20   A    I would have in starting in, I think,
21   2013.  Prior to that, I did the scheduling of it.
22   Q    And in the prior duration, how long was
23   the NET team in existence?
24   A    I believe it was started in '07-'08.
25   Q    So Sheriff Trowbridge started it?

Page 35

DARIAN SMITH

1
2    A    Correct.
3    Q    And was there any other version or, you
4    know, similar type of unit before '07-'08?
5        MR. GRAVES:  Object to the form.  You
6        can answer it if you understand the
7        question.
8    A    I started in '06.  When I started, there
9    was not, but I can't speak prior to that.
10   Q    (Mr. Tom)  So why did the NET team change
11   from the rotating unit to the permanent unit?
12   A    It was just made a full-time position.  I
13   can't answer why.
14   Q    Uh-huh.  And the type of activities that
15   we've discussed already, when the NET team was the
16   rotating unit, you did the same activities?
17   A    Yes.
18   Q    In the prior version of the NET team and
19   the current version of the NET team, besides the
20   rotating nature of it versus the permanent nature of
21   it, what are the differences?
22   A    Under the old administration you were
23   assigned all days of Monday and Tuesday when you
24   worked on it.  The five days you worked on it, you
25   worked 4 to 12.  Once the new administration come in

Page 36

DARIAN SMITH

1
2    and under the old administration, you were primarily
3    in the apartments around Canton, the Canton area.
4        Under the new administration, they changed it
5    to where like the first three days you were on
6    evening shift, the next two days you were on day
7    shift.  You were allowed to work with
8    investigations, work with narcotics, work with
9    warrants, to go throughout the whole county.
10       From there it evolved into, during the winter
11   months, when it was cold and crime trended down, we
12   let these guys who were on normally on evenings and
13   midnight shift work the full five days on day shift
14   and be assigned to investigations or to warrants to
15   assist them.
16   Q    So how did the oversight or supervision of
17   the rotating NET team work?
18   A    As far as?
19   Q    So, currently, you oversee the NET team?
20   A    Right.
21   Q    And you oversee Mr. Howard?
22   A    Right.
23   Q    Before it was this rotating version --
24   A    Right.
25   Q    -- how did all of those people on the NET

Page 37

DARIAN SMITH

1
2    team get supervised?
3        MR. GRAVES:  Are you asking him who
4        they reported to?
5        MR. TOM:  No.  Do you understand my
6        question?
7    A    I think what you're asking, if they were
8    working from three to eleven, they reported to the
9    ranking supervisor on evening shift.
10       If they were working seven to three, eight to
11   four on day shift and were assigned to
12   investigations, they would answer to the ranking
13   investigator or ranking warrants officer, whoever
14   they were working with.
15   Q    (Mr. Tom)  So there was no -- because
16   right now you're like the head of the NET team?
17   A    Correct.
18   Q    And before, the rotating, there was no
19   head of the NET team?
20   A    Correct.
21   Q    They just reported to whatever shift they
22   were on, they reported to that supervisor?
23   A    Correct.
24   Q    And who -- how did the rotating schedule
25   get filled out?  Like they just brought people

Page 38

DARIAN SMITH

1
2  volunteered?
3      A    They volunteered.  Under the old
4  administration it was mandatory.  Under the current
5  administration, it was voluntary.
6      Q    And so let's talk about the mandatory one
7  under Sheriff Trowbridge.  Who was required to be on
8  the NET team?
9      A    Patrol deputies.
10     Q    And that's of any rank?
11     A    Up to sergeant, I believe.  If I remember
12  correctly.
13     Q    So up to means sergeants also had to be on
14  the NET team?
15     A    I believe so, but I'm not sure.  I can't
16  recall.
17     Q    So you have like all of the patrol
18  deputies within the ranks that we just talked about,
19  and they would have to work this rotating NET team
20  on a rotating schedule?
21     A    Correct.
22     Q    And then when Sheriff Tucker came on
23  board, it was purely voluntary?
24     A    Correct.
25     Q    And why was that change made?

Page 39

DARIAN SMITH

1
2      A    Well, going back to what I said earlier,
3  when your off days are mandatory Monday, Tuesday and
4  you're working 4 to 12, you take a guy working on
5  midnight shift, his off days may be Thursday,
6  Friday.
7      Q    Uh-huh.
8      A    So when he switches over that week, on the
9  front end he may get an extra day off, but it may
10  also put him on the back-end working 10 days in a
11  row to get back to his normal off days.
12         He'll work his five days on NET team, and then,
13  say, he has three more days on regular shift before
14  he gets to his off days.  That was the reason for
15  the change when it came to Sheriff Tucker.  It was
16  made to where it was voluntary and deputies were
17  matched up by their off days.  So that way they
18  didn't get caught in stretches working eight to ten
19  to twelve days in a row without off days.
20     Q    I see.  And so you mentioned that there
21  was a change at some point where the NET team, you
22  know, mainly focused on apartment complexes, and
23  then it sort of went county-wide?
24     A    Yes.
25     Q    And when did that happen?

Page 40

DARIAN SMITH

1
2      A    Under the new administration.
3      Q    And so Sheriff Tucker came in in
4  January 2012; is that right?
5      A    Correct.
6      Q    And so that change happened right then?
7      A    No, the NET team was disbanded, for lack
8  of a better word, for several months.
9      Q    So when Sheriff Tucker first started as
10  sheriff, the NET team was disbanded?
11     A    Correct.
12     Q    And so after those couple of months, the
13  NET team came back online, and that's when it became
14  county-wide?
15     A    Right.  When it came back online -- like I
16  say, it was several months it had been disbanded and
17  they called me in and we talked and they shared
18  their vision of what they -- they wanted it to be
19  more of a special operations group, not limited to
20  one specific area.  And that's the way it started
21  back.
22     Q    So tell me if I have this right:  So
23  Trowbridge, Sheriff Trowbridge creates the NET team
24  that's mandatory, rotating, but it focuses on
25  apartment complexes?

Page 41

DARIAN SMITH

1
2      A    Correct.
3      Q    Sheriff Tucker comes in goes off line.
4  The NET team, after a couple of months, the NET team
5  comes back on line.  It's voluntary, but still
6  rotating but it goes county-wide?
7      A    Correct.
8      Q    And then after that, the NET team is a
9  permanent position with just two people?
10     A    Correct.
11     Q    Are there any other versions of the NET
12  team besides those?
13     A    No.
14     Q    So within those three iterations -- uh --
15  well, let's go between like the second version,
16  which is -- uh -- it's county-wide, voluntary, and
17  rotating, it's like the first version under
18  Sheriff Tucker versus now, so how does -- uh -- what
19  are the differences between those two?
20     A    Between the rotating and between the
21  permanent now?
22     Q    Yeah.
23     A    It is permanent days off, because when
24  you're matching deputies up by days off, of course,
25  everybody has different off days.

Page 42

DARIAN SMITH

1
2    Q   Uh-huh.
3    A   Permanent off days to Saturday, Sunday.
4  And that's pretty much everything's still the same.
5    Q   So like y'all's duties are still the same?
6    A   Correct.
7    Q   I mean, besides the schedule, the schedule
8  is different.
9    A   No, the schedule, I wouldn't say it's
10 different.
11   Q   Okay.
12   A   Because of the simple fact, on a voluntary
13 basis, say they were scheduled to work five days on
14 day shift, and all of a sudden two nights in a row
15 you had a rash of burglaries somewhere.  Well, then
16 they're going to get switched to midnight shift to
17 work those areas where those burglaries are.
18      So even though it was voluntary and a schedule
19 was made, it wasn't set in stone to what hours they
20 were going to work, if that's the question you're
21 asking.
22   Q   So if you're on the NET team, under
23 Sheriff Trowbridge's version, what kind of car do
24 you drive?  Is it a marked car or unmarked?
25   A   Unmarked.

Page 43

DARIAN SMITH

1
2    Q   And under Sheriff Tucker's first version,
3  you've got an unmarked car or a marked car?
4    A   Marked.
5    Q   So the voluntary rotating NET team under
6  Sheriff Tucker, all of those deputies drove marked
7  cars?
8    A   For a time.
9    Q   Did they ever drive -- uh -- was there
10 ever like a mix of marked and unmarked cars?
11   A   No.
12   Q   And then what change, when did that change
13 when they went from marked to unmarked cars under
14 Sheriff Tucker?
15   A   When they brought it back on line.
16   Q   So you're saying they drove, the NET team
17 drove marked cars when it was off line?
18   A   No, for about two to three months when
19 they took office, I continued scheduling it.  They
20 told us if we were going to do it, we had to do it
21 in marked cars.  And then after two or three months,
22 I can't remember exactly how long it was, they
23 disbanded the whole thing.  They said, "Don't
24 schedule anymore."
25   Q   Okay.

Page 44

DARIAN SMITH

1
2    A   And then several months later is when they
3  came back and we went back to the unmarked cars.
4    Q   So besides that brief time where you drove
5  the marked cars for those couple of months, is it
6  right to say that, otherwise, the NET team has
7  always had unmarked cars?
8    A   Correct.
9    Q   And, currently, the NET team has two
10 people.  How many people would, say, on a given NET
11 shift in the prior version of the NET team, the
12 second version, how many people would be on NET?
13   A   Two.
14   Q   Was there ever more than two people on NET
15 at the prior version, the second version?
16   A   The second version being under Sheriff
17 Tucker.
18   Q   Tucker.
19   A   No, two.
20   Q   And what about under Sheriff Trowbridge?
21   A   There may have been at times been three.
22   Q   Has there ever been more than three?
23   A   Not that I recall.
24   Q   And does the NET team ever drive around
25 with other unmarked units?

Page 45

DARIAN SMITH

1
2    A   Yes.
3    Q   Is there a time where there could be, you
4  know, say three or four unmarked cars driving around
5  together?
6    A   Yes.
7    Q   And tell me, what are the circumstances?
8  Give me an example of that.
9    A   Uh -- narcotics has called and said they
10 are getting reports of high drug activity in a
11 certain area and requested we come assist them.
12   Q   Can you think of the last time that
13 happened?
14   A   Between six months and a year.  I'm not
15 sure.
16   Q   Do you remember the last time that that
17 happened, like any details about it?
18   A   I recall we were told Canton police had
19 requested assistance in certain areas.  They were
20 having high crime that they couldn't handle, and
21 narcotics was in charge of it and called us to
22 assist them.
23   Q   Uh-huh.  And where was that in Canton?
24   A   All over Canton.
25   Q   So what did -- so you go assist narcotics,

Page 46

DARIAN SMITH

so let's talk about this situation.  What did you
do?
    A   As far as we'd go to an area and enforce
traffic, things like that.
    Q   I mean would you set up a roadblock?
    A   We could.
    Q   Do you do patrol?
    A   We do.
    Q   Like apartment walk-through?
    A   Yes.
    Q   What else?  What else would you do?
    A   Like I said, high visibility patrols in
the areas where the crimes occurred.
    Q   So how is it high visibility if you get
all of the unmarked cars?
    A   Not us being high visibility.  High
visibility crime areas.  Now, if we get out and do
apartment walk-throughs, of course, we're
identifiable as deputy sheriffs, so that's high
visibility.
    Q   Uh-huh.  And this is just -- yeah, this is
more definitional than anything.  What is "high
visibility crime area"?  What does that mean?
    A   The crime -- people are calling

Page 47

DARIAN SMITH

complaining that crime is visible to the residents
and to the people in that area.  Like an open area
drug market.
    Q   Okay.  And so you have the unmarked car.
Tell me about the NET teams and its current version
of what y'all wear, like on your person.  What kind
of clothes do you wear?
    A   Like tactical pants, Polo shirts.  We have
a vest.  On the front of the vest it's got
"Sheriff," and it's got a sewn-on badge.  And then
our gold badge we wear attached to that, and then on
the back, it has "sheriff" across the back, and
that's all reflective.
    Q   Uh-huh.  So it's obvious that you're a
sheriff?
    A   Correct.
    Q   At night would be it be obvious?
    A   Yes.
    Q   And what did you wear when Sheriff Tucker
first started in that version of the NET team?
    A   Same thing.
    Q   And what about under Sheriff Trowbridge?
    A   Same thing.
    Q   So you have like a patrol deputy that has,

Page 48

DARIAN SMITH

you know, they wear a uniform; right?
    A   Right.
    Q   But then when they go on NET, they wear
something plain?
    A   Plain clothes.
    Q   Would ever a patrol deputy wear a uniform
on NET?
    A   No.
    Q   So the -- if you're on NET, you wear plain
clothes?
    A   Correct.
    Q   So do you choose where you set up
roadblocks?
    A   Generally.
    Q   Do you choose which apartments to walk
through?
    A   Generally.
    Q   And what's the non-general situation?
    A   Patrol or the chief is getting complaints
in the area that traffic is running stop signs,
speeding through the neighborhood.  Things like
that, we'll get a call, "Hey, we'll go set up over
there."
    Q   Uh-huh.  So when you choose to set up a

Page 49

DARIAN SMITH

roadblock, do you have to pass that by anybody?
    A   No.
    Q   Do you have to fill out -- so I'm not
talking about an incident report for CAD, but when
you set up a roadblock, are there any other
paperwork you have to fill out?
    A   No.
    Q   But when you set up a roadblock in what
circumstances would CAD happen?  Like a CAD report
happen?
    A   We'll call out at the location and let
them know where we're at and what we're doing.
    Q   And you always do that?
    A   Yes.
    Q   In what circumstance do you -- uh -- do an
incident report?
    A   As far as if there's an arrest made or
contraband found or...
    Q   So what happens if you, you know, say you
have a roadblock, and somebody comes up to the
roadblock and, you know, say there is some
suspicious activity or something, and you ended up
searching them and their car but nothing, you know,
it turned out to be a false alarm, and so then you

DARIAN SMITH

1
2  let them go.  What kind of reporting happens then?
3      A  There wouldn't be an incident report.
4      Q  Would there be any like additional -- so
5  you've already called out CAD; right?
6      A  Right.
7      Q  To set up a roadblock?
8      A  Right.
9      Q  And, you know, at MLK and wherever.
10     A  Right.
11     Q  But is there anything else that you --
12  would you say "we stopped a car, we let them
13  through," would that be caught on CAD?
14     A  No.
15     Q  So in that example I just gave, the only
16  paper record is the initial call-out on CAD?
17     A  The initial call-out on CAD or any
18  driver's license or information that's ran at the
19  roadblock.
20     Q  And you run that through how?  How do you
21  do that?
22     A  Dispatch.
23     Q  And you call that out on?
24     A  Radio.
25     Q  Radio?  So do you have a car computer?

DARIAN SMITH

1
2      A  I do not.
3      Q  Do you have an office computer?
4      A  I have a laptop.
5      Q  And where is that?
6      A  At my apartment.
7      Q  I'm not talking about personal things, but
8  for work computers?
9      A  Yes.
10     Q  And what kind of stuff do you do on the
11  NET laptop?
12     A  Scheduling, read reports.  Things of that
13  nature.
14     Q  Did -- uh -- were all of the word
15  documents you had on that, were those turned over
16  for search or identified for this lawsuit?
17     A  Yes.
18     Q  Now, do you have any other records from
19  work besides what's on this laptop?
20     A  No.
21     Q  Like any -- uh -- like file cabinets?
22     A  No.
23     Q  What about a zip drive?
24     A  Yes.
25     Q  And where is that?

DARIAN SMITH

1
2      A  It's on my key chain.
3      Q  What kind of stuff is on your zip drive?
4      A  Affidavits.
5      Q  Anything else?
6      A  No.
7      Q  Was the higher powers, did you let them
8  know, "I have this zip drive," when they asked you
9  what documents you had for purposes of this lawsuit?
10     A  That didn't cross my mind.
11     Q  And what do you do with these affidavits?
12     A  Say I make an arrest for public drunk, the
13  affidavit for, the statute for public drunk is on
14  that zip drive.  All I have to do is fill in the
15  name and the information and everything.
16     Q  And so on this zip drive, is it just the
17  blank form, or is it all of the ones you fill out
18  and save it on the zip drive?
19     A  I don't think I understand the question,
20  but I typed -- I took the statute book and typed it
21  into the zip drive.
22         MR. GRAVES:  I think -- well, go
23  ahead.
24     Q  (Mr. Tom)  But you said you fill out
25  affidavits whenever you, you know?

DARIAN SMITH

1
2      A  Correct.
3      Q  Do you save the filled-out affidavit,
4  also, on the zip drive?
5      A  No.
6      Q  So the zip drive just has a statute book
7  on it?
8      A  Right.  When I plug in the information and
9  print it out and close out, it just goes back to the
10  original blank form.
11     Q  Uh-huh.  So what -- are there any other
12  things you have besides your laptop and a zip drive?
13     A  That's it.  There may be schedules on the
14  zip drive.  I'm not sure.
15     Q  Do you keep any like files in your car?
16     A  No.
17     Q  So how long have you been in your current
18  truck?  The -- you said it's silver?
19     A  Silver truck.
20     Q  Silver truck?
21     A  I think we got them April of last year.
22  No, April of this year.
23     Q  And what did you drive before that?
24     A  A black Chevy Tahoe.
25     Q  And how long did you drive the Tahoe?

Page 54

DARIAN SMITH

A   From March 15th until I got the silver truck in April.  March 2015.

Q   And that was unmarked?

A   Correct.

Q   And what did you drive before the Tahoe?

A   A marked patrol Tahoe.

Q   And what about before that?

A   A marked Ford Crown Vic.

Q   So we talked about how you only briefly drove a marked car.  The NET team only briefly drove a marked car, the NET only briefly drove marked cars, but, otherwise, you drove unmarked cars?

A   Right.

Q   And then you just said you had two marked cars.

A   Right.  I went to the NET team full-time in March 2015, which is when I started driving the black Tahoe, unmarked Tahoe.

Prior to that, I was a shift, master sergeant shift supervisor on evening shift patrol three to eleven.

Q   I've gotcha.  Okay.  That clears it up.  I had forgotten about that.  I was so focused on the NET here, I forgot about what all you were doing

Page 55

DARIAN SMITH

during the NET.

What kind of car does Mr. Howard drive currently?

A   Black Chevy Tahoe.

Q   Unmarked?

A   Unmarked.

Q   Now, these unmarked cars have all of the same dash and back-seat cams as a patrol car?

A   No.

Q   Do they have any cameras?

A   The black Tahoe that Sam, Sergeant Howard drives does, has all of the camera equipment, computer stand.  Mine does not.

Q   Why is that?

A   I'm not sure.  You'd have to ask Chief that.

Q   So besides the blue lights, the lights that we talked about that you went over before, what other kind of police hardware, you know, implement stuff does your car have?

A   It's equipped with audible siren and a radio.

Q   And the laptop is not in your car?

A   No.

Page 56

DARIAN SMITH

Q   Now, do you keep a, say you do an apartment walk-through --

A   Uh-huh.

Q   Besides CAD, incident report, stat sheet, do you, besides those, do you ever keep track of your apartment walk-throughs?

A   Keep track as far as?

Q   Like I went to this, you know, say it's November 29th, I went to this apartment, we walked through, and, you know, keep track of anything like that?

A   Only if an arrest is made or contraband and guns are found on the property, things of that nature.

Q   And in which case an incident report would be created?

A   Correct.

Q   Would there be any other kind of report?

A   No.

Q   Okay.

MR. GRAVES:  Can we take a five minute break?  Is this a good time?

MR. TOM:  That's perfect.  Let's do that.

Page 57

DARIAN SMITH

(BRIEF RECESS)

Q   (Mr. Tom)  All right, Mr. Smith, back on the record.  So you mentioned at one time the NET team was focused on apartment complexes?

A   Correct.

Q   And that was under Sheriff Trowbridge?

A   Correct.

Q   And was the whole time that the NET team was in existence, while you were employed with the sheriff, under Sheriff Trowbridge, it was focused on apartment complexes?

A   There were times when burglaries were occurring that they would be moved to that area or to assist with round-ups or search warrants or things of that nature.

Q   What's a round-up?

A   When you have a bunch of warrants you're trying to get picked up.

Q   Would the NET team do anything else besides what you just mentioned?

A   No.

Q   And so what percentage of the Sheriff Trowbridge NET team was focused on apartment complexes?

Page 58

DARIAN SMITH

1
2     A   Probably 80 percent.
3     Q   So, I want to talk about, you know, I
4   understand what that is.  So tell me like a typical
5   day of the Sheriff Trowbridge NET team, what would
6   happen?
7     A   We would patrol the apartments, do
8   apartment walk-throughs, roadblocks, things of that
9   nature.
10    Q   And patrolling an apartment is just
11  driving around in your car?  What does patrolling an
12  apartment mean?
13    A   Patrolling -- we have -- to go back to the
14  very beginning in the apartment complexes, you had
15  gangs that controlled each apartment complex.
16    Q   Uh-huh.
17    A   If you were working north in patrol, you
18  had to come back to Canton at dark-thirty, because
19  you were going to be steady going through the
20  apartments because you are going to have large
21  fights.  These are calls for service.
22    Q   Uh-huh.
23    A   Large fights, fights with weapons, drug
24  activity, shootings, murders in certain areas of the
25  apartment.

Page 59

DARIAN SMITH

1
2     Q   Uh-huh.
3     A   I think it was Valentines Day of '07 or
4   '08, I'm not sure, we had deputies in an apartment
5   complex answering a call.  A fight broke out between
6   these gangs, shots were fired, a juvenile was killed
7   and a juvenile was murdered.  That's what created
8   the kind of the going to the apartments, rotating
9   deputies through to where they didn't have any call
10  responsibility.
11    So we knew, based on patrol, say at 388 Ricks
12  Drive, at Building 7, at the air conditioner, if
13  it's five or six guys hanging out, those are going
14  to be the guys controlling the apartment, that's
15  where the weapons and that's where the dope is going
16  to be at.
17    So we would patrol in, get out, and make
18  contact with those people.
19    Q   And how did you -- uh -- what does that
20  mean "controlling the apartment"?
21    A   Pretty much that gang controlled that area
22  who come in and out as far as their narcotic sales
23  or those things.
24    Q   So the 388 Ricks Drive is an apartment
25  complex that has, you know, 15, 20 buildings.

Page 60

DARIAN SMITH

1
2   There's like various people live there, including
3   families, you know, small kids and stuff?
4     A   Correct.
5         MR. GRAVES:  Object to the form.
6     Q   (Mr. Tom)  And so what do you mean, like
7   how do those people, how do they interact?
8     A   They rob people, they assault people, they
9   sell drugs.  They're involved in shootings.  All
10  sorts of criminal activity.
11    Q   And so this is -- my question was about
12  Sheriff Trowbridge.
13    A   Right.
14    Q   So this is --
15    A   It was during that time, yes.
16    Q   And so is the situation that you're
17  explaining now, specifically for 388 Ricks Drive, is
18  that currently the situation there?
19    A   No.
20        MR. GRAVES:  Object to the form.  But
21        you can answer if you understand what he's
22        asking.
23    A   No, the crime has trended down since then.
24    Q   (Mr. Tom)  Was that type of environment
25  that you just described at 388 Ricks Drive, did that

Page 61

DARIAN SMITH

1
2   continue into Sheriff Tucker's tenure, as well?
3     A   No.
4     Q   What was the reason that it trended, the
5   crime trended down at 388 Ricks Drive?
6     A   Because of the active police presence in
7   those areas.
8     Q   So, you know, say you see, you know,
9   Building 7 by the -- uh -- what did you say, the AC
10  unit?
11    A   Right.
12    Q   So by the AC unit at Building 7, and you
13  see the guys standing there, like what do you do?
14        MR. GRAVES:  Object to the form.  I
15        mean, you can answer.
16    A   Okay.
17        MR. GRAVES:  He said "the guys."  I
18        don't know what guys he's talking about,
19        but you can answer it if you understand
20        what he's saying.
21    Q   (Mr. Tom)  These are the guys that you are
22  talking about that control the --
23    A   Right.  The ones that management has
24  reported to us and the residents have reported to us
25  that they're afraid of.  When we first started back

Page 62

DARIAN SMITH

1
2    probably '07, '08, at the site of police unprovoked,
3    they would run.
4        Q    Uh-huh.
5        A    We would go over there, find the guns,
6    find the dope on the ground, and that's how we were
7    making contact.
8        Q    And, you know, generally, at this time,
9    you know, Sheriff Trowbridge, 388 Ricks Drive, are
10   you pulling up in cars or on foot, or how is it
11   happening on these guys?
12       A    It could be in cars or on foot.
13       Q    Uh-huh.  Now, is there a road that leads
14   to behind the, you know, this AC unit at Building 7?
15       A    No.
16       Q    So like the car maybe pulled up on the
17   grass or something?
18       A    We have.
19       Q    When was the last time you pulled up on
20   the grass at 388 Ricks Drive?
21       A    I don't recall.  It's been so long ago.
22       Q    So the apartment complexes that the NET
23   team focused on under Sheriff Trowbridge, where are
24   the apartment complexes, besides the one at 388
25   Ricks Drive?

Page 63

DARIAN SMITH

1
2        A    At 388 Ricks Drive.  390 Ricks Drive.  707
3    Mace Street.  1110 Holmes Avenue.  619 MKL.  Then at
4    some point Joe Prichard Homes, I'm not sure of their
5    address, contacted the sheriff's office requesting
6    extra patrol.
7        Q    What -- are all of those addresses you
8    just named in Canton?
9        A    They're in Canton.
10       Q    Now, were there other apartment complexes
11   in Madison County that, under Sheriff Trowbridge,
12   that the NET team focused on?
13       A    No.
14       Q    Just those?
15       A    Yes, sir.
16       Q    And you said under Sheriff Trowbridge
17   there was normally two, maybe three deputies on the
18   NET team?
19       A    Correct.
20       Q    And so when, you know, let's use this
21   example where the guys are by the AC unit, it's just
22   two or three guys, the sheriff's deputies
23   approaching these guys, or is there additional
24   support?
25       A    The general rule was, you know, two guys

Page 64

DARIAN SMITH

1
2    mainly were on the NET team.  Rarely was it three.
3        Q    Uh-huh.
4        A    We tried to have a marked unit in the area
5    in case they ran, or, you know, we needed a marked
6    unit in there.
7        Q    Uh-huh.  Uh-huh.  So how many times would
8    you say you pulled up on somebody in one of these
9    apartment complexes under Sheriff Trowbridge's
10   tenure where people ran?
11       A    On a daily basis.
12       Q    And how many times, once they ran, would
13   you find contraband?
14       A    Probably 60 to 70 percent of the time.
15       Q    And did you ever -- would you guys go like
16   pursue these people when they ran?
17       A    Yes.
18       Q    Can you explain an example of that?  Like
19   what happens when you -- like say you, you know, you
20   pull up on the AC unit, and there's the guys there,
21   and then they run away.
22       A    If they run unprovoked at the sight of the
23   police in that area with the crime like it was,
24   that's the reason we believe they're involved in
25   criminal activity.  So, yes, I didn't give chase.

Page 65

DARIAN SMITH

1
2    You can see I can't run, and I haven't ran in years.
3    One of the deputies may give chase.
4        Q    But sometimes you're in a car though;
5    right?
6        A    Right.
7        Q    And so with a car, I mean, do you drive
8    after them in the car?
9        A    No.
10       Q    So you would get out of the car and run
11   after them?
12       A    Correct.
13       Q    I see.  And I mean would you say that your
14   cars are truly undercover?
15       A    No.
16       Q    People know them?
17       A    Yes.
18       Q    When they see the silver truck, they know
19   it's you?
20       A    Yes.
21       Q    So what is the apartment detail?
22       A    The NET team.
23       Q    Do you still call it the apartment detail?
24       A    Most call it the NET team now.
25       Q    Have you ever set up a roadblock at 388

17

Page 66

DARIAN SMITH

Ricks Drive?
A   Yes.
Q   Where do you set it up?
A   On the street just outside of 388.
Q   Is that West North Street?
A   Yes.
Q   Why do you choose that location?
A   As a visible deterrent to crime, for one.
And to check for the safety of the drivers.
Q   Now, when you said "these roadblocks,"
were you on patrol, or were you on NET?
A   NET.
Q   Now, who do you set the roadblock up with?
A   Sergeant Howard.
Q   So the just the two of y'all?
A   Correct.
Q   And both of y'all are in unmarked cars?
A   Correct.
Q   Were there -- are there any other cars
there when you set these up?
A   Sometimes there may be a marked car.
Sometimes there may be another narcotics officer
there.
Q   So sometimes it's all unmarked cars?

Page 67

DARIAN SMITH

A   Correct.
Q   And are there, you know, during the day?
At night?
A   Both.
Q   And do you always have lights?  Are your
lights on?
A   Yes, sir, we have lights.
Q   Have you ever had like a no lights on but
you shine people down with a flashlight?
A   I don't recall ever doing that, but no.
Q   So in order to get in or out of 388 Ricks
Drive when you set up a roadblock there, do you have
to go by the roadblock?
A   Yes.
Q   And do you -- have you ever stopped a
pedestrian walking by there?
A   Yes.
Q   And what was the purpose of that?
A   Uh -- we received information from the
management that they were having problems with
people, non-residents walking through the
apartments, causing property damage and crimes
against persons, stealing things and assaulting
people.  They were walking through after dark,

Page 68

DARIAN SMITH

causing these problems.
      Had two subjects approach an entrance on foot
walking the apartments.  Told them to take their
hands out of their pockets for officers' safety and
their safety.  One of them openly admitted he had a
gun concealed, and at that point we started the
investigation.
Q   Have you ever, you know, stopped a -- so
this was -- the circumstances you're talking about
was you had set up a roadblock on West North Street?
A   I don't think we ever -- I think we did
an apartment walk-through that night and were coming
back to our vehicles.
Q   Okay, okay.  And your vehicles were parked
where?
A   They would have been outside on West North
or North West, whichever street that is.
Q   So you guys were walking through 388 Ricks
Drive and coming back to your cars?  This is you and
Mr. Howard?
A   Correct.
Q   Was there anybody else there?
A   I think Deputy Josh Fische may have been
there.  I'm not sure.

Page 69

DARIAN SMITH

Q   And what division is he in?
A   He's in narcotics.
Q   So he was also in an unmarked car?
A   Correct.
Q   And so the three of y'all -- was there
anybody else?
A   Not that I recall.
Q   So the three of y'all were walking out,
and then you see these two guys with their hands in
their pockets?
A   Correct.
Q   And what time was this?  Was it night or
day?
A   It was night.  Probably between eight and
nine o'clock, somewhere around there.
Q   And what was suspicious about it?
A   The information we had was that non-
residents were walking through the apartments at
certain hours, committing certain crimes.  You have
two individuals walking into the apartment at that
certain time, we have every right to stop and
investigate and find out if they legitimate business
in those apartments.
Q   Are those apartments private property?

| Page 70 |
| --- |

DARIAN SMITH

1
2     A   I would say yeah.
3     Q   What do you mean that you have business
4  with talking with people if they're going in that
5  apartment?
6     A   To make sure they're not going in there to
7  commit a crime.
8     Q   So have you ever had, had that before?
9     A   Yes.
10    Q   Let me -- that was unclear.  Have you ever
11 stopped a pedestrian besides this circumstance
12 you're talking about now, while they're just walking
13 down the street, you know, at one of those apartment
14 complexes?
15    A   Just walking down the street?  Yes.
16    Q   And how many times do you think you have
17 done that?
18    A   I couldn't answer that question correctly.
19 I don't know.
20    Q   I mean is it like less than five?
21    A   It's more than five.
22    Q   Like more than 10?
23    A   Probably.
24    Q   More than 20?
25    A   Yes.

| Page 71 |
| --- |

DARIAN SMITH

1
2     Q   More than 50?
3     A   I would -- that I would not know.  I would
4  not.
5     Q   More like --
6     A   I don't know.
7     Q   But it's more than 20?
8     A   I would agree with that.
9     Q   And each time -- so is your explanation
10 that you just gave beforehand about that it being in
11 a high crime area, you had heard about people
12 walking through the apartment complex, and these
13 pedestrians were doing just that, they were walking
14 through the apartment complex, so that gave you at
15 least reasonable suspicion to approach them?
16        MR. GRAVES:  Object to the form.
17    A   I'm not sure I understand the question.
18    Q   (Mr. Tom) So you know how you -- uh --
19    A   Well, I know what I explained as far as my
20 reason for stopping them.
21    Q   Before them?
22    A   Right.
23    Q   Does that apply to all of, all of, you
24 know, the north of 20 pedestrians that you stopped
25 that, you know, that they were walking in a high

| Page 72 |
| --- |

DARIAN SMITH

1
2  crime area, and so you thought, you know, that gave
3  you reasonable suspicion to speak with them that
4  maybe they are committing a crime?
5     A   No.
6        MR. GRAVES:  Object to the form.
7     Q   (Mr. Tom) So why did you speak with them?
8  You said you talked -- explain the one time.
9     A   Right.
10    Q   What about all of those like the 19 other
11 times?  Like why would you talk to somebody like
12 that?
13    A   Because we were patrolling on Welsh Street
14 and it's three or four people walking in the middle
15 of the road and traffic has to stop or go around
16 them, that's obstructing traffic.  So we're going to
17 get out and make contact with them.
18    Q   What about somebody walking on the side of
19 the road?
20    A   There is occasionally they can be stopped
21 if we see what we believe is a weapon, a gun, or if
22 we have reason to believe they're involved in
23 criminal activity, we'll get out and talk to them.
24    Q   Isn't that legal to carry a gun in
25 Mississippi now?

| Page 73 |
| --- |

DARIAN SMITH

1
2     A   Is it legal?
3     Q   Legal?
4     A   It's legal if you carry it openly.
5     Q   Uh-huh.
6     A   And everybody can see.  It's illegal if
7  you carry it concealed without a concealed carry
8  permit.
9     Q   So if somebody has a concealed carry, they
10 can only do that with a permit?
11    A   Right.
12    Q   So if somebody has a concealed carry, does
13 that provide you with reason to go approach them and
14 see if they have the permit?
15    A   Yes.
16    Q   And you have done that before?
17    A   Yes.
18    Q   Have you ever been inside 388 Ricks Drive,
19 because it's fully enclosed?  There's just one
20 entrance and one exit, and, you know, you're inside
21 that apartment complex, not on the street, but
22 inside within the gates, you ever stopped a
23 pedestrian inside there?
24        MR. GRAVES:  Object to the form.
25    A   Yes.

Page 74

DARIAN SMITH

1
2    Q   (Mr. Tom) Go ahead.
3    A   Yes.
4    Q   And when was the last time you did that?
5    A   At 388?  Several months ago.
6    Q   Tell me about it.
7    A   I can't recall the circumstance.  It may
8    have been more than several months ago.
9    Q   Uh-huh.  Do you remember if you, if these
10   people were arrested?
11   A   The last people I had contact with at 388,
12   I don't.
13   Q   How many times do you think, out of these,
14   you know, 20 pedestrians that we have discussed, how
15   many of these people have been arrested?
16   A   I don't know the answer to that.
17   Q   Is there any way to figure that out?
18   A   I suppose you could go back and pull
19   records, but I don't know how.  I don't know.
20   Q   So unless there's an incident report, how
21   else would we figure that out?
22   A   Check the CAD.
23   Q   And what would the CAD say?
24   A   Normally, if we got out with somebody
25   walking, we say, "SO arrived at such and such

Page 75

DARIAN SMITH

1
2    location with a pedestrian or a subject."
3    Q   And you know how there's certain
4    categories on a CAD, like "traffic stop" or
5    "roadblock" or whatever else?  What's the category
6    for stopping a pedestrian?
7    A   Whatever the offense is.
8    Q   But so there's not -- so when you first
9    stop them and you call out a CAD, there's no offense
10   yet, there's not always an offense right away?
11   A   Correct.
12   Q   So what is the -- if there's not an
13   offense immediately, what's the call-out on the CAD,
14   or what is it that shows up on the CAD?
15   A   I don't know.  Dispatch puts that in.
16   Q   But what do you say?
17   A   I'll say I'll be out with a person walking
18   at such and such location.
19   Q   Have you ever stopped pedestrians outside
20   of these apartment complexes that we're talking
21   about in Canton?
22   A   That was what I was just talking about.  I
23   may have misunderstood your question, but that's
24   what I was just talking about.
25   Q   Tell me again.

Page 76

DARIAN SMITH

1
2    A   I thought you were talking about people
3    walking down the street, stopping those.
4    Q   And where are these people that you're
5    talking about?  Are these the people in Canton?
6    A   They could be in Canton.  They could be in
7    Ridgeland.  They could be in Gluckstadt or Madison,
8    wherever.
9    Q   So you're talking about people walking in
10   the middle of the street?
11   A   Right.
12   Q   So let's disregard all of those people.
13   A   Okay.
14   Q   So somebody that, say, is walking on the
15   sidewalk or walking in an apartment complex or, you
16   know, it's not obvious that they're doing, you know,
17   violating a traffic law, where have you stopped
18   pedestrians in that circumstance?
19   A   I haven't.  Unless there is reason to
20   believe they're involved in criminal activity.
21   Q   And so you just mentioned all of the
22   places that you've stopped a pedestrian, and that's
23   sort of been look all over the county?
24   A   Right.
25   Q   Is it more likely to stop a pedestrian in

Page 77

DARIAN SMITH

1
2    an apartment complex, like in the Canton region or
3    like in Ridgeland?  Because you know there's like
4    the apartment complexes in Ridgeland, there's one in
5    Canton.  There's some in Flora.  Madison doesn't
6    have apartments.
7    A   Right.
8    Q   The unincorporated areas don't have
9    apartments --
10   A   Right.
11   Q   -- I don't think.  And so is it more
12   likely to stop a pedestrian at the apartment
13   complexes?
14         MR. GRAVES:  Object to the form.  You
15         said the unincorporated places don't have
16         -- the unincorporated areas of what don't
17         have apartment complexes?
18         MR. TOM:  Madison County.
19   Q   (Mr. Tom) Is that true?
20   A   No.
21   Q   Do you stop -- is it more likely to stop a
22   pedestrian in an apartment complex than at a
23   non-apartment complex?
24         MR. GRAVES:  Object to the form.
25   A   That's situational.

Page 78

DARIAN SMITH

1
2    Q   (Mr. Tom)  Have you ever heard of this
3  term "jump-out boys"?
4    A   Yes.
5    Q   What does that mean?
6    A   That goes back to what we discussed
7  earlier.  Back years ago, when you'd patrol into the
8  apartments, they would see the car, they'd take off
9  running.  The deputy would jump out, for lack of a
10  better word, and give chase.  That's where the term
11  came from.
12    Q   So does that still happen?
13    A   No.
14    Q   When was the last time you think that that
15  happened?
16    A   Years.
17    Q   So this was only under Trowbridge?
18    A   Right.
19    Q   And how often did that happen under
20  Trowbridge?
21    A   As far as people running?
22    Q   As far as people running and people
23  jumping out, like they jumped out?
24    A   On a daily basis.
25    Q   And on the jump-out boys, it would always

Page 79

DARIAN SMITH

1
2  be in unmarked cars?
3    A   Yes.
4      MR. GRAVES:  Object to the form.
5    Q   (Mr. Tom)  Did you ever have jump-out boys
6  under Sheriff Tucker?
7      MR. GRAVES:  Object to the form.  He
8      didn't say that they were the jump-out
9      boys.  He said people called certain
10      deputies jump-out boys.
11    Q   (Mr. Tom)  You know what I'm talking
12  about; right?
13      MR. GRAVES:  That's not such a thing
14      as jump-out boys.
15    A   That's the nickname given to the NET team.
16    Q   (Mr. Tom)  Okay.  So I mean do you
17  understand what I'm asking?
18    A   I don't know that I do.
19    Q   Have people in an unmarked car jumped out
20  of the car in this fashion that we're talking about
21  under Sheriff Tucker?
22    A   Yes.
23    Q   And when was the last time that happened?
24    A   The last time I can remember, we received
25  information from the apartment manager at 619 MLK

Page 80

DARIAN SMITH

1
2  that several people were hanging out at I think it
3  was A building, after hours, smoking marijuana,
4  selling marijuana, causing a disturbance.  So we
5  went to that location.  There were several people
6  hanging out at that apartment she gave us.  Several
7  of them had marijuana.  There was large amounts of
8  marijuana on the ground.  Scales were recovered and
9  that sort of thing.
10    Q   So say you get a call to one of these
11  apartment complexes and the manager says that
12  there's drug use and people being rowdy, "yeah, we
13  need you to come quiet things down."
14    A   Right.
15    Q   "Fix this situation.  People are trying to
16  go to sleep."  And you come up, you drive up or walk
17  up.  Does the fact that somebody is in one of these
18  apartment complexes outside provide you reason to go
19  and talk to them?
20    A   You just said -- I don't understand if
21  they're inside or outside.
22    Q   They're standing outside, because these
23  apartment complexes, they're all, all of the
24  walkways are outside?
25    A   Correct.

Page 81

DARIAN SMITH

1
2    Q   But there is no inside --
3    A   Correct.
4    Q   The only inside is the actual apartment.
5    A   Correct.
6    Q   And so if somebody is outside, you know --
7    A   Okay, I've gotcha now.
8    Q   So does that, the fact that you've gotten
9  this call and the apartment manager was like, these
10  people, like they have, you know, they're causing a
11  ruckus and I can smell marijuana, and when you
12  respond to that call, does the fact that somebody is
13  outside in the same apartment complex give you
14  reason to go and approach them and see if -- does
15  that give you reasonable suspicion or probable
16  cause?
17    A   Yes, if we received information that at
18  that particular location these particular people are
19  hanging out, smoking dope, gambling, you know,
20  whatever, and we identify, "Hey, they're at that
21  apartment they're talking about," that gives us
22  reason to make contact.
23    Q   What if somebody was -- uh -- I mean
24  before we were talking about those two guys that
25  were walking outside 388 Ricks Drive --

Page 82

DARIAN SMITH

1
2     A   Correct.
3     Q   -- it's not that they were at an
4  apartment, they were walking on the street.
5     A   They were walking into the apartments.
6     Q   Walking into the apartments?
7     A   Correct.
8     Q   And so -- uh -- it's a little bit more
9  general.
10    A   Correct.
11    Q   It's not a specific apartment, but it's
12 that same apartment complex.
13    A   Right.
14    Q   And so would anybody walking into that
15 apartment complex, you'd have reasonable suspicion
16 or probable cause to go and --
17         MR. GRAVES:  Object to the form.
18    Q   (Mr. Tom)  To talk to them?
19         MR. GRAVES:  Earlier he said he had
20         specific information of a call.  He got
21         specific information that there were
22         people coming in at a specific time.  And
23         that's what gave him suspicion.
24         I don't know how that relates to what
25         your question is now, but I'm going to

Page 83

DARIAN SMITH

1
2  object to the form of that whole question.
3     Q   (Mr. Tom)  Do you understand my question?
4     A   I think.  I'm not sure.
5     Q   So the time that you're at 388 Ricks Drive
6  and you guys had, had been -- uh -- or why were you
7  guys there?
8     A   Because we had received reports of
9  criminal activity going on by non-residents walking
10 through the apartments.
11    Q   Okay, and so does the fact that anybody,
12 at this time I'm talking about, 388 Ricks Drive, you
13 just mentioned that you got the call?
14    A   Correct.
15    Q   About non-residents walking through, does
16 the fact that anybody is walking through that
17 apartment complex give you reasonable suspicion of
18 probable cause to approach them and think that a
19 crime is being committed?
20    A   I would say with the specific information
21 we had and the specific hours, people walking into
22 the apartments, they were inside the apartments
23 doing to walk through and witness somebody come off
24 the street, through the gate, into the apartment
25 complex, yes, we have the right to stop them and see

Page 84

DARIAN SMITH

1
2  what they're doing.
3     Q   Did those two people that you had arrested
4  with their hands in their pocket, did they live at
5  388 Ricks Drive?
6     A   I think one did.
7     Q   So one of them, at least, was just going
8  home?
9     A   Correct.
10    Q   So what's the purpose or mission of the
11 NET team?
12    A   As far as?
13    Q   You know, patrol is designed to, you know,
14 patrol the neighborhoods, you know, be seen.  Sort
15 of a police presence has a reduction in crime
16 effect.  Narcotics is designed to go and, you know,
17 cut down on narcotics.  What's the purpose of the
18 NET team?
19    A   I would say it's special operations
20 because we do some of everything.  We're not just
21 specifically focused on one thing.
22    Q   Uh-huh.
23    A   I don't know how you would summarize that.
24    A   I mean, y'all are -- are y'all like there
25 for like general like crime deterrence?

Page 85

DARIAN SMITH

1
2     A   I would agree with that.
3     Q   Now, to what extent does the chief or
4  Sheriff Tucker know what the NET team does?  Would
5  you say that they fully know what the NET team does
6  on a daily basis?
7     A   Yes.  Yes.
8     Q   And in the current version of the NET
9  team, that was created by Sheriff Tucker --
10    A   Yes.
11    Q   -- for permanent?
12    A   Yes.
13    Q   I mean would -- you know, say you have a
14 deputy, you have a certain role, and, you know,
15 that's a well defined role that you do, and that's
16 overseen by Sheriff Tucker.  Uh -- let me just
17 rephrase it.
18    Does every unit in the sheriff, every division,
19 whether it's NET or patrol or narcotics or, you
20 know, any unit, is that overseen and directed by
21 Sheriff Tucker?
22    A   Not -- they each have a supervisor, a
23 ranking supervisor, and then your chain-of-command
24 would be the ranking supervisor, the chief deputy
25 and then the sheriff, if I'm understanding your

Page 86

DARIAN SMITH

1  question correctly.
2      Q   Like you know like that, I forget what
3  president it is, but he was like "the buck stops
4  with me." Do you know what I'm talking about? He's
5  the ultimate decider. He gets to decide the
6  ultimate responsibility of what happens and this
7  department rests with Sheriff Tucker?
8      A   Yes.
9      Q   You would agree with that?
10      A   Yes.
11      Q   So besides making it permanent, which is
12  its current version --
13      A   Correct.
14      Q   -- did Sheriff Tucker make any other
15  changes within that team?
16          MR. GRAVES: Object to the form. I
17      think he already testified to a number of
18      changes, but I'll let him testify to it
19      one more time.
20      Q   (Mr. Tom) Besides anything that we talked
21  about?
22      A   At one point it was talk of making it, at
23  some point, not in the near future, maybe a four to
24  five man team assigned to court services, but that's

Page 87

DARIAN SMITH

1  yet to come to fruition.
2      Q   What does that mean "core services"?
3      A   Court services will be --
4      Q   Oh, court services? Is that what you
5  said?
6      A   Yeah.
7      Q   Okay.
8          (Exhibit 1 marked for the record)
9      Q   We've marked this as Smith Exhibit 1. And
10  so this is, Master Sergeant Smith, is, you know, in
11  a lawsuit, you know, the plaintiffs and defendants
12  both have lawyers, and the lawyers, you know, talk
13  and write a bunch of stuff back with each other, and
14  the court reads these things that the lawyers write.
15      A   Yes.
16      Q   So this is something that the defendants'
17  lawyers wrote, and, you know, on behalf of the
18  sheriff, so this is, basically, the sheriff for
19  Madison County talking. And this is called the
20  Defendants' Response to Interrogatories. So turn to
21  page 8.
22      A   Okay.
23      Q   Okay, so you see we have on page 8, and we
24  have 9, and then it says "response," and then

Page 88

DARIAN SMITH

1  there's A, B.
2      A   Uh-huh.
3      Q   So read B?
4      A   "Changed the method by which the
5  Neighborhood Enforcement Team functioned, obtained
6  funding to have a separate NET department, appointed
7  to be in charge of the team and establish a working
8  calendar for the NET and establish the new method on
9  how NET will operate within a Madison County
10  municipality if they requested its help, change the
11  concentration of the team from being focused solely
12  on apartment complexes to serving various
13  subdivisions with help patrolling on an as-needed
14  basis on a level of reported crimes."
15          MR. GRAVES: I think you probably
16      need to read two back up at the beginning
17      just to see what the context of that is.
18      Q   (Mr. Tom) Okay, so the interrogatory
19  here, this is the plaintiffs' interrogatory,
20  "Identify and describe all changes and/or
21  variations, whether formal, informal, written or
22  unwritten made by Sheriff Tucker to the policies and
23  procedures in place under Sheriff Toby Trowbridge."
24          And what Master Sergeant Smith just read is the

Page 89

DARIAN SMITH

1  changes that Sheriff Tucker made to the policies and
2  procedures under Sheriff Trowbridge that relate to
3  the NET team.
4          So do you have any idea why Sheriff Tucker made
5  these changes?
6      A   I don't.
7      Q   As the head of the NET team, you know, you
8  were there when it became from voluntary to
9  permanent?
10      A   Correct.
11      Q   Did you have any role in creating the NET
12  team, or was Sheriff Tucker just said, "This is how
13  it's going to be, and there's an opening for
14  somebody else to do it"?
15      A   No, we had discussions about it.
16      Q   So tell me about those discussions.
17      A   They were with both the chief and the
18  sheriff. They shared their vision of what they
19  wanted out of the unit, and I shared my vision of
20  what I would like to see the unit grow into, which
21  was mutual -- uh -- about everything we have already
22  discussed previously. And it started out in just
23  baby-steps, changes, changes, changes to where we're
24  at today.

Page 90

DARIAN SMITH

1
2    Q   When did this discussion happen?
3    A   I can't -- maybe 2012, 2013.  Basically,
4  when we brought it back to full-time and then when
5  we sat down and talked about making it a
6  full-time -- uh -- it was discussed in further
7  detail.
8    Q   So it was you and Chief Williams and
9  Sheriff Tucker?
10   A   Correct.
11   Q   Was there anybody else?
12   A   Not that I recall.
13   Q   What was Sheriff Tucker's vision for the
14  --
15   A   The same thing.  To make it more of a
16  special operations group that could be used, a tool
17  to be used more effectively.
18     Like I said, you know, now, we're assisting
19  investigations, we're assisting warrants, we're
20  assisting narcotics, we're assisting patrol.  And
21  that's helped those divisions, free them up a great
22  deal more to do their responsibilities.
23   Q   Have you -- have the goals been achieved?
24   A   I think they have.
25   Q   Like the NET has been like successful?

Page 91

DARIAN SMITH

1
2    A   I think so, yes.
3    Q   So how do you -- uh -- is there any kind
4  of like metrics where you track that?  Like what are
5  the metrics?
6    A   I would say we read the reports every day
7  of patrol, and the patrol is not receiving the call
8  volume in these high crime areas that they used to.
9  Crime has gone down.  I think that's one measure of
10  success.
11   Q   And do you correlate the reduction in
12  crime with NET activity?
13   A   In some areas.
14   Q   And what areas are those?
15   A   High crime areas.
16   Q   Which is what?
17   A   They could be anywhere in the county.
18   Q   Do you have an idea of where the high
19  crime areas are in Madison County?
20   A   There are high crime areas in Canton,
21  there's high crime areas in Gluckstadt.  There's
22  high crime areas in Flora.
23   Q   Anywhere else?
24   A   Pretty much all over the county.
25   Q   Now, the high crime, you know Jackson is

Page 92

DARIAN SMITH

1
2  known to have a high crime rate.  Now, the high
3  crime -- would you agree with that?
4    A   Yes.
5    Q   So the high crime, are you saying that
6  it's -- like how does it compare to Jackson in these
7  high crime areas?
8    A   I would say at one point in time the
9  apartments in Canton and the unincorporated areas
10  were equal to.
11   Q   And which apartments in Canton are these?
12   A   The unincorporated apartments?
13   Q   I'm not sure which ones those are?
14   A   The apartments that we patrol are in,
15  they're unincorporated.  We are the only people that
16  have jurisdiction in those apartments.  That's 388,
17  390 Ricks Drive, 1110 Holmes Avenue, 707 Mace
18  Street, 619 MLK.  Yeah.
19   Q   So if you'd turn back to Exhibit 1, 9B, if
20  you'd look at the last sentence here, it says:
21  "Change the concentration of the team from being
22  focused solely on apartment complexes to serving
23  various subdivisions without patrolling on an
24  as-needed basis," et cetera.  What are these various
25  subdivisions?  What does that mean?

Page 93

DARIAN SMITH

1
2    A   Various subdivisions.  I don't know
3  exactly how many subdivisions there are in
4  unincorporated Madison County.  I know as of maybe a
5  year ago, there were 52 new subdivisions under
6  construction --
7    Q   Uh-huh.
8    A   -- in the Gluckstadt area, which is the
9  south part of the county.  That could be referring
10  to when we have these large construction of
11  neighborhoods, we have property theft, appliance
12  theft, people come in and steal washers and driers
13  once they put them in these houses.  They may send
14  us in in unmarked units during the daytime to do
15  surveillance in those neighborhoods.
16     You may have neighborhoods anywhere in the
17  county call and complain, "Hey, they're running the
18  stop sign here all of the time.  There's kids
19  playing.  Can y'all send somebody over here?"  We go
20  handle that.
21     You may have a neighborhood over here that has
22  a lot of construction going on and the residents are
23  complaining that the construction workers are
24  speeding, littering, "can y'all come in here and
25  handle that?"  I think that's what that means.

Page 126

DARIAN SMITH

Q   So "paper service warrant," what does that mean?

A   It means he had a paper or a warrant was served.

Q   So do you remember how we talked about before, I think his name was Lieutenant Hicks who gave the warrants out and the NET team would go and serve the warrants?

A   Correct.

Q   Is that what was happening here?

A   I'm not sure.

Q   But whether he handed it, Lieutenant Hicks handed you this warrant or not, is that what's going on, you're serving warrants on Steven Carter?

A   Yeah, that's where we're serving a warrant.

Q   So do you remember this incident?

A   I don't.

Q   I'll just read the narrative here.  It says, "On the above date and time, deputies were conducting apartment walk-through at 388 Ricks Drive (Canton Estates) when contact was made with Steven L. Carter in front of Building 9.  Carter had three outstanding warrants through Madison County Justice

Page 127

DARIAN SMITH

Court for failure to appear on traffic citations.  Carter was taken into custody."  And skipping some stuff, "transported to MCDC."

So before you said that you would do a bunch of research and you would try to figure out who the guy was with the warrants --

A   Correct.

Q   -- and then get served on them.

MR. GRAVES:  Object to the form.  I think what he said is he had to mail them but he may have to do an investigation to figure out where they were.  But who they were is the name.  He said it was already on the warrant.  I may be mischaracterizing it, but I believe that's what he said.

Q   (Mr. Tom)  So explain what happened to this one.

A   I can't.  It was two years ago.  I don't recall how we came in contact with him.

Q   So but it says you were conducting an apartment walk-through?

A   Correct.

Q   So that's how you came in contact with

Page 128

DARIAN SMITH

him; right?

A   Yes.

Q   So and when you came into contact with Steven L. Carter during the apartment walk-through, do you have any idea if you knew that this was the guy that you were trying to serve warrants on?

A   I don't know that we were looking for Steven Carter in specific.  We could have been there on a complaint at a certain area and he was in that area.  I just can't recall that.

Q   Do you have any idea how -- so you come into contact with Steven L. Carter while conducting an apartment walk-through.  Any idea how you found out that he had three outstanding warrants?

MR. GRAVES:  I mean, I've let him answer this three times.  I think he said he doesn't remember.  I mean, I'll let him say it one more time.  But go ahead.

Q   (Mr. Tom)  You may answer.

A   I don't recall.

Q   (Mr. Tom)  What does that mean "contact was made"?

A   It means you came in contact with somebody.

Page 129

DARIAN SMITH

Q   Does that mean you just walked up and started talking to him?

A   It could be.

Q   What else would it mean?

A   It could be somebody flagged us down in the apartment and said "that guy has got dope on him" or "that guy's got a gun," so we go over there and make contact.

Q   Uh-huh.

(Exhibit Number 6 marked for the record)

Q   I'm going to hand you Smith Exhibit 6.  Smith Exhibit 6 is actually a two-page document.  The numbers at the bottom are NCRP- INCREP 032726.  And then the second page is 727.  So Exhibit 6 is this two-page -- so this is an incident report; right?

A   Correct.

Q   And on the second page, Reporting Officer is George Darian Smith?

A   Correct.

Q   And did you write this incident report?

A   I did.

Q   Do you remember this incident?

DARIAN SMITH

1
2    A   I do.
3    Q   So under the narrative, well, it just
4  starts on the first page, it says, "On the above
5  date and time, deputies were conducting a
6  walk-through of" -- and then on the second page,
7  "Canton Garden Apartments did the recent calls for
8  service involving narcotics, gambling, and
9  shootings. Deputies observed several black males
10 loitering in the parking lot near Building L. All
11 subjects were checked for safety reasons and advised
12 to go inside or leave the parking lot. Several
13 subjects went inside, but four of the subjects did
14 not. They were identified as" -- and then the
15 exhibit lists four names.
16    "A small bag of marijuana was located in
17 Bridgeman's sock and another larger bag stuffed into
18 the grill of a truck where Turner and Allen were
19 standing. The gun was also recovered from the
20 above-mentioned truck."
21    And then the report goes on. So tell me about
22 this exhibit, or tell me about this incident, what
23 you remember.
24    A   Uh -- I know we had several complaints
25 from management. Also, several call runs from

DARIAN SMITH

1
2  patrol deputies of fights, large groups of people
3  fighting, gambling, narcotics distribution. Just a
4  lot of problems in the back of 619 MLK around
5  Building N.
6    Q   Okay. And this incident took place at, it
7  says "begin date on page one of this  exhibit,
8  12/11/15. The end time 2004. So this is like, you
9  know, like mid-evening?
10    A   8:04.
11    Q   Yeah. So do you remember when you
12 observed the several black males in the parking lot
13 what you did?
14    A   I recall there was a lot of people in the
15 parking lot. There was loud music playing,
16 disturbing the peace. They were advised if they
17 were there visiting somebody, they needed to go to
18 whoever they were visiting and go inside. Then we
19 came in contact with the other guys.
20    Q   So do you remember how many people were
21 here? It says "several black males." Do you
22 remember --
23    A   I can't give an estimate. It was a large
24 group of people.
25    Q   And then it says, "All subjects were

DARIAN SMITH

1
2  checked for safety reasons." What does that mean?
3    A   They were patted down to make sure they
4  didn't have any weapons on them.
5    Q   So you patted down everybody there?
6    A   Everybody who didn't leave.
7    Q   Was there any women in the parking lot?
8    A   I can't recall.
9    Q   Was there any kids out there?
10    A   I can't recall.
11    Q   Were these guys just having a party?
12    A   No, they were out there smoking dope and
13 keeping up a lot of noise.
14    Q   So you said that, I mean the, I'm just
15 trying to get it straight here, but you said that
16 people that didn't go inside got patted down?
17    A   Whoever didn't leave.
18    Q   Whoever didn't leave got patted down. But
19 the report says it's slightly different. It says,
20 "All subjects were checked for safety reasons and
21 advised to go inside or leave the parking lot." So
22 that sort of makes it seem that before people left,
23 they got --
24    A   No, because you've got to remember going
25 back to earlier, when we pulled up, everybody knows

DARIAN SMITH

1
2  the vehicles we were in. Some people chose to leave
3  and go inside or leave the area.
4    Q   Uh-huh.
5    A   But some people remained.
6    Q   And they remained after you told them that
7  they should go in or after you pulled up?
8    A   After we pulled up.
9    Q   And so when you check somebody for safety
10 reasons, what does that tell?
11    A   Patting them down for weapons.
12    Q   So that's a frisk?
13    A   Right.
14    Q   So but then you found this bag stuffed in
15 the grill of a truck?
16    A   Correct.
17    Q   That's a search?
18    A   That's plain view.
19    Q   And you were able to -- how -- y'all were
20 just -- how did y'all find that thing in the grill?
21    A   We made contact with the three guys, the
22 three or four guys standing by the truck, to speak
23 with them, and the marijuana was in plain view,
24 hanging halfway out of the grill.
25    Q   Where was the gun that was recovered from

DARIAN SMITH

1
2    Q   And how does that work?
3    A   You just patrol.
4    Q   Okay, so say you have -- are you guys like
5  driving next to each other, or are y'all just in the
6  same area?
7    A   Just may be in the same area.
8    Q   Do you ever make pedestrian stops while
9  patrolling in your car?
10   A   In a car?
11   Q   Yeah.
12   A   I patrol in a truck.
13   Q   In your truck?
14   A   Yes.
15   Q   Tell me about that.  Like why would that
16 happen?
17   A   If you have reasonable suspicion they're
18 involved in criminal activity, then we'll stop and
19 get out with them.
20   Q   Uh-huh.  I mean, would that potentially be
21 what the locals call a jump-out boy because you have
22 an unmarked car?
23   A   It could be.
24       (Exhibit 10 marked for the record)
25   Q   So this will be Exhibit 10.  So one

DARIAN SMITH

1
2  incident report; right?
3    A   Correct.
4    Q   Do you recognize this?
5    A   Let me read it. (PAUSE).  It looks like a
6  report Hunt Johnson did.
7    Q   Did you see this incident?
8    A   No.
9    Q   You're just at the end of it?
10   A   Correct.
11   Q   So the deputy wrote this -- uh -- Oliver
12 Johnson, on page 1 of this exhibit, it says that "it
13 appeared that the subject had some type of black
14 object in his hand.  I proceeded with caution and
15 deployed the X-26 taser, striking his body."  Is
16 that a proper procedure?
17   A   If he felt his life was in danger and that
18 black object in his hand was a gun, yes.
19   Q   Do you have any idea what this black
20 object was?
21   A   No.
22   Q   Is this a -- so you were at the
23 supplement, I mean, because you showed up on the
24 scene as a supervisor?
25   A   Correct.

DARIAN SMITH

1
2    Q   Would you also review this incident report
3  for -- uh -- to make sure that everything was
4  appropriate in it?
5    A   I may have or another supervisor may have.
6    Q   Would it be normal to say what the black
7  object was in this incident?
8    A   I don't recall.
9    Q   So this is May 8th at 4:51; is that right?
10   A   Let's see.  Yes.
11   Q   So this is light.  This is the summer.
12 It's light at 4:51.
13   A   Correct.
14   Q   So put it aside.  So a sobriety check
15 point is the same type of roadblocks that you set
16 up?
17   A   Yes.
18   Q   Same procedure, same policies?
19   A   Yes.
20   Q   What policies and procedures do you follow
21 when you set up your roadblocks?
22       MR. GRAVES:  Object to form.
23   A   Policies as far as?
24   Q   (Mr. Tom)  For like an appropriate
25 roadblock?

DARIAN SMITH

1
2    A   The policies in our SOP.
3    Q   What time of day do you typically set up a
4  roadblock?
5    A   Times could vary.  Depending on the
6  situation.
7    Q   Do you set up roadblocks during holidays?
8    A   Yes.
9    Q   Is that a -- do you always set up
10 roadblocks on holidays?
11   A   I wouldn't say always.
12   Q   When you set up a roadblock, do you wear a
13 traffic vest?
14   A   On occasion.
15   Q   Not always though?
16   A   No.
17   Q   What about Mr. Howard?
18   A   No.
19   Q   He only wears it on occasion?
20   A   On occasion.
21   Q   How do you select a motorist that you stop
22 at a roadblock?
23   A   We try to check every motorist.
24   Q   What do you do when you approach somebody
25 stopped at your roadblock?

DARIAN SMITH

1
2     A   Just pulled up to the roadblock?
3     Q   Uh-huh.
4     A   Ask for driver's license.
5     Q   And that's it?  Insurance?
6     A   Sometimes you ask for insurance, sometimes
7  the driver's license.
8     Q   When would you talk with the passengers?
9     A   What do you mean?  I don't understand the
10 question.  I may say "hello" or "hi, how are you
11 doing?"
12    Q   When would you ask a passenger for a
13 license?
14    A   If I had a reason to believe he was
15 involved in criminal activity.
16    Q   Do you have passengers get out of the car?
17    A   Passengers get out?
18    Q   Yeah.
19    A   Yes.
20    Q   At the roadblock?
21    A   Yes.
22    Q   Do you ever search passengers?
23    A   If I have reason to believe they're
24 involved in criminal activity.
25    Q   Have you ever arrested a passenger?

DARIAN SMITH

1
2     A   I have.
3     Q   What would you do if somebody drives up to
4  a roadblock and then doesn't want to go in it and so
5  they turn around and park in front of the roadblock?
6     A   If they park in front of the roadblock,
7  they're blocking the street so we can make contact.
8     Q   What if there's like a place to park like,
9  you know, on Pine Knoll Road you set up in the
10 parking lot, so what if somebody --
11    A   If there's no traffic violation, there's
12 really nothing you can do.
13    Q   Have the roadblocks that you have set
14 up -- uh -- have they changed over time?
15    A   As far as?
16    Q   From Sheriff Trowbridge to Tucker?  Like
17 the policies or procedures or how you set up a
18 roadblock?
19    A   Not that I'm aware of.
20       (Exhibit 11 marked for the record)
21    Q   This will be Exhibit 11.  So this is an
22 incident report; right?
23    A   It appears to be.
24    Q   And if you'd look on page two, the very
25 last sentence, EOR Darian Smith, SO 47?

DARIAN SMITH

1
2     A   Correct.
3     Q   Did you write this one?
4     A   Correct.
5     Q   And this is the incident that we were
6  talking about before, right, where the -- uh -- two
7  subjects were walking near 388 Ricks?
8     A   Correct.
9     Q   And we have already discussed this; right?
10    A   Correct.
11    Q   So let's see.  I'm going to start sort of
12 in the center here, towards the top.  "While
13 deputies were on the property, contact was made with
14 Steven Smith and Terrence Thompson near the
15 entrance.  For officers' safety, both subjects were
16 advised to take their hands out of their pockets.
17 This time Thompson stated that he had a pistol in
18 the inner pocket of his coat.  Deputy Howard secured
19 the gun."  Uh -- et cetera.  So let's just talk
20 about that part.  So go over with me just what
21 happened there.
22    A   We conducted an apartment walk-through.
23 We had information that people who did not live on
24 the property were cutting through or walking through
25 the property, committing crimes -- crimes of

DARIAN SMITH

1
2  violence, crimes against persons, crimes against
3  property during certain hours.
4     As we were coming out, as I recall they were
5  walking into the apartments.  They had their hands
6  in their pockets.  We told them to take their hands
7  out.  Sergeant Howard told them to take their hands
8  out of their pockets.  At which time Thompson freely
9  admitted he had a pistol concealed in his inner
10 jacket.
11    At that time, Sergeant Howard secured the
12 weapon and walked over to the other side of the
13 street with Thompson, and I walked to the other side
14 of the street with Smith.  What was his name?
15 Smith.
16    Q   So is that a common -- why did you ask
17 them to take their hands out of their pockets?
18    A   For officers' safety.
19    Q   Is that like a menacing, having hands in
20 pockets, is that like an unsafe --
21    A   I don't know what is in your pocket when
22 you approach me.  You could have a gun or a knife,
23 anything.
24    Q   So we're on like Capitol Street currently,
25 so if I'm walking down Capitol Street with my hands

# EXHIBIT 21

Page 1

1                    Brad Sullivan
2            UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   MCFIELD; NICHOLAS
7  SINGLETON; STEVEN SMITH;
   BESSIE THOMAS; AND BETTY
8  JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON
9  BEHALF OF A CLASS OF ALL
   OTHERS SIMILARLY SITUATED
10                                        PLAINTIFFS
11 VS.          CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
12

   MADISON COUNTY,
13 MISSISSIPPI; SHERIFF
   RANDALL S. TUCKER, IN HIS
14 OFFICIAL CAPACITY; AND
   MADISON COUNTY SHERIFF'S
15 DEPUTIES JOHN DOES #1
   THROUGH #6, IN THEIR
16 INDIVIDUAL CAPACITIES
                                         DEFENDANTS
17
18
19           DEPOSITION OF BRAD SULLIVAN
20

    Taken at the instance of the Plaintiffs, at the
21   Hilton Garden Inn at 235 West Capitol Street,
    Jackson, Mississippi, on Tuesday, November 28,
22           2017, beginning at 3:53 p.m.
23
   REPORTED BY:  Robin G. Burwell, CSR #1651
24
25 JOB NO. 133421

Page 26

Brad Sullivan

to take my gun away from me.  I tased him and it
did not phase him and he took my TASER away from
me at that point in time.  And then we fought on
the ground for 15 minutes before getting into --
    Q.  After you placed the subject into
custody, were you required to fill out any forms?
    A.  Yes, ma'am.
    Q.  And what form is that?
    A.  A TASER use form at the Sheriff's
Office.
    Q.  Do you have to fill out a TASER use form
every time you discharge your TASER?
    A.  Yes, ma'am, if you're using your TASER
you have to fill out the form.
    Q.  Anything else you have to fill out?
    A.  You have to write an incident report
also.
    Q.  Going back to firearms, after you
discharge your firearm are you required to fill
out any forms?
    A.  No, ma'am, an incident report.
    Q.  Anything other than that?
    A.  I think that's the only report I filled
out when I got shot at.

Page 27

Brad Sullivan

    Q.  For incidents like we just discussed,
were you reprimanded by anyone at Madison County
Sheriff's Department for your conduct for the
incidents?
    A.  For me being shot at no, ma'am, I wasn't
reprimanded for me being shot at.
    Q.  For your actions?
    A.  My actions were being shot at.
Retaliating.  So, no, ma'am, I was not.
    Q.  Do you receive any performance reviews?
    A.  No, ma'am, not to my knowledge.
    Q.  Do you have Madison County Sheriff's
Department issued laptop?
    A.  Yes, ma'am.
    Q.  And where do you keep your laptop?
    A.  My patrol vehicle.
    Q.  Do you have a work station at the
headquarters of the Madison County Sheriff's
Department?
    A.  No, ma'am.
    Q.  So, if you're there and you want to work
on an incident report for instance, what would you
use?
    A.  There's computers there that you can

Page 28

Brad Sullivan

use.  I use my laptop that's provided for me.
    Q.  Do you use a assigned work station or is
it a work station that any other deputies can
access?
    A.  The only work station I use is my patrol
vehicle laptop.  There are work stations there
that you can use, but I use my laptop.
    Q.  Do you use any other electronic devices
for work?
    A.  Not issued by the Sheriff's Department.
    Q.  Do you use your personal cellphone?
    A.  You use yours every day, I use mine
every day.
    Q.  I'll clarify, do you use your personal
cell for work?
    A.  To call into dispatch or talk to other
deputies, yes, ma'am.
    Q.  Do you ever send text messages for work?
    A.  For work?  Not usually, it's just
talking back and forth to deputies.
    Q.  Do you have a personal email address
that you use to send work related emails?
    A.  No, ma'am.
    Q.  Do you have a Madison County Sheriff's

Page 29

Brad Sullivan

Department email address?
    A.  Yes, ma'am.
    Q.  And what is that?
    A.  I'm sorry?
    Q.  What is your email address?
    A.  I never use it so, I couldn't tell you.
I don't know.
    Q.  Do you use any applications on your
cellphone for work?
    A.  No, ma'am.
    Q.  Were any of the documents or were any --
strike that.
        Were documents from your laptop
collected by counsel in connection with this
lawsuit?
    A.  I believe so.  They had my laptop.
    Q.  What about your personal cellphone?
    A.  No, ma'am.
    Q.  Do you keep any paper files of any kind
for work?
    A.  I'm sorry?
    Q.  Do you keep any paper files of any kind
for work?
    A.  No, ma'am.

Page 30

Brad Sullivan

1
2    Q.  Do you have any files in your patrol
3  car?
4    A.  Gas receipts and where I've had my
5  vehicle worked on.
6    Q.  Have you received any notice to preserve
7  documents after this lawsuit was filed?
8    A.  I received it.  Don't take anything off
9  your laptop.
10    Q.  And when did you receive that?
11    A.  About the time they were taking the
12  laptops to download the information or whatever
13  they did to the laptops.
14    Q.  Was that a few months ago?
15    A.  I believe so.
16    Q.  And how were you instructed?
17    A.  How was I instructed to what?
18    Q.  To not delete things off your laptop?
19    A.  A letter to every deputy was put in our
20  box.
21    Q.  What box are you referring to?
22    A.  It's like a mailbox that's in the
23  Sheriff's Office where you pick up your check or
24  where they put subpoenas.
25    Q.  Okay.  Do you have to write an incident

Page 31

Brad Sullivan

1
2  report for every interaction you have with a
3  civilian?
4    A.  Yes, ma'am.
5    Q.  Including if the interaction does not
6  result in an arrest?
7    A.  Yes, ma'am.
8    Q.  Do you have to write an incident report
9  if your interaction only results in a ticket?
10    A.  Yes, ma'am.
11    Q.  What if you only gave the civilian a
12  verbal warning?
13    A.  Yes, ma'am.
14    Q.  Do you know if there are any
15  requirements for what your incident reports must
16  contain?
17    A.  It's all laid out in the incident
18  report.
19    Q.  Can you walk through what's required in
20  an incident report?
21    A.  Ma'am, there's -- it asks a lot of
22  information in an incident report.  Again, you'll
23  have to give me a little bit more detail.
24    Q.  Are there any fields that are required
25  in an incident report?

Page 32

Brad Sullivan

1
2    A.  Yes, ma'am.
3    Q.  And what are they?
4    A.  Names, dates of birth, Social Security
5  numbers if you can get it.  The names are required
6  usually.
7    Q.  Are you required to have narrative for
8  every incident report?
9    A.  Yes, ma'am.
10    Q.  If multiple deputies are involved in an
11  incident, do you know if every single one has to
12  write an incident report?
13    A.  Depends on what type of incident it is.
14    Q.  When are the situations for which all
15  deputies involved must write an incident report?
16    A.  Usually if they're involved in an
17  arrest.
18    Q.  Does anyone review your incident reports
19  after you submit them?
20    A.  Yes, ma'am.
21    Q.  Who reviews them?
22    A.  Either the sergeant, master sergeant or
23  lieutenant on the shift.
24    Q.  Have you ever had any of your incident
25  reports sent back?

Page 33

Brad Sullivan

1
2    A.  Yes, ma'am.
3    Q.  Why were they sent back?
4    A.  Spelling or grammar errors.
5    Q.  Are you able to edit your incident
6  report after you submit them?
7    A.  If it's sent back to you, yes.
8    Q.  Other than if it was sent back to you,
9  can you edit your incident report in any way?
10    A.  Never had to so, I would say no.
11    (Exhibit 1 marked for identification.)
12    Q.  (By Ms. Chan)  Take a minute to read
13  this report over and let me know when you're done.
14    A.  Okay.
15    Q.  Do you recognize this as a report you
16  wrote for an incident on March 26th, 2015?
17    A.  It's got my name on it.
18    Q.  Do you recall this incident?
19    A.  No, ma'am.
20    Q.  If you look on top there's a field that
21  says, "location" and it says, "100 not on file,"
22  right?
23    A.  Yes, ma'am.
24    Q.  Do you know why it says, "not on file"?
25    A.  Our computer system don't have every

Page 34

Brad Sullivan

1
2  road in the county in the CAD network.
3      Q.  So, reading this incident report, is
4  there any way for someone to identify where this
5  incident occurred?
6      A.  No, ma'am.
7      Q.  If you look down the narrative section
8  it says, "I, Deputy B Sullivan, SO 23 came into
9  contact with a black male."  Do you see that?
10      A.  Yes, ma'am.
11      Q.  Is SO 23 your badge number?
12      A.  Yes, ma'am.
13      Q.  Have you ever had a different badge
14  number?
15      A.  Yes, ma'am.
16      Q.  And what is that?
17      A.  SO 46.
18      Q.  And when did you change your badge
19  number?
20      A.  A couple of months after I was hired at
21  the Sheriff's Office.
22      Q.  And what do you mean by "came into
23  contact"?
24      A.  Basically what it says, I came into
25  contact with that subject.

Page 35

Brad Sullivan

1
2      Q.  How did you come into contact with the
3  individual?
4      A.  It doesn't say it in my narrative so, I
5  couldn't tell you.
6      Q.  Can you tell why you decided to come
7  into contact with this individual?
8      A.  Not from this narrative, I cannot.
9      Q.  So, would you agree that reading this
10  narrative doesn't give a reader any context for
11  understanding why you stopped the individual?
12      A.  No, ma'am, it doesn't.  It says I came
13  in contact with him.
14      Q.  And if you read on, "I found that
15  Tillman had two justice court warrants for his
16  arrest."  Correct?
17      A.  That's correct.
18      Q.  How did you find out that he had two
19  justice court warrants?
20      A.  Through the dispatch center.
21      Q.  So, would you have need to look for his
22  ID first?
23      A.  I'm sorry?
24      Q.  Would you needed to have asked for his
25  ID first?

Page 36

Brad Sullivan

1
2      A.  Yes, ma'am.
3          (Exhibit 2 marked for identification.)
4      Q.  (By Ms. Chan)  Again, take a look and
5  let me know when you're done?
6          MR. GRAVES:  For the record, this is
7  Exhibit 2.
8          THE WITNESS:  Okay.
9      Q.  (By Ms. Chan)  Do you recognize this
10  document as an incident report that you wrote for
11  an incident occurring on July 30th, 2014?
12      A.  I recognize it due to the fact that's
13  what it says.  It says my name, that I did the
14  report and has a date of 07/30 of '14.
15      Q.  Do you recall this incident?
16      A.  No, ma'am.
17      Q.  If you look on top of Exhibit No. 2,
18  location states "not on file," correct?
19      A.  That is correct.
20      Q.  Do you know why it says, "not on file"?
21      A.  Same reason the other one wasn't.
22      Q.  And if you look at the narrative
23  section, it says, "I, Deputy B Sullivan SO 23,
24  came into contact with a black female," correct?
25      A.  Correct.

Page 37

Brad Sullivan

1
2      Q.  What does "came into contact" mean?
3      A.  Came into contact with her.
4      Q.  Do you know how you came into contact?
5      A.  No, ma'am.  It doesn't state it in the
6  narrative.
7      Q.  Do you know why you came into contact?
8      A.  No, ma'am, it was 2014 so, no, ma'am.
9      Q.  Do you agree that reading this document
10  doesn't give the reader any context for why
11  contact was initiated?
12      A.  Yes, ma'am.
13      Q.  So, would you agree that if the
14  supervisor was reading this, he wouldn't know
15  whether you had probable cause to stop the
16  individual?
17      A.  Ma'am, I can't answer that.  I can't
18  answer that.  You'd have to ask the supervisor.
19      Q.  Reading this incident report, can you
20  tell whether there's any probable cause to
21  initiate contact with this individual?
22      A.  If I was out with them, there was
23  probable cause.
24      Q.  Reading this report on its own can you
25  tell whether there was probable cause or not?

Page 38

Brad Sullivan

1
2     A.  No, ma'am.
3     Q.  Has your supervisor or anyone else ever
4  commented on your use of the phrase "came into
5  contact"?
6     A.  No, ma'am.
7     Q.  Reading this report today, can you tell
8  whether you had reasonable suspicion to come into
9  contact with this individual?
10     A.  Ma'am, if I got out with them and asked
11  for their identification, I had reasonable
12  suspicion or probable cause to come into contact
13  with them.
14     Q.  Reading this report today, can you tell
15  what your reasonable suspicion would have been?
16        MR. GRAVES:  Object, asked and answered
17  two times already.
18     Q.  (By Ms. Chan)  So, earlier in the
19  deposition we talked a little bit about the use of
20  firearms and the use of TASERS.  Has Sheriff
21  Tucker ever talked about the use of force in
22  meetings?
23     A.  I don't think Sheriff Tucker has, no.
24     Q.  Has Chief Williams ever talked about the
25  use of force in meetings?

Page 39

Brad Sullivan

1
2     A.  We have a training officer that has.  I
3  don't recall Sheriff Tucker or Chief ever speaking
4  on it.  I don't recall.
5     Q.  Who is the training officer?
6     A.  Jeff Waldrop.
7     Q.  What did Jeff Waldrop say about the use
8  of force?
9     A.  The use of force continuum is normal.
10  Again, you're going to have to give a little bit
11  more detail as far as use of force.  I'm not
12  understanding your use of force.
13     Q.  I just want to understand your
14  conversation with Jeffrey Waldrop?
15     A.  Ma'am, I don't have a one to one
16  conversation with Jeffrey Waldrop.
17     Q.  In what context did he talk to you about
18  the use of force?
19     A.  Training classes.
20     Q.  And when was that training class?
21     A.  We have training classes off and on.  I
22  can't tell you when the last one was or when the
23  first one was or when the next one is going to be.
24     Q.  So, earlier you mentioned that you have
25  worked at roadblocks before, correct?

Page 40

Brad Sullivan

1
2     A.  Yes, ma'am.
3     Q.  I just want to spend a little bit more
4  time talking about it.
5     A.  Okay.
6     Q.  Have you ever heard of the term "safety
7  checkpoint"?
8     A.  Yes, ma'am.
9     Q.  What's your understanding of what that
10  term means?
11     A.  Safety checkpoint is a safety checkpoint
12  to check safety of people driving vehicles and the
13  vehicle roadblock is blocking the roadway.
14  They're two different things.  Are we going to
15  talk about roadblock or safety checkpoints?
16     Q.  I'm asking about safety checkpoints.
17     A.  Okay.
18     Q.  And what's your understanding of
19  roadblocks?
20     A.  Roadblocks?  My understanding of a
21  roadblock is shutting the road down completely, no
22  through traffic, shutting down.  Roadblock, the
23  road is blocked with barricades.
24     Q.  So, for a roadblock will you be checking
25  the identification of drivers that come through

Page 41

Brad Sullivan

1
2  that location?
3     A.  No, ma'am.
4     Q.  What's your understanding the words
5  sobriety checkpoint?
6     A.  Sobriety checkpoint...  I've never done
7  a sobriety checkpoint.
8     Q.  Based on your understanding as a deputy
9  in the Sheriff's Department, do you understand
10  sobriety checkpoints to be different than safety
11  checkpoints?
12     A.  Ma'am, I couldn't answer that.  I set up
13  safety checkpoints.  I'm involved with safety
14  checkpoints, but not sobriety checkpoints.
15     Q.  Have you ever heard of the term general
16  roadblocks?
17     A.  No, ma'am.
18     Q.  What about roving checkpoints?
19     A.  Roving checkpoints?
20     Q.  Uh-huh.  (Affirmative response.)
21        No, ma'am.  I'm not familiar with that
22  term.
23        (Exhibit 3 marked for identification.)
24     Q.  (By Ms. Chan)  The court reporter has
25  just handed you Exhibit 3.  Do you recognize this

Page 46

Brad Sullivan

1
2     A.  Until we talked about the one earlier
3  that I let go, yes, ma'am.
4     Q.  In the context of a roadblock, do you
5  always ask -- strike that.
6        In the context of a roadblock, do you
7  always arrest an individual with an outstanding
8  Madison County Sheriff's Department?
9     A.  On a roadblock, I'm shutting down a road
10 and not letting any traffic through.  So, I'm
11 usually not checking anybody that's coming
12 through.
13    Q.  When I refer to roadblocks, I am talking
14 in the context of also safety checkpoint so, I
15 apologize for the confusion just now.  I will try
16 to refer to them as just safety checkpoints from
17 now on.
18    A.  Okay.
19    Q.  How often do you work at a safety
20 checkpoint?
21    A.  I hadn't in quite a while, maybe a few
22 months ago.  I'm also a DUI officer.
23    Q.  How do you find out that you are working
24 a safety checkpoint?
25    A.  They're noticed at the justice court,

Page 47

Brad Sullivan

1
2  but I find out if I call the person that notices
3  on them, if they've got one, I go assist with it.
4     Q.  By notices by the justice court, what
5  are you referring to?
6     A.  Notices on the door of the justice court
7  might have a safety checkpoint.
8     Q.  Do you ever post those notices?
9     A.  I used to in the past, yes.
10    Q.  Do you recall what language you use when
11 you post a safety checkpoint notice?
12    A.  No, ma'am, it's already on the computer.
13    Q.  Is there a form template you use when
14 you're posting safety checkpoint notices?
15    A.  Yes, ma'am.
16       (Exhibit 4 marked for identification.)
17    Q.  (By Ms. Chan)  I apologize for the
18 quality of the document it's hard to read.  Let me
19 know when you're done.
20    A.  Okay.
21    Q.  Do you see on top of this notice it
22 says, "the purpose of the checkpoint will be to
23 check for driver's license, warrants and whatever
24 else we encounter."
25    A.  Yes, ma'am.

Page 48

Brad Sullivan

1
2     Q.  Is that the same language you use in
3  your notices?
4     A.  Ma'am, I've seen several different types
5  of notices where they have changed over the
6  different timeframes.
7     Q.  Do you agree with the statement that the
8  purpose of checkpoints is to check for driver's
9  license, warrants and whatever else we encounter?
10    A.  Not necessarily, no.
11    Q.  Why do you disagree?
12    A.  If you want to lay everything out you
13 can say seatbelts, valid driver's license, child
14 safety restraints, drinking and impaired driving.
15    Q.  So, you think this statement is not
16 comprehensive enough?
17    A.  It says whatever else we encounter so, I
18 think it covers about everything.
19    Q.  Is a purpose of a checkpoint to look for
20 warrants, outstanding warrants?
21    A.  That's not the purpose, no, ma'am.
22    Q.  Is that one of the purposes?
23    A.  If up come up to me and you have a
24 warrant you would be arrested, but that's not the
25 purpose for setting them up.  We're setting them

Page 49

Brad Sullivan

1
2  up as a safety checkpoint.
3     Q.  Have you ever posted notices with this
4  language on them?
5     A.  Ma'am, I couldn't tell you.
6     Q.  How far in advance would you post safety
7  checkpoint notices?
8     A.  Day of.
9     Q.  Do you ever post them further in
10 advance?
11    A.  I don't post them any more, but yes, I
12 have in the past.
13    Q.  When you used to post safety checkpoint
14 notices, would you point them a few hours in
15 advance?
16    A.  About a day in advance, a few hours in
17 advance, about a day in advance.
18    Q.  Did you post them on the justice court
19 door?
20    A.  Yes, ma'am.
21    Q.  Do you post them anywhere else?
22    A.  No, ma'am.
23    Q.  Do you keep a copy of the notices that
24 you posted?
25    A.  They're turned in.

Brad Sullivan
withdraw your handgun?
A. I stated I holstered my handgun after that. I just stated it earlier.
Q. I'm sorry, I had trouble hearing you so I apologize if I'm repeating. It then says in this first paragraph that, "Sheriff Brad stated -- made this following statement. Do you see that the complainants here allege that you made a racial slur against them?
A. Yes, ma'am, I see where that's wrote there.
Q. Do you recall ever making a racial slur --
A. I did not.
Q. Have you ever made a racial slur in connection with your Madison County Sheriff's Department work duties?
A. No.
Q. Have you ever made racial slur while you were on duty?
A. No.
Q. Have you ever heard anyone else in the Madison County Sheriff's Department make a racial slur?

Brad Sullivan
A. No, ma'am.
Q. On the second numbered paragraph of page one it says that you made disparaging remarks to Darryl Dozier. Do you recall what those remarks were that he allege were disparaging?
A. I don't know that I made any remarks. He did.
Q. Can you turn to the second page on top of the page, the last sentence on the top paragraph states that or alleges that Sheriff Brad Sullivan plans to force Darryl Dozier to have additional charges filed against them; is that correct?
A. No, ma'am, that's not correct.
Q. What does the sentence state?
A. It says that I was going to force charges to be on Darryl Dozier. How could I force charges?
Q. Do you recall having a conversation with Mr. Dozier about his charges?
A. The charges that I charged him with, I probably advised him what he was charged with.
Q. Do you recall what you spoke to him about?

Brad Sullivan
A. Whatever his charges were.
Q. Do you recall what charges you made against Mr. Dozier?
A. No, ma'am.
Q. Do you recall whether you added any charges after the initial ones?
A. I didn't.
Q. Who would have the authority to add charges?
A. Somebody comes and signs an affidavit on him at justice court, charges will be added.
Q. In this case who would that person be?
A. I guess the original caller, 911 call of disturbance.
Q. The rest of the page alleges that Mr. Dozier paid a bond and was held for four hours against his will; is that correct?
A. Ma'am, I don't know.
Q. On paragraph four, four sentences down it states that the Deputy and the justice court clerks withheld Darryl Dozier for another four hours against his will, correct?
A. Ma'am, I don't know. I know what that states, but I can't tell you that that was what --

Brad Sullivan
Q. I'm asking you what that states?
A. Yes, ma'am, that's what it states.
Q. Okay. Were you involved in the justice court proceedings against Mr. Dozier?
A. For court case, yes.
Q. Can you describe your involvement?
A. Testifying at the trial.
Q. Do you recall whether Mr. Dozier was found guilty of his charges?
A. He was.
Q. Do you recall whether Mr. Dozier paid his bond?
A. No, ma'am, he was sentenced that day.
Q. Do you recall whether you gave Mr. Dozier his Miranda warnings whenever you arrested him?
A. No, ma'am, I don't recall.
Q. To your knowledge, was there a investigation of Mr. Dozier's complaint?
A. No, ma'am, I'm not aware.
Q. I believe you mentioned earlier that Chief Williams mentioned this complaint to you, correct?
A. I believe so, yes, ma'am.

Page 90

1   Brad Sullivan
2       Q.  Can you describe for me the conversation
3   you had with Chief Williams?
4       A.  No, ma'am, I don't recall.
5       Q.  Were you disciplined in any way in
6   connection with this complaint?
7       A.  No, ma'am.
8       Q.  Can you please just give us -- let's
9   take a five minute break and then we'll --
10      (Off the record.)
11      Q.  (By Ms. Chan)  So, I'm just basically
12  wrapping up.  I believe you mentioned that you
13  were hired in July 2010 so, you would have worked
14  under Sheriff Trowbridge, correct?
15      A.  Yes, ma'am.
16      Q.  Based on your experience working under
17  both Sheriff Trowbridge and Sheriff Tucker, have
18  you noticed a difference in their approach?
19      A.  No, ma'am.
20      Q.  Any difference in culture?
21      A.  No, ma'am.
22      Q.  I don't have any further questions.
23  Thank you for your time.
24      MR. GRAVES:  No questions.  Read and
25  sign.

Page 91

1   Brad Sullivan
2   (Off the record at 5:51 p.m.)

Page 92

1       Brad Sullivan
2       CERTIFICATE OF DEPONENT
    DEPONENT: Brad Sullivan
3   DATE:  November 28, 2017
    CASE STYLE:  Brown, et a vs. Madison County,
4   Mississippi, et al
    ORIGINAL TO:  Ms. Chan, Esq.
5       I, the above-named deponent in the
    deposition taken in the herein styled and numbered
6   cause, certify that I have examined the deposition
    taken on the date above as to the correctness
7   thereof, and that after reading said pages, I find
    them to contain a full and true transcript of the
8   testimony as given by me.
        Subject to those corrections listed
9   below, if any, I find the transcript to be the
    correct testimony I gave at the aforestated time
10  and place.
11  Page   Line        Comment
    ____  ____  _____
12  ____  ____  _____
    ____  ____  _____
13  ____  ____  _____
    ____  ____  _____
14  ____  ____  _____
    ____  ____  _____
15  ____  ____  _____
    ____  ____  _____
16  ____  ____  _____
    ____  ____  _____
17
    This the ____ day of _____, 2017.
18  _____
        BRAD SULLIVAN
19  State of Mississippi
    County of _____
20
    Subscribed and sworn to before me, this the
21  _____ day of _____, 2017.
    My Commission Expires:
22  _____
23
24  _____
        Notary Public
25

Page 93

1       Brad Sullivan
2       CERTIFICATE OF COURT REPORTER
3       I, Robin G. Burwell, Court Reporter and
4   Notary Public, in and for the State of
5   Mississippi, hereby certify that the foregoing
6   contains a true and correct transcript of the
7   testimony of Brad Sullivan, as taken by me in the
8   aforementioned matter at the time and place
9   heretofore stated, as taken by stenotype and later
10  reduced to typewritten form under my supervision
11  by means of computer-aided transcription.
12      I further certify that under the
13  authority vested in me by the State of Mississippi
14  that the witness was placed under oath by me to
15  truthfully answer all questions in the matter.
16      I further certify that I am not in the
17  employ of or related to any counsel or party in
18  this matter and have no interest, monetary or
19  otherwise, in the final outcome of this matter.
20      Witness my signature and seal this the
21  6th day of December, 2017.
22
23      _____
24          Robin G. Burwell, CSR
            CSR #1651
    My Commission Expires:
25  April 6, 2021

# EXHIBIT 22

1                      RYLON THOMPSON
2            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                      NORTHERN DIVISION
4   LATOYA BROWN; LAWRENCE
    BLACKMON; HERBERT ANTHONY
5   GREEN; KHADAFY MANNING;
    QUINNETTA MANNING; MARVIN
6   MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; and
7   BETTY JEAN WILLIAMS TUCKER,
    individually and on behalf of a class
8   of all others similarly situated        PLAINTIFFS
9   VERSUS          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
10  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, in his
11  official capacity; and MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1
12  through #6, in their individual
    capacities                              DEFENDANTS
13
14  ****************************************************
                  DEPOSITION OF RYLON THOMPSON
15  ****************************************************
16
                  APPEARANCES NOTED HEREIN
17
18            TAKEN AT INSTANCE OF:  PLAINTIFFS
                  DATE:  OCTOBER 24, 2017
19            PLACE:  HILTON GARDEN INN-JACKSON
                  235 WEST CAPITOL STREET
20                JACKSON, MISSISSIPPI
                  TIME:  8:56 A.M.
21
    REPORTED BY:  CONNIE CHASTAIN, RMR
22                CSR No. 1025
23
24
25  JOB NO:  132676

Page 18

RYLON THOMPSON

Q. Okay. Do you recall any specific portions of the Constitution that were highlighted for you?

A. No.

Q. Did you have training on any specific amendments to the Constitution?

A. I don't remember any specific amendment that was highlighted as brought out, if that's what you're asking.

Q. Okay. So then you worked, I think you said, September 2010, was it, or do I have the year wrong? When did you go to Pearl?

A. I went to Pearl in 2009.

Q. Did you receive any additional training when you went to Pearl?

A. Yes.

Q. What did you receive?

A. Various classes as far as -- for instance, field sobriety training. I received interview classes, court testimony, various law enforcement training.

Q. Okay.

A. Continued education classes.

Q. In any training either in the original police academy program that you attended in 2008 or

Page 19

RYLON THOMPSON

late in 2009 on setting up roadblocks?

A. Did I --

Q. Was there any training --

A. In Pearl?

Q. Well, you know what, I'm not being -- I should break it apart. Let's go back to 2008. Any training on setting up roadblocks?

A. Not that I recall.

MR. ROSS: Are you talking about at the police academy?

MR. YOUNGWOOD: Yes, the police academy.

A. Not that I recall.

MR. YOUNGWOOD:

Q. And then how about in connection with Pearl?

A. Yes.

Q. What do you recall about that?

A. As part of the standardized field sobriety testing program it was briefly covered. Different aspects that you might encounter on a safety checkpoint.

Q. Okay. And let's address terminology because we've seen in the various documents that have been shared with us by the sheriff's office,

Page 20

RYLON THOMPSON

different words. We've seen roadblock, you just used what, security checkpoint?

A. Safety checkpoint.

Q. Safety checkpoint, okay. Are there other words that are used for that?

MR. ROSS: Can we take one second?

MR. YOUNGWOOD: Of course.

(Off the record.)

MR. YOUNGWOOD:

Q. What is a safety checkpoint? I'm sorry, let me -- I'm now asking you as that term's used in your current employment.

A. Okay. A safety checkpoint would be an event that is conducted by the sheriff's department where basically we position ourselves on a road and check the driver's license and insurance and various things of motorists as they come through.

Q. And you're doing that to assist in general crime prevention?

A. Yes.

Q. Okay. That's the primary purpose of it; correct?

MR. ROSS: Object to the form.

MR. YOUNGWOOD:

Page 21

RYLON THOMPSON

Q. You can answer.

A. Yes.

Q. Okay. Are there any other words you use in your current employment for safety checkpoint?

A. That I personally use?

Q. Well, let's start with that.

A. No.

Q. Okay. That you've heard others in the department use?

A. Yes.

Q. What words?

A. Roadblock.

Q. Okay. Any others?

A. Not that I recall.

Q. Okay. So I'll try to use either safety checkpoint or roadblock as we have our conversation today. It seems to me that, in your mind, they're the same thing?

A. Not exactly.

Q. What's the difference?

A. When I --

MR. ROSS: Let me interject. You're talking about the present time?

MR. YOUNGWOOD: Yeah, I'm talking about the

Page 22

RYLON THOMPSON

1  present.  I'll move back to the training, but
2  let's -- dealing with today and the Madison County
3  Sheriff's Office.
4      A.  When I think of the word roadblock, I think
5  as a literal blockage of the road, not letting
6  anyone pass.  For example, it could be obstructions
7  in the road ahead or if you're blocking the road and
8  only letting certain individuals come through, like
9  if you're -- have an escaped convict, that's what in
10  my mind I think of as that.
11  MR. YOUNGWOOD:
12      Q.  Okay.  So you view safety checkpoints as
13  something distinct and we'll maybe -- well, tell me
14  what you view to be a safety checkpoint.  What is
15  that in your job today?
16      A.  As I just stated earlier, it's just an
17  event that is conducted by the sheriff's department
18  where you position your vehicles on a roadway and
19  check for driver's license, insurance and other
20  various things as vehicles are coming through --
21  coming down that road.
22      Q.  What are the other various things?
23      A.  For example, someone is wearing their
24  seatbelt or not, there's a child that's not properly

---

Page 23

RYLON THOMPSON

1  restrained in a car seat, if the tag is expired.
2  Those are some general items that come to mind.
3      Q.  Okay.  You said that you -- in your mind a
4  roadblock is something distinct and you outlined
5  that for us, but you did say that you've heard other
6  people in the department use the word roadblock.
7  When they use it do you often understand them to be
8  referring to what you call a safety checkpoint?
9      A.  Yes.
10      Q.  Okay.  There are also sobriety checkpoints
11  if I'm using that term correctly?
12      A.  Are you asking --
13      Q.  I'm asking if that's a term that's used in
14  your employment today?
15      A.  At our sheriff's department?
16      Q.  Yes.
17      A.  I've never heard anyone at our sheriff's
18  department say sobriety checkpoint.
19      Q.  Okay.  What do you call something where a
20  checkpoint of some point has been set up where
21  you're going to run sobriety tests?  Is that
22  different than a safety checkpoint?
23      MR. ROSS:  Do you understand the question?
24      THE WITNESS:  No.

---

Page 24

RYLON THOMPSON

1      (Exhibit 3 was marked.)
2  MR. YOUNGWOOD:
3      Q.  I'm going to hand you, Deputy Thompson,
4  what's been marked as Thompson Exhibit 3.  It's a
5  five-page document with the title Policy and
6  Procedure, Sobriety Checkpoint Guidelines.
7          Take a look at that and tell me if you've
8  seen that document before.  And I'll represent to
9  you that this comes from the Madison County
10  Sheriff's Department.
11      A.  I believe I have seen it.
12      Q.  You have, that's a yes?
13      A.  Yes.
14      Q.  Okay.  So what I was using -- we'll
15  probably look at this document in some more detail
16  later, but see sobriety checkpoint on the top?
17      A.  Yes.
18      Q.  Does that refresh your recollection if
19  that's a term used in the department?
20      A.  Yes.
21      Q.  What is a sobriety checkpoint?  Is that in
22  some way distinct from either a roadblock or a
23  safety checkpoint?
24      A.  It's basically the same thing.

---

Page 25

RYLON THOMPSON

1      Q.  Okay.  We'll come back to that.  Let me
2  move now back to your time at Pearl and even before
3  that.  Let's start at the police academy.  Did you
4  receive any training at the police academy on what
5  you call today safety checkpoints?
6      A.  I don't recall.
7      Q.  Okay.  And how about a part of your
8  training for Pearl in 2009?
9      A.  There was -- as I said earlier, there was a
10  standardized field sobriety training that I went
11  through where safety checkpoints was briefly
12  covered.
13      Q.  Okay.  How long were you -- what was your
14  position when you were with Pearl?
15      A.  Patrolman.
16      Q.  Patrolman.  And for how long did you hold
17  that position?
18      A.  Approximately two years.
19      Q.  Okay.  When did you leave?
20      A.  In September of 2011.
21      Q.  And why did you leave?
22      A.  I resigned at the conclusion of an
23  investigation.
24      Q.  What was that investigation?

Page 26

RYLON THOMPSON

1
2    A.  It stemmed from an incident where I was
3  attacked by a dog and ultimately ending up shooting
4  the dog.
5    Q.  Okay.  Were you asked to leave or -- you
6  say you resigned.  Can you give me a little more
7  detail on why you resigned?
8    A.  I was told that if I did not resign that
9  the department would ask the board of aldermen to
10  terminate my employment.
11    Q.  Can you give me the details that led to the
12  death of the dog?
13    A.  I was at a house one night attempting to
14  make contact with a female who her daughter
15  reportedly said that she was trying to either stab
16  her or cut her with a knife.
17        I arrived there with another officer and
18  was trying to make contact with this lady when her
19  dog, who was -- which was not on a leash, ran
20  outside and was attempting to bite me.
21    Q.  Okay.  And so what did you do?
22    A.  I shot the dog.
23    Q.  Is that the first time you discharged your
24  firearm in the line of duty?
25    A.  No.

Page 27

RYLON THOMPSON

1
2    Q.  What prior times have you used your gun?
3    A.  We are required to qualify as part of our
4  training.
5    Q.  So a target practice type of thing?
6    A.  Yes.
7    Q.  Okay.  And so I didn't ask my question
8  precisely enough.  Other than target practice and
9  training, had you ever discharged your weapon?
10    A.  No.
11    Q.  Okay.  Have you since?
12    A.  Yes.
13    Q.  Okay.  We'll maybe get to that in a bit.
14  And so the dog died, I assume?
15    A.  That's correct.
16    Q.  And so you said an investigation, what did
17  the investigation consist of?
18    A.  I don't know.
19    Q.  Okay.  And were you interviewed or
20  something from it?
21    A.  Yes, sir.
22    Q.  Not deposed?
23    A.  No.
24    Q.  And after some amount of time you were
25  told, I'm going to -- be your words, that if you

Page 28

RYLON THOMPSON

1
2  didn't leave you would be terminated, something like
3  that?
4    A.  They would request the board of aldermen to
5  terminate my employment.
6    Q.  So you decided to resign?
7    A.  That's correct.
8    Q.  Do you recall the name of the person who
9  owned the dog?
10    A.  No.
11    Q.  Do you recall the race of the person who
12  owned the dog?
13    A.  Yes.
14    Q.  What was that?
15    A.  It was a white female.
16    Q.  Okay.  Where did you go after Pearl?
17    A.  For a short period of time I worked with
18  Loomis and then --
19    Q.  I'm sorry, what is Loomis?
20    A.  A security money exchange company.
21    Q.  Okay.  How long, a couple months or --
22    A.  A few months until I was later hired with
23  the Hinds County Sheriff's Department.
24    Q.  Okay.  And what was your position with
25  Loomis?

Page 29

RYLON THOMPSON

1
2    A.  I don't remember what exactly I was called,
3  but basically I was a carrier.
4    Q.  A carrier of what?
5    A.  Currency.
6    Q.  I see.  Okay.  And then you got a job with
7  Hinds County Sheriff's Department, was that 2010
8  perhaps by then, or no?  No probably later, it must
9  be 2011 or '12.
10    A.  2012, I believe.
11    Q.  Okay.
12    A.  Early 2012.
13    Q.  And what position did you assume with Hinds
14  County?
15    A.  Deputy sheriff.
16    Q.  Did you receive any further training when
17  you took your position at Hinds County?
18    A.  I did.
19    Q.  What training?
20    A.  Various different courses that I attended.
21  One would be a drug recognition expert course.
22  Other courses pertained to driving, search and
23  seizure, other various courses.
24    Q.  Any further training on what you call today
25  safety checkpoints?

Page 30

RYLON THOMPSON

1
2    A.  Yes.  I'm a member of an organization
3  called STORM, it's Sobriety Trained Officers
4  Representing Mississippi and we have a spring and a
5  fall conference.  I've tried to consistently attend
6  those conferences and at which point safety
7  checkpoints are discussed as part of the training
8  and, also, through the various continued education
9  classes involving DUI enforcement.
10    Q.  Any training on the constitutional rights
11  of citizens?
12    A.  While I was at Hinds?
13    Q.  Yes.
14    A.  I don't recall any specific.
15    Q.  Okay.  How long were you at Hinds?
16    A.  Approximately two years.
17    Q.  Okay.  When did you leave Hinds?
18    A.  I believe it was in March or April of 2014,
19  somewhere around that time period.
20    Q.  And what was the reason that you left?
21    A.  I obtained a position at the Madison County
22  Sheriff's Department.  Also, around that same time
23  period, I was involved in an incident in Edwards,
24  Mississippi as an employee of the Hinds County
25  Sheriff's Department.

Page 31

RYLON THOMPSON

1
2    Q.  Was that an incident with Derrick Fleming?
3    A.  It was.
4    Q.  Tell me about that incident.
5    A.  I don't remember the exact date, but one
6  evening while I was working at the Hinds County
7  Sheriff's Department I heard another deputy initiate
8  a traffic stop in the City of Edwards.  Shortly
9  thereafter he called out on the radio in a seemingly
10  frantic manner and requested assistance from other
11  deputies citing that the individual that he had
12  stopped was trying to eat drugs and saw white
13  powder and he requested other deputies to respond to
14  the scene to offer assistance.
15    Q.  Okay.  And you responded to that call?
16    A.  I did.
17    Q.  What happened -- and did you arrive at the
18  scene?
19    A.  I did.
20    Q.  What happened when you arrived?
21    A.  When I arrived at the scene I saw the
22  individual, Mr. Fleming, was handcuffed and appeared
23  to have a mouthful of some substance.  He was
24  identified as the suspect by the deputy that stopped
25  him and then I was told that he still had the drugs

Page 32

RYLON THOMPSON

1
2  in his mouth.
3    Q.  And then what happened?
4    A.  I attempted to retrieve the drugs from his
5  mouth and the individual -- during the course of me
6  trying to do that, the individual continued to try
7  to swallow whatever was in his mouth and appeared to
8  have some problem getting it down his throat and was
9  making choking motions, choking sounds.
10    And I continued trying to retrieve the
11  substance from his mouth and to clear his airway, at
12  which point I had -- the defendant attempted to bite
13  my fingers as I was trying to get the substance out
14  of his mouth.
15    It was at night so I carry a flashlight to
16  see with at night and I had the flashlight in my
17  hand as the individual tried to bite my fingers.  I
18  moved the flashlight into his mouth, the back side
19  of the flashlight, to try to keep him from biting my
20  fingers and he violently was -- began shaking his
21  head and we ended up falling on the ground.
22    He was kicking and continued to shake his
23  head and not let me retrieve the substance from his
24  mouth.  Another deputy used a Taser as a drive stun
25  technique in the side of the neck of the individual.

Page 33

RYLON THOMPSON

1
2    As this was going on, the deputy that had
3  originally stopped the individual said that he was
4  on the phone with his sergeant and his sergeant said
5  to just stop dealing with the individual and
6  allow -- and wait for the ambulance to come take the
7  individual to the hospital.
8    He was bleeding from his nose whenever I
9  arrived and the ambulance had already been called
10  because it was believed that he had ingested drugs.
11    Q.  Okay.  And that was the conclusion of your
12  involvement in the incident?
13    A.  That's correct.
14    Q.  Okay.  Do you recall the race of
15  Mr. Fleming?
16    A.  Yes.
17    Q.  What was that?
18    A.  He was a black man.
19    Q.  Do you recall his age approximately?
20    A.  I don't.
21    Q.  I'm sorry, while she's doing that, you used
22  one phrase I didn't either hear correctly or perhaps
23  I did hear correctly and I don't know it, it ended
24  with the word technique, something technique?  You
25  don't recall?

Page 34

RYLON THOMPSON

1
2     MR. YOUNGWOOD:  Could you see what he said?
3          (Wherein the reporter read back.)
4   MR. YOUNGWOOD:
5     Q.  Were those the words you used?
6     A.  I don't recall saying technique, but it was
7   a drive stun with a Taser.
8     Q.  Can you say that again?
9     A.  Drive stun, D-R-I-V-E.
10    Q.  Drive stun, I see.  What does that mean?
11    A.  It's essentially when the Taser cartridge
12  that shoots prongs out is removed from the Taser and
13  the end of the Taser itself where the electricity is
14  conducted is administered to the individual.
15    Q.  And where on his body was that?
16    A.  On the side of his neck.
17    Q.  You were not the one operating the Taser?
18    A.  No.
19    Q.  Who was?
20    A.  Jason Clark.
21    Q.  Officer Jason Clark.
22         (Exhibit 4 was marked.)
23  MR. YOUNGWOOD:
24    Q.  Sir, I'm going to hand you what's been
25  marked as Thompson Exhibit 4, it's a copy of what's

Page 35

RYLON THOMPSON

1
2   entitled Modified Second Amended Complaint in the
3   case of Fleming versus Hinds County and a number of
4   individuals, including you.
5          Have you seen that complaint before?
6     A.  Yes.
7     Q.  Do you know how this matter resolved?
8     A.  Yes.
9     Q.  How did it resolve?
10    A.  There was a settlement.
11    Q.  Okay.  And the settlement came just this
12  year; is that correct?
13    A.  That's correct.
14    Q.  Do you know what the terms of that
15  settlement were?
16    A.  No, I don't.
17    Q.  Did you personally pay any money as part of
18  that settlement?
19    A.  No.
20    Q.  Am I correct that the settlement came after
21  the Federal Court for the Southern District of
22  Mississippi denied defendant's motion to dismiss?
23         MR. ROSS:  Object to the form.  If you
24  know, you can answer.
25  MR. YOUNGWOOD:

Page 36

RYLON THOMPSON

1
2     Q.  If you know.  All of these are if you know.
3     A.  I don't -- I don't know.
4     Q.  Okay.  If you could turn to Page 3 of the
5   document, please, sir.  Paragraph 15 reads, Officers
6   Richard, Rylon and Clark and Does 1 through 7
7   proceeded to choke, beat, discharge their Tasers
8   onto the mouth of the plaintiff and fractured the
9   plaintiff's foot.
10         Do you see that?
11    A.  I see that.
12    Q.  I think you've testified that it was
13  Officer Clark who used the Taser?
14    A.  That's correct.
15    Q.  Did anyone else use a Taser?
16    A.  No.
17    Q.  You did not use a Taser?
18    A.  No.
19    Q.  There's a reference to choking.  Did you in
20  any way choke the plaintiff?
21    A.  No.
22    Q.  It says beat.  Did you beat the plaintiff?
23    A.  No.
24    Q.  There's a reference to the plaintiff's foot
25  being fractured.  Do you believe that to be correct?

Page 37

RYLON THOMPSON

1
2     A.  No.
3     Q.  Did any -- did you see any injuries on
4   Mr. Fleming at the conclusion of the incident?
5     A.  The individual was bleeding from his nose
6   before I arrived.  That was the extent of the
7   injuries that I saw.  I can't say why he was
8   bleeding from his nose.
9     Q.  Did you give a deposition or other
10  testimony in connection with this matter?
11    A.  No.
12    Q.  Did this incident have to do with your
13  departure from Hinds County in 2014?
14    A.  I was seeking to obtain a position with the
15  Madison County Sheriff's Department prior to this
16  incident occurring and it just kind of fell along
17  the same timeline and I was hired by the Madison
18  County Sheriff's Department.
19    Q.  And when were you hired by Madison County?
20    A.  In April of 2014.
21    Q.  Okay.  Why did you want to get a job at
22  Madison County?
23    A.  Because I was tired of working for Hinds
24  County.
25    Q.  Why?

Page 38

RYLON THOMPSON

1
2     A.  I lived in Madison County and I've
3  always -- when I worked in Pearl, I lived in Pearl.
4  I've always enjoyed serving the community which I
5  live and that was a major factor in that.
6     Q.  Okay.  You said the word tired.  What were
7  you tired of at Hinds?
8     A.  Every day I would have to make a pretty
9  significant drive.
10     Q.  I see.
11     A.  And that was one of the factors.
12     Q.  Other factors, other than what you've just
13  listed?
14     A.  I believed that from talking to other
15  individuals in law enforcement that Madison County
16  would have been a better place for me to work.  The
17  pay was more and the medical benefits were
18  significantly better.
19     Q.  So what position did you assume in April
20  2014 with Madison County?
21     A.  Deputy sheriff.
22     Q.  Deputy sheriff.  Same position you hold
23  today?
24     A.  That's correct.
25     Q.  Okay.  Tell me about the employment process

Page 39

RYLON THOMPSON

1
2  that you went through to be hired by Madison County.
3  What was the process?  How did you apply?  How did
4  they come to hire you?
5     A.  My resume was presented to the chief.  As
6  far as I know, my resume was presented to the chief.
7     MR. ROSS:  Testify what you know.
8     THE WITNESS:  Okay.
9     A.  I was told that my resume was presented to
10  the chief and I had several individuals make contact
11  with the chief and the sheriff recommending that
12  they hire me.
13  MR. YOUNGWOOD:
14     Q.  When you use the word chief, who is the
15  chief?
16     A.  Chief Deputy Jeremy Williams.
17     Q.  I see.  And by sheriff, you mean Randy
18  Tucker?
19     A.  That's correct.
20     Q.  Who is sitting at this table today?
21     A.  That's correct.
22     Q.  Did anyone tell you why Mr. Tucker is here
23  today?  I'm sorry, Sheriff Tucker is here today?
24     MR. ROSS:  I object, that's totally
25  irrelevant to this lawsuit.  You know we're entitled

Page 40

RYLON THOMPSON

1
2  to a corporate representative.
3     MR. GRAVES:  He's a defendant in this
4  lawsuit.
5     MR. YOUNGWOOD:  I wasn't challenging his
6  right to be here.  I was asking if the witness knew
7  why he was here.
8     MR. ROSS:  And I'm instructing the witness
9  not to answer.  That's totally irrelevant.  Move on,
10  please.
11  MR. YOUNGWOOD:
12     Q.  You're going to follow your attorney's
13  instruction not to answer that question?
14     A.  That's correct.
15     Q.  Okay.  And what happened after you
16  submitted your resume?
17     A.  I was contacted by Chief Williams and asked
18  to come in for an interview.
19     Q.  Okay.  Which I assume you did?
20     A.  I did.
21     Q.  Okay.  Who did you interview with?
22     A.  Chief Williams and the sheriff.
23     Q.  Okay.  And were there interviews that
24  followed that or were those the only interviews?
25     A.  Yes, I had the second interview.

Page 41

RYLON THOMPSON

1
2     Q.  With whom?
3     A.  The chief and the sheriff.
4     Q.  And following that, you were employed?
5     A.  Yes.
6     Q.  Or offered employment?
7     A.  Yes.
8     Q.  At any of those interviews did any of the
9  three incidents we've discussed today, either the
10  department store, the Pearl incident involving the
11  dog or the incident involving Mr. Fleming come up?
12     A.  Yes.
13     Q.  Which of those three subjects came up?
14     A.  I recall speaking to them about the Fleming
15  and about the dog.  I don't recall having a
16  conversation with them about the event that happened
17  with my employment at Belk.
18     Q.  Okay.  Do you believe you made them aware
19  of the event with the employment at the department
20  store?
21     A.  I don't recall.
22     Q.  Okay.  What questions, if you recall, were
23  asked of you and by whom regarding the later two
24  incidents?
25     A.  I don't remember any specific questions.

Page 42

RYLON THOMPSON

2  Q.  Okay.  Did they ask you if there were other
3  incidents in your past?
4     A.  I don't remember.
5        MR. ROSS:  I object to the form.  Incidents
6  is broad and vague.
7  MR. YOUNGWOOD:
8     Q.  Okay.  Sir, what is your formal education?
9     A.  Some college.  I don't recall how many
10 exact credits, but no degree.
11    Q.  Where did you go to college?
12    A.  I have credited hours through Hinds
13 Community College and also Holmes Community College.
14    Q.  And you are originally from Mississippi?
15    A.  That's correct.
16    Q.  So you went to high school in Mississippi?
17    A.  That's correct.
18    Q.  When you joined Madison County, did you
19 receive any training?
20    A.  Yes.
21    Q.  What training did you receive when you
22 joined Madison County?
23    A.  Various classes related to DUI enforcement.
24 I'm trying to recall any other -- various general
25 law enforcement classes.

Page 43

RYLON THOMPSON

2     Q.  Anything regarding what you've termed
3  safety checkpoints?
4     A.  Yes.
5     Q.  What?  What training did you receive about
6  safety checkpoints?
7     A.  Those were included in the DUI training
8  that I continued to receive.  Also, as part of my
9  membership with STORM, going and attending the DUI
10 conferences and such.
11    Q.  Anything regarding the constitutional
12 rights of the individuals who reside in or pass
13 through Madison County?
14    A.  Not that I recall.
15    Q.  Okay.  Do you know what the fourth
16 amendment is to the United States Constitution?
17    A.  The right against unreasonable search and
18 seizure.
19    Q.  What does that mean, based on your
20 understanding?
21       MR. ROSS:  I object to the form.  You can
22 answer to the best of your ability.
23    A.  That a person -- that an individual has
24 certain rights and in order to obtain, like, a
25 search, say for instance, of their house, you would

Page 44

RYLON THOMPSON

2  need to go through a legal process in order to be
3  able to walk in a person's house.
4  MR. YOUNGWOOD:
5     Q.  Okay.
6     A.  General things like that.
7     Q.  Does a person passing through a safety
8  checkpoint have rights under the fourth amendment
9  based on your understanding?
10    A.  Yes.
11    Q.  What rights does he or she have?
12    A.  The same rights as a vehicle is -- it's my
13 understanding that a vehicle is an extension of the
14 home, so to speak, so I would need either consent to
15 search, probable cause, or a search warrant to
16 search a vehicle, for example.
17    Q.  Do you need consent to stop a vehicle?
18    A.  No.
19    Q.  Do you need probable cause to stop a
20 vehicle?
21    A.  Not if I'm conducting a safety checkpoint.
22    Q.  How about for other reasons?  What if
23 you're not conducting a safety checkpoint, do you
24 need probable cause to stop a vehicle?
25    A.  No.

Page 45

RYLON THOMPSON

2     Q.  14th amendment of the Constitution.  Do you
3  know what that is?
4        MR. ROSS:  Just a minute, I object to the
5  form of that previous question.
6        MR. YOUNGWOOD:  Yes, of course.
7        MR. ROSS:  You can proceed.
8  MR. YOUNGWOOD:
9     Q.  Do you know what the 14th amendment of the
10 United States Constitution is?
11    A.  No.
12    Q.  Let me ask you just a few very quick
13 questions about how kind of do your job and
14 tools you might use.  For your day-to-day work, do
15 you use a vehicle?
16    A.  Yes.
17    Q.  Okay.  And you always have a partner in
18 the vehicle?  How is that done?
19    A.  No, I patrol alone, generally.
20    Q.  Use the same vehicle every day?
21    A.  Yes.
22    Q.  Do you have an in-vehicle laptop?
23    A.  I do.
24    Q.  What do you use that for?
25    A.  For reports, monitoring calls.

# EXHIBIT 23

Toby Trowbridge

1                    Toby Trowbridge
              UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                    NORTHERN DIVISION
3

4     LATOYA BROWN; LAWRENCE BLACKMON;
      HERBERT ANTHONY GREEN; KHADAFY
5     MANNING; QUINNETTA MANNING; MARVIN
      McFIELD; NICHOLAS SINGLETON;
6     STEVEN SMITH; BESSIE THOMAS; AND
      BETTY JEAN WILLIAMS TUCKER,
7     INDIVIDUALLY AND ON BEHALF OF A CLASS
      OF ALL OTHERS SIMILARLY SITUATED         PLAINTIFFS
8

9     v.              CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA

10

      MADISON COUNTY, MISSISSIPPI;
11    SHERIFF RANDALL S. TUCKER, IN HIS
      OFFICIAL CAPACITY; AND MADISON COUNTY
12    SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
      #6, IN THEIR INDIVIDUAL CAPACITIES        DEFENDANTS
13

14
      *****************************************************
15              VIDEOTAPED DEPOSITION OF
             MILTON E. TOBY TROWBRIDGE, JR.
16    *****************************************************

17

18              APPEARANCES NOTED HEREIN

19

20
                DATE:  TUESDAY, FEBRUARY 13, 2018
21               PLACE:  HILTON GARDEN INN
                  235 WEST CAPITOL STREET
22                JACKSON, MISSISSIPPI
                   TIME:  9:07 A.M.
23

24    REPORTED BY:  KELLYE S. SHOWS, BCR, CSR, CSR #1290

25    JOB NO: 137863

Page 10

Toby Trowbridge

1       somebody and vice versa.  And I -- excuse me.  And,
2       of course, I speak to the deputies if I see them at a
3       restaurant or something like that.
4          Q.   Right.  Have you ever been deposed before?
5          A.   Yes, sir.
6          Q.   And how many times?
7          A.   Maybe once or twice.
8          Q.   Do you recall the context or, like, what cases
9       those were in?
10         A.   I do not.
11         Q.   Do you recall when the last deposition --
12         A.   No --
13         Q.   -- you gave was?
14         A.   -- I do not.
15         Q.   Would it have been since leaving the sheriff's
16      department or before then?
17         A.   No.  It would have been before I left.
18         Q.   Would either of these -- would any of these
19      depositions have been in your capacity as sheriff of
20      Madison County?
21         A.   I just can't remember.  I'd tell you if
22      they were or not, you know.
23         Q.   So you're not sure whether they were, you
24      know, about something that happened in the course of
25

Page 11

Toby Trowbridge

1       your -- you know, the performance of your work
2       obligations --
3          A.   Right.
4          Q.   -- versus it being a personal matter, like
5       a car accident or something like that?
6          A.   And it -- you know, I just can't remember.
7       If I could sit here for two hours I might could
8       think about it, but I just have to tell you I got a
9       lot of other things been -- things going on, too,
10      besides when I was sheriff, so I just --
11         Q.   Sure.
12         A.   -- can't tell you.
13         Q.   So I'll go over a few, like, ground rules
14      for the deposition since it's been, you know, a few
15      years since you've gone --
16         A.   Uh-huh.
17         Q.   -- through the process.  So you understand
18      we're being videotaped and also we have a court
19      reporter who is typing the transcript.  Right?
20         A.   Correct.
21         Q.   So for purposes of the transcript it's
22      important to give, you know, audible clear answers
23      rather than responding to a question by, say, shaking
24      your head --
25

Page 12

Toby Trowbridge

1          A.   Right.
2          Q.   -- which is, you know, difficult for the
3       court reporter to deal with.
4              If you don't understand a question that I
5       ask let me know or if I'm speaking too quietly or
6       too quickly or something let me know and, you know,
7       I'll rephrase or clarify it.
8          A.   I will.
9          Q.   And --
10         A.   And likewise because I hadn't done this a
11      lot, thank the Lord, and if I nod my head sometimes
12      tell me say yes or no.
13         Q.   All right.  Will do.  You understand this
14      is sort of as if it was a court proceeding such that
15      you're under oath, et cetera, but we're obviously
16      not in court.  We're in this board room in this hotel.
17         A.   Correct.
18         Q.   Is there any reason why you couldn't give,
19      you know, complete, accurate, and truthful testimony
20      today?
21         A.   I can give you complete and accurate
22      testimony to the best of my remembrance for things
23      that -- I left in 2011.  I started in 2000, so --
24         Q.   Right.
25

Page 13

Toby Trowbridge

1          A.   -- we're looking at close to 18 years in
2       some instances.
3          Q.   Fair enough.
4          A.   Thank you.
5          Q.   And so we'll probably take a break about,
6       you know, maybe -- maybe once an hour.  If you want
7       to break at some other time --
8          A.   Okay.
9          Q.   -- feel free to ask.
10         A.   Thank you.
11         Q.   It shouldn't be a problem.  We -- I guess
12      the only -- the only rule about breaks is that if you
13      could just complete answering a question that's been
14      posed before asking for a break that would be great.
15         A.   That's fair enough.
16         Q.   Do you have any questions about the process?
17         A.   No, sir.
18         Q.   So when did you first join the Madison County
19      Sheriff's Department?
20         A.   In a paid position?
21         Q.   Sure.
22         A.   Okay.  I was sworn in January of 2000.
23         Q.   And so you distinguished between a paid
24      position and some other capacity.  So were you
25

4 (Pages 10 to 13)

Page 74

Toby Trowbridge
1
2          (EXHIBIT 4 MARKED.)
3    BY MR. RETHY:
4        Q.   If you'll just take a look at -- you'll
5    see that this is defendants' responses to
6    interrogatories served by plaintiffs in this case which
7    means that we asked Madison County and Sheriff Tucker
8    some questions and then Sheriff Tucker and counsel
9    submitted responses.
10       A.   Okay.
11       Q.   If you'll go to what is the response to
12   Number 52 which is at the bottom of 14.  So you just
13   read the --
14       A.   Number 52?
15       Q.   Right.  The question and the answer which
16   carries on to the next page.
17       A.   (Reviewed document.)  Okay.
18       Q.   So you see that it says at the end of the
19   answer, "Complaint procedure for the MCSD has changed
20   since Sheriff Tucker became sheriff in order to
21   eliminate the underlying processes previously involved
22   in the receipt and investigation of any complaints by
23   anyone other than Chief Deputy Williams."
24       A.   Okay.
25       Q.   During your tenure were there any

Page 75

Toby Trowbridge
1
2    processes involved in investigations other than them
3    just being received and handled by Chief Deputy
4    Belvedresi?
5        A.   You know, if I received a complaint it
6    went to Chief Belvedresi and I told him to look into
7    it, respond to it, and settle it.
8        Q.   And so beyond just giving the complaints
9    to Chief Belvedresi to handle, you're not aware of
10   there having been any additional processes?
11       A.   You know, I don't recall any.
12       Q.   Did -- did Chief Belvedresi submit to you
13   any kind of written report regarding the resolution
14   of the complaint?
15       A.   Not to my knowledge.
16       Q.   Would he convey that to you orally or did he
17   just handle it by himself?
18       A.   You know, it's been so long ago.  He may have
19   said it's handled or what he did or the correction
20   he took.  And, of course, you know, one might have just
21   taken he handled it and the other one may have taken
22   it to a correction.  I can't tell you exactly which
23   one was what, but I can tell you that Chief Belvedresi
24   was the type of person that looked into a complaint
25   and didn't slide it under a desk or anything.  He looked

Page 76

Toby Trowbridge
1
2    into it.  It wasn't necessary -- if anything was
3    necessary.
4            MR. RETHY:  This will be Exhibit 5.
5            (EXHIBIT 5 MARKED.)
6        A.   (Reviewed document.)
7    BY MR. RETHY:
8        Q.   So is this the document you mentioned
9    earlier that you reviewed yesterday?
10       A.   Right.
11       Q.   Have you ever seen it before yesterday?
12       A.   No.
13       Q.   Do you -- do you know who Joe Butler is?
14       A.   I can only assume that's Joey Butler.
15       Q.   And who would that be?
16       A.   Deputy.
17       Q.   And then you see that it's sent to a long
18   list of recipients that includes Chief Belvedresi?
19       A.   Yes, sir.
20       Q.   You see that this was sent June 4, 2009,
21   which would have been while you were sheriff.
22       A.   Yes, sir.
23       Q.   Would sending this e-mail have violated any
24   policy in place at the time?
25       A.   I'm not -- I'm not sure of written policy

Page 77

Toby Trowbridge
1
2    but it was a, you know, unspoken and -- unspoken
3    policy that I didn't condone stuff like this and I
4    can only imagine -- I don't know -- assume why I
5    didn't get it.
6        Q.   So would you have -- if Chief Belvedresi
7    received this e-mail as it appears from the -- you
8    know, from the recipient's list, would you have
9    expected him to take any kind of action related to
10   this e-mail?
11       A.   Well, Chief -- I hired Chief Belvedresi
12   because I know him to be a good and upstanding right
13   person, and he and I wanted the same thing and that
14   was good law enforcement with no racism, no stuff
15   like that, and I can only believe that Chief
16   Belvedresi did not care to see that.
17       Q.   And if you'll look at the page with Number
18   460.
19       A.   On this -- on this right here?
20       Q.   In this document.
21       A.   460?
22       Q.   Yes.  It's like four pages in.
23       A.   Okay.  (Reviewed document.)  Okay.
24       Q.   And this main paragraph in the middle
25   says, When I call you -- and then there's a variety

20  (Pages 74 to 77)

Page 78

Toby Trowbridge

1  of terms, and it says you call me a racist, would
2  you consider the terms used in this paragraph to be
3  racist terms?
4  A.  Yes.
5  Q.  Did you ever hear anyone use any of these
6  -- any of the listed terms at the sheriff's
7  department while you were sheriff?
8  A.  Yes.
9  Q.  Which terms?
10  A.  Nigger.
11  Q.  And do you recall who used that term?
12  A.  No, I don't.  Just in passing.
13  Q.  And do you recall taking any disciplinary
14  action --
15  A.  No.
16  Q.  -- when that term was used?
17  A.  It was just in passing, not pointed at any
18  one person.
19  Q.  So there was no policy that that violated?
20  A.  You know, I didn't see anything in writing.
21  It wasn't pointed at any person.
22  Q.  So so long as it's not directed to a
23  specific individual it doesn't violate a policy?
24  A.  Well, you --
25

Page 79

Toby Trowbridge

1  MR. ROSS:  Object to the form.  That's not
2  what he said.
3  A.  I mean, you know, a lot of people say a lot
4  of things but they certainly are not pointing it at
5  any one person.  That's kind of like the law.  I can
6  tell you I'm going to do something to you but it's not
7  violating a law and -- you know, I hadn't broken any
8  law or anything.
9  BY MR. RETHY:
10  Q.  If you look at page 467 --
11  A.  Uh-huh.
12  Q.  -- do you see at the bottom of that page
13  it says "Be proud to be White"?
14  A.  Uh-huh.
15  Q.  Do you think that's a racist statement?
16  A.  You know, I just -- I don't get involved
17  in stuff like this.  I don't condone it, so I didn't
18  read it all the way through yesterday and I didn't
19  read it through today.  I just don't get -- I don't
20  like this kind of stuff.  I know Chief Belvedresi
21  doesn't like this kind of stuff.  And, I mean, for me
22  to sit here and decide which way I go with stuff
23  like this, I don't even finish reading this stuff no
24  matter if it's in here or on TV or in a newspaper
25

Page 80

Toby Trowbridge

1  article, I don't waste my time with junk like this.
2  Q.  But do you have a view as to the --
3  A.  No, I don't have a view.
4  Q.  -- statement?
5  A.  I don't -- I don't like it, but I don't
6  -- that's -- I didn't write it and I certainly would
7  never say it to -- to anybody.  I'm just proud to be
8  an American.
9  Q.  Do you see on the next page it says, "It's
10  estimated that only 5 percent of those reaching this
11  point in the e-mail will pass it on."
12  A.  Go ahead.
13  Q.  Then if you look at the -- look at the first
14  page.
15  A.  Back to the first page?
16  Q.  Yes.
17  A.  Okay.
18  Q.  You'll see that Randy Tucker received it
19  and passed it on.  Right?
20  A.  Well, I'm -- I'm not computer savvy, so I
21  can't tell you Joey Butler -- and if it was Joey
22  Butler.  I don't -- you know, I see a Joe Butler.  I
23  don't know.  Whoever Joe Butler is, the only Joe I
24  -- Joey Butler, but when it says to, I can't see --
25

Page 81

Toby Trowbridge

1  I don't understand or know how it's passed on.  It
2  looked like to me he just sent it to everybody.
3  Q.  Right.  But then you'll see at the very
4  -- the very top is where it's forwarded.
5  A.  Oh, I see that.  Okay.  I don't -- was it
6  forwarded?
7  Q.  Yes.
8  A.  Okay.  You want to -- that's one of the
9  reasons that I retired from the sheriff's department:
10  Computers.
11  Q.  Technology?
12  A.  Yes, sir.
13  Q.  And do you -- do you see in that list of
14  recipients there's Tjones@madison-co.com?
15  A.  Up in the top?
16  Q.  Yes, the very top, the second line of to's.
17  A.  Is that a T J-O-N-E-S?
18  Q.  Yes.
19  A.  Okay.
20  Q.  Do you know who that might be?
21  A.  The only T. Jones I know would be Tommy Jones.
22  Q.  And that's someone who doing your tenure was
23  on narcotics.  Right?
24  A.  Yes, sir.
25

Page 86

Toby Trowbridge

1               Toby Trowbridge
2  was forwarded?  And who is Bates?
3     Q.   So Bates number -- Bates stamp range.  It's
4  just a way that lawyers use -- it's what lawyers call
5  these numbers that are put --
6     A.   I know you're going to smile because I
7  don't understand, but I don't understand, so would
8  you -- so start explaining.
9     Q.   So if you look at -- look at Document 5,
10  so the e-mail chain, White Pride.
11     A.   Oh, back here?  Okay.
12     Q.   Yes.  So you see on the -- right below
13  the stamp there's that --
14     A.   Square?  Oh.
15     Q.   The exhibit sticker on the --
16     A.   Right here?
17     Q.   You see below that --
18     A.   Yes, sir.
19     Q.   -- it says MC --
20     A.   Yes.
21     Q.   -- - e-mails 457?
22     A.   Uh-huh.
23     Q.   And then if you'll look at the bottom of
24  the next page of that same document -- sorry, number
25  -- Document 5.  If you'll look at the bottom of each

Page 87

Toby Trowbridge

1               Toby Trowbridge
2  page --
3     A.   Y'all see why I retired now?  I'm sorry.  Go
4  ahead.
5     Q.   But you'll see --
6     A.   You want to come over here and show me?
7     Q.   You see those sequential numbers on the
8  bottom.  Right?  Like --
9     A.   Yes, sir.
10     Q.   -- 457, 458 --
11     A.   Yes, sir.
12     Q.   -- 459, 460.
13     A.   Yes, sir.
14     Q.   So that's what's being referred to as the
15  Bates stamp range.
16     A.   Okay.
17     Q.   And so it's just a way to identify that.
18     A.   Okay.
19     Q.   It means it's been produced.
20     A.   457 to 468?  Is that the last one?
21     Q.   Yes.
22     A.   Okay.  Again, what is Bates?
23     Q.   It's, you know, the guy who invented the
24  stamp that they use before it went computerized.
25     A.   Okay.

Page 88

Toby Trowbridge

1               Toby Trowbridge
2     Q.   It's just a system of -- a system of
3  numbering documents that get produced in lawsuits.
4     A.   Okay.  Oh, in lawsuits --
5     Q.   Yes.
6     A.   -- only.  Okay.
7     Q.   And so, you know, the defendants here --
8     A.   Oh, I got you.
9     Q.   -- produced this documentation.
10     A.   In lawsuits only.  Okay.
11     Q.   Yes.  And so we can track it and refer to
12  it by the -- you know, the number that --
13     A.   Yes, sir.
14     Q.   -- we put on it.
15     A.   Okay.
16     Q.   So all I'm getting at here --
17     A.   Am I interrupting him too much?  Okay.
18     Q.   So all I'm getting at here is that this
19  question is about this e-mail.
20     A.   Are you asking me?
21     Q.   I'm just trying to confirm your
22  understanding that that's the case.
23     A.   Well, okay.  Well, by reading into this
24  Number 37 --
25     Q.   Yes.

Page 89

Toby Trowbridge

1               Toby Trowbridge
2     A.   -- it looks like you were trying to refer
3  to it.  Okay.
4     Q.   Yes.  So the answer is about whether sending
5  this -- whether sending this e-mail, the Exhibit 5,
6  White Pride e-mail --
7     A.   Okay.
8     Q.   -- violated policies.  And the response is
9  that "The transmission of the identified e-mail did not
10  violate any policies of the sheriff's department in
11  existence at the time of his transmission.  For that
12  reason no one was investigated or disciplined
13  because of its transmission."
14     A.   Okay.
15     Q.   Do you agree with that response?
16     A.   Well, I don't know if Sheriff Tucker had any
17  policy in -- in play at that time.  I wasn't the sheriff.
18     Q.   No, this e-mail is from 2009, so you were the
19  sheriff.
20     A.   Oh, okay, I see what you're saying.  Yes.
21  I -- I -- I don't know.  There was -- I don't know
22  if there was a written policy involved but I wouldn't
23  have approved of it.  Is that what you're asking?
24     Q.   I'm asking whether you agree with, you know,
25  Sheriff Tucker and Madison County's response that it

Page 90

Toby Trowbridge

1
2   didn't -- sending this e-mail didn't violate any
3   policies and because it didn't violate any policies
4   no one was investigated or disciplined when this e-mail
5   was sent.
6       A.   Well, I can't tell you if anybody was
7   investigated or disciplined because I didn't even know
8   this existed until yesterday.
9       Q.   But in terms of whether it violated any
10  policies, you would agree that it didn't violate any
11  policies at that time?
12      A.   Well, I don't know.  I'd have to go back
13  and look and see what the policy -- I can't remember
14  every policy and procedure that was printed.
15      Q.   You said that you heard racial slurs used
16  in passing.  Did you ever hear Captain Barfield use any
17  racial slurs?
18      A.   Yes.
19      Q.   How about Tommy Jones?
20      A.   Yes.
21      Q.   How about Joey Butler?
22      A.   I don't recall Joey Butler doing anything.
23  I -- I -- I would only see Joey when he would come off the
24  road into the office and stuff like that.
25      Q.   How about Chief Belvedresi?

Page 91

Toby Trowbridge

1
2       A.   Yes.
3       Q.   How about Sheriff Tucker?
4       A.   Yes.
5       Q.   How about an officer named George Elliott?
6       A.   I don't recall.
7       Q.   How about Chief Deputy Williams?
8       A.   I don't recall Jeremy ever using the word or
9   not.
10      Q.   Did you ever use the word?
11      A.   What?
12      Q.   The word "nigger."
13      A.   Nigger?
14      Q.   Yes.
15      A.   Yes, sir.
16      Q.   Do you recall Mark Sandridge ever using
17  racial slurs?
18      A.   I don't recall it, but I can tell you what,
19  Mark Sandridge is one of the finest upstanding Christian
20  men you'll ever know.
21      Q.   Do you recall Kip Lubey using racial slurs?
22      A.   No.  I mean, I don't recall.
23      Q.   How about Todd Wilson?
24      A.   I don't recall.
25      Q.   And no one was -- no one was disciplined for

Page 92

Toby Trowbridge

1
2   using racial slurs to your recollection?
3       A.   No.
4       Q.   And we've been talking about the use of
5   racial slurs.  In any case has it been a racial slur
6   other than the word "nigger"?
7       A.   Not that I, you know, recall.
8       MR. RETHY:  I think we'll break for lunch.
9   Be back at 1:00.
10      MR. ROSS:  That's fine.
11      THE VIDEOGRAPHER:  Off record.  11:57.
12      (LUNCH BREAK TAKEN.)
13      THE VIDEOGRAPHER:  Back on record.  1:09.
14  BY MR. RETHY:
15      Q.   Good afternoon.
16      A.   Good evening.
17      Q.   You understand you're still under oath?
18      A.   Yes, I do.
19      MR. RETHY:  This will be Exhibit 6.
20      (EXHIBIT 6 MARKED.)
21      A.   (Reviewed document.)
22  BY MR. RETHY:
23      Q.   Now, you can stop reading where it says
24  "Previous comments."
25      A.   Okay.  Well, if you don't mind, I'm going

Page 93

Toby Trowbridge

1
2   to finish it --
3       Q.   Sure.
4       A.   -- just to see what -- what previous
5   comments were made.  Okay.
6       Q.   So this -- this is a news article and it's
7   discussing a protest.  Do you recall the protest that's
8   being discussed here?
9       A.   Yes, I do.
10      Q.   What's your -- what's your recollection of
11  the reason for that protest?
12      A.   To the best of my recollection, David Archie
13  had been arrested and evidently he didn't like being
14  arrested.  I mean, he never told me why he was doing it.
15  I didn't talk with him, but he had been arrested and I
16  assume, I don't know, I guess he's the one that organized
17  the march, but they marched down to the sheriff's office
18  and stood around and marched down there for a little while.
19      Q.   Do you see that the article states towards
20  the middle of the page that organizers arranged the
21  rally to protest alleged racial -- racial profiling by
22  the Madison County Sheriff's Office?
23      A.   Yes, sir, I see that.  Let's see.  I saw
24  -- let me get the exact paragraph you're looking at.
25  What paragraph is that?

Page 94

Toby Trowbridge

1
2    Q.   It's maybe the --
3    A.   Third?
4    Q.   -- sixth one down.
5    A.   Sixth?
6    Q.   It starts with the word "Organizers...."
7    It's just one line.
8    A.   I got it, yes, sir.  Okay.
9    Q.   So what's your understanding of what racial
10   profiling is?
11   A.   Well, to me, racial profiling is whenever
12   you would break the law as to -- what word am I -- you
13   could -- looking for the word, to go against one group
14   and not another one or a couple of groups and not, you
15   know, do an across the board policing or across the
16   board of anything when you start profiling.  And it
17   wouldn't -- whether it be black, blue, green, white,
18   rich or poor, if you single one out you're racial
19   profiling.
20   Q.   When you were sheriff, did the sheriff's
21   office engage in racial profiling?
22   A.   No, sir.
23   Q.   So we earlier talked about complaints that
24   have been made and these protests weren't specifically
25   brought up.  Would you consider these protests to be

Page 95

Toby Trowbridge

1
2    complaints that were made during your tenure?
3    A.   I hadn't seen them so I can't -- you know,
4    have you got any of the protests -- I mean,
5    complaints?
6    Q.   You mean that you didn't see any document
7    that contained a written complaint?  Is that what
8    you're saying?
9    A.   I'm asking you if you want to show me one
10   I'll -- I'll look at it, but I -- I -- I don't have
11   any of them.
12   Q.   But you were aware that this was going on
13   at the time?
14       MR. ROSS:  Object to the form.
15   A.   Not racial profiling.
16   BY MR. RETHY:
17   Q.   The protests.  You were aware that the
18   protests were going on?
19   A.   Oh, yes, I was there.  Uh-huh.  I was at
20   the office.
21   Q.   And did you take any action to investigate
22   whether the claims of racial profiling had any merit?
23   A.   No.
24   Q.   Why not?
25   A.   Just because they were protesting and

Page 96

Toby Trowbridge

1
2    marching down the street is no cause for me -- we had
3    -- any other -- if there were any other letters or
4    complaint or whatever, you know, me being the chief
5    law enforcement officer I would have given them to the
6    chief and he looked into them, and knowing the chief
7    as I do if there was any discrimination or racial
8    profiling he would have brought it to my attention and
9    stopped it.  Mind you, just because a person says
10   you're racial profiling doesn't mean you're racial
11   profiling.
12   Q.   You testified previously that you had heard
13   Chief Belvedresi use racial slurs.  Right?
14   A.   (Nodded head affirmatively.)
15   Q.   If you could answer --
16   A.   Yes.  I'm sorry.  Yes.
17   Q.   -- audibly.  And would that be any cause
18   for concern about his qualification to investigate
19   complaints of racial profiling?
20   A.   In my opinion, in the way -- and then when
21   you asked me about all of these people if they used
22   it, including myself, none of those were ever pointed
23   directly at a person and called by a name or you --
24   called you out like that.  It was just in passing,
25   maybe in conversation or walking down the hall or

Page 97

Toby Trowbridge

1
2    walking across a parking lot or whatever.  And there
3    is -- there is nothing that I know of using that
4    word that's discriminatorily or racially against the
5    law.  Is there?  Is there?
6    Q.   We're not talking about whether anyone would
7    be arrested for using that word.
8    A.   All right.  I'm just saying that had I felt
9    like it was pointed point-blank at somebody or they
10   were called -- if I called you that or something or
11   anybody of that color or whatever, I would have
12   certainly gotten involved in it and done something
13   with it, but in passing when it didn't mean to point
14   at any one person or call somebody out or call
15   somebody on the carpet and it did not discriminate
16   against a person or a group of people, no, I didn't
17   find it very dis -- discriminating at all that I
18   could charge them with any kind of violation, and that
19   included myself.
20   Q.   So you're saying that the fact that --
21   A.   I know I'm the one that's being deposed here,
22   but I asked you a question.
23       MR. PEDERSEN:  You can't -- you can't do that.
24   He asks the questions.  We give the answers.
25   A.   I understand.  I remember a judge telling

Page 98

Toby Trowbridge

1  me that one time.
2  BY MR. RETHY:
3      Q.   So you're saying that the fact that Chief
4  Belvedresi used racial slurs as discussed to you didn't
5  give you the cause for concern regarding him being
6  an appropriate person to investigate claims of racial
7  profiling?
8      A.   Just because a person uses slurs or slang
9  or something like that does not mean that they're not
10 a person that would look into both sides of the
11 story, and I can tell you right now that Chief Eddie
12 Belvedresi is the type of person that would take very
13 to heart both sides of every story no matter if they
14 were blue, white, green, rich or poor, wore the
15 uniform, or on the other side of that table, no, sir.
16 And I hired him because he felt basically the same
17 way I did, and there's no -- to be no discrimination.
18 And just because you make a remark doesn't mean that
19 you are a discriminatory person and that you can't do
20 your job right.  And if there's anybody in this room
21 that thinks that they have ever not done the same
22 thing, let them throw that first stone.
23      MR. RETHY:  This document is 7.
24      (EXHIBIT 7 MARKED.)

Page 99

Toby Trowbridge

1      A.   And I going to get to keep all of these
2  or give them back?
3  BY MR. RETHY:
4      Q.   No.  They go to the court reporter.
5      A.   Okay.  (Reviewed document.)  Is there a
6  third page?
7      Q.   Two pages.  It doesn't have anything on it.
8      A.   Okay.
9      Q.   So this is another news article and it's
10 discussing a board of -- events at a board of
11 supervisors meeting.  Do you recall that board of
12 supervisors meeting?
13     A.   I do not recall that one.  I do -- I do
14 recall the one where I was telling you about
15 Patricia, ICE --
16     Q.   Right.
17     A.   -- on that second page.  And I want to add
18 that it says here that ICE claimed that the Madison
19 County Detention Center takes bond from jailed
20 undocumented Latino immigrants but does not let them
21 out.  Okay.  Well, her complaint was that I was
22 stealing money from them, and I explained to you the
23 process of where it went under lock and key.
24     She was ignorant to the fact of how it works

Page 100

Toby Trowbridge

1  and probably, if not all the time -- no, I can't say
2  all the time, but the majority of the time ICE had a
3  hold on -- they were undocumented.  So when they bonded
4  out or bond for the county thing they still had a
5  federal hold on them.  I can't let them go if that's
6  what she's alluding to.
7      Q.   So ICE, you mean Immigration Customs
8  Enforcement --
9      A.   Yeah, I don't what it is now.
10     Q.   -- not Patricia Ice?
11     A.   Yeah.  You understand what I'm saying?
12     Q.   Yes.
13     A.   Even though they bond on our charges or
14 Madison's charges or Canton's charges, they still --
15 a hold is there for ICE.
16     Q.   So the news article also discusses --
17 discusses Mr. Archie being present and discussing
18 issues of supervisors.  Do you recall that aspect of
19 the meeting?
20     A.   I do not.  I -- you know, I don't believe
21 he was at that meeting and I don't recall ever David
22 Archie being in a supervisor meeting.
23     Q.   There's -- on the second page, there's
24 recorded statements by Supervisor Carl Banks and it

Page 101

Toby Trowbridge

1  states, "Banks said he think there's a problem with
2  the perception of the sheriff's department.  The
3  conversation today was about a feeling in the
4  community, Banks said.  I know as an
5  African-American that there's a real feeling in the
6  community that the department is discriminating
7  against people."
8      Do you see that?
9      A.   Yes, sir.
10     Q.   Did you have an understanding at that time
11 that there was that feeling in the community?
12     A.   Well, anytime you're a chief law
13 enforcement officer or just an officer of the law,
14 things are going to be said about you, written about
15 you.  That doesn't mean they're true.  And if you've
16 got the perception that was true every time
17 that somebody said something you'd end up with ulcers
18 or a heart attack or something else.  I did whatever
19 I thought I could to take care of the people in Madison
20 County and that meant blue, white, green, red, rich
21 or poor evenly across the board.
22     Now, you know, I got along with Carl Banks
23 fine.  He's a -- he's a good man, a supervisor.  Was
24 supervisor for like 28 years.  I don't know if this was

26 (Pages 98 to 101)

Page 102

Toby Trowbridge

1
2  after or before we had to arrest his son or not.  You
3  can ask him that.
4       Q.   Do you recall when you arrested his son?
5       A.   I do not.
6       Q.   Are you saying that he might have been
7  making up these statements based on --
8       A.   I don't know.
9       Q.   -- a grudge that he held?
10      A.   I wasn't -- I don't recall him ever saying
11 anything to me.  The board to the best of my knowledge
12 has never ever tried to tell me that I was not doing
13 a good job.
14      Q.   So you say you never discussed any issues
15 regarding racial profiling or discrimination or a
16 perception of racial profiling or discrimination with
17 Carl Banks?
18      A.   Not that I recall.
19      Q.   Towards the bottom of the story it says,
20 "Banks said he routinely fields complaints about the
21 sheriff's department.  He said the sheriff -- the
22 sheriff should work with people to change the
23 department's image.  Communication could help bring
24 about an understanding, he said.  Trowbridge has
25 said that he does not meet with residents to discuss

Page 103

Toby Trowbridge

1
2  complaints."
3            Is it correct that you would not meet with
4  residents to discuss complaints?
5       A.   No, I'm not going to go into a group of
6  people and just start fending for myself, no.
7       Q.   And why not?
8       A.   Well, I felt like everything was going the
9  way it should be.  You're going to have disgruntled
10 people whether it be in law enforcement or the car
11 business if they don't like the way their car's
12 running or whatever, and for me to just go sit in
13 there and field 20, 30, 40, 50 questions of just
14 throwing them at me left and right, I wasn't going
15 to let it get out of hand like that.  Any complaint
16 that came to the sheriff's office was given to the
17 chief, Belvedresi, to look into.
18            MR. RETHY:  Exhibit 8.
19            (EXHIBIT 8 MARKED.)
20      A.   (Reviewed document.)  All right.
21 BY MR. RETHY:
22      Q.   Look towards the bottom of the first page
23 of Exhibit 8 here.  It's another news article.  It
24 states, "Madison County District 5 supervisor said
25 many people in Madison County are aware that the

Page 104

Toby Trowbridge

1
2  department is perceived as targeting blacks and have
3  tried to get Trowbridge to meet with concerned
4  citizens."
5            Do you see that?
6       A.   Uh-huh.
7       Q.   Have you ever spoken with -- with Paul
8  Griffin about racial profiling or racial discrimination
9  or the perception of either?
10      A.   Not that I recall.
11      Q.   Do you recall providing any statistics
12 about arrests to media companies or anyone else during
13 this time period?
14      A.   I don't think that I did.  You know, I don't
15 know who would have, other than it could have been
16 Justice Court.  You know, I don't -- I just don't know
17 who did that.
18      Q.   And as a general rule, you didn't keep
19 statistics broken down by race in the department.  Is
20 that right?
21      A.   I did not, no.  It's a good article, though.
22 It lets you know that other cities are doing their job,
23 too.
24      Q.   On the second page, it says, Griffin, the
25 former deputy -- deputy sheriff, says he thinks

Page 105

Toby Trowbridge

1
2  racial profiling goes on in every department in the
3  country.  It's not something that's just in Madison
4  County, he said.
5            Do you agree with that statement?
6       A.   Well, I don't know how deputy/supervisor
7  Griffin would know that.  It sounds like that's
8  being taken out of context to say that every other
9  department in this country.  What kind of profiling
10 is that?  And I'm not asking you the question.  I'm
11 just making a statement.  We -- we got to just figure
12 out just -- you know, you just don't make statements
13 like that.  He can't back that up, but yet he charges
14 me with racial discrimination.
15      Q.   Do you have any sense of why he would do
16 that?
17      A.   No, I don't.  Unless he's listening to his
18 constituents and he's got to get re-elected.
19      Q.   So do his constituents believe they're
20 being racially profiled?
21      A.   Pardon?
22      Q.   You're saying you think his -- his
23 constituents were telling him that he was racially
24 profiling?
25      A.   I don't know.  I mean, you're telling me.

# EXHIBIT 24

1            RANDALL TUCKER
2        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                NORTHERN DIVISION
4  LATOYA BROWN; LAWRENCE
   BLACKMON; HERBERT ANTHONY
5  GREEN; KHADAFY MANNING;
   QUINNETTA MANNING; MARVIN
6  McFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; and
7  BETTY JEAN WILLIAMS TUCKER,
   individually and on behalf of a class
8  of all others similarly situated,      PLAINTIFFS
9
10 V.          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                              DEFENDANTS
15
16    ************************************************
17     VIDEOTAPED DEPOSITION OF SHERIFF RANDALL TUCKER
18    ************************************************
19            APPEARANCES NOTED HEREIN
20
        DATE: THURSDAY, DECEMBER 21, 2017
21          PLACE: HILTON GARDEN INN
             WEST CAPITOL STREET
22              Jackson, MS
             TIME:  9:00 A.M.
23
24     REPORTED BY: DEBORAH H. NELSON
               CSR #1256
25 JOB NO. 133425

Page 6

RANDALL TUCKER

1
2    VIDEOGRAPHER:  This is the start of
3    DVD Label Number 1 of the videotaped
4    deposition of Sheriff Randall Tucker in
5    the matter of Latoya Brown, et. al. vs.
6    Madison County Mississippi, et. al.
7        In the United States District Court,
8    Southern District of Mississippi, Jackson
9    Division, Number 317-CV-347WHB-LRA.  This
10   deposition is being held at the Hilton
11   Garden Inn, 235 West Capitol Street,
12   Jackson, Mississippi, on December 21st.
13   The time on the monitor is nine o'clock.
14       My name is Eddie Nabors.  I'm the
15   legal video specialist for TSG Reporting,
16   Inc, headquartered at 747 Third Avenue,
17   New York, New York.
18       The court reporter is Debbie Nelson,
19   also in association with TSG Reporting.
20       We'd ask for attorney introductions
21   on the audio portion.
22       MR. YOUNGWOOD:  Jonathan Youngwood,
23   Simpson, Thacher & Bartlett for the
24   plaintiffs in the proposed class.
25       MS. GOCHMAN:  Janet Gochman, Simpson,

Page 7

RANDALL TUCKER

1
2    Thacher & Bartlett for the plaintiffs in
3    the proposed class.
4        MR. TOM:  Joshua Tom, ACLU of
5    Mississippi, for the plaintiffs in the
6    proposed class.
7        MS. COLLINS:  Jennifer Riley-Collins,
8    attorney and Executive Director for the
9    ACLU of Mississippi.
10       MR. ROSS:  Charlie Ross with Wise
11   Carter on behalf of the defendants.
12       MS. COWAN:  Becky Cowan with Currie
13   Johnson and Myers on behalf of the
14   defendants.
15       MR. WALLACE:  Mike Wallace with Wise
16   Caraway, with Wise Carter Child & Caraway
17   for the defendants.
18       VIDEOGRAPHER:  The court reporter may
19   administer the oath, please.
20       SHERIFF RANDALL TUCKER
21   after having first been duly sworn by the court
22   reporter, was examined and testified under oath as
23   follows:
24   EXAMINATION BY MR. YOUNGWOOD:
25       Q   Good morning, Sheriff Tucker.

Page 8

RANDALL TUCKER

1
2    A   Good morning.
3    Q   You became sheriff in 2012; am I correct?
4    A   That's correct.
5    Q   And at that time, is it correct, sir, that
6    you were of the view that race relations in Madison
7    County needed improvement?
8    A   I think there is always room for
9    improvement.  I don't know that there was a need at
10   the time, specifically, to address that, but that
11   was one of our missions, yes.
12   Q   Okay.  In fact, improving race relations
13   you considered to be one of your main objectives as
14   sheriff; is that correct?
15   A   Yes.
16   Q   What have you done to improve race
17   relations since becoming the sheriff?
18   A   Uh -- one of the main things that the
19   department did or that I did through the department
20   was create a community advisory group, wherein we
21   took members or representatives from each
22   municipality in the county, as well as members from
23   the county jurisdiction, to bring those into a
24   setting within the department to discuss the
25   procedures of the sheriff's department and to have

Page 9

RANDALL TUCKER

1
2    those members go back out into the public and have a
3    venue to be able to bring their concerns and have a
4    discussion.
5    Q   Is there anything else you have done to
6    improve race relations in Madison County since
7    becoming sheriff?
8    A   We have strengthened our DARE program
9    within our county schools.  That's a
10   fifth-grade-geared program, wherein we go into the
11   schools and teach the kids about law enforcement,
12   about -- uh -- well, about law enforcement as a
13   whole and drug resistance and alcohol resistance
14   through that program.
15       We implemented an Explorer program wherein we
16   involved all 14 to 18-year-olds within our school
17   system, encouraged them to join the Explorer
18   program, where they are basically, they give up, it
19   was a period of eight weeks during their summer
20   vacation to come in and participate in, basically, a
21   mini-police academy to see what the profession of
22   law enforcement entails to educate them on the
23   day-to-day operations of being a police officer.
24       There is any manner of things.  We have held
25   general meetings with our staff and encouraged them

RANDALL TUCKER

1
2   to be professional, to treat people fairly, just to
3   smile and say "hi."
4       Q    You mentioned a fifth-grade program, and I
5   don't know if you said DARE or There.  What did you
6   call it?
7       A    DARE.
8       Q    D-A-R?
9       A    D-A-R-E.
10      Q    And what are those?  Do those letters
11  stand for something?
12      A    Drug Awareness Resistance Education.
13      Q    Okay.  Other than the items you have just
14  listed, is there anything else you have done since
15  being elected to the office of sheriff to improve
16  race relations in Madison County?
17      A    I can't cite specific instances.  I'm sure
18  along the way there's been other things.  Those are
19  the highlights.
20      Q    Let me go, perhaps, backwards of the list
21  you just gave me.  You mentioned general meetings of
22  the staff.
23      A    That's correct.
24      Q    Is race discussed at those meetings?
25      A    I don't know race, per se, but the equal

RANDALL TUCKER

1
2   treatment of all citizens, yes.
3       Q    In what way is equal treatment of all
4   citizens discussed at those meetings?
5       A    Uh -- I think it's a general term,
6   basically, to treat everybody with respect.  I think
7   race would fall under everybody.
8       Q    And who gives this instruction "treat
9   everybody with respect"?
10      A    Either the chief or myself.
11      Q    Okay.  And how often are these meetings
12  held?
13      A    We have at least one annually.
14  Occasionally, there's more than one.  Two or three.
15  If the need arises, we will have a meeting.
16      Q    And can you recall race being mentioned,
17  specifically, at any of these meetings since you
18  have become sheriff?
19      A    No, that's what I was just stating.  Not
20  race, specifically.  Just in general terms to treat
21  everyone fairly professionally, courteously.
22      Q    Have you -- and we'll leave this lawsuit
23  aside, any conversations in connection with it, have
24  you, in your years of sheriff, had any conversations
25  explicitly regarding race in connection with the

RANDALL TUCKER

1
2   performance of your professional duties?
3       A    With my professional duties?  No, not that
4   I recall.
5       Q    Let's talk about the Community Advocacy
6   Group, if I have that correct?
7       A    Community Advisory Group.
8       Q    Advisory Group.
9       A    Yes, sir.
10      Q    I wrote it down wrong.  Thank you.  When
11  was that created?
12      A    I believe it was the first year I was in
13  office.  I believe it was in -- uh -- I want to say
14  around April of that year.  April of 2012, I think.
15      Q    And what is the composition of that group?
16      A    There are two members of each municipality
17  or two residents that reside within each
18  municipality of the county.  There's four
19  municipalities.  There were two representatives from
20  county jurisdiction or jurisdiction outside of those
21  municipalities, and then one at-large
22  representative.
23      Q    So if I count correctly that's -- uh --
24      A    Eleven.
25      Q    -- 11 people?

RANDALL TUCKER

1
2       A    Yes.
3       Q    Okay.  And the four municipalities, those
4   are the towns or the cities within?
5       A    Correct.
6       Q    And so can you list those for me?
7       A    Flora.
8       Q    Uh-huh.
9       A    Canton, Madison, and Ridgeland.
10      Q    And then the two on top of that are from
11  unincorporated portions of the county?  Is that how
12  I understand your testimony?
13      A    Correct.  Possibly three.  The one
14  at-large could be from a municipality or county
15  jurisdiction.
16      Q    And how were these 11 people selected?
17      A    They were selected by -- well, I can't
18  give you the exact criteria.  Mark Sandridge
19  assisted me in that, so I don't want to give you
20  inaccurate information.
21      Q    Okay.  Has the membership changed in the,
22  I guess, nearly six years you have been sheriff?
23      A    It's rotated annually where those members
24  nominate other members within the community.
25      Q    And how often does the group meet?

| Page 22 |
| --- |

RANDALL TUCKER

1
2  toward their future, to get involved, to see what
3  police work is about -- uh -- possibly as a future
4  or to certainly encourage them in an environmental
5  structure.
6      Q   So how many kids, if you know, right now,
7  approximately, are in the Madison County Explorer
8  Program?
9      A   I don't know how many are active right
10  this minute.  I don't have that figure, but there
11  is -- you know, once they're 18, they're out of the
12  program.  We've got some -- uh -- some of the
13  graduates that actually work for the sheriff's
14  department ran through that program.  One is a
15  dispatcher, one is a jailer.  I can't give you an
16  exact number, how many are actually active right
17  now.
18      Q   Okay, and is it the one entrance at 14 and
19  graduates at 18, or can you come in at any time?
20      A   You can come in at any time between those
21  numbers of years.  Any time between the age of 14 to
22  18.
23      Q   Okay, and is discussion or addressing
24  issues of race part of the Explorer program?
25      A   I don't know that an actual discussion is

| Page 23 |
| --- |

RANDALL TUCKER

1
2  held about race.  There's a discussion about how to
3  treat people of all races equally and fairly -- just
4  as an officer would receive that same type of
5  instruction.
6      Q   Okay, but just to be specific, because I
7  think you previously testified that, at least with
8  your officers, race is not explicitly discussed.  In
9  the Explorer Program, do you believe race is
10  discussed, you should treat all races the same
11  or equally or whatever?
12      A   I think you asked me at the general
13  meeting if race was discussed, generally.
14      Q   Why don't we go back to -- let's focus on
15  the Explorer program, and then we'll go back.
16      A   I just don't want you to mischaracterize
17  what I said.  But go ahead.
18      Q   Let's stick with the Explorer Program for
19  a moment.
20      A   Okay.
21      Q   Is race explicitly discussed as part of
22  the Explorer program?
23          MR. ROSS:  Objection.  He's asked and
24          answered it.
25      A   I don't know that the term "race," itself,

| Page 24 |
| --- |

RANDALL TUCKER

1
2  is used.  Equal treatment of all races is taught and
3  encouraged.
4      Q   (Mr. Youngwood)  And so my question is, is
5  it taught and encouraged by saying "equal treatment
6  of all people," or is it taught and encouraged by
7  saying "equal treatment of all races," or a synonym
8  for the word "race"?
9      A   You know, I can't sit here and tell you
10  that I have attended every session of an Explorer
11  class.  Equal treatment of all persons, human race,
12  whatever race you want to, however you want to label
13  it, equal treatment of all people is encouraged.
14      Q   Okay.  We discussed the general meetings.
15  I do believe you gave testimony already regarding
16  other aspects of your work as sheriff, but let's go
17  back to because you have raised it.
18      Putting aside the general meetings, in
19  connection with your work as sheriff over the last
20  almost six years, have you had explicit discussions
21  concerning race unrelated to this lawsuit?
22      A   Yes.
23          MR. ROSS:  I object to the form.  You
24          can answer to the best of your ability.
25      Q   (Mr. Youngwood)  Tell me in what context

| Page 25 |
| --- |

RANDALL TUCKER

1
2  those have taken place, please?
3      A   Anytime we have a new employee that goes
4  through orientation, the chief and I generally have
5  a meeting with them -- uh -- whether it be one or a
6  dozen new employees at a time, and I tell them that
7  I want them to treat everybody with professionalism,
8  with courtesy, with respect.  I don't care if
9  they're black, white, Hispanic, male, female,
10  Indian, green, yellow, brown.  I don't know if I say
11  those exact words in every time, but, yes, I do say
12  that.
13      Q   Okay, and whether you say those exact
14  words every time or not, you explicitly raise race?
15      A   Yes, I do.
16      Q   Okay.  And any other ways in which you
17  discuss race as part of your professional duties?
18      A   As part of my professional what?
19      Q   Duties.  As your job as sheriff?
20      A   I'm sure the term comes up all of the
21  time, yeah.
22      Q   But do you discuss problems with race
23  relations in Madison County?
24      A   I'm sure I have at some point, yeah.
25      Q   Can you remember any specific instances?

Page 26

RANDALL TUCKER

1
2      A   I can't cite a specific instance, but if
3  it's brought up, I'm sure that it's addressed.
4      Q   Have you had discussions regarding
5  disparate treatment of the races in Madison County
6  by your officers since you became sheriff?
7          MR. ROSS:  Object to the form.  Do
8      you understand the question?
9      A   I do not.  Would you rephrase it or repeat
10  it?
11          MR. YOUNGWOOD:  Would you read back
12      the question, please?
13          (COURT REPORTER READS BACK WITH
14      DIFFICULTY WITH WORD)
15          MR. YOUNGWOOD:  Disparate.
16      A   I'm ignorant to that word.
17      Q   (Mr. Youngwood)  Treating races
18  differently by your officers?
19      A   I can say that since I've taken office I
20  haven't had it brought to my attention.
21      Q   You track the -- uh -- race of the people
22  who are involved in incident reports; correct?  Let
23  me say that differently.
24      A   I do not.
25      Q   Let me say that differently.  Incident

Page 27

RANDALL TUCKER

1
2  reports record the race of people who are mentioned
3  in incident reports?
4      A   There is a block where you, it asks for
5  race, yes, yes.
6      Q   And so you have data available to you that
7  tells you the race of people who are involved in
8  incident reports dating back to before you maybe
9  became sheriff?
10      A   Yes.
11      Q   That's available to you?
12      A   Yes.
13      Q   Have you ever made any observations about
14  the different way in which race, the people of their
15  various races are treated by your officers by going
16  through incident reports and looking at the races of
17  the people involved?
18      A   I don't know that an incident report would
19  indicate the different treatment, but no.
20      Q   Have you ever, and we'll leave this
21  lawsuit aside, observed whether or not the races are
22  arrested at rates proportionate to their
23  representation in the county?
24          MR. ROSS:  Object to the form.
25      A   I don't differentiate in the race.  We

Page 28

RANDALL TUCKER

1
2  arrest people who violate the law, regardless of
3  their race.
4      Q   (Mr. Youngwood)  Are you aware that your
5  officers arrest black people at a rate five times
6  that that they arrest white people?
7          MR. ROSS:  I object to the form.
8      A   I don't know whose figure those are.  I
9  haven't done any figures though.
10      Q   (Mr. Youngwood)  You have read the
11  complaint in this case?
12      A   I have.
13      Q   We'll get to the complaint in a bit.
14  Going back to the beginning question:  You noted
15  that -- uh -- and, again, I'm not trying to put
16  words in your mouth so you can correct me, but I
17  believe your testimony was that race relations can
18  always be improved, and that was your observation at
19  the time you became sheriff?
20      A   Absolutely!
21      Q   What needed improvement in Madison County
22  race relations at the time you became sheriff?
23          MR. ROSS:  I object to the form.
24      He's the sheriff.  He's not involved in
25      every aspect of the county.  Answer to the

Page 29

RANDALL TUCKER

1
2  best of your ability.
3      A   Can you repeat the question?
4          MR. YOUNGWOOD:  Please read it back.
5          (COURT REPORTER READS BACK)
6      Q   (Mr. Youngwood)  Let me ask it clean and
7  the court reporter is correct, and I'm going to
8  be -- I'm going to be, I'm sure part of the problem
9  here is we both need to try not to talk over each
10  other or we'll have a mess of a record.  What was
11  your understanding at the time you became sheriff of
12  what aspect of race relations needed improvement in
13  Madison County?
14          MR. ROSS:  Object to the form.  Broad
15      and vague.  You can answer.
16      A   It was my opinion at the time that all
17  races needed to be involved more, and there needed
18  to be more transparency within the department to the
19  community that we involve everyone in what we were
20  doing and have involvement from the community that
21  we serve.  I felt like that was one of our biggest
22  missions coming into office.
23      Q   (Mr. Youngwood)  And anything else that
24  was your observation regarding the need to improve
25  race relations in Madison County at the time you

## Page 38

RANDALL TUCKER

1
2    Q   Okay, and if you'd look at page 19 of the
3  document?
4    A   (Witness adheres).
5    Q   Is that your signature, sir, under
6  "respectfully submitted"?
7    A   Yes.
8    Q   Okay.  And you believe the responses
9  within this document above your signature to be
10  accurate?
11        MR. ROSS:  I object to the form.  You
12        haven't given him time to read it right
13        now, but answer to the best of your
14        ability.
15    A   Yes.
16    Q   (Mr. Youngwood)  You wouldn't have signed
17  it if you didn't believe it to be accurate; correct,
18  sir?
19    A   Yes.
20        (Exhibit 4 marked for the record)
21    Q   Okay.  I'll give you what's been marked
22  Exhibit 4.  These are Defendants' Response to
23  Plaintiff's First Set of Requests for Admission.  Is
24  this a document you recognize, sir?
25    A   Yes.

## Page 39

RANDALL TUCKER

1
2    Q   Okay.  And were you -- is it a document
3  you reviewed prior to it being filed?
4    A   I think so, yes.
5    Q   Okay.  Do you believe it to be accurate,
6  sir?
7        MR. ROSS:  Object to the form.
8        Request for Admissions are answered by
9        attorneys, not by the party.  And,
10        Sheriff, take your time to read it if you
11        need to.
12    A   I've read it, yes.
13    Q   (Mr. Youngwood)  Yes, you believe it to be
14  accurate?
15    A   Yes.
16    Q   Sir, you have sat through a number of the
17  depositions in this case; correct?
18    A   Yes.
19    Q   So by my record, you were here for
20  Deputy Thompson's deposition, Lieutenant Sandridge's
21  deposition, Lieutenant Waldrop's deposition,
22  Lieutenant Wilson's deposition, Sergeant Flax's
23  deposition, and Chief Williams' deposition.  Do you
24  recall being at all of those depositions?
25    A   Yes.

## Page 40

RANDALL TUCKER

1
2    Q   And during any of those depositions, did
3  you hear testimony you believed to be inaccurate?
4        MR. ROSS:  I object to the form.
5        That's several days of deposition asking
6        him to recall.
7    A   I --
8        MR. ROSS:  You can answer.
9    A   I recall a couple of instances where I
10  believe I disagreed with what was said, yes.
11    Q   (Mr. Youngwood)  Could you, based on your
12  memory, specify those instances for me?
13    A   Without reading back through it, I can't
14  cite them.  I just recall that I had the thought
15  that "Well, I don't agree with that," but that was
16  that person's testimony at the time.
17    Q   Do you remember any of those instances,
18  specifically?
19    A   One, yes.
20    Q   What was that?
21    A   The e-mail that Jeremy characterized as
22  unethical.
23    Q   Okay.  That's the e-mail with the subject
24  "White Pride"?
25    A   Yes.

## Page 41

RANDALL TUCKER

1
2    Q   Okay.  And you disagreed with Chief
3  Williams' testimony regarding the unethical nature
4  of that e-mail?
5    A   Correct.
6    Q   And did you disagree with his statements
7  regarding the violation of department policies
8  associated with sending that e-mail?
9    A   Yes.
10    Q   So you believe sending that e-mail is
11  consistent with your department's policies?
12    A   I didn't say that.
13    Q   Okay.  You believe sending that e-mail is
14  not unethical?
15    A   I believe it's inappropriate.
16    Q   Okay.  What would be inappropriate about
17  sending that e-mail?
18    A   In a professional setting, I don't feel
19  like that's -- sharing someone else's opinion on a
20  topic like that is not appropriate in a professional
21  setting, I wouldn't think.
22    Q   Okay, and in what way?
23    A   Because there is some derogatory language
24  in there.
25    Q   It's a racist e-mail, right, sir?

Page 42

RANDALL TUCKER

1  
2      MR. ROSS: Object to the form.
3      A   You would have to ask the gentleman who
4  wrote it what his view was at the time. It's
5  certainly not my opinion.
6      Q   (Mr. Youngwood) And when you forwarded
7  that e-mail, did you tell anyone that you disagreed
8  with the contents?
9      A   I don't even recall the e-mail, to be
10  honest with you. I don't recall receiving it or
11  sending it.
12      Q   Okay.
13          MR. YOUNGWOOD: I'll mark this tab,
14      I'm sorry, Exhibit 5.
15          Exhibit 5 marked for the record)
16      Q   (Mr. Youngwood) This is the e-mail you're
17  referring to, sir?
18      A   Yes.
19      Q   Okay. Have you had occasion to read this
20  e-mail since Chief Williams's testimony last week?
21      A   To be honest with you, no, I haven't read
22  it in its entirety.
23      Q   Okay. Who is Joe Butler?
24      A   What do you mean, "who is he?" He's Joe
25  Butler, Joey Butler.

Page 43

RANDALL TUCKER

1  
2      Q   Okay. How do you know him?
3      A   He's an employee at the sheriff's
4  department.
5      Q   Okay. And he forwarded this e-mail to you
6  and to a number of other people; correct?
7      A   Yes, it appears.
8      Q   Okay, he sent it to you at your Madison
9  County Sheriff's Department e-mail address; correct?
10      A   Yes.
11      Q   Okay. And then you sent it on to one,
12  two, three, four, five, six, seven people, if I
13  count correctly?
14      A   It would appear.
15      Q   Can you tell me who each of these people
16  are?
17      A   Brad Harbour was a deputy with the
18  sheriff's department. MSO 18, I believe. I believe
19  it's Tommy Jones. Don't quote me on that, but I
20  believe that's who that was.
21      Betty Tucker --
22      Q   And let me just interrupt you. Tommy
23  Jones a sheriff department employee?
24      A   Yes.
25      Q   Okay.

Page 44

RANDALL TUCKER

1  
2      A   Betty Tucker is my mother. Trey Curtis
3  was a deputy. Taylor Chastain is a deputy. Tommy
4  Jones -- so that MSO 18, that may or may not -- I'm
5  not sure who the MSO 18 is, to be honest with you.
6      Q   Okay.
7      A   Tommy Jones -- uh -- and John Martin
8  Harris.
9      Q   And are Jones and Harris also department
10  employees?
11      A   Yes.
12      Q   Okay. And I went through this with Chief
13  Williams, but he didn't know the answer to all.
14  Could you go through the people that Mr. Butler sent
15  the e-mail to and tell me, if you can, whether or
16  not they work, worked for the Madison County
17  Sheriff's Department at the time this was sent? And
18  if not, if you could tell me if you know who they
19  are, please?
20      A   Kevin Akins. I don't know him. Brian
21  Albin, I know the name, but I don't know from where.
22  Trip Bailey, I don't know. Doug Barneski, I don't
23  know. Chief Belvedresi (sic) was, that's Eddie
24  Belvadressi. He was a department employee. LeeBo
25  Brock was a department employee. Mike Brown is a

Page 45

RANDALL TUCKER

1  
2  constable, duly elected constable in Madison County,
3  as well as a police officer in the City of Madison.
4  Bryan Burnside I know just in my personal life.
5  He's not a police officer, not affiliated. Brad
6  Butler, I do not know. Jim Butler -- uh -- Joey
7  Butler's father's name is Jim Butler. I don't that
8  that's the same person, but probably so. Taylor
9  Chastain was a deputy. Sean Dodds is a business
10  owner in Gluckstadt. Amanda Dodds is his wife. Lee
11  Drake, I believe, is with the attorney general's
12  office for Mississippi. I believe. He was with
13  Ridgeland, but I believe he's now at the attorney
14  general's office.
15      Robby Gray, I do not know. Brad Harbour is a
16  constable in Madison County. Josh/Andrea Harkins, I
17  do not know. Wait, yes, I do. Josh Harkins is a, I
18  think he's either a representative or congressman of
19  some type. Jay Houston is an investigator with the
20  attorney general's office. Bee Hudson is a Madison
21  County employee. Taco Johnson, I know a Taco and
22  Richard Johnson. I can't say that that's the same
23  person, so I'll withhold comment on him. Chad Joy,
24  I do not know. Jason King, I don't know. Russell
25  Kirby is a current employee of the sheriff's

RANDALL TUCKER

1
2  black drug dealer running from the law and posing a
3  threat to society, you call him a racist."  Do you
4  see that?
5      A   I do see that.
6      Q   Well, would you agree that if a white
7  police officer should say "black gang member or at
8  least beats up a black drug dealer running from the
9  law," that that is a racist act, sir?
10         MR. ROSS:  Object to the form.  No
11      context.
12      A   If he's running away?  Is that your
13  question?
14      Q   (Mr. Youngwood)  Let me ask the question
15  differently.  You have read this paragraph, and
16  you've read the e-mail.  In the context of this
17  e-mail, would you agree with me that this paragraph
18  expresses racist sentiment, sir?
19         MR. ROSS:  Object to the form.  You
20      can answer.
21      A   I think each incident would be unique.  I
22  don't know if he's running shooting, or if it's just
23  a flight, no, I wouldn't agree that the officer
24  should shoot him, and I wouldn't agree that if he
25  did, it would necessarily be a racist act.  It would

RANDALL TUCKER

1
2  be a criminal act.
3      Q   (Mr. Youngwood)  Do you have an opinion,
4  sir, as to whether or not this paragraph, in the
5  context of this e-mail expresses racist sentiment?
6         MR. ROSS:  Same objection.
7      A   I think this, as well as the rest of the
8  text, is inappropriate, yes.
9      Q   (Mr. Youngwood)  Okay.  You think it's
10  inappropriate.  Do you think it's racist?
11      A   The whole context of the e-mail can be
12  considered that from any point of view, yeah.
13      Q   Do you believe it to be racist?  This
14  e-mail?
15      A   It's not an e-mail that I would send, if
16  that's what you're asking me.
17      Q   It's not what I'm asking you.  I'm asking
18  you if you think it's racist?
19      A   The context of this e-mail?  Yes.
20      Q   This is a racist e-mail?
21      A   This man's opinion is a racist opinion.
22      Q   Okay.  If you'd go to the front of the
23  e-mail, please?  You sent it, as we went through, to
24  seven people?
25      A   Let me see.  1, 2, 3 -- yes.

RANDALL TUCKER

1
2      Q   Are all of them white?
3      A   Yes.
4      Q   And you went through the list of people
5  that Mr. Butler sent it to.  I recognize you don't
6  know all of them, but for those that you earlier
7  testified to that you are able to identify, were all
8  of them white?
9      A   I think you said the ones I don't know?
10      Q   Right.  I can't ask you about the ones you
11  don't know.
12      A   I don't know about the ones that I have no
13  affiliation with, but the others, yes, they're
14  white.
15      Q   Okay.  You can put the e-mail aside for
16  now.  We got to this e-mail because you have
17  identified it as related to one aspect of
18  Chief Williams' testimony that you didn't agree
19  with.  Were there any other specific instances of
20  testimony, of the six depositions that you sat
21  through, that you thought was wrong or you didn't
22  agree with?
23         MR. ROSS:  Object to the form.  You
24      can answer to the extent you can recall.
25      A   I recall at some points in some of the

RANDALL TUCKER

1
2  testimony that I thought to my head, I don't know
3  that that's right or that I don't agree with it, but
4  I can't sit here and tell you what those were.
5      Q   (Mr. Youngwood)  Okay.  There were --
6  there have been approximately 10 other depositions
7  in the case that you did not attend.  Have you been
8  apprized as to the contents of those depositions?
9      A   No.
10      Q   You have not seen the transcripts for
11  those depositions?
12      A   No.
13      Q   While on the topic of other depositions,
14  sir, what role, if any, have you played in
15  connection with the depositions that have taken
16  place in this case of your deputies and officers?
17      A   You mean the actual depositions?
18      Q   Let me ask a better question.  You
19  attended some, we know that.  You didn't attend
20  others.  Did you discuss testimony with any of the
21  officers or deputies who have testified prior to
22  their testimony?
23      A   I sat in meetings with my attorneys with
24  them, yes.
25      Q   Did you have any conversations with any of

RANDALL TUCKER

1  Ohio" or "Jeff from Ohio"?
2  MR. YOUNGWOOD: Jeff Ohio. And he
3  may also be from Ohio. I don't know.
4  Q  (Mr. Youngwood) Let me give you two
5  documents at once, sir. One is Exhibit 7 and one is
6  going to be Exhibit 8.
7  (Exhibits 7 and 8 marked for the record)
8  Q  Exhibit 7 has Bates Number 1182, and
9  Exhibit 8 has Bates Number 955. And the reason I
10  asked about Mr. Ohio, if, in fact, that's his name,
11  released these e-mails, does this refresh your
12  recollection as to Mr. Ohio?
13  A  I vaguely recall this e-mail, yes.
14  Q  Okay. Do you know who this person is?
15  A  I have no idea.
16  Q  Did you respond to these e-mails in any
17  way?
18  A  No.
19  Q  Did you review them when they came in?
20  A  I'm sure I read it.
21  Q  Okay. Did you take any action with
22  respect to receiving them?
23  A  No.
24  Q  Okay. The first one, Exhibit 7, it says

RANDALL TUCKER

1  "In your statements to the press, you stated your
2  deputies are professional law enforcement officers."
3  Well your deputies did not appear very professional
4  when they were forcing Mr. Manning to sign the
5  documents that he did not want to sign. A
6  professional law enforcement officer would know that
7  Mr. Manning has a Fifth Amendment right to remain
8  silent. Professional is a strong word. How about
9  Thug or Criminal? Sincerely, Jeff."
10  Do you see that?
11  A  I do.
12  Q  Okay. I take it you don't agree with
13  Mr. Ohio's sentiments in this e-mail?
14  A  Absolutely not.
15  Q  Okay. We'll talk about Mr. Manning later.
16  The second e-mail 8, "Mr. Tucker, I would like to
17  request to know if any of the officers in the video
18  featuring Mr. Manning have been disciplined or fired
19  because as I'm sure you know, it is a violation of
20  the Constitution to force citizens to sign
21  documents. If you would get back to me as soon as
22  possible, I would appreciate it."
23  Do you see that?
24  A  I do see that.

RANDALL TUCKER

1  Q  Okay. You did not respond to this e-mail
2  either; is that correct?
3  A  No.
4  Q  And his question, "if any of the officers
5  featured in the video of Mr. Manning" -- well, let
6  me take a step back. Have you seen that video?
7  A  Yes.
8  Q  Okay. And have you identified the
9  officers that are in that video at any time?
10  A  Yes.
11  Q  Okay. Have any of them been disciplined
12  in connection with that incident with Mr. Manning?
13  A  No.
14  Q  Okay. We'll discuss that later, as well.
15  You can put this one aside. Today in your job, what
16  e-mail account do you use?
17  A  Excuse me?
18  Q  What e-mail account do you use to perform
19  your work?
20  A  Rtucker@madison-co.com.
21  Q  And has that -- how long have you used
22  that account in connection with your work?
23  A  I guess since I started.
24  Q  Which was when, sir?

RANDALL TUCKER

1  A  I started with the sheriff's department in
2  2000.
3  Q  Okay. And you believe you have used that
4  account consistently since 2000?
5  A  Yeah, I think so.
6  Q  Have you ever used a personal account or
7  another account in connection with any of your
8  official duties?
9  A  No.
10  Q  Okay. How about texts? Have you used
11  texts on your phone?
12  A  Yes.
13  Q  In connection with your official duties?
14  A  Yes.
15  Q  And other officers within the sheriff's
16  department, am I correct that up until a year or two
17  ago many of them used personal accounts
18  in connection with the performance of their official
19  duties because they did not have -- well, strike
20  that. Other officers, up until a few years ago, had
21  used personal accounts in connection with their
22  official duties; is that correct?
23  MR. ROSS: Object to the form.
24  Asking him about things that may not be

RANDALL TUCKER

1
2 three years.  I don't recall a date that they
3 replaced that computer.
4    Q   Do you use a laptop?
5    A   I do not.
6    Q   Do you use any computer for your work,
7 other than the computer you just referenced, in your
8 office?
9    A   I have an iPad, but it has nothing on it.
10 All I do is look at the board agenda on it.
11    Q   You don't, otherwise, use it for your
12 work?
13    A   No, sir.
14    Q   Okay.  Do you maintain files in your
15 office at work?
16    A   No.
17    Q   You don't have any files?
18    A   No.
19    Q   Do you have files at home?
20    A   No.
21    Q   Do you have a county-issued car in some
22 way?
23    A   Yes.
24    Q   Do you maintain any files in that car?
25    A   No.

RANDALL TUCKER

1
2    Q   So you personally maintain no paper files?
3    A   Any file that I have is maintained at the
4 sheriff's department in our records department.
5    Q   Not in your office?
6    A   Right.
7    Q   And not in files assigned, file drawers
8 assigned to you or something like that?
9    A   Right.
10    Q   Okay.  Let's go back in time, sir.  Can
11 you briefly tell me your educational history?
12    A   A twelfth-grade education with, dropped
13 out after one, or during one semester of college to
14 raise my son.
15    Q   Where did you graduate from high school,
16 sir?
17    A   Madison-Ridgeland Academy in Madison,
18 Mississippi.
19    Q   So you've lived in Madison County your
20 whole life; is that right?
21    A   No.
22    Q   No?  Have you lived in Madison County
23 since graduating from high school?
24    A   Yes.  Well, no.  Let me back up.
25    Q   Certainly.

RANDALL TUCKER

1
2    A   I went and lived with my mother for a
3 short period of time in Dale City, Virginia, I
4 think.  Just out -- or Woodbridge.  I don't remember
5 the exact name of the county or what-have-you, but
6 it was very short.  And, yes, I went and lived with
7 my father in 1988 or '89, for about a year in Holly
8 Springs, Mississippi.  Other than that, I have been
9 here.
10    Q   Okay.  And you said you did one year of
11 college, approximately?
12    A   No, I started and during my first semester
13 I dropped out.
14    Q   Okay, where was that?
15    A   Mississippi State.
16    Q   Okay.  And upon leaving college, did you
17 secure employment?
18    A   Yes.
19    Q   Where did you work?
20    A   I believe Lake -- and I don't have an
21 order.  I don't remember.  Lake Harbor Marine, I
22 believe, is where I went right after that.
23    Q   Let me abbreviate this.  When did you get
24 your first law enforcement-related job?
25    A   In 1994.

RANDALL TUCKER

1
2    Q   Okay.  And prior to that, had you had law
3 enforcement training?
4    A   Prior to 1994?
5    Q   Yes.
6    A   No.
7    Q   Okay.  So where did you get a -- what job
8 did you secure in 1994?
9    A   I was a detention officer for then Sheriff
10 Jessie Hopkins at the Sheriff's Department in
11 Madison.
12    Q   Have you been employed by Madison County
13 Sheriff's Department continuously since 1994?
14    A   No.
15    Q   Okay.  How long did you serve as a
16 detention officer?
17    A   Until, let's see.  I think I was hired in
18 March or April and left in July to go to the Canton
19 Police Department.
20    Q   Okay.  July of '94?
21    A   Yes, sir.
22    Q   How long were you with the Canton Police
23 Department?
24    A   Until from July of '94 until the -- uh --
25 until 2000.

Page 82

RANDALL TUCKER

1
2      Q   And at that point, you re-joined the
3   Madison County Sheriff's Department?
4      A   That's correct.
5      Q   What positions did you have with the
6   Canton Police Department?
7      A   I started off as a patrolman.  After a
8   year or 16 months or so, I was promoted to narcotics
9   investigator.  And, ultimately, sometime in '98, I
10   believe, to narcotics supervisor.
11      Q   Okay.  And upon joining the Madison County
12   Sheriff's Department, what position did you have?
13      A   I was the narcotics investigator.
14      Q   Okay.  How long did you hold that
15   position?
16      A   Until -- well, actually, until I was
17   elected sheriff.
18      Q   In 2012?
19      A   Correct.
20      Q   Or elected in 2011?  Is that -- will you
21   tell me when you were elected?
22      A   I was elected in November of 2011, to
23   begin the term in January 2012.  But let me back up
24   just a minute.
25      Q   Yes, sir.

Page 83

RANDALL TUCKER

1
2      A   During that period, I was promoted within
3   the narcotics division.
4      Q   Do you remember when that was?
5      A   I want to say I was promoted from master
6   sergeant to lieutenant, and I want to say it was
7   July 2002.  And then sometime around 2007 or '8, I
8   was promoted to a captain, which I held, ultimately,
9   that position until I was elected sheriff in
10   November of 2011.
11      Q   Going back to 1994, when you secured your
12   first law enforcement-related job, did you receive
13   any training in connection with assuming that job?
14   Detention officer?
15      A   At that time, it was just in-house
16   training or on-the-job training, I guess you would
17   say.  Just training about proper procedure to do
18   things within the department.
19      Q   Did you later receive more formal
20   training?
21      A   No, I actually left there before I was
22   sent to any detention officer school.
23      Q   And how about when you were with Canton,
24   did you receive training?
25      A   After I was hired in July, I attended the

Page 84

RANDALL TUCKER

1
2   Mississippi Law Enforcement Officers Training
3   Academy in Pearl, Mississippi.  I don't remember the
4   exact start date, but I graduated on, I think it was
5   November 18th of that same year.
6      Q   Okay.  Did -- and I understand it was a
7   while ago -- did that training include any
8   instruction regarding issues related to race?
9      A   Uh -- I don't want to sit here and try to
10   cite the curriculum because it has been much too
11   long, but I think the curriculum is pretty well the
12   same today that it was back then.  So I would say, I
13   don't know that it said the word "race," but it
14   definitely addressed the treatment of all
15   individuals.
16      Q   Okay.  And since obtaining that -- I'm
17   sorry, attending that program, have you received
18   further training, further formal training?
19      A   Yes.
20      Q   And it may be quite a bit --
21      A   Ooh!
22      Q   -- but why don't you list for me what you
23   recall?
24      A   First line supervisor one and two.  Basic
25   narcotics investigation, undercover surveillance.

Page 85

RANDALL TUCKER

1
2   Gang violence.  Wow!  Uh -- I'm trying to -- T Kat
3   and criminal patrol.  Shoot, I don't know.  It's
4   extensive.
5      Q   Can you recall any of those later
6   programs, either the ones you've listed, or the ones
7   you haven't listed, concerning training,
8   specifically regarding race or race relations?
9      A   I don't know that specific, that it was
10   addressed specifically to that topic, no.
11      Q   Okay.  In terms of the training that you
12   currently give your officers, does any of it cover
13   race or race relations?
14      A   Uh -- we've recently, and I say "recent,"
15   I don't remember the exact dates in the last couple
16   of years, have had -- uh -- the FBI come in and do
17   civil rights training for our detention officers and
18   our deputies.  That was specific to civil rights
19   stuff.
20      I don't know that any other, anything else we
21   do.  You know, we have sent some officers to Spanish
22   classes to be able to speak with the Hispanic
23   population that speaks that language solely within
24   our community.  I don't know that there are any
25   specific classes geared toward race or geared toward

RANDALL TUCKER

1  everyone, I think.
2      Q   Let's take a look at Exhibit 3, which is
3  in your stack, sir.  It's the interrogatory
4  responses.  And I'd like to refer you to, sir, it's
5  about halfway through the document.  After the
6  signature pages that we looked at earlier, there's
7  some pages with Bates numbers that say MC-INT.  It
8  begins 1-1, but I want to refer you to 1-2.
9      A   Okay.  I believe I have it.
10     Q   Okay.  There's a description here in these
11  responses of job descriptions.  If you can see, they
12  start on 1-1 and they continue to 1-2?
13     A   Yes, sir.
14     Q   And sheriff is listed toward the
15  middle-ish of the page on 1-2.  Do you see that?
16     A   Yes.
17     Q   And it says, "Senior executive position.
18  Serves as the point and authority for the entire
19  department.  It develops policy and procedure and
20  directs all activities of the department."  Do you
21  see that?
22     A   Yes.
23     Q   Is that a correct description of your job
24  responsibilities, sir?

RANDALL TUCKER

1      A   Among others, yes.
2      Q   We'll come back to this, but what are the
3  others?
4      A   Well, I think, basically, I oversee
5  personnel for the department.  Now, a lot of that I
6  delegate, but, ultimately, I'm responsible for
7  everything in the department.
8      Q   Okay.  And being responsible for
9  everything means you're responsible for the policies
10  of the department; correct?
11     A   Yes.
12     Q   You're responsible for the procedures
13  undertaken by the officers and the deputies within
14  your department; correct?
15     A   Yes.
16     Q   You're responsible for the acts of your
17  officers and deputies; correct?
18     A   No.
19     Q   Okay, why not?
20     A   Well, I'm certainly not responsible for
21  any criminal act they commit or anything of that
22  nature.
23     Q   Okay.  Are you aware of any criminal acts
24  that your deputies have committed since you became

RANDALL TUCKER

1  sheriff?
2      A   Yes.
3      Q   And what are those?
4      A   I had a narcotics officer that committed
5  fraud that, ultimately, confessed to his crime and
6  was terminated.
7      Q   Okay.  Any others?
8      A   I had an officer that, basically, was
9  found to be in possession of a firearm that he did
10  not turn in as evidence, and it was located at his
11  residence.  He was terminated.
12     Q   Okay.  Any others?
13     A   Uh -- not that I can think of off the top
14  of my head.  I'm not saying there aren't, but I --
15     Q   I understand.
16     A   Yeah.
17     Q   Other than those two incidents and
18  recognizing there may be others that come to you,
19  are there any other acts of your officers or
20  deputies that you're aware they have committed in
21  connection with their professional responsibilities
22  that you do not believe you're responsible for?
23         MR. ROSS:  Object to the form.
24         Answer if you can if you're responsible

RANDALL TUCKER

1  for the policies and the procedures, and then
2  if you follow them on every patrol.
3         (COURT REPORTER ASKS FOR
4         CLARIFICATION)
5         MR. ROSS:  He doesn't follow them on
6         every patrol.
7      A   While they are on duty, I would say that
8  outside of a criminal act or a violation of the law
9  or someone's rights, I would say that I oversee
10  their activities or probably am responsible for
11  their activities.
12     Q   (Mr. Youngwood)  Okay.  And we had covered
13  violation of the law a moment ago.  You also then
14  listed violation of rights.  Other than, perhaps,
15  the two incidents you listed that were criminal
16  violations, are you aware of any of your officers,
17  since you have been sheriff, violating anyone's
18  rights?
19     A   No, I'm not.
20         (Exhibit 10 marked for the record)
21     Q   I'm giving you Tab 10, sir.  I'm sorry,
22  Exhibit 10.  Sir, this is a collection of material
23  that I believe you're probably more familiar with as
24  sitting in a binder, but it's titled "Policies and

Page 102

RANDALL TUCKER

1
2     Q   And you were employed by the Madison
3  County Sheriff's Department in 2006; correct?
4     A   Yes.
5     Q   Were you aware that a group of Canton
6  residents had presented certain grievances to the
7  Madison County Board of Supervisors?
8     A   I wasn't aware of any petition or anything
9  to the Board of Supervisors.  I was aware of David
10 Archie, who is a good friend of mine, who was, I
11 guess a liaison for some residents in the City of
12 Canton.
13    Q   I'm sorry, what about Mr. Archie were you
14 aware of?
15    A   I think he -- I think they -- uh -- if
16 this is what I'm thinking of, I think they,
17 ultimately, marched from Canton towards the
18 sheriff's department and went to ultimately
19 arrest -- he was ultimately arrested, I think by
20 then Chief Robert Wynn of the Canton Police
21 Department.
22    Q   Did you have an understanding as to what
23 prompted their march?
24    A   No, I was not privy to any administrative
25 proceedings back then.

Page 103

RANDALL TUCKER

1
2     Q   Did you have an understanding as to what
3  message they were seeking to convey by making this
4  march?
5     A   No, I didn't participate in that.  I was
6  over the narcotics unit.
7     Q   Were you aware that there were complaints
8  raised in 2006 regarding frequent roadblocks in
9  predominantly black neighborhoods?
10    A   I'm aware that there were complaints of
11 roadblocks all over Madison County.
12    Q   In 2006?
13    A   Yes.
14    Q   What was the nature of the complaints that
15 you were aware of in 2006?
16    A   They're always going to have somebody
17 unhappy if they have to sit at a roadblock.  I don't
18 know the nature of any complaint.  I know there were
19 some complaints made about roadblocks back then, but
20 I couldn't tell you who made them or where they were
21 generated from.
22    Q   Were you aware of complaints regarding
23 racial profiling?
24    A   No, I was not.
25    Q   The Clarion-Ledger, is that a newspaper

Page 104

RANDALL TUCKER

1
2  you read?
3     A   No.  I do not read it.
4     Q   What newspapers do you read?
5     A   I don't read newspapers.
6     Q   Okay.  How do you get your news?
7     A   Occasionally, I watch it on the
8  television, but I generally try to form my own
9  opinion.  I don't base it off of what the news
10 opinion is.
11    Q   Well, how do you get your facts that serve
12 as the basis for your opinion?
13    A   I investigate if I want to know something
14 before I give an opinion.  I don't just blurt it
15 out.
16    Q   Okay.  How do you learn about news and
17 facts within Madison County?
18        MR. ROSS:  Object to the form.
19        Broad.
20    A   Can you be more specific?  I don't know
21 what news or facts you're referring to.
22    Q   (Mr. Youngwood)  Well, we can focus on
23 what we have been discussing, paragraph 118 of the
24 complaint.  You said you were aware of a march.  You
25 said you were aware of complaints about roadblocks.

Page 105

RANDALL TUCKER

1
2  What was your source of that awareness?
3     A   I had heard from other deputies about the
4  complaints of the roadblocks.  I, actually, saw
5  Mr. Archie when he was arrested with my own eyes.
6  That's not an investigation, if that's what you're
7  asking, but that's how I gave you the information.
8     Q   But you were unaware of the reason for
9  Mr. Archie's march?
10    A   I didn't know what the reasons were.
11    Q   If you'd go to paragraph 121, sir?  This
12 references an article in The Clarion-Ledger in July,
13 2007, regarding District 5 Supervisor, Paul Griffin.
14 Do you know District Supervisor Paul Griffin?
15    A   I do know him.
16    Q   Okay.  And were you aware of concerns
17 raised by him about there were people in Madison
18 County who believed that the Madison County
19 Sheriff's Department was perceived as targeting
20 black community members?
21    A   Back then or now?
22    Q   Well, back then.
23    A   I didn't talk to him back then.
24    Q   So you were -- well, what if I change the
25 question to now?

RANDALL TUCKER

1
2      A   Well, he and I sit next to each other at
3   every board meeting, and are good friends and
4   discuss issues, and he doesn't understand why I'm
5   being sued either.
6      Q   Tell me about your conversations with him
7   regarding this lawsuit.
8      A   That was the only remark he made.
9      Q   Tell me how long of a conversation.
10     A   I just told you that's the only remark he
11  made.
12     Q   He didn't understand why you were being
13  sued?
14     A   That's what he said.
15     Q   Okay.  How about The Madison County
16  Journal, is that something that you read?
17     A   I don't read the newspaper.
18     Q   Okay.  Paragraph 123, there's a discussion
19  of a January 2008 article in that publication.  The
20  article notes that "Sheriff Trowbridge has been the
21  subject of complaints from African-Americans living
22  in Canton, Flora, who say he practices racial
23  profiling."  Do you see that?
24     A   Yes.
25     Q   Were you aware that Sheriff Trowbridge had

RANDALL TUCKER

1
2   been the subject of complaints from
3   African-Americans regarding racial profiling?
4      A   I think I have already testified I didn't
5   know about any racial profiling complaints.  I knew
6   there was a complaint about roadblocks, but I don't
7   know where that was generated from.
8      Q   And to your knowledge, did that complaint
9   about roadblocks relate to race?
10     A   I do not know.  I don't know where they
11  were generated from.
12     Q   Okay.  When you took over as sheriff, you
13  had access to any written complaints that existed
14  regarding Sheriff Trowbridge; correct?
15     A   I don't know that I had access or not, to
16  be honest with you.  I had never seen any.
17     Q   Okay.  Put that document to the side for
18  now.  Let's return to what we previously marked as
19  Exhibit 10, please, sir.  This is the collection of
20  policies.  And to that letter that or memo dated
21  January 3, 2012, do you see that?
22     A   You're referring to the back of the --
23     Q   Yes.
24     A   Yes.
25     Q   It's the second, it's the second cited

RANDALL TUCKER

1
2   piece of paper in the document.  The sentence you
3   pointed me toward earlier, "Variations of these
4   policies and procedures may be made at the
5   discretion of the sheriff," do you see that?
6      A   Yes.
7      Q   What does that mean?
8      A   That means if I decide to change a policy,
9   update a policy, add a policy, delete a policy, that
10  I have that discretion to do that.
11     Q   And how would -- if I were employed in the
12  Madison County Sheriff's Department, how would I
13  know if you had done so?
14     A   If it was a written policy, you would be
15  advised to place it in your binder.  If it was a
16  verbal change in policy, it may be something that
17  was addressed at a general meeting or a verbatim
18  with each division.
19     Q   Okay.  And so if it was a written policy,
20  it should be in a current version of the manual;
21  fair to say?
22     A   Yes.
23     Q   Okay.  And if it was -- what's a non-
24  written policy?
25     A   A non-written policy would be a five guys

RANDALL TUCKER

1
2   don't go to the same restaurant at eleven o'clock
3   for dinner.
4      Q   Okay.
5      A   It's not written, but they know I don't
6   want five people in the same location for lunch.  It
7   looks, gives the appearance to the citizens that,
8   "Hey, who is protecting Madison County?"
9      Q   I understand.
10     A   Okay.
11     Q   And such unwritten policies, you're
12  saying, would be conveyed either at these periodic
13  staff meetings that you testified about earlier this
14  morning; correct?
15     A   Possibly.
16     Q   Okay.  Well, how else would they -- if I
17  worked there, how would I know how to follow your
18  unwritten policies?
19     A   Uh -- if it was division-specific, I may
20  call the division head in, or the chief may call the
21  division head in and address something with them
22  personally.  That's not written, but if I tell you
23  don't fill out a report in blue ink, fill it out in
24  black ink, and they -- you know, that's the way I
25  want it filled out.  Does that answer your question?

Page 110

RANDALL TUCKER

Q   Are you aware of any unwritten policies --
strike that.  Are there any unwritten policies in
Madison County Sheriff's Department regarding race?
A   I don't know if they are unwritten or not.
I mean, like I said, I address it with every new
employee that we get in an orientation-type setting,
but I think there is some, some language within the
policy and procedure manual, itself, that says to
treat all citizens the same or with respect
regardless of race, gender.  I can't quote it
word-for-word.
Q   Why don't we take a look at that?
A   Okay.
Q   And you were here, I believe, when
Chief Williams went through Exhibit 10 with me and
identified a number of policies in response to my
questions regarding race; correct?
A   Yes.
Q   Okay.  Uh -- if we go to page -- well,
they're not page numbered, but Section 34?  Is this
the policy you were just thinking of, sir?  Ethics?
A   I wasn't thinking of one specific there.
I think there is probably more than one area.  But
-- uh --

Page 111

RANDALL TUCKER

MR. ROSS:  Take the time to read that
if you need to, Sheriff.
Q   (Mr. Youngwood)  Read it as much as you
wish, sir, but if it would assist you, I think Chief
Williams refers to section or Paragraph C of this.
A   Yes.
Q   Do officers receive any training
specifically on this paragraph?
A   I'm not sure I follow you.  Are you
talking about as written in this policy and
procedure manual?
Q   Yes.
A   They're given this manual when they're
employed.  They are to study and know this manual,
and they're not tested on it, I wouldn't say, but I
don't know that there's any specific training toward
Paragraph C of Policy 34.1, no.
Q   You said they weren't tested on this.
What steps, if any, do you take to ensure that they
actually have absorbed the substance of the policy
manual, including Section 34.1?
A   Just a verbal questioning.  "Have you read
and understanding any questions."
Q   Anything further?

Page 112

RANDALL TUCKER

A   No, there's no other verification, no.
They are instructed that they are to know it.
Q   Okay.  When Chief Williams and I discussed
this manual and issues or policies that related to
race within it, he also referenced Section 15.1
earlier in the document.  Do you see that?
A   I see page 15.1, yes, sir.
Q   And he referred me to Section A,
"Prohibited Activity," Paragraph 2, "Employee shall
not make offensive or derogatory comments based on
race, color, sex, religion, or national origin,
either directly or indirectly to another person."
Do you see that?
A   Yes.
Q   Okay.  What if any training or what if any
training do your officers receive to ensure they
comply with Section 15.1 A, Subparagraph 2?
A   I don't know that there's a specific test
or training curriculum for 15.1, Subsection 2, but,
again, they're instructed to know the policies and
procedures, and this is an actual workplace -- uh --
harassment workplace policy.  I don't know if
there's any specific training.  It's pretty much
common sense.

Page 113

RANDALL TUCKER

Q   Go to Section 24.1.  This is another page
of the manual that Sheriff, I'm sorry, Chief
Williams referred me to.  Its title is "Conduct
Unbecoming to An Employee."  24.1.
A   Okay.
Q   And he referred me, I believe, to Section
A, Section B, but, generally, to this page.  Do you
see it?
A   I'm on page 24.  Are you talking about A
under procedures here?
Q   Yes, sir.
A   Yes, I see it.
Q   And then he also referenced me to the next
page, "The Law Enforcement Code of Ethics."  Do you
see that?
A   I do.
Q   What training or steps are taken to ensure
that employees comply with this section of the
manual?
MR. ROSS:  Object to the form.  It's
two whole pages.  You can answer to the
best of your ability.
A   Again, they are instructed and sign for
this when they're employed and questioned to whether

Page 114

RANDALL TUCKER

or not they have read it and understand it.  There's
no specific training after it's been issued and the
employee acknowledges that they have read it and
understand it.  There's no specific training to
these topics therein.  Is that what you're asking
me?
    Q    That is what I'm asking you, yes, sir.
    A    Okay.
    Q    And is there any ongoing monitoring to
ensure compliance with the sections of the manual
that we've discussed in the last five minutes?
    A    Through supervisors, observations, or the
chief deputy's observations, or mine.  I mean these
are professional men and women.  I don't follow them
around.  But I think if there's a violation of
those, it's the duty of those supervisors to bring
it to our attention.
    Q    Okay.  And are you aware of, of any
violations of the sections of the manual that we
have just looked at in the last five or ten minutes
being brought to your attention since you have been
sheriff?
        MR. ROSS:  I object to the form.  You
    have brought several to his attention.  A

Page 115

RANDALL TUCKER

compound question.
    A    I don't think he or I have done anything
in the last five or ten minutes that would violate
that.
    Q    (Mr. Youngwood)  That was -- that was not
my question.  My question is are you aware, since
you have been sheriff, of supervisors bringing to
your attention violations of these sections?
        MR. ROSS:  Same objection.
    A    I can't cite one.  I'm sorry.
        MR. ROSS:  Same objection.
    A    I can't cite one.
    Q    (Mr. Youngwood)  Are you aware of any
improper behavior tied to race being brought to your
attention since you have been sheriff?
    A    No.
    Q    Let's go to 37.1, please.  It's called
"Impartiality."  Do you see this?
    A    Yes.
    Q    And Subsection A, "No employee will be
given or denied any assignment based only upon age,
sex, race, religion, politics, or physical handicap
unless such action will create a hazardous condition
for the individual of others."  Do you see that?

Page 116

RANDALL TUCKER

    A    Yes.
    Q    Can you tell me how assigning something,
assigning somebody, based on race, could create a
hazardous condition to the individual or others?
        MR. ROSS:  Object to the form.  It's
    not what the policy necessarily says.
    A    Do you mind if I take a second and read
it?
    Q    (Mr. Youngwood)  No.
    A    I don't understand your question, so I
want to be sure and read.
    Q    Yes, sir, take your time.
    A    (PAUSE WHILE WITNESS EXAMINES DOCUMENT)
Okay, now what's your question again?
    Q    This rule says that an employee can be
denied an assignment if such action will create a
hazardous condition for the individual or officer.
Is that a fair reading of the rule?
    A    Yes.
    Q    And it says "that such denial could be
based on age, sex, race, religion, politics, or  a
physical handicap, again, if such hazard, if it
would create a hazardous condition."  Is that
correct?

Page 117

RANDALL TUCKER

    A    That's what it says.
    Q    Can you give me an example of how an
assignment based on, for example, race, would
create a hazardous condition for an individual or
others?
    A    I don't know that it's specific that each
section addresses each criteria specifically.
There's -- I'm sure there's -- uh -- let me use
something other than race.  I mean like religion, I
wouldn't ask a, let's just say Pentecostal, for
instance.  They are known for not cutting their hair
and wearing skirts and things of that nature.  If
that's part of their religious belief, I wouldn't
ask them to go against that.  Does that make sense?
    Q    I understand.
    A    By requiring them to wear trousers.
    Q    But you can't think of a similar example
that would apply to race?
    A    Well, no, and I don't know that this, that
that -- I don't know that any subsection of that
would apply to every -- I can't think of one that
would necessarily apply to sex either, but --
    Q    Okay.  Let's go to 38.1, just the next
page.  "Police Offenses: Disciplinary," and there's

RANDALL TUCKER

1
2  be on the driver's license being run.  I don't know
3  if that's maintained.  It's not on the CAD report,
4  so.
5      Q   Right.
6      A   -- I don't -- I don't think we maintain a
7  --
8      Q   Right.
9      A   -- a log of race on a driver's license.
10      Q   Now, the decision to run a license, that's
11  left to the discretion of the officer; fair to say?
12      A   Yes.  That -- the more information he
13  gives about that stop, in the event something
14  happens, yes, the dispatcher would be able to say
15  "we're looking for a vehicle with this tag number or
16  this color vehicle or -- a starting location," where
17  we need to start looking for an incident that may
18  happen, yes.
19      Q   I'm trying to keep with your example that
20  simply somebody stopped, ran a -- I'm sorry, ran a
21  stop sign.  So you're not looking for a vehicle.
22  You just stopped somebody.  Whether or not to run
23  that license is left to the --
24      A   I don't mean to cut you off.
25      Q   Yeah.

RANDALL TUCKER

1
2      A   But any stop, something can happen.
3      Q   I understand.
4      A   The more indicators he gives about the
5  vehicle, the tag information, the make of the
6  vehicle, the color of the vehicle, the location
7  where they are, that is all information -- the more
8  information they can give his dispatcher, the better
9  off he's going to be in the event that something
10  happens.  That's all I was trying to say.
11      Q   I appreciate that, but how much of that
12  information to give is left to the discretion of the
13  individual officer; fair to say?
14      A   Yes.
15      Q   And then whether or not to give a citation
16  for running a stop sign left to the discretion of
17  the officer; fair to say?
18      A   Yes.
19      Q   Okay.  What, if anything, does the
20  sheriff's department do to ensure that officers, in
21  exercising their discretion, are not making
22  decisions based on race in the situation we have
23  just been discussing?
24      A   Well, I think it's a lengthy process, to
25  be honest with you.  I think it starts at the hiring

RANDALL TUCKER

1
2  process.  You hire good quality folks, good folks of
3  good moral character, you give them a policy and
4  procedure book, and you explain to them the rules
5  and regulations of the department, and you stress
6  that in meetings.  I don't know that there's a
7  specific curriculum addressing that.
8      Q   Okay.  Is there any monitoring of the
9  actual behavior of the officers that your department
10  performs to ensure that people are not exercising
11  the discretion in some manner, based on race?
12      A   Aside from the supervisors or the chief
13  deputy or myself watching or listening to the radio,
14  there's -- I don't keep my hand, my phone on them,
15  no.  I've got professional deputies.  I don't have
16  to do that.
17      Q   Okay.  So nothing is done, for example, to
18  determine whether or not certain deputies give
19  citations to flag people at a higher frequency than
20  they give them to white people for similar offenses?
21      A   If I received a complaint or information
22  that a certain deputy was being indifferent,
23  absolutely, I would monitor that more closely to
24  ensure it.
25      Q   Okay.  Have you ever received such a

RANDALL TUCKER

1
2  complaint?
3      A   I have not.
4      Q   Let's also discuss roadblocks.  My
5  understanding is that at roadblocks, cars are
6  stopped and that driver's licenses are requested.
7  Is that fair, initial summary of what happens at a
8  roadblock?
9      A   Yes.
10      Q   And is that discretionary?  If somebody is
11  driving through a roadblock, do the officers have
12  any discretion not to ask for that driver's license?
13      A   No, we stop every vehicle and ask for
14  those.  If that's the purpose of the roadblock, to
15  check driver's license.
16      Q   We'll get to the purposes of the
17  roadblocks in a bit, but you, I think you have been
18  in the room, sir, when there's been testimony from
19  officers, for example, that if the roadblock gets
20  backed up, cars get waved through; correct?
21      A   Yes.
22      Q   And so the determination of whether or not
23  the roadblock is backed up and which cars to wave
24  through, that's left to the discretion of the
25  officers; fair to say?

Page 130

RANDALL TUCKER

1
2    A   It's based on the circumstance, but yes.
3    Q   And once somebody is stopped at a
4  roadblock, it could be that the officer observes a
5  busted taillight or some other infraction of that
6  nature; correct?
7    A   Yes, that's possible.
8    Q   And they would be empowered to issue a
9  citation in that case, as well; correct?
10   A   They could issue a citation for any
11 infraction, yes.
12   Q   Okay.  And for some infractions, they
13 could arrest an individual; correct?
14   A   Under the law, you can arrest an
15 individual for any infraction.
16   Q   Okay.  So somebody has a busted taillight,
17 one could be arrested for that?
18   A   Yes, you could.
19   Q   Okay.  And so if somebody has a busted
20 taillight, am I correct there are at least three
21 broad categories of options:  Arrest, citation, or
22 wave the person through with a verbal warning; is
23 that fair to say?
24   A   Those are three options, yes.
25   Q   Okay.  And if the third option is taken,

Page 131

RANDALL TUCKER

1
2  the verbal warning, would there be any record of
3  that?
4    A   No.  Unless he calls it into dispatch and
5  says "verbal warning."  There would be no written
6  record, no.
7    Q   But there is no requirement that one calls
8  in a verbal warning?
9    A   No.
10   Q   Okay.  Citation, there would be a record;
11 correct?
12   A   Yes.
13   Q   Incident report or no incident report, in
14 case of a citation at a roadblock?
15   A   There is no incident report on the ticket.
16 There would be a general CAD report on the
17 roadblock, itself.
18   Q   Okay.  But the CAD report, and we have
19 discussed, probably does not indicate the race;
20 right?
21   A   Right.
22   Q   And, certainly, this is going back to the
23 other category, if there's no record of a warning,
24 there is going to be no record of what race it is of
25 the people who got the verbal warning; right?

Page 132

RANDALL TUCKER

1
2    A   Right.
3    Q   Okay.  Arrests would have to be an
4  incident report; correct?
5    A   It should be an incident report, yes.
6    Q   And then we would know race; right?
7    A   Yes, there's a block for race on an
8  incident report.
9    Q   And between the three options we have just
10 outlined at the roadblocks -- a verbal warning,
11 incident report, or arrest -- that is also left to
12 the discretion of the officers, depending on the
13 situation; correct?
14   A   Can you repeat that, because I -- my
15 inclination is to say no, but I want to make sure.
16      MR. ROSS:  Are you still talking
17   about the taillight example?
18      MR. YOUNGWOOD:  The taillight
19   example, yes.
20   A   Okay.
21   Q   (Mr. Youngwood)  So taillight example at a
22 roadblock, whether or not there's an arrest, a
23 citation, or a verbal warning without a record
24 created, that's left to the discretion of the
25 officer?

Page 133

RANDALL TUCKER

1
2    A   No.  Part no.  Part yes.
3    Q   Okay.  Explain, please.
4    A   The arrest is not -- there's no discretion
5  to the officer whether or not he writes the report.
6  There's a report due on every arrest.  The other
7  two, yes.
8    Q   Okay.  I'm sorry.  Thank you.  I
9  appreciate the elaboration.  I was asking a more
10 basic question which is which of those three
11 options -- arrest, citation, verbal
12 warning/nothing -- that decision is left to the
13 discretion of the officer?
14   A   Whether or not to issue a citation, the
15 officer doesn't have to arrest you for the busted --
16 he doesn't have to arrest you for any of them,
17 unless it's a warrant for a busted taillight from a
18 previous encounter.
19   Q   All right.  So whether or not to arrest is
20 left to the discretion of the officer?
21   A   Yes.
22   Q   Okay.  And whether or not to issue the
23 citation is left to the discretion of the officer?
24   A   Yes.
25   Q   Or whether or not to either give a verbal

RANDALL TUCKER

1
2 warning or no warning, left to the discretion of the
3 officer; correct?
4    A   Yes.
5    Q   And are there any written policies or
6 procedures that guide officers in exercising that
7 discretion?
8    A   No.
9    Q   And you just said, sir, that the decision
10 of whether or not to exercise a warrant and arrest
11 somebody, that is not discretionary?
12    A   I think there are instances where common
13 sense and good judgments has to be used, but the
14 warrant, itself, is commanding you to take the body
15 of.
16    Q   Okay.  So in certain circumstances,
17 officers may exercise their discretion not to
18 enforce a warrant on the spot?
19    A   Yes.
20    Q   Okay.  And that's a use of their
21 discretion again; correct?
22    A   I want to make sure you understand that
23 that's only under very limited circumstances.  If I
24 was to pull someone over and I recognize her and
25 know she's got a warrant and she's in labor,

RANDALL TUCKER

1
2 obviously, I'm going to let her go to the hospital
3 and have the baby.
4    Q   So you said if you recognize her?
5    A   Yeah, from a previous encounter, yeah.
6    Q   So if you didn't recognize her, you --
7    A   I would still let her go and have her
8 baby.
9    Q   Well, what is the relevance of the
10 recognize in your answer, sir?
11    A   It was trying to give you an example.
12    Q   Okay.  Going back to the overall taillight
13 at a roadblock situation, is there any monitoring
14 that you do of your officers to ensure that the
15 "exercise at their discretion" between those three
16 categories is not in some manner based on race?
17    A   No, I don't keep a thumb on the
18 supervisors on the shift or at the roadblock unless
19 I get a complaint of a certain officer that is
20 exhibiting that type of conduct, and then I would
21 look into it further.
22    Q   Okay.  And even in some serious situations
23 there is some discretion left to you and your
24 officers regarding whether or not to arrest people
25 for what might constitute a crime; is that fair to

RANDALL TUCKER

1
2 say?
3    A   Yes.
4    Q   And so I'm going to refer you -- I'm going
5 to refer you to an incident that I saw in the press
6 that, apparently, took place in May 2016, regarding
7 the unfortunate death of a child in a hot car.  Do
8 you recall that, sir?
9    A   I do.  It was my birthday.
10    Q   And what do you recall about that
11 incident, sir?
12    A   I know that my friend, David Archie's
13 grandson was killed.
14    Q   Okay.  And this was a two-year-old girl;
15 is that right?
16    A   No, it was a six-year-old boy.
17    Q   Okay.  We may be referring to different
18 incidents.  What's the incident regarding
19 Mr. Archie?
20    Q   Did you say in May of 2016?
21    Q   I did, but, obviously, could be many
22 things that happened in May of 2016.
23    A   You just tell me which incident you're
24 talking about, and I'll answer it.
25    Q   Well, why don't you tell me about

RANDALL TUCKER

1
2 Mr. Archie first, and I'll get back to this one.
3    A   I just told you his grandson was killed,
4 and you asked me about that date.  I remember that
5 incident because it was my birthday.
6    Q   Okay, was he -- what were the
7 circumstances of the death?
8    A   He was kidnapped in Jackson as a toddler
9 in a vehicle.
10    Q   Are we referring to May '16 or May '17,
11 sir?  I'm wondering if we might be on different
12 years.  This past year or a year and a half ago?
13    A   He was actually kidnapped on the 17th,
14 and was found on the 18th.
15    Q   I was referring to year.  I think you're
16 referring to day.  I was referring to -- are you
17 referring to May 16, 2017?
18    A   No.
19    Q   What year are you referring to?
20    A   I think it was last year.
21    Q   Eighteen months ago?
22    A   I think that's correct.  I don't remember
23 the exact date.
24    Q   Okay.
25    A   I thought that's what you were

Page 138

RANDALL TUCKER

1
2 referencing.
3     Q   Okay.
4     A   That's my mistake.
5     Q   No, I'm referring to a different thing.
6 In that matter, there were arrests made; is that
7 correct?  In the matter you were just referring to?
8     A   Yes.
9     Q   Yes?  Okay.  No, that is not what I'm
10 referring to.  I'm referring to an incident reported
11 in the press in May 2016.  So, again, it is the same
12 time period where a two-year-old girl was found dead
13 in a vehicle at a daycare center.  Do you recall
14 that at all?
15     A   Yes.
16     Q   Okay.  No arrest was made of the mother in
17 that matter; is that correct?
18     A   The grand jury decided not to indict her.
19     Q   Okay.  Did your discretion or the
20 department's discretion play any role in that
21 incident?
22         MR. ROSS:  Object to the form.
23     Q   (Mr. Youngwood)  To your knowledge?
24         MR. ROSS:  Are you talking about the
25         grand jury's decision or what aspect?

Page 139

RANDALL TUCKER

1
2         MR. YOUNGWOOD:  Yes, the grand jury's
3 decision.
4     Q   (Mr. Youngwood)  To your knowledge?
5     A   Did my office have anything to do with
6 grand jury decision?  No.
7     Q   Okay.  Did you arrest the mother?
8     A   They didn't indict her.  No, sir, we
9 didn't.
10     Q   Well, sometimes you arrest people before
11 they're indicted; correct?
12     A   Oh, absolutely!
13     Q   Okay. and was it an exercise of your
14 discretion there not to indict, I'm sorry, not to
15 arrest the mother?
16     A   Based -- you know every situation is
17 unique, but based on the circumstances in that
18 particular case, and in discussions with the
19 district attorney, who would ultimately prosecute
20 the case, it was his decision that we should present
21 it to the grand jury and act on their actions.
22     Q   And I don't believe the name of the mother
23 is public, and if that's the case, I certainly don't
24 need to hear it, but do you know what the race of
25 the mother was?

Page 140

RANDALL TUCKER

1
2     A   I believe she was a white lady.
3     Q   Tell me, sir, based on your knowledge how
4 it is determined where roadblocks are set in Madison
5 County?
6     A   Uh -- there's a number of criteria,
7 actually, and I can't sit here and cite them all.
8 But you've got to consider the general safety of the
9 public and the officers in determining a location.
10 You don't want to sit up around a curve or over a
11 hill or anywhere of that manner.  You want to be
12 sure and set up where you can safely get the
13 vehicles out of the flow of traffic, off on the
14 shoulder of the road if you have to issue a citation
15 or conduct a further investigation.
16         You have, you know, in the best-case scenario,
17 you have marked vehicles with blue lights, officers
18 wear safety vests.  It's generally posted at the
19 justice court the location, the times, things of
20 that nature.
21     Q   Okay, you said, generally, you'd have
22 marked cars, blue lights.  What did you mean by
23 that?
24     A   We do have officers that don't have marked
25 cars, and they, obviously, are allowed under the law

Page 141

RANDALL TUCKER

1
2 to conduct a check-point as long as they've got the
3 identifying information -- vehicles have blue
4 Lights, what have you.
5     Q   But who determines where officers set up a
6 roadblock?
7     A   I guess that would be the discretion of
8 the supervisor at the time to approve that location.
9     Q   And the various factors that you outlined
10 a moment ago that might go into setting up the
11 location, are those written out somewhere?
12     A   Yeah, they're in the policy and procedure
13 manual.  I don't know that every single thing
14 outlined is, but the general guidelines are.
15     Q   Let's take a look at that.  This marked as
16 Exhibit 7, I'm sorry, 14.  Sorry.
17         (Exhibit 14 marked for the record)
18     Q   Is this the policy that you were just
19 referring to?
20     A   It appears to be.
21     Q   Okay.  And is this policy currently in
22 effect?
23     A   Yes.
24     Q   Is there any aspect of the policy that is
25 not contained within these four pages marked Bates

RANDALL TUCKER

1
2 Number MC-RFP 2-1 through 2-4?
3         MR. ROSS:  Object to the form.  Are
4     you talking about with regard to criteria
5     for the location of roadblocks?  Is that
6     what you are talking about?
7         MR. YOUNGWOOD:  Well, I'll broaden.
8     Q   (Mr. Youngwood)  Is there any aspect of
9 your roadblock policy that is not reflected in these
10 pages?
11    A   I don't think so.
12    Q   And the first several pages of this
13 document refers to sobriety checkpoint guidelines.
14 Do you see that?
15    A   Yes.
16    Q   Okay.  And then the end refers to general
17 roadblocks; do you see that?
18    A   Yes.
19    Q   Okay.  What is the difference between the
20 sobriety checkpoint and a general roadblock?
21    A   There is no difference.  They're conducted
22 the same way.
23    Q   Okay.  If I were your supervisor, your
24 deputy, where in here would I be able to determine
25 what my guidance is and where and when I can set up

RANDALL TUCKER

1
2 a roadblock?
3     A   I don't -- I don't know that there is on a
4 sobriety checkpoint that you're saying that there's
5 a guideline on when you can set one up?
6     Q   Or we'll go with the where.  Start with
7 the where.
8     A   Where would you go in this policy to get
9 instruction for that?  Was that your question?
10    Q   Where in this policy does it tell me where
11 I can set up a checkpoint or a roadblock?
12    A   It doesn't tell you where you can set it
13 up.
14    Q   Okay.  Does it tell me when I can set one
15 up?
16    A   I mean, it says that officers can set up a
17 roadblock in the event of escaped subjects.  I'm not
18 sure what your question is.
19    Q   Well, let's go into the general roadblock
20 section.
21    A   Okay.
22    Q   According to this section, where in
23 Madison County may I set up roadblocks?
24    A   A deputy has the authority to set up a
25 roadblock anywhere in Madison County with their

RANDALL TUCKER

1
2 supervisor's approval.
3     Q   Okay.  And both the -- and in doing so,
4 both the supervisor and the deputy are exercising
5 their discretion; is that fair to say?
6     A   To a degree, yes.
7     Q   Okay, to what degree?
8     A   Well, as I stated, they don't need to set
9 them up over around a curve or over a hill.  They
10 need to be where they're visible.  Those are the
11 things I outlined to you.
12    Q   Okay.  And those are all for the safety of
13 the officers and the safety of the drivers?
14    A   That's for the safety of everybody
15 involved.
16    Q   Okay, fair enough.  Other than guidance
17 on, I mean, you know, assuming you don't set it up
18 around a curve or something, what other direction is
19 given to officers and deputies about where it is
20 acceptable to set up a roadblock within Madison
21 County?
22    A   I don't know that they're given any
23 direction, specifically.
24    Q   Okay.  And you would agree with me that
25 the use of roadblocks and the personnel dedicated to

RANDALL TUCKER

1
2 them consumes the resources of your department;
3 correct?
4     A   No.
5     Q   Well, you can't be everywhere at all
6 times; right?
7     A   That's correct.  That's not what you asked
8 me.
9     Q   And I probably didn't ask it clear enough.
10 You have limited personnel and limited budget;
11 right?
12    A   I have adequate personnel and adequate
13 budget.
14    Q   But you do not have unlimited personnel or
15 budget; correct?
16    A   Of course not.  I wish I did, but, no, I
17 don't.
18    Q   Yeah.  You have to set priorities?
19    A   Absolutely!
20    Q   And where you set up a roadblock is a
21 reflection of some of those priorities; correct?
22        MR. ROSS:  Object to the form.
23    A   I'm not sure I understand what --
24    Q   (Mr. Youngwood)  You --
25    A   If --

RANDALL TUCKER

1
2       A   I can address the body camera one first
3   and then go to the next one.  However you want me to
4   do it.
5       Q   Well, let me make sure.  If you look back
6   on the first page of the exhibit, you received this
7   e-mail from Mr. Bob Bobinger at 4:35 P.M.; correct?
8       A   Yes, that's what it says.
9       Q   And you responded using your iPhone at
10  4:40 P.M., five minutes later.  Do I read that
11  correctly?
12      A   Yes.
13      Q   Okay.  So did you open the attachments?
14      A   Yes.
15      Q   Between 4:35 and 4:40?
16      A   Yes.
17      Q   And you spent up to five minutes reviewing
18  them; correct?
19      A   Yes.
20      Q   And you have now had them in front of you
21  for nine minutes, not on an iPhone but in hard copy.
22  So do you need more time today to review them than
23  you needed in 2016 to come to the conclusion that
24  they are utterly ridiculous?
25      A   I'm sorry, by my e-mail you probably

RANDALL TUCKER

1
2   didn't understand that him sending them was not the
3   first time I had seen them.
4       Q   Okay.
5       A   So, no, I'm not a speed reader.  I didn't
6   read them in four or five minutes.
7       Q   Why don't we go with the first one.  Why
8   don't you tell me what about it you found to be
9   utterly ridiculous?
10      A   I think the body cameras are an extreme
11  burden to law enforcement in that they can cause an
12  officer to hesitate when action needs to be taken at
13  the scene of an incident or at the time of a
14  criminal offense.  I think it unduly burdens a
15  department to try to figure out a way to manage to
16  store data for that length of time.  That's an
17  exuberant cost I don't know if you're familiar with.
18  I'm not necessarily greatly familiar with it,
19  myself, but according to our IT Department, it would
20  be a significant expense.
21      And at the time this was being proposed, there
22  were some pilot programs up in the northern part of
23  the United States that we were waiting to get the
24  results of, some of which turned them back in saying
25  that they didn't want to participate.  And it opens

RANDALL TUCKER

1
2   up, I mean it labels a department or it saddles a
3   department with all manner of new policy and
4   procedure and opens them up to extensive lawsuit
5   based on the fact that they suggests that every
6   department should wear body cameras, basically, was
7   the gist of the bill.
8       Q   Can you see any good that would come with
9   having officers wear body cameras, sir?
10      A   I don't know about body cameras, but
11  there's good comes from cameras.  Obviously, that's
12  the reason that my administration put them in every
13  vehicle that we patrol with.
14      Q   We'll get to the vehicles in a moment, but
15  would you agree with me that if the officers were
16  wearing body cameras, it would be easier to track
17  whether or not an officer behaved in any police
18  misconduct?
19      A   I can't answer that.  We haven't done
20  that.
21      Q   Okay, and, well, you haven't done it, but
22  you concluded the bill was ridiculous; right?
23      A   I think it is ridiculous.  That's my
24  opinion.
25      Q   All right.  And would you agree with me

RANDALL TUCKER

1
2   that body cameras might assist in preventing
3   officers from acting in an impermissible racially
4   discriminatory manner?
5           MR. ROSS:  Object to the form.
6           Absolutely no context to your question.
7       A   I have professional officers.  They're
8   screened.  I don't believe they act inappropriately
9   in any rate.  I don't agree with your assessment.
10      Q   (Mr. Youngwood)  Okay.  Why don't we go,
11  skip the second of the bills and go to the third,
12  the one that's described in the PDF or in the first
13  page of the exhibits -- "oral advisement, written
14  consent part of search of a vehicle or person."
15  See if you can find that in the attachments.  Take a
16  review and --
17          MR. ROSS:  What page is that on?
18          MR. YOUNGWOOD:  Well, he's the one
19          who reviewed them a year ago or almost
20          two.
21      Q   (Mr. Youngwood)  I'm going to let you tell
22  me what you need to review to tell me why you found
23  the third of these three bills utterly ridiculous.
24      A   Can you tell me a page, or do you just
25  want me to just sit here and figure out what you're

---

Page 178

RANDALL TUCKER

talking about?

Q   Or we can look together.  I don't know what you wish to review, sir.  This is what was sent to you a year ago, two years ago.  I don't want to limit your review.

MR. ROSS:  Well, you specified the third bill.  Do you know where the third bill starts so that we can move this along?

MR. YOUNGWOOD:  It's not my e-mail.

MR. ROSS:  It's your question.  The third bill.  Which bill are you talking about?

MR. YOUNGWOOD:  Oral advisement and written consent prior to search of the vehicle or a person during this contact.  The witness concluded it was utterly ridiculous, and I'd like to know the basis.

MR. ROSS:  Let the record reflect that counsel has refused to point the pages out that he's referring to  in Exhibit 21.  And I'll refer you to --

Q   (Mr. Youngwood)  I believe it starts at

---

Page 179

RANDALL TUCKER

1386, sir.

MR. ROSS:  Thank you.

Q   (Mr. Youngwood)  Third-to-last page.

A   (WITNESS EXAMINES DOCUMENT)  Yes, I recall the bill.

Q   Why did you conclude that it was utterly ridiculous?

A   Because it requires an officer to obtain a written authorization, a written consent.  I think it's ridiculous to require an officer to obtain written consent -- uh -- an individual, on the First Amendment freedom of speech, and an individual can freely tell you you can search.  I don't think that requires written consent.

Q   Well, how will we know if an individual has provided consent, other than if it's in writing?

A   There are videos in our patrol cars now.  That was one of the reasons we did that, sir.

Q   Okay.  And let's discuss the video.  And so, I'm sorry, what's the reason you believe this bill to be utterly ridiculous?  I want to make sure I know all of your reasons.

A   Let me make sure.  Utterly ridiculous.  You're right.  They're utterly ridiculous in that an

---

Page 180

RANDALL TUCKER

individual can't look you in the eye and tell you that you can search his vehicle.

Q   So you referenced the cameras in your patrol cars.  It's left to the discretion of the officer whether or not to turn on that camera; correct?

A   Not necessarily, no.

Q   Why do you say "not necessarily"?

A   If the officer activates the blue lights, then the camera comes on.  I mean on the car the camera comes on.

Q   Okay, and at whose discretion is it as to whether or not the officer activates the blue lights?

A   I guess the officer turns the blue lights on.

Q   Acting within his or her discretion; correct?

A   Well, yes.

Q   And if the officer wishes to turn on their camera and the microphone, absent activation of the blue lights, that would also be left to his or her discretion; correct?

A   Yes.

---

Page 181

RANDALL TUCKER

Q   It's not left, for example, to the discretion of the driver of the vehicle who has been stopped?

A   No.

Q   And so, although the officer has the discretion to record the conversation, the driver of the vehicle has no say in that matter; correct?

A   They can record it.  There's a law says they can record stops.

Q   I'm sorry, with what would they be recording the stops?

A   I guess if they purchased a camera like we did.

Q   Okay.  Any other way you think they might record their stops?

A   Through an audio recording device or whatever.

Q   So if they want to, if I drive around Madison County and I want to make sure I get a record of any stops by the police, I should purchase a car camera or some other mechanism of recording my interactions with the sheriff's department?

A   I didn't say that.

Q   Okay.  Well, you didn't give me any other

---

Page 182

RANDALL TUCKER

ways that I might record my stops.
     A   Okay, do I need to?
     Q   Only if you know of other ways, sir.
     A   You can take a ledger and write it.  You
can do whatever you want to do, within the confines
of the law.  We're not trying to restrict anybody.
     Q   Okay.  But you leave it to within the
discretion of your officers as to whether or not to
record any interaction with the citizens in
Madison County; correct?
     A   The cameras in our squad cars are set up
and installed such that they come on whenever the
blue lights are activated.  Yes, the officer has
discretion to stop somebody for running a stop sign
or whatever.  But when he cuts those lights on, the
camera is activated.
     Q   But he determines when to turn on the
lights; correct?
     A   He determines when to initiate a stop;
yes.
     Q   And if the lights aren't on, he determines
whether or not he thinks it useful to have the
camera on; correct?
     A   Yes.

Page 183

RANDALL TUCKER

     Q   Okay.  If -- I want to talk about other
uses of officer discretion.  Back to the roadblock
scenario.  If the officer stops somebody and asks to
see their license and the license looks valid on its
face, does the officer run the license back through
the central office?
     A   As a general rule, no, but they could if
they desired to.
     Q   And so it's within their discretion
whether or not to run those licenses, apparently,
valid licenses, through the state system; correct?
     A   Yes.
     Q   And what is that discretion supposed to be
based on?
     A   You would have to ask the individual
officer.  I don't know what the cause would be at
the time.  I mean, I haven't been on every stop made
in Madison County.
     Q   Do they receive any training as to when
they should exercise the discretion to run an
apparently valid license?
     A   I think I've testified there is no
training about discretion.
     Q   How about passengers who are in vehicles

Page 184

RANDALL TUCKER

stopped at roadblocks?  Is an officer supposed to
check the ID of the passenger?
     A   Supposed to?
          MR. ROSS:  Object to the form.
     Q   (Mr. Youngwood)  Is it policy or practice
of your department for officers to check the
identification of a passenger stopped at a roadblock
or a car stopped at a roadblock?
     A   There is no policy that says they are to
do that, no.
     Q   So is that within their discretion?
     A   Certainly they can ask for an
identification, but if they're told no, that's not
any type of offense that they could take action on.
     Q   Do they tell the passengers "I'd like to
see your identification, but you don't need to show
it to me"?
     A   I haven't been on --
          MR. ROSS:  I object to the form.
          This is in the abstract, but you can
          answer to the best of your ability.
     A   I haven't been on individual stops.  I
couldn't tell you what the wording is.
     Q   (Mr. Youngwood)  Well, do you instruct

Page 185

RANDALL TUCKER

them to tell passengers that showing their license
is voluntary, or other forms of identification?
     A   I do not.
     Q   And so who is it up to whether or not they
ask the passenger for identification?
     A   The officer on the scene.
     Q   Again, no training on how to exercise
discretion in that situation; correct?
     A   I'll say it again.  I've already told you
there is no training in discretion.
     Q   How about the search of vehicles stopped
at roadblocks?  Is that left to the discretion of
the officer as to whether or not a search is
warranted?
          MS. ROSS:  Object to the form.  No
          context of what the stop consists of.
     A   The officer would need to have probable
cause to conduct the search.
     Q   (Mr. Youngwood)  Is there training in
probable cause?
     A   Yes.
     Q   What is that training?
     A   There is all manner of training.  Depends
on which courses they have been through.  Our

Page 186

RANDALL TUCKER

1
2 district attorney's holds a search and seizure class
3 that officers go to.
4     Again, we send officers to all manner of
5 training throughout the year. So, yes, they are --
6 in the Police Academy, they are taught about search
7 and seizure. So, yes, there is training on that.
8     Q   Is there any review by you or your senior
9 supervisors as to whether or not individual officers
10 properly conduct the determination of whether or not
11 to search a vehicle at any given situation?
12     A   Not every situation, but some, yes.
13     Q   How would you determine which ones to
14 monitor?
15     A   I don't know about how to determine which
16 one to monitor. I understood the question to be
17 "has there been any monitoring?" And, yes, there
18 has been, whether it be the narcotics supervisors
19 watching or monitoring their guys do it, or me or
20 our chief watching our guys do it. I have
21 personally watched guys do it, so, yes, there has
22 been some monitoring.
23     Q   So when you're on scene, there is
24 monitoring?
25     A   Yes.

Page 187

RANDALL TUCKER

1
2     Q   Okay. And how do you determine when you
3 will be on the scene for the roadblock?
4     A   If I have time, I'll go.
5     Q   Okay. Do you seek to randomly check
6 various officers?
7     A   No, I do not.
8     Q   Do you seek to randomly check, you know,
9 dependent on geographically where roadblocks are
10 located?
11     A   No, I do not. I have supervisors that do
12 that.
13     Q   Do you know how the supervisors determine
14 when they are monitoring the search and seizure
15 activity of your deputies?
16     A   No.
17     Q   If an officer sees a driver going down the
18 street without a seatbelt, is the officer required
19 to stop that driver?
20     A   "Required"?
21     Q   Yes.
22     A   No.
23     Q   So it's left to the discretion of the
24 officer whether or not to stop the driver?
25     A   Any stop for traffic violation is left to

Page 188

RANDALL TUCKER

1
2 the discretion of the officer.
3     Q   And there's no training on how to exercise
4 that discretion; correct?
5     A   There is no training on discretion.
6     Q   And no checking as to whether or not that
7 discretion is being exercised in a racially
8 inappropriate manner; correct?
9     A   Wrong. There are supervisors on some of
10 these things that, you know, I don't know how else
11 to tell you. We don't ride around with our thumb on
12 individuals, but they have supervisors. They
13 prepare reports. The public has an open-door policy
14 at any point they want to come to my office and talk
15 to me. I have stressed that from day one, they can
16 come and talk to me. I don't know how else to be
17 more available.
18     Q   Do you think it possible, sir, that
19 members of certain racial groups in the county are
20 intimidated by your office?
21     A   I think the criminal element is, yeah.
22     Q   And do you think the criminal element
23 falls disproportionably within one race versus
24 another in your county?
25     A   I don't prepare statistics with races.

Page 189

RANDALL TUCKER

1
2     Q   You have been presented with statistics on
3 arrests in your county through this lawsuit;
4 correct?
5     A   Yes.
6     Q   And you're aware of them, they're in the
7 complaint. I'd be glad to show you some of the
8 pages, if useful. If we look at exhibit -- you are
9 probably better organized than I am, sir, but I'll
10 find it. Seventeen, I believe.
11         MR. ROSS: Exhibit 17 is the notice
12     of a roadblock.
13     A   I have 17 as a --
14     Q   (Mr. Youngwood) Yeah, it's the wrong
15 exhibit.
16     A   Here, you're welcome to look at this stack
17 here.
18     Q   Yeah, I'll do that. Thank you, sir.
19 Yeah, it's 13. So this is the complaint we looked
20 at it -- uh -- statistics are given in various
21 places, but let's look, for example, at -- uh -- you
22 can look, for example, at page 17. But you see 58
23 discusses percentages of roadblock arrests broken
24 down by race. According to the allegation in the
25 complaint, 81 percent of roadblocks or less were

RANDALL TUCKER

1  black people.  19 percent of white.  If you'd look
2  at page 26, paragraph 84, it talks about pedestrian
3  stops.  I'm sorry, arrests at pedestrian stops, 82
4  percent black.  Remaining 18 percent white.  You
5  have seen these statistics through this case;
6  correct?
7       A  I've seen what was prepared by the
8  plaintiff's side.  I don't know where they got these
9  statistics, but if you look at that, 81 and 19
10  percent, I guess you would suggest that there is
11  only two races in Madison County, which I guess that
12  would be racially biased toward Hispanics and
13  Indians and what have you, so.
14       Q  Sir, do you have any basis on which to
15  doubt the statistics in this complaint?
16       A  I have --
17          MS. ROSS:  Object to the form.  I
18          mean object to the question.
19       A  I don't know where these were compiled,
20  but they're certainly not anything that I have
21  compiled, and, no, I do not agree with them.
22       Q  (Mr. Youngwood)  Okay.  Well, do you have
23  a basis for not agreeing with them?
24          MR. ROSS:  Object to the form.  This

RANDALL TUCKER

1  is the complaint.  He says he don't know
2  where they came from, and I don't know
3  what more he can say.
4          MR. YOUNGWOOD:  Well, no, he said he
5  didn't agree with them.  Now, I'm asking
6  him his basis.
7       A  The basis is I don't know if they're
8  accurate.  I didn't prepare them, so I'm not going
9  to just --
10       Q  (Mr. Youngwood)  You don't know?
11       A  -- unilaterally agree to something like
12  that.
13       Q  Okay, you don't know if they're accurate?
14       A  Have no idea.
15       Q  Okay.  Do you believe that blacks in
16  Madison County commit crimes at a higher rate than
17  whites?
18       A  I haven't broken it down.  I couldn't tell
19  you.  We arrest criminals.
20       Q  Does, did in any way receiving this
21  complaint make you question whether or not there is
22  some inherent racial bias in the policing policies
23  and practices?
24       A  No, it doesn't.

RANDALL TUCKER

1       Q  Do you continue to monitor legislation
2  that might affect police activity?
3       A  I haven't had a lot of time to monitor
4  anything since this lawsuit.  I've been monitoring
5  this.
6       Q  Okay.  Are you aware of any recent
7  legislature initiatives regarding body cameras for
8  police officers?
9       A  I haven't had an opportunity to --
10          MR. ROSS:  Object to the form.  I
11          don't know what "recent" means.
12       Q  (Mr. Youngwood)  Well, since the e-mail we
13  looked at, that was Exhibit 21, in 2016.
14       A  I haven't had a lot of time.  I have been
15  consumed with this lawsuit.
16       Q  Let's take a look at Exhibit 4, please,
17  sir?  I recognize you did not sign these.  I think
18  you testified earlier you had reviewed them before
19  they were finalized.  These are the Requests to
20  Admit.  I'm going to ask you about several of the
21  answers.  If you don't know the answer, then you can
22  tell me that.
23       Request Number 1 asks about whether or not
24  defendants maintain or possess any written policies

RANDALL TUCKER

1  or procedures concerning the MCSD's jurisdiction.
2  Do you see that?
3       A  I do.
4       Q  Does the MCSD retain written policies or
5  procedures concerning its jurisdiction?
6       A  No.
7       Q  Number 2 concerns the maintenance of
8  written policies or procedures concerning traffic
9  stops.  Do you see that?
10       A  Yes.
11       Q  And the answer, in part, given is
12  "Defendants admit that MCSD has no written criteria
13  concerning when MCSD personnel should make a vehicle
14  stop, other than complying with existing state and
15  federal laws."  Do you see that?
16       A  Yes.
17       Q  Is that a correct statement?
18       A  Yes.
19       Q  Number 3 concerns the maintenance of
20  written policies or procedures concerning pedestrian
21  stops.  Is it correct that the MCSD has no written
22  policies or procedures concerning pedestrian stops?
23          MR. ROSS:  Object to the form.
24       A  Correct.

Page 210

RANDALL TUCKER

1
2  you when he was hired, or what I would do
3  differently at that point.  At that point, I made a
4  decision to hire him, and I stand by that decision.
5      (Exhibit 24 marked for the record)
6      Q   Giving you Exhibit 24, sir.  Have you seen
7  this document before, sir?
8      A   I don't know that I have seen this
9  particular document.  It's possible that I saw it in
10 the deposition I referenced in response to the
11 previous question, but I don't recall reading this
12 document, no.
13     Q   At the time that you hired him, had
14 Mr. Moore told you -- and I'm reading from the
15 second sentence of the document -- that "there had
16 been approximately 30 internal affairs complaints
17 filed, including pending civil litigation
18 matters" -- I'm paraphrasing -- relating to his
19 conduct as an officer in the City of Jackson Police
20 Department.  Had he given you information regarding
21 these 30 internal affairs complaints?
22     A   I don't know about the number 30.  He did
23 guess us information that he had had some litigation
24 and complaints during this time with his previous
25 employers, and, again, that's the reason we could

Page 211

RANDALL TUCKER

1
2  call and verify those employers what those --
3  uh -- were, and if they would recommend him for
4  employment, which they ultimately did, so he must
5  not have been much of a menace.
6      Q   Okay.  Recognizing that the City of
7  Jackson has determined him to be a menace; correct?
8      A   That's not a governing body I don't guess.
9      Q   The City of Jackson is not a governing --
10     A   That's not a court record.
11     Q   Right.
12     A   Anybody can make an allegation.  That
13 doesn't make it true.
14     Q   And the Court of Appeals had concluded
15 that his acts were more than negligent; correct?
16     A   In this document here?
17         MR. ROSS:  Object to the form.
18     A   No, I don't see a Court of Appeals ruling
19 with these 30 that you're referencing.
20     Q   (Mr. Youngwood)  Regarding these 30, what
21 are you telling me about them?
22     A   I don't recall any specific conversation.
23 That's been a number of years ago.  He did -- I can
24 tell you that he did indicate that he had had some
25 disciplinary actions, and we called and verified

Page 212

RANDALL TUCKER

1
2  those actions with the chief deputy at the time for
3  the Jackson Police Department, and he gave him a
4  good recommendation.
5      Q   There are also allegations of excessive
6  force lodged against Officer Thompson at the time
7  you hired him; is that correct?
8      A   I don't know about plural.  I knew of an
9  incident, and he openly told us about that when he
10 came for his interview.
11     Q   And what was the basis -- did you conclude
12 that the incident was without basis, without merit?
13     A   I did.  Yes.
14     Q   And what did you base that decision on?
15     A   Based on speaking with the Hinds County
16 Sheriff's Department's Chief Deputy and the accounts
17 from Deputy Thompson of the incident.  I felt like
18 he did what was necessary, in effect, for the
19 suspect in the case, as well as the preservation of
20 evidence.
21     Q   And you were aware of allegations that the
22 victim in that incident had been attacked, beaten,
23 choked, and tasered?
24         MR. ROSS:  Object to form.  Implying
25         that it was by Thompson.

Page 213

RANDALL TUCKER

1
2      A   I wasn't under the impression that
3  Deputy Thompson had done any of that.
4      Q   (Mr. Youngwood)  What did you do to
5  ascertain that Deputy Thompson had not attacked,
6  beaten, choked, and tasered the victim in that case?
7      A   I spoke with Chief Deputy William Pecu.
8      Q   Did you review the court file?
9      A   No, I did not.  Not that I recall.
10     Q   Would you hire an officer who had
11 attacked, beaten, choked, or tasered a citizen?
12         MR. ROSS:  Object to the form.  No
13         context.
14     A   If it was unprovoked, no, I wouldn't.
15     Q   (Mr. Youngwood)  So a provoked beating
16 would be acceptable to you, sir?
17         MR. ROSS:  Object to the form.
18         Object to the form.  You can answer to the
19         best of your ability.
20     A   You know, you -- I don't know if beating
21 is a proper term or not, but, certainly, you have a
22 right to defend yourself, even if you're a police
23 officer, which some people don't believe, but I
24 wouldn't say "beat," but there is a way to defend
25 yourself that causes bodily injuries to others, but

Page 214

RANDALL TUCKER

1
2  that's dependent on the situation.
3      Q   (Mr. Youngwood) So you would agree with me
4  that beating a citizen is not acceptable?
5      A   I would agree with the beating, yes.
6      Q   How about choking?  Is that acceptable?
7          MR. ROSS:  Object to the form.  No
8      context, whatsoever.
9      A   I don't know what you are referring to.
10     Q   (Mr. Youngwood) Well, I'm referring to
11  the allegations against Defendant Thompson.  I'm
12  sorry, Officer Thompson.
13     A   That was just an allegation.  I don't know
14  that there was any choking.
15     Q   So my question is, is it ever acceptable
16  for one of your officers to choke a citizen?
17     A   No.
18         VIDEOGRAPHER:  I need to change DVDs.
19         MR. YOUNGWOOD:  Why don't we take a
20     break?
21         VIDEOGRAPHER:  Off the record. 2:47.
22         (BRIEF RECESS)
23         VIDEOGRAPHER:  DVD 4.  Back on
24     record.  2:58.
25     Q   (Mr. Youngwood) How do you review

Page 215

RANDALL TUCKER

1
2  performance of your officers and deputies?
3      A   It's daily observation.  There's no
4  written review.
5      Q   Is there an annual meeting with officers
6  or deputies to tell them how they're doing?
7      A   No.  That's done daily or monthly.
8      Q   Well, as in what manner is it done?
9      A   Just verbally just -- if there's an issue
10  that either the chief or myself will address it with
11  them and their supervisor.  There's no annual
12  review, per se.
13     Q   Do you review statistics associated with
14  the various deputies?
15     A   I don't, no.
16     Q   Do you know if anyone in the department
17  does?
18     A   There are monthly reports submitted to the
19  chief.
20     Q   And what is the purpose of the creation of
21  those statistics?
22     A   I guess to monitor the activities of the
23  individual officers.
24     Q   What are you looking for in reviewing, or
25  what is the department looking for in reviewing the

Page 216

RANDALL TUCKER

1
2  statistics?
3      A   Uh -- I guess it's just a -- it's review
4  to basically make sure people are patrolling, which
5  is indicated by mileage on their vehicle or whether
6  or not they're responding to calls and writing
7  reports.  And there's a block on there that
8  indicates how many citations they've written.
9  Again, I don't review it, so I can't sit here and
10  cite everything on it.
11     Q   One of the things that's kept are related
12  to arrests; correct?
13     A   Uh -- I think there's a block on there,
14  maybe two, maybe differentiating between misdemeanor
15  and felony arrests.  Again, I can't sit here and
16  tell you.  I don't look at it.
17     Q   Well, you do believe data is collected
18  regarding the arrests associated with each deputy;
19  correct?
20     A   Yes.
21     Q   Why track that?
22     A   To make sure that they're doing the job
23  they're supposed to be doing.
24     Q   How can you tell that, based on the number
25  of arrests that they make?

Page 217

RANDALL TUCKER

1
2      A   I don't necessarily know that by the
3  number of arrests they make.  They may work eight
4  hours and not arrest anybody.  I mean, I'm not
5  saying it's mandatory that you arrest somebody every
6  day.
7      Q   Well, do you do any study to see if their
8  arrests are valid?
9      A   Uh -- they go through the court system,
10  and, you know, it's either dismissed by the court or
11  prosecuted by the court.  I don't keep an individual
12  track of it.
13     Q   Well, no, you track it anyway, whether or
14  not one deputy versus another makes more arrests
15  that end up being dismissed?
16     A   No, I don't track it.  I'm sure you
17  probably could through -- the court could.  I can't
18  do that.
19     Q   Do you do any monitoring to ensure that
20  arrests aren't racially motivated?
21     A   No.
22     Q   Or that the issuance of citations aren't
23  racially motivated?
24     A   As long as there's probable cause for a
25  citation or there's a criminal affidavit, no, I

Page 218

RANDALL TUCKER

1
2  don't.  No, I don't.
3      Q   And you have no way of tracking, am I
4  correct, whether or not certain deputies are making
5  racially motivated decisions regarding which
6  citizens they allow to get off with a verbal
7  warning, as opposed to an arrest or a citation;
8  correct?
9          MR. ROSS:  Object to the form.  It
10          assumes things that haven't been proven.
11     A   Other than my supervisors' presence or
12  another officer's presence and lack of complaints,
13  no, I don't.
14     Q   (Mr. Youngwood)  How do you monitor your
15  supervisors to see whether or not they perform in a
16  racially discriminatory manner?
17     A   I don't monitor anybody to see if they're
18  performing in a racially discriminatory manner.  We
19  arrest criminals.  We don't discern by race.
20     Q   Well, how do you know you don't discern by
21  race?
22     A   Because I'm sitting here telling you I
23  don't know.
24     Q   How do you know your officers don't?
25     A   Because of what I have just told you.  I

Page 219

RANDALL TUCKER

1
2  mean, we track them through their supervisors
3  observing their activities, through our
4  observations, through radio traffic.  I haven't seen
5  anything to indicate anything along those lines.
6      Q   And the complaint filed in this case and
7  the statistics contained in it don't cause you to
8  question that assumption, sir?
9      A   I think the complaint is baseless, and
10  those statistics were made you or your firm.
11     Q   Well, you --
12     A   -- put together.  I haven't put together
13  any statistics.  Our legal team hasn't put together
14  any of those statistics.  I don't know that they're
15  true.
16     Q   Okay.  You have access to the same data we
17  have access to; correct?
18     A   I can't answer that.  I don't know what
19  you have access to.
20     Q   Well, you have access to your own incident
21  reports; correct?
22     A   Absolutely, I do.
23     Q   And, in fact, you have access to more
24  incident reports than I do; right?
25     A   I don't know that.  I don't know what you

Page 220

RANDALL TUCKER

1
2  have access to.
3      Q   You know what's been produced in this
4  case, don't you, sir?
5      A   Sure, I do.
6      Q   And you, in fact, submitted an affidavit
7  to the court concerning the need for privacy and
8  confidentiality regarding certain data; correct?
9      A   Absolutely!
10     Q   Okay.  And you are aware the court ruled
11  against you on the CAD data yesterday; correct?
12     A   I don't know what the court ruled, to be
13  honest with you.  I know we have got to produce CAD
14  reports.
15     Q   Right.  But you didn't want to produce to
16  us; right, sir?
17     A   No, I didn't.
18     Q   Why not?
19     A   Because it protects the integrity of the
20  victims, witnesses, other individuals that may not
21  be a party or subject to this action.
22     Q   Although you did produce unredacted CAD
23  reports in response to a Public Records Request;
24  correct?
25     A   Shame on me for trying to cooperate.

Page 221

RANDALL TUCKER

1
2      Q   Well, I'm not sure you should be shamed at
3  all, sir, for complying with the law.
4          MR. ROSS:  I object to your
5          gratuitous opinions.  You can ask him
6          questions.
7      Q   (Mr. Youngwood)  Okay, you did produce
8  those; reports correct?
9      A   Which reports?
10     Q   The unredacted CAD reports as part of the
11  Public Records Request; correct?
12     A   Yes.
13     Q   Okay.  You have access to incident reports
14  that you have not produced to us; correct?
15     A   Not that I'm aware of, no.
16     Q   You believe you produced every incident
17  report in the department's possession?
18     A   I don't know what's been produced to you,
19  every single incident report.
20     Q   Do you have any objections producing all
21  of the incident reports to us in the department's
22  possession?
23          MR. ROSS:  And I object.  It calls
24          for a legal conclusion.  We made it clear
25          that we produced relevant incident reports

Page 222

RANDALL TUCKER

1
2  and that we have redacted privileged and
3  victim and witness information.
4        MR. YOUNGWOOD:  I'm unaware if you
5  redacted any privileged information from
6  the incident reports.
7        MR. ROSS:  We will review them all
8  for privilege and for -- and it probably
9  wasn't any privilege in the incident
10  reports, you're right.  But we did redact
11  victim and witness information per
12  stipulation entered into with your firm,
13  and we did review them for relevancy, and
14  we did not produce incident reports that
15  were not relevant.
16      Q   (Mr. Youngwood)  Do you understand that
17  you have incident reports that we do not have access
18  to; correct?
19      A   No, I don't understand that.  But I will
20  consult with my counsel about it after this.
21      Q   Did you play any role, and you don't have
22  to tell me what role you played, but let's ask one
23  question at a time, in the determination of which
24  incident reports were relevant to this case?
25      A   Did I play a role in determining which

Page 223

RANDALL TUCKER

1
2  ones?
3      Q   Yes, sir.
4      A   I didn't play a determination in the court
5  proceeding, no.
6      Q   That wasn't my question.  Your attorneys
7  reviewed incident reports and produced to us those
8  deemed to be relevant.  You just heard your counsel
9  say that.
10      A   Right.
11      Q   Did you have any part in making the
12  determination as to which reports would be deemed
13  relevant?
14      A   I don't recall that, no.
15      Q   Do you know what methodology was used to
16  determine which reports were deemed to be relevant?
17      A   I do not.
18      Q   Okay.  So you have access to the incident
19  reports clearly; right?
20      A   I think I can access, yes.
21      Q   Okay, and you certainly have access to any
22  incident report that's been produced to us from your
23  department; correct?
24      A   Yes.
25      Q   Okay.  And race is an indicator, it's a

Page 224

RANDALL TUCKER

1
2  box on that report; right?
3      A   Right.
4      Q   And you could use those reports to
5  generate statistics regarding the race of people
6  arrested under your, by your department and under
7  your supervision; correct?
8      A   I think you could, yeah.
9      Q   So --
10      A   You can do it with a docket book, too.
11      Q   What does that mean, "with a docket book"?
12      A   There's a docket book at every jail
13  facility that when somebody is booked in, it goes
14  into a public document.
15      Q   Okay.  And have you ever done such an
16  analysis?
17      A   No, I have not.
18      Q   Given the context of this lawsuit, do you
19  have any curiosity as to what that analysis would
20  show?
21      A   None, whatsoever.
22        (Exhibit 25 marked for the record)
23      Q   I've marked this as 25, sir.  Do you
24  recall engaging in an interview with The Madison
25  County Journal in January 2015?

Page 225

RANDALL TUCKER

1
2      A   I don't dispute that I did.  I don't
3  necessarily recall, but I don't dispute it, no.
4      Q   Okay.  Have you seen this interview
5  before?
6      A   I don't know that I have read it, no.
7      Q   Would you go to the second page, sir?
8  There's a question about body cameras.  It says MS,
9  which is the reporter, I believe.  And then RT,
10  which is you.
11      The question is: "Does your department have
12  body cameras or plans to introduce them in the
13  future?"
14      "We do not.  We have recently as of late this
15  year sought a camera in every vehicle.  We have
16  cameras as well as back-seat cameras for detention
17  purposes.  We have talked about the body cams.
18  That's one of those deals where you're going to
19  scrutinize every little thing a guy does or a girl
20  does, based on a few bad apples.  If you've got to
21  stand there with your thumb on them constantly, I'd
22  rather not need them.  The people we hire go through
23  a rigorous process.  We don't hire anybody off the
24  street.  I put my faith and belief in them, or I
25  wouldn't hire them."  Do you see that?

RANDALL TUCKER

1
2    A   Yes.
3    Q   Do you believe those are the words you
4    gave in response to that question?
5    A   Again, I don't recall this.  This is the
6    first time I have read it, but I don't disagree with
7    it.
8    Q   Okay.  I want to just ask you about the
9    middle of it.  "Are you going to scrutinize every
10   little thing a guy does or a girl does based on a
11   few bad apples?"  What did you mean by that.
12   A   I mean, I think there's bad apples in the
13   every profession that there are, whether, you know,
14   they're in my department or other departments or
15   what have you.
16       I mean, if you're going to sit there and have
17   to worry about what every member of your department
18   is doing, you know, you need to hire quality people,
19   and that's what we do.  That's the reason we go
20   through the process we go through.  I don't want one
21   of those bad apples in my department.
22   Q   Are you aware of any bad apples in your
23   department?
24   A   No, I'm not.
25   Q   Sir, just going back briefly to the data

RANDALL TUCKER

1
2    that's in our complaint and the incident reports and
3    other methods you would have of tracking race, would
4    it be of concern to you if you were shown data that
5    demonstrated that your department was
6    disproportionately targeting black citizens for
7    arrest?
8        MR. ROSS:  Object to the form.
9        Abstract.  Doesn't say what type of data
10       or if they were all together.
11   A   I don't target anybody but criminals, sir.
12   Q   (Mr. Youngwood)  Okay.
13   A   And I don't decide who breaks the law.  We
14   arrest criminals based on criminal activity, not on
15   race.
16   Q   Okay.  And so you don't believe it
17   possible that there's data demonstrating that your
18   department targets blacks disproportionately over
19   whites?
20   A   I don't believe there's any targeting at
21   all. I don't believe there's anything that you can
22   show me that says that my department is targeting
23   anybody.  We don't target.  I don't know what -- I
24   don't know what racial statistics are, because I
25   have no basis to even go look for that.

RANDALL TUCKER

1
2    Q   Would you agree, sir, that your department
3    arrests more blacks than whites?
4    A   I've already told you I haven't done any
5    statistics.  I couldn't tell you.
6    Q   You have no idea if your department
7    arrests more black people than white people?
8        MR. ROSS:  Objection.  Asked and
9        answered.
10   A   We arrest a lot of criminals.  I couldn't
11   tell you what color they are.
12   Q   (Mr. Youngwood)  But the data maintained
13   by your department tells me exactly what color they
14   are; correct?
15   A   I haven't done any statistical analysis.
16   Q   But the raw data is there; right?
17       MR. ROSS:  Objection.  Asked and
18       answered.  You can look at what has been
19       produced as well he can.
20   A   I think the data speaks for itself,
21   whatever that is.
22   Q   (Mr. Youngwood)  We agree on that, sir.
23   A   Good.
24   Q   Tell me about the process that's
25   undertaken by your department in the case of an

RANDALL TUCKER

1
2    allegation of improper policing behavior made by a
3    citizen in the county.
4    A   Again, I'll tell you every situation is
5    unique.  There is no two that come out the same.  It
6    would be based on the factors of that individual
7    complaint, the actions of the suspect, the actions
8    of the officers.  I can't sit here and give you that
9    without knowing what the situation is.
10   Q   Was there a change in the manner in which
11   you investigated complaints made since you have
12   become sheriff?
13   A   Yes.
14   Q   What was that change, sir?
15   A   All complaints are investigated by my
16   chief deputy.  He handles every one so that I can
17   ensure that they're all looked at from the same
18   point of view, same eyes.
19   Q   Okay.  And do you know, since you've
20   become sheriff, how many complaints have been
21   investigated by your chief deputy?
22   A   I do not, but it's not many.  We haven't
23   received many.
24   Q   Do you recall any that have resulted in
25   the discipline of an officer?  I know you testified

Page 234

RANDALL TUCKER

1
2    A   Right.
3    Q   What does that mean?  I don't know what
4  that means.
5    A   A party to.  Involved with.
6    Q   Whose burglary did they assist?
7    A   I don't remember the young man's name.
8    Q   Okay.  And how do you know -- what causes
9  you to believe that they were an accessory to
10  burglary?
11    A   The state statute on failure to report an
12  offense, and they didn't do that.  And they, I
13  believe, assisted with a mat or a towel or some type
14  to keep the man that was breaking into the house
15  from cutting his arm or -- to me that's helping.
16    Q   You believe they helped the perpetrator,
17  I'm sorry, do what with his arm?  I'm not
18  understanding what you're saying how they helped the
19  perpetrator.
20    A   Handed him something to lay across the
21  window to keep from cutting his arm.
22    Q   Okay.
23    A   Is that your question?
24    Q   That is my question, yes.
25    A   Okay.

Page 235

RANDALL TUCKER

1
2    Q   Give me one minute.  (PAUSE)  And who told
3  you that they gave the suspect something with
4  respect to his arm?
5    A   I don't recall who told me or where I read
6  it, and it's possible I may have two incidents
7  confused.  I mean, he may -- maybe they watched for
8  him while he carried off glass or what-have-you.  I
9  don't have the offense report here in front of me.
10    Q   Okay.  And then you, also, believe that
11  they were an accessory to burglary because they did
12  not report the burglary?
13    A   Right.  In the state of Mississippi, it's
14  a law that if you witness a crime, you're supposed
15  to report it.
16    Q   So if one of your officers witnesses
17  somebody driving without a seatbelt and he fails to
18  report it, he or she is committing a crime?
19    A   No.
20    Q   Okay.  But the Khadafys, I'm sorry, the
21  Mannings, if they were to witness a crime and not
22  report it, they would be violating the law?
23    A   Yeah.
24    Q   Okay.  You're aware that there was an
25  altercation inside the apartment in which

Page 236

RANDALL TUCKER

1
2  Mr. Manning and his wife were located that night?
3    A   What do you mean by "altercation"?
4    Q   Officers went into their apartment?
5    A   Correct.
6    Q   Do you know why they went into the
7  apartment?
8    A   They were pursuing them for being involved
9  in what had transpired downstairs, yes.
10    Q   Okay, and, again, the involvement was
11  giving something to the person whose arm was used to
12  break into a house or an apartment and not reporting
13  it?
14    A   Anything they did to assist, whether it be
15  a lookout or hand him something or give him
16  guidance, they would be involved in that, yes.
17    Q   Which of those did Mr. Manning and his
18  wife do?
19    A   I don't have the report here in front of
20  me.
21      MR. ROSS:  I was going to say I
22    object.  He doesn't have the report and
23    doesn't have first-hand knowledge.
24    Q   (Mr. Youngwood) Well, I'm asking what you
25  were told.  Did somebody tell you that they assisted

Page 237

RANDALL TUCKER

1
2  or gave them guidance or helped him plan an escape
3  route or any of the things you just listed?
4      MR. ROSS:  Counsel, why don't you
5    give him the incident report if you're
6    want him to --
7      MR. YOUNGWOOD:  Because I'm asking
8    his knowledge.  He is a named defendant in
9    this case.
10      MS. ROSS:  To the extent you know,
11    but if you don't know, you don't know.
12    A   I don't know without reviewing the report.
13    Q   (Mr. Youngwood) One moment, please.  Did
14  anyone tell you, sir, independent of any written
15  report, and I will show you the reports in a moment,
16  did anyone tell you orally what happened that
17  evening?
18    A   I don't recall that, no.
19    Q   So you have never had any discussions with
20  anyone regarding, in your department regarding what
21  happened with Mr. Manning and his wife that evening?
22    A   I can't say that either.  It's very
23  possible I did.  I just told you I don't recall it.
24    Q   Okay.  You're aware that there are
25  allegations regarding that evening in the complaint

RANDALL TUCKER

1
2  in this case; correct?
3      A   Yes.
4      Q   And you have read the complaint in this
5  case; correct?
6      A   Yes.
7      Q   And you have read that section of the
8  complaint?
9      A   Yes.
10     Q   Okay.  And prior to the complaint being
11 filed, you're aware that there was a, you learned
12 that there was a video of a portion of the events of
13 that evening?
14     A   I don't remember at what point, but I
15 became aware there was a video at some point, yes.
16     Q   Okay.  And that video and that -- uh --
17 the events of that night led to an inquiry led by
18 Chief Williams regarding that evening; correct?
19     A   I don't know that it was necessarily that
20 video or other, or circumstances, you could ask him
21 that, but I'm aware of a video.
22     Q   Okay, have you seen the video?
23     A   Yes, I have.
24     Q   Okay.  All the way through?
25     A   I have seen the whole one.  Not a clip.

RANDALL TUCKER

1
2  Narrated.
3      Q   Okay.  So you have seen the whole video?
4      A   Yes.
5      Q   And you -- did you take any disciplinary
6  action regarding the officers involved in that
7  incident, based on that video?
8      A   No.
9      Q   Did you see any inappropriate behavior in
10 that video?
11     A   No.
12     Q   It's acceptable for your officers to call
13 people a cripple?
14         MR. ROSS:  Object to the form.
15     A   I don't know that he called anybody a
16 cripple.
17     Q   (Mr. Youngwood)  Okay.  You've watched the
18 video though; correct?
19     A   I have.  Yeah.
20     Q   Okay.  And is it acceptable for your
21 officers to tell citizens that they have a choice of
22 being a witness or a suspect in connection with an
23 event?  Is that an acceptable thing for them to say?
24     A   They can explain the law to them.  I don't
25 know that anybody said that.

RANDALL TUCKER

1
2      Q   Okay.  But you have watched the video?
3      A   I have.
4      Q   Okay.  And is it acceptable for your
5  officers to tell individuals that if they don't
6  cooperate, they'll have to sleep on concrete?
7      A   Well, I guess if there is no room in the
8  jail, they would sleep on concrete.  Ultimately,
9  everything down there is on concrete, so that would
10 be a true statement.
11     Q   So that is acceptable to you?
12     A   Yes.
13     Q   Is it acceptable for officers to use the
14 word "horseshit" when interviewing citizens?
15         MR. ROSS:  Objection.  No context.
16     Q   (Mr. Youngwood)  Is that an acceptable
17 term for your officers to use?
18     A   I would prefer they didn't cuss at all,
19 but, you know, each situation is unique.
20     Q   So that's not a violation of any of the
21 ethical or other policy provisions you and I
22 reviewed this morning?
23     A   Saying horseshit?
24     Q   Yes, sir.
25     A   No, it's not a violation.

RANDALL TUCKER

1
2      Q   Okay.  How about calling people cripple.
3  Is that a violation?
4          MR. ROSS:  Objection.  No context.
5          Each situation is different.
6      A   I don't know that anybody called anybody
7  crippled.
8      Q   (Mr. Youngwood)  Okay.  And is it
9  acceptable to you to tell a witness to an alleged
10 crime that they can either put it down on paper or
11 they're just as guilty as the perpetrator and the
12 person has to go to jail?
13     A   I think it's perfectly acceptable to
14 explain to someone their options.
15     Q   And a legitimate option is either you give
16 a witness statement or you go to jail?
17         MR. ROSS:  Object to the form.  No
18 context.
19     A   I don't know what you mean by a legitimate
20 option.  Options are options.  I don't know that
21 there's an illegitimate option.
22     Q   (Mr. Youngwood)  In your view, under the
23 policies and practices of your department, it's
24 acceptable to give the citizen a choice of being
25 arrested and put in jail if they will not give a

Page 242

RANDALL TUCKER

1  witness statement?
2     A   I think each situation is unique.  Like I
3  have told you before, in this instance, I don't
4  think he did anything wrong.
5     Q   Who didn't do anything wrong?
6     A   I'm assuming you're referring to Slade
7  Moore.  He was the officer.  That's who we're
8  talking about; right?
9     Q   We're talking about any officers at the
10  scene, but --
11    A   Okay.
12    Q   -- if you -- so you don't think Slade
13  Moore did anything wrong?
14    A   I do not.
15    Q   And his actions that night were consistent
16  with the policies and practices of your department?
17    A   I didn't say that.
18    Q   Well, I'm asking you.  Were his actions
19  that night consistent with the policies and
20  practices of your department?
21    A   I didn't say that.  I don't think that his
22  actions necessarily reflect everybody in the
23  department.  I don't know that the policy and
24  procedure prevents him from what he said or did.

Page 243

RANDALL TUCKER

1     Q   Let me try again, sir.
2     A   Okay.
3     Q   Did anything he did that night, to your
4  knowledge, violate any policy and procedure of your
5  department?
6     A   No.
7     Q   And he has not been disciplined in any
8  way; correct?
9     A   No, sir.
10        (Exhibit 26 marked for the record)
11    Q   Let me give you what's been marked as
12  Exhibit 22.  I'm sorry, that's the wrong exhibit.
13  26.  Do you know if you have seen this before, sir?
14  Take a minute to look at it.
15    A   This appears to be a narrative prepared by
16  my Chief Deputy Jeremy Williams and an incident
17  report reflecting that, the incident with Mr.
18  Manning.
19    Q   Okay.  Have you seen these documents
20  before, sir?
21        MR. YOUNGWOOD:  Just for the record,
22     they're Bates stamped MC-RFP-8-182 through
23     193.
24    A   I'm sure I have at some point.  I mean, I

Page 244

RANDALL TUCKER

1  don't know at what point, but yeah.
2     Q   (Mr. Youngwood) Did you then discuss this
3  incident with Mr. Williams?
4     A   Yes, I'm sure I did.  We discuss just
5  about everything.
6     Q   Tell me the nature of that discussion.
7     A   I don't recall the nature of it.
8     Q   Did you discuss this incident with
9  Slade Moore?
10    A   I don't think that I did.  I think
11  probably Chief Williams did that.
12    Q   Other than your attorneys, have you
13  discussed this incident with anyone other than
14  Mr. Williams?
15    A   Not that I recall, no, sir.
16    Q   Okay.  Do you believe that the
17  investigation Chief Williams conducted into this
18  matter was sufficient?
19    A   I have every confidence, and, yes, I would
20  say it was.
21    Q   I take it you had not seen the video at
22  the time that you first saw this report, which is
23  Exhibit 26?
24    A   I think I testified that I have seen it,

Page 245

RANDALL TUCKER

1  but I don't know at what point I saw it.
2     Q   Have you seen it more than once?
3     A   I don't know that I have.  It's possible,
4  yes, but I can't testify 100 percent to that.
5     Q   Okay.  And are you aware that the officers
6  choked Mr. Manning that night?
7        MR. ROSS:  Object to the form.
8     A   No, I'm not aware of that.
9     Q   (Mr. Youngwood) Okay.  Are you aware that
10  they handcuffed him?
11    A   I think at some point they did.
12    Q   And do you know why they handcuffed him?
13    A   I think he was going to jail.
14    Q   What was he going to jail for?
15    A   Being an accessory to burglary.
16    Q   And the accessory to burglary was based on
17  what, to your knowledge?  You now have the report in
18  front of you.
19    A   I'll have to read the report.
20    Q   Go for it.
21    A   (PAUSE)  Okay.
22    Q   So why was he being brought to jail?
23    A   I don't know the officer's
24  train-of-thought, but, from the report, one thing

Page 246

RANDALL TUCKER

1
2  stands out to me, they were standing there with him
3  and discussing or talking with him while he was
4  breaking out the window and carting off the glass,
5  and then allowed him to go, run upstairs, he ran
6  upstairs with Quintetta (sic) and Kenyatta into the
7  apartment, so the first thing, when they saw the
8  deputy, so one of the first things that would come
9  to my mind that they would be aiding and abetting by
10  allowing or helping him or concealing his position
11  from authorities, for one.  Uh -- the fact that
12  they're there as lookouts would be another.  That's,
13  in my eyes, aiding in a way.
14     Q    Sir, where does it say that they were
15  lookouts?
16     A    I didn't say that they were there.  I said
17  if they were there and they ran with him.  I said I
18  don't know the officer's train of thought.
19     Q    So you don't know why they were taking him
20  to jail?
21     A    No, we'd have to ask Slade Moore that.
22     Q    Okay.  And nothing in this report tells
23  you why they were taking them to jail?
24     A    I didn't see anything as a reason he took
25  him into custody.

Page 247

RANDALL TUCKER

1
2     Q    You don't see any reason why he took him
3  into custody?
4     A    I said I don't see anything in here as to
5  why he took him into custody.
6     Q    Well, is there some report -- this
7  includes an incident report and a write-up by Chief
8  Williams and a three-page letter or memo by
9  Slade Moore.  Is there other material we should look
10  at to try and to determine why Mr. Manning was being
11  taken to jail?
12     A    Well, his confession right here.
13     Q    His confession?
14     A    Yeah.  He said he knocked on the door.  He
15  was -- uh -- I don't remember the young man's name
16  right now because it's on the other page.  He had
17  knowledge that the man was fixing to break in his
18  baby's girl's house to get a TV out, and he went
19  with him.  So he had knowledge of what was going to
20  happen when he went downstairs.  And that's his
21  words, not mine.
22     Q    I see.  And do you think it's possible
23  Mr. Manning was under some threats from your
24  officers at the time he wrote this?
25     A    No, I don't.

Page 248

RANDALL TUCKER

1
2     Q    Okay.  And you don't believe that, based
3  on the video that you have seen?
4     A    Absolutely not!
5     Q    Let's look at the video.
6     A    Let's do that.
7         (VIDEO PLAYED OFF RECORD)
8         (VIDEO STOPPED)
9     Q    (Mr. Youngwood)  Is that an inappropriate
10  statement by your officer, sir?
11     A    I don't know what the bond is, but it very
12  well could be.
13     Q    Well, do you think that's a fair threat to
14  impart on a witness, sir?
15     A    I don't know that that was a threat.
16     Q    Okay.  So you think telling them they come
17  clean or they can go down to jail is an acceptable
18  thing for your officer to say?
19     A    Well, that was his intention right there,
20  I believe.  He was going to take them to jail.
21     Q    So you have no problem with the tape up
22  until now?
23     A    Not until now, no.
24         (ATTORNEY CONTINUES TO PLAY VIDEO)
25     Q    (Mr. Youngwood)  How about the use of the

Page 249

RANDALL TUCKER

1
2  word "cripple" there, sir, is that acceptable?
3     A    No, it's probably not.  Probably not the
4  best term, but he's claiming that he's crippled or
5  has claimed that he's crippled.  I think he was
6  speaking off of prior knowledge.
7     Q    Well, they're not saying that he's
8  crippled.  They're calling Him "Cripple."  Right?
9     A    You would have to ask that officer that.
10     Q    Did you take any action against
11  Officer Moore for using the phrase "Cripple"?
12     A    He said I didn't take any disciplinary
13  action on this incident at all.
14         (ATTORNEY CONTINUES TO PLAY AUDIO)
15     Q    Is that acceptable to you, sir, to tell
16  somebody they can be a witness or a suspect?
17     A    Yes.
18     Q    And what law authorizes, you believe,
19  arresting somebody for not writing a witness
20  statement?
21         MR. ROSS:  Object to the form.
22     A    What law does what now?
23     Q    (Mr. Youngwood)  You've told me that it's
24  illegal under Mississippi law for citizens not to
25  report a crime.  I believe that's what you told me.

Page 250

1          RANDALL TUCKER
2    A   Yes.
3    Q   What law is that?
4    A   I don't remember the code section.
5    Q   But it's acceptable for police officers to
6  allow people to commit violations or crimes and not
7  arrest them; correct?
8    A   Yes.
9          (ATTORNEY PLAYS VIDEO)
10   Q   Do you agree with that statement of your
11 officer?
12   A   Yes.
13         (COURT REPORTER DISCUSSES WITH ATTORNEY
14 REGARDING THE VIDEO)
15         (ATTORNEY PLAYS VIDEO -- BACKS UP VIDEO TO
16 MAKE SURE AUDIO PORTION IS APPLICABLE TO ANSWER)
17         MR. YOUNGWOOD:  Let the record
18     reflect I have restarted the tape.  I'm
19     going to pause it two or three times to
20     get us caught up, and I will read into the
21     record approximately, as best we can, what
22     the statements were on the tape that
23     prompt my questions.  Obviously, the tape
24     speaks for itself, and my reading of it
25     doesn't change the words on it.

Page 251

1          RANDALL TUCKER
2          (ATTORNEY PLAYS VIDEO)
3    Q   (Mr. Youngwood) So I believe this was the
4  first time I paused it earlier, sir.  The officer on
5  the tape, who is addressing Mr. Manning and his
6  wife, Quinnetta, says, "Now, you all can come clean,
7  or he can go down to jail and about Tuesday, you can
8  see a judge and get you about a
9  fifty-thousand-dollar bond for burglary."
10        My question to you is that an acceptable
11 statement?
12        MR. ROSS:  I object to the form.  You
13     left out the fact that prior to that
14     statement also Moore informed him that he
15     had seen them committing a crime.  You can
16     answer.
17        MR. YOUNGWOOD:  I don't believe
18     Officer Moore said that at all.
19        MR. ROSS:  Well, you weren't
20     listening then.  I'm sorry.  I don't mean
21     to be argumentative, but he said what he
22     saw.
23        MR. YOUNGWOOD:  The tape says what it
24     says, but there's no word "crime" prior to
25     this point on -- so I really don't know

Page 252

1          RANDALL TUCKER
2     what you're talking about.
3    Q   (Mr. Youngwood) But my question to you,
4  sir, is is that statement acceptable to you?
5    A   I haven't heard him say anything wrong to
6  this point.
7        MR. YOUNGWOOD:  And I'll just note
8     for the record the incident report
9     associated with this is June 26, 2016,
10    and, obviously, the date is what it is,
11    but my calendar tells me that's a Sunday.
12   Q   (Mr. Youngwood) Does it trouble you at
13 all, sir, that the officer suggests that they would
14 have to sit in jail from Sunday to Tuesday before
15 they could even appear for a bond hearing?
16   A   No, it doesn't trouble me.  I think the
17 law is 48 hours.
18   Q   Let's continue.
19        (ATTORNEY CONTINUES TO PLAY VIDEO)
20   Q   I'm pausing it again.  The officer just
21 used the word "Cripple."  Specifically, said "all
22 three of you have run right up the steps, and
23 Cripple here run right up the steps, too."
24        Is it a violation of your policies and
25 procedure, sir, for the officer to call Mr. Manning

Page 253

1          RANDALL TUCKER
2  a cripple?
3    A   Not when he's characterized himself as
4  that, no.
5    Q   Okay, and where in the tape that we've
6  listened to has he characterized himself as a
7  cripple?
8    A   I don't know at what point this tape
9  started.  I mean, obviously, as soon as she hit
10 record, but it was my understanding, which, I mean,
11 I don't have anything in writing, but he
12 characterized himself by saying he couldn't run up
13 the stairs because he was crippled.  I think that
14 was more of a he's claiming he's cripple and he's
15 referring to his claim.
16   Q   Well, sir, you have looked through the
17 file, which is marked as Exhibit 26, and we've
18 listened to the tape from the beginning that we have
19 it, what do you base your belief that he had
20 previously identified himself to be a cripple?
21   A   Again, it's -- uh -- for some reason it's
22 in my memory that he made that statement.  I don't
23 know if -- I don't know at what point I heard it.
24 But I'm sure Deputy Moore can clear it up for you.
25   Q   But so far still nothing about this tape

Page 262

RANDALL TUCKER

1    question.
2        Q   Do you view any of the statements by the
3    officer coercive?
4        A   No.
5        Q   So these are acceptable ways to
6    interrogate a witness?
7        A   No, what he should have done was gone on
8    and taken him to jail and gotten a statement from
9    him there.
10       Q   Do you know if Mr. --
11       A   Due to his condition, he allowed him to
12   give a statement at the scene.
13       Q   I'm sorry, "due to his condition." What
14   condition is that?
15       A   You sit here and listen to him talking
16   about being cripple.
17       Q   And why do you believe he allowed him to
18   do it at the scene because of his physical
19   condition?
20       A   He's sitting there explaining it to him.
21           (ATTORNEY CONTINUES TO PLAY TAPE)
22       Q   The officer just said, Mr. Manning just
23   said, "What do I do?"
24           And the officer responded, "You're going to

Page 263

RANDALL TUCKER

1    jail. I'm tired of fooling with you. I don't want
2    to fool with you no more. You don't want to act
3    right."
4        Is that exchange a violation of the policies
5    and procedures of the Madison County Sheriff's
6    Department?
7        A   No.
8            MR. ROSS:  And I object because it's
9            indecipherable what came before that or
10           even after that or even if counsel is
11           repeating it correctly.  But subject to
12           that, you can answer it.
13       A   No.
14       Q   (Mr. Youngwood)  Not a violation?
15       A   No.
16           (ATTORNEY CONTINUES TO PLAY TAPE)
17       Q   The tape concluded.  At the end of it, the
18   scene shifts and it seems to be moving.  The officer
19   says to Mr. Manning's wife, "You going to finish
20   this or you gone go, too."
21       Mr. Manning responds, "Man, please, man, I have
22   been shot five times in the spinal cord, man,
23   please, please, ouch!"  Is there anything about that
24   exchange cause you to believe that the policies and

Page 264

RANDALL TUCKER

1    procedures of the Madison County Police Department
2    were violated in connection with this incident?
3        A   No.
4        Q   And I'll ask you one more time, sir, what
5    law do you believe Mr. Manning was violating by
6    failing to voluntarily give a witness statement?
7        A   By failing to give a witness statement?  I
8    don't know that he violated a law.
9        Q   Well, you said earlier that it was your
10   understanding that he became an accessory to
11   burglary by refusing to report the crime?
12       A   Okay.
13       Q   That was your testimony?
14       A   Yes.
15       Q   And what is that violation in the State of
16   Mississippi?
17       A   I told you don't know the State statute.
18       Q   And if you're wrong on that, sir, that
19   there's no law that requires such reporting, would
20   that change your analysis of this tape?
21       A   No, not a bit.
22       Q   So it's perfectly acceptable for an
23   officer to give somebody a choice between submitting
24   a statement or going to jail?

Page 265

RANDALL TUCKER

1            MR. ROSS:  Object to the form.
2        A   Like I said, each situation is unique, but
3    the officer witnessed him and the other two
4    individuals.  It's admitted on the tape that they
5    went downstairs knowing what he was going to do, and
6    the officer said he was charging him as an
7    accomplice.  I think he even explained the after,
8    accessory-after-the-fact and the accomplice law to
9    burglary.  No, I don't have a problem with it.
10           MR. YOUNGWOOD:  Why don't we take a
11           break?
12           VIDEOGRAPHER:  Off record.  4:03.
13           (BRIEF RECESS)
14           VIDEOGRAPHER:  DVD 5.  Back on the
15           record.
16       Q   (Mr. Youngwood)  Sheriff Tucker, have
17   there been other incidents involving Slade Moore
18   that required investigation?
19       A   Not that I can think of off the top of my
20   head.
21       Q   Okay.  Do you know who Destiny Jones is?
22       A   I don't believe I know a Destiny Jones.
23       Q   Do you recall any investigation involving
24   Slade Moore involving Destiny Jones?

Page 266

RANDALL TUCKER

1
2      A   I don't believe I know a Destiny Jones.
3      Q   And how about John Leach?  Do you recall
4  any accusations or investigations involving
5  John Leach?
6      A   I don't know a Joan Leach either.
7          (Exhibit 27 marked for the record)
8      Q   Let me give you Exhibit 27.  Let me hand
9  you what we've marked as Exhibit 27, sir.  It's MC
10  RFP 8 211 through 214.  Recover -- it's an e-mail
11  from Susan McCarty to Chief Williams and you,
12  copying others.  Do you see that?
13      A   Yes.
14      Q   And who is Ms. McCarty?
15      A   She's the former Justice Court Clerk for
16  Madison County.
17      Q   Okay.  Do you recall this e-mail?
18      A   I do not.  I see that I am copied or it
19  was sent to me.
20      Q   And you'll see it's a reference, and you
21  can turn to the second page to Jones, Destiny.  I
22  think it's last name first.  Destiny Jones?  Do you
23  see that?
24      A   I do.
25      Q   And if you look down toward the middle of

Page 267

RANDALL TUCKER

1
2  the page, it says, "On or about November 27, 2016,
3  in Madison County, Mississippi," and it refers to
4  Deputy Slade Moore "did willfully and unlawfully in
5  violation of Section 99-3-28, and during the time
6  that he was acting in the scope of his official duty
7  as a sworn officer for the Madison County Sheriff
8  Department caused affiant to be put in fear of harm
9  by allowing the following to occur:  Grabbing the
10  affiant's arm, placing affiant in cuffs, and stated
11  to the affiant, 'I'm taking your ass to jail,' and
12  squeezing the affiant's arms, this occurring in
13  Madison County, Mississippi."  Do you see that?
14      A   Yes, I see.
15      Q   Do you recall any investigation into the
16  allegations contained in this affidavit?
17      A   I do not.  That would have been handled by
18  my chief deputy.
19          (Exhibit 28 marked for the record)
20      Q   I'm giving you what I'm marking as Exhibit
21  28.  It's a document with Bates Number MC RFP 8 29
22  through 8 31.
23      A   Uh-huh.
24      Q   I'll refer you to this first numbered
25  paragraph.  First of all, this is addressed to you,

Page 268

RANDALL TUCKER

1
2  sir.  Do you recall receiving it?
3      A   Yes, I do.
4      Q   And it's dated March 16, 2015?
5      A   March 16, 2015, yes, sir.
6      Q   Okay.  And there are allegations in the
7  first paragraph.  This is not about Slade Moore.
8  It's about a different deputy, Brad Sullivan.  Do
9  you see that?
10      A   Yes, sir, I do.
11      Q   It says, "On October 12, 2014, Madison
12  County Sheriff Brad Sullivan, a white male police
13  officer, pointed his police-issued handgun at Daryl
14  Dozier, Ms. Domekia-Myers Dozier, wife, and Dishanta
15  -- Dishantia Dozer, daughter, age five, with the
16  intent to cause bodily harm, causing fear, stress,
17  and the family to be terrorized and that Sheriff
18  Brad stated, 'I got you niggers now,' and that
19  Sheriff Brad Sullivan used deadly force on the
20  unarmed and defenseless African-Americans.  Witness
21  written statements are available upon request."
22      Do you see that?
23      A   Yes, I see that.
24      Q   What did you do to look into the
25  allegations in this paragraph?

Page 269

RANDALL TUCKER

1
2      A   I discussed it with my chief deputy.  I
3  think he, in turn, discussed it with Deputy
4  Sullivan.  I personally attempted to call Daryl
5  Dozier back at the number he provided under his
6  signature on page three of the document.  I got no
7  response.  I never did receive any type of affidavit
8  or statement.
9      There were no charges filed against the deputy.
10  The deputy denied using the terms that he's alleged
11  to have used in this allegation, and that was the
12  extent of it.
13      Q   Okay.  Have you heard the racial slur used
14  in this paragraph used at the Madison County
15  Sheriff's Department?
16      A   No, not at the sheriff's department, no.
17      Q   Have you heard it used by any of your
18  officers or deputies, even if not within the sheriff
19  department building?
20      A   No, not during my time at the sheriff's
21  office.
22      Q   Okay.  I'm not sure what you mean by
23  qualify or not during your time at the sheriff's
24  office.  So not since 2000?
25      A   Right.  Prior to 2000, I was with the

<br>

**Page 270**

RANDALL TUCKER

Canton Police Department, and I had an
African-American partner that was a good friend of
mine there, and I've heard him use it.

Q   I'm asking you about Madison County
Sheriff's Department, you have never heard this
racial slur used?

A   I said no.

Q   Have you heard other racial slurs used by
Madison County officers or deputies?

A   I'd have to know what you consider a
racial slur, and I'm not slighting you in any way.
I don't know what you would consider a racial slur.

Q   Well, have you heard anyone use any
language you would consider to be racially
offensive?

A   No, sir, not that I consider offensive,
no, sir.

Q   Go back to Exhibit 5, please, sir.  This
is the e-mail you forwarded on June 5th, 2009?

A   Yes, sir.

Q   If you'll go to the page, I mean Bates
number 460, a paragraph you and I have read earlier,
begins with the words, "But when I call you," do you
see that?

**Page 271**

RANDALL TUCKER

A   Yes.

Q   And you would agree with me all of those
words in that paragraph are racial slurs, sir?  I'm
sorry, all of the words that follow the word you,
down to the double dots, those are all racial slurs;
correct?

A   I'm not sure what a camel jockey is.  I
would agree most are, but there is some I've never
heard before, so I don't know what their meaning
are, but, in general, is.

Q   Have you ever heard any of these words
used as racial slurs by any Madison County officers
or deputies during your time?

A   No, sir, I have not.

Q   Okay.  Put that aside again.

A   Can I point something out for the record?

Q   Absolutely!

A   That was none of my employees said that.
That statement.

Q   So to help the record, the witness is
referring to Exhibit 5, which is an e-mail from
2009, we discussed this morning; correct?

A   Correct.

Q   Okay.  And I apologize forgetting

**Page 272**

RANDALL TUCKER

Mr. Butler, Joe Butler, is he a Madison County
employee?

A   Yes.

Q   So he forwarded an e-mail that said all of
these things; correct?

A   He forwarded a man's opinion.  The man's
opinion says those things.

Q   Okay, the man being Michael Richards?

A   I think he played Kramer.

Q   Right.

A   If I'm -- on a sit-com show.  I don't know
him personally.

Q   I don't either, but would it surprise you
to know, sir, that Mr. Richards didn't write this
e-mail and didn't say any of these things?

A   I don't know whether he did or not, but I
can tell you my employees didn't.

Q   Okay.  No, your employee forwarded the
e-mail that said these things; correct?

A   Correct.

Q   And forwarded it to numerous people, both
within and without the Madison County Sheriff's
Department; correct?

A   With all of those names, yes.

**Page 273**

RANDALL TUCKER

Q   And then you forwarded it to seven people,
including a number of people within the Madison
County Sheriff's Department?

A   Yes.

MR. ROSS:  I object to the form.
Let's set the record straight.  Mr. --
Sheriff Tucker was not the sheriff in
2009, so I don't think that Mr. Butler
would be his employee at that time.  His
employer at that time.

Q   (Mr. Youngwood)  What was Mr. Butler's
position at that time?

A   I don't know what his assignment was,
personally.  I mean, he was an employee of the
sheriff's department at that time.

Q   And did he report to you in any way?

A   No.

Q   Did any of the people that he sent this
e-mail to report to you in any way?  Do you want to
look at Exhibit 5 again?

A   There are two names on here that worked
for me at one point during my tenure in the
narcotics division, which would have been during
that time, but I'm not sure if they were in the

RANDALL TUCKER

1
2  narcotics division at that time.
3      Q   Okay.
4      A   Does that answer your question?
5      Q   It does, and -- I'm sorry, sir, go ahead.
6      A   And those names are Jay Houston and
7  Taylor Chastain.
8      Q   Thank you.  And did you -- I'm sorry, any
9  of the people that you forwarded it to, were they
10 reporting to you?
11     A   Let me pull it back up.  I apologize.
12 Well, one of the ones is Taylor Chastain, and,
13 again, I don't know if it was during that period or
14 not.  And Trey Curtis is in narcotics.  Tommy Jones
15 was in narcotics.  And John Martin Harris was in
16 narcotics.  I don't have the relevant dates of their
17 tenure in narcotics, but at one point, all of those
18 did.
19     Q   Terry Barfield was one of your colleagues
20 that passed away recently; is that correct?
21     A   Yes, sir.
22     Q   Did you ever hear him use a racial slur,
23 sir?
24     A   No.
25     Q   Okay.  And was there a Kristy, who is a

RANDALL TUCKER

1
2  dispatcher at some point in 2013, in the Madison
3  County Sheriff's Department?
4      A   I don't recall a Kristy.  I'm not saying
5  there wasn't.  I mean, if she was, she was.  I don't
6  recall her.
7      Q   There was a case, sir, a Robert Cooper
8  brought in the Southern District of Mississippi in
9  2013 against you in your official capacity.  Do you
10 recall that litigation?
11     A   No, sir I don't.
12         (Exhibit 29 marked for the record)
13     Q   I'll give you what we'll mark as Exhibit
14 27? I'm sorry, 29.  Thank you.  Does this refresh
15 your recollection of the existence of the Cooper
16 versus Tucker case from 2013?
17     A   Can I have just a moment to review it?
18     Q   Absolutely!
19     A   It doesn't ring a bell, but I've got it
20 here in front of me.
21     Q   Okay.  If you go to paragraph seven,
22 there's a reference to a Lieutenant, it's a little
23 hard for me to read, but it looks like -- uh --
24 Pot-scar-by?
25     A   Potskarby.

RANDALL TUCKER

1
2      Q   Yes.  Is that somebody who works or used
3  to work at the Madison County Sheriff's Department?
4      A   Yes, he did.
5      Q   And you'll see there allegations regarding
6  the lieutenant, made by plaintiff, regarding racial
7  jokes, racial remarks; do you see that?
8      A   Yes, I see that.
9      Q   Are you aware of any such remarks being
10 made by the lieutenant?
11     A   No, I'm not.
12     Q   This may be a hard question to answer, but
13 it sounds like you don't recall the lawsuit.  Do you
14 recall any investigation into whether such remarks
15 were made?
16     A   Uh -- no, I personally don't know that,
17 no.
18     Q   Okay.  You can put that to the side, sir.
19 Do you recall allegations against Deputy
20 Weisenberger concerning excessive force made in
21 2014?
22     A   No, I don't.
23         (Exhibit 30 marked for the record)
24     Q   I'm going to give you what we're marking
25 as Exhibit 30.  Do you recognize this as an -- I'm

RANDALL TUCKER

1
2  sorry -- an investigatorial report prepared by
3  Chief Williams?
4      A   This is a narrative with his -- yeah, it's
5  a narrative.  Yes, of his.
6      Q   And you see about four lines down to the
7  narrative, what regards Deputy Thames?
8      A   Deputy Tims (sic).
9      Q   Tims (sic)?
10     A   Yes.
11     Q   And you see allegations of excessive
12 force? I'm sorry, I completely bumbled this.  The
13 allegations, I believe, are being made by Deputy
14 Thames; is that right?
15     A   That's what this says, yes.
16     Q   And they concern Deputy Weisenberger;
17 correct?
18     A   Yes.
19     Q   Okay.  And a sentence down, "Deputy Thames
20 stated that the last name of Fyer as the possible
21 last name of the subject arrested and that he was
22 struck while in handcuffs by Deputy Weisenberger."
23 Do you see that?
24     A   That's what it says, yes.
25     Q   And do you recall this incident?

RANDALL TUCKER

1
2    A   No, I do not.
3    Q   Okay.  Do you recall whether any action
4  was taken directed at Deputy Weisenberger as a
5  result of this incident?
6    A   It's possible, but I don't know.  I don't
7  recall the incident, itself.  If there is, it would
8  be reflected in his file.
9        (Exhibit 31 marked for the record)
10   Q   Going to give you what we're marking as
11 Exhibit 31, MC e-mails 264.  This is an e-mail from
12 March of 2014, from Susan McCarty to what appears to
13 be you and Chief Williams.  Do you see that?
14   A   Yes.
15       MR. ROSS:  Is this Exhibit 31?
16       MR. YOUNGWOOD:  Yes.
17   A   I think he said 32, but it is 31.
18   Q   (Mr. Youngwood)  It is 31.  I do
19 apologize.  Do you see the e-mail, sir, that is
20 marked as Exhibit 31, Bates Number MC e-mails 264?
21   A   Yes, I see this.
22   Q   Okay.  Do you recall receiving this?
23   A   Vaguely.  Yes.  I think this was a -- if
24 I'm not mistaken, and, again, I don't have a report
25 in front of me.  I think this was from an incident

RANDALL TUCKER

1
2  at Velma Jackson High School, if I'm not mistaken.
3    Q   Okay.  And the individual being referenced
4  is Chuck McNeal?  Do I understand that correctly?
5    A   Yes.
6    Q   Okay, and that's one of your officers or
7  deputies?
8    A   He is the jail administrator.
9    Q   Do you know what came of this accusation,
10 sir?
11   A   I think it was dismissed.  And, again,
12 don't hold me to that because I don't recall.  But
13 had it been adjudicated guilty, there would have
14 been some action against the officer.
15   Q   Was any action taken against the officer?
16   A   Not that I recall, no, and that's the
17 reason I'm assuming it was dismissed.
18   Q   Was any investigation done of the officer?
19   A   If this is the incident that I'm thinking
20 about, yes, my chief deputy would have handled it.
21   Q   Okay.  And do you recall the results of
22 that investigation?
23   A   I'm assuming there was no action taken if
24 it was dismissed.  But, again, I don't have it in
25 front of me, and I'm not even sure that's the

RANDALL TUCKER

1
2  incident.  I recall an incident with a Murray and
3  Chuck at Velma Jackson, but I can't swear that this
4  is in reference to that incident.
5    Q   Okay.  Prior to this lawsuit, have you
6  ever been made aware of racial discriminatory
7  practices within your department?
8        MS. ROSS:  Object to the form.  It
9        assumes he's been aware through this
10       lawsuit, but you can answer.
11   A   I'm sorry to both of you.  I didn't
12 understand either one of you.  (LAUGHTER)
13   Q   (Mr. Youngwood)  I'll ask it differently
14 which should address the objection and perhaps make
15 the question easier.  Prior to this lawsuit, sir,
16 have you ever been made aware of any allegations of
17 racially discriminatory practices within the
18 Madison County Sheriff's Department?
19   A   While I've been the sheriff?
20   Q   Many times since 2000?
21   A   I think I testified earlier that I think
22 there were some racial overtones toward roadblocks
23 when Toby was sheriff, that they marched about, but
24 other than that, no.
25   Q   Okay.  How about the Gibson complaint,

RANDALL TUCKER

1
2  sir?
3    A   What about it?
4    Q   That contains allegations of racial
5  discriminatory practices.
6    A   Oh, that's part of this lawsuit.
7    Q   No, it's not, sir.
8    A   Well, he's mentioned in there, so.
9    Q   Well, I'm speaking of his lawsuit, sir.
10   A   Okay.  Well, I apologize.
11   Q   Yeah.
12   A   What about it?
13   Q   Were you made aware through that lawsuit
14 of racially discriminatory practices?
15       MR. ROSS:  Object to the form.
16   Q   (Mr. Youngwood)  Within your department?
17   A   I was not, but he claims in his lawsuit he
18 did.
19   Q   He claims in his lawsuit he did what, sir?
20   A   He claims that he told me or me and chief
21 deputy, one of us, about the allegations, but that's
22 false.  He didn't ever tell me anything about any
23 racial profiling.
24   Q   Okay.  And how about Lieutenant Sandridge?
25 Do you understand that he told Lieutenant Sandridge

# EXHIBIT 25

```
 1                    Jeffrey Waldrop
              UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                    NORTHERN DIVISION
 3
 4

   LATOYA BROWN; LAWRENCE BLACKMON;
 5 HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
 6 McFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
 7 BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
 8 OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
 9
   v.             CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER; IN HIS
12 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13 #6, IN THEIR INDIVIDUAL CAPACITIES       DEFENDANTS
14
15 *****************************************************
                 DEPOSITION OF JEFFREY WALDROP
16 *****************************************************
17
                  APPEARANCES NOTED HEREIN
18
19
                DATE:  TUESDAY, NOVEMBER 14, 2017
20                    PLACE:  MARRIOTT
                   200 EAST AMITE STREET
21                  JACKSON, MISSISSIPPI
                    TIME:  2:00 P.M.
22
23
24 REPORTED BY:  KELLYE S. SHOWS, BCR, CSR
                 CSR #1290
25 JOB NO. 133401
```

Page 26

Jeffrey Waldrop

1
2     A.   It's at what?
3     Q.   It's just random?  It's when you're needed?
4     A.   Yes, it's whenever they -- yes.
5     Q.   Pardon?
6     A.   When I'm needed.
7     Q.   Do you have your own patrol vehicle?
8     A.   I have an unmarked vehicle, yes.
9     Q.   Do you share it with anyone?
10    A.   Not on a normal basis.
11    Q.   Do you have a dash camera?
12    A.   No.
13    Q.   Any in-car camera?
14    A.   No.
15    Q.   Does every marked patrol vehicle have a
16    camera?
17    A.   I haven't looked.
18    Q.   Switch back to the -- we were talking about
19    evaluations.  How are deputies evaluated in terms of
20    their performance?
21    A.   You'd have to ask one evaluating them.
22    Q.   Well, you've had four or five different jobs
23    at the MCSD.
24    A.   Uh-huh.
25    Q.   So do you have any experience being evaluated?

Page 27

Jeffrey Waldrop

1
2     A.   I mean, I've put in for my time.  I go
3     through my interview and they tell me if I did or didn't
4     make it.
5     Q.   But there's no annual review process?
6     A.   Not that I'm aware of.
7     Q.   There's no structured feedback that you
8     receive?
9     A.   Yes, I get feedback.
10    Q.   Monthly?
11    A.   Whenever I put in for an advancement.
12    Q.   So you could get feedback never if you
13    never applied for advancement?
14    A.   I don't know where you're looking for
15    feedback from.  I'm not totally understanding your
16    question.
17    Q.   Someone to tell you whether you're doing
18    a good job, someone giving you feedback on whether
19    or not you're complying with the policies and
20    procedures of the MCSD.  You never get any feedback
21    of that type unless you're applying for an
22    advancement?
23    A.   No.  I mean, I've been told I'm doing a
24    good job.  I've been told if I'm not doing such a
25    good job if that's the feedback you're looking for.

Page 28

Jeffrey Waldrop

1
2     I don't know.
3     Q.   Do you ever receive feedback in writing?
4     A.   No.
5     Q.   Are any promotions automatic?
6     A.   Not that I'm aware of.
7     Q.   So back to when you were first hired.  Were
8     you put on a probationary period?
9     A.   I don't think.
10    Q.   What kind of training did you receive when
11    you were first hired?
12    A.   As a jailer, they just had somebody walk around
13    with you telling you what to do, how to do it.
14    Q.   And as you changed roles as you changed ranks,
15    would you get trained on each role every time you received
16    an advancement?
17    A.   Yes.
18    Q.   What kind of training?  Let's talk about patrol.
19    So you advanced to patrol.  What kind of training did
20    you receive when you began that job?
21    A.   I would ride with other deputies that were
22    already on patrol and they would kind of go over some
23    things.
24    Q.   And when you moved to investigations, did you
25    receive new training at that point?

Page 29

Jeffrey Waldrop

1
2     A.   I did.
3     Q.   How did that training work?
4     A.   You get a case and needed some help you'd go
5     to them.  And I've been to some death scene investigations,
6     I've been to CIP school.  I don't -- I've got a lot
7     of schools.  I don't know all of them right off.  It's
8     been a long time.
9     Q.   Is there any sort of ongoing training program
10    offered by the MCSD in-house?
11    A.   Yes.
12    Q.   Are they classes?
13    A.   Yes.
14    Q.   Seminars?
15    A.   What's the difference?
16    Q.   Maybe one is interactive and in the field and
17    the other is taught.
18    A.   Both.
19    Q.   Are there any other types of in-house training
20    programs?
21    A.   I mean, there's training programs.  You just
22    covered a wide range of them.  I don't know what you're
23    looking for.
24    Q.   When you began, did the MCSD policy handbook
25    exist?

## Page 30

Jeffrey Waldrop

2  A.  In '95?
3  Q.  Uh-huh.
4  A.  No.
5  Q.  When was it introduced?
6  A.  Sheriff Trowbridge.
7  Q.  And when it was introduced, were you given
8  a copy?
9  A.  I was.
10  Q.  Were you required to read it?
11  A.  I don't know about required, but yes, I read
12  it.
13  Q.  Were you ever tested on any aspect of the
14  policy?
15  A.  No.
16  Q.  Do you ever refer to the policy for guidance?
17  A.  Yes.
18  Q.  Can you give me an example of what you would
19  refer to the policy for?
20  A.  I referred back to it on as far as carrying
21  weapons off duty.  Just whatever I needed to look at
22  it for.  Weapons and different things.
23  Q.  Do you provide training on the policy
24  handbook?
25  A.  No.

## Page 31

Jeffrey Waldrop

2  Q.  Do you know if new hires are required to
3  review -- read the policy handbook?
4  A.  I'm sure they do.
5  Q.  Are they required to as part of their
6  employment?
7  A.  I know they're given one.
8  Q.  But are they tested on it in any respect?
9  A.  I don't give them a test.
10  Q.  Let's talk about the purpose of the training
11  programs that you do.  Who decides the training
12  curriculum?
13  A.  Me.
14  Q.  Is it created in conjunction with Sheriff
15  Tucker?
16  A.  Yes.
17  Q.  Does Sheriff Tucker approve all of the
18  training programs?
19  A.  Him or Chief Williams.  But if it's something
20  we do yearly anyway, I don't -- I just make sure that
21  they're free for that time.
22  Q.  Have there been any changes to the training
23  program in recent years?
24  A.  Like what?
25  Q.  Can you think of any changes?

## Page 32

Jeffrey Waldrop

2  A.  Not right off.
3  Q.  Is there any training on when an officer may
4  refuse to follow a supervisor's orders if the supervisor
5  asks him to do something unconstitutional?
6  A.  Is there any training for that?
7  Q.  Uh-huh.  Yes.
8  A.  I mean, we get that kind of training in the
9  academy.
10  Q.  Are you aware that there's an insubordination
11  section of the policy handbook?
12  A.  I believe so.
13  Q.  Do you provide any training on that section
14  of the policy handbook?
15  A.  No.
16  Q.  Is there any training on what to do in the
17  event that a citizen makes a complaint?
18  A.  Who are they making a complaint to?
19  Q.  MCSD?
20  A.  The chief?  He can handle that.  I don't do
21  nothing with that.
22  Q.  What if they're making a complaint directly
23  to someone on patrol?
24  A.  They're going to refer to the chief.
25  Q.  Is there training on that?

## Page 33

Jeffrey Waldrop

2  A.  I've not had any training on that.  That's
3  common sense.
4  Q.  Do you have to raise 100 percent of the
5  complaints that you receive to the chief?
6  A.  Do I have to raise?
7  Q.  100 percent of complaints that you receive
8  to the chief.
9  A.  Like let him know?
10  Q.  Uh-huh.
11  A.  If I get one I let him know.
12  Q.  Every time?
13  A.  Yes.
14  Q.  You don't use any discretion?
15  A.  I can't recall any.
16  Q.  And that's common sense?
17  A.  Yes.
18  Q.  But there's no training that says that one
19  ought to do that?
20  A.  Unless it's in the SOP.
21  Q.  Pardon?
22  A.  Unless it's in the SOP.  I'll refer back
23  to it later.  I didn't look at it anytime lately.
24  Q.  Is there any training on when an officer
25  must report another officer's misconduct?

Page 34

Jeffrey Waldrop

1
2   A.  Is there any training?
3   Q.  Yes.
4   A.  No.
5   Q.  Does Sheriff Tucker require officers to
6   report if another officer is violating the
7   constitutional requirements for some sort of policing?
8       MR. ROSS:  I object to the form.  The
9   constitutional requirements for some form of policing
10  is very broad.  If you understand the question you
11  can answer it.
12  A.  Ask it again.
13  BY MS. JARRETT:
14  Q.  Does Sheriff Tucker require officers to
15  report if another officer is violating the
16  constitutional requirements of whatever police work
17  he is doing?
18  A.  I would think so.
19  Q.  What policies are in place to enable that
20  type of reporting?
21  A.  I don't know of any policy other than -- I
22  mean, I'd have to go back and look.  If you're asking
23  are we supposed to tell on somebody that's doing
24  something wrong, yes.
25  Q.  Are there any procedures set up for people

Page 35

Jeffrey Waldrop

1
2   to do that?
3   A.  I mean, it's an open door.  You can just
4   go in and speak to him, either one of them, whenever
5   you need to see them.
6   Q.  Is there any training on quotas or
7   expectations?
8   A.  No.
9   Q.  Do you train officers on what they're
10  expected to do in terms of numbers?
11  A.  No.
12  Q.  Let's talk about training on specific
13  types of police work.
14      MR. ROSS:  Can we take two minutes since
15  you're sort of changing?
16      MS. JARRETT:  Yes.
17      (OFF RECORD 2:33 P.M. TO 2:36 P.M.)
18  BY MS. JARRETT:
19  Q.  We were about to start talking about
20  specific types of training that you offer.
21  A.  Okay.
22  Q.  Do you give any training on establishing
23  roadblocks?
24  A.  No.
25  Q.  Do you give any training on establishing

Page 36

Jeffrey Waldrop

1
2   checkpoints?
3   A.  No.
4   Q.  Okay.
5       (EXHIBIT 1 MARKED.)
6   BY MS. JARRETT:
7   Q.  Are there any written guidelines regarding
8   roadblocks?
9   A.  I don't know of any.
10  Q.  Can you describe the document that is in your
11  hand.
12  A.  It says Sobriety Checkpoint Guidelines.
13  Q.  What is a sobriety checkpoint?
14  A.  Checking to see if somebody's impaired.
15  Q.  Can you turn to the last past of this
16  document.
17  A.  (Witness complied.)
18  Q.  Do you see where it says General Roadblocks?
19  A.  Uh-huh.
20  Q.  Does this refresh your recollection as to
21  whether or not there are any written roadblock
22  guidelines?
23  A.  I've not seen any.  I mean, I don't know what
24  exactly -- what are you asking me?
25  Q.  Have you ever seen this document before?

Page 37

Jeffrey Waldrop

1
2   I mean, I don't do roadblocks.  I don't even know what
3   this is.
4   Q.  You don't do roadblocks?
5   A.  Huh-uh.
6   Q.  You've never done a roadblock?
7   A.  I didn't say that.  I don't do them now.
8   Q.  When was the last time --
9   A.  I have not done them since this was going
10  on, evidently.
11  Q.  When was the last time you believe you did
12  a roadblock?
13  A.  It's been a while.
14      (EXHIBIT 2 MARKED.)
15  BY MS. JARRETT:
16  Q.  Do you recognize the document I just gave
17  you?
18  A.  It looks like our CAD readout maybe.
19  Q.  What's the incident type?
20  A.  Roadblock.
21  Q.  What's the date?
22  A.  2/26 of '16.
23  Q.  Do you see your name as the recording
24  officer?
25  A.  I see that.

Page 38

Jeffrey Waldrop

1
2      Q.   Does this refresh your recollection about
3  the last time you worked a roadblock?
4      A.   No, ma'am.
5      Q.   You don't recall filling out this incident
6  report?
7      A.   No, ma'am.
8      Q.   How does this incident report get generated?
9      A.   Dispatch.
10     Q.   Do you have any recollection of working on
11 a roadblock on February 26, 2016, at 1415 West
12 Highway 16?
13     A.   I do not recall this.  Now, this -- you're
14 asking is this something that I go by?  Is that what
15 you're asking me?
16     Q.   No.  But that's an interesting question.
17 Is that something you go by?
18         MR. ROSS:  You're referring to Exhibit 1?
19         MS. JARRETT:  Yes.
20     A.   When you say responsible for a roadblock
21 that's when a supervisor or somebody gets one
22 together and then other officers come and assist.
23 We're acting under that officer.  I've not done that
24 in a long time.  I'm not saying I have not assisted
25 but I don't know what this is on this.

Page 39

Jeffrey Waldrop

1
2         MR. ROSS:  He's referring to Exhibit 2
3  when he says he doesn't know what it is.
4  BY MS. JARRETT:
5      Q.   I'm not sure I understand the distinction.
6  What was your role at this roadblock that is in
7  Exhibit 2?
8      A.   I have no idea.
9      Q.   Do you believe that you worked at a roadblock
10 in February of 2016?
11     A.   I'm not saying I didn't but I don't -- I
12 don't know what this is about on Highway 16 West.  I
13 don't -- I don't recall any roadblock.  I mean, this
14 is at 1831.  It's not around a holiday.  I normally
15 wouldn't be out at this time.
16     Q.   When you work roadblocks, do you follow
17 the policy from the policy handbook that is currently
18 marked as Exhibit 1?
19     A.   Okay.  Yes.  I do know what this is.  This
20 is out of the SOP.  Yes.  Okay.  Yes, I do follow these.
21     Q.   When you work at these roadblocks, do you
22 bring your unmarked car with you?
23     A.   Yes.
24     Q.   Do you wear a uniform?
25     A.   No.

Page 40

Jeffrey Waldrop

1
2      Q.   So let's return to Exhibit 1.  Do you
3  agree that these are written roadblock guidelines?
4      A.   Yes.  This is, yes.
5      Q.   Okay.  Can you describe for me again --
6  I'm sorry -- what is a sobriety checkpoint?
7      A.   It's when you're looking for DUIs.
8      Q.   And what is a general roadblock as per the
9  last page of the document, Roman IX?
10     A.   That you're basically making sure that
11 the drivers are -- they got a good driver's license
12 and so forth.
13     Q.   And do you provide any training on setting
14 up these general roadblocks?
15     A.   No.
16     Q.   Do you think that all of the deputies
17 understand that there is a difference between a
18 sobriety checkpoint and a general roadblock?
19         MR. ROSS:  Object to the form.  You're
20 asking him to testify as to what other people think.
21     A.   I mean, I don't do DUIs, so it throws me
22 off a little bit.  I've done them in the past.  It's
23 been a very long time, but if I'm doing a roadblock
24 and I think you've had something to drink, we'll go
25 that step forward.

Page 41

Jeffrey Waldrop

1
2  BY MS. JARRETT:
3      Q.   Uh-huh.  Can you read C, please, Roman IX,
4  the C in Exhibit 1.
5      Q.   Where are you talking about?
6      Q.   The last page.
7      A.   Oh, okay.
8      Q.   Oh, I can read it.  "All deputies may conduct
9  general roadblocks when necessary to check for traffic
10 violations, escapees, or wanted subjects upon the
11 public streets, highways, and right-of-ways within this
12 county."
13     A.   Okay.
14     Q.   And B, "The requirements of this section
15 shall not be confused with the policies set out
16 above on the methods to be used for sobriety
17 checkpoints."
18         Did I read that correctly?
19     A.   Okay.
20     Q.   Is this the full extent of the guidelines
21 for setting up roadblocks, general roadblocks?
22     A.   Are you asking me is this everything we
23 have to go by?
24     Q.   Yes.
25     A.   As far as I know.

Page 42

Jeffrey Waldrop

1
2    Q.   Are you required to have a marked car at
3    roadblocks?
4    A.   Yes.
5    Q.   Is that in the policy?
6    A.   I haven't read it.
7    Q.   Well, is that in the general roadblock policy
8    that consists of A, B, and C?
9    A.   I don't know if it's there.  It's common
10   sense to have a marked vehicle there.  It doesn't
11   always happen, I guess.
12   Q.   Do you provide any training on whether or
13   not you need to have a marked vehicle at a roadblock?
14   A.   No.
15   Q.   Do you always need to have your lights on
16   at a roadblock?
17   A.   Yes.
18   Q.   Do you think it always happens?
19   A.   Yes.
20   Q.   Do you provide any training on whether or
21   not you need lights?
22   A.   I do not.
23   Q.   Do you see anywhere in Roman IX a policy
24   that requires one to have lights on at a general
25   roadblock?

Page 43

Jeffrey Waldrop

1
2    A.   I don't see it.
3    Q.   Is a uniformed officer required at a general
4    roadblock or can it be all officers in plain clothes?
5    A.   I would think it would be any officer.
6    Q.   Do you give any training on how and when to
7    make traffic stops, including the basis for making a
8    traffic stop?
9    A.   That's done at the academy.
10   Q.   Are there any written guidelines?
11   A.   Policies?
12   Q.   Yes.
13   A.   I'd have to look.
14   Q.   Any on-the-job training?
15   A.   Yes.
16   Q.   By whom?
17   A.   FTOs.
18   Q.   What is an FTO?
19   A.   Field training officer.
20   Q.   Who are they?
21   A.   I have no idea.
22   Q.   Oh, are there FTOs as part -- are they
23   part of Madison County Sheriff's Department?
24   A.   They're on patrol.  They're experienced
25   officers.

Page 44

Jeffrey Waldrop

1
2    Q.   Okay.  So they're supervising officers?
3    A.   Not necessarily.  Just experienced.
4    Q.   I see.  Do you give any training on how
5    to check an individual's identification?
6    A.   I do not.
7    Q.   Are there any particular databases that must
8    be checked?
9    A.   To find out what?
10   Q.   If you're checking someone's ID, are you
11   required to check a particular database or is it enough
12   to look at the face of a license?
13   MR. ROSS:  Object to the form.  In what
14   context?
15   A.   I mean, I can look at a driver's license
16   and not run it through our system.  If it's up to date
17   I don't have to, but if we call in to somewhere, yes,
18   we can call in to dispatch and they run it on our system.
19   BY MS. JARRETT:
20   Q.   Is there any training for when one should call
21   it in versus just look at an ID?
22   A.   Is there any training for it?
23   Q.   (Nodded head affirmatively.)
24   A.   If your license are expired, I will run
25   them to see why they're expired.  If there's training

Page 45

Jeffrey Waldrop

1
2    on it, I mean, that's common sense.  I don't have to
3    have training to know that the date is expired.
4    Q.   So let's go back to the roadblocks that we
5    were talking about earlier.  Let's say the first car
6    pulls up and they have a license that is not expired.
7    A.   Okay.
8    Q.   Do you run that license through a database?
9    A.   I do not.  I call it in on the radio to
10   dispatch.  They do it.
11   Q.   Would you do that every time if you were
12   at a roadblock?
13   A.   I just answered.  I wouldn't.
14   Q.   You would not?
15   A.   Not all the time.  If they're not expired,
16   I may or may not.
17   Q.   So how do you decide whether you may or
18   you may not?  How do you make the decision whether
19   to run the license or to call dispatch and have them
20   run the license?
21   A.   Like if they are good?  Just to check.
22   Q.   Do you provide any training on how to make
23   that decision?
24   A.   No.
25   Q.   Do you give any training on when you may

Page 46

Jeffrey Waldrop

1   ask for a passenger's identification at a traffic stop?
2       A.   No.
3       Q.   Do you give any training on when you may
4   ask for a passenger's identification at a roadblock?
5       A.   No.
6       Q.   Do you have any personal practices?  Do you
7   ask for a passenger's ID?
8       A.   Sometimes.
9       Q.   How do you decide?
10      A.   If the driver is not in compliance.
11      Q.   So if the driver isn't in compliance you will
12  then ask the passenger for their ID?
13      A.   I have.
14      Q.   Why?
15      A.   Somebody needs to drive the vehicle away to
16  keep me from towing it.
17      Q.   And that's the only reason why you would ask
18  for a passenger's identification?
19      A.   I don't know of any other.
20      Q.   Can you think of any?
21      A.   No.  Maybe if somebody was -- we were
22  looking for somebody and they fit the description or
23  something.
24      Q.   Is it the policy of the MCSD at a traffic

Page 47

Jeffrey Waldrop

1   stop or a roadblock to also check the license of the
2   passenger?
3       A.   Is it a policy?  I would have to look but
4   I wouldn't think so.
5       Q.   Do you give any training on when and how
6   to evaluate individuals for intoxication and/or drug
7   use?
8       A.   No.
9       Q.   Are there any written guidelines?
10      A.   Policies?  I'd have to look.
11      Q.   Any oral guidelines?
12      A.   I don't do DUI, so I don't know what they do.
13      Q.   Well, you are in charge of training.
14      A.   I don't train DUIs.
15      Q.   Okay.  Do you understand there is
16  on-the-job training for people checking for DUIs?
17      A.   Uh-huh.
18      Q.   Do you supervise that training in any way?
19      A.   DUI training?
20      Q.   Yes.
21      A.   No.
22      Q.   Do you give any training on when you may
23  search a vehicle at a roadblock or a traffic stop?
24      A.   No.

Page 48

Jeffrey Waldrop

1       Q.   Are there any written guidelines?
2       A.   I'd have to look.
3       Q.   Are there any oral guidelines?
4       A.   Not that I'm aware of.
5       Q.   Is there any on-the-job training?
6       A.   I mean, whenever the situation arises, yes.
7       Q.   Is there any structured on-the-job training
8   that is preplanned, prearranged for the curriculum
9   that you have approved because you are in charge of
10  training?
11      A.   What training are you talking about now?
12  Are you talking about any training or are you talking
13  about --
14      Q.   Searching vehicles in general at a
15  roadblock at a traffic stop, is there any on-the-job
16  training?
17      A.   I mean, I've had the DA's office come in
18  and do some law stuff.
19      Q.   Some?
20      A.   Some law updates and search and seizures and
21  that kind of thing.
22      Q.   Do you give any training on when an officer
23  can lean into a vehicle?
24      A.   No.

Page 49

Jeffrey Waldrop

1       Q.   Do you give any training on when a deputy
2   can ask an individual to step out of his or her
3   vehicle?
4       A.   No.
5       Q.   Do you give any training on whether a deputy
6   is allowed to search easily visible parts of a vehicle?
7       A.   If I understand your question right, no.
8       Q.   Can I rephrase the question?
9       A.   Absolutely.
10      Q.   Do you give any training on when a deputy is
11  permitted to search a vehicle?
12      A.   No.
13      Q.   What about when they're allowed to search
14  just the parts that they can see from outside of the
15  vehicle?
16      A.   I do not give training for that, no.
17      Q.   Do you train deputies to conduct vehicle
18  searches when they have even the slightest suspicion that
19  there may be drugs in the vehicle?
20      A.   No.
21      Q.   Do you give any training on when you may search
22  the person of a driver?
23      A.   No.
24      Q.   Do you give any training on when you may

Page 50

Jeffrey Waldrop

1  
2  search the passenger in a car?
3      A.  No.
4      Q.  Are there any written guidelines?
5      A.  I don't know.
6      Q.  Are there any oral guidelines?
7      A.  Not that I'm aware of.
8      Q.  Is there any specific structured
9  on-the-job training that deals with searches of
10  individuals?
11      A.  I think so.  I'm not sure of your question.
12      Q.  You think there may be on-the-job
13  training?
14      A.  Yes.  You go out there and work.  That's
15  on-the-job training.  I don't know what you're asking
16  me past that.
17      Q.  Well, you can imagine a world in which
18  you have a new class of deputies come in and you say,
19  okay, at 6 o'clock everyone's going to go out and
20  we're going to practice, you know, various ideas or
21  we're going to all, you know, review search
22  guidelines and then we're going to head out into the
23  field together.  That would be an on-the-job
24  structured training.
25      A.  Anything dealing with, like, search and

Page 51

Jeffrey Waldrop

1  
2  seizure is what you're speaking of at this moment?
3      Q.  Yes.
4      A.  Yes, I've had the DA's office come in and
5  speak to that.  But if you're asking me if I give that
6  training, no.
7      Q.  When I say do you give that training, I also
8  mean do you facilitate that training.  Is that training
9  required?
10      A.  Not required maybe.
11      Q.  Do you give any training on stopping individuals
12  for loitering?
13      MR. ROSS:  I object to the form.  Are you
14  still talking about him personally or him -- or are
15  you talking about him personally or are you talking
16  about him either personally or facilitating it so we
17  can clear that up.
18      MS. JARRETT:  I'm going to ask both.
19  BY MS. JARRETT:
20      Q.  Do you facilitate any training?
21      MR. ROSS:  Him personally?
22  BY MS. JARRETT:
23      Q.  Do you personally in your role as the head
24  of training personally train on stopping individuals
25  for loitering?

Page 52

Jeffrey Waldrop

1  
2      A.  No.
3      Q.  Do you personally train on stopping people
4  because they appear suspicious in some way?
5      A.  No.
6      Q.  Do you facilitate training on either of those?
7      A.  No.
8      Q.  Are there any written guidelines on stopping
9  individuals for loitering or because of suspicious --
10      A.  I would have to look again.
11      Q.  Are there any oral guidelines of which you
12  are aware?
13      A.  Not that I'm aware of.
14      Q.  Do you give any training, you personally, on
15  when you may ask for an individual's identification --
16      A.  No.
17      Q.  -- when they're just walking down the street?
18      A.  No.
19      Q.  Do you have any personal practices in that
20  regard?
21      A.  No.
22      Q.  Have you ever asked an individual on foot
23  for their identification?
24      A.  I don't remember.  I don't know.
25      Q.  Is it a policy of the Madison County Sheriff's

Page 53

Jeffrey Waldrop

1  
2  Department that one may ask individuals on foot for
3  their identification?
4      A.  I don't -- I don't know.
5      Q.  Are there any written guidelines regarding
6  stopping pedestrians?
7      A.  If you're asking if it's in the SOP, I'd
8  have to look.
9      Q.  Do you give any training on searching
10  pedestrians?
11      A.  No.
12      Q.  Do you personally specifically train on
13  procedures for pat-downs?
14      A.  No.
15      Q.  Searching inside pockets?  Do you personally
16  give any training in that regard?
17      A.  No.
18      Q.  How about looking in a bag or a pocketbook
19  or a backpack?
20      A.  No.
21      Q.  Do you facilitate any training in that
22  regard?
23      A.  No.
24      Q.  Do you encourage deputies to search
25  pedestrians when they suspect that they have drugs

Page 82

Jeffrey Waldrop

-- I don't do a whole lot of this anymore.

Q.   Okay.

A.   So it's changed since the last time I did reports daily.

Q.   I see.  So when the incident report changed there was no new training on it?

A.   Yes.  When it went through the computer system there was some training on it.

Q.   Who did the training?

A.   The computer company.

Q.   But who does the training on which offense to select?  It seems like there are quite a few options.  Right?

A.   You don't have to have training.  All right.  I get called to a suspicious person.

Q.   Uh-huh.

A.   When  get there, I see somebody being carjacked, shot, or whatever, I know that's what happened.  All I've got to do is go through there and find what fits, what happened.  There's a drop-down.

Q.   It's a drop-down?

A.   Yes.

Q.   How many items are in the drop-down?

---

Page 83

Jeffrey Waldrop

A.   I have no idea.

Q.   Can we go back to the narrative quickly.  When is a narrative required?

A.   Every time.

Q.   Every time.  Do you see the first sentence?  I already read it to you.

A.   Yes.

Q.   Do you know what a walk-through is?

A.   I'm assuming they walk through the apartment complex.

Q.   Why would one walk through the apartment complex?

A.   I'm assuming a suspicious call.

Q.   Well, it says that apartment manager, Angela Lyons, requested the deputies to do extra patrol.  Right?

A.   Yes.

Q.   Have you ever heard of this extra patrol on the request of apartment managers?

A.   I've heard of apartment managers asking for deputies to come through more regular than usual.

Q.   And why would they do that?

A.   Because people are getting shot out there, people are being there stealing cars, breaking in cars.  Just a number of things.

---

Page 84

Jeffrey Waldrop

Q.   And so the presence of deputies does what?

A.   Deter crime, I would think.

Q.   Have you ever done one of those walk-thrus?

A.   On this request?

Q.   Sure.  Have you ever done a walk-thru on a request from an apartment manager or owner?

A.   I've walked through the apartments but I don't know why.  It's been a long time ago.  We look for people and we walk through there.  I'm not trying to get tripped up on a -- you know, giving you the wrong answer.  Yes, I've walked through them but was it because this person called in, I don't know.

Q.   I'm no trying to trip you up.  I'm trying to understand.  So you walk through.  You said you're looking for people.

A.   Uh-huh.

Q.   What does that mean?

A.   The suspicious person.

Q.   Okay.

A.   In this call.

Q.   So you weren't at this call.  I'm talking generally about walk-thrus.  Have you been asked to

---

Page 85

Jeffrey Waldrop

do a walk-thru in an apartment?

A.   I have not.

Q.   You have not.  You've never walked through an apartment complex?

A.   I've never been asked personally, but yes, I have walked through the apartment complexes, all of them.

Q.   At the direction of whom?

A.   If we're looking for somebody and they live in this apartment complex and they always run to this corner and get away, it doesn't have to from direct.  It may be hey, I'm going to walk over here where they always run to, and sure enough, that's what happens usually.  So, I mean, there's different situations, there's, you know, different -- it doesn't have to be one person saying you walk through.

Q.   You said that police presence deters crime.  Have you ever walked through just for that purpose of deterring crime?

A.   I mean, it's more than one thing you're doing at a time.  You can be looking for somebody and doing that at the same as far as -- I mean, it's yes and no.  I mean, I've walked through there and

---

Page 86

Jeffrey Waldrop

1  talked to the kids. I mean, yes, I have.
2      Q.   On any occasion that you've walked through
3  the apartments have you asked people for their
4  identification?
5      A.   I don't know. It's been a long time since
6  I've done anything like that.
7      Q.   Do you recall if every time you walked
8  through the apartments you would write an incident
9  report?
10     A.   No.
11     Q.   You don't recall or you did not?
12     A.   I would not. Just walking through?
13     Q.   Uh-huh.
14     A.   No.
15     Q.   In the times that you've walked through
16 the apartments, have you ever stood at the entrance
17 to the apartments and spoken to people as they've
18 entered the apartment complexes?
19     A.   No. If you go to some of these apartment
20 complexes, the gate and the residents are all
21 wrapped around there.
22     Q.   Right.
23     A.   And I have talked to people but not
24 necessarily stopping folks driving through.

Page 87

Jeffrey Waldrop

1      Q.   Have you ever stopped folks walking
2  through?
3      A.   To talk and just a general conversation,
4  yes.
5      Q.   To ask for their IDs? Anything like that?
6      A.   I'm sure I have at some time. If it was,
7  it was -- you know, I'm not going to speculate. Yes,
8  I probably have, but it's not just for the purpose
9  of give me your driver's license for no reason.
10          (EXHIBIT 6 MARKED.)
11 BY MS. JARRETT:
12     Q.   So this is another roadblock incident
13 report. We looked at one from 2016 earlier.
14     A.   Uh-huh.
15     Q.   This is from 2013. Correct?
16     A.   Correct.
17     Q.   And it is comments, safety checkpoint. I
18 think you testified earlier that incident reports
19 require a narrative.
20     A.   Yes.
21     Q.   What's the difference between a narrative
22 and a comment?
23     A.   I didn't do this.
24     Q.   Uh-huh.

Page 88

Jeffrey Waldrop

1      A.   This is done by dispatch.
2      Q.   So how does this come to be? You're at a
3  roadblock and you call dispatch and you say hi, I'm
4  at a roadblock?
5          MR. ROSS: If you know.
6      A.   Pretty much.
7  BY MS. JARRETT:
8      Q.   Okay. What's a safety checkpoint?
9      A.   When you're checking to make sure
10 driver's licenses are good and car tags.
11     Q.   So it's the same as the general roadblock
12 that we were looking at in the policy all the way
13 back at Exhibit 1?
14     A.   Safety checkpoint is -- and roadblock, I
15 mean, it's just to make sure everything is abiding by
16 the law and, you know, the safety of the public is
17 there.
18     Q.   The purpose of a safety checkpoint is
19 just general public safety?
20     A.   Yes, ma'am.
21     Q.   General crime deterrence?
22         MR. ROSS: Object to the form.
23     A.   No. I mean, it's -- a safety checkpoint
24 is just to make sure that -- like, this is done on

Page 89

Jeffrey Waldrop

1  July 4, I think it said.
2  BY MS. JARRETT:
3      Q.   Yes.
4      A.   I mean, that's just to make sure that,
5  you know, everybody's seat belt is there, there's
6  not any DUI drinking going on and that kind of thing
7  while you're operating a motor vehicle.
8      Q.   Are there any other kinds of checkpoints?
9  We've discussed the DUI checkpoints, we've discussed
10 safety checkpoints. Is there any other kind of
11 roadblock or checkpoint?
12     A.   Not that I know of.
13     Q.   Are incident reports submitted for every
14 roadblock?
15     A.   Are you calling this an incident report?
16     Q.   Yes. It says Incident Report at the top.
17     A.   This is generated by dispatch.
18     Q.   Okay.
19     A.   This is so they can keep up with where we're
20 at in case something happens. So if you're asking
21 if a narrative -- is that what you're asking, a
22 narrative to be done?
23     Q.   No. I'm asking whether every time
24 there's a roadblock a piece of paper like Exhibit 6

# EXHIBIT 26

1                    Will Weisenberger
2              UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                    NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   MCFIELD; NICHOLAS
7  SINGLETON; STEVEN SMITH;
   BESSIE THOMAS; AND BETTY
8  JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON
9  BEHALF OF A CLASS OF ALL
   OTHERS SIMILARLY SITUATED
10                                          PLAINTIFFS
11 VS.          CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
12

   MADISON COUNTY,
13 MISSISSIPPI; SHERIFF
   RANDALL S. TUCKER, IN HIS
14 OFFICIAL CAPACITY; AND
   MADISON COUNTY SHERIFF'S
15 DEPUTIES JOHN DOES #1
   THROUGH #6, IN THEIR
16 INDIVIDUAL CAPACITIES

                                            DEFENDANTS
17
18
19     DEPOSITION OF WILLIAM "WILL" WEISENBERGER
20

    Taken at the instance of the Plaintiffs, at the
21   Hilton Garden Inn at 235 West Capitol Street,
    Jackson, Mississippi, on Tuesday, November 28,
22          2017, beginning at 10:24 a.m.
23

   REPORTED BY:  Robin G. Burwell, CSR #1651
24
25 JOB NO. 133421

Page 54

Will Weisenberger

1
2     A.  I would think, yes.
3     Q.  So if there's a problem with the
4  incident report, then you would send it back to
5  the deputy somehow for them to correct?
6     A.  Yes.
7     Q.  How do you ensure they've corrected it
8  appropriately?
9     A.  I have to review it again and make sure
10  that those things have been changed.
11     Q.  And how often would you say you send --
12  you reject incident report drafts and require
13  changes to be made?
14     A.  Not very often.  Most deputies are
15  pretty accustomed to it.
16     Q.  Is there any way that your having
17  reviewed and signed off on the incident report is
18  recorded?
19     A.  Once I sign off on it, it's submitted to
20  the next person, which I believe is the records
21  clerk, and it's in her hands from there.
22     Q.  Right.  What I'm trying to ask is, is
23  there like a notation or other record generated
24  that you have reviewed and signed off on a
25  specific report?

Page 55

Will Weisenberger

1
2     A.  Yes, I believe it's listed on the
3  report.
4     Q.  Do you have a recollection of where on
5  the report?
6     A.  I do not.  I don't know where it shows
7  up on there.
8     Q.  What's the make and model of your patrol
9  vehicle?
10     A.  2014 Chevrolet Tahoe.
11     Q.  Is that like an SUV-type vehicle?
12     A.  Yes.
13     Q.  How long have you had that same vehicle?
14     A.  July of '14, I think.
15     Q.  Did you have like a similar SUV-type
16  vehicle before that?
17     A.  No.
18     Q.  What did you have before that?
19     A.  Ford Crown Vic.
20     Q.  Did the department as a whole change
21  from the Crown Vics to the SUVs?
22     A.  They started phasing in the SUVs, yes.
23     Q.  Do you have any sense of why that change
24  was made?
25     A.  Ford quit making the Crown Vic.

Page 56

Will Weisenberger

1
2     Q.  Fair enough.
3        Do all of the deputies that you
4  supervise drive the same make and model car?
5     A.  Same make, different year.
6     Q.  Are you responsible for disciplining the
7  deputies you supervise?
8     A.  To a certain level or extent.
9     Q.  Could you describe what that extent is?
10     A.  Verbal reprimands.  I can write a letter
11  or a memo of an action and present it to my
12  supervisors, which we can then push it up to chief
13  deputy for a written reprimand.
14     Q.  When is the last time you've had
15  occasion to do that?
16     A.  I've never had to, I guess, request a
17  written reprimand -- I take that back.  Yes.  That
18  would have been mid this year.
19     Q.  What were those circumstances?
20     A.  Had an incident with a deputy that was
21  not coming on duty on time.  He was still at his
22  residence past time to be in his vehicle.
23     Q.  And how about oral reprimands?
24     A.  I couldn't tell you when the last time
25  that had to happen.

Page 57

Will Weisenberger

1
2     Q.  Do you remember any incidence in which
3  that happened?
4     A.  Not right off the top of my head, I
5  don't.
6     Q.  Do you conduct any sort of performance
7  of evaluation of the deputies you supervise?
8     A.  No.
9     Q.  Are you aware of anyone else conducting
10  any sort of performance evaluation?
11     A.  No.
12     Q.  If a member of the public makes a
13  complaint regarding a deputy that you supervise,
14  would that complaint go to you?
15     A.  No.
16     Q.  Who would that go to?
17     A.  The chief deputy, Williams.
18     Q.  And would you be made aware of that by
19  Chief Williams or otherwise?
20        MR. GRAVES:  Are you talking about for
21  people in his department or just anybody?
22     Q.  (By Mr. Rethy)  For people in his
23  department.
24     A.  On my shift, if he deems necessary that
25  there's something that I need to know about, he

Page 58

Will Weisenberger

1 will let me know.
2     Q.  Has that ever happened since you've been
3 sergeant?
4     A.  Not that I can recall.  I don't have a
5 lot of issues with my deputies.
6     Q.  Have you ever been the subject of a
7 complaint from a member of the public that you can
8 recall?
9     A.  Yes.
10    Q.  What do you -- is that once or more than
11 once?
12    A.  I know of one.
13    Q.  Could you describe that?
14    A.  It was a neighbor dispute.  Contacted
15 because the neighbors had been feuding over the
16 last couple of days, going back and forth, and we
17 received a call that a male -- the female caller
18 had come outside and found the neighbor who they
19 had been arguing with was inside of her garage
20 speaking with her special needs son.  And she felt
21 threatened by it and contacted the sheriff's
22 office and went and spoke to her.
23       She told me who it was.  I went to the
24 house and tried to speak to them and tell them

Page 59

Will Weisenberger

1 that, you know, that she doesn't want you on her
2 property.  You don't need to go to her property.
3 She's been told not to come to your property and
4 to leave you alone.  Basically the gist of it.
5     Q.  And there is a complaint generated
6 related to that?
7     A.  Yes.
8     Q.  Do you recall the substance of that
9 complaint?
10    A.  Not in its entirety.  I got a letter
11 from some attorney threatening me with legal
12 action if I didn't stop harassing his client.
13    Q.  What did you do when you received that
14 letter?
15    A.  Contacted my chief deputy.
16    Q.  What happened then?
17    A.  I would assume that he looked into it,
18 the situation further.  I was instructed to not --
19 unless it was just a dire emergency, to make sure
20 that other deputies -- if there was a call for
21 service at that address to make sure that other
22 deputies responded.  And I stayed away unless it
23 was just an endangerment situation.
24    Q.  How many years ago approximately was

Page 60

Will Weisenberger

1 that?
2     A.  A couple of years.
3     Q.  So going back to incident reports for a
4 second.  If there's an incident that involves more
5 than one officer, would all of the officers
6 involved write incident report narratives?
7     A.  Depending on if they had any function.
8 If they're just there, don't actually interact
9 with the situation, they may not write a
10 supplemental report to the primary officer.  But
11 if they're there and perform functions, you know,
12 duties, then, yes, they should be expected to
13 write a supplemental report.
14    Q.  Would that be included within the same
15 document or would a separate incident --
16    A.  As far as I know, they all get connected
17 into one once they're written.
18       (Exhibit 1 marked for identification.)
19    Q.  (By Mr. Rethy)  Take a minute to review
20 this.  The narrative on the first page, not the
21 whole packet.
22       Are you familiar with the incident
23 discussed in this packet of materials?
24    A.  Yes, I remember that.

Page 61

Will Weisenberger

1     Q.  There's a different incident than what
2 you just described, right?
3     A.  Yes.
4     Q.  Were you made aware that Deputy Thames
5 made the allegations against you that are
6 reflected in this document?
7     A.  Yes, I did speak with Chief Williams
8 about it.
9     Q.  What was the result of your discussion
10 with Chief Williams?
11    A.  I was informed to write a type of
12 supplemental report as to my actions of the
13 situation and have it turned in.
14    Q.  Were Deputy Thames allegations accurate?
15    A.  Clarify what you're -- what you're
16 saying he --
17    Q.  He accused you of using excessive force.
18    A.  No.
19    Q.  Do you recall the incident in question?
20    A.  I do.
21    Q.  What's your recollection of that
22 incident?
23    A.  I was secondary officer to Deputy
24 Thames.  I arrived, Deputy Thames had the guy, the

---

Page 130

Will Weisenberger

There's a pink copy that is called "Officer's
Copy."  I will keep that copy until -- you know,
for a couple of months until that court case is
over with or something like that, then I'll
discard them.

Q.  Is that the only form, hard copy
document you keep?

A.  Yes.

Q.  Do you keep electronic copies of any
documents, like stored on your laptop?

A.  I have --

MR. GRAVES:  Talking about work-related
documents?

Q.  (By Mr. Rethy)  Yeah.

A.  I have a file that has affidavits listed
on those.  They're used as a -- what's the word
I'm looking for?

MS. COWAN:  Template.

THE WITNESS:  A template, thank you.

A template for new affidavits.  They're
not stored for any particular reason other than to
use as a template.

Q.  (By Mr. Rethy)  So you use those to
generate new affidavits?

---

Page 131

Will Weisenberger

A.  Yes.

Q.  And do you store copies of the new
affidavits?

A.  No.

Q.  What do you do with the affidavits once
you generate them?

A.  They're printed.  Then I will either
have a DC at the office, DC it and I'll turn it
in, or I hand-deliver it over to justice court
where I give it to the clerk, it's DC'd into their
custody.

Q.  Can you explain what "DC" is?

A.  Deputy clerk, somebody swear you to an
affidavit.

Q.  And so -- you don't save on your
computer any -- like the copies, the new
affidavits?

A.  No, not unless it's just a new -- an
affidavit that I don't have, one that I have --
had to make from scratch, I will save that one.

Q.  Were you told to preserve any documents
in connection with this case?

A.  I was told not to delete anything off my
laptop, yes.

---

Page 132

Will Weisenberger

Q.  Have you heard anyone use any racially
derogatory language while you've been at the
sheriff's department?

A.  As in?

Q.  As in racial slurs?

A.  I've heard racial slurs in my time.

Q.  That were spoken by other members of the
department?

A.  Yes.

Q.  Can you identify any of those by name,
any of the people who use racial slurs?

A.  No, sir, not a common occurrence.

Q.  How long ago would you say the last time
you heard a racial slur?

A.  I couldn't say.

Q.  Do you ever use racial slurs?

A.  I have in the past, yes.

Q.  Which racial slurs?

A.  I've used -- I may have used the "N"
word.  You can clarify that from -- by that
terminology.

Q.  Have you used that racial slur in the
course of work?

A.  Clarify.

---

Page 133

Will Weisenberger

Q.  Have you used that while on duty?

A.  As in telling it to an individual or --

Q.  In any context while on duty.

A.  I've spoken to a fellow employee, yes.

Q.  Do you recall when?

A.  I do not.  There again, it's not
something I proud of or do every day.

Q.  Did you ever -- were you ever
disciplined for using any racial slurs?

A.  Not that I can recall, no.

Q.  Have you disclosed to the sheriff's
department in the past that you've used racial
slurs?

MR. GRAVES:  Object to the form.

Q.  (By Mr. Rethy)  Or to Chief Williams or
Sheriff Tucker?

A.  Clarify.  Are you asking if I've gone to
them and told them that I've used this particular
word before?

Q.  Yes.

A.  No, I have not.

Q.  Have you heard Sheriff Tucker use any
racial slurs?

A.  I have not.

---

Page 134

Will Weisenberger

1
2   Q.  How about Chief Williams?
3   A.  No, sir.
4        (Exhibit 19 marked for identification.)
5   Q.  (By Mr. Rethy)  This is Exhibit 19.
6   This document is a legal document prepared by
7   counsel for the defendants.  The lawyers sitting
8   here and their colleagues.  It's the sheriff's
9   department's response to the complaint that we
10  filed in this case.
11       Does that make sense to you?
12  A.  Yes.
13  Q.  Have you read this document before?
14  A.  I have not.
15  Q.  If you'll turn to page 12.  You see the
16  first full paragraph?
17  A.  Yes.
18  Q.  It states: "Sheriff Tucker has also
19  received multiple requests since taking office
20  from the Canton, Mississippi, Police Department,
21  managers in various apartment complexes and
22  housing projects, in predominately Black
23  neighborhoods in both Madison County and the City
24  of Canton, and many businesses asking that the
25  Madison County Sheriff's Department conduct

Page 135

Will Weisenberger

1
2   roadblocks near their neighborhoods and
3   businesses."
4   A.  Okay.
5   Q.  Is it your understanding that that
6   statement is accurate?
7   A.  I would assume.  I've not been told.  I
8   don't know anything of that statement, but if
9   that's what they say.
10  Q.  Have you ever received a request to
11  conduct a roadblock near an apartment complex?
12  A.  Have I received?
13  Q.  Yeah.
14  A.  No.
15  Q.  Do you understand why a business owner
16  would ask the sheriff's department to conduct
17  roadblocks near their business?
18  A.  As to that particular business owner's
19  reason, no.  I don't know why they would ask
20  unless they just want to ward off wrongdoers.
21  Q.  You've conducted roadblocks.  Have you
22  ever asked pedestrian walking in the area of the
23  roadblock to stop?
24  A.  If that pedestrian presents himself in
25  the middle of my checkpoint, yes.

Page 136

Will Weisenberger

1
2   Q.  So in that case, you would engage with
3   that individual and potentially ask for his
4   identification or conduct a pat down?
5   A.  If it led to that, yes.
6   Q.  I think we're going to go off the
7   record.  I may be done, but I want to consult with
8   my colleagues to make sure.
9        (A short break was taken.)
10  Q.  (By Mr. Rethy)  Sir, back on the record.
11       No further questions at this time.
12  Thank you for your time today, sir.
13  A.  Yes, sir.
14  MR. GRAVES:  I only have a few
15  questions, a follow-up basically right where we
16  left off.
17  EXAMINATION BY MR. GRAVES:
18  Q.  Mr. Rethy asked you about stopping
19  pedestrians coming through safety checkpoints.  I
20  think you said something to the effect of, if they
21  were interfering with your business, you may stop
22  them.
23  MR. RETHY:  Objection.  I believe that
24  mischaracterizes the testimony.
25  Q.  (By Mr. Graves)  Let me ask you:  What

Page 137

Will Weisenberger

1
2   situations are you talking about where you might
3   stop a pedestrian coming through a safety
4   checkpoint?
5   A.  If that pedestrian interferes with the
6   business being conducted or the safety of myself
7   or fellow officers or civilians, then, yes, I will
8   make contact with that person.  Make a one-on-one
9   interaction with them.  I don't want a person
10  walking up in the middle of what I'm doing.  They
11  could be, you know, intoxicated.  You know,
12  carrying a weapon, have any kind of, you know,
13  harmful intentions of that nature, anything like
14  that.  It's just a safety concern.  You don't want
15  anybody on top of your business of what you're
16  doing.
17  Q.  If you've got a safety checkpoint,
18  you're not stopping people just walking along the
19  side of the road, are you?
20  A.  No, sir.
21  MR. RETHY:  Objection, leading.
22  Q.  (By Mr. Graves)  Are you stopping people
23  along the side of the road?
24  A.  No, sir.
25  MR. GRAVES:  No further questions.

# EXHIBIT 27

1      Chief Deputy Jeremy Williams
2           UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3               NORTHERN DIVISION
4

    LATOYA BROWN; LAWRENCE BLACKMON;
5   HERBERT ANTHONY GREEN; KHADAFY
    MANNING; QUINNETTA MANNING; MARVIN
6   MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; AND
7   BETTY JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON BEHALF OF A CLASS
8   OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS,
9   V.      CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, IN HIS
11  OFFICIAL CAPACITY; AND MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
12  #6, IN THEIR INDIVIDUAL CAPACITIES      DEFENDANTS.
13

        *********************************************

14

            VIDEO DEPOSITION OF
15        CHIEF DEPUTY JEREMY WILLIAMS
16      *********************************************
17

            APPEARANCES NOTED HEREIN
18
19          MONDAY, DECEMBER 11, 2017
            HILTON GARDEN INN
20          235 WEST CAPITOL STREET
            JACKSON, MISSISSIPPI
21              8:13 A.M.
22
23
24
25  Job No: 133424

Page 18

Chief Deputy Jeremy Williams

1   had many policy changes, not all written, but in
2   regards to several aspects.
3       Q   Okay.  Can you list those for me,
4   please?
5       A   I don't know that I can begin to list
6   all of them or remember all of them.  We've
7   changed the NET team for one example.  Over the
8   course of Sheriff Tucker's administration we've
9   changed the format of that and moved it to a
10   full-time position.  Is that what you're
11   referring to?  I'm sorry.
12      Q   Well, again, I'm -- and you'll see I do
13   this throughout the day.  I'm trying my best to
14   use words that you've used.  You referred to
15   policies and procedures.  I'm trying to determine
16   which ones, other than the social media and the
17   bleeding and control team, have been changed
18   under Sheriff Tucker.
19      A   Which policies -- I'm trying to
20   understand you.  I'm sorry.  Which policies in
21   our manual or --
22      Q   Well, let's start including in the
23   manual, but if there are unwritten policies I'd
24   want to know about that, too.

Page 19

Chief Deputy Jeremy Williams

1       A   Okay.
2       Q   So the manual we probably can trace
3   pretty clearly because we have copies and you and
4   your lawyers have done a job of responding to our
5   requests.  So I think we can trace many of the
6   written changes.  So maybe I'm asking more about
7   unwritten policies.
8       A   I just don't know that I can sit here
9   and answer accurately as to every unwritten
10   policy that we've ever changed.  I mean, I've
11   provided my attorneys copies of everything I
12   could think that would -- that would satisfy
13   that.  Maybe I'm not following you.
14      Q   Well, just sitting here today what can
15   you recall has been changed that isn't reflected
16   in the policy manual?
17      A   We've asked our deputies to wear their
18   traffic vests on roadblocks or safety
19   checkpoints.  We've made a clear chain of command
20   and had several meetings with supervisors on a
21   regular basis, as well as deputies.  We've
22   implemented programs in the school system, like
23   the DARE program.  We've implemented the Explorer
24   program.  I don't know if that's all, you know,

Page 20

Chief Deputy Jeremy Williams

1   policies but I can't -- trying to sit here and
2   recall everything, it's been six years' worth of
3   stuff.
4       Q   Are you aware of any changes in
5   policies directed toward ensuring that the
6   Sheriff's Department conforms to the United
7   States Constitution in its actions and its
8   behavior?
9       A   I think that's something that's taught
10   at the Police Academy and something that we
11   always require.
12      Q   Okay.  But any changes in how that
13   training is done or how the department conducts
14   itself with respect to complying with the United
15   States Constitution?
16      A   I mentioned earlier that, you know, we
17   have general meetings.  I get up and talk about,
18   you know, different aspects of making sure that
19   you comply with the Constitution every time we
20   meet.
21      Q   So every meeting you tell your deputies
22   to comply with the Constitution?
23      A   I'm sure in some aspects.  I can't sit
24   here and recall every meeting we've had in the

Page 21

Chief Deputy Jeremy Williams

1   past six years.
2       Q   Okay.  Is that a change in policy,
3   speaking about the Constitution at these
4   meetings?
5       A   Yes, sir.  I mean, I think if I get up
6   at every meeting and I'm the one saying it then,
7   yes, sir.
8       Q   Okay.  Because you weren't the chief
9   deputy before you became the chief deputy?
10      A   Yes, sir.
11      Q   Okay.  Other than you -- well, you
12   would go to those meetings prior to becoming
13   chief deputy.
14      A   Yes,
15      Q   All right.  And who was chief deputy
16   then?
17      A   Eddie Belvadressi.
18      Q   And would he address issues related to
19   the United States Constitution?
20      A   I don't recall.
21      Q   So other than you speaking at these
22   monthly meetings regarding the United States
23   Constitution, are you aware of any other changes
24   in policies or practices since Sheriff Tucker

Page 22

Chief Deputy Jeremy Williams

became sheriff on this topic?

A   We ask the District Attorney's office to come in and do training, you know, in different aspects of the law all the time. They've done training in search and seizure and, you know, there's continuing training that goes on.

Q   Is that new?

A   We've asked them to do it. I don't recall, you know -- I'm trying to understand and answer your question.

Q   Do you discuss race at these meetings?

A   At the general meetings?

Q   Yes, race.

A   Don't know that I specifically discuss race.

Q   I'm sorry? No, you don't specifically discuss race?

A   No, sir. I said I don't know that I specifically discuss race.

Q   Okay. Any other changes in policies or practices since Sheriff Tucker became sheriff that relate to compliance with the United States Constitution?

Page 23

Chief Deputy Jeremy Williams

A   Not that I can recall, but I'm not saying there's not more. I just don't recall.

Q   Okay. Let me ask you now specifically about race. Any changes in policies or practices that you're aware of since Sheriff Tucker became sheriff relating to race?

A   Can you define relating to race for me? I mean we --

Q   Ensuring nondiscriminatory police practices with regard to race.

A   Again, we have continuing training that we have all of the time. I spoke earlier about the FBI, asking the FBI to come in. The District Attorney on law updates. And, you know, I can't recall any other specifics.

Q   And let's start with the -- anything other than those three? And then I'll go through those three.

A   Like I said, there's probably more. I'm just trying to recall.

Q   So with the FBI, was race discussed at the FBI session in 2016?

A   It was a civil rights class, yes, sir. Race was discussed.

Page 24

Chief Deputy Jeremy Williams

Q   Okay. And do you recall what was said about race?

A   No, sir. I don't recall the specifics.

Q   Was there any discussion at the FBI session as to placement of roadblocks in the county?

A   No, sir, not that I recall.

Q   Okay. Any discussion -- strike that. You mentioned the District Attorney office training. How often does that take place?

A   Usually -- Mississippi law usually changes July 1st, like if new laws are passed in the Legislature. So usually sometime just prior to that.

Q   Okay. And is there any discussion of race in those District Attorney sessions?

A   I don't recall any specific discussions.

Q   Okay. And then you just mentioned continuous training. Other than the FBI training where you indicated race was discussed or is discussed, is there any discussion of race in your other training?

A   I think I said continuing training.

Page 25

Chief Deputy Jeremy Williams

Q   Yes.

A   And I was referring to -- continuing training is a term we use for, like, when we ask the FBI or the District Attorney or we send people --

Q   I see.

A   -- to classes, you know, out of town.

Q   I see. So FBI and District Attorney would be a subset of continuing training?

A   Yes, sir. Continuing education would encompany any training. Does that --

Q   Okay.

A   I may not have been clear.

Q   I see. Is there any other instances of that other than the FBI and the District Attorney?

A   Of any continuing training?

Q   Yes.

A   Yes, sir.

Q   What would that be?

A   Firearms qualifications are training four times a year. We've done training on stop and approach of vehicles. We've -- I send every officer to a class that's called Below 100. I'm

Page 38

1    Chief Deputy Jeremy Williams
2        MR. ROSS:  Object to the form.
3    Postings is plural, over a long time.
4    Answer to the best of your ability.
5        A   I don't know what you mean by reaction,
6    but I don't pay a lot of attention to anything in
7    the news media or on a blog.
8    BY MR. YOUNGWOOD: (Continuing)
9        Q   If you could go now, sir, to I think
10   what's been marked as Exhibit 2.
11       A   2?
12       Q   Yes, please.  And if you look at the
13   bottom of the page it says MC-INT.  And if you'll
14   flip about halfway through the document there's
15   something that says MC-INT 1-2.
16       A   On Exhibit 2?  Oh, okay.  I see it.
17   It's towards the back.  I'm sorry.
18       Q   Do I have you on the wrong document?
19   MC-INT 1-2.
20       A   1-2?
21       Q   Yes.
22       A   Yes, sir.
23       Q   Okay.  A third of the way down the page
24   it says Chief Deputy.  If you could read the
25   description that it says there for chief deputy

Page 39

1    Chief Deputy Jeremy Williams
2    to yourself for a moment.  And my question to you
3    when you're done, just so you have it in mind, is
4    going to be, is this an accurate description of
5    your responsibilities?
6        A   Duties include all the duties of a --
7        Q   You can read it to yourself.
8        A   Oh, I'm sorry.  I thought you wanted me
9    to read it out loud.
10       Q   Or read it out loud.  Whatever you
11   prefer.  But I'm happy to have you read it to
12   yourself.
13       A   Okay.  Yes, sir.  I agree with that.
14       Q   Do you have any responsibilities that
15   aren't listed in this paragraph?
16       A   I think in a broad way this covers
17   about everything.  I mean, you know, the last
18   sentence, May act on behalf of the sheriff in his
19   absence, you know, it doesn't specifically say
20   but an example of that would be to attend board
21   meetings or something.  It doesn't specifically
22   lay that out, but I think broadly it covers
23   everything.
24       Q   Okay.  So I want to ask you about a few
25   of these responsibilities.  First, going back to

Page 40

1    Chief Deputy Jeremy Williams
2    an area we began to at least cover, second
3    sentence, Responsible for enforcing and
4    developing the policies and procedures of the
5    Sheriff's Department.  I want to ask you about
6    the word developing.
7        A   Yes, sir.
8        Q   Have you worked to develop policies and
9    procedures of the Sheriff's Department since
10   you've assumed the position of chief deputy in
11   2012?
12       A   Yes, sir.
13       Q   In what way?
14       A   I believe I wrote and the sheriff
15   approved the social media policy.  I believe I
16   wrote and the sheriff approved, I also had some
17   help from a third party, the policy that we
18   talked about earlier on bleeding control.  I'm
19   trying to think if there's others but...
20       Q   Are you aware of any development of
21   policies or procedures regarding
22   nondiscriminatory race -- nonracially
23   discriminatory policing practices?
24       A   I think I stand up at every general
25   meeting and tell everybody that we're going to

Page 41

1    Chief Deputy Jeremy Williams
2    treat the public with respect and fairly.  I
3    would consider that a reminder or, you know,
4    development of policy.
5        Q   Okay.  But don't mention race in that
6    discussion?
7        A   I say everybody.
8        Q   I understand.  But specifically you
9    don't mention one racial group versus another?
10       A   I don't recall that I have, no, sir.
11       Q   Other than that example that you just
12   gave or those examples, because I recognize
13   there's multiple meetings, anything else?
14       A   I think -- yes, sir.  I did write a
15   policy about the mandatory use of body armor.
16       Q   Okay.  So that's another policy or
17   procedure.  Anything else that might relate to
18   nonracially discriminatory policing policies?
19       A   Again, I think I preach, you know,
20   every time we get together to treat people fairly
21   no matter what.
22       Q   Anything else?
23       A   No, sir, not that I can think of.
24       Q   What policies do you have in place to
25   ensure against nonracially discriminatory

Page 42

Chief Deputy Jeremy Williams

1   policing practices?
2   A   There's a policy in our --
3   MR. ROSS:  Object to form.  To ensure
4   against nondiscriminatory?  Was that your
5   question?
6   MR. YOUNGWOOD:  Yes, it was.
7   MR. ROSS:  Okay.  Against
8   nondiscriminatory?
9   MR. YOUNGWOOD:  To prevent.  To
10  prevent, if that's more --
11  A   Are you saying to prevent
12  discriminatory practices?
13  BY MR. YOUNGWOOD:  (Continuing)
14  Q   Yes.
15  A   Okay.  There's a policy in our policy
16  and procedure manual under the ethics that
17  addresses that.  There's a policy under
18  harassment that addresses that.  There may be
19  some others.  That's the two that come to mind.
20  Q   Okay.  Anything else?
21  A   Anything else?  I'm sorry?
22  Q   Any other policies or practices -- any
23  other further answer to my question?
24  A   Other than what I testified to earlier,

Page 43

Chief Deputy Jeremy Williams

1   no, about speaking to people.
2   Q   Okay.  We'll look at the manual in a
3   bit.  And let me ask you about the sentence
4   further in, Assign manpower as needed in the
5   county.  Do you see that?
6   A   Yes, sir.
7   Q   What does that mean?
8   A   It means that if there's a particular
9   need in the county, I will address that need.
10  Q   Okay.  And how do you determine --
11  well, strike that.  Does that include determining
12  where patrols and deputies spend their time in
13  the county?
14  A   It can.
15  Q   Okay.  Are there others who make
16  determination as to where deputies and patrols
17  spend their time in the county other than you?
18  A   The supervisors on the shift.
19  Q   They report to you then?
20  A   Yes, sir.
21  Q   So ultimately it goes to you?
22  A   Yes, sir.
23  Q   Okay.  What role does Sheriff Tucker
24  play in assigning manpower as needed in the

Page 44

Chief Deputy Jeremy Williams

1   county?
2   A   He's the head of the agency.  The buck
3   stops with him.  If he has -- hears of a need or
4   something, he and I will discuss it and we will
5   pass that on to our supervisor.
6   Q   What efforts, if any, are made to
7   ensure that the focus of manpower in the county
8   is distributed in a manner in which certain races
9   are not targeted for disproportionate police
10  presence?
11  A   We distribute deputies in all areas of
12  the county.  I think what I'm referring to in
13  this is if we have a need to allocate more or
14  additional resources we will.
15  And, you know, an instance would be
16  maybe three weeks ago we had a lot of auto
17  burglaries in the Ashbrooke area.  I authorized
18  some of my investigators and patrol deputies to
19  work overtime and try to catch the people that
20  were doing that.
21  Q   Okay.
22  A   I guess it would be in response to
23  crime.
24  Q   I'm sorry.  What would be in response

Page 45

Chief Deputy Jeremy Williams

1   to crime?
2   A   The assignment of manpower, you know,
3   extra manpower.  I said outside of the normal
4   areas that we patrol.
5   Q   So take the example of roadblocks.  Are
6   road blocks set up with regard to where there is
7   -- a roadblock set up with regard to where high
8   crime areas are located in the county?
9   A   No, sir.  Roadblocks are set up all
10  over the county.
11  Q   Okay. So --
12  A   They would be set up -- I mean, if you
13  have a particular area that's seeing a lot of
14  traffic violations or DUIs, that would be, you
15  know, an area that we would conduct a safety
16  checkpoint in.
17  Q   Okay.  And do you consider the overall
18  crime rate of an area in determining where to set
19  up a roadblock?
20  A   Not other than, like I said, the
21  traffic, traffic volume and traffic crime that
22  may be occurring in an area.
23  Q   Okay.  So it's your testimony that only
24  traffic crime is a -- traffic crime and you said

Page 54

Chief Deputy Jeremy Williams

A   Yes, sir.

Q   But that might have nothing to do with a citizen complaint?

A   It might have something to do with a citizen complaint. It might not. I don't specifically recall.

Q   Okay. And I don't want to make you repeat, but sitting here today you can recall verbal warnings, written reprimands in connection with citizen complaints, but you can't recall any specific instances of suspensions or dismissals as a result of citizen complaints. Is that a fair summary?

A   I think I did -- again, I provided all of them. I'd have to look at the specific reports that I produced. I think Deputy Johnny Burse was fired as a result of a citizen complaint. There may be others. I don't recall.

Q   Okay. And other than Johnny Burse, you can't think of anyone who was fired as a result of a citizen complaint?

A   I just don't recall now. They could very well have happened, but I just don't recall.

Q   Okay. What happened with that deputy?

---

Page 55

Chief Deputy Jeremy Williams

A   Deputy Burse?

Q   Yes.

A   I received a complaint from a citizen of -- I'm trying to think how to characterize it -- sexual misconduct.

Q   Okay. And when was that?

A   I don't specifically recall. It's been in the last six years. I was chief deputy.

Q   Okay. We may come back to that.

A   Okay.

MR. YOUNGWOOD: We've been going about an hour. Would you like to break or keep going?

MR. ROSS: Let's break.

MR. YOUNGWOOD: Anytime you'd like a break you just ask me.

THE WITNESS: Yes, sir.

MR. YOUNGWOOD: Otherwise I'll do it every hour.

THE WITNESS: Yes, sir.

THE VIDEOGRAPHER: Off record at 9:04.

(OFF THE RECORD.)

THE VIDEOGRAPHER: Back on the record, 9:17.

---

Page 56

Chief Deputy Jeremy Williams

BY MR. YOUNGWOOD: (Continuing)

Q   Chief Williams, what interaction do you have with the Board of Supervisors?

A   I attend meetings when they meet if the sheriff cannot attend.

Q   Anything else?

A   No, sir, not really. I mean, I may speak to them at those meetings or if I see them out speak to them, but, no, no other interaction.

Q   Am I correct that they have responsibility for the Sheriff's Department budget, for setting the budget?

A   Yes, sir.

Q   And do you interact with them at all with respect to that process?

A   When they hold budget hearings the sheriff and I will usually attend and present the budget hearings -- or the budget request to the Board of Supervisors.

Q   And do you have an understanding as to where the funds that support the department come from?

A   The taxes of Madison County, tax levy of Madison County.

---

Page 57

Chief Deputy Jeremy Williams

Q   Am I correct that there are certain violations that result in citizens owing fines to the county?

A   There's certain violations that result in fines to the county, yes, sir.

Q   Like, for example, traffic-related violations?

A   Yes, sir. And if you receive a speeding ticket you would pay a fine to the justice court. Now, as far as does that go to the county, I don't know. That would depend on state statute, where the assessments go.

Q   Okay. And are you aware of any interplay between the fines collected by the justice court relating to infractions put in in Madison County and the budget of the Sheriff's Department?

A   No, sir, I'm not.

Q   Are you aware of any statistics kept by the department relating to race?

A   No, sir, I'm not.

Q   Well, if an incident report is completed, the race of the individual involved is recorded, correct?

---

Page 58

Chief Deputy Jeremy Williams

1  Chief Deputy Jeremy Williams
2      A   Yes, sir.
3      Q   Okay.  Where else is race recorded in
4  connection with records maintained by your
5  department?
6      A   If an individual is booked into the
7  jail, that would be recorded in the booking
8  record.  Incident reports.  I'm not sure if it's
9  on the accident report form.  I believe it is.
10  It's a state form.  I don't recall any other
11  statistics.
12     Q   Okay.  Why is race reported?
13     A   In what instance?
14     Q   Let's start with the incident reports.
15     A   It's a physical descriptor.
16     Q   But why report race?  Just so you can
17  have a sense of what the person looks like?
18     A   It would be the same reason you record
19  a date of birth or social security number, an
20  address or anything else.  It's just a physical
21  descriptor, and usually we get it off the
22  driver's license.
23     Q   And is anything done with the
24  statistics that are being gathered with respect
25  to race on the incident reports?

Page 59

1  Chief Deputy Jeremy Williams
2      A   No, sir.  I'm not even sure if you can
3  filter that by race or anything.
4      Q   Well, but you have the records,
5  correct?
6      A   Yes, sir.  It's part of the form.
7      Q   Okay.  And to your knowledge prior to
8  this lawsuit has the department ever studied, for
9  example, the percentage of people who are
10  arrested in Madison County who were black versus
11  the percentage of people arrested in Madison
12  County who were white?
13     A   No, sir.
14     Q   And since this litigation has been
15  commenced are you aware of any studies of that
16  subject within the department?
17     A   I know --
18         MR. ROSS:  I object.  It's work
19  product.
20         MR. YOUNGWOOD:  Well, I said within the
21  department.
22         MR. ROSS:  But the department, if they
23  do it at the instruction of the attorneys,
24  it could be work product.
25         MR. YOUNGWOOD:  I don't have a -- are

Page 60

1  Chief Deputy Jeremy Williams
2  you telling him not to answer the question?
3         MR. ROSS:  Have you done any
4  statistical analysis aside from this
5  lawsuit?
6         THE WITNESS:  Aside from this lawsuit?
7         MR. ROSS:  Correct.
8         THE WITNESS:  No, sir.
9         MR. ROSS:  Then I'm telling him not to
10  answer.
11         MR. YOUNGWOOD:  Okay.
12  BY MR. YOUNGWOOD:  (Continuing)
13     Q   You read the complaint in this matter?
14     A   Yes, sir.
15         (EXHIBIT NUMBER 6 MARKED.)
16  BY MR. YOUNGWOOD:  (Continuing)
17     Q   This is Exhibit 6 to your deposition.
18     A   Yes, sir.
19     Q   Have you -- you've seen this document
20  before I take it.
21     A   Yes, sir.
22     Q   Have you read it?
23     A   I read it early on.  I don't know that
24  I read it recently, but, yes, sir I read it.
25     Q   If you could turn to page 32 of it.

Page 61

1  Chief Deputy Jeremy Williams
2      A   32.  Is that what you said?
3      Q   Yes.  Okay.  And I'll direct you to
4  Paragraph 106.  You can read it to yourself.
5      A   (Witness examined document.) Okay.
6      Q   Do you recall reading this paragraph
7  prior to today?
8      A   Yes, sir.
9      Q   Okay.  Do you have any reaction to it?
10     A   What do you mean by reaction?
11     Q   Were you aware of these statistics
12  before this complaint was filed?
13     A   No, sir.
14     Q   Do you have any explanation for why
15  blacks are arrested at a rate significantly
16  higher than whites in Madison County?
17     A   No, sir.  We arrest people if we have
18  probable cause or reason to arrest regardless of
19  race.
20     Q   Did reading -- so you have no
21  explanation for the discrepancy?
22     A   I don't know -- discrepancy?
23     Q   You have no explanation for the fact
24  that blacks are arrested at a rate significantly
25  higher than whites in the county?

Page 74

Chief Deputy Jeremy Williams

1
2    A   Yes, sir.
3    Q   How does the officer decide?
4    A   It's up to the officer's discretion.
5    Q   Is there any guidance they're given how
6    to exercise that discretion?
7    A   No, sir.  Not that I'm aware of.
8    Q   And is race a permitted factor in
9    exercising that discretion?
10   A   No, sir.
11   Q   How do you ensure that race isn't used
12   as a factor in exercising that discretion?
13   A   Again, we have, you know, policies and
14   procedures against that.  I ask shift supervisors
15   on the shift that if they suspected something
16   like that was going on they should bring it to my
17   attention.
18   Q   How would they know if it was going on?
19   A   I mean, you listen to the radio.  Shift
20   supervisors listen to the radio.  You call out on
21   traffic stops, they would hear the traffic stops.
22   Most officers -- I know I'm getting into police
23   language; but, you know, if you call out on a
24   traffic stop when they call back 10-8, which
25   means back in service, like, I'm finished with

Page 75

Chief Deputy Jeremy Williams

1
2    the traffic stop, they would -- most officers
3    say, you know, warning or citation issue.  You
4    know, something like that.
5    Q   Can I tell from that what the race is
6    of the person who was either given a ticket,
7    arrested, or let go with a warning?
8    A   No, sir, but you would be able to tell
9    previous in the interaction when an officer ran
10   the driver's license on the radio.
11   Q   Okay.  And is there any effort made to
12   monitor whether or not, for example, more black
13   people are being given tickets while white people
14   are given verbal warnings?
15   A   That practice does not occur that I'm
16   aware of, sir.
17   Q   I understand it's not a -- well, thank
18   you for that testimony.  But how do you know it's
19   not occurring?
20   A   I listen to the radio.  I have
21   supervisors out there that listen to the radio.
22   Q   Is there any records kept to test
23   whether or not blacks are more likely to get
24   tickets over whites?
25   A   The actual ticket itself has a spot for

Page 76

Chief Deputy Jeremy Williams

1
2    race on it.
3    Q   I didn't ask it correctly.  Is there
4    anything done to test whether or not a white
5    person is more likely to get a verbal warning or
6    nothing at all than a black person for the same
7    infraction?
8    A   Not that I'm aware of, no, sir.  I
9    apologize.  I wasn't understanding your question.
10   Q   I didn't ask -- one you didn't
11   understand but I didn't ask well.  Let's take a
12   look at some of your notes.  Let's start with
13   Exhibit 7.  And I'm looking at the first page at
14   the top.  It says, Fully staffed.  Do you see
15   that?
16   A   Yes, sir.
17   Q   What do you recall -- I know it's a
18   couple of years ago.  Do you recall what that was
19   in reference to?
20      MR. ROSS:  Object to the form.  It was
21   five years ago.
22      MR. YOUNGWOOD:  Fair enough.
23   A   If I'm not mistaken, this would have
24   been the second general assembly we had.  The
25   first being immediately when Sheriff Tucker was

Page 77

Chief Deputy Jeremy Williams

1
2    elected where he swore in all of the deputies and
3    we met with them.  This would have been five
4    months later.  And that is a note that I said was
5    telling the employees we were fully staffed, as
6    in had no open positions.  Every open position
7    had been filled.
8    Q   Okay.  And then it says right close to
9    that, Did what was best for department to bring
10   in qualified deputies to bring us to full
11   staffed.
12   A   Yes, sir.
13   Q   Was the department not fully staffed
14   when Sheriff Tucker took over?  Do you know what
15   that's in reference to?
16   A   No, sir.  There were several openings
17   when Sheriff Tucker took over.
18   Q   Okay.  I'm going to skip way down to
19   Number 10.
20   A   Yes, sir.
21   Q   And it says, Apt. detail.  What does
22   that mean?
23   A   Apartment detail.
24   Q   What does that mean?
25   A   That would be referring to the NET

Page 86

1      Chief Deputy Jeremy Williams
2  general roadblocks and sobriety checkpoints are
3  all done the same way.
4      Q   Well, what are the criteria used for
5  selecting a location of general roadblocks?
6      A   Flip over to the next page, Select
7  locations which permit the safe flow of traffic,
8  the a through d considerations that were listed
9  there, in addition to what I testified to
10 earlier.  You know, well-lit areas, somewhere
11 where you're having traffic problems.
12     Q   Okay.  Where would I find in writing
13 the criteria that you listed earlier regarding
14 traffic problems or other considerations?
15     A   I don't know.
16     Q   So how would I be able to determine
17 what the objectively outlined criteria are with
18 respect to the location of general roadblocks?
19     A   I think I testified to it earlier.
20     Q   Okay.  And in whose discretion does it
21 fall to set the location of general roadblocks?
22     A   I think we're getting confused on terms
23 again.  Are you talking about just -- there is no
24 such thing as a -- you know, you say general
25 roadblocks, sobriety checkpoints.  You know, if

Page 87

1      Chief Deputy Jeremy Williams
2  somebody wants to do a checkpoint, Lieutenant
3  Sandridge coordinates a lot of those locations
4  through his administration of the DUI grant.
5  Patrol will do safety checkpoints on occasion.
6  They are approved by the shift supervisor on duty
7  at that time.
8      Q   Okay.  And so the setting of those
9  locations is left to the discretion of the shift
10 supervisor or someone else?
11     A   I believe Lieutenant Sandridge has a
12 list of locations that he's developed for the
13 administration of the DUI grant.  We're given
14 instructions in our meetings of, you know, if
15 you're going to set up a checkpoint set it up all
16 over the county.  And if somebody wants to set up
17 a checkpoint, it's approved by a supervisor.
18     Q   And so it's to the discretion of the
19 supervisor to approve the location of that
20 roadblock?
21     A   In that instance, yes, sir.  It should
22 always be approved by a supervisor.
23     Q   Okay.  What training do the supervisors
24 get in selecting a location of roadblocks?
25     A   Again, like I said, we talk about it at

Page 88

1      Chief Deputy Jeremy Williams
2  general meetings.  Lieutenant Sandridge has
3  developed many protocols and lists through his
4  administration of the DUI grant policy that I
5  believe you have.  I was presented it during a
6  30(b)(6) deposition.
7      Q   Okay.  Is it your testimony that all of
8  the roadblocks set up in the county by the
9  Sheriff's Department are for the purposes of DUI
10 checks?
11     A   No, sir.  I think I testified earlier
12 it could be -- it's traffic issues.  Driver's
13 license, insurance, tag, sobriety.
14     Q   Okay.  What is the -- what percentage
15 of the roadblocks set up in the county are for
16 purposes of the traffic category that you just
17 raised versus sobriety?
18         MR. ROSS:  Object to the form.  I think
19 he said --
20     A   All checkpoints check for sobriety.  If
21 you're asking what's the percentage of ones that
22 are set up under the DUI grant, I do not know.
23 BY MR. YOUNGWOOD:  (Continuing)
24     Q   Okay.  And if a roadblock is not set up
25 pursuant to the DUI grant, what criteria are used

Page 89

1      Chief Deputy Jeremy Williams
2  to set it up?
3      A   The same criteria that's set up for any
4  checkpoint.
5      Q   Which are what?
6      A   This Policy and Procedure that we've
7  just been going over.
8      Q   Okay.  Where in this Policy and
9  Procedure does it say that you should set up --
10 does it outline the criteria for setting up a
11 checkpoint that relates to traffic violations?
12     A   I think you've got a section on here
13 that says procedures with site selection.  And
14 then Section 2, Select locations which permit
15 safe flow of traffic through the checkpoint.
16 Consideration should be given to posted speed
17 limits, traffic volume and visibility.  Ensure
18 sufficient adjoining space is available to pull
19 vehicles off the traveled portion of the roadway.
20 C, Consider other conditions that may pose a
21 hazard.  D, The site should have maximum
22 visibility from each direction and sufficient
23 illumination.
24     Q   So those are the only criteria that go
25 into play in setting up the location of a

Page 90

Chief Deputy Jeremy Williams

1
2  roadblock designed to check for traffic
3  violations?
4      A   Those that I just read?
5      Q   Yes.
6      A   No, sir.  I think this policy as a
7  whole, in addition to what I testified to
8  earlier.  We have areas that we're having traffic
9  problems in.
10     Q   All right.  And that's the part I'm
11 trying to ask you about, sir.  How do you
12 determine which areas are having traffic
13 problems?
14     A   I've been working for the Sheriff's
15 Department for 20 years.  I may get complaints
16 from citizens.  I may just know where there's a
17 lot of traffic problems.
18     Q   Okay.  And it's left to the discretion
19 of the supervisor to approve the location of a
20 roadblock set up with respect to traffic
21 problems, correct?
22     A   Supervisors approve the location of
23 every roadblock.
24     Q   Okay.  And that's -- so it's left to
25 their discretion, correct?

Page 91

Chief Deputy Jeremy Williams

1
2      A   Yes, sir.  They approve every
3  roadblock.
4      Q   Okay.  And what training do they get in
5  exercising that discretion?
6      A   They receive training in how to conduct
7  safety checkpoints at the Police Academy.  We go
8  over it in general meetings.  Maybe I'm not
9  understanding your question.
10     Q   I'm not asking about how to conduct
11 them right now.  I'm asking about where they get
12 located.
13     A   Sir, I think we've -- I don't know how
14 else to answer your question.  I've testified
15 that we have general meetings and we tell them to
16 set up in areas that we have problems, set up all
17 over the county.  I don't know how else to answer
18 your question.
19     Q   And are there any procedures put in
20 place to ensure that these checkpoints aren't
21 disproportionately being placed in black
22 neighborhoods?
23     A   I think I've testified three or four
24 times that we instruct them to spread out the
25 locations of safety checkpoints all over Madison

Page 92

Chief Deputy Jeremy Williams

1
2  County.
3      Q   Do you do anything to ensure that they
4  in fact do that?
5      A   Yes, sir.  I monitor the radio.  I look
6  at the reports that are being written.  I know
7  where they're setting up at.
8      Q   Do you do anything to ensure that
9  they're not disproportionately placing roadblocks
10 in black neighborhoods?
11     A   Again, I look at the location of the
12 roadblocks in the CAD, view the reports, listen
13 to the radio.  I don't know that I have ever
14 known to disproportionately set up anywhere.
15     Q   Have you ever tried to graph a map
16 showing the locations?
17     A   No, sir.
18     Q   Or have you done any other statistical
19 steps independent of this lawsuit to try and
20 identify whether or not there's a
21 disproportionate placement of roadblocks for
22 traffic purposes in black areas?
23     A   No, sir.  I've lived in Madison County
24 my whole life.  I know where the roads are.
25     Q   Okay.  Let's go back if we can, please,

Page 93

Chief Deputy Jeremy Williams

1
2  sir, to Exhibit 7.  So we can turn the page Bates
3  Number 170.
4      A   Yes, sir.
5      Q   This is now an October 3rd, 2012,
6  meeting looks like?
7      A   Yes, sir.
8      Q   And Number 7 says, APT detail for
9  November to February.  Is that the NET team
10 again?
11     A   Yes, sir.
12     Q   And what is this in reference to then,
13 this line?
14     A   If I remember correctly, the apartment
15 detail around that time, which the NET team, like
16 I said, it's just a term, I believe that's around
17 the time that we switched them to helping out the
18 warrants unit and doing some other activities
19 over the winter months.
20     Q   Okay.  Let's turn the page, 177 is the
21 next page.  This is a general meeting, January
22 21, 2014.  Number 2 it says, Cameras, review
23 camera policy.  What is that in reference to?
24     A   I think that we reviewed over the motor
25 vehicle recording, audio and recording equipment

Page 98

Chief Deputy Jeremy Williams

1
2    A   I encourage them to, you know, use
3  their microphones as much as they can.
4    Q   So we may get to this a little bit more
5  in a bit, but you know who Khadafy Manning is?
6    A   Yes, sir.
7    Q   He's one of the plaintiffs in this
8  lawsuit.
9    A   Yes, sir.
10    Q   And there was an incident that took
11  place in an apartment building.
12    A   Yes, sir.
13    Q   You're aware of that?
14    A   Yes, sir.
15    Q   Okay.  And do you know if any of the
16  officers turned their mikes on and recorded that
17  incident?
18    A   I do not think so.  I'm not sure that
19  it would work as far away as the parking lot is
20  from the apartment building even if they had.
21    Q   And there was a portion of that
22  incident where Mr. Manning was seated in a patrol
23  car you're aware, correct?
24    A   Yes, sir.
25    Q   Do you know if any officers had -- or

Page 99

Chief Deputy Jeremy Williams

1
2  any of the patrol cars had cameras on for that?
3    A   I do not believe there was.
4    Q   Okay.  And what would have led an
5  officer to turn on their camera in such an
6  incident or not?  What guidance are they given to
7  guide them as to whether or not a camera should
8  be on for Mr. Manning sitting in that patrol car?
9    A   I don't know that there is any.
10    Q   So it's left to the discretion of the
11  officers?
12    A   Yes, sir.
13    Q   Number 9, This is election year.
14    A   Uh-huh.
15    Q   People are watching every move.  Do you
16  see that?
17    A   Yes, sir.
18    Q   What is that in reference to?
19    A   I believe I've said at many general
20  meetings that the public is always watching you.
21  Be nice and be respectful.
22    Q   And by election year, what were you
23  referring to?
24    A   That was a year that Sheriff Tucker was
25  running for reelection.

Page 100

Chief Deputy Jeremy Williams

1
2    Q   So were you trying to encourage the
3  officers to behave in a certain way so as to have
4  Sheriff Tucker reelected?
5    A   I always encourage the officers to be
6  respectful regardless of whether it's an election
7  year.  But when you work for a Sheriff's
8  Department the sheriff is an elected official.
9  You're cognizant when election year comes around.
10  You know, not that you'd behave any differently
11  but you just know it.  Your job depends on it.
12    Q   I'm sorry.  So how does your job depend
13  on it?
14    A   If a new sheriff is elected he's not
15  going to keep me as chief deputy.
16    Q   So your job is dependant on it.
17    A   Any job.  By state law a new sheriff
18  can come in and let go of every single employee
19  and bring new employees in.  Sometimes they do,
20  sometimes they don't.
21    Q   Okay.  So it's in your view in the
22  interest of yourself to support the reelection of
23  Sheriff Tucker?
24    A   I have no reason not to support the
25  reelection of Sheriff Tucker.

Page 101

Chief Deputy Jeremy Williams

1
2    Q   Well, but from your livelihood, from
3  your job it's in your interest.
4    A   I am --
5    Q   And in your view every officer in the
6  police department also is under the impression
7  that their jobs depended on the reelection of
8  Sheriff Tucker?
9    A   No, sir.  We don't tell the employees
10  to support Sheriff Tucker or not.  Most of them
11  chose to do so.  We don't make them.
12    Q   Well, why were you reminding them then
13  it was an election year?
14    A   It's an election year.
15    Q   Right.  So why were you reminding them,
16  sir, other than to have them behave in a certain
17  manner so as to support the reelection of Sheriff
18  Tucker?
19    A   No, sir.  Like I testified earlier,
20  every general meeting we have I ask them to do
21  that, but it is important, you know, at any time
22  whether it's an election year or not.
23    Q   I'm going to try again.  Why were you
24  telling them it was an election year?
25        MR. ROSS:  I object.  He's asked and

Page 114

Chief Deputy Jeremy Williams

Calls Answered, Back Up Unit, Incident Reports,
Traffic Stops, Accident Reports, Citations at
Justice Court, Monthly Report.  I was comparing
those statistics and at that time I told them I
believe they needed to answer more calls, back up
more units, write more incident reports.

Q   Issue more citations?

A   Yes, sir.  It's on there.

Q   Okay.  So why did you want them to
issue more citations?

A   It wasn't necessarily I wanted them to
issue more citations.  I wanted them to be
working as hard as the men and women that were
underneath them.

Q   Why do you track the number of
citations issued per deputy?

A   We have a monthly report the deputies
turn in.  It's a factor you can use in just
looking at a one of many factors in work
production.  Also, Lieutenant Sandridge needs
those statistics to complete, department wide
statistics for his grant reporting.

Q   Including the citations?

A   Yes, sir.

Page 115

Chief Deputy Jeremy Williams

Q   Okay.  And is there any other use of
the number of citations that you track?

A   No, sir.

Q   Okay.  Do you track citations based on
race?

A   No, sir.

Q   Why not?

A   Just don't.

Q   Is the data available?  Could you, in
other words, if you did the work?

A   There's no spot on the monthly citation
form that breaks down race of offender.  I
suppose specific to citations you could go pull
every citation in justice court and look at it.
There's a blank for race on that citation.

Q   So I'm sorry.  Where is there -- so in
your own -- I didn't follow you.  Where can you
see race for citations and where can you not?

A   On the actual citation itself there is
a blank for race.  There is not one on the
monthly activity reports that the deputies turn
in to the Sheriff's Department.

Q   Okay.  So you would have to go to kind
of a raw data and assemble it to count it?

Page 116

Chief Deputy Jeremy Williams

A   Yes, sir.  You'd have to go to the
court where the citation is filed.

Q   And that's because the officers don't
maintain a copy of the citation than they filed?

A   In order for a citation to be
prosecuted in court, it's an affidavit report and
you turn it in to the court.

Q   They don't keep a copy?

A   Some may, some don't.

Q   You don't --

A   The citation is a carbon copy.  It's
got like an original and three or four, and one
of them is labeled officer's copy.  Some officers
might keep them, some may not.

Q   You don't require them to keep them.

A   No, sir.  No.  I'm sorry.

Q   There's no centralized place in your
office where they're kept?

A   No, sir.

Q   Okay.  And you've never done a study
or, again, I'll exclude anything that might have
been done in connection with this lawsuit, to
determine which citations are issued comparing
white people to black people, for example?

Page 117

Chief Deputy Jeremy Williams

A   No, sir.

MR. YOUNGWOOD:  This will be 11.

(EXHIBIT NUMBER 11 MARKED.)

BY MR. YOUNGWOOD: (Continuing)

Q   So is this the -- Exhibit 11, Bates
Number MC 0256, what is this?

A   This is the monthly citation report I
was referring to.  There is this and another form
that tracks the gasoline used, vehicle repairs,
such as that were the two forms that I was
referring to.

Q   And who assembles this?  Who fills in
this?

A   The deputy.

Q   So it's self reporting?

A   Yes, sir.

Q   Okay.  And does he or she compile it --
strike that.  Do you know how they get the data
to compile it?

A   Based on the number of whatever is
listed on there that they do per month.

Q   But how do they track it?

A   They keep up with it themselves.  I
don't know how the individual officers track it.

Page 118

Chief Deputy Jeremy Williams

1    Chief Deputy Jeremy Williams
2    Q   Is there any verification as to whether
3    or not it's accurate?
4    A   Occasionally I think on the back of
5    this memo we talked about earlier there's a line
6    that says, Citations at Justice Court and then
7    the next line is Monthly Report.  You could
8    compare the two.  I don't often do it though.
9    Q   Okay.  So how would you figure out how
10   many are at the justice court per officer?
11   A   Call the clerk and ask her.
12   Q   They have them sorted by officer?
13   A   I don't know how the clerk would do it.
14   I would just call and ask her.
15   Q   And what would give you reason to do
16   that?
17   A   The preparation of this memo.  I don't
18   recall another reason to do it.  I mean, I don't
19   recall another instance that I'd do it.
20   Q   And so does this memo -- well, walk me
21   through what came from the justice court on this
22   memo.  Looking at page 4, Exhibit 10, ending
23   Bates Number 431.
24   A   The next to the last column that says,
25   Citations at JC, JC would be Justice Court.

Page 119

1    Chief Deputy Jeremy Williams
2    Q   And is there a way to compare this to
3    the officer's self-reported statistics on this
4    chart?
5    A   The next column is Monthly Report.  I
6    mean, you could look at the two of them.
7    Q   So if I read these correctly in every
8    single instance the number at the justice court
9    is lower than the number that was self-reported.
10   A   Yes, sir, but you have to realize that
11   there's stuff on this report and the other report
12   that I mentioned that would not be a citation
13   turned in to justice court.
14   Q   Okay.  You're referring to another
15   report.  I want to see if I can get the right
16   documents in front of you.
17   A   For example, halfway down this page it
18   says, Fugitives arrested.
19   Q   Yes.
20   A   That would not be -- if you arrested
21   somebody with a warrant through circuit court or
22   county court, that would not be reported to
23   justice court.
24   Q   I see.  And a warrant could be, for
25   example, for getting a citation for not wearing a

Page 120

1    Chief Deputy Jeremy Williams
2    seat belt and then not paying the fine?  Yes?
3    A   Yes.  That could be one instance.
4    Q   You would call me a fugitive if I
5    hadn't paid a citation, a fine for not wearing a
6    seat belt?
7    A   Well, like I said earlier, circuit
8    court or county court, you know, I would --
9    technically if you have a warrant for your arrest
10   for whatever reason you would be considered a
11   fugitive.  But I believe, you know, like I said,
12   you may be indicted by the grand jury through
13   circuit court and that would be a warrant.
14   Q   Okay.  What other numbers would account
15   -- what other categories would account for the
16   difference between the Monthly Report column and
17   the Citations at Justice Court column on page
18   ending 431?
19   A   Let me read them real quick.
20   Q   Thank you.
21   A   Felony arrest.  If you made a felony
22   arrest on somebody and filed that affidavit
23   through county court or, you know, again, circuit
24   court, it may not be included.  Stolen vehicles
25   recovered, you know, would not be included.

Page 121

1    Chief Deputy Jeremy Williams
2    Fugitives arrested like we spoke about earlier.
3    Drug arrest.  I mean, depending upon whether or
4    not, like I said, what court the affidavit was
5    filed in.  And then other is kind of, you know, a
6    catchall.
7    Q   So when you said earlier that you could
8    kind of check the self-reporting against the
9    justice court, it sounds to me like that actually
10   doesn't work because there's going to be a
11   discrepancy and you won't know what the cause is.
12   A   I testified that I think I gathered the
13   information for this memo.  I could, that I never
14   had done it before, but if I wanted to I guess I
15   could get the numbers from justice court and go
16   through here and eliminate what wasn't
17   applicable.
18   Q   Okay.  You've never done that.
19   A   No, sir.
20   Q   You're not --
21   A   Not that I recall.
22   Q   I'm sorry for speaking over you.
23   A   No.  That's fine.
24   Q   You're not aware of anyone else doing
25   that?

Page 122

Chief Deputy Jeremy Williams

1
2     A   Not that I recall, no, sir.
3     Q   Okay.
4        MR. YOUNGWOOD:  Let me mark this as 12.
5        (EXHIBIT NUMBER 12 MARKED.)
6  BY MR. YOUNGWOOD: (Continuing)
7     Q   What is this?
8     A   This is a spreadsheet or summary those
9  two end of month reports that I was talking
10 about, that mine and Sheriff Tucker's secretary
11 Lee Ann Sanders prepares for me at the end of the
12 month after she compiles all of those reports.
13    Q   So this comes from Exhibit 11?
14    A   Exhibit 11 and the other form that I
15 was telling you about.
16    Q   Let me show you that form.
17       MR. YOUNGWOOD:  Let's mark this as 13.
18       (EXHIBIT NUMBER 13 MARKED.)
19 BY MR. YOUNGWOOD: (Continuing)
20    Q   You're being handed Exhibit 13, MC
21 0255.
22    A   Yes, sir.
23    Q   Is this that other form?
24    A   Yes, sir.  This would be it.
25    Q   So perhaps you could use Exhibit 11,

Page 123

Chief Deputy Jeremy Williams

1
2  Exhibit 13 and explain to me how Exhibit 12 gets
3  created.
4     A   The deputies at the end of the month
5  would turn in Exhibit 11 and Exhibit 13 to Lee
6  Ann Sanders.  She would compile the statistics
7  from those into this spreadsheet.  Does that make
8  sense?
9     Q   Yes.
10    A   I think the majority of this
11 information from this spreadsheet comes from
12 Exhibit 11, but I'm not 100 percent sure.  Again,
13 like I said, Exhibit 13 has some extra categories
14 on there, Accidents worked, Arrests.
15    Q   And then what is Exhibit 12 used for?
16    A   To help me -- instead of having to go
17 through 46 of these I can look at it on one
18 spreadsheet.
19    Q   But what are you looking for?  What are
20 you -- what decisions are you making based on
21 this document, if any?
22    A   I don't know if any decisions are made.
23 Like I testified earlier, you know, a tool to
24 evaluate performance but not the only tool.
25    Q   In what way does this evaluate

Page 124

Chief Deputy Jeremy Williams

1
2  performance?
3     A   It tells how many DUI arrests you made,
4  how many felony arrests, stolen vehicles
5  recovered, seat belt citations.  Everything
6  that's listed down there.
7     Q   With more being better?
8     A   Not necessarily.  It just depends.
9     Q   What does it depend on?
10    A   I mean, you can take this, like I said,
11 as a tool and then you look at Exhibit 13 and
12 there's a spot for beginning mileage and ending
13 mileage, you know.  I would expect a patrol
14 deputy that's out patrolling eight hours a day to
15 put some miles on a car.  You know, if you turn
16 in a report that's got 500 miles ridden for a
17 month, you're not out there patrolling the
18 streets like you're supposed to be.
19    Q   Okay.  The mileage doesn't go on the
20 summary form, does it?
21    A   That's why I said take a tool in
22 conjunction with several others.
23    Q   Okay.  But I'm trying to understand how
24 this tool, Exhibit 12, is used?
25    A   I told you it would be a tool to use

Page 125

Chief Deputy Jeremy Williams

1
2  and see how many of each of these the deputies do
3  in a month.
4     Q   Okay.  So if I look through, you know,
5  Number 17, that refers to an individual I take
6  it?
7     A   Yes, sir.
8     Q   Has 34 total.  Number 23 has 70 total.
9     A   Yes, sir.
10    Q   Right?  And so those are on the higher
11 end, correct?
12    A   Yes, sir.
13    Q   But if you look at, like, 26 and 27 one
14 has 2 and one has 1.
15    A   Yes, sir.
16    Q   So what conclusions do you draw between
17 the individuals that have higher numbers versus
18 the lower numbers?
19    A   Those particular individuals you called
20 out, 23 and 17, are individuals that work the DUI
21 grant.  So that would be normal for them to have
22 higher statistics.  They're working many more
23 hours than the other deputies.
24    Q   So they work the DUI grant.  But we'll
25 take Number 23, the largest category there is

Chief Deputy Jeremy Williams

1   Chief Deputy Jeremy Williams
2   supervisors in place to monitor how they interact
3   with the public.  I've never known of a problem.
4   If I did we'd handle it.
5       Q   Okay.  You're speaking of individual
6   interactions, if somebody does something that's
7   obviously against a religion or something like
8   that.  You would note that and do something if
9   you saw it?
10      A   Yes, sir.
11      Q   Okay.  What do you do, though, to make
12  sure that the overall policies of the department
13  -- and we can just go back to roadblocks, for
14  example -- don't have a racial bias as a
15  component of them?
16      A   Again, I know the officers that work
17  for me.  I monitor their activity.  I have
18  supervisors in place in the shift that monitor
19  their activity the whole time they're working.
20      Q   Okay.  And when you learn that blacks
21  are five times as likely to be arrested as
22  whites, what does that do to your analysis as to
23  whether or not your department is complying with
24  Section C?
25      A   We arrest the people we have probable

Chief Deputy Jeremy Williams

1   Chief Deputy Jeremy Williams
2   cause or have warrants issued by a judge
3   regardless of race.
4       Q   Well, you don't arrest all of the
5   people you have probable cause for, right,
6   because officers have discretion to arrest or not
7   arrest, correct?
8       A   Yes, sir.  I mean, officers have
9   discretion.
10      Q   Okay.  And how do you know that they're
11  not exercising racial bias in exercising that
12  discretion?
13      A   I know the officers.  I monitor their
14  activity.  I have supervisors on the shift that
15  work with them.
16      Q   Okay.  But you keep no statistics as to
17  -- that tie race to whether or not an officer
18  gives a citation or arrest or lets somebody go,
19  correct?
20      A   I think we addressed earlier that race
21  is included in incident reports and traffic
22  tickets.
23      Q   But you do nothing to track those --
24      A   I've never had a reason to track them.
25      Q   This lawsuit give you a reason?

Chief Deputy Jeremy Williams

1   Chief Deputy Jeremy Williams
2       A   I believe we've answered that question
3   earlier but...
4       Q   I'm sorry.  What was the answer?
5       A   I believe my attorney advised me not to
6   answer because attorney/work product.
7       Q   Okay.  That's fine.  That's fine.  I
8   think Impartiality.
9       A   Yes, sir.  37.
10      Q   Was that one you identified, sir?
11      A   The first line, Officers shall in all
12  cases enforce laws and ordinances in a fair and
13  impartial manner.
14      Q   Okay.  That's the section of this
15  policy you're referring to?
16      A   I think it's appropriate.
17      Q   Okay.  And then I think you also
18  referred to 38.1 which is the next one.
19      A   There's some more in 37 but I think
20  it's --
21      Q   Oh, go ahead.
22      A   I think it's more referring to what you
23  were talking about earlier, employees within the
24  department.
25      Q   Okay.  Thank you.  And 38?

Chief Deputy Jeremy Williams

1   Chief Deputy Jeremy Williams
2       A   Police Offenses: Disciplinary is the
3   title of the policy.
4       Q   Yes.
5       A   The section at the top that says
6   towards the end, A public servant is expected to
7   be at all times helpful and courteous to the
8   public.  There is a section under Definitions.
9       Q   I think you were referring to m before.
10      A   Yeah, Section m, The mistreatment of
11  any person in the performance of duty.
12      Q   So I think we went through all of the
13  sections you identified?
14      A   Yes, sir, I believe so.
15      Q   Okay.
16          MR. YOUNGWOOD:  So it's 11:15.  If
17  you'd like to break we could do that and
18  reconvene at 1:00.
19          THE VIDEOGRAPHER:  Off record, 11:15.
20          (OFF THE RECORD.)
21          THE VIDEOGRAPHER:  Back on the record,
22  1:06.
23  BY MR. YOUNGWOOD:  (Continuing)
24      Q   Okay.  Chief Williams, I want to
25  discuss the hiring process for a little bit with

Page 170

Chief Deputy Jeremy Williams

not they should call out?

A   They're trained in the Police Academy and I've reviewed it several times in our general meetings.  Call out on your stops, call out on where you're at.

Q   Okay.

A   I think I testified in my 30(b)(6) deposition that, you know, we have a saying we go by that you may know where you are and God may know where you are but if your dispatcher doesn't know where you are you and God better be on good terms.

Q   That's the exact testimony you gave in your deposition.  I read that yesterday.  But what -- and then what happens when they call out?  What --

A   They would pick up the radio in their car and, you know, like in the instance of a traffic stop they should give their location and the tag number of the -- tag number or if it doesn't have a tag the vehicle description of where they're at.

Q   Okay.  And then that gets recorded in the CAD?

Page 171

Chief Deputy Jeremy Williams

A   Yes, sir.

Q   And what other information do they have to give?

A   When they initially call out?

Q   Yeah.

A   On a traffic stop?

Q   Right.

A   Tag number, location, vehicle description if it doesn't have a tag number.  That's all that's necessary, I guess.  There would be more information given as the traffic stop progressed.

Q   Okay.  And by location, they're going to give an address or an intersection, something like that?

A   Yes, sir, either or.  Whatever they're close to.

Q   Okay.  But they don't give the race of the person that they're stopping?

A   No, sir.

Q   Okay.  Or --

A   They may run the driver's license and, you know, it may be on the driver's license but...

Page 172

Chief Deputy Jeremy Williams

Q   Okay.  And then some things that are called out result in incident reports, right?

A   Yes, sir.

Q   And what determines if you need an incident report?

A   What determines if you need an incident report?

Q   Yes.

A   If you make an arrest, if there's something that needs to be documented.  An incident report should be done on anytime there's an arrest.

Q   Okay.  What less than an arrest would result in an incident report?

A   Maybe a warning.  And I think I testified -- I'm not trying to back up.

Q   Yeah.

A   But you had asked would they call out the race of the person.

Q   Yes.

A   It's not common practice, but, I mean, it does happen sometimes.  If you're getting out with -- not necessarily on a traffic stop, but, say, at an armed robbery and you see a particular

Page 173

Chief Deputy Jeremy Williams

race run you want to relay that information that, you know, with this person.  I just didn't want to testify wrong -- I mean falsely.  I want to be --

Q   Go back anytime you need to.  I understand.  But that race wouldn't be recorded we know in the CAD report, right?

A   It depends on what the dispatcher puts in there.  It may very well be.

Q   Okay.  There's no column that requires that?

A   There's no column.

Q   There's no box.

A   They would put it in the comments, yeah.

Q   Right.  The incident reports are going to tend to have race, right?  That's a field?

A   Yes, sir.

Q   Okay.  So you were starting to say an arrest would result in an incident report.  A citation would as well, right?

A   It depends on the officer.  We ask our officers to write incident reports on anything, but, you know, I'm not saying every citation

1      Chief Deputy Jeremy Williams
2  would have an incident report.
3      Q   Okay.  So that's somewhat in the
4  officer's discretion, whether or not to write an
5  incident report in the case of a citation?
6      A   In the case of a citation, yes, sir.
7      Q   Okay.  You would say an arrest is not
8  in their discretion.
9      A   An arrest and an incident report is
10  supposed to be written.  Yes, sir.
11      Q   Okay.  Citations a discretion.  And how
12  about a warning?  You could write an incident
13  report for a warning?
14      A   You could.
15      Q   But that is within the officer's
16  discretion?
17      A   Yes, sir.
18      Q   Would those be the three categories?
19      A   I mean, there's many other types of
20  calls.  You know, a domestic call you would write
21  an incident report.  Or an auto theft call, you
22  would write an incident report.  You know, I
23  don't know that I can sit here and list every
24  call type there is.  A vehicle accident, you
25  would write an accident report, not necessarily

1      Chief Deputy Jeremy Williams
2  an incident report.
3      Q   Okay.  Okay.  And how about if you stop
4  somebody, you called it into the CAD because you
5  called out but you don't arrest them, you don't
6  give them a citation, you don't even give them a
7  warning, could that result in an incident report?
8  Would that be in the officer's discretion or --
9      A   It could, yes, sir.
10      Q   Okay.  And what training do the
11  officers get in those situations?  Incident --
12  I'm sorry.  Citations, warnings, no warnings, as
13  to when they should write an incident report?
14      A   Anytime there's an arrest made there
15  should be an incident report.
16      Q   That I understand.
17      A   We tell them at general meetings and,
18  you know, general assemblies that you need to
19  document your encounters, but I don't know that
20  there's a specific you do this in this situation
21  type training.  I don't know if that's what
22  you're asking.  I'm sorry.
23      Q   Okay.  But it would not be a violation
24  of your policy for them to fail to write an
25  incident report for a citation, correct?

1      Chief Deputy Jeremy Williams
2      A   That's correct.
3      Q   That's within their discretion.  And
4  the warning is within their discretion, correct?
5      A   Yes, sir.
6      Q   And the stop but no warning or anything
7  else, that's within their discretion, too,
8  whether they write an incident report?
9      A   Yes, sir.
10      Q   Okay.  Was there a change in
11  requirements regarding incident reports for
12  citations this year?
13      A   Earlier this year Sheriff Tucker asked
14  all of the supervisors that there would be no
15  more, I think the right word, maybe call
16  disposition as handled by an officer, that he
17  wished for a report to be written on every call.
18      Q   Okay.  So that seems to be a change in
19  the policy that we had discussed two minutes ago
20  regarding the writing of incident reports?  Or do
21  I misunderstand you?
22      A   I'm talking about like a call for
23  service.  A citizen calls in.  Not --
24      Q   I see.  I see.
25      A   Okay.

1      Chief Deputy Jeremy Williams
2      Q   So that's somebody calls in to 911 and
3  says, Please come help me or something?
4      A   Yes, sir.
5      Q   That now needs to be written up.  But
6  prior to that, it was left to the officer's
7  discretion as to whether that got written up?
8      A   Prior to that there was some discretion
9  in it.  Like I said, if there was an arrest made,
10  you needed to have an incident report.  But, you
11  know, if you got to a scene and there wasn't
12  anything to it you may say -- the code we use is
13  HBO, handled by officer.  Sheriff Tucker stated
14  earlier this year he wanted an incident report on
15  those type incidents.
16      Q   Okay.  So previously that was left --
17  HBOs were left to the discretion of the officer,
18  whether or not they got written up as an incident
19  report.  Today they have to write them up.
20      A   Yes, sir.
21      Q   Okay.  How do you -- do deputies get
22  reviewed annually or is there some sort of annual
23  review process?
24      A   No, sir.
25      Q   Okay.  Even if it's not annual, is

Page 178

Chief Deputy Jeremy Williams

there some periodic review process conducted of
the officers?

A   Not a formal process.  I mean, I'm
always watching and listening but not a formal
review process if that's what you're asking.

Q   Do people come up, say, for
opportunities for raises annually and they need
to be reviewed in connection with anything like
that?

A   Our pay scale is set.  There's not like
a, you know, every two-year step raise or
anything.  There is a pay rate for an officer
less than a year.  And then once you've been here
a year, it's a different pay rate.  But short of
that --

Q   But it's not like an annual review that
leads to a two percent increase or something like
that?

A   No, sir.  Nothing like that.

Q   Okay.  So how does an officer know if
he or she is performing their duties adequately?

A   If they weren't, I or the supervisors
would be having a conversation with them.

Q   Okay.  Do you maintain personnel files

Page 179

Chief Deputy Jeremy Williams

for officers?

A   Yes, sir.

Q   What is in that personnel file
typically?

A   The application, the resumé, the
documentation where they went and got a physical
and were cleared medically, results of the drug
tests, notes from my interview.  Any reprimands
or suspensions or, you know, discipline-type
action.  If an officer gets hurt on the job, the
accident report where he was hurt and
documentation where everything was sent to the
human resources for workers' comp.  I'm trying to
think.  There could be other stuff.  Personnel
information.

Q   You're involved in the disciplinary
process, correct?

A   Yes, sir.

Q   And I think we already looked and I
don't think we need to look again, but you're
involved in handling citizen or civilian I should
say complaints, correct?

A   Yes, sir.

Q   Okay.  And what is the process if a

Page 180

Chief Deputy Jeremy Williams

civilian or citizen complaint comes in that you
follow?

A   I will talk to that person, find out
what the complaint is.  They may call on the
phone.  They may come to the office.  And if
actions needs to be taken, I'll document that
action.  If an investigation is done, I'll
document that.  And I'll generally let the person
know the result of that, you know, either by
phone or in person.

Q   Okay.  I asked you about this this
morning but a few hours have passed.  You can't
recall any instance, am I correct, in your six
years as chief where an officer was suspended or
fired as a result of a citizen complaint; is that
right?

A   I think I testified that Mr. Burse was
fired as a result of a citizen complaint.  And
that there could be others, but I didn't recall
them.

Q   Okay.  Then I misheard you.  I thought
Mr. Burse was fired as a result of an internal
investigation but that it wasn't the result of
this -- that it came in by means other than a

Page 181

Chief Deputy Jeremy Williams

citizen complaint.

A   No, I believe -- I mean, no, sir.  I
believe a citizen complaint on Mr. Burse.

Q   Okay.  Thank you.  I'm sure I misheard
you earlier.  You're aware I know of the
complaint that came in regarding the Manning
incident, correct?

A   Yes, sir.  I don't know that I ever got
a complaint from the Mannings.  I think I was
notified by Heath Hall with SMG.  And I believe
Sheriff Tucker got a call from Chief Otha Brown
at the Canton Police Department.

Q   Okay.

MR. YOUNGWOOD:  Let's mark that as 19,
please.

(EXHIBIT NUMBER 19 MARKED.)

BY MR. YOUNGWOOD: (Continuing)

Q   Do you recognize this?

A   This appears to be my documentation.
Well, the first two pages are my report that I
wrote when I was made aware of an incident.  And
then there is several pages of attachments to it
that I attached to the incident report.

Q   So is the front written by you?

Page 182

Chief Deputy Jeremy Williams

1
2     A   Yes, sir.
3     Q   Okay.  And within it, it appears that
4  you contacted Sergeant Slade Moore and asked him
5  about the incident.
6     A   Yes, sir.
7     Q   And then towards the back of this is a
8  statement by Slade Moore, correct?
9     A   Yes, sir.
10    Q   Did you play any role in preparing this
11 statement by Slade Moore?
12    A   Other than calling him and asking him
13 to provide me a statement of what occurred, no,
14 sir.
15    Q   Okay.  And then we'll flip backwards
16 here.  The next page, 190, on the bottom.
17    A   Yes, sir.
18    Q   It appears to be a statement by Mr.
19 Manning, Khadafy Manning?
20    A   Yes, sir.
21    Q   Did you speak to Mr. Manning regarding
22 this incident?
23    A   No, sir.  Mr. Manning never contacted
24 me about the incident.  No.  I never spoke to
25 him.

Page 183

Chief Deputy Jeremy Williams

1
2     Q   Okay.  And there's a statement here by
3  Quinnetta Thomas.
4     A   Yes, sir.
5     Q   Did you ever speak to Ms. Thomas?
6     A   No, sir.
7     Q   Okay.  Did you interview or speak in
8  some way to the other officers present at the
9  scene of the incident?
10    A   May I read my report just a second?
11    Q   Of course.
12    A   I don't specifically recall.  I believe
13 I did, but I don't know for 100 percent sure.
14 (Witness examined document.) It doesn't say and I
15 don't recall, but it would be common practice
16 that if more than one deputy was involved I
17 usually would talk to them.
18    Q   Okay.  But you can't recall doing that
19 and you agree that the report doesn't say that
20 you did?
21    A   Yes, sir.  That's correct.
22    Q   Okay.  And what was your conclusion
23 upon your investigation of this incident?
24    A   I think in my last paragraph here
25 Sergeant Moore provided a statement as to what

Page 184

Chief Deputy Jeremy Williams

1
2  had occurred.  At this time no complaints had
3  been received from Manning.  And I have not seen
4  the video.  After talking with Sergeant Moore and
5  reviewing the reports, I concluded that I didn't
6  see any basis to take any disciplinary action.
7     Q   So no disciplinary action was taken,
8  correct?
9     A   No, sir.
10    Q   Okay.  Do you recall investigating an
11 incident involving, again, Slade Moore and a
12 citizen by the name of Destiny Jones?
13    A   Yes, sir.
14    Q   What do you recall about that?
15    A   I don't know whether again Ms. Jones
16 ever came to me to file a complaint, but I
17 believe that's the case where they filed an
18 affidavit in the court against Mr. Moore.
19    Q   Do you know what the -- and let me give
20 you --
21        MR. YOUNGWOOD:  This will be 20.
22        (EXHIBIT NUMBER 20 MARKED.)
23 BY MR. YOUNGWOOD: (Continuing)
24    Q   Did you make any investigation of this
25 matter?

Page 185

Chief Deputy Jeremy Williams

1
2     A   I remember getting this e-mail and
3  reading this and looking into it.  I don't recall
4  if I did a report or a documentation of it, but I
5  do recall looking into the incident.
6     Q   And what did you conclude?
7     A   I concluded after talking to the
8  officers on the scene that Ms. Jones was being
9  disorderly and was arrested.  And I also attended
10 the court hearing when they had the court
11 hearing.
12    Q   And so you took no action against the
13 officer in connection with that?
14    A   No, sir.  Not that I can recall.
15    Q   Do you recall an incident and a
16 complaint filed by Daryl Dozier and Domekia
17 Myers-Dozier?
18    A   I recall receiving something in the
19 mail that was sent to several different people.
20 I don't know that Mr. Dozier ever came in to see
21 me or filed a formal complaint.
22        (EXHIBIT NUMBER 21 MARKED.)
23 BY MR. YOUNGWOOD: (Continuing)
24    Q   I'm going to hand you what's been
25 marked as Exhibit 21.  Do you recognize this as

Page 186

Chief Deputy Jeremy Williams

1
2 that document that you just referred to?
3     A   Yes, sir.  This is what I was talking
4 about.  It appears that he sent it to the
5 Sheriff's Department, Eric Holder, the Federal
6 Bureau of Investigation, Greg Davis, Bennie
7 Thompson and Department of Public Safety.
8     Q   I just want to direct you to Paragraph
9 1.
10     A   Yes, sir.  The one that's labeled 1?
11     Q   Labeled 1.  Thank you, sir.  Yes.
12     A   Okay.
13     Q   Thank you.  On October 12, 2014,
14 Madison County Sheriff Brad Sullivan, a white
15 male police officer, pointed his police-issued
16 handgun at Daryl Dozier, Ms. Domekia
17 Myers-Dozier, wife, and Dshantia Dozier,
18 daughter, age 5, with intent to cause bodily harm
19 causing fear, stress, and the family to be
20 terrorized.  And that Sheriff Brad stated, "I've
21 got you niggers now" and that Sheriff Brad
22 Sullivan would use deadly force on the unarmed
23 defenseless African Americans.  Do you see that?
24     A   Yes, sir.
25     Q   Did you investigate that allegation in

Page 187

Chief Deputy Jeremy Williams

1
2 in any way?
3     A   Yes, sir.
4     Q   What did you do to investigate it?
5     A   Talked to Mr. Dozier, reviewed
6 videotape -- I mean not Mr. Dozier.  Talked to
7 Mr. Sullivan, the deputy, and reviewed videotapes
8 from the car.
9     Q   And I'm sorry.  What was the videotape
10 from the car?
11     A   I don't believe the first part of the
12 incident was on the videotape, but the transport
13 of Mr. Dozier to the jail was.
14     Q   Okay.  So there's no way to verify in
15 the video one way or the other whether or not the
16 allegation in Paragraph Number 1 is correct?
17     A   I don't specifically recall.  I do
18 recall the video camera wasn't pointing in that
19 direction.  I don't recall whether the audio was
20 on or not.
21     Q   Okay.  Did you ask if Deputy Sullivan
22 had used the word nigger?
23     A   I did.
24     Q   And you asked that of Deputy Sullivan?
25     A   I did.

Page 188

Chief Deputy Jeremy Williams

1
2     Q   What was his response?
3     A   He had not.
4     Q   Okay.  Have you ever heard that word
5 used in the Madison County Sheriff's Department?
6     A   No, sir.
7     Q   Not even once?
8     A   No, sir.
9     Q   And by that I mean both within the
10 building, outside, by any of the officers?
11     A   I've never heard it by any officers.
12 I've heard it before on the streets policing, you
13 know, I've heard it.
14     Q   So your testimony is not by an officer.
15     A   Yes, sir.  I thought that's what you
16 were asking.  I apologize.
17     Q   It was.  It was.  How about by officers
18 off duty, have you ever heard them use the word?
19     A   No, sir.
20     Q   And what if I broadened it to the other
21 sorts of racial slurs?  Have you ever heard
22 racial slurs being used by officers in Madison
23 County Sheriff's Department?
24     A   No, sir.
25     Q   Both on and off duty you've never heard

Page 189

Chief Deputy Jeremy Williams

1
2 it?
3     A   No, sir.
4     Q   Okay.  That would be a violation of
5 some of the provisions of the policy handbook
6 that you showed me before lunch?
7     A   Absolutely.
8         MR. ROSS:  Can we go off the record?
9         MR. YOUNGWOOD:  Yeah.
10         THE VIDEOGRAPHER:  Off record.
11         (OFF THE RECORD.)
12         THE VIDEOGRAPHER:  Back on the record.
13 BY MR. YOUNGWOOD:  (Continuing)
14     Q   Have you -- you said you've not seen
15 racial slurs used.  Have you seen people joke
16 about racial issues?
17     A   Seen people joke about them?
18     Q   Yeah.  Officers.  My question is about
19 your employees, your officers.  Not about other
20 people.
21     A   Not that I can recall, no, sir.
22     Q   Okay.
23         MR. YOUNGWOOD:  22.
24         (EXHIBIT NUMBER 22 MARKED.)
25 BY MR. YOUNGWOOD:  (Continuing)

Page 214

Chief Deputy Jeremy Williams

1
2      A    Like I testified earlier, I don't know
3   that it's factually wrong.  If we set up a
4   checkpoint, we're checking for driver's license,
5   insurance, tags.  But if we have reason to
6   believe that -- or reason to run the driver's
7   license, warrants are going to be checked.  I
8   don't know that it's inaccurate.  I just think
9   it's a poor choice of words.
10     Q    Okay.  Well, if somebody drives through
11  a roadblock -- let's do this.  If somebody drives
12  through a roadblock, they are stopped, correct?
13     A    Yes, sir.
14     Q    If they don't wish to be stopped can
15  they keep going?
16     A    If they're driving through a safety
17  checkpoint?
18     Q    Yeah.
19     A    No, sir.  We're going to stop every
20  vehicle.
21     Q    Going to stop every vehicle unless the
22  line is very long and then you'll wave some
23  through, right?
24     A    If traffic gets very backed up or all
25  of the officers on the checkpoint are busy with

Page 215

Chief Deputy Jeremy Williams

1
2   cars that they pulled over to the side of the
3   road, traffic will flow until that checkpoint
4   resumes.
5      Q    And it's up to the officer's discretion
6   to decide when that flow should stop and start,
7   correct?
8      A    Like I said, if all of the officers
9   are busy with investigating some violation on the
10  side of the road and there's no officers there to
11  stop vehicles, then traffic would flow when they
12  get through and get back and reestablish a
13  checkpoint and we check every car.
14     Q    But do cars just pass through or do
15  they kind of get waved through?
16     A    In that particular instance?
17     Q    Yes.
18     A    They would just pass through because
19  officers would be busy with other motorists.
20     Q    Okay.  So if officers are all busy with
21  other motorists, automatically every car can just
22  go on through?
23     A    Yes, sir.  There would not be an
24  officer there to stop them, so, yes, sir.
25     Q    Well, but the cars would be blocking

Page 216

Chief Deputy Jeremy Williams

1
2   the road, wouldn't they?
3      A    No, sir.  They would be pulled over to
4   the side of the road.  If the officer was
5   investigating a violation they would ask that
6   person to pull over to the side of the road.
7      Q    Okay.  But what if an officer car comes
8   -- let me go more slowly.  A car comes up to the
9   checkpoint, the car doesn't pull off the road to
10  come through the checkpoint, right?  It's on the
11  road.
12     A    Yes, sir.
13     Q    All right.  Some of these are two-lane
14  roads I assume.
15     A    Yes, sir.
16     Q    So there's no way to pass other than to
17  leave the lane or go off the road, right?
18     A    Maybe I didn't do a good job of
19  explaining it.  If the checkpoint is established,
20  we're going to check every car that comes through
21  it.
22     Q    Right.
23     A    If a car came through and there was
24  probable cause to investigate something further,
25  like, you know, smell of alcoholic beverages

Page 217

Chief Deputy Jeremy Williams

1
2   coming from the car or marijuana or something
3   then that vehicle would then pull over to the
4   side of the road.  And if all of the officers on
5   the roadblock had a vehicle pulled over, then
6   traffic would flow and they wouldn't be in the
7   road.  But if we're checking cars, we're checking
8   every car that's coming through.
9      Q    Car comes up to the roadblock.  Officer
10  comes over to the driver's side, right?
11     A    Yes, sir.
12     Q    What does the officer say?
13     A    Typically when I'm on one I say, How
14  are you doing this evening.  We're checking
15  driver's license and insurance cards.  May I
16  please see it.
17     Q    So I show it to you.  It appears valid
18  and you just wave me through?
19     A    I would probably walk back to the rear
20  of your vehicle and look at your tag and make
21  sure your tag was valid.  And if all of that was
22  good, I'd come back, tell you to drive safe and
23  have a nice evening and wave you through.
24     Q    Okay.  You don't call my driver's
25  license in?

Page 218

Chief Deputy Jeremy Williams

1
2     A   No, sir. Not in that situation.
3     Q   Not ever?
4     A   I wouldn't, no, sir.
5     Q   Well, is that again up to the officer's
6   discretion, whether they call the driver's
7   license in?
8     A   I think there's nothing illegal about
9   calling the driver's license in. Every
10  checkpoint I've ever been on, if everything is
11  going on the face of it we'll just wave them
12  through.
13    Q   Okay. So an officer would have
14  discretion to call it in if he or she thought it
15  appropriate in their discretion?
16    A   I think an officer can. I've never
17  seen it.
18    Q   Okay. You've never done it?
19    A   No, sir.
20    Q   Okay.
21    A   Not absent a reason to.
22    Q   Okay. And do you ever interact with
23  the passenger?
24    A   No, sir. Not unless I have reason to.
25    Q   What would be a good reason to interact

Page 219

Chief Deputy Jeremy Williams

1
2   with the passenger?
3     A   If for some reason the driver was being
4   arrested for something or there was a -- you
5   know, I needed to then see if somebody could
6   drive that vehicle away, I may would ask a
7   passenger in the car does anybody have a license
8   and like to drive the vehicle away. If there was
9   probable cause to believe the passenger was
10  involved in some crime, I may talk to him. But
11  typical rule, absent that, no, sir, I wouldn't.
12    Q   Okay. Do officers have discretion to
13  talk to the passenger?
14    A   If they have probable cause or
15  reasonable suspicion to or they have some
16  interaction with the driver.
17    Q   Okay. And if there's no -- if there's
18  no probable cause or reasonable suspicion, are
19  the officers permitted to talk to the passengers?
20        MR. ROSS: I object to the form. Using
21    the word talk. Is that your intentional --
22    is that the word you mean to use?
23        MR. YOUNGWOOD: Well, I'll go with
24    speak to. Yeah.
25    A   Ask them how they're doing or wouldn't

Page 220

Chief Deputy Jeremy Williams

1
2   be unusual that I may --
3   BY MR. YOUNGWOOD: (Continuing)
4     Q   Would they have discretion to ask them
5   their name?
6     A   Absent probable cause or reasonable
7   suspicion, I don't see why they would.
8     Q   Okay. I understand it sounds like you
9   wouldn't.
10    A   Yes, sir.
11    Q   But would an officer have discretion to
12  do so? Would it be a violation of policy if the
13  officer asked the persons their name?
14    A   It's not the policy or practice of the
15  Sheriff's Department to ID or ask the passengers
16  for their name.
17    Q   Okay.
18    A   If that's what -- I'm sorry. Is that
19  what you're asking?
20    Q   That is my -- yes. That's a good
21  answer -- or that's a helpful answer to my
22  question. Thank you. And how about asking the
23  passenger -- well, I asked the name. How about
24  asking for identification?
25    A   Be the same. It would not be the

Page 221

Chief Deputy Jeremy Williams

1
2   policy or the practice of the Sheriff's
3   department absence some probable cause or
4   reasonable suspicion.
5     Q   Okay. The determination in that
6   circumstance of probable cause and reasonable
7   suspicion is left to the discretion of the
8   officer, correct?
9     A   I think officers are trained on how to
10  detect probable cause or know probable cause or
11  reasonable suspicion, but they'd have to
12  articulate that in court and in their incident
13  report.
14    Q   Okay. And if the passenger declines to
15  give information or respond to an officer
16  request, what happens?
17        MR. ROSS: Object to the form. You're
18    talking about with reasonable suspicion or
19    probable cause or otherwise?
20    A   If an officer has probable cause or
21  reasonable suspicion to ask for an ID, the person
22  is required to give it to them. If they don't --
23  I don't know that they would ask them, but if
24  they did, you don't have -- they wouldn't have
25  to.

## Page 234

Chief Deputy Jeremy Williams

got hit by a car, he was wearing a traffic vest,
but certainly provides more justification for
always having that on if you're going to be in
the road.

Q   Okay.  Did the change in procedure have
anything to do with inquiries that were being
made at this time by the ACLU of Mississippi?

A   No, sir.

Q   You can put that to the side.  What is
done to ensure that roadblocks or safety
checkpoints are properly recorded in your data as
roadblocks or safety checkpoints?

A   When an officer calls out on any call,
but safety checkpoint, dispatchers should put
that into the CAD system.  When they do that it
will assign a case number.  That's true of any
call, that it should be coded as to the best of
their knowledge correctly.

Q   And is there a practice, sir, to your
knowledge of setting up roadblocks that are not
recorded properly in the CAD system?

A   No, sir.  It goes back to what I
testified earlier.  Any activity you do, you
advise dispatch of where you're at and what

## Page 235

Chief Deputy Jeremy Williams

you're doing.

Q   And have you done any checks to ensure
that your officers aren't setting up roadblocks
that are not set up -- that are not identified by
the notices of the type we looked at earlier,
Exhibits 29, 27, 28 and 30?

A   I'm not sure I understand your
question.  Can you try it again?

Q   Yes.  Could an officer set up a
roadblock without first posting a notice in
advance?

A   They're not supposed to, no.

Q   Okay.  Is it within their discretion to
do so if they wish to do so?

A   No, sir.  They're supposed to post the
notice.

Q   And if they set up a roadblock are they
supposed to record it somewhere that they've set
up the roadblock?

A   They would call into dispatch and tell
dispatch and it should be in the -- placed in
there and placed on the board and in the CAD
system.

(EXHIBIT NUMBER 35 MARKED.)

## Page 236

Chief Deputy Jeremy Williams

BY MR. YOUNGWOOD: (Continuing)

Q   Okay.  I'm giving you Exhibit 35.  This
is an incident report, correct?

A   It appears so, yes, sir.  I'm sorry.
I was trying to read it.

Q   No, take your time.

A   Yes, sir.

Q   So what type of incident is this logged
as?

A   It appears that the type to be traffic
stop.

Q   Okay.  And if this were for a roadblock
or a safety checkpoint, what should incident type
read?

A   I believe this is the report we
reviewed in the 30(b)(6) deposition.  And if it
was a safety checkpoint, the initial incident
type should be safety checkpoint.

Q   And the narrative calls it a safety
checkpoint, right?  Do you recall that?

A   Yes, sir.

Q   Okay.  So this is an error in calling
it a traffic stop?

A   If you read the narrative it says, On

## Page 237

Chief Deputy Jeremy Williams

3/14/14, I Deputy Strait and Deputy Barnes were
working a neighborhood enhancement detail.  We
were on Adeline Street at Singleton Street
conducting a safety checkpoint when we saw a blue
Honda heading towards us at a high rate of speed.
We were able to get the car stopped and the
driver -- it goes on.  I don't know whether this
is a traffic stop they made outside the roadblock
or whether this was during.  I just don't know.
I know in the 30(b)(6) deposition we couldn't
find anything on the report.  I don't know if it
was an error.  I just -- I didn't write the
report.  I don't know.

Q   And how should this incident have been
recorded in the CAD system?

A   Like I said, if there was a roadblock
that day it should have shown, but I don't -- you
know, I don't know what the circumstances were to
this.

Q   Okay.

(EXHIBIT NUMBER 36 MARKED.)

BY MR. YOUNGWOOD: (Continuing)

Q   So this is -- I think you've seen this
before.  This is CAD data sorted by offense type

# EXHIBIT 28

1                        TODD WILSON
2                UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                     NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   McFIELD; NICHOLAS SINGLETON;
7  STEVEN SMITH; BESSIE THOMAS; and
   BETTY JEAN WILLIAMS TUCKER,
8  individually and on behalf of a class
   of all others similarly situated,        PLAINTIFFS
9
10 V.             CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                                      DEFENDANTS
15
16     ************************************************
17               DEPOSITION OF TODD WILSON
18     ************************************************
19              APPEARANCES NOTED HEREIN
20
21          DATE: WEDNESDAY, NOVEMBER 15, 2017
                PLACE: MARRIOTT HOTEL
22                   Amite Street
                     Jackson, MS
23                TIME:  8:00 A.M.
24        REPORTED BY: DEBORAH H. NELSON
                    CSR #1256
25 Job No. 133402

Page 38

TODD WILSON

1
2  of?
3      A   We have a policy and procedure handbook.
4      Q   That's for the investigations unit or just
5  for the sheriff's department?
6      A   No, it's for the sheriff's office.
7      Q   And you don't recall there being like a
8  section called "Investigations" and it's specific to
9  investigations or anything like that?
10      A   I don't recall that, no.
11      Q   Do you conduct or do you or did your
12  predecessors, captain, conduct evaluations or
13  performance reviews of the officers assigned to
14  investigations?
15      A   No.
16      Q   Do you have any say in whether -- so, for
17  instance, you haven't filled the lieutenant position
18  in investigations.  Will you have any input in who
19  fills that position?
20      A   I don't know if I will or not, to be
21  honest.
22      Q   So it's Sheriff Tucker's decision?
23      A   Ultimately, it's his decision.  You know,
24  he's the sheriff.
25      Q   Right.  And so he may ask you for your

Page 39

TODD WILSON

1
2  input, but he may not; it's ultimately his authority
3  to make that decision?
4      A   That's correct.
5      Q   Okay.  Do you receive any kind of
6  performance reviews or evaluations from Sheriff
7  Tucker or Chief Williams?
8      A   I have not.
9      Q   Have not?  When you moved from being a
10  patrol deputy into investigations, did that change
11  in role?  Was that accompanied with a raise or a
12  salary increase?
13      A   For me it was a lateral move.
14      Q   And when you became the lieutenant, was
15  that accompanied by a salary increase?
16      A   Yes, sir.
17      Q   And lieutenant to captain also accompanied
18  by a salary increase?
19      A   Yes, sir.  The salary increase from master
20  sergeant to lieutenant was six cents an hour for me.
21      Q   And is that something that -- do you
22  understand how that's determined?
23      A   I do not.
24      Q   Do you know whether it's at Sheriff Tucker
25  or Chief Williams' discretion, or whether it's sort

Page 40

TODD WILSON

1
2  of a formula?
3      A   I don't know.
4      Q   Do you keep any records or statistics
5  regarding the, if you say, you know, the traffic
6  stops you conduct or within the -- well, let's just
7  stop there.  Do you keep like specific records of
8  those of how many traffic stops you conduct within a
9  given year?
10      A   No, sir.
11      Q   And how about any records relating to or
12  statistics relating to your work in investigations?
13  Like cases cleared or anything like that?
14      A   I don't keep it, no, sir.
15      Q   Do you know if anyone else keeps any such
16  records?
17      A   I do not.
18      Q   You do not know?
19      A   I do not.
20      Q   Do you have a sense of whether
21  investigations resolves or clears most of the
22  matters that come to it, or whether most of the
23  matters remain unresolved?
24          MR. GRAVES:  Object to the form, but
25      you can answer if you understand.

Page 41

TODD WILSON

1
2      A   It's a -- it's really impossible to answer
3  because you're asking me to answer a question that I
4  don't have all of the variables to.  If we have good
5  information and evidence, we do pretty good with
6  them, yes, sir.
7      Q   When you're working not in the office,
8  what sort of things would you be doing?
9      A   Following up on cases.
10      Q   And what would that -- what would that
11  involve?
12      A   If a case comes in that needs to be
13  followed up on, I would do whatever it took to go
14  follow-up on it.  It's an impossible question.  It's
15  sort of like when you asked it before, it's, you
16  know, I'm trying to solve a case.
17      Q   So you were talking about -- you were
18  talking awhile ago about the atmosphere under
19  different sheriffs, and you said that, I guess, the
20  atmosphere became somewhat more stressful towards
21  the end of Trowbridge's tenure.
22      A   Uh-huh.
23      Q   Has the atmosphere changed under
24  Sheriff Tucker?
25      A   It has.

Page 42

TODD WILSON

1
2      Q   In what way?
3      A   Uh -- the guys seem to be happier.  They
4  seem to be -- uh -- it's a feeling of you feel like
5  you've got a safety net.  You feel like you're not
6  just out there by yourself.  It's comforting.
7      Q   And has anything else changed in the
8  department under Sheriff Tucker's tenure?
9          MR. GRAVES:  I'm going to make the
10         same objection I made earlier.  "Changes."
11         I mean, what are you talking about?
12     Q   (Mr. Rethy)  Have any policies or
13  procedures changed?
14     A   The biggest change I have noticed is
15  morale, and it's up.
16     Q   In terms of the policies or procedures, so
17  there's continuity between the policies and
18  procedures in place under Sheriff Trowbridge and
19  under Sheriff Tucker?
20     A   Not that have affected me that I know of.
21     Q   So no changes that have affected you in
22  that regard?
23     A   Not that I'm aware of.
24     Q   Were there any changes in policies and
25  procedures as a result of the change from Hopkins to

Page 43

TODD WILSON

1
2  Sheriff Trowbridge?
3      A   Well, you have two different
4  administrations.  I mean, of course, there are
5  changes.  But I don't -- I don't recall specific.
6  That's been a long time ago.
7      Q   All right.
8          MR. RETHY:  Let's take a quick break.
9          MR. GRAVES:  Let's do that.
10             (BRIEF RECESS)
11         (Exhibit 1 marked for the record)
12     Q   (Mr. Rethy)  So we have marked Exhibit 1.
13  Would you take a look at this?  Is this a document
14  that you're familiar with?
15     A   I am not.
16     Q   So I will represent that it's the Answer
17  and Deferment of Defenses that was filed in this
18  case by the defendants, and it's Madison County and
19  Sheriff Tucker by your lawyers.  Do you understand
20  that?
21     A   These people are suing the sheriff's
22  office.
23     Q   Correct.
24     A   Yes, sir.
25     Q   And this document is a document filed by

Page 44

TODD WILSON

1
2  the sheriff's office in response to the lawsuit.
3      A   Okay.
4      Q   If you'll look at page 12.  Do you see
5  there's the -- uh -- the first full paragraph that
6  starts:  "Sheriff Tucker"?
7      A   Yes, sir.
8      Q   That first sentence:  "Sheriff Tucker has
9  also received multiple requests since taking office
10  from the Canton, Mississippi Police Department.
11  Managers of various apartment complexes and housing
12  projects in predominantly black neighborhoods in
13  both Madison County and the City of Canton and many
14  businesses asking that the Madison County Sheriff's
15  Department conduct roadblocks near their
16  neighborhoods and businesses."
17  So does that sound accurate to you?
18     A   Yes, sir.
19     Q   So are you -- so you're aware of managers
20  of apartment complexes and businesses asking the
21  sheriff's department to conduct roadblocks near
22  their neighborhoods and businesses?
23     A   I have heard that before, yes, sir.
24     Q   Who have you heard that from?
25     A   Different people.  I mean, I don't recall

Page 45

TODD WILSON

1
2  anybody specific, but I've heard it.
3      Q   Do you have a sense of why, so why the
4  sheriff's department would be asked to conduct
5  roadblocks in front of neighborhoods and businesses?
6          MR. GRAVES:  Object to the form.  I
7          don't think it said "in front of."  I
8          think it says "near."  You can answer.
9      Q   (Mr. Rethy)  Near neighborhoods and
10  businesses.  That's fair enough.
11     A   I think it's a way of them asking for help
12  in their communities with problems that they're
13  having within their community.
14     Q   What sort of problems?
15     A   Any kind of problems.  It could be
16  traffic, you know, high crime.
17     Q   Do you have any understanding of what
18  businesses would be making this request?
19     A   Uh -- let's see here.  Well, I don't know
20  any specific businesses.
21     Q   But you think it's generally accurate that
22  businesses have made this request?
23          MR. GRAVES:  And I'm going to object
24          to the form, also.  I don't think this
25          actually says "businesses made the

12

# EXHIBIT 29

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE BLACKMON;
HERBERT ANTHONY GREEN; KHADAFY
MANNING; QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON; STEVEN
SMITH; BESSIE THOMAS; and BETTY JEAN
WILLIAMS TUCKER, individually and on behalf of a
class of all others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL S. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

## DECLARATION OF LAWRENCE BLACKMON

LAWRENCE BLACKMON hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA. I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.      I am a 32 year-old Black man. I grew up in Madison County and have spent most of my life in Canton, Mississippi. I have family members who continue to reside in Canton. I currently reside in Washington, D.C., where I attended a postgraduate program at George Washington University and received a Masters of Law degree in 2017. I plan to move back to

Canton in 2018 to take the Mississippi Bar Examination and work at my family's law office in Canton.

3.      In 2015, while I was living at my grandmother's house in Canton, MCSD deputies arrived and began banging loudly on the door, demanding that they be let in. When I asked the officers to show me the warrant, they threatened to kick down the door to the house. When I then let them in to avoid damage to my grandmother's house, the officers entered and immediately pointed their guns at me. The officers tackled me, put me in handcuffs, and then proceeded to search the entire residence. The officers never showed me any warrant. The officers then released me from the handcuffs, and I was not charged with any crime. I believe I was detained and subjected to excessive force at least in part on the basis of my race, and I am afraid that I again will be the victim of a home invasion, as well as the use of excessive force by the MCSD, when I move back to Madison County this year.

4.      I have been stopped multiple times at roadblocks conducted by the MCSD in predominantly Black neighborhoods of Canton, including in the three year period before the filing of this lawsuit. I believe that I will be improperly stopped again at a roadblock by the MCSD.

5.      My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks and its unreasonable stops of pedestrians in Madison County's Black communities. I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing.

6.      I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit. I do not seek any money damages.

7.      As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit.  I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation.  I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

8.      Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

9.      I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14 day of March, 2018.

Lawrence Blackmon

3

# EXHIBIT 30

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, | Civil Action No. 3:17-cv-00347-WHB-LRA |
|      Plaintiffs, | |
|       v. | |
| MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, | |
|      Defendants. | |

## <u>DECLARATION OF LATOYA BROWN</u>

LATOYA BROWN hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.     I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA.  I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.     I am a 28 year-old Black woman.  I grew up in Madison County, have lived there most of my life, and currently reside in Canton, Mississippi.

3.     I have been detained multiple times by MCSD deputies while I was walking. During these pedestrian stops, I have been required by the officers to provide identification.  I believe that the MCSD deputies did not have a reasonable basis to stop me.   I have also been stopped at numerous roadblocks conducted by the MCSD in predominantly Black neighborhoods

in the three year period preceding the filing of this lawsuit, and required to provide my identification to the MCSD deputies. I believe that I will be improperly stopped again – either as a pedestrian or in a car – by the MCSD.

4.   MCSD deputies also entered and searched my home without a warrant and without permission in October 2015. The deputies pushed the door open and searched through drawers of my house and other small spaces, allegedly in attempt to locate a child that had been reported missing. The MCSD deputies went into a bedroom and shined a flashlight in the face of my three year-old daughter, who had been sleeping at the time. This frightened my daughter and me, and made me feel demeaned. I am afraid that I will be subjected to another home invasion by the MCSD in the future.

5.   My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks and its unreasonable stops of pedestrians in Madison County's Black communities. I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing.

6.   I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit. I do not seek any money damages.

7.   As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit. I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation. I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

2

8.      Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

9.      I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _5_ day of March, 2018.

Latoya Brown

3

# EXHIBIT 31

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>      Plaintiffs,<br><br>          v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>      Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA |

## DECLARATION OF KHADAFY MANNING

KHADAFY MANNING hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA.  I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.      I am a 36 year-old Black man.  I grew up in Madison County, have spent most of my life there, and currently reside in Canton, Mississippi.  I am physically disabled and struggle to walk without a cane.

3.      In June 2016, I was forced to write a false witness statement by the MCSD.  The MCSD officers threatened to jail both Quinnetta and me and set our bonds at $50,000, if we did not write the statement.  One dragged me in handcuffs down the stairs and outside, where they

put me in the back of an MCSD vehicle. Once I was in their car, one of the MCSD deputies
continued to belittle and threaten me. When I still did not provide the witness statement he
seemed to want, the deputy began to beat me with an object, striking my head and chest. Finally,
out of fear of being arrested, held with an unpayable bond, and being subjected to further
beatings, I agreed to provide the MCSD deputies the witness statement I believed they wanted.
I did not want to provide the witness statement, but I felt I had no choice but to do what the
officers said in order to avoid further physical harm. I was terrified by the MCSD deputies' use
of force, and I subsequently went to the hospital for my injuries that resulted from the deputy
hauling me down the stairs and beating me.

4.      In February 2017, I was arrested after an MCSD deputy patrolling on foot
confronted me in the parking lot of the Canton Estates apartment complex. The deputy checked
my ID, searched me and my car, and arrested me for a suspended driver's license. I have also
been stopped as a driver or a passenger in a vehicle at multiple roadblocks conducted by the
MCSD in predominantly Black neighborhoods of Canton.

5.      I am afraid that I will be subjected to additional improper stops, searches, and
seizures by the MCSD in the future.

6.      My goal in joining this lawsuit is to end the MCSD's racially motivated policing
against Black people, including the MCSD's improper use of roadblocks and its unreasonable
stops of pedestrians in Madison County's Black communities. I chose to assert legal claims as a
named plaintiff in this case because I want to protect all Black persons who reside in or travel
through Madison County from the MCSD's unfair and discriminatory policing policies and
practices.

<div align="center">2</div>

7.    As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit. I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation. I will continue to work together with my attorneys to represent the interests of the class as long as I am a named plaintiff in this lawsuit.

8.    Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

9.    I understand that if I am certified as a class representative, it will be for purposes of declaratory and injunctive relief only and will not affect my separate, individual claim for money damages.

10.    I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _3_ day of March, 2018.

Khadafy Manning

EXHIBIT 32

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, <br><br> Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA |

## DECLARATION OF QUINNETTA MANNING

QUINNETTA MANNING hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA.  I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.      I am a 30 year-old Black woman.  I grew up in Madison County and have lived my entire life there.  I currently reside in Canton, Mississippi.

3.      I have been subjected to a home invasion and have witnessed the use of excessive force by the MCSD while inside my home.  In June 2016, numerous MCSD deputies came into my home and demanded the my husband and I write false witness statement.  They threatened

that if we refused, we would be fined and jailed.  My husband also suffered injuries such that I took him to the hospital after the MCSD left.

4.   I have also witnessed and/or been stopped at multiple roadblocks conducted by the MCSD in predominantly Black neighborhoods of Canton.  For example, an MCSD deputy pulled me over as I was dropping a friend off at her home on Harvey Watkins Drive in Canton, because the deputy apparently thought I had been avoiding a roadblock established near the entrance to the Canton Estates Apartment Complex.  After he pulled me over, the deputy cursed at me and requested my license.  I do not believe his abusive words or conduct were justified or appropriate.  I believe that the MCSD deputy pulled over and spoke to me the way he did on the basis of my race.

5.   I believe that the MCSD deputies' invasion of my home and their conduct toward my husband and me was based at least in part on our race.  I am afraid that the MCSD will invade my home again, as well as mistreat me in my home or at stops at roadblocks in my community.

6.   My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks in Madison County's Black communities.  I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing policies and practices.

7.   As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit.  I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the

2

litigation. I will continue to work together with my attorneys to represent the interests of the class as long as I am a named plaintiff in this lawsuit.

8.      Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

9.      I understand that if I am certified as a class representative, it will be for purposes of declaratory and injunctive relief only and will not affect my separate, individual claim for money damages.

10.     I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this _3_ day of March, 2018 at Canton, Mississippi.

Quinnetta Manning

3

# EXHIBIT 33

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA |

## DECLARATION OF NICHOLAS SINGLETON

NICHOLAS SINGLETON hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.    I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No.

3:17-cv-347-WHB-LRA. I submit this declaration in support of Plaintiffs' Motion for Class

Certification.

2.    I am a 32 year-old Black man. I grew up in Madison County, have lived there

most of my life, and currently reside in Canton, Mississippi.

3.    I have been stopped at multiple roadblocks conducted by the MCSD in

predominantly Black neighborhoods of Madison County, including in the three year period

preceding the filing of this lawsuit.

4. My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks and its unreasonable stops of pedestrians in Madison County's Black communities. I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing.

5. I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit. I do not seek any money damages.

6. As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit. I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation. I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

7. Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

8. I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _3_ day of March, 2018.

Nicholas Singleton

EXHIBIT 34

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA |

### DECLARATION OF STEVEN SMITH

STEVEN SMITH hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.       I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA. I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.       I am a 28 year-old Black man. I grew up in Madison County and have spent most of my life in Canton, Mississippi. I recently moved to Dallas, Texas to seek employment, but I plan to return to Madison County regularly to visit my friends and family members who continue to reside there. I also plan to move back to Mississippi in the future to remain near my family.

3.      I have been stopped at numerous roadblocks conducted by the MCSD.  I have also been stopped and detained by MCSD officers while walking on or near the premises of the Canton Estates apartment complex, where I resided at the time.

4.      I was arrested in January 2017 after being stopped as a pedestrian by two MCSD deputies as I was returning home from the store with a friend.  As I walked by, the officers stopped me and ordered me to take my hands out of my pockets and to produce my identification.  I do not believe that the officers would have allowed me to refuse their commands.  When I provided my identification as instructed, the officers ran my name through dispatch and arrested me for unpaid traffic citations.  On a separate occasion, I was handcuffed and searched while standing outside my apartment at Canton Estates by MCSD deputies.  The deputies gave no explanation for handcuffing me and, finding nothing, they eventually released me.  In each of these stops, I believe that the MCSD deputies did not have a reasonable basis to stop me.  I fear that MCSD will continue to target me for stops and searches in the future.

5.      MCSD deputies also unlawfully entered and searched my home without a warrant in October 2015.  Even though I told the MCSD deputies that they could not enter my apartment, they pushed the door open and searched through various rooms and drawers in the apartment, allegedly in attempt to locate a child that had been reported missing.  The deputies' went into my three year-old daughter's bedroom while she was sleeping, shined a flashlight in her face, and woke her.  I believe I am at risk of the MCSD entering my home again without my permission and without a warrant when I am in Madison County.

6.      My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks and its unreasonable stops of pedestrians in Madison County's Black communities.  I chose to assert legal claims as a

named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing.

7.     I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit.  I do not seek any money damages.

8.     As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit.  I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation.  I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

9.     Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests interrogatories from Defendants.

10.     I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this ___6___ day of March, 2018.

Steven Smith

3

# EXHIBIT 35

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA |

## DECLARATION OF BESSIE THOMAS

BESSIE THOMAS hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA.  I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.      I am a 59 year-old African-American woman.  I grew up in Madison County, have lived most of my life there, and currently reside in Canton, Mississippi.

3.      I have been stopped at multiple roadblocks conducted by the MCSD, including in the three year period preceding the filing of this lawsuit.  These roadblocks have been in predominantly Black neighborhoods of Madison County, including in front of the church at which I am a minister.

4.    My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks in Madison County's Black communities. I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County the MCSD's unfair and discriminatory policing policies and practices.

5.    I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit. I do not seek any money damages.

6.    As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit. I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation. I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

7.    Since joining this lawsuit as a named plaintiff, I have fully participated in discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

8.    I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _3_ day of March, 2018.

Bessie Thomas

EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, <br><br> Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA |

## DECLARATION OF BETTY JEAN WILLIAMS TUCKER

BETTY JEAN WILLIAMS TUCKER hereby declares as follows pursuant to 28 U.S.C. § 1746:

1.  I am a named plaintiff in *Brown, et al. v. Madison County, Mississippi, et al.*, No. 3:17-cv-347-WHB-LRA.  I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2.  I am a 63 year-old Black woman.  I grew up in Madison County, have lived most of my life there, and I currently reside in Canton, Mississippi.

3.  I have been stopped at multiple roadblocks conducted by the MCSD, including in the three year period preceding the filing of this lawsuit.  These roadblocks have been in predominantly Black neighborhoods of Madison County, and I have rarely, if ever, seen a roadblock in a white neighborhood.   Based on my previous experiences with the MCSD, I fear

the MCSD roadblocks, and have altered my daily plans and activities in an effort avoid invasive and demeaning interactions with MCSD deputies at these roadblocks.

4.    My family was also subject to a search at a family barbecue. The MCSD jump out patrol came onto my property and searched all my guests, and then searched around in the grass before driving away.

5.    My goal in joining this lawsuit is to end the MCSD's racially motivated policing against Black people, including the MCSD's improper use of roadblocks and its unreasonable stops of pedestrians in Madison County's Black communities. I chose to assert legal claims as a named plaintiff in this case because I want to protect all Black persons who reside in or travel through Madison County from the MCSD's unfair and discriminatory policing policies and practices.

6.    I seek only declaratory and injunctive relief for all class members through my participation in this lawsuit. I do not seek any money damages.

7.    As a named plaintiff, I have been working with my lawyers from the American Civil Liberties Union, the American Civil Liberties Union of Mississippi and Simpson Thacher & Bartlett LLP to help them prepare and litigate this lawsuit. I am available to assist my lawyers with the case, and they are available to answer my questions and keep me updated on the litigation. I will continue to work together with my attorneys to represent the interests of the class members as long as I am a named plaintiff in this lawsuit.

8.    Since joining this lawsuit as a named plaintiff, I have participated in extensive discovery, including sitting for a deposition and, with the assistance of my lawyers, responding to multiple sets of document requests and interrogatories from Defendants.

9.      I am very satisfied with the work performed by my lawyers, and I am confident that if they are appointed as class counsel, they will continue to vigorously and competently represent my interests and the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __5__ day of March, 2018.

Betty Jean Williams Tucker

# EXHIBIT 37

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, | Civil Action No. 3:17-cv-00347-WHB-LRA |
| Plaintiffs, | **DECLARATION OF JAMES BACON** |
| v. | |
| MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, | |
| Defendants. | |

I, JAMES BACON, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is James Bacon.  I am a 58-year-old Black man.  I live in Camden, Mississippi.  I have had a convenience store in Camden for 17 years.

2.     Madison County Sheriff's Department sets up roadblocks in Camden two to three times a month.  They often set up roadblocks when there are events in town, like a local football game.

3.     MCSD also sets up roadblocks down the road from my business both ways so that people can't leave my business without passing through a roadblock.

PL-MCSD 0000043

2

4.      Two or three years ago I drove through a roadblock on Highway 51 and Morgan Road.  The officers asked for my ID and registration.  After running my driver's license, they told me they had a warrant for me.  I explained that they must be wrong, but they arrested me anyway.

5.       I paid about $1,400 to get out of jail.

6.       I later found out they had arrested me for a crime allegedly committed by my son.  But my son had died three years earlier.  And while he and I had the same name, we have different birthdays.  I do not know why they would have told me there was a warrant for my arrest based on my driver's license.

7.      I believe that the MCSD sets up roadblocks in my community because the residents are majority Black.  They interfere with my business and our community when we gather together because we are black.


I declare under penalty of perjury that the statements above are true and correct.


_____                    _____
                                                                                                      Date

# EXHIBIT 38

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>　　　Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF MICHAEL BRACY** |

I, MICHAEL BRACEY, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Michael Bracey.  I am a 53-year-old Black man.  I live in Kearney Park, Mississippi.  I have lived here since I was five years old.  I was formerly employed as a truck driver.

2.      In March 2012, around 11:30 p.m., I was driving home from my neighbor's house four houses down the street. I drove around the block and stopped at the stop sign, waiting to make a right turn onto my street.

10/21/17 2:16 PM

PL-MCSD 0000045

2

3.      At that time, an officer from the Madison County Sheriff's Department drove past me, driving the opposite direction.  I made my turn, pulled onto my property, and drove behind my house where I always park my car.

4.      As I was getting out of my car, I saw the same officer pull onto my property, over my grass and behind my house.  He jumped out of his car, pulled out his gun, and started screaming and cursing at me to get down onto the ground.

5.      I lay down on the ground on my stomach and he continued to yell at me. He put handcuffs on me.  He put his knee on my back and placed his gun against the back of my head.  I feared for my life.

6.      I tried to explain to him that this was my house that I had pulled into.  He made so much noise that the preacher who lived across the street came over to see what was happening and try to help me.

7.      The officer proceeded to search me and search my car.  He arrested me.

8.      When I asked the officer why he was arresting me, he told me that I was driving without a seatbelt.  He also told me that I was evading the police.

9.      The officer then tried to drive me to the Madison County Detention Center.  But, because he was driving so quickly he drove off the driveway and got stuck in a ditch on my lawn.  He then called for backup and a tow truck.  Eventually I was taken to MCDC.

10.      I know that I was wearing my seatbelt.  I also was not evading the police – I was pulling into my driveway.  I believe he came after me because I am black.

11.      It took me two years of going to court to fight these false charges.

10/21/17 2:16 PM

PL-MCSD 0000046

3

12.    I don't drive much anymore because I am afraid of the MCSD and what could happen if they pull me over again.  I am afraid they will target me again.  I no longer can work as a truck driver.  Whenever I see an MCSD officer I am shaking nervous.


I declare under penalty of perjury that the statements above are true and correct.


_____                    _____
                                                                     Date

10/21/17 2:16 PM

PL-MCSD 0000047

# EXHIBIT 39

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF ANTHONY**
**BROWN**

I, ANTHONY BROWN, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

      1.     My name is Anthony Brown, Sr.  I am a 43-year-old Black man.  I live in

Kearney Park, Mississippi.  I have lived here all my life.

      2.     In 2014, around 9:30 p.m., I was driving home from my grandmother's house and

I was stopped at a Madison County Sheriff's Department roadblock.

      3.     The officer had parked his car off the side of the road and turned off the lights.

He signaled to me to pull over with a flashlight.

2

    4.     I provided the officer with my license and registration, but he directed me to step out of the car.

    5.     He searched me.  He then searched my entire truck.

    6.     I was pulled over for more than 30 minutes.  After he searched me and my car he told me he believed I smelled like marijuana and someone else would need to drive home.

    7.     The MCSD regularly sets up roadblocks at the entrance of the Magnolia Heights community in Kearney Park.  Recently, there have been roadblocks set up more than once a week.

    8.     I believe I was stopped without good cause and subjected to discriminatory treatment on the basis of my race.

    9.     I believe that the MCSD sets up its roadblocks in my community because the residents are Black.

I declare under penalty of perjury that the statements above are true and correct.

_____          10 / 21 / 2017

                                                                Date

PL-MCSD 0000049

# EXHIBIT 40

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF BYSHEBA
BROWN**

I, BYSHEBA BROWN, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

      1.     My name is Bysheba Brown. I am a 28-year-old Black woman. I live in

Ridgeland, Mississippi in the Pine Knoll neighborhood. I grew up in Canton, Mississippi.

      2.     Since moving to Ridgeland I have seen around five roadblocks at the entrance to

my neighborhood while I was driving.

      3.     Madison County Sheriff's Department comes to my neighborhood with as many

as four cars. They park in the parking lots to the left and right of the entrance and turn off all

their lights. Then one or two officers stand in the street.

PL-MCSD 0000050

2

4.      The officers look like pedestrians until they start waving their flashlights to signal cars to stop.

5.      Each time I have been stopped the officers have shone their flashlights around the inside of my car and then asked for my license.  I gave them my license and they let me pass through.

6.      In the time I have lived in Ridgeland I have only seen roadblocks on Pine Knoll street.

7.      I don't believe the officers had any reason to stop me.  I believe they set up roadblocks on Pine Knoll because they know that is the entrance to a community where Black people live.

8.      When I lived in Canton I believe I drove through more than 100 roadblocks.  I don't believe the officers had any reason to stop me.

9.      At one stop, as I looked through my purse for my license, the officer who stopped me rifled through my purse himself, and pulled out a ziploc bag of makeup and inspected it.

10.     I believe the MCSD engages in discriminatory policing toward black people.  In Canton and Ridgeland MCSD only sets up roadblocks in Black neighborhoods.


I declare under penalty of perjury that the statements above are true and correct.


_Du̇jhdba̧ Bṃ_____          _10 - 25 - 2017_____
                                        Date


10/25/17 2:22 PM

PL-MCSD 0000051

# EXHIBIT 41

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF WILLIE CARTER** |

I, WILLIE CARTER, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    My name is William Carter. I am a 69-year-old Black man. I have lived in Camden since 1957.

2.    Madison County Sheriff's Department sets up roadblocks in Camden more than once a month. They pull off on the side of the road and turn off all their lights. Then once the driver is coming into the intersection MCSD pulls you over with a flashlight.

3.    I have been stopped at roadblocks in Camden six times. Each time I was asked for my license, registration, and proof of insurance.

PL-MCSD 0000052

2

4.      Last year I went through two roadblocks within thirty minutes.

5.      I think they set up roadblocks in Camden because they are targeting a black area. Whenever they get word of Black people gathering together at a celebration or a wedding they set up a roadblock.

6.      Even though I am licensed and have all the correct documents I am always concerned about running into a roadblock.  I drive less because I don't want to be stopped at a roadblock.

I declare under penalty of perjury that the statements above are true and correct.

_____                    _____
                                                                    Date

# EXHIBIT 42

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br>       v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>     Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF RASHEID DAVIS** |

I, RASHEID DAVIS, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    My name is Rasheid Davis. I am a 40-year-old Black man. I have been a business owner in Canton for 8 years. I have a barber shop, a boutique, and a restaurant.

2.    I have seen almost 40 roadblocks set up by the Madison County Sheriff's Department in the last year. Sometimes there are roadblocks up in Canton every night.

3.    A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars.

PL-MCSD 0000054

4.    In the last year I have passed through about five roadblocks.

5.    Two weeks ago I was stopped at roadblock on my way home from work. I gave the officer my license but I couldn't find my insurance card immediately. The officer wouldn't give me any time to look.

6.    Instead, he directed me to get out the car and started searching around in my car. He patted me down.

7.    The officer kept insisting that I smoke, even though I repeatedly told him that I do not. He gave me a sobriety test, which I passed.

8.    I asked if I could leave or what else I needed to do to be able to go home. He told me to stop "smoking dope." I think he said that to me because I am black.

9.    The roadblocks also hurt my businesses.

10.   Once the roadblocks go up in Canton people stop coming to my stores. The officers stop people driving to my store, or even just walking. Because people don't want to be harassed they just stay home.

11.   I believe the MCSD engages in discriminatory policing. I have been stopped for no cause, harassed and roadblocks, and had my businesses harmed because I am a black man and I work in a black neighborhood.


I declare under penalty of perjury that the statements above are true and correct.


10/24/17

Date

# EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF VERONICA**
**DAVIS**

I, VERONICA DAVIS, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Veronica Davis. I am 37-year-old a Black woman. I live in Canton
Estates in Canton, Mississippi with my four children.

    2.    The Madison County Sheriff Department regularly sets up roadblocks at the
entrance to my neighborhood. I believe they set up the roadblocks in Canton Estates because the
people who live here are Black.

2

3.      In 2014, I was stopped by two officers at a roadblock when I was driving home with my daughter.  The officers had no justification to stop me.  I believe I was the subject of discriminatory policing by the MCSD.

4.      I did not have my license, but I handed one of the officers my Mississippi state ID.

5.      While I was pulled over, another driver drove through the roadblock without stopping.  Both of the officers then got in their car and drove after that driver.  They took my ID with them.  I was never given a ticket or a summons.

6.      A year later, six uniformed MCSD officers came to my door and told me they had a warrant to arrest me.  I didn't understand why.  They told me it was for failure to pay a ticket for driving without a license or insurance.

7.      I spent three days away from my children in jail until my sister was able to pay the money for the tickets so I could come home.


I declare under penalty of perjury that the statements above are true and correct.

Oct 22, 2017

                                                                Date

# EXHIBIT 44

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF DEMARIO DAY**

I, Delores Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Demario Day. I am a 26-year-old Black man. I live in the Madison Heights apartment complex. I have lived here since the 6th grade.

2.      I have been stopped by the MCSD jump out patrol more than ten times.

3.      The MCSD drives into my apartment complex in unmarked cars. When they see young people outside they ask for our driver's licenses. If I don't have my driver's license they ask me for my social security number.

4.      Then, they check every one for outstanding warrants. Because I don't have any, they just leave.

5.     I don't know why they are asking for my driver's license.  I am not driving and I'm not doing anything illegal.  I am simply standing outside my apartment.

6.     They are intimidating.  I don't want to give them my license or social security number, but I feel that I am required to.  I fear what would happen to me if I refused or walked away .

7.     I think the MCSD patrols Madison Heights because this is where black people live.  I believe MCSD targets, harasses, and discriminates against Black people.

_Demaris Day_

_2/6/18_
Date

# EXHIBIT 45

2fc2ac7fefc07b8f

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF
DOMUNIQUE DOSS**

I, DOMUNIQUE DOSS, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

      1.    My name is Domunique Doss. I am a 31-year-old Black man. I live in Jackson,

Mississippi.

      2.    My grandparents have lived in Flora for 60 years. I travel to Madison County to

visit them. Sometimes as often as three times a day.

      3.    The Madison County Sheriff's Department regularly sets up roadblocks outside of

the Black community in Flora. They frequently set up on the weekends. They also set up on

holidays or when there are events like birthday parties.

10/25/17 11:14 AM

PL-MCSD 0000058

2

4.     When people have parties or family gatherings at the volunteer community center, the officers frequent set up roadblocks to harass the people coming and going from these events.

5.     On numerous occasions I have missed family gatherings because I did not want to have to pass through a roadblock.

6.     I have been stopped twice at the MCSD roadblocks, in 2010 and 2012.  On both occasions I was asked for my driver's license but didn't have it in the car.

7.     I was then directed to get out of my car and was searched.  The officer searched in my clothes and my pants pockets and even asked me to take off my shoes.  He also searched in my car.

8.     I don't believe the officer had any reason to stop me.  I believe I was only stopped because I was black.

I declare under penalty of perjury that the statements above are true and correct.

_10_/_25_/_2017_
Date

10/25/17 11:14 AM

PL-MCSD 0000059

EXHIBIT 46

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>　　　　Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br><br>**DECLARATION OF UNDREA GUISE** |

I, UNDREA GUISE, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

　　　　1.　　　My name is Undrea Guise.  I am a Black woman.  I live in Canton Estates in

Canton, Mississippi.

　　　　2.　　　In September 2016, the Madison County Sheriff's Department set up a roadblock

around 9 a.m. with three or four officers on North Liberty by the Fire Department.

　　　　3.　　　The officers directed me to stop and asked me for my license and insurance.

Because I didn't have insurance I was issued a ticket with a very large fine.

　　　　4.　　　I do not believe the officers had any reason to stop me.

PL-MCSD 0000060

2

5.     I live near the entrance of Canton Estates.  I have seen the MCSD set up roadblocks at the entrance of the community sometimes as often as once a week.

6.     I also have seen MCSD officers driving in unmarked vehicles and jumping out and stopping Black drivers.

7.     Because of the roadblocks and the jump out patrol I am afraid to drive and I don't leave my house as often as I would like.

8.     The two times I have called the MCSD for help, they have refused to help me.

9.     I called the MCSD because my car was broken into and my radio was stolen. They would not write up a police report.

10.     Another time I called the MCSD because a man threatened to kill me and wrote threats on my door.  Again, they said they wouldn't help me.

11.     I believe that the MCSD sets up its roadblocks in my community because the residents are Black.  However, when the residents need help the MCSD is absent.

I declare under penalty of perjury that the statements above are true and correct.

_____                    10/12/17
                                                                                      Date

EXHIBIT 47

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF KENNETH
HARRIS**

I, KENNETH HARRIS, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Kenneth Harris. I am a 38-year-old Black man. I have lived in
Canton, Mississippi about 12 years

    2.    I have seen countless roadblocks in the time I have lived in Canton. In the last
year I have been stopped six roadblocks. Even though I had my license on me, I was directed to
exit my vehicle and the officer searched me.

    3.    On more than one occasion they stopped me and searched me with four-year-old
child in the backseat.

PL-MCSD 0000062

4.     These stops last as long as 45 minutes.

5.     I do not believe the officers had any cause to stop me.  I believe they set up the roadblocks in Canton to stop and harass Black people.

6.     I have two cars that I drive.  However, when I drive my older-model car I am frequently pulled over.  The officer asks me where I am going, and asks for my license.  I have often asked why I am being pulled over and the officer has always refused to answer.

7.     I don't believe the officers have any cause to stop me.  I believe that the MCSD targets me when I am driving because they think that my older car means that I am poor and black.

I declare under penalty of perjury that the statements above are true and correct.

_Kennett Harris_                                    _10/24/17_
                                                                            Date

EXHIBIT 48

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br><br>**DECLARATION OF LESTER HOLLINS** |

I, LESTER HOLLINS, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is Lester Hollins.  I am a 32-year-old Black man.  I live in Ridgeland, Mississippi in the Pine Knoll community.  I have lived in Ridgeland for four years.

2.     In four years I have seen countless Madison County Sheriff's Department roadblocks at the entrance to the community.  Pine Knoll is a majority Black community.

3.     Typically, two or three officers pull their cars over to the side of the road after dark.  They then stand in the middle of the street and stop cars that are entering the community. They then lean into the car and ask for identification.

PL-MCSD 0000064

2

4.    While stopped at a roadblock, I have seen officers stop Black drivers and let white drivers continue through without stopping.

5.    On one occasion I asked the MCSD officer why he was stopping Black drivers and waving through white drivers and he told me that the white drivers were "good people."

6.    On more than five occasions I have been told to pull my car over to the side of the road.  On each occasion I was directed to exit my car. Officers searched my person, reaching inside my clothes and inside my pockets.  They also searched the inside of my car and inside of my trunk.

7.    I believe that I was stopped and searched without suspicion and for no reason other than I was a Black driver.

8.    The MCSD continues to set up roadblocks around my community and I fear I will be targeted again for searches.

I declare under penalty of perjury that the statements above are true and correct.

_____                          10/21/17
                                                                          _____
                                                                                Date

# EXHIBIT 49

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

         v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF ANTONIO
HOWARD**

I, ANTONIO HOWARD, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Antonio Howard.  I am a 26-year-old Black man.  I have lived in
Ridgeland for 13 years.  I went to Ridgeland High School.  I live in the Northbrook apartment
complex off Pine Knoll Street.

    2.    Northbrook apartments, along with Bay Meadows apartments and the homes in
the Country Club neighborhood are only accessed by Pine Knoll Street.  I believe this is the only
predominately black neighborhood in Ridgeland.

2

3.      Madison County Sheriff's Department sets up a roadblock at the entrance to the neighborhood, at the beginning of Pine Knoll Street.  They set up the roadblocks as often as every weekend.

4.      Typically, two officers will park off the road in the carwash parking lot or on in the parking lot on the other side of the street and turn off their lights.  Then they will wave cars down with a flashlight, look in the car with the flashlight and then and ask for license and insurance.  The officers also searched my car.

5.      I have been stopped at the roadblock on Pine Knoll while I was driving close to ten times.  Each time I have been stopped I have been directed to exit my car and an officer has patted me down and searched me.

6.      On one occasion I was driving my mother's car.  I think that because the officer thought it was a nice car he asked me who it belonged to.  He then searched it.

7.      On two occasions after running my license I was arrested.  Once for driving without a license and once because I had failed to appear in court for a traffic ticket.

8.      I have also been stopped at roadblocks as a passenger.  The officers have asked me for my identification at those stops as well.

9.      I believe they are stopping people at the entrance to my neighborhood because this is a black neighborhood.

10.     In all the years I have lived and driven in Ridgeland, I have never seen a roadblock set up by MCSD anywhere but at the entrance to my neighborhood.

PL-MCSD 0000067

3

11.     I don't believe they had any reason to stop me as I was driving to or from my

house.


I declare under penalty of perjury that the statements above are true and correct.


_Antonio Howard_                                    _11/25/17_

                                                                Date

# EXHIBIT 50

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>     Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF DESTINY JONES** |

I, Destiny Jones, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Destiny Jones. I am 24 years old. I am a Black woman. I was born and raised in Canton, Mississippi. I recently moved to Dallas, Texas, but my family still lives in Canton.

2.      I was mistreated by the MCSD. When I complained, I wasn't taken seriously. To my knowledge there was no investigation, and ultimately, nothing happened. The officers I interacted with are dangerous and scary. I am afraid that when I am back in Madison County visiting I will be hurt by them again.

PL-MCSD 00000099

3.      In 2016, my brother Aaron lost a wheel while driving on Highway 55.  He called 9-1-1 and my husband, John, for help.  A state trooper arrived, and the three called for a tow truck.

4.      The tow truck took a long time to arrive, so I came to the scene of the accident so John could leave and go to work.  However, before John left, a drunk driver hit our cars.  We were standing right there, so the driver nearly hit us as well.  My car went down into a ravine off the road.

5.      It was very frightening.  I called my mom because I wanted her there to help me. With our cars damaged, there was no way to get home.

6.      Over the next hour, we helped get the drunk driver and his passenger out of the car.  We waited for the tow truck and my mom.  I believe because the accident was causing traffic, the MCSD also showed up at the scene.

7.      Before the MCSD arrived, everything was friendly and relaxed.  We had calmed down from a scary accident and were dealing with the tow truck.  The tow truck driver asked me to pay him in advance, so I began to walk to my car to get a credit card.

8.      As I was walking to my car, the MCSD arrived, and a deputy began screaming and cursing at me not to walk to my car, but also to get off the street and get in my car and wait. I tried to explain that it was my car down in the ravine smoking and that I couldn't get in my car to sit.  I also tried to explain I needed my card from my car.  He just kept yelling.

9.      Finally, my mom told me to just get in her car and wait while the officers figured out what they wanted me to do.  I got in her car and waited.  The deputy yelled at my mom that he was going to arrest me.  I began to cry.

10.     Then, the state trooper came over to the car and asked me to get out of the car so I could give him my statement about what happened with the drunk driver. I told him I was afraid and confused. On the one hand he was asking me to get out, but I also had this MCSD officer yelling at me and threatening me if I got out of the car. It was extremely overwhelming.

11.     The state trooper opened the door of the car and I kept crying. Then the MCSD officer dragged me out of the car and arrested me. He was extremely forceful – yanking and twisting my arms. I told him he was hurting me, but he didn't care.

12.     I couldn't understand why I was being arrested. All I was doing was crying and trying to comply with competing instructions from different officers. But, the officer told me, "I'm taking your ass to jail." My mom begged them to release me and let me go home.

13.     My husband John tried to help me. He tried to intervene to get them to stop roughing me up so badly.

14.     The MCSD officer walked me over and stood me in front of a MCSD car.

15.     Once I was at the car, I turned around and saw that three MCSD officers had tackled John. The MCSD officer who had taken me to the car said, "turn back around or I'll put your face in the pavement." Then he took me and threw me in the back of his car.

16.     It took my family a day to get me out of jail.

17.     After the incident, I filed a complaint with the MCSD. I thought it was important that the officers' supervisors be aware of the way I was treated.

18.     I went to the courthouse and filed a complaint there. No one took my complaint seriously. No one ever called or got in contact with me or my husband (or my mother or brother) to find out what happened or investigate. On the day I was told to come to court, the whole thing took just a few minutes. I was laughed at and my complaint was dismissed.

19.     I think I was only treated this way because I am Black.  I cannot believe that if a white family was on the side of the street trying to deal with a very upsetting car accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail.

20.     The MCSD treats the people in the Black community different then the people in the white community.  And, clearly based on how I was treated, they don't train their officers to deal with people appropriately and with respect.

I declare under penalty of perjury that the statements above are true and correct.

_Peetijs Jones_                                    _2/7/18_

                                                                    Date

EXHIBIT 51

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON: HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>        Plaintiffs,<br><br>                v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>        Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br><br>**DECLARATION OF LISA LEWIS JONES** |

I, Lisa Lewis Jones, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Lisa Lewis Jones. I am 46 years old. I am a Black woman. I have lived in Canton, Mississippi for my entire life.

2.      I had an extremely upsetting experience with MCSD on Highway 55 with my son, daughter, son-in-law, and brother.

3.      In 2016, my son, Aaron was driving on the highway when his wheel came off.

4.      As I understand it, he pulled over to the side of the road. He called his brother-in-law, John, for help. He also called the police. A state trooper arrived to help him. The group

2 of 5

waited on the tow truck. Because the tow truck was taking a long time, my daughter, Destiny, arrived to wait with my son so her husband, John, could go back to work.

5.      Then, a drunk driver ran into the entire group. The drunk driver hit the state trooper's car, John's car, and Destiny's car. Destiny's car rolled over into the ravine.

6.      My children called me and told me what happened. I drove to the highway to wait with them and take care of them.

7.      The tow truck driver told Destiny he needed to be pre-paid for the whole group of cars. As she went to the tow truck to pay the driver. An MCSD officer who had recently arrived started screaming and cursing at us to get in our cars and wait.

8.      Destiny tried to explain to the MCSD officer that she was walking to the car to pay the tow truck but he kept screaming and cursing to get in her car. She tried to explain she couldn't get in her car because it was in the ravine, but he wouldn't stop yelling. So, I told Destiny to just wait in my car with me while the officers figured out what they wanted us to do.

9.      Destiny started to cry. She was extremely shaken by the car accident and the officer screaming at her.

10.      The MCSD officer then came up to the my car and told Destiny he was going to arrest her. He never told us why. I begged the officer to just let me take her home. But he just kept cursing at me and screaming at me that "she is going to jail."

11.      Then, the state trooper came over to the car and politely asked Destiny to get out of the car so he could take her statement. She was crying, but she was trying to explain that she didn't know whose directions to follow: the state trooper asking her to get out, or the MCSD officer screaming at her to stay in the car. The state trooper opened her door for her to get out and the MCSD officer ran around the car and grabbed her and arrested her.

12.     I started to cry and beg the officer to let her stay.

13.     Her husband John, who was in the car behind us, saw the MCSD officer handling Destiny in a rough way and came toward her to try to get the officer to calm down and explain he was hurting her.

14.     The other MCSD deputies on the scene then tackled John. I watched them press John's head into the ground, one officer had his knee on John's neck. I was terrified.

15.     The MCSD took Destiny and John to jail.

16.     It took the entire next day to get Destiny out of jail. It took even longer to get John out.

17.     The entire experience was surreal. None of my children have a criminal record. The officer arrested Destiny simply because she was crying and upset having watched everyone she loved almost get killed by a drunk driver.

18.     I think the officer reacted in this way because my family is Black.

19.     Over my 46 years I have witnessed the MCSD target and mistreat the Black community.

20.     In my experience, they set up the roadblocks in Black neighborhoods at the beginning of the month, when people are receiving money.

21.     I have been stopped at least six times in the last three years. I am frequently stopped at the exit off of the interstate on my way home from work. The exit is the one used by the Black residents of Canton.

22.     On one occasion I was stopped at a roadblock. I gave the MCSD officer my license and proof of insurance. Even though my documents were in order, he told me to pull over. I waited on the side of the road for him for 20 minutes. Finally, he came over.

4

23. He asked me, "why does your tag say that – what does that mean?" I realized that he was upset because my license plate contains the letters "B," "A," and "D," my children's initials: Brian, Aaron, and Destiny. I use their initials on all sorts of things, like my email address.

24. He asked if it was some sort of gang affiliation. I was insulted. I am a mother of three grown children. I have worked at my job for over 20 years. I am certainly not a member of some gang. He only asked me that because I am Black.

25. I was scared by his anger as I tried to explain. Finally he allowed me to leave.

26. I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen.

27. It makes me sad and afraid to watch them mistreat my family and my neighbors. During the scene on Highway 55, I asked the state trooper if he could do something. I asked him why this was happening. The state trooper, who was black, told me that we should all just be quiet. About the MCSD, he said to me, "we all know how they are."

I declare under penalty of perjury that the statements above are true and correct.

_Lisa Jones_                                         2-9-18

                                                                    Date

EXHIBIT 52

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>　　　Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF ARCHIE MCKAY** |

I, Archie McKay, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.　　　My name is Archie McKay. I am a 52 year old Black man. I have lived in Camden, Mississippi since I was six years old.

2.　　　I live on a long road off of Highway 43. Only nine or ten families live on my entire six-mile road.

3.　　　About 6 months ago, I was driving from my house, and I came upon an MCSD roadblock set up at the end of my street. Because of the way their cars were parked, I couldn't see the roadblock until I was already being stopped by the officer. The officer checked my license and let me go.

4.      I don't know why the MCSD would set up a roadblock on my street.  There is very little traffic because so few people drive in this rural area.

5.      In April 2015, I was stopped at a roadblock at Highway 43 and Goodloe Road. The officer told me I had a warrant, arrested me, and took me to the Madison County Detention Center.

6.      The arrest was a mistake, they actually had papers for my son for trespassing. However, I still had to go to jail and pay $1,400 in order to leave.  Because I was arrested on a Saturday, I had to stay in jail until Monday.  Eventually, after going to court, a judge dismissed the trespassing charge.


*Archie B. McKaZZr*                          2/4/18
                                                          Date

# EXHIBIT 53

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

       Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

       Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF ANTONIO
MITCHELL**

I, Antonio Mitchell, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is Antonio Mitchell. I am 29-year-old Black man. I live in the Magnolia Heights neighborhood in Flora, Mississippi. I have lived in Flora since 1997.

2.     In the last three years I have been stopped at roadblocks at the entrance to my neighborhood about 10 times. I have been stopped three or four times in the last year.

3.     When the MCSD sets up a roadblock, the officers park their cars – sometimes marked, sometimes unmarked – off to the side of the road. They rarely have their lights on, but when they do, they only turn on the lights in the back so it is impossible to see the cars until I am already up on the roadblock.

4.      At the roadblocks, the deputies ask for license and insurance.  They always talk to me as though I am a criminal.  They immediately start asking about drugs in my car.  At one roadblock, the deputy said to me, "I know you have something."

5.      At two roadblocks in the last year, I had a passenger in my car at the roadblock. They asked that person for their license as well.

6.      During at least half of the roadblocks I have been through, the officers have directed me to get out of my car, searched my person, and asked to search my car as well.  When they search me, I have to take off any layers, they put their hands in my pockets, open my pants up, search around my genitals, and in my socks and shoes.  All of this happens on the side of the road in my neighborhood.  It is humiliating.

7.      Every time they have asked to search my car, I have said no.  However, the deputies have threatened to Taser me, pull me out of my car, and arrest me for my refusal to allow them to search.  After being threatened, I just let them search.  One time, a deputy ignored when I said "no," and just started searching my car anyway.

8.      Two years ago, I was stopped and searched at a roadblock on my way home from the hospital where I had taken my infant son because he was very sick.  I had just dropped him off back home when I came into the roadblock.  I was covered in my son's vomit, I was distraught, and they insisted on searching me and my car anyway.

9.      I believe they set up these roadblocks to harass and intimidate Black people.  I have seen roadblocks set up where they stop every single Black person, and then waive the white people through.  In the town of Flora, I have seen them stop Black pedestrians and drivers leaving stores, while they escort white drivers from the Blue Rooster (a restaurant frequented by white people) home.  I have never seen a roadblock set up in the white communities.

3

10.     When we have gatherings and birthday parties at the community center, the MCSD sets up a roadblock right outside on both directions, so everyone leaving the party has to pass through.

11.     It is well known in my community when the MCSD sets up roadblocks. I am a licensed and insured driver, but on the evenings the MCSD is out, I try to not even leave my house. However, it isn't always possible to avoid their roadblocks. I am certain I will be stopped again. And, I think it is unfair that I have to take such precautions to avoid being mistreated by the MCSD.

12.     I have also been stopped by the jump out patrol. Last year, I was driving my mother's car into town to get gas with two friends. As I was exiting my neighborhood, a red Dodge Charger with deeply tinted windows started following us. The car followed us for miles – all the way into town, waited while we got gas, and all the way back to my neighborhood.

13.     As we drove back into Magnolia Heights, the Charger lights turned on. Two deputies jumped out of the car. They came up to the car and immediately started yelling at us and threatening us. They ran our licenses, but nothing came back. So, they called backup.

14.     Another unmarked car and a marked car arrived. Then the MCSD told us they wanted permission to search the car. As with the roadblocks, I told them they did not have my consent. They pulled me and my two friends out of the car. They threatened to Taser us. They threatened to bring me to jail. I was never told why I was pulled over or why they wanted to search me. But, I felt forced to give consent, so I did. They then spent an hour searching my mom's car. When they were finished there were papers everywhere, floor mats thrown out on the ground – the car was a mess. They found nothing, so they drove away.

I declare under penalty of perjury that the statements above are true and correct.

_Atone Mitchel_       _2, 5, 18_

                       Date

PL-MCSD 0000081

EXHIBIT 54

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF EARNEST**
**PATE, JR.**

I, Earnest Pate, Jr., declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Earnest Pate. I am a 46 year old black man. I live in Magnolia Heights in Flora. I grew up here, and I moved back 4 years ago.

2. On June 9, 2015, I was driving with my Black male friend around 3pm in the evening, when we came upon a roadblock on Livingston Vernon Rd.

3. The MCSD deputy initially asked the driver for his license and insurance and I thought we would then be free to continue on our way home. However, the officer then walked around the car to the passenger side window and asked me to get out of the car.

4. Once I got out of the car he began searching me. He patted down my body and stuck his hands in my pockets. He didn't find anything. Then he asked me for my license.

5. I was confused about why all this was happening. I wasn't driving the car. I certainly wasn't doing anything illegal. I didn't understand why he needed my license or how he could legally be demanding it and searching me.

PL-MCSD 00000097

6. But, the MCSD has a reputation for picking on Black people. People in the Black communities know that we have to do whatever they say. I complied with the officer even though it didn't feel right. I was afraid to do otherwise.

7. I tried to explain to the deputy that I was a law abiding citizen, a government employee, and that my relative was with the MCSD. He began cursing and yelling at me that he didn't care.

8. He ran my license and told me I had a warrant for a bad check. He taunted me and laughed at me and told me he was looking forward to taking me to jail.

9. The check was my ex-wife's, it had her signature on it.

10. More recently, in fall 2017, I had a very stressful experience where an MCSD officer in a marked car followed me close on my car for miles as I drove to work. He followed me all the way onto the property of my job.

11. I told my supervisor about it, and he told me "that's just how they are."

12. The MCSD targets the Black community in Flora. They set up roadblocks and mistreat Black people. I believe that I was treated with such disrespect at the roadblock where I was arrested because I am Black. In fact, I believe they only asked for my license – even though I was a passenger – because I am black.

I declare under penalty of perjury that the statements above are true and correct.

_____          2/5/18
                                          Date

# EXHIBIT 55

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

|  |  |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF DELORES SMITH** |

I, Delores Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    My name is Delores Smith.  I am a 56 year old Black woman.  I have lived in Camden nearly my whole life.

2.    I believe that the Madison County Sheriff's Department targets the black community, particularly the young black men in the county, for harassment.

3.    The MCSD officers are disrespectful, and often scary.

4.    In 2015, I was driving in Canton, Mississippi, when a white MCSD officer in an undercover truck started driving very close to my car.  Eventually he pulled me over.

5.      He came up to my window and began screaming and cursing at me for not pulling over sooner.  I was shaken up for days.

6.      I fear for my young sons.  A year ago he came home and told me that he was driving and was pulled over by an MCSD officer.  When he asked the officer why he was pulled over, the officer told him he fit a profile because he has dreadlocks and was wearing a hat.

7.      The MCSD sets up roadblocks in my community.  They pull off to the side of the road and stand in the road to pull people over.

8.      Even though I am a licensed and insured driver, I still spend time trying to figure out where the MCSD is so I can avoid them.  I try not to leave my house when I know they are out setting up roadblocks.

*Melanie Smith*                                    2-4-18
                                                              Date

EXHIBIT 56

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br>       v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>     Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF QUINCY SMITH** |

I, Quincy Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Quincy Smith. I am 29 years old. I am a Black man. I grew up in Canton, Mississippi. I currently live in Philadephia, Mississippi. I travel to Madison County to see my family and my children.

2.      In the last three or four years, I have driven through as many as thirty roadblocks. The MCSD sets up roadblocks in the Black neighborhoods to target Black people

3.      The MCSD parks off of the road and turns off all lights on their trucks. Then they stand in the road with flashlights.

PL-MCSD 0000084

4.      They also set up roadblocks in the apartment complexes with their lights off. I have seen them sitting at the gates in Canton estates. When I lived at Marbella Estates, the MCSD set up roadblocks at both the entrance and the exit at the same time. I could not come or go from my home without passing through a roadblock.

5.      At least half of the times I have driven through a roadblock, the MCSD officer has not even asked me for my license or insurance. He just asks for my social security number and runs it for warrants.

6.      In 2014, I was stopped at a roadblock as I drove into my apartment in Marbella Estates. The officer didn't ask me for my license or social, he just asked me "where are the drugs?" I was frustrated that he was targeting me as a drug dealer. I don't do drugs, he only asked me that because I am black. I told him "I don't know where drugs are, you're the one looking for them." He directed me to get out of my car. I complied.

7.      He told me I was being smart with him and that he was going to take me to jail. He never told me why I was being arrested. He didn't even know my name until I was taken the MCDC. Once I was at the MCSD, they discovered unpaid fines and booked me.

8.      On May 3, 2015, I was stopped at roadblock on George Washington and Welsh. The MCSD had two trucks pulled over to the side. It was dark out and all the lights were off. As I drove up to them, the officers stepped into the road with flashlights.

9.      The officer asked me for my social security number. I gave it to him. He arrested me for unpaid fines.

10.     I tried to explain that the fines were my brother's and were under the wrong name. No one would listen to me or try to help me. I didn't want to miss work, so I just paid the fines and went home.

11.     I was even stopped at a roadblock when I was on a bicycle. Around 2014, I was riding into Canton Estates. The MCSD had set up a roadblock at the entrance. The officer told me to get off my bike and demanded my social security number. I didn't want to give it to him, but I felt that if I said "no," they would arrest me for failure to comply. They arrested me for unpaid fines.

12.     The MCSD also harasses Black people at traffic stops. Every time I have been a passenger in a car that is stopped, the MCSD has asked me for my license.

13.     In early 2016, I was riding as a passenger when my friend was pulled over. The MCSD asked for my social security number. When nothing came back, he insisted I take a breathalyzer test. I do not know to this day why I had to give him my information and take a test if I wasn't driving.

14.     Several years earlier, I was a passenger when my friend was stopped at a traffic stop. Both of us were asked for identification. The Black MCSD officer who pulled us over said to his white colleague that he was going to let us go. The white MCSD officer replied, "I'm not going to help a nigger out." Then, the white officer wrote my friend tickets.

15.     I have also been stopped as many as fifteen times by the MCSD when I was on foot and been required to give my social security number.

16.     Several years ago, I was walking three friends on Welsh Street when two MCSD cars pulled up on us. They demanded all of our social security numbers. We were afraid and felt like if we said no or walked away there would have been real trouble. After they ran our social security numbers and found nothing they put us up against the car and searched us. An officer patted me up and down, put his hands in my pockets, and searched inside my wallet.

17.    I asked why they stopped us and searched us and they told me we looked like we were fixing to do something. I know that he meant we were just Black males walking. Just being Black makes us suspicious.

18.    I have known to be afraid of the MCSD since I was a child. When I was about 11 years old Sheriff Tucker and several other deputies came to my apartment to arrest my step-father. I watched Tucker handcuff my step-father. Once he was in handcuffs Tucker punched him in the face and threw him on the ground. Tucker then turned to me and told me that this was part of the job, it was protocol, and I better not deal drugs.

I declare under penalty of perjury that the statements above are true and correct.

Quincy Smith                              02/07/2018
                                          Date

# EXHIBIT 57

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF JOHN SPANN** |

I, JOHN SPANN, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

    1.      My name is John Spann. I am a 27-year-old Black man. I live in Flowood, Mississippi.

    2.      For 3 years, I lived in Gluckstadt, a community in Madison County. I moved to Flowood in 2016, but many of my mother and friends still live in Gluckstadt. As a result, I travel to Madison County on a regular basis.

    3.      I take great care to appear respectable when I travel – often wearing dress clothes and bow tie. I also try to keep a low profile by driving a car that is modest and clean.

4.      In the summer of 2016, I was stopped by the Madison County Sheriff's Department while I was driving home from visiting my grandmother in Gluckstadt. The stop lasted over 45 minutes. The two officers at the stop never explained to me why I was stopped and searched.

5.      First, the officer asked me if I had been drinking. I responded that I had not and offered to take a sobriety test. The officer declined.

6.      The officer then took my license and insurance and returned to his patrol car.

7.      I told the officer that my insurance was on my back seat and offered to get it. He told me to stay where I was. Instead, without asking, his partner opened my back door and retrieved it himself.

8.      The officer started to return to his car, but turned back to ask if I had a record of any kind like a warrant or priors. He then asked if I had any drugs or weapons. I responded that I did not. I could not understand what even prompted him to ask me. I believe he was profiling me because I am black.

9.      When he returned to my car the officer demanded that I perform a search of my own car for him. I was extremely uncomfortable throughout the entire interaction. He directed me to uncover a plate of home-made food I was bringing home from my grandmother's house and show him what was on the plate. He also directed me to show him what was underneath a baseball cap in my passenger seat.

10.     Finding nothing, he repeatedly asked me if I was drinking or had any weapons.

11.     I do not believe the officer had any reason to stop me or instruct me to search my car.

PL-MCSD 0000070

3

12.     When the stop was over the officer told me I was a "good sport" and drove away. He did not write a ticket for any traffic violation.  I asked him why I was stopped and he told me I was "bumping the lines."  I know I was not.

13.     I believe I was stopped for no reason and subjected to discriminatory treatment because my race.  I am concerned that I will again be subjected to targeting and discrimination by the MCSD on the basis of my race while traveling in Madison County in the future.

I declare under penalty of perjury that the statements above are true and correct.

_____               10/22/2017
                                                                                    Date

# EXHIBIT 58

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF TERRANCE
THOMPSON**

I, Terrance Thompson, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.     My name is Terrance Thompson. I am a 24-year-old Black man. I have lived in
Canton, Mississippi for most of my life.

    2.     In January 2017, I was walking with my friend Steven Smith. We were both
stopped by three plainclothes MCSD deputies at a "checkpoint" at the entrance to the
predominantly-Black affordable housing complex, Canton Estates, where Mr. Smith lives.

3.      The officers were standing right at the gate at the entrance to Canton Estates. Their cars were parked inside of the gates. They appeared to be conducting a roadblock. They were stopping and checking every car as it drove in.

4.      It was a cold night, so we were walking with our hands in our pockets. The officers demanded we take our hands out and we complied. At that point, I hoped that we would just pass through.

5.      Instead, the officers began to search us. They did not tell us why. Prior to searching me, the deputy asked whether either I was carrying a weapon. I told them I was carrying an appropriately registered handgun that I had a license to use. I also told the deputies where they could find the handgun on my person.

6.      One of the deputies retrieved the handgun, checked its serial number, confirmed that it belonged to me, and returned it to me.

7.      The MCSD deputies also demanded to see my identification and ran my name for warrants. Finding nothing, I was told I was free to go.

8.      However, a second deputy who was arresting my friend Steven for an outstanding warrant, asked the deputy why he wasn't arresting me. The deputy told him my gun was clean and appropriately registered, and that I had no outstanding warrants. But the second deputy instructed him to arrest me for concealed weapon. He did.

9.      I asked the deputy for his badge information, but he refused to give it to me.

10.     I was then taken to Madison County Detention Center, where I spent nearly a full day in jail. Because I didn't have the money to defend myself, I pleaded guilty to the charges.

11.     I have also been stopped at least twice by the jump out patrol since 2014.

3

12.     On one occasion, in 2015, I was walking with a Black male friend when an unmarked MCSD vehicle drove close to us. A plainclothes MCSD deputy rapidly exited the vehicle and stopped us both.

13.     The MCSD deputy proceeded to search us both.  I don't believe he had any legitimate reason to do so.  He told me I was stopped because I looked like a "Black dope boy."

14.     I had just received a refund of my college tuition, so I was carrying some cash in my pocket.  When the deputy found the cash, he deputy demanded to know how I got it.  I tried to explain to him about the refund.

15.     He kept referring to me as a "Black dope boy" and told me he was going to "get some of that dope boy money."

16.     He eventually released us.

17.     On another occasion, in 2014, I was walking with a Black male friend near my house when an unmarked Tahoe pulled up on us.  Two MCSD officers jumped out of the car and immediately put us in handcuffs.

18.     Without any explanation, they began searching us.  Finding nothing, they demanded I give them my social security number so they could run my name for warrants.

19.     I complied and gave them the number.  I was handcuffed.  I did not feel that I had any choice.

20.     When nothing came back on the warrant check, they allowed me to leave.

21.     I am certain I will be stopped again at a checkpoint and by the jump out patrol.  I feel that I, and the rest of the Black community, are targeted for unfair and discriminatory policing by the MCSD.  When I am in Canton, I am always in danger of them jumping out on me or stopping me without reason.

I declare under penalty of perjury that the statements above are true and correct.

_Jerome Thompson_                              _2-5-18_

                                                                      Date

PL-MCSD 0000091

# EXHIBIT 59

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>   Plaintiffs,<br><br>   v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>   Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF MONTREAL TILLMAN** |

I, Montreal Tillman, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Montreal Tillman.  I am a 29-year-old Black man.  I have lived in Madison County since 2008.  I live in Canton.

2.      I have seen more than twenty roadblocks in the time I have lived in Canton.  The MCSD sets up roadblocks in the areas where Black people drive and walk.  From my apartment I could see the MCSD set up roadblocks in Canton Estates and Joe Pritchard.

3.      I have spent a great deal of time in the white neighborhood in Canton because it is where my fiancé lived.  I have never seen a roadblock in the white neighborhood.  I believe the MCSD sets them only in Black neighborhoods to target Black people.

4.      In the past three years, I have driven through more than five roadblocks.

5.      A typical roadblock is like the one I experienced one night, about three years ago. I went through a roadblock set up by MCSD in the industrial area of Canton.  There were no blue lights on.  I realized I was at a roadblock when a deputy jumped out at me with a flashlight.  He waved the flashlight for me to pull over.  He ran my license and checked my insurance and let me go.

6.      On two occasions in the last three years, I was a passenger in a car that went through a roadblock.

7.      On the first occasion, I was on my way work.  The MCSD officer asked for my identification and ran my license.  Nothing came back.  Then, for no reason at all, he asked me "where are the drugs?"  I told him there are none and he let us go.

8.      The second time, I was coming home from work.  There were no lights on at the roadblock.  The driver and I didn't see the roadblock until an officer stepped out in the street with his flashlight.  Again the officer asked for my license.  I complied.

9.      The officer ran my license and found nothing.  He then returned to the car and asked me to get out so he could search me.  I felt scared.  I did not feel like I could say no.

10.     I got out of the car and patted me down, and went into my pockets.  He also searched the entire car.  He kept asking whether there was anything illegal.  He found nothing and he let us leave.

11.    I do not understand why the MCSD asked for my license when I was not driving. The first time, I even asked the officer why he was asking for my license if I was the passenger. He told me he needed to identify me to check for warrants.

12.    The MCSD has even stopped me and asked for my license when I was walking.

13.    On one occasion, in 2015, I was walking home to Joe Pritchard. The MCSD officer who stopped me was driving in an unmarked vehicle. At first he started shouting at me through his window to stop walking. Then he jumped out of his car. I was afraid. My heart was pounding.

14.    He asked me who I was, where I was going, or if I had any illegal drugs or warrants. He asked for my license. I felt like I had to give it to him. He ran my name and nothing came back.

15.    Then he told me to put my hands on the back of his truck so he could search me. He patted down my entire body and checked the insides of my pockets. I was right outside my house in my own neighborhood. I was, and still am, incredibly embarrassed. I was treated like a criminal in front of my friends and neighbors.

16.    After about ten or fifteen minutes, he let go.

17.    On another occasion, in 2015, I was walking to on Barfield Street in Canton, Mississippi. The neighborhood was a white neighborhood where my fiancé was living.

18.    An MCSD officer saw me walking and jumped out of the car. He started asking me what I was doing in that neighborhood and who I knew in that neighborhood. I tried to explain that I was walking to my fiancé's house. But, he was extremely aggressive. He acted mad that I would be in that neighborhood. He insisted he had never seen me there before. He asked me again who I knew there.

19.     After questioning me for about five minutes he asked for my license.  After being interrogated by an angry officer, I knew I had to give it to him.  He ran it, found nothing, and then went back to asking me more questions.  He asked me whether I plan on coming around all the time and whether I have drugs or weapons.

20.     Then, he told me to put my hands on the back of the car and he searched me.  He humiliated me in plain view of everyone.  He found nothing and let me go.

21.     I feel like he targeted me because I was a Black person in a white neighborhood and that meant I must be up to no good or doing something illegal.  It made me feel angry, stressed, and mostly sad, that I somehow didn't belong because of what I look like.

22.     I have been mistreated by the MCSD at even the most routine traffic stops.  In 2014, an MCSD officer pulled me over after I made a left turn at a stop sign on King Ranch Road.  I had fully stopped, looked both ways, and decided it was safe to make the turn.

23.     Rather than writing me a ticket, the MCSD officer escalated the situation.  I asked the officer why he had stopped me, and he told me to "shut the fuck up."  He told me that if he had "not taken anger management classes, [he] would drag my black ass up and down the street."

24.     He asked me whether I had drugs in the car.  I told him I did not.  He asked if he could search the car.  Again, I felt required to give my consent, so I told him he could.  He directed my then girlfriend to step out of the vehicle, searched me, and searched my car.

25.     He found nothing.  It wasn't until he gave me the ticket for careless driving that he told me he stopped me because I made the left turn too fast.

26.     The officer made it clear from the very words that he said the he was stopping me and harassing me because I am black.

PL-MCSD 0000095

5

I declare under penalty of perjury that the statements above are true and correct.

_Montreal Tillman_                    Feb-5-18

                                              Date

# EXHIBIT 60

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF EARLINE
WILDER**

I, EARLINE WILDER, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Earline Wilder.  I am 41-year-old a Black woman.  I live in Canton
Estates in Canton, Mississippi.

    2.    The Madison County Sheriff's Department regularly sets up roadblocks at the
entrance the Canton Estates.  Because the roadblocks are at the entrance, residents can't enter or
exit the community without passing through the roadblock.

PL-MCSD 0000072

2

3.       They set up the roadblocks in the mornings and in the evenings when people are leaving for and coming home from work.  Sometimes the roadblocks are set up multiple times in a week.

4.       I believe they set up roadblocks in Canton Estates because the residents are Black.

5.       I have been stopped at the roadblocks twice.  I the MCSD officers had no reason to stop me.  I was only stopped because I was driving into Canton Estates.  Everyone I saw enter before and after me was stopped as well.

6.       The MCSD officers also have a jump out patrol that drives recklessly around my community and puts our children in danger.  I have witnessed them speeding on the grass around our homes where children are out playing.

7.       As a result, I have to keep my children and grandchildren inside when the MCSD is in my neighborhood because I fear they will be hurt.

I declare under penalty of perjury that the statements above are true and correct.

*Earlene M. Webber*                              10/22/17

                                                                    Date

PL-MCSD 0000073

# EXHIBIT 61

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

Plaintiffs,

v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF MICHELLE
WILLIAMS**

I, Michelle Williams, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

1. My name is Michelle Williams. I am 31 years old. I am a Black woman. I live

in Fort Pierce, Florida.

2. In April 2015, I was living in Oxford, Mississippi. I was a full-time law student at

University of Mississippi School of Law. I was finishing my third year. I was also seven

months pregnant.

3. My husband and I own a piece of land in Port Gibson, Mississippi. In order to get

from Oxford to Port Gibson, we had to drive through Madison County.

4. Late at night on April 12, 2015, we were driving home to Oxford from Port Gibson. I was driving, my husband was in the front seat, and my 11-month-old daughter was in the back seat.

5. We were driving a brand new car, so we did not yet have a tag on the car. But we had all of the necessary information with us.

6. We pulled off of I-55 in Madison County to get gas and some food. As soon as we pulled back onto the highway, a MCSD car started to follow us. As soon as we left the lit area around the exit, the MCSD officer turned on his lights signaling me to pull over. It was very dark and we were the only car on the road.

7. I was already scared of the Madison County Sheriff's Department. Several months earlier there had been a presentation at my law school which included information on the vast levels of racism in the city of Madison and the Madison County Sheriff's Department. I was warned to be very careful when driving through Madison County and was wary of the MCSD.

8. This was also at a time when almost every night on the news I would see that Black people, particularly Black men, were being killed during seemingly routine interactions with police officers. Just the night before, I remember seeing on the news that a man was killed during a traffic stop.

9. I was scared for my safety. I was even more scared for my husband and my child.

10. I immediately slowed down and put on my hazard lights to indicate to the officer that I saw him. I called dispatch to ask them to get in touch with the officer and tell him I was afraid to pull over on a dark, empty road, but that I would pull over at the next lighted area. Dispatch agreed.

11.    When dispatch came back on the phone with me, however, he told me that the officer had told him the next lighted area was in Memphis, Tennessee.

12.    I had driven this road many times before and I knew this was not true.

13.    The officer sped up beside and was shining a flashlight in my car. This made us even more afraid.

14.    I asked my husband if he would feel comfortable if I pulled over and he was terrified as well. He said no.

15.    I then gave dispatch all of my information: my name, social security number, my driver's license number, my address. He told me I would receive a ticket in the mail.

16.    I was relieved by this result and agreed to look out for, and promptly respond to, the ticket. The officer pulled away and we continued back to Oxford.

17.    Two days later the Oxford Police department showed up to arrest me for the incident in Madison County. I was extremely embarrassed because my husband was in the Oxford Police Academy at that time. But I was also completely confused – I had been told I would be receiving a ticket in the mail, I couldn't understand how this had transformed into my arrest.

18.    The Oxford Police brought me to their jail to hold me until the MCSD arrived to take me to Madison County. Oxford Police called three times to the MCSD telling them to come pick me up, but they did not show up. During the last phone call they said they told the MCSD they were going to let me go home if the MCSD didn't arrive shortly.

19.    The MCSD finally showed up very late at night. All told, I waited almost five or six hours for them in Oxford.

20.     They drove me to the Madison County Detention Center. The judge made it extremely difficult for me to get bail. Even though I had no criminal history, a husband at home with an infant missing work, and was seven months pregnant, I spent three nights in jail.

21.     When I went before the judge, I was charged with resisting arrest, despite there being no attempt at an arrest. I was also charged with failure to stop, speeding, and not having a tag.

22.     I plead guilty to speeding. I showed proof of tag, and that charge was dismissed.

23.     I did not plead guilty to resisting arrest or failure to stop. I tried to explain to the judge that I wanted to stop, but too afraid to stop on an empty dark road.

24.     The judge, who was white, told me my concern was unwarranted. She told me she knew the officer and "he's a big teddy bear." She found me guilty.

25.     This is the same officer who followed me until it was dark, lied about how far it was until the next lighted area, drove around my car in menacing way, shined a flashlight in my face, and misled me to believe I would receive a ticket in the mail just to turn around and have me arrested. I do not believe this man is a teddy bear.

26.     I did not have any money to appeal.

27.     In May 2015, I graduated from law school. After graduation, I applied to take the Mississippi Bar.

28.     In order to take the bar, I first had to sit for a character and fitness exam. During the interview with the Character and Fitness Committee, I was asked questions about what happened on that night in April 2015 with the MCSD. I answered their questions honestly. I told them I was trying to comply and I was afraid.

29.     Ultimately, the committee decided I was not allowed to sit for the bar exam. They told me I had showed a lack of respect for law enforcement.

30.     I had thirty days to appeal to a court, but I couldn't afford it.

31.     This one incident with the MCSD essentially ruined my life. I have wanted to be a lawyer since I was nine years old. Despite having no money, I worked hard to get into law school, and even harder to graduate. My family was so supportive and excited for me that I was following my dreams.

32.     Yet, I was denied a chance to take the bar. I fell into a state of depression. I felt like I wasn't doing my part to support my husband and my children. I had gotten so far, and I let my family down.

33.     We ultimately moved to Florida, where my mom lived, just a few months ago. My hope was I could take the Florida bar, having been denied my opportunity in Mississippi. My mom was going to take care of my children while I studied. Sadly, just a month ago, my mom passed away.

34.     I don't know what I am going to do or where we are going to live now. We still have property in Mississippi, but travelling back to Mississippi, or visiting my law school, means I may have to drive through Madison County again. I am afraid of what may happen to me.

I declare under penalty of perjury that the statements above are true and correct.

Michelle Williams

2/12/18
Date

# EXHIBIT 62



## QuickFacts

**Madison County, Mississippi; Mississippi**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

**Table**

| All Topics | Madison County, Mississippi | Mississippi |
|---|---|---|
| **Population estimates, July 1, 2016, (V2016)** | **105,114** | **2,988,726** |
| 👤 PEOPLE | | |
| **Population** | | |
| Population estimates, July 1, 2017, (V2017) | NA | 2,984,100 |
| Population estimates, July 1, 2016, (V2016) | **105,114** | **2,988,726** |
| Population estimates base, April 1, 2010, (V2017) | NA | 2,968,103 |
| Population estimates base, April 1, 2010, (V2016) | 95,203 | 2,968,103 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2017, (V2017) | NA | 0.5% |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2016, (V2016) | 10.4% | 0.7% |
| Population, Census, April 1, 2010 | 95,203 | 2,967,297 |
| **Age and Sex** | | |
| Persons under 5 years, percent, July 1, 2016, (V2016) | 6.4% | 6.3% |
| Persons under 5 years, percent, April 1, 2010 | 7.4% | 7.1% |
| Persons under 18 years, percent, July 1, 2016, (V2016) | 25.2% | 24.1% |
| Persons under 18 years, percent, April 1, 2010 | 26.9% | 25.5% |
| Persons 65 years and over, percent, July 1, 2016, (V2016) | 13.2% | 15.1% |
| Persons 65 years and over, percent, April 1, 2010 | 10.4% | 12.8% |
| Female persons, percent, July 1, 2016, (V2016) | 52.2% | 51.5% |
| Female persons, percent, April 1, 2010 | 52.1% | 51.4% |
| **Race and Hispanic Origin** | | |
| White alone, percent, July 1, 2016, (V2016)   (a) | 57.8% | 59.3% |
| Black or African American alone, percent, July 1, 2016, (V2016)   (a) | 38.4% | 37.7% |
| American Indian and Alaska Native alone, percent, July 1, 2016, (V2016)   (a) | 0.3% | 0.6% |
| Asian alone, percent, July 1, 2016, (V2016)   (a) | 2.6% | 1.1% |
| Native Hawaiian and Other Pacific Islander alone, percent, July 1, 2016, (V2016)   (a) | 0.1% | 0.1% |
| Two or More Races, percent, July 1, 2016, (V2016) | 0.8% | 1.2% |
| Hispanic or Latino, percent, July 1, 2016, (V2016)   (b) | 2.8% | 3.1% |
| White alone, not Hispanic or Latino, percent, July 1, 2016, (V2016) | 55.7% | 56.9% |
| **Population Characteristics** | | |
| Veterans, 2012-2016 | 5,080 | 180,251 |
| Foreign born persons, percent, 2012-2016 | 3.9% | 2.3% |
| **Housing** | | |
| Housing units, July 1, 2016, (V2016) | 42,536 | 1,307,441 |
| Housing units, April 1, 2010 | 38,558 | 1,274,719 |
| Owner-occupied housing unit rate, 2012-2016 | 71.4% | 67.9% |
| Median value of owner-occupied housing units, 2012-2016 | $208,800 | $105,700 |
| Median selected monthly owner costs -with a mortgage, 2012-2016 | $1,477 | $1,084 |
| Median selected monthly owner costs -without a mortgage, 2012-2016 | $421 | $342 |
| Median gross rent, 2012-2016 | $904 | $723 |
| Building permits, 2016 | 714 | 6,886 |
| **Families & Living Arrangements** | | |
| Households, 2012-2016 | 37,415 | 1,098,803 |
| Persons per household, 2012-2016 | 2.67 | 2.63 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2012-2016 | 87.4% | 86.1% |
| Language other than English spoken at home, percent of persons age 5 years+, 2012-2016 | 5.4% | 3.9% |
| **Education** | | |
| High school graduate or higher, percent of persons age 25 years+, 2012-2016 | 90.3% | 83.0% |

62.1

Bachelor's degree or higher, percent of persons age 25 years+, 2012-2016 ... 46.7% ... 21.0%

### Health

| | | |
|---|---|---|
| With a disability, under age 65 years, percent, 2012-2016 | 7.1% | 11.9% |
| Persons without health insurance, under age 65 years, percent | ▲ 10.9% | ▲ 13.9% |

### Economy

| | | |
|---|---|---|
| In civilian labor force, total, percent of population age 16 years+, 2012-2016 | 66.8% | 57.4% |
| In civilian labor force, female, percent of population age 16 years+, 2012-2016 | 62.0% | 53.6% |
| Total accommodation and food services sales, 2012 ($1,000)   (c) | 230,133 | 6,999,175 |
| Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c) | 339,333 | 16,630,587 |
| Total manufacturers shipments, 2012 ($1,000)   (c) | 4,567,972 | 66,441,608 |
| Total merchant wholesaler sales, 2012 ($1,000)   (c) | 4,549,363 | 28,302,952 |
| Total retail sales, 2012 ($1,000)   (c) | 1,616,887 | 37,053,190 |
| Total retail sales per capita, 2012   (c) | $16,420 | $12,413 |

### Transportation

| | | |
|---|---|---|
| Mean travel time to work (minutes), workers age 16 years+, 2012-2016 | 22.3 | 24.2 |

### Income & Poverty

| | | |
|---|---|---|
| Median household income (in 2016 dollars), 2012-2016 | $65,924 | $40,528 |
| Per capita income in past 12 months (in 2016 dollars), 2012-2016 | $35,435 | $21,651 |
| Persons in poverty, percent | ▲ 12.0% | ▲ 20.8% |

## 🏭 BUSINESSES

### Businesses

| | | |
|---|---|---|
| Total employer establishments, 2015 | 3,022 | 58,662[1] |
| Total employment, 2015 | 49,231 | 926,391[1] |
| Total annual payroll, 2015 ($1,000) | 2,056,059 | 33,948,151[1] |
| Total employment, percent change, 2014-2015 | 5.8% | 1.6%[1] |
| Total nonemployer establishments, 2015 | 10,623 | 211,955 |
| All firms, 2012 | 11,227 | 235,454 |
| Men-owned firms, 2012 | 6,225 | 125,079 |
| Women-owned firms, 2012 | 3,592 | 89,159 |
| Minority-owned firms, 2012 | 2,650 | 74,824 |
| Nonminority-owned firms, 2012 | 8,046 | 155,094 |
| Veteran-owned firms, 2012 | 1,234 | 26,789 |
| Nonveteran-owned firms, 2012 | 9,158 | 198,566 |

## 🌐 GEOGRAPHY

### Geography

| | | |
|---|---|---|
| Population per square mile, 2010 | 133.2 | 63.2 |
| Land area in square miles, 2010 | 714.51 | 46,923.27 |
| FIPS Code | 28089 | 28 |

62.1

**Value Notes**

    **1.**  Includes data not distributed by county.

▲  This geographic level of poverty and health estimates is not comparable to other geographic levels of these estimates

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2017) refers to the final year of the series (2010 thru 2017). *Different vintage years of estimates are not comparable.*

**Fact Notes**

    **(a)**  Includes persons reporting only one race
    **(b)**  Hispanics may be of any race, so also are included in applicable race categories
    **(c)**  Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

    **-**  Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval of an open ended distribution.
    **D**  Suppressed to avoid disclosure of confidential information
    **F**  Fewer than 25 firms
    **FN**  Footnote on this item in place of data
    **NA**  Not available
    **S**  Suppressed; does not meet publication standards
    **X**  Not applicable
    **Z**  Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

62.1



CP05        COMPARATIVE DEMOGRAPHIC ESTIMATES

2012-2016 American Community Survey 5-Year Estimates

Geographic areas are based on the geographic boundaries of the data year. Current year comparisons with past-year estimates are not re-tabulated to the current year's geographies; rather, the comparison is with the existing geography of each data year. Statistically significant change from prior years' estimates could be the result of changes in the geographic boundaries of an area and not necessarily the demographic, social, or economic characteristics. For more information on geographic changes, see: https://www.census.gov/programs-surveys/acs/guidance.html.

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

Since the 5-year data do not benefit from data quality filtering, comparisons are only made for populations of 5,000 or more.

| Subject | Madison County, Mississippi | | | Canton city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| SEX AND AGE | | | | | | |
| Total population | 101,791 | 93,807 | c | 13,504 | 13,184 | * |
| Male | 47.8% | 48.0% | | 47.8% | 48.5% | |
| Female | 52.2% | 52.0% | | 52.2% | 51.5% | |
| | | | | | | |
| Under 5 years | 6.5% | 7.2% | * | 7.4% | 7.5% | |
| 5 to 9 years | 6.7% | 7.9% | * | 5.0% | 7.5% | * |
| 10 to 14 years | 8.0% | 7.4% | | 6.9% | 7.8% | |
| 15 to 19 years | 7.0% | 7.4% | * | 6.6% | 8.7% | |
| 20 to 24 years | 6.1% | 5.9% | | 7.8% | 9.1% | |
| 25 to 34 years | 13.4% | 13.3% | | 16.0% | 18.0% | |

62.2

| Subject | Madison County, Mississippi | | | Canton city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| 35 to 44 years | 13.5% | 14.0% | * | 13.2% | 11.8% | |
| 45 to 54 years | 14.0% | 15.2% | * | 11.5% | 12.3% | |
| 55 to 59 years | 6.3% | 6.4% | | 3.4% | 4.7% | |
| 60 to 64 years | 6.1% | 4.9% | * | 6.2% | 3.3% | * |
| 65 to 74 years | 7.5% | 5.4% | * | 8.9% | 4.4% | * |
| 75 to 84 years | 3.5% | 3.2% | | 4.7% | 2.9% | * |
| 85 years and over | 1.5% | 1.7% | | 2.3% | 2.1% | |
| | | | | | | |
| Median age (years) | 37.1 | 35.7 | * | 35.1 | 30.0 | * |
| | | | | | | |
| 18 years and over | 74.4% | 72.9% | * | 76.1% | 71.8% | * |
| 21 years and over | 70.5% | 68.7% | * | 71.8% | 65.1% | * |
| 62 years and over | 16.1% | 13.0% | * | 19.9% | 10.5% | * |
| 65 years and over | 12.5% | 10.3% | * | 16.0% | 9.3% | * |
| | | | | | | |
| 18 years and over | 75,728 | 68,358 | * | 10,273 | 9,464 | * |
| Male | 46.7% | 46.7% | | 46.4% | 48.4% | |
| Female | 53.3% | 53.3% | | 53.6% | 51.6% | |
| | | | | | | |
| 65 years and over | 12,693 | 9,693 | * | 2,156 | 1,225 | * |
| Male | 43.0% | 41.1% | * | 34.5% | 32.2% | |
| Female | 57.0% | 58.9% | * | 65.5% | 67.8% | |
| | | | | | | |
| RACE | | | | | | |
| Total population | 101,791 | 93,807 | c | 13,504 | 13,184 | * |
| One race | 99.4% | 99.5% | | 99.1% | 99.5% | |
| Two or more races | 0.6% | 0.5% | | 0.9% | 0.5% | |
| | | | | | | |
| One race | 99.4% | 99.5% | | 99.1% | 99.5% | |
| White | 56.8% | 57.8% | * | 22.9% | 20.3% | |
| Black or African American | 38.2% | 38.3% | | 70.8% | 75.3% | |
| American Indian and Alaska Native | 0.2% | 0.1% | | 0.2% | 0.5% | |
| Cherokee tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Chippewa tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Navajo tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Sioux tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Asian | 2.4% | 2.1% | * | 1.9% | 1.6% | |
| Asian Indian | 1.1% | (X) | | 1.9% | (X) | |
| Chinese | 0.4% | (X) | | 0.0% | (X) | |
| Filipino | 0.1% | (X) | | 0.0% | (X) | |
| Japanese | 0.1% | (X) | | 0.0% | (X) | |
| Korean | 0.2% | (X) | | 0.0% | (X) | |
| Vietnamese | 0.0% | (X) | | 0.0% | (X) | |
| Other Asian | 0.5% | (X) | | 0.0% | (X) | |

62.2

| Subject | Madison County, Mississippi | | | Canton city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| Native Hawaiian and Other Pacific Islander | 0.0% | 0.0% | | 0.0% | 0.0% | |
| Native Hawaiian | 0.0% | (X) | | 0.0% | (X) | |
| Guamanian or Chamorro | 0.0% | (X) | | 0.0% | (X) | |
| Samoan | 0.0% | (X) | | 0.0% | (X) | |
| Other Pacific Islander | 0.0% | (X) | | 0.0% | (X) | |
| Some other race | 1.8% | 1.2% | * | 3.3% | 1.8% | |
| Two or more races | 0.6% | 0.5% | | 0.9% | 0.5% | |
| White and Black or African American | 0.2% | 0.2% | | 0.5% | 0.3% | |
| White and American Indian and Alaska Native | 0.1% | 0.1% | | 0.0% | 0.1% | |
| White and Asian | 0.1% | 0.1% | | 0.0% | 0.0% | |
| Black or African American and American Indian and Alaska Native | 0.0% | 0.0% | | 0.0% | 0.0% | |
| | | | | | | |
| Race alone or in combination with one or more other races | | | | | | |
| Total population | 101,791 | 93,807 | c | 13,504 | 13,184 | * |
| White | 57.4% | 58.3% | * | 23.6% | 20.8% | |
| Black or African American | 38.5% | 38.6% | | 71.5% | 75.6% | |
| American Indian and Alaska Native | 0.3% | 0.2% | | 0.3% | 0.5% | |
| Asian | 2.6% | 2.2% | * | 1.9% | 1.6% | |
| Native Hawaiian and Other Pacific Islander | 0.1% | 0.0% | | 0.1% | 0.0% | |
| Some other race | 1.9% | 1.2% | * | 3.5% | 1.9% | |
| | | | | | | |
| HISPANIC OR LATINO AND RACE | | | | | | |
| Total population | 101,791 | 93,807 | c | 13,504 | 13,184 | * |
| Hispanic or Latino (of any race) | 2.8% | 2.8% | c | 4.6% | 4.9% | |
| Mexican | 1.5% | 1.8% | | 2.9% | 3.0% | |
| Puerto Rican | 0.1% | 0.0% | * | 0.4% | 0.0% | |
| Cuban | 0.1% | 0.2% | | 0.0% | 0.1% | |
| Other Hispanic or Latino | 1.1% | 0.8% | | 1.3% | 1.7% | |
| Not Hispanic or Latino | 97.2% | 97.2% | c | 95.4% | 95.1% | |
| White alone | 55.9% | 56.3% | * | 22.5% | 18.0% | |
| Black or African American alone | 38.1% | 38.2% | | 70.3% | 75.1% | |
| American Indian and Alaska Native alone | 0.2% | 0.0% | * | 0.2% | 0.0% | |
| Asian alone | 2.4% | 2.1% | * | 1.9% | 1.6% | |
| Native Hawaiian and Other Pacific Islander alone | 0.0% | 0.0% | | 0.0% | 0.0% | |
| Some other race alone | 0.2% | 0.2% | | 0.0% | 0.0% | |
| Two or more races | 0.5% | 0.4% | | 0.5% | 0.4% | |
| Two races including Some other race | 0.0% | 0.0% | | 0.0% | 0.0% | |
| Two races excluding Some other race, and Three or more races | 0.5% | 0.4% | | 0.5% | 0.4% | |
| | | | | | | |
| Total housing units | 41,072 | 38,055 | * | 5,402 | 5,023 | |
| | | | | | | |
| CITIZEN, VOTING AGE POPULATION | | | | | | |
| Citizen, 18 and over population | 73,690 | 66,112 | * | 9,841 | 8,979 | * |

62.2

| Subject | Madison County, Mississippi | | | Canton city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| Male | 46.6% | 46.5% | | 45.9% | 47.8% | |
| Female | 53.4% | 53.5% | | 54.1% | 52.2% | |

62.2

03/12/2018

| Subject | Madison city, Mississippi | | | Ridgeland city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| SEX AND AGE | | | | | | |
| Total population | 25,473 | 23,774 | * | 24,338 | 23,858 | * |
| Male | 48.2% | 49.8% | | 47.0% | 46.8% | |
| Female | 51.8% | 50.2% | | 53.0% | 53.2% | |
| | | | | | | |
| Under 5 years | 5.3% | 6.7% | * | 6.5% | 5.4% | |
| 5 to 9 years | 6.9% | 8.8% | * | 6.2% | 7.3% | |
| 10 to 14 years | 10.8% | 9.2% | * | 7.4% | 5.4% | * |
| 15 to 19 years | 7.2% | 7.4% | | 6.2% | 5.9% | |
| 20 to 24 years | 3.6% | 2.8% | | 8.4% | 9.3% | |
| 25 to 34 years | 9.2% | 7.6% | | 18.1% | 17.8% | |
| 35 to 44 years | 13.6% | 16.2% | * | 13.5% | 14.5% | |
| 45 to 54 years | 17.1% | 19.5% | * | 12.4% | 13.5% | |
| 55 to 59 years | 6.8% | 6.3% | | 5.0% | 6.2% | |
| 60 to 64 years | 6.5% | 4.5% | * | 4.8% | 4.3% | |
| 65 to 74 years | 8.0% | 5.4% | * | 6.3% | 5.0% | * |
| 75 to 84 years | 3.3% | 3.7% | | 3.2% | 3.5% | |
| 85 years and over | 1.7% | 1.9% | | 2.1% | 1.7% | |
| | | | | | | |
| Median age (years) | 41.2 | 40.2 | | 33.3 | 34.1 | |
| | | | | | | |
| 18 years and over | 72.2% | 70.0% | * | 76.1% | 77.8% | |
| 21 years and over | 69.2% | 67.0% | | 72.4% | 74.7% | |
| 62 years and over | 16.9% | 13.7% | * | 14.0% | 12.2% | * |
| 65 years and over | 13.0% | 11.0% | * | 11.6% | 10.3% | |
| | | | | | | |
| 18 years and over | 18,395 | 16,636 | * | 18,528 | 18,573 | |
| Male | 48.0% | 48.5% | | 45.1% | 45.5% | |
| Female | 52.0% | 51.5% | | 54.9% | 54.5% | |
| | | | | | | |
| 65 years and over | 3,314 | 2,619 | * | 2,814 | 2,453 | * |
| Male | 44.4% | 39.4% | * | 37.0% | 38.5% | |
| Female | 55.6% | 60.6% | * | 63.0% | 61.5% | |
| | | | | | | |
| RACE | | | | | | |
| Total population | 25,473 | 23,774 | * | 24,338 | 23,858 | * |
| One race | 99.2% | 99.1% | | 99.0% | 99.7% | * |
| Two or more races | 0.8% | 0.9% | | 1.0% | 0.3% | * |
| | | | | | | |
| One race | 99.2% | 99.1% | | 99.0% | 99.7% | * |
| White | 86.4% | 86.5% | | 54.7% | 63.1% | * |
| Black or African American | 9.0% | 10.1% | | 36.1% | 29.9% | * |
| American Indian and Alaska Native | 0.2% | 0.0% | | 0.3% | 0.0% | * |
| Cherokee tribal grouping | 0.0% | (X) | | 0.0% | (X) | |

62.2

| Subject | Madison city, Mississippi | | | Ridgeland city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| Chippewa tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Navajo tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Sioux tribal grouping | 0.0% | (X) | | 0.0% | (X) | |
| Asian | 3.0% | 2.4% | | 5.1% | 3.5% | |
| Asian Indian | 0.6% | (X) | | 2.7% | (X) | |
| Chinese | 1.0% | (X) | | 0.8% | (X) | |
| Filipino | 0.1% | (X) | | 0.3% | (X) | |
| Japanese | 0.0% | (X) | | 0.4% | (X) | |
| Korean | 0.2% | (X) | | 0.4% | (X) | |
| Vietnamese | 0.1% | (X) | | 0.0% | (X) | |
| Other Asian | 1.1% | (X) | | 0.5% | (X) | |
| Native Hawaiian and Other Pacific Islander | 0.0% | 0.1% | | 0.0% | 0.0% | |
| Native Hawaiian | 0.0% | (X) | | 0.0% | (X) | |
| Guamanian or Chamorro | 0.0% | (X) | | 0.0% | (X) | |
| Samoan | 0.0% | (X) | | 0.0% | (X) | |
| Other Pacific Islander | 0.0% | (X) | | 0.0% | (X) | |
| Some other race | 0.7% | 0.0% | * | 2.8% | 3.3% | |
| Two or more races | 0.8% | 0.9% | | 1.0% | 0.3% | * |
| White and Black or African American | 0.2% | 0.3% | | 0.4% | 0.2% | |
| White and American Indian and Alaska Native | 0.2% | 0.3% | | 0.0% | 0.0% | |
| White and Asian | 0.2% | 0.3% | | 0.3% | 0.1% | |
| Black or African American and American Indian and Alaska Native | 0.0% | 0.0% | | 0.0% | 0.0% | |
| | | | | | | |
| Race alone or in combination with one or more other races | | | | | | |
| Total population | 25,473 | 23,774 | * | 24,338 | 23,858 | * |
| White | 87.1% | 87.4% | | 55.5% | 63.4% | * |
| Black or African American | 9.2% | 10.4% | | 36.5% | 30.0% | * |
| American Indian and Alaska Native | 0.5% | 0.3% | | 0.3% | 0.0% | * |
| Asian | 3.3% | 2.7% | | 5.6% | 3.6% | * |
| Native Hawaiian and Other Pacific Islander | 0.2% | 0.1% | | 0.1% | 0.0% | |
| Some other race | 0.7% | 0.0% | * | 3.1% | 3.3% | |
| | | | | | | |
| HISPANIC OR LATINO AND RACE | | | | | | |
| Total population | 25,473 | 23,774 | * | 24,338 | 23,858 | * |
| Hispanic or Latino (of any race) | 1.0% | 1.1% | | 4.2% | 6.1% | |
| Mexican | 0.2% | 0.4% | | 1.9% | 4.4% | * |
| Puerto Rican | 0.1% | 0.0% | | 0.1% | 0.0% | |
| Cuban | 0.2% | 0.6% | | 0.1% | 0.0% | |
| Other Hispanic or Latino | 0.5% | 0.0% | * | 2.2% | 1.7% | |
| Not Hispanic or Latino | 99.0% | 98.9% | | 95.8% | 93.9% | |
| White alone | 85.5% | 85.5% | | 53.4% | 59.7% | * |
| Black or African American alone | 9.0% | 10.1% | | 36.0% | 29.9% | * |
| American Indian and Alaska Native alone | 0.2% | 0.0% | | 0.3% | 0.0% | * |

62.2

03/12/2018

| Subject | Madison city, Mississippi | | | Ridgeland city, Mississippi | | |
|---|---|---|---|---|---|---|
| | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance | 2012-2016 Estimates | 2007-2011 Estimates | Statistical Significance |
| Asian alone | 3.0% | 2.4% | | 5.1% | 3.5% | |
| Native Hawaiian and Other Pacific Islander alone | 0.0% | 0.1% | | 0.0% | 0.0% | |
| Some other race alone | 0.7% | 0.0% | * | 0.1% | 0.6% | |
| Two or more races | 0.8% | 0.9% | | 0.8% | 0.3% | * |
| Two races including Some other race | 0.0% | 0.0% | | 0.0% | 0.0% | |
| Two races excluding Some other race, and Three or more races | 0.8% | 0.9% | | 0.7% | 0.3% | |
| | | | | | | |
| | | | | | | |
| Total housing units | 9,680 | 8,773 | * | 11,206 | 11,876 | * |
| | | | | | | |
| CITIZEN, VOTING AGE POPULATION | | | | | | |
| Citizen, 18 and over population | 18,080 | 16,360 | * | 17,550 | 17,236 | |
| Male | 47.8% | 48.5% | | 45.0% | 45.1% | |
| Female | 52.2% | 51.5% | | 55.0% | 54.9% | |

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

The definitions of the metropolitan and micropolitan statistical areas for the 2013 American Community Survey are based on the commuting patterns identified in the 2010 Census. Estimates prior to 2013 are based on the results of the 2000 Census. Statistically significant change from prior years' estimates could be the result of changes in the metropolitan geographic definitions and not necessarily the demographic, social or economic characteristic. For more information, see: Metropolitan and Micropolitan Statistical Areas.

For more information on understanding race and Hispanic origin data, please see the Census 2010 Brief entitled, Overview of Race and Hispanic Origin: 2010, issued March 2011. (pdf format)

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

An * indicates that the estimate is significantly different (at a 90% confidence level) than the estimate from the most current year. A "c" indicates the estimates for that year and the current year are both controlled; a statistical test is not appropriate. A blank indicates that the estimate is not significantly different from the estimate of the most current year, or that a test could not be done because one or both of the estimates is displayed as "-", "N", or "(X)", or the estimate ends with a "+" or "-". (For more information on these symbols, see the Explanation of Symbols below this table.)

Explanation of Symbols:

1. An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the

62.2

margin of error. A statistical test is not appropriate.

2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.

3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.

4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.

5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.

6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

7. An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

8. An '(X)' means that the estimate is not applicable or not available.

62.2



AMERICAN
**FactFinder**

| DP05 | ACS DEMOGRAPHIC AND HOUSING ESTIMATES |
|---|---|
| | 2012-2016 American Community Survey 5-Year Estimates |

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

| Subject | Kearney Park CDP, Mississippi | | | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Percent | Percent Margin of Error |
| SEX AND AGE | | | | |
| Total population | 1,405 | +/-388 | 1,405 | (X) |
| Male | 745 | +/-223 | 53.0% | +/-6.8 |
| Female | 660 | +/-207 | 47.0% | +/-6.8 |
| | | | | |
| Under 5 years | 94 | +/-77 | 6.7% | +/-5.6 |
| 5 to 9 years | 62 | +/-63 | 4.4% | +/-4.1 |
| 10 to 14 years | 61 | +/-58 | 4.3% | +/-4.2 |
| 15 to 19 years | 207 | +/-136 | 14.7% | +/-7.7 |
| 20 to 24 years | 106 | +/-81 | 7.5% | +/-5.2 |
| 25 to 34 years | 271 | +/-159 | 19.3% | +/-9.6 |
| 35 to 44 years | 195 | +/-107 | 13.9% | +/-7.4 |
| 45 to 54 years | 160 | +/-95 | 11.4% | +/-6.0 |
| 55 to 59 years | 53 | +/-57 | 3.8% | +/-4.3 |
| 60 to 64 years | 75 | +/-59 | 5.3% | +/-4.0 |
| 65 to 74 years | 121 | +/-68 | 8.6% | +/-4.6 |
| 75 to 84 years | 0 | +/-12 | 0.0% | +/-2.5 |
| 85 years and over | 0 | +/-12 | 0.0% | +/-2.5 |
| | | | | |
| Median age (years) | 32.8 | +/-3.4 | (X) | (X) |
| | | | | |
| 18 years and over | 1,035 | +/-281 | 73.7% | +/-6.7 |
| 21 years and over | 886 | +/-253 | 63.1% | +/-9.7 |
| 62 years and over | 196 | +/-99 | 14.0% | +/-6.5 |
| 65 years and over | 121 | +/-68 | 8.6% | +/-4.6 |
| | | | | |
| 18 years and over | 1,035 | +/-281 | 1,035 | (X) |
| Male | 528 | +/-176 | 51.0% | +/-8.8 |
| Female | 507 | +/-158 | 49.0% | +/-8.8 |
| | | | | |
| 65 years and over | 121 | +/-68 | 121 | (X) |
| Male | 77 | +/-54 | 63.6% | +/-26.1 |

62.3

| Subject | Estimate | Margin of Error | Percent | Percent Margin of Error |
|---|---|---|---|---|
| Female | 44 | +/-39 | 36.4% | +/-26.1 |
| | | | | |
| **RACE** | | | | |
| Total population | 1,405 | +/-388 | 1,405 | (X) |
| One race | 1,405 | +/-388 | 100.0% | +/-2.5 |
| Two or more races | 0 | +/-12 | 0.0% | +/-2.5 |
| | | | | |
| One race | 1,405 | +/-388 | 100.0% | +/-2.5 |
| White | 258 | +/-247 | 18.4% | +/-16.2 |
| Black or African American | 1,147 | +/-360 | 81.6% | +/-16.2 |
| American Indian and Alaska Native | 0 | +/-12 | 0.0% | +/-2.5 |
| Cherokee tribal grouping | 0 | +/-12 | 0.0% | +/-2.5 |
| Chippewa tribal grouping | 0 | +/-12 | 0.0% | +/-2.5 |
| Navajo tribal grouping | 0 | +/-12 | 0.0% | +/-2.5 |
| Sioux tribal grouping | 0 | +/-12 | 0.0% | +/-2.5 |
| Asian | 0 | +/-12 | 0.0% | +/-2.5 |
| Asian Indian | 0 | +/-12 | 0.0% | +/-2.5 |
| Chinese | 0 | +/-12 | 0.0% | +/-2.5 |
| Filipino | 0 | +/-12 | 0.0% | +/-2.5 |
| Japanese | 0 | +/-12 | 0.0% | +/-2.5 |
| Korean | 0 | +/-12 | 0.0% | +/-2.5 |
| Vietnamese | 0 | +/-12 | 0.0% | +/-2.5 |
| Other Asian | 0 | +/-12 | 0.0% | +/-2.5 |
| Native Hawaiian and Other Pacific Islander | 0 | +/-12 | 0.0% | +/-2.5 |
| Native Hawaiian | 0 | +/-12 | 0.0% | +/-2.5 |
| Guamanian or Chamorro | 0 | +/-12 | 0.0% | +/-2.5 |
| Samoan | 0 | +/-12 | 0.0% | +/-2.5 |
| Other Pacific Islander | 0 | +/-12 | 0.0% | +/-2.5 |
| Some other race | 0 | +/-12 | 0.0% | +/-2.5 |
| Two or more races | 0 | +/-12 | 0.0% | +/-2.5 |
| White and Black or African American | 0 | +/-12 | 0.0% | +/-2.5 |
| White and American Indian and Alaska Native | 0 | +/-12 | 0.0% | +/-2.5 |
| White and Asian | 0 | +/-12 | 0.0% | +/-2.5 |
| Black or African American and American Indian and Alaska Native | 0 | +/-12 | 0.0% | +/-2.5 |
| | | | | |
| Race alone or in combination with one or more other races | | | | |
| Total population | 1,405 | +/-388 | 1,405 | (X) |
| White | 258 | +/-247 | 18.4% | +/-16.2 |
| Black or African American | 1,147 | +/-360 | 81.6% | +/-16.2 |
| American Indian and Alaska Native | 0 | +/-12 | 0.0% | +/-2.5 |
| Asian | 0 | +/-12 | 0.0% | +/-2.5 |
| Native Hawaiian and Other Pacific Islander | 0 | +/-12 | 0.0% | +/-2.5 |
| Some other race | 0 | +/-12 | 0.0% | +/-2.5 |
| | | | | |
| **HISPANIC OR LATINO AND RACE** | | | | |
| Total population | 1,405 | +/-388 | 1,405 | (X) |
| Hispanic or Latino (of any race) | 0 | +/-12 | 0.0% | +/-2.5 |
| Mexican | 0 | +/-12 | 0.0% | +/-2.5 |
| Puerto Rican | 0 | +/-12 | 0.0% | +/-2.5 |
| Cuban | 0 | +/-12 | 0.0% | +/-2.5 |
| Other Hispanic or Latino | 0 | +/-12 | 0.0% | +/-2.5 |
| Not Hispanic or Latino | 1,405 | +/-388 | 100.0% | +/-2.5 |
| White alone | 258 | +/-247 | 18.4% | +/-16.2 |
| Black or African American alone | 1,147 | +/-360 | 81.6% | +/-16.2 |
| American Indian and Alaska Native alone | 0 | +/-12 | 0.0% | +/-2.5 |
| Asian alone | 0 | +/-12 | 0.0% | +/-2.5 |
| Native Hawaiian and Other Pacific Islander alone | 0 | +/-12 | 0.0% | +/-2.5 |

62.3

03/07/2018

| Subject | Estimate | Margin of Error | Percent | Percent Margin of Error |
|---|---|---|---|---|
| Some other race alone | 0 | +/-12 | 0.0% | +/-2.5 |
| Two or more races | 0 | +/-12 | 0.0% | +/-2.5 |
| Two races including Some other race | 0 | +/-12 | 0.0% | +/-2.5 |
| Two races excluding Some other race, and Three or more races | 0 | +/-12 | 0.0% | +/-2.5 |
| | | | | |
| Total housing units | 382 | +/-114 | (X) | (X) |
| | | | | |
| CITIZEN, VOTING AGE POPULATION | | | | |
| Citizen, 18 and over population | 1,035 | +/-281 | 1,035 | (X) |
| Male | 528 | +/-176 | 51.0% | +/-8.8 |
| Female | 507 | +/-158 | 49.0% | +/-8.8 |

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

For more information on understanding race and Hispanic origin data, please see the Census 2010 Brief entitled, Overview of Race and Hispanic Origin: 2010, issued March 2011. (pdf format)

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

Explanation of Symbols:

1. An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.
7. An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.
8. An '(X)' means that the estimate is not applicable or not available.

62.3

03/07/2018


AMERICAN
FactFinder

| DP05 | ACS DEMOGRAPHIC AND HOUSING ESTIMATES |
|------|----------------------------------------|
| | 2012-2016 American Community Survey 5-Year Estimates |

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

| Subject | Flora town, Mississippi | | | |
|---------|----------|----------------|---------|---------------------------|
| | Estimate | Margin of Error | Percent | Percent Margin of Error |
| SEX AND AGE | | | | |
| Total population | 2,058 | +/-344 | 2,058 | (X) |
| Male | 961 | +/-199 | 46.7% | +/-5.0 |
| Female | 1,097 | +/-204 | 53.3% | +/-5.0 |
| | | | | |
| Under 5 years | 190 | +/-94 | 9.2% | +/-3.9 |
| 5 to 9 years | 143 | +/-79 | 6.9% | +/-3.7 |
| 10 to 14 years | 236 | +/-119 | 11.5% | +/-5.2 |
| 15 to 19 years | 234 | +/-78 | 11.4% | +/-3.5 |
| 20 to 24 years | 112 | +/-67 | 5.4% | +/-2.9 |
| 25 to 34 years | 310 | +/-109 | 15.1% | +/-4.2 |
| 35 to 44 years | 165 | +/-55 | 8.0% | +/-2.7 |
| 45 to 54 years | 210 | +/-88 | 10.2% | +/-3.9 |
| 55 to 59 years | 156 | +/-62 | 7.6% | +/-2.8 |
| 60 to 64 years | 82 | +/-45 | 4.0% | +/-2.1 |
| 65 to 74 years | 142 | +/-64 | 6.9% | +/-3.0 |
| 75 to 84 years | 60 | +/-36 | 2.9% | +/-1.7 |
| 85 years and over | 18 | +/-22 | 0.9% | +/-1.0 |
| | | | | |
| Median age (years) | 28.7 | +/-4.8 | (X) | (X) |
| | | | | |
| 18 years and over | 1,331 | +/-239 | 64.7% | +/-5.9 |
| 21 years and over | 1,239 | +/-217 | 60.2% | +/-5.1 |
| 62 years and over | 258 | +/-76 | 12.5% | +/-3.4 |
| 65 years and over | 220 | +/-69 | 10.7% | +/-3.2 |
| | | | | |
| 18 years and over | 1,331 | +/-239 | 1,331 | (X) |
| Male | 550 | +/-143 | 41.3% | +/-5.4 |
| Female | 781 | +/-133 | 58.7% | +/-5.4 |
| | | | | |
| 65 years and over | 220 | +/-69 | 220 | (X) |
| Male | 119 | +/-55 | 54.1% | +/-13.8 |

62.4

| Subject | Estimate | Margin of Error | Percent | Percent Margin of Error |
|---|---|---|---|---|
| Female | 101 | +/-38 | 45.9% | +/-13.8 |
| **RACE** | | | | |
| Total population | 2,058 | +/-344 | 2,058 | (X) |
| One race | 2,055 | +/-344 | 99.9% | +/-0.2 |
| Two or more races | 3 | +/-5 | 0.1% | +/-0.2 |
| | | | | |
| One race | 2,055 | +/-344 | 99.9% | +/-0.2 |
| White | 916 | +/-224 | 44.5% | +/-10.0 |
| Black or African American | 1,080 | +/-292 | 52.5% | +/-9.3 |
| American Indian and Alaska Native | 11 | +/-18 | 0.5% | +/-0.8 |
| Cherokee tribal grouping | 0 | +/-12 | 0.0% | +/-1.7 |
| Chippewa tribal grouping | 0 | +/-12 | 0.0% | +/-1.7 |
| Navajo tribal grouping | 0 | +/-12 | 0.0% | +/-1.7 |
| Sioux tribal grouping | 0 | +/-12 | 0.0% | +/-1.7 |
| Asian | 0 | +/-12 | 0.0% | +/-1.7 |
| Asian Indian | 0 | +/-12 | 0.0% | +/-1.7 |
| Chinese | 0 | +/-12 | 0.0% | +/-1.7 |
| Filipino | 0 | +/-12 | 0.0% | +/-1.7 |
| Japanese | 0 | +/-12 | 0.0% | +/-1.7 |
| Korean | 0 | +/-12 | 0.0% | +/-1.7 |
| Vietnamese | 0 | +/-12 | 0.0% | +/-1.7 |
| Other Asian | 0 | +/-12 | 0.0% | +/-1.7 |
| Native Hawaiian and Other Pacific Islander | 0 | +/-12 | 0.0% | +/-1.7 |
| Native Hawaiian | 0 | +/-12 | 0.0% | +/-1.7 |
| Guamanian or Chamorro | 0 | +/-12 | 0.0% | +/-1.7 |
| Samoan | 0 | +/-12 | 0.0% | +/-1.7 |
| Other Pacific Islander | 0 | +/-12 | 0.0% | +/-1.7 |
| Some other race | 48 | +/-72 | 2.3% | +/-3.4 |
| Two or more races | 3 | +/-5 | 0.1% | +/-0.2 |
| White and Black or African American | 0 | +/-12 | 0.0% | +/-1.7 |
| White and American Indian and Alaska Native | 3 | +/-5 | 0.1% | +/-0.2 |
| White and Asian | 0 | +/-12 | 0.0% | +/-1.7 |
| Black or African American and American Indian and Alaska Native | 0 | +/-12 | 0.0% | +/-1.7 |
| | | | | |
| Race alone or in combination with one or more other races | | | | |
| Total population | 2,058 | +/-344 | 2,058 | (X) |
| White | 919 | +/-223 | 44.7% | +/-10.0 |
| Black or African American | 1,080 | +/-292 | 52.5% | +/-9.3 |
| American Indian and Alaska Native | 14 | +/-18 | 0.7% | +/-0.8 |
| Asian | 0 | +/-12 | 0.0% | +/-1.7 |
| Native Hawaiian and Other Pacific Islander | 0 | +/-12 | 0.0% | +/-1.7 |
| Some other race | 48 | +/-72 | 2.3% | +/-3.4 |
| | | | | |
| **HISPANIC OR LATINO AND RACE** | | | | |
| Total population | 2,058 | +/-344 | 2,058 | (X) |
| Hispanic or Latino (of any race) | 53 | +/-73 | 2.6% | +/-3.4 |
| Mexican | 48 | +/-72 | 2.3% | +/-3.4 |
| Puerto Rican | 0 | +/-12 | 0.0% | +/-1.7 |
| Cuban | 0 | +/-12 | 0.0% | +/-1.7 |
| Other Hispanic or Latino | 5 | +/-11 | 0.2% | +/-0.5 |
| Not Hispanic or Latino | 2,005 | +/-331 | 97.4% | +/-3.4 |
| White alone | 911 | +/-222 | 44.3% | +/-9.9 |
| Black or African American alone | 1,080 | +/-292 | 52.5% | +/-9.3 |
| American Indian and Alaska Native alone | 11 | +/-18 | 0.5% | +/-0.8 |
| Asian alone | 0 | +/-12 | 0.0% | +/-1.7 |
| Native Hawaiian and Other Pacific Islander alone | 0 | +/-12 | 0.0% | +/-1.7 |

62.4

03/07/2018

| Subject | Estimate | Margin of Error | Percent | Percent Margin of Error |
|---|---|---|---|---|
| Some other race alone | 0 | +/-12 | 0.0% | +/-1.7 |
| Two or more races | 3 | +/-5 | 0.1% | +/-0.2 |
| Two races including Some other race | 0 | +/-12 | 0.0% | +/-1.7 |
| Two races excluding Some other race, and Three or more races | 3 | +/-5 | 0.1% | +/-0.2 |
| | | | | |
| Total housing units | 738 | +/-116 | (X) | (X) |
| | | | | |
| CITIZEN, VOTING AGE POPULATION | | | | |
| Citizen, 18 and over population | 1,295 | +/-230 | 1,295 | (X) |
| Male | 518 | +/-130 | 40.0% | +/-4.9 |
| Female | 777 | +/-133 | 60.0% | +/-4.9 |

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

For more information on understanding race and Hispanic origin data, please see the Census 2010 Brief entitled, Overview of Race and Hispanic Origin: 2010, issued March 2011. (pdf format)

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

Explanation of Symbols:

1.  An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
2.  An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
3.  An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
4.  An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
5.  An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
6.  An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.
7.  An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.
8.  An '(X)' means that the estimate is not applicable or not available.

62.4



## QuickFacts
**Madison County, Mississippi**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

## Chart



**Median household income (in 2016 dollars), 2012-2016**

| County | Income |
|---|---|
| Madison County, Mississippi | $65,924 |
| Adams County, Mississippi | $31,283 |
| Alcorn County, Mississippi | $38,892 |
| Amite County, Mississippi | $27,334 |
| Attala County, Mississippi | $33,018 |
| Benton County, Mississippi | $36,302 |
| Bolivar County, Mississippi | $27,457 |
| Calhoun County, Mississippi | $31,141 |
| Carroll County, Mississippi | $40,278 |
| Chickasaw County, Mississippi | $31,048 |
| Choctaw County, Mississippi | $32,953 |
| Claiborne County, Mississippi | $25,000 |

62.5



| County | Value |
|---|---|
| Clarke County, Mississippi | $36,441 |
| Clay County, Mississippi | $33,142 |
| Coahoma County, Mississippi | $28,217 |
| Copiah County, Mississippi | $34,738 |
| Covington County, Mississippi | $31,684 |
| DeSoto County, Mississippi | $60,111 |
| Forrest County, Mississippi | $37,017 |
| Franklin County, Mississippi | $40,081 |
| George County, Mississippi | $47,313 |
| Greene County, Mississippi | $40,069 |
| Grenada County, Mississippi | $33,026 |
| Hancock County, Mississippi | $46,542 |
| Harrison County, Mississippi | $43,095 |
| Hinds County, Mississippi | $38,773 |
| Holmes County, Mississippi | $20,800 |
| Humphreys County, Mississippi | $23,442 |
| Issaquena County, Mississippi | $24,306 |
| Itawamba County, Mississippi | $35,380 |

62.5



| County | Value |
|---|---|
| Jackson County, Mississippi | $49,158 |
| Jasper County, Mississippi | $34,993 |
| Jefferson County, Mississippi | $23,773 |
| Jefferson Davis County, Mississippi | $26,429 |
| Jones County, Mississippi | $37,846 |
| Kemper County, Mississippi | $29,925 |
| Lafayette County, Mississippi | $43,162 |
| Lamar County, Mississippi | $53,888 |
| Lauderdale County, Mississippi | $38,399 |
| Lawrence County, Mississippi | $38,155 |
| Leake County, Mississippi | $32,657 |
| Lee County, Mississippi | $43,224 |
| Leflore County, Mississippi | $25,356 |
| Lincoln County, Mississippi | $36,250 |
| Lowndes County, Mississippi | $41,219 |
| Marion County, Mississippi | $30,914 |
| Marshall County, Mississippi | $40,598 |
| Monroe County, Mississippi | $37,345 |

62.5



| County | Value |
|---|---|
| Montgomery County, Mississippi | $31,207 |
| Neshoba County, Mississippi | $35,991 |
| Newton County, Mississippi | $35,527 |
| Noxubee County, Mississippi | $31,472 |
| Oktibbeha County, Mississippi | $33,431 |
| Panola County, Mississippi | $37,556 |
| Pearl River County, Mississippi | $41,598 |
| Perry County, Mississippi | $34,774 |
| Pike County, Mississippi | $31,511 |
| Pontotoc County, Mississippi | $39,869 |
| Prentiss County, Mississippi | $33,509 |
| Quitman County, Mississippi | $24,835 |
| Rankin County, Mississippi | $59,370 |
| Scott County, Mississippi | $32,615 |
| Sharkey County, Mississippi | $28,878 |
| Simpson County, Mississippi | $37,285 |
| Smith County, Mississippi | $33,696 |
| Stone County, Mississippi | $44,995 |

62.5



| County | Value |
|---|---|
| Sunflower County, Mississippi | $27,126 |
| Tallahatchie County, Mississippi | $29,837 |
| Tate County, Mississippi | $43,883 |
| Tippah County, Mississippi | $37,109 |
| Tishomingo County, Mississippi | $35,364 |
| Tunica County, Mississippi | $31,918 |
| Union County, Mississippi | $37,898 |
| Walthall County, Mississippi | $30,571 |
| Warren County, Mississippi | $40,475 |
| Washington County, Mississippi | $28,452 |
| Wayne County, Mississippi | $34,458 |
| Webster County, Mississippi | $37,083 |
| Wilkinson County, Mississippi | $25,846 |
| Winston County, Mississippi | $32,820 |
| Yalobusha County, Mississippi | $34,749 |
| Yazoo County, Mississippi | $27,560 |

62.5

**Value Notes**

▲ This geographic level of poverty and health estimates is not comparable to other geographic levels of these estimates

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ icon to the left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2017) refers to the final year of the series (2010 thru 2017). *Different vintage years of estimates are not comparable.*

**Fact Notes**
- **(a)** Includes persons reporting only one race
- **(b)** Hispanics may be of any race, so also are included in applicable race categories
- **(c)** Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**
- **-** Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ended distribution.
- **D** Suppressed to avoid disclosure of confidential information
- **F** Fewer than 25 firms
- **FN** Footnote on this item in place of data
- **NA** Not available
- **S** Suppressed; does not meet publication standards
- **X** Not applicable
- **Z** Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

62.5

EXHIBIT 63

U.S. Department of Commerce
Economics and Statistics Administration
BUREAU OF THE CENSUS

1990 CP-1-26

1990 Census of Population

**General Population
Characteristics**

# Mississippi

# CENSUS '90





Table 1. **Summary of General Characteristics of Persons: 1990**

[For definitions of terms and meanings of symbols, see text]

| State Urban and Rural and Size of Place Inside and Outside Metropolitan Area County Place and [In Selected States] County Subdivision [1,000 or More Persons] | All persons | Percent of all persons | | | | | | | | | Percent of all persons | | | Persons in group quarters | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Under 5 years | Under 18 years | 18 to 24 years | 25 to 44 years | 45 to 64 years | 65 years and over | 80 years and over | Median age | Persons 18 years and over—Males per 100 females | In households | | | | |
| | | | | | | | | | | | In families | Non-family householders and non-relatives of householder | In group quarters | Total | Percent institutionalized |
| The State ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 2 573 216 | 7.6 | 28.9 | 11.4 | 29.1 | 18.0 | 12.5 | 2.9 | 31.1 | 86.9 | 85.7 | 11.6 | 2.7 | 69 717 | 42.6 |
| **URBAN AND RURAL AND SIZE OF PLACE** | | | | | | | | | | | | | | | |
| Urban ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 1 210 729 | 7.7 | 28.1 | 11.9 | 29.7 | 17.3 | 13.0 | 3.2 | 31.0 | 82.9 | 82.4 | 14.0 | 3.6 | 43 887 | 47.3 |
| Inside urbanized area ‑‑‑‑‑‑‑‑‑ | 617 412 | 7.7 | 27.5 | 12.3 | 32.2 | 17.4 | 10.6 | 2.3 | 30.7 | 87.6 | 82.4 | 13.8 | 3.8 | 23 273 | 38.2 |
| Central place ‑‑‑‑‑‑‑‑‑‑‑‑ | 351 512 | 7.8 | 26.5 | 13.9 | 31.1 | 16.4 | 12.0 | 2.7 | 30.3 | 86.5 | 78.6 | 16.1 | 5.3 | 18 578 | 29.4 |
| Urban fringe ‑‑‑‑‑‑‑‑‑‑‑‑ | 265 900 | 7.6 | 28.9 | 10.0 | 33.6 | 18.7 | 8.8 | 1.8 | 31.2 | 89.2 | 87.5 | 10.8 | 1.8 | 4 695 | 73.1 |
| Outside urbanized area ‑‑‑‑‑‑‑ | 593 317 | 7.8 | 28.8 | 11.5 | 27.2 | 17.1 | 15.4 | 4.1 | 31.5 | 78.2 | 82.3 | 14.2 | 3.4 | 20 614 | 57.6 |
| Place of 10,000 or more ‑‑‑ | 361 414 | 7.9 | 29.2 | 11.0 | 27.6 | 17.1 | 15.1 | 4.0 | 31.6 | 77.1 | 82.5 | 14.7 | 2.7 | 9 874 | 65.6 |
| Place of 2,500 to 9,999 ‑‑ | 231 903 | 7.6 | 28.0 | 12.3 | 26.6 | 17.1 | 15.9 | 4.4 | 31.4 | 80.0 | 82.1 | 13.3 | 4.6 | 10 740 | 50.2 |
| Rural ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 1 362 487 | 7.5 | 29.8 | 11.0 | 28.6 | 18.6 | 12.0 | 2.7 | 31.2 | 90.7 | 88.7 | 9.4 | 1.9 | 25 830 | 34.7 |
| Place of 1,000 to 2,499 ‑‑‑‑‑ | 126 605 | 8.0 | 30.7 | 11.8 | 26.1 | 16.8 | 14.6 | 4.0 | 30.4 | 78.5 | 84.7 | 11.6 | 3.7 | 4 728 | 40.4 |
| Place of less than 1,000 ‑‑‑‑ | 65 446 | 8.1 | 30.3 | 10.2 | 26.0 | 17.7 | 15.7 | 4.0 | 31.7 | 79.4 | 87.2 | 12.0 | .8 | 498 | 67.5 |
| Other rural ‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 1 170 436 | 7.4 | 29.7 | 10.9 | 29.0 | 18.8 | 11.6 | 2.5 | 31.3 | 92.8 | 89.2 | 9.1 | 1.8 | 20 604 | 32.6 |
| **INSIDE AND OUTSIDE METROPOLITAN AREA** | | | | | | | | | | | | | | | |
| Inside metropolitan area ‑‑‑‑‑‑‑ | 775 674 | 7.7 | 28.2 | 11.1 | 32.1 | 18.2 | 10.4 | 2.2 | 31.2 | 89.8 | 85.2 | 11.9 | 2.8 | 21 996 | 43.3 |
| In central city ‑‑‑‑‑‑‑‑‑‑‑ | 309 630 | 7.9 | 26.9 | 12.7 | 31.6 | 16.8 | 11.9 | 2.7 | 30.7 | 87.5 | 80.0 | 15.4 | 4.6 | 14 226 | 31.6 |
| Not in central city ‑‑‑‑‑‑‑‑ | 466 044 | 7.6 | 29.1 | 10.0 | 32.5 | 19.2 | 9.3 | 1.8 | 31.5 | 91.5 | 88.7 | 9.4 | 1.7 | 7 770 | 64.8 |
| Urban ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 276 651 | 7.8 | 28.7 | 9.9 | 33.2 | 18.9 | 9.2 | 1.8 | 31.5 | 89.5 | 87.4 | 10.8 | 1.8 | 4 990 | 72.6 |
| Inside urbanized area ‑‑‑ | 248 025 | 7.6 | 28.8 | 9.9 | 33.7 | 18.8 | 8.7 | 1.8 | 31.3 | 89.5 | 87.4 | 10.7 | 1.9 | 4 635 | 72.7 |
| Outside urbanized area ‑ | 28 626 | 7.6 | 28.4 | 10.3 | 28.9 | 20.3 | 13.3 | 2.2 | 33.1 | 90.1 | 87.9 | 10.9 | 1.2 | 355 | 71.8 |
| Rural ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 189 393 | 7.6 | 29.6 | 10.0 | 31.3 | 19.5 | 9.5 | 1.9 | 31.6 | 94.4 | 90.5 | 8.0 | 1.5 | 2 780 | 50.6 |
| Outside metropolitan area ‑‑‑‑‑‑ | 1 797 542 | 7.5 | 29.4 | 11.5 | 27.8 | 17.8 | 13.4 | 3.3 | 31.1 | 85.7 | 85.9 | 11.4 | 2.7 | 47 721 | 42.3 |
| Urban ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 624 448 | 7.7 | 28.5 | 12.4 | 27.3 | 16.7 | 15.2 | 4.1 | 31.0 | 78.0 | 81.3 | 14.7 | 4.0 | 24 671 | 51.2 |
| Inside urbanized area ‑‑‑ | 59 757 | 7.4 | 25.4 | 19.3 | 28.7 | 14.8 | 11.8 | 3.0 | 27.8 | 81.3 | 74.1 | 18.5 | 7.4 | 4 412 | 23.1 |
| Outside urbanized area ‑ | 564 691 | 7.8 | 28.8 | 11.6 | 27.1 | 16.9 | 15.5 | 4.2 | 31.5 | 77.7 | 82.1 | 14.3 | 3.6 | 20 259 | 57.4 |
| Place of 10,000 or more ‑‑ | 351 352 | 7.9 | 29.2 | 11.0 | 27.6 | 17.1 | 15.1 | 4.0 | 31.6 | 76.7 | 82.4 | 14.8 | 2.8 | 9 681 | 65.1 |
| Place of 2,500 to 9,999 ‑ | 213 339 | 7.6 | 28.2 | 12.6 | 26.3 | 16.7 | 16.2 | 4.7 | 31.1 | 78.6 | 81.5 | 13.6 | 5.0 | 10 578 | 50.3 |
| Rural ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 1 173 094 | 7.4 | 29.8 | 11.1 | 28.2 | 18.4 | 12.5 | 2.8 | 31.2 | 90.1 | 88.4 | 9.7 | 2.0 | 23 050 | 32.8 |
| **COUNTY** | | | | | | | | | | | | | | | |
| Adams County ‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 35 356 | 7.5 | 29.0 | 8.5 | 28.4 | 19.8 | 14.4 | 3.4 | 33.7 | 80.1 | 86.6 | 12.2 | 1.1 | 395 | 83.0 |
| Alcorn County ‑‑‑‑‑‑‑‑‑‑‑‑‑ | 31 722 | 6.3 | 25.5 | 9.4 | 29.0 | 20.8 | 15.4 | 3.9 | 35.4 | 86.6 | 87.1 | 11.9 | 1.0 | 319 | 90.9 |
| Amite County ‑‑‑‑‑‑‑‑‑‑‑‑‑ | 13 328 | 7.2 | 29.3 | 9.2 | 26.4 | 19.6 | 15.5 | 3.3 | 33.2 | 89.5 | 89.1 | 10.8 | .2 | 20 | 100.0 |
| Attala County ‑‑‑‑‑‑‑‑‑‑‑‑ | 18 481 | 6.9 | 27.3 | 9.5 | 25.2 | 19.6 | 18.4 | 4.6 | 35.1 | 83.5 | 87.0 | 12.0 | 1.0 | 182 | 87.9 |
| Benton County ‑‑‑‑‑‑‑‑‑‑‑‑ | 8 046 | 7.4 | 29.8 | 10.1 | 26.5 | 18.9 | 14.8 | 3.2 | 31.7 | 90.7 | 90.4 | 9.3 | .3 | 21 | 28.6 |
| Bolivar County ‑‑‑‑‑‑‑‑‑‑‑‑ | 41 875 | 8.7 | 33.8 | 14.3 | 24.9 | 14.5 | 12.4 | 3.2 | 26.3 | 77.3 | 84.2 | 11.5 | 4.2 | 1 775 | 29.5 |
| Calhoun County ‑‑‑‑‑‑‑‑‑‑‑ | 14 908 | 6.8 | 26.3 | 10.3 | 26.7 | 19.8 | 16.9 | 4.5 | 34.8 | 86.1 | 87.2 | 11.5 | 1.3 | 197 | 97.5 |
| Carroll County ‑‑‑‑‑‑‑‑‑‑‑‑ | 9 237 | 7.1 | 28.7 | 8.9 | 26.8 | 20.4 | 15.2 | 3.2 | 34.0 | 89.9 | 89.7 | 10.1 | .3 | 24 | 75.0 |
| Chickasaw County ‑‑‑‑‑‑‑‑‑‑ | 18 085 | 8.1 | 29.9 | 10.4 | 27.9 | 18.1 | 13.6 | 3.7 | 31.3 | 84.3 | 88.8 | 10.5 | .8 | 139 | 100.0 |
| Choctaw County ‑‑‑‑‑‑‑‑‑‑‑ | 9 071 | 7.0 | 30.2 | 8.8 | 26.9 | 19.4 | 14.7 | 3.9 | 32.6 | 86.1 | 87.6 | 10.1 | 2.3 | 207 | 100.0 |
| Claiborne County ‑‑‑‑‑‑‑‑‑‑‑ | 11 370 | 7.0 | 28.0 | 24.2 | 22.9 | 13.3 | 11.7 | 2.9 | 23.3 | 80.6 | 72.2 | 10.6 | 17.2 | 1 951 | .7 |
| Clarke County ‑‑‑‑‑‑‑‑‑‑‑‑ | 17 313 | 6.9 | 29.0 | 9.8 | 27.5 | 18.9 | 14.9 | 4.0 | 33.1 | 85.6 | 88.5 | 10.5 | 1.0 | 177 | 92.7 |
| Clay County ‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 21 120 | 7.8 | 30.9 | 11.1 | 27.8 | 16.8 | 13.3 | 3.5 | 30.6 | 83.5 | 86.9 | 10.3 | 2.8 | 593 | 39.0 |
| Coahoma County ‑‑‑‑‑‑‑‑‑‑‑ | 31 665 | 9.0 | 34.2 | 10.6 | 24.9 | 16.2 | 14.2 | 3.7 | 29.0 | 74.6 | 85.7 | 11.9 | 2.4 | 768 | 66.7 |
| Copiah County ‑‑‑‑‑‑‑‑‑‑‑‑ | 27 592 | 7.7 | 29.9 | 12.5 | 26.9 | 17.2 | 13.5 | 3.3 | 30.3 | 86.4 | 85.1 | 10.2 | 4.7 | 1 297 | 12.3 |
| Covington County ‑‑‑‑‑‑‑‑‑‑ | 16 527 | 7.9 | 30.9 | 10.3 | 27.3 | 18.6 | 12.9 | 3.0 | 31.0 | 88.8 | 90.0 | 9.6 | .4 | 69 | 95.7 |
| DeSoto County ‑‑‑‑‑‑‑‑‑‑‑‑ | 67 910 | 7.9 | 28.9 | 10.1 | 32.7 | 20.0 | 8.3 | 1.5 | 31.5 | 93.4 | 91.9 | 7.7 | .3 | 219 | 83.1 |
| Forrest County ‑‑‑‑‑‑‑‑‑‑‑‑ | 68 314 | 7.3 | 25.9 | 17.5 | 28.5 | 15.9 | 12.1 | 2.9 | 28.7 | 82.7 | 77.2 | 16.3 | 6.5 | 4 443 | 22.9 |
| Franklin County ‑‑‑‑‑‑‑‑‑‑‑ | 8 377 | 7.5 | 29.6 | 8.3 | 27.1 | 18.8 | 16.2 | 4.2 | 33.6 | 88.0 | 87.9 | 11.3 | .8 | 67 | 100.0 |
| George County ‑‑‑‑‑‑‑‑‑‑‑‑ | 16 673 | 7.6 | 30.3 | 10.6 | 28.7 | 19.2 | 11.2 | 2.5 | 30.8 | 93.1 | 90.8 | 8.4 | .8 | 137 | 100.0 |
| Greene County ‑‑‑‑‑‑‑‑‑‑‑‑ | 10 220 | 7.1 | 30.1 | 10.3 | 30.1 | 17.9 | 11.6 | 2.7 | 30.9 | 104.5 | 86.3 | 7.9 | 5.7 | 585 | 100.0 |
| Grenada County ‑‑‑‑‑‑‑‑‑‑‑ | 21 555 | 7.9 | 29.2 | 9.8 | 28.8 | 18.1 | 14.2 | 3.5 | 32.5 | 82.5 | 87.2 | 11.2 | 1.6 | 344 | 83.1 |
| Hancock County ‑‑‑‑‑‑‑‑‑‑‑ | 31 760 | 7.2 | 27.3 | 8.8 | 28.4 | 21.3 | 14.2 | 3.1 | 34.5 | 96.3 | 85.5 | 12.7 | 1.9 | 596 | 42.3 |
| Harrison County ‑‑‑‑‑‑‑‑‑‑‑ | 165 365 | 8.0 | 27.5 | 12.1 | 31.8 | 17.8 | 10.8 | 2.2 | 30.6 | 97.5 | 82.4 | 13.1 | 4.5 | 7 444 | 34.8 |
| Hinds County ‑‑‑‑‑‑‑‑‑‑‑‑‑ | 254 441 | 7.7 | 27.9 | 12.2 | 31.8 | 16.9 | 11.2 | 2.6 | 30.8 | 82.9 | 82.7 | 13.9 | 3.4 | 8 703 | 27.9 |
| Holmes County ‑‑‑‑‑‑‑‑‑‑‑‑ | 21 604 | 8.9 | 35.0 | 11.6 | 24.0 | 15.1 | 14.3 | 3.8 | 27.5 | 76.9 | 87.1 | 11.0 | 1.8 | 399 | 28.1 |
| Humphreys County ‑‑‑‑‑‑‑‑‑ | 12 134 | 9.0 | 35.8 | 10.5 | 25.4 | 15.6 | 12.8 | 3.7 | 27.6 | 77.8 | 87.2 | 12.3 | .6 | 71 | 100.0 |
| Issaquena County ‑‑‑‑‑‑‑‑‑‑ | 1 909 | 8.9 | 32.5 | 9.9 | 25.6 | 19.1 | 12.9 | 3.4 | 30.3 | 96.3 | 89.1 | 10.9 | — | — | — |
| Itawamba County ‑‑‑‑‑‑‑‑‑‑ | 20 017 | 6.1 | 24.3 | 11.8 | 27.3 | 21.2 | 15.4 | 3.5 | 35.0 | 92.4 | 87.5 | 9.6 | 2.9 | 589 | 36.0 |
| Jackson County ‑‑‑‑‑‑‑‑‑‑‑ | 115 243 | 7.6 | 29.7 | 9.7 | 31.1 | 20.1 | 9.4 | 1.6 | 31.7 | 93.2 | 89.1 | 10.0 | .9 | 994 | 63.9 |
| Jasper County ‑‑‑‑‑‑‑‑‑‑‑‑ | 17 114 | 7.0 | 30.6 | 9.9 | 26.9 | 17.8 | 14.8 | 3.6 | 31.7 | 86.6 | 90.0 | 9.4 | .6 | 98 | 100.0 |
| Jefferson County ‑‑‑‑‑‑‑‑‑‑ | 8 653 | 8.8 | 35.4 | 10.4 | 26.4 | 15.9 | 11.8 | 2.8 | 28.3 | 81.1 | 89.6 | 10.4 | — | 4 | — |
| Jefferson Davis County ‑‑‑‑‑‑ | 14 051 | 7.3 | 31.0 | 10.7 | 26.1 | 17.8 | 14.4 | 3.3 | 31.1 | 84.8 | 89.6 | 9.5 | .8 | 118 | 94.1 |
| Jones County ‑‑‑‑‑‑‑‑‑‑‑‑‑ | 62 031 | 6.9 | 27.3 | 10.0 | 28.7 | 19.7 | 14.3 | 3.3 | 33.6 | 86.1 | 86.8 | 10.7 | 2.6 | 1 590 | 39.5 |
| Kemper County ‑‑‑‑‑‑‑‑‑‑‑‑ | 10 356 | 7.3 | 29.7 | 11.3 | 25.3 | 17.9 | 15.8 | 4.6 | 31.9 | 87.9 | 86.0 | 11.0 | 3.1 | 317 | 28.7 |
| Lafayette County ‑‑‑‑‑‑‑‑‑‑ | 31 826 | 5.4 | 20.8 | 27.9 | 26.6 | 14.7 | 10.1 | 2.7 | 25.7 | 93.4 | 67.4 | 18.6 | 13.9 | 4 439 | 10.9 |
| Lamar County ‑‑‑‑‑‑‑‑‑‑‑‑ | 30 424 | 7.9 | 29.9 | 10.7 | 32.7 | 17.3 | 9.4 | 2.1 | 30.4 | 91.2 | 89.6 | 9.9 | .4 | 136 | 100.0 |
| Lauderdale County ‑‑‑‑‑‑‑‑‑ | 75 555 | 7.5 | 28.0 | 10.8 | 29.6 | 18.1 | 13.5 | 3.2 | 32.1 | 84.5 | 83.5 | 13.2 | 3.3 | 2 464 | 48.2 |
| Lawrence County ‑‑‑‑‑‑‑‑‑‑ | 12 458 | 7.0 | 30.2 | 9.3 | 27.5 | 19.5 | 13.5 | 3.1 | 32.4 | 86.0 | 89.4 | 9.7 | .8 | 102 | 75.5 |
| Leake County ‑‑‑‑‑‑‑‑‑‑‑‑ | 18 436 | 7.0 | 28.5 | 9.5 | 26.6 | 19.3 | 16.1 | 4.4 | 33.7 | 85.5 | 88.2 | 11.0 | .8 | 152 | 98.7 |
| Lee County ‑‑‑‑‑‑‑‑‑‑‑‑‑‑ | 65 581 | 8.0 | 28.2 | 9.8 | 31.8 | 18.6 | 11.6 | 2.8 | 32.0 | 86.4 | 86.8 | 11.9 | 1.3 | 849 | 85.0 |
| Leflore County ‑‑‑‑‑‑‑‑‑‑‑‑ | 37 341 | 8.3 | 32.2 | 11.9 | 26.0 | 15.5 | 14.2 | 3.6 | 29.2 | 79.2 | 83.5 | 12.7 | 3.8 | 1 423 | 35.8 |
| Lincoln County ‑‑‑‑‑‑‑‑‑‑‑ | 30 278 | 6.4 | 28.4 | 9.3 | 28.4 | 19.2 | 14.8 | 3.7 | 33.5 | 86.3 | 88.0 | 10.6 | 1.5 | 450 | 67.1 |
| Lowndes County ‑‑‑‑‑‑‑‑‑‑‑ | 59 308 | 8.5 | 29.7 | 12.1 | 31.4 | 16.6 | 10.2 | 2.4 | 29.5 | 86.0 | 85.6 | 12.1 | 2.3 | 1 392 | 23.3 |
| Madison County ‑‑‑‑‑‑‑‑‑‑‑ | 53 794 | 8.8 | 29.6 | 10.8 | 34.8 | 15.3 | 8.0 | 1.7 | 28.6 | 88.7 | 86.7 | 10.3 | 1.8 | 1 308 | 100.0 |
| Marion County ‑‑‑‑‑‑‑‑‑‑‑‑ | 25 544 | 7.1 | 30.5 | 9.4 | 27.5 | 18.3 | 14.4 | 3.2 | 32.0 | 85.7 | 88.3 | 10.0 | .7 | 448 | 100.0 |
| Marshall County ‑‑‑‑‑‑‑‑‑‑‑ | 30 361 | 8.1 | 30.0 | 12.3 | 28.6 | 15.9 | 12.1 | 2.6 | 30.1 | 87.6 | 87.6 | 9.7 | 2.7 | 807 | 18.5 |
| Monroe County ‑‑‑‑‑‑‑‑‑‑‑‑ | 36 582 | 7.3 | 28.7 | 10.1 | 28.0 | 18.9 | 14.9 | 3.8 | 33.2 | 82.2 | 88.7 | 10.6 | .7 | 261 | 100.0 |
| Montgomery County ‑‑‑‑‑‑‑‑‑ | 12 388 | 6.3 | 28.0 | 9.7 | 25.9 | 16.8 | 18.4 | 4.3 | 33.8 | 81.0 | 87.7 | 11.1 | 1.1 | 140 | 94.3 |
| Neshoba County ‑‑‑‑‑‑‑‑‑‑‑ | 24 800 | 7.3 | 29.9 | 9.7 | 27.6 | 18.6 | 14.3 | 3.6 | 32.5 | 86.0 | 87.8 | 10.9 | 1.3 | 331 | 68.0 |

TIPSII [UPF] GP128 CENSUS90 72583600 05/01/92 9:37 PM MACHINE: C DATA:CENSUS90*P1TIPSDA28. 04/24/92 21:27:45 TAPE: NONE FRAME: 1
TSF:CENSUS90*92. 04/24/92 21:29:19 UTF:CENSUS90*93. 04/24/92 21:29:19 META:CENSUS90*P1TABLES28. 04/24/92 21:45:22

Table 1. **Summary of General Characteristics of Persons: 1990**—Con.

[For definitions of terms and meanings of symbols, see text]

| State Urban and Rural and Size of Place Inside and Outside Metropolitan Area County Place and [In Selected States] County Subdivision [1,000 or More Persons] | All persons | Percent of all persons | | | | | | | | Persons 18 years and over— Males per 100 females | Percent of all persons | | | Persons in group quarters | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | In households | | | | |
| | | Under 5 years | Under 18 years | 18 to 24 years | 25 to 44 years | 45 to 64 years | 65 years and over | 80 years and over | Median age | | In families | Nonfamily householders and nonrelatives of householder | In group quarters | Total | Percent institutionalized |
| **COUNTY**—Con. | | | | | | | | | | | | | | | |
| Newton County | 20 291 | 7.0 | 27.5 | 11.6 | 26.2 | 19.0 | 15.6 | 3.9 | 33.1 | 87.8 | 86.7 | 10.4 | 2.9 | 591 | 29.3 |
| Noxubee County | 12 604 | 9.2 | 33.8 | 10.3 | 26.3 | 16.2 | 13.3 | 3.7 | 29.1 | 82.5 | 89.5 | 10.2 | .3 | 32 | 62.5 |
| Oktibbeha County | 38 375 | 6.3 | 22.6 | 28.7 | 26.1 | 13.7 | 8.9 | 2.4 | 24.4 | 98.1 | 68.4 | 18.4 | 13.1 | 5 037 | 3.4 |
| Panola County | 29 996 | 8.2 | 31.9 | 10.8 | 27.0 | 17.2 | 13.2 | 3.2 | 30.0 | 83.9 | 87.8 | 10.5 | 1.7 | 520 | 40.8 |
| Pearl River County | 38 714 | 7.4 | 28.9 | 10.3 | 28.4 | 20.8 | 11.6 | 2.3 | 32.5 | 89.3 | 88.7 | 9.9 | 1.5 | 564 | 39.0 |
| Perry County | 10 865 | 7.7 | 31.3 | 10.3 | 28.8 | 18.3 | 11.3 | 2.5 | 30.6 | 89.2 | 90.2 | 9.3 | .5 | 56 | 80.4 |
| Pike County | 36 882 | 7.0 | 30.1 | 10.1 | 27.3 | 18.0 | 14.6 | 3.5 | 32.1 | 80.8 | 86.1 | 12.0 | 1.9 | 697 | 51.1 |
| Pontotoc County | 22 237 | 7.2 | 27.1 | 10.2 | 29.5 | 18.9 | 14.2 | 3.3 | 33.1 | 89.3 | 89.1 | 10.3 | .7 | 147 | 100.0 |
| Prentiss County | 23 278 | 7.0 | 25.8 | 12.6 | 27.5 | 19.8 | 14.2 | 3.1 | 33.1 | 87.9 | 87.3 | 10.4 | 2.4 | 551 | 14.7 |
| Quitman County | 10 490 | 8.6 | 33.1 | 10.4 | 24.7 | 16.0 | 15.7 | 3.8 | 29.8 | 79.4 | 87.7 | 11.4 | .8 | 87 | 100.0 |
| Rankin County | 87 161 | 6.9 | 27.7 | 9.4 | 34.1 | 19.8 | 9.1 | 1.8 | 32.6 | 91.0 | 87.8 | 8.7 | 3.4 | 3 002 | 95.4 |
| Scott County | 24 137 | 8.2 | 30.2 | 10.2 | 27.7 | 18.5 | 13.4 | 3.4 | 31.5 | 86.5 | 88.8 | 10.5 | .7 | 172 | 94.8 |
| Sharkey County | 7 066 | 8.6 | 36.8 | 11.0 | 25.6 | 14.5 | 12.1 | 3.2 | 26.8 | 77.9 | 88.9 | 10.2 | .9 | 63 | 100.0 |
| Simpson County | 23 953 | 7.5 | 29.6 | 9.4 | 29.2 | 18.9 | 12.9 | 3.2 | 32.2 | 90.8 | 86.9 | 10.1 | 3.0 | 713 | 94.1 |
| Smith County | 14 798 | 7.2 | 28.4 | 9.8 | 27.5 | 19.9 | 14.4 | 3.4 | 33.3 | 91.7 | 90.1 | 9.0 | .9 | 127 | 100.0 |
| Stone County | 10 750 | 7.6 | 28.5 | 13.1 | 28.1 | 18.0 | 12.2 | 2.4 | 30.9 | 92.7 | 84.6 | 10.1 | 5.3 | 575 | 28.7 |
| Sunflower County | 32 867 | 7.8 | 31.8 | 12.3 | 28.8 | 14.6 | 12.5 | 3.3 | 28.7 | 101.4 | 79.5 | 10.2 | 10.2 | 3 366 | 87.5 |
| Tallahatchie County | 15 210 | 8.7 | 33.2 | 10.6 | 25.3 | 16.6 | 14.4 | 3.6 | 29.6 | 83.0 | 88.1 | 11.4 | .5 | 82 | 100.0 |
| Tate County | 21 432 | 7.6 | 29.3 | 12.5 | 28.2 | 17.9 | 12.1 | 2.9 | 30.6 | 88.0 | 87.2 | 8.5 | 4.3 | 917 | 16.7 |
| Tippah County | 19 523 | 6.9 | 27.0 | 10.7 | 27.5 | 19.4 | 15.4 | 3.9 | 33.3 | 89.9 | 88.3 | 10.1 | 1.6 | 314 | 67.2 |
| Tishomingo County | 17 683 | 6.3 | 23.6 | 9.8 | 27.6 | 22.1 | 16.9 | 3.9 | 36.8 | 87.4 | 88.0 | 11.0 | 1.0 | 170 | 100.0 |
| Tunica County | 8 164 | 9.7 | 37.8 | 11.4 | 24.3 | 14.4 | 12.1 | 2.5 | 25.7 | 80.5 | 88.2 | 11.5 | .3 | 26 | 100.0 |
| Union County | 22 085 | 6.7 | 26.4 | 10.0 | 28.4 | 19.7 | 15.4 | 3.8 | 34.4 | 88.9 | 88.7 | 10.6 | .6 | 133 | 100.0 |
| Walthall County | 14 352 | 7.5 | 31.6 | 9.6 | 25.9 | 18.4 | 14.5 | 3.6 | 31.4 | 87.2 | 88.9 | 9.9 | 1.2 | 179 | 75.4 |
| Warren County | 47 880 | 7.2 | 29.9 | 9.1 | 30.0 | 18.0 | 13.0 | 3.4 | 32.4 | 83.9 | 86.8 | 12.1 | 1.1 | 526 | 94.3 |
| Washington County | 67 935 | 8.7 | 33.9 | 10.3 | 27.7 | 16.1 | 12.0 | 2.9 | 29.1 | 80.7 | 87.5 | 11.5 | 1.0 | 703 | 90.3 |
| Wayne County | 19 517 | 7.7 | 31.2 | 9.9 | 29.1 | 18.0 | 11.7 | 2.7 | 30.8 | 87.2 | 90.4 | 9.2 | .4 | 83 | 100.0 |
| Webster County | 10 222 | 6.5 | 26.9 | 9.7 | 26.4 | 19.5 | 17.6 | 4.5 | 34.8 | 85.2 | 87.4 | 11.0 | 1.6 | 165 | 63.0 |
| Wilkinson County | 9 678 | 8.1 | 30.5 | 9.9 | 27.4 | 17.3 | 14.9 | 4.1 | 31.4 | 82.4 | 88.2 | 10.4 | 1.4 | 132 | 100.0 |
| Winston County | 19 433 | 7.1 | 29.4 | 9.2 | 26.6 | 19.4 | 15.3 | 3.9 | 33.9 | 84.1 | 88.3 | 10.8 | .9 | 169 | 99.4 |
| Yalobusha County | 12 033 | 7.0 | 27.9 | 9.0 | 26.4 | 19.1 | 17.6 | 4.1 | 34.7 | 80.5 | 86.3 | 13.1 | .7 | 82 | 70.7 |
| Yazoo County | 25 506 | 8.3 | 32.4 | 9.2 | 25.9 | 17.6 | 14.8 | 3.9 | 31.1 | 81.4 | 87.5 | 11.2 | 1.3 | 336 | 93.2 |
| **PLACE AND COUNTY SUBDIVISION** | | | | | | | | | | | | | | | |
| Aberdeen city | 6 837 | 8.6 | 30.8 | 10.0 | 26.9 | 17.1 | 15.2 | 4.3 | 31.2 | 76.7 | 84.6 | 12.4 | 3.0 | 205 | 100.0 |
| Ackerman town | 1 573 | 8.6 | 28.5 | 7.6 | 25.0 | 18.8 | 20.0 | 5.6 | 34.4 | 70.3 | 81.0 | 14.7 | 4.3 | 67 | 100.0 |
| Amory city | 7 093 | 7.0 | 25.4 | 10.0 | 26.0 | 19.8 | 18.7 | 5.0 | 36.1 | 75.9 | 84.7 | 13.6 | 1.7 | 120 | 100.0 |
| Baldwyn city | 3 204 | 8.1 | 26.8 | 9.8 | 26.9 | 18.8 | 17.6 | 5.5 | 34.4 | 78.4 | 85.3 | 12.6 | 2.1 | 67 | 100.0 |
| Batesville city | 6 403 | 7.0 | 29.9 | 11.4 | 25.9 | 16.6 | 16.3 | 4.6 | 31.8 | 77.6 | 81.2 | 11.6 | 7.2 | 460 | 33.0 |
| Bay St. Louis city | 8 063 | 7.1 | 29.5 | 8.6 | 28.1 | 18.1 | 15.7 | 3.7 | 33.4 | 90.3 | 79.2 | 13.8 | 7.0 | 566 | 44.5 |
| Bay Springs town | 1 729 | 6.2 | 28.3 | 8.4 | 24.2 | 17.8 | 21.3 | 8.9 | 35.4 | 70.7 | 81.6 | 12.7 | 5.7 | 98 | 100.0 |
| Beaumont town | 1 054 | 6.8 | 31.8 | 9.8 | 28.7 | 19.3 | 10.5 | 2.3 | 31.2 | 91.2 | 89.6 | 10.4 | — | — | — |
| Belmont town | 1 554 | 6.4 | 23.7 | 10.1 | 27.1 | 21.7 | 17.4 | 3.7 | 36.1 | 86.5 | 87.8 | 12.2 | — | — | — |
| Belzoni city | 2 536 | 8.9 | 32.3 | 9.3 | 26.5 | 15.3 | 16.6 | 4.6 | 30.1 | 70.4 | 83.7 | 15.9 | .4 | 11 | 100.0 |
| Biloxi city | 46 319 | 8.6 | 25.3 | 17.3 | 30.8 | 15.2 | 11.4 | 2.4 | 28.4 | 107.0 | 75.2 | 14.6 | 10.2 | 4 705 | 17.2 |
| Booneville city | 7 955 | 6.2 | 22.9 | 16.2 | 25.6 | 18.1 | 17.3 | 4.3 | 33.5 | 82.2 | 80.0 | 13.1 | 6.9 | 551 | 14.7 |
| Brandon city | 11 077 | 6.8 | 29.2 | 8.8 | 34.3 | 19.6 | 8.0 | 1.3 | 33.7 | 88.1 | 91.3 | 8.0 | .7 | 77 | 94.8 |
| Brookhaven city | 10 243 | 6.8 | 27.7 | 8.6 | 26.6 | 18.3 | 18.8 | 6.1 | 34.9 | 75.5 | 82.2 | 13.2 | 4.5 | 462 | 68.8 |
| Brooksville town | 1 098 | 9.8 | 35.2 | 10.6 | 25.6 | 15.8 | 12.8 | 3.8 | 28.1 | 73.3 | 88.3 | 11.7 | — | — | — |
| Bruce town | 2 127 | 7.5 | 28.6 | 10.3 | 25.8 | 18.2 | 17.1 | 4.1 | 34.2 | 73.7 | 85.5 | 14.2 | .2 | 5 | — |
| Calhoun City town | 1 838 | 7.8 | 23.7 | 11.5 | 22.1 | 18.1 | 24.6 | 9.1 | 38.1 | 73.4 | 79.3 | 14.3 | 6.5 | 119 | 100.0 |
| Canton city | 10 062 | 8.5 | 31.2 | 10.8 | 26.4 | 17.2 | 14.4 | 3.5 | 30.3 | 75.7 | 86.6 | 11.4 | 1.9 | 193 | 93.3 |
| Carthage city | 3 819 | 8.0 | 29.4 | 8.6 | 25.6 | 18.1 | 18.3 | 5.9 | 33.9 | 70.4 | 83.8 | 12.3 | 4.0 | 152 | 98.7 |
| Centreville town | 1 771 | 8.1 | 32.0 | 8.8 | 26.4 | 14.7 | 18.1 | 6.5 | 30.8 | 76.7 | 84.1 | 10.9 | 5.0 | 88 | 100.0 |
| Charleston city | 2 328 | 7.0 | 28.4 | 9.9 | 23.9 | 16.9 | 20.9 | 6.4 | 33.9 | 73.9 | 83.1 | 14.0 | 2.9 | 68 | 100.0 |
| Clarksdale city | 19 717 | 8.9 | 33.3 | 9.8 | 25.3 | 16.2 | 15.4 | 4.4 | 30.2 | 71.8 | 84.6 | 12.5 | 2.8 | 558 | 91.8 |
| Cleveland city | 15 384 | 7.5 | 29.4 | 20.3 | 25.2 | 15.2 | 15.4 | 4.3 | 29.5 | 79.4 | 78.7 | 12.3 | 9.0 | 1 383 | 10.3 |
| Clinton city | 21 847 | 6.8 | 27.5 | 13.6 | 32.5 | 18.0 | 8.4 | 2.1 | 30.5 | 87.1 | 85.5 | 9.8 | 4.7 | 1 025 | 23.7 |
| Coldwater town | 1 502 | 8.7 | 29.4 | 11.8 | 26.8 | 17.2 | 14.8 | 3.8 | 30.3 | 77.3 | 88.4 | 11.6 | — | — | — |
| Collins city | 2 541 | 8.1 | 31.3 | 10.9 | 24.9 | 17.7 | 15.2 | 4.7 | 31.0 | 75.5 | 86.3 | 11.1 | 2.6 | 66 | 100.0 |
| Collinsville CDP | 1 364 | 5.6 | 25.5 | 9.4 | 32.0 | 20.2 | 13.0 | 2.8 | 35.0 | 95.9 | 88.5 | 11.5 | — | — | — |
| Columbia city | 6 815 | 6.5 | 26.0 | 8.9 | 24.8 | 19.4 | 21.0 | 5.7 | 36.3 | 73.7 | 81.0 | 15.0 | 4.0 | 274 | 100.0 |
| Columbus city | 23 799 | 7.9 | 27.3 | 13.0 | 27.8 | 17.7 | 14.2 | 3.8 | 31.3 | 80.3 | 80.3 | 16.2 | 3.5 | 826 | 30.1 |
| Columbus AFB CDP | 2 890 | 14.4 | 30.2 | 27.0 | 41.2 | 1.3 | .3 | -.1 | 23.9 | 143.9 | 83.2 | 2.0 | 14.8 | 429 | — |
| Como town | 1 387 | 7.8 | 29.4 | 12.1 | 26.0 | 17.4 | 15.1 | 3.6 | 30.6 | 74.8 | 88.2 | 11.8 | — | — | — |
| Corinth city | 11 820 | 6.2 | 23.3 | 8.5 | 25.9 | 20.4 | 21.9 | 6.5 | 38.9 | 74.7 | 80.5 | 17.0 | 2.6 | 302 | 96.0 |
| Crystal Springs city | 5 643 | 7.5 | 31.0 | 13.9 | 24.6 | 15.8 | 14.7 | 3.7 | 28.9 | 81.9 | 81.5 | 11.0 | 7.4 | 419 | — |
| Decatur town | 1 248 | 6.7 | 23.7 | 24.3 | 26.4 | 14.2 | 13.9 | 2.0 | 21.7 | 97.9 | 67.6 | 10.8 | 21.5 | 266 | — |
| De Kalb town | 1 073 | 6.9 | 26.0 | 6.2 | 23.1 | 20.2 | 24.5 | 10.0 | 39.4 | 75.7 | 81.2 | 11.2 | 7.6 | 81 | 100.0 |
| Diamondhead CDP | 2 661 | 4.7 | 14.5 | 3.6 | 22.4 | 33.8 | 25.7 | 1.6 | 52.3 | 93.9 | 89.9 | 10.1 | .1 | 2 | — |
| D'Iberville city | 6 566 | 7.8 | 29.3 | 11.7 | 32.3 | 19.5 | 7.9 | 1.2 | 30.3 | 95.1 | 88.2 | 10.2 | 1.6 | 106 | — |
| Drew city | 2 349 | 8.9 | 34.2 | 10.9 | 23.8 | 15.8 | 15.5 | 3.4 | 29.7 | 74.3 | 86.7 | 13.3 | — | — | — |
| Durant city | 2 838 | 8.5 | 33.7 | 8.7 | 23.7 | 16.7 | 17.2 | 5.3 | 30.9 | 69.2 | 86.2 | 12.5 | 1.3 | 36 | 100.0 |
| Edwards town | 1 279 | 9.9 | 35.5 | 9.1 | 28.1 | 14.5 | 12.7 | 4.2 | 28.0 | 73.7 | 89.2 | 10.2 | — | — | — |
| Ellisville city | 3 634 | 4.5 | 20.9 | 12.0 | 28.8 | 19.3 | 18.9 | 5.6 | 36.1 | 88.0 | 67.8 | 11.5 | 20.7 | 754 | 34.1 |
| Escatawpa CDP | 3 922 | 8.7 | 30.9 | 10.1 | 32.6 | 19.5 | 8.8 | 2.1 | 30.2 | 96.5 | 91.5 | 8.5 | — | — | — |
| Eupora town | 2 145 | 8.1 | 27.9 | 9.3 | 23.7 | 18.2 | 21.0 | 7.1 | 34.3 | 72.5 | 81.8 | 13.3 | 4.8 | 104 | 100.0 |
| Fayette city | 1 853 | 8.9 | 36.9 | 11.1 | 27.3 | 14.6 | 10.1 | 2.3 | 26.8 | 77.1 | 88.5 | 11.3 | .2 | 4 | — |
| Flora town | 1 482 | 6.1 | 30.8 | 9.7 | 31.9 | 15.9 | 12.3 | 2.0 | 30.5 | 84.2 | 90.6 | 9.4 | — | — | — |
| Florence town | 1 831 | 5.8 | 26.1 | 10.4 | 34.9 | 16.7 | 6.2 | 2.1 | 30.8 | 90.9 | 89.3 | 9.4 | 1.5 | 27 | — |
| Flowood town | 2 860 | 6.3 | 22.1 | 12.7 | 43.1 | 15.2 | 6.8 | 1.5 | 29.5 | 88.6 | 74.4 | 21.6 | 4.0 | 114 | 69.3 |
| Forest city | 5 060 | 8.8 | 32.2 | 9.7 | 26.6 | 17.4 | 15.3 | 3.7 | 30.6 | 77.9 | 87.0 | 11.5 | 1.4 | 69 | 100.0 |
| Friars Point town | 1 334 | 10.5 | 38.2 | 11.5 | 24.9 | 13.4 | 11.4 | 2.6 | 26.1 | 76.8 | 87.9 | 10.8 | .3 | 4 | — |
| Fulton city | 3 387 | 5.2 | 19.9 | 18.3 | 21.6 | 19.4 | 20.8 | 5.8 | 37.7 | 77.0 | 71.0 | 13.8 | 15.2 | 514 | 26.7 |

GENERAL POPULATION CHARACTERISTICS

TIPSII [UPF] GP128 CENSUS90 72583600 05/01/92 9:37 PM MACHINE: C DATA:CENSUS90*P1TIPSDA28. 04/24/92 21:27:45 TAPE: NONE FRAME: 2
TSF:CENSUS90*92. 04/24/92 21:29:19 UTF:CENSUS90*93. 04/24/92 21:29:19 META:CENSUS90*P1TABLES28. 04/24/92 21:45:22

Table 1. **Summary of General Characteristics of Persons: 1990** —Con.

[For definitions of terms and meanings of symbols, see text]

| State Urban and Rural and Size of Place Inside and Outside Metropolitan Area County Place and [In Selected States] County Subdivision [1,000 or More Persons] | All persons | Percent of all persons | | | | | | | | Persons 18 years and over— Males per 100 females | Percent of all persons | | | Persons in group quarters | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | In households | | | | |
| | | Under 5 years | Under 18 years | 18 to 24 years | 25 to 44 years | 45 to 64 years | 65 years and over | 80 years and over | Median age | | In families | Nonfamily householders and nonrelatives of householder | In group quarters | Total | Percent institutionalized |
| **PLACE AND COUNTY SUBDIVISION— Con.** | | | | | | | | | | | | | | | |
| Gautier city | 10 088 | 8.3 | 32.8 | 10.0 | 31.9 | 19.0 | 6.3 | 1.1 | 29.7 | 90.9 | 90.9 | 8.8 | .3 | 26 | 65.4 |
| Gloster town | 1 323 | 8.8 | 33.5 | 8.0 | 26.3 | 15.9 | 16.3 | 3.8 | 30.7 | 74.6 | 85.6 | 14.4 | — | — | — |
| Goodman town | 1 256 | 8.3 | 28.3 | 32.1 | 20.1 | 11.1 | 8.4 | 3.2 | 20.5 | 88.1 | 70.2 | 6.9 | 22.9 | 287 | — |
| Greenville city | 45 226 | 8.5 | 33.3 | 10.0 | 28.1 | 16.3 | 12.3 | 3.1 | 29.7 | 79.1 | 86.5 | 12.1 | 1.5 | 664 | 94.9 |
| Greenwood city | 18 906 | 8.2 | 31.5 | 9.2 | 27.3 | 15.9 | 16.2 | 4.3 | 31.2 | 74.1 | 82.8 | 15.3 | 1.9 | 353 | 93.5 |
| Grenada city | 10 864 | 8.2 | 28.7 | 9.5 | 26.5 | 17.7 | 13.6 | 4.7 | 33.5 | 73.1 | 84.0 | 13.4 | 2.6 | 286 | 100.0 |
| Gulf Hills CDP | 5 004 | 6.6 | 28.1 | 6.6 | 31.8 | 21.8 | 11.7 | 1.6 | 34.5 | 94.1 | 91.2 | 8.8 | — | — | — |
| Gulf Park Estates CDP | 2 314 | 6.7 | 31.3 | 7.5 | 37.7 | 17.8 | 5.7 | 1.0 | 30.6 | 98.4 | 91.9 | 8.1 | — | — | — |
| Gulfport city | 40 775 | 7.4 | 25.1 | 11.0 | 31.1 | 18.4 | 14.4 | 3.1 | 32.9 | 95.2 | 77.9 | 17.0 | 5.2 | 2 102 | 61.0 |
| Hattiesburg city | 41 882 | 7.2 | 23.4 | 22.9 | 27.4 | 13.7 | 12.7 | 3.4 | 26.8 | 79.6 | 67.9 | 21.7 | 10.4 | 4 352 | 22.1 |
| Hazlehurst city | 4 221 | 8.3 | 29.8 | 9.0 | 26.1 | 17.2 | 18.0 | 5.6 | 32.7 | 73.8 | 84.2 | 12.7 | 3.1 | 131 | 90.8 |
| Hernando city | 3 125 | 7.2 | 26.9 | 9.0 | 30.6 | 19.7 | 14.3 | 2.8 | 33.4 | 89.6 | 86.1 | 11.2 | 2.7 | 83 | 77.1 |
| Hollandale city | 3 576 | 9.3 | 36.8 | 10.9 | 23.2 | 15.1 | 14.0 | 3.6 | 27.0 | 69.6 | 89.3 | 10.6 | .1 | 5 | 100.0 |
| Holly Springs city | 7 261 | 8.2 | 28.7 | 17.9 | 25.8 | 14.7 | 12.8 | 3.7 | 27.1 | 73.4 | 77.9 | 10.9 | 11.1 | 807 | 18.5 |
| Horn Lake city | 9 069 | 11.7 | 34.8 | 11.9 | 38.5 | 11.6 | 3.1 | .6 | 26.8 | 92.8 | 92.6 | 7.4 | — | — | — |
| Houston city | 3 903 | 7.9 | 27.8 | 10.1 | 26.5 | 17.9 | 17.6 | 5.1 | 32.6 | 73.7 | 85.8 | 12.3 | 1.8 | 72 | 100.0 |
| Indianola city | 11 809 | 9.0 | 35.7 | 10.4 | 26.6 | 14.8 | 12.5 | 3.3 | 27.7 | 73.8 | 88.4 | 10.6 | 1.1 | 124 | 100.0 |
| Inverness town | 1 174 | 7.3 | 29.7 | 10.6 | 25.1 | 18.1 | 16.4 | 3.8 | 32.2 | 82.1 | 88.7 | 11.3 | — | — | — |
| Itta Bena city | 2 377 | 9.2 | 36.7 | 10.4 | 24.8 | 14.4 | 13.7 | 4.1 | 27.2 | 75.4 | 88.6 | 11.4 | — | — | — |
| Iuka city | 3 122 | 6.8 | 23.4 | 8.1 | 25.3 | 20.1 | 23.1 | 7.2 | 39.0 | 71.8 | 79.7 | 14.8 | 5.4 | 170 | 100.0 |
| Jackson city | 196 637 | 7.8 | 27.6 | 12.3 | 32.0 | 16.6 | 11.6 | 2.7 | 30.7 | 81.3 | 81.1 | 15.5 | 3.5 | 6 805 | 30.0 |
| Jonestown town | 1 467 | 13.4 | 44.2 | 10.8 | 23.2 | 10.4 | 11.4 | 2.9 | 21.3 | 58.7 | 89.0 | 11.0 | — | — | — |
| Kiln CDP | 1 262 | 7.5 | 25.7 | 10.2 | 26.4 | 24.8 | 12.9 | 2.2 | 35.4 | 107.1 | 87.1 | 12.9 | — | — | — |
| Kosciusko city | 6 986 | 7.2 | 26.8 | 8.6 | 25.2 | 17.6 | 21.7 | 6.0 | 35.8 | 72.3 | 83.3 | 14.4 | 2.3 | 164 | 86.6 |
| Lambert town | 1 131 | 8.0 | 33.3 | 9.0 | 25.8 | 15.7 | 16.1 | 4.5 | 31.8 | 83.0 | 87.9 | 12.1 | — | — | — |
| Latimer CDP | 3 222 | 8.0 | 30.1 | 11.1 | 32.0 | 20.0 | 6.7 | 1.0 | 29.7 | 105.8 | 91.0 | 8.5 | .5 | 16 | 68.8 |
| Laurel city | 18 827 | 7.5 | 27.4 | 8.9 | 26.2 | 18.8 | 18.7 | 5.0 | 34.9 | 74.8 | 82.9 | 15.0 | 2.1 | 397 | 84.1 |
| Leakesville town | 1 129 | 5.2 | 26.1 | 8.1 | 23.7 | 19.8 | 22.2 | 7.0 | 37.9 | 80.9 | 79.1 | 12.9 | 8.0 | 90 | 100.0 |
| Leland city | 6 366 | 8.7 | 35.2 | 10.5 | 26.3 | 14.5 | 13.4 | 3.1 | 28.3 | 77.3 | 89.1 | 10.9 | — | — | — |
| Lexington city | 2 227 | 8.3 | 29.7 | 10.7 | 23.9 | 16.8 | 18.9 | 3.8 | 31.9 | 73.1 | 84.4 | 14.9 | .7 | 16 | 100.0 |
| Long Beach city | 15 804 | 7.2 | 29.2 | 9.4 | 33.0 | 19.4 | 9.1 | 1.5 | 32.4 | 90.9 | 88.7 | 10.1 | 1.1 | 175 | 81.1 |
| Louisville city | 7 169 | 7.7 | 30.6 | 9.1 | 25.2 | 17.4 | 17.6 | 5.4 | 33.2 | 73.6 | 85.2 | 12.5 | 2.4 | 169 | 99.4 |
| Lucedale city | 2 592 | 8.2 | 28.5 | 11.0 | 25.3 | 18.1 | 17.0 | 5.2 | 31.4 | 84.6 | 81.2 | 13.8 | 5.0 | 129 | 100.0 |
| Lumberton city | 2 121 | 9.6 | 33.1 | 10.6 | 26.7 | 15.9 | 13.6 | 3.8 | 28.9 | 74.8 | 88.4 | 11.6 | — | — | — |
| Lyman CDP | 1 117 | 8.1 | 30.7 | 9.8 | 34.1 | 18.1 | 7.3 | 1.3 | 30.6 | 88.3 | 88.6 | 11.4 | — | — | — |
| Lynchburg CDP | 2 071 | 9.3 | 32.6 | 10.4 | 37.3 | 14.8 | 4.9 | .6 | 29.0 | 95.8 | 93.9 | 6.1 | — | — | — |
| McComb city | 11 591 | 7.3 | 29.4 | 9.0 | 26.2 | 17.2 | 18.3 | 5.1 | 33.9 | 68.5 | 83.6 | 14.0 | 2.4 | 278 | 97.8 |
| Macon city | 2 256 | 9.0 | 30.3 | 9.4 | 25.4 | 16.0 | 18.9 | 5.2 | 32.2 | 72.6 | 84.8 | 14.3 | .9 | 20 | 100.0 |
| Madison city | 7 471 | 11.0 | 29.9 | 4.9 | 42.7 | 14.0 | 8.6 | 3.2 | 32.4 | 91.3 | 92.0 | 6.1 | 1.9 | 145 | 100.0 |
| Magee city | 3 607 | 6.1 | 29.0 | 9.9 | 26.6 | 17.7 | 16.7 | 5.3 | 32.9 | 78.0 | 78.3 | 13.1 | 8.6 | 310 | 98.1 |
| Magnolia city | 2 245 | 7.4 | 32.4 | 9.9 | 24.0 | 18.2 | 15.5 | 3.7 | 31.5 | 76.8 | 85.5 | 12.9 | 1.6 | 36 | 100.0 |
| Mantachie town | 1 359 | 10.2 | 31.2 | 12.1 | 30.0 | 11.8 | 14.8 | 7.1 | 28.1 | 64.3 | 80.5 | 11.3 | 8.2 | 111 | 100.0 |
| Marks city | 1 758 | 8.9 | 30.2 | 9.8 | 24.9 | 15.8 | 19.3 | 4.7 | 32.1 | 72.2 | 84.4 | 13.9 | 1.7 | 30 | 100.0 |
| Martin Bluff CDP | 1 928 | 7.5 | 34.2 | 8.6 | 31.7 | 18.8 | 6.8 | .5 | 30.1 | 100.8 | 90.7 | 7.8 | 1.5 | 28 | 92.9 |
| Mendenhall city | 2 463 | 6.8 | 24.7 | 11.2 | 29.4 | 20.1 | 14.7 | 4.1 | 34.4 | 90.5 | 82.1 | 12.1 | 5.8 | 144 | 91.0 |
| Meridian city | 41 036 | 7.6 | 27.4 | 9.9 | 28.3 | 18.0 | 16.5 | 3.9 | 33.4 | 76.1 | 80.9 | 16.1 | 3.0 | 1 227 | 77.1 |
| Meridian Station CDP | 2 503 | 12.7 | 27.2 | 38.3 | 33.4 | 1.1 | — | — | 21.4 | 203.2 | 60.3 | .4 | 39.3 | 984 | — |
| Metcalfe town | 1 092 | 10.5 | 42.1 | 12.5 | 24.5 | 10.7 | 10.1 | 3.0 | 22.3 | 68.1 | 88.6 | 11.4 | — | — | — |
| Monticello town | 1 755 | 8.4 | 29.1 | 8.3 | 25.4 | 19.4 | 17.5 | 5.9 | 33.7 | 73.0 | 80.7 | 14.9 | 4.4 | 77 | 100.0 |
| Moorhead town | 2 417 | 7.4 | 30.6 | 25.1 | 21.1 | 11.6 | 11.7 | 3.8 | 21.1 | 83.4 | 72.7 | 9.9 | 17.4 | 420 | — |
| Morton city | 3 212 | 8.3 | 29.8 | 10.5 | 27.2 | 16.9 | 15.6 | 5.7 | 32.0 | 76.7 | 86.3 | 10.0 | 3.7 | 119 | 100.0 |
| Moss Point city | 17 837 | 7.2 | 31.1 | 9.8 | 27.8 | 20.0 | 11.3 | 1.9 | 32.3 | 88.4 | 89.8 | 9.7 | .5 | 92 | 100.0 |
| Mound Bayou city | 2 222 | 9.0 | 42.4 | 10.8 | 22.8 | 12.1 | 11.9 | 3.1 | 22.3 | 63.9 | 89.6 | 10.4 | — | — | — |
| Natchez city | 19 460 | 7.2 | 27.5 | 8.6 | 27.1 | 19.0 | 17.7 | 4.6 | 35.2 | 76.0 | 82.8 | 15.5 | 2.0 | 393 | 83.5 |
| Nellieburg CDP | 1 208 | 6.5 | 24.3 | 10.4 | 29.6 | 25.3 | 10.4 | 2.1 | 36.1 | 93.4 | 91.6 | 8.4 | — | — | — |
| Nettleton town | 2 462 | 6.8 | 27.7 | 10.4 | 27.6 | 19.0 | 15.4 | 3.4 | 33.5 | 78.0 | 88.6 | 11.4 | — | — | — |
| New Albany city | 6 775 | 7.1 | 25.6 | 10.1 | 27.3 | 18.7 | 18.3 | 5.4 | 34.4 | 78.5 | 83.5 | 14.6 | 2.0 | 133 | 100.0 |
| New Hope CDP | 1 663 | 7.5 | 35.1 | 7.7 | 39.4 | 14.5 | 3.3 | .2 | 29.5 | 94.8 | 95.9 | 4.1 | — | — | — |
| Newton city | 3 701 | 7.9 | 28.1 | 11.0 | 24.5 | 17.9 | 18.5 | 6.5 | 33.1 | 74.1 | 81.6 | 12.5 | 5.9 | 217 | 67.7 |
| North Gulfport CDP | 4 966 | 7.6 | 34.6 | 11.8 | 26.5 | 17.9 | 9.2 | 1.6 | 27.4 | 86.1 | 88.3 | 11.7 | — | — | — |
| North Tunica CDP | 1 314 | 9.4 | 41.7 | 11.7 | 23.8 | 10.9 | 11.9 | 2.7 | 22.5 | 71.7 | 89.1 | 10.9 | — | — | — |
| Ocean Springs city | 14 658 | 6.5 | 27.2 | 8.0 | 32.6 | 21.7 | 10.5 | 2.3 | 34.6 | 86.5 | 86.7 | 12.5 | .9 | 125 | 84.0 |
| Okolona city | 3 267 | 8.2 | 29.5 | 10.7 | 25.6 | 18.2 | 16.1 | 5.0 | 32.7 | 76.0 | 83.9 | 14.1 | 2.1 | 67 | 100.0 |
| Olive Branch city | 3 567 | 8.7 | 28.8 | 9.5 | 33.7 | 17.4 | 10.6 | 1.7 | 31.5 | 93.0 | 89.1 | 10.9 | — | — | — |
| Orange Grove CDP | 15 676 | 9.3 | 32.7 | 9.9 | 34.4 | 17.4 | 5.6 | .8 | 29.0 | 91.9 | 90.5 | 9.2 | .3 | 50 | 78.0 |
| Oxford city | 9 984 | 4.9 | 16.5 | 29.9 | 27.3 | 13.8 | 12.5 | 4.0 | 26.3 | 95.4 | 58.1 | 36.4 | 5.4 | 544 | 89.3 |
| Pascagoula city | 25 899 | 8.1 | 28.0 | 11.0 | 30.6 | 19.1 | 11.4 | 2.2 | 31.6 | 92.7 | 84.0 | 13.6 | 2.4 | 614 | 59.4 |
| Pass Christian city | 5 557 | 7.1 | 25.1 | 7.9 | 27.3 | 20.2 | 19.5 | 5.3 | 37.0 | 85.1 | 82.0 | 13.9 | 4.0 | 224 | 100.0 |
| Pearl city | 19 588 | 6.9 | 26.7 | 10.3 | 33.5 | 21.1 | 8.4 | 1.7 | 32.1 | 87.9 | 88.1 | 10.7 | 1.2 | 238 | 95.4 |
| Pearlington CDP | 1 603 | 8.7 | 30.2 | 9.5 | 30.4 | 18.4 | 11.5 | 1.6 | 32.2 | 96.3 | 88.7 | 11.3 | — | — | — |
| Pearl River CDP | 2 136 | 11.9 | 43.8 | 9.8 | 26.1 | 11.3 | 9.0 | 4.1 | 22.2 | 82.1 | 79.7 | 10.4 | 9.9 | 212 | 61.8 |
| Pelahatchie city | 1 553 | 6.6 | 29.2 | 11.3 | 27.0 | 20.1 | 12.4 | 2.9 | 31.7 | 83.3 | 90.1 | 9.9 | — | — | — |
| Petal city | 7 883 | 7.5 | 28.4 | 10.1 | 29.0 | 19.2 | 13.3 | 2.8 | 32.2 | 82.3 | 88.1 | 11.1 | .8 | 60 | 100.0 |
| Philadelphia city | 6 758 | 7.7 | 28.6 | 10.0 | 27.9 | 18.5 | 14.8 | 3.6 | 32.5 | 77.5 | 85.5 | 13.8 | .7 | 49 | 69.4 |
| Picayune city | 10 633 | 8.4 | 30.5 | 9.5 | 27.0 | 17.7 | 15.4 | 4.5 | 31.4 | 82.6 | 85.4 | 12.4 | 1.2 | 132 | 93.3 |
| Pickens town | 1 285 | 9.3 | 35.0 | 11.8 | 23.7 | 15.3 | 14.1 | 5.4 | 27.8 | 72.9 | 88.9 | 11.1 | — | — | — |
| Plantersville town | 1 046 | 8.7 | 31.6 | 10.8 | 32.4 | 16.2 | 9.0 | 1.9 | 29.5 | 86.2 | 89.2 | 10.8 | — | — | — |
| Pontotoc city | 4 570 | 6.7 | 25.8 | 9.1 | 28.4 | 16.1 | 19.9 | 5.6 | 35.4 | 76.1 | 84.5 | 14.2 | 1.3 | 60 | 100.0 |
| Poplarville city | 2 561 | 6.1 | 24.4 | 21.5 | 28.2 | 14.5 | 15.7 | 4.8 | 29.2 | 84.4 | 72.1 | 11.4 | 16.5 | 423 | 22.9 |
| Port Gibson city | 1 810 | 7.7 | 29.7 | 7.7 | 26.7 | 17.2 | 19.2 | 5.1 | 34.0 | 74.1 | 82.7 | 16.6 | .8 | 14 | 100.0 |

GENERAL POPULATION CHARACTERISTICS

TIPSII [UPF] GP128 CENSUS90 72583600 05/01/92 9:37 PM MACHINE: C DATA:CENSUS90*P1TIPSDA28. 04/24/92 21:27:45 TAPE: NONE FRAME: 3
TSF:CENSUS90*92. 04/24/92 21:29:19 UTF:CENSUS90*93. 04/24/92 21:29:19 META:CENSUS90*P1TABLES28. 04/24/92 21:45:22

Table 1. **Summary of General Characteristics of Persons: 1990** —Con.

[For definitions of terms and meanings of symbols, see text]

| State Urban and Rural and Size of Place Inside and Outside Metropolitan Area County Place and [In Selected States] County Subdivision [1,000 or More Persons] | All persons | Percent of all persons | | | | | | | Median age | Persons 18 years and over— Males per 100 females | Percent of all persons / In households | | In group quarters | Persons in group quarters | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Under 5 years | Under 18 years | 18 to 24 years | 25 to 44 years | 45 to 64 years | 65 years and over | 80 years and over | | | In families | Nonfamily householders and nonrelatives of householder | | Total | Percent institutionalized |

**PLACE AND COUNTY SUBDIVISION— Con.**

| Prentiss town | 1 487 | 5.9 | 22.1 | 10.0 | 25.1 | 22.3 | 20.5 | 6.1 | 39.3 | 82.4 | 76.9 | 15.1 | 7.9 | 118 | 94.1 |
| Purvis city | 2 140 | 6.7 | 28.0 | 10.4 | 28.3 | 18.0 | 14.5 | 3.0 | 32.3 | 82.0 | 89.5 | 9.7 | .8 | 17 | 100.0 |
| Quitman city | 2 736 | 7.2 | 28.0 | 9.4 | 25.7 | 18.5 | 18.5 | 6.3 | 35.2 | 72.0 | 83.0 | 11.6 | 5.4 | 148 | 100.0 |
| Raleigh town | 1 291 | 6.9 | 24.6 | 9.2 | 25.2 | 20.3 | 20.7 | 8.9 | 37.0 | 75.3 | 80.2 | 9.9 | 9.8 | 127 | 100.0 |
| Raymond town | 2 275 | 3.2 | 13.0 | 54.7 | 15.4 | 9.9 | 7.0 | 1.9 | 20.2 | 76.2 | 43.2 | 6.3 | 50.5 | 1 150 | — |
| Richland city | 4 014 | 8.1 | 26.3 | 11.7 | 32.9 | 19.7 | 9.4 | 1.2 | 30.6 | 90.9 | 87.9 | 12.1 | — | — | — |
| Richton town | 1 034 | 6.7 | 30.9 | 8.8 | 22.2 | 18.1 | 19.9 | 7.2 | 34.5 | 68.0 | 83.8 | 13.4 | 2.7 | 28 | 100.0 |
| Ridgeland city | 11 714 | 7.6 | 21.1 | 12.6 | 48.9 | 11.2 | 6.2 | 2.1 | 29.0 | 85.4 | 70.7 | 28.9 | .5 | 58 | 93.1 |
| Ripley city | 5 371 | 7.0 | 25.9 | 9.9 | 26.7 | 18.4 | 19.2 | 5.8 | 34.9 | 81.2 | 83.8 | 12.2 | 4.0 | 216 | 97.7 |
| Rolling Fork city | 2 444 | 8.1 | 35.4 | 10.5 | 25.7 | 15.3 | 13.1 | 4.0 | 29.1 | 66.0 | 87.8 | 9.7 | 2.6 | 63 | 100.0 |

| Rosedale city | 2 595 | 10.2 | 37.2 | 13.4 | 24.9 | 13.1 | 11.4 | 2.7 | 24.6 | 81.4 | 85.5 | 11.4 | 3.2 | 82 | 100.0 |
| Ruleville city | 3 245 | 7.1 | 33.3 | 9.7 | 23.6 | 14.8 | 18.6 | 6.7 | 30.8 | 65.1 | 84.0 | 12.3 | 3.5 | 113 | 100.0 |
| St. Martin CDP | 6 349 | 7.6 | 30.0 | 9.7 | 31.5 | 21.5 | 7.3 | 1.1 | 30.9 | 95.1 | 91.7 | 8.3 | — | — | — |
| Saltillo town | 1 782 | 7.9 | 27.3 | 10.0 | 28.3 | 20.7 | 13.7 | 3.2 | 33.2 | 78.8 | 87.6 | 12.4 | — | — | — |
| Sardis town | 2 128 | 6.4 | 27.0 | 9.3 | 23.2 | 19.3 | 21.3 | 5.4 | 36.1 | 71.1 | 82.3 | 14.9 | 2.8 | 60 | 100.0 |
| Senatobia city | 4 772 | 6.7 | 24.8 | 21.7 | 24.4 | 14.4 | 14.8 | 4.7 | 27.4 | 77.5 | 73.5 | 11.5 | 15.0 | 715 | 17.8 |
| Shannon town | 1 419 | 7.5 | 28.6 | 10.3 | 29.2 | 17.4 | 14.4 | 3.3 | 31.6 | 83.5 | 87.6 | 12.4 | — | — | — |
| Shaw city | 2 349 | 11.5 | 37.4 | 11.9 | 23.1 | 14.0 | 13.5 | 3.5 | 25.5 | 71.5 | 90.2 | 9.8 | — | — | — |
| Shelby city | 2 806 | 9.9 | 37.8 | 10.8 | 22.6 | 11.2 | 17.5 | 5.5 | 26.1 | 61.8 | 85.3 | 10.7 | 4.0 | 112 | 100.0 |
| Shoreline Park CDP | 2 775 | 6.6 | 24.6 | 8.6 | 28.6 | 25.8 | 12.3 | 1.3 | 36.1 | 108.3 | 83.4 | 16.6 | — | — | — |

| Southaven city | 17 949 | 7.1 | 28.3 | 10.2 | 33.2 | 21.8 | 6.5 | 1.2 | 31.9 | 90.0 | 92.6 | 6.8 | .7 | 118 | 100.0 |
| Starkville city | 18 458 | 6.7 | 22.4 | 26.3 | 29.0 | 13.2 | 9.1 | 2.6 | 25.6 | 99.2 | 68.7 | 26.5 | 4.8 | 880 | 18.0 |
| Stonewall town | 1 148 | 5.6 | 27.2 | 9.3 | 26.5 | 20.3 | 16.7 | 3.7 | 35.4 | 79.0 | 87.3 | 12.7 | — | — | — |
| Summit town | 1 566 | 6.8 | 29.9 | 11.1 | 26.2 | 18.8 | 14.0 | 4.0 | 32.0 | 72.8 | 87.3 | 12.7 | — | — | — |
| Taylorsville town | 1 412 | 7.4 | 28.8 | 8.1 | 29.7 | 17.8 | 15.7 | 3.3 | 33.5 | 87.5 | 88.2 | 11.8 | — | — | — |
| Tchula town | 2 186 | 11.2 | 42.0 | 10.3 | 22.3 | 13.4 | 11.9 | 2.7 | 23.3 | 62.4 | 89.4 | 10.6 | — | — | — |
| Tunica town | 1 175 | 8.2 | 27.2 | 8.3 | 25.0 | 18.6 | 20.9 | 4.8 | 37.0 | 77.4 | 80.5 | 17.3 | 2.2 | 26 | 100.0 |
| Tupelo city | 30 685 | 8.0 | 27.6 | 9.4 | 32.5 | 18.3 | 12.3 | 3.2 | 32.5 | 82.5 | 84.1 | 13.4 | 2.5 | 770 | 84.2 |
| Tutwiler town | 1 391 | 9.9 | 38.5 | 9.8 | 23.3 | 13.7 | 14.7 | 4.5 | 25.8 | 69.8 | 87.3 | 12.7 | — | — | — |
| Tylertown town | 1 938 | 7.8 | 29.9 | 9.1 | 22.1 | 17.6 | 21.3 | 7.4 | 34.1 | 68.4 | 80.5 | 12.5 | 7.0 | 135 | 100.0 |

| Union city | 1 875 | 6.3 | 27.5 | 7.7 | 23.5 | 19.3 | 21.9 | 5.9 | 37.2 | 71.6 | 85.5 | 14.5 | — | — | — |
| Utica town | 1 033 | 8.6 | 31.0 | 8.7 | 24.9 | 16.2 | 19.3 | 4.5 | 32.7 | 80.1 | 87.5 | 12.5 | — | — | — |
| Vancleave CDP | 3 214 | 6.8 | 29.8 | 10.1 | 32.3 | 18.7 | 9.1 | 1.1 | 31.4 | 102.0 | 91.0 | 7.1 | 1.9 | 61 | — |
| Verona town | 2 893 | 9.5 | 28.2 | 10.9 | 33.5 | 18.1 | 9.3 | 1.7 | 29.7 | 89.4 | 83.4 | 16.6 | — | — | — |
| Vicksburg city | 20 908 | 7.4 | 28.6 | 8.8 | 27.8 | 16.1 | 18.6 | 5.1 | 33.2 | 74.5 | 81.4 | 17.1 | 1.5 | 321 | 92.5 |
| Water Valley city | 3 610 | 7.2 | 27.5 | 8.5 | 25.1 | 17.8 | 21.1 | 5.9 | 35.5 | 69.8 | 82.4 | 16.0 | 1.6 | 58 | 100.0 |
| Waveland city | 5 369 | 7.5 | 28.1 | 8.0 | 28.7 | 18.6 | 16.7 | 2.6 | 34.2 | 82.8 | 84.7 | 15.3 | — | 2 | — |
| Waynesboro city | 5 143 | 8.3 | 32.5 | 9.9 | 27.9 | 16.4 | 13.3 | 3.5 | 29.9 | 73.4 | 86.5 | 11.9 | 1.6 | 83 | 100.0 |
| Wesson town | 1 510 | 5.0 | 18.9 | 39.3 | 19.4 | 9.3 | 8.5 | 1.7 | 20.8 | 105.9 | 62.7 | 5.8 | 31.5 | 475 | — |
| West Hattiesburg CDP | 5 450 | 8.8 | 29.8 | 12.4 | 36.1 | 16.7 | 5.0 | .8 | 28.9 | 92.6 | 88.9 | 11.1 | — | — | — |

| West Point city | 8 489 | 8.1 | 30.3 | 10.0 | 28.0 | 16.4 | 15.3 | 4.0 | 32.0 | 75.3 | 85.9 | 12.7 | 1.3 | 113 | 98.2 |
| Wiggins city | 3 185 | 8.2 | 29.1 | 10.9 | 25.9 | 17.6 | 16.6 | 4.4 | 32.2 | 78.2 | 83.3 | 12.2 | 4.5 | 143 | 100.0 |
| Winona city | 5 705 | 7.3 | 29.0 | 10.3 | 24.7 | 19.0 | 17.0 | 5.3 | 33.3 | 74.5 | 85.3 | 12.2 | 2.5 | 140 | 94.3 |
| Woodville town | 1 393 | 7.6 | 31.7 | 9.3 | 26.4 | 16.4 | 16.2 | 4.5 | 31.5 | 68.3 | 86.0 | 13.1 | .9 | 12 | 100.0 |
| Wool Market CDP | 1 166 | 6.3 | 27.1 | 8.1 | 33.7 | 22.6 | 8.5 | 1.1 | 32.8 | 98.6 | 88.4 | 11.6 | — | — | — |
| Yazoo City city | 12 427 | 9.2 | 33.5 | 9.5 | 24.8 | 16.3 | 15.9 | 4.7 | 30.1 | 73.4 | 84.3 | 13.1 | 2.6 | 325 | 96.3 |

TIPSII [UPF] GP128 CENSUS90 72583600 05/01/92 9:37 PM MACHINE: C DATA:CENSUS90*P1TIPSDA28. 04/24/92 21:27:45 TAPE: NONE FRAME: 4
TSF:CENSUS90*92. 04/24/92 21:29:19 UTF:CENSUS90*93. 04/24/92 21:29:19 META:CENSUS90*P1TABLES28. 04/24/92 21:45:22

# EXHIBIT 64

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON**
**HERBERT ANTHONY GREEN; KHADAFY MANNING;**
**QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS**
**SINGLETON; STEVEN SMITH; BESSIE THOMAS; and**
**BETTY JEAN WILLIAMS TUCKER, individually and on**
**behalf of a class of all other similarly situated**                         **PLAINTIFFS**

**v.**                                          **CIVIL ACTION NO. 3:17-cv-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF**
**RANDALL S. TUCKER, in his official capacity; and**
**MADISON COUNTY SHERIFF'S DEPUTIES JOHN**
**DOES #1 through #6, in their individual capacities**                        **DEFENDANTS**

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**FIRST SET OF REQUESTS FOR ADMISSION**

Defendants Madison County and Sheriff Randall C. Tucker, in his official capacity, by and

through counsel, respond to Plaintiffs' First Set of Requests for Admission as follows:

**GENERAL OBJECTION**

Defendants, by and through their counsel of record, object to the arbitrary, overly-broad,

and abusive definitions and instructions which Plaintiffs, through counsel, are attempting to

impose, which are beyond the scope of and inconsistent with Rule 36 *FRCP*.  Defendants,

through counsel, state that their responses to the written discovery submitted herein are provided

in good faith, in accordance with the *Federal Rules of Civil Procedure* and within the plain and

common meanings of the terms contained in the Plaintiffs' written discovery.

Defendants further object to all requests for admissions propounded by Plaintiffs on the

basis that they are not limited to time and scope.  Subject to numerous other stated objections set

forth in their responses, Defendants are limiting their responses to the foregoing requests for

1

admissions in accordance with and subject to events subsequent to Sheriff Randall C. Tucker serving as Sheriff of Madison County, Mississippi in January 2012. Defendants object to any request for admission which may intend to seek information to any time subsequent to January 2012 as irrelevant to Plaintiffs' claims and not proportional to the needs of the case as described in *FRCP* 26(b)(1).

**REQUEST NO 1:** Admit that, as stated in Defendants' First RFP R&Os, Defendants do not maintain or possess any written policies or procedures concerning the MCSD's jurisdiction.

**ANSWER:** Denied.

**REQUEST NO 2:** Admit that, as stated in Defendants' First RFP R&Os, Defendants do not maintain or possess any written policies or procedures concerning traffic stops.

**ANSWER:** Defendants object to this request as overly-broad. Subject to and without waiving this objection, Defendants admit that MCSD has no written criteria concerning when MCSD personnel should make a vehicle stop other than complying with existing state and federal laws. The remainder of this request is otherwise denied.

**REQUEST NO 3:** Admit that, as stated in Defendants' First RFP R&Os, Defendants do not maintain or possess any written policies or procedures concerning pedestrian stops.

**ANSWER:** Defendants object to the term "pedestrian stop" as being overly-broad and vague. Subject to and without waiving this objection, denied.

**REQUEST NO 4:** Admit that, as stated in Defendants' First RFP R&Os, MCSD personnel are not required to submit written requests before conducting any roadblock/checkpoint, and that Defendants do not maintain any records of any oral requests concerning roadblocks/checkpoints.

2

**ANSWER:**  Denied in part as written.  As stated in Defendants' Response to Request No. 3 of Plaintiffs' First Set of Requests for Production, Defendants admit that MCSD personnel are not required to make written requests for approval of vehicle checkpoints prior to conducting them.  Defendants further admit that they do not maintain records of oral requests to conduct checkpoints made by MCSD personnel.   Otherwise, denied.

**REQUEST NO 5:**  Admit that the MCSD has jurisdiction to engage in law enforcement activities in every location, town, or municipality, whether incorporated or unincorporated, within Madison County.

**ANSWER:**  Defendants admit that MCSD has jurisdiction to conduct law enforcement activities throughout the entire county.  However, as a matter of comity, MCSD personnel generally do not act as the primary law enforcement agency in a municipality if that municipality has its own law enforcement agency unless a MCSD personnel observe a criminal offense while within the municipality or unless the municipality requests assistance from MCSD personnel.

**REQUEST NO 6:**  Admit that, as stated in Defendants' Answer, MCSD personnel determine whether to cite persons stopped at roadblocks/checkpoints "based on the officer's observation of each vehicle and its driver."

**ANSWER:**  Denied in part as written.  MCSD personnel issue citations at roadblocks\checkpoints based upon a violation of the law the officers observe during their stop of the vehicle, their interaction with the driver, their observation of the occupants, and their determination in the field of whether there is reasonable suspicion and/or probable cause under state and federal law.

**REQUEST NO 7:**  Admit that Defendants do not maintain or possess any written policies or procedures prohibiting racial profiling.

**ANSWER:**  Defendants object to the term "racial profiling" as being overly-broad and vague.  Subject to and without waiving this objection, denied.   MCSD personnel are sworn to and required under existing MCSD policies to protect and serve all citizens in Madison County equally, without regard to race, color, religion, age, sex, political belief or other personal opinions, and to not interfere with the equal administration of justice under the United States Constitution and the laws of the State of Mississippi.

**REQUEST NO 8:**  Admit that, as stated in the MCSD's Policies and Procedures manual, the training of law enforcement personnel is "one of the most important responsibilities in any law enforcement agency."

**ANSWER:**  Admitted.

**REQUEST NO 9:**  Admit that, in each year beginning in 2012 and continuing to the present, the MCSD has arrested a greater number of Black persons than White persons.

**ANSWER:**  Defendants object to this request on the basis that its use of the term "black persons" or "white persons" is vague and overly-broad.  Subject to and without waiving this objection, Defendants, after reasonable inquiry, do not have readily obtainable information sufficient to admit or deny this request.

**REQUEST NO 10:**  Admit that, as stated in Defendants' Answer, the Madison County Board of Supervisors "has held itself out to receive any and all complaints about any constitutional violation claimed by an individual or group of individuals," including complaints concerning racially discriminatory policing practices.

**ANSWER:**  Denied in part as written.  Defendants admit that, as stated in their Answer, Madison County through the Madison County Board of Supervisors has held itself out to receive any and all complaints about anything related to government, including constitutional violations

4

claimed by an individual or group of individuals and makes its meetings open to the public to hear any such complaints.  Otherwise, denied.

**REQUEST NO 11:**  Admit that, as stated in Defendants' Answer, MCSD personnel are authorized to handcuff, detain, and arrest individuals who do not provide witness statements and to charge them with being an accomplice to the crime allegedly witnessed.

**ANSWER:**  Denied.  MCSD personnel have the discretion to handcuff any individual while they assess acute or exigent situations as allowed by federal and state law.  They also have the right to detain and arrest a person reasonably suspected to be an accomplice to a crime regardless of whether he or she gives a statement as allowed by federal and state law.

**REQUEST NO 12:**  Admit that the MCSD has operated roadblocks/checkpoints within, or at the entrances and exits of, apartment complexes or other multi-unit housing developments.

**ANSWER:**  Denied in part as written.  Defendants admit that the MCSD has conducted roadblocks on public roadways near apartment complexes, multi-unit housing developments, and many other parts of Madison County.  Otherwise, denied.

THIS the 20th day of October, 2017.

Respectfully submitted:

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY: *s/ James E. Graves, III*
Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738

5

mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com
OF COUNSEL:

Rebecca B. Cowan #7735
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, MS   39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Graves, III, hereby certify that I have this day, electronically mailed the above

and foregoing to the following:

Joshua Tom, Esq.
Paloma Wu, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
PWu@aclu-ms.org
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq.
Janet A. Gochman, Esq.
Isaac Rethy, Esq.
Nihara K. Choudhri, Esq.
Yukiu Chan, Esq.
Simpson Thatcher & Bartlett, LLP
425 Lexington A Venue
New York, NY 10017
jyoungblood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

Ezekiel Edwards, Esq.
Jeffery Robinson, Esq.
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

This the 20th day of October, 2017.

<u>*s/ James E. Graves, III*</u>
James. E. Graves, III

7

# EXHIBIT 65

**Department 200 (Sheriff Administration)**

Dispatcher: Receives all calls coming into the communications center to include 911 calls. Assigns deputies to calls and maintains a log of those calls and responding officers. Communicates with deputies in the field and operates NCIC terminal. Communicates with the public to relay information to responding units and outside agencies.

Sergeant (dispatch): Duties include all the duties of a dispatcher as well as supervising activities of dispatchers on duty. Assist the lieutenant in scheduling and day to day operations.

Lieutenant (dispatch, support services): Duties include all the duties of a dispatcher as well as dispatch sergeant. Scheduling shift assignments, approving leave, and extra duty assignments. May make personnel changes and discipline. Additionally responsible for payroll time keeping, inmate billing, working on IT issues.

Administration (civilian personnel): Duties include administrative and secretarial responsibilities to include records of reports, reception for the public, filing, maintaining civil and criminal process logs, and ordering supplies for the office. Additionally, assisting in record keeping and bank deposits.

Deputy Sheriff: Duties include patrolling the roads and highways in Madison County. Responding to calls for service, enforcing the traffic laws, maintaining order in courtrooms and courthouse security, and documenting information on report forms. Position holds full arrest powers.

Sergeant (patrol): Duties include all of the duties of a deputy sheriff as well as supervising activities of deputies assigned to shift, assisting in the scheduling of deputies, and approving reports.

Sergeant (admin): Duties include all the duties of a deputy sheriff as well as additional duties related to specific assignments. This may include the administration of school programs such as DARE, organizing specific neighborhood patrols and details with the NET team, and organizing inmate transports to court and other locations in transportation.

Master Sergeant (patrol): Duties include all of the duties of a deputy sheriff as well as a patrol sergeant and acting in the capacity of shift commander in the absence of the patrol lieutenant.

Master Sergeant (admin): Duties include all the duties of a deputy sheriff as well as additional duties related to specific assignments. This may include the investigation of major crimes in the Criminal Investigations division, investigation of narcotics violations in the Narcotics division, coordinating patrols of high crime areas and schedules in the NET team, service of warrants and court in the Warrants division, or service of process in Civil Process division.

Lieutenant (patrol): The shift commander. Reports to the Chief Deputy. Duties include all the duties of a deputy sheriff, patrol sergeant, and patrol master sergeant. Additional duties include maintaining order on the shift and handling minor disciplinary issues. Also will take initial complaints from citizens, respond to incidents involving use of force, and assign deputies as needed during major calls for service.

Lieutenant (admin): Duties include all the duties of a deputy sheriff as well as duties related to specific assignments. Reports to the Chief Deputy. This may include the investigations of major crimes or narcotics violations in the CID or Narcotics divisions. Supervising the investigators in those divisions as well as approving reports. Scheduling investigators or deputies for on call duties and DUI enforcement,

community events, court and transportation of inmates, training and SWAT team call outs, and courtroom assignments during court sessions.

Captain: Duties include all the duties of a deputy sheriff as well as additional duties in the Criminal Investigation Division and Narcotics Division. Reports to the Chief Deputy. These duties include approving all shift schedules and on call schedules as well as search and arrest warrants. Responding to incidents involving use of force and handling minor disciplinary issues. May act on behalf of the Chief Deputy in his absence. E

Chief Deputy: Duties include all the duties of a deputy sheriff. Reports to the Sheriff. Responsible for enforcing and developing the policies and procedures of the Sheriff's Department. May make personnel changes and discipline. Manage the day to day operations of the department and budget. Assign manpower as needed in the county. Respond to citizen complaints and investigate internal affairs issues. May act on behalf of the Sheriff in his absence.

Sheriff: Senior executive position. Serves as the appointing authority for the entire department. Develops policy and procedure and directs all activities of the department.

**Department 220 (Detention Center)**

Detention Recruit: The duties of Detention Recruits are to learn the principles, policies, and directives of the Madison County Detention Center. The Detention Recruit must follow direction and report to the Field Training Officer.

Detention Officer: The Detention Officer is the entry-level position for certified detention officers at the Madison County Detention Center. The Detention Officer reports directly to a supervising officer. The Detention Officer must comply with all agency policies, procedures, and principles.

Field Training Officer: The Field Training Officer is responsible for providing careful directions to Detention Officer Recruits. The Field Training Officer is responsible for completing all required reports and forms necessary for the Field Training Officer Program. The Field Training Officer reports directly to the Filed Training Coordinator. The Field Training Officers is a quasi-functional position. The Field Training Officer is not a full time position.

Corporal: The Corporal is the junior entry-level supervisory position for the detention center. The Corporal reports to the Watch Commander. The Corporal may assume the duties of the Watch Commander in the absence of the Lieutenant, Master Sergeant and Sergeant. The Sergeant must enforce policies, procedures, and principles of the Madison County Detention Center. The Corporal may not approve leave or days off unless he or she is the supervising officer of a specialized unit. However, the Corporal may place personnel on Administrative Leave when acting as the supervising officer. Such leave would be necessary pending the completion of an investigation.

Sergeant: The Sergeant is the senior entry-level supervisory position for the detention center. The Sergeant reports to the Watch Commander. The Sergeant may assume the duties of the Watch Commander in the absence of the Lieutenant and Master Sergeant. The Sergeant must enforce policies, procedures, and principles of the Madison County Detention Center. The Sergeant may not approve leave or days off unless he or she is the supervising officer of a specialized unit. However, the Sergeant may place personnel on Administrative Leave when acting as the supervising officer. Such leave would

be necessary pending the completion of an investigation. A Sergeant will be assigned to each security shift. Sergeants will be responsible for supervising specialized units consisting of four or more subordinate officers. The Sergeant is responsible for briefing the Lieutenant of all activities occurring during the Lieutenant's absence.

Master Sergeant: The Master Sergeant is the mid-level supervisory position for the detention center. The Master Sergeant reports to the supervising officer. The Master Sergeant may assume the duties of Watch Commander in the absence of the Lieutenant. The Master Sergeant must enforce policies, procedures, and principles of the Madison County Detention Center. The Master Sergeant may not approve leave or days off unless he or she is the supervising officer of a specialized unit. However, the Master Sergeant may place personnel on Administrative Leave when acting as the Watch Commander. Such leave would be necessary pending completion of an investigation. Master Sergeants will be responsible for supervising specialized units consisting of six or more subordinates. The Master Sergeant is responsible for briefing the Lieutenant of all activities occurring during the Lieutenant's absence.

Lieutenant: The Lieutenant is the senior-level supervisory position for the detention center. The Lieutenant reports to the Captain. The Lieutenant is the Watch Commander. The Lieutenant is responsible for enforcing policies, procedures, and principles of the Madison County Detention Center. The Lieutenant may approve leave within compliance of detention center policy. A Lieutenant will be assigned to each security shift and to specialized units consisting of ten or more subordinates. The Lieutenant may assign days off, in accordance with detention center policies. The Lieutenant may place personnel on Administrative Leave for investigative purposes.

Captain: The Captain is the mid-level executive position. The Captain reports to the supervising officer. The Captain is responsible for enforcing policies, procedures, and principles of the Madison County Detention Center. The Captain may assign shift assignments and make necessary personnel changes for the agency to accomplish its objectives. The Captain also performs duties of Assistant Jail Administrator and has full administrative authority.

Major: The Major is the senior executive position. The Major serves as the appointing authority for the Madison County Detention. The Major also develops policy and procedure.

# EXHIBIT 66

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**LATOYA BROWN; LAWRENCE BLACKMON
HERBERT ANTHONY GREEN; KHADAFY MANNING;
QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS
SINGLETON; STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER, individually and on
Behalf of a class of all other similarly situated,**                          **PLAINTIFFS**

**V.**                                        **CIVIL ACTION NO. 3:17-CV-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,**                        **DEFENDANTS**

---

## RESPONSE BY DEFENDANTS, MADISON COUNTY, MISSISSIPPI AND SHERIFF RANDALL TUCKER, IN HIS OFFICIAL CAPACITY, TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

---

COME NOW, Defendants, Madison County, Mississippi and Sheriff Randall C. Tucker,
in his official capacity, by and through their counsel, and submit their responses to Plaintiffs' *First
Set of Interrogatories*, pursuant to *Federal Rule of Civil Procedure* 33.

### GENERAL OBJECTION

Defendants, by and through their counsel of record, object to the arbitrary, overly-broad,
and abusive definitions and instructions which Plaintiffs, through counsel, are attempting to
impose, which are beyond the scope of and inconsistent with Rule 33, *FRCP*. Defendants,
through counsel, state that their responses to the written discovery submitted herein are provided
in good faith, in accordance with the *Federal Rules of Civil Procedure* and within the plain and
common meanings of the terms contained in the Plaintiffs' written discovery.

Defendants further object to all interrogatories propounded by Plaintiffs on the basis that they are not limited to time and scope.  Subject to numerous other stated objections set forth in their responses, Defendants are limiting their responses to the foregoing interrogatories in accordance with and subject to events subsequent to Sheriff Randall C. Tucker serving as Sheriff of Madison County, Mississippi in January 2012.  Defendants object to any interrogatory which may intend to seek information to any time subsequent to January 2012 as irrelevant to Plaintiffs' claims and not proportional to the needs of the case as described in *FRCP* 26(b)(1).

Defendants further object to these interrogatories on the basis that many of them ask for codes, lists of items, and other information that can best be provided through a response to a request for production.  When exhaustive lists or other information is sought by Plaintiffs through an interrogatory that can best be provided through the production of a document, Defendants will produce that document rather than place its contents in their response to that interrogatory.

1.      For all persons identified on the document produced by Defendants at RFP 1-2 to 1-3, provide a narrative description of each person's role and responsibilities within the MCSD, including his/her immediate and indirect supervisor(s) and any person(s) whom such person directly or indirectly supervises, and his/her assignment to any unit, department, team, task force, working group, or similar subdivision of the MCSD.

**RESPONSE:**  A narrative description of these roles and responsibilities and their hierarchy is attached to these responses as MC-INT-1-1-3.

2.      Identify, define and explain the meaning of any and all codes used by the MCSD, including radio and signal codes and abbreviations (including disposition codes) in CAD reports, activity reports, "stat" sheets, incident reports and any other MCSD documents.

**RESPONSE:**  A copy of the radio codes is attached to these responses as MC-INT-2-1-2.  A copy of all arrest codes is attached as MC-INT-2-7.  A copy of all case status or disposition for calls codes is attached as MC-INT-2-8-21.

3.      Identify and describe all units, departments, teams, task forces, working groups, or similar subdivisions of the MCSD that existed at any time between 2007 and the present, including formation date, date of dissolution, purpose, responsibilities, and how it is staffed, supervised, and operated.

**RESPONSE:**  See Defendants' Response to Interrogatory No. 1 as well as previously produced document MC-RFP-1-1 through 1-2.  The only departments that have been created since January 1, 2012, are the NET (going from part-time to full-time deputies), the Explorer Program, and the DUI Grant program, which the MCSD reapplied for and started participating in October 2012.

4.      Describe the manner(s) in which the MCSD "utilizes patrols known as the 'NET' or Neighborhood Enhancement Team," including the criteria used in determining whether, when, and how the Neighborhood Enhancement Team is "disbursed at night in neighborhoods to combat crimes…" and "used in apartment complexes and on streets and highways…," as stated in paragraph 4 of the Defendants' Answer.

**RESPONSE:**  The Team is utilized where they are needed most based on requests for extra patrols because of an increase in crimes being committed in a particular area within Madison County, *e.g.,* auto burglaries, home burglaries, appliance thefts in new construction areas, and they are used to assist the warrants division in the service of arrest warrants.

5.      Identify and describe all instances, from 2012 to the present, in which Defendants have utilized or deployed the Neighborhood Enhancement Team.

**RESPONSE:**  Defendants have no readily available information to respond to this interrogatory.  The only method for tracking the utilization and deployment of the Neighborhood Enhancement Team is by reviewing incident reports and monthly Activity/Citations Reports prepared by Darrian Smith after March 22, 2012, and by Sam Howard after September 27, 2015. Relevant incident reports and monthly Activity/Citations Reports are in the process of being produced.

6.      Describe the criteria employed by Defendants in reviewing personnel and in making any hiring, disciplinary, firing, promotion, or demotion decisions with respect to MCSD personnel.

**RESPONSE:**  Defendants object to this interrogatory on the basis that it is vague and overly-broad.  Without waiving these objections, certain written hiring criteria used while screening individuals applying for work as deputies with the MCSD are contained in the Personnel Policies & procedures of the Department.  Additionally, other criteria have been utilized by Chief Deputy Williams and Sheriff Tucker while conducting interviews with prospective deputies.  The written policies include, but are not limited to, those found in Section 2 of the Personnel Policies & Procedures of the MCSD.   These policies require a good faith effort to be made to provide fair employment practices and equal opportunity for all prospective employees.  This entails providing equal employment opportunities to all qualified persons without regard to race, creed, color, sex, age, national origin, religion, physical or mental handicap or veteran's status.

Additionally, individuals applying for deputy positions are asked to submit resumes and to fill out an application that asks them to provide certain personal data, their educational background, employment history, a list of references, a history of any arrests, detentions or

litigation, their traffic record, including any traffic related citations and accidents, their military service and any discipline they received during that service, their use of alcoholic beverages and any drug use, their work hours availability, and any other applications they have made for law enforcement employment. They are finger printed, screened through the MS Justice Information Center and the NCIC.

Prospective applicants are also interviewed for the job. Notes are taken during these interviews, and a summary of the positive and negative feedback obtained during these interviews are reviewed. During these interviews, each applicant's professionalism is also assessed.

Once hired, each applicant is asked to meet with the Human Resources representative for the Madison County, asked to apply for and obtain a bond, complete a Minimum Standards Application, obtain a physical, be sworn in by taking the necessary oath of office, fingerprinted and photographed, put through taser training if he or she is not already certified, participate in a three-week ride along for training, qualify for the use of a firearm, issued a uniform, issued MCSD equipment, and added as a member of the National Sheriff's Association and the 100 Club.

MCSD personnel who seek promotions are asked to submit a letter to Chief Deputy Williams by a particular date and instructed that they should include in their letter their years of experience as a law enforcement officer, their years of experience with the MCSD, and to identify the particular shift and/or job opening. After receipt of these letters, a summary is prepared for all applicants for the promotion. In addition to obtaining and reviewing the criteria requested in the letters submitted by these personnel, a review is made of any disciplinary actions taken against these applicants while employed at the MCSD. Based on these criteria and other

factors such as job performance, work ethic, and other factors, the applicant with the most number of years in law enforcement, the most number of years with the MCSD, and the applicant with the least number of disciplinary actions taken while employed at the MCSD is chosen for the promotion.

Decisions to discipline, fire or demote deputies or other personnel are made in accordance with policies and procedures.   Due to the nature of law enforcement work, each individual case may be unique and is analyzed and appropriate action is taken equally by the Chief Deputy and submitted to the Sheriff for his approval.  Discipline can include anything from a verbal warning, written reprimand, work suspension, termination of employment, or demotion depending on the offense. Any disciplinary action is documented in an internal narrative report and/or letter to the employee and placed in the employees personnel file.

7.       Identify by name, title, and responsibilities all current or former MCSD personnel who are or appear to be Black between 2007 and the present.  For all such personnel whose employment was terminated or who otherwise separated from service with the MCSD, describe the circumstances of their termination or separation.

**RESPONSE:**  Defendant object to the information sought in this interrogatory on the basis that it is irrelevant to the issues addressed by Plaintiffs' Complaint.  Without waiving this objection, from January 1, 2012, see the following:

Present:

| | |
|---|---|
| Lieutenant Albert Jones | Patrol Supervisor |
| Master Sergeant Elton Flax | Patrol Supervisor |
| Deputy Jacoby Cowan - | Patrol |
| Sergeant Radford Shearrill | D.A.R.E., School Resource Officer, Explorer Program |
| | |
| Deputy Newman Bernard Newsome | Patrol |
| Deputy Kevin Moffett | Transport and DUI Officer |
| Deputy Kyrie Lucas | Patrol |

| | |
|---|---|
| Deputy Jeremy Hamlin | Patrol |
| Master Sergeant Kim Henderson | Investigations |
| Sergeant Donyel Beals | Dispatch Supervisor |
| Deputy Jamal Watkins | Courthouse Security |
| Deputy Jessie Smith | Courthouse Security |
| Deputy Andre Jones | SRT Detention |

Former

| | |
|---|---|
| Master Sergeant Marcus Hudson | Narcotics<br>Terminated 4/30/12 for felony crime of fraud by MS State Auditor's Office |
| Deputy Johnny Burse | Patrol<br>Terminated 10/31/12 for conduct unbecoming a law enforcement officer |
| Deputy Robert L. Jackson | Patrol<br>Resigned 12/14/13 to become Chief of Canton Public Schools |
| Lieutenant Otha Brown | Patrol Supervisor<br>Resigned 9/29/13 to become Canton Chief Of Police |
| Deputy Robert Jackson | Patrol<br>Resigned 3/12/14 during investigation |
| Sergeant Nate Johnson | Transport<br>Retired 6/30/15 |
| Deputy Robert Gibson | Patrol<br>Terminated 2/19/13 |
| Deputy Eugene Luckett | Courthouse Security<br>Resigned 5/27/16 |

8.     Identify and describe any unwritten or oral policies, procedures, or guidelines that Defendants contend are maintained by the MCSD.

**RESPONSE:** Defendants object to this interrogatory on the basis that it is vague, overly-broad, and unduly burdensome. Defendants further object to the extent that Plaintiffs may be seeking a legal opinion. Without waiving this objection, if Plaintiffs will inquire about

an unwritten or oral policy or procedure in regard to a particular area of law enforcement,

Defendants will identify any unwritten or oral policies applicable to that area.

      9.     Identify and describe all changes and/or variations, whether formal, informal,

written, or unwritten, made by Sheriff Tucker to the policies and procedures in place under

Sheriff Toby Trowbridge.

**RESPONSE:**  The following changes and/or improvements were made by Sheriff

Tucker within the MCSD after he was elected to office:

    a.    Reinforced appropriate conduct by MCSD officers by holding regular meetings with the Supervisors of each shift and general meetings with all Lieutenants, Master Sergeants, Sergeants, and Deputies.

    b.    Changed the method by which the Neighborhood Enhancement Team functioned, obtained funding to have a separate NET department, appointed a deputy to be in charge of the Team, established a working calendar for the NET, and established a new method on how the NET would operate within Madison County and the Municipalities that requested its help.  Changed the concentration of the Team from being focused solely on apartment complexes to serving various subdivisions with help patrolling on an as-needed basis based on the level of reported crimes.

    c.    Posted all MCSD policies regarding the provision of equal opportunities without regard to race, sex, religion or creed in regard to hiring policies of the MCSD and policing policies of the Department in the squad room and various other rooms within the offices of the MCSD.

    d.    Required officers to go through firearm training and qualifications four times a year.

    e.    Discussed the meaning of "bullying" and stressed that bullying of any type by officers within the MCSD between themselves or toward citizens they encounter is prohibited.

    f.    Established a more defined and firm chain of command of officers within the MCSD and defining the duties each officer has within his position.

    g.    Limited the review of all complaints made by personnel within the MCSD and by citizens, whether verbally or in writing, to the Chief Deputy and not to supervisors or other personnel receiving the complaints.

h.      Formed community groups and hired personnel to go into the local Madison County Schools to work with the students in those schools in demonstrating the purpose for the MCSD, other law enforcement agencies, and teaching them teamwork and morals in their personal lives, including the D.A.R.E. and Explorer programs.

i.      Required any and all deputies who perform off-duty work to submit a form for their work and to have that form on file.

j.      Discussed the reasonable use of force and the need for force at regular meetings held with Supervisors or with all officers within the MCSD.

k.      Stressed the need for impartiality between fellow deputies and between the deputies and the general public at every Supervisor meeting and general meeting.

l.      Stressed the need to keep any and all information deemed confidential from being discussed or revealed by personnel within the MCSD.

m.      Required each MCSD officer who requests leave to fill out a form and obtain permission to take leave.

n.      Required mandatory 24 hours of in-service training of each MCSD officer on a yearly basis.

o.      Stressed the need for all MCSD personnel to be ethical while dealing with fellow officers and with the public.

p.      Made the wearing of body armor mandatory with each MCSD officer.

q.      Added video/audio recording to each patrol vehicle.

s.      Stressed the need for each officer of the MCSD to impartially enforce laws at orientation of new hires and at general meetings with supervisors and with all MCSD personnel.

t.      Made it mandatory that each officer who conducts checkpoints to wear a safety vest exhibiting an emblem and wording that he or she is working for the MCSD and required that blue lights be operational during each checkpoint.

u.      Made the Crime Victims Bill of Rights mandatory and to be used when dealing with an incident involving a crime.

v.      Added a Social Media Policy applicable to the MCSD personnel.

w.      Began posting all promotion opportunities and sending out letters to all deputies informing them of these opportunities.

x.     Developed a website about the MCSD which included identifying the divisions of the Department, giving the biographical information on the Sheriff and Chief Deputy, providing contact information, and giving the public the opportunity to invite Sheriff Tucker to speak on behalf of the Department.

y.     Created a GED program for inmates at the Madison County Detention Center.

z.     Expanded the location of checkpoint/roadblocks within Madison County.

aa.    Required Supervisors to be present at each checkpoint/roadblock.

bb.    Changed the locations of roadblocks/checkpoints to make the officers and their vehicles more visible and to prevent the roadblocks/checkpoints from being adjacent to businesses and bars.

10.    Identify and describe all instances of actual or alleged racial discrimination towards any individual or group of people by MCSD personnel.

**RESPONSE**: Defendants know of only one act of an instance where a MCSD dispatcher, while off duty, posted an inappropriate post to her personal Facebook page that was derogatory of African Americans. The act occurred and the incident was reported in early 2011 prior to Sheriff Tucker becoming Sheriff.  It was then reported again in January 2012. During an investigation of the act and complaint received, Sheriff Tucker was informed that the individual had already been disciplined for her actions in 2011. The individual was moved from dispatcher to file clerk in July 2012 and was terminated in November 2015.

11.    Identify and describe all instances of actual or alleged use of excessive, unlawful, unconstitutional, or otherwise wrongful use of physical force by any MCSD personnel.

**RESPONSE:** Other than the complaints of use of alleged force produced by Defendants in response to prior Request for Production No. 8, MC-RFP-8-1-1(1)-(32), MC-RFP-8-4 - 8-5-1(1)-(32), MC-RFP-8-18, MC-RFP-8-29 – 8-31, MC-RPD 8-130, MC-RFP-131, MC-RFP-8-

133-139, MC-RFP-8-140-144, and MC-RFP-8-203-8-217, Defendants lack any knowledge of any other complaints of the actual or alleged use of excessive force.

12.    Identify and describe all instances in which any current or former MCSD personnel were arrested, cited, detained, sued, or charged in connection with any civil or criminal offense, regardless of whether the arrest, citation, detention, suit or charge arose out of the individual's performance of his or her duties as a current or former employee of the MCSD. This Interrogatory encompasses instances that predate an individual's employment with the MCSD to the extent that Defendants have now or at any point had knowledge of any such arrest, citation, detention, suite or charge.

**RESPONSE:**  Defendants object to this interrogatory to the extent that it seeks information concerning any arrests, suits or charges made against former or current MCSD personnel prior to their employment with the MCSD on the basis that such information is irrelevant to the issues in this matter and not proportional to the need.  Defendants further object to any information sought in this interrogatory regarding any criminal charges or convictions of any MCSD personnel of misdemeanors since such evidence is irrelevant and would be inadmissible at any trial under *F.R.E.* 609.  Without waiving these objections, Defendants know of no felony convictions of any MCSD personnel who have been hired by the Department and have produced all civil suits and criminal affidavits filed against MCSD personnel since January 2012. Former Deputy Marcus Hudson was fired after admitting to making false statements in time sheets to the Madison County Tax Collector and was fired as an employee of the MCSD as a result of these charges.

13.    Identify and describe every database or other recordkeeping system employed by the MCSD at any time from 2012 through the present, including (i) the purposes and function of

11

any such database or recordkeeping system, and (ii) whether the database or recordkeeping tracks the race, ethnicity, and/or national origin of any person identified therein.

**RESPONSE:** (i) The MCSD uses a computerized program that manages law enforcement data that begins at the dispatch stage. MCSD dispatch personnel field calls from 911 callers by land lines or cell phones and receive radio calls from MCSD officers who are out in the field. When dispatch personnel receive a call, they create an entry into the CAD (computer aided dispatch) program and an incident number is assigned to it. These incident numbers are unique identifiers that allow the MCSD categorize each and every report to dispatch. When an incident number is assigned, dispatch also assigns an "Incident Type" to each call. These codes have been furnished to Plaintiff in Defendants' response to Interrogatory No. 2. Once an incident is created in the CAD system by assigning a number and choosing an incident type, MCSD dispatch and individual MCSD officers can access the DCS software to input more and more information about a particular incident if necessary. The Madison County Detention Center also utilizes a computerized jail docket; and (ii) both the CAD statistics program and the MCDC jail docket contain information giving the race or ethnicity of the individual arrested.

14.     Identify and describe (a) every database, whether local, county, state, federal or privately-run, that is accessed or checked when the MCSD runs a background check in the course of its law enforcement duties; and (b) whether the MCSD keeps logs or records of these checks, including who ran the checks, when the checks were run, where the checks were run, on whom the checks were run, and the results of any such checks.

**RESPONSE:** Defendants object to Plaintiffs' use of the term "background check" without defining the term. Without waiving this objection, Defendants would show that (a) NCIC data base, CAD system, County AS400 system that includes justice court and circuit court information,

and Accurint (lexis nexis) that is a private service used for investigations and warrants division; and (b) the MCSD has a log of all NCIC searches that can be searched by date and time.  No other searches are recorded.

15.     Identify and describe all reports or records, including CAD reports and citation data, that MCSD personnel are required to prepare to memorialize any type of law enforcement encounter, including (i) the method or form used to prepare any such report or record; (ii) whether there is any review process for such reports/records, and if so, who reviews them; (iii) the circumstances under which the report or record must be completed, including whether an incident report must be prepared for every traffic stop based on a violation of the law, such as a seatbelt violation or improper vehicle equipment, regardless of whether the stop results in a citation or an arrest; and (iv) the document retention policy for any such report or record.

**RESPONSE:**  (i) Incident reports are prepared on a system designed by DCS, a third party vendor, end of the month DUI reports are prepared on a spreadsheet provided by the State of Mississippi, and deputies are required to submit monthly activity reports and citation reports, which are then used to create the statistic summaries Defendants have already produced; (ii) incident reports are approved by shift supervisors on the DCS system, and DUI end of the month reports are reviewed by Lieutenant Mark Sandridge; (iii) an incident report with a narrative report is not prepared as a result of every encounter experienced by a MCSD officer, but if an arrest is made, an incident report is prepared; (iv) incident reports are retained in the DCS system indefinitely, and from October 2012 through January 1, 2017, end of the month DUI summaries were prepared manually and filed, and these summaries have been maintained on a computerized system since January 1, 2017, and will be maintained indefinitely.

16.    Identify and describe every oral or written request made by any person or organization (whether incorporated or unincorporated) in Madison County, Mississippi, including managers of apartment complexes, municipal police departments, business owners, and schools, for assistance of any type from the MCSD, as stated in paragraph 3 and 210 of Defendants' Answer, including the date, the identity of the individual requestor and his or her institutional affiliation, the specific nature of the assistance requested, and any action taken by the MCSD in response to such request.

**RESPONSE:**  Each written request has been produced by Defendants as MC-RFP-10-26 – MC-RFP-10 42.  Numerous oral requests for assistance are received on a monthly basis, but there is no record kept of these requests.

17.    Explain and describe the policing activity that MCSD performs in response to the requests that Defendants produced in RFPs 10-26 to 10-45, including the tactics, policies, procedures and practices used when interacting with individuals at these locations.

**RESPONSE:**  MCSD personnel provide extra patrols in response to these requests and traffic enforcement, including the use of safety checkpoints.  These responses are conducted according to the existing practices of the MCSD.

18.    Identify every action taken by Defendants "to ensure that the Black community has input into the daily operations of the Madison County Sheriff's Department" and/or to "communicate and coordinate with" the Black community "regarding the services of the Madison County Sheriff['s] Department," as stated in paragraphs 8 and 112 of Defendants' Answer.

**RESPONSE:**  MCSD personnel have implemented the D.A.R.E. and Explorer Programs in the Madison County Public Schools to teach the students about law enforcement activities and

to encourage them to become a part of those activities. Madison County Advisory Groups have been formed to improve racial relations within the entire Madison County area. Sheriff Tucker has also held meetings at certain predominately black churches, met with neighborhood leaders in predominately black neighborhoods, and met with various community groups to improve these members' relationships with the MCSD.

19.    Identify the author of the MCSD's General Roadblocks Policy and describe the circumstances in which roadblocks/checkpoints have been conducted pursuant to the General Roadblocks Policy. To the extent Defendants contend that the General Roadblocks Policy is inoperative, identify any directive superseding or negating the General Roadblocks Policy and explain why the General Roadblocks Policy nonetheless remains part of the MCSD's POLICIES AND PROCEDURES.

**RESPONSE:**  Defendants lack any specific knowledge of who authored the checkpoint/ roadblock policy, but the policy remains in effect.   All roadblocks/checkpoints conducted by MCSD personnel are conducted pursuant the existing Sobriety Checkpoint Guidelines.

20.    Identify and describe any roadblocks/checkpoint at which (i) MSCD personnel used one or more unmarked vehicles; (ii) any or all MCSD personnel present at the roadblock/checkpoint wore plainclothes and/or clothing other than a complete uniform; and/or (iii) MCSD personnel did not employ emergency and/or overhead lighting.

**RESPONSE:**  (i) Unmarked cars have been used at roadblocks/checkpoints conducted by the MCSD, but Defendants lack sufficient knowledge to identify these roadblocks/ checkpoints.  However, all vehicles are required to have operational blue lights during the roadblock/checkpoint and are more likely than not to have at least one marked patrol car at the roadblock; (ii) Non-uniformed personnel have been used at roadblocks/checkpoints, but all

15

personnel are required to wear identifying reflective vests showing that they are employed by the MCSD; and (iii) Defendants lack any knowledge of any roadblocks/checkpoints conducted where blue lights were not operational. Sometimes it is impossible to have overhead lighting with some roadblocks/checkpoints conducted on highways or outside city limits.

21.     Identify every roadblock/checkpoint conducted in conjunction or cooperation with, at the request of, or with the assistance of, any other governmental or law enforcement agency. For each such roadblock/checkpoint, identify the time, date, location, and the name of the relevant agency.

**RESPONSE:** Roadblocks/checkpoints are often conducted in conjunction with other law enforcement agencies, but it is impossible for Defendants to identify these roadblocks/checkpoints because any incident report prepared as a result of a roadblock/checkpoint where MCSD personnel are present will not always contain information about another agency.

22.     Describe in detail any requirement, policy, or practice concerning advance public notice provided by the MCSD for roadblocks/checkpoints. To the extent that such requirements, policies or practices differ depending on the nature, purpose, or location of the roadblock/checkpoint, separately specify the requirement, policy, or practice applicable to each type of roadblock/checkpoint.

**RESPONSE:** Locations of all roadblocks/checkpoints normally conducted by MCSD personnel and the purpose of these roadblocks/checkpoints are usually posted on the door of the Justice Court Building prior to the conducting of any roadblock/checkpoint. Random and unannounced roadblocks/checkpoints are scheduled without notice to check for escapees, wanted subjects or under other exigent circumstances that involve the search of particular wanted individuals.

23.   Identify all criteria used for selecting locations for roadblocks/checkpoints, and the relevant weight placed on each criterion.  To the extent that these criteria differ depending on the purpose for which the roadblock/checkpoint is established, separately specify the criteria for selecting locations for each type of roadblock/checkpoint.

**RESPONSE:**  Some of the criteria used while selecting roadblock/checkpoint locations are traffic complaints, requests by businesses or other entities for safety, and particular intersections where impaired drivers may be expected to travel.  Another criteria is that the roadblocks/checkpoints locations be spread throughout Madison County and not concentrated in certain areas.  No formal system of weighting or priority is used.

24.   Identify and describe any means by which MCSD tracks or measures roadblock/checkpoint activity, including tracking based on: (i) the number of roadblocks/checkpoints conducted in any given time period; (ii) the number of vehicles, pedestrians, or bicyclists stopped; (iii) the number of searches conducted; (iv) the number of search warrants issued; (v) the number, type, and/or value of contraband found; (vi) the amount of time spent by any or all MCSD personnel at any or all roadblocks/checkpoints; and (vii) the number of arrests made and/or citations issued by MCSD personnel.  This includes any tracking or measuring of roadblock/checkpoint activity as part of the MCSD's monitoring and/or enforcement of targets and quotas, as well as the MCSD's general statistics-gathering and/or productivity-tracking efforts.

**RESPONSE:**  (i) The number of roadblocks/checkpoints conducted by MCSD personnel can be obtained through statistical data from the CAD system; (ii) No pedestrians or bicyclists are stopped during a MCSD roadblock/ checkpoint.  The number of vehicles stopped during any given roadblock/checkpoint is not recorded; (iii) The number of searches during any given

17

roadblock/checkpoint would be reflected in any incident reports prepared as a result of these searches; (iv) any resulting search warrants from any vehicle stop at a roadblock/checkpoint would be recorded in an investigatory report or incident report addressing that particular warrant; (v) any contraband found during a search at a roadblock/checkpoint would be recorded in either an investigatory report or incident report; (vi) the amount of time spent at any roadblock/ checkpoint would be reflected in the statistical reports, and the amount of time spent at any DUI roadblock/checkpoint would also be reflected in the monthly summaries prepared for the State of Mississippi; and (vii) the number of arrests are reflected in the DUI monthly reports prepared by MCSD personnel on each DUI roadblock or in individual incident reports prepared as a result of the roadblock/checkpoint.

25.     Identify and describe the bases or justifications for any detention, search, or arrest described in the Complaint with respect to any of the Plaintiffs.

**RESPONSE:**  Any documented detention, search or arrest of any Plaintiff in this action is addressed by the incident reports previously produced by Defendants.

26.     Identify and describe every complaint and/or petition of any kind made to the Board of Supervisors or any individual member of the Board of Supervisors concerning the MCSD, including the date of the complaint/petition, the name of the individual or entity making the complaint/filing the petition, the substance of the complaint/petition, a list of any documents concerning the complaint/petition, and a description of any actions taken by the board of Supervisors or the MCSD in response.

**RESPONSE:**  The only complaints Defendants are aware of are the filed complaints and the tort claim notices the Board of Supervisors received in regard to the MCSD.  These complaints and tort claim notices have been produced by Defendants.

27.    Identify all current or former MCSD personnel who received and/or reviewed any complaint by any person or entity concerning any of the customs, policies, and/or practices alleged in the Complaint, including any actual or alleged incident of racial discrimination or profiling, any traffic stop, any pedestrian stop, any search, any entry into any home, any use of physical force, and any roadblock/checkpoint.

**RESPONSE:** Sheriff Randy Tucker and Chief Deputy Jeremy Williams.

28.    Identify and describe any practices, policies, and/or procedures for determining when MCSD deputies respond to an incident that is within the jurisdiction of a municipal police department within Madison County, Mississippi.

**RESPONSE:** MCSD deputies respond to an incident when a deputy is the originating officer of the arrest or the call for service, when a vehicle stop is conducted by a MCSD deputy, when MCSD personnel are requested to respond by a municipality's police department within its city limits or when a citizen of a municipality calls and requests a response or help from the MCSD rather than from the municipality's police department.

THIS the 20 day of October, 2017.

Respectfully submitted,

BY:    _____

SHERIFF RANDALL C. TUCKER

As to objections:

_____

REBECCA B. COWAN (MSB #7735)
OF COUNSEL:
CURRIE, JOHNSON & MYERS, P.A.
1044 River Oaks Drive
P.O. Box 750
Jackson, MS 39205-0750
Telephone: (601) 969-1010
Facsimile: (601) 969-5120
bcowan@curriejohnson.com

19

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

STATE OF MISSISSIPPI
COUNTY OF _Madison_

PERSONALLY APPEARED BEFORE ME, the within named Randall C. Tucker, who,

being by me first duly sworn, states that he executed the above and foregoing instrument for and

on behalf of Madison County, Mississippi as the duly elected Sheriff of Madison County.

SWORN TO AND SUBSCRIBED BEFORE ME, this the 20th day of

_October_, 2017.

_LeeAnn H. Sanders_

NOTARY PUBLIC

My Commission Expires:

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID #10161
LEEANN H. SANDERS
Commission Expires
March 8, 2020
MADISON COUNTY

21

## CERTIFICATE OF SERVICE

I, Rebecca B. Cowan, counsel for the above referenced defendants, do hereby certify that I have mailed by United States Mail, postage prepaid, a true and correct copy of the above and foregoing pleading to the following attorneys at their usual mailing addresses as follows:

Joshua Tom, Esq.
Paloma Wu, Esq. (*pro hac vice*)
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
PWu@aclu-ms.org
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Yukiu Chan, Esq. (*pro hac vice*)
Kavitha S. Sivashanker, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
jyoungblood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 20ᵗʰ day of October, 2017.

Rebecca B. Cowan

# EXHIBIT 67

| BADGE# | NAME | Division |
|--------|------|----------|

## DEPUTIES

| BADGE# | NAME | Division |
|--------|------|----------|
| SO1 | SHERIFF RANDALL TUCKER | Administration |
| SO2 | CHIEF JEREMY WILLAMS | Administration |
| SO3 | LT. GEORGE ELLIOTT | Patrol |
| SO4 | LT. CLINE WYMAN | Patrol |
| SO5 | LT. ALBERT JONES | Patrol |
| SO6 | SGT. TOMMY SQUIRES | Patrol |
| SO7 | SGT. WILL WEISENBERGER | Patrol |
| SO8 | SGT. SLADE MOORE | Patrol |
| SO9 | M/SGT. TAYLOR CHASTAIN | Patrol |
| SO10 | M/SGT. JOSEPH BUTLER | Patrol |
| SO11 | M/SGT. ELTON FLAX | Patrol |
| SO12 | JACOBY COWAN | Patrol |
| SO13 | SGT. BEAU DAVIS | Transportation |
| SO14 | KRISTOPHER STONE | Patrol |
| SO15 | GLEN FOX | Patrol |
| SO16 | KYLE MILLICAN | Patrol |
| SO17 | LT. MARK SANDRIDGE | Comm. Relations / DUI |
| SO18 | SETH EVERETT | Patrol |
| SO19 | M/SGT. JEFFERY WALDROP | Training / SWAT |
| SO20 | LT. DONALD HICKS | Warrants |
| SO21 | M/SGT. KIP LUBY | Warrants |
| SO22 | M/SGT. RANDALL GREWE | Civil Process |
| SO23 | BRADLEY SULLIVAN | Patrol |
| SO24 | ROBERT PARKER | Patrol |
| SO25 | PERRY ABLES | Patrol |
| SO26 | JAMES CANNON | Patrol |
| SO27 | DANIEL SMITH | Patrol |
| SO28 | WILLIAM HUDSON | Transportation |
| SO29 | SGT. RADFORD SHEARRILL | School Resource / DARE |
| SO30 | ROBERT GRAVES | Patrol |
| SO31 | RYLON THOMPSON | Patrol |
| SO32 | SAMUEL HOWARD | NET Team |
| SO33 | DONOVAN GERLACH | Patrol |
| SO34 | WATTS JOHNSON | Civil Process |
| SO35 | NEWMAN NEWSOME | Patrol |
| SO36 | M/SGT. SCOTT MCDONALD | Warrants |
| SO37 | JOEL EVANS | Patrol |
| SO38 | KEVIN MOFFETT | Transportation |
| SO39 | JEREMIAH THORNTON | Patrol |

| SO40 | JOHN GARCIA | Patrol |
| SO41 | JAMES MANGUM | Patrol |
| SO42 | TONY ALEXANDER | Patrol |
| SO43 | KYRIE LUCAS | Patrol |
| SO44 | MATTHEW HOLCOMB | Patrol |
| SO45 | JAMES HALL | Patrol |
| SO46 | JEREMY HAMLIN | Patrol |
| SO47 | M/SGT. DARIAN SMITH | NET Team |

| A1 | CAPT. TODD WILLSON | Investigations |
| A2 | | Investigations |
| A3 | M/SGT. ROBIN WELCH | Investigations |
| A4 | M/SGT RUSSELL KIRBY | Investigations |
| A5 | M/SGT. JAMES KNIGHT | Investigations |
| A6 | M/SGT. MICHAEL CHAPMAN | Investigations |
| A9 | M/SGT. KIM HENDERSON | Investigations |

| V1 | CAPT. TOMMY JONES | Narcotics |
| V2 | LT. TREY CURTIS | Narcotics |
| V3 | M/SGT. BRIAN LOVEALL | Narcotics |
| V4 | M/SGT. JOSH FISH | Narcotics |
| V5 | M/SGT. RICHARD LADNIER | Narcotics |
| V6 | M/SGT JASON BARNES | Narcotics |
| V7 | M/SGT. JOSEPH MANGINO | Narcotics K9 |

| S1 | LT. EARL TAYLOR | Courthouse Security |
| S2 | WILLIAM BROCK | Courthouse Security |
| S4 | DAVID REDD | Courthouse Security |
| S5 | JAMAL WATKINS | Courthouse Security |
| S6 | CHAD HATHCOCK | Courthouse Security |
| S7 | J P PILGRIM | Courthouse Security |
| S8 | JESSIE SMITH | Courthouse Security |
| S9 | GREG PHILLIPS | Courthouse Security |
| S10 | PAUL COX | Courthouse Security |

| D60 | THOMAS STRAIT | Detention - SRT |
| D62 | ANDRE JONES | Detention - SRT |

EXHIBIT 68

---

| | |
|---|---|
| **From:** | Mark Sandridge |
| **To:** | Randall Tucker; Jeremy Williams |
| **Sent:** | 3/3/2015 6:14:07 PM |
| **Subject:** | info going to community meeting / for your review |

Sheriff & Chief,

Here is what I put together for Erica Goodloe's community meeting.  Please look over it and let me know what you think before I send it.

Thanks,

Mark

## The Madison County Sheriff's Department Employee Demographics;

Males – 114
Females – 38

African Americans – 55
Whites – 98
Hispanic – 0
Other – 0

## Info about Patrol Shifts;

The Madison County Sheriff's Department has three shifts.
Day Shift – 7 am – 3 pm          (approximately 5-8 deputies are on duty at a time)
Evening Shift – 3 pm – 11 pm     (approximately 6-9 deputies are on duty at a time)
Mid-Night Shift – 11pm – 7am     (approximately 5-8 deputies are on duty at a time)

*Shift lieutenants break the county down geographically into four patrol zones  (North, South, Central & West)

*Each shift sergeant makes the schedule and rotates each deputy daily in one of the four patrol zones

*The north end of the county is the largest area geographically to patrol.  The Sheriff's Department is also responsible for covering 8-9 large apartment complexes and neighborhoods inside the city of Canton.  The Canton area demands the most time out of the 3 shifts, because of the number of violent crime calls for service.  A special, fulltime, undercover, two-man detail (N.E.T. Team – Neighborhood Enforcement Team) was activated by Sheriff Tucker to help assist the shift deputies and thwart the on-going violence inside these Canton Apartment Complexes.  The N.E.T. Team allows the shift deputies working central and north, to patrol more without interruption.  Until this unit was created, many of our central and north units stayed tied up in Canton on violent crime calls for service.  The violent crime calls for service coming from Canton, often require multiple deputies to leave their assigned areas temporarily, to help make the scene safe for the general public and law enforcement.

*We are confident our coverage will produce quick response times and proactive enforcement.

*Examples of a shift deputy's responsibility;  walk through the schools, answer calls, work accidents, enforce traffic laws, patrol neighborhoods

## Tips on assisting law enforcement:

*Keep doors locked on your vehicles, buildings and homes when not in use

*Form an active neighborhood watch program

*Communicate with your neighbors about suspicious activity

*Call the Sheriff's Department  and report any suspicious activity, people or vehicles

*By in large, the north, rural part of the county is a safe place to live and raise a family.  We have had several burglaries reported from areas where residents left their vehicles and or houses unlocked while at work.  We also are having trouble with vehicles passing school buses when stopped at a high rate of speed.  Our deputies are following these buses as much as possible, but we need your help.  If you see this or any type of reckless driving, please get a tag number, description of the vehicle and call the Sheriff's Department @ (601) 859-2345

CONFIDENTIAL

MCSD_Emails_Reproduced-01246

EXHIBIT 69





Home | Sign-up for Email Updates | RSS Feed | Submit News

NEWS    EDITORIAL    SPORTS    OBITUARIES    CONTACT US    ABOUT US    CLASSIFIEDS    LIFESTYLES    MAGAZINE    ADVERTISING    CIRCULA▸



Search



# New supervisors take office Friday

Byline info is not available

Wednesday, January 2, 2008 11:00 PM

When the new Board of Supervisors is sworn in on Friday, Jan. 4 at 10 a.m., they will be grappling with several key issues remaining from the previous term from 2004 through 2007.

Some of these policy areas include road maintenance, new transportation infrastructure, and the county's continuing economic development.

The goal will be to manage residential and commercial growth and transportation needs in one of the fastest-growing counties in the state. The county's tax value grew 4.1 percent in 2007.

"We have to reach out and plan for future growth," said John Bell Crosby, the new District 1 Supervisor, during an October speech.

The biggest ongoing issue for the county is improving the road infrastructure. In addition to the dozens of dirt roads in the county that supervisors have pledged to pave by 2014, officials are continuing to prepare for new road projects.

Some of the major ongoing projects include Reunion Parkway connecting U.S. Highway 51 to Mississippi 463 north of Madison, the widening of Gluckstadt Road west of Interstate 55, and the construction of Calhoun Station Parkway connecting Church Road to Gluckstadt Road.

Supervisors will be entering the third year of a four-year, $100 million transportation plan that calls for $50 million in borrowing. So far, the county has borrowed $29.5 million as part of that plan, although some of those funds went to refinancing previous debt from the Mississippi Development Bank.

Some other roads high on the priority list included Yandell Road, residential streets in Annandale that may require $5 million in repair work, and Highland Colony Parkway.

The supervisors agreed to partner with Ridgeland and Madison for studying the condition of the Parkway, and a major renovation could be in store for the seven miles of road within the two municipalities.

Supervisors also continue to lobby for improvements to the Gluckstadt Interchange with I-55, although Central District Transportation Commissioner Dick Hall last reported that work on the project may not begin until 2014.

The biggest infrastructure project, however, remains the Reunion Parkway interchange with I-55. With a price tag last reported at approximately $38 million, there is still uncertainty as to how the county will pay for it.

The county has received $6 million for the project from the state Department of Transportation, and continues to lobby Congress for federal funds.

Crosby has previously stated that the county should expect more road bonds in the future to pay for new construction projects.

One of the major goals of new road projects is to handle new growth, and the county has taken recent measures to ensure that new residential developments meet certain standards.

After a lengthy dispute over the Eastview subdivision in Gluckstadt, the supervisors oversaw an increase in the minimum home size. The developers agreed to make 75 percent of the lots at least 1,800 square feet.

This 1,800-square-foot standard was also used in the Oak Field subdivision in Gluckstadt, after developers initially requested a 1,300-square-foot minimum for homes.

Supervisors appear reluctant so far, however, to become more deeply involved in subdivision ordinance enforcement disputes as the city of Madison has done.

While Madison has given its Municipal Court the power to rule on ordinance violations, turning such disagreements into criminal cases, the county has not taken the parallel step of allowing Justice Court to consider such matters.

Another major project facing the supervisors early in 2008 will be the fate of a possible $19.5 million jail expansion.

The board is expected to decide in the spring if 209 beds will be added to the jail. A $4.1 million juvenile justice center with 50 beds and a juvenile court is also up for consideration.

Website de
SEO, digital
marketing.

PRINC
DIGITAL

LEARN MORE


Case 3:17-cv-00347-WHB-LRA Document 231-69 Filed 09/14/18 Page 3 of 3

If construction is officially approved in the spring, the expansion should take about three years to complete.

While Sheriff Toby Trowbridge generally receives very high marks from the supervisors, he has been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling.

Most recently, the Concerned Citizens of Flora II demanded that Trowbridge engage in more dialogue with residents about his law enforcement practices. A Jackson-based group threatened late in the year to lead a boycott of county businesses.

It is unclear if the disagreements between Trowbridge and these residents have been satisfactorily resolved.

‹   ALL

SPORTS     NEWCOMER'S GUIDE     ABOUT US     CHURCH DIRECTORY     CIRCULATION     PAY MY BILL     ADVERTISING     LIFE

Home | Sign-up for Email Updates | RSS Feed | Submit News

**Copyright 2016 The Madison County Publishing Co. Inc.**

Software © 1998-2018 **1up! Software**, All Rights Reserved

# EXHIBIT 70

**News**Room

7/22/07 Clarion-Ledger (Jackson, Miss.) A1
2007 WLNR 27765629

Clarion-Ledger, The (Jackson, MS)
Copyright © 2007 Gannett

July 22, 2007

Section: Main

IS system fair?

July 22, 2007

nicklaus.lovelady@jackson.gannett.com

The Madison County Sheriff's Department led the metro area in DUI arrests in 2006, and most of those arrested were black and between 28 and 39 years old.

nicklaus.lovelady@jackson.gannett.com

Statistics obtained by The Clarion-Ledger through an open records request also show Jackson police were next in the number of DUI arrests, followed by the Hinds County Sheriff's Department, and the Brandon and Flowood police departments.

While the statistics confirm that MadisonCounty is a force in DUI enforcement, the department has been accused by some of racial profiling.

Sheriff Toby Trowbridge did not return repeated calls seeking comment for this story. Earlier this year, when his officers were honored as being among the state's top DUI enforcers, Trowbridge said he did not think drunken driving was being taken seriously enough by many people.

Flowood Police Chief JohnnyDeWitt wants it to be known that his department doesn't tolerate drinking and driving. "Anyone who drinks and drives needs to be worried about coming through Flowood,"DeWitt said.

But getting stopped by the MadisonCounty Sheriff's Department worries bus driver Domonic Marshall of Edwards the most.

"I stay away from there after dark," said Marshall, who is black. "If you have one beer and you get pulled over, that will mess up your whole life."

Madison County District 5 Supervisor Paul Griffin said many people in Madison County are aware that the department is perceived as targeting blacks and have tried to get Trowbridge to meet with concerned citizens.

"There is a limit to what the Board of Supervisors can do because the sheriff is elected by the people to do his job," Griffin said.

Griffin, a former deputy sheriff, said he thinks racial profiling goes on in every department in the country. "It's not something that's just in Madison County," he said.

Trowbridge has denied his department engages in racial profiling. He has said he enforces the law no matter what color a person is. Responding to criticism in 2004, he said, "There is no racial profiling, just criminal profiling."

Of the 1,215 arrested by the Madison County Sheriff'sDepartment in 2006, 591 were black, 536 were white, 84 were Hispanic and 4 were of another race.

Since 2005, the number of blacks and Hispanics arrested on DUI charges by the Madison County Sheriff'sDepartment is 1,381 out of a total of 2,331, or about 60 percent.

Blacks and Hispanics make up about 40 percent of the population of the county, according to the 2005 U.S. Census.

Compared to other predominantly white jurisdictions, blacks and Hispanics arrested on DUI charges totaled 45 percent in Clinton, 25 percent in Ridgeland and 15 percent in the city of Madison.

Several local law enforcement agencies, including the Brandon Police Department and the Madison and Rankin county sheriff's departments, have officers dedicated to DUI enforcement. The officers generally are funded by a grant through the Mississippi Division of Public Safety Planning.

Earlier this year, the Rankin County Sheriff's Department received a $56,000 state grant to funda DUI officer for the first time.

In 2006, prior to the DUI officer, the department had 37 DUI arrests. In the seven months since the officer has come on, the county's arrests are now 67.

Walter Higgs of Clinton has been arrested twice on DUI charges, once in Clinton and once in Byram.

"Everywhere in Rankin County is tough, but I think Clinton and Hinds County are the toughest," Higgs said. "In Clinton, they lock you up and make you serve out your time if you don't pay your fine right there in court."

Clinton reported 120 DUI arrests in 2005 and 124 in 2006. So far this year, it has had 37.

"We have a reputation that our Police Department runs a tight ship, and it passes on to the people in the community," Clinton Police Chief Don Byington said.

The Jackson Police Department showed the biggest drop in DUI arrests, going from 710 in 2005 to 429 in 2006, according to the statistics. The number so far this year is 214. A shortage of officers was one reason cited by officials.The department has about 435 officers.Police officials have acknowledged the need for about 200 more.

"I would also like to think that the decrease is a reflection that our proactive programs are starting to work," JPD Lt. Jesse Robinson said.

According to the Mississippi chapter for Mothers Against Drunk Driving, of the 911 traffic fatalities in the state, 346 were alcohol-related last year.

Regardless of in what city or county a person receives a DUI, officers must be trained effectively to get a conviction in court, Clinton Police Sgt. Creston Berch said. "Everybody knows DUI is one of the most contested things in court because of the consequences it carries," said Berch. "A person loses their license for a period of time, and they stand a chance of losing their job."

- 

To comment on this story, call Nicklaus Lovelady at (601) 961-7239.

---- Index References ----

Company: CLARION CO LTD

News Subject: (Population Demographics (1PO77); Criminal Law (1CR79); Police (1PO98); Crime (1CR87); Minority & Ethnic Groups (1MI43); Automobile Crime (1AU99); Forecasts (1FO11); Legal (1LE33); Social Issues (1SO05))

Region: (U.S. Southeast Region (1SO88); USA (1US73); North America (1NO39); Americas (1AM92); Mississippi (1MI74))

Language: EN

Other Indexing: (Don Byington; Hillary Clinton; Walter Higgs; Toby Trowbridge; Domonic Marshall; Creston Berch; Jesse Robinson)

Edition: Metro

Word Count: 799

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

EXHIBIT 71

**News**Room

7/18/06 Clarion-Ledger (Jackson, Miss.) B1
2006 WLNR 25321982

Clarion-Ledger, The (Jackson, MS)
Copyright © 2006 Gannett

July 18, 2006

Section: State/Metro

Roadblocks questioned in Canton

July 18, 2006

smetz@clarionledger.com

CANTON - Tired of the roadblocks around her Canton neighborhood and the badgering she and her neighbors allege they endure from law enforcement authorities, Laura Elaine Blair came to the Madison County Board of Supervisors on Monday seeking help.

smetz@clarionledger.com

Blair and the group she leads called "Concerned Citizens of Canton, MS" have gathered 664 signatures asking for an end to "frequent roadblocks in the predominantly black neighborhoods," "the excessive force and brutality administered by police officers" and "racial profiling."

She asked that her group be granted meetings with law enforcement to discuss their concerns.

Canton Police Chief Robert Winn, who was not present at the supervisor's meeting, could not be reached for comment. Blair said afterward she plans to meet with Winn about the group's concerns.

But the majority of complaints are directed at the Madison County Sheriff's Department, Blair said.

Sheriff Toby Trowbridge, who was present at the meeting, refused to meet with the group and later explained a meeting was a "lose-lose" situation.

Trowbridge said he's not ending roadblocks because they are useful in nabbing drivers under the influence and those with outstanding warrants and for confiscating illegal drugs. Therefore, he said, there's no point to meet.

Trowbridge also denied that his office engaged in racial profiling, noting that the majority of people caught in roadblocks were white and the typical arrest was a white female on a DUI charge.

"I will enforce the law, no matter what color (they are)," Trowbridge said.

**WESTLAW**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

Blair and fellow Canton resident Brenda Grice said they've seen as many as five roadblocks around their neighborhood referred to as the "old projects" around George Washington Avenue, formerly known as Lutz Street.

And the officers are rude, Grice said. "It's the way they talk to you."

Grice, 44, said her 17-year-old daughter was threatened with arrest for not having her driver's license when the daughter drove down the street to an aunt's house. Grice said she had to walk down to the house to get the license and ride back with her frightened daughter.

Responding, Trowbridge said state law mandates drivers have a valid license on their person when they operate a motor vehicle. "It's a (ticketing) offense," he said.

Blair said afterward that her organization will begin document-ing complaints.

"You can always get bad apples in any bunch," said District 5 Supervisor Paul Griffin, who was a deputy sheriff for 15 years before his election as supervisor in 2000.

Griffin said he's received numerous complaints alleging verbal abuse as well as some cases of physical abuse at the hands of the Sheriff's Department. When he served under a previous sheriff, he said he witnessed abuse.

Trowbridge took offense to Griffin's remarks.

---- Index References ----

News Subject: (Crime (1CR87); Criminal Law (1CR79); Civil Rights Law (1CI34); Social Issues (1SO05); Minority & Ethnic Groups (1MI43); Automobile Crime (1AU99); Legal (1LE33); Police (1PO98); Race Relations (1RA49))

Language: EN

Other Indexing: (Toby Trowbridge; Brenda Grice; Robert Winn; Laura Elaine Blair)

Edition: Metro

Word Count: 454

---

End of Document                           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 72

**News**Room

11/6/07 Clarion-Ledger (Jackson, Miss.) B1
2007 WLNR 27805274

Clarion-Ledger, The (Jackson, MS)
Copyright © 2007 Gannett

November 6, 2007

Section: State/Metro

Racial profiling accusations thrown at Madison sheriff in board meeting

November 6, 2007

elizabeth.crisp@clarionledger.com

CANTON - Several people accused the Madison County Sheriff's Department of racial discrimination during the supervisors' meeting on Monday, but Sheriff Toby Trowbridge insisted it isn't so.

elizabeth.crisp@clarionledger.com

"I hate that they feel that way about me, but it's just not true," Trowbridge said outside the supervisors' meeting room at the Circuit Courthouse. The allegations are "totally unfounded," he said.

Jackson resident David Archie told supervisors that he believes the department treats African Americans unfairly through racial profiling, intimidation and a disproportional use of roadblocks in predominantly black areas.

"There's a real issue here that needs to be dealt with," said Archie, who hosts a local talk radio show.

In 2004, Archie accused Madison County deputies of illegally stopping people and ordering Breathalyzer tests without probable cause after he was arrested and charged with driving under the influence. The charge eventually was dropped, and he started a group called Citizens Against Racial Profiling.

At the meeting Monday, Archie called for Trowbridge's resignation and said he is planning a boycott of Madison County businesses.

"If you are going to be sheriff, then you need to understand all people, not just Caucasians, not just Republicans, but all people," Archie said. "(Trowbridge is) not concerned about other folks."

Archie was joined by Bill Chandler and Patricia Ice of the Mississippi Immigrants Rights Alliance, state Rep. Erik Fleming, D-Clinton, and Bolton resident Annie Green.

Ice claimed that the Madison County Detention Center takes bond money from jailed undocumented Latino immigrants but does not let them out. "There have been several attorneys complain about this," she said. "That is stealing, and it's fraud."

Trowbridge did not address any of the allegations during the meeting, but three of the county's supervisors who are white voiced their support for the sheriff.

Near the end of the meeting, District 2 Supervisor Tim Johnson thanked Trowbridge for his service. "The sheriff's job is to protect the citizens, and you do a great job," he said.

Board president and District 3 Supervisor Andy Taggart echoed Johnson's remarks, and District 1 Supervisor Doug Jones wished Trowbridge luck in today's election.

District 4 Supervisor Karl Banks, who is black, said he was disappointed with the way the issue was handled during the meeting. "I think that the people who were there were expecting to get more from the conversation," Banks said. "With the obvious support from some board members for the sheriff regardless of these concerns, it kind of shut down the possibility of anything being accomplished."

Banks said he thinks there is a problem with the perception of the Sheriff's Department.

"The conversation today was about a feeling in the community," Banks said. "I know, as an African American, that there is a real feeling in the community that the department is discriminating against people."

Fleming also expressed concern about public perception.

"We have some great things that are happening in Madison County, but we don't want some segments of the population to feel like they can't participate," he said.

Banks said he routinely fields complaints about the Sheriff's Department. He said the sheriff should work with people to change the department's image.

"Communication could help bring about an understanding," he said.

Trowbridge has said he does not meet with residents to discuss complaints.

•

To comment on this story, call Elizabeth Crisp at (601)942-9019.

---- Index References ----

News Subject: (Race Relations (1RA49); Police (1PO98); Minority & Ethnic Groups (1MI43); Legal (1LE33); Social Issues (1SO05); Civil Rights Law (1CI34))

Region: (U.S. Southeast Region (1SO88); Mississippi (1MI74); USA (1US73); Americas (1AM92); North America (1NO39))

Language: EN

Other Indexing: (Patricia Ice; Erik Fleming; Annie Green; Bill Chandler; Toby Trowbridge; David Archie)

Edition: Metro

Word Count: 558

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 73

**News**Room

1/14/09 Clarion-Ledger (Jackson, Miss.) A1
2009 WLNR 19779141

Clarion-Ledger, The (Jackson, MS)
Copyright © 2009 Gannett

January 14, 2009

Section: Main

House panel considers bill to outlaw racial profiling

January 14, 2009

•Some say police target minorities for shakedowns, beatings

By Elizabeth Crisp

elizabeth.crisp@clarionledger.com

elizabeth.crisp@clarionledger.com

Several Mississippians told a state House panel Tuesday they had been victims of racial profiling and asked legislators to toughen laws against the practice.

Two metro-area police chiefs testified they believe racial profiling is occurring in the state, while Jackson's chief questioned the need for legislators' involvement.

"A lot of folks think just because they've not experienced it, it doesn't exist," said House Judiciary B Committee chairman Willie Bailey, D-Greenville.

For Jernel Winters, it was being pulled over for "careless driving,"which led to a pat-down search and a request to go through his car, he said.

Officers found nothing, he said, and the careless driving charge was dropped. "It really hurt me that they did that because Idon't fool with nobody or drugs or anything," said Winters, a Flora resident.

Otis Ashford of Moss Point told lawmakers he believes he was beaten and shocked with a stun gun for being black in the wrong place at the wrong time.

"They were looking for a guy who had broken into a house about a mile away," his wife, Rosa, said.

Proposed legislation by the ACLU prompted the hearing. The draft legislation would fine officers who commit acts of racial profiling and would require that law enforcement agencies collect race and gender data when arrests are made.

The goal, ACLU of Mississippi director Nsombi Lambright said, is to make sure officers aren't basing stops solely on race.

"Racial profiling is (a subject)that we at the ACLUwork on on a daily basis," she said. "Incidents happen all across the state."

Mississippi is one of about 25 states with no law on racial profiling. Others have laws that define the practice, and some mandate that law enforcement keep traffic stop records that include the race of those who are stopped and searched by police.

State Rep. John Moore, R-Brandon, raised several questions about whether a law would hinder police. If police have a description of a suspect, they have to stop people who fit that profile, he said.

"If it were me, I would want them doing whatever is necessary to catch the guy,"he said.

With local law enforcement holding considerable influence at the Capitol, the move for a law on racial profiling likely will face a tough fight.

Jackson Police Chief Malcolm McMillin, who's also the Hinds County sheriff, testified during the hearing that he did not see a need for a law. "Each case has to be judged by its own circumstances,"he said.

Madison County Sheriff Toby Trowbridge, who did not attend the hearing, also was critical of the proposal.

"(The legislators) are wasting people's time and money,"said Trowbridge, whose department has faced allegations of racial profiling in recent years.

The U.S. Supreme Court has ruled that profiling is unconstitutional, so Trowbridge said there's no need for a state law on the matter.

"It's already against the law,"he said.

As for Winters' allegations that a Madison County deputy intimidated him in Flora last year, Trowbridge said,"There are two sides to every story."

Ridgeland Police Chief Jimmy Houston, who is white, and Canton Police Chief Robert Winn, who is black, both testified they believe racial profiling is a problem in Mississippi.

"We can't deny the fact that it's happening,"said Winn, whose own department faced allegations of profiling in 2004 when an officer was accused of shaking down Hispanic residents for money. The officer eventually pleaded guilty to extortion.

Houston said he has conducted two officer investigations in the past six months related to profiling. "The last one has resulted in the dismissal of a young officer,"he said.

A total of 10 people, including law enforcement officials, testified at the hearing.

Bailey said he expects state Rep. Joe Gardner, D-Batesville, will sponsor the House legislation. Gardner could not be reached for comment.

State Sen. Johnnie Walls Jr., D-Greenville, already has filed a bill to prohibit racial profiling and provide penalties. Lawmakers have until Monday to introduce bills.

Trowbridge said he thinks state legislators should focus their efforts on matters such as improving education and increasing law enforcement pay.

"They also need to start worrying about the things they can do to help us save lives,"he said.

•

To comment on this story, call Elizabeth Crisp at (601)961-7303.

---- Index References ----

News Subject: (Government (1GO80); Minority & Ethnic Groups (1MI43); Race Relations (1RA49); Civil Rights Law (1CI34); Legislation (1LE97); Legal (1LE33); Social Issues (1SO05); Police (1PO98))

Region: (U.S. Southeast Region (1SO88); USA (1US73); South Carolina (1SO63); Mississippi (1MI74); Alabama (1AL90); U.S. Southwest Region (1SO89); North America (1NO39); Americas (1AM92); Texas (1TE14))

Language: EN

Other Indexing: (Robert Winn; Otis Ashford; Jimmy Houston; Joe Gardner; Johnnie Walls Jr.; Rosa; John Moore; Malcolm McMillin; Nsombi Lambright; Toby Trowbridge; Willie Bailey)

Edition: Metro

Word Count: 738

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

EXHIBIT 74

| From: | RandyTucker |
|---|---|
| To: | bharbour@madison-co.com; mso18@aol.com; tucker_betty@bellsouth.net; tcurtis@madison-co.com; TAYLOR.CHASTAIN@MADISON-CO.COM; tjones@madison-co.com; 'John Martin Harris' |
| Sent: | 6/5/2009 1:17:47 PM |
| Subject: | FW: "WHITE" Pride" |
| Attachments: | ATT00064.jpg |

**From:** Joe Butler [mailto:jbutler.madisonso@yahoo.com]
**Sent:** Thursday, June 04, 2009 10:35 AM
**To:** Kevin Akins; Brian Albin; Trip Bailey; Doug Barneski; Cheif Belvedresi; LeeBo Brock; Mike Brown; Bryan Burnside; Brad Butler; Jim Butler; Taylor Chastain; Sean Dodds; Amanda Dodds; Lee Drake; Robby Gray; Brad Harbour; Josh/Andrea Harkins; Jay Houston; Bee Hudson; Taco Johnson; Chad Joy; Jason King; Russell Kirby; Johnny Little; Kip Luby; Anthony Mitchell; Bo/Barbie scales; Darren Smith; Chad Trigg; Randy Tucker; Jerry Upton; Steve Vinson; Jeff Waldrop; Bill Weisenberger; Will Weisenberger; Robin Welch; Dick Wheeler; TJ Williams; Jeremy Williams; Todd Wilson; Chris Wright; Joey Wuess
**Subject:** "WHITE" Pride"

-

"GOD BLESS AMERICA "

# "WHITE" Pride"

## *This is great.  I have been wondering about why Whites are racists, and no other race is.....*

## Proud to be White

CONFIDENTIAL

# Michael Richards makes his point.................
# Michael Richards better known as *Kramer* from TVs Seinfeld does make a good point.

# This was his defense speech in court after making racial comments in his comedy act.  He makes some very interesting points...

# Someone finally said it.  How many are actually paying attention to this?  There are African

Americans, Mexican Americans, Asian Americans, Arab Americans, etc.

And then there are just Americans.  You pass me on the street and sneer in my direction.  You call me 'White boy,' 'Cracker,' 'Honkey,' 'Whitey,' 'Caveman'... and that's OK..

But when I call you, Nigger, Kike, Towel head, Sand-nigger, Camel Jockey, Beaner, Gook, or Chink .. You call me a racist.

# You say that whites commit a lot of violence against you... so why are the ghettos the most dangerous places to live?

# You have the United Negro College Fund. You have Martin Luther King Day.

# You have Black History Month. You have Cesar Chavez Day..

# You have Yom Hashoah.  You have Ma'uled Al-Nabi.

CONFIDENTIAL

You have the NAACP.  You have BET.... If we had WET (White Entertainment Television), we'd be racists.  If we had a White Pride Day, you would call us racists.

If we had White History Month, we'd be racists.

If we had any organization for only whites to 'advance' OUR lives, we'd be racists.

We have a Hispanic Chamber of Commerce, a Black Chamber of Commerce, and then we just have

CONFIDENTIAL

MCSD_Emails_Reproduced-00285

the plain Chamber of Commerce. Wonder who pays for that??

A white woman could not be in the Miss Black American pageant, but any color can be in the Miss America pageant.

If we had a college fund that only gave white students scholarships... You know we'd be racists.

There are over 60 openly proclaimed Black Colleges in the US .  Yet if there were 'White colleges', that would be a racist

CONFIDENTIAL

# college.

# In the Million Man March, you believed that you were marching for your race and rights.  If we marched for our race and rights, you would call us racists.

# You are proud to be black, brown, yellow and orange, and you're not afraid to announce it.  But when we announce our white pride, you call us racists.

# You rob us, carjack us, and shoot at us. But, when a white police

MCSD_Emails_Reproduced-00287

**officer shoots a black gang member or beats up a black drug dealer running from the law and posing a threat to society, you call him a racist.**

**I am proud.... But you call me a racist.**

**Why is it that only whites can be racists??**

**There is nothing improper about this e-mail..  Let's see which of you are proud enough to send it on.  I sadly don't think many will.**

CONFIDENTIAL

# That's why we have <u>LOST</u> most of <u>OUR RIGHTS</u> in this country. We won't stand up for ourselves!

## *<u>BE PROUD TO BE WHITE!</u>*

**It's not a crime YET... but getting very close!**

**It is estimated that ONLY 5% of those reaching this point in this e-mail, will pass it on.**

---

**An Excellent Credit Score is 750.. <u>See Yours in Just 2 Easy Steps!</u>**

---

Insert movie times and more without leaving Hotmail®. <u>See how.</u>

MCSD_Emails_Reproduced-00289

EXHIBIT 75



## Making Amends

By **Lacey McLaughlin**

Wednesday, August 17, 2011 3:37 p.m. CDT

0



Courtesy Jimmy Houston

Former Ridgeland Police Chief Jimmy Houston wants to be the next Madison County Sheriff.

The Aug. 2 Republican primary for Madison County sheriff was a fierce race with five candidates vying for the post. Madison County Sheriff Toby Trowbridge will retire this year. One of the candidates, Mark Sandridge, caught the most media attention this spring after his campaign portrayed Jackson in a negative light. His campaign tactic may have backfired; he received only 11 percent of the vote.

The two candidates with the most primary votes, Jimmy Houston and Randy Tucker, will compete in a run-off election Aug. 23. The winner will face Democratic candidate Ted Smith in the Nov. 8 general election.

### Jimmy Houston

Former Ridgeland Police Chief Jimmy Houston began his career in law enforcement in 1973 as a Jackson Police Department officer. In 1999 he left JPD to serve as Flowood police chief until 2000 when he became director of the Department of Public Safety. In 2002, he became Ridgeland's police chief. He retired earlier this year. The 59-year-old cites his experience and the relationships he has with area law enforcement as his advantages in the race. Visit his website (http://www.jimmyhoustonforsheriff.com) for more information.

**How did you work with JPD when you were chief?**
The Precinct 4 commander and I did stake outs together. Up until we changed radio systems, we had radios that talked to each other. Jackson is trying right now to come online so we can get back to that.

**How much of your resources did you allocate to County Line Road when you were Ridgeland's chief?**
If you are talking about accidents, County Line Road is one of the biggest areas between Ridgewood Road and I-55 that lead our cities on accidents. Did I put people there? Absolutely. Why did I do it? Because people were running red lights, blocking intersections and having a lot of wrecks.

**Why do you want to be Madison County sheriff?**
I want to take what Jimmy Houston accomplishes to the sheriff's department. I want to make it county wide instead of just city wide. I am a leader. I recognize leadership. I want to take the department to the next level through training, technology and efficient budgeting.

**There is a perception from some people in Hinds County that if you drive into Madison County with Hinds County tags it's likely you are going to get pulled over. Is that true?**
A lot of times perception is reality, but that was another sheriff candidate's feelings. With the technology that we have in Ridgeland, a complaint of that it's easy to check. All I have to do is pull up the computer, take a look at the video and see why the officer stops them. The Ridgeland Police Department also has a stringent racial-profiling policy that is adhered to and checked when there is a complaint.

 Courtesy Randy Tucker

### Randy Tucker

Randy Tucker calls Madison County home. His immediate and extended family live in the county, and he calls himself a dedicated citizen. The 41-year-old graduated from the Mississippi Law Enforcement Officers Training Academy in 1994. He began his career working at the Madison County Sheriff Detention Center. In 2000, he moved the Madison County Sheriff's Department and, in 2002, received a promotion to serve as chief officer of the narcotics division. Visit http://www.tuckerforsheriff.com for more.

**Why do you want to run for sheriff?**
We want to maintain the quality of law enforcement that we have under Sheriff Trowbridge. These men and women in this department have gotten behind me and think I am the man for the job. I want to do the job not only for them but for Madison County.

Case 3:17-cv-00347-WHB-LRA   Document 231-75   Filed 03/14/18   Page 3 of 4

**How will you work with other metro-area law enforcement?**

It's vital for all of law enforcement to work together. We are outnumbered by criminals as it is. Our neighboring law enforcement entities such as the Jackson Police Department, Hinds County and Yazoo or Holmes—we have to have a good working relationship with them. Crime is going to go over the county lines.

**How are you already working the different counties?**

If you have got a suspect that has left your jurisdiction, in, say, Madison County and gone into Hinds County, you need a representative from that department or jurisdiction to accompany you and make a lawful arrest. Drug deals, for example, that we have done a million times over the last few years spill over to other jurisdictions.

**Your former opponent's ads insinuated that crime stops at County Line Road. What do you think about that?**

I don't agree that crime stops at any boundary, imaginary or visible. I think the population level of Hinds County has overwhelmed their law enforcement. But it's not their fault. Anytime you have a metropolitan area, the crime is going to be higher because there is a more dense population.

*To read more candidate interviews and more political news, visit http://www.jfppolitics.com and follow @jfppolitics on Twitter.*

Facebook        Twitter        LinkedIn        Email        CleanPrint        More

## More like this story

Sheriff: Man Fatally Shoots Defendant Waiting at Courthouse
Stokes Comments Spark AG Charges, Fundraising in Madison County
The JFP Interview With Tyrone Lewis
Officials: Madison County Courthouse Shooting Suspect 'Peacefully' Taken Into Custody
Crossing the Line?

## More stories by this author

Lots of Mouths to Feed
The Lone Democrat
Bennie Hopkins
Farish to Face More Delays Without Financing
Second Chances

## Comments

Use the comment form below to begin a discussion about this content.



**Jackson Free Press Comment Policy**

"Disagree agreeably." Don't insult others, no slurs, stay on topic.
Please read our Comment Policy before commenting.

**0 Comments**        **Jackson Free Press**                                    💬 Login ▾

♡ Recommend    ⬆ Share                                            Sort by Oldest ▾

Start the discussion…

LOG IN WITH                    OR SIGN UP WITH DISQUS ⑦

Name

Be the first to comment.

✉ Subscribe    ⓓ Add Disqus to your siteAdd DisqusAdd    🔒 Privacy

**Sections**        News, Opinion, Arts, Music, Events, Life+Style, Food+Drink, Sports
**Events**          Events Calendar, Submit an Event
**Media**           Photos, Galleries, Videos, Audio, Documents
**Advertise**       In the JFP, Classifieds, Email the Publisher
**Jobs**            At the JFP

© Jackson Free Press, Inc.
User agreement and privacy statement.
phone: 601-362-6121 (ext 11 sales, ext 16 editorial, ext 17 publisher)
fax: 601-510-9019
125 S. Congress St. #1324 * Jackson, MS * 39201

EXHIBIT 76



## Y'all Politics

**Wednesday, March 7, 2018**

# Madison County Sheriff's Deputy Captain Randy Tucker To Run for Madison County Sheriff

Madison County Sheriff's Deputy Captain Randy Tucker To Run for Madison County Sheriff

Randall "Randy" Tucker of Gluckstadt announced today that he will be a candidate for Madison County Sheriff in November.

"My campaign for Sheriff will be about maintaining the professionalism, integrity and high quality of law enforcement in Madison County. I believe the Sheriff's Department should vigorously protect the citizens of the county and enforce the laws of Mississippi, with no exceptions," stated Tucker. He added, "As Madison County Sheriff, I will continue the high level of law enforcement and justice Madison County residents expect and have enjoyed under Sheriff Toby Trowbridge."

"As a husband, father, longtime law enforcement officer and current Captain in the Madison County Sheriff's Department, I know and understand that integrity and justice go hand-in-hand," stated Tucker. "I am proud of Madison County and proud that it is a place where people feel safe and want to raise their families."

Randy Tucker has been a sworn law enforcement officer for 17 years, having graduated from the Mississippi Law Enforcement Officers Training Academy in 1994. He first worked for the Madison County Sheriff's Detention Center under Sheriff Hopkins and was then employed by the Canton Police Department, where he was a patrolman before being assigned to the Narcotics Division where he was promoted to supervisor. In 2000, Tucker returned to the Madison County Sheriff's Department, assigned to the Narcotics Division and in 2002 was promoted to chief officer of the Narcotics Division, where he currently serves as Captain.

As a law enforcement officer, Tucker has received formal, specialized training and graduated from courses in Undercover Investigations, Narcotics Investigations, Criminal Patrol, Clandestine Methamphetamine Labs, Violent Street Gang Investigations, Crisis / Hostage Negotiations and Management, First Line Supervisor, Advanced Supervisor and Asset Seizure and Forfeiture.

The Narcotics Division under Tucker, recently received the highest award from the Organized Crime Drug Enforcement Task Force (OCDETF) in Ashville, North Carolina, for their work on a cocaine investigation, earning them the award for the Southeastern Case of the



Case 3:17-cv-00347-WHB-LRA   Document 231-76   Filed 03/14/18   Page 3 of 4

Year.

During his career in law enforcement in Madison County, Tucker has received Outstanding Narcotics Agents awards, Officer of the Month awards, served as Mentor for the National Guard Youth Challenge Program, served on the Madison Ridgeland Youth Club Baseball Board and spoken at numerous schools and functions such as Lions Clubs and the Madison Ridgeland Rotary Club.

Tucker, 41, grew up in Madison County where he and his family currently reside. He is a graduate of Madison Ridgeland High School. Tucker has been married to the former Michelle Gainey of Canton for eighteen years and has two children: Stephen and Kyle. Tucker and his family are long-time members of Grace Chapel in Madison.

Randy Tucker Press Release
1/18/11

**Posted January 19, 2011 - 4:32 pm**



YallPolitics.Com now uses Facebook for comments. Log into Facebook to comment here.



**0 Comments**        Sort by   Newest ⇕



Add a comment...

f  Facebook Comments Plugin

©2005-2018 Jackson New Media, Inc. All rights reserved. Contact us at editor at yallpolitics.com

# EXHIBIT 77



# Office of the Sheriff
## Madison County, Mississippi
2941 Highway 51 ● Canton, Mississippi 39046 ● Phone: 601-859-2345 ● Toll Free 1-877-736-2883
### Toby Trowbridge, Jr., Sheriff

January 3, 2012

To:     All Deputies / Employees

From:  Sheriff Randall Tucker

Re:     Policies and Procedures


The policies and procedures under the administration of Sheriff Toby Trowbridge shall remain in place and effective as the policies and procedures for the administration of Sheriff Randy Tucker.


Please place this memo in your policies and procedure book before Section 1.


Variations to these policies and procedures may be made at the discretion of the Sheriff.


If you have any questions please feel free to contact me or Chief Deputy Williams.


Sheriff Randall Tucker

# EXHIBIT 78

MADISON COUNTY SHERIFF'S OFFICE PHONE LISTINGS
THESE NUMBERS ARE CONFIDENTIAL******DO NOT GIVE OUT****** AUTH: SO-1

EMPLOYEE, CONSTABLE, GAME WARDEN, CORONER, FLORA POLICE, ABC AGENT  RESERVE, EMERGENCY MANAGEMENT, STATE  FIRE DEPT. OTHER.

* INDICATES SWAT TEAM MEMBER
* INDICATES TACTICAL DISPATCH / SWAT CALLOUT
+ INDICATES NEGOTIATOR / SWAT CALLOUT
** INDICATES A EMPLOYEE WITH RESERVE CERTIFICATION
*** INDICATES A DIVE/RESCUE TEAM MEMBER

| BADGE# | EID # | NAME | HOME | CELL | PAGER/ALT CELL/ALT HOME | EXT. | OFFICE FAX | MOBILE | HAND-HELD | UPDATE 02-2009 | BADGE# |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SO1 | 5095 | SHERIFF TOBY TROWBRIDGE, JR | | | | 722 | (601) 855-0783 | 101 | 201 | | SO1 |
| SO2 | | | | | | 715 | (601) 855-0779 | | | | SO2 |
| A1 | 556 | CAPT. TERRY BARFIELD | | | (601) 920-7952 | 717 | (601) 855-0774 | 119 | 218 | | A1 |
| A2 | 2560 | LT. DON HICKS | | | | 747 | (601) 855-0774 | 177 | | | A2 |
| A3 | 4998 | M/SGT. JEFF WALDROP | | | (601) 929-4967 | 778 | (601) 855-0774 | 126 | 204 | | A3 |
| A4 * | 5318 | M/SGT. ROBBIN WELCH | | | | 751 | (601) 859-6764 | | 294 | | A4 * |
| A5 | 5335 | M/SGT. TODD WILSON | | | (601) 929-4979 | 716 | (601) 855-0774 | | | | A5 |
| V1 *+ | 5107 | CAPT. RANDY TUCKER | | | | 743 | (601) 855-0770 | 174 | 220 | | V1 *+ |
| V2 | 2719 | LT. TOMMY JONES | | | (601) 940-4910 | 733 | (601) 855-0770 | 147 | 216 | | V2 |
| V3 | 1747 | M/SGT. TREY CURTIS | | | | 726 | (601) 855-0770 | 171 | 208 | | V3 |
| V4 | 1190 | M/SGT. TAYLOR CHASTAIN | | | | 724 | (601) 855-0770 | 118 | 211 | | V4 |
| V5 | 2504 | M/SGT. JOHN HARRIS | | | | 742 | (601) 855-0770 | 148 | 232 | | V5 |
| V6 | 2803 | M/SGT. SHANE LANG | | | | 753 | (601) 855-0770 | | | | V6 |
| SO3 | 1888 | LT. GEORGE ELLIOTT | | | (601) 954-2626 | 710 | (601) 859-6764 | 179 | 245 | | SO3 |
| SO4 | 801 | LT. OTHA BROWN | | | | 710 | (601) 859-6764 | 128 | 235 | | SO4 |
| SO5 | 2705 | LT. ALBERT JONES | | | (601) 750-8878 | 710 | (601) 859-6764 | 116 | 229 | | SO5 |
| SO6 | 5493 | SGT. CLINE WYMAN | | | (601) 260-3140 | 710 | (601) 859-6764 | 111 | 242 | | SO6 |
| SO7 * | 4681 | SGT DARIAN SMITH | | | | 710 | (601) 859-6764 | | | | SO7 |
| SO8 | 2716 | RUSSELL KIRBY | | | (601) 929-4978 | 710 | (601) 859-6764 | 129 | 213 | | SO8 |
| SO9 | 3948 | LT. BRAD HARBOUR | | | (601) 929-4966 | 741 | (601) 855-0784 | 173 | 205 | | SO9 * |
| SO10 * | 3356 | JOEY BUTLER | | | (601) 929-4972 | 710 | (601) 859-6764 | 133 | 206 | | SO10 * |
| SO11 | 1914 | M/SGT. ELTON FLAX | | | (601) 951-6116 | 710 | (601) 859-6764 | 134 | 236 | | SO11 |
| SO12 | | OPEN | | | | 710 | (601) 859-6764 | | | | SO12 |
| SO13 | 3042 | BRIAN LOVEALL | | | | 710 | (601) 859-6764 | | 238 | | SO13 |
| SO14 *** | 3350 | CHRIS McDONALD | | | (601) 540-7905 | 710 | (601) 859-6764 | 113 | 601 | | SO14 *** |
| SO15 *+ | 5241 | WILL WEISENBERGER | | | | 710 | (601) 859-6764 | | 243 | | SO15 *+ |
| SO16* *** | 5027 | BUBBA THOMAS | | | (601) 942-2498 | 710 | (601) 859-6764 | 117 | 600 | | SO16* *** |
| SO17 * | 4543 | SGT. MARK SANDRIDGE | | | (601) 929-4973 | 710 | (601) 859-6764 | 132 | 239 | | SO17 * |
| SO18 | 1962 | SETH EVERETT | | | N/A | 710 | (601) 859-5972 | | | | SO18 |
| SO19 * | 2667 | MARCUS HUDSON | | | (601) 929-4968 | 710 | (601) 859-6764 | | | | SO19 * |
| SO20 | 2547 | KIM HENDERSON | | | (601) 750-5368 | 776 | (601) 859-6764 | 127 | 233 | | SO20 |
| SO21 * | 3144 | SGT. KIP LUBY | | | (601) 929-4975 | 746 | (601) 855-0748 | 105 | 230 | | SO21* |
| SO22 | 2402 | SGT. RANDY GREWE | | | | 757 | (601) 859-3070 | 131 | 210 | | SO22 |
| SO23 | 4943 | BRADLEY SULLIVAN | | | | 710 | (601) 859-6764 | | | | SO23 |
| SO24 | 4960 | TOMMY STRAIT | | | N/A | 756 | (601) 855-0772 | | | | SO24 |
| SO25 | | OPEN | | | | 710 | (601) 859-6764 | | | | SO25 |

2011 MCSO Roster - 1

| Code | Num | Name | Phone A | Ext | Phone B | Col1 | Col2 | Code |
|---|---|---|---|---|---|---|---|---|
| SO26 | 3355 | JOHNNY BURSE, JR | | 710 | (601) 859-6764 | | | SO26 |
| SO27 | 2695 | SGT. NATE JOHNSON | | 758 | (601) 859-6764 | 109 | 202 | SO27 |
| SO28 | 2669 | WILLIAM "BEE" HUDSON | | 758 | (601) 859-6764 | | | SO28 |
| SO29 | 4997 | RALPH SHEARRILL | | 758 | (601) 859-6764 | 114 | 227 | SO29 |
| SO30 | 2258 | SCOTT GRAVES | | 710 | (601) 859-6764 | 169 | 296 | SO30 |
| SO31 | 2883 | ROBERT JACKSON | | 710 | (601) 859-6764 | | | SO31 |
| SO32 * | 1893 | JOSH FISH | | 710 | (601) 859-6764 | | | SO32 * |
| SO33 | 2730 | JAMES KNIGHT | | 710 | (601) 859-6764 | 139 | 185 | SO33 |
| SO34 | 2715 | WATTS JOHNSON | | 720 | (601) 859-3070 | 123 | 212 | SO34 |
| SO35 *+* | 2568 | LT. JEREMY WILLIAMS | (601) 929-4984 | 749 | (601) 855-0748 | 157 | 215 | SO35 *+* |
| SO36 * | 3352 | SCOTT McDONALD | (601) 929-4970 | 710 | (601) 859-6764 | | | SO36 * |
| SO37 | 800 | LEE BROCK | | 710 | (601) 859-6764 | 138 | 297 | SO37 |
| SO38 | 3456 | KEVIN MOFFETT | | 710 | (601) 859-6764 | | | SO38 |
| SO39 | | OPEN | | 710 | (601) 859-6764 | | | SO39 |
| SO40 | | OPEN | | 710 | (601) 859-6764 | | | SO40 |
| SO41*** | 1727 | BEAU DAVIS | (769) 798-0171 | 710 | (601) 859-6764 | | | SO41*** |
| SO42 | 1447 | GUY COLLINS | | 710 | (601) 859-6764 | | | SO42 |
| SO43 | 4954 | PETER STONE | | 710 | (601) 859-6764 | | | SO43 |
| SO44 | 4980 | BRANDON THAMES | | 710 | (601) 859-6764 | | | SO44 |
| SO45 | 5498 | MIKE ZIMMERMAN | | 710 | (601) 859-6764 | | | SO45 |
| SO46 | 2112 | ROBERT GIBSON | | 710 | (601) 859-6764 | | | SO46 |
| SO50 | 4065 | DWAYNE MOAK | | | (601) 879-9559 | 183 | 252 | SO50 |
| SO51 | 39071 | WAYNE BARFIELD | | | | | | SO51 |
| SO52 | 12563 | FRANK BELL | | | | | | SO52 |
| SO53 | 2856 | BILLY LESTER | | | | | | SO53 |
| SO60 | 3216 | MIKE FURR | | | | 136 | 257 | SO60 |
| A10 | 3648 | DIRECTOR BILLY MYERS | (601) 405-4216 | 718 | (601) 855-0773 | 104 | 214 | |
| C1 | 5819 | LT. WAYNE WELLS | | 775 | (601) 855-0782 | | | C1 |
| C2 | 1905 | DONYEL BEALS | | 728 | (601) 859-6764 | 143 | 200 | C2 |
| C3 | 29103 | STEVE VINSON | | 728 | (601) 859-6764 | | 293 | C3 |
| C4 | 601 | BRENT BIGBY | | 728 | (601) 859-6764 | | | C4 |
| C5 | 2876 | KIM LAYTON | | 728 | (601) 859-6764 | | | C5 |
| C6 | 5314 | MARYANN WHITAKER | | 728 | (601) 859-6764 | | | C6 |
| C7 | 602 | CHRISTIE BISHOP | | 728 | (601) 859-6764 | | | C7 |
| C8 | 2584 | BRITTANY WILKINSON | | 728 | (601) 859-6764 | | | C8 |
| C9 | 3353 | KEISHAWN McDONALD | | 728 | (601) 859-6764 | | | C9 |
| C10 | 3640 | TINA MULLEN | N/A | 728 | (601) 859-6764 | | | C10 |
| C11 | 1963 | JOEL EVANS | N/A | 728 | (601) 859-6764 | | | C11 |
| S1 | 4095 | LT. J.P. PILGRIM | | 5672 | | | | S1 |
| S2 | 3387 | CPL. ALLEN McGREGOR | | 5672 | | | | S2 |
| S3 | 884 | MICHAEL R MYRICK | N/A | 5672 | | | | S3 |
| S4 | 1925 | LESLIE PAXTON | | 5672 | | | | S4 |
| S5 | 3395 | JAMES RAYBORN | | 5672 | | | | S5 |
| ADMIN | 5086 | LYNN THORNBURG | | 721 | (601) 859-9163 | | | ADMIN |
| ADMIN | 3434 | MARY ANN McNEAL | | 731 | (601) 855-0771 | | | ADMIN |
| ADMIN | 1910 | CYNTHIA ESCO | | 719 | (601) 859-3070 | | | ADMIN |
| 510 | 8453 | CONSTABLE MIKE BROWN | | 6337 | (601) 859-5878 | | | 510 |

# EXHIBIT 79

 



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Jackson Area Office**

Dr A H McCoy Federal Building
100 W Capitol Street, Suite 338
Jackson, MS 39269
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Jackson Status Line: 866-408-8075
Jackson Direct Dial (601) 948-8366
TTY (601) 948-8369
FAX (601) 948-8401
Website  www.eeoc.gov

May 9, 2013

Visited by Robert Gipson-Charging Party

Four guys (police officers) were working. I (CP) called Jeremy, I told him that I got word that he said, I did not back him up. When I got to where Jeremy was, the guy (suspect) was already in custody. Per the Chief, he found out that was a lie per Jeremy.

There are three supervisors, Lieutenant Brown, Master Sergeant Flax and Bo Davis. I have never been counseled, never pulled to the side.  ????Me and no officers-nothing.

This summer they assigned me to apartment detail where all Blacks are. Three months, back to back.  Per  (who)-Gipson you worked department detail. Never had officers with drug arrest.

Mark Standridge told reason why.??????
Worked at bank-girlfriend (white). Serving papers for Tax Commission office while on clock-getting double pay.

Hudson messing with white female. She is sister-in-law to Bo Davis. (Theft and Fraud) Off duty fight with some guy.
Double pay-tax collector office working .

8:00 a.m. to 5:00 Narcotics (w/m) Narcotics Deputy on clock for narcotics  go work school traffic in afternoon. School pay-3:00 traffic detail-in afternoon (He quit). Work second job while on clock with County.

Christy (white) dispatcher  Madison County Sheriff car. She printed on car nigger Fax????
Picture within last year.

Within six months ago. Deputy (w/m) Range officer sent to Training Academy. He had two guns in his hand  (on internet) He said, this what I got for those Democrats.

Alpha One-Captain Barfield said, "I'm sick of these niggers."
Alpha Two-Todd
Jeff Waldrop-(white) Investigator Knight replaced him  training and Investigator now just training.

Alpha Nine-Kim Henderson-over by Civilian employees-Junvile cases from 8:00 a.m. to 5:00 p.m.

MC  0037

Robbin Welch-Alpha 3
    Kirby-Alpha 4
    Knight-Alpha 5-no investigation experience from jail to patrol

Mark Standridge-I made sure CP would never get another job in Madison County. Road block-R did 3x weekly.

He shook my hand. I thought maybe you had problem with me. I told him way treating blacks wrong. I keep tract of everything going on around here.

Lt. Standridge over DUI.
Chief Williams-Sheriff Department

Brandon Thames all this never happened.
Bo Davis-Sgt. He's on probation when he got Sgt. This occurred December 2012. January 2013. he was texting and lost control.

11:00 p.m. to 7:00 a.m. CP worked.
8:00 p.m.??? to 11:00 p.m.??? DUI Unit-Grant got from government to get drunks off road. He would be in office not on patrol.

Job Description for Investigators-CP will provide.

No Blacks make over time.

Chief Williams best friend with Randy Tucker.


Visited by Robert Gipson-05/16/2013

Internal Investigation

Lisa Mayo and an Attorney-Putting employees in positions before responding to EEOC. Moffett assigned to work DUI grant. Work 11:00 p.m. to 7:00 a.m. He can work the grant now. Work 5 to 6 hours to look for DUI employees.

Old Canton & William Blvd.-Moffett and Standridge working a road block. Brandon Thames, he's also on DUI-made bunch of complaints he was quitting-moved to different shift-he wanted. He told Lisa Mayo this. He's been moved to afternoon shift.

Lt. Brown was angry said, Moffett and Brandon Thames wrong way he did it. Over racism and they fired him.?????????????

Fired me-two jobs without permission. Hammer (w/) officer quit. Don Hicks (white) -6 months ago beat his wife, put her in hospital. No action taken. He committed a crime. We take care of this subject to termination.

Black reserve officer-terminated not allowed on property.
Mike Zimmerman (white) stealing taking man money and took his gun. Said he did not have the gun, tried to sell gun to SO43 - Kyree (black). Fired 2/3 weeks ago as of 05/16/2013. He has been back in the Sheriff's department 5/6 times.

NOTE:GET MEMO ABOUT CP AND RESERVE NOT ALLOWED ON GROUNDS.

Day Shift-Court Duty-

# EXHIBIT 80

*Madison sheriff responds to Jackson councilman's remarks*,
THE CLARION-LEDGER (Jan. 4, 2016)

Video available at:
https://www.clarionledger.com/videos/news/local/2016/01/04/78247954

EXHIBIT 81

| | |
|---|---|
| **From:** | fhalford@comcast.net |
| **To:** | Tucker, Randy |
| **Sent:** | 1/18/2016 9:57:46 PM |
| **Subject:** | Re: Annual Meeting |

Correction....meeting starts at 2:00

---

**From:** fhalford@comcast.net
**To:** "Randy Tucker" <randy.tucker@madison-co.com>
**Sent:** Monday, January 18, 2016 6:23:50 AM
**Subject:** Annual Meeting

We scheduled our annual homeowner's meeting for March 5 (Saturday) @ 3:00 at Grace Crossing Church

---

**From:** fhalford@comcast.net
**To:** "Randall Tucker" <Randall.Tucker@madison-co.com>
**Sent:** Tuesday, January 5, 2016 5:53:41 PM
**Subject:** Re: Thanks

Will do

---

**From:** "Randall Tucker" <Randall.Tucker@madison-co.com>
**To:** fhalford@comcast.net
**Sent:** Tuesday, January 5, 2016 5:47:03 PM
**Subject:** Re: Thanks

Ok great just let me know when you settle on a time

Sent from my iPhone

On Jan 5, 2016, at 5:40 PM, "fhalford@comcast.net" <fhalford@comcast.net> wrote:

By the way we are planning our annual homeowner meeting on Sat Feb 27.  Not sure of the time probably 2 or 3.

---

**From:** "Randall Tucker" <Randall.Tucker@madison-co.com>
**To:** fhalford@comcast.net
**Sent:** Tuesday, January 5, 2016 5:37:49 PM
**Subject:** Re: Thanks

Thank you sir and I wholeheartedly agree with you on mr griffin

Sent from my iPhone

CONFIDENTIAL

On Jan 5, 2016, at 5:30 PM, "fhalford@comcast.net" <fhalford@comcast.net> wrote:

Sheriff Tucker,
First I want to thank you for supporting Law Enforcement in the Madison County and Tri-County area agains the ignorant Kenneth Stokes.  Rest assured that all of Madison County is behind you.

Also, as a resident of District 5 I am ashamed of the behavior of our so called supervisor at Monday's BOS meeting.  This is the second meeting that I have recently attended where he had uncalled for outburst and also the second time that he tried to put you in the position to remove another elected official.  From what I saw in both cases, Mr Jenkins was trying to clarify confusion and mis-information. The subject matter, as you know is a very serious matter and the facts need to be presented and documented correctly since the matter is in litigation.

I'm curious if Mr Griffin is related to Kenneth Stokes since their language is similar (dis, dat, dees, and doez), he is quick to use the race card, and most times he speaks before he thinks and refuses to listen to the opposing side.

In my opinion, Mr Griffin should not be allowed to act in the manner that he has recently exhibited. These actions reflect poorly on the BOS and by extension Madison County.  He constantly shows lack of respect for residents and now for elected officials.  Calling Mr Jenkins "Boy" in a derogatory manner and I believe he did the same to the newly elected Supervisor and President of the BOS, Trey Baxter,  and this confirms his lack of respect.

Keep up the great work you do for Madison County!!!

Frank Halford

# EXHIBIT 82





**JACKSON POLICE DEPARTMENT**
Shirlene Anderson,
Chief of Police
127 S. Roach Street
Jackson, MS 39201
601-960-1217

# <u>MEMORANDUM</u>

**TO:**      Sgt. Slade Moore

**FROM:**   Shirlene Anderson, Chief of Police

**DATE:**    June 15, 2006

**RE:**      Grievance Response
_____

    You are currently under investigation for several administrative matters. Specifically, there are approximately 30 internal affairs complaints filed including pending civil litigation matters relating to your conduct as an officer of the City of Jackson Police Department. Federal law holds the City of Jackson accountable for any behavior that may be considered common practice, pattern or procedure. According to the laws of the state of Mississippi, specifically the most recent Mississippi Court of Appeals' ruling in *Calcote vs. the City of Jackson,* a municipality may be liable for conduct of its employees if such conduct was undertaken with reckless disregard.

    In *Calcote,* the Mississippi Court of Appeals ruled your actions were undertaken with reckless disregard for the rights of a handcuffed arrestee, thereby negligent, resulting in a civil judgment against the City. Therefore, it is incumbent upon the City of Jackson to conduct a thorough investigation of each allegation before reinstating any police powers. The City of Jackson's desire to exercise due diligence in its investigations of these matters is required by current federal, state and local laws. You have not received any demotion in pay or benefits as a result of the re-assignment to the impound lot. Therefore all actions by the City of Jackson's Police Department fall within the guidelines of general orders, local, state and federal guidelines and are proper considering the circumstances.

    Additionally, the grievance you submitted on May 22, 2006 in regard to the September 28, 2005 action is not timely filing of a grievance.

6/15/2006                                                                                                  1

The City of Jackson Employee Handbook states, "Aggrieved employees shall provide grievances in writing to the immediate supervisors within five (5) working days after occurrence of the grievance and attempt to resolve the matter."

# EXHIBIT 83

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

**SLADE MOORE**                                                    **PLAINTIFF**

**VS.**                                              NO. 25H0-592CV

**CITY OF JACKSON, MISSISSIPPI, and**
**JACKSON POLICE DEPARTMENT**              **DEFENDANTS**

## COMPLAINT

### Jury Trial Demanded

**COMES NOW** Plaintiff Slade Moore, by and through his attorney, and files this his Complaint against the City of Jackson, Mississippi, and Jackson Police Department. Plaintiff is seeking monetary, declaratory relief and injunctive relief. As more specifically set forth below, Plaintiff has been subjected to race discrimination and retaliation in the terms and conditions of his employment with Defendants. The actions of the Defendants described herein constitute a violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983.

### PARTIES

1.    The Plaintiff, Slade Moore, is a Caucasian adult resident citizen of Hinds County, Mississippi who resides at 8358 Lebanon Pine Grove, Terry, Mississippi, 39170.

2.    The Defendant, City of Jackson, Mississippi, is Plaintiff's former employer and is a municipal corporation with a principal place of business at 219 South President Street, Jackson, Mississippi 39205. Defendant may be served

with process through the Interim City Clerk Gail Green at: 219 South President Street, Jackson, Mississippi 39205.

     3.    The Defendant, Jackson Police Department, is Plaintiff's former employer and is a Mississippi state agency qualified to do business in Mississippi with a principal place of business at City Hall, 200 South President Street, Jackson, Mississippi 39205. Defendant may be served with process through Chief of Police Tyrone Lewis at: 200 South President Street, Jackson, Mississippi 39205.

## JURISDICTION AND VENUE

     4.    This Court has subject matter jurisdiction over the claims contained in this Complaint.

     5.    Venue is proper in this Court in that substantially all of the transactions, acts, and events complained of occurred in Hinds County, Mississippi.

## STATEMENT OF FACTS

     6.    Plaintiff began working for Defendants on February 12, 1995, as a Patrolman.

     7.    In May, 1997, Plaintiff was involved in an arrest that resulted in the arrestee suing the City of Jackson.

     8.    A Judgment was entered on behalf of the Defendants in *Chad E. Calcote v. City of Jackson, Billy Dilmore and Slade Moore*. However, Mr. Calcote appealed to Hinds County Circuit Court and the county court's decision was reversed. Mr. Calcote was ultimately awarded a monetary settlement.

-2-

9.     Plaintiff remained with the Jackson Police Department, earning several awards and commendations, was assigned to the SWAT Team, was a firearms instructor, a certified accident reconstructionist, a certified police instructor at the Academy, and was promoted to Sergeant.

10.     On September 28, 2005, Plaintiff was abruptly presented with correspondence from Chief of Police Shirlene Anderson that stated Plaintiff was relieved of his police powers (gun, badge, police car, and all Department-issued equipment) in his current position of Sergeant and was immediately placed on change-of-duty status.  Plaintiff was re-assigned to Planning and Research, without police powers that were normally afforded to Sergeants, and without powers that were afforded to similarly situated African-American co-workers.

11.     Plaintiff was informed that his change of status was a result of an administrative investigation being conducted against him.

12.     Plaintiff reported for work the next day on September 29, 2005, at the Planning and Research Division of the Jackson Police Department.

13.     On October 10, 2005, Plaintiff began using acquired Sick Leave because of the enormous stress he was placed under regarding his situation.  Plaintiff remained on Sick/Vacation leave until February 27, 2006.

14.     Upon Plaintiff's return to work, Plaintiff inquired several times regarding the status of the investigation against him.  Plaintiff was never given an update as to the status.

15.     On May 24, 2006, Plaintiff filed a grievance with Chief Anderson's office. Plaintiff's grievances were not satisfied, yet Plaintiff continued to do menial and mundane tasks without his police powers.

16.     On June 19, 2006, Plaintiff's grievance was officially denied by Chief Anderson and Plaintiff was instructed that he would work directly for Mayor Frank Melton.

17.     Mayor Melton instructed Plaintiff to retrieve his gun and equipment and that he would reinstate Plaintiff's police powers.

18.     On July 5, 2006, Plaintiff was served a letter of Intent to Terminate Jackson Police Department.

19.     On July 10, 2006, Plaintiff was given a letter of re-instatement to the Police Department by Mayor Melton.

20.     Plaintiff was wrongfully terminated from Jackson Police Department on July 18, 2006, citing Plaintiff's involvement in the *Calcote* matter and his violation of General Orders and Rules. This termination by Chief Anderson shows a policy or practice of race discrimination that was adopted by the Defendant through Chief Anderson's actions.

21.     Plaintiff was wrongfully terminated and discriminated against by the City of Jackson and the Jackson Police Department based upon his race. Two African-American officers were in violation of the same General Orders and Rules that Plaintiff was accused of violating and were simply suspended without pay. One officer never lost police powers. Further, six African-American officers

were involved in various lawsuits brought against the City of Jackson within the time frame of the lawsuit against Plaintiff, yet none were discharged.

## CAUSES OF ACTION

### COUNT I:  RACE DISCRIMINATION-VIOLATION OF

### 42 U.S.C. § 1981 through 42 U.S.C. § 1983

22.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 21 above as if fully incorporated herein.

23.    Defendants' actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983.

24.    As a direct and proximate result of Defendants' unlawful, discriminatory conduct toward Plaintiff, Plaintiff has lost wages and benefits and has sustained other pecuniary loss.

25.    The unlawful actions of the Defendants complained of above were intentional, malicious and taken in reckless disregard of the statutory rights of Plaintiff.

### COUNT II: RETALIATION-VIOLATION OF 42 U.S.C. § 1981

### through 42 U.S.C. § 1983

26.    Plaintiff re-alleges and incorporates all averments set forth in Paragraphs 1 through 25 above as if fully incorporated herein.

27.    Defendants have unlawfully retaliated against Plaintiff for his involvement in the *Calcote* matter, which eventually cost the Defendants a monetary settlement.  Defendants terminated Plaintiff while the Plaintiff was

engaged in protected activity under 42 U.S.C. § 1981 through 42 U.S.C. § 1983.

Plaintiff had been continually harassed and retaliated against after engaging in

protected activity.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that

the Court cause service to issue in the cause upon the Defendants and that this

matter be set for trial. Upon trial by jury thereon, Plaintiff prays that the following

relief be granted:

a.  Reinstatement or front pay in lieu of reinstatement, back pay,
    liquidated damages, lost benefits, and other pecuniary losses
    proximately caused by Defendants' unlawful conduct;

b.  Compensatory damages against Defendants in an amount to be
    determined by the jury;

c.  All costs, disbursements, pre-judgment interest, post-judgment
    interest, expert witness fees and reasonable attorney's fees allowed
    under actions brought pursuant to 42 U.S.C. § 1981 through 42
    U.S.C. § 1983; and

e.  Such further relief as is deemed just and proper.

THIS the 19th day of July, 2010.

Respectfully submitted,

SLADE MOORE

-6-

By: _____
Louis H. Watson, Jr. (MB# 9053)
R. Nick Norris (MB# 101574)
Attorneys for Plaintiff

OF COUNSEL:

LOUIS H. WATSON, JR., P.A.
520 East Capitol Street
Jackson, Mississippi 39201
(601) 968-0000 Telephone
(601) 968-0010 Facsimile
Email: louis@louiswatson.com
Web:    www.louiswatson.com
        www.msemploymentlaw.com

EXHIBIT 84

2008 WL 5723271 (S.D.Miss.) (Trial Motion, Memorandum and Affidavit)
United States District Court, S.D. Mississippi.
Southern Division

Jafinni HUGGINS, Plaintiff,

v.

BELK DEPARTMENT STORES LP, and John Does I-III, Defendants.

No. 407CV00134.
August 3, 2008.

**Plaintiff's Memorandum of Points and Authorities in Support of
Her Response to Defendant's Motion for Summary Judgement**

Jafinni Huggins, Wesley T. Evans, Attorney for Plaintiff, The Evans Law Firm, Attorneys-At-Law, 712 East Peace Street, Post Office Drawer 528, Canton, Mississippi 39046, (601) 855-2255, Ms. Bar No. 9956.

COMES NOW the Plaintiff, by and through her attorney, and submits her Memorandum of Points and Authorities in Support of her Response to Defendant Belk's Motion for Summary Judgment filed in the above styled and numbered cause and in support of the same would show the following unto the court, to-wit:

**FACTS**

On or about on or about November 17, 2006, Jafinni Huggins, an African American female lawfully entered the store owned by defendant Belk Department Store for the purpose of purchasing a pair of pants sold by the store, specifically items of clothing. After examining different pieces of merchandise and trying on items of clothing, specifically a pair of pants, Jafinni Huggins proceeded to leave the store and shop elsewhere within the shopping mall. While leaving the store, Rylon Thompson, a loss prevention associate employed by the defendant Belks with a history of animosity towards African Americans followed Jafinni Huggins, after profiling her solely on the basis of race and forcibly detained the plaintiff on the suspicion of stealing a pair of pants she was trying on within the store Jafinni Huggins was stopped by Rylon Thompon within the shopping mall with the assistance of an armed guard, and at the same time and place, falsely, publicly, maliciously accused plaintiff of having stolen clothing from the defendant's store.

Jafinni Huggins did not steal clothing or any other item, from defendant's store, and Jafinni Huggins then and there so stated to Rylon Thompson. The Belk employees refused to release plaintiff, but on the contrary, then and there, without and probable or reasonable cause therefor, detained the Jafinni Huggins and unlawfully arrested Jafinni Huggins and threatened Jafinni Huggins with prosecution for the alleged theft of clothing from defendant's store. Jafinni Huggins was confined inside a room in the back of Belk's Store and interrogated by employees of Belk's about whether she stole any clothing. Defendants forcibly searched the plaintiff's person and belongings and did not find any Belk's items. One of the defendants told the plaintiff that he was a "racist". Plaintiff Jafinni Huggins was subjected to great indignities, humiliation, and disgrace in being so assaulted, detained, and imprisoned, and was physically compelled to walk through a large crowd of shoppers and customers within the shopping mall and Belks who were thereby made aware that plaintiff had been arrested and charged with being a thief.

Employees of Belk, then and there, acting within the scope of their employment, forcibly compelled plaintiff to come with them into and through certain parts of the store, all in plain view of numerous persons, and then and there, Belk employees, acting within the scope of their authority, wrongfully and unlawfully imprisoned plaintiff, without any reasonable or probable cause, and against the will of plaintiff. Defendants, on their failure to find any un-purchased

goods or merchandise belonging to defendant's store, then manufactured criminal charges and falsely accused plaintiff of disturbing the peace and indecent exposure.

Plaintiff was later found not guilty of Disturbing the Peace in the Municipal Court of Meridian. The indecent exposure charge is currently on appeal. Jafinni Huggins was subsequently taken to jail based upon the false allegations made by Belks' employees. Plaintiff Jafinni Huggins did not at any time commit theft or any offense against defendant's store or its property. The charge of theft was wholly groundless, and plaintiff had not committed any act or conducted herself in any manner so as to create a reasonable ground of belief or probable cause that plaintiff had committed theft or any offense against the defendant's store.

## INTRODUCTION

To sustain a grant osummary jugment, the pleangs, depositions, admissions, answers to interrogatories, and affidavits must demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265, 273 (1986). If the record would not allow a rational jury to find for the nonmoving party, no genuine issue remains. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274. But if the nonmoving party will bear the burden of proof on the issue at trial, "the burden on the moving party may be discharged by "showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554, 91 L. Ed. 2d at 275. This procedural device does not permit a district court to resolve factual issues that are properly left to a jury. *Little v. Liquid Air Corp.,* 952 F.2d 841 (5th Cir. 1992). The court must review the evidence, as well as inferences that may be drawn from the evidence, in the light most favorable to the party that opposed the motion for summary judgment. *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.,* 804 F.2d 879, 881 (5th Cir. 1986).

### PLAINTIFF ESTABLISHED A PRIMA FACIE CASE OF FALSE ARREST/IMPRISONMENT AND ASSAULT

There exist in the instant case genuine issues of material fact as to whether in regards to the allegations of false imprisonment and false arrest. Plaintiff Jafinni Huggins was detained by a Belk Loss Prevention Associate with the assistance of Armed Security guard outside the entrance of Belk's Department Store. False imprisonment is an intentional tort comprised of two elements: (1) detention of the plaintiff; and (2) that such a detention was unlawful. *Wallace v. Thornton,* 672 So.2d 724, 727 (Miss. 1996). The second element turns on whether, looking at the totality of the circumstances, the actions of the defendant were "objectively reasonable in their nature, purpose, extent and duration." *Thornhill v. Wilson,* 504 So.2d 1205, 1208 (Miss. 1987). The actions of Rylon Thompson, according to amounted to conspiracy to cover "bad stop" on part of Belk's Loss Prevention. See (Latonja Johnson Depo. at 41, 42, 59). Rylon Thompson admitted to not following proper procedures. (Rylon Thompson Depo. at 33). Thompson manufactured false charges of indecent exposure and disturbing the peace to conceal a wrongful detainment of Jafinni Huggins. (Latonja Johnson Depo. at 41, 59). Rylon Thompson initially suspected Jafinni Huggins of Shoplifting. He had no explicit authority from Belk's to detain someone for "indecent exposure. Rylon Thompson's Depo. at 41, 42). A simple investigative stop would have confirmed Ms. Huggins did not shoplift. In fact, Rylon Thompson informed Jafinni Huggins that the reason she was being detained was that a customer representative suspected her of taking a pair of pants. (Jafinni Huggins Depo. at 30, 33). The law allows, indeed commands, that its officers investigate possible criminal activity. Reasonable opportunities therefor are conferred consistent with and without unnecessary sacrifice of the individual's interest in freedom from confinement. *See Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 68 L.Ed.2d 340, 348 (1981). A detention reasonable at its inception, however, may become unreasonable,

and the imprisonment thus false, when it continues past the point where the officers' objectively reasonable needs for the detention cease to exist. *See McNeel v. State,* 277 So.2d 435, 437 (Miss. 1973). Once it was determined that Ms. Huggins did not take any pair of pants, she should have been apologized too and let go. However, the situation escalated due solely to the actions of Belk's. Because a wrongful detainment or "Bad Stop" occurred, Belk employee Rylon Thompson sought to cover up the incident by manufacturing false criminal charges against Jafinni Huggins.

In order to constitute an unlawful imprisonment, where no force or violence is actually employed, the submission of the plaintiff must be to a reasonably apprehended force. The circumstances merely that one considers himself restrained in his person is not sufficient to constitute false imprisonment unless it is shown that there was a reasonable ground to have believed defendant would resort to force if plaintiff attempted to assert her right to freedom. *Martin v. Santora,* 199 So.2d 63, 65 (Miss. 1967). The very fact that Rylon Thompson brought an armed guard when he detained Jafinni Huggins within the mall illustrated to the plaintiff that the defendant would resort to force to detain her. (Rylon Thompson's Depo. at 44).

Under Mississippi law, the elements of false arrest or imprisonment are two-fold: (1) the detention of a person; and (2) the unlawfulness of the detention. See, e.g., *Powell v. Moore,* 252 Miss. 471, 174 So.2d 352, 354 (1965). Where there is no manual touching or seizure of the person, there must be an intention on the part of one to arrest the other and an intention on the part of such other to submit under the belief and impression that submission was necessary." *Id.* (quoting 22 Am.Jur. False Imprisonment § 7 (1939)). See also *Martin v. Santora,* 199 So.2d 63, 65 (Miss.1967) ("where no force or violence is actually employed, the submission of the plaintiff must be to a reasonably apprehended force"). Rylon Thompson instigated the detention and arrest of Jafinni Huggins by falsely accusing Ms. Huggins of indecent exposure an disturbing the peace. The arrest ultimately lead her to be placed in handcuffs and placed in jail against her will. Rylon Thompson personally and actively caused the false arrest and imprisonment of Jafinni Huggins "directly or indirectly procurement". See *Smith v. Patterson,* 58 So.2d 64, 66 (Miss. 1962). While merely providing accurate information to police may not be instigation, knowingly giving false information may be an attempt to influence the officer's judgment in deciding whether to effect an arrest. This may be enough to hold the informer liable. *See Ginn v. Citizens & Southern National Ban*k, 145 Ga.App. 175, 178, 243 S.E.2d 528, 531 (1978); *Garner v. Texas Discount Gas* Co., 723 S.W.2d 446, 447 (Mo.Ct.App.1987); *Powers v. Carvalho,* 117 R.I. 519, 368 A.2d 1242, 1248 (1977); 1 F. Harper, F. James & O. Gray, The Law of Torts § 4.11 at 512-13 (2d ed.1986). As respects liability for false imprisonment, a storekeeper who called on policeman to arrest two persons, falsely charging that they were counterfeiters, in effect made the arrest himself. *See Howell v. Viener,* 176 So. 872 (Miss. 1937). It has long been held, however, that the good faith of a person unlawfully causing the arrest of an innocent person is no defense to an action for damages by the latter against him but goes only to diminish damages, and that the question of his probable cause to believe the arrested person to have been guilty of the crime for which he caused his arrest, is one for the jury, and in the absence of any negligence or wrongful conduct on the part of the accused, does not justify the arrest but serves likewise only to mitigate damages, and the burden of proof in each instance is on the defendant. *Id.* at 873.

## AN ASSAULT CAN OCCUR WITHOUT PHYSICAL TOUCHING

There exist in the instant case genuine issues of material fact as to whether an assault occurred when Rylon Thompson detained Jafinni Huggins outside of the Belk's Department Store even though he did not physically touch her person. The Mississippi Supreme has held where a store manager, without any substantial ground therefor, suspected that customer had taken two garments but paid for only one and without making any inquiry of clerk or of customer before customer had left store, manager followed customer and when about a block away and in presence of others stated that he was obliged to investigate and forcibly seized the package, the manager's action constituted an "assault and battery." *Morgan v. Loyacomo,* 1 So.2d 510 (Miss. 1941). An assault occurs where a person (1) acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (2) the other is thereby put in such imminent apprehension. *Webb v. Jackson,* 583 So.2d 946, 951 (Miss.1991) (citing Restatement (Second) of Torts § 21 (1965)). The exhibition of a gun... accompanied by a an expression of vexed discontent [is] a

sufficient gesture of support a charge of simple [criminal] assault." *Edgar v. State, 32 So.2d 441, 442 (Miss. 1947).* Likewise, a loss prevention associate approaches a customer with an armed guard, it is reasonable to assume there is the imminent apprehension that force will be used.

**BELK'S CLAIIM OF QUALIFIED PRIVILEGE IS OVERCOME BY MALICE AND/OR BAD FAITH AND THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO THE DEFAMATION CLAIM**

Defamation and/or slander is a viable claim and is not overcome by the defendant's claim of a qualified privilege. When analyzing defamation claims, Mississippi courts employ a bifurcated process. First, the Court must determine whether the occasion called for a qualified privilege. If a qualified privilege does exist, the Court must then determine whether the privilege is overcome by malice, bad faith, or abuse. *Garziano v. E.I. Dupont de Nemours & Co.,* 818 F.2d 380, 386-87 (5th Cir. 1987) (applying Mississippi law). In *Smith v. White,* 799 So.2d 83, 86 (Miss. 2001), this Court described the qualified privilege:

> A communication made in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, **provided the statement is made without malice and in good faith.**

(Emphasis added).

Customers witnessed the arrest and handcuffing of Jafinni Huggins. Ms. Huggins was paraded through the store in front of crowed of customers while in handcuffs. A qualified privilege does not protect a defamatory statement where there is excessive publication to persons not within the "circle" of those people who have a legitimate and direct interest in the subject mater of the communication. *Garziano,* 818 F.2d at 391-92. If the publication is subject to the qualified privilege from business communications, liability for defamation may still attach upon a finding of malice, defined by this Court as "knowledge of falsity or reckless disregard to as to truth or falsity." *Hayden v. Foryt,* 407 So.2d 535, 536 (Miss. 1981). In *Summer Stores of Mississippi, Inc. V. Little,* 192 So. 857, 862 (Miss. 1940) the court stated:

> Each case of slander must be settled upon its own facts and circumstances. This court has several times held that although there is qualified privilege, that privilege may not be exercised to excess. As we view the case, we think there was no evidence upon which the jury could have found that Rabins had probable cause for accusing Little of stealing the shoes. He was hasty, intemperate, and, according to his own admissions, which we have set forth in the statement of facts, there was no basis for the charge no matter when he discovered that the shoes had not been delivered by Little. It would have been so easy for him to ascertain that they had never been wrapped and sent out; that they were still in the stock of merchandise. He selected Little as the offending party rather than the wrapping clerk or the salesman

The privilege was exceeded by the wanton and malicious actions of loss prevention associate Rylon Thompson detained the plaintiff without probable cause in violation of Belk's on "5 step policy" and subsequently manufactured criminal charges to cover up the fact that he made a "bad stop". (Belk Policy, attached as an Exhibit). The Belk employee admitted to the plaintiff during the detainment that he was a "racist" and after not finding any items of clothing after a search of her person, falsely accused the plaintiff of disturbing the peace. In *J.C. Penney Company* 148 So.2d 679 (Miss. 1967), there was no testimony that an accused shoplifter was seen taking anything. The only testimony was that it was suspected that the shopper had possibly taken something, like the case at bar. The court held that the manager through its manager exceeded the privilege and the court stated that the investigation was not justified or based on probable cause, and that the method used in the investigations was unreasonable. Whether privilege is available as a defense may depend on the

manner in which the communication is made. The protection of a qualified privilege may be lost by the manner of its exercise, although belief in the truth of the charge exists. *Mc-Crory Corp. v. Istre,* 252 Miss. 679, 173 So.2d 640 (1965); *Montgomery Ward & Co. v. Skinner,* 200 Miss. 44, 25 So.2d 572 (1946).

## MALICIOUS PROSECUTION AND ABUSE OF PROCESS CLAIM ESTABLISHED

In order to prevail on a claim for malicious prosecution, the burden is on the plaintiff to prove by a preponderance of the evidence: (1) the institution of a criminal or civil judicial proceeding; (2) by, or at the insistence state of, the defendant; (3) the termination of such proceeding in the plaintiffs favor; (4) malice in initiating the proceeding; (5) lack of probable cause for the proceeding; and (6) damage to the plaintiff as a result of the judicial proceeding. *Bankston v. Pass Road,* 611 So.2d 998, 1004 (Miss.1992). There is no doubt charges of indecent exposure and disturbing the peace was brought at the insistence of Belk's to conceal the fact that Jafinni Huggins was detained on the mistaken belief she had taken a pair of pants. Malice can be show in that the Loss prevention associate Rylon Thompson was known as a racist by other employees at Belks. (Dea Hill's Depo. at 32, 33, 35, 36 62 and Latonja Johnson's Depo. at 12, 21, 62) and he was known to racially profile customers solely on the basis of African Ancestry. To determine whether or not the defendant acted with malice in instituting the proceedings, the court is required to examine the defendant's subjective state of mind *Owens v. Kroger Co.,* 430 So.2d 843, 846 (Miss. 1983). Malice is a mental state. Its existence may be proved by circumstantial evidence, or the jury may infer malice from the facts of the case. *Id.* In the nature of things, malice is incapable of positive direct proof. Malice "refers to the defendant's objective, not his attitude," and can be inferred from the fact that a defendant may have acted with reckless disregard for a plaintiffs rights. Benjamin, 568 So.2d at 1191; Strong, 580 So.2d at 1293. The absence of probable cause in the institution of a criminal proceeding is a circumstance from which the jury would be permitted, but not required, to infer malice. *Whitfield v. Westbrook,* 40 Miss. 311 (1866). The employee of Belks even told Jafinni Huggins that he was a racist. A jury could easily infer malice.

The other element of malicious prosecution is termination of the proceeding in the plaintiff's favor. Jafinni Huggins was found **Not Guilty** in the Municipal Court of Meridian as the manufactured charge of Disturbing the Peace. The charge of Indecent Exposure is currently on appeal in the County Court of Lauderdale County for a trial de novo, awaiting disposition.

Malice does not refer, in this context, to evil intent. Rather, it refers to her objective or purpose in instituting the proceedings. Benjamin, 568 So.2d at 1191. It connotes a prosecution instituted primarily for a purpose other than that of bringing an offender to justice. *Id.; Owens,* 430 So.2d at 847; *State Life Ins. Co. of Indianapolis v. Hardy,* 189 Miss. 266, 277, 195 So. 708, 713 (1940). Furthermore, Mississippi law has emphasized that the question of malice is one of fact to be determined by a jury unless only one conclusion may reasonably be drawn from the evidence. Owens, 430 So.2d at 848 (quoting *Brown v. Watkins,* 213 Miss. 365, 373, 56 So.2d 888, 891 (1952)). The jury is free to infer malice from the totality of the circumstances presented to it and is restricted only by the boundaries of truth, without regard to policy or convenience. *Owens,* 430 So.2d at 846.

The elements of abuse of process are: (1) an illegal and improper perverted use of the process, which was neither warranted nor authorized by the process; (2) ulterior motive or purpose of a person in exercising such illegal, perverted, or improper use of process; and (3) resulting damage or injury. *Moon v. Condere Corp.,* 690 So.2d 1191, 1197 (Miss. 1997).; *State ex rel Foster v. Turner,* 319 So.2d 233, 236 (Miss.1975). The Mississippi Supreme Court has said;

> The action of abuse of process consists in the misuse or misapplication of a legal process to accomplish some purpose not warranted or commanded by the writ. It is the malicious perversion of a regularly issued civil or criminal process, for a purpose and to obtain a result not lawfully warranted or properly attainable thereby, and for which perversion an action will lie to recover the pecuniary loss sustained. This Court has stated that the crucial element of this tort is the intent to abuse the privileges of the legal system.

Id.

Clearly Belk's Loss Prevention Associate abused the process to conceal its pattern of racial profiling that resulted in the wrongful detainment of Jafinni Huggins. The deposition of Latonj a Johnson revealed that the charges of Indecent Exposure and Disturbing the Peace were almost an afterthought and brought only after Rylon Thompon realized that Jafinni Huggins had not taken anything from Belk's Department Store. (Latonj a Johnson Depo. at 41, 40, 59). Rylon Thompson's own co-worker felt that the charges of indecent exposure and disturbing were unwarranted and unjustified. (Latonja Johnson Depo. at 40, 41, 59). Even Rylon Thompson's co-worker believed there was malice in the actions of Rylon Thompson on the night of the incident which resulted in the jailing and imprisonment of Jafinni Huggins. Rylon Thompson even admitted to destroying video evidence of the incident involving Jafinni Huggins. (Rylon Thompson Depo. at 42).

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The defendant argues that the plaintiff failed to prove any significant injuries, thereby defeating a claim of intentional infliction of emotional distress. It has long been recognized that the difference between that negligence tort and a claim involving a wilful tort is that, in the case of a recognized wilful tort, an actual injury is not essential to establish a case of liability. *Bumgart v. Bailey,* 156 So.2d 823, 824--25 (Miss. 1963). Because wilful torts involve a conscious act by the defendant undertaken in disregard of the plaintiffs rights, the law contemplates that a plaintiff is entitled to formal redress for the wrong committed against him even if he cannot demonstrate by a preponderance of the evidence that he suffered an actual injury as a result. *Id.;* see also *Harbin v. Jennings,* 734 So.2d 269, 273 (Miss. Ct. App. 1999). In *Sears, Roebuck & Co. v. Devers,* 405 So.2d 898 (Miss. 1981), this Court stated:

> Where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally-or even unintentionally yet the results being reasonably foreseeable-Courts can in certain circumstances comfortably assess damages for mental and emotional stress, even though there has been no physical injury. In such instances, it is the nature of the act itself-as opposed to the seriousness of the consequences-which gives impetus to legal redress.

405 So.2d at 902.

Where an intentional tort has been committed "it is the nature of the act itself---as opposed to the seriousness of the consequences---which gives impetus to legal redress...." *Devers,* 405 So.2d at 902. Damages are recoverable for mental anguish and suffering caused by a willful, wanton, malicious, or intentional wrong, even though no bodily injury is sustained or other pecuniary damage alleged or proved. Jafinni Huggins was humiliated and for the first time in her life, handcuffed and taken to jail. She had trouble sleeping and had to get counseling from her father. This incident was right on top of the untimely death of her brother and only serve to exacerbate her emotional turmoil. There is a genuine material issue of fact for the jury to consider on the issue of the intentional infliction of emotional distress.

# EXHIBIT 85

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

DEDRICK A. FLEMING, SR.                                          PLAINTIFF

v.                                          Civil Action No. 3:16-cv-554-TSL-RHW

HINDS COUNTY, DEPUTY JEREMY
LEE, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY, OFFICER RICHARD
THOMPSON, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY, OFFICER RYLON
THOMPSON, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITY, OFFICER JASON
CLARK, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY, AND OFFICERS
JOHN DOES (1-7)                                          DEFENDANTS

## MODIFIED SECOND AMENDED COMPLAINT

### (JURY TRIAL DEMANDED)

1.      Comes Now, DEDRICK A. FLEMING, SR., and files this, his Complaint against

the Defendants, Hinds County, Deputy Jeremy Lee, Officer Richard Thompson, Officer Rylon

Thompson, and Officer Jason Clark and alleges the following:

### PARTIES

2.      Plaintiff, Dedrick A. Fleming, Sr. (hereinafter Plaintiff), is an adult resident

citizen of Mississippi, whose permanent place of residence is 118 Barrett St., Edwards, MS,

39066.

3.      Defendant, Hinds County (hereinafter Hinds County), is a governmental entity

existing in the State of Mississippi, and may be served with process upon Eddie Jean Carr,

Chancery Clerk at 316 S. President St., Jackson, Mississippi, 39201.

4.      Defendant Deputy Jeremy Lee (hereinafter Defendant Deputy Lee), employed

with the State of Mississippi, is an adult resident citizen of Mississippi, and he may be served

with process at 407 E. Pascagoula St., Jackson, Mississippi 39201.

5.     Defendant, Officer Richard Thompson (hereinafter Defendant Officer Richard), employed with the State of Mississippi, is an adult resident citizen of Mississippi, and he may be served with process at 224 Sylvan Drive, Richland, MS 39218.

6.     Defendant, Officer Rylon Thompson (hereinafter Defendant Officer Rylon), employed with the State of Mississippi, is an adult resident citizen of Mississippi, and he may be served with process at 125 Brigade Avenue, Canton, MS 39046.

7.     Defendant, Officer Jason Clark (hereinafter Defendant Officer Clark), employed with the State of Mississippi, is an adult resident citizen of Mississippi, and he may be served with process at 72101 Royal Court, Brandon, MS 39024.

8.     Defendant, Officer "John Does" (hereinafter Officer Does 1-10), employed with Neshoba County Sheriff's Department, is an adult resident citizen of Mississippi, and he may be served with process at 407 E. Pascagoula St., Jackson, Mississippi, 39201.

<u>JURISDICTION</u>

9.     This court has jurisdiction over the subject matter herein pursuant to the provisions of Section 9-7-81 of the Mississippi Code of 1972, annotated, as amended in that all defendants are domiciled in Mississippi.

10.     This court has in personam jurisdiction over the Defendants in that all defendants are residents of or do business in Hinds County, Mississippi.

<u>VENUE</u>

11.     Venue is proper in this Court pursuant to Section 11-11-3 of the Mississippi Code of 1972, annotated, as amended, in that the incidents which gave rise to these claims occurred in Hinds County, Mississippi.

<u>FACTUAL ALLEGATIONS</u>

12. On or about February 25, 2014, Plaintiff was pulled over by a Hinds County Officer while they were investigating drug activity.

13. On the aforementioned date, Officers Richard, Rylon, Clark, and Does 1-7 did not arrest the Plaintiff nor did they provide him with a citation.

14. Officers Richard, Rylon, Clark, and Does 1-7 proceeded to unlawfully attack the Plaintiff.

15. Officers Richard, Rylon, Clark, and Does 1-7 proceeded to choke, beat, discharge their tasers onto the mouth of the plaintiff, and fractured the Plaintiffs foot.

16. Plaintiff was transported to a medical facility after the attack where he was treated for various injuries.

17. As a result of the Defendants' negligent actions, Plaintiff sustained injuries to his head, face, and body as a whole.

## COUNT ONE
## VIOLATION OF FEDERAL DUE PROCESS, EQUAL PROTECTION, CIVIL RIGHTS LAWS UNDER 42 U.S.C. Section 1983 and 28 U.S.C. Section 1343 et al

18. The Plaintiff incorporates and adopts all prior paragraphs, averments, and statements.

19. Plaintiff would show unto the Court that the Defendants, with reckless disregard for Plaintiff's rights, took actions to deprive Plaintiff of his due process rights and equal protection rights.

20. Plaintiff suffered damages as a result of the aforementioned conduct as set out heretofore and/or hereinafter.

## PRAYER FOR APPROPRIATE RELIEF

21. Plaintiff incorporates and adopts all prior paragraphs, averments, and statements.

22.     As a result of the intentional and/or reckless disregard and/or grossly negligent and/or otHer negligent acts of the Defendants named herein, the Plaintiff has suffered severe and permanent damages for which the Defendants should be held jointly and vicariously liable.

23.     All Defendants are jointly and severally liable to the Plaintiff for the following damages: past, present and future pain, suffering and mental and emotional anguish; past, present and future loss of mobility and capacity; loss of enjoyment of life's normal activities; loss of society, and all other damages to be proved at trial.

24.     The Plaintiff brings this action against all Defendants and demands judgment and compensatory damages as a result of the negligent and/or intentional acts enumerated herein in an amount to be determined by this Court.

25.     The acts of the Defendants enumerated herein were so grossly negligent and reckless; utterly offensive; and were committed with such utter disregard for the rights of the Plaintiff and others similarly situated as to amount to willful, wanton, and/or intentional misconduct, thereby entitling the Plaintiff to an award of punitive damages to be determined by the Court, with this amount being sufficient to deter these Defendants from continuing this conduct in the future.

**WHEREFORE, THE ABOVE BEING CONSIDERED,** the Plaintiff respectfully prays for judgment against all Defendants, compensatory damages, punitive damages, any and all damages allowed by Mississippi or federal law, pre-judgment interest, post-judgment interest, attorney's fees, Veasley type damages, and all costs of this proceeding with such final amount being at least $500,000.00 or an aggregate sum equal to the maximum amount of recovery allowed by the Mississippi Tort Claims Act plus any recovery to be determined by a jury and allowed under any applicable state or federal laws and guidelines.

This the ___30th___ day of November, 2016.

RESPECTFULLY SUBMITTED,
PLAINTIFF

By: __s/ Carlos E. Moore_____
CARLOS E. MOORE, MSB #100685

OF COUNSEL:

**MOORE LAW GROUP, P.C.**
306 BRANSCOME DRIVE
P.O. BOX 1487
GRENADA, MS 38902
(662) 227-9940
(662) 227-9941 (FAX)

CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have this date served via ECF system and/or mailed via U.S. Mail, postage pre-paid, a true and correct copy of the above and foregoing to the following:

William R. Allen, Esq.
Jessica A. Malone, Esq.
ALLEN, ALLEN, BREELAND & ALLEN, PLLC
214 Justice Street
P. O. Box 751
Brookhaven, MS 39602

THIS, the _30th_ day of November, 2016.

_s/ Carlos E. Moore_____
CARLOS E. MOORE, ESQ.

EXHIBIT 86

**From:**        Joseph Mangino
**To:**          Joseph Mangino
**Date:**        Tuesday, May 27, 2014 5:02:00 PM
**Attachments:** GA-14-7025 moudy.doc
                 General Affidavit-1.doc
                 General Affidavit-F WEED.doc
                 grand jury transmittal sheet.pdf
                 narc report.doc
                 NOTICE OF FORFEITURE (MADISON).rtf
                 Notice of Seizure.doc
                 Notice of Seizure-14-3758.doc
                 Affidavit S.W. Phone.docx
                 Booking Sheet.pdf
                 CASE FILE COVERSHEET 1.doc

### MADISON COUNTY SHERIFF'S OFFICE
### NARCOTICS UNIT
### CASE FILE COVER SHEET

**CASE #** _____

**CRIME:** _____

**DATE & TIME OF OCCURRENCE:** _____ **AT** _____

**LOCATION OF OCCURRENCE:** _____

**ARRESTING OFFICER (S):** _____ **EID# :** _____ / _____ **EID# :** _____

**INVESTIGATING OFFICER (S):** _____ **EID# :** _____ / _____ **EID# :** _____

## SUSPECT (S)

**NAME:** _____

**ADDRESS:** _____

**D.O.B.:** _____ **SOCIAL SECURITY #:** _____

**DISPOSITION:** ARRESTED, _____ **RACE:** BLACK **SEX:** MALE **HOME PHONE:** _____

**DRUG AMOUNT (if applicable) :** _____ **VALUE:** _____


**NAME:** _____

**ADDRESS:** _____

**D.O.B.:** _____ **SOCIAL SECURITY #:** _____

**DISPOSITION:** _____, _____ **RACE:** _____ **SEX:** _____ **HOME PHONE:** _____

**DRUG AMOUNT (if applicable) :** _____ **VALUE:** _____

## CHECK LIST

| | | | |
|---|---|---|---|
| OFFENSE REPORT | _ | WITNESS STATEMENT | _ |
| RIGHTS SHEET | _ | PHOTOGRAPHS | _ |
| ARREST WARRANT | _ | ARREST HISTORY | _ |
| AFFIDAVIT | _ | SEARCH WARRANT | _ |
| VICTIMS STATEMENT | _ | CRIME LAB REPORT | _ |
| SUSPECTS STATEMENT | _ | NARRATIVE REPORT | _ |

**EVIDENCE LOCATION:** _____

# EXHIBIT 87

## *MADISON COUNTY SHERIFF'S OFFICE*
## *NARCOTICS UNIT*
## *CASE FILE COVER SHEET*

**CASE #** _____

**CRIME:** _____

**DATE & TIME OF OCCURRENCE:** _____ **AT** _____

**LOCATION OF OCCURRENCE:** _____

**ARRESTING OFFICER (S):** _____ **EID# :** _____ / _____ **EID# :** _____

**INVESTIGATING OFFICER (S):** _____ **EID# :** _____ / _____ **EID# :** _____

## *SUSPECT (S)*

**NAME:** _____

**ADDRESS:** _____

**D.O.B.:** _____ **SOCIAL SECURITY #:** _____

**DISPOSITION:** ARRESTED, _____ **RACE:** BLACK **SEX:** MALE **HOME PHONE:** _____

**DRUG AMOUNT (if applicable) :** _____ **VALUE:** _____


**NAME:** _____

**ADDRESS:** _____

**D.O.B.:** _____ **SOCIAL SECURITY #:** _____

**DISPOSITION:** _____, _____ **RACE:** _____ **SEX:** _____ **HOME PHONE:** _____

**DRUG AMOUNT (if applicable) :** _____ **VALUE:** _____

## *CHECK LIST*

| | | | |
|---|---|---|---|
| **OFFENSE REPORT** | _ | **WITNESS STATEMENT** | _ |
| **RIGHTS SHEET** | _ | **PHOTOGRAPHS** | _ |
| **ARREST WARRANT** | _ | **ARREST HISTORY** | _ |
| **AFFIDAVIT** | _ | **SEARCH WARRANT** | _ |
| **VICTIMS STATEMENT** | _ | **CRIME LAB REPORT** | _ |
| **SUSPECTS STATEMENT** | _ | **NARRATIVE REPORT** | _ |

**EVIDENCE LOCATION:** _____

# EXHIBIT 88



**U.S. Department Of Housing and Urban Development**
Georgia State Office
Five Points Plaza
40 Marietta Street
Atlanta, GA 30303-2806

## VIA UPS: NEXT DAY DELIVERY

December 3, 2015

City of Ridgeland, Mississippi
c/o Gene F. McGee, Mayor
Office of the Mayor
304 Highway 51
Ridgeland, MS 39157

**MAYOR'S OFFICE
RECEIVED

DEC – 4 2015

CITY OF RIDGELAND**

Dear Respondent:

Subject: Housing Discrimination Complaint
Assistant Secretary for Fair Housing & Equal Opportunity v. City of Ridgeland, MS
Inquiry No. 500825
HUD Case No. 04-16-4066-8

We have received a formal complaint alleging that you have engaged in one or more discriminatory housing practices under the Federal Fair Housing Law, 42 U.S.C. Sections 3601-3619. We are required by statute to send you a copy of the complaint.

We are enclosing a copy of the complaint for you. The alleged discriminatory practices are identified in this complaint. We have made no determination as to whether the complaint against you has merit.

The purpose of this letter is to inform you of: 1) the rights you have in responding to this complaint, 2) the rights each complainant has, and 3) the steps the U.S. Department of Housing and Urban Development (the Department) will take to determine whether the complaint has merit.

In order to insure that the Department informs you properly of the law's requirements, this notification letter contains language required by the law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department under the Federal Fair Housing Law.

We are governed by federal law, which sets out what steps we must take when a formal complaint is filed. The law also includes steps that you can take to answer or refute the allegations of this complaint.

Under federal law, any answer from you to this complaint can be filed within 10 calendar days of your receipt of this letter or receipt of a letter notifying you of any amendments to this complaint. Your answer must be signed and you must affirm that you have given a truthful response by including the statement "I declare under penalty of perjury that the foregoing is true

and correct."

You will be allowed to amend your statement at any time, if our investigation shows that it is reasonable and fair for you to do so.

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the complainant(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Law in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant(s) may initiate court action. You may consult a private attorney in this regard.

The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal

Fair Housing Law.  The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

Some explanatory material on the law is enclosed for your information.

If you have any questions regarding this case, please contact Dita McCarthy at (202) 236-7871.  Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Carlos Osegueda
FHEO Region IV Director

Enclosures

## HOUSING DISCRIMINATION COMPLAINT

**CASE NAME:**    Assistant Secretary for Fair Housing & Equal Opportunity v. City of Ridgeland, MS

**CASE NO:**    04-16-4066-8

1. **Complainant**

   Assistant Secretary for Fair Housing and Equal Opportunity
   U.S. Department of Housing and Urban Development
   451 Seventh Street, S.W.
   Suite 510
   Washington, D.C.  29419

2. **Other Aggrieved Persons**

   Undetermined at this time

3. **The following is alleged to have occurred or is about to occur:**

   Discriminatory denial or otherwise make housing unavailable.
   Discriminatory terms, conditions, privileges, or services and facilities.
   Discriminatory Acts under Section 818 (coercion, etc.).
   Using ordinances to discriminate in zoning and land use.

4. **The alleged violation occurred because of:**

   Race.

5. **Address and location of the property in question (or if no property is involved, the city and state where the discrimination occurred):**

   Ridgeland, Mississippi

6. **Respondent**

   The City of Ridgeland, Mississippi
   C/O Gene F. McGee, Mayor
   Office of the Mayor
   304 Highway 51
   Ridgeland, MS 39157

7.  **The following is a brief and concise statement of the facts regarding the alleged violation:**

The Assistant Secretary for Fair Housing and Equal Opportunity, on behalf of the Secretary of the U.S. Department of Housing and Urban Development, files this Secretary-initiated complaint of housing discrimination as authorized by Section 810(a)(1)(A)(i) of the Fair Housing Act, 42 U.S.C. Section 3610.

The Department alleges that the Respondent, the City of Ridgeland, Mississippi, is engaging in unlawful discrimination based on race in its ongoing "amortization," condemnation,  and threatened removal of five apartment complexes and rezoning of approximately nine apartment complex buildings to lower density requirements as a result of the enactment of its 2014 Comprehensive Zoning Ordinance. There is no alternate plan for the residents of these buildings.

In 1981, the Respondent City of Ridgeland annexed an area that is now known as Southeast Ridgeland. At the time of annexation, the area was classified as multifamily residential and many of the present day apartment buildings already existed. Ridgeland's current rental housing is concentrated in this part of the City as is its minority population.  Between 1990 and 2010, Southeast Ridgeland's demographics shifted dramatically, the area changing from integrated, majority white, to majority African American.  Between 2000 and 2010, Southeast Ridgeland's minority population increased by 25%. Moreover, by 2010, Southeast Ridgeland, loosely defined as the area south of Lake Harbour Drive and east of Highway 51, was 59.4% minority, whereas the rest of the City was 26.3% minority. Despite this demographic shift, Ridgeland has remained very segregated. A driver of this segregation is the racial disparity between Southeast Ridgeland and the remainder of the town.

Sometime in 2006, the City began working on a "Master Plan" that identified the redevelopment of Southeast Ridgeland as its top priority.  As part of this planning process, the Mayor and Board of Alderman selected an all-white "Community Awareness Committee" (CAC) despite the fact that Ridgeland is 30% African American and despite the fact that the Master Plan focused on the redevelopment of a majority African American portion of the City. The Respondent also created the "Ridgeland Area Master Plan Steering Committee" which was, upon information, entirely white.  Further, the City's entire Community Development staff was white.

Both City officials and the newly appointed Community Awareness Committee ("CAC") members openly and repeatedly identified "demographics" as a key

2

problem with Ridgeland public schools, even though the district as a whole continued to perform well by state standards. For example, when a constituent stated that the problem with Ann Smith Elementary School (the elementary school servicing part of Southeast Ridgeland) was "demographics, first, last, and always." The Mayor responded "**You are so correct**." Email from Mayor Gene McGee to Charles Rafferty, June 18, 2009 (bold and underline in original). CAC Meeting Minutes reflect that other town officials were even more explicit in framing the issue in racial terms. The CAC identified the driver of this demographic shift in the town and in the public school system as the presence of multi-family housing in Southeast Ridgeland.

Motivated by these discriminatory sentiments, the Respondent implemented an aggressive code enforcement regime for apartment complexes in 2010. The changes included: shifting from a 20% apartment inspection limit to a requirement that all apartments be inspected before occupation; mandatory re-inspection of individual units every time that unit was vacated; and coordination with the electric company to tie electrical service to Code compliance. The Respondent's officials simultaneously marketed Southeast Ridgeland for redevelopment to developers and other real estate professionals and explored a variety of strategies, some publically, some behind closed doors.

Ultimately, the code enforcement strategy did not drive the apartment buildings (and their predominantly African American residents) out of Ridgeland and a willing investor could not be identified. Consequently, Ridgeland shifted strategies again. By September-October 2012, the City and its Board of Alderman began reviewing drafts of a new ordinance that would rezone part of Southeast Ridgeland. The 2014 Ordinance was adopted on February 4, 2014. The new ordinance rezoned five apartment complexes from R-5, which permits multi-family development, to MU-1, which is "mixed use," and does not allow for multi-family development. Because the 2014 Rezoning does not include a pre-existing nonconforming use provision, each of the five apartment buildings located in the new MU-1 zone were all immediately designated as a nonconforming use. These five apartment complexes re-designated MU-1 are all located within a high-minority concentrated area in the eastern half of Southeast Ridgeland. An additional nine apartment complexes also lost their nonconforming use status as to density and will be subject to the 2014 Rezoning density requirement for the R-1 zone of ten units per acre. Under the 2014 Ordinance, once a property has been designated as a non-conforming use, it potentially falls into one of three classes of non-conformities: Class A, Class B, or Class C. Class A Nonconformities are deemed to be not contrary to the public health, safety, and welfare. With slight variation, it appears these nonconformities will be permitted to continue to exist, for at least a period of time, provided an application for designation is properly filed and granted by Respondent. Class B nonconformities

3

include "any registered nonconformity not classified as Class A." Class B Nonconformities are subject to very specific amortization provisions of the Ordinance. The owner's right to change, repair, and/or maintain Class B Nonconformities is limited. Finally, Class C Nonconformities must cease to non-conform within one year of February 4, 2014, or be demolished, without further opportunity to cure and without amortization. The Amortization formula is complex and it allows a finite period of time for continued nonconforming use, to be calculated by the Respondent. Upon expiration of that time, the nonconforming use must cease.

Some apartment complex owners have sought relief from the ordinance in the form of Petitions for Reconsideration of the new zoning Classification and applications for the granting of Class A Nonconforming use status. During 2015, the Respondent has ruled on some of these petitions, denying some, granting some, and ignoring or failing to rule on others. Apartment complex owner whose properties were reclassified as Class B nonconforming uses by the 2014 Ordinance have been denied the ability to make certain repairs and/or to re-lease vacant units, causing immediate harm while the threat of condemnation looms.

The enactment of the 2014 Zoning Ordinance followed by Respondent's denial of Petitions for Reconsideration and denial of apartment owners' requests for permits to make repairs show a clear intent to rid the City of Ridgeland of a portion of its minority population. There is strong evidence that the Respondent took and continues to take these zoning actions because of the racial identity of the apartment buildings' inhabitants for the express purpose of driving these minority residents out of the City. Other multifamily housing located in the majority white areas of Ridgeland has not been similarly treated under the 2014 Zoning Ordinance. Moreover, the policies and practices of the Respondent have harmed and threaten imminent harm to African American residents in disproportionate numbers without sufficient justification. The harm from these exclusionary practices is both imminent and ongoing, as is the threat of condemnation.

8.    **The most recent date on which the alleged discrimination occurred:**

Beginning no later than October 7, 2015, and continuing through to the present.

9.    **Types of Federal Funds identified:**

In 2014, the City of Ridgeland reported $4,890,913 in federal awards and grants: $4.6 million from the Department of Transportation, $29,670 from the Office of National Drug Control Policy, $46,291 from Department of Justice, $100,000 from HUD and $83,490 from the Department of Agriculture.

4

COMPLAINT
CASE NUMBER:

The City's proposed budget for FY 2016 anticipates $6,531,873 in both federal and state grants.

10. **The acts alleged in this complaint, if proven, may constitute a violation of the following:**

Sections 804(a), 804(b), and 818 of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Act of 1988.

**I declare under penalty of perjury that I have read this complaint and that it is true and correct.**

_____     12/1/15
Assistant Secretary for Fair Housing and Equal Opportunity          Date

5

COMPLAINT
CASE NUMBER:

U. S. Department of Housing and Urban Development
Southeast /Caribbean Office of Fair Housing
and Equal Opportunity
Five Points Plaza
40 Marietta Street.
Atlanta, Georgia 30303-2806

# The Fair Housing Act – Key Provisions

The Fair Housing Act prohibits discrimination in housing because of:
Race, Color, National Origin, Religion, Sex, Familial Status, and Disability

## What Housing Is Covered?

The Fair Housing Act covers most housing.  In some circumstances, the Act exempts owner occupied buildings with no more than four units, single-family housing sold or rented without the use of a broker, and housing operated by organizations and private clubs that limit occupancy to members.

## What Is Prohibited?

**In the sale and rental of housing**:  No one may take any of the following actions based on race, color, national origin, religion, sex, familial status, or disability:
- Refuse to rent or sell housing
- Refuse to negotiate for housing
- Make housing unavailable
- Deny a dwelling
- Set different terms, conditions, or privileges for sale or rental of a dwelling
- Provide different housing services or facilities
- Falsely deny that housing is available for inspection, sale, or rental
- For profit, persuade owners to sell or rent (blockbusting) or
- Deny anyone access to or membership in a facility or service (such as a multiple listing service) related to the sale or rental of housing.

**In mortgage lending:**  No one may take any of the following actions based on race, color, national origin, religion, sex, familial status, or disability:
- Refuse to make a mortgage loan
- Refuse to provide information regarding loans
- Impose different terms or conditions on a loan, such as different interest rates, points, or fees
- Discriminate in appraising property
- Refuse to purchase a loan or
- Set different terms or conditions for purchasing a loan.

**In addition**:  It is illegal for anyone to
- Threaten, coerce, intimidate, or interfere with anyone exercising a fair housing right or assisting others who exercise that right
- Advertise or make any statement that indicates a limitation or preference based on race, color, national origin, religion, sex, familial status, or disability.  This prohibition against discriminatory advertising applies to single-family and owner-occupied housing that is otherwise exempted from the Fair Housing Act.

**Additional Protection If You Have A Disability**

If you or someone associated with you:
- Have a physical or mental disability that substantially limits one or more major life activities
- Have a record of such a disability o
- Are regarded as having such a disability

Your landlord **may not**:
- Refuse to let you make reasonable modifications to your dwelling or common use areas, at your expense, if necessary for the disabled person to use the housing. (Where reasonable, the landlord may permit changes only if you agree to restore the property to its original conditions when you move).
- Refuse to make reasonable accommodations in rules, policies, practices, or services if necessary for the disabled person to use the housing. For example: (1) a building with a "no pets" policy must allow a visually impaired tenant to keep a guide dog; or (2) an apartment complex that offers tenants ample, unassigned parking must honor a request for a mobility-impaired tenant for a reserved space near his/her apartment if necessary to assure that he/she can have access to their apartment. However, housing need not be made available to a person who is a direct threat to the health or safety of others or who currently uses illegal drugs.

**Requirements For New Buildings**

In buildings that are ready for first occupancy after March 13, 1991, and have an elevator and four or more units:
- Public and common areas must be accessible to person with disabilities
- Doors and hallways must be wide enough for wheelchairs
- All units must have:
  - An accessible route into and through the unit
  - Accessible light switches, electrical outlets, thermostats, and other environmental controls
  - Reinforced bathroom walls to allow later installation of grab bars and
  - Kitchens and bathrooms that can be used by people in wheelchairs

**Housing Opportunities For Families**

Unless a building or community qualifies as housing for older persons, it may not discriminate based on familial status. That is, it may not discriminate against families in which one or more children under the age of 18 live with:
- A parent
- A person who has legal custody of the child or children or
- The designee of the parent or legal custodian, with the parent or custodian's written permission.

Familial status protection also applies to pregnant women and anyone securing legal custody of a child under 18.

Exemption: Housing for older person is exempt from the prohibition against familial status discrimination if:
- The HUD Secretary has determined that it is specifically designed for and occupied by elderly persons under a Federal, State, or local government program or
- It is occupied solely by person who are 62 or older or
- It houses at least one person who is 55 or older in at least 80 percent of the occupied units, and adheres to a policy that demonstrates intent to house person who are 55 or older.

A transition period permits residents on or before September 13, 1988, to continue living in the housing, regardless of their age without interfering with the exemption.

## FACT SHEET

## CONCILIATION UNDER THE FAIR HOUSING ACT

The Fair Housing Act requires HUD, to the extent feasible, pursue conciliation, which give the parties a chance to reach a satisfactory settlement through conciliation from the time the aggrieved person files the Fair Housing Act complaint until the Secretary issues the charge or dismisses the complaint.

### Parties' Rights

Confidentiality. Nothing said or done during the course of conciliation can be used in a subsequent hearing or trial regarding the alleged violation.

Legal counsel. Parties may be represented by attorneys.

Voluntary Nature of Conciliation. Participation in conciliation is entirely voluntary. There is no penalty for declining to settle through conciliation.

### Role of Conciliator. The HUD conciliator (who may also be the investigator on the case):

- Functions as a neutral participant seeking to negotiate a mutually agreeable settlement between the complainant and the respondent;
- Informs the parties of their rights during conciliation
- Informs the parties about the process, and help to structure negotiation arrangements in which the parties can have confidence;
- May provide interpretations of the Act to permit the parties to bargain from informed positions;
- May describe the evidence gathered up to that time, but only to permit the parties to bargain from informed positions;
- Communicates offers between the parties;
- Prepares the Conciliation Agreement; and
- Will not discuss the probable outcome of the case

Effect of Agreement. The regulations require the parties to agree to the terms and conditions of the conciliation in a formal and written conciliation agreement, which requires approval by HUD. The conciliation agreement, signed by all parties and the Department, will terminate the investigation of the complaint, the respondent's potential liability, and the complainant's right to pursue relief, provided that the respondent complies with the terms and conditions of the conciliation agreement.

Nature of Agreement. The essential terms of the agreement will be those negotiated by the parties. The parties may agree to refer disputes about compliance with the signed agreement to an arbitrator. The agreement will also include standard provisions intended

to protect the public interests: for example, a provision that requires the respondent to submit reports, or permits the Department to review and examine the respondent's practices.

<u>HUD's Role</u>. By approving the agreement, HUD acknowledges that its terms serve the public interests.

<u>Role of Department of Justice</u>. If the facts establish that the respondent has intentionally or willfully failed to comply with the terms and conditions of the conciliation agreement, the Justice Department will enforce the conciliation agreement.

# EXHIBIT 89

**POLICY AND PROCEDURE**

<u>SOBRIETY CHECKPOINT GUIDELINES</u>

I.   PURPOSE

The purpose of this policy is to provide guidelines for the physical construction and operation of a sobriety checkpoint in order to maximize the deterrent effect and increase the perception of "risk of apprehension" of motorists who would operate a vehicle while impaired by alcohol or other drugs.

II.  POLICY

It shall be the policy of this department to implement a sobriety checkpoint program. This will be done as part of a comprehensive enforcement program. To ensure standardization of this program a clear and concise set of written guidelines has been developed governing procedure on how checkpoint will be operated within this Department.

To implement this policy this agency must:

1.   Satisfy federal, state and local legal requirements.

2.   Conduct checkpoints with a minimal amount of intrusion or motorist inconvenience.

3.   Assure the safety of the general public as well as law enforcement officers involved.

4.   Provide for an objective site selection process based on relevant data.

**CONFIDENTIAL**

**MC - RFP 2 - 1**

Policy and Procedure
Page 2

5.    Officer selection should be based on experience and training.  Operational procedure will be covered during a briefing period prior to each sobriety checkpoint.

III.   DEPARTMENTAL GUIDELINES

███████████████████████████████████████████

A.  Be approved by the Sheriff or the Chief Deputy or designee prior to commencement of the sobriety checkpoint.

B.  Specify the method for selecting motorists to be contacted, e.g., every vehicle, every fifth vehicle, etc. to ensure objectivity.

C.  Provide for an operational briefing of personnel prior to each checkpoint.  At this time designate assignments and respective duties.

D.  Specify dialogue and educational material to be used by checkpoint Personnel.

E.  Provide for the removal of vehicles to the predetermined area when further investigation is required.

IV.   PROCEDURES

A. Site Selection

The department must be able to objectively outline criteria utilized in the site selection process:

1.  Alcohol/Drug related traffic experiences.

a.  Unusual incidence of alcohol/drug related crashes.

b.  Alcohol/drug impaired driving violations.

c.  Unusual number of night- time single vehicle crashes.

d.  Any other documented alcohol/drug related vehicular Incidents.

**CONFIDENTIAL**

**MC - RFP 2 - 2**

Policy and Procedure
Page 3

    2.  Select locations which permit the safe flow of traffic through the checkpoint.

        a.  Consideration should be given to posted speed limits, traffic volume and visibility.

        b.  Ensure sufficient adjoining space is available to pull vehicles off the traveled portion of the roadway.

        c.  Consider other conditions that may pose a hazard.

        d.  The site should have maximum visibility from each direction and sufficient illumination.

## V.   PERSONNEL

    1.  A sworn, uniformed officer will be assigned to provide on-scene supervision of the sobriety checkpoint.

    2.  The sobriety checkpoint will be staffed by a sufficient number of uniformed personnel to assure a safe and efficient operation.

## VI.   MOTORISTS WARNINGS/ SAFETY METHODS

    1.  Special care is required to warn approaching motorist of the sobriety checkpoint.

    2.  Notice of sobriety checkpoints will be posted at the Justice Court Bldg. on the day of the checkpoint.

    3.  Basic equipment may include, but is not limited to:

        a.  Warning signs placed in advance of the checkpoint.
        b.  Flares, fugues, or similar devices.
        c.  Safety cones or similar devices.
        d.  Marked patrol vehicles.

    4.  The use, placement and types of traffic control devices must comply with federal, state, or local transportation codes.

**CONFIDENTIAL**

Policy and Procedure
Page 4

VII.   CONTINGENCY PLANNING

Any deviation from the predetermined guidelines must thoroughly document the reason for the deviation.  (i.e. traffic backing up, intermittent inclement weather.)



IX.   GENERAL ROADBLOCKS

    a.   This section allows officers to conduct random roadblocks for all traffic violations, escapees or wanted subjects.

    b.   The requirements of this section shall not be confused with the policy set out above on the methods to be used for sobriety checkpoints.

    c.   All Deputies may conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within this county.

**CONFIDENTIAL**

# EXHIBIT 90

# *Canton Estates Apartments*



388 Ricks Drive • Canton, MS 39046
Office: 601-859-7014 • Fax: 601-859-9070
email: cantonestatesapts@kirklandprop.com

October 31, 2017

Deputy Sheriff Jeremy Williams
Madison County Sheriff Department
2941 US-51
Canton, MS 39046

     RE:    Canton Estates Apartments, 388 Ricks Drive, Canton, MS 39046

Dear Deputy Williams:

We strive diligently here at Canton Estates to provide our residents with decent and sanitary housing. As you know we are in a constant effort with the Madison County Sheriff Department to assist in any way necessary to rid our community and surrounding neighborhood of illegal activity. Lately, the following issues have been observed in our community:

- Heavier traffic than normal
- Individuals loitering with no particular destination in mind
- Individuals sitting on stairs smoking something which appears and smells to be marijuana
- Young males riding through on bicycles with what appears to be hand guns and possibly dealing drugs

We're asking the Madison County Sheriff's office for additional patrol specifically between the hours of 5pm and 2am. Also, is it possible to set up a random road block in our area? Any preventative measure that you can offer is greatly appreciated.

I can be reached at the office of Canton Estates or via telephone at 601-859-7014. Thank you in advance for your attention to this matter.

Sincerely,

Mrs. Angela Lyons
Property Manager

**MC - RFP 10 - 42(1)**

EXHIBIT 91

CASE SO13008552      * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1

INCIDENT REPORT

INCIDENT TYPE: ROAD_BLOCK___ _____    PREMISE TYPE: HIGHWAY/ROAD/ALLEY_____

LOCATION:388_____ _____RICKS_DR_____ _____O__ APT/LOT:____  ZONE_____

BUSINESS:_____  WEAPON TYPE__UNKNOWN_____

BEGIN DATE:_5/23/13  BEGIN TIME::1912  END DATE:_5/23/13  END TIME:1912

  COMMENTS: MS DL800788182 / GREEN,MARCHELLO IN CUSTODY@ 1925HRS

*************************** P E R S O N S ***************************

PERSON #:001  STATUS:_ARREST_____

NAME:_MARCHELLO_R_GREEN_____  RACE:_BLACK_____

SEX:_MALE__ DOB:▇▇▇▇▇  AGE:31_ HGT:510 WGT:210 HAIR:_BLACK_____

EYES:_BROWN_____  FACIAL HAIR:_CLEAN_SHAVEN__  BUILD:MUS  COMPLEXION:DBR

ADDRESS:_48_MCCLENDON_DR_____  LAKE_____  MS

SOC SEC:▇▇▇▇▇▇▇  PHONE (RES):000-000-0000

*************************** N A R R A T I V E ***************************

ON 05/22/2013 DEPUTIES JAMES MANGUM AND MICHAEL CHAPMAN ESTABLISHED A

SAFETY CHECK POINT AT 388 RICKS DR. TO CHECK FOR OUT STANDING WARRANTS

AND OTHER VIOLATIONS. A MARCHELLO GREEN APPROACHED THE SAFETY CHECK

POINT, DEPUTY MANGUM REQUESTED TO SEE A DRIVERS LICENSE AND PROOF OF

INSURANCE. GREEN STATED VERBALLY THAT HIS LICENSE WAS SUSPENDED. DEPUTY

MANGUM REQUESTED INFORMATION FROM DISPATCH ABOUT THE STATUS OF GREEN'S

LICENSE AND DISPATCH ADVISED DEPUTY MANGUM THAT THERE WAS TWO WARRANTS

FOR A MARCHELLO RAMO GREEN. DEPUTY MANGUM ARRESTED GREEN FOR FTA NO PROOF

OF LIABILITY INSURANCE AND FTA IMPROPER EQUIPMENT. GREEN WAS TRANSPORTED

TO MADISON COUNTY DETENTION CENTER.

Confidential

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* A D M I N I S T R A T I O N \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CASE STATUS:_PENDING_____

REPORTING OFFICER: MANGUM,_JAMES_____         REPORT DATE:__5/23/13

    ASSIGNED TO: _____

Confidential

EXHIBIT 92

# NOTICE

The Madison County Sheriff's Department will have a checkpoint at one or more of the following locations.  The purpose of the checkpoint will be to check for Driver's license, warrants and what ever else we encounter.

These checkpoints will begin on
March 11th at 1500 hrs and end on
March 16th, 2012 at 0400 hrs.

Ridgewood Rd. @ Highway 51
Spillway Road @ / near Breakers Lane
William Blvd @ Old Canton Rd
Rice Rd. @ The Point Apartments
W. County Line Rd. @ Highland Colony Pkwy.
W. County Line Rd. @ N. Livingston Rd.
Rice Rd. @ Breezy Hill Rd
N. Livingston Rd @ Mary Miles Rd.
Stumpbridge Rd @ Sharon Rd.
HWY 43 @ Sharon Rd.
Highway 22 @ Harris Rd.
Yandell Rd. @ Clarkdell Rd.
Steed Rd. @ Richardson Rd.
Hwy 16 E. @ Hwy 51
Yandell Rd. @ Bainbridge  Rd.
HWY43 @ Natchez Trace Pkwy
Highway 43 @ Cotton Blossom
G. Washington @ Dr. MLK, Jr. Dr.
Nissan Dr.. @ Highway 51
Robinson Springs Rd. @  Pocahontas Rd.
Highway 51. @ Corrections Dr..
Boyd St. @ W. North St.
W. North @ 388 Ricks Dr.
W. Peace St @ Plummer Dr.
King Ranch Dr. @ Foley Ave.
Canton Estates & West North
Rice Rd & Pear Orchard
Main St. @ First St.

_____
Posted by:  Dep Mike Zimmerman

# EXHIBIT 93

# NOTICE

The Madison County Sheriff's Department will have a checkpoint at one or more of the following locations.  The purpose of the checkpoint will be to check for Driver's license, warrants and what ever else we encounter.

These checkpoints will begin on
April 18th at 1500 hrs and end on
April 21st, 2013 at 0400 hrs.

Ridgewood Rd. @ Highway 51
Spillway Road @ / near Breakers Lane
William Blvd @ Old Canton Rd
Rice Rd. @ The Point Apartments
W. County Line Rd. @ Highland Colony Pkwy.
W. County Line Rd. @ N. Livingston Rd.
Rice Rd. @ Breezy Hill Rd
N. Livingston Rd @ Mary Miles Rd.
Stumpbridge Rd @ Sharon Rd.
HWY 43 @ Yandell Rd.
Highway 16W @ Old Yazoo City Rd
Yandell Rd. @ Clarkdell Rd.
Steed Rd. @ Richardson Rd.
Hwy 16 E. @ Avondale Rd
Yandell Rd. @ Bainbridge  Rd.
HWY43 @ Natchez Trace Pkwy
County line Rd @ Old Canton Rd
Yandel ave @ Dobson dr.
Nissan Dr.. @ Highway 51
Natchez Tr @ Old Craft Center.
Highway 51. @ Corrections Dr..
Boyd St. @ W. North St.
W. North @ 388 Ricks Dr.
Harbor rd @ lake harbour dr.
Rice Rd @ Post Rd.
Hwy 43 @ Madison/Rankin line
West County line rd @ I220
Spillway rd @ Madison/Rankin line

Posted by:  Dep Mike Zimmerman

**MC T. CHASTAIN LAPTOP 17**

# EXHIBIT 94

# *From the desk of Captain Tommy Jones*

Date: January 30, 2017

To: All Narcotics Agents

From: Captain Tommy Jones

---

After meeting with Chief Williams, we feel that for the safety of the agents and MCSO, **reflective vests must be worn instead of reflective patches**.

As stated at an earlier date, any narcotics agent that is conducting or participating in a roadblock must wear a reflective vest and must make sure that there is a marked unit on the location of the roadblock. Also, one of the vehicles MUST have blue lights activated. This is for your safety as well as the safety of the public.

If this is not done as requested, disciplinary action will be taken.

**I need your vest size ASAP. Please make sure you plan for a larger size if you plan on wearing the reflective vest OVER the tactical vest.**

Thank you for your cooperation and be safe!

**MC L. SANDERS MAIN SERVER 93**

# EXHIBIT 95

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br><br>**PLAINTIFF STEVEN SMITH'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Steven Smith ("Plaintiff" or "Mr. Smith"), by and through his attorneys, hereby submits the following responses and objections to Defendants' First Set of Interrogatories served by Defendants on Plaintiffs on September 22, 2017 (collectively, the "Interrogatories," and each an "Interrogatory"). These responses and objections are hereby designated as Confidential pursuant to the Stipulated Protective Order (Dkt. No. 32), so-ordered by the Court on September 6, 2017 in the above-captioned action. Plaintiff hereby objects and responds to the Interrogatories as set forth below:

CONFIDENTIAL

**Interrogatory No. 4:**

Please state whether you have been involved in or witnessed a "pedestrian stop" or "pedestrian checkpoint," and for each, state:

(a)     The date of the checkpoint or stop;

(b)     The address or approximate location of the checkpoint or stop;

(c)     The name, address, and telephone number of any person arrested or searched;

(d)     The identity of any property searched or seized;

(e)     Whether the search, seizure or arrest was done pursuant to a warrant;

(f)     The name of all officers involved; and

(g)     The name, address and telephone number of any witnesses.

**Response to Interrogatory No. 4:**

        In addition to the General Objections set forth above, Plaintiff objects to Interrogatory

No. 4 on the grounds that it seeks information already in the possession, custody, or control of or

that is known to or otherwise equally available to Defendants.  Plaintiff further objects to this

Interrogatory as vague and unduly burdensome.  Plaintiff also objects to Interrogatory No. 4(g)

to the extent it seeks information that is protected from disclosure by, or disclosure of which is

prohibited or restricted under, any privilege or immunity, and/or any constitutional, statutory,

and/or common law rights of privacy.

        In response to Interrogatory No. 4, subject to, and without waiving, the General

Objections and the specific objections set forth above, Plaintiff has been involved in or witnessed

a "pedestrian stop" or "pedestrian checkpoint" including, but not limited to, the following:

- Plaintiff refers Defendants to: (i) the allegations set forth at paragraphs 89 and 271-275 of
  the Complaint; and (ii) the incident report that has been produced by Defendants in this
  action at Bates number MC-RFP 9-46–47.  To the best of his knowledge, information,

CONFIDENTIAL

and belief, Mr. Smith states that the following individuals were witnesses to the incident described at paragraphs 89 and 271-275 of the Complaint:  Terrance Thompson and Randy Speidle.  In Fall 2015, Mr. Smith was handcuffed and searched at Canton Estates in Canton, MS by deputies from the Madison County Sheriff's Department.  Mr. Smith further refers Defendants to any relevant incident reports and/or other documents that have been or will be produced by Defendants in this action.

**Interrogatory No. 5:**

Please state whether you have been involved in or witnessed a "jump out" as described in paragraphs 97 through 104 of the Complaint, and for each, state:

(a)     The date of the "jump out";

(b)     The address or approximate location of the "jump out";

(c)     The name, address, and telephone number of any person arrested or searched;

(d)     The identity of any property searched or seized;

(e)     Whether the search, seizure or arrest was done pursuant to a warrant;

(f)     The name of all officers involved; and

(g)     The name, address and telephone number of any witnesses.

**Response to Interrogatory No. 5:**

In addition to the General Objections set forth above, Plaintiff objects to Interrogatory No. 5 on the grounds that it seeks information already in the possession, custody, or control of or that is known to or otherwise equally available to Defendants.  Plaintiff further objects to this Interrogatory as vague and unduly burdensome.  Plaintiff also objects to Interrogatory No. 5(g) to the extent it seeks information that is protected from disclosure by, or disclosure of which is prohibited or restricted under, any privilege or immunity, and/or any constitutional, statutory, and/or common law rights of privacy.

# EXHIBIT 96

CASE SO17006312     * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                            INCIDENT REPORT
INCIDENT TYPE: SUSPICIOUS_ACTIVITY_____  PREMISE TYPE: _____
LOCATION:707_____MACE_ST_____4_ APT/LOT:____ ZONE_SO_
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_4/28/17  BEGIN TIME:2137  END DATE:_4/28/17  END TIME:2137
    COMMENTS: IN CUST @ 2140 / ▓▓▓▓▓▓OLIVER,DIRCO
**************************** P E R S O N S ******************************
PERSON #:001  STATUS:_ARREST_____  SUPPLEMENT DATED: 4/28/17
NAME:_DRICO_T._OLIVER_____  RACE:_BLACK_____ _____
SEX:_MALE__ DOB:▓▓▓▓▓▓ AGE:028 HGT:509 WGT:180 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_MUSTACHE_____ BUILD:MED  COMPLEXION:DRK
ADDRESS:_1193_SHADY_LANE_RD_____ PICKENS_____ MS
SOC SEC:▓▓▓▓▓▓ PHONE (RES):000-000-0000
**************************** N A R R A T I V E ******************************
ON 28 APRIL 2017 I SGT WILL WEISENBERGER JR WAS PATROLLING THE AREA OF 707
MACE ST, THE MADISON HEIGHTS APARTMENT COMPLEX. DURING MY PATROL I
OBSERVED TWO BLACK MALES STANDING BEING A PARKED VEHICLE. THE MALES THEN
LOOKED IN MY DIRECTION AND THEN QUICKLY TURNED AND STARTED WALKING AWAY.
DUE TO THIS AREA OF THE COMPLEX BEING A HIGH TRAFFIC AREA FOR NARCOTICS
AND ILLEGAL ACTIVITY I ATTEMPTED T STOP AND SPEAK WITH THE MALES. I
EXITED MY VEHICLE AND INSTRUCTED THE MALES TO STOP, THEY THEN BEGAN TO
RUN IN SEPARATE DIRECTIONS I INSTRUCTED THE SUBJECTS TO STOP ONCE AGAIN
IN WHICH THEY DID NOT. I THEN  GAVE CHASE, ONE MALE RAN AROUND A
APARTMENT BUILDING AND INTO AN UNKNOWN APARTMENT, I THEN SPOTTED THE
SECOND MALE RUN ACROSS THE BACK AREA OF THE PROPERTY. I INSTRUCTED THE
MALE TO STOP ONCE AGAIN AND HE DID NOT. I WAS ABLE TO CATCH THAT MALE AT
THE BACK OF THE COMPLEX PROPERTY, AND PLACE HIM INTO CUFFS WITH MINOR
RESISTANCE. THAT MALE SUBJECT WAS IDENTIFIED AS OLIVER,DRICO T. MR OLIVER
WAS TAKEN TO MY PATROL VEHICLE WHERE I THEN TRANSPORTED HIM TO MCDC WERE
HE WAS BOOKED ON ALL CHARGES. END OF REPORT   SGT WILL WEISENBERGER
JR  MCSO-7
**************************** A D M I N I S T R A T I O N ******************************
CASE STATUS:_____
REPORTING OFFICER: WEISENBERGER_JR,_WILLI__     REPORT DATE:__4/28/17
    ASSIGNED TO: _____

CASE SO15002731    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                INCIDENT REPORT
INCIDENT TYPE: INTOXICATED_SUBJECT_____   PREMISE TYPE: APT./CONDO_COMPLEX_____
LOCATION:619_____MARTIN_LUTHER_KING_DR_____7_  APT/LOT:____  ZONE_SO_
BUSINESS:_____  WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_2/21/15  BEGIN TIME:0025  END DATE:_2/21/15  END TIME:0025
   COMMENTS:_____<SMOOTS,DERRICK> //_____<HARRIS,QUINDERRIOUS
   > // 1X CUSTODY @ 0040
******************************* P E R S O N S *******************************
PERSON #:001  STATUS:_ARREST_____    SUPPLEMENT DATED: 2/21/15
NAME:_QUINDERRIOUS_J._HARRIS_____  RACE:_BLACK_____
SEX:_MALE__ DOB:_____ AGE:21_ HGT:504  WGT:181  HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_GOATEE_____  BUILD:MED  COMPLEXION:BLK
ADDRESS:_423_JOHNSON_STREET_____  CANTON_____  MS
SOC SEC:_____  PHONE [RES]:000-000-0000
PERSON #:002  STATUS:_VICTIM-SOCIETY/PUBLIC___  SUPPLEMENT DATED: 2/21/15
NAME:___._____  RACE:_____
SEX:_____ DOB:_0/00/00  AGE:___ HGT:000  WGT:000  HAIR:_____
EYES:_____  FACIAL HAIR:_____  BUILD:___  COMPLEXION:____
ADDRESS:_____  MS
SOC SEC: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  PHONE [RES]:000-000-0000
******************************* N A R R A T I V E *******************************
Rylon Thompson 5098      On February 21, 2015, at approximately 0030
hours, I was patrolling the apartment complex, located at 619 Martin
Luther King Drive. During the course of my patrol, I saw four black males
standing outside the "H" building. As I drove closer to the individuals,
they began walking away at a fast pace, so I stopped to talk with them.
One individual was identified as Quendarrious Harris by his social
security number.      While speaking with Mr. Harris, I noticed that
his speech was slow and slurred. Additionally, I noticed that he was
unsteady on his feet and very talkative. I asked if he had been drinking
and he said, "No." After further inquiry, Mr. Harris said, "I did
earlier." I offered him a preliminary breath test, to which he submitted.
The test indicated that his breath alcohol concentration (BrAC) was
.166 Based on the totality of the circumstances, Mr. Harris was arrested
for Public Drunk. I transported him to the Madison County Jail, where he
was held on a $300.00 written bond.  (EOR)
*********************** A D M I N I S T R A T I O N ***********************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: THOMPSON,_RYLON_____    REPORT DATE:__2/21/15
   ASSIGNED TO: _____

CONFIDENTIAL                                    MC-RFP-Inc. Rep. 058887

CASE SO14008732     * MADISON COUNTY SHERIFF'S OFFICE *          PAGE: 1
                    INCIDENT REPORT
INCIDENT TYPE: APARTMENT_WALK_THRU_____   PREMISE TYPE: APT./CONDO_COMPLEX_____
LOCATION:619_____MARTIN_LUTHER_KING_DR____5__ APT/LOT:___ ZONE_SO__
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_6/05/14_ BEGIN TIME:1628  END DATE:_6/05/14_ END TIME:1628
  COMMENTS: 2X IN CUSTODY @ 1636 // HARVEY,KENDRICK▮▮▮▮▮▮▮ // RATLIFF,
        LADARRON▮▮▮▮▮▮▮
***********************************  P E R S O N S  ***************************
PERSON #:001  STATUS:_ARREST_____           SUPPLEMENT DATED: 6/05/14
NAME:_LADARRON_M._RATLIFF_____  RACE:_BLACK_____
SEX:_MALE__ DOB:▮▮▮▮▮ AGE:23_ HGT:509 WGT:160 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_UNKNOWN_____  BUILD:SLM  COMPLEXION:DBR
ADDRESS:_580_MLK_DRIVE_____  CANTON_____ MS
SOC SEC▮▮▮▮▮▮ PHONE (RES):000-000-0000
PERSON #:002  STATUS:_ARREST_____           SUPPLEMENT DATED: 6/05/14
NAME:_KENDERICK_D._HARVEY_____  RACE:_BLACK_____
SEX:_MALE__ DOB:▮▮▮▮▮ AGE:19_ HGT:508 WGT:154 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_UNSHAVEN_____  BUILD:FRL  COMPLEXION:DBR
ADDRESS:_529_S._ADAM_ST_____  CANTON_____ MS
SOC SEC▮▮▮▮▮▮ PHONE (RES):000-000-0000
**********************************  P R O P E R T Y  **************************
PROPERTY #:001  STATUS:EVIDENCE_  TYPE:_MARIJUANA_____
MAKE:_MARIJUANA_____    MODEL:_____
COLOR:_GREEN_____   SERIAL NO:_____
STOLEN VALUE: $ _____   RECOVERED VALUE: $ _____
**********************************  N A R R A T I V E  ***********************
    On June 5, 2014, at approximately 1628 hours, I, Deputy Thompson and
Deputy Johnson were at the apartment complex of 619 Martin Luther King
Drive. Here, we saw several individual loitering in the complex. As we
approached the individuals, a subject later identified as Ladarron
Ratliff began walking inside of apartment #33. Deputy Johnson yelled for
the individual to stop. Mr. Ratliff walked inside of the apartment and
closed the door. Another subject, Kenderick Harvey was walking toward Mr.
Ratliff. I approached the individual and smelled a strong odor and burned
marijuana coming from Harvey's clothing. I asked him where the marijuana
was and he said, "I already smoked it." I patted Mr. Harvey down for
weapons and felt a bulge in his right front pants pocket. The bulge felt
like a bag of marijuana and I took it out of his pocket. The bag of
marijuana was later weighed at approximately 4 grams.    Deputy
Johnson talked Mr. Ratliff into coming out of the apartment and he was
placed under arrest for failure to comply. We transported both
individuals to the Madison County Jail. Mr. Ratliff was held on a $500
bond for Failure to Comply and Mr. Harvey was held on a $450 bond for
Possession of Marijuana. The marijuana was secured in the Narcotics vault
as evidence. (EOR)
**********************************  A D M I N I S T R A T I O N  *************

CONFIDENTIAL

RUN DATE:  8/28/17   * MADISON COUNTY SHERIFF'S OFFICE *        PAGE:  2
 SO14008732            INCIDENT REPORT
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: THOMPSON,_RYLON_____        REPORT DATE:__6/05/14
     ASSIGNED TO: _____

CONFIDENTIAL                                    MC-RFP-Inc. Rep. 025722

EXHIBIT 97

CASE SO17002404      * MADISON COUNTY SHERIFF'S OFFICE *         PAGE: 1
                          INCIDENT REPORT
INCIDENT TYPE: TRAFFIC_OFFENSES_____   PREMISE TYPE: APT./CONDO_COMPLEX_____
LOCATION:_____NOT_ON_FILE_____0_  APT/LOT:____ ZONE_SO_
BUSINESS:_____  WEAPON TYPE_UNKNOWN_____
BEGIN DATE:_2/14/17  BEGIN TIME:1031  END DATE:_2/14/17  END TIME:1031
    COMMENTS:  IN CUSD 10:30██████████MANNING,KHADAFY)
********************************* P E R S O N S ****************************
PERSON #:001  STATUS:_ARREST_____   SUPPLEMENT DATED: 2/14/17
NAME:_KHADAFY_C._MANNING_____   RACE:_BLACK_____
SEX:_MALE__ DOB:_██████_AGE:35_ HGT:601 WGT:160 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_UNSHAVEN_____   BUILD:SLM  COMPLEXION:DRK
ADDRESS:_388_RICKS_DRIVE_____  CANTON_____ MS
SOC SEC:██████  PHONE [RES]:000-000-0000
****************************** P R O P E R T Y ****************************
PROPERTY #:001  STATUS:EVIDENCE_ TYPE:_CONTROLLED_SUBS
MAKE:_UNK_LIQUID_____     MODEL:_NA_____
COLOR:_CLEAR/RED_____     SERIAL NO:_NA_____
STOLEN VALUE: $ _____   RECOVERED VALUE: $ _____
***************************** V E H I C L E ****************************
VEHICLE #:001  STATUS:SUSPECT___
LICENSE  TAG:MDQ035_____ STATE:MS  YEAR:____ VIN:1G1PK5SB4D7187673___
VEHICLE  YEAR:2013       MAKE:_CHEVROLET___MODEL:CZT_____
    STYLE:4D COLOR (TOP):SIL  (BOTTOM):SIL
**************************** N A R R A T I V E ****************************
On Tuesday 14, 2017 at approximately 1001 hrs. I, Sgt. Sam Howard (SO-32),
was conducting a walk-through of Canton Estates Apt. s located at 388
Ricks Drive, Canton, MS. I have been personally requested by management
to conduct walk-throughs due to numerous incidents of gambling, narcotics
usage and selling, consumption of alcohol in public, and gang
activity.    During this time, I observed a 2013 Chevrolet sedan make
an abrupt turn into a parking space leading me to believe the driver was
trying to avoid me. I approached the vehicle and identified the driver
as Khadafy Charlie Manning. I asked Manning why he was attempting to
avoid me and he stated  my driver s license is suspended .   At this
time, I arrested Manning and transported him to MCDC.      I charged
Manning with DWLS (Citation #129239) and NPOLI (Citation #129240). The
vehicle was secured on scene at owners request and the keys were left
with apartment manager.
**************************** S U P P L E M E N T ****************************
ON 02/14/2017 REPORTING DEPUTY WAS ASSISTING SGT. SAM HOWARD ARREST
KHADAFY MANNING FOR TRAFFIC VIOLATIONS.  SGT. HOWARD ASKED MANNING IF
THERE WAS ANY WEAPONS OR ILLEGAL SUBSTANCES IN THE CAR.  MANNING STATED

CONFIDENTIAL

MC-RFP-Inc. Rep. 047927

RUN DATE:  8/28/17   * MADISON COUNTY SHERIFF'S OFFICE *         PAGE:  2
SO17002404            INCIDENT REPORT
   THERE WERE NOT AND GAVE VERBAL CONSENT TO SEARCH THE VEHICLE.  REPORTING
   DEPUTY RECOVERED A 20 OUNCE JOLLY RANCHER SODA BOTTLE CONTAINING A RED
   LIQUID.  THIS WAS RECOVERED FROM THE TRUNK OF THE VEHICLE MANNING WAS
   DRIVING HIDDEN UNDER A PIECE OF CLOTH IN A BLACK PLASTIC BAG.  THE SODA
   BOTTLE IS BELIEVED TO CONTAIN A CONTROLLED SUBSTANCE AND WILL BE SENT TO
   THE CRIME LAB  FOR VERIFICATION.  MANNING WAS ONLY CHARGED AT THIS TIME
   WITH TRAFFIC VIOLATIONS PENDING LAB RESULTS FROM THE MISSISSIPPI STATE
   CRIME LAB.  E.O.R. DARIAN SMITH S.O.47
*********************** A D M I N I S T R A T I O N **********************
CASE STATUS:_____
REPORTING OFFICER: HOWARD,_SAMUEL_M_____         REPORT DATE:__2/14/17
   ASSIGNED TO: _____

                                                    MC-RFP-Inc. Rep. 047928

# EXHIBIT 98

CASE SO15018540    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                        INCIDENT REPORT
INCIDENT TYPE: APARTMENT_WALK_THRU_____ PREMISE TYPE: GOVERNMENT/PUBLIC_BUILDIN
LOCATION:619_____MARTIN_LUTHER_KING_DR_____14  APT/LOT:____ ZONE_SO_
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:11/18/15  BEGIN TIME:1658  END DATE:11/18/15  END TIME:1658
  COMMENTS: ▇▇▇▇▇▇CLARK,JOSHOUA / IN CUST @ 1732
*********************************** P E R S O N S ***********************************
PERSON #:001 STATUS:_ARREST_____     SUPPLEMENT DATED: 11/18/15
NAME:_JOSHUA_E._DAVIDSON_____ RACE:_BLACK_____
SEX:_MALE__ DOB:▇▇▇▇▇▇ AGE:26_ HGT:504 WGT:165 HAIR:_BLACK_____
EYES:_BROWN_____ FACIAL HAIR:_GOATEE_____ BUILD:SLM  COMPLEXION:MBR
ADDRESS:_922_HWY_16_WEST_____ CANTON_____ MS
SOC SEC:▇▇▇▇▇▇ PHONE (RES):000-000-0000
************************** N A R R A T I V E ***********************************
   On the above date and time while doing an apartment walk through at Canton
   Garden Apartments(619 M.L.K.) deputies came in contact with Joshua
   Davidson. Davidson had four outstanding warrants through Madison County
   Justice Court for failure to appear on various charges. Davidson was
   taken into custody and transported to the MCDC where he was served with
   the warrants. Bond was set in the amount of 1851.50 dollars cash per the
   warrants. e.o.r. Darian Smith S.O.47
****************************** A D M I N I S T R A T I O N ***********************
CASE STATUS:_____
REPORTING OFFICER: SMITH,_GEORGE_DARIAN_____     REPORT DATE:_11/18/15
       ASSIGNED TO: _____

CONFIDENTIAL                                                    MC-RFP-Inc. Rep. 032317

```
CASE SO12019724    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                         INCIDENT REPORT
INCIDENT TYPE: PAPER_SERVICE-WARRANT____ PREMISE TYPE: HIGHWAY/ROAD/ALLEY_____
LOCATION:388_____RICKS_DR_____O_ APT/LOT:___ ZONE_SO_
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:12/01/12  BEGIN TIME:1832  END DATE:12/01/12  END TIME:1832
COMMENTS: MAD789 /████████ HOBSON,MICHAEL IN CUST JC WARRANT
*****************************  P E R S O N S  ***************************
PERSON #:001  STATUS:_ARREST_____
NAME:_MICHAEL_J._HOBSON_____ RACE:_BLACK_____
SEX:_MALE__ DOB:████████ AGE:26_ HGT:508 WGT:200 HAIR:_BROWN_____
EYES:_BROWN_____ FACIAL HAIR:_UNSHAVEN_____ BUILD:CHB COMPLEXION:MBR
ADDRESS:_601_MARTIN_LUTHER_KING_DR____ CANTON_____ MS
SOC SEC████████ PHONE (RES):000-000-0000
*************************  N A R R A T I V E  ***************************
  ON 12-01-2012 I DEPUTY KYRIE LUCAS SO-43 AND DEPUTY THOMAS STRAIT SO-24
  WERE PATROLLING IN 388 RICKS DR WHEN I OBSERVED A UNIDENTIFIED BLACKMALE
  LOITERING IN FRONT OF BUILDING SEVEN. THE BLACKMALE WAS IDENTIFIED AS
  MICHAEL HOBSON DOB ████████ SS#████████. AFTER PROCESSING HIS
  INFORMATION THROUGH NCIC DISPATCH ADVISED ME THAT HE CURRENTLY HAD A
  ACTIVE WARRANT THOUGHT THE MADISON COUNTY SHERIFF'S OFFICE FOR LITTERING.
  HOBSON WAS TAKEN INTO CUSTODY AND TRANSPORTED TO THE MADISON COUNTY
  DETENTION CENTER FOR BOOKING AN PROCESSING. UPON ARRIVAL I SERVED HOBSON
  ONE PAPER WARRANT (JUSTICE COURT) FOR LITTERING IN THE AMOUNT OF $250.00
  CASH BOND. NOTHING FURTHER TO REPORT AT THIS TIME.
**********************  A D M I N I S T R A T I O N  ********************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: LUCAS,_KYRIE_____       REPORT DATE:_12/01/12
    ASSIGNED TO: _____
```

Confidential

MC-RFP-Inc. Rep. 007631

CASE SO12018897    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                   INCIDENT REPORT
INCIDENT TYPE: PAPER_SERVICE-WARRANT_____   PREMISE TYPE: PARKING_LOT_____
LOCATION:619_____MARTIN_LUTHER_KING_DR_____0_  APT/LOT:____ ZONE_SO_
BUSINESS:_____  WEAPON TYPE_UNKNOWN_____
BEGIN DATE:11/16/12  BEGIN TIME:2128  END DATE:11/16/12  END TIME:2128
COMMENTS: ████████COLEMAN,RANDY // IN CUSTODY @ 2134
********************************** P E R S O N S ***********************************
PERSON #:001  STATUS:_WARRANT/SERVED_____
NAME:_RANDY__._COLEMEN_____  RACE:_BLACK_____
SEX:_MALE__ DOB████████AGE:40_HGT:504 WGT:132 HAIR:_BLACK_____
EYES:_BROWN_____ FACIAL HAIR:_UNSHAVEN_____ BUILD:SML COMPLEXION:DBR
ADDRESS:_619_MARTIN_LUTHER_KING_DRIVE_ CANTON_____ MS
SOC SEC████████ PHONE (RES):000-000-0000
********************************** N A R R A T I V E ***********************************
ON NOVEMBER 16, 2012 I DEPUTY ABELS WAS CONDUCTING AN APARTMENT WALK
THROUGH WHEN I CAME INTO CONTACT WITH A RANDY COLEMEN (SS# ████████
COLEMEN SHOWED POSITIVE FOR AN ACTIVE WARRANT THROUGH JUSTICE COURT.
COLEMEN WAS TAKEN INTO CUSTODY AND TRANSPORTED TO THE MADISON COUNTY
DETENTION CENTER. WARRANT # 96289 ( NO PROOF OF INSURANCE) CASH BOND
WAS SET @ $650.00. EOR. SO-25 DEPUTY PERRY ABELS
******************* A D M I N I S T R A T I O N *********************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: ABELS,_PERRY_C._____      REPORT DATE:_11/16/12
    ASSIGNED TO:_____

Confidential

```
CASE SO12013170      * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                        INCIDENT REPORT
INCIDENT TYPE: PAPER_SERVICE-WARRANT_____ PREMISE TYPE: RESIDENCE/HOME_____
LOCATION:619_____MARTIN_LUTHER_KING_DR_____9_  APT/LOT:____ ZONE_SO_
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_8/15/12  BEGIN TIME:2136  END DATE:_8/15/12  END TIME:2136
    COMMENTS: SSN███████/ WILKES,CHRISTOPHER IN CUSTODY @ 2139 - REF CA
        SE #SO12013169 FOR TRANSPORT MILEAGE
*********************** P E R S O N S ***********************
PERSON #:001  STATUS:_ WARRANT/SERVED___
NAME:_CHRISTOPHER__._WILKES_____ RACE:_BLACK_____
SEX:_MALE__ DOB:███████ AGE:23_ HGT:507  WGT:145  HAIR:_BLACK_____
EYES:_BROWN_____ FACIAL HAIR:_CLEAN_SHAVEN__ BUILD:SLM  COMPLEXION:DBR
ADDRESS:_1340_YANDELL_ROAD_____ CANTON_____ MS
EMPLOYMENT:_UNKNOWN_____ _____
OCCUPATION:_____
SOC SEC: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  PHONE (RES):000-000-0000  PHONE (BUS):000-000-0000
*********************** N A R R A T I V E ***********************
ON AUGUST 15, 2012 I DEPUTY ABELS WAS ON ROUTINE PATROL WHEN I OBSERVED
SEVERAL SUBJECTS LOITERING IN THE PARKING LOT OF 619 MARTIN LUTHER KING
DRIVE. I STOP TO ADVISE THE SUBJECT TO MOVE ALONG. WHILE SPEAKING WITH
THE SUBJECTS I ADVISED DISPATCH OF THE IDENTIFICATION OF A CHRISTOPHER
DRAYUS WILKES. DISPATCHED RETURNED ADVISED THAT WILKES HAD TWO ACTIVE
JUSTICE COURT WARRANTS. WILKES WAS TAKEN INTO CUSTODY AND TRANSPORTED TO
THE MADISON COUNTY DETENTION CENTER. HE WAS BOOKED FOR THE TWO WARRANTS
WHICH ARE AS FOLLOWED. FAILURE TO APPEAR ON A SPEEDING TICKET FROM MHP
WARRANT #25189 4, FAILURE TO APPEAR ON A NO PROOF OF INSURANCE MCSO
WARRANT #98619. TOTAL CASH BOND WAS SET AT $875.00. EOR.
SO-25 DEPUTY PERRY ABELS
*********************** A D M I N I S T R A T I O N ***********************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: ABELS,_PERRY_C._____      REPORT DATE:__8/15/12
    ASSIGNED TO: _____
```

Confidential

CASE SO14008826    * MADISON COUNTY SHERIFF'S OFFICE *         PAGE: 1
                INCIDENT REPORT
INCIDENT TYPE: APARTMENT_WALK_THRU_____ PREMISE TYPE: PARKING_LOT_____
LOCATION:619_____MARTIN_LUTHER_KING_DR_____6_ APT/LOT:____ ZONE_CW_
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_6/06/14  BEGIN TIME:2216  END DATE:_6/06/14  END TIME:2216
    COMMENTS: GRIFFIN,WILLIE D
****************************** P E R S O N S ******************************
PERSON #:001  STATUS:_ARREST_____         SUPPLEMENT DATED: 6/06/14
NAME:_WILLIE____GRIFFINE_____ RACE:_BLACK_____
SEX:_MALE__ DOB:_____AGE:51_ HGT:509 WGT:120 HAIR:_BALD_____
EYES:_BROWN_____ FACIAL HAIR:_UNSHAVEN_____ BUILD:MED  COMPLEXION:DRK
ADDRESS:_601_MARTIN_LUTHER_KING_DR_____ CANTON_____ MS
SOC SEC: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  PHONE (RES):000-000-0000
****************************** N A R R A T I V E ******************************
    On Friday, June 6, 2014 at approximately 2230hrs, I, Deputy Johnson SO-12
    observed a black male walking in the area of Canton Garden Apts. located
    at 619 Martin Luther King Drive. I stopped the subject to see if he lived
    in the Complex and he stated no he was just walking. I ran the subjects
    information (Willie Griffine██████████████) and had dispatch run a
    check. Dispatch advised that Griffine has (3) active warrants: (1)
    DUI-2nd, (2) No DL, and (3) No Proof of Insurance. I placed Griffine in
    handcuffs and sat him in the rear of my patrol car. Griffine was
    transported to the jail for booking purposes. EOR
****************************** A D M I N I S T R A T I O N ******************************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: Z-JOHNSON,_OLIVER_H_____         REPORT DATE:__6/06/14
    ASSIGNED TO: _____

CONFIDENTIAL

MC-RFP-Inc. Rep. 025778

# EXHIBIT 99

| | |
|---|---|
| **From:** | Trey Bobinger |
| **To:** | 'Randall Tucker' |
| **Sent:** | 1/8/2016 11:20:58 PM |
| **Subject:** | RE: Bills we're sponsoring that your client might have an interest in... |

They are completely and utterly ridiculous!! I am not concerned about them at this point but just wanted to make you aware. I also forwarded Alex Hodge and Steve Rushing copies of the bills. I will let you know if there are any developments.........Thx............Trey

**From:** Randall Tucker [mailto:Randall.Tucker@madison-co.com]
**Sent:** Friday, January 08, 2016 4:40 PM
**To:** Trey Bobinger
**Subject:** Re: Bills we're sponsoring that your client might have an interest in...

I've read these and all are utterly ridiculous. Sure hope they don't pass any of them!

Sent from my iPhone

On Jan 8, 2016, at 4:35 PM, Trey Bobinger <tbobi@bellsouth.net> wrote:

Sheriff,

I received this e-mail from the representative of the ACLU today. It contains three (3) bills that they are going to have introduced in the current legislative session. Please review, I know you are going to be all for them!! (CRAZY!)

**From:** Erik Fleming [mailto:EFleming@aclu-ms.org]
**Sent:** Friday, January 08, 2016 11:50 AM
**To:** TreyBobinger@bellsouth.net
**Subject:** Bills we're sponsoring that your client might have an interest in...

See attached.
<ACLU of MS Police Body Cam bill '16.docx>
<DP Bill 2016 read only.docx>
<Oral advisement and written consent prior to search of a vehicle or a person during police contact.docx>

CONFIDENTIAL

# EXHIBIT 100

# Q&A with Sheriff Randy Tucker

Wednesday, January 14, 2015 12:00 PM

Madison County Sheriff Randy Tucker sat down for a one-on-one with the Journal to discuss everything from his stance on legalizing marijuana to the terrorist attack in Paris last week that ended with over a dozen dead.

Prior to his election as sheriff in 2011, Tucker served as a narcotics investigator for 20 years with the sheriff's department. In December, his department made 22 drug arrests in one of many investigative stings.

MS: Explain the drug situation in Madison County. Are there kingpins or more low-level dealers?

RT: I think our version of kingpin differs from what they would look at on a federal level. A kingpin to Madison County is somebody who has a tri-county reach, distributing several pounds of marijuana or a pound or more of cocaine each month. I'd classify the (local activity) as street level dealers and the occasional mid-level man.

MS: What's the biggest problem right now?

RT: Our biggest problem right now is homegrown - it's prescription drugs. Prescription drugs, they're not a chosen addiction like marijuana, cocaine or heroin. Eighty-ninety percent of prescription drug addicts are that way because of an involuntary addiction. Just kind of involuntary and subconsciously hooked on it. Most of those addictions started out innocently and legally.

MS: How does that progress into people buying them on the street illegally?

RT: I think the prescription drug abusers are more prevalent in the middle-to-upper class areas. They can afford healthcare readily. That's how those start, with going to the doctor and insurance paying. Then it progresses into an addiction. They have to go outside those means to find someone that provides them, and that's generally associated with lower income areas.

MS: You've said in previous interviews you do not agree with legalization of marijuana as seen in other states. With a ballot initiative underway in Mississippi to legalize marijuana, what are your thoughts on this?

RT: The push is coming and I know that. I don't think the general public views what law enforcement or doctors see in people that abuse drugs like marijuana. A lot of people think it's a recreational drug. I've heard it all, at the end of the day I've seen it over a 20-year period. I can't think of one life it's affected in a positive manner, but I can think of thousands of instances where its been a negative effect on someone's life. It's a drug that begins a downward spiral. I don't think there's any way you can ever regulate it. I've seen the stats from Colorado. For every pro they can present to you I can give you a con. They're trying to justify a means with an end.

MS: Where are we with the war on drugs? Some say that we've already lost it.

RT: I don't know that we've lost it. It's a depressing war. The fact that you put the same people in jail over and over and they're back out before you can get through the paperwork. I think it's incumbent for every jurisdiction to do as much as they can to combat it. We need to try to keep our head above water. I don't think justifying one drug is the means to survive the drug war.

MS: What's the next big thing when it comes to drugs and what are you looking out for?

RT: The synthetic drug - synthetic marijuana or spice, LSD 25I. The laws as they are set up right now govern certain parts of a drug, like marijuana is THC. Chemists now are learning they can create these synthetic drugs. It's a big struggle for the legislature to identify the compounds creating the illegal drug and try to add to the uniformed controlled substance statute.

MS: What about drug education? DARE is there for young children, but how to we educate the teenagers,

when they're at the age when they begin experimenting?

RT: Education starts at home. Parenting has really gotten away from what it was when I grew up. I don't parent the way my parents did. The value that you want to instill in the kids is still the same, but it has evolved to the point where we don't want to hurt kids feelings. You can't discipline them, can't paddle them. There was a winner and a loser and now everybody's a winner. I think we've really got to back up and put the value back in personal hygiene and accountability back home. I think church numbers are down. We need to get people back in the church.

MS: Shifting gears, you are the chief law enforcement officer of the county. What's your biggest fear each day?

RT: I don't know that I could say there would be one incident. There's so many things that go through my head everyday that could happen. There's so much loss of life in law enforcement nowadays. I dread the day I have to tell a wife or husband, spouse or child their parent is not coming home. I dread the fact law enforcement in today's society is disrespected based on a certain number of events that are not factually commented on.

I do dread an active shooter scenario because that's a "nobody's gonna win" situation.

MS: Do you instantly worry if your phone rings at 11 o'clock at night?

RT: If I'm asleep. I don't sleep much. I worry every day. You worry about those incidents. It's not just one, you play scenarios over in your head, anything tragic that can happen. Myra Lewis. I think about her every single night before I go to sleep. I wonder where she is. When I wake up I talk to our investigators, tell them what I thought about, it's just one of those things.

MS: Do you think you'll ever find out what happened? (Two-year-old went missing in Camden in March and police continue to search for evidence of her whereabouts).

RT: Yes, at some point we will. I hope it's today. I wish the phone would ring right now. I don't know which way it's gonna go. I'm an optimist, I believe she's out there waiting to be found.

MS: You just touched on this, disrespect to law enforcement. There's a sentiment going on right now across the country. Two officers were killed in New York City a few weeks back. Do you think there needs to be a discussion on the national level?

RT: First off, I think to ambush anybody whether it's a citizen law enforcement officer, is a cowardly thing to do. Beyond that I would submit that each individual, each individual incident has a set of circumstances unique to that own incident. I don't know that there are any greater number of incidents happening today than there were 10 years ago. There are a few isolated incidents that have brought more extension and exposure to those incidents.

Citizen reactions - good or bad situations - have always happened. Is every officer always right in every incident, no.

Is every incident the fault of a citizen, no. But at the same time I would say that officers are trained. I have a hard time believing they would go out and single out people purposefully to violate their rights and mistreat them.

MS: Does your department have body cameras or plans to introduce them in the future?

RT: We do not. We have recently, as late as this year, installed a camera in every vehicle we have. We have cameras as well as backseat cameras for detention purposes. We've talked about...the body cams. That's one of those deals - are you gonna scrutinize every little thing a guy does or girl does based on a few bad apples? If you've got to stand there with your thumb on them constantly I'd rather not need them. The people we hire go through a rigorous process. We don't hire anybody off the street. I put my faith and belief in them or I wouldn't hire them.

MS: Are people more violent in your opinion today, compared to a few years ago?

RT: Absolutely! People are frustrated economically, frustrated morally. People are frustrated with what's going on, what's being perceived in the public eye. A lot of conclusions are being jumped to without facts.

MS: With what happened recently in Paris, is that a threat you take seriously, even here in the heart of Mississippi?

RT: I think anybody that doesn't take it seriously is naive. No community is immune to an incident like that. Go back to fears. I fear something just like that. It can happen anywhere. You really rely on the fact you've hired the best possible candidates for your jobs and trained them properly and given them equipment. You can prepare all day and you're not gonna be prepared. You can be more prepared than you were yesterday but you're not gonna ever be fully prepared for something like that.

How can you be prepared for chaos - you can't.

EXHIBIT 101

**Jeremy Williams**

| | |
|---|---|
| **From:** | Susan McCarty |
| **Sent:** | Wednesday, November 30, 2016 12:50 PM |
| **To:** | Jeremy Williams; Randall Tucker |
| **Cc:** | Pamela Hancock; Cheryl Horn; Shelia Taylor |
| **Subject:** | FW: charges |
| **Attachments:** | 201611301154.pdf |

Please see attached Affidavits and fact sheets where charges have been filed against Slade and James Hall.

Per Statute, these cases are being delivered to the County Prosecutor for proper handling in Circuit/County Court.

Susan McCarty, JCC
Madison County Justice Court
2961 S Liberty, Canton, MS 39046
601-855-5619


-----Original Message-----
From: madisoncourt@madison-co.com [mailto:madisoncourt@madison-co.com]
Sent: Wednesday, November 30, 2016 10:54 AM
To: Susan McCarty <Susan.McCarty@madison-co.com>
Subject: Message from "RNP0026738E7FC7"

This E-mail was sent from "RNP0026738E7FC7" (Aficio MP 4002).

Scan Date: 11.30.2016 11:54:04 (-0500)
Queries to: madisoncourt@madison-co.com

1

**CONFIDENTIAL**                    **MC - RFP 8 - 211**

CASE NO MIS 00 028351 _                    JUDGE  BRUCE MCKINLEY

CHARGE  COMMITTING A CRIME W/IN PERFORMANCE OF OFF. DUTY

GENERAL AFFIDAVIT

THE STATE OF MISSISSIPPI

COUNTY OF MADISON

PERSONALLY APPEARED BEFORE ME STEPHANIE BURTON, DC

A JUSTICE COURT CLERK OF MADISON COUNTY,

        JONES DESTINY
        107 WAY CIRCLE
        CANTON          MS  39046-0000

MAKES AFFIDAVIT THAT

        MOORE SLADE DEPUTY
        2935 HWY 51
        CANTON          MS  39046-0000

ON OR ABOUT 11/27/2016 IN MADISON COUNTY, MISSISSIPPI

        DID WILLFULLY AND UNLAWFULLY, AND IN VIOLATION OF
        SECTION 99-3-28, AND DURING A TIME THAT HE WAS
        ACTING WITHIN THE SCOPE OF HIS OFFICIAL DUTY AS A
        SWORN OFFICER OF THE MADISON COUNTY SHERIFF'S
        DEPARTMENT CAUSE AFFIANT TO BE PUT IN FEAR OF HARM
        BY ALLOWING THE FOLLOWING TO OCCUR, GRABBING THE
        AFFIANT'S ARM, PLACING AFFIANT IN CUFFS AND
        STATING TO THE AFFIANT "I'M TAKING YOUR ASS TO
        JAIL", AND SQUEEZING AFFIANT'S ARM. THIS
        OCCURRING IN MADISON COUNTY, MS.

AGAINST THE PEACE AND DIGNITY OF THE STATE OF MISSISSIPPI.

SWORN TO AND SUBSCRIBED BEFORE ME, THIS THE 11/29/2016

MADISON COUNTY JUSTICE COURT

2961 SOUTH LIBERTY, CANTON, MS 39046

**CONFIDENTIAL**                    **MC - RFP 8 - 212**

## CRIMINAL FACTS AND CIRCUMSTANCES
### (Affiant Section)

Name: Destiny Jones
(YOUR FULL LEGAL NAME)                    Phone: 601-567-5421

Address: 107 Way Circle , Canton , MS , 39046
(HOUSE NUMBER AND STREET NAME)        (CITY)        (STATE)    (ZIP)

Employer: Student (JSU)
(NAME OF COMPANY)                         Phone:

Address: _____ / _____ / _____ / _____
(NUMBER AND STREET NAME)        (CITY)        (STATE)    (ZIP)

### (Defendant Section)

Name: Slade Moore
(THEIR FULL LEGAL NAME)                    Phone:

Address: _____ / _____ / _____ / _____
(HOUSE NUMBER AND STREET NAME)        (CITY)        (STATE)    (ZIP)

Employer:
(NAME OF COMPANY)                         Phone:

Address: _____ / _____ / _____ / _____
(NUMBER AND STREET NAME)        (CITY)        (STATE)    (ZIP)

THE DATE OF THE INCIDENT: 11/27/16

Describe what happened below in detail:

My brothers car lost a wheel on the North bound side of
I 55 in the left lane. My brother called 911 for assistance.
I went to provide assistance to my brother. I pulled to
the left of the highway a car length in front of my brother.
By this time my fiancé (John Leach) had already arrived before
me behind my brother, and a State trooper behind him. Then
a drunk driver slammed into the State troopers car pushing the state
trooper into my fiances car, then it slid into my car. Then the
Sheriff Department arrived on scene. The trooper told me
to do one thing and the sheriff told me to do another. When
I explained to the sheriff what the trooper told me he got
angry. I feel like this wasn't appropriate for Sheriff to use the
language he used or the excessive force. I was not read any of my rights.
I just wanted to notify the department of this incident and behavior
of Slade Moore.

**CONFIDENTIAL**                          **MC - RFP 8 - 213**

## CRIMINAL FACTS AND CIRCUMSTANCES
### (Affiant Section)

Name: Destiny Jones

Phone: _____

(YOUR FULL LEGAL NAME)

Address: _____ / _____ / _____ / _____

(HOUSE NUMBER AND STREET NAME)    (CITY)    (STATE)    (ZIP)

Employer: _____

Phone: _____

(NAME OF COMPANY)

Address: _____ / _____ / _____ / _____

(NUMBER AND STREET NAME)    (CITY)    (STATE)    (ZIP)

### (Defendant Section)

Name: _____

Phone: _____

(GIVEN FULL LEGAL NAME)

Address: _____ / _____ / _____ / _____

(HOUSE NUMBER AND STREET NAME)    (CITY)    (STATE)    (ZIP)

Employer: _____

Phone: _____

(NAME OF COMPANY)

Address: _____ / _____ / _____ / _____

(NUMBER AND STREET NAME)    (CITY)    (STATE)    (ZIP)

THE DATE OF THE INCIDENT: _____

Describe what happened below in detail:

continued I was scared crying heavily talking to a trooper scared. The officer grabbed my arm aggressively and placed me in handcuffs and stated I'm taking your ass to jail. He then lead me to another sheriffs car and told him when he get done to take me to jail. The officer was squeezing my arms. I was crying telling him he was hurting my arms and calling for my mother, he then threw me in the back of his car and I remained there until the scene was clear. I was then transported to the county jail. Where I was charged with disordely conduct and resisting arrest, which was false.

**CONFIDENTIAL**                    **MC - RFP 8 - 214**

# EXHIBIT 102

```
CASE SO15009132    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
                 INCIDENT REPORT
INCIDENT TYPE: PAPER_SERVICE-WARRANT____  PREMISE TYPE: HIGHWAY/ROAD/ALLEY_____
LOCATION:_____LIVINGSTON_VERNON_RD_/_HW_3_  APT/LOT:____  ZONE_XN_
BUSINESS:_____  WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_6/09/15  BEGIN TIME:1354  END DATE:_6/09/15  END TIME:1354
COMMENTS: MS
        MS / VBLESSN /              /            IN CUST @ 1418
**********************************  P E R S O N S  *********************************
PERSON #:001  STATUS:_ARREST_____  SUPPLEMENT DATED: 6/09/15
NAME:_EARNEST_L._PATE_____  RACE:_BLACK_____
SEX:_MALE__ DOB:             AGE:43_ HGT:511 WGT:170 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_UNKNOWN_____  BUILD:SLM  COMPLEXION:BLK
ADDRESS:_117_COMPRESS_ST._____  FLORA_____  MS
SOC SEC:             PHONE (RES):000-000-0000
*****************************  N A R R A T I V E  ****************************
ON TUESDAY, JUNE 9, 2015, AT APPROXIMATELY 1415 HRS., I CAME IN CONTACT
 WITH EARNEST L. PATE ON LIVINGSTON VERNON RD. NEAR HWY 22. PATE HAD A BAD
 CHECK WARRANT, WARRANT#BCU02199. PATE WAS TRANSPORTED TO THE MADISON
 COUNTY JAIL WHERE HE WAS SERVED WITH THE WARRANT AND GIVEN A $1,000.00
 WRITTEN BOND.
**********************  A D M I N I S T R A T I O N  *********************
CASE STATUS:_____
REPORTING OFFICER: Z-THOMAS,_JAMES_L_(BUB__    REPORT DATE:__6/09/15
    ASSIGNED TO: _____
```

Confidential

EXHIBIT 103

CASE SO15006923    * MADISON COUNTY SHERIFF'S OFFICE *        PAGE: 1
        INCIDENT REPORT
INCIDENT TYPE: PAPER_SERVICE-WARRANT____  PREMISE TYPE: HIGHWAY/ROAD/ALLEY_____
LOCATION:_____GEORGE_WASHINGTON_AVE_/_W_7_  APT/LOT:____  ZONE____
BUSINESS:_____ WEAPON TYPE__UNKNOWN_____
BEGIN DATE:_5/03/15  BEGIN TIME:2033  END DATE:_5/03/15  END TIME:2033
    COMMENTS: _____SMITH,QUINCY / IN CUST @ 2050 SPOKE TO THE PERSON'
        S MOTHER AND SHE IS ENROUTE TO GET THE CAR 20:54// MCE736
***************************** P E R S O N S ********************************
PERSON #:001  STATUS:_ARREST_____        SUPPLEMENT DATED: 5/03/15
NAME:_QUINCY_C._SMITH_____  RACE:_BLACK_____
SEX:_MALE__ DOB:_____ AGE:26_ HGT:509 WGT:180 HAIR:_BLACK_____
EYES:_BROWN_____  FACIAL HAIR:_CLEAN_SHAVEN__  BUILD:MED  COMPLEXION:MBR
ADDRESS:_204_DOBSON_AVE_____  CANTON_____ MS
SOC SEC:_____ PHONE (RES):000-000-0000
PERSON #:002  STATUS:_VICTIM-SOCIETY/PUBLIC___  SUPPLEMENT DATED: 5/03/15
NAME:___._____  RACE:_____
SEX:_____ DOB:_0/00/00 AGE:___ HGT:000 WGT:000 HAIR:_____
EYES:_____  FACIAL HAIR:_____  BUILD:___  COMPLEXION:___
ADDRESS:_____  _____ MS
SOC SEC: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  PHONE (RES):000-000-0000
***************************** N A R R A T I V E *****************************
 On the above date and time deputies came in contact with Quincy Smith on
 George Washington Str near Welsh Str. Smith had and outstanding warrant
 through MCJC for failure to pay fine. Smith was taken into custody and
 transported to the MCDC on the above charge and given a cash bond of
 532.50 dollars per the warrant. e.o.r. Darian Smith S.O.47
********************** A D M I N I S T R A T I O N ********************
CASE STATUS:_CLEARED_BY_ARREST_____
REPORTING OFFICER: SMITH,_GEORGE_DARIAN____      REPORT DATE:__5/03/15
    ASSIGNED TO: _____

                                    MC-RFP-Inc. Rep. 020065

# EXHIBIT 104

### Madison County Sheriff's Office
### Narrative

| CASE NUMBER | | PAGE NUMBER |
|---|---|---|
| N/A | | 1 OF 2 |

| COMPLAINANT'S NAME (Firm's Name if a Complainant) | OFFENSE DISPOSITION | | |
|---|---|---|---|
| N/A | ☐ Cleared Adult Arrest ☐ Cleared Exception Juv ☐ Inactive | ☐ Cleared Exception Adult ☒ Closed ☒ Unfounded | ☐ Cleared Juvenile Custody ☐ Open / Active |

| TYPE OFFENSE | DATE/TIME OF REPORT | OFFICER # | REPORTING OFFICERS NAME |
|---|---|---|---|
| INTERNAL | 06/27/2016 17:00 HRS. | 2568 | JEREMY WILLIAMS SO-2 |

#### NARRATIVE

ON 06/26/2016 I WAS CONTACTED BY HEATH HALL WITH SMG WHO ADVISED HE RECEIVED A CALL FROM A REPORTER WITH WJTV WHO ADVISED HIM SHE HAD A VIDEO OF A MADISON COUNTY DEPUTY SENT TO HER FROM A FAMILY WHO LIVED AT 388 RICKS DR IN CANTON MS. THE REPORTER STATED TO HALL THAT THE FAMILY ALLEGED AN UNKNOWN DEPUTY CHOKED KHADAFEY MANNING WHILE IN HANDCUFFS AND THE VIDEO WHILE UNCLEAR SHOWED A DEPUTY WITH HIS ARM IN THE NECK AREA OF WHO WAS ALLEGED TO BE MANNING.

SHERIFF TUCKER HAD CALLED JUST PRIOR TO ME HEARING FROM HALL AND ADVISED HE GOT A SIMILAR CALL FROM CHIEF BROWN AT CANTON POLICE DEPT STATING A FAMILY WAS MEETING WITH MAYOR ARNEL BOULDIN AND CONTACTING THE NEWS MEDIA ABOUT AN ALLEGED INCIDENT. I OR SHERIFF TUCKER HAVE HAD NO CONTACT FROM A FAMILY MEMBER OR MR MANNING ABOUT THIS INCIDENT.

I SEARCHED THE CAD FOR ANY RECORDS OF CALLS FROM 388 RICKS DR AND FOUND CASE#2016-9669 A REPORT OF A HOUSE BURGLARY THAT LISTED MANNING AS A WITNESS. A COPY OF THAT REPORT IS ATTACHDED TO THIS NARRATIVE AS WELL AS TWO WITNESS STATEMENTS ONE MADE BY MANNING. I CONTACTED SGT SLADE MOORE AND ASKED HIM ABOUT THE INCIDENT. SGT MOORE ADVISED ME OF THE CALL AND CIRCUMSTANCES LISTED IN THE ATTACHED REPORT. SGT MOORE ADVISED MANNING WAS INVOLVED AND HE HAD WITNESSED HIM WITH THE SUSPECT AS HE BROKE A WINDOW AND TRIED TO ENTER THE RESIDENCE. SGT MOORE ADVISED HE AND THE OTHER DEPUTIES WHO RESPONDED TO THE CALL MADE CONTACT WITH MANNING IN AN APARTMENT HE WITNESSED HIM RUN TO. SGT MOORE ADVISED THAT MANNING WAS BEING DISORDERLY AND HE DID HANDCUFF MR MANNING. SGT MOORE ALSO ADVISED THAT AT SOME POINT DURING THE INTERVIEW MANNIGN DID HAVE TO BE RESTRAINED AND HE DID HAVE TO USE APPROPRIATE FORCE TO GET HIM INTO THE BACK OF A

SHERIFF DEPT VEHICLE. THIS FORCE DID INCLUDE SGT MOORE WITH HIS ARM IN THE AREA OF MANNINGS NECK. SGT MOORE ADVISED THAT MANNING DID EVENTUALLY CALM DOWN AND GIVE A STATEMENT TO WHAT HAPPENED AT THE APARTMENT COMPLEX AND WAS RELEASED.

SGT MOORE PROVIDED A STATEMENT TO WHAT OCCURRED IN THE APARTMENT AND THAT STATEMENT IS ATTACHED TO THIS NARRATIVE. AT THIS TIME NO COMPLAINT HAS BEEN RECEIVED FROM MANNING OR HIS FAMILY MEMBERS. I, SHERIFF TUCKER, OR HALL HAVE NOT SEEN THE VIDEO THAT WAS SENT TO WJTV DESPITE REQUESTS THAT THE REPORTER SEND IT. ---- END OF NARRATIVE ---- J. WILLIAMS SO-2 ----

**CONFIDENTIAL**

# EXHIBIT 105



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
AUG 15 2016
ARTHUR JOHNSTON
BY_____ DEPUTY

**ROBERT L. GIBSON**                                                   **PLAINTIFF**

**V.**                               CAUSE NO.: 3:16cv633 HTW-LRA

**MADISON COUNTY SHERIFF'S DEPARTMENT**                      **DEFENDANT**

<div align="center">

**COMPLAINT**

**(A JURY TRIAL IS DEMANDED)**

</div>

**COMES NOW** Plaintiff, ROBERT L. GIBSON, brings this action against the captioned Defendant(s). Unless otherwise stated, "Defendant" or "Defendants" shall also refer to Defendant as well as all Defendants to be named (to the extent Plaintiff agrees to proceed against them). As more specifically set forth below, Plaintiff has been subjected to race-based discrimination prior to termination and in the form of discriminatory discharge. He was also subject to retaliation prior to termination, and at the time of his retaliatory discharge. The actions of the Madison County Sheriff's Department described herein constitute violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000 et seq. as amended, 42 U.S.C. § 1981a. This is to allege PLAINTIFF is entitled to all recoverable costs, amounts, damages provided for by 42 U.S.C § 1981a, and under Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000 et seq. as amended.

In support of his Complaint and causes of action set as forth therein, Plaintiff states as follows.

## JURISDICTION AND VENUE

1. At all relevant times hereto the Madison County Sheriff's Department has been entity engaged in an industry affecting commerce within the meaning of Section 701(b), through (h) of Title VII, 42 U.S.C. §2000e(b) through (h) (and any related subsections), and other relevant sections of law. In the alternative, Defendant otherwise falls under the jurisdiction of Federal laws noted above and below. All damages and losses are sought to be recovered according to all provisions allowing or addressing recoverable damages set forth in the above-mentioned laws. Plaintiff incorporates, in his prayer for relief below, all provisions of the above-mentioned laws defining and describing the types of damages and categories of damages he may recover. He specifically claims he is entitled to recover all such available damages recoverable under all law referred to in this Complaint, (or otherwise implicated by the facts or causes of action) all of which are sought pursuant to this Complaint whether or not specifically noted below.

2. The civil rights violations, and wrongful employment practices perpetuated by Defendants (including but not limited to race discrimination, retaliation, and all conduct, facts, occurrences, acts or omissions providing any basis for legal action) shall hereafter also be referred to as "actionable conduct". This Honorable Court has jurisdiction of this matter (due to federal questions according to 28 USC § 1331) and venue is proper according to 28 USC § 1391.

3. Plaintiff has satisfied administrative conditions prior to the commencement of this action under Title VII, by filing his Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. Plaintiff was issued a Right to Sue letter dated May 20, 2016 and received thereafter. The Right to Sue and Charge are collectively attached hereto as *Exhibit "A"*. **Mr. Gibson has another pending Charge that was filed with the Jackson Area EEOC office and which has been forwarded to the US Department of Justice. This Complaint does not bring claims pursuant to that second Charge which alleges retaliation occurring after the**

retaliatory termination alleged in the Exhibit "A" Charge. While Plaintiff alleges in this Complaint that he was discriminated against and retaliated against, resulting in his discriminatory and retaliatory termination, Plaintiff also reserves the right to allege separate acts of retaliation occurring due to actionable conduct on the part of Defendant after the termination. He reserves the right to bring legal claims alleging those acts of retaliation in a separate Complaint or amendment to this Complaint.

4.     All Counts, claims, causes of action, allegations, statements, and theories of recovery are alleged in the alternative to each other, and also in addition to each other. The matters below are set forth while reserving the chance to provide alternate or additional explaining details. Nothing herein shall be deemed as waiving requirements of notice pleading. Unless otherwise stated in the heading of the Count or within the Count, all Counts, and claims within them, are meant to be applicable to all Defendants named or to be named.

## PARTIES

5.     Plaintiff, ROBERT GIBSON, is an adult resident of Madison County, Mississippi. At times contemplated by the facts and causes of action contemplated herein, he resided at 879 Williams Boulevard, Apartment 23B, Ridgeland, Mississippi 39157.

6.     Defendant, MADISON COUNTY SHERIFF'S DEPARTMENT, was an Employer in Mississippi within the above judicial district at the time of all acts and omissions which are the subject of this Complaint. Substantial actionable conduct giving rise to the claims occurred there. Plaintiff reserves the right to amend this Complaint to assure proper parties are before the Court, (and the proper registered agent is served and that the proper places of business are noted). This shall also serve as Plaintiff's Motion to substitute parties or amend as needed to assure proper names are before the Court. Defendant, MADISON COUNTY SHERIFF'S DEPARTMENT, is

3

reasonably believed to be able to be served with process c/o Sheriff Randy Tucker, 2941 U.S. Highway 51, Canton, Mississippi 39046 and\or wherever else Defendant may be found.

## STATEMENT OF FACTS

7.      Plaintiff was employed as a sheriff's deputy with Defendant beginning on or about February 28, 2011. Plaintiff worked with Defendant in a law enforcement capacity. Plaintiff is a member of a protected class, the African-American race. Prior to working in law enforcement, Plaintiff held a leadership position in the United States Marine Corps wherein he performed valuable service, and obtained experience working in stressful conflict situations.

8.      During the time of Plaintiff's employment with Defendant, both he and other officers, regardless of race were expected to, and did, respond to stressful situations. That were reasonably expected to arise as part of law enforcement duties. Some of those situations, that involved or implicated understandable issues that needed to be worked out among officers and supervisors. Further, officers such as Plaintiff and other non-African American officers experienced these issues and they were to be expected in the course of Defendant's operations.

9.      Plaintiff worked, in part. under the supervision of Deputy Chief Jeremy Williams at times relevant to the facts and actionable conduct providing the basis for this Complaint. Plaintiff worked under others as well.

10.     Notwithstanding the above, and prior to Plaintiff's discriminatory and/or retaliatory discharge on or about February 19, 2013, Plaintiff performed his law enforcement duties and worked for Defendant as reasonably expected.

11.     In the alternative and in addition, Plaintiff performed his law enforcement duties in a manner, at least substantially similar to other deputies, when considering issues that might commonly arise as well as other reasonably expected matters associated with law enforcement.

4

12.     In the alternative and in addition, there was no significant problem with Plaintiff's job performance or activities as a law enforcement officer that should have justified termination, when considering the circumstances under which the termination occurred. The above was also true when considering Defendant's treatment of other deputies (and matters involving them).

13.     In the alternative and in addition, there was no significant problem with Plaintiff's job performance or activities as a law enforcement officer that should have justified failure to promote Plaintiff, when considering the circumstances under which the failure occurred. The above was also true when considering Defendant's treatment of other deputies (and matters involving them).

14.     In the alternative and in addition, any alleged deviations from expected practice were not significant so as to warrant termination, and/or failure to promote and/or adverse employment action against Plaintiff, when considering Defendant's treatment of other deputies, and/or matters involving them.

15.     In the alternative and in addition, any alleged problems with Plaintiff's job performance were not any substantial reason to write-up, reprimand, nor counsel Plaintiff in a manner that reasonably indicated there were significant problems with his job performance warranting termination and/or failure to promote and/or adverse employment action against him.

16.     In the alternative and in addition, when considering Plaintiff's job performance, attitude, and actions as a whole, he performed very good work as a law enforcement officer.

17.     While Plaintiff denies he violated any work rule in any significant way that should have justified termination and/or failure to promote and/or adverse employment action, Plaintiff reserves the right to argue that any alleged deviation from the Defendant's practices which the Defendant has alleged to EEOC or which it may allege in this action, were not substantially different

5

from the alleged deviations commonly engaged in by similarly situated non African-American employees.

18.     On or about January 1, 2013, Plaintiff was denied promotion to the position of investigator in the CID division under Captain Barfield.  He previously applied for the position on or about October 2012.

19.     The position in criminal investigations at CID under Captain Barfield (non-juvenile) was conveyed to be open to employees by memorandum from Deputy Chief Jeremy Williams's desk on or about October 8, 2012.  While the memorandum specifically asked deputies to state their number of years in law enforcement as well as number of years with the department, the memorandum did not state, (nor did the Defendant ever convey or represent) that time in law enforcement or time with the department were the criteria for selection.

20.     In the alternative and in addition, Defendant never conveyed or represented that time in law enforcement or time with the department were the only criteria for selection or the criteria to be given greatest weight.

21.     The announcement did not indicate that other criteria including but not limited to work ethic and/or productivity were requirements that needed to be met in order to qualify for the position.

22.     In the alternative and in addition, Defendant never adequately defined the criteria of work ethic and/or productivity so as to fairly include them as criteria for selection.

23.     In the alternative and in addition, Defendant never represented how it intended to evaluate or measure work ethic or productivity and it never had adequate clear, objectively conveyed standards for measuring work ethic or productivity.

6

24.     In the alternative and in addition, Defendant's criteria for selection of an applicant was significantly subjective at best such that there was no adequately defined specific criteria or set of criteria at the time of the announcement.

25.     In the alternative and in addition, given the subjective nature of Defendant's selection criteria (or set of criteria) they were not able to uniformly applied to both African American and non African-American deputies.

26.     In the alternative and in addition, Defendant never had adequately established, nor clearly established criteria or set of criteria for selection.

27.     In the alternative and in addition, Defendant never adequately carried out policies, procedures, and practices so as to provide subjective information as to the exact selection criteria for the positions.  The above resulted in Defendant's decision-makers having significant subjective control over selecting individuals for the positions.

28.     In the alternative and in addition, Defendant's decision-makers otherwise had significant subjective control over selecting individuals for the positions.

29.     Defendant's practice which was not based on adequately defined criteria or set of criteria resulted in a discriminatory effect upon Plaintiff and potentially other African-Americans. While Plaintiff maintains that Defendant's methods for granting promotions were discriminatory, his claims are founded in the disparate treatment of Plaintiff when compared to non African-Americans. Nevertheless, Plaintiff reserves the right to claim (and/or otherwise support) that Defendant engaged in a pattern and practice of using methods (or lack of appropriate methods) which had a discriminatory effect upon Plaintiff and other African-Americans when considering factors, including but not limited to, the promotions received and not received by African-Americans in relation to the racial make-up of the work force on or about 2012 to 2013.  Plaintiff reserves the right to otherwise support that Defendant engaged in pattern(s) and/or practice(s) that

7

occurred in various forms and manifested themselves in discrimination affecting Plaintiff as alleged in this Complaint, and potentially others.

30.     Plaintiff was denied promotion to the position of investigator while one or more similarly-situated non-African American employees received promotion to investigator in the adult CID.

31.     While Plaintiff reserves the right to argue that there were not clearly defined criteria conveyed as being part of the selection process, he also argues in the alternative and in addition that by a reasonable standard, his work ethic and/or productivity were sufficient for the promotion. When considering Plaintiff's work ethic alone as exemplified by his performance, and when considering it was good, it should have been given weight so as to determine him to be more suited and/or more qualified for the position than the non African-American who received the promotion. In the alternative and in addition, when considering Plaintiff's work ethic and productivity from an objective standard Plaintiff was more suited than the lesser suited and/or lesser qualified non African-American who received the promotion.

32.     In the alternative and in addition, when considering all factors as a whole including but not limited to Plaintiff's certification, knowledge of law enforcement responsibilities and other factors related to job performance and to Plaintiff's abilities, Plaintiff was more suited and/or qualified to receive the position.

33.     Plaintiff sets forth that some, or all statistical information gathered or assembled by EEOC as contained in the investigative file, supports a pattern or practice of racial discrimination when considering the circumstances involving Plaintiff and non African-Americans. Plaintiff reserves the right to rely upon that information to establish, along with other evidence, that Defendant discriminated. Plaintiff otherwise also reserves the right to rely upon statistical information which may be determined in discovery and/or which may be obtained from available

information. Plaintiff reserves the right to challenge Defendant's claimed statistical evidence or interpretation of matters involving its workforce.

34.     Defendant's failure to apply uniform, clearly conveyed, objective and clearly practiced, standards of selection resulted in the discriminatory promotion of one or more non African-American's instead of Plaintiff.

35.     In the alternative and in addition, when considering a reasonable comparison between Plaintiff and other non-African American deputies, and Defendant's lack of clearly defined criteria, Plaintiff was passed over for promotion in favor of one or more lesser qualified, and/or less suited, and/or uncertified non-African American individuals.

36.     While Plaintiff denies he violated any work rule (or deviated from commonly expected practice) in any manner which would have justified the discriminatory failure to promote, discriminatory discharge, or retaliation, Plaintiff alleges similarly-situated non African-American deputies engaged in similar or worse conduct than Plaintiff. Notwithstanding, they were not subject to Defendant's actionable conduct resulting in the discriminatory failure to promote, resulting in the discriminatory and retaliatory work environment, as well as resulting in discriminatory and retaliatory termination that occurred on February 19, 2013.

37.     Prior to Plaintiff's termination, and within relatively close time, Plaintiff discussed with Lieutenant Mark Sandridge (over the DUI unit) Plaintiff's concerns about racially discriminatory practices that affected both the employees and the community. Plaintiff complained to Lt. Sandridge about white officers using excessive force and beating black individuals. Plaintiff also complained about the Department setting up roadblocks primarily in the minority neighborhoods. Around the time of Plaintiff's complaints, Plaintiff personally witnessed officers using excessive force and severely beating a suspect along Highway 55 while the suspect was still in

9

handcuffs. Plaintiff firmly opposed this mistreatment, and picked up the individual, thereafter put him in a police cruiser.

38.     Further, Plaintiff was informed of other instances wherein excessive force was used upon black individuals.

39.     The above referenced multiple instances of excessive force used upon black individuals were reasonably believed to represent discriminatory terms and conditions of employment for officers working for the department, and which Plaintiff complained about. Even though the above conduct Plaintiff complained about also involved third-parties and the community, it represented discriminatory terms and conditions of employment for Plaintiff and potentially other officers as well. Mr. Gibson reasonably believed he and other officers were being required to work in an environment containing discriminatory terms and conditions insofar as it involved mistreatment of black individuals, and in so far as it required officers to work in circumstances involving, and around, the discriminatory mistreatment. As a result, he reasonably, and of good faith believed that the terms and conditions of employment were discriminatory for himself and other employees required to work in the conditions.

40.     Further, Plaintiff complained to Lt. Sandridge on the occasion referred to above, about what he reasonably perceived to be no black officers being in the investigations or DUI unit (reasonably referring to adult investigations unit (CID)). Plaintiff otherwise complained about black officers not being promoted to important positions of responsibility in SWAT and narcotics even though they were certified and otherwise qualified. Regardless of whether Defendant may now claim there were black officers in certain positions of responsibility, Plaintiff had a reasonable and good faith belief that there was discriminatory mistreatment insofar as black officers were not substantially involved in certain positions and/or promoted to positions of responsibility including but potentially not limited to the above positions. He therefore complained. Plaintiff specifically

complained about the matters in this Complaint representing what he reasonably believed to be racial discrimination in the terms, conditions of employment when he communicated with Lieutenant Sandridge.

41.     Further, in response to the EEOC, Defendant set forth that Kim Henderson, black female, was in the job sought by Plaintiff (Charging Party) and that all the other investigators were white. Plaintiff submits that while she was over child crimes and Plaintiff reasonably complained about the lack of black investigators in CID (adult) under Captain Barfield. In the alternative and in addition, one or more of his complaints could be reasonably construed to refer to the investigations unit at CID (adult investigations) wherein there were no black investigators. Plaintiff sought a job in CID over the adult crimes investigatory unit which was separate from the unit involving Ms. Henderson. Plaintiff submits there should be no disputing that he never applied for any job involving investigating crimes against youth. When considering that Defendant knew of or should have known that the job sought by Plaintiff was in the adult CID, Plaintiff reasonably and in good faith believed that the unit for which he sought employment contained no African-Americans.

42.     Plaintiff never expressed unhappiness about Defendant or Defendant's operations to Lt. Sandridge or Plaintiff's supervisors (including Sheriff Tucker and Chief Jeremy Williams) before discussing it with Lt. Sandridge at the time referred to here. Plaintiff in fact expressed unhappiness and conveyed he was expressing that unhappiness because of Defendant's race discrimination.

43.     It is reasonably believed that Lieutenant Sandridge discussed with Sheriff Tucker and Chief Williams the matters Plaintiff conveyed to Lt. Sandridge.

44.     After the above events in the prior paragraph, Plaintiff was brought into a meeting with Chief Williams and Sheriff Tucker wherein Plaintiff was informed during the brief communication by Chief Williams that it was understood Plaintiff was not happy at the Sheriff's Department, and was therefore given the option of resignation or to be terminated. Plaintiff was

given no reasonable choice and/or option under the circumstances. Plaintiff declined resignation and was issued a letter terminating him.

45. Defendant alleged to Plaintiff that he was being terminated because Defendant believed he was unhappy working for the Department.

46. Defendant has alleged numerous reasons for termination to the EEOC that were not the true reasons for Plaintiff's termination as expressed to him. Plaintiff sets forth that there should be no material fact dispute that he was terminated for expressing unhappiness, and that Plaintiff in fact expressed unhappiness due to what he reasonably believed were Defendant's racially discriminatory practices (and that Defendant knew of and/or should have known at the time of termination that Plaintiff was expressing unhappiness due to what he reasonably, and in good faith, believed to be racially discriminatory terms, conditions and/or privileges of employment).

47. Defendant has expressed reasons for termination to the EEOC that were significantly based on its subjective perception of Plaintiff, and/or otherwise not adequately supported.

48. Nevertheless, to the extent Defendant now claims reasons for termination that were not expressed (or adequately expressed) to Plaintiff prior to the EEOC investigation, similarly-situated white deputies engaged in similar or worse conduct than Defendant alleged to the EEOC that Plaintiff engaged in. Defendant knew of or should have known of this conduct, and they were not terminated. For example, while reserving the right to provide others in discovery, Plaintiff was reasonably informed by a supervisory employee that there were circumstances involving the potentially violent propensities of another officer that should have reasonably indicated concerns with the officer. The similarly situated white employee was not terminated.

49. In the alternative and in addition, Defendant misrepresented and/or incorrectly misrepresented, within information it presented to the EEOC, material matters related to Plaintiff's

12

ability to function as a law enforcement officer. The above is also supported by the fact that Plaintiff was never issued any write up nor formal reprimand.

50.     In the alternative and in addition, Defendant has otherwise alleged concerns with Plaintiff's job performance wherein it tolerated similar or worse conduct, behavior, and/or attitude on the part of non African-Americans.

51.     Plaintiff denies that he engaged in any conduct or behavior that was outside what was reasonably expected and tolerated by Defendant in the law enforcement context.

52.     In the alternative and in addition, regardless of whether or not Defendant failed to promote Plaintiff under circumstances which were discriminatory, Defendant failed to retain Plaintiff and instead retained one or more similarly situated non African American employees under circumstances wherein Plaintiff was terminated, even though one or more were not terminated for similar or worse conduct. Plaintiff maintains the above while also reserving the right to argue that he was not informed of, and had no reason to know of, any substantial issue with his job performance that should have warranted termination. Plaintiff therefore also reserves the right to argue that when his job performance, conduct, approach to the work, and work as performed, is compared to one or more similarly situated, non African Americans, he was treated differently under sufficiently similar circumstances so as to constitute disparate treatment.

53.     At no time during the above events did Chief Williams, Lt. Sandridge, Sherriff Tucker, or any other person with supervisory authority over Plaintiff or with authority to make a termination decision, ever inform Plaintiff that he was terminated for any other reason aside from being unhappy at the Department.

54.     Defendant did not adequately investigate or address Plaintiff's concerns affecting Plaintiff and potentially others. Defendant instead summarily terminated Plaintiff.

55.     While Defendant's termination was retaliatory, Defendant also retaliated against Plaintiff prior to termination by the denial of an adequate opportunity for his concerns regarding alleged race discrimination to be ever adequately investigated, or addressed.

56.     It is reasonably believed, based upon all available information, and the events occurring at the time, that Plaintiff was terminated for being allegedly unhappy at the Department due to the discriminatory terms and conditions of employment, which he complained about.

57.     Plaintiff was never issued any formal nor informal write-up claiming he acted in a way that would have or should have justified his termination.

58.     In the alternative and in addition, Plaintiff was never informed that he ever acted in any such manner that should have justified termination.

59.     In the alternative and in addition to the above, Plaintiff denies there was ever any stated or claimed reason by Defendant for his termination aside from his unhappiness with the department. That unhappiness was for the reasons Plaintiff expressed such that Defendant knew of or should have known of them.

60.     In fact, Plaintiff clearly conveyed that he was unhappy as a result of perceived race discrimination, such that Defendant was reasonably aware Plaintiff complained about race discrimination and terminated him as a result.

61.     In the alternative and in addition to the allegations in the prior paragraphs, the environment essentially allowed one or more inadequate avenues to complain.

62.     Defendant's discriminatory and retaliatory environment resulted in tangible employment action and resulted in Plaintiff being terminated from the employment.

63.     In the alternative to the above, and in addition, Defendant terminated Plaintiff in retaliation because Plaintiff opposed and/or complained of race-based discrimination.

14

64. In the alternative to the above, and in addition, Defendant terminated Plaintiff under circumstances that were discriminatory.

65. Defendant's stated reasons for termination (and/or for differences in treatment between Plaintiff and other deputies) and any reasons it claimed or may claim were pretextual for discriminatory termination.

66. In the alternative and in addition, Defendant's stated reasons for termination and any reasons it claimed or may claim for differences in treatment between Plaintiff and other deputies were pretextual for retaliatory termination.

67. Plaintiff reserves the right to set forth that any stated reasons for termination (and/or reasons for differences in treatment between Plaintiff and other deputies) were not the true reasons and/or were unworthy of belief, (in the alternative and in addition).

68. In the alternative and in addition to the above allegations, Plaintiff was subject to conditions ending his employment for discriminatory and/or retaliatory reasons. The EEOC initiated an investigation pursuant to Plaintiff's *Exhibit "A"* Charge of Discrimination which was timely filed. Pursuant to that investigation the EEOC issued a Determination, the contents of which are attached as *Exhibit "B"*, and incorporated. Plaintiff reserves the right to rely upon any information contained in the investigative file of the EEOC. Plaintiff suffered losses as more fully described above and below. The contents of any exhibits to this Complaint are incorporated as though expressly set forth. As a result of the above-referenced events, Plaintiff suffered all damages further referred to below and incorporated here.

## CAUSES OF ACTION

### COUNT I
### CLAIMS UNDER SECTION 703 OF TITLE VII
### BASED ON RACE DISCRIMINATION
### IN THE TERMS, CONDITIONS, AND/OR PRIVILEGES OF EMPLOYMENT
### IN THE FORM OF FAILURE TO PROMOTE
### DURING THE EMPLOYMENT

69. Plaintiff re-alleges and incorporates all provisions set forth above and below as if fully incorporated herein. The claims alleged in this Count are alleged in the alternative, and in addition, to each other. They are alleged in the alternative, and in addition, to the claims in the other Counts as well.

70. Defendant is alleged to have violated Section 703 of Title VII, 42 U.S.C. § 2000e-2 et seq. as amended, as well as 42 U.S.C. § 1981a, in ways outlined in this Complaint. Plaintiff seeks all damages available under all laws referred to in this Complaint.

71. Plaintiff was discriminated against with regard to the terms, conditions, and/or privileges of employment. Plaintiff was subject to disparate treatment.

72. Plaintiff was discriminated against with regard to the terms, and/or conditions, and/or privileges of employment when considering differences in treatment between himself and one or more similarly situated non-African Americans when he was not promoted under circumstances, wherein one or more similarly situated non-African-Americans was promoted to investigator. Plaintiff incorporates any of the above or below allegations in this Complaint reasonably providing a basis for claims in this Count.

73. As a direct and proximate result of Defendant's conduct toward Plaintiff, Plaintiff has sustained losses as more fully described below herein. The losses and damages which Plaintiff suffered and as referred to in this paragraph are also meant to include and incorporate any losses and damages noted and referred to in all other parts of this pleading incorporated herein.

16

74.     In the alternative and in addition, the unlawful actions of the Defendant in reckless disregard of the statutory rights of Plaintiff. Plaintiff reserves the right to argue Defendant's actions were wanton, and/or willful.

75.     Plaintiff incorporate the information contained in the exhibits to this Complaint as though set forth and reserves the right to provide additional information in discovery.

## COUNT II
## CLAIMS UNDER SECTION 703 OF TITLE VII
## BASED ON RACE DISCRIMINATION
## IN THE TERMS, CONDITIONS AND/OR PRIVILEGES OF EMPLOYMENT
## IN THE FORM OF OTHER DISCRIMINATION UPON PLAINTIFF DURING THE
## EMPLOYMENT ASIDE FROM FAILURE TO PROMOTE

76.     Plaintiff re-alleges and incorporates all provisions set forth above and below as if fully incorporated herein.  The claims alleged in this Count are alleged in the alternative, and in addition, to each other.  They are alleged in the alternative, and in addition, to the claims in the other Counts as well.

77.     Defendant is alleged to have violated section 703 of Title VII, 42 U.S.C. § 2000e-2 et seq. as amended, as well as 42 U.S.C. § 1981a, in ways outlined in this Complaint.  Plaintiff seeks all damages available under all laws referred to in this Complaint.

78.     Plaintiff was discriminated against with regard to the terms, conditions, and/or privileges of employment. Plaintiff was subject to disparate treatment.

79.     Plaintiff was discriminated against with regard to the terms, conditions, and/or privileges of employment when considering he was required to work in an environment imposing discriminatory terms and conditions. It involved intentional excessive force being used upon a black suspect when he did not witness the same force used upon white suspects.  While the excessive force was used against the black suspect, and not against Plaintiff, the requirement that Plaintiff work in the environment where such conduct was reasonably believed to have occurred

17

was unacceptable and discriminatory to Plaintiff as an African-American law enforcement officer. It was discriminatory to require Plaintiff to work in an environment involving discrimination. Further Plaintiff was informed of other similar conduct, and Plaintiff reasonably believed he was required to work in a discriminatory environment for this reason as well. Plaintiff was subject to discriminatory terms and conditions of employment as a result of being required to work in an environment that carried out its practices in what he reasonably believed was a discriminatory manner. Plaintiff was denied the privilege of an employment in law enforcement that did not involve discriminatory mistreatment of one or more suspects.

80.     In the alternative and in addition, Plaintiff was treated differently than one or more similarly situated non-African Americans when Plaintiff, as an African-American, was exposed to an environment containing discriminatory mistreatment of other African Americans in the manner in which it occurred.   In the alternative and in addition, this mistreatment affected Plaintiff discriminatorily as an African American in a manner differently than it affected other non African Americans.  In the alternative and in addition, the mistreatment was discriminatory to Plaintiff as an African American when it was not to one or more non African Americans.   Plaintiff reserves the right to use comparators including, but potentially not limited, to those non African Americans involved in the conduct Plaintiff complained about.

81.     In the alternative and in addition, Plaintiff was required to work in an environment where concerns of discrimination were not adequately investigated, addressed, or corrected.  He was denied the privilege of employment of seeing his concerns of discrimination adequately investigated or addressed, which he should have been able to reasonable expect. Defendant failed to adequately, investigate, or address Plaintiff's complaints of the discriminatory environment which ultimately resulted in his discharge as well.  Plaintiff incorporates any of the above or below allegations in this Complaint reasonably providing a basis for claims in this Count.

82.     As a direct and proximate result of Defendant's conduct toward Plaintiff, Plaintiff has sustained losses as more fully described below herein. The losses and damages which Plaintiff suffered and as referred to in this paragraph are also meant to include and incorporate any losses and damages noted and referred to in all other parts of this pleading incorporated herein.

83.     In the alternative and in addition, the unlawful actions of the Defendant were in reckless disregard of the statutory rights of Plaintiff. Plaintiff reserves the right to argue Defendant's actions were wanton, and/or willful.

84.     Plaintiff incorporate the information contained in the exhibits to this Complaint as though set forth and reserves the right to provide additional information in discovery.

## COUNT III
## CLAIMS UNDER SECTION 703 OF TITLE VII
## BASED ON RACE DISCRIMINATION
## IN THE TERMS, CONDITIONS, AND/OR PRIVILEGES OF EMPLOYMENT
## IN THE FORM OF DISCRIMINATORY TERMINATION

85.     Plaintiff re-alleges and incorporates all provisions set forth above and below as if fully incorporated herein.  The claims alleged in this Count are alleged in the alternative, and in addition, to each other.  They are alleged in the alternative, and in addition, to the claims in the other Counts as well.

86.     Defendant is alleged to have violated section 703 of Title VII, 42 U.S.C. § 2000e-2 et seq. as amended, as well as 42 U.S.C. § 1981a, in ways outlined in this Complaint.  Plaintiff seeks all damages and losses available under all laws referred to in this Complaint.

87.     Plaintiff was discriminated against with regard to the terms, conditions, and/or privileges of employment. Plaintiff was subject to disparate treatment.

88.     Plaintiff was discriminated against with regard to the terms, and/or conditions, and/or privileges of employment when considering differences in treatment between himself and one or more similarly situated non-African Americans when he terminated under circumstances

19

wherein one or more similarly situated non African-Americans were not terminated. Plaintiff reserves the right to argue that he engaged in no significant conduct that was outside of Defendant's expected practices that should have warranted termination when considering the treatment of similarly situated employees outside his protected class. In the alternative and in addition, Plaintiff engaged in no significant conduct that was outside what was reasonably expected in a law enforcement context and/or outside that which should have been reasonably expected by Defendant. In the alternative and in addition, Plaintiff was terminated under circumstances wherein one or more similarly situated non African-Americans were not terminated for similar or worse conduct. In the alternative and in addition, Plaintiff was terminated for the fact that he was given the option of resignation or termination which represented no reasonable choice and/or options under the circumstances. In the alternative and in addition Plaintiff performed satisfactorily at the very least, and was subject to discriminatory mistreatment notwithstanding.

89.     In the alternative and in addition, Plaintiff performed satisfactory at the very least, (when considering his actions, conduct, job performance, and work as a whole) when one or more similarly situated non Aftrican Americans were not terminated under similarly circumstances using proper factors of comparison. Plaintiff incorporates any of the above or below allegations in this Complaint reasonably providing a basis for claims in this Count.

90.     As a direct and proximate result of Defendant's conduct toward Plaintiff, Plaintiff has sustained losses as more fully described below herein. The losses and damages which Plaintiff suffered and as referred to in this paragraph are also meant to include and incorporate any losses and damages noted and referred to in all other parts of this pleading incorporated herein.

91.     In the alternative and in addition, the unlawful actions of the Defendant in reckless disregard of the statutory rights of Plaintiff. Plaintiff reserves the right to argue Defendant's actions were wanton, and/or willful.

20

92.     Plaintiff incorporate the information contained in the exhibits to this Complaint as though set forth and reserves the right to provide additional information in discovery.

## COUNT IV
## CLAIMS BASED ON ACTS OF RETALIATION UNDER TITLE VII
## FOR ACTS OF RETALIATION DURING
## EVENTS PRIOR TO TERMINATION

93.     Plaintiff re-alleges and incorporates all provisions set forth above and below as if fully incorporated herein.  The claims alleged in this Count are alleged in the alternative, and in addition, to each other.  They are alleged in the alternative, and in addition, to the claims in the other Counts as well.

94.     Plaintiff was treated adversely with regard to the terms and conditions of Employment when he was retaliated against by Defendant due to complaining about conduct in good faith believed to be discriminatory (opposing it). He was retaliated against following the time he complained and when considering the events prior to termination.  Defendant retaliated against Plaintiff prior to his termination by Defendant's open intentional failure to adequately investigate, or address his complaints of discrimination referred to above, and by its failure to allow him to see his concerns investigated prior to his termination, as a result of his complaints.

95.     In the alternative and in addition, Defendant retaliated against Plaintiff prior to termination by failing to afford him adequate opportunity to assure his alleged concerns of race discrimination were adequately investigated or addressed.   Defendant denied Plaintiff these opportunities because he expressed unhappiness due to race discrimination.   This denial of opportunity constituted adverse employment action in addition to other adverse employment actions. Plaintiff incorporates any of the above or below allegations in this Complaint reasonably providing a basis for claims in this Count.

21

96.    In the alternative and in addition, Plaintiff was retaliated against following his complaints of race discrimination, by being given the only option of resigning as opposed to termination.  In carrying out Defendant's practices in response to complaints of discrimination by affording Plaintiff only two unacceptable options,  (and without adequate investigation or action). Defendant retaliated against Plaintiff regardless of any decision ultimately made by Plaintiff or Defendant.

97.    Plaintiff suffered adverse employment actions and losses as a direct and proximate result of Defendant's response to the same.  Plaintiff was retaliated against before he was discharged.

98.    Defendant is alleged to have violated section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), as amended including but not limited to the Civil Rights Act of 1991, 42 U.S.C. § 1981a, providing rights to broad recoverable damages, and/or all other provisions which would address the actionable conduct or provide remedies therefore.  Plaintiff had a right to be free from the effects of retaliatory practices in his employment relationship with Defendant.

99.    Plaintiff makes separate claims for each act of retaliation perpetuated upon him following each separate time complaining (opposing).  Plaintiff makes separate claims under section 704 of Title VII and Title VII as amended for each act of retaliation referred to in this paragraph, this Complaint, and which may be illustrated in discovery.  Plaintiff therefore makes claims for the retaliation occurring prior to his discharge.

100.    As a direct and proximate result of Defendant's conduct toward Plaintiff, Plaintiff has sustained losses as more fully described below herein. The losses and damages which Plaintiff suffered and as referred to in this paragraph are also meant to include and incorporate any losses and damages noted and referred to in all other parts of this pleading incorporated herein.

101.    In the alternative and in addition, the unlawful actions of the Defendant in reckless disregard of the statutory rights of Plaintiff.  Plaintiff reserves the right to argue Defendant's actions were wanton, and/or willful.

102.    Plaintiff incorporate the information contained in the exhibits to this Complaint as though set forth and reserves the right to provide additional information in discovery.

## COUNT V
## CLAIMS BASED ON ACTS OF RETALIATION UNDER TITLE VII
## FOR ACTS OF RETALIATION
## RESULTING IN RETALIATORY TERMINATION

103.    Plaintiff re-alleges and incorporates all provisions set forth above and below as if fully incorporated herein.  The claims alleged in this Count are alleged in the alternative, and in addition, to each other.  They are alleged in the alternative, and in addition, to the claims in the other Counts as well.

104.    Plaintiff was treated adversely with regard to the terms and conditions of Employment when he was retaliated against by Defendant due to complaining about conduct in good faith believed to be discriminatory (opposing it). He was retaliated against following the time he complained.  Defendant retaliated against Plaintiff when considering his discharge under circumstances wherein he was given no reasonable choice but to accept resignation or discharge. Plaintiff was discharged in retaliation for his complaints of race discrimination.    In the alternative and in addition, Plaintiff was constructively discharged and/or discharged for all intents and purposes, under retaliatory circumstances.

105.    Plaintiff suffered adverse employment actions and losses as a direct and proximate result of Defendant's response to the same.  Plaintiff was separately retaliated against both before he was discharged and when he was ultimately and discharged for reporting and opposing racial

discrimination. In the alternative and in addition, he was not allowed to work under circumstances rendering Defendant liable.

106.     Defendant is alleged to have violated section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), as amended including but not limited to the Civil Rights Act of 1991, 42 U.S.C. § 1981a, providing rights to broad recoverable damages, and/or all other provisions which would address the actionable conduct or provide remedies therefore.   Plaintiff had a right to be free from the effects of retaliatory practices in his employment relationship with Defendant.

107.     Plaintiff makes separate claims for each act of retaliation perpetuated upon him following each separate time complaining (opposing).  Plaintiff makes separate claims under section 704 of Title VII and Title VII as amended for each act of retaliation referred to in this paragraph, this Complaint, and which may be illustrated in discovery.  Plaintiff therefore makes claims for the retaliation occurring prior to his discharge and for retaliation in the form of discharge. Plaintiff incorporates any of the above or below allegations in this Complaint reasonably providing a basis for claims in this Count.

108.     As a direct and proximate result of Defendant's conduct toward Plaintiff, Plaintiff has sustained losses as more fully described below herein. The losses and damages which Plaintiff suffered and as referred to in this paragraph are also meant to include and incorporate any losses and damages noted and referred to in all other parts of this pleading incorporated herein.

109.     In the alternative and in addition, the unlawful actions of the Defendant in reckless disregard of the statutory rights of Plaintiff.  Plaintiff reserves the right to argue Defendant's actions were wanton, and/or willful.

110.     Plaintiff incorporate the information contained in the exhibits to this Complaint as though set forth and reserves the right to provide additional information in discovery.

## DAMAGES INCLUDING, BUT NOT LIMITED TO, PUNITIVE DAMAGES

111.    Plaintiff re-alleges and incorporates all averments set forth in all paragraphs above as if fully incorporated herein.    Plaintiff suffered losses and damages as set forth below and incorporated herein from the section beginning "WHEREFORE PREMESIS CONSIDERED…." He also preserves a claim for punitive damages for conduct which was willful and/or wanton and/or in reckless disregard for his civil rights as well as in reckless disregard for the above law (as they allege the conduct was).    Defendant acted in reckless disregard for Plaintiff's civil rights and for the law in its actionable conduct giving rise to the above claims.

CONSOLIDATED PRAYER FOR RELIEF TO BE APPLICABLE TO ALL ABOVE SEPARATE CLAIMS INDIVIDUALLY AND TOGETHER.    (THE BELOW IS INCORPORATED INTO ALL ABOVE COUNTS AND CLAIMS AND DEMANDED AS A RESULT OF THE ACTIONABLE CONDUCT DESCRIBED ABOVE.)

112.    Plaintiff re-alleges and incorporates all averments set forth in all paragraphs above as if fully incorporated herein.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF RESPECTFULLY PRAYS that the Court cause service to issue in this cause upon the Defendant and that this matter be set for trial on each separate claim(s) in each separate Count.    Upon trial by jury thereon, Plaintiff prays that the following relief be granted separately for each Count, claim, or cause of action:

1.    Front pay/lost wages as well as back pay/lost wages to the fullest extent recoverable, value of employment benefits of any kind (including but not limited to lost value of any insurance or anything of value Plaintiff received during employment or would have received during or following employment if not for the conduct alleged), lost value of incidentals and other pecuniary losses proximately caused by Defendant's unlawful conduct, as well as fair compensation for the acts and omissions referred to;

2.      Damages against Defendant in an amount to be determined by the jury for damages described above and herein and above the minimum jurisdictional amount. Those damages include but are not limited to (recovery for the following categories of damages are sought in the alternative and in addition to each other): compensation for past, present, and future emotional distress or non-economic losses; past, present, and future out of pocket costs and attorney fees; past, present, and future loss of enjoyment of life; past, present, and future pain and suffering; past, present, and future mental anguish; past, present, and future lost wages to the fullest extent recoverable; loss of wage earning capacity; costs related to medical or mental health treatment which might occur in the future if OR which Plaintiff might be recommended to have or might have been recommended. Plaintiff otherwise prays for any medical care, counseling, mental health care, psychiatric or psychological care which might be recommended or which might have been recommended in the past present or future, or for the past, present and future.  Recovery is sought to be calculated based on each separate claim and cause of action individually to the fullest extent possible. Plaintiff prays for a right to a jury trial under the Constitution for each claim. Plaintiff prays for all other compensatory damages, and other damages he may legally recover.  Plaintiff also claim all costs, pre-judgment interest, post-judgment interest, costs of this action, expenses of this action, expert witness fees and reasonable attorney's fees and <u>any other damages allowed under actions brought pursuant to all above laws, under which Plaintiff specifically intends to bring this Complaint</u>; and

3.      Plaintiff prays for punitive damages in the maximum amount allowed by law.

4.      Such further relief as is deemed just and proper. (Plaintiff claim all categories of damages recoverable in this action including but not limited to all compensatory and punitive damages.

# JURY TRIAL DEMAND

### Plaintiff demands a jury trial on all matters raised by the Complaint

### as Respectfully Stated Herein pursuant to the U.S. Constitution

RESPECTFULLY SUBMITTED, this the 15th day August, 2016.

FOR THE PLAINTIFF,
ROBERT L. GIBSON

BY: _____

MICHAEL R. BROWN, ESQ.

BY: _____

WINSTON J. THOMPSON, III, ESQ.

CO COUNSEL FOR PLAINITFF:
Michael R. Brown, Esq., (MSB# 99126)
THE MICHAEL R. BROWN LAW OFFICES, PLLC
120 North Congress Street, Suite 710
Jackson, Mississippi 39201
Tel: (601) 948-5330
Fax: (601) 948-5415
Email: mbrown@mikelawms.com

CO COUNSEL FOR PLAINITFF:
Winston J. Thompson, III, Esq., (MSB# 100157)
THE COCHRAN FIRM
620 North State Street, Suite 303
Jackson, MS 39225
Tel: (601) 321-9052
Fax: (769) 251-2631
Email: wjt3law@yahoo.com

## VERIFICATION

I, Robert L. Gibson, certify and verify to the Honorable Court and to the Defendant that I have reviewed and read all provisions of the foregoing Complaint and verification containing 28 pages. I verify that I understand all provisions and allegations. I have directed my attorney to include all above provisions in the Complaint, as well as to file the Complaint on my behalf. I assume full, final responsibility for all representations made in the Complaint such that I certify and verify they are accurate and truthful.

ROBERT L. GIBSON

08/15/16
DATE

EXHIBIT 106

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROBERT L. GIBSON                        PLAINTIFF

VS.                          3:16-cv-00633-HTW-LRA

MADISON COUNTY, MISSISSIPPI,
AND SHERIFF RANDY TUCKER                DEFENDANTS


                   consolidated with


ROBERT L. GIBSON                        PLAINTIFF

VS.                          3:16-cv-00633-HTW-LRA

MADISON COUNTY, MISSISSIPPI,
AND SHERIFF RANDY TUCKER                DEFENDANTS

************************************************
  DEPOSITION OF SHERIFF RANDALL "RANDY" TUCKER
************************************************


        Taken at the instance of the Plaintiff
      at Daniel Coker Horton & Bell, P.A.,
           4400 Old Canton Road, Suite 400
                Jackson, Mississippi, on
                 September 19, 2017,
        beginning at approximately 10:31 a.m.




               (Appearances noted herein.)



REPORTED BY:

     EMM, INC. REPORTING
     ELISA M. McKINION, BCR, CCR #1670
     POST OFFICE BOX 1439
     BRANDON, MISSISSIPPI  39043
     EMMREPORTING@GMAIL.COM

dc914000-fdf2-4ae6-97e0-8408451d4799

Page 70

1    would be addressed, and we don't retaliate on
2    anybody.
3        Q.   Are you aware of any investigation
4    into alleged discrimination or retaliation at
5    the time of Mr. Gibson's employment as a result
6    of his alleged complains?
7        A.   No.
8        Q.   Are you aware of any interviews with
9    any employees, whether they be black or white,
10   deputies or others, to determine whether there
11   might be discrimination in the -- in the
12   promotion decisions or in any other aspect?
13           MR. MCCHAREN:   You mean as to
14   Mr. Gibson's promotion or termination?
15   BY MR. BROWN:
16       Q.   During the time of Mr. Gibson and his
17   employment --
18       A.   Okay.
19       Q.   -- which I think is fair -- a fair
20   scope, but during that time, are you aware of
21   any investigation into alleged discrimination or
22   retaliation to determine whether it had any
23   credibility or merit?
24       A.   There was no report, so I guess the
25   answer would be no.

Page 71

1        Q.   Okay.  But if there were reports made
2    known to you, would you have been responsible to
3    investigate or correct it to make sure that the
4    decision-making was not based on retaliation?
5        A.   Yes.
6        Q.   And I think you may have just said
7    this, but you're aware of no other invest-- no
8    investigation into whether there was -- strike
9    that.
10           You're aware of no investigation into
11   whether there was race discrimination at the
12   department during the time of Mr. Gibson's
13   employment?
14       A.   I'm aware of no -- no report or
15   investigation.
16       Q.   Are you aware of any investigation
17   with Mr. Gibson, himself, or questioning of
18   Mr. Gibson, himself, as to why he was allegedly
19   unhappy at the department according to
20   Mark Sandridge?
21       A.   Am I aware if there was an
22   investigation?  I'm sorry.  I --
23       Q.   Yeah.  Are you aware of an
24   investigation from you or Chief Williams with
25   Mr. Gibson, himself, meaning talking with

Page 72

1    Mr. Gibson, himself, to determine why he was
2    allegedly unhappy at the department according to
3    Mark Sandridge?
4        A.   I never spoke to Mr. Gibson other than
5    the termination hearing.  I'm not aware of any
6    investigation by Mark Sandridge.  Is that what
7    you're asking me?
8        Q.   That's correct.
9        A.   No, I'm not.
10       Q.   And the purpose for having objective
11   criteria to determine when and how to write up,
12   reprimand, determine an officer's fitness for
13   duty, terminate, suspend, having objective
14   criteria for those things is important to make
15   sure that there's no potential discriminatory or
16   retaliatory motivation or impact?
17           MR. MCCHAREN:   Object.  Asked and
18   answered.
19           But you can go ahead and answer.
20       A.   Can you -- can you repeat the
21   question?
22   BY MR. BROWN:
23       Q.   Yeah, and it was a compoundy kind of
24   question -- compoundy -- it may -- may be
25   compound, but am I under- -- I'm understanding

Page 73

1    correctly -- I'm allowed to ask some leading
2    questions, but...
3           MR. MCCHAREN:   Sure.
4    BY MR. BROWN:
5        Q.   For the purposes of -- am I correct
6    that the purpose of -- having objective criteria
7    to determine how and when to write up, promote,
8    terminate, reprimand is important to ensure that
9    there's no potential discriminatory or
10   retaliatory motivation in a termination decision
11   or the -- I mean, in the employment decision?
12           MR. MCCHAREN:   I'm going to object to
13   that, but I -- I -- the basis for the
14   objection is, I don't think it includes all
15   the circumstances for which the policy is
16   in place, and I think it's unfair to ask
17   him for just this one person -- one purpose
18   to assume this.  The policy says what the
19   policy says.
20   BY MR. BROWN:
21       Q.   Okay.  Just the --
22           MR. MCCHAREN:   But go ahead and answer
23   it, if you know.
24       A.   Well, and that's -- that's my point.
25   Yes, that's part of it.  It's not all of it.

EMM, INC. REPORTING   (601)506-8261
EMMREPORTING@GMAIL.COM

dc914000-fdf2-4ae6-97e0-8408451d4799

# EXHIBIT 107



FILED
JUN 07 2013
BY _____ J T NOBLIN, CLERK
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

**ROBERT L. COOPER**                                                      **PLAINTIFF**

**V.**                                          **CIVIL ACTION NO.:** 3:13cv350 HTW-LRA

**RANDY TUCKER, IN HIS OFFICIAL CAPACITY**
**AS SHERIFF OF MADISON COUNTY, MISSISSIPPI**                            **DEFENDANT**

---

### COMPLAINT
### JURY TRIAL DEMANDED

---

**COMES NOW** the Plaintiff, Robert L. Cooper, by and through his counsel, Louis H.

Watson, Jr., and files this action to recover damages for violations of his rights under, Title VII of

the Civil Rights Act of 1964, as amended, against Randy Tucker, in his official capacity as Sheriff

of Madison County, Mississippi. In support of this cause, the Plaintiff would show unto the Court

the following facts to-wit:

### PARTIES

1.      Plaintiff, Robert L. Cooper, is an adult African American male resident of Hinds

County, Mississippi, residing at 342 North Prentiss, Jackson, Mississippi 39203.

2.      Defendant, Randy Tucker, in his official capacity as Sheriff of Madison County may

be served at the Madison County Sheriff Department, 2941 U.S. Highway 51, Canton, Mississippi

39046.

### JURISDICTION AND VENUE

3.      This court has civil rights and federal question jurisdiction for a cause of action

arising under Title VII of the Civil Rights Act of 1964.

4.     This Court has personal and subject matter jurisdiction over the Defendant and venue is proper in this Court.

5.     Plaintiff timely filed a Charge of Discrimination with the EEOC, a true and correct copy of which is attached as Exhibit "A." The EEOC issued a Notice of Right to Sue on March 21, 2013, a true and correct copy of which is attached as Exhibit "B." Plaintiff timely files this cause of action within ninety (90) days of receipt of his Notice of Right to Sue.

## STATEMENT OF THE FACTS

6.     Plaintiff began working for the Defendant in May, 2012, as a Detention Officer. Withing three months, Plaintiff was promoted to Corporal and placed on a Special Response Team This team consisted of five members all under the supervision of Lieutenant Potskarby, a white male.

7.     While under the supervision of Lieutenant Potskarby, Plaintiff was subjected to racial jokes, racial remarks, and being talked to "like a child" causing a hostile work environment for Plaintiff. Lt. Potskarby accused Plaintiff of doing drugs, selling drugs, and not answering his phone calls that he placed to Plaintiff. When ask by Plaintiff to prove that he made these phone calls, Lt. Potskarby could not show any proof the calls were ever made.

8.     Plaintiff spoke to his supervisor, Sargent John Rozell, a black male, regarding Lt. Potskarby's racial remarks. When things did not get any better, Plaintiff complained to Captain Brian Watson, a black male and to Major Chuck McNeal, a white male. Plaintiff asked at that time to be removed from the Special Response Team. Major McNeal encouraged Lieutenant Potskarby and the SRT Team to sit down and try to work it out; however, things became even worse.

9.     While at work, Plaintiff became involved in an altercation with an inmate in his cell, and Plaintiff had to spray the inmate with pepper spray. Lieutenant Potskarby was seen on camera

walking over to both Plaintiff and the inmate on the floor and leaving the scene without giving Plaintiff any assistance. Plaintiff injured his arm in this altercation.

10.     Plaintiff and Corporal Shawn Daves, a white male, transported an inmate together. The next day, Lt. Potskarby told Plaintiff that he was not given permission to leave and conduct the transport. As a result, Plaintiff was demoted from Corporal to Officer with a pay cut and suspension. No actions were taken against the white male Corporal Daves.

11.     As such, Defendant has unlawfully discriminated against Plaintiff because of his race and has unlawfully retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended.

## CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF TITLE VII - RACE DISCRIMINATION

12.     Plaintiff incorporates the above paragraphs 1 through 11 as though specifically set forth herein and alleges as follows:

13.     Plaintiff has been discriminated against in the terms and conditions of his employment on the basis of his race.

14.     Plaintiff is an African American. Plaintiff was more than qualified for his position. Plaintiff has suffered an adverse employment action as a result of the Defendant's racially discriminatory treatment of Plaintiff. Similarly situated white males such as Corporal Shawn Daves committed the same alleged offense as Plaintiff; however, Defendant did not cut his pay or demote him as Defendant did to Plaintiff.

15.     Plaintiff has been harmed as a result of the Defendant's discrimination, and the Defendant is liable to the Plaintiff for the same.

## COUNT TWO: RETALIATION

16.     Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 15 above as if fully incorporated herein.

17.     Defendant has violated Title VII of the Civil Rights Act of 1964 by retaliating against the Plaintiff for making complaints about Lieutenant Poskarby's racial treatment towards Plaintiff. Plaintiff is entitled to protection for making complaints or charges of misconduct in violation of Title VII of the Civil Rights Act of 1964, as amended.

18.     The acts of the Defendant constitute a willful intentional violation of Title VII of the Civil Rights Act of 1964 and entitle Plaintiff to recovery of damages.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1. Promotion or front pay in lieu of promotion;
2. Back pay;
3. Compensatory damages;
4. Attorney's fees;
5. Costs and expenses; and
6. Any other relief to which he may be properly entitled.

THIS the 5th day of June, 2013.

Respectfully submitted,

ROBERT L. COOPER, PLAINTIFF

By: _____

Louis H. Watson, Jr.  (MB# 9053)
Nick Norris (MB#101574)
Attorneys for Plaintiff

OF COUNSEL:
WATSON & NORRIS, PLLC
628 North State Street
Jackson, Mississippi 39202
Telephone: (601) 968-0000
Facsimile:  (601) 968-0010
Email: louis@watsonnorris.com

# EXHIBIT 108

# Affidavit

(Police Officer Insurance Bond)

Madison County Sheriff's Office
Sheriff's Department
2941 US-51
Canton, MS 39046

March 16, 2015

Dear Randy Tucker, Sheriff

We, Daryl Dozier and Domekia Myers-Dozier are writing this letter to file a complaint to report what we believe to be a total disregard for the public safety, the use of excessive force, use of deadly weapon with the intent to do harm in the presence of a minor child involving an alleged misdemeanor calls, reporting and receiving false affidavits; administrative clerks and deputies refusal to obey or execute the Judge's order is allegedly systematic racism that is administered by the Madison County Sherriff Department as a County Agency and this complaint reads as follows:

1. On October 12, 2014, Madison County Sheriff, Brad Sullivan, a White male police officer, pointed his police issued handgun at Daryl Dozier, Mrs. Domekia Myers-Dozier (wife) and Dshantia Dozier (daughter age 5) with the intent to cause bodily harm causing fear, stress and the family to be terrorized and that Sherriff Brad stated "I've got you niggers now" and that Sherriff Brad Sullivan would use deadly force on the unarmed and defenseless African Americans. (Witnesses written statements are available upon request).

2. On October 12, 2014, Madison County Sheriff, Brad Sullivan, made disparaging remarks to Daryl Dozier, Affiant at Detention Center Location, that he intends to charge him (Affiant) with disorderly conduct-failure to comply with state statue 97-35-7 (1), and during the arrest Deputy Brad Sullivan never administered or read Daryl Dozier his Miranda rights.  Sheriff Brad Sullivan charges are false, Affiant, Daryl Dozier complied with every verbal command.  The Madison

**MC - RFP - 8 - 29**

County Sheriff Department as an observation with the use of digital surveillance cameras can verify that in plain view of the cameras, Daryl Dozier complied and during the process, Deputy Brad Sullivan made more remarks that he intends to hold Daryl Dozier in custody after he (Daryl Dozier) posted a cash bond to bond out to be released and that his (Sheriff Brad Sullivan) plans were fore Daryl Dozier to have additional charges to be filed against him and that he (Deputy Brad Sullivan) has done this before on many occasions.

3. On October 13, 2014, via video T.V. Conference Court, an appointed Justice Court Judge during Daryl Dozier initial appearance ruled and issued an order after Affiant Daryl Dozier pled not guilty. The Justice Court Judge ordered for bond to be posted and for the Affiant to be released and that she acknowledged that there wasn't any charges pending before the Court and that Daryl Dozier is to be released.

4. On October 13, 2014, Affiant, Daryl Dozier, as ordered by the Judge, at that time, did post bond but was denied Due Process and prohibited from exercising his rights to obtain an attorney. After the Justice Court Judge gave her order for Daryl Dozier to be released, the Deputy and the Justice Court Clerks withheld Daryl Dozier for another 4 hours against his will and against the order of the Judge allegedly waiting for additional charges to be filed therefore abusing the system and to get more money from Daryl Dozier. The actions taken by the Sherriff Department and the Justice Court Clerks, gives the impression that this type of practice happens regularly and in addition is a violation of their own internal policy. Brad Sullivan willfully and knowingly created a hostile environment and a set of outcomes that was more favorable to financially satisfy him (Brad Sullivan) and the Madison County Sheriff Department causing Daryl Dozier to make two cash bonds instead of one. The sound wisdom of just charging one cash bond was not applied in this matter but should raise questions concerning the event when additional charges are pending. Should the Court be made aware of pending charges in order to properly hold into custody an offender until all charges have been addressed by the Court? The actions can be viewed as double dipping and cashing in on excessive fees as it relates to posting double cash bonds. These practices should be a violation of Constitutional Statues.

We, Daryl Dozier and Domekia Myers-Dozier are requesting a thorough investigation and audit involving the allegations that are brought forth in this complaint.

In addition, we the Dozier family is requesting a meeting with the Madison County Sheriff Randy Tucker and that this matter will be reported to the following persons listed below.

Thank you for your time.

**MC - RFP - 8 - 30**

Signed:

_____
Daryl Dozier
Telephone Number: 769-223-5693

_____
Domekia Myers-Dozier

Cc: Eric Holder, United States, Attorney General
Federal Bureau of Investigation (Jackson Office)
Greg Davis, United States Attorney
Bennie G. Thompson, U.S. Representative
Mississippi Department of Public Safety Certification, Law Enforcement

State _Miss._____

County _Madison_____


SWORN TO AND SUBSCRIBED BEFORE ME, this, the _18_ day of _March_____,
2015.


_____
NOTARY PUBLIC

My Commission Expires: _Oct 28, 2018_____

(Notary seal:)
STATE OF MISSISSIPPI
NICKIE BRANCH
ID No
53892
NOTARY PUBLIC
Comm Expires
October 28, 2018
MADISON COUNTY


-Legal Document-

**MC - RFP - 8 - 31**

# EXHIBIT 109

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**LATOYA BROWN; LAWRENCE BLACKMON**
**HERBERT ANTHONY GREEN; KHADAFY MANNING;**
**QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS**
**SINGLETON; STEVEN SMITH; BESSIE THOMAS; and**
**BETTY JEAN WILLIAMS TUCKER, individually and on**
Behalf of a class of all other similarly situated,                              **PLAINTIFFS**

**V.**                                                      **CIVIL ACTION NO. 3:17-CV-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI;**
**SHERIFF RANDALL S. TUCKER, in his official capacity; and**
**MADISON COUNTY SHERIFF'S DEPUTIES JOHN**
**DOES #1 through #6, in their individual capacities,**                          **DEFENDANTS**

---

### RESPONSE BY DEFENDANTS, MADISON COUNTY, MISSISSIPPI AND SHERIFF RANDALL TUCKER, IN HIS OFFICIAL CAPACITY, TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

---

COME NOW, Defendants, Madison County, Mississippi and Sheriff Randall Tucker, in his official capacity, by and through their counsel, and submit their responses to Plaintiffs' *First Set of Requests for Production of Documents*, pursuant to *Federal Rule of Civil Procedure* 34.

### <u>GENERAL OBJECTION</u>

Defendants, by and through their counsel of record, object to the arbitrary, overly-broad, and abusive definitions and instructions which Plaintiffs, through counsel, are attempting to impose, which are beyond the scope of and inconsistent with Rule 34, *FRCP*. Defendants, through counsel, state that their responses to the written discovery submitted herein are provided in good faith, in accordance with the *Federal Rules of Civil Procedure* and within the plain and common meanings of the terms contained in the Plaintiffs' written discovery.

Defendants further object to all requests for production propounded by Plaintiffs on the basis that they are not limited to time and scope. Subject to numerous other stated objections set forth in their responses, Defendants are limiting their production of documents to those prepared and/or generated after Sheriff Randall C. Tucker began serving as Sheriff of Madison County, Mississippi in January 2012. Defendants object to any request that seeks any documents prior to this time since these documents are not relevant to Plaintiffs' claims and are not proportional to the needs of the case as described in *FRCP* 26(b)(1).

Defendants further object to Plaintiffs' request of any MVR records on the basis that these records are not relevant to the issues concerning class certification and are not proportional to the needs of the case regarding these issues. Defendants would show that their production of any of these MVR's will be unduly burdensome in regard to time and costs because several thousands of these MVR's are archived, and none are classified or identified as having to do with the subjects for which Plaintiffs seek production of them. Should Plaintiffs identify a specific date for which a MVR exists, and subject to Plaintiffs demonstrating to Defendants and the Court why the MVR is relevant to the issues of class certification, Defendants will retrieve and review that MVR for any privileged information and, subject to the entry of a protective order protecting the viewing of that MVR to an attorney's eyes only review, will produce the MVR within fourteen days or a reasonable time, depending on the number of MVR's Plaintiffs seek.

1.   All documents, including organizational charts, concerning the MCSD's jurisdiction, organization, structure, reporting lines, and divisions, including documents concerning the divisions and task forces identified at http://www.sheriffrandytucker.com/ divisions, and their respective roles and responsibilities, and all documents concerning the scope of MCSD's jurisdiction and authority over each municipality and unincorporated area in

Madison County and the resources dedicated by the MCSD to policing such separate municipality and unincorporated area.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.  Without waiving these objections, Defendants are producing a list of all members of the Madison County Sheriff's Department ("MCSD") and the division in which they are employed and a map of Madison County showing the boundary lines of each municipality.  The extent of Sheriff Tucker's jurisdiction in Madison County is provided in *Miss. Code Ann.* §19-25-69 (Supp. 1995), and in any case law addressing this statute.  A map of Madison County can be viewed in more detail at http://gis.cmpdd.org/madison.  Defendants are not in possession of any other documents responsive to this request.

2.      All documents, including training materials and communications, concerning Defendants' policies, customs and/or practices in connection with vehicular roadblocks, sobriety checkpoints, and/or pedestrian checkpoints, including, with respect to any of the foregoing which are purportedly conducted under the policies and procedures governing sobriety checkpoints, all documents concerning, reflecting, or constituting:

(a)      "educational material" that has been or will be used by MCSD personnel in connection with a sobriety checkpoint, as described in Procedure III (A) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES;

(b)       "relevant data" used in selecting sites for sobriety checkpoints, as described in Procedure II(3) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES;

(c)      notices of sobriety checkpoints as described in Procedure VI (2) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES.

(d)      "[a]fter action reports" as described in Procedure VIII (1) of the MCSD's

SOBRIETY CHECKPOINT GUIDELINES.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad,

vague, and unduly burdensome.   Defendants further object to this request to the extent it seeks

documents protected under the attorney/client privilege or work product privilege because they

were prepared in anticipation of litigation.   Without waiving these objections, no MCSD

personnel conduct "pedestrian checkpoints," and, therefore, Defendants have no documents

responsive to this request.  In further response to this request, Defendants state:

(a)      Defendants, subject to the entry of a confidentiality order, are producing the

MCSD's policy regarding vehicular checkpoints, including sobriety checkpoints.  Defendants are

also producing Educational guidelines, including DWI Investigation Field Notes, the DUI Grant

Unit Protocol, several Check Point Protocols, and a DUI Resource Manual distributed to DUI

officers, as well as additional personnel within the MCSD who conduct checkpoints, to educated

and guide them while performing sobriety checkpoints.  Defendants are also producing emails

concerning the MCSD's conducting of sobriety checkpoints in Madison County.

(b)      Defendants have no written data regarding the selection of sobriety checkpoints in

response to this request.

(c)      Defendants have not retained copies of the posted notices showing the locations

of vehicular checkpoints conducted by MCSD personnel.

(d)      Defendants are producing reports prepared by MCSD personnel subsequent to

sobriety checkpoints showing their locations and results from October 2012 through July 2017.

3.      All documents concerning any aspect of any roadblock/checkpoint, including any

document requesting approval for or reporting on any aspect of a roadblock/checkpoint; any

document concerning the basis for instituting or operating any roadblock/checkpoint at any particular location; any public notice or similar document concerning any roadblock/checkpoint; any document concerning the operation of any roadblock/checkpoint; any document concerning any stop or search associated therewith; any document containing or referencing any statistics or data concerning roadblocks/checkpoints or any stops or searches associated therewith; any MVR recordings; any communications with any MCSD personnel concerning any roadblock/checkpoint; and any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent these documents make any reference to any roadblock/checkpoint.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.  Defendants further object to this request to the extent it seeks documents protected under the attorney/client privilege or work product privilege because they were prepared in anticipation of litigation.  Without waiving these objections, Defendants state the following:

- Defendants have no written requests for approval for checkpoints conducted by MCSD personnel.   All requests are made orally.

- Defendants have not retained copies of the posted vehicular checkpoint notices, which would have shown the bases of vehicular checkpoints conducted by MCSD personnel.

- Defendants have not retained copies of the posted notices of vehicular checkpoints conducted by MCSD personnel.

- As stated above, subject to the entry of a confidentiality order, Defendants are producing the Sobriety Checkpoint Guidelines policy of the MCSD, which applies to any vehicular checkpoint conducted by MCSD personnel regardless of its purpose.

5

Defendants are also producing a CAD summary showing all checkpoints conducted by Defendants from January 1, 2012, through August 19, 2017.

Subject to the entry of a protective order regarding all incident reports being produced by Defendants, they will produce all incident reports addressing roadblocks conducted by MCSD. Any stop and search of a vehicle conducted at a checkpoint by MCSD personnel will be reflected in the incident reports being produced by Defendants.   Defendants' production of these incident reports in response to this request is based on their belief that these incident reports involve vehicular checkpoints and/or searches conducted at these checkpoints.  Their production of these documents, however, is not an admission of these facts.

- The reports prepared by MCSD personnel subsequent to sobriety checkpoints as referenced by Defendants in response to Request No. 2 (d) contain data regarding the results of those checkpoints.  Defendants are also producing the Activity Reports for the MCSD from January 2012 through June 2017, which show a summary of all arrests made or citations issued by MCSD personnel for each month.  Defendants do not have any other documents containing any such statistics or data.

- Subject to the entry of a confidentiality order, Defendants are producing emails exchanged between MCSD personnel regarding vehicular checkpoints.

- The reports and/or logs of hours prepared by MCSD personnel regarding sobriety checkpoints are the documents Defendants have concerning work/hour logs, duty assignments, and daily schedules of MCSD personnel for vehicular checkpoints.

4.     All documents concerning any search, including all documents concerning Defendants' policies, customs and/or practices concerning any search and any training materials and communications related thereto; any document requesting approval for or reporting on any

aspect of any search; any statistics or data concerning searches; any MVR recordings; any communications with any MCSD personnel concerning any roadblock/checkpoint; and any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent these documents make any reference to any search.

**RESPONSE:** Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.   Defendants further object to this request to the extent it seeks documents protected under the attorney/client privilege or work product privilege because they were prepared in anticipation of litigation.  Defendants further object to Plaintiffs' request of any documents having to do with any searches that are not the subject of Plaintiffs' Complaint since these documents are irrelevant to the issues and not proportional to the needs of the case. Without waiving these objections, Defendants state as follows:

-      Subject to the entry of confidentiality order, Defendants are producing an un-redacted copy of the policies of the MCSD in regard to the execution of search warrants. Defendants have no other policies addressing searches by personnel of the MCSD.

-      Defendants are producing training and educational materials used by personnel of the MCSD while executing search warrants of homes and vehicles in regard to illegal drugs, as well as emails exchanged between MCSD personnel addressing these searches.

-      Defendants have no requests for approval of any search warrants in their possession since approval for any search warrant has to be obtained from a court, and any search warrant duly executed and served has to be returned to that court.

-      Defendants have produced the Activity Reports for the MCSD from January 2012 through June 2017, which would include all arrests made as a result of searches by MCSD personnel each month although not specified as such on the reports.

-         Subject to the entry of a protective order, Defendants are producing incident reports having to do with any searches of homes, vehicles or persons from January 2012 through July 2017.  Defendants do not have any other documents containing any such statistics or data.

-         Subject to the entry of a confidentiality order, Defendants are producing emails exchanged between MCSD personnel regarding search warrants of homes, vehicles or persons. Defendants have no other communications.

-         Defendants do not have any work/hour logs, duty assignments or daily work schedules indicating what MCSD personnel participated in any searches.

5.     All documents concerning the entry of any MCSD personnel into any home, including all documents concerning Defendants' policies, customs and/or practices concerning the entry of MCSD personnel into any home and any training materials and communications related thereto; any document prepared or submitted by any MCSD personnel requesting approval for or reporting on any aspect of any such entry; any related statistics or data; any MVR recordings; and any communications with any MCSD personnel concerning any such entry.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.   Defendants further object to this request to the extent it seeks documents protected under the attorney/client privilege or work product privilege because they were prepared in anticipation of litigation.  Defendants further object to Plaintiffs' request of any documents having to do with any entries any home for any reason since these entries are not the subject of Plaintiffs' Complaint and, as a result, any such documents are irrelevant to the issues and not proportional to the needs of the case.  Without waiving these objections, Defendants state as follows:

- Subject to the entry of confidentiality order, Defendants are producing an un-redacted copy of the policies of the MCSD in regard to the execution of search warrants in response to Request No. 4, which would possibly include the entry into a home.  Defendants have no other policies addressing searches of homes by personnel of the MCSD.

- Defendants have no requests for approval of any searches of homes in their possession since approval for any search warrant has to be obtained from a court, and any search warrant duly executed and served has to be returned to that court.

- Defendants are producing policies and training/educational materials regarding the execution of search warrants for homes by MCSD personnel as referenced above in their response to Request No. 4.  Defendants do not have any other documents responsive to this request.

- Defendants have no requests for approval of any searches of homes in their possession.

- Defendants have produced the Activity Reports for the MCSD from January 2012 through June 2017, which would include any arrests made as a result of the entry into any homes by MCSD personnel each month.

- Subject to the entry of a protective order, Defendants are producing incident reports prepared by MCSD personnel having to do with any entries into and searches of homes from January 2012 through July 2017.  Defendants' production of these incident reports in response to this request is based on their belief that these incident reports involve entry into homes by MCSD personnel.  Their production of these documents, however, is not an admission of these facts.   Defendants do not have any other documents containing any such statistics or data.

9

6.     All documents concerning traffic stops, including all documentations concerning Defendants' policies, customs, and/or practices concerning traffic stops and any training materials or communications related thereto; any document prepared or submitted by any MCSD personnel requesting approval for or reporting on any aspect of a traffic stop; any statistics or data concerning traffic stops; any MVR recordings, any communications with any MCSD personnel concerning any traffic stop; and any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent these documents make any reference to any traffic stop.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.   Defendants further object to this request to the extent it seeks documents protected under the attorney/client privilege or work product privilege because they were prepared in anticipation of litigation.  Without waiving these objections, Defendants state as follows:

-     Defendants have no written policies or training materials regarding MCSD personnel conducting traffic stops.

-     Subject to the entry of a confidentiality order, Defendants are producing emails exchanged between MCSD personnel addressing traffic stops.

-     Defendants have no documents related to requests for approval of traffic stops since MCSD personnel do not have to obtain approval prior to conducting a traffic stop.

-     Defendants have produced the Activity Reports for the MCSD from January 2012 through June 2017, which would include all arrests and/or citations issued as a result of traffic stops by MCSD personnel each month.   Defendants do not have any other documents responsive to this request.

10

-       Subject to the entry of a protective order, Defendants are producing incident reports prepared by MCSD personnel having to do with traffic stops they made which resulted in an arrest from January 2012 through July 2017. Defendants' production of these incident reports in response to this request is based on their belief that these incident reports involve traffic stops conducted by MCSD personnel. Their production of these documents, however, is not an admission of these facts.  Defendants do not have any other documents containing any such statistics or data.

-       Defendants are producing hand-written notes showing that discussions took place about traffic stops during meetings held with all MCSD deputies or with their supervisors. Defendants have no other documents showing any communications between MCSD personnel regarding traffic stops.

-       Defendants are producing the overall assignment rosters for all shifts of MCSD personnel from February 2012 through July 2017.  Defendants do not have any separate work logs or duty schedules prepared specifically showing what personnel with the MCSD conducted traffic stops during this time period.

7.      All documents concerning pedestrian stops, including all documents concerning Defendants' policies, customs and/or practices concerning pedestrian stops and any training materials or communications related thereto; any document prepared or submitted by any MCSD personnel requesting approval for or reporting on any aspect of any pedestrian stop; any statistics or data concerning pedestrian stops; any MVR recordings; any communications with any MCSD personnel concerning any pedestrian stop; any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent that these documents make any reference to any pedestrian stop; and all documents, including training

materials and communications, concerning any sweep, dragnet, or other similar program or operation, including programs and operations conducted by the MCSD's "Narcotics Task Force," including the "spontaneous sweep-type efforts" described at http://www.sheriffrandytucker.com/divisions/narcotics.

**RESPONSE:** Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome. Without waiving these objections, Defendants state as follows:

- Defendants have no policies, customs, training materials or communications regarding the MCSD personnel conducting pedestrian stops.

- Defendants have no documents showing requests for pedestrian stops because no requests have to be in order for a pedestrian stop to occur.

- Defendants have produced the Activity Reports for the MCSD from January 2012 through June 2017, which would include all arrests and/or citations arising out of pedestrian stops by MCSD personnel each month.   Defendants have no other documents responsive to this request.

- Defendants are producing the overall assignment rosters for all shifts of MCSD personnel from February 2012 through July 2017.   Defendants have no written work logs, duty assignments and/or daily work schedules showing which MCSD personnel stopped pedestrians while on patrol.

- Subject to the entry of a protective order, Defendants are producing incident reports related to stops of pedestrians by MCSD personnel.   Defendants' production of these incident reports in response to this request is based on their belief that these incident reports involve pedestrian stops conducted by MCSD personnel.  Their production of these documents, however, is not an admission of these facts.

8.      All documents concerning any internal or external complaints or statements by any person (including members of the public, current or former MCSD personnel or other agents or employees of Defendants) concerning any of the Defendants' policies, customs and/or practices, including all documents concerning complaints made or brought in connection with roadblocks/checkpoints, searches, entries, stops, or use of force; all documents concerning, reflecting, or alleging racial discrimination, racial profiling, or other racial animus; and all documents concerning any disciplinary or other personnel actions taken by Defendants in connection with any of the forgoing issues.

**RESPONSE:**  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.  Without waiving these objections and subject to the entry of a confidentiality order, Defendants are producing complaint reports summarizing individual complaints on issues addressed in this request made against individual MCSD personnel which show what, if any, actions were taken as a result of each complaint.

9.      All documents concerning the Plaintiffs and/or any incident described in the Class Action Complaint, including documents sufficient to identify any MCSD personnel having knowledge or information relevant thereto.

**RESPONSE:**   Defendants are producing these documents.

10.      To the extent not encompassed by the foregoing Requests, all other documents on which Defendants intend to rely in connection with this action, including the documents referenced or relied upon in Defendants' Answer, for example, all documents concerning Defendants' contentions in paragraphs 1, 3, 4, 8, 9, 10, 11, 15, 16, 46, 48, 62, 63, 70, 89, 93, 112, 140, 161, 163, 166, 167, 185, 210, 214, 237, 251, and 263.

**RESPONSE**:  Defendants object to this request on the basis that it is overly-broad, vague, and unduly burdensome.  Defendants further object to this request to the extent it seeks attorney/client communications or attorney work product.  Without waiving these objections, to the extent these documents exist, they are being produced.

THIS the __1st__ day of September, 2017.

Respectfully submitted:

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY: _____
Rebecca B. Cowan #7735

OF COUNSEL:
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, MS   39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

14

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

## CERTIFICATE OF SERVICE

I, Rebecca B. Cowan, counsel for the above referenced defendants, do hereby certify that I have mailed by United States Mail, postage prepaid, a true and correct copy of the above and foregoing pleading to the following attorneys at their usual mailing addresses as follows:

Joshua Tom, Esq.
Paloma Wu, Esq. (*pro hac vice*)
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
PWu@aclu-ms.org
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Yukiu Chan, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
jyoungblood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice)*
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 1st day of September, 2017.

Rebecca B. Cowan

16

# EXHIBIT 110

| | |
|---|---|
| **From:** | Charles Cowan <cec@wisecarter.com> |
| **Sent:** | Tuesday, February 6, 2018 7:33 PM |
| **To:** | Sivashanker, Kavitha; James Graves; Mike Wallace; Russell Nobile; Charlie Ross; bcowan@curriejohnson.com; Katie Snell |
| **Cc:** | Joshua Tom; jrobinson@aclu.org; Youngwood, Jonathan; Gochman, Janet A.; Rethy, Isaac; Choudhri, Nihara K; eedwards@aclu.org; Lee, Christopher Jumin |
| **Subject:** | RE: Latoya Brown, et al. v. Madison County, MS, et al., No. 3:17-cv-347 WHB LRA [EXT] |

Kavitha,

I write in response to your discovery-related email of February 1, 2018.

Addressing your first topic, Defendants utilized the over two-hundred (200) search terms Plaintiffs proposed to search the emails for the following email accounts associated with the MCSD: If an email registered as a hit for one of the search terms proposed by Plaintiffs and it was responsive to one of Plaintiffs' requests for production, it was produced. Defendants will not undertake the burden of re-reviewing the trove of emails provided to their counsel to determine the total volume reviewed for each such individual. Individuals whose Madison County email addressed were searched included: Barry Jones, Brad Sullivan, Brian Loveall, Tyler Burnell, Darien Smith, David Redd, Don Hicks, James Cannon, Jamie Knight, Jeff Waldrop, Jeremy Williams, Joey Butler, Joseph Mangino, Josh Fish, Kim Henderson, Lee Brock, Mark Sandridge, Mike Chapman, Perry Abels, Ralph Shearill, Randy Tucker, Randy Grewe, Richard Ladneir, Robin Welch, Robert Jackson, Russell Kirby, Rylon Thompson, Sam Howard, Scott McDonald, Taylor Chastain, Terry Barfield, Todd Alison, Tommy Jones, Tommy Squires, Trey Curtis, Will Weisenberger, Glen Fox, James Thomas, Richard Clark, Barry Chandler, Jonathan Lumbley, Eric Rather, Wayne Wells, LeeAnn Sanders, Lynn Thornburg, and Kathy Kehle.

Second, the production you refer to covers electronic documents in the personal possession of individual officers and not those maintained by the MCSD on the MCSD's main server, laptops, desktop computers, and the two shared computers in the MCSD squad room. As to the documents in the possession of MCSD officers outside of the MCSD office, Defendants' counsel utilized the list of individuals provided by Issac Rethy in his December 1, 2017, email, requested those officers provide them (Defendants' counsel) with any MCSD related electronic and non-electronic documents in their personal possession (including any MCSD-related emails on those officers' personal email accounts). Defendants' counsel then reviewed these documents and identified for production those documents that were relevant. Those officers who maintained documents included: Sam Howard, Darrian Smith, Rylon Thompson, and Mark Sandridge. Neither Sherriff Tucker, nor Jeremy Williams maintained any MCSD related documents outside of those maintained on their work computers or the MCSD server.

Third, I believe Becky Cowan's reproduction yesterday of certain MVRs should address the problems you raised in your first point. Defendants can confirm there are no other MVRs records related to the incidents identified in your January 10, 2018, request other than those already produced by Defendants on January 19, 2018.

Fourth, Defendants have included in their production all narratives, to the extent they exist, for incident reports previously produced in this matter.  Defendants have produced all investigative reports to which they have not claimed a law enforcement privilege.

Fifth, Defendants have not delegated relevance determinations to individual MCSD officers.  The officers in the list contained in Issac Rethy's December 1, 2017, email were instructed to produce to Defendants' counsel all MCSD-related documents in their possession (including any MCSD-related personal emails) regardless of if such documents were or were not responsive to any of Plaintiffs' document requests.  Defendants' counsel then made any decisions regarding relevancy to Plaintiffs' requests.

Sixth, all complaints regarding the MCSD in the possession of Defendants have been produced in this matter.

Seventh, we believe the index you provided is an accurate representation of the documents Defendants have produced in this matter except that it fails to account for the deposition transcripts we provided for the individuals in the separate Robert Gibson lawsuit.

Finally, Defendants have produced a privilege log in this matter, but have not received such a log from Plaintiffs.  There are multiple instances in which the individual plaintiff state a claim for privilege (i.e., work product or attorney client), but Defendants are not aware of what documents, if any, Plaintiffs have withheld on the basis of such privileges.  Please promptly provide Plaintiffs' privilege log(s).

Charles E. Cowan
Attorney
Post Office Box 651
Jackson, MS 39205-0651
600 Heritage Building
401 East Capitol St.
Jackson, MS 39201
P: 601-968-5514
F: 601-968-5519
E: cec@wisecarter.com
www.wisecarter.com





The preceding e-mail is privileged and confidential and is intended only for the named addressee.  If you received this message in error, please delete it and notify the sender by return e-mail or by phone at the numbers noted above.

**From:** Sivashanker, Kavitha [mailto:Kavitha.Sivashanker@stblaw.com]
**Sent:** Thursday, February 01, 2018 1:55 PM
**To:** Charles Cowan <cec@wisecarter.com>; James Graves <jeg@wisecarter.com>; Mike Wallace

<mbw@wisecarter.com>; Russell Nobile <trn@wisecarter.com>; Charlie Ross <cer@wisecarter.com>;
bcowan@curriejohnson.com; Katie Snell <Katie@katiebryantsnell.com>
**Cc:** Joshua Tom <JTom@aclu-ms.org>; jrobinson@aclu.org; Youngwood, Jonathan <jyoungwood@stblaw.com>;
Gochman, Janet A. <jgochman@stblaw.com>; Rethy, Isaac <IRethy@stblaw.com>; Choudhri, Nihara K
<NChoudhri@stblaw.com>; eedwards@aclu.org; Lee, Christopher Jumin <christopherjumin.lee@stblaw.com>
**Subject:** Latoya Brown, et al. v. Madison County, MS, et al., No. 3:17-cv-347 WHB LRA

Counsel,

We write to address the following additional production and discovery issues.

First, we understand that Defendants have produced emails in the Bates range MCSD_Reproduced-00001 –
MCSD_Reproduced-02114.  The number of produced emails is surprisingly low given the list of custodians, relevant
time period, and relevant subject matter.  The vast majority of produced emails either were sent to or received by Sheriff
Randall Tucker (~140 emails), Chief Jeremy Williams (~120 emails), and Lieutenant Mark Sandridge (~116 emails), and
the number of emails provided herein further does not account for any duplicative emails among these three officers.  For
all other officers, the number of associated emails is lower than 30, and, for the vast majority, lower than 10.  For
example, to date, Defendants appear to have produced only one email associated with M/Sgt. Darian Smith and Deputy
Rylon Thompson, respectively.  Please provide a list of the MCSD personnel whose emails were searched and reviewed
in connection with Defendants' email production, and the total volume of emails reviewed for each such
individual.  Please also explain the responsiveness criteria used by Defendants to identify responsive emails for
production.

Second, Defendants have produced electronic documents in the possession of individual deputies in the Bates range
MCSD_Officer Documents-00001 – MCSD_Officer Documents-3500.  Again, the number of produced electronic
documents from individual deputies appears to be quite low given the number of custodians, relevant time period, and
relevant subject matter.  For example, this production only includes emails from the personal email accounts of Lieutenant
Mark Sandridge, Deputy Samuel Howard, and Deputy Rylon Thompson, and no other deputies.  Please provide a list of
the individual officers who maintained any electronic documents, including confirming whether Sheriff Randall Tucker
and Chief Jeremy Williams maintained such documents.  Please also provide a description of the process by which
Defendants searched, reviewed, and identified for production electronic documents in the possession of individual
deputies in response to Plaintiffs' document requests.

Third, Plaintiffs have had technical issues viewing the MVR records produced by Defendants on January 19, 2017.  The
autoplay.exe file does not work, and attempts to view the videos directly through the AVDViewer.exe file result in a
prompt for login information.  As a result, the AVD files within file folders 180118_2016-19058_210+Disc+1 and
180118_2016-19279_213+Disk+1 cannot currently be reviewed.  Please provide the information necessary for viewing
these videos in their currently produced format, or re-produce them in a viewable and accessible format.  In addition, the
other three MVR records, produced in .qbx file format, while reviewable and timestamped with the relevant day, do not
encompass the specific hours or events referenced in the incident reports identified in Plaintiffs' January 10, 2018 request
for MVR records.  Please confirm that there are no MVR records concerning these and/or any other incidents identified in
our prior January 10, 2018 request for which MVR records have not been produced.  To the extent an additional
production is necessary, please promptly make that production.

Fourth, in our January 19th email, we stated that Plaintiffs have identified numerous incident reports in Defendants'
production concerning incidents in which an arrest was made (as further confirmed by the related CAD data), but no
written narrative is included in the as-produced version of the incident report.  In Defendants' January 25th response,
Defendants confirmed that it is the policy of the MCSD for officers to provide a written report when an arrest is made, but
then stated that "[i]t appears Plaintiffs have found a few limited instances in which there is no written narrative for an
arrest."  This issue is not confined to a "few limited instances."  Please find attached a list of Bates numbers for over 160
additional incident reports concerning incidents in which an arrest was made, but no written narrative is included in the
as-produced version of the incident report.  The incident reports identified in this list again solely represent examples of
this issue, and such examples are being provided in order to demonstrate the breadth of this issue.  We again request that
Defendants confirm that all incident report narratives, as well as all investigative reports and/or "Offense Reports"
(including all such reports, if any, pertaining to produced incident reports), have been produced.

Fifth, in Defendants' January 25th email, Defendants again claim that Sheriff Tucker's search of his personal emails was adequate under the Federal Rules, but provide no legal support for this position.  Instead, Defendants refer to their November 30, 2017 email regarding collection of sheriff department records in the possession of individual deputies, which states that Defendants "will direct those identified deputies to turn over to defendants' counsel sheriff department records or documents the deputies have in their patrol car or in their possession at home."  The next sentence of that email provides that "Defendants will then produce the documents that are relevant that are turned over by the deputies …."  This email clearly indicates that (i) the agreed-upon MCSD personnel would turn over the records in their possession and (ii) Defendants' counsel would then determine whether those documents were relevant.  This is the opposite of an agreement by Plaintiffs to a procedure in which individual officers, rather than counsel, run email searches or otherwise determine the relevance of particular documents.  As the authorities cited by Plaintiffs demonstrate, such discovery procedures are inadequate under the Federal Rules.  Please explain whether there are any other instances, beyond Sheriff Tucker's search of his own emails, in which Defendants delegated relevance determinations, including email searches, to MCSD personnel.

Sixth, during his deposition, Supervisor Trey Baxter was asked whether the Board had ever received complaints about policing in Madison County.  Supervisor Baxter testified that he believes that he may have "gotten a letter or two."  Baxter Tr. at 83:6-83:12.  He further testified that whenever he gets a letter of that nature, he sends it straight to "Katie" (Plaintiffs understand that he was referencing Katie Bryant Snell).  *Id*. at 83:12-83:23.  Please confirm that Defendants have located and produced any such letters, whether addressed to Mr. Baxter or to other Madison County personnel, concerning complaints about policing in Madison County.

Finally, we have attached a document reflecting our log of all productions (identified by Bates range) made by Defendants in this matter as of today's date.  In light of the numerous productions and the many different Bates ranges employed by Defendants, we would like to confirm that all of Defendants' productions to date are accounted for.

Best,
Kavitha

_____

Kavitha Sivashanker
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-2197
kavitha.sivashanker@stblaw.com

# EXHIBIT 111

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br>          v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>     Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA |

<u>**DECLARATION OF JONATHAN K. YOUNGWOOD**</u>

I, Jonathan K. Youngwood, declare:

1.      I am a partner with the law firm Simpson Thacher & Bartlett LLP ("Simpson Thacher") and the co-chair of its Litigation Department.  Together with the American Civil Liberties Union and the American Civil Liberties Union of Mississippi, Simpson Thacher co-represents the named plaintiffs pro bono in the above-captioned action.  Plaintiffs' counsel have agreed to act jointly as class counsel, if the Court so designates them.

2.      The Simpson Thacher attorneys representing the named plaintiffs include myself, Senior Counsel Janet Gochman, and a number of other attorneys including Isaac Rethy, Nihara Choudhri, Kavitha Sivashanker, Christopher Shields, Bonnie Jarrett, and Christopher Jumin Lee.

3.      Founded in 1884, Simpson Thacher has more than 900 lawyers spread among its 11 offices and 22 major practices areas, and consistently ranks among the world's leading law firms in a wide variety of publications.  Additionally, Simpson Thacher's Litigation Department is regularly recognized as among the nation's best, including in the field of class actions.

4.      Simpson Thacher has long had a strong commitment to public service and pro bono cases.  Each year, the Firm's attorneys devote tens of thousands of hours to pro bono projects and advocate on behalf of low-income clients and the non-profit organizations that serve them, including in civil rights actions.  Simpson Thacher was profiled in the publication *Law360* as "Pro Bono Firm of the Year" in 2016.

5.      Simpson Thacher has vigorously and competently represented plaintiffs in other pro bono civil rights litigation, including class actions.  Among other pro bono cases, I personally worked for years as a leader of the team of Simpson Thacher attorneys that successfully sued to reform New York's education financing system.  *See Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326 (N.Y. 2003).  Other successful pro bono litigation in this category includes the Firm's representation of plaintiffs in a lawsuit against a California school district for violating state education law, *American Academy of Pediatrics, et al. v. Clovis Unified School District*, Case No. 12CECG02608 DSB (Cal. Super. Ct. 2015); a lawsuit brought to expand the rights of elderly adults with mental health disabilities to access state licensed housing, *California Association of Mental Health Patients' Rights Advocates v. California Department of Social Services et al.*, Case No. 106CV061397 (Cal. Super. Ct. 2009); and the Firm's co-counsel representation of detained Haitian refugees, *see Haitian Centers Council, Inc. v. Sale*, 509 U.S. 155 (1993).  The Firm's active cases in this category include litigation on behalf of immigrant detainees, *see Charles v. U.S.*, Case No. 18-cv-00883 (S.D.N.Y.), and

litigation on behalf of a class of U.S. military veterans seeking to remedy the Department of Veterans' Affairs' longstanding delays in resolving claims for disability benefits, *see Monk v. Shulkin*, No. 15-1280 (Vet. App.).

6.      As co-lead counsel in this action, Simpson Thacher is committed to the vigorous, effective, and efficient representation of the interests of Plaintiffs and the proposed class. Simpson Thacher has devoted, and will continue to devote, substantial resources to the prosecution of this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2018 at Jackson, MS.

_/s/ Jonathan K. Youngwood_____
Jonathan K. Youngwood

# EXHIBIT 112

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, <br><br> Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA |

## DECLARATION OF JOSHUA F. TOM

I, Joshua F. Tom, declare:

1.      I am a member in good standing of the bars of Mississippi and New York.  I am admitted to practice in the U.S. District Courts for the Southern and Northern Districts of Mississippi and in the Fifth Circuit Court of Appeals.  I currently serve as Legal Director of the American Civil Liberties Union of Mississippi (the "ACLU of MS") in Jackson, MS.

2.      Together with Simpson, Thacher & Bartlett LLP and the American Civil Liberties Union, the ACLU of MS co-represents the named plaintiffs in the above-captioned action. Plaintiffs' counsel have agreed to act jointly as class counsel, if the Court so designates them.

3.      The American Civil Liberties Union is a nationwide, nonpartisan, nonprofit, organization with over 1,840,000 members dedicated to defending the principles embodied in the

Constitution and in our nation's civil rights laws.  The ACLU of MS is one of its state affiliates.

Founded in 1969, the ACLU of MS has approximately 2,000 members across the state.  A core

mission of the ACLU of MS is to ensure equality to all Mississippians and to promote criminal

justice reform through litigation, advocacy and lobbying efforts.

4.     To achieve this mission, the ACLU of MS often partners with local and national

organizations.  This combination of local counsel expertise, experienced litigators, financial and

human resources and subject matter expertise provides clients with excellent representation.

That combination has been brought to the present case.

5.     In recent years, the ACLU of MS has litigated numerous civil rights lawsuits,

including eight criminal justice cases.  Among others, recent cases have included a challenge to

debtors' prisons in Biloxi, Mississippi, *Kennedy v. City of Biloxi*, No. 1:15-cv-348-HSO-JCG

(S.D. Miss. 2015), and a class action lawsuit against Scott County, Mississippi involving claims

of indefinite detention and indefinite denial of counsel, *Burks v. Scott County*, No. 3:14-cv-745-

HTW-LRA (S.D. Miss. 2014).

6.     The ACLU of MS expended substantial efforts towards developing the present

case before the lawsuit was filed.  This activity covered everything necessary to file the current

lawsuit, including an investigation that involved tens of public records requests under the

Mississippi Public Records Act and three public records appeals to the Mississippi Ethics

Commission.

7.     As co-lead counsel in this action, the ACLU of MS is committed to the vigorous,

effective, and efficient prosecution of the interests of Plaintiffs and the proposed class.  The

ACLU of MS has devoted, and will continue to devote, substantial resources to the prosecution

of this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2018 at Jackson, MS.

/s/Joshua F. Tom
Joshua F. Tom

# EXHIBIT 113

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, <br><br> Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA |

## <u>DECLARATION OF EZEKIEL R. EDWARDS</u>

I, Ezekiel R. Edwards, declare:

1.      I am a member in good standing of the bar of New York State.  I am admitted to practice in the District Courts of the Southern District of New York and Eastern District of Michigan, the U.S. Court of Appeals for the Sixth Circuit, and the United States Supreme Court. I currently serve as Director of the Criminal Law Reform Project at the American Civil Liberties Union ("ACLU") headquartered in New York City.

2.      Simpson Thacher & Bartlett LLP, the American Civil Liberties Union of Mississippi ("ACLU of MS") and the ACLU national office co-represent the named plaintiffs in the above-captioned class action and plaintiffs' counsel will, if the Court approves, act jointly as class counsel.

3.      As noted in the declaration of Joshua F. Tom, the American Civil Liberties Union is a nationwide, nonpartisan, nonprofit, organization with over 1.84 million members dedicated to defending the principles embodied in the Constitution and in our nation's civil rights laws.  In my role as Director of the Criminal Law Reform Project I am responsible for supervising a wide range of the national ACLU's work on criminal justice.  A primary point of emphasis in our criminal justice reform work is the advancement of constitutional, unbiased policing in America.

4.      In addition to the experience of the ACLU of MS, I have more than 15 years of civil and criminal litigation experience in state and federal courts, including numerous class action lawsuits, and have been admitted *pro hac vice* in federal and state courts. Currently, I am lead counsel in a putative class action lawsuit, *Bairefoot v. Beaufort*, in federal district court in South Carolina.  My immediate supervisor, Jeffery Robinson, who is the ACLU's Deputy Legal Director and Director of the Trone Center for Justice and Equality, has over 35 years of litigation experience and has tried over 200 criminal cases and more than a dozen civil cases in state and federal courts, and has been admitted *pro hac* in federal courts in California, Idaho and Alaska.

5.      Mr. Robinson and I also supervise lawyers with significant class action and litigation experience, several of whom are litigating class action cases, including a class action against the Milwaukee Police Department, *Collins v. The City of Milwaukee*, scheduled for trial in May 2018.

6.      Like the ACLU of MS, the national ACLU is committed to the vigorous, effective, and efficient pursuit of the interests of Plaintiffs and the proposed class.  We stand ready to devote the necessary resources, both in and out of court, to ensure the highest level of representation for the plaintiffs in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of March, 2018 at New York, NY.

<div style="text-align:right">

/s/Ezekiel Edwards
Ezekiel R. Edwards

</div>

3