# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE BLACKMON;
HERBERT ANTHONY GREEN; KHADAFY
MANNING; QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON; STEVEN
SMITH; BESSIE THOMAS; and BETTY JEAN
WILLIAMS TUCKER, individually and on behalf of a
class of all others similarly situated,

                    Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL S. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,

                Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

AMERICAN CIVIL LIBERTIES UNION OF
    MISSISSIPPI FOUNDATION
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2610

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................3

    A.    The MCSD's Culture Of Racial Discrimination ....................................4

        1.    The MCSD's Policing Program Under Sheriff Toby Trowbridge ..............4

        2.    The MCSD's Culture Of Discrimination Persists To The Present Day ....................................................................................5

    B.    Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD ........................................8

    C.    The MCSD's Policing Program ..........................................................10

        1.    The MCSD Disproportionately Arrests And Cites Black Persons ............10

        2.    The MCSD Disproportionately Targets Black Communities ..................11

        3.    Roadblocks Are A Key Element Of The MCSD's Policing Program ........................................................................14

            (a)    The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods ....................................14

            (b)    The Primary Purpose Of The Roadblock Program Is Crime Control ....................................................16

            (c)    MCSD Roadblocks Lack Uniform Procedures Or Safeguards ....................................................18

        4.    Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program ....................................20

    D.    The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program ........................................23

        1.    MCSD Personnel Are Inadequately Trained And Supervised ................24

        2.    The MCSD Does Not Maintain Complete Or Accurate Records ............26

        3.    The MCSD Lacks Meaningful Complaint Procedures ..........................27

ARGUMENT ..............................................................................................29

I.      PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT .............29

II.     PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT .........30

        A.      The Targeting Class Satisfies The Commonality Requirement ..........................32

        B.      The Roadblock Subclass Satisfies The Commonality Requirement ...................34

        C.      The Pedestrian Stop Subclass Satisfies The Commonality Requirement ............35

III.    PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE
        23(a)(3) .......................................................................................................................37

IV.     PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE
        INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4) ...........................40

V.      THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED ...................................42

CONCLUSION....................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 613 (1997) ......................................................................................................29

*Braggs v. Dunn,*
    317 F.R.D. 634 (M.D. Ala. 2016) ..................................................................................31

*Brown v. Nucor Corp.,*
    785 F.3d 895 (4th Cir. 2015) .........................................................................................34

*Choice Inc. of Texas v. Graham,*
    No. 04-cv-1581, 2005 WL 1400408 (E.D. La. June 3, 2005) .......................................29

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000) ...................................................................................................30, 35

*City of Jackson v. Calcote,*
    910 So. 2d 1103 (Miss. Ct. App. 2005) ...........................................................................7

*Cole v. City of Memphis,*
    839 F.3d 530 (6th Cir. 2016) .........................................................................................42

*Collins v. Ainsworth,*
    382 F.3d 529 (5th Cir. 2004) .........................................................................................35

*Delaware v. Prouse,*
    440 U.S. 648 (1979) ................................................................................................18, 35

*Dockery v. Fischer,*
    253 F. Supp. 3d 832 (S.D. Miss. 2015) .............................................................31, 37, 40

*Feder v. Electronic Data Systems Corp.,*
    429 F.3d 125 (5th Cir. 2005) .........................................................................................37

*Floyd v. City of New York,*
    283 F.R.D. 153 (S.D.N.Y. 2012) ...................................................................................33

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) .........................................................................................................1

*Groover v. Michelin North America, Inc.,*
    192 F.R.D. 305 (M.D. Ala. 2000) ..................................................................................41

*Horton v. Goose Creek Independent School District,*
    690 F.2d 470 (5th Cir. 1982) .........................................................................................41

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ........................................................................... 31, 32

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................. 41

*James v. City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) ............................................................................. 37

*Jones v. Diamond*,
   519 F.2d 1090 (5th Cir. 1975) ..................................................................... 29, 42

*Lanner v. Wimmer*,
   662 F.2d 1349 (10th Cir. 1981) .......................................................................... 41

*Lehocky v. Tidel Technologies, Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ........................................................................ 41

*Lightbourn v. County of El Paso, Texas*,
   118 F.3d 421 (5th Cir. 1997) ............................................................................. 37

*Ligon v. City of New York*,
   288 F.R.D. 72 (S.D.N.Y. 2013) .......................................................................... 36

*M.D. v. Perry*,
   294 F.R.D. 7 (S.D. Tex. 2013) ........................................................................... 43

*Morrow v. Washington*,
   277 F.R.D. 172 (E.D. Tex. 2011) .......................................................... 31, 33, 34, 35, 41

*Mullen v. Treasure Chest Casino*,
   186 F.3d 620 (5th Cir. 1999) ......................................................................... 29, 30

*ODonnell v. Harris County, Texas*,
   No. H-16-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) ............................................ 42

*Ortega-Melendres v. Arpaio*,
   836 F. Supp. 2d 959 (D. Ariz. 2011) ..................................................................... 33

*Pederson v. Louisiana State University*,
   213 F.3d 858 (5th Cir. 2000) ............................................................................. 30

*Shankle v. Texas City*,
   885 F. Supp. 996 (S.D. Tex. 1995) ....................................................................... 35

*Steward v. Janek*,
   315 F.R.D. 472 (W.D. Tex. 2016) ......................................................................... 40

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) .................................................................40

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .................................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................30, 31, 33, 34, 37, 42

**Statutes**

42 U.S.C. § 1983 ............................................................................................1

42 U.S.C. § 2000d ..........................................................................................1

Fed. R. Civ. P. 23 ...........................................................................................1

Fed. R. Civ. P. 23 Adv. Comm. Notes,
    *reprinted in* 39 F.R.D. 69, 102 (1966) ...................................................42

Fed. R. Civ. P. 23(a) .......................................2, 29, 32, 34, 40, 41, 43

Fed. R. Civ. P. 23(a)(1) ...............................................................................29

Fed. R. Civ. P. 23(a)(2) ............................................... 30, 31, 35, 37

Fed. R. Civ. P. 23(a)(3) ...............................................................................37

Fed. R. Civ. P. 23(a)(4) ........................................................................41, 42

Fed. R. Civ. P. 23(b)(2) ........................................2, 3, 29, 32, 34, 42, 43

Fed. R. Civ. P. 23(g) ....................................................................................43

L.U. Civ. R. 7(b)(6)(A) .................................................................................1

U.S. CONST. amend. IV .........................................1, 2, 16, 32, 34, 35

U.S. CONST. amend. XIV ............................................. 1, 2, 31, 32, 34

U.S. CONST. amend. XIV, § 1 ................................... 1, 31, 32, 35

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas and Betty Jean Williams Tucker ("Plaintiffs" or "Named Plaintiffs") respectfully submit this memorandum in support of Plaintiffs' Motion for Class Certification (the "Motion") in this civil rights action brought against defendants Madison County, Mississippi ("Madison County") and Sheriff Randall Tucker, sued herein in his official capacity ("Sheriff Tucker," and with Madison County, "Defendants"). Pursuant to L.U. Civ. R. 7(b)(6)(A), Plaintiffs respectfully request oral argument on this Motion.

## PRELIMINARY STATEMENT

This is a motion for class certification under Federal Rule of Civil Procedure 23. In six months of discovery, Plaintiffs have developed substantial evidence of Defendants' longstanding policy of stopping and searching Madison County's Black citizens on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "Policing Program").[1] The Policing Program is executed by the Madison County Sheriff's Department ("MCSD") at the direction of Sheriff Tucker.

One of the key components of the Policing Program is the disproportionate placement of roadblocks in predominantly Black neighborhoods (the "Roadblock Program"). Such roadblocks are established to further a primary purpose of general crime control in these communities. The Roadblock Program thus runs afoul of both the Fourth and Fourteenth Amendments. Another essential component of the Policing Program is Defendants' policy of suspicionless stops and searches in majority-Black neighborhoods, particularly in the vicinity of the majority-Black

---

[1] In addition to their constitutional claims brought pursuant to 42 U.S.C. § 1983, Plaintiffs also assert a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Conduct that violates the Equal Protection Clause also violates Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.").

apartment complexes located in and around the city of Canton (the "Pedestrian Stop Program"). MCSD deputies routinely stop Black individuals and ask to see their identification when they are on their way to work, returning to their homes, or walking with friends. The Pedestrian Stop Program also violates both the Fourth and Fourteenth Amendments.

Pursuant to Rule 23(b)(2), the Named Plaintiffs seek to represent a class of all Black persons who presently or in the future will reside in or travel through Madison County (the "Targeting Class") in order to obtain injunctive and declaratory relief to remedy the constitutional violations caused by the Policing Program. Plaintiffs also seek to represent two subclasses in order to obtain declaratory and injunctive relief to remedy the constitutional violations caused by the Roadblock Program and the Pedestrian Stop Program. The first subclass consists of all Black persons who travel or will travel by car through majority-Black areas of Madison County. These persons have been or are likely to be stopped at roadblocks established by the MCSD based on racially discriminatory criteria and/or for purposes of general crime control (the "Roadblock Subclass"). The second subclass consists of all Black persons who travel or will travel by foot in Madison County's majority-Black neighborhoods. These persons have been or are likely to be subject to searches and/or seizures by the MCSD without reasonable suspicion or probable cause, and/or on the basis of their race (the "Pedestrian Stop Subclass").

Pursuant to Rule 23(a), one or more members of a class may sue as representative parties if (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Plaintiffs meet each of these requirements. Defendants also "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

2

corresponding declarative relief is appropriate respecting the class as a whole," thus satisfying Rule 23(b)(2). Plaintiffs' Motion should therefore be granted.

## STATEMENT OF FACTS

Madison County, located directly to the north of Jackson, is approximately 57% white and 38% Black. *See* Ex. 62 (Census data), at 62.1. The white population is concentrated in the southern part of the county, including the cities of Madison and Ridgeland. *Id.* 62.2. The Black population is concentrated in the north and west of the county, including the city of Canton, the town of Flora, and the rural areas near Camden and Kearney Park. *Id.* 62.2-62.4; Ex. 1, Ricchetti Rep. Ex. 3. Southeast Ridgeland also has a substantial Black population. *See* Ex. 88, HUD Compl. at 2. Madison County has experienced significant growth in recent decades. Since 1990, its population has nearly doubled, largely due to the growth of the Madison and Ridgeland areas. Ex. 63 (1990 Census data). Madison County is the wealthiest county in Mississippi. Ex. 62.5.

The MCSD is the primary law enforcement agency for Madison County, with jurisdiction throughout the county. Ex. 64, Resp. to Pls.' 1st Set of Reqs. for Admiss., No. 5. Madison, Ridgeland, Canton, and Flora each maintain their own police departments, which share jurisdiction with the MCSD within their city or town limits. *Id.*; Ans. ¶ 9, 62. The MCSD is headed by Sheriff Tucker, who has held the office of Sheriff since 2012. Ex. 24, R. Tucker Tr. 8:3-4. Sheriff Tucker succeeded Sheriff Toby Trowbridge, who held office from 2000 until 2011. Ex. 23, Trowbridge Tr. 12:24. Sheriff Tucker's chief deputy, Jeremy Williams, is responsible for, *inter alia*, personnel and administrative matters. Ex. 65, MC-INT 1-1-3, 2.

The MCSD currently consists of 71 officers. *See* Ex. 67, MCSD Roster. The largest division is Patrol, which has general responsibility for patrolling the county, responding to calls, and making traffic stops. Seven officers are assigned to the MCSD's Narcotics division, which focuses on drug enforcement, and six to its Criminal Investigations division. *See id.* The

department also includes several officers who focus on warrant service, transportation, and certain other matters, as well as a two-person "Neighborhood Enhancement" or "Neighborhood Enforcement" team, also referred to as the "NET Team," which focuses on the majority-Black housing complexes in the Canton area. *See id.*; *see also* Ex. 68, Mar. 3, 2015 Email.

### A.   The MCSD's Culture Of Racial Discrimination

### 1.   The MCSD's Policing Program Under Sheriff Toby Trowbridge

For more than eleven years, Sheriff Tucker worked in the MCSD's Narcotics division under Sheriff Toby Trowbridge, including as Captain. Ex. 24, R. Tucker Tr. 82:11-83:10. During Sheriff Trowbridge's administration, Black citizens repeatedly protested the MCSD, in particular its practice of establishing roadblocks primarily in majority-Black areas.[2] For example, in 2006, a group of Canton residents presented a petition bearing 664 signatures to the Madison County Board of Supervisors demanding an end to "frequent roadblocks in the predominantly black neighborhoods" and "racial profiling."[3] In 2007, Karl Banks, a Black member of the Board of Supervisors, stated "there is a real feeling in the community that the department is discriminating against people," and that these concerns were not being addressed.[4] Trowbridge refused to meet with aggrieved Black residents, later testifying that he "felt like everything was going the way it should be." Ex. 23, Trowbridge Tr. 103:8-14. And, in 2009, a panel of the state legislature considered a law prohibiting racial profiling. While the former chiefs of police of Ridgeland and Canton both testified that racial profiling is a significant problem, Sheriff Trowbridge refused to

---

[2] *See, e.g.*, Ex. 69, *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008) (noting that Trowbridge has "been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling"); Ex. 70, *Is system fair?*, THE CLARION-LEDGER (July 22, 2007) (Supervisor Griffin stating that the MCSD was perceived as targeting Black community members).

[3] *See, e.g.*, Ex. 71, *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006).

[4] Ex. 72, Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007).

attend, claiming that legislators were "wasting people's time and money" by debating the bill.[5]

Sheriff Trowbridge testified in this action that, during the time he was Sheriff, MCSD personnel, including himself and now-Sheriff Tucker, used the racial slur "nigger" while on duty. Ex. 23, Trowbridge Tr. 78:6-13, 90:10-91:4. According to Sheriff Trowbridge, MCSD personnel used racial slurs "in passing, maybe in conversation or walking down the hall or walking across a parking lot or whatever." *Id.* 96:24-97:2.[6]

Sheriff Trowbridge never disciplined any deputy for using racial slurs. Ex. 23, Trowbridge Tr. 91:25-92:3. To the contrary, casual racial discrimination was so commonplace and accepted that in 2009, a blatantly racist email entitled "White Pride" circulated among many of the MCSD's most senior members, including Trowbridge's chief deputy and Sheriff Tucker himself. Ex. 74, June 5, 2009 Email. The email, sent exclusively to white officers, contains such lines as, "when I call you Nigger, Kike, Towel head, Sand-nigger, Camel Jockey, Beaner, Gook, or Chink …You call me a racist." *Id.* The email concludes by encouraging the reader to express support for its sentiments by forwarding it along. *Id.* Now-Sheriff Tucker forwarded the email to seven more of his MCSD colleagues and personal contacts. *Id.*; Ex. 24, R. Tucker Tr. 43:11-44:11. During his deposition, Sheriff Tucker acknowledged that the email itself reflected a "racist opinion." Ex. 24, R. Tucker Tr. 63:20-21.

### 2. The MCSD's Culture Of Discrimination Persists To The Present Day

When he ran for office, Sheriff Tucker knew of the complaints and protests concerning the MCSD's racially discriminatory policing practices under Sheriff Trowbridge's Administration. *Id.* 104:22-105:7, 280:13-24. Nonetheless, Sheriff Tucker pledged to "maintain

---

[5] Ex. 73, Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, The Clarion-Ledger (Jan. 14, 2009).

[6] Sheriff Tucker denies hearing or using racial slurs used at the MCSD. Ex. 24, Tucker Tr. 269:13-21.

the quality of law enforcement that we have under Sheriff Trowbridge," and upon taking office, officially adopted all of Trowbridge's policies.[7] Numerous deputies testified that Tucker did not implement new policies that changed the culture of the MCSD. *See, e.g.*, Ex. 21, Sullivan Tr. 90:16-21; Ex. 12, Flax Tr. 89:6-8; Ex. 28, Wilson Tr. 42:7-23.

Many current MCSD personnel who serve in senior positions in the department also served under Sheriff Trowbridge. *See* Ex. 67, MCSD Roster; Ex. 78, 2011 MCSO Roster-1-2. M/Sgt. Joseph Butler, the individual who first sent the "White Pride" email, is a supervisor in Patrol. Ex. 24, R. Tucker Tr. 42:23-43:10. Other officers to whom Sheriff Tucker forwarded the email currently hold the positions of Master Sergeant in Patrol and Captain of Narcotics. *Id.* at 43:11-44:11. The late Terry Barfield, who served as Captain of Investigations until his death in 2017, used the term "nigger" while on duty. Ex. 23, Trowbridge Tr. 90:16-18, 92:4-7. According to a 2013 memo by the EEOC, Captain Barfield reportedly continued to make racist comments. Ex. 79, EEOC Memo, MC 0037-39 (May 9, 2013) ("I'm sick of these niggers"). Similarly, Will Weisenberger, also a Patrol supervisor, testified that he has used the term "nigger" in the course of his official duties, that other MCSD personnel also use the term while on duty, and that he had never been disciplined for his use of racial slurs. Ex. 26, Weisenberger Tr. 132:2-133:11.

Sheriff Tucker has also made and endorsed racially charged remarks since taking office. For example, in a January 2016 interview regarding a dispute with Kenneth Stokes, a Jackson city councilman, Sheriff Tucker referred to Jackson residents as Mr. Stokes' "thug constituents" and stated that Stokes was "setting his race back by implicating a race issue."[8] Around this same

---

[7] Ex. 75, Lacey McLaughlin, *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011); Ex. 76, *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011); *see also* Ex. 77, Memo from Sheriff Tucker to All Deputies/Employees (Jan. 3, 2012).

[8] Ex. 80, *Madison sheriff responds to Jackson councilman's remarks*, THE CLARION-LEDGER (Jan. 4, 2016), https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/, at 1:50-57, 4:46-50.

time, a Madison County resident emailed Sheriff Tucker, "I'm curious if Mr Griffin is related to Kenneth Stokes since their language is similar (dis, dat, dees, and doez)." Ex. 81, Jan. 18, 2016 Email. Sheriff Tucker replied, "I wholeheartedly agree with you on mr griffin." *Id.*[9]

Sheriff Tucker also has hired officers who have been accused of racial discrimination. Sheriff Tucker hired Slade Moore, now a Sergeant in Patrol, even though he had been terminated from his position as an officer in the Jackson Police Department after over 30 complaints had been filed against him.[10] One incident led to a lawsuit in which the City of Jackson was held liable for Moore's use of excessive force.[11] Following his termination, now-Sgt. Moore, who is white, filed a racial discrimination suit in which he claimed he was treated differently than similarly-situated Black officers.[12] Another white patrol deputy hired by Sheriff Tucker had faced allegations that he had "a history of animosity toward African Americans,"[13] and was sued by a Black man for alleged use of excessive force while the deputy was employed by the Hinds County Sheriff's Department.[14] Ex. 22, R. Thompson Tr. 29:6-15. Sheriff Tucker was aware of this excessive force incident, but nevertheless hired the deputy in 2014, *just weeks* after it occurred. *Id.* 37:19-20, 41:8-15; Ex. 24, R. Tucker Tr. 212:5-20.

Since Sheriff Tucker took office, eight Black officers have resigned or been terminated by Sheriff Tucker.[15] Currently, twelve of the MCSD's 71 officers are Black.

---

[9] At his deposition, Supervisor Griffin testified that, in his view, the email from the Madison County resident expressed racist sentiment. Ex. 13, Griffin Tr. 82:22-82:24.

[10] Ex. 82, Memo from Shirlene Anderson, Jackson Chief of Police, to Sgt. Slade Moore (June 15, 2006).

[11] *See City of Jackson v. Calcote*, 910 So. 2d 1103, 1110-11 (Miss. Ct. App. 2005) .

[12] Ex. 83, Compl., *Moore v. City of Jackson*, No. 251-10-592CIV (Hinds Cnty. Circuit Ct., Jul. 19, 2010), ¶¶ 20-21.

[13] Ex. 84, Pl.'s Mem., *Huggins v. Belk Dep't Stores*, No. 4:07-cv-134, 1 (S.D. Miss. Aug. 3, 2008).

[14] Ex. 85, Mod. 2d Am. Compl., *Fleming v. Hinds Cnty.*, No. 3:16-cv-554 (S.D. Miss. Nov. 30, 2016), ¶¶ 14-15.

[15] *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 7; *Compare* Ex. 67, MCSD Roster *with* Ex.

**B.**     **Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD**

Black residents of Madison County regularly encounter racism and discrimination in their interactions with the MCSD. For example, Plaintiff Bessie Thomas testified that when she tried to speak to an MCSD deputy during a roadblock the deputy cut her off and, referring to the cars behind her, said, "I've got all these niggers off the side of this road." Ex. 9, Thomas Tr. 77:3-22. Class member Quincy Smith stated that at a traffic stop, he witnessed a white MCSD deputy tell a Black MCSD deputy that he wasn't "going to help a nigger out" by letting a driver go without a ticket. Ex. 56, Q. Smith Decl. ¶ 14. Class member Montreal Tillman was told by an MCSD deputy that if the deputy had "not taken anger management classes, [he] would drag [Tillman's] black ass up and down the street." Ex. 59, Tillman Decl. ¶ 23. All in all, MCSD deputies treat Black citizens "with no respect. ... The way they talk to you, it's like they look down on you. They are unconcerned about what you tell them." Ex. 9, Thomas Tr. 68:24-69:13; *see also* Ex. 6, Q. Manning Tr. 46:2-22 (MCSD deputy "wasn't talking to me as if I was a person. ... He asked me why the hell did I pull over in this driveway and where is my damn license and registration."); Ex. 61, M. Williams Decl. ¶ 7.

Class members have been stereotyped as gang members and drug dealers.[16] The MCSD

---

78, 2011 MCSO Roster-1-2. The roster produced by Defendants appears to exclude most Madison County Detention Center employees, as well as dispatchers and administrative personnel.

[16] Class member Lisa Jones, a 46-year-old woman and mother of three, was asked at a roadblock if her license plate meant she was part of a gang. Her license plate had the letters "B," "A," and "D," which are her children's initials. Ex. 51, L. Jones Decl. ¶¶ 23-24. An MCSD deputy repeatedly referred to class member Terrance Thompson as a "Black dope boy," even though he had no drugs in his possession when he was stopped. Ex. 58, T. Thompson Decl. ¶¶ 12-15. Quincy Smith was stopped at a roadblock at the entrance to his apartment; the MCSD deputy immediately asked "where are the drugs?" Ex. 56, Q. Smith Decl. ¶ 6. *See also* Ex. 53, Mitchell Decl. ¶ 4 ("They always talk to me as though I am a criminal. They immediately start asking about drugs in my car. At one roadblock, the deputy said to me, 'I know you have something.'"); Ex. 42, R. Davis Decl. ¶¶ 7-8 (MCSD deputy repeatedly accused class member Rasheid Davis of "smoking dope" during a roadblock, even after he passed a sobriety test).

routinely stops and harasses Black pedestrians without reasonable suspicion. For example, Plaintiff Latoya Brown has been stopped numerous times simply walking down the street. Ex. 4, L. Brown Tr. 50:22-51:9, 53:2-54:10, 74:19-76:9. On each occasion she was compelled to provide identification so that MCSD personnel could run warrant checks. *Id.* Class member Delores Smith's son was told he fit a "profile" because he had dreadlocks and wore a hat. Ex. 55, D. Smith Decl. ¶ 6. Mr. Tillman was stopped while walking in a white neighborhood where his fiancée lived, and asked whether he we was "plan[ning] on coming around all the time" and if he had any weapons. Ex. 59, Tillman Decl. ¶¶ 17-20. MCSD deputies also conduct lengthy, intrusive, and even violent stops of Black motorists.[17]

Black residents know that they are treated differently than white residents. Plaintiff Lawrence Blackmon was tackled and handcuffed at gunpoint in his own foyer after requesting to see a warrant before he allowed the MCSD to enter his home. Ex. 3, Blackmon Tr. 73:20-76:5. He understands that the incident "would not have happened to me if I were a white person." *Id.* 161:19-21. Class members report MCSD roadblocks at which Black drivers have been stopped and white drivers have been waved through. *See* Ex. 53, Mitchell Decl. ¶ 9; Ex. 48, Hollins Decl. ¶¶ 4-5 (officer stated white drivers were "good people"). Class member Destiny Jones "cannot believe that if a white family was on the side of the street trying to deal with a very upsetting car accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail,"

---

[17] For example, in 2016, class member John Spann was pulled over by the MCSD for allegedly "bumping the lines." Ex. 57, Spann Decl. ¶ 12. The officers asked him whether he had outstanding warrants or prior offenses, or whether there were drugs or weapons in his car, and demanded that he search his own car while they watched. *Id.* at ¶¶ 8-10. The search turned up nothing, but it nonetheless took 45 minutes for the deputies to leave the scene. *Id.* ¶¶ 4, 10. Similarly, even though class member Quincy Smith was a passenger, the MCSD required him to take a breathalyzer test. Ex. 56, Q. Smith Decl. ¶ 13. And, in 2012, an MCSD officer believed that he saw Michael Bracey driving without a seatbelt as Mr. Bracey was about to pull into his driveway. Ex. 38, Bracey Decl. ¶¶ 3-10. The officer followed Mr. Bracey onto his property, screamed at him to get on the ground, placed his gun to the back of his head, and handcuffed him. *Id.* The officer then searched Mr. Bracey and his car, and placed him under arrest. *Id.*

like she was after being hit by a drunk driver. Ex. 50, D. Jones Decl. ¶¶ 10-11, 19. When her mother complained to a Black state trooper who also was at the scene, he acknowledged as much, telling her, "we all know how they are." Ex. 51, L. Jones Decl. ¶ 27.

### C.    The MCSD's Policing Program

The MCSD's culture of racism directly impacts how it polices Madison County. For decades, the MCSD has implemented and enforced an unwritten policy, or longstanding custom and practice, of racially profiling Black individuals and disproportionately targeting Madison County's Black communities through roadblocks, pedestrian stops, and other aggressive tactics.

#### 1.    The MCSD Disproportionately Arrests And Cites Black Persons

The MCSD's Policing Program has led to stark racial disparities in the MCSD's arrest and citation rates. While Black individuals represent only 38% of Madison County's population, Black individuals accounted for over 77% of all arrests made by the MCSD between January 1, 2012 and September 20, 2017, as well as 72% of all citations made by the MCSD between January 2012 and December 31, 2017. Ex. 2, Guha Decl. ¶¶ 10, 19. Nearly 76% of arrests made by the MCSD at roadblocks, and 74% of the arrests made by the MCSD at traffic stops, between January 1, 2012 and September 20, 2017 were of Black individuals. *Id.* ¶¶ 32, 36.

MCSD deputies routinely opt to arrest Black drivers for traffic violations. Black drivers represented 87% of arrests for driving with a suspended or revoked license; 83% of arrests for no proof of liability insurance; 83% of arrests for having an expired tag or no tag on a license plate; and 80% of arrests for improper vehicle equipment for the time period between January 1, 2012 and September 20, 2017. Black drivers also accounted for 94% of arrests for a child restraint violation; 88% of arrests for a seatbelt violation; almost 85% of arrests for speeding on local highways; 77% of arrests for turning without a turn signal; and 68% of arrests for careless driving for the time period between January 1, 2012 and September 20, 2017. *Id.* ¶ 11.

10

The MCSD's citation statistics reflect a similar pattern. Between January 1, 2012 and December 31, 2017, Black individuals received 94% of citations for child restraint violations; 84% of citations for driving with a suspended license; 77% of citations for no proof of liability insurance; 76% of citations for following another vehicle too closely; 74% of citations for a seatbelt violation; 73% of citations for failure to yield; 71% of citations for improper vehicle equipment; 71% of citations for making an improper turn; and 63% of citations for driving with an improper tag or no tag. *Id.* ¶ 20.

The MCSD's own paperwork confirms that it targets Black citizens for arrest. In the course of discovery, Defendants produced to Plaintiffs templates of forms that deputies fill out in the course of their duties. Defendants produced multiple copies of one such form, the case file cover sheet for the narcotics unit, from the files of two officers. On each, the form is blank, except for three items that appear pre-populated: "black"; "male"; and "arrested." Ex. 86, May 27, 2014 Email, at 217; Ex. 87, MCSD-Officer Documents-01393.

## 2.    The MCSD Disproportionately Targets Black Communities

The MCSD implements the Policing Program by disproportionately targeting Madison County's majority-Black communities for roadblocks, traffic and pedestrian stops, and other aggressive law enforcement tactics. The MCSD has jurisdiction over the entirety of Madison County, but primarily operates in Canton, Flora, and the unincorporated areas of the county. Ans. ¶ 9. This is where most of the Black population resides. Ex. 62 at 62.2-62.4 (Census data). Defendants claim they police in Flora and Canton at the request of city police departments, and do not police Madison or Ridgeland except for in "special and/or limited circumstances." Ans. ¶ 48. However, Black residents from Ridgeland regularly encounter MCSD roadblocks at the entrance to their street, in the majority-Black southeast corner of Ridgeland. *See* Ex. 48, Hollins Decl. ¶ 2; Ex. 49, A. Howard Decl. ¶¶ 2-3; Ex. 40, B. Brown Decl. ¶ 2; Ex. 1, Ricchetti Rep. Ex.

2; *see also* Ex. 88, HUD Compl., at 2 (describing racial segregation in Ridgeland). The MCSD does not simply police the cities upon request, nor does it uniformly stay out of Ridgeland and Madison. Rather, the MCSD targets its policing where Black people live, work, gather and pray.

The MCSD established an entire unit, the so-called NET Team, to target apartments in majority-Black neighborhoods. The NET Team, originally called the "apartment detail," was created under Sheriff Trowbridge as a rotating unit of plainclothes deputies in unmarked cars, specifically deployed to patrol majority-Black apartment complexes in the Canton area. *See* Ex. 20, D. Smith Tr. 35:18-36:3, 42:22-25, 47:5-24, 65:21-24. The deputies would "patrol the apartments, do apartment walk-throughs, roadblocks, things of that nature." *Id.* 58:7-9. NET Team deputies have a reputation for jumping out of their cars and chasing Black residents. *Id.* 78:2-11; *see also* Ex. 3, L. Blackmon Tr. 129:20-130:2 ("[MCSD deputies] have unmarked cars … they will pull up on you and jump out of the car and search you."). In 2015, Sheriff Tucker made the NET team a full-time, two-man unit. Ex. 20, D. Smith Tr. 41:3-10.[18] Sheriff Tucker or Chief Williams are informed daily of the NET Team's activities. Ex. 20, D. Smith Tr. 85:3-7.

The MCSD targets businesses frequented by Black patrons. *See, e.g.*, Ex. 8, S. Smith Tr. 55:15-56:3 (describing a jump-out incident at Brooklyn Mart, a store adjacent to majority-Black apartment complexes in Canton); Ex. 9, Thomas Tr. 26:9-12 (describing a roadblock at Brooklyn Mart).[19] MCSD deputies also harass Black people where they worship and when they celebrate.

---

[18] The permanent NET team received expanded responsibilities, *see Id.* 90:18-22, but the Canton area apartment complexes have remained a major focus. *See, e.g.*, Ex. 68, Mar. 3, 2015 Email (The permanent NET Team was established as a "special, fulltime, undercover, two-man detail … to help assist the shift deputies and thwart the ongoing violence inside these Canton Apartment Complexes.").

[19] *See also* Ex. 37, Bacon Decl. ¶ 3 ("MCSD also sets up roadblocks down the road from my business both ways so that people can't leave my business without passing through a roadblock."); Ex. 42, R. Davis Decl. ¶¶ 9-10 ("Once the roadblocks go up in Canton people stop coming to my stores. The officers stop people driving to my store, or even just walking. Because people don't want to be harassed they just stay home."); Ex. 53, Mitchell Decl. ¶ 9 (MCSD officers target Black persons patronizing Black businesses, while going as far as escorting home drivers leaving a bar and restaurant frequented by white

Plaintiff Bessie Thomas testified that the MCSD sets up roadblocks outside of her church and the local middle school. Ex. 9, Thomas Tr. 25:21-26:12. Class member Domunique Doss stated that in Flora, the MCSD sets up roadblocks in Black neighborhoods on holidays and when Black residents hold community events or family gatherings. Ex. 45, Doss. Decl. ¶¶ 3-4; *see also* Ex. 10, B. Tucker Tr. 23:11-24:2 (suspicionless search of guests at a holiday barbecue).[20]

MCSD deputies also infringe on Black citizens' constitutional rights inside their homes. In 2016, Plaintiffs Khadafy Manning and Quinnetta Manning were confronted at the door of Ms. Manning's Canton-area apartment by deputies seeking witness statements related to an alleged burglary. Ex. 6, Q. Manning Tr. 85:3-7. The deputies, without a warrant or consent, forced their way inside the home. *Id.* When Mr. Manning told his wife that she was not required to write a statement, a deputy became aggressive, choking Mr. Manning, cursing at him, calling him "Mr. Cripple," and telling the Mannings they could either write statements or go to jail. Ex. 5, K. Manning Tr. 96:2-100:5. The deputy then dragged Mr. Manning down the stairs in his underwear and beat him in the back of a squad car until he agreed to write the statement they wanted. *Id.* Lawrence Blackmon was also subjected to forced entry and excessive force in his home. He woke up one morning to the MCSD banging on his door. Ex. 3, Blackmon Tr. 73:20-77:17. When he asked to see a warrant, the deputies shook some paper by his window, but would not allow him to see it. *Id.* The MCSD began kicking the door until Mr. Blackmon opened it, at which point they entered with guns drawn and placed him in handcuffs. *Id.* Mr. Blackmon

---

people in Flora).

[20] *See also* Ex. 53, Mitchell Decl. ¶ 10 ("When we have gatherings and birthday parties at the community center, the MCSD sets up a roadblock right outside on both directions, so everyone leaving the party has to pass through."); Ex. 37, Bacon Decl. ¶ 2 ("[MCSD] often set[s] up roadblocks [in Camden] when there are events in town, like a local football game."); Ex. 41, Carter Decl. ¶ 5 ("Whenever [the MCSD] get[s] word of Black people gathering together at a celebration or a wedding they set up a roadblock.").

remained cuffed for an extended period of time while they searched his house. *Id.* Mr. Blackmon

testified that he believes the incident was "something that only happens in … the black areas."

*Id.* 115:6-12.

### 3. Roadblocks Are A Key Element Of The MCSD's Policing Program

As part of its overall Policing Program, the MCSD has a policy, or widespread custom or

practice, of conducting roadblocks for purposes of crime control in Black communities.

Substantial record evidence demonstrates the improper purpose behind this Roadblock Program,

as well as its discriminatory application to majority-Black neighborhoods.[21]

#### (a) The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods

The MCSD's policy of conducting roadblocks in Black neighborhoods has been in place

since at least Sheriff Trowbridge's administration, when it was the subject of repeated,

unaddressed protests and civilian complaints. *See supra* at 4. While roadblocks are common in

majority-Black neighborhoods,[22] Plaintiffs testified that they rarely, if ever, see a roadblock in

white areas. *See* Ex. 3, Blackmon Tr. 141:11-142:1 ("[T]his issue with [roadblocks] is, is that

they are disproportionately set up in the predominantly African-American areas of town."); Ex.

10, B. Tucker Tr. 17:4-9; Ex. 4, L. Brown Tr. 82:7-12.[23]

---

[21] The MCSD's policies handbook sets forth (i) a set of "Sobriety Checkpoint Guidelines" which, despite Defendants' contentions to the contrary (*e.g.*, Ans. ¶ 140), are not regularly followed, and (ii) a vague "General Roadblocks" policy which provides blanket authorization for deputies to "conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within th[e] county." Ex. 89, MC-RFP 2-1 at 2-4, § IX(c).

[22] *See* Ex. 7, Singleton Tr. 42:17-23 (stating he has seen more than 20 roadblocks); Ex. 40, B. Brown Decl. ¶ 8 ("When I lived in Canton I believe I drove through more than 100 roadblocks."); Ex. 41, Carter Decl. ¶ 4 ("Last year I went through two roadblocks within thirty minutes."); Ex. 56, Q. Smith Decl. ¶ 2 ("In the last three or four years, I have driven through as many as thirty roadblocks.").

[23] *See also* Ex. 56, Q. Smith Decl. ¶ 2 ("MCSD sets up roadblocks in the Black neighborhoods to target Black people."); Ex. 53, Mitchell Decl. ¶ 9 ("I have never seen a roadblock set up in the white communities."); Ex. 59, Tillman Decl. ¶ 3 (same); Ex. 41, Carter Decl. ¶ 5 (same, regarding Camden); Ex. 37, Bacon Decl. ¶ 7 (same); Ex. 39, A. Brown Decl. ¶ 9 (same, regarding his community in Flora);

Statistical analysis of the MCSD's own data confirms this. The expert report of Bryan Ricchetti, Ph.D., demonstrates that the MCSD disproportionately conducts roadblocks in substantially-Black areas of the county. *See* Ex. 1, Ricchetti Rep. ¶¶ 52-53. Dr. Ricchetti has reviewed the available data on the locations and frequency of roadblocks conducted by the MCSD and overlaid this data with Census data for Madison County. *Id.* ¶ 38, Ex. 2 (*see* below).

Exhibit 2
*Location of Roadblocks by Census Tract within Madison County (2012–2017)*



In so doing, Dr. Ricchetti has determined that there is a statistically significant and positive correlation between the percentage of Black residents in a census tract in Madison County and the rate of roadblocks in that tract. *Id.* § 2.2. He demonstrates that on average, the per capita rate of roadblocks in substantially Black census tracts is ***nearly double*** that of predominantly white census tracts. *Id.* ¶ 39, Ex. 3 (*see* below).

Ex. 40, B. Brown Decl. ¶ 10 (same, regarding her neighborhood in Ridgeland); Ex. 49, A. Howard Decl. ¶ 9 (same); Ex. 43, V. Davis Decl. ¶ 2 (same, regarding her neighborhood in Canton); Ex. 46, Guise Decl. ¶ 11 (same); Ex. 47, Harris Decl. ¶ 5 (same); Ex. 60, Wilder Decl. ¶ 4 (same).



Exhibit 3
*Frequency of Roadblocks by Racial Breakdown*

This sizable disparity persists throughout the County even when controlling for other potential non-racial explanations. *Id.* ¶ 46, Ex. 6. Dr. Ricchetti's analysis strongly suggests that racial bias animates the disparity in the frequency of roadblocks in predominantly Black communities.[24]

      (b)      <u>The Primary Purpose Of The Roadblock Program Is Crime Control</u>

Defendants effectively concede that the MCSD establishes roadblocks in majority-Black neighborhoods to control general crime, a clear violation of the Fourth Amendment. Defendants' Answer states that Sheriff Tucker has honored "multiple requests" from "managers of various apartment complexes and housing projects in predominantly Black neighborhoods in both Madison County and the City of Canton, and many businesses asking that the [MCSD] conduct

---

[24] Dr. Ricchetti's multivariate regression analyses demonstrate that even after accounting for "the fact that communities with a higher percentage of Black residents have, on average, other characteristics that are predictive of traffic behavior, such as higher rates of DUI arrests and traffic arrests and citations, lower income, higher unemployment, and younger populations, … there remains an unexplained difference in the frequency of roadblocks in communities that have a higher percentage of Black residents relative to communities with a higher percentage of white residents." Ex. 1, Ricchetti Rep. § 2.2.

roadblocks near their neighborhoods and businesses." Ans. ¶ 3; *see also* Ex. 90, MC-RFP 10-42(1) (Oct. 31, 2017 request from apartment manager for a "random road block in our area" as a "preventative measure"). Officers have also testified that they set up roadblocks, unprompted by such requests, to detect and deter criminal activity.[25] *See, e.g.*, Ex. 22, R. Thompson Tr. 20:19-21:13 (agreeing that "general crime prevention" is the "primary purpose" of MCSD's roadblocks); Ex. 19, Squires Tr. 171:10-172:4 (deterring crime is "definitely" a purpose of roadblocks); Ex. 17, Moore Tr. 159:2-4 ("Q. Now, with regard to roadblocks, what's the purpose of a roadblock? A. To prevent crime."); Ex. 91, MC-RFP-Inc. Rep. 010886 (MCSD "established a safety checkpoint at [the Canton Estates apartment complex] to check for out standing [sic] warrants and other violations.").[26]

The MCSD's use of roadblocks as a crime control measure is further demonstrated by the involvement of the NET Team and of MCSD narcotics agents in conducting roadblocks. The NET Team has the authority to conduct roadblocks without specific approval from higher authorities. Ex. 20, D. Smith Tr. 48:13-49:3. So do officers in the Narcotics Division. Ex. 16, T. Jones Tr. 232:14-233:4. Unlike Patrol, Narcotics and the NET Team focus on specific aspects of criminal law, not traffic enforcement. NET and Narcotics nonetheless operate roadblocks in Canton's majority-Black neighborhoods, the clear purpose of which is crime control and narcotics interdiction. *Id.* 227:19-24 (testifying that, as Captain of Narcotics, he set up

---

[25] Other MCSD officers testified to different purposes for roadblocks. *See, e.g.*, Ex. 18, Sandridge Tr. 44:3-10 ("The primary interest is to check for seatbelt, child restraints, impaired drivers, and vehicle equipment violations."); Ex. 21, Sullivan Tr. 48:7-14 ("seatbelts, valid driver's license, child safety restraints, drinking and impaired driving").

[26] The general crime control purpose of roadblocks is further evidenced by notices the MCSD has posted regarding upcoming roadblocks, which on numerous occasions have stated that the purpose of the roadblocks is "to check for Driver's license, warrants and what ever else we encounter." *See, e.g.*, Ex. 92, MC B. Davis Laptop 4; Ex. 93, MC T. Chastain Laptop 17.

roadblocks "for a crime deterrent"); Ex. 20, D. Smith Tr. 45:18-46:7 (testifying that the NET

team would employ roadblocks to counter "high crime" in Canton).

(c)   MCSD Roadblocks Lack Uniform Procedures Or Safeguards

MCSD personnel also regularly exercise substantial discretion in conducting roadblocks,

despite the Supreme Court's clear statement that "the unconstrained exercise of discretion" by

officers at roadblocks is unconstitutional. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

Deputies have discretion to waive cars through a checkpoint. Ex. 24, R. Tucker Tr. 129:16-

130:2; Ex. 11, Fish Tr. 54:3-19. Deputies also have complete discretion to decide whether to run

drivers' licenses, even if facially valid. Ex. 24, R. Tucker Tr. 183:3-13; Ex. 25, Waldrop Tr.

45:4-24 (he "may or may not" run a warrant check on a valid license); Ex. 27, Williams Tr.

218:5-17 (officers have discretion to call in licenses). It is also left to the deputy's discretion

whether to demand passengers' identification or to search the vehicle or its occupants.[27] Khadafy

Manning, for instance, has been searched at least three times as a passenger at an MCSD

roadblock. Ex. 5, K. Manning Tr. 51:3-52:3, 53:1-3; *see also, e.g.*, Ex. 53, Mitchell Decl. ¶ 6

(describing experience of intrusive searches at roadblocks).

MCSD roadblocks also lack reasonable procedural safeguards. MCSD personnel are

authorized to use unmarked cars at roadblocks (*see* Ex. 66, Defs.' Resps. to Pls.' 1st Set of

Interrogs., No. 20), and numerous officers have testified that they have done so. *See, e.g.*, Ex. 25,

Waldrop Tr. 39:21-23; Ex. 20, D. Smith Tr. 66:11-19. Indeed, NET Team leader Darian Smith

testified that he has participated in roadblocks outside the Canton Estates apartment complex

---

[27] Ex. 24, R. Tucker Tr. 184:6-185:7; Ex. 15, S. Howard Tr. 110:21-24 ("Q: And you use your discretion
to decide when to check licenses or identifications for passengers? A: Yes, ma'am."); Ex. 11, Fish Tr.
55:15-17 ("Q: What about passengers? Do you ask them for anything? A: It just depends."); Ex. 25,
Waldrop Tr. 45:25-46:6 ("Q: Do you give any training on when you may ask for a passenger's
identification at a traffic stop? A: No.").

with only unmarked cars as a "deterrent to crime." Ex. 20, D. Smith Tr. 65:25-67:2.

Second, the MCSD does not require its personnel to be in uniforms when conducting roadblocks, thereby compounding the surprise and apprehension caused by the Roadblock Program. While Patrol deputies are usually uniformed, NET team and Narcotics officers wear plain clothes when conducting roadblocks, as well as driving unmarked cars. *E.g.*, *id.* 48:10-12.[28] So do other high-ranking officers. *See* Ex. 25, Waldrop Tr. 39:21-25.

Third, while Sheriff Tucker concedes that a roadblock identified by marked vehicles with flashing lights and uniformed officers is a "best-case scenario," this does not always happen. Ex. 24, R. Tucker Tr. 140:16-141:14. To the contrary, in Black neighborhoods, residents report that roadblocks conducted after dark routinely are entirely unlit, with the exception of the officers' handheld flashlights. Bessie Thomas has driven through roadblocks at night where she did not see flashing lights. Ex. 9, Thomas Tr. 28:5-20; *see also* Ex. 5, K. Manning Tr. 56:16-57:5 (describing stops at roadblocks where officers wave vehicles down with flashlights). So have many other class members.[29] Moreover, the MCSD sets up roadblocks in poorly-lit locations, including dark, rural streets in Black areas, despite relatively little traffic, or parks their cars where they are not visible.[30]

---

[28] Captain Tommy Jones circulated a memorandum dated January 30, 2017 that directs Narcotics officers to wear reflective vests while participating in a roadblock (Ex. 94, MC L. Sanders Main Server 93), but NET personnel continue to conduct roadblocks without wearing reflective vests to identify them, let alone an MCSD uniform. *See* Ex. 20, D. Smith Tr. 149:12-20.

[29] *See also* Ex. 42, R. Davis Decl. ¶ 3 ("A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars."); Ex. 56, Q. Smith Decl. ¶ 3 ("MCSD parks off of the road and turns off all lights on their trucks."); Ex. 41, Carter Decl. ¶ 2 (same); Ex. 39, A. Brown Decl. ¶ 3 (same); Ex. 53, Mitchell Decl. ¶ 3 ("[The MCSD] rarely have their lights on [at a roadblock], but when they do, they only turn on the lights in the back so it is impossible to see the cars until I am already up on the roadblock.").

[30] *See* Ex. 9, B. Thomas Tr. 24:17-22 (cars park off the street, inside apartment complexes and thus are not visible); Ex. 49, A. Howard Decl. ¶¶ 3-4 (on Pine Knoll Road, a roadblock location near a majority-Black apartment complex in Ridgeland, the MCSD parks in parking lots, where they are not visible, and then waves cars down with flashlights); Ex. 40, B. Brown Decl. ¶ 3 (same); Ex. 52, McKay Decl. ¶ 4 ("I

### 4.      Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program

Another significant aspect of the MCSD's Policing Program is the Pedestrian Stop Program, a policy of conducting suspicionless stops of pedestrians in Black neighborhoods and on the grounds of majority-Black apartment complexes. Many such pedestrian stops occur during "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits, while other such stops are conducted in Madison County's Black communities by roving patrols of deputies who stop pedestrians on the street. These stops are typically conducted by teams of plainclothes officers who wear tactical vests and drive unmarked cars, referred to by community members as the "jump out patrol" or the "jump out boys."

The MCSD, as a matter of explicit policy, has conducted special "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits since at least 2008, using the "Apartment Detail" or "NET Team." *See* Ex. 20, D. Smith Tr. 34:22-24. At present, the NET Team has primary responsibility for these patrols, but other units, including Patrol and Narcotics, remain involved. *Id.* 35:22-36:9. During these patrols, officers demand that persons they encounter produce their identification,[31] and treat attempts to avoid these interactions as suspicious behavior that itself justifies detention and search.[32] Hundreds of

---

don't know why the MCSD would set up a roadblock on my street. There is very little traffic because so few people drive in this rural area."); Ex. 51, L. Jones Decl. ¶ 26 ("I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen.").

[31] *See, e.g.*, Ex. 15, S. Howard Tr. 160:5-25, 182:2-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:2-12; Ex. 25, Waldrop Tr. 86:24-87:10; Ex. 20, D. Smith Tr. 70:10-25, 128:12-129:4.

[32] *See, e.g.*, Ex. 96 (MC-RFP-Inc. Rep. 040697 (an officer "observed two black males standing be[side] a parked vehicle"; the subjects looked at the officer and "started walking away," so the officer ordered them to stop, gave chase, arrested one, and booked him "on all charges"); MC-RFP-Inc. Rep. 058887 (when an officer "saw four black males standing outside" a building; when the officer drove closer "they began walking away," so the officer stopped them, noticed one was slurring his speech, and subsequently arrested him for public drunkenness); MC-RFP-Inc. Rep. 025721 (when officers saw "several individual[s] loitering" and one "began walking inside of" an apartment, an officer yelled for him to stop,

these patrols have taken place since Sheriff Tucker took office. *See* Ex. 2, Guha Decl. ¶¶ 33-34.

Plaintiff Steven Smith was recently arrested after a suspicionless stop that took place during an apartment walkthrough conducted by the NET Team. On his daughter's birthday in January 2017, while walking from the store to his home to Canton Estates, Mr. Smith and his friend Terrance Thompson, were stopped and instructed to "remove their hands from their pockets" and produce their identifications. *See* Ans. ¶ 89; Ex. 8, S. Smith Tr. 35:3-24. The officers ran Mr. Smith's identification, found outstanding warrants related to old, unresolved traffic citations, and arrested him. *See* Ex. 8, S. Smith Tr. 38:13-16; Ex. 15, S. Howard Tr. 131:14-16. Mr. Smith was also detained during an apartment walkthrough in the fall of 2015. *See* Ex. 95, Smith Resp. to Defs.' 1st Set of Interrogs., No. 4. Two deputies approached and told Mr. Smith to walk with them behind a building. Ex. 4, L. Brown Tr. 70:10-23. The deputies handcuffed Mr. Smith, ran his identification, and then let him go. *Id.* 71:3-5, 71:20-22.

Plaintiff Latoya Brown has also been subjected to suspicionless stops by MCSD personnel. Ms. Brown was stopped in 2014 while walking to the front gate of Canton Estates in order to meet her ride to work when two deputies stopped her, demanded her identification, and ran a warrant check. *Id.* 50:24-51:9. She was also stopped for a warrant check during an apartment walkthrough in 2013. *Id.* 53:2-54:10. On other occasions, Ms. Brown has been stopped for warrant checks when walking past roadblocks set up in front of Canton Estates. *Id.* 74:19-76:9. Plaintiff Khadafy Manning was also stopped in February 2017 by MCSD deputies conducting an apartment walkthrough. Ex. 97, MC-RFP-Inc. Rep. 047927. In his incident report, Sgt. Howard of the NET Team wrote that he stopped Mr. Manning because he believed Mr. Manning was trying to avoid him. *Id.*

---

and then "placed [him] under arrest for failure to comply" after he entered the apartment)).

These incidents are not unique to the Named Plaintiffs. *See, e.g.*, Ex. 44, Day Decl. ¶¶ 2-4 (describing at least ten such stops at his Madison Heights apartment complex). Incident reports produced by Defendants are replete with examples of similar suspicionless stops.[33] In these reports, officers conducting "apartment walkthrus" time and again "come into contact" with Black persons and subsequently arrest them for outstanding warrants. These reports represent only a fraction of many similar incident reports produced by Defendants, which themselves only reflect those stops that resulted in arrests.[34]

The NET Team and other MCSD units also regularly engage in suspicionless stops and searches of Black pedestrians while conducting roving patrols of Madison County's Black neighborhoods in unmarked cars. These patrols are colloquially referred to as the "jump-out patrol" or the "jump out boys." *See* Ex. 20, D. Smith Tr. 79:5-15 ("Jump-out boys" is "the nickname given to the NET team."); Ex. 10, B. Tucker Tr. 32:15-21 (the jump-out boys "are always in the black neighborhoods jumping out."). On one occasion, the jump-out patrol came onto Ms. Tucker's property in the middle of the day during a holiday barbecue and, without

---

[33] *See, e.g.*, Ex. 98 (MC-RFP-Inc. Rep. 032317 (deputies "came in contact" with a Black man and arrested him for outstanding warrants for failure to appear); MC-RFP-Inc. Rep. 007631 (an officer "observed a unidentified black-male [sic] loitering in front of building seven," so the officer identified him, checked for warrants, and then arrested him for an outstanding warrant for littering); MC-RFP-Inc. Rep. 007292 (a deputy "came into contact" with a Black man, found a warrant for no proof of insurance, and arrested him); MC-RFP-Inc. Rep. 004715 (an officer "observed several subjects loitering" so he "stop[ped] to advise the subject[s] to move along," ran a warrant check, and arrested one Black man for two warrants for "failure to appear on a speeding ticket" and "failure to appear on a no proof of insurance"); MC-RFP-Inc. Rep. 025778 (a deputy "observed a black male walking in the area of Canton Gardens Apts." and stopped him "to see if he lived in the Complex"; when the man said "no he was just walking," the officer ran his ID, found outstanding warrants, and arrested him)).

[34] MCSD officers have been unable to articulate any reasonable suspicion to justify the stops that occur when they "come into contact" with Black pedestrians. *See, e.g.*, Ex. 15, S. Howard Tr. 182:24-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:7-12; Ex. 20, D. Smith Tr. 128:12-129:4. Instead, Defendants have attempted to characterize these stops as "consensual." *See, e.g.*, Ex. 15, S. Howard Tr. 117:4-9, 125:8-9, 128:11-13, 139:7-8. This is incorrect. When individuals attempt to avoid these encounters, they are frequently met with pursuit, arrest, and charges for failure to comply. *See supra* note 32.

cause, searched her friends and family; finding nothing, they drove off. Ex. 10, B. Tucker Tr. 23:23-24:2. Another time, Ms. Tucker's grandson was walking to her house, shirtless, to help fix his brother's bike. *Id.* 29:5-20. The jump out patrol drove by, jumped out of their truck, and searched him. *Id.* When they let him go, a deputy said to Ms. Tucker, "next time tell him to put a shirt on." *Id.* Numerous other class members report similar encounters.[35]

### D.     The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program

The MCSD does not train deputies to police in a race-neutral manner, or monitor deputies to prevent racial discrimination. The MCSD does not conduct meaningful investigations of complaints, discipline deputies for unconstitutional policing, or even evaluate deputies' performance in a transparent manner. The MCSD also fails to maintain data or statistics showing the racial breakdown of stops, citations, and arrests conducted by the department. These major process deficiencies are central to the operation of the Policing Program. They insulate Defendants from scrutiny and community oversight, forestall the prevention and remediation of constitutional violations through consensual channels, and enable Defendants to publicly deny the existence of the Policing Program. These deficient training and supervision policies demonstrate, at the very least, a policy of deliberate indifference to the routine violations of the

---

[35] The jump-out patrol has also stopped Terrance Thompson at least twice since 2014 while walking down the street in Canton. Ex. 58, T. Thompson Decl. ¶ 11. On one occasion, in 2014, an unmarked Tahoe pulled up on him and friend while they were walking; the officers jumped out and without explanation put both men in handcuffs and searched them. *Id.* ¶¶ 17-20. After finding nothing, they demanded identification and ran warrant checks. *Id.* Only after the check came back clean did they remove the handcuffs and let the men go. *Id.* Class member Montreal Tillman, also a Canton resident, explained that when he was stopped, the officer "started shouting at me through his window to stop walking. ... .He asked for my license. I felt like I had to give it to him." Ex. 59, Tillman Decl. ¶¶ 12-14. Class member Quincy Smith has been stopped as many as fifteen times by the MCSD while walking. Ex. 56, Q. Smith Decl. ¶ 15. On one occasion, he and three friends were stopped on the street by MCSD deputies and forced to provide social security numbers and submit to a pat down. *Id.* ¶¶ 16-17. Mr. Smith and his friends "were afraid and felt like if [they] said no or walked away there would have been real trouble." *Id.*

constitutional rights of Madison County's Black community.

### 1.    MCSD Personnel Are Inadequately Trained And Supervised

The MCSD does not explicitly train deputies not to use racial slurs or racially derogatory language. Ex. 24, R. Tucker Tr. 112:9-25. Sheriff Tucker and Chief Williams have not discussed the constitutional obligation to police in a race-neutral manner during department-wide meetings. *Id.* 10:24-11:21; Ex. 27, Williams Tr. 22:13-21, 40:20-41:10. The MCSD's training officer, M/Sgt. Jeffery Waldrop, testified that he developed the training curriculum in conjunction with Sheriff Tucker. Ex. 25, Waldrop Tr. 31:10-16. M/Sgt. Waldrop does not provide deputies with any training or testing on any policies regarding racial discrimination. Ex. 25, Waldrop Tr. 30:23-25, 31:8-9.[36] Nor does he train MCSD deputies on (i) how to establish roadblocks; (ii) when deputies may conduct searches at roadblocks and traffic stops; (iii) when deputies may demand that a pedestrian produce his or her identification; or (iv) when they must report a fellow officer's misconduct. Ex. 25, Waldrop Tr. 33:24-36:3, 47:23-25, 49:11-13, 49:22-50:3, 52:14-18.

The MCSD also provides no training or guidelines on how MCSD personnel should exercise their discretion, and many important MCSD functions are performed with minimal, if any, oversight or reporting requirements. *See* Ex. 24, R. Tucker Tr. 183:23-24 ("there is no training about discretion"). For instance, supervising deputies have complete authority to select specific roadblock locations. *Id.* 141:5-8, 143:24-144:2; Ex. 27, Williams Tr. 90:18-91:3. MCSD deputies also have complete discretion to determine whether to make traffic stops for any reason. Ex. 24, R. Tucker Tr. 187:25-188:2.[37]

---

[36] Sheriff Tucker testified that the FBI conducted a civil rights training for detention officers and deputies. Ex. 24, R. Tucker Tr. 85:14-19. Officers did not recall what the training covered. *See, e.g.*, Ex. 15, S. Howard Tr. 77:3-9 ("Q: Okay. Do you recall what you learned during that training? A: No, ma'am.").

[37] *See also* Ex. 64, Defs.' Resp. to Pls.' First Set of Req. for Admis., No. 2 ("Defendants admit that MCSD has no written criteria concerning when MCSD personnel should make a vehicle stop other than complying with existing state and federal laws."); Ex. 109, Defs.' Resp. to Pls.' First Set of Req. for Prod.

Sheriff Tucker also testified that he does nothing to ensure that his deputies are not profiling or targeting Madison County's Black population. Ex. 24, R. Tucker. 218:14-19 ("I don't monitor anybody to see if they're performing in a racially discriminatory manner."), 128:8-16, 135:12-21, 217:19-218:2; *see also* Ex. 27, Williams Tr. 76:3-8, 151:16-24 (no awareness of any attempts to determine whether deputies charge Black persons more severely than white persons). Sheriff Tucker is also steadfastly opposed to the use of technology that would record his deputies' actions. Ex. 99, Jan. 8, 2016 Email (calling a proposed bill that would require the use of body cameras "utterly ridiculous"); *see also* Ex. 100, *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015); Ex. 24, R. Tucker Tr. 175:7-14.[38] Sheriff Tucker claims that he relies on his supervising deputies to report instances of racial discrimination. Ex. 24, R. Tucker Tr. 114:10-18. He could not recall a single instance in the past six years in which a supervising deputy had made such a report. *Id.* 115:6-17, 128:25-129:3.

The MCSD also has no established processes for evaluating deputies' job performances. *Id.* 214:25-215:12; Ex. 27, Williams Tr. 177:21-178:6. In fact, numerous deputies testified that they have never received a performance evaluation of any kind. *See, e.g.*, Ex. 21, Sullivan Tr. 27:11-12; Ex. 14, Hall Tr. 21:22-25; *see also* Ex. 26, Weisenberger Tr. 57:6-11 (neither he nor anyone else conducts performance evaluations of the deputies he supervises). Deputies' performance is instead measured primarily by looking at the *quantity* of their policing, as reflected by metrics such as the number of arrests they make and the number of citations they

---

of Docs., No. 6 ("Defendants have no written policies or training materials regarding MCSD personnel conducting traffic stops.").

[38] Deputies have discretion to decide when to activate their in-vehicle cameras and microphones. Ex. 24, R. Tucker Tr. 180:4-25, 182:22-25. The MCSD also does not train deputies to turn on their in-vehicle cameras when they have a subject in the vehicle, such as when Sgt. Moore restrained Plaintiff Khadafy Manning in Deputy Thompson's vehicle. Ex. 27, Williams Tr. 99:4-12.

issue. Ex. 24, R. Tucker Tr. 215:13-23, 216:17-23; *see also* Ex. 27, Williams Tr. 122:25-124:8 (arrest and citation statistics are "a tool to evaluate performance").

**2.      The MCSD Does Not Maintain Complete Or Accurate Records**

The MCSD does not track citation or arrest rates by race. Ex. 24, R. Tucker Tr. 188:25, 191:16-20; Ex. 27, Williams Tr. 57:20-22, 115:5-9. Sheriff Tucker testified that he has no idea whether his deputies arrest more Black individuals than white individuals. Ex. 24, R. Tucker Tr. 228:2-11 ("We arrest a lot of criminals. I couldn't tell you what color they are."). Sheriff Tucker acknowledged that he has access to years of records that he could use to determine arrest rates by race. *Id.* 26:25-27:12, 223:18-224:14. Yet the MCSD has never compiled such statistics because he has no interest "whatsoever" in finding out what they would show. *Id.* 224:15-21.

Moreover, the records that do exist are not comprehensive. For instance, deputies are supposed to complete an incident report with a written narrative every time they make an arrest. *Id.* 132:3-5, 133:4-6; Ex. 27, Williams Tr. 172:5-13. The evidence demonstrates that deputies often disregard this policy. Based on a review of dispatch data entries produced by Defendants, Plaintiffs discovered over 160 instances of arrests in which an MCSD deputy did not prepare an incident report with a narrative, a finding Defendants did not contest. Ex. 110, Feb. 6, 2018 Email. Plaintiffs have also identified over 300 roadblocks that were not included in the MCSD's dispatch data, even though all roadblocks should be recorded therein. Ex. 1, Ricchetti Rep. ¶ 38, n. 23; *see also* Ex. 27, Williams Tr. 235:18-24 (roadblocks should be recorded in dispatch data). Plaintiffs discovered many such roadblocks by reviewing incident reports which described their dates and locations in the course of documenting arrests. If no arrests had been made at those roadblocks, or deputies failed to disclose in incident report narratives that the arrests took place

26

at a roadblock, the MCSD would have no records that these roadblocks had ever taken place.[39]

### 3. The MCSD Lacks Meaningful Complaint Procedures

Sheriff Tucker has delegated to Chief Williams *sole authority* to review citizen complaints and address personnel matters. *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 9. The evidence indicates that Chief Williams conducts bare-bones investigations of citizen complaints, and rarely elevates those complaints to Sheriff Tucker's attention. For example, in November 2016, class member Destiny Jones filed a complaint against Sgt. Moore for using excessive force and falsely arresting her at the scene of a car crash caused by a drunk driver. Ex. 101, MC-RFP 8-211-214. Sheriff Tucker did not recall any investigation into her complaint. Ex. 24, R. Tucker Tr. 265:22-266:2, 267:15-18. Chief Williams testified that he recalled "looking into the incident" and determining not to take action, but could not remember if he "did a report or documentation of it." Ex. 27, Williams Tr. 184:10-185:14 *see also* Ex. 17, Moore Tr. 58:21-25. Chief Williams did not contact Ms. Jones. Ex. 50, D. Jones Decl. ¶ 18.

Chief Williams' investigation of the June 2016 incident involving Plaintiffs Khadafy and Quinnetta Manning was even more limited. On June 26, 2016, Chief Williams learned that the Mannings claimed that a MCSD deputy had handcuffed, choked, and beaten Mr. Manning. *See* Ex. 104 MC-RFP-8-182-183. Chief Williams asked Sgt. Moore to prepare a supplemental report setting forth his account of the events, but he never questioned Moore about the incident. Ex. 17,

---

[39] At least two class members have reported being arrested at roadblocks that appear neither in the MCSD's dispatch data nor in the incident report narratives for the arrests. *Compare* Ex. 54, E. Pate Decl. ¶ 2 (reporting a roadblock on Livingston Vernon Road on June 9, 2015) *with* Ex. 102, MC-RFP-Inc. Rep. 020907 (incident report for "paper service – warrant" on June 9, 2015, which states "I came in contact with Earnest L. Pate on Livingston Vernon Rd. near Hwy 22," but does not disclose the roadblock.); *compare* Ex. 56, Q. Smith Decl. ¶ 8 (reporting a roadblock on May 3, 2015 on George Washington and Welsh) *with* Ex. 103, MC-RFP-Inc. Rep. 020065 (Incident report for "paper service warrant" on May 3, 2015, which states "deputies came in contact with Quincy Smith on George Washington Str near Welsh Str.," but fails to mention a roadblock.).

Moore Tr. 47:4-20. At no point did Chief Williams reach out to Mr. or Mrs. Manning. Ex. 27, Williams Tr. 182:21-183:6. At the conclusion of this cursory investigation, Chief Williams determined not to take any action. *Id.* 184:4-9; *see also* Ex. 24, R. Tucker Tr. 72:9-14.[40]

When allegations of racial discrimination have been brought to Sheriff Tucker's attention, he has failed to conduct meaningful investigations. For example, in February 2013, then-Deputy Robert L. Gibson, who is Black, allegedly shared with a supervisor his "concerns about racially discriminatory [policing practices] that affected both the employees and the community," including white officers using excessive force and beating [B]lack individuals," and "setting up roadblocks primarily in the minority neighborhoods." Ex. 105, Compl., *Gibson v. Madison County*, No. 3:16-cv-633 HTW-LRA (S.D. Miss. Aug. 15, 2016), ¶ 37. Sheriff Tucker at no point commissioned an investigation into Mr. Gibson's allegations of racially discriminatory policing practices. Ex. 106, R. Tucker Tr. (*Gibson*) 71:10-15. Similarly, in June 2013, a former Madison County Detention Center officer claimed that he had been "subject to racial jokes [and] racial remarks" by his supervisor. Ex. 107, Compl., *Cooper v. Tucker*, No. 3:13-cv-350 HTW-LRA (S.D. Miss. June 7, 2013), at ¶ 7. Sheriff Tucker did not commission an investigation into these claims either. Ex. 24, R. Tucker Tr. 276:12-17. And, in March 2015, Sheriff Tucker received a notarized letter from a Black couple, stating that Deputy Brad Sullivan drew his gun on the couple and their five year old daughter and stated "I've got you niggers now." Ex. 108, MC-RFP-8-29. The letter complained of "systematic racism" and requested a "thorough investigation." *Id.* at MC-RFP-8-29-30. Sheriff Tucker attempted to call the

---

[40] Sheriff Tucker testified that he believed Chief Williams' investigation was adequate, and that Sgt. Moore had not violated any MCSD policies or procedures. Ex. 24, R. Tucker Tr. 243:4-7, 244:17-21. He testified that it was appropriate for Sgt. Moore to give the Mannings the "choice" of either providing witness statements or sleeping on a concrete floor in jail, *id.* at 239:20-241:21, incorrectly insisting that Mississippi law criminalizes witnesses' failure to report crimes. *Id.* at 235:10-15, 249:23-250:4, 264:5-18.

complainant, but did not reach him; he then delegated the matter to Chief Williams. Ex. 24, R. Tucker Tr. 268:6-269-8. Sheriff Tucker testified that Sullivan represented to Chief Williams that he did not use the term "niggers," and "that was the extent" of the inquiry. *Id.* 268:24-269:12.

## ARGUMENT

"Rule 23(a) states four threshold requirements applicable to all class actions." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Plaintiffs must establish "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses are 'typical … of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Id.* (quoting Fed. R. Civ. P. 23(a)). The Fifth Circuit has emphasized that "Rule 23(a) must be read liberally in the context of civil rights suits," especially when, as here, "the class action falls under Rule 23(b)(2)." *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975). Plaintiffs' proposed class and subclasses meet each of these requirements.

## I.    PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT

For a class to be certified, it must be so numerous that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). A class of 100 to 150 members "generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999). When a class seeks only injunctive relief, even a relatively small class will satisfy numerosity, as "the benefits to be gained not only inure to the benefit of the known class but will benefit a future class of indeterminate size." *Choice Inc. of Texas v. Graham*, No. 04-cv-1581, 2005 WL 1400408, at *2-3 (E.D. La. June 3, 2005).

The proposed class easily satisfies the numerosity requirement. It includes all Black persons who reside in or travel through Madison County and who are, as a result, subject to the MCSD's Policing Program. There are over 36,000 Black residents of Madison County. *See* Ex.

29

62, (Census Data). This number is more than sufficient. The two proposed subclasses also readily satisfy the numerosity requirement. The Roadblocks Subclass includes all Black persons who are stopped at roadblocks established by the MCSD for crime control purposes. Since 2012, the MCSD has established over 2,000 roadblocks.[41] Ex. 1, Ricchetti Rep. ¶ 38. The Pedestrian Stop Subclass covers Black pedestrians in Madison County, including the hundreds, if not thousands of residents of and visitors to the specifically-targeted Canton area apartments.

Moreover, both the proposed class and subclasses include unknown individuals who may in the future reside in and/or travel through Madison County. "[T]he fact that the class includes unknown, unnamed future members … weighs in favor of certification." *Pederson v. La. St. Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000). And certain class members may be hesitant to assert claims for fear of retaliation. *See, e.g.*, *Mullen*, 186 F.3d at 624.[42] In light of all these factors, the proposed class and subclasses satisfy the numerosity requirement.

## II.  PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT

The commonality requirement of Rule 23(a)(2) requires that there must be one or more questions of law or fact common to the class, such that a "determination of [the] truth or falsity" of that question "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality requires "merely a single common contention that enables the class action 'to

---

[41] Incident reports indicate that at least 956 arrests of Black persons have occurred at MCSD roadblocks since January 1, 2012. *See* Ex. 2, Guha Decl. Ex. 6. By comparison, the class that was certified in *City of Indianapolis v. Edmond* consisted of motorists who had been or would be subjected to the Indianapolis police department's drug interdiction roadblock program, which comprised six total roadblocks that resulted in 104 total arrests. 531 U.S. 32, 34-35 (2000).

[42] For example, Defendants stated in their Answer that they found it "ironic" that Plaintiff Latoya Brown had filed suit in light of her having allegedly contacted the MCSD in the past for police assistance, and proceeded to detail the nature of those alleged calls. *See* Ans. ¶ 185. Other potential class members have good reason to fear that attempts to assert claims regarding MCSD's Policing Program may expose them to retaliation or embarrassment.

generate common *answers* apt to drive the resolution of the litigation.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

To satisfy Rule 23(a)(2), plaintiffs must "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury." *Dockery v. Fischer*, 253 F. Supp. 3d 832, 846 (S.D. Miss. 2015). Such a policy or practice "need not be formal or officially-adopted." *Id.* "Absent official sanction, a policy can be identified on the basis of custom or consistent practice" or "based on the defendant's deliberate indifference." *Id.* at 847. "[F]ailure to act can also constitute a policy or practice." *Id.* at 848. The commonality requirement can be met by identifying a "general policy of discrimination." *Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011); *see also Wal-Mart*, 564 U.S. at 350 (a quintessential "common contention" is "the assertion of discriminatory bias on the part of the same supervisor"). For class certification purposes, plaintiffs need only demonstrate that "the policies and practices they challenge are common, not (yet) that the common policies and practices are unconstitutional." *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016); *accord Morrow*, 277 F.R.D. at 184. And, to the extent that Plaintiffs are required to provide evidence of discriminatory intent at the class certification stage, such intent can be shown using circumstantial evidence. *See Veasey v. Abbott*, 830 F.3d 216, 235-36 (5th Cir. 2016) ("neutral reasons can and do mask racial intent").

Under these standards, the proposed class and two subclasses satisfy the commonality requirement. The Fourteenth Amendment claims of the proposed Targeting Class present common questions, including whether the MCSD has a policy of targeting Black communities and racially profiling Black individuals, and whether this policy violates the Equal Protection Clause. The claims of the Roadblock Subclass turn on the common question of whether the MCSD has a policy, custom, or consistent practice of conducting roadblocks in majority-Black

areas of Madison County for purposes of crime control, and whether the roadblocks carried out pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth Amendments. The claims of the Pedestrian Stop Subclass turn on whether the MCSD has a policy, custom, or consistent practice of engaging in searches and seizures of Black persons in Madison County in the absence of individualized reasonable suspicion, and if so, whether the searches and seizures carried out pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth Amendments.

A.    **The Targeting Class Satisfies The Commonality Requirement**

Plaintiffs seek to certify the following class (the "Targeting Class") for declaratory and injunctive relief under Rule 23(a) and 23(b)(2):

> All Black persons who have been, or will be, subjected to the MCSD's policy and/or widespread custom or practice of racially profiling and targeting Black persons for stops, searches, and/or seizures on the basis of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.

While the Fifth Circuit requires only a "single common question" for commonality purposes, *Deepwater Horizon*, 739 F.3d at 811, the claims of the Targeting Class raise numerous common questions of law or fact, including the following:

- Whether the MCSD has a policy or widespread custom or practice of racially profiling Black persons in Madison County;

- Whether the MCSD has a policy or widespread custom or practice of disproportionately targeting majority-Black communities;

- Whether the MCSD has a policy or widespread custom or practice of conducting searches and seizures of Black persons at least in part on the basis of race;

- Whether the MCSD has a policy or widespread custom or practice of failing to train officers adequately to prevent racial targeting and profiling; and

- Whether the MCSD has a policy or widespread custom or practice of failing to monitor officers adequately to prevent racial targeting and profiling.

Several post-*Wal-Mart* courts have found commonality where plaintiffs have alleged and

presented evidence of an unwritten policy of racial profiling by a law enforcement agency.[43]

Plaintiffs' evidence of Defendants' Policing Program is consistent with the evidence presented in

these in post-*Wal-Mart* profiling cases. In *Ortega-Melendres*, 836 F. Supp. 2d at 986-87,

plaintiffs provided evidence that Sheriff Arpaio had made "public statements that a fact finder

could interpret as endorsing racial profiling" against individuals of Hispanic descent, as well as

evidence of a culture of discrimination against Hispanic individuals, including Sheriff Arpaio

having forwarded a racially discriminatory email. Here, Plaintiffs have provided evidence of

public and private statements by Sheriff Tucker that indicate racial animus. Plaintiffs have also

presented evidence of a culture of discrimination, including testimony by current and former

MCSD personnel regarding the use of racial epithets by Sheriff Tucker and his deputies. In

*Morrow*, plaintiffs "provided anecdotal evidence that the stops of class representatives" were

"based … on racial profiling." 277 F.R.D. at 193. Here, Plaintiffs have provided extensive

anecdotal evidence by more than 33 named Plaintiffs and class members of racial profiling at

roadblocks, traffic stops, and pedestrian stops. *See generally*, Ex. 29 through 61. And, in *Floyd*,

plaintiffs presented expert testimony that racial composition of a census tract "is a statistically

significant, strong and robust predictor of NYPD stop-and-frisk patterns even after controlling

for" relevant confounding factors. 283 F.R.D. at 168. Here, Plaintiffs present analogous expert

testimony on the MCSD's disproportionate concentration of roadblocks in majority-Black

communities, one of the most significant components of its Policing Program.[44] *See supra* at 16.

---

[43] *See, e.g.*, *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (commonality met through evidence of "a policy of racial profiling, in violation of the Fourteenth Amendment"); *Morrow*, 277 F.R.D. at 192 (commonality met through evidence of a "city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property"); *Floyd v. City of New York*, 283 F.R.D. 153, 159, 173-75 (S.D.N.Y. 2012) (commonality met through evidence that police department "engaged in a policy and/or practice of unlawfully stopping and frisking [Black and Latino] people").

[44] In determining whether the commonality requirement is satisfied with respect to an alleged policy of

Viewed in its entirety, Plaintiffs' evidence provides "significant proof" of Defendants' policy of racially profiling and targeting Black individuals. *Wal-Mart*, 564 U.S. at 353. Because the claims of the Targeting Class turn on common questions concerning this policy, this Court should find the commonality requirement satisfied as to the Targeting Class.

### B.   The Roadblock Subclass Satisfies The Commonality Requirement

Plaintiffs Lawrence Blackmon, Latoya Brown, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker also seek to certify the following subclass (the "Roadblock Subclass") for declaratory and injunctive relief under Fed R. Civ. P. 23(a) and 23(b)(2):

> All Black motorists and passengers who have been, or will be, subject to the MCSD's policy of disproportionately conducting roadblocks in majority-Black neighborhoods for general crime control purposes and without appropriate procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

Plaintiffs have been illegally stopped and searched at roadblocks conducted by the MCSD under the Roadblock Program, and seek relief on behalf of all similarly-situated individuals who have been or will be stopped at similar unconstitutional roadblocks.[45] Plaintiffs, like other members of the proposed Roadblock Subclass, have been and continue to be subjected to the Roadblock Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Roadblock Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks in Black communities in Madison County, including roadblocks at or near the entrances of majority-Black apartment complexes, for the primary purpose of crime

---

discrimination, courts do not require "perfect" statistical evidence. *See, e.g., Morrow*, 277 F.R.D. at 192 (finding the commonality requirement satisfied even though "the statistical evidence presented by Plaintiff is not perfect"). In particular, courts permit the use of "less precise" data when a defendant has not retained "the primary evidence in a discrimination case." *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2015). Here, Defendants have no data on the race of persons stopped but not arrested or cited.

[45] *See* Ex. 4, L. Brown Tr. 45:12-21, 48:19-50:13; Ex. 3, Blackmon Tr. 144:4-11; Ex. 7, N. Singleton Tr. 41:23-45:7; Ex. 9, Thomas Tr. 25:21-26:20; Ex. 10, B. Tucker Tr. 19:2-18.

control, in contravention of the Fourth Amendment;

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks with inadequate procedural safeguards, in contravention of the Fourth Amendment; and

- Whether the MCSD has a policy or widespread custom or practice of disproportionately establishing roadblocks in Black communities in Madison County on a racially discriminatory basis, in violation of the Equal Protection Clause.

It is well-established that roadblock programs that have the primary purpose of general crime control violate the Fourth Amendment. *See Edmond*, 531 U.S. at 44; *Prouse*, 440 U.S. at 659 n.18. Thus, the use of roadblocks for crime prevention in purportedly "high crime" apartment complexes or subdivisions is unconstitutional. *See, e.g.*, *Shankle v. Texas City*, 885 F. Supp. 996, 1003-04 (S.D. Tex. 1995) (roadblocks located at each of the entrances to subdivision with high crime rates violated Fourth Amendment).[46] Many courts have certified classes in civil rights class actions asserting claims under the Fourth Amendment and/or the Equal Protection Clause with respect to an alleged policy, or widespread custom or practice, of unconstitutional traffic stops, including checkpoints and roadblocks. *See, e.g.*, *Edmond*, 531 U.S. at 36 (affirming injunctive relief granted to certified class of motorists who had been subjected to city's drug interdiction checkpoints); *Morrow*, 277 F.R.D. at 202 (certifying class of racial minority motorists alleging they were subjected to discriminatory traffic stop program). The Roadblock Subclass therefore satisfies the commonality requirement of Rule 23(a)(2).

### C.   The Pedestrian Stop Subclass Satisfies The Commonality Requirement

Finally, Plaintiffs Steven Smith, Latoya Brown, and Khadafy Manning seek to certify the

---

[46] Any contentions by Defendants that they do not conduct roadblocks for purposes of crime control are irrelevant to the limited inquiry into the merits that is permissible at the class certification stage. *See, e.g.*, *Collins v. Ainsworth*, 382 F.3d 529, 543-44 (5th Cir. 2004) ("Though Ainsworth claims the checkpoints were set up to advance general highway safety, and the checkpoints may have been facially valid pursuant to Mississippi law …, Plaintiffs have put forth material evidence that shows another programmatic purpose which was advanced by Sheriff Ainsworth.").

following subclass (the "Pedestrian Stop Subclass") for declaratory and injunctive relief:

> All Black persons who have been, or will be, subject to the MCSD's policy of conducting stops, searches and/or seizures of Black pedestrians in Madison County in the absence of reasonable, articulable suspicion or probable cause.

These Plaintiffs have been illegally stopped by the MCSD under the Pedestrian Stop Program, and seek relief on behalf of all similarly-situated individuals.[47] Plaintiffs, like other members of the proposed Pedestrian Stop Subclass, have been and continue to be subjected to the Pedestrian Stop Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Pedestrian Stop Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons present in the vicinity of the Apartment Complexes in the absence of reasonable, articulable suspicion, or probable cause;

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons in the vicinity of the Apartment Complexes at least in part on the basis of race and/or ethnicity; and

- Whether the MCSD has a policy, or longstanding custom or practice of targeting the Apartment Complexes at least in part on the basis of race.

The MCSD's policies, customs, and practices concerning the Pedestrian Stop Program, including the creation and implementation of the Apartment Detail and the NET Team, were promulgated by the highest level of MCSD's leadership, disseminated to rank-and-file officers through meetings, instructions, and directives, and implemented pursuant to a hierarchical supervisory structure. *See supra* at 12. Therefore, the injuries derived from the Pedestrian Stop Program are substantially similar across the Subclass and implicate common issues of proof. *See, e.g., Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (commonality satisfied in

---

[47] *See* Ex. 8, S. Smith Tr. 34:16-35:4, 38:13-16; Ex. 4, L. Brown Tr. 50:24-51:9, 53:2-54:10, 74:19-76:9; Ex. 97, MC-RFP-Inc. Rep. 047927 (K. Manning incident report).

case involving a program of "unjustified *Terry* stops, not supported by reasonable suspicion, occurring outdoors in the vicinity of [certain apartment] buildings"). Consequently, the claims of the Subclass turn on common questions of law and fact that will establish Defendants' liability, and the commonality requirement of Rule 23(a)(2) is satisfied. *See Wal-Mart*, 564 U.S. at 350.

## III. PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE 23(a)(3)

To satisfy the typicality requirement, the claims or defenses of the representative parties must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test for typicality … is not demanding." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997); *see also James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."). As long as there is similarity in the underlying legal theories, the fact that one or more of the Named Plaintiffs' claims may be subject to a unique defense does not defeat typicality. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting claim that "the presence of an arguable unique defense necessarily destroys typicality"). As a practical matter, "'[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" *Wal-Mart*, 564 U.S. at 349 n.5. Therefore, once commonality is shown, as it has been here, typicality often "will follow as a matter of course." *Dockery*, 253 F. Supp. 3d at 850.

**Plaintiff Latoya Brown** is a resident of Canton, Mississippi, where she has lived most of her life. Ex. 30, L. Brown Decl. ¶ 2. In the last three years, Ms. Brown has been subjected to several suspicionless pedestrian stops by the MCSD. *Id.* ¶ 3; Compl. ¶¶ 83-87. Each time she was forced to provide identification and wait for the deputies to check for warrants before she could proceed. Ex. 4, L. Brown Tr. 50:22-52:3, 75:20-76:9. The MCSD also entered and searched the home Ms. Brown then shared with Plaintiff Steven Smith without a warrant and without permission. Ex. 30, L. Brown Decl. ¶ 4; Compl. ¶¶ 276-81. Ms. Brown remains at risk of

being subjected to these suspicionless, race-based searches and seizures in the future.

**Plaintiff Lawrence Blackmon** currently resides in Washington, D.C. Ex. 29, Blackmon Decl. ¶ 2. In the coming months he will return to Canton, where he has lived most of his life, to begin his law career. *Id.*; Compl. ¶ 191. In 2015, MCSD personnel forced their way into Mr. Blackmon's home after he requested to see a warrant before allowing them in. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 194-96. The officers handcuffed Mr. Blackmon at gunpoint and searched his home. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 196-97. Mr. Blackmon has also been subjected to numerous MCSD roadblocks. Ex. 29, Blackmon Decl. ¶ 4; Compl. ¶ 201. Upon his return to Canton, Mr. Blackmon will be at risk of further suspicionless, race-based searches and seizures.

**Plaintiff Khadafy Manning** is a resident of Canton, Mississippi, where he has lived for many years. Ex. 31, K. Manning Decl. ¶ 2. Mr. Manning was forced to write a false witness statement after MCSD deputies entered his wife's home without a warrant and subjected him to an unlawful seizure and the use of excessive force. *Id.* ¶ 3; Compl. ¶ 211. Mr. Manning was arrested last year in Canton Estates after a NET Team officer conducting a foot patrol stopped Mr. Manning because he believed he was avoiding him. Ex. 31, K. Manning Decl. ¶ 4; Ex. 97, MC-RFP Inc. 047927. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Quinnetta Manning** is a lifelong resident of Canton, Mississippi. Ex. 32, Q. Manning Decl. ¶ 2. Ms. Manning was also forced to write a false witness statement after the MCSD deputies entered her home without a warrant and threatened her and beat her husband. *Id.* ¶ 3; Compl. ¶ 211. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Nicholas Singleton** is a resident of Canton, Mississippi. Ex. 33, Singleton Decl.

¶ 2. Mr. Singleton has been stopped at more than 20 roadblocks in recent years, several of which occurred within the last four years. *Id.* ¶ 3; Compl. ¶ 265. As a current Canton resident, Mr. Singleton remains at risk of being subject to further MCSD roadblocks in the future.

**Plaintiff Steven Smith** is a longtime resident of Canton who recently moved to Dallas, Texas, where he recently moved to start a new job. Ex. 34, S. Smith Decl. ¶ 2. Much of his family lives in Madison County and he expects to travel back to Madison County regularly and eventually move back. *Id.* Mr. Smith has been subjected to numerous suspicionless pedestrian stops by the MCSD, including a stop for a warrant check in January 2017 as he was walking onto the grounds of his former home. *Id.* ¶ 3; Compl. ¶¶ 271-73. With Ms. Brown, he was also the victim of a warrantless home search. Ex. 34, S. Smith Decl. ¶ 5; Compl. ¶¶ 276-81. Because Mr. Smith continues to travel to Madison County to visit his family and intends to move back permanently in the future, Mr. Smith remains at risk of being subject to the MCSD's unconstitutional and suspicionless stops and searches in the future.

**Plaintiff Bessie Thomas** is a resident of Canton, Mississippi, where she has lived for over 50 years. Ex. 35, B. Thomas Decl. ¶ 2. While Ms. Thomas attempts to avoid the MCSD's roadblocks, she has been stopped at numerous roadblocks, including at least one in the last three years that was located outside her church and resulted in a citation. *Id.* ¶ 3; Compl. ¶ 287; Ex. 9, B. Thomas Tr. 28:22-29:12. As a current Canton resident, Ms. Thomas remains at risk of being subject to further unconstitutional MCSD roadblocks in the future.

**Plaintiff Betty Jean Williams Tucker** is a long-time resident of Canton, Mississippi, where she was born and raised. Ex. 36, B. Tucker Decl. ¶ 2. Ms. Tucker has been stopped at numerous roadblocks, at least two in the last two years. *Id.* ¶ 3; Compl. ¶ 296; Ex. 10, B. Tucker Tr. at 19:23-20:6. As a current Canton resident, Ms. Tucker remains at risk of being subject to

further unconstitutional MCSD roadblocks in the future.

The claims of the Named Plaintiffs are typical of those of Class and the Subclasses. All Named Plaintiffs have claims typical of the Class, as they have been, and likely again will be, victims of Defendants' unconstitutional Policing Program. Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker have claims typical of the Roadblock Subclass, as they have been stopped at MCSD roadblocks and are at risk of being stopped again in the future. Steven Smith, Latoya Brown, and Khadafy Manning have claims typical of the Pedestrian Stop Subclass, as they have been and remain at risk of being subject to suspicionless, race-based pedestrian stops. Regardless of any differences in the details of each Named Plaintiff's claims, the claims of the Named Plaintiffs share a common underlying legal theory and thus satisfy the typicality requirement.

## IV.  PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4)

The final requirement of Rule 23(a) is also satisfied, because the "class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). In analyzing this requirement, courts consider "the zeal and competence of the representatives' counsel and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Dockery*, 253 F. Supp. 3d at 850.

With respect to the adequacy of the Named Plaintiffs, the standard "is not exacting; it is sufficient that the class representatives have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Steward v. Janek*, 315 F.R.D. 472, 490 (W.D. Tex. 2016). Here, each named Plaintiff has declared his or her understanding of the responsibilities of a class representative, as

well as his or her willingness to prosecute this litigation.[48] Further, all named Plaintiffs have sat for depositions, responded to multiple sets of interrogatories, and continue to be actively engaged with counsel in prosecuting this action. *Id.* This easily satisfies the adequacy requirement.

Further, no conflict of interest exists between the named Plaintiffs and the proposed classes. "A sufficient alignment of interests" exists for Rule 23(a)(4) purposes if "all class members are united in asserting a common right." *Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 502-03 (S.D. Tex. 2004). Here, the named Plaintiffs assert the same injury as the unnamed class members. *See In re Heartland Pmt. Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012). Each Named Plaintiff is a Black person who presently resides in, travels frequently to, and/or has a principal place of residence in Madison County, and each Named Plaintiff has been subjected to, and remains at risk that he or she again will be subjected to, the MCSD's Policing Program. *See supra* 38-40. Accordingly, each named Plaintiff and all unnamed class members will derive the same benefit from the injunctive and declaratory relief sought in this action with respect to the MCSD's Policing Program.[49]

Finally, Plaintiffs are represented by experienced and qualified counsel who have been and will continue to vigorously and diligently prosecute this action on behalf of the proposed

---

[48] Ex. 30, L. Brown Decl. ¶ 7-8; Ex. 29, L. Blackmon Decl. ¶ 7-8; Ex. 31, K. Manning Decl. ¶¶ 7-8; Ex. 32, Q. Manning Decl. ¶¶ 7-8; Ex. 33, N. Singleton Decl. ¶¶ 6-7; Ex. 34, S. Smith Decl. ¶¶ 8-9, Ex. 35, B. Thomas Decl. ¶¶ 6-7; Ex. 36, B. Tucker Decl. ¶¶ 7-8.

[49] That unnamed class members have sought or might in the future seek the assistance of the MCSD, or the hypothetical possibility that one or more class members could support the conduct challenged herein, does not create a conflict between Plaintiffs and unnamed class members. *See Morrow*, 277 F.R.D. at 195. Plaintiffs only seek relief with respect to policies, customs, and practices that violate the Constitution. In any event, potential diversity of opinion within a class is not a basis for denying certification. *See, e.g.*, *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 486 (5th Cir. 1982) ("[I]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so."); *Groover v. Michelin North Am., Inc.*, 192 F.R.D. 305, 306 (M.D. Ala. 2000) ("The fact that some class members … would prefer to … leave violations of their rights, if violations exist, unremedied is not dispositive under Rule 23(a)."); *Lanner v. Wimmer*, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal if some members of the class might prefer not to have violations of their rights remedied.").

classes: namely, the American Civil Liberties Union of Mississippi, the American Civil Liberties Union Foundation, and Simpson Thacher & Bartlett LLP. Counsel for Plaintiffs have the resources, expertise, and experience to prosecute this action. *See generally* Ex. 111, Youngwood Decl.; Ex. 112, Tom Decl.; Ex. 113, Edwards Decl. Counsel for Plaintiffs further know of no conflicts among members of the classes or between the attorneys and members of the classes. Named Plaintiffs and their counsel therefore meet the requirements of Rule 23(a)(4).

## V.     THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED

This case fits squarely within Rule 23(b)(2), which authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Certification is proper under Rule 23(b)(2) where, as here, a class seeks "an indivisible injunction benefiting all its members at once." *Wal-Mart*, 564 U.S. at 362. Rule 23(b)(2) was designed as a vehicle for challenging discrimination and fostering institutional reform. *See* Fed. R. Civ. P. 23 Adv. Comm. Notes, *reprinted in* 39 F.R.D. 69, 102 (1966). Thus, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture." *Wal-Mart*, 564 U.S. at 361.[50]

Plaintiffs' claims are clearly susceptible to common specific relief so that final injunctive relief would be appropriate for the class as a whole. "The Court need not, at this stage, determine what remedy Plaintiffs [will] be entitled to if they prevail[] on the merits of their claim." *M.D. v.*

---

[50] Because Plaintiffs seek to certify the proposed class and subclasses pursuant to Rule 23(b)(2), "it is not necessary that the members of [each] class be so clearly identified that any member can be presently ascertained." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *see also ODonnell v. Harris County, Texas*, No. H-16-1414, 2017 WL 1542457, at *3 (S.D. Tex. Apr. 28, 2017) ("[T]he strict ascertainability requirements for a proposed damages class action do not apply to a Rule 23(b)(2) class seeking prospective relief under the Fifth Circuit's standard for civil rights litigation."); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

*Perry*, 294 F.R.D. 7, 47 (S.D. Tex. 2013). "Rather, the Court must determine that the Plaintiffs'

claim is one that is susceptible to common, specific relief." *Id.* Plaintiffs do not request

individualized relief, but instead seek to require Defendants to reform their policies to conform

to the requirements of the Constitution. Thus, the same final injunctive and declaratory relief

would be appropriate for all members of the class and for all members of the two subclasses on

the issues relevant to each subclass. The requirements of Rule 23(b)(2) are therefore satisfied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court find that Plaintiffs satisfy the

requirements of Fed. R. Civ. P. 23(a) and 23(b)(2); certify the designated class and subclasses;

and, pursuant to Fed. R. Civ. P. 23(g), appoint current counsel for Plaintiffs as class counsel.

Dated: March 14, 2018

By:     /s/ Joshua Tom
           Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Christopher Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, I caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com

/s/ Joshua Tom
Joshua Tom