**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON**
**HERBERT ANTHONY GREEN; KHADAFY MANNING;**
**QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS**
**SINGLETON; STEVEN SMITH; BESSIE THOMAS; and**
**BETTY JEAN WILLIAMS TUCKER, individually and on**
**behalf of a class of all other similarly situated,**                **PLAINTIFFS**

**VS.**                           **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF**
**RANDALL C. TUCKER, in his official capacity; and**
**MADISON COUNTY SHERIFF'S DEPUTIES JOHN**
**DOES #1 through #6, in their individual capacities,**                **DEFENDANTS**

---

**REVISED MEMORANDUM IN SUPPORT OF [DKT. #209] MOTION BY**
**DEFENDANTS FOR SUMMARY JUDGMENT AS TO INDIVIDUAL**
**AND CLASS BASED CLAIMS BY PLAINTIFF, LATOYA BROWN**

---

COME NOW Defendants, Madison County, Mississippi, and Sheriff Randall C. Tucker, in his official capacity, by and through counsel, and respectfully submit the following Memorandum in Support of their Motion for Summary Judgment as to Individual and Class Based Claims by Plaintiff, Latoya Brown.

## INTRODUCTION

The instant class-action lawsuit was filed on May 8, 2017, by ten plaintiffs. The Complaint is 86 pages long and contains 337 paragraphs. Brown claims violations of her Fourth and Fourteenth Amendment rights by personnel of the Madison County Sheriff's Department ("MCSD") under 42 U.S.C. §1983 and intentional racial discrimination under Title VI of the Civil Rights Act of 1964. She sues on behalf of herself and a purported class of individuals she defines as:

People who (1) are, or who appear to be, Black and those in their company, and (2) were, are, or will be in Madison County, and (3) were, are, or will be, subject to the MCSD's policy, custom, and/or practice of systematically executing unreasonable searches and seizures of person, homes, cars, and property on the basis of race."

Brown seeks only injunctive and declaratory relief from Defendants.  (#1, Pgs. 82-85).

## STATEMENT OF THE FACTS

Before filing her lawsuit, Brown lived in Canton Estates, an apartment complex located in Madison County, for approximately three and one-half years with Plaintiff, Steven Smith.[1] Brown and Smith moved to Columbus, Georgia in July 2017 to provide a better life for Brown's children.[2]  Brown now works for a chicken processing plant located in Alabama.  She has enrolled her nine-year old daughter in a Georgia school and has applied for a Georgia driver's license.[3]

While living in Canton Estates, Brown recalls three times she asked the MCSD for help. Once, she reported that Smith had taken her PlayStation and choked her.  MCSD deputies came to the scene and spoke with her about her options for charging Smith.[4]  She also reported that individuals were gambling near her apartment.  MCSD deputies responded to her call and began patrolling in the complex.[5]  Finally, she reported hearing gun shots in the complex.  MCSD deputies responded, found a shotgun in the grass near her apartment, and patrolled the complex.[6]

---

[1]  Exhibit A, Pg. 12:3-4.
[2]  Exhibit A, Pg. 9:6-8; Pg. 11:20-21; Pg. 12:13-17.
[3]  Exhibit A, Pg. 9:18-25; Pg. 10:1-4.
[4]  Exhibit A, Pg. 27:8-25; Pg. 28:1-8.
[5]  Exhibit A, Pg. 30:4-25; Pg. 31:1-16.
[6]  Exhibit A, Pg. 31:17-25; Pg. 32:1-25; Pg. 33:1-8.

Brown testified during her deposition that she appreciated the deputies' response each time she called,[7] and expressed no problems with MCSD deputies patrolling Canton Estates.[8]

Brown testified that she believed most roadblocks or checkpoints conducted by the MCSD occurred in Black areas rather than White areas of Madison County.  She bases this belief on the fact that she had observed five checkpoints in her predominately Black neighborhood while she lived in Canton Estates and one checkpoint on a highway on which, in her opinion, Blacks travel in order to go to work.[9]

Brown testified that she filed her lawsuit to get "better policing" by the MCSD regarding "excessive roadblocks," "warrantless searches," and "pedestrian stops."[10]   She described her experiences with each of these policing activities as follows:

### A.    Roadblocks or Safety Checkpoints

Brown has never applied for a Mississippi driver's license and, as a result, received two tickets for having no license while driving through two MCSD safety checkpoints.[11]  She has traveled through three MCSD checkpoints as a passenger and been asked to provide her identification.[12]  She testified that she complied with each request and, afterwards, was either told to "go away,"[13] was "let go"[14] or was allowed to walk home after the driver of the car in which she was a passenger was ticketed for not having a license.[15]  She received no tickets, was not searched, and was not arrested during any of these checkpoints.

---

[7]  Exhibit A, Pg. 28:5-8; Pg. 31:14-16; Pg. 33:7-8.
[8]  Exhibit A, Pg. 52:10-12, 20-25; Pg. 53:1.
[9]  Exhibit A, Pg. 79:23-25; Pg. 80-84:1-18.
[10]  Exhibit A, Pg. 43:13-25.
[11]  Exhibit A, Pg. 10:20-25; Pg. 11:1-7; Pg. 18:14-16; Pg. 45:7-25; Pg. 46.
[12]  Exhibit A, Pg. 49; Pg. 50:1-16.
[13]  Exhibit A, Pg. 49:10-13.
[14]  Exhibit A, *Id.*

### B.      Warrantless Searches

Brown claims that MCSD deputies conducted a "warrantless search" of her apartment on Halloween Night, 2015 soon after a birthday party she had given for her young nephew.  She recalls the deputies' knocking on her apartment door and telling Smith that they were looking for a missing child whose mother lived in the apartment complex.  Brown testified that the deputies entered her apartment, looked in closets, shined their flashlights in her youngest child's face, and left to search the remaining apartments in her building, walking up and down the stairs and going door to door.[16]

### C.      Pedestrian Stops or Checkpoints

#### 1.      Pedestrian Stops

Brown describes two incidents when she was approached by MCSD deputies performing foot patrols in Canton Estates and asked to show her identification.  One incident occurred while she was standing in the bed of her step-father's pickup truck.  The other occurred around 11:00 p.m. while she was walking to the entrance of Canton Estates to meet a ride to take her to work.[17] Brown did not refuse the deputies' request and confirmed in her deposition that nothing else occurred during either of these incidents after the deputies checked her identification with dispatch.[18]  She also admits that neither of these incident occurred because of her race.[19]

#### 2.      Pedestrian Checkpoints

Brown testified that she had walked through two MCSD vehicle safety checkpoints while living in Canton Estates.[20]   At the first checkpoint, she did not have her identification

---

[15]   Exhibit A, Pg. 50:1-8.
[16]   Exhibit A, Pg. 54:13-25; Pg. 55; Pg. 56:1-17.
[17]   Exhibit A, Pg. 53:9-25; Pg. 54:1-12; Pg. 50:17-25; Pg. 51:1-25.
[18]   Exhibit A, Pg. 51; Pg. 54:7-12.
[19]   Exhibit A, Pg. 56:21-25; Pg. 57:17-19.

information, but gave the deputy her Social Security number, and was then allowed walked

through.   At the second checkpoint, she showed the deputy her identification, heard him check

her identification on his walkie-talkie, and then was allowed to walk through.[21]  When asked

why she thought Blacks were treated differently than Whites in Madison County, Brown limited

her testimony to MCSD checkpoints,[22] and claimed that most of the checkpoints she had seen

were set up in Black area.[23]

## ARGUMENT AND AUTHORITIES

The party moving for summary judgment bears the responsibility of providing the  court

with the basis of its motion and identifying the portions of the record in the case that establish the

absence of a genuine issue of material fact.  *Celotex Corporation v. Catrett*, 477 U.S. 317,  323

(1986).  Once the moving party has properly supported his motion for summary judgment, the

non-moving party must respond by setting forth "specific facts showing that there is a genuine

issue for trial." *Id.* at 324; *see also United Steel  Workers, Etc. v. University of Alabama*, 599 F.2d

56 (5th Cir.1979).  "The moving party bears the initial burden of showing that there is no genuine

issue for trial;  it may do so by pointing out the absence of evidence supporting the nonmoving

party's case."  *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citation

omitted)  (internal quotations omitted).  If the moving party meets its burden, "the nonmoving

party who  will have the burden of proof at trial must come forward with summary judgment

evidence establishing the existence of a genuine issue; that evidence must be such that if

introduced at trial  it would suffice to prevent a directed verdict against the nonmovant."  *Id*.

*************

---

[20]  Exhibit A, Pg. 74:19-25; Pg. 75; Pg. 76; Pg. 77:23-25; Pg. 78; Pg. 79:1-13.
[21]  Exhibit A, Pg. 75:10-25; Pg. 76:1-9.
[22]  Exhibit A, Pg. 82:7-12.
[23]  Exhibit A, Pg. 79:23-25; Pg. 80:1-8.

Brown's claims must be dismissed for two separate reasons.  First, there is no evidence Sheriff Tucker has ever deprived her of any federal rights.  Second, even if she could prove violations in the past, there is no likelihood she will be subjected to similar violations in the future, rendering injunctive relief unavailable.

### A.   Brown Cannot Establish That She Has Been Subjected to Intentional Racial Discrimination.

Although Brown in her testimony describes a series of encounters with the MCSD, the heart of her complaint is not a succession of incidents, but a supposed policy of racial discrimination.  The very first paragraph of her complaint alleges that the MCSD "implements a **coordinated top-down program** of methodically targeting Black individuals for suspicionless searches and seizures while they are driving their cars, walking in their neighborhoods, or even just spending time in their own homes (the "Policing Program")."  [Dkt. #1 ¶ 1 (emphasis in original)].  This claim of intentional racial discrimination is the only basis in her complaint for her request to represent a class, describing the common issue as "whether the MCSD has a policy, practice, and/or custom of targeting members of the Class for unreasonable searches and seizures on the basis of race in violation of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment."  [Dkt. #1 ¶ 304].  To obtain the only relief she seeks, which is on behalf of the class, Brown must prove, not merely a violation of her rights, but the existence of the "Policing Program" that she alleged.

She asserts her claims of intentional racial discrimination in the second and third causes of action of her complaint.  The second cause of action seeks relief under 42 U.S.C. § 1983 for violations of the Equal Protection Clause, which, of course, requires proof of intentional racial discrimination.  *Coleman v. Houston Independent School District,* 113 F.3d 528, 533 (5th Cir. 1997) (citations omitted).  *See also Vera v. Tue,* 73 F.3d 604, 609 (5th Cir.1996) ("Proof of

6

racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")  Her third cause of action seeks relief under Title VI, 42 U.S.C. § 2000(d) *et seq*., under which Brown, as a private party, must prove race discrimination by an entity that receives federal funds.  *Alexander v. Sandoval,* 532 U.S. 276, 280 (2001).  She cannot succeed with this claim simply by proving disparate impact.  *Id.*  Further, both the United States Supreme Court and the Fifth Circuit Court of Appeals have held that a private right of action under Title VI can only be brought for acts of intentional discrimination.  *Id.* at 281 ("What we said in *Alexander v. Choate*, 469 U.S. 287, 293 (1985), is true today, 'Title VI itself directly reaches only instances of intentional discrimination.'")

The only racial discrimination claim Brown describes in her deposition involves the MCSD's conducting roadblocks or checkpoints in predominately Black neighborhoods.[24]  She bases this claim solely on her observing checkpoints during the three and one-half years she lived in Canton Estates.  She saw five of these checkpoints while walking through her neighborhood, which is a predominately Black neighborhood, and one checkpoint set up on a highway on which, in her opinion, Blacks travel in order to go to work.  Brown's allegation is actually nothing more than an assertion that the roadblocks she questions were racially motivated because they were in predominately Black areas.  She in no way offers any evidence that Black areas were intentionally targeted.

This unreliable and sparse evidence is insufficient to support Brown's claims of a "Policing Program" of intentional racial discrimination by the MCSD throughout all of Madison

---

[24]  Although Brown claimed in both her complaint [Dkt. #1 ¶ 4] and during her deposition that the MCSD has a policy of targeting only Black neighborhoods while conducting checkpoints, she does not include this policy while identifying and describing all MCSD policies she claims sanction or encourage" unreasonable searches and seizures or racial discrimination" while supplementing her responses to an interrogatory inquiring about these policies.  Therefore, it appears that she has abandoned this claim.  (Exhibit B, Pgs. 3-6).

County.  "A plaintiff's subjective belief of race discrimination cannot alone establish that he has been a victim of intentional discrimination."  *Laborde v. City of Houston*, 31 F. App'x 151 (5th Cir. 2001) (citing *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434- 435 (5th Cir. 1995)).  *See also Nichols v. Grocer,* 138 F.3d 563, 570 (5th Cir. 1998) ("[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.").  What Brown offers is her subjective belief that MCSD checkpoints are set up with the aim of intentionally discriminating against Blacks.  Without more, Brown cannot establish that MCSD checkpoints are placed or operate in such a manner as to intentionally discriminate against Blacks.  *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) ("In short, conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.") (en banc).   Brown's second and third causes of action, therefore, should be dismissed.

### B.    Brown Cannot Create Genuine Issues of Material Fact Regarding Any Element of her Fourth Amendment Claims under 42 U.S.C. §1983.

To hold Madison County liable to her under §1983 in her first cause of action, Brown must allege and establish two threshold elements: (1) that she was deprived of a right or interest secured by the Constitution and laws of the United States, and (2) that the deprivation occurred under color of state law.  *See West v. Atkins,* 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 331-32 (1986).  Defendants submit that Brown cannot satisfy the first element of this test because no act by any MCSD personnel violated her constitutional rights.[25]

---

[25] In addition, to secure relief against the County and Sheriff Tucker in his official capacity, Brown "must demonstrate a policy or custom which caused the alleged violation."  *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996).  No evidence of any such policy exists, but the Court need not reach that issue, because no evidence of any violation of constitutional rights exists.

Brown's §1983 claims against Defendants arise out of the following events: (1) three safety checkpoints conducted by the MCSD where Brown was asked to show her identification as a passenger in a vehicle; (2) an alleged warrantless entry into her apartment by deputies looking for a missing child; (3) two instances where Brown was approached by MCSD deputies and asked for her identification while in the parking lot of her apartment complex; (4) and two vehicle safety checkpoints where Brown was asked for her identification while voluntarily walking through them.  A review of the law applicable to these alleged constitutional violations shows that Brown has no §1983 claim against Defendants.

First, Brown suffered no constitutional violation when she was asked to show her identification while traveling through a MCSD checkpoint as a passenger.  In *United States v. Wise,* 877 F.3d 209, 220 (5th Cir. 2017), the Court held that "'a seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" (quoting *Florida v. Bostick,* 501 U.S. 429, 434 (1991)).  The individual in *Wise* was a passenger on a bus who was approached by officers and consented to their request to show them his identification and to allow them to search his luggage.  The Court held that "police do not need reasonable suspicion to approach someone for questioning;" instead, "'[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.'" (quoting *Bostick*, 501 U.S. at 434).  The *Wise* court held that "an encounter with police is "consensual" so long as the civilian would feel free to either terminate the encounter or disregard the questioning."  *Id.* (citing *Bostick*, 501 U.S. at 434).  Brown does not claim that she refused to show her identification to the officers at these checkpoints.[26]  Therefore, any protection she held at the time under the Fourth Amendment was not triggered.

---

[26] Other courts have applied these principles to passengers in an automobile at a checkpoint where the stop was not unreasonably extended.  *United States v. Slater*, 411 F.3d 1003, 1004-05 (8th Cir. 2005).

Second, it is undisputed that the circumstances surrounding the MCSD deputies' entry into Brown's apartment did not involve an investigation of any criminal activity, *i.e.*, they did not enter her apartment to arrest anyone or obtain evidence of a crime.  Instead, Brown readily admits that the deputies immediately told her and Smith that they were searching for a missing child who lived at the apartment complex.  She also admits that while in her apartment, the deputies only looked in areas where a child could hide and shined a flashlight in the face of Brown's child who apparently was near the missing girl's age.  Finally, Brown acknowledges that the deputies were going door to door, walking up and down stairs of her building, and searching other apartments.

These circumstances described by Brown were clearly exigent ones that did not require the MCSD deputies to obtain search warrant.  As recognized by the Court in *Mincey v. Arizona,* 437 U.S. 385, 394 (1978), officers may enter a home if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.  *Id.*  As stated above, the deputies were not conducting a criminal investigation.  Rather, they were searching for a missing child and wanted to return her to her mother.  Because probable cause was not an issue during their search, their entry into Brown's apartment was not a violation of her Fourth Amendment rights.  *See, e.g., U.S. v. Taylor,* 624 F.3d 626, 632-633 (4th Cir. 2010)(officers were not required to obtain a warrant before entering defendant's house with an abandoned four-year old girl to search for her parents); *see also Hunsberger v. Wood,* 570 F.3d 546 (4th Cir. 2009) (exigent circumstances allowed officers to enter a home at night to search for a teenage girl whose parents could not get her to answer her cell phone).

Third, the deputies who had two brief consensual encounters with Brown in her

apartment complex parking lot did not violate her Fourth Amendment rights by asking her to

show them her identification.  The Fifth Circuit Court of Appeals has recognized three different

"'tiers of citizen-police contact for purposes of [F]ourth [A]mendment analysis:'"

> The first tier involves no coercion or detention and does not implicate the fourth
> amendment.  The second tier, an investigatory stop, is a brief seizure that must be
> supported by reasonable suspicion . . .  Finally, the third tier is a full scale arrest
> [which] must be supported by probable cause.

*Lincoln v. Turner*, 874 F.3d 833, 840 (5th Cir. 2017) (quoting *United States v. Massi,* 761 F.3d

512, 520 (5th Cir. 2014).  Brown's encounter falls under the first tier, and, as a result, nothing the

deputies did while speaking with her constituted a seizure under the Fourth Amendment.  *See,*

*e.g., U.S. v. Cooper,* 43 F.3d 140, 145 (5th 1995) ("[A] "consensual encounter," during which an

individual agrees to speak to officers, "may be initiated by the police without any objective level

of suspicion" and is not a "seizure" under the Fourth Amendment).

The same holds true for Brown's claim that she was asked to show her identification to

officers while walking through two vehicle safety checkpoints.  Brown obviously consented to

walking through both checkpoints since she did not turn around and walk away.  Further, the fact

that she was asked to show her identification or provide her Social Security number at the

checkpoint does not support a claim that she was "seized."  For a seizure to have occurred,

Brown must have believed that she could not avoid the checkpoint by walking in another

direction.  *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 554 (1980) (a seizure occurs

only if "in view of all of the circumstances surrounding the incident, a reasonable person would

have believed that he was not free to leave . . . .").  Unlike someone driving a vehicle though a

checkpoint, Brown's person was not seized during the checkpoints in question because she was

free to walk away.  She did not testify that she was threatened by the presence of the officers at

the checkpoint, that any of the officers displayed a weapon, that the officers made any physical contact with her or that they used words threatening her with compliance.  Without something to indicate that she was not free to walk away from the checkpoint, no seizure or a violation of Brown's Fourth Amendment rights occurred.  *See, e.g., Terry v. Ohio,* 392 U.S. 1, 19, n. 16 (1968).

C.   **Brown Lacks Standing under Article III to Bring Her Own Claims for Injunctive and Declaratory Relief, as well as those of Her Purported Class Members.**

The United States Supreme Court has recognized three requirements for Article III standing.  First, "the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *United States v. Hays,* 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of. Wildlife,* 504 U.S. 555, 560-561 (1992).  Further, because Brown is seeking injunctive and declaratory relief, she must show that she is "likely to suffer future injury by the defendant and that the sought-after relief will prevent that future injury."  *James v. City of Dallas,* 254 F.3d 551, 563 (5th Cir. 2001) *cert. denied,* 534 U.S. 1113 (2002).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief."  *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-96)  Instead, a plaintiff seeking injunctive or declaratory relief "must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future" *i.e.,* a "'substantial and continuing controversy' between two adverse

12

parties" that is not "conjectural, hypothetical, or contingent . . . ."  *Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir. 2003).

Brown cannot satisfy any of these Article III standing requirements.  She has no individual standing because she has not suffered a violation of her Fourth or Fourteenth Amendment rights.  She has proven no private right to sue under Title VI.  Finally, she cannot show that she is likely to suffer any injury in the future from any conduct by the MCSD since she no longer resides in Madison County or, for that matter, in the State of Mississippi.  Without standing under Article III, Brown cannot "seek [injunctive] relief on behalf of . . . herself or any other member of the [purported] class."  *James,* 254 F.3d at 563 (citing *O'Shea,* 414 U.S. at 494).  For these reasons, Brown lacks standing to pursue her claims or those of her purported class.  Her individual claims should be dismissed with prejudice, and she should be disqualified from representing the class of individuals she seeks to represent in this matter.

## CONCLUSION

For the reasons set forth above, all of Brown's claims against Defendants should be dismissed with prejudice.

This the 14th day of March, 2018.

Respectfully submitted:

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

By: /s/ Rebecca B. Cowan
Rebecca B. Cowan (MSB #7735)

OF COUNSEL:
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, MS   39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Telephone: 601-968-5534
Facsimile: 601-944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

Katie Bryant Snell (MSB #103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester (MSB #2394)
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
Telephone:  601-987-5300
Facsimile:  601-987-5353
lhester@pbhfirm.com

14

## CERTIFICATE OF SERVICE

I, Rebecca B. Cowan, do hereby certify that I have this day, electronically filed the above and foregoing with the Clerk of the Court using the ECF system which will automatically provide e-mail notification of said filing upon the following:

Joshua Tom, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, Mississippi 39201
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Jumin Lee, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 14th day of March, 2018.

/s/ Rebecca B. Cowan

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                     JACKSON DIVISION
 3   LATOYA BROWN; LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4   QUINETTA MANNING; MARVIN MCFIELD;
     NICHOLAS SINGLETON; STEVEN SMITH;
 5   BESSIE THOMAS; and BETTY JEAN
     WILLIAMS TUCKER, individually and on
 6   behalf of a class of all others
     similarly situated              PLAINTIFFS
 7
 8   VS.              CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 9   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER,
10   in his official capacity; and
     MADISON COUNTY SHERIFF'S DEPUTIES
11   JOHN DOES #1 through #6,
     in their individual capacities      DEFENDANTS
12
13   *****************************************************
14           DEPOSITION OF LATOYA BROWN
15   *****************************************************
16           (APPEARANCES NOTED HEREIN)
17           TAKEN AT THE OFFICES OF:
18              WISE, CARTER, CHILD & CARAWAY
                401 EAST CAPITOL STREET
                JACKSON, MISSISSIPPI
19
20           TUESDAY, JANUARY 9, 2018
             AT APPROXIMATELY 10:59 A.M.
21
22   REPORTED BY:
23           TAMMY MCDANIEL-BAGNATO, #1910
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3       MIKE WALLACE, ESQ.
         Wise, Carter, Child & Caraway
         Post Office Box 651
 4       Jackson, Mississippi 39205-0651
 5           COUNSEL FOR THE DEFENDANTS
 6
 7       REBECCA B. COWAN, ESQ.
         Currie, Johnson & Myers
         Post Office Box 750
 8       Jackson, Mississippi 39205-0750
         bcowan@curriejohnson.com
 9
         COUNSEL FOR THE DEFENDANTS
10
11       J. LAWSON HESTER, ESQ.
         Pettis, Barfield & Hester
12       Post Office Box 16089
         Jackson, Mississippi 39236-6089
13       lhester@pbhfirm.com
14           COUNSEL FOR THE DEFENDANTS
15
16       Isaac Rethy, Esq.
         Simpson Thacher & Bartlett
17       425 Lexington Avenue
         New York, New York 10017
         Irethy@stblaw.com
18
             COUNSEL FOR THE PLAINTIFFS
19
20       BROOKE JARRETT, ESQ.
         JOSHUA TOM, ESQ.
         American Civil Liberties Union
21       of Mississippi Foundation
         233 East Capitol Street
22       Jackson, Mississippi 39201
         jtom@aclu-ms.org
23
             COUNSEL FOR THE PLAINTIFFS
24
25
```

Page 3

```
 1   ALSO PRESENT:
 2       CHIEF DEPUTY JEREMY WILLIAMS
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           TABLE OF CONTENTS
 2
```
```
 2   Title Page.............................................1
 3   Appearance Page.......................................2
 4   Table of Contents.....................................4
 5   Exhibits..............................................5
 6   Stipulation...........................................6
 7   Examination by Ms. Cowan..............................7
 8   Examination by Ms. Jarrett...........................74
 9   Examination by Ms. Cowan.............................77
10   Certificate of Reporter..............................86
11   Certificate of Deponent..............................87
12   Errata Sheets........................................88
13              - - -
```
```
14
15
16
17
18
19
20
21
22
23
24
25
```





EXHIBIT
"A"

LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
5–8

**Page 5**

```
1                    EXHIBITS
2    No Exhibits Marked.................................
3                        - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

```
1                    STIPULATION
2           It is hereby stipulated and agreed by and
3    between the parties hereto, through their respective
4    attorneys of record, that this deposition may be taken
5    at the time and place hereinbefore set forth, by Tammy
6    McDaniel-Bagnato, Court Reporter and Notary Public.
7           The formality of READING AND SIGNING is
8    specifically NOT WAIVED.
9                        - - -
10       (PAGE 84 LINE 24 THROUGH PAGE 85 LINE 6)
11       "MR. RETHY:  We'll take both transcripts for
12   two weeks to determine whether there's anything in here
13   that warrants designating as confidential.
14       MS. COWAN:  On this one?
15       MR. RETHY:  On this one and on Mr. Smith's.
16   I'm not trying to mark anything at this moment."
17                       - - -
18
19
20
21
22
23
24
25
```

**Page 7**

1             LATOYA BROWN,
2        (After having been first duly sworn,
3      testified as follows:)
4              - - -
5        (DIRECT EXAMINATION)
6  BY MS. COWAN:
7      Q.  Ms. Brown, I've introduced myself.
8  I'm Becky Cowan.  I'm one of the attorneys
9  for the defendants.  And I also have Lawson
10 Hester and I believe Mr. Mike Wallace is
11 going to be coming in pretty soon.  This is
12 Chief Deputy Jeremy Williams.
13     A.  Mm-hmm (affirmative response).
14     Q.  Have you ever given a deposition
15 before?
16     A.  No, ma'am.
17     Q.  Okay.  This -- I'm going to be
18 asking you some questions and you've been
19 placed under oath.  So I want to make sure
20 that when I ask a question, that you
21 understand the question and answer it so that
22 I can be assured that the answer you gave me
23 was the correct answer.  So if you don't
24 understand some of my questions, just tell me
25 you don't understand them.

**Page 8**

1      The court reporter is going to be
2  putting all -- everything that everybody says
3  down.  So rather than going uh-huh
4  (affirmative response) and uh-uh (negative
5  response) or shaking your head or this way or
6  that way, if you could say yes, no, or answer
7  the question verbally.
8      Your attorney may make some
9  objections, but unless he tells you not to
10 answer the question, I expect you to answer.
11 Do you understand that?
12     A.  Yes.
13     Q.  Okay.  Okay.  And some of the
14 questions that I'm going to ask you I have
15 already asked Mr. Smith and I probably know
16 the answers to but I'm going to go ahead and
17 ask you too.
18     A.  Mm-hmm (affirmative response).
19     Q.  All right.  Can you give me your
20 full name?
21     A.  Latoya Brown.
22     Q.  Do you have a middle name?
23     A.  Yes.  Lanae.
24     Q.  L?
25     A.  A-N-A-E.



LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
9–12

Page 9

1    Q.   Okay.  And do you go by any
2  nickname?
3    A.   Yes.  Nae-Nae.
4    Q.   N-A-E-N-A-E?
5    A.   Yes.
6    Q.   And are you currently living at ███
7  ██████████ Columbus, Georgia?
8    A.   Yes.
9    Q.   And you're living with some friends?
10   A.   Yes.
11   Q.   Okay.  Who are your friends that
12  you're living with?
13   A.   They're Steven's relatives.
14  Steven's relatives.
15   Q.   Okay.  And I believe Mr. Smith said
16  that y'all were looking for a place to rent?
17   A.   Yes.
18   Q.   And you've enrolled your daughter,
19  8, 9 years old?
20   A.   She'll be 9 in June.
21   Q.   And you've enrolled her in the
22  school district?
23   A.   Yes.
24   Q.   And I believe he told me that both
25  of y'all have applied for Georgia driver's

Page 10

1  license.  Is that correct?
2    A.   Yes.
3    Q.   Have you received yours?
4    A.   My permit.
5    Q.   Permit, okay.  Do you have to take a
6  test over there?  Or do you just get a
7  license because you have one in another
8  state?
9    A.   You have to take a test.
10   Q.   Okay.  Did you take the test?
11   A.   No, they had switched my permit from
12  Mississippi to Georgia because I misplaced my
13  Mississippi permit.
14   Q.   Okay.  You misplaced your
15  Mississippi license?
16   A.   Permit.
17   Q.   Permit.
18   A.   Yes, and they switched it over to
19  Georgia as a permit too.
20   Q.   And they wouldn't just take your
21  license?
22   A.   No, I didn't -- I didn't have any
23  license.
24   Q.   You don't have a Mississippi
25  license?

Page 11

1    A.   No.
2    Q.   When did you lose your Mississippi
3  license?
4    A.   I never had them.
5    Q.   You never had a Mississippi driver's
6  license?
7    A.   No.
8    Q.   Okay.  And I believe before y'all
9  moved to Steven's friends or relatives house,
10  or is it a house or an apartment?
11   A.   An apartment.
12   Q.   You lived at 5521 North Cut Drive?
13   A.   Mm-hmm (affirmative response).
14   Q.   And was that someone -- say yes or
15  no.
16   A.   Yes.
17   Q.   Okay.  And that was in College Park,
18  Georgia?
19   A.   Yes.
20   Q.   And you stayed there for two months?
21   A.   Yes.
22   Q.   And that was your brother and his
23  wife?
24   A.   Yes, ma'am.
25   Q.   And before that you lived at 388

Page 12

1  Ricks Drive in Canton, Mississippi?
2    A.   Yes, ma'am.
3    Q.   And how long did you live there?
4    A.   3 1/2 years.
5    Q.   And the lease that was signed with
6  the apartment complex, was it in your name?
7    A.   Yes.
8    Q.   So Steven's name was not on the
9  lease?
10   A.   Yes.
11   Q.   Both of your names were?
12   A.   Yes, ma'am.
13   Q.   And why did you move to Georgia?
14   A.   To provide a better life for my
15  kids.
16   Q.   Okay.  And when did you move?
17   A.   I moved to Georgia July 1st.
18   Q.   July 1st.  And what employment have
19  you held over there?
20   A.   I worked at Subway and now I'm at
21  Alatrade Foods.
22   Q.   Subway?
23   A.   Mm-hmm (affirmative response).
24   Q.   And then --
25   A.   Yes, ma'am.



Page 13

1   Q. And is it --
2   A. Alatrade.
3   Q. A-L-A-T-R-A-D-E?
4   A. Yes, ma'am.
5   Q. And it's a chicken processing plant?
6   A. Yes, ma'am.
7   Q. Okay. And I believe Steven said
8   that you collect data on the kinds of cuts of
9   meat?
10  A. Yes. Data collector.
11  Q. Data collector. And when did you
12  get a job at Alatrade?
13  A. December 4th.
14  Q. And I believe that Mr. Smith has a
15  job there too?
16  A. Yes, ma'am.
17  Q. And did he get his job the same time
18  you got yours?
19  A. I started first.
20  Q. When did he start his job? Do you
21  remember?
22  A. The week after I did. I think it's
23  like the 10th.
24  Q. Of December?
25  A. Yes, ma'am.

Page 14

1   Q. And I believe you have two children?
2   A. Yes.
3   Q. And you have a two-year-old with Mr.
4   Smith?
5   A. Yes.
6   Q. And you have your soon to be
7   nine-year-old?
8   A. Yes.
9   Q. And who is, her name is ▌
10  ▌
11  ▌
12  ▌
13  ▌
14  ▌
15  ▌
16  ▌
17  ▌
18  ▌
19  Q. And where did you grow up?
20  A. Canton.
21  Q. You grew up in Canton?
22  A. Yes.
23  Q. I asked you about your educational
24  background. 2005 to 2009 you went to Canton
25  High School?

Page 15

1   A. Yes.
2   Q. And then you got your GED in 2016?
3   A. Yes.
4   Q. And then you went to a little bit of
5   junior college. Tell me about that.
6   A. The junior college thing was the GED
7   program.
8   Q. Oh, okay. You didn't go to actual
9   associate --
10  A. No.
11  Q. -- college.
12  A. No, ma'am. It was Win Job Center --
13  Q. Okay.
14  A. -- Holmes Community College.
15  Q. Okay. Have you ever been married
16  before?
17  A. No, ma'am.
18  Q. And are your parents living?
19  A. Yes.
20  Q. Where do they live?
21  A. My mom lives on Walnut Street in
22  Canton and my dad lives at West Peace Street
23  in Canton.
24  Q. And Walnut Street, that's where your
25  mom lives?

Page 16

1   A. Walnut, yes.
2   Q. What's your mother's name?
3   A. Deborah Hawkins.
4   Q. Is she married?
5   A. No, ma'am.
6   Q. Does she work?
7   A. Yes.
8   Q. Where does she work?
9   A. Shelby Smith.
10  Q. Shelby Smith?
11  A. Mm-hmm (affirmative response).
12  Q. What is that?
13  A. She do housekeeping for him.
14  Q. Okay. What about your dad?
15  A. He works at PF Chang in Ridgeland.
16  Q. Okay. Eat there all the time. I
17  love it.
18      Okay. When you got out of high
19  school, tell me what jobs you held
20  immediately out of high school?
21  A. None.
22  Q. None?
23  A. No.
24  Q. Is this the first job you have ever
25  had, the Alatrade job? I mean the Subway



Page 17

1  job?
2     A.  No, ma'am.  I --
3     Q.  Tell me what your first job was.
4     A.  Working housekeeping at LaQuinta Inn
5  in Canton.
6     Q.  And when was that?
7     A.  That was in 2010.
8     Q.  2010?
9     A.  Mm-hmm (affirmative response).
10    Q.  And how long did you work there?
11    A.  A year and a half.
12    Q.  And why did you leave?
13    A.  Not enough pay.
14    Q.  Where did you go after that?
15    A.  I went to Canton Manor in Canton.
16    Q.  And Mr. Smith testified that he
17  worked there too.  Were you there when he was
18  working there?
19    A.  No.
20    Q.  In what year did you work at Canton
21  Manor?
22    A.  2012 to 2013.
23    Q.  Through '13?
24    A.  Mm-hmm (affirmative response).
25    Q.  How long?  Was it a year?

Page 18

1     A.  Yes.
2     Q.  Okay.  What did you do?
3     A.  Laundry aide.
4     Q.  And why did you leave there?
5     A.  Transportation.
6     Q.  Did you have to rely on people to
7  take you to your jobs?
8     A.  Yes, ma'am.
9     Q.  Who would take you to your jobs?
10    A.  My mom.
11    Q.  So did you receive a driver's permit
12  in the State of Mississippi?
13    A.  Yes.
14    Q.  But, you never applied and got a
15  license?
16    A.  No.
17    Q.  Do you own a car?
18    A.  No.
19    Q.  Have you ever owned a car?
20    A.  Yes.
21    Q.  When did you own a car?
22    A.  2014 and 2015.
23    Q.  What kind of car did you own?
24    A.  I owned a Toyota Camry and a Nissan
25  Altima.

Page 19

1     Q.  And who drove those cars?
2     A.  I did.
3     Q.  I believe your job now is in Phoenix
4  City, Alabama, is that right?
5     A.  Yes.
6     Q.  And how far is that from where y'all
7  are staying with Steven's relatives?
8     A.  About 15 to 20 minutes away.
9     Q.  But, as I understand, y'all plan to
10  try and stay in Georgia?
11    A.  Yes.
12    Q.  Do you ever plan to come back this
13  way?
14    A.  Yes, ma'am.
15    Q.  When do you plan to come back?
16    A.  In a couple of years from now.
17    Q.  And why would that be?
18    A.  Because I still have family here and
19  I just plan on moving back home.
20    Q.  Have you told your present employer
21  that, that you don't plan to work more than
22  two years with him?
23    A.  No, I haven't told him.
24    Q.  Okay.  Tell me, other than Canton
25  Estates, prior to that, where did you live?

Page 20

1     A.  With my mom on Walnut.
2     Q.  And is that in Canton?
3     A.  Yes.
4     Q.  Do you have any brothers and
5  sisters?
6     A.  Yes, I have two brothers and two
7  more sisters.
8     Q.  Two brothers and two sisters?
9     A.  Mm-hmm (affirmative response).
10    Q.  Tell me who your brothers are.
11    A.  Octavius Hawkins, ███████████
12  ███
13    Q.  ████  I don't hear very well, I'm
14  sorry.
15    A.  That's all right.
16    Q.  I'm fighting not getting a hearing
17  aide.  Octavius, where does he live?
18    A.  He's doing in College Park --
19    Q.  Okay.
20    A.  -- Georgia.
21    Q.  All right.  And ████ where does he
22  live?
23    A.  With my mom on Walnut.
24    Q.  Does he have a job?
25    A.  No, he's 16.



Page 21

1    Q. All right. Tell me who your sisters
2  are.
3    A. Karlisha Hawkins, K-A-R-L-I-S-H-A.
4    Q. Okay. And where does she live?
5    A. ██████████████
6    Q. And who's the other sister?
7    A. Adrian Hawkins.
8    Q. Where does she live?
9    A. With my mom on Walnut Street.
10    Q. How old is she?
11    A. She's 25.
12    Q. Does she have a job?
13    A. Yes.
14    Q. What does she do?
15    A. She works at the DeBeukelaer Cookie
16  Plant.
17    Q. And other than Walnut Street with
18  your mom, have you lived anywhere else?
19    A. Yes, we was living in Canton Estate
20  before my mom moved to Walnut. I was living
21  in Canton Estate with my mom at first.
22    Q. With your mom?
23    A. Yes. 388 --
24    Q. How long did you live in Canton
25  Estates with your mom before you moved to

Page 22

1  Walnut Street?
2    A. Two and a half years.
3    Q. And what years would that have been?
4    A. It would have been 2008 and '09.
5    Q. And Walnut Street, you would have
6  lived there from 2009 to what?
7    A. 2010.
8    Q. Are you and Mr. Smith married?
9    A. No, ma'am.
10    Q. Are you engaged?
11    A. No, ma'am.
12    Q. Have you ever been engaged?
13    A. No, ma'am.
14    Q. Can you tell me what you did to get
15  ready for your deposition today?
16    A. I got a lot of sleep.
17    Q. Join the club. I did too getting
18  ready for the deposition. Other than losing
19  sleep what else did you do? Did you meet
20  with anyone?
21    A. Yes, I met with my lawyers.
22    Q. Okay. When did you meet with your
23  lawyers?
24    A. On Saturday.
25    Q. On Saturday? Was anybody else there

Page 23

1  when you were meeting with them? Just you?
2    A. Just me.
3    Q. Mr. Smith was not there?
4    A. No.
5    Q. Did your lawyer show you any kind of
6  documents?
7    A. Yes.
8    Q. What did they show you?
9    A. They showed me my interrogatories,
10  my complaints.
11    Q. Your complaint and your
12  interrogatory responses?
13    A. Mm-hmm (affirmative response).
14    Q. Do you recall -- we've gotten three
15  separate interrogatory responses from you.
16  Do you recall which ones they showed you?
17    A. No, ma'am, I can't recall.
18    Q. Did they show you more than one
19  version or one copy?
20    A. Yeah.
21    Q. How many did they show you?
22    A. I can recall two.
23    Q. Two?
24    A. Yeah.
25    Q. And they showed you the complaint?

Page 24

1    A. Yes, we went -- yes.
2    Q. Did you read the whole complaint?
3    A. Yes.
4    Q. All the paragraphs?
5    A. Just the -- let me see --
6    Q. There's one in my briefcase.
7    A. No, ma'am.
8    Q. I represent to you that the
9  complaint, without exhibits, is 86 pages
10  long. Did you read the whole entire
11  complaint?
12    A. No.
13    Q. Did you read -- what portions of the
14  complaint did you read, do you remember?
15    A. No.
16    Q. Have you talked to Mr. Smith since
17  his deposition today?
18    A. No.
19    Q. Did you talk to Mr. Smith before his
20  deposition? Did y'all talk about the case
21  outside the presence of your attorneys?
22    A. No, ma'am.
23    Q. So y'all have never discussed the
24  lawsuit together?
25    A. We did when we first started out,



Page 25

1 yeah, but not since we've been --
2     Q.  Tell me about that.
3     A.  We was just saying, like when he
4 first got out of jail, I was letting him know
5 about, you know, the lawsuit that the lawyers
6 had going on and stuff.
7     Q.  How did you find out about the
8 lawsuit?
9     A.  I was staying in Canton Estate at
10 the time and the lawyers they was canvassing
11 through the apartment complex.
12     Q.  And did they come to your apartment?
13     A.  Yes.
14     Q.  And they met with you?
15     A.  Yes.
16     Q.  Don't tell me what y'all said but
17 tell me, how long did they meet with you?
18     A.  No more than about 15 minutes.
19     Q.  Did -- was anybody else there when
20 they met with you?
21     A.  No, it was just me.
22     Q.  Mr. Smith wasn't there?
23     A.  No.
24     Q.  None of your neighbors?
25     A.  No.

Page 26

1     Q.  Your mother?
2     A.  No.
3     Q.  No?  Okay.  After that meeting tell
4 me which attorneys met with you that day?
5     A.  Jade Morgan.
6     Q.  Do you know Jade is?
7     A.  Yes.
8     Q.  Who is she?
9     A.  She works for the ACLU.
10     Q.  And she's the only one that met with
11 you?
12     A.  Yes, well he came the second time
13 with her.  (Indicating.)
14     Q.  Mr. Tom?  All right.  Tell me about
15 the second time?
16     A.  The second time is when they was --
17 I was just giving them insight on what goes
18 on in my neighborhood.
19     Q.  Do you consider Canton Estates to be
20 a high crime area?
21     A.  No, ma'am.
22     Q.  Have you ever called Madison County
23 Sheriff's Department to report about any
24 crimes taking place in Canton Estates?
25     A.  Once.

Page 27

1     Q.  Just once?
2     A.  Yes.
3     Q.  When was that?
4     A.  That was when -- there was some
5 gambling going on in front of my apartment.
6     Q.  Do you recall what year?
7     A.  No, ma'am.
8     Q.  Do you recall in May of 2007 calling
9 the Madison County Sheriff's Department
10 complaining about Mr. Smith taking a
11 PlayStation from your apartment and choking
12 you?
13     A.  Yes.  I remember calling, but I
14 don't think it was in 2007.
15     Q.  2017?
16     A.  Yes.
17     Q.  Okay.  Tell me about that.
18     A.  We had got into a argument or
19 whatever.  And one thing led to another.
20     Q.  Okay.  So that would be a time that
21 you called Canton -- I mean the Madison
22 County Sheriff's Department for help?
23     A.  Yes.
24     Q.  And how was that handled?
25     A.  The deputy handled it.  He told me

Page 28

1 that if I press charges and that -- he said
2 ain't no sense in me pressing charges because
3 if I'm still going to be with him, I have to
4 pay to drop the charges.
5     Q.  Okay.  Were you please with their,
6 the Madison County Sheriff's Departments
7 response?
8     A.  Yes.
9     Q.  Did you ever live at Loring Road and
10 Stump Bridge Road in Camden?
11     A.  No.
12     Q.  In April 2007, did you call the
13 Madison County Sheriff's Department
14 complaining about some guys walking around
15 drinking beer and smoking marijuana?
16     A.  No.
17     Q.  Are there any other Latoya Brown's
18 that live in Madison County --
19     A.  Yes.
20     Q.  -- that you know of?
21     A.  Yes.
22     Q.  Yes?  Who is that?
23     A.  My second cousin.
24     Q.  And where does she live?
25     A.  She was living on Stump Bridge Road



Page 29

1  at the time.
2      Q.  Okay.  So that may have been your
3  second cousin calling?
4      A.  Mm-hmm (affirmative response).
5          THE REPORTER:  You have to say yes or
6  no.
7      A.  Yes, ma'am.
8          MS. COWAN:  I'm missing half of them.
9  I'm sorry.
10  BY MS. COWAN:
11      Q.  In November of 2014, did you call
12  the Madison County Sheriff's Department
13  complaining about a suspicious vehicle, Ford
14  Expedition being in Canton Estates?
15      A.  No, ma'am.
16      Q.  You don't recall making that call?
17      A.  No, ma'am.
18      Q.  Did your second cousin ever live in
19  Canton Estates?
20      A.  No.  Her sister did.
21      Q.  So if there's a record of your
22  calling in May -- November of 2014 about a
23  suspicious vehicle, that would be incorrect?
24          MR. RETHY:  Object to form.
25  BY MS. COWAN:

Page 30

1      Q.  Did you ever call in 2014 reporting
2  a suspicious vehicle in Canton Estates?
3      A.  No.
4      Q.  No?  And I believe you testified you
5  did call one time about guys gambling?
6      A.  Yes.
7      Q.  And that would have been, according
8  to our records, June of 2011?
9      A.  Yes.
10      Q.  All right.  Tell me about that.
11      A.  I was getting off work and I walked
12  up and seen them gambling in front of my
13  window.
14      Q.  Did you see people gambling pretty
15  frequently at Canton Estates?
16      A.  No.
17      Q.  No?  Is that the first time you'd
18  ever seen anybody gambling?
19      A.  Yes, ma'am.
20      Q.  Okay.  So you called --
21      A.  Yes, ma'am.
22      Q.  Pardon?
23      A.  I said "yes, ma'am."
24      Q.  Okay.  You called, what happened?
25  Did somebody from the Sheriff's Department

Page 31

1  show up?
2      A.  Yes.  They patrolled the area.
3      Q.  They patrolled it for you?
4      A.  Mm-hmm (affirmative response).
5      Q.  And what time of day was this?
6      A.  This was at night.  Around 8:00 or
7  9:00.
8      Q.  And did they tell you they were
9  going to patrol the area for you?
10      A.  Yes.
11      Q.  Did they ever report back to you?
12  Did you ever see that happening again?
13      A.  No, ma'am.
14      Q.  Did you have any complaints about
15  them coming and patrolling the area for you?
16      A.  No.
17      Q.  Did you ever call to complain about
18  people shooting a gun?
19      A.  Yes.
20      Q.  2011?
21      A.  Yes.  I heard gunshots one night and
22  I called them.
23      Q.  Would that have been in February of
24  2011?
25      A.  Yes, ma'am.

Page 32

1      Q.  All right.  So that's another time
2  you called the Sheriff's Department?
3      A.  Mm-hmm (affirmative response).
4      Q.  What'd they do?
5      A.  Well, they came out and they found
6  guns in the grass.
7      Q.  Tell me about that.  How many guns?
8      A.  I only seen one officer pick up one
9  gun.
10      Q.  What time of day was this?
11      A.  It was early in the morning when the
12  officers came but the shooting happened at
13  night.
14      Q.  Did the officers come -- excuse me,
15  when you called them?
16      A.  Yes, but they didn't see the gun
17  hiding in the grass then.
18      Q.  Did they do anything when they first
19  came?  Did they go look for people?
20      A.  No.
21      Q.  Did they talk to you about it?
22      A.  No.  They didn't come to my house.
23  I just told them I heard gunshots and they
24  just came over to Canton Estates.
25      Q.  Okay.  So they didn't come to your

LATOYA BROWN                                      January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.              33–36

Page 33

1 apartment.  They just came -- were in the
2 area.
3      A.  Yeah.  Around the area.  Around my
4 apartment building.
5      Q.  Did you see them patrolling?
6      A.  Yes.
7      Q.  Did you appreciate that?
8      A.  Yes.
9      Q.  Did you ever find out what the
10 shooting was about?
11     A.  No, ma'am.
12     Q.  Do you know who had -- where the
13 guns came from, who tossed them in the grass?
14     A.  No, ma'am.
15     Q.  In 2010, did you call again about
16 some shooting at Canton Estates?  Shooting
17 into a building, two groups of guys?  One ran
18 into an apartment.  Does that ring a bell?
19     A.  No, I wasn't staying over there
20 then.
21     Q.  Okay.  Were you visiting there at
22 that time?
23     A.  No.
24     Q.  So you don't recall anything about a
25 call to the Sheriff's Department in 2010

Page 34

1 about guys shooting at each other and running
2 into apartments?
3      A.  No.
4      Q.  Do you know who Sheila Mack is?
5      A.  No.
6      Q.  Who's Debra -- Denise Hawkins?
7      A.  That's my momma.
8      Q.  Do you recall whether or not your
9 mother ever called a Madison County Sheriff's
10 Department complaining about some shooting
11 and maybe some guys running into y'all's
12 apartment or somebody else's apartment at
13 Canton Estates?
14     A.  Possibly, yes.
15     Q.  Possibly?
16     A.  Yes, ma'am.
17     Q.  Tell me about it.
18     A.  I'm not -- I don't know if she
19 called them or not.
20     Q.  Okay.  Do you recall the event?
21     A.  No.  I don't.
22     Q.  So you don't recall anybody coming
23 out?
24     A.  (Shakes head negatively.)
25         MR. RETHY:  Yes or no.

Page 35

1      A.  No.  No.
2 BY MS. COWAN:
3      Q.  Did you call the Madison County
4 Sheriff's Department in 2009 complaining
5 about your mother fighting with you?
6      A.  Yes.
7      Q.  Okay.  That's another one.  What was
8 that about?
9      A.  Me and her got into an altercation
10 about this boy I was dating.
11     Q.  Tell me why.  Was she upset about
12 who you were dating?
13     A.  Yes.
14     Q.  And who was that?
15     A.  ████████ dad.
16     Q.  Tell me about the fight and what
17 happened.
18     A.  Basically, I was hard headed, stayed
19 out late and stuff like that.  Just staying
20 out late.
21     Q.  Did some deputies respond to the
22 call?
23     A.  Yes.
24     Q.  And what did they do?
25     A.  They came out to the house and then

Page 36

1 me and my boyfriend at the time, we left.
2      Q.  Okay.  Anything about that -- were
3 you okay with that visit from the deputies?
4 Did they talk to you?
5      A.  They did.  They mostly were talking
6 to my mom while me and him was just sitting
7 in the car ready to go.
8      Q.  Did you hear anything the deputy
9 said to your mother?
10     A.  No.  I was already outside.
11     Q.  All right.  I asked you this before
12 and I think I hopefully refreshed your memory
13 somewhat.  How many times did you call the
14 Madison County Sheriff's Department while you
15 were living at Canton Estates and asked for
16 any kind of help?
17     A.  Twice.
18     Q.  Twice?  Did you see -- have you
19 observed the Madison County Sheriff's
20 Department patrolling within Canton Estates?
21     A.  Yes.
22     Q.  Have you ever observed guys with
23 guns in Canton Estates?
24     A.  No.
25     Q.  No guns.



LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
37–40

Page 37

1    A.  Huh-uh (negative response).
2    Q.  The shooting that we talked about,
3  how many times have you experienced somebody
4  shooting guns in Canton Estates?
5    A.  It was just that once.
6    Q.  Okay.  Prior to this lawsuit, did
7  you ever meet with anybody with the ACLU?  I
8  know you told me you met in the apartment
9  and, once or twice, how many times have you
10  met with somebody or a group of people
11  concerning this lawsuit?
12    A.  Twice.
13    Q.  Okay.  And both of them were in your
14  apartment?
15    A.  Yes.
16    Q.  Did you ever go to any meetings
17  where the ACLU talked about the lawsuit with
18  a group of people?
19    A.  I went to the press conference.
20    Q.  You just went to the press
21  conference?
22    A.  Yes, ma'am.
23    Q.  Did you go to the Canton Library to
24  meet with anybody at any point in time?
25    A.  No, ma'am.

Page 38

1    Q.  What about the LaQuinta Inn?
2    A.  No, ma'am.
3    Q.  Mr. Smith said he was there, did you
4  not accompany him there?
5    A.  I didn't go.
6    Q.  You didn't go?  Did you hear about
7  it?
8    A.  I heard about it, but I didn't go.
9    Q.  And why didn't you go?
10    A.  Because I didn't supposed to go.  I
11  didn't -- they weren't looking for me to go.
12    Q.  They weren't looking for you to go?
13    A.  No.
14    Q.  Who were they looking to go?
15    A.  They wanted Steven there.
16    Q.  They just wanted Steven there?
17    A.  Mm-hmm (affirmative response).
18    Q.  And did Steven tell you that?
19    A.  Yes.
20    Q.  Has there ever been a time when you
21  went to a meeting where the ACLU was meeting
22  with any of the plaintiffs that are named in
23  this case?
24    A.  No.
25    Q.  Do you know Lawrence Blackmon?

Page 39

1    A.  Only by name.
2    Q.  How do you know him by name?
3    A.  I know him through Anthony Herbert
4  Green.
5    Q.  Anthony Green?  How do you know
6  Anthony Green?
7    A.  Through Steven.
8    Q.  Have you talked to Anthony Green
9  about this lawsuit?
10    A.  No.
11    Q.  Has Steven told you anything he
12  talked to Anthony Green about in regard to
13  the lawsuit?
14    A.  No, ma'am.
15    Q.  When was the last time you saw
16  Anthony Green?
17    A.  Before I moved to Georgia.
18    Q.  Before?
19    A.  I moved to Georgia.
20    Q.  All right.  When was that?
21    A.  At the end of June.  The last week
22  of June.
23    Q.  Tell me about that.  Where was he
24  and what did y'all do?
25    A.  He was on Martin Luther King at his

Page 40

1  house.  And he wanted to see the kids before
2  we moved out of town.
3    Q.  Why would he want to see the kids?
4    A.  Because he bonded with them.
5    Q.  And how often did he spend time with
6  the kids?
7    A.  You know, we was always -- used to
8  just sit around and hang out and talk and
9  stuff.  And we used to bring our kids
10  together so they could play.  And stuff like
11  that.
12    Q.  Do you know where he is now?
13    A.  No, ma'am.
14    Q.  That was the last time you heard
15  from him?
16    A.  Yes, ma'am.
17    Q.  What about Khadafy Manning, do you
18  know him?
19    A.  From the neighborhood in Canton
20  Estates.
21    Q.  Okay.  Have you talked to him about
22  this lawsuit?
23    A.  No, ma'am.
24    Q.  Have you talked to his wife
25  Quinnetta about the lawsuit?



Page 41

1    A.  No, ma'am.
2    Q.  When was the last time you saw Mr.
3 Manning?
4    A.  I don't -- I can't -- I don't
5 remember.
6    Q.  Did you ever -- do you know what Mr.
7 Manning's claiming in this lawsuit?
8    A.  No.
9    Q.  You don't?  You never talked to
10 anybody about what Mr. Manning was claiming
11 in this lawsuit?
12    A.  No, ma'am.
13    Q.  What about Mr. Blackmon?  Do you
14 know what Mr. Blackmon is claiming in this
15 lawsuit?
16    A.  No, ma'am.
17    Q.  Okay.  What about Mr. Green?
18    A.  No, ma'am.
19    Q.  You don't know anything about why
20 he's a plaintiff in this lawsuit?
21    A.  No.
22    Q.  You never talked to him about it?
23    A.  No, ma'am.
24    Q.  Has Mr. Smith ever told you about
25 why Mr. Green's suing?

Page 42

1    A.  No.
2    Q.  You know Marvin McField?
3    A.  No.
4    Q.  What about Nick Singleton?
5    A.  No.
6    Q.  You know Rasheid Davis?
7    A.  No.
8    Q.  Bessie Thomas?  Quinnetta's mother?
9    A.  Yeah, I know her.
10    Q.  How do you know Bessie Thomas?
11    A.  She used to make our dancing
12 costumes.
13    Q.  She makes dancing costumes?
14    A.  Yes.
15    Q.  She make some for your daughters?
16    A.  No.  I was in -- I knew her from
17 some years ago, when I used to be in the
18 dance team with Quinnetta.
19    Q.  Okay.  So you and Quinnetta were in
20 dancing classes, or --
21    A.  It was a majorette team.
22    Q.  And that was in high school?
23    A.  I was in middle school at the time.
24    Q.  Okay.  Have you talked to Ms. Thomas
25 about this lawsuit?

Page 43

1    A.  No.
2    Q.  Have you seen her recently?
3    A.  No.
4    Q.  What about Betty Jean Williams
5 Tucker, do you know her?
6    A.  No, ma'am.
7    Q.  I may have already asked you this.
8 Other than the complaint and some part of it
9 that you read, and your interrogatory
10 answers, did you look at any other documents,
11 any Sheriff's Department documents?
12    A.  No.
13    Q.  Can you tell me why you filed this
14 lawsuit?  Why you're a plaintiff?
15    A.  Yes.  Because I want better
16 policing.
17    Q.  You want better policing?
18    A.  Mm-hmm (affirmative response).
19    Q.  Tell me a little bit more about
20 that.
21    A.  The excessive roadblocks.  The
22 excessive roadblocks, like warrantless
23 searches, pedestrian stops.
24    Q.  Anything else?
25    A.  No, that's all.

Page 44

1    Q.  Let's talk about your wanting better
2 roadblocks.  Tell me about that.
3        MR. RETHY:  Object to form.
4        MS. COWAN:  What's your objection?
5        MR. RETHY:  She said excessive
6    roadblocks and then you said, "You want
7    better roadblocks," which isn't a completely
8    accurate characterization of the testimony.
9        MS. COWAN:  Okay.
10 BY MS. COWAN:
11    Q.  When you tell me you want better
12 policing in regard to roadblocks, what do you
13 mean by that?
14    A.  I have noticed that, well I have
15 seen, there used to be like three to four
16 roadblocks a day in the same neighborhood.
17    Q.  Three to four roadblocks a day in
18 the same neighborhood?
19    A.  Mm-hmm (affirmative response).
20    Q.  And how often have you seen that?
21    A.  Common.  Common.
22    Q.  It's common?  And what neighborhood
23 would that be?
24    A.  Multiple.  Like Canton Estates, Joe
25 Pritchard Homes, MLK.



Page 45

1    Q.  Anywhere else?
2    A.  Yes.  May Street, King Ranch, and
3  Ricks Drive.
4    Q.  You ever seen roadblocks in any
5  other part of Madison County?
6    A.  No.
7    Q.  And as I understand it, you don't
8  have a driver's license?
9    A.  No.
10   Q.  So you wouldn't be driving a car
11  around encountering roadblocks anywhere?
12   A.  I went through a few, I mean two of
13  them without a license.
14   Q.  Without a license?
15   A.  Mm-hmm (affirmative response).
16   Q.  And did you get a citation?
17   A.  Yes.
18   Q.  And what two were those?
19   A.  2014 and 2013.
20   Q.  2018?
21   A.  '13.
22   Q.  '13.  Where did you get a citation
23  in 2013?
24   A.  I was coming home from work.  I
25  wasn't coming home from work, I was coming

Page 46

1  home from the store.  And they had one in
2  front of Canton Estates.
3    Q.  And you're sure that you got a
4  ticket?
5    A.  Yes.
6    Q.  And that would not have been in
7  2014?
8    A.  No.
9    Q.  Tell me about the one in 2014.
10   A.  That was on MLK.
11   Q.  And tell me about that.
12   A.  That was when I was coming over the
13  bridge, coming from my sister's house.
14   Q.  And your sister lives where?
15   A.  Martin Luther King, Canton Garden
16  Apartments.
17   Q.  And tell me what happened there.
18   A.  They wrote me a citation.  My mom
19  had to come and pick the car up.
20   Q.  Okay.  Cause you couldn't drive
21  cause you didn't have a license?
22   A.  Mm-hmm (affirmative response).  Yes,
23  ma'am.
24   Q.  How did you know that it was the
25  Madison County Sheriff's Department?

Page 47

1    A.  The cars.
2    Q.  They had marked vehicles?
3    A.  Mm-hmm (affirmative response).
4    Q.  Did they -- and lights?
5    A.  I didn't see any lights.
6    Q.  You didn't see the lights?  Was it
7  during the day?
8    A.  Night.
9    Q.  Okay.  Did you see people standing
10  in the road, deputies standing in the road?
11   A.  One stood in the road with his
12  flashlight.
13   Q.  Were they stopping every car in
14  front of you?
15   A.  Well, at the time I was the only car
16  coming down the road.
17   Q.  Okay.  And that was on which street?
18   A.  MLK.
19   Q.  And when you stopped they asked you
20  for your driver's license?
21   A.  Yes.
22   Q.  And you said you didn't have one?
23   A.  Yes, ma'am.
24   Q.  They gave you a ticket --
25   A.  Yes, ma'am.

Page 48

1    Q.  -- and you called your mom to come
2  get the car?
3    A.  Yes, ma'am.
4    Q.  And they waited around, let your mom
5  come get it, rather than towing it?
6    A.  Yes.
7    Q.  Okay.  And in 2013, was that -- did
8  the same thing happened then?
9    A.  Yes.
10   Q.  Nothing else happened during the
11  roadblock?
12   A.  No.
13   Q.  They just gave you a ticket for it?
14   A.  Yes.
15   Q.  Okay.  Didn't arrest you?
16   A.  No, ma'am.
17   Q.  No?
18   A.  No, ma'am.
19   Q.  Okay.  That was the only two
20  roadblocks that you've been through?
21   A.  It could be more.  I'm not sure.
22   Q.  But you don't recall any other ones?
23   A.  No, ma'am.
24   Q.  That was driving and/or passenger?
25   A.  Passenger, yes.

LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.
January 09, 2018
49–52

Page 49

1    Q.  Okay.  Tell me about that -- those.
2    A.  There was three occasions.  I was
3  with my sister on one.  And they asked her
4  for her driver's license and my ID.
5    Q.  Okay.
6    A.  The second one --
7    Q.  Did anything happen?  Did she have a
8  license?
9    A.  Yeah, she had a license?
10    Q.  You had and ID?
11    A.  Yes.  They let us go.
12    Q.  They said, "Go away?"
13    A.  Yes.
14    Q.  All right.  Next?
15    A.  I was with my friend girl Amanda.
16    Q.  Who?
17    A.  Amanda.
18    Q.  Amanda?
19    A.  Yes.
20    Q.  You remember when this was and
21  where?
22    A.  This was in front of Brooklyn -- I
23  mean, Boyd -- no, not Boyd street.  Canton
24  Estates.  Canton Estates.
25    Q.  Okay.

Page 50

1    A.  She was taking me home.
2    Q.  And anything significant happen
3  there?  Did they just check and let you go?
4    A.  She didn't have any license.
5    Q.  Okay.
6    A.  So they wrote her a ticket and I
7  walked on to my apartment.  Her mom came and
8  got her car.
9    Q.  And they waited around and let her
10  mom come get the car?
11    A.  Yes.
12    Q.  Didn't tow it.
13    A.  No.
14    Q.  Anything else happen at that one
15  other than what you just told me?
16    A.  No.
17    Q.  Okay.  Okay.  You talked about
18  better policing and you talked about
19  roadblocks.  Is there anything else that you
20  want better policing in regard to Madison
21  County?
22    A.  Yes.  Pedestrian stops.
23    Q.  Okay.  Tell me about that.
24    A.  I was walking to the front of the
25  gate to meet my ride for work one night.  And

Page 51

1  there was two deputies on feet.  And they
2  stopped and they asked me for my
3  identification.  And I was already running
4  late for work.
5    Q.  You give it to them?
6    A.  Yes.
7    Q.  And nothing else happened?
8    A.  Yes.  They ran my name and nothing
9  else happened.
10    Q.  Okay.  Do you remember -- did you
11  work the night shift?
12    A.  Yes.
13    Q.  Okay.  What time were you walking in
14  Canton Estates?
15    A.  I had to be at work at 11:00.  So it
16  was about 11:10 because I was already running
17  late.
18    Q.  And your friend was going to pick
19  you up outside?
20    A.  Outside the gate.
21    Q.  Okay.
22    A.  At the front gate.
23    Q.  And the deputies were walking around
24  in Canton Estates?
25    A.  Yes.

Page 52

1    Q.  And -- but you'd seen them walking
2  around before?
3    A.  Yes.
4    Q.  Did they walk around when you called
5  about the gambling or did they drive around?
6    A.  They drove.
7    Q.  What about the guns?  Did they walk
8  or --
9    A.  Drove.
10    Q.  Okay.  Did you have any problems
11  with the officers patrolling Canton Estates?
12    A.  No.
13    MR. RETHY:  I'll object to the form
14  of the last question.
15    MS. COWAN:  What's the basis of your
16  objection?
17    MR. RETHY:  "Any problems", vague.
18    MS. COWAN:  Okay.
19  BY MS. COWAN:
20    Q.  Do you have any problems, at all,
21  about the officers walking around and
22  patrolling Canton Estates?
23    MR. RETHY:  At what time.
24  BY MS. COWAN:
25    Q.  At any time?



Page 53

1    A. No.
2    Q. Okay. Okay. Was the time that the
3 deputies stopped you while you were walking
4 towards the gate going outside Canton
5 Estates, is that the only time you were ever
6 stopped by deputies patrolling Canton
7 Estates?
8    A. No.
9    Q. Tell me about that.
10    A. Yes. I was standing back of my
11 stepdad's truck and --
12    Q. Who's your stepdad?
13    A. Leroy McDonald. Leroy McDonald.
14    Q. Does he live in Canton Estates?
15    A. No. He stay with my mom on Walnut
16 now.
17    Q. Was he visiting Canton Estates?
18    A. Yes.
19    Q. Okay. He was visiting your mother?
20    A. He was visiting me at the time in my
21 apartment.
22    Q. Okay. That was when you were living
23 with Mr. Smith?
24    A. Yes.
25    Q. What year was that?

Page 54

1    A. That was in 2013.
2    Q. Okay. Tell me about that.
3    A. Yes. Him and my mom came over to my
4 house and I was standing on the back of the
5 truck outside on the phone and they walked up
6 to me and asked me for my identification.
7    Q. Okay. And you gave it to them.
8 Anything else happen?
9    A. No. They ran my name and they let
10 me go.
11    Q. Okay. And is that it?
12    A. Yes.
13    Q. Okay. You referred to another
14 incident where something happened on
15 Halloween night in 2015. Do you recall that
16 where deputies came and knocked on y'all's
17 door?
18    A. Yes.
19    Q. Mr. Smith's told me a little bit
20 about it. Can you tell me -- tell me what
21 you remember about it.
22    A. Yes. It was before dawn.
23    Q. Before dawn is pretty early in the
24 morning?
25    A. Yes. I heard a knocking at the

Page 55

1 door. Steven went to the door. I was still
2 in the room putting my clothes on. I heard
3 the officer say that they just want to search
4 for a missing child. They're not going to
5 look through anything else. They just want
6 to search for a missing child. Her name is
7 ███████ Steve told them that they didn't
8 have a warrant, they can't come in. So one
9 of the deputies pushed the door open and
10 walked on in my house. As they was searching
11 through, they was looking through drawers and
12 stuff.
13    So my three year old at the time,
14 she was asleep in her bed. When they came in
15 her room, they looked through her closets and
16 they put the flashlight on her face and they
17 woke up. One of the deputies asked her, "Is
18 you ███████ And they assumed to leave
19 after that.
20    Q. And Mr. Smith said he heard them
21 going up and down steps to other apartments.
22    A. Yeah. They was going to everybody's
23 apartment that day.
24    Q. Everybody's apartment. Do you know
25 who is ███████

Page 56

1    A. No, ma'am.
2    Q. Did they tell you? Was it a child?
3 I know you said it was a child. Did they say
4 what age or anything about her?
5    A. No, ma'am.
6    Q. Did you ever hear anything on the
7 street about who ███████ was and what
8 happened to her?
9    A. Yes. I know that her mom lived at
10 Canton Estates.
11    Q. Okay. Did you ever talk to her mom
12 about it?
13    A. No. I don't even know her mom.
14    Q. But it was your understanding that
15 lived in Canton Estates was missing?
16    A. Mm-hmm (affirmative response). Yes,
17 ma'am.
18    Q. And they were going door to door
19 looking for her.
20    A. Yes, ma'am.
21    Q. When the deputies stopped you, you
22 know, going -- walking out, going to meet
23 your ride, do you believe that that had
24 anything to do with your race?
25    A. No. I just think it had something

LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
57–60

Page 57

1   to do with harassing.
2       Q.  Okay.
3           MS. COWAN:  You are at an advantage
4       because I've gotten most of these answers
5       from Mr. Smith, so yours will be shorter.
6           THE WITNESS:  Okay.
7   BY MS. COWAN:
8       Q.  The time that you were sitting on
9   the back of the truck and the time you were
10  walking towards the entrance to Canton
11  Estates --
12      A.  Mm-hmm (affirmative response).
13      Q.  -- I think you told me this, but you
14  encountered the deputies were walking.  They
15  were doing a walking patrol?
16      A.  Yes.
17      Q.  Okay.  The truck incident, do you
18  believe that that was because of your race?
19      A.  No.
20      Q.  Do you recall Mr. Smith calling the
21  Sheriff's Department about seeing kids that
22  were walking through the breezeway of y'all's
23  apartment and they kept looking down, he
24  called the Sheriff's Department and they
25  found a gun in the grass?  Does that ring a

Page 58

1   bell to you?
2       A.  Yes.  That's the same incident when
3   I told you about the gun they found in the
4   grass at the house.
5       Q.  Okay.  It was a shotgun?
6       A.  Yes.  It was a shotgun.
7       Q.  It wasn't a pistol?
8       A.  No.
9       Q.  I think he said it was a 12 gauge
10  shotgun?
11      A.  Yes, ma'am.
12      Q.  You never knew where it came from or
13  anything about it?
14      A.  No.
15      Q.  Okay.  Other than the plaintiff's
16  whose names I read you, you know some, you
17  don't know some, have you talked to anybody
18  else about this lawsuit?
19      A.  No, ma'am.
20      Q.  Have you talked to your dad about
21  it?
22      A.  No.
23      Q.  Does he know that you're a plaintiff
24  in the lawsuit?
25      A.  No.

Page 59

1       Q.  I believe Mr. Smith said you dressed
2   him for the press conference.  Did you go to
3   the press conference too?
4       A.  Yes, I was at the press conference.
5       Q.  Did you talk to anybody other than
6   the lawyers about what to say at the press
7   conference?
8       A.  No, ma'am.
9       Q.  And did you say anything?
10      A.  No, ma'am.
11      Q.  You didn't say anything.  Who talked
12  during the press conference?
13      A.  Steven and Quinnetta did.
14      Q.  What did Steven say?  Do you recall?
15      A.  No, ma'am.
16      Q.  What about Quinnetta?
17      A.  No, ma'am.  I don't recall.
18      Q.  When was the last time you say
19  Quinnetta?
20      A.  At the press conference.
21      Q.  Okay.  Do you know anything about an
22  incident involving Mr. Manning getting shot
23  at Canton Estates?
24      A.  Yes.
25      Q.  What do you know about that?

Page 60

1       A.  I was living across the street from
2   them at the time and I heard the gunshots,
3   but I was, you know, looking out my window.
4   No, peeking out.  And I didn't -- that's all
5   I seen.  Then about five minutes later the
6   police come in.
7       Q.  Was it the Sheriff's Department?
8       A.  Yes.
9       Q.  And is the reason you didn't go out
10  because you thought it might be dangerous?
11      A.  Yes.
12      Q.  Did you ever talk to anybody about
13  what happened to Mr. Manning?
14      A.  No, ma'am.
15      Q.  Do you know whether or not Mr.
16  Manning sold drugs Canton Estates?
17      A.  No, ma'am.
18      Q.  Did anybody tell you that he was
19  shot because he was selling drugs at Canton
20  Estates?
21      A.  No, ma'am.
22      Q.  I may have already asked you this.
23  How did you first find out about this
24  lawsuit?  The very first time?
25      A.  When Jade and them was doing



LATOYA BROWN                                         January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                61–64



Page 61

1  canvassing through the apartment complex.
2      Q.  Do you know whether or not Jade
3  visited other apartment complexes other than
4  Canton Estates?
5      A.  No, ma'am.
6      Q.  She just showed up at your door?
7      A.  Yeah.  I think they was canvassing,
8  but I was already in the house so I don't
9  know if she went to somebody else's house or
10  not.
11     Q.  Have you talked to anybody who has
12  said they don't want to be a part of this
13  lawsuit?
14     A.  No, ma'am.
15     Q.  Do you know what Mr. Smith is
16  claiming in this lawsuit?
17     A.  Yes.
18     Q.  What's he claiming?
19     A.  Harassment.
20     Q.  What kind of harassment?
21     A.  The time he was walking home from
22  the store, I sent him to the store, and he
23  was walking back to the house and there was a
24  roadblock in the front and they stopped him
25  and they ran his name in.

Page 62

1      Q.  Okay.  So he's told you that he
2  walked through a roadblock?
3      A.  Yes.
4      Q.  Okay.  And he walked through the
5  roadblock with whom?
6      A.  It was him and his friend.
7      Q.  Who's his friend?
8      A.  Ty.  I don't know his first name.  I
9  just call him Ty.
10     Q.  Did Ty frequently visit y'all's
11  apartment?
12     A.  Yes.
13     Q.  How often?
14     A.  Maybe -- he worked during the week
15  so it would be like on the weekend or
16  something when he come over.
17     Q.  Once a month, twice a month, three
18  time?
19     A.  Twice a month.  Twice a month.
20
21
22
23
24
25

Page 63

12     Q.  Were they stopping other cars going
13  through a roadblock?
14     A.  Not after theirs.  Not after what
15  happened with Steven and Ty.  They left.
16     Q.  Did you see any actual roadblock
17  being conducted?
18     A.  Yes.
19     Q.  All right.  Tell me about that.
20     A.  Times I was walking to the mailbox,
21  walking to the store, walking my kids.
22     Q.  No, I mean that night.
23     A.  Oh, that night.  No, it was just
24  one.
25     Q.  Okay.  You keep a journal or a

Page 64

1  diary?
2      A.  No, ma'am.
3      Q.  Do you use social media?
4      A.  Yes.
5      Q.  Do you have a Facebook page?
6      A.  Yes.
7      Q.  What's your name on your Facebook
8  page?
9      A.  ▆▆▆▆▆▆▆▆▆
10     Q.  Is it a public Facebook?
11     A.  No, it's private.
12     Q.  Private.  Have you ever made any
13  comments or talked about this lawsuit on your
14  Facebook page?
15     A.  No, ma'am.
16     Q.  Does Mr. Smith use your Facebook
17  page?
18     A.  No, ma'am.
19     Q.  Does anybody else use your Facebook
20  page?
21     A.  No, ma'am.
22     Q.  Do you have any knowledge whether or
23  not roadblocks are conducted anywhere else,
24  other than where you've seen them, in Madison
25  County?



LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
65–68

Page 65

1  A. No.
2  Q. Have you ever filed a lawsuit
3  against anybody or any company or anything?
4  A. No, ma'am.
5  Q. Have you ever been sued?
6  A. No, ma'am.
7  Q. Have you ever been hurt on the job?
8  A. No, ma'am.
9  Q. You ever filed a workman's comp
10 claim?
11 A. No, ma'am.
12 Q. What about unemployment?
13 A. Yes, I have -- no, no, no.
14 Q. No?
15
16
17
18
19
20
21
22
23
24
25

Page 66

1
2
3
4
5
6
7
8
9
10 Q. I'm going to go through some names
11 that you gave me in some answers to the
12 interrogatories that you looked through.
13 A. Mm-hmm (affirmative response).
14 Q. And ask you if you know these people
15 and how you know them.
16    James Bacon?
17 A. I don't know him.
18 Q. Michael Bracy?
19 A. I don't know him.
20 Q. Anthony Brown?
21 A. I don't know him.
22 Q. From Flora?
23 A. I don't know him.
24 Q. Bysheba Brown from Ridgeland?
25 A. She's my classmate.

Page 67

1  Q. Your who?
2  A. Classmate.
3  Q. All right. Tell me about her. When
4  was the last time you saw her?
5  A. I haven't seen her in years.
6  Q. A year?
7  A. Years.
8  Q. Years. Have you talked to her about
9  this lawsuit?
10 A. No.
11 Q. Do you know what she knows about
12 this lawsuit?
13 A. No.
14 Q. Do you know if Mr. Smith has talked
15 with her?
16 A. No.
17 Q. What about Mr. Willie Carter?
18 A. I don't know him.
19 Q. Rasheid Davis?
20 A. I don't know him.
21 Q. The hairdresser?
22 A. I don't --
23 Q. No?
24 A. -- know him.
25 Q. Veronica Davis.

Page 68

1  A. I don't know her.
2  Q. Dominique Doss?
3  A. I don't know her.
4  Q. Undrea Guise?
5  A. I don't know her.
6  Q. From Canton? No? Kenneth Harris?
7  A. I don't know him.
8  Q. Lester Hollins?
9  A. I don't know him.
10 Q. From Jackson? Antonio Howard?
11 A. I don't know him.
12 Q. John Spann?
13 A. I don't know him.
14 Q. What about Earline Wilder?
15 A. I worked with her -- I worked with
16 her at the hospital.
17 Q. Okay. What does she do?
18 A. She was a housekeeper.
19 Q. Housekeeper at Canton Manor?
20 A. No, we worked at Merit Health
21 together.
22 Q. Okay. You didn't tell me about
23 that. When did you work for Merit Health?
24 A. 2015.
25 Q. How long did you work there?



LATOYA BROWN                                                January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                        69–72

Page 69

1    A. Seven months.
2    Q. Seven months?
3    A. Yes.
4    Q. And what did you do there?
5    A. Housekeeping.
6    Q. And why did you leave?
7    A. Maternity leave.
8    Q. Maternity leave.
9        MS. COWAN: Let's take a break.
10       - - -
11   (OFF THE RECORD AT 11:57 P.M.)
12   (BACK ON THE RECORD AT 12:05 P.M.)
13   BY MS. COWAN:
14   Q. Ms. Brown, the October 31st, 2015
15   Halloween incident. Mr. Smith said that
16   y'all had given a party earlier in the day
17   for one of your daughters?
18   A. No. It was my nephew.
19   Q. Oh, that's right. I'm sorry. Your
20   nephew.
21   A. Yes.
22   Q. Okay. And do you know when that
23   party stopped?
24   A. It stopped pretty early. Around
25   8:00.

Page 70

1    Q. 8:00 at night?
2    A. Yes.
3    Q. And was it a birthday party?
4    A. Yes.
5    Q. Okay. You mentioned better policing
6    and warrantless searches. Is that the only
7    warrantless search that you can tell me about
8    that's happened to you that you know
9    personally about?
10   A. No, there was this incident with
11   Steven.
12   Q. Okay.
13   A. Me and him both were sitting outside
14   our apartment, and it was two deputies walk
15   -- walk by. It was night time.
16   Q. What time?
17   A. It was like 9:30 at night. And we
18   was sitting out and they walked by. We
19   thought it was the two security guards that
20   worked there. So when they walked up, they
21   put they flashlight on us. They told Steven
22   to stand up, and they asked him to walk
23   around the building with them. And so I go
24   in the house, I check on my kids.
25       So with the way they walked it

Page 71

1    wasn't too far from my building. So I walked
2    around the front windows to around the
3    apartment, and I seen Steven in handcuffs
4    sitting on the ground. They had his ID
5    running his name in.
6    Q. Do you know what year this was?
7    A. 2015.
8    Q. 2015. Do you know why they put him
9    in handcuffs?
10   A. No.
11   Q. Did he ever talk to you about it?
12   A. Yes, I said -- but no, he didn't
13   tell me why they had him in handcuffs.
14   Q. He didn't tell you anything about
15   what -- the incident occurred?
16   A. No.
17   Q. Well, he didn't tell us either.
18   That's why I was asking.
19   A. No.
20   Q. Was he arrested?
21   A. No. They let him go after they ran
22   his name in.
23   Q. Okay. But he didn't tell you why
24   they asked him to walk around to the other
25   side of the apartment or anything?

Page 72

1    A. No.
2    Q. Did you ask him?
3    A. No, I just walked around the
4    building and seen him in handcuffs. And when
5    they were like taking the handcuffs off of
6    him, that's when I walked back to the
7    apartment.
8    Q. When he got back to the apartment,
9    you didn't ask him anything about what
10   happened?
11   A. Huh-uh (negative response). Because
12   I thought maybe that's all they was doing was
13   running his name in.
14   Q. Okay. Did you think they thought he
15   was somebody else?
16   A. No.
17   Q. Okay. Tell me how the Madison
18   County Sheriff's Department can have better
19   policing in Madison County.
20   A. By not walking in people's houses
21   without warrants. The pedestrian stops.
22   Through roadblocks. You know.
23   Q. When you say through roadblocks,
24   what do you mean? Holding roadblocks?
25   A. Like, if I'm walking through a



LATOYA BROWN                                      January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.             73–76

Page 73

1  roadblock and they stop me and ask me, and
2  I'm not driving, for my ID or something.
3     Q.  When you're walking through a
4  roadblock, have you ever been ID'd walking
5  through a roadblock?
6     A.  No.
7     Q.  Anything else?
8     A.  No, ma'am.
9     Q.  And the complaint you have about the
10 warrantless search was when the deputies was
11 looking for ██████████
12    A.  Mm-hmm (affirmative response).
13    Q.  Yes?
14    A.  Yes, ma'am.
15    Q.  Do you know if whether Mr. Smith
16 allowed them to come into the apartment?
17    A.  No.
18    Q.  You didn't hear one way or the
19 other?
20    A.  Huh-uh (negative response).
21    Q.  No?
22    A.  No, ma'am.
23       MS. COWAN:  Anything else, y'all?
24 No?
25       You did well.

Page 74

1        THE WITNESS:  Well, I can breathe.
2        MS. COWAN:  I don't know.  Your
3  attorneys might have some questions for you
4  after.  We'll just have to wait.
5        MR. RETHY:  Okay.  Give us a second.
6        MS. COWAN:  Yeah.  You want us to
7  leave?
8        MR. RETHY:  We can leave.
9        MS. COWAN:  Okay.
10            - - -
11       (OFF THE RECORD AT 12:10 P.M.)
12       (BACK ON THE RECORD AT 12:15 P.M.)
13            - - -
14       (CROSS-EXAMINATION)
15 BY MS. JARRETT:
16    Q.  Ms. Brown, I'm just going to ask you
17 a couple questions, okay?
18    A.  Yes, ma'am.
19    Q.  Have you ever been through a
20 pedestrian checkpoint?
21    A.  Yes.
22    Q.  When?
23    A.  When I was walking from the store.
24    Q.  And where was the checkpoint setup?
25    A.  In front of Canton Estates.

Page 75

1     Q.  Did the officers -- what happened at
2  the checkpoint?  Did the officers ask for
3  your identification?
4     A.  Yes, but I didn't have it on me.
5     Q.  So then what happened?
6     A.  They asked for my Social Security
7  Number and they wrote it down.
8     Q.  And then?
9     A.  They ran my name.
10    Q.  Have you been through a pedestrian
11 checkpoint another time?
12    A.  Possibly, I'm not sure.
13    Q.  Have you ever seen pedestrian
14 checkpoints outside of the park where you
15 take your children?
16    A.  Yes, that's on Ricks Drive.
17    Q.  Okay.  Have you been through a
18 pedestrian checkpoint there?
19    A.  Yes, I was with my cousin.
20    Q.  And what happened?
21    A.  They asked for me and his
22 identification.
23    Q.  Did you have it?
24    A.  Yes.  And I showed it to him, I
25 showed my ID to him and my cousin did also.

Page 76

1     Q.  And what did the officer do with
2  your identification?
3     A.  They ran our names.
4     Q.  When you say they ran your names,
5  what do you mean?
6     A.  They did it on the walkie-talkie to
7  the dispatcher.
8     Q.  And then did you leave?
9     A.  Yes.
10    Q.  Have you ever been through any other
11 pedestrian checkpoints?
12    A.  Not that I can recall.
13    Q.  Do you ever come into pedestrian
14 checkpoints when you are -- where does your
15 mom live?
16    A.  She lives on Walnut.
17    Q.  Have you ever run into pedestrian
18 checkpoints going to or from your mom's
19 house?
20    A.  No.
21    Q.  And when you say pedestrian
22 checkpoint, what does that mean to you?
23    A.  That if I'm walking through a
24 roadblock and I get stopped, then asked for
25 identification.



Page 77

1    Q. Earlier Ms. Cowen asked you if you'd
2  ever been stopped at a roadblock while you
3  were on foot.  Have you ever been stopped at
4  a roadblock while you were on foot?
5    A. Yes.
6    Q. Ms. Brown, do you think that the
7  Madison County Sheriff's Department treats
8  the black residents of Madison County
9  differently than the white residents of
10 Madison County?
11       MS. COWAN:  Object to the form.
12   Leading.
13       MS. JARRETT:  You can answer.
14   A. Yes.
15 BY MS. JARRETT:
16   Q. Okay.
17       MS. JARRETT:  Thank you.
18       MS. COWAN:  I just have a couple of
19   follow up questions.
20            - - -
21       (REDIRECT EXAMINATION)
22 BY MS. COWAN:
23   Q. You were asked what a pedestrian
24 checkpoint is, I believe I heard your
25 testimony and you say that is a roadblock

Page 78

1  where cars are being stopped going through?
2    A. Roadblock to me is when cars, they
3  checking cars.
4    Q. Okay.
5    A. Pedestrian stops is when you walking
6  through a roadblock.  I was walking my kids
7  from the park to my house and they stopped
8  me.  But it was a roadblock setup.
9    Q. It was a roadblock where cars --
10   A. Yes, they were stopping cars before
11 I got to them.
12   Q. Okay.  So you walked through the
13 roadblock?
14   A. Yes, to go home.
15   Q. To go home?
16   A. Yes.
17   Q. They asked for your ID?
18   A. Yes.
19   Q. And you had your children with you?
20   A. Yes.
21   Q. Was there any way you could have
22 walked around the roadblock?
23   A. No, because the way we was walking
24 on the side of the road, it was like one
25 officer car over here and one officer car

Page 79

1  over here.
2    Q. So it's impossible to walk around?
3    A. Yes, because it's a straight and
4  narrow road.
5    Q. And what time of day was this?
6    A. This was like at 6:00 going -- 5:00
7  going on 6:00 I want to say.
8    Q. All right.  So let me make sure I
9  understand this.  When you talk about what
10 you consider a pedestrian checkpoint, that's
11 when a roadblock has been setup and they're
12 actually ID'ing pedestrians who walk through
13 a roadblock?
14   A. Yes.
15   Q. Okay.
16       MS. COWEN:  Hold on.
17       MS. JARRETT:  I think we can go off
18   the record.
19            - - -
20     (OFF THE RECORD AT 12:17 P.M.)
21     (BACK ON THE RECORD AT 12:18 P.M.)
22 BY MS. COWAN:
23   Q. Ms. Brown, you testified that you
24 think that blacks are treated differently
25 than whites by the Madison County Sheriff's

Page 80

1  Department.  Can you tell me why and how they
2  are?
3    A. Yes, because most of the roadblocks
4  I see or when I'm walking I see roadblocks
5  also, it's mostly in our black communities
6  where most of the black people live.
7    Q. This is roadblocks --
8    A. Yes.
9    Q. -- vehicle roadblocks?
10   A. Yes.
11   Q. And have you ever checked the
12 posting of the roadblocks that are on the
13 justice court door in the Madison County
14 Justice Court building?
15   A. No, ma'am.
16   Q. And have you ever seen any
17 roadblocks being conducted anywhere else in
18 Madison county?
19   A. Yes.
20   Q. Where would that be?
21   A. Walnut, at the top of Walnut, right
22 there by the highway.
23   Q. Which highway?
24   A. Highway 22.
25   Q. Okay.

Page 81

1     A.  And New Edition.
2     Q.  What is that?
3     A.  That's an apartment complex.
4     Q.  Where is that?
5     A.  It's on Ricks Drive also.
6     Q.  When was that?
7     A.  Frequently when I used to stay over
8  there in Canton Estates, cause Canton Estate
9  is here in -- I mean, New Edition is the next
10  apartment complex.
11     Q.  Is it safe for me to say that since
12  you don't have a driver's license you don't
13  drive that frequently in Madison County?
14     A.  No, ma'am.
15     Q.  Have you been driving frequently in
16  Madison County without a driver's license?
17     A.  Not recently, no.
18     Q.  No.  All right.  So we've got the
19  roadblocks near Canton Estates, we've got
20  Walnut Street, top of the Highway 22, the New
21  Edition.  Any other roadblocks that you've
22  observed?
23     A.  Yes, Boyd Street.
24     Q.  Did you have to go through one of
25  those?

Page 82

1     A.  No, but I have seen them.
2     Q.  Okay.  When did you see them?
3     A.  Walking to the stores, walking to my
4  sister's house.  She stays on Boyd Street,
5  one of my sisters on my dad's side and on
6  MLK.
7     Q.  Okay.  As I understand it, your
8  testimony today about the Madison County
9  Sheriff's Department treating blacks
10  differently than whites is based on where
11  they set up roadblocks?
12     A.  Yes, I think they target blacks.
13     Q.  Okay.  As I understand it you don't
14  have a driver's license.
15     A.  Mm-hmm (affirmative response).  Yes,
16  ma'am.
17     Q.  And you have told me about four
18  roadblocks that you've seen, is that correct?
19     A.  Yes.
20        MS. JARRETT:  Object to form.
21        MS. COWAN:  What's your objection?
22        MS. JARRETT:  It's unclear whether
23     you mean four individual roadblocks or
24     roadblocks set up in four different
25     locations.

Page 83

1  BY MS. COWAN:
2     Q.  How many roadblocks have you
3  observed within Madison County?  You told me
4  about one at Walnut, top of Highway 22; is
5  that right?
6     A.  Yes, May Street also.
7     Q.  May Street.  The New Edition, is
8  that May Street?
9     A.  No, that's Ricks Drive.
10     Q.  Okay.  That's Ricks Drive.
11     A.  Canton Estates, MLK, King Ranch.
12     Q.  Okay.
13     A.  And also Highway 51.
14     Q.  Where on Highway 51?
15     A.  Right in front of the jailhouse.
16     Q.  Okay.  And why is it your testimony
17  that a roadblock set up on Highway 51 in
18  front of the jail, the detention center is
19  set up to target blacks?
20        MS. JARRETT:  Object to form.
21     A.  Cause most of --
22        MS. COWAN:  What's your objection?
23        MS. JARRETT:  Ms. Brown testified
24     that a roadblock was set up there.
25        MS. COWAN:  Okay.

Page 84

1  BY MS. COWAN:
2     Q.  Do you feel like the roadblock that
3  was set up on Highway 51 in front of the
4  Madison County Detention Center was set up to
5  target blacks?
6     A.  Yes.
7     Q.  Tell me why.
8     A.  Because I know a lot of folks use
9  that road to go to work and drive back and
10  forth to work.
11     Q.  A lot of folks, you mean black
12  folks?
13     A.  Yes, a lot of black people.
14     Q.  Other than that, I mean, is that
15  just your opinion, you've not seen how many
16  blacks go through, how many whites go
17  through, just your opinion?
18     A.  Yes.
19        MS. COWAN:  That's all I got.
20        MR. RETHY:  All right.  So we'll read
21     and sign this.
22        MS. COWAN:  Okay.
23        MR. RETHY:  We'll take both
24     transcripts for two weeks to determine
25     whether there's anything in here that



LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
85–88

Page 85

1 warrants designating as confidential.
2     MS. COWAN:  On this one?
3     MR. RETHY:  On this one and on Mr.
4 Smith's.  I'm not trying to mark anything at
5 this moment.
6     MS. COWAN:  Did you understand that?
7     THE REPORTER:  Yes, ma'am.
8        - - -
9     (OFF THE RECORD AT 12:23 P.M.)
10 (WHEREUPON THE ABOVE-ENTITLED DEPOSITION WAS
11 SUSPENDED AT APPROXIMATELY 12:23 P.M.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1       CERTIFICATE OF COURT REPORTER
2     I, Tammy McDaniel-Bagnato, Court Reporter and
3 Notary Public, in and for the State of Mississippi,
4 hereby certify that the foregoing contains a true and
5 correct transcript of the testimony of LATOYA BROWN, as
6 taken by me in the aforementioned matter at the time and
7 place heretofore stated, as taken by me and later
8 reduced to typewritten form under my supervision by
9 means of computer-aided transcription.
10     I further certify that under the authority vested
11 in me by the State of Mississippi that the witness was
12 placed under oath by me to truthfully answer all
13 questions in the matter.
14     I further certify that I am not in the employment
15 of or related to any counsel or party in this matter and
16 have no interest, monetary or otherwise, in the final
17 outcome of this matter.
18     Witness my signature and seal, this the 21st day,
19 January, 2018.
20

       Tammy McDaniel-Bagnato
21
22 MY COMMISSION EXPIRES:
23     _____
24
25

Page 87

1          CERTIFICATE OF DEPONENT
2     I, LATOYA BROWN, have read the foregoing pages,
3 of the transcript of my deposition given on January 9,
4 2018, and it is true, correct and complete to the best
5 of my knowledge, recollection and belief except for the
6 list of corrections, if any, attached on a separate
7 sheet herewith.
8     Witness my hand, this the _____ day of
9 _____, 2018.
10
            _____
            LATOYA BROWN
11
12
     Subscribed and sworn to before me, this the
13
     _____day of _____, 2018.
14
15
16   _____
     Notary Public in and for the
17   County of _____
     State of Mississippi
18   My Commission Expires:  _____
19
20
21
22
23
24
25

Page 88

1       DEPOSITION ERRATA SHEET
2  PAGE NO._____ LINE NO._____CHANGE TO:_____
   _____
3  _____
4  REASON FOR CHANGE:_____
5  PAGE NO._____ LINE NO._____CHANGE TO:_____
6  _____
7  REASON FOR CHANGE:_____
8  PAGE NO._____ LINE NO._____CHANGE TO:_____
9  _____
10 REASON FOR CHANGE:_____
11 PAGE NO._____ LINE NO._____CHANGE TO:_____
12 _____
13 REASON FOR CHANGE:_____
14 PAGE NO._____ LINE NO._____CHANGE TO:_____
15 _____
16 REASON FOR CHANGE:_____
17 PAGE NO._____ LINE NO._____CHANGE TO:_____
18 _____
19 REASON FOR CHANGE:_____
20 PAGE NO._____ LINE NO._____CHANGE TO:_____
21 _____
22 REASON FOR CHANGE:_____
23
24 SIGNATURE:_____ DATE:_____
25        LATOYA BROWN

LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

```
1              DEPOSITION ERRATA SHEET

2   PAGE NO. 45    LINE NO. 2    CHANGE TO: "May" into "Mace"

3   _____

4   REASON FOR CHANGE: _____

5   PAGE NO. 63    LINE NO. 6    CHANGE TO: "door" into "store"

6   _____

7   REASON FOR CHANGE: _____

8   PAGE NO. 83    LINE NO. 6    CHANGE TO: "May" into "Mace"

9   _____

10  REASON FOR CHANGE: _____

11  PAGE NO._____ LINE NO._____ CHANGE TO:_____

12  _____

13  REASON FOR CHANGE: _____

14  PAGE NO._____ LINE NO._____ CHANGE TO:_____

15  _____

16  REASON FOR CHANGE: _____

17  PAGE NO._____ LINE NO._____ CHANGE TO:_____

18  _____

19  REASON FOR CHANGE: _____

20  PAGE NO._____ LINE NO._____ CHANGE TO:_____

21  _____

22  REASON FOR CHANGE: _____

23

24  SIGNATURE:_____ DATE:_____

25             LATOYA BROWN
```



```
 1                  DEPOSITION ERRATA SHEET
 2    PAGE NO._____LINE NO._____CHANGE TO:_____
 3    _____
 4    REASON FOR CHANGE:_____
 5    PAGE NO._____LINE NO._____CHANGE TO:_____
 6    _____
 7    REASON FOR CHANGE:_____
 8    PAGE NO._____LINE NO._____CHANGE TO:_____
 9    _____
10    REASON FOR CHANGE:_____
11    PAGE NO._____LINE NO._____CHANGE TO:_____
12    _____
13    REASON FOR CHANGE:_____
14    PAGE NO._____LINE NO._____CHANGE TO:_____
15    _____
16    REASON FOR CHANGE:_____
17    PAGE NO._____LINE NO._____CHANGE TO:_____
18    _____
19    REASON FOR CHANGE:_____
20    PAGE NO._____LINE NO._____CHANGE TO:_____
21    _____
22    REASON FOR CHANGE:_____
23
24    SIGNATURE:_____DATE:_____
25                    LATOYA BROWN
```



LATOYA BROWN
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
87

```
1          CERTIFICATE OF DEPONENT
2          I, LATOYA BROWN, have read the foregoing pages,
3    of the transcript of my deposition given on January 9,
4    2018, and it is true, correct and complete to the best
5    of my knowledge, recollection and belief except for the
6    list of corrections, if any, attached on a separate
7    sheet herewith.
8    Witness my hand, this the  24  day of
9    January     , 2018.
10                              _____
11                              LATOYA BROWN
12
13   Subscribed and sworn to before me, this the
     24 day of January     , 2018.
14
15
16   _____
17   Notary Public in and for the
     County of Hinds
18   State of Mississippi
     My Commission Expires:  11/30/2021
19
20
21
22
23
24
25
```



*ESQUIRE*
DEPOSITION SOLUTIONS

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFF LATOYA BROWN'S
SECOND SUPPLEMENTAL
RESPONSES AND OBJECTIONS
TO DEFENDANTS' FIRST SET
OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Latoya

Brown ("Plaintiff" or "Ms. Brown"), by and through her attorneys, hereby submits the following

supplemental responses and objections to Interrogatories Nos. 1(a), 8, and 14 of Defendants'

First Set of Interrogatories served by Defendants on Plaintiffs on September 22, 2017

(collectively, the "Interrogatories," and each an "Interrogatory"). These responses and

objections are hereby designated as Confidential pursuant to the Stipulated Protective Order

(Dkt. No. 32), so-ordered by the Court on September 6, 2017 in the above-captioned Action.

The Second Supplemental Responses and Objections set forth below are made in further



EXHIBIT
"B"

response to the Interrogatories and supplement the Responses and Objections previously served by Plaintiff.

**GENERAL OBJECTIONS**

Plaintiff hereby incorporates by reference the General Objections set forth in her Responses and Objections to Defendants' First Set of Interrogatories dated October 20, 2017 and her Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated November 10, 2017.  Plaintiff asserts those General Objections as to each Interrogatory, whether or not such objections are repeated below in response to each individual Interrogatory.

**SPECIFIC SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO INTERROGATORIES NOS. 1(a), 8, AND 14**

**Interrogatory No. 8:**

Please identify and describe in detail the form and substance of any policy or procedure of the Defendants or the Madison County Sheriff's Department you contend constitutes a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination. For each such policy, please state:

(a)     the name of the policy;

(b)     the terms of the policy;

(c)     the date it went into effect;

(d)     the means by which it went into effect;

(e)     how you learned of such policy; and

(f)     the name, address, and telephone number of the person who provided it to you.

### Supplemental Response to Interrogatory No. 8:

In addition to the General Objections incorporated herein by reference, Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information already in the possession, custody, or control of or that is known to, equally available to, or solely available to Defendants. Plaintiff further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by, or disclosure of which is prohibited or restricted under, any privilege or immunity, including the attorney-client privilege, the work product doctrine, the joint defense privilege, the common interest privilege or any other applicable privilege, immunity or limitation on discovery. Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly burdensome. Plaintiff further objects to this Interrogatory because class certification-related discovery is ongoing and incomplete, and to the extent that this Interrogatory purports to require Plaintiffs to marshal evidence in support of any right or claim. Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly burdensome. Plaintiff further objects to this Interrogatory on the grounds that it requests information regarding counsel's preparation of the case on behalf of the named Plaintiffs and the proposed class, rather than information that is within the personal knowledge of Plaintiff. Any information provided by Plaintiff in response to this Interrogatory is provided subject to and without waiver of these objections and qualifications.

Subject to and without waiver of the foregoing objections, and in addition to the information previously provided by Plaintiff in response to this Interrogatory, Plaintiff states that

3

policies and procedures of Defendants or the Madison County Sheriff's Department that constitute a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination include, but are not limited to:

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks without appropriate procedural safeguards, including (i) roadblocks conducted using unmarked cars, (ii) roadblocks conducted using cars without emergency lighting engaged and/or using flashlights as a primary light source, (iii) roadblocks conducted by plainclothes or undercover officers, including narcotics officers and members of the "NET Team," "Jump Out Detail," and/or "Apartment Detail," (iv) roadblocks conducted in inadequately lit areas, (v) "roving" roadblocks, and (vi) roadblocks at which officers do not stop every car, but instead use their discretion to only stop certain vehicles.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which officers require persons other than the driver to produce identification or provide other information, or otherwise search or detain persons without reasonable suspicion or probable cause.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which Madison County Sheriff's Department personnel stop, question, detain, and/or search pedestrians in the vicinity of the roadblock without reasonable suspicion or probable cause and/or on the basis of race.

- The Madison County Sheriff's Department's policy, custom, and/or practice of stopping, questioning, detaining, and/or searching pedestrians travelling through majority-Black areas of Madison County without reasonable suspicion or probable cause and/or on the

basis of race, including as implemented by narcotics officers and members of the "NET

Team," "Jump Out Detail," and/or "Apartment Detail."

- The Madison County Sheriff's Department's policy, custom, and/or practice of

  conducting vehicular roadblocks for the purpose of checking for outstanding warrants,

  including but not limited to as described in the Notices produced at (i) MC T.

  CHASTAIN LAPTOP 17, (ii) MC MAD. COUNTY MAIN SERVER 1, and (iii) MC –

  SANDRIDGE DESKTOP 23, as well as the Notice annexed to the Complaint and the

  incident report produced at Bates numbers MC-RFP-Inc. Rep. 010886-010887.

- The Madison County Sheriff's Department's policy, custom, and/or practice of

  disproportionately conducting traffic stops in majority-Black areas, conducting pretextual

  traffic stops on the basis of race, and disproportionately issuing citations to and making

  arrests of Black individuals during traffic stops.

- The Madison County Sheriff's Department's policy, custom, and/or practice of

  discriminatorily arresting, citing, and/or charging Black individuals at higher rates, and/or

  with greater severity, than white persons engaged in the same or similar conduct.

- The Madison County Sheriff's Department's policy, custom, and/or practice of entering

  the homes of Black residents of Madison County without warrants or other valid legal

  justification in the course of serving warrants and/or conducting investigations, and of

  conducting unreasonable and warrantless searches of such premises in connection

  therewith.

- The Madison County Sheriff's Department's deliberate indifference to violations of the

  Fourth and Fourteenth Amendments by its personnel, as demonstrated by (i) the Madison

  County Sheriff's Department's failure to adequately train, supervise, and/or discipline

officers with respect to unconstitutional policing practices and with respect to officers'
exercise of discretion in conducting law enforcement activities, (ii) the Madison County
Sheriff's Department's failure to adequately investigate or otherwise respond to citizen
complaints, (iii) the Madison County Sheriff's Department's failure to maintain data
and/or statistics regarding incidents involving the use of force and the racial composition
of persons subject to the Madison County Sheriff's Department's policing activities, and
(iv) the Madison County Sheriff's Department's culture of racial discrimination and of
explicitly or implicitly condoning, authorizing, and/or acquiescing to racially
discriminatory attitudes, statements, and actions by Madison County Sheriff's
Department personnel.

The policies, customs, and/or practices described above have been identified through
analysis of deposition testimony taken in this Action, documents produced by the parties, and
documents received in response to requests made under the Mississippi Public Records Act.
Plaintiff's investigation, discovery, and preparation of her case and her legal theories, through
counsel, are ongoing, and Plaintiff reserves all rights to identify other policies and/or procedures,
to clarify or refine Plaintiff's characterizations of the above-mentioned policies and/or
procedures, and/or to rely on other or additional evidence concerning any such policies and/or
procedures, including as a result of documentary or testimonial evidence that may be adduced in
this Action after the date hereof.

Dated: January 16, 2018

By:  /s/ Joshua Tom
        Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Jumin Lee (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopherjumin.lee@stblaw.com
bonnie.jarrett@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiff*

11

## Verification

I hereby declare under penalty of perjury that the responses contained in the foregoing Supplemental Responses and Objections to Interrogatories propounded by Defendants, which were prepared with the assistance of counsel, are true and correct to the best of my knowledge, information, and belief.