**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON
HERBERT ANTHONY GREEN; KHADAFY MANNING;
QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS
SINGLETON; STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER, individually and on
behalf of a class of all other similarly situated,**          **PLAINTIFFS**

**VS.**              **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL C. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,**         **DEFENDANTS**

---

**REVISED MEMORANDUM IN SUPPORT OF [DKT. # 211] MOTION BY
DEFENDANTS FOR SUMMARY JUDGMENT AS TO INDIVIDUAL
AND CLASS BASED CLAIMS BY PLAINTIFF, STEVEN SMITH**

---

COME NOW Defendants, Madison County, Mississippi, and Sheriff Randall C. Tucker, in his official capacity, by and through counsel, and respectfully submit the following Memorandum in Support of their Motion for Summary Judgment as to Individual and Class Based Claims by Plaintiff, Steven Smith.

## INTRODUCTION

The instant class-action lawsuit was filed on May 8, 2017, by ten plaintiffs. The Complaint is 86 pages long and contains 337 paragraphs. Smith claims violations of his Fourth and Fourteenth Amendment rights by personnel of the Madison County Sheriff's Department ("MCSD") under 42 U.S.C. §1983 and intentional racial discrimination under Title VI of the Civil Rights Act of 1964. He sues on behalf of himself and a purported class of individuals he defines as:

People who (1) are, or who appear to be, Black and those in their company, and (2) were, are, or will be in Madison County, and (3) were, are, or will be, subject to the MCSD's policy, custom, and/or practice of systematically executing unreasonable searches and seizures of person, homes, cars, and property on the basis of race."

Smith seeks only injunctive and declaratory relief from Defendants.   [Dkt. #1, Pgs. 82-85].

## STATEMENT OF THE FACTS

Before filing his lawsuit, Smith lived in Canton Estates, an apartment complex located in Madison County, for approximately three and one-half years with Plaintiff, Latoya Brown.[1] Smith and Brown have since moved to Columbus, Georgia to find better job opportunities.[2] Smith now works for a chicken processing plant located across the Alabama line.[3]   He and Brown have applied for a Georgia driver's license,[4] and Smith has no plans to move back to Madison County.[5]

Smith has received more than 20 traffic citations from Madison County,[6] approximately 12 from the City of Canton,[7] and more from the City of Jackson.[8]   He has only traveled through two or three safety checkpoints in Madison County.[9]   During one checkpoint, Smith and Brown were passengers in a vehicle that had a child restraint seat in it.  After asking Brown and the driver to show him their identification, the deputy conducting the stop complained about the position of a child seat.  Smith exited the vehicle, corrected the problem, and then he and Brown

---

[1]   Exhibit A, Pgs. 9:24-25; 10:1-8.
[2]   Exhibit A, Pgs. 9:11-16; 11:9-12.
[3]   Exhibit A, Pg. 11:15-25.
[4]   Exhibit A, Pgs. 88:19-25; 89:1.
[5]   Exhibit A, Pgs. 59:22-25; 60:1.
[6]   Exhibit A, Pgs. 39:17-25; 39:1-6; 40:1-14.
[7]   Exhibit A, Pg. 86:10-15.
[8]   Exhibit A, Pgs. 86:10-15; 90:14-17; 91:1 -14.
[9]   Exhibit A, Pg. 31:12-25.

walked home rather than continuing to ride in the car.[10]  During the second checkpoint, Smith was asked to show his driver's license and, after realizing he did not have it, asked if he could use a recent receipt he had received after renewing his license.  The deputy agreed and let Smith go through the checkpoint without any problems.[11]  Smith testified that he has seen three other checkpoints in Madison County and, although he did not travel through them, he witnessed MCSD marked cars at these checkpoints, MCSD deputies standing in the road, and MCSD deputies stopping every vehicle.[12]

Smith claims he filed this lawsuit to "do [his] part in getting better policing in [his] community."[13]  When asked what complaint he had about MCSD policing, Smith described the policing as "very aggressive in the black neighborhoods,"[14] and gave several examples to support his opinion:  (1) a January 23, 2017, incident when he was stopped while walking to Canton Estates;[15] (2) MCSD holiday checkpoints he claimed were focused only on Canton Estates rather than on White areas of Madison County;[16] (3) MCSD "jump-out procedures;"[17] (4) a 2015 Halloween night "home invasion" of his apartment at Canton Estates; [18] and (5) another alleged "home invasion" he claims occurred in his neighborhood.[19]

---

[10]  Exhibit A, Pgs. 52: 53:1-18.
[11]  Exhibit A, Pgs. 54; 55:1-24.
[12]  Exhibit A, Pgs. 97; 98:1-21.
[13]  Exhibit A, Pg. 31:7-25.
[14]  *Id.*
[15]  Exhibit A, Pg. 32:1-19.
[16]  Exhibit A, Pg. 16:14-25.
[17]  Exhibit A, Pgs. 67:11-25; 68:11-21.
[18]  Exhibit A, Pgs. 42:15-25; 43; 44; 45; 46:12-19.
[19]  Exhibit A, Pgs. 46:20-25; 47; 48.

### A.     The January 23, 2017, Incident

Smith testified that he walked to a local store around 7:00 p.m. on January 23, 2017, and met up with an old high school friend, who he invited to walk back with him to his apartment. On their way back, Smith and his friend were the only persons on the street.[20]  As they walked into the parking lot of Canton Estates, they were met by two MCSD deputies, who asked both men to take their hands out of their pockets and then to show them their identification.  One deputy questioned Smith and the other one questioned Smith's friend while both men stood about 10 feet apart.[21]  Smith heard the deputy questioning his friend about a handgun the deputy had retrieved from the friend's pocket and hearing the deputy tell his friend that no records showed that he had a permit to carry the gun.[22]

The deputy questioning Smith ran his identification through dispatch and, after learning that Smith had two outstanding warrants for unpaid traffic fines, placed Smith under arrest.[23]  Smith testified that he felt that he was stopped either because of his race or because the area around his apartment complex was over-policed.[24]   Immediately after expressing this opinion, however, Smith agreed that Canton Estates was a high crime area and that it did not bother him that the MCSD patrolled there to combat crime.[25]

### B.     Checkpoints Focused Only on Canton Estates During Holidays

When asked what proof he had that the MCSD set up checkpoints only around Canton Estates during the holidays, Smith testified that he would call his grandparents, who lived across

---

[20]   Exhibit A, Pg. 42:6-14.
[21]   Exhibit A, Pg. 36:21-25.
[22]   Exhibit A, Pg. 36:9-13; 37:15-25; 38:1-12.
[23]   Exhibit A, Pgs. 33-38:1-16.
[24]   Exhibit A, Pg. 49:5-25.
[25]   Exhibit A, Pgs. 50:5-25; 51:1-4.

town, and ask them if they had seen any deputies patrolling in their neighborhood, and that they would tell him "no."  He also testified that during the four years he lived in Canton Estates, he looked on Facebook about 10 times to see where MCSD holiday checkpoints were located. When asked whether this list showed any checkpoints scheduled for White areas, Smith admitted that he did not know.[26]

### C.    The Alleged "Home Invasion" on Halloween Night 2015

Smith testified that MCSD deputies came to his and Brown's apartment around midnight on Halloween night 2015 and knocked on the door.  Smith went to the door and asked "what's going on," and the deputies told him "[w]e're looking for a missing person, a missing kid," and told him her name.  Smith told the deputies he and Brown had a party for Brown's nephew that night, but that he was sure everyone had left.   The deputies responded by telling Smith "[l]ook, we need to check every apartment.  We're checking every apartment."  Smith testified that he told the deputies, "I don't give you permission," but did not resist when they walked past him and into the apartment.   After the deputies left his apartment, Smith heard them going up and down the stairs in his building.[27]

When asked about the other illegal "home invasion" he had identified in interrogatory responses, Smith testified that it occurred while he was at a neighbor's house.  He testified that MCSD deputies arrived at the house, walked into the house, and asked him and another man to wait outside.  Smith has no idea why the deputies came to the house and cannot provide any more details about the incident.[28]

---

[26]  Exhibit A, Pgs. 64:14-25; 65; 66; 67:1-10.
[27]  Exhibit A, Pgs. 42:15-25; 43; 44; 45; 46:12-19.
[28]  Exhibit A, Pgs. 46:20-25; 47; 48.

### D.      MCSD "Jump-Out Procedures"

Smith testified that he had seen MCSD deputies stop and search one vehicle in Canton, Mississippi, and another vehicle in a park.[29]  When asked about the specifics of these stops and searches, Smith admitted that he has no personal knowledge about either of them.[30]

## ARGUMENT AND AUTHORITIES

The party moving for summary judgment bears the responsibility of providing the court with the basis of its motion and identifying the portions of the record in the case that establish the absence of a genuine issue of material fact.  *Celotex Corporation v. Catrett*, 477 U.S. 317,  323 (1986).  Once the moving party has properly supported his motion for summary judgment, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also United Steel Workers, Etc. v. University of Alabama*, 599 F.2d 56 (5th Cir.1979).  "The moving party bears the initial burden of showing that there is no genuine issue for trial;  it may do so by pointing out the absence of evidence supporting the nonmoving party's case." *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir.1995) (citation omitted) (internal quotations omitted).  If the moving party meets its burden, "the nonmoving party who will have the burden of proof at trial must come forward with summary judgment evidence establishing the existence of a genuine issue; that evidence must be such that if introduced at trial it would suffice to prevent a directed verdict against the nonmovant." *Id.*

*************

Smith's claims must be dismissed for two separate reasons.  First, there is no evidence Sheriff Tucker has ever deprived him of any federal rights.  Second, even if he could prove

---

[29]  Exhibit A, Pgs. 55:25; 56:1-11.
[30]  Exhibit A, Pg. 68:11-21.

violations in the past, there is no likelihood he will be subjected to similar violations in the future, rendering injunctive relief unavailable.

    **A.**    **Smith Cannot Establish that He Has Been Subjected to Intentional Racial Discrimination.**

Although Smith in his testimony describes a series of encounters with the MCSD, the heart of his complaint is not a succession of incidents, but a supposed policy of racial discrimination.  The very first paragraph of his complaint alleges that the MCSD "implements a **coordinated top-down program** of methodically targeting Black individuals for suspicionless searches and seizures while they are driving their cars, walking in their neighborhoods, or even just spending time in their own homes (the "Policing Program")."  [Dkt. #1 ¶ 1 (emphasis in original)].  This claim of intentional racial discrimination is the only basis in his complaint for his request to represent a class, describing the common issue as "whether the MCSD has a policy, practice, and/or custom of targeting members of the Class for unreasonable searches and seizures on the basis of race in violation of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment."  [Dkt. #1 ¶ 304].  To obtain the only relief he seeks, which is on behalf of the class, Smith must prove, not merely a violation of his rights, but the existence of the "Policing Program" that he alleged.

He asserts his claims of intentional racial discrimination in the second and third causes of action of his complaint.  The second cause of action seeks relief under 42 U.S.C. §1983 for violations of the Equal Protection Clause, which, of course, requires proof of intentional racial discrimination.  *Coleman v. Houston Independent School District,* 113 F.3d 528, 533 (5th Cir. 1997) (citations omitted).  *See also Vera v. Tue,* 73 F.3d 604, 609 (5th Cir.1996) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")  His third cause of action seeks relief under Title VI, 42 U.S.C. § 2000d *et seq*., under

which Smith, as a private party, must prove race discrimination by an entity that receives federal funds. *Alexander v. Sandoval,* 532 U.S. 276, 280 (2001). He cannot succeed with this claim simply by proving disparate impact. *Id.* Further, both the United States Supreme Court and the Fifth Circuit Court of Appeals have held that a private right of action under Title VI can only be brought for acts of intentional discrimination. *Id.* at 281 ("What we said in *Alexander v. Choate*, 469 U.S. 287, 293 (1985), is true today, 'Title VI itself directly reaches only instances of intentional discrimination.'")

The only racial discrimination claims Smith describes in his deposition involve the event that occurred on January 23, 2017, when he encountered MCSD deputies outside Canton Estates, and the MCSD's targeting of predominantly Black neighborhoods to conduct roadblocks or checkpoints.[31] Smith's description of what occurred the night of January 23 does not in any way suggest that the deputies stopped him solely because of his race. There is no evidence that either deputy made a racially derogatory remark to him or treated him any differently because of his race. Further, had they made any such comments, this would not be enough to establish intentional discrimination. *See Williams v. Bramer,* 180 F.3d 699, 706 (5th Cir.), *decision clarified on reh'g,* 186 F.3d 633 (5th Cir. 1999). Finally, he cannot claim that he was arrested that night because of his race since valid warrants existed for his arrest. He bases his claim that the MCSD checkpoints are racially discriminatory on two things, telephone conversations he had on a particular holiday with his grandparents, who told him that they had not seen any checkpoints in their neighborhood across town, and his review of a Facebook page "at the most"

---

[31] Although Smith claimed in both his complaint [Dkt. #1 ¶ 4] and during his deposition that the MCSD has a policy of targeting only Black neighborhoods while conducting checkpoints, he does not include this policy in his supplemental interrogatory responses. The interrogatories ask him to identify and describe all MCSD policies he claims sanction or encourage "unreasonable searches and seizures or racial discrimination." Therefore, it appears that he has abandoned this claim. (Exhibit B, Pgs. 3-6).

10 times and seeing checkpoints that were going to be set up near Canton Estates.  (Exhibit A, Pg. 66:4-19).  Smith could not testify whether these posts only listed checkpoints scheduled in his neighborhood or whether they included those scheduled for all areas in Madison County. Smith's allegation is actually nothing more than an assertion that the checkpoints he questions were racially motivated because they were in predominantly Black areas.  He in no way offers any evidence that Black areas were intentionally targeted.

This unreliable and sparse evidence is insufficient to support Smith's claims of a "Policing Program" of intentional racial discrimination by the MCSD throughout all of Madison County.   What Smith offers is simply his subjective belief that he was stopped based on his race on January 23, 2017, and that MCSD checkpoints are set up with the aim of intentionally discriminating against Blacks.  "A plaintiff's subjective belief of race discrimination cannot alone establish that he has been a victim of intentional discrimination."  *Laborde v. City of Houston*, 31 F. App'x 151 (5th Cir. 2001) (citing *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434- 435 (5th Cir. 1995)).  *See also Nichols v. Grocer,* 138 F.3d 563, 570 (5th Cir. 1998) ("[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief.").   Without more, Smith cannot establish that MCSD checkpoints are placed or operate in such a manner as to intentionally discriminate against Blacks.  *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) ("In short, conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.") (en banc). Smith's second and third causes of action, therefore, should be dismissed.

### B.   Smith Cannot Create Genuine Issues of Material Fact Regarding Any Element of his Fourth Amendment Claims under 42 U.S.C. §1983.

To hold Madison County liable to his under §1983 in this action, Smith must allege and establish two threshold elements: (1) that he was deprived of a right or interest secured by the

Constitution and laws of the United States, and (2) that the deprivation occurred under color of state law.  *See West v. Atkins,* 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 331-32 (1986). Defendants submit that Smith cannot satisfy the first element of this test because no act by any MCSD personnel violated his constitutional rights.[32]

Smith's §1983 claims against Defendants arise out of the following events: (1) a January 23, 2017, incident where he was stopped while walking to Canton Estates by two MCSD deputies, asked for his identification, and subsequently arrested on two outstanding Justice Court warrants; (2) MCSD holiday checkpoints he claims were focused only on Canton Estates rather than on White communities of Madison County; (3) MCSD "jump-out procedures" involving MCSD deputies' stopping and searching a vehicle; (4) a 2015 Halloween night "home invasion" of his apartment at Canton Estates; and (5) another alleged "home invasion" he claims occurred in his neighborhood.

Smith claims he suffered a violation of his Fourth Amendment rights when he was stopped by a MCSD deputy, asked to take his hands out of his pockets, asked to show his identification, and then arrested.  The incident occurred at night while Smith and a high school friend were walking on a public street toward Canton Estates.  Defendants submit that the circumstances surrounding this event do not trigger Fourth Amendment protections.

In *U.S. v. Drayton*, 536 U.S. 194, 203-204 (2002), the Court affirmed the district court's finding that no Fourth Amendment violation occurred when an officer boarded a bus and began

---

[32]   In addition, to secure relief against the County and Sheriff Tucker in his official capacity, Smith "must demonstrate a policy or custom which caused the alleged violation."  *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996).  No evidence of any such policy exists, but the Court need not reach that issue, because no evidence of any violation of constitutional rights exists.

to question its passengers.  Both respondents, who were passengers, complied with every request the officers made to them, including allowing searches of their luggage and of their persons. Both respondents were arrested after the officers found drugs taped between their shorts.  While affirming the respondents' criminal convictions, the Court agreed that "everything that took place between Officer Land and [respondents] suggests that it was cooperative," and that their encounter with the officers involved "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."  *Id.*

The Court in *United States v. Wise,* 877 F.3d 209, 220 (5th Cir. 2017), applied *Drayton* while holding that "'a seizure does not occur simply because a police officer approaches an individual and asks a few questions.'"  *Id.*  (quoting *Florida v. Bostick,* 501 U.S. 429, 434 (1991)).   Wise was also a passenger on a bus who, after being approached by officers, consented to their request to show them his identification and to allow them to search his luggage.  Wise subsequently was arrested for possession of drugs.   The Court refused to find that Wise's Fourth Amendment rights were violated during his encounter with the officers.  It held that "police do not need reasonable suspicion to approach someone for questioning;" instead, "'[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.'" (quoting *Bostick*, 501 U.S. at 434).  It also held that "an encounter with police is "consensual" so long as the civilian would feel free to either terminate the encounter or disregard the questioning."  *Id.* (citing *Bostick*, 501 U.S. at 434).   Applying *Drayton,* the Court held that the officers gave the passengers on the bus "no reason to believe that they were required to answer the [officers'] questions."  *Id.* at 221.  Like the respondents in *Wise* and *Drayton*, Smith never refused any of the MCSD deputies' requests that night.  Rather, he testified that once asked, he took his hands

out of his pockets and gave the deputy his identification.  Smith, therefore, consented to the stop and was not "seized" under the Fourth Amendment.

Smith bases his "jump-out procedures" claim on two separate stops and searches of vehicles by MCSD deputies that he observed, one in a parking lot and the one in a park.  When pressed about any specific knowledge he has about the circumstances surrounding these stops, Smith could provide nothing.  He does not know the individuals involved and cannot provide the bases of these stops and searches.  This conclusory and unreliable evidence cannot be used to support a Fourth Amendment claim by Smith in this action.

Both Brown and Smith have given details of the events of that night, but Smith recalls more of what the deputies told him when they came to his apartment door.  He admits that the deputies told him that they were searching every apartment for a missing girl and that they even identified the girl.  Smith also confirms that the deputies did not single out his apartment while searching; instead, Smith agrees that the deputies told him they intended to search every apartment and describes hearing these deputies climbing stairs in his building after they left his apartment.   Smith's testimony never suggests that the deputies who entered his apartment were conducting a criminal investigation, removing any claim he may make that they needed probable cause to enter.  Finally, Smith's testimony clearly shows that the deputies' entry was based on exigent circumstances, thereby removing their actions from any scrutiny under the Fourth Amendment.  Defendants adopt the authorities they cited in support of the Motion for Summary Judgment of Brown's claims in further support of their position that this claim by Smith does not trigger Fourth Amendment protections and should be dismissed by this Court.

Like Smith's description of the two "jump-out procedures" he claims he witnessed, Smith lacks any knowledge of the details surrounding his second "home invasion" claim by MCSD

deputies.   Smith only recalls that he was in a neighbor's house, that MCSD deputies arrived at

the house, and, upon entry into the house, asked Smith and his companion to leave the house.

Smith does not know who lived in the home and cannot provide any details about why the

deputies entered the home.   As a result, this claim should also be dismissed with prejudice as

completely lacking any evidentiary basis to show a violation of the Fourth Amendment.

### C.   Smith Lacks Standing under Article III to Bring His Own Claims for Injunctive and Declaratory Relief, as well as those of His Purported Class Members.

The United States Supreme Court has recognized three requirements for Article III

standing.  First, "the plaintiff must have suffered an 'injury in fact' – an invasion of a legally

protected interest that is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical.  Second, there must be a causal connection between the injury and

the conduct complained of . . . .   Third, it must be likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision."   *United States v. Hays,* 515 U.S. 737, 742-

43 (1995) (quoting *Lujan v. Defenders of. Wildlife,* 504 U.S. 555, 560-561 (1992).   Further,

because Smith is seeking injunctive and declaratory relief, he must show that he is "likely to

suffer future injury by the defendant and that the sought-after relief will prevent that future

injury." *James v. City of Dallas,* 254 F.3d 551, 563 (5th Cir. 2001) *cert. denied,* 534 U.S. 1113

(2002).   "Past exposure to illegal conduct does not in itself show a present case or controversy

regarding injunctive relief."   *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983) (quoting

*O'Shea v. Littleton,* 414 U.S. 488, 495-96)   Instead, a plaintiff seeking injunctive or declaratory

relief "must allege facts from which it appears there is a substantial likelihood that he will suffer

injury in the future" *i.e.,* a "'substantial and continuing controversy' between two adverse

parties" that is not "conjectural, hypothetical, or contingent . . . ." *Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir. 2003).

Smith cannot satisfy any of these Article III standing requirements. He has no individual standing because he has not suffered a violation of his Fourth or Fourteenth Amendment rights. He has proven no private right to sue under Title VI. Finally, he cannot show that he is likely to suffer any injury in the future from any conduct by the MCSD since he no longer resides in Madison County or, for that matter, in the State of Mississippi. Without standing under Article III, Smith cannot "seek [injunctive] relief on behalf of . . . [himself] or any other member of the [purported] class." *James,* 254 F.3d at 563 (citing *O'Shea,* 414 U.S. at 494). For these reasons, Smith lacks standing to pursue his claims or those of his purported class. His individual claims should be dismissed with prejudice, and he should be disqualified from representing the class of individuals he seeks to represent in this matter.

## CONCLUSION

For the reasons set forth above, all of Smith's claims against Defendants should be dismissed with prejudice.

This the 14th day of March, 2018.

Respectfully submitted:

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

By:      */s/ Rebecca B. Cowan*

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, MS   39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Telephone: 601-968-5534
Facsimile: 601-944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

Katie Bryant Snell (MSB #103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester (MSB #2394)
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
Telephone:  601-987-5300
Facsimile:  601-987-5353
lhester@pbhfirm.com

16

## **CERTIFICATE OF SERVICE**

I, Rebecca B. Cowan, do hereby certify that I have this day, electronically filed the above

and foregoing with the Clerk of the Court using the ECF system which will automatically provide

e-mail notification of said filing upon the following:

Joshua Tom, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, Mississippi 39201
JTom@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Jumin Lee, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 14th day of March, 2018.

/s/ Rebecca B. Cowan

## Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                      JACKSON DIVISION
3   LATOYA BROWN; LAWRENCE BLACKMON;
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
4   QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
5   BESSIE THOMAS; and BETTY JEAN
    WILLIAMS TUCKER, individually and on
6   behalf of a class of all others
    similarly situated                    PLAINTIFFS
7
    VS.              CIVIL ACTION NO. 3:17-cv-347 WHB LRA
8
9   MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER,
10  in his official capacity; and
    MADISON COUNTY SHERIFF'S DEPUTIES
11  JOHN DOES #1 through #6,
    in their individual capacities        DEFENDANTS
12
13  ***************************************************
14            DEPOSITION OF STEVEN SMITH
15  ***************************************************
16           (APPEARANCES NOTED HEREIN)
17           TAKEN AT THE OFFICES OF:
             WISE, CARTER, CHILD & CARAWAY
             401 EAST CAPITOL STREET
18           JACKSON, MISSISSIPPI
19
             TUESDAY, JANUARY 9, 2018
20           AT APPROXIMATELY 8:31 A.M.
21
22  REPORTED BY:
23           TAMMY MCDANIEL-BAGNATO, #1910
24
25
```

## Page 2

```
1   APPEARANCES:
2
    MIKE WALLACE, ESQ.
3   Wise, Carter, Child & Caraway
    Post Office Box 651
4   Jackson, Mississippi 39205-0651
5           COUNSEL FOR THE DEFENDANTS
6
    REBECCA B. COWAN, ESQ.
7   Currie, Johnson & Myers
    Post Office Box 750
8   Jackson, Mississippi 39205-0750
    bcowan@curriejohnson.com
9
            COUNSEL FOR THE DEFENDANTS
10
11  J. LAWSON HESTER, ESQ.
    Pettis, Barfield & Hester
12  Post Office Box 16089
    Jackson, Mississippi 39236-6089
13  lhester@pbhfirm.com
14          COUNSEL FOR THE DEFENDANTS
15
    Isaac Rethy, Esq.
16  Simpson Thacher & Bartlett
    425 Lexington Avenue
17  New York, New York 10017
    Irethy@stblaw.com
18
            COUNSEL FOR THE PLAINTIFFS
19
    BROOKE JARRETT, ESQ.
20  JOSHUA TOM, ESQ.
    American Civil Liberties Union
21  of Mississippi Foundation
    233 East Capitol Street
22  Jackson, Mississippi 39201
    jtom@aclu-ms.org
23
            COUNSEL FOR THE PLAINTIFFS
24
25
```

## Page 3

```
1   ALSO PRESENT:
2          CHIEF DEPUTY JEREMY WILLIAMS
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                TABLE OF CONTENTS
```

```
2   Title Page...........................................1
3   Appearance Page......................................2
4   Table of Contents....................................4
5   Exhibits.............................................5
6   Stipulation..........................................6
7   Examination by Ms. Cowan.............................7
8   Examination by Mr. Rethy............................96
9   Examination by Ms. Cowan............................97
10  Certificate of Reporter............................100
11  Certificate of Deponent............................101
12  Errata Sheets......................................102
13                     - - -
```

```
14
15
16
17
18
19
20
21
22
23
24
25
```





EXHIBIT
tabbies "A"

**Page 5**

```
 1              EXHIBITS
 2  No Exhibits Marked................................
 3                - - -
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

```
 1              STIPULATION
 2          It is hereby stipulated and agreed by and
 3  between the parties hereto, through their respective
 4  attorneys of record, that this deposition may be taken
 5  at the time and place hereinbefore set forth, by Tammy
 6  McDaniel-Bagnato, Court Reporter and Notary Public.
 7          The formality of READING AND SIGNING is
 8  specifically NOT WAIVED.
 9                - - -
10      (TAKEN FROM THE DEPOSITION OF LATOYA BROWN)
11        (PAGE 84 LINE 24 THROUGH PAGE 85 LINE 6)
12      "MR. RETHY:  We'll take both transcripts for
13  two weeks to determine whether there's anything in here
14  that warrants designating as confidential.
15      MS. COWAN:  On this one?
16      MR. RETHY:  On this one and on Mr. Smith's.
17  I'm not trying to mark anything at this moment."
18                - - -
19
20
21
22
23
24
25
```

**Page 7**

```
 1                - - -
 2          STEVEN SMITH,
 3      (After having been first duly sworn,
 4      testified as follows:)
 5                - - -
 6      (DIRECT EXAMINATION)
 7  BY MS. COWAN:
 8      Q.  Mr. Smith, I just introduced myself
 9  to you a few minutes ago.  I'm Becky Cowan.
10      A.  Yes.
11      Q.  And I'm here on behalf of the
12  defendants.  And I have Mike Wallace, who's
13  also an attorney for the defendants, Chief
14  Deputy Williams --
15      A.  Yes.
16      Q.  -- and Lawson Hester.  And I'm going
17  to ask you some questions today.  Have you
18  ever given a deposition before?
19      A.  No, ma'am.
20      Q.  Okay.  This is sort of like court in
21  that you have been sworn to tell the truth.
22  You've taken an oath, and so I am
23  anticipating that you will tell me the truth
24  when I ask you questions.
25          If you don't understand my
```

**Page 8**

```
 1  questions, I want you to tell me you don't
 2  understand so I can re-ask it so that when
 3  you answer it, I can be -- rest assured that
 4  you understood my question and how you
 5  answered it is the correct answer that you
 6  would have wanted to give me.
 7      A.  Yes.
 8      Q.  And I hear you're saying "yes."
 9  Don't say "uh-huh" or "uh-uh" to the court --
10  because the court reporter has to get
11  everything down.  So if you -- if you can,
12  answer "yes," "no," "I don't know," verbal
13  responses, not nodding your head or "uh-huh"
14  or "uh-uh" --
15      A.  Yes.
16      Q.  -- so she'll know which -- which way
17  you're answering.
18          Your counsel may object to the form
19  of a question, but unless your counsel tells
20  you not to answer the question, I'm going to
21  expect you to answer the question.
22      A.  Yes.
23      Q.  You understand?
24      A.  Yes.
25      Q.  Have you taken any kind of
```



STEVEN SMITH                                           January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                    9–12

Page 9

1  medication today that would influence or have
2  any effect on your responses to any of my
3  questions?
4      A. No.
5      Q. Can you give me your whole name,
6  please?
7      A. Whole name is Steven Andrew Smith.
8      Q. And do you go by any nicknames or
9  aliases?
10     A. No.
11     Q. What's your current address?
12     A. ███████████████
13     Q.
14     A. Yes, ma'am.
15     Q. Okay.
16     A. Columbus, Georgia.
17     Q. And how long have you lived there?
18     A. A little over a month and a half.
19     Q. Where did you live before that?
20     A. Before then it was 5521 Northcut
21  Drive.  That would be College Park, Georgia.
22     Q. And how long did you live there?
23     A. Same -- two months there.
24     Q. And before that?
25     A. It was 388 Ricks Drive, Canton,

Page 10

1  Mississippi.
2      Q. And is that in Canton Estates?
3      A. Yes, ma'am.
4      Q. And how long did you live in Canton
5  Estates?
6      A. Four years.
7      Q. Four years?
8      A. Yes.
9      Q. And am I correct in believing that
10  you were living with Latoya Brown?
11     A. Yes.
12     Q. Who leased the apartment?
13     A. Both.
14     Q. Both your names were on the lease?
15     A. Yes, ma'am.
16     Q. All right.  And with the Hilton
17  Avenue address where you're living right now,
18  are you renting or buying?
19     A. We're staying, cohabitating with
20  my -- a good friend and his wife.
21     Q. Okay.  Do you have plans to find an
22  apartment or move somewhere by yourselves?
23     A. Yes, ma'am.
24     Q. And it would still be in the
25  Columbus, Georgia, area?

Page 11

1      A. Yes, ma'am.
2      Q. And then with the Northcut Drive
3  address, was that a rental or were you living
4  with somebody then?
5      A. Living with someone then.
6      Q. And who was that?
7      A. That was Latoya's brother and his
8  wife.
9      Q. And can you tell me why you moved to
10  Georgia?
11     A. Better opportunities, working
12  opportunities.
13     Q. For both of you or for one of you?
14     A. Both.
15     Q. Okay.  Where are you working?
16     A. Now, I am working at the Alatrade
17  Foods.
18     Q. Alatrade?
19     A. Uh-huh (affirmative response).
20  Foods.
21     Q. Foods.
22     A. Yes.
23     Q. What is that?
24     A. Excuse me for lack of better terms.
25  A chicken plant.

Page 12

1      Q. Oh, a chicken plant?  Okay.  How
2  long have you worked there?
3      A. Just over a month now.
4      Q. Where did you work before that?
5      A. Clorox Industries.
6      Q. Where is Clorox Industries?
7      A. That's off of Fairbank -- Fairburn,
8  Georgia.
9      Q. Fairbaron?
10     A. Fairburn.
11     Q. Burn?
12     A. Uh-huh (affirmative response).
13     Q. And Alatrade, is it in Georgia?
14     A. No, ma'am.  It's in Phoenix City,
15  Alabama.
16     Q. And how far away is that from where
17  y'all are staying right now?
18     A. It's about 10 miles.
19     Q. And Latoya Brown -- are you married
20  to Latoya?
21     A. No, ma'am.
22     Q. Are you engaged?
23     A. No, ma'am.
24     Q. Okay.  And how long have you and
25  Latoya been together?



STEVEN SMITH                                          January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                    13—16

Page 13

1    A. Four and a half years.
2    Q. Have you ever been married?
3    A. No, ma'am.
4    Q. Do you and Latoya have children
5    together?
6    A. One child together.
7    Q. One child together?
8    A. Yes.
9    Q. And how old is that child?
10   A. Two.
11   Q. What's her name?
12   A. ▮▮▮▮▮▮▮▮▮▮▮▮
13   Q. And does Latoya have other children?
14   A. Yes.
15   Q. Do they live with her?
16   A. Yes.
17   Q. How many?
18   A. One.
19   Q. One?
20   A. Uh-huh (affirmative response).
21   Q. And what is that child's name?
22   A. ▮▮▮▮▮▮▮▮▮▮
23   Q. ▮▮▮▮▮▮▮▮▮▮
24   A. ▮▮▮▮▮▮▮▮▮▮
25   Q. ▮▮▮▮▮▮▮▮▮▮

Page 14

1    A. Yes.
2    Q. And how old is she?
3    A. She's eight.
4    Q. Do you have any other children?
5    A. Yes.
6    Q. What other children do you have?
7    A. I have a nine-year-old, ▮▮▮▮▮
8    Q. Where does she live?
9    A. Jackson.
10   Q. Does she live with her mother?
11   A. Yes.
12   Q. Any other children?
13   A. ▮▮▮▮▮▮▮▮▮▮
14   A. ▮▮▮▮▮▮▮▮▮▮
15   A. ▮▮▮▮▮▮▮▮▮▮
16   Q. ▮▮▮▮▮▮▮▮▮▮
17   A. ▮▮▮▮▮▮▮▮▮▮
18   Q. ▮▮▮▮▮▮▮▮▮▮
19   A. Uh-huh (affirmative response).
20   Q. And how old is she?
21   A. She's four.
22   Q. And where does she live?
23   A. With her mother in Canton.
24   Q. And did you grow up in Canton?
25   A. Yes, ma'am.

Page 15

1    Q. I know you've answered some
2    interrogatories that we sent to you, and I'm
3    trying -- I'm going to try not to repeat
4    those. But I'm just going to go over your
5    eduction. I think you told me you went to
6    Velma Jackson High School; is that correct?
7    A. Yes.
8    Q. From 2004 to 2006?
9    A. Yes.
10   Q. You didn't graduate?
11   A. No, ma'am.
12   Q. And you studied for the GED in 2006
13   but did not take it or --
14   A. I got the GED.
15   Q. You did get it?
16   A. Yes, ma'am.
17   Q. Okay. You went to an electrical
18   program down on the coast with Job Corps from
19   '08 to '09?
20   A. Not on the coast. It was in Crystal
21   Springs.
22   Q. Crystal Springs?
23   A. Yes, ma'am.
24   Q. Okay. And what did you do there?
25   Did you get some kind of certification or

Page 16

1    anything?
2    A. No, ma'am.
3    Q. Did you complete the program?
4    A. No, ma'am.
5    Q. Then you went to a couple of
6    community colleges. Tell me about that.
7    A. Yes. Utica -- I attended Hinds in
8    Utica for -- what is that -- architecture and
9    drafting. I didn't finish that either. Then
10   my last schooling was at Holmes Community
11   College in Ridgeland where I did the
12   embalming course, but I didn't finish the
13   clinical part.
14   Q. So you're not certified to do any
15   kind of embalming?
16   A. No, ma'am.
17   Q. All right. What exactly do you do
18   at Alatrade? What are your duties, your
19   responsibilities?
20   A. Handling the knives, knife
21   sharpening, and cutting shoulders on the line
22   when needed.
23   Q. Do you hold any kind of supervisor
24   position or anything like that?
25   A. No, ma'am.



Page 17

1    Q. And I believe -- does Latoya work
2  there too?
3    A. Yes.
4    Q. What's her position?
5    A. Data collector.
6    Q. What does that mean?
7    A. Collecting data -- from my
8  understanding, collecting data from the cuts
9  of meat that's running on each line, checking
10 temperatures and other quality.
11   Q. Have you enrolled Latoya's child in
12 school there?
13   A. Yes.
14   Q. And what grade is she in?
15   A. She's in the third grade.
16   Q. And I know you said you intended to
17 try and find something. Do you intend to
18 rent or do you intend to buy something there?
19   A. Rent.
20   Q. Okay. Starting with when you got
21 out of high school in, I think you said, '06,
22 tell me about what kind of jobs you've had.
23   A. From 2006, I started at -- I want to
24 say I started at Whataburger, High Street.
25 Went from Whataburger to American Deli in the

Page 18

1  Metrocenter.
2    Q. American Deli, what stores do they
3  run?
4    A. It's restaurants.
5    Q. Restaurants?
6    A. Yes. From there I went to -- I'm
7  pretty sure I'm missing a gap, but where I
8  pick up at is Cardinal Health in Gluckstadt.
9    Q. What did you do there?
10   A. Picker. I was a picker, picking
11 medicines to be shipped out right in
12 shipping.
13   Q. And with Cardinal Health, how long
14 did you work there?
15   A. About three months.
16   Q. And why did you leave?
17   A. It was a temporary assignment.
18   Q. Were you with a temp staff company?
19   A. Yes, ma'am.
20   Q. Which one?
21   A. BelFlex
22   Q. BelFlex?
23   A. Yes.
24   Q. All right. Then what did you do?
25   A. Went over to the Nissan plant.

Page 19

1  What's the -- Aramark.
2    Q. Okay. And was that still with
3  BelFlex?
4    A. Yes.
5    Q. How long did you work there?
6    A. Just over four months.
7    Q. Then where?
8    A. Then I went back into Penn's To Go
9  restaurant in Canton.
10   Q. The what now?
11   A. Penn's To Go. Well, in Madison.
12   Q. Penn?
13   A. Penn's.
14   Q. Penn's? Okay. Oh, okay.
15   A. Uh-huh (affirmative response), Fish
16 House. Let's see. Canton Manor in Canton.
17   Q. What did you do at Canton Manor?
18   A. DCP, direct care provider.
19   Q. How long did you work there?
20   A. I would say four months there.
21   Q. Were you still with BelFlex during
22 this time?
23   A. No.
24   Q. No?
25   A. Uh-uh (negative response).

Page 20

1    Q. Why did you leave Canton Manor?
2    A. Didn't pay enough. It wasn't enough
3  to make the bills and put something aside.
4    Q. How long did you work there?
5    A. Four months.
6    Q. Okay. And then where did you go?
7    A. That's -- I was still at Penn's also
8  when I worked there.
9    Q. Okay. Oh, two jobs?
10   A. Uh-huh (affirmative response).
11   Q. Yes?
12   A. Yes, yes.
13   Q. Okay. Then where?
14   A. Then I went to Peco's, Feather Lane.
15 And I was a scale man there.
16   Q. Okay. How long did you work there?
17   A. A year.
18   Q. Why did you leave there?
19   A. I think I left because of point --
20 the point system. I was let go.
21   Q. You were let go?
22   A. Yes.
23   Q. What is the point system?
24   A. The point system is unexcused days
25 or days that you have to take before your



STEVEN SMITH                                          January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                    21–24

Page 21

1    probation.
2        Q.  So how long did you work at Petco --
3    not Petco.  I'm sorry.  Peco?
4        A.  A year.
5        Q.  Okay.  And were you let go because
6    you missed work or didn't --
7        A.  Missed work.
8        Q.  Okay.  Then where?
9        A.  After Peco's, it was --
10       Q.  What year were you at Peco's?
11       A.  Levi's, that's what it was.
12       Q.  Okay.
13       A.  Levi Strauss in Gluckstadt.
14       Q.  Was that the fill-in-the-gap place,
15   or did you go there next after --
16       A.  After Peco's.
17       Q.  Okay.  What did you do at Levi?
18       A.  Carton breakdown, sorting the boxes,
19   box sorter.
20       Q.  How long did you work there?
21       A.  Four months.
22       Q.  Why did you leave?
23       A.  Temporary assignment.  And it's not
24   through BelFlex.  It was through Onin, I want
25   to say.  Onin.

Page 22

1        Q.  Spell that for me.
2        A.  O-N-I-N.
3        Q.  Okay.
4        A.  Staffing.
5        Q.  Where next?
6        A.  That was the last job before I went
7    to Alatrade.
8        Q.  Have you ever gone through any
9    length of time without a job since high
10   school?
11       A.  Yes.
12       Q.  How long of time?
13       A.  I'd say safely, but not sure, but I
14   know I could say a year and a half without a
15   job.
16       Q.  A continuous year and a half?
17       A.  Yes.
18       Q.  Have you ever applied for
19   unemployment benefits?
20       A.  Yes.
21       Q.  When?
22       A.  Recently before Alatrade and right
23   after Levi's in Canton.  And then way back
24   before the continuance, the gap in the jobs,
25   then also.

Page 23

1        Q.  When was the one-and-a-half-year
2    gap?
3        A.  In the way earlier -- between Penn's
4    and -- yeah, Penn's and Canton --
5        Q.  Penn's and Canton Manor?
6        A.  Yes.
7        Q.  Where did you live at that point in
8    time?
9        A.  I was in Canton, but probably
10   from -- between my grandmother's house and a
11   friend's house.
12       Q.  Prior to living in Canton Estates,
13   where did you live?
14       A.  1581 Highway 43.
15       Q.  Is that in Canton or outside of
16   Canton?
17       A.  That's -- I think that --
18       Q.  Is that in the county?
19       A.  I think that's in the city now.  But
20   yes, it was the county.
21       Q.  It was in the county?
22       A.  Yes.
23       Q.  I think I'm safe in assuming that
24   you never served in the military?
25       A.  Yes, never.

Page 24

1        Q.  Okay.  Can you tell me what you did
2    to prepare for this deposition?
3        A.  Just discussed things with counsel.
4        Q.  Okay.  Without telling me what you
5    discussed with them, how long did you meet
6    with them?
7        A.  Maybe two or three times in the last
8    -- how long have we been here?
9        Q.  In the last what?
10       A.  Three days.
11       Q.  In the last three days, you've met
12   with them two or three times?
13       A.  Yes.
14       Q.  And when you say "the last few
15   days," how many days is that?  How long have
16   you been back from Georgia?
17       A.  Got here -- from Friday until today,
18   Friday evening.
19       Q.  Did you drive over here or fly?
20       A.  I drove.
21       Q.  Okay.  Did Latoya come with you?
22       A.  Yes.
23       Q.  The two or three times that you met
24   with your attorneys, was Latoya there also?
25       A.  No.



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
25–28

Page 25

1    Q.  Where did you meet with your
2  attorneys?
3    A.  At the ACLU.
4    Q.  Okay.  Prior to meeting with your
5  attorneys to get ready for this deposition,
6  can you tell me whether or not you met with
7  them prior to get deposition prep?  Have you
8  met with them before?
9       MR. RETHY:  Object to form.
10  BY MS. COWAN:
11    Q.  Like anytime before -- the
12  attorneys, the ACLU, have you met with them
13  prior to Friday forward in the last few days
14  when you met with them?
15    A.  Any other -- excuse me?
16    Q.  Any other times that you met with
17  your attorneys or anybody from the ACLU prior
18  to Friday and going forward to today?
19       MR. RETHY:  Object to form.
20       MS. COWAN:  I'm sorry.  What's your
21  objection?
22       MR. RETHY:  I feel like the question
23  is just vague.
24       MS. COWAN:  Okay.
25  BY MS. COWAN:

Page 26

1    Q.  I'm talking anytime in your life,
2  other than from Friday forward, have you ever
3  met with anyone from the ACLU?  Let's talk
4  about the ACLU first.
5    A.  Yes.
6    Q.  Okay.  Tell me about that.  How many
7  meetings were there?
8    A.  When I first got involved.
9    Q.  Okay.  When was that?
10    A.  I'm not sure.
11    Q.  Was it before the lawsuit was filed?
12    A.  I'm not sure.
13    Q.  Was it a year ago?
14    A.  Not quite.
15    Q.  Okay.  Not quite a year.  Was it --
16  all right.  The lawsuit was filed in May of
17  2017.  Does that help you remember when you
18  met with anybody from the ACLU?
19    A.  Yes.
20    Q.  Okay.  How did it help you?  We got
21  a time or date or month?
22    A.  I would say for sure June, maybe
23  earlier, I met with them.
24    Q.  Okay.
25    A.  No, no, not June '17, because I

Page 27

1  wasn't there.
2    Q.  Did they meet with some people in
3  June?
4    A.  I wouldn't know.
5    Q.  Okay.  Tell me when you met with
6  them.
7    A.  March.
8    Q.  March of 2017?
9    A.  Yes.
10    Q.  Where did you meet with them?
11    A.  At my home in Canton Estates.
12    Q.  Who did you meet with?
13    A.  I met with Jade.
14    Q.  Okay.  He can't help you, but if you
15  remember, tell me who else.  Jade.  Was there
16  anybody else?
17    A.  Some -- her name is hard to
18  pronounce.  I want to say P --
19    Q.  Paloma?
20    A.  Paloma, yes.
21    Q.  Paloma, okay.  I can't pronounce it
22  either.
23       All right.  Was there anybody else
24  there?  Did she meet with both you and
25  Latoya, or did these two meet with both you

Page 28

1  and Latoya?
2    A.  Yes.
3    Q.  So anybody else other than you and
4  Latoya there?
5    A.  No.
6    Q.  Did you look at any documents?
7    A.  No.
8    Q.  Did you look at any videotapes?
9    A.  No.
10    Q.  Okay.  Other than the meeting in
11  March of 2017, what other times did you meet
12  with anybody from the ACLU about this
13  lawsuit?
14    A.  We met in April also.
15    Q.  Okay.  2017?
16    A.  Yeah.
17    Q.  Where did y'all meet?
18    A.  La Quinta Inn in Canton.
19    Q.  Was it like in a hotel room or a
20  conference room?
21    A.  Conference room.
22    Q.  Okay.  And who all was there?
23    A.  Myself, Latoya and a few other
24  plaintiffs, I want to say.
25    Q.  Okay.  And do you remember who they



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
29–32

Page 29

1   were?
2       A.  No.
3       Q.  Do you know Lawrence Blackmon?
4       A.  Yes.
5       Q.  Was he there?
6       A.  Yes.
7       Q.  Did he have anything to say?
8       A.  No.
9       Q.  Was Herbert Anthony Green there?
10      A.  Yes.
11      Q.  Khadafy Manning?
12      A.  I don't remember seeing Khadafy
13  there.
14      Q.  But you know who Khadafy is, right?
15      A.  Yes.
16      Q.  Was his wife, Quinnetta, there?
17      A.  I don't remember seeing her.
18      Q.  You don't remember or you --
19      A.  I don't remember seeing them.
20      Q.  Okay.  Do you Marvin McField?
21      A.  No.
22      Q.  So you -- if you don't know him, you
23  don't know if he was there or not?
24      A.  No.
25      Q.  What about Nick Singleton?

Page 30

1       A.  I wouldn't -- I don't want to say
2   that I know him, so no.  I don't know.
3       Q.  You don't know him?
4       A.  I don't know him.
5       Q.  Okay.  What about Bessie Thomas?
6       A.  No, I don't know her.
7       Q.  She's Quinnetta's mother.  You don't
8   know her?
9       A.  Well, I didn't see her either there.
10      Q.  What about Betty Jean Williams
11  Tucker?
12      A.  I don't know her.
13      Q.  Okay.  Approximately how many people
14  were there?
15      A.  I'd say about -- including myself,
16  about seven or eight.
17      Q.  How long did the meeting last?
18      A.  An hour and a half.
19      Q.  Okay.  Did you have any other
20  meetings with anybody from the ACLU?
21      A.  Not that I can recall at this time.
22      Q.  I think that some of the
23  plaintiffs -- well, at least one has said
24  that they had a meeting at the Canton Public
25  Library.  Did you go to that meeting?

Page 31

1       A.  No.
2       Q.  And at the La Quinta Inn, did you
3   review any -- were you asked to review any
4   kind of documents or videotapes or anything
5   like that?
6       A.  No.
7       Q.  Mr. Smith, can you tell me why you
8   filed this lawsuit, why you're a plaintiff in
9   this lawsuit?
10      A.  Yes.  It's simply to do my part in
11  getting a better policy and having a better
12  way of going about policing in my community,
13  in the Canton community.
14      Q.  In the City of Canton community?
15      A.  City, yes.  Well, everywhere in
16  Canton --
17      Q.  Okay.
18      A.  -- better policing.
19      Q.  When you say "policing," what do you
20  mean by that?
21      A.  Currently, from my experience and
22  understanding, policing is very aggressive in
23  the black neighborhoods.
24      Q.  Okay.
25      A.  Yes.

Page 32

1       Q.  And so you joined this lawsuit to
2   change that?
3       A.  Yes.
4       Q.  All right.  Tell me, when you say
5   that the policing is aggressive, what do you
6   mean by that?
7       A.  I mean, if I was -- as in the
8   documents, I was walking and was stopped for
9   no reason, no reason.  And I had to produce a
10  driver's license without driving, had to
11  produce an ID.  Yeah, I have the ID and it
12  showed that I stay where I'm going to.  I was
13  a resident there, ████████████
14      Or if I'm riding with someone as a
15  passenger and the driver gets pulled over
16  with license and ID that checks out, I have
17  to give up my ID also and hope it checks out
18  and -- when I could easily be let go without
19  asking.
20      Q.  Okay.  I think we're going to go
21  over most of what you're talking about --
22      A.  Okay.
23      Q.  -- in just a few minutes.
24      First of all, let's go through the
25  time when you said you were walking in Canton

STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
33–36

Page 33

1  Estates.
2      A.  Yes.
3      Q.  Tell me more specifically about
4  that.  Like what time of day was it?
5      A.  Okay.  January 23rd.  I remember.
6  It's my daughter's birthday.  So I'm walking.
7  I decided to walk to the store.  I had a
8  vehicle, but I decided to walk to the store.
9      Q.  What time?
10      A.  It's about 7:00, maybe later because
11  I'm not sure if it was daylight savings time.
12  I know it was dark.
13      Q.  It was dark?
14      A.  Yes.
15      Q.  Okay.  Was anybody with you?
16      A.  Yes.  Terrance Thompson.
17      Q.  Terrance Thompson?
18      A.  Yes.
19      Q.  How do you know Terrance Thompson?
20      A.  I've known him since we were in
21  school, so from Canton.  He stays on Boyd
22  Street.
23      Q.  He does not live in Canton Estates?
24      A.  No.
25      Q.  Okay.  How did you hook up with him

Page 34

1  that night?
2      A.  I was walking past Boyd Street and
3  he was coming off the street.  Good friends
4  of ours stay on the side of the store, so he
5  was headed up there.  We bought -- we went to
6  the store and grabbed a few things.  And on
7  the way back, he asked, you know, what I was
8  doing.  I was like, "I was going back home.
9  You can come with me."  He decided to walk
10  with me.
11      Q.  Why did he decide to come to your
12  house -- to your apartment?
13      A.  I have no idea, no more than to hang
14  out, I would guess.
15      Q.  Okay.
16      A.  So we're walking home -- well, I'm
17  walking home, and I see police at the gate, a
18  red Charger and a squad car.  I see them.
19      Q.  You see the cars?
20      A.  Yes.
21      Q.  Okay.  Where are the officers?  Were
22  they walking inside the apartment complex?
23      A.  I think they were standing out near
24  the cars, I would say.  And by the time we
25  approached them -- which I was expecting to

Page 35

1  just go ahead and walk past.  I'm not
2  driving, you know.  And while we was walking,
3  I was asked could I take my hands out of my
4  pocket, which I did.
5      Q.  Did the officer tell you why he
6  wanted you to take your hands out of your
7  pocket?
8      A.  No.
9      Q.  Okay.  Did he ask Mr. Thompson to do
10  the same?
11      A.  I think he did.  He -- when he said,
12  "Take your hands out of your pocket," we both
13  just automatically did it.
14      Q.  Okay.
15      A.  It was cold that night, so...
16      Q.  All right.
17      A.  And asked if we had ID, and I told
18  him, "Yes."  He asked could he see it, and I
19  did a gesture as this (indicating) because it
20  was in my back pocket.  I didn't want to
21  reach for it.  So I asked -- I told him,
22  "It's in my back pocket right there.  You can
23  look at the ID and tell that I'm going home.
24  My apartment number is on it."
25      Q.  And during this time, where is

Page 36

1  Mr. Thompson?
2      A.  He's a few steps away from me.  It
3  was two officers.  So the other officer --
4      Q.  So he's talking to another
5  officer --
6      A.  Yes.
7      Q.  -- when you're talking to one?
8      A.  Yes.
9      Q.  Did you overhear what Mr. Thompson
10  and the other officer were talking about?
11      A.  A little bit of it.  I noticed that
12  the officer pulled a firearm out of his
13  jacket.
14      Q.  Did you hear the officer ask whether
15  or not he had a firearm?
16      A.  No.
17      Q.  Okay.  And so you did see the
18  officer that was dealing with Mr. Thompson to
19  your side?
20      A.  Uh-huh (affirmative response).
21      Q.  How far apart were y'all?
22      A.  I would say from -- say about 10
23  feet.
24      Q.  Ten feet?
25      A.  Yeah.



STEVEN SMITH                                              January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                      37—40

Page 37

1        Q. And when you first saw the officers,
2  did you have your hands in your pockets?  Did
3  you have a coat on?
4        A. It was a coverall suit, like a
5  jumper.
6        Q. Okay.  Did both you and Mr. Thompson
7  have your hands in your pockets?
8        A. Yes.
9        Q. It was cold that night?
10       A. Yes.
11       Q. Okay.  And so you're separated.  One
12  officer talks to Mr. Thompson and one officer
13  talks to you; is that correct?
14       A. Yes.
15       Q. Okay.  When you saw the officer
16  retrieve the weapon from Mr. Thompson, did
17  you hear anything else that was said between
18  that officer and Mr. Thompson?
19       A. He asked him was this -- "Is this
20  yours?  Is it registered?"  He said, "Yes."
21  And he said that -- he ran it.  He said, "I'm
22  fixing to find out," and ran off.  I was --
23  back to me.  We were waiting on my callback
24  to see if I had any warrant.
25           Between that time, while I'm

Page 38

1  waiting, you know, he said, "It's
2  registered."  I heard that.  And he -- I
3  actually seen the officer put the gun back
4  inside his pocket, inside his coat pocket.
5  And that's when it came up that I did have
6  one, and I was put in handcuffs.
7           After that, the officer -- my
8  arresting officer asked Terrance's arresting
9  officer, "Why did you give him his gun back?
10  He doesn't have a permit to carry concealed."
11  So he took that weapon back out and arrested
12  him also.
13       Q. Okay.  And what did you get arrested
14  for?
15       A. Old fines, traffic, driving without
16  a license and no insurance.
17       Q. Okay.  While you lived in Madison
18  County, can you tell me how many different
19  times you got citations or tickets?
20       A. Not exactly, but it was quite a few.
21       Q. Like more than 10?
22       A. More than 10.
23       Q. More than 20?
24       A. More than 20.
25       Q. Okay.  Do you recall where you

Page 39

1  received those citations?  Were you driving
2  on streets or highways?
3        A. Streets.
4        Q. Okay.  And were they the result of
5  traffic stops?
6        A. Yes.
7        Q. Okay.  And you never got any of
8  those going through any kind of safety
9  checkpoint or roadblock, did you?
10       A. No.
11       Q. Okay.
12       A. Well, yes.
13       Q. Which one?
14       A. The one that I was arrested on the
15  night that we were just talking about, that
16  was from a roadblock at Canton Estates, just
17  in a different car.
18       Q. You were in a car that night?
19       A. Not that night.  The reason I was
20  arrested --
21       Q. Was because of an outstanding
22  warrant that you'd gotten at a roadblock?
23       A. Yes, in a car.
24       Q. While you were driving a car?
25       A. Yes.

Page 40

1        Q. Where was that roadblock?
2        A. In Canton Estates.
3        Q. Okay.  And what was the -- what kind
4  of ticket did you get?
5        A. Driving without a license, but --
6  yeah, and he gave me a ticket for it, and no
7  insurance.
8        Q. And no insurance?
9        A. Yes.
10       Q. So you just got a ticket for that
11  instance?
12       A. Uh-huh (affirmative response).
13          THE REPORTER:  Remember to say "yes."
14       A. Yes.
15          MS. COWAN:  I'm missing it too.
16  BY MS. COWAN:
17       Q. All right.  So the night that you
18  encountered the officers in Canton Estates,
19  you had an outstanding warrant.  Was it one
20  warrant or two?
21       A. They classify it as two because no
22  insurance and no driver's license.
23       Q. No driver's license.  And you had
24  received that citation at a safety checkpoint
25  at Canton Estates -- outside of -- the street

STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
41–44

Page 41



Page 42



6     Q.  All right.  And in your complaint,
7  you also -- that night, was anybody else
8  walking with you other than Mr. Thompson?
9     A.  No.
10     Q.  There wasn't anybody behind you or
11  in front of you that you saw?
12     A.  No.
13     Q.  Y'all were by yourselves?
14     A.  Yes.
15     Q.  The next thing you complain about in
16  your complaint, and I'm at a loss to
17  understand it, but in October 2015, you said
18  that some sheriff's deputies came into your
19  apartment.  Was that at Canton Estates?
20     A.  Yes, ma'am.
21     Q.  Okay.  Tell me about that.
22     A.  We were in 14A.  That was the first
23  apartment we had, and then we moved to 3H
24  later.  But 14A was -- I would just safely
25  say after midnight we heard knocking on the

Page 43

1  door that turned into louder knocking.  And I
2  went to the door and they said -- and all I
3  heard was -- I asked who it was, and they
4  said, "sheriff's department."
5     So I went back to tell Latoya, you
6  know, what was -- the sheriff's department is
7  at the door.  She was like, "What's going
8  on?"  I opened the door, and I was asking,
9  "What's going on?"  And they was like, "We're
10  looking for a missing person, a missing kid."
11     And I was like, "Well, we had a
12  party and I made sure everybody's gone."  And
13  they was like, "Look, we need to check every
14  apartment.  We're checking every apartment."
15  And I was moved out of the way.  I was like,
16  "I don't give you permission but" --
17     Q.  Okay.  Let's back up a minute.
18  Y'all had given a party that night?
19     A.  A kid's party.
20     Q.  A kid's party?
21     A.  Uh-huh (affirmative response).
22     Q.  For which child?
23     A.  Her nephew.
24     Q.  Her nephew.  How old was her nephew?
25     A.  He just turned four or -- yeah, had

Page 44

1  to be about four.
2     Q.  And was it a birthday party?
3     A.  Yes.
4     Q.  What time did it start?
5     A.  It was in the daytime.  It was over
6  with by 9:00.
7     Q.  And the deputy said they were
8  checking every apartment.  Had you seen them
9  check other apartments?  Had you heard them?
10     A.  I mean, I heard them go up the
11  stairs and down the stairs.
12     Q.  So they were --
13     A.  But actually see them go in another
14  apartment, no.
15     Q.  Okay.  But they were climbing the
16  stairs to other --
17     A.  Units, yeah.
18     Q.  Units.  Okay.
19     Do you know who the child was that
20  was missing?
21     A.  I heard them use the name ████
22  when they stood over my daughter.
23     Q.  ████████
24     A.  Yes.
25     Q.  And do you know who ████ is?



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
45–48

Page 45

1     A.  No.
2     Q.  Did they say how old he was?
3     A.  No.
4     Q.  Did they say how long he'd been
5   missing?
6     A.  No.
7     Q.  All right.  Did they find ▉▉▉▉ in
8   your apartment?
9     A.  No.
10    Q.  Did they leave?
11    A.  Yes.
12    Q.  Okay.  No other details about who
13   ▉▉▉▉▉ is, whether he lived in Canton
14   Estates, anything like that, and you've never
15   heard of him?
16    A.  ▉▉▉▉▉
17    Q.  Uh-huh (affirmative response).
18    A.  No.  I'm not even sure if it's a
19   male or a female.
20    Q.  Okay.  But you never encountered a
21   child with the nickname of ▉▉▉▉ at Canton
22   Estates?
23    A.  No.
24    Q.  All right.  So we've gone through
25   the January 23rd, 2017, encounter you had

Page 46

1   with a sheriff's deputy.  Do you know who
2   that sheriff's deputy was?
3     A.  No.
4   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
5   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
6   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
7     A.  No.
8     Q.  Do you recall providing answers to
9   some interrogatories that the defendant sent
10   to you, some questions?
11    A.  Yes.
12    Q.  You were asked about -- I know we've
13   gone through the time when the deputies were
14   searching for a missing child.  That was in
15   2015; is that correct?
16    A.  Yes.
17    Q.  And let's see.  October 31st, is
18   that Halloween?  Was it Halloween that night?
19    A.  Yes.  Somewhere in there, yes.
20    Q.  You mentioned another time in your
21   answers, that in 2013 deputies walked into
22   the house of a neighborhood friend and asked
23   you to wait outside.  Tell me about that.
24    A.  Yes.  I was on the way to the store.
25   A few of these incidents -- it's not uncommon

Page 47

1   for us to walk in Canton.  It's a small town.
2   We were walking to the store.  I see a --
3   with a friend of mine.  I see a guy come
4   outside, and he's hollering at ▉▉▉▉▉▉▉▉▉
5   He's like, "What's up?"
6     Q.  Hollering at who?
7     A.  ▉▉▉▉▉ the friend of mine that I
8   was walking with.
9     Q.  Who -- tell me, what is ▉▉▉▉▉▉
10   last name?
11    A.  I'm not sure.
12    Q.  What was his address?
13    A.  He stayed -- he was from Jackson, so
14   I don't know his address.
15    Q.  He didn't live in Madison County?
16    A.  No.
17    Q.  All right.  Keep going.
18    A.  Okay.  We stopped at this friend's
19   house after he waved us over and asked us
20   where we were going.  We said, "To the
21   store."  He's like, "Where after that?"  They
22   were -- him and ▉▉▉▉▉ were talking
23   mostly.  And we was like, "We'll be back.
24   We're coming through."
25         But before we could even walk off of

Page 48

1   his porch and back onto the street, cars
2   pulled up, told us to "Hold up, hold up," and
3   walked in, walked inside.  And while we was
4   looking -- because we didn't go back in.  He
5   was like, "Y'all stand there.  Y'all stand
6   out there."  And they were talking.
7     Q.  But you don't know what it was
8   about?
9     A.  No.
10    Q.  And they just asked you to stand
11   outside while they went in.  They didn't want
12   you inside the -- was it an apartment or a
13   house?
14    A.  It was a house.  Uh-huh (affirmative
15   response).
16    Q.  ▉▉▉▉▉▉, was he meeting with
17   somebody at the house?
18    A.  They called both of us over there.
19   Not meeting, but --
20    Q.  Okay.  Did ▉▉▉▉▉ stand with you
21   outside?
22    A.  Uh-huh (affirmative response).
23    Q.  Yes?
24    A.  Yes, yes.
25    Q.  Okay.  Any other times that you



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
49–52

Page 49

1  witnessed any kind of a search of a home or
2  an apartment?  And I'll represent you haven't
3  told me about any.  I just want to know.
4      A.  Not that I would...
5      Q.  The January 23rd, 2017, you know,
6  when you were asked to take your hands out of
7  your pockets and then somehow a gun was
8  retrieved from Mr. Thompson, do you believe
9  that that was based on your race?
10      A.  The fact that we were stopped
11  walking, yes.
12      Q.  Tell me about that.  Tell me why you
13  believe that.
14      A.  I would -- because of the way I was
15  dressed or -- I just believe that it's an
16  over-policed area anyway.
17      Q.  It is over-policed?  You mean Canton
18  Estates?
19      A.  Yes.
20      Q.  Back at that time and since you
21  lived there, would you consider Canton
22  Estates to be a high-crime area?
23      A.  Yes.
24      Q.  Okay.  And I believe that while
25  Latoya was living there she made several

Page 50

1  calls to the sheriff's department about some
2  criminal activity.  Do you know anything
3  about that?
4      A.  No.
5      Q.  Okay.  So Canton Estates, you
6  believe, is a high-crime area.  Did it bother
7  you or did you appreciated the fact that it
8  was -- the Madison County Sheriff's
9  Department patrolled the area for crime?
10      MR. RETHY:  Object to form.
11      A.  Did it bother me?
12  BY MS. COWAN:
13      Q.  Uh-huh (affirmative response).
14      A.  Could you --
15      Q.  Okay.  You've already told me you
16  thought Canton Estates was a high-crime area.
17  Do you know -- you probably do.  Canton
18  Estates is part of Madison County.  Do you
19  know that, it's not in the city limits?
20      A.  Yes.
21      Q.  And you understand that the Madison
22  County Sheriff's Department is supposed to
23  patrol Madison County?
24      A.  Yes.
25      Q.  Does it bother you that Madison

Page 51

1  County Sheriff Deputies patrol Canton Estates
2  to try and combat crime in the area?
3      MR. RETHY:  Object to form.
4      A.  No.
5  BY MS. COWAN:
6      Q.  Okay.
7      MR. RETHY:  Can we take a break soon?
8      MS. COWAN:  In just a few minutes.
9  Let me get through with -- I've got about 10
10  more minutes.
11  BY MS. COWAN:
12      Q.  Okay.  We asked you about searching
13  homes.  You told me that.  You talked about
14  being stopped and about the -- let's see.
15  Just a minute.
16      You talked about roadblocks in some
17  of your answers.  Tell me -- you said that
18  you had gone through about four roadblocks;
19  is that correct?  How many roadblocks have
20  you gone through while you lived in Madison
21  County that were conducted by the Madison
22  County Sheriff's Department and not somebody
23  else?
24      A.  Two or three.
25      Q.  Okay.  And do you recall where they

Page 52

1  were?
2      A.  Yes.  One in the Joe Prichard Homes.
3      Q.  Okay.  And do you recall when that
4  was?
5      A.  No, I don't recall.
6      Q.  And tell me what happened there.
7      A.  Me and Latoya were walking.  It was
8  a cold evening.  A friend of hers stopped on
9  Boyd Street, picked us up, asked us did we
10  want a ride home.  We agreed to the ride
11  home.  She had to make a stop in the
12  apartment complex before taking us home.  We
13  turned into the apartment complex.
14      Q.  Which apartment complex?
15      A.  Joe Prichard.
16      Q.  Joe Prichard.
17      A.  It was a roadblock going on.
18  Checked her ID -- her driver's license,
19  rather, Latoya's driver's license also, and
20  made a complaint about a child restraint, the
21  officer did.  So I asked the officer could I
22  fix the child restraint, you know, for her.
23  He said, "Go ahead."  I did that while he ran
24  her name, both of the young ladies' names.
25      And after that, after everything was



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
53—56

Page 53

1  cleared, I asked Latoya -- the officer could
2  we just continue walking home, you know,
3  because that's the whole point. I didn't
4  want to get in a car for a while.
5     Q.  So nothing else happened?
6     A.  No.
7     Q.  And the officer did see that a child
8  was -- which child? Was it your child?
9     A.  No.
10    Q.  The people that picked you up's
11 child?
12    A.  Uh-huh (affirmative response).
13    Q.  And didn't have a seatbelt on, or
14 was it a car seat?
15    A.  The car seat was faced frontwards
16 instead of back.
17    Q.  Okay. And you fixed it?
18    A.  Yes.
19    Q.  Okay. All right. That's one. Tell
20 me about the other two. Do you recall those?
21    A.  No.
22    Q.  You don't remember where they were?
23    A.  No.
24    Q.  Did anything happen at them? You
25 get a citation?

Page 54

1     A.  Yeah.
2     Q.  What --
3     A.  I've been driving since I was 16
4  with a license, so I remember getting the
5  ticket.
6     Q.  Do you remember what it was for?
7     A.  Speeding. And the other one, I
8  can't...
9     Q.  Okay. You mentioned something about
10 driving with Wilson Jermany Smith through a
11 roadblock. Do you know who that is?
12    A.  Yes.
13    Q.  Who is -- is that your brother?
14    A.  No. No relation, actually.
15    Q.  Okay. Do you recall that event?
16    A.  Yes.
17    Q.  Tell me about that.
18    A.  Martin Luther King Drive, just over
19 the railroad tracks. Pulled up. License
20 just been renewed.
21    Q.  Your license?
22    A.  Yes.
23    Q.  Okay. Had it been suspended prior
24 to that?
25    A.  Yes.

Page 55

1     Q.  For what?
2     A.  Outstanding --
3     Q.  Tickets?
4     A.  -- tickets.
5     Q.  Okay.
6     A.  But I luckily had the printouts from
7  the Madison County Sheriff's Department in
8  the car.
9     Q.  Good.
10    A.  So I showed him that, and he was
11 like, "Oh, okay. It's just still in the
12 system for now." So that was --
13    Q.  That was it?
14    A.  Uh-huh (affirmative response).
15    Q.  Okay. And I asked you about -- when
16 I use the term "jump out," do you know what
17 that means?
18    A.  Yes.
19    Q.  What does that mean?
20    A.  From my understanding, it's the
21 plainclothes, unmarked cars, but usually more
22 of a sort of drug enforcement task force.
23    Q.  Okay. Narcotics agents?
24    A.  Yeah.
25    Q.  You said in 2015 you saw deputies

Page 56

1  stop and search a car at Brooklyn Mart in
2  Canton. Do you recall?
3     A.  Yes.
4     Q.  Do you know anything about that
5  other than just seeing what you saw?
6     A.  I just saw what I saw.
7     Q.  And the same -- you said in 2016 you
8  saw a parked vehicle around Rogers Park being
9  stopped and searched. Same deal? You don't
10 know what that was about?
11    A.  No.
12       MS. COWAN: I think we can take a
13    break.
14              - - -
15    (OFF THE RECORD AT 9:25 A.M.)
16    (BACK ON THE RECORD AT 9:35 A.M.)
17 BY MS. COWAN:
18    Q.  Now, Mr. Smith, in the questions
19 that we sent to you, we asked you about any
20 crime that you'd been charged or arrested
21 for. I want to go through some of these and
22 just ask you about them.
23       You said in 2012 you were charged
24 with possession of marijuana and improper
25 vehicle in Flowood. Do you recall that?



Page 57

1   A. Yes.
2   Q. When you say "improper vehicle,"
3 what does that mean?
4   A. My tag was -- I didn't have a tag.
5   Q. Didn't have a tag?
6   A. No.
7   Q. And you spent some time in jail?
8   A. Yes.
9   Q. Where did you spend time?
10   A. Brandon. That would be the Rankin
11 County facility.
12   Q. Okay. And then in 2012, you didn't
13 have a tag. In Madison County, you were
14 charged with -- is that the same vehicle?
15   A. Yes.
16   Q. Okay. And you didn't --
17   A. But I wasn't charged. I was --
18   Q. You were given a citation?
19   A. Citation, yes.
20   Q. You weren't arrested?
21   A. No.
22   Q. So you -- and then did you pay --
23 you said you did not pay the fine on that,
24 which was $175. So you had a warrant
25 outstanding for your arrest on that?

Page 58

1   A. Yes.
2   Q. Okay. And then it says you pleaded
3 guilty and served 30 days in jail. Where did
4 you spend that time?
5   A. For what?
6   Q. In 2012, when you didn't pay your
7 ticket for not having a tag on your car, it
8 says you pleaded guilty and you were in jail
9 for 30 days. Do you recall where you were
10 jailed?
11   A. No.
12   Q. And then you said in 2013, April,
13 you had an improper tag. Was that that you
14 didn't have a tag in 2013 still or was it
15 expired? Do you recall?
16   A. I don't recall.
17   Q. In 2014, you say you were -- got a
18 ticket for driving while license was
19 suspended. Do you recall why your license
20 was suspended in 2014?
21   A. No.
22   Q. And then in 2016, you said you got a
23 ticket for driving while license was
24 suspended. Do you recall why your license
25 was suspended in 2016?

Page 59

1   A. No.
2   Q. And no proof of insurance. And you
3 spent 45 days at the Madison County Detention
4 Center; is that correct?
5   A. For what incident?
6   Q. For the 2016, when you -- were you
7 arrested because you didn't pay the fines in
8 2016 for driving while license suspended and
9 no proof of liability insurance?
10   A. Yes.
11   Q. Mr. Smith, you testified that you
12 and Ms. Brown had moved from Canton Estates
13 to Georgia for better job opportunities. Do
14 you plan to ever come back here, or are you
15 planning to remain in Georgia where you are
16 working at the Alatrade?
17   A. I plan to frequent here, yes.
18   Q. Just visits?
19   A. Yes.
20   Q. Do you plan to ever move back here?
21   A. Yes.
22   Q. When do you plan to move back here?
23   A. In the distant future.
24   Q. Okay. But you don't have any
25 specific plans right now to move back?

Page 60

1   A. No.
2   Q. The meeting that you told me about
3 with the ACLU, I think in your apartment and
4 at the La Quinta -- and I've read some names
5 of some plaintiffs that are plaintiffs in
6 this lawsuit. Do you recall whether or not
7 anybody else was there, anybody that you
8 recognized?
9   A. At the La Quinta Inn?
10   Q. Yeah.
11   A. At the hotel in the conference room?
12 What was the question again?
13   Q. Do you recall anybody that you
14 recognized, other than one of the plaintiffs
15 that's in this lawsuit, who was there?
16   A. No.
17   Q. What about Rasheid Davis? Was he
18 there?
19   A. Who?
20   Q. Do you know Rasheid Davis?
21   A. No.
22   Q. Okay. So you don't recall anybody
23 specifically who was there? I think you said
24 that Lawrence Blackmon was there. Herbert
25 Green was there. Do you recall anybody being



Page 61

1 there other than one of the plaintiffs that's
2 filed this lawsuit?
3     A. No.
4     Q. Any other individual from Canton or
5 from Jackson, anywhere?
6     A. Anybody that I would know?  No.
7     Q. Okay.  Were there people there that
8 you did not know?
9     A. Yes.
10     Q. Did they ever introduce theirselves
11 to you?
12     A. What, the people that I didn't know?
13     Q. Uh-huh (affirmative response).
14     A. No.
15     Q. Did they have name tags on?
16     A. No.
17     Q. Okay.  So none of them came up and
18 said, "Hey, I'm so-and-so"?
19     A. Not that I can recall.
20     Q. Did any of them speak at the
21 meeting?
22     A. Yes.
23     Q. People that you did not know?
24     A. No.
25     Q. Okay.  The people that spoke at the

Page 62

1 meeting, were they members of the ACLU?
2     A. Yes.
3     Q. So as we sit here today, you cannot
4 recall anybody that was at that meeting in, I
5 think you said, April 2017 that's not either
6 a plaintiff to this lawsuit or with the ACLU?
7     A. I do not remember seeing anybody
8 that wasn't a plaintiff or with the ACLU at
9 that time.
10     Q. And tell me again how many people
11 were there.
12     A. Six to eight people.
13     Q. Can you tell me who was there?  I
14 know you told me Lawrence Blackmon was there.
15 And you said -- did you say Herbert Green was
16 there?
17     A. Yes.
18     Q. Who else was there?
19     A. That I can recall?
20     Q. Uh-huh (affirmative response).
21     A. I said Jade also --
22     Q. Uh-huh (affirmative response).
23     A. -- ACLU.  Paloma.
24     Q. Uh-huh (affirmative response).
25     A. I met her there.  Latoya was there

Page 63

1 with me.  That's about the names that I can
2 recall.
3     Q. Okay.  And when they came to your
4 apartment in March of 2017, was anybody else
5 in the apartment with you when they were
6 talking to you about the lawsuit?
7     A. No one but the kids.  That's it.
8     Q. Just your children?
9     A. Yes.  Me and Latoya?
10     Q. No relatives?
11     A. No.
12     Q. No neighbors?
13     A. No.
14     Q. I know we talked about Canton
15 Estates being essentially a high-crime area.
16 And you mentioned -- you used the term
17 "over-policing."  What does that mean?
18     A. In my terms, you can almost
19 guarantee -- on a holiday, Memorial Day,
20 Fourth of July, you can almost guarantee
21 there's going to be roadblocks, a heavier
22 police presence there in Canton Estates,
23 there, like Canton Estates is the only place
24 where people are drinking or partying or
25 anything.  They're going to be right there.

Page 64

1     Q. Do you know if they're anywhere else
2 in the county also?
3     A. I'm sure that they're not.
4     Q. You're sure they're not?
5     A. Yes.
6     Q. What do you base that on?
7     A. Based on I can call across town to
8 my grandparents, who still drive and
9 everything, and haven't seen police all day,
10 you know.  And they're clean across town,
11 across the tracks, coming to and going to
12 their house, so they would know.
13     Q. So did you call them?
14     A. I have --
15     Q. You have?
16     A. -- before.
17     Q. Where do your grandparents live?
18     A. Highway 43 South.
19     Q. Okay.
20     A. ████████████
21     Q. Anywhere else did you check within
22 Madison County, especially on the holidays,
23 whether or not there were any roadblocks out
24 for sobriety checkpoints?
25     A. No.



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
65–68

Page 65

1    Q.  So that's essentially the only --
2  the basis for your telling me that there were
3  no checkpoints out during these holidays when
4  people are drinking, except in Canton
5  Estates, is your call to your grandparents?
6          MR. RETHY:  Object to form.
7  BY MS. COWAN:
8    Q.  Is that what you base your testimony
9  on?
10   A.  No.
11   Q.  All right.  Tell me what else you
12  base it on.
13   A.  I would also say Facebook, on social
14  media, it's always popped up.  Everybody
15  would let you know where are the roadblocks.
16  And that is Canton Estates, most -- the black
17  side of the town, yes.
18   Q.  How often have you communicated
19  through Facebook for the location of
20  roadblocks?
21   A.  When I was in Canton?
22   Q.  Uh-huh (affirmative response).
23   A.  I would do it almost every holiday.
24  Any holiday.
25   Q.  Every holiday?

Page 66

1    A.  Yes.
2    Q.  And did you ever go and check to see
3  where the locations of the checkpoints were
4  that were posted on the justice court door?
5    A.  Justice court, no.
6    Q.  The Facebook -- have you been told
7  to -- are you a member of Facebook?
8    A.  Yes, ma'am.
9    Q.  Have you been told to preserve all
10  of your Facebook posts and any texts or
11  anything having to do with your being
12  notified of roadblocks?
13   A.  No.
14   Q.  Okay.  How many times have you
15  checked Facebook to find out where the
16  roadblocks are located?
17   A.  At the most, 10.
18   Q.  Ten?
19   A.  Yeah.
20   Q.  Okay.  And is your testimony today
21  that none of the roadblocks that you checked
22  to see -- well, did the -- Facebook, did it
23  give all locations of roadblocks or just
24  roadblocks in black communities?
25   A.  I wouldn't know.

Page 67

1    Q.  You wouldn't know?
2    A.  I wouldn't know.
3    Q.  Okay.  So you've done nothing other
4  than looking at the Facebook posts and
5  talking to your grandparents to determine
6  whether or not there'd been any other, during
7  the holidays, sobriety checkpoints held
8  anywhere else in Madison County by the
9  sheriff's department?
10   A.  Correct.
11   Q.  Okay.  We talked about -- is that
12  your description of over-policing, is the
13  roadblocks set up during holidays near Canton
14  Estates?
15          MR. RETHY:  Object to form.
16   A.  Could you ask me again?
17  BY MS. COWAN:
18   Q.  I asked you about over-policing.
19  And you talked to me about the --
20   A.  Roadblocks.
21   Q.  -- Roadblocks.  Is that essentially
22  how you feel that the sheriff's department
23  conducts over-policing near Canton Estates?
24   A.  I would also like to mention the
25  jump-out procedures that go on.  I mean, I'm

Page 68

1  pretty sure it's okay when drugs are found.
2  But when drugs aren't found and everything,
3  what is the whole reason?  I've seen that
4  also at like the cases at Brooklyn Mark, you
5  know.
6    Q.  I thought you told me you didn't
7  really know much about the specifics of that
8  stop or search.
9    A.  Not that stop, but stops like those
10  or searches like those.
11   Q.  Okay.  Tell me about other ones that
12  you have knowledge about personally.  Or is
13  it just that you have that opinion but
14  haven't -- don't have any personal knowledge
15  of any other instances?
16   A.  It's safe to say that I have that
17  opinion, yes.
18   Q.  Okay.  And the two jump-out stops
19  are the one at Brooklyn and the one at the
20  park?
21   A.  Yes.
22   Q.  Have you ever called the Madison
23  County Sheriff's Department to ask for any
24  kind of help or report any kind of crime?
25   A.  Yes.



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
69–72

| Page 69 |
|---|
| 1   Q. Tell me about that. |
| 2   A. At 14A, I woke up, drinking coffee |
| 3   outside of my unit, and there was a -- I |
| 4   noticed kids. That's what made me go outside |
| 5   and drink my coffee. I noticed kids walking |
| 6   past between my buildings going to school, |
| 7   school kids. |
| 8   Q. I'm sorry. Walking between -- |
| 9   A. Between the buildings going out of |
| 10  the gate to go to school. |
| 11  Q. Is that -- |
| 12  A. In Canton Estates. |
| 13  Q. Is that odd for them to be walking |
| 14  through the buildings? |
| 15  A. No, it's not odd. But I noticed |
| 16  that they were looking down and even stopping |
| 17  sometimes and looking down and looking down. |
| 18  I was like, "What are they looking at?" So I |
| 19  go outside, come out from the breezeway, and |
| 20  I go to the spot where I saw them looking. |
| 21  There was a 12-gauge shotgun just laying in |
| 22  the grass right there. |
| 23  Q. Near your apartment? |
| 24  A. Yes. |
| 25  Q. Do you know whose it was? |

| Page 70 |
|---|
| 1   A. No, ma'am. |
| 2   Q. And did you call and tell the |
| 3   sheriff's department about it? |
| 4   A. Yes, ma'am. |
| 5   Q. Did someone come? |
| 6   A. Yes, ma'am. |
| 7   Q. Did they retrieve the gun? |
| 8   A. Yes. |
| 9   Q. Had you seen any other firearms that |
| 10  were left around in Canton Estates like in |
| 11  the grass or near air-conditioning units? |
| 12  A. That's the first time right there. |
| 13  Q. Do you know about any being in the |
| 14  child's playgrounds, like where the swing |
| 15  sets are or anything like that, buried in the |
| 16  sand? |
| 17  A. We don't have playgrounds there. |
| 18  Q. You don't have playgrounds? |
| 19  A. Uh-uh (negative response). |
| 20  Q. Okay. Is that the only time you |
| 21  called the sheriff's department for help? |
| 22  A. Yes. |
| 23  Q. Do you know of anybody else -- |
| 24  Latoya or anybody else calling the sheriff's |
| 25  department for help within Canton Estates? |

| Page 71 |
|---|
| 1   A. Not that I could say, that I could |
| 2   recall. |
| 3   Q. Have you witnessed or heard |
| 4   gunfire -- |
| 5   A. Yes. |
| 6   Q. -- being exchanged in Canton |
| 7   Estates? |
| 8   A. Yes. |
| 9   Q. Do you know what that was about? |
| 10  A. No. |
| 11  Q. When did it occur and how many |
| 12  times? |
| 13  A. I don't remember exactly when, but I |
| 14  do remember gunshots. It was in -- I would |
| 15  say early '17, late '16. |
| 16  Q. Did you ever hear what happened? |
| 17  A. Yes. I was staying across the |
| 18  street when Khadafy was shot. |
| 19  Q. And that's what you're referring to, |
| 20  when Khadafy was shot? |
| 21  A. Uh-huh (affirmative response). |
| 22  Q. Did you go to the scene when Khadafy |
| 23  was shot? |
| 24  A. No. |
| 25  Q. Did you stay in your apartment? |

| Page 72 |
|---|
| 1   A. Yes. |
| 2   Q. Did you ever hear anything about who |
| 3   shot him or why? |
| 4   A. No. |
| 5   Q. Did you ever talk to Quinnetta about |
| 6   him being shot? |
| 7   A. No. |
| 8   Q. Have you talked to Quinnetta or |
| 9   Khadafy about this lawsuit? |
| 10  A. Only about the facts that we are in |
| 11  it, you know. That's it. |
| 12  Q. What does that mean? |
| 13  A. The fact that we are a part of it, |
| 14  you know. I'm a plaintiff and she's a |
| 15  plaintiff. That's it. |
| 16  Q. Y'all haven't talked about your |
| 17  claims? Do you know what Quinnetta and |
| 18  Khadafy are claiming in this lawsuit? |
| 19  A. No. |
| 20  Q. You hadn't talked to them about what |
| 21  they're claiming? |
| 22  A. No. |
| 23  Q. Have you seen the video that |
| 24  Quinnetta and Khadafy have -- you've seen |
| 25  that video? |

STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
73–76

Page 73

1    A. Yes.
2    Q. Have either one of them talked to
3  you about that incident?
4    A. No.
5    Q. Have you talked to Latoya about that
6  incident?
7    A. Yes.
8    Q. Does Latoya know what happened
9  during the incident?
10    A. No, no more than what the video
11  shows.
12    Q. Did either of y'all see any part of
13  that incident?
14    A. No.
15    Q. Have you talked to Lawrence Blackmon
16  about this lawsuit?
17    A. No further than after he introduced
18  us to -- introduced me to Jade and Paloma and
19  everybody else. That's it.
20    Q. Did he sort of MC the meeting at the
21  La Quinta Inn?
22    A. No.
23    Q. Okay. Was that when Lawrence
24  introduced you? Or when did Lawrence
25  introduce you to Jade and Paloma?

Page 74

1    A. He was involved in our introduction
2  at the La Quinta Inn, yes.
3    Q. Have you talked to him about why
4  he's a plaintiff in this lawsuit?
5    A. No.
6    Q. Do you know anything about his
7  claims in this lawsuit?
8    A. No.
9    Q. What about Herbert Green? Have you
10  talked to him about this lawsuit?
11    A. No.
12    Q. Do you know what he's claiming?
13    A. Not the ins and outs. Not really.
14    Q. Well, has he told you anything about
15  why he's a plaintiff in this lawsuit?
16    A. No.
17    Q. Do you know him personally?
18    A. Yes.
19    Q. How do you know him?
20    A. Been friends for over nine years.
21  His grandmother's my mentor, so...
22    Q. Who's his grandmother?
23    A. Emma Strickland.
24    Q. All right. And Lawrence Blackmon,
25  how long have you known him?

Page 75

1    A. A little less than I've known
2  Herbert Green.
3    Q. How'd you meet Lawrence?
4    A. Through Herbert Green.
5    Q. Do they hang out together?
6    A. Yes, sometimes.
7    Q. Do they stay together sometimes?
8    A. I wouldn't say stay together, no.
9    Q. Khadafy Manning, how long have you
10  known him?
11    A. I can't say I've known him. We've
12  met each other. I wouldn't -- he's not
13  somebody that I hang out with or anything.
14    Q. Why is that?
15    A. Just older, I guess.
16    Q. Okay. He's older?
17    A. Yes.
18    Q. What about Quinnetta Manning?
19    A. No.
20    Q. Have you ever talked to her about
21  this lawsuit?
22    A. No.
23    Q. Where in relation was your apartment
24  to Quinnetta and Khadafy's?
25    A. He was -- on the building that's

Page 76

1  directly across the street from me --
2    Q. Uh-huh (affirmative response).
3    A. -- he was on the back side of it.
4    Q. Back side?
5    A. Yes.
6    Q. Did Khadafy live in Canton Estates
7  with Quinnetta?
8    A. From my understanding, yes.
9    Q. Okay. Do you know how long?
10    A. No.
11    Q. Do you know whether or not they're
12  still together?
13    A. No.
14    Q. You don't know one way or the other?
15    A. No.
16    Q. Do you know Marvin McField?
17    A. No.
18    Q. What about Nick Singleton?
19    A. No.
20    Q. You don't know him?
21    A. No.
22    Q. Bessie Thomas, do you know her?
23    A. No.
24    Q. That's Quinnetta's mother. You
25  don't know her?



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
77—80

---

Page 77

1    A.  Yes, yes.  Quinnetta's mom.
2    Q.  Okay.  How do you know her?
3    A.  My mother knows her, and I've seen
4 my mother talking to her a few times.
5    Q.  Have you talked to your mother about
6 this lawsuit?
7    A.  No, not really.
8    Q.  Has she asked you anything about it?
9    A.  How's it been going and everything.
10 That's it.
11    Q.  What do you tell her?
12    A.  I tell her it's going as good as I
13 could tell.  I don't know.
14    Q.  Betty Jean Williams Tucker, do you
15 know her?
16    A.  No.  Now, what I'm saying is that
17 I -- just to be clear, what I'm saying it's
18 because these are official names.  And from a
19 small town, that could be Aunt Betty or
20 somebody we call her.  I don't know them by
21 these names.
22    Q.  Well, do you have an Aunt Betty?
23    A.  No.
24    Q.  Okay.  So best of your recollection,
25 you don't know Betty Jean Williams Tucker?

---

Page 78

1    A.  Correct.
2    Q.  Do you know James Williams?
3    A.  No.
4    Q.  Okay.  We asked you to give us some
5 names of people that might have knowledge
6 about this lawsuit.  I'm going to ask you
7 about them.
8       Do you know James Bacon?  Lives in
9 Camden.
10    A.  Yes.
11    Q.  Who's James Bacon?
12    A.  He's a store owner.
13    Q.  Have you ever talked to him about
14 this lawsuit?
15    A.  No.
16    Q.  Do you know what he knows?
17    A.  No.
18    Q.  Michael Bracy from Flora?
19    A.  Yes.
20    Q.  And who's Michael?
21    A.  I think that's the mechanic that I
22 talked to.
23    Q.  Do you use him?  Do you use Michael
24 Bracy as a mechanic?
25    A.  I did.

---

Page 79

1    Q.  When?
2    A.  Oh, I want to say back, maybe, 2010.
3    Q.  Have you talked to him about this
4 lawsuit?
5    A.  I asked -- he's one of the guys I
6 asked did anybody contact him.
7    Q.  Okay.  When did you do that?
8    A.  '16.  August '16, last year.
9    Q.  Was it before or after the lawsuit
10 was filed?
11    A.  After.
12    Q.  What'd he say?
13    A.  He said, "No."
14    Q.  Did he ever tell you what he knows
15 about the lawsuit?
16    A.  No.
17    Q.  How did you come to ask Michael
18 about the lawsuit?
19    A.  Seen him in a grocery store.  Seen
20 him, yeah, and I asked him just in our
21 conversation.  Just in conversation.
22    Q.  Was he at the La Quinta with y'all?
23    A.  Not sure.  I'm not sure.
24    Q.  Could've been?
25    A.  Could've been, couldn't have been.

---

Page 80

1    Q.  What prompted you to ask him about
2 the lawsuit when you were in the grocery
3 store?
4    A.  Just being nosy.
5    Q.  Just being nosy?
6    A.  Uh-huh (affirmative response).
7    Q.  And tell me what he said again.
8    A.  He said no one has contacted him.
9    Q.  What about Anthony Brown?  Do you
10 know him?
11    A.  Anthony Brown?
12    Q.  From Flora, Compress Street.
13    A.  I don't recall that name.
14    Q.  Was he at the La Quinta, or do you
15 know?
16    A.  I don't know.
17    Q.  Bysheba Brown, do you know who that
18 is?  Ridgeland, lives in an apartment
19 complex.
20    A.  I don't recall that name.
21    Q.  So you don't know whether or not she
22 was at the -- he or she was at the meeting?
23    A.  No.
24    Q.  What about Willie Carter from
25 Camden?



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
81–84

Page 81

1    A. I don't recall that name.
2    Q. And you told me you don't know
3  Rasheid Davis?
4    A. Yes, I don't know him.
5    Q. You don't know him? You wouldn't
6  know him if he walked in the room?
7    A. Not by that name.
8    Q. Okay. What about Veronica Davis?
9    A. Don't recall that name.
10    Q. Dominique Doss?
11    A. Doesn't --
12    Q. No?
13    A. No.
14    Q. Undrea Guise?
15    A. No.
16    Q. Kenneth Harris?
17    A. No.
18    Q. What about Lester Hollins from
19  Jackson?
20    A. No.
21    Q. Antonio Howard?
22    A. No.
23    Q. John Spann?
24    A. No.
25    Q. Earline Wilder?

Page 82

1    A. No.
2    Q. Other than Lawrence Blackmon and
3  Michael Bracy, have you talked to anybody
4  else about this lawsuit, other than your
5  lawyers and your mother?
6    A. No.
7    Q. Have you tried to get anyone to join
8  in the lawsuit?
9    A. No.
10    Q. Do you keep a journal or a diary?
11    A. No.
12    Q. And I believe you said you were on
13  Facebook. Do you have any other -- do you
14  use any other kind of social media?
15    A. No. Just Facebook.
16    Q. No Twitter account? Have you posted
17  anything on your Facebook about this lawsuit?
18    A. Only the picture that the Clarion
19  Ledger has about the press conference.
20  That's the last thing --
21    Q. Were you at the press conference?
22    A. Yes.
23    Q. Did you talk at that press
24  conference?
25    A. Yes.

Page 83

1    Q. What did you say?
2    A. I don't recall everything I said at
3  that.
4    Q. Who else was at the press
5  conference? Was Latoya there?
6    A. She was there, yes.
7    Q. Anybody else?
8    A. Quinnetta Manning.
9    Q. Did you talk to Quinnetta prior to
10  the press conference?
11    A. No.
12    Q. Did you talk to Latoya about the
13  press conference and what y'all were going to
14  say?
15    A. No, not what we were going to say.
16  More of what I'm going to wear and things
17  like that.
18    Q. She was worried about what you were
19  going to wear?
20    A. Yeah. You know, she had to dress
21  me.
22    Q. Okay. Other than your attorneys,
23  did you talk to anyone else about what you
24  were going to say at the press conference?
25    A. No.

Page 84

1    Q. Do you still -- the post about the
2  press conference, is it still on your
3  Facebook page?
4    A. It may be, because mother was so
5  proud. She reposted it and tagged me in it.
6    Q. Is your Facebook page public?
7    A. Yes.
8    Q. If I go on there, would I be able to
9  find that post?
10    A. Yes.
11    Q. You remember what month and year you
12  put it -- posted it?
13    A. '17.
14    Q. So right after the lawsuit was
15  filed?
16    A. I'm guessing.
17    Q. But you hadn't deleted that post?
18    A. No.
19    Q. Have you deleted any posts on your
20  Facebook page?
21    A. No.
22    Q. Since this lawsuit was filed, have
23  you deleted any posts?
24    A. I'm not sure. I'm not sure.
25    Q. Okay. Have you deleted any posts



STEVEN SMITH                                    January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.              85–88



Page 85

1  about this lawsuit on your Facebook page?
2      A.  No.
3      Q.  I know I asked you what doc- -- have
4  you looked at any documents having to do with
5  this case at all?
6      A.  Yes.
7      Q.  What'd you look at?
8      A.  The interrogatories --
9      Q.  Uh-huh (affirmative response).
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1
2
3
4
5
6
7
8
9
10      Q.  How many citations have you received
11  from the Canton Police Department?
12      A.  No more than -- I'd say 12 to be
13  just safe, 12.
14      Q.  Twelve?
15      A.  Yes.
16
17
18
19
20
21
22
23
24
25

Page 87

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20      Q.  Do you currently have a valid
21  driver's license?
22      A.  I would like to take the Fifth on
23  that question.
24      Q.  You're claiming the Fifth because I
25  asked you whether or not you have a valid

Page 88

1  driver's license?
2      A.  Yes.
3      Q.  Have you been arrested in the state
4  of Georgia?
5      A.  No.
6
7
8
9
10
11
12
13
14      Q.  Have you applied for a driver's
15  license in the state of Georgia?
16      A.  Yes.
17      Q.  Has Latoya?
18      A.  Yes.
19      Q.  Do y'all have valid driver's
20  licenses from the state of Georgia?
21      A.  No.
22      Q.  Neither of you?
23      A.  No.
24      Q.  When did y'all apply?
25      A.  Three months ago when we were in





Page 89

1 College Park.
2      Q. Have you been given any traffic
3 citations in the state of Georgia or the
4 state of Alabama?
5      A. No.
6      Q. And what about Latoya?
7      A. No.
8      Q. Your application for a Georgia
9 driver's license, has anybody told you how
10 long it'll take before you get one?
11     A. No.
12     Q. Have you been denied a Georgia
13 driver's license?
14     A. Yes.
15     Q. What about Latoya?
16     A. No.
17
18
19
20
21
22
23
24
25

Page 90

1
2
3
4
5
6
7
8
9
10
11
12
13
14     Q. Okay.  Have you ever gotten
15 citations from the City of Jackson Police
16 Department?
17     A. Yes.
18
19
20
21
22
23
24
25

Page 91

1      A. 2007 or '08.
2      Q. Okay.  Or '08?
3      A. Yes.
4      Q. Or 2008?
5      A. Yes.
6      Q. Okay.  So you have outstanding
7 tickets in the City of Jackson?
8      A. Yes, I guess.
9      Q. How many?
10     A. I'm not sure.
11     Q. More than five?
12     A. I'm not sure.
13     Q. Can you tell me what they're for?
14     A. It's driving-related.
15
16
17
18
19
20
21
22
23
24
25

Page 92

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

January 09, 2018
93—96



**Page 93**

1
2
3
4
5      Q.  Have you ever filed any other
6  lawsuit?
7      A.  No.
8      Q.  Have you ever been sued by anybody?
9      A.  No.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 94**

1
2
3
4
5      Q.  Have you ever filed a worker's
6  compensation claim?
7      A.  No.
8      Q.  And I think you told me about two
9  unemployment claims you made, unemployment
10  compensation?
11      A.  Which I never received unemployment.
12  I just filed for it.
13      Q.  Did your employer contest it?
14      A.  Yes.  Well, no.  Did my employer
15  contest it?
16      Q.  Yeah.
17      A.  I think once they did, and the other
18  incident I don't know.  I just found another
19  job.  I always found a job before --
20      Q.  You just didn't pursue it?
21      A.  Uh-huh (affirmative response).
22      Q.  Why did your -- one of your
23  employers contest your unemployment claim?
24      A.  Because the reason was -- for
25  leaving was he wanted me to do a job.  I

**Page 95**

1  told -- the reason was me and management
2  disagreed about some things, so...
3      Q.  He wanted you to do a job and
4  management said you couldn't do it?
5      A.  Yes.
6      Q.  Which employer was that?
7      A.  I don't recall.
8      Q.  What was the job that they wanted
9  you to do?
10      A.  I want to say operate a pallet jack
11  because my line was down.  Since my line was
12  down, it really bothered him that I -- the
13  only thing that I had -- that the rules said,
14  to just stay in place.
15      Q.  Okay.  You couldn't go to the other
16  department?
17      A.  Uh-uh (negative response).  But he
18  was like, "Get the pallet jack and get it
19  ready."  And I'm like, "I'm not assigned to
20  operate a pallet jack."
21      Q.  Have you ever been a member of a
22  gang?
23      A.  No.
24          MS. COWAN:  I think I'm through.  Let
25  me just check with co-counsel and make sure.

**Page 96**

1          THE WITNESS:  Okay.
2                   - - -
3      (OFF THE RECORD AT 10:18 A.M.)
4      (BACK ON THE RECORD AT 10:22 A.M.)
5          MS. COWAN:  That's all the defense
6  has.
7          MR. RETHY:  And I just have one
8  question.
9                   - - -
10          (CROSS-EXAMINATION)
11  BY MR. RETHY:
12      Q.  Mr. Smith, you've seen roadblocks in
13  Madison County, in Canton, on dates other
14  than holidays; is that correct?
15      A.  Yes.
16          MS. COWAN:  Object to leading.  Okay.
17  Is that it?
18          MR. RETHY:  That's it.
19          THE WITNESS:  Yes, yes.
20          MS. COWAN:  Okay.
21                   - - -
22      (OFF THE RECORD AT 10:22 A.M.)
23      (BACK ON THE RECORD AT 10:23 A.M.)
24                   - - -
25          (REDIRECT EXAMINATION)



STEVEN SMITH
BROWN, et al. vs MADISON COUNTY, MS, et al.

Page 97

1  BY MS. COWAN:
2      Q.  Mr. Smith, your counsel asked you
3  whether or not you'd seen other roadblocks in
4  Madison County.  And you said "yes"?
5      A.  Other than holidays, yes.
6      Q.  Other than holidays.  And where were
7  those roadblocks?  Are those the ones we --
8  you testified about before the three?
9      A.  No.
10     Q.  Okay.  Tell me about those.
11     A.  I mean, I've seen them on Highway 16
12  going up toward -- you know, into the county.
13  I've even seen them conducted when they
14  constructed the connector from 55 to 43.
15  I've seen them there.
16     Q.  Okay.  And Highway 16, how many
17  times have you seen them there?
18     A.  I'm recalling one, once.
19     Q.  And 55 to 43, let's see, you said
20  "the connector."  Is that --
21     A.  It was newly constructed, so that's
22  why.
23     Q.  How many times have you seen them
24  there?
25     A.  Twice.  Once going through it, and

Page 98

1  once I came through Peace Street and 16, so I
2  passed it.  I saw them there, but I was going
3  the other way.
4      Q.  But you didn't go through it?
5      A.  Yes.
6      Q.  Okay.  And how did you know that
7  they were being conducted by the Madison
8  County Sheriff's Department?
9      A.  I've been there looking at the cars
10  all my life, and I'm just pretty sure that
11  that's them.
12     Q.  So there were marked cars there?
13     A.  Yes.
14     Q.  And when you went through them, did
15  the -- was every car stopped?
16     A.  I wouldn't know.
17     Q.  Was every car in front of you
18  stopped?
19     A.  When I went through it?  Yes, yes.
20     Q.  Okay.  And there were officers out
21  in the road?
22     A.  Yes.
23         MS. COWAN:  That's it.
24             - - -
25     (OFF THE RECORD AT 10:25 A.M.)

Page 99

1  (WHEREUPON THE ABOVE-ENTITLED DEPOSITION WAS
2      SUSPENDED AT APPROXIMATELY 10:25 A.M.)

Page 100

1      CERTIFICATE OF COURT REPORTER
2      I, Tammy McDaniel-Bagnato, Court Reporter and
3  Notary Public, in and for the State of Mississippi,
4  hereby certify that the foregoing contains a true and
5  correct transcript of the testimony of STEVEN SMITH, as
6  taken by me in the aforementioned matter at the time and
7  place heretofore stated, as taken by me and later
8  reduced to typewritten form under my supervision by
9  means of computer-aided transcription.
10     I further certify that under the authority vested
11  in me by the State of Mississippi that the witness was
12  placed under oath by me to truthfully answer all
13  questions in the matter.
14     I further certify that I am not in the employment
15  of or related to any counsel or party in this matter and
16  have no interest, monetary or otherwise, in the final
17  outcome of this matter.
18     Witness my signature and seal, this the 21st day,
19  January, 2018.
20                          Tammy McDaniel-Bagnato
21
22  MY COMMISSION EXPIRES:
23  _____
24
25



STEVEN SMITH                                        January 09, 2018
BROWN, et al. vs MADISON COUNTY, MS, et al.                     101

```
1                 CERTIFICATE OF DEPONENT

2           I, STEVEN SMITH, have read the foregoing pages,

3    of the transcript of my deposition given on January 9,

4    2018, and it is true, correct and complete to the best

5    of my knowledge, recollection and belief except for the

6    list of corrections, if any, attached on a separate

7    sheet herewith.

8       Witness my hand, this the ___20th___ day of

9    __FEBRUARY___, 2018.

10                               _____Steven Smith_____

11                               STEVEN SMITH

12

13      Subscribed and sworn to before me, this the

14   _20th_ day of _FEBRUARY___, 2018.

15

16   _____
     Notary Public in and for the
17   County of _DALLAS_
     State of Mississippi TEXAS
18   My Commission Expires: __8/20/2020__

19

20

21

22

23

24

25
```

GLEN FLY
Notary Public, State of Texas
Comm. Expires 08-20-2020
Notary ID 120003890



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

  Plaintiffs,

   v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

  Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFF STEVEN SMITH'S
SECOND SUPPLEMENTAL
RESPONSES AND OBJECTIONS
TO DEFENDANTS' FIRST SET
OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Steven

Smith ("Plaintiff" or "Mr. Smith"), by and through his attorneys, hereby submits the following

supplemental responses and objections to Interrogatories Nos. 1(a), 8, and 14 of Defendants'

First Set of Interrogatories served by Defendants on Plaintiffs on September 22, 2017

(collectively, the "Interrogatories," and each an "Interrogatory"). These responses and

objections are hereby designated as Confidential pursuant to the Stipulated Protective Order

(Dkt. No. 32), so-ordered by the Court on September 6, 2017 in the above-captioned Action.

The Second Supplemental Responses and Objections set forth below are made in further



CONFIDENTIAL

response to the Interrogatories and supplement the Responses and Objections previously served by Plaintiff.

## GENERAL OBJECTIONS

Plaintiff hereby incorporates by reference the General Objections set forth in his Responses and Objections to Defendants' First Set of Interrogatories dated October 20, 2017 and his Supplemental Responses and Objections to Defendants' First Set of Interrogatories dated November 10, 2017.  Plaintiff asserts those General Objections as to each Interrogatory, whether or not such objections are repeated below in response to each individual Interrogatory.

## SPECIFIC SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO INTERROGATORIES NOS. 1(a), 8, AND 14

**Interrogatory No. 1(a):**

Please state the following:

(a)     Your full legal name, any alias by which you are known or have been known, date of birth, social security number and each residence address you have had during the immediately preceding ten (10) years, including your present residence address, and the inclusive dates you lived at such address;

**Supplemental Response to Interrogatory No. 1(a):**

Mr. Smith amends his prior response to Interrogatory 1(a) as follows:  Mr. Smith's current residence address is 630 Scott Street, Jackson, MS, 39203.

**Interrogatory No. 8:**

Please identify and describe in detail the form and substance of any policy or procedure of the Defendants or the Madison County Sheriff's Department you contend constitutes a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination. For each such policy, please state:

(a)     the name of the policy;

(b)     the terms of the policy;

(c)     the date it went into effect;

CONFIDENTIAL

(d)      the means by which it went into effect;

(e)      how you learned of such policy; and

(f)      the name, address, and telephone number of the person who provided it to you.

**Supplemental Response to Interrogatory No. 8:**

In addition to the General Objections incorporated herein by reference, Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information already in the possession, custody, or control of or that is known to, equally available to, or solely available to Defendants.  Plaintiff further objects to this Interrogatory on the grounds that it seeks information that is protected from disclosure by, or disclosure of which is prohibited or restricted under, any privilege or immunity, including the attorney-client privilege, the work product doctrine, the joint defense privilege, the common interest privilege or any other applicable privilege, immunity or limitation on discovery.  Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly burdensome.  Plaintiff further objects to this Interrogatory because class certification-related discovery is ongoing and incomplete, and to the extent that this Interrogatory purports to require Plaintiffs to marshal evidence in support of any right or claim.  Plaintiff also objects to this Interrogatory as vague, overbroad, and unduly burdensome.  Plaintiff further objects to this Interrogatory on the grounds that it requests information regarding counsel's preparation of the case on behalf of the named Plaintiffs and the proposed class, rather than information that is within the personal knowledge of Plaintiff.  Any information provided by Plaintiff in response to this Interrogatory is provided subject to and without waiver of these objections and qualifications.

Subject to and without waiver of the foregoing objections, and in addition to the information previously provided by Plaintiff in response to this Interrogatory, Plaintiff states that

policies and procedures of Defendants or the Madison County Sheriff's Department that constitute a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination include, but are not limited to:

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks without appropriate procedural safeguards, including (i) roadblocks conducted using unmarked cars, (ii) roadblocks conducted using cars without emergency lighting engaged and/or using flashlights as a primary light source, (iii) roadblocks conducted by plainclothes or undercover officers, including narcotics officers and members of the "NET Team," "Jump Out Detail," and/or "Apartment Detail," (iv) roadblocks conducted in inadequately lit areas, (v) "roving" roadblocks, and (vi) roadblocks at which officers do not stop every car, but instead use their discretion to only stop certain vehicles.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which officers require persons other than the driver to produce identification or provide other information, or otherwise search or detain persons without reasonable suspicion or probable cause.

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks at which Madison County Sheriff's Department personnel stop, question, detain, and/or search pedestrians in the vicinity of the roadblock without reasonable suspicion or probable cause and/or on the basis of race.

- The Madison County Sheriff's Department's policy, custom, and/or practice of stopping, questioning, detaining, and/or searching pedestrians travelling through majority-Black areas of Madison County without reasonable suspicion or probable cause and/or on the

CONFIDENTIAL

basis of race, including as implemented by narcotics officers and members of the "NET Team," "Jump Out Detail," and/or "Apartment Detail."

- The Madison County Sheriff's Department's policy, custom, and/or practice of conducting vehicular roadblocks for the purpose of checking for outstanding warrants, including but not limited to as described in the Notices produced at (i) MC T. CHASTAIN LAPTOP 17, (ii) MC MAD. COUNTY MAIN SERVER 1, and (iii) MC – SANDRIDGE DESKTOP 23, as well as the Notice annexed to the Complaint and the incident report produced at Bates numbers MC-RFP-Inc. Rep. 010886-010887.

- The Madison County Sheriff's Department's policy, custom, and/or practice of disproportionately conducting traffic stops in majority-Black areas, conducting pretextual traffic stops on the basis of race, and disproportionately issuing citations to and making arrests of Black individuals during traffic stops.

- The Madison County Sheriff's Department's policy, custom, and/or practice of discriminatorily arresting, citing, and/or charging Black individuals at higher rates, and/or with greater severity, than white persons engaged in the same or similar conduct.

- The Madison County Sheriff's Department's policy, custom, and/or practice of entering the homes of Black residents of Madison County without warrants or other valid legal justification in the course of serving warrants and/or conducting investigations, and of conducting unreasonable and warrantless searches of such premises in connection therewith.

- The Madison County Sheriff's Department's deliberate indifference to violations of the Fourth and Fourteenth Amendments by its personnel, as demonstrated by (i) the Madison County Sheriff's Department's failure to adequately train, supervise, and/or discipline

CONFIDENTIAL

officers with respect to unconstitutional policing practices and with respect to officers'
exercise of discretion in conducting law enforcement activities, (ii) the Madison County
Sheriff's Department's failure to adequately investigate or otherwise respond to citizen
complaints, (iii) the Madison County Sheriff's Department's failure to maintain data
and/or statistics regarding incidents involving the use of force and the racial composition
of persons subject to the Madison County Sheriff's Department's policing activities, and
(iv) the Madison County Sheriff's Department's culture of racial discrimination and of
explicitly or implicitly condoning, authorizing, and/or acquiescing to racially
discriminatory attitudes, statements, and actions by Madison County Sheriff's
Department personnel.

The policies, customs, and/or practices described above have been identified through
analysis of deposition testimony taken in this Action, documents produced by the parties, and
documents received in response to requests made under the Mississippi Public Records Act.
Plaintiff's investigation, discovery, and preparation of his case and his legal theories, through
counsel, are ongoing, and Plaintiff reserves all rights to identify other policies and/or procedures,
to clarify or refine Plaintiff's characterizations of the above-mentioned policies and/or
procedures, and/or to rely on other or additional evidence concerning any such policies and/or
procedures, including as a result of documentary or testimonial evidence that may be adduced in
this Action after the date hereof.

**Interrogatory No. 14:**

Please state the questions of law and fact you contend are common to the class your Complaint
alleges, and identify any documents related to the common questions of law and fact.

**Supplemental Response to Interrogatory No. 14:**

Dated: January 16, 2018

By:   /s/ Joshua Tom_____
      Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Jumin Lee (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopherjumin.lee@stblaw.com
bonnie.jarrett@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiff*

11

**<u>Verification</u>**

I hereby declare under penalty of perjury that the responses contained in the foregoing Supplemental Responses and Objections to Interrogatories propounded by Defendants, which were prepared with the assistance of counsel, are true and correct to the best of my knowledge, information, and belief.

_Steven Smith_
_____