**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON
HERBERT ANTHONY GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS
SINGLETON; STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER, individually and on
behalf of a class of all other similarly situated**                    **PLAINTIFFS**

**v.**                                         **CIVIL ACTION NO. 3:17-cv-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL C. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities**                    **DEFENDANTS**

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON THE CLASS-BASED CLAIMS OF PLAINTIFFS
KHADAFY MANNING AND QUINNETTA MANNING**

---

Defendants Madison County, Mississippi, and Sheriff Randall C. Tucker, by and through

counsel, file the following Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 on the

class-based claims of plaintiffs Khadafy Manning and Quinnetta Manning:

1.      Khadafy and Quinnetta Manning filed this action along with eight other plaintiffs

alleging that the Madison County Sheriff's Department ("MCSD") "implements a **coordinated**

**top-down program** of methodically targeting Black individuals for suspicionless searches and

seizures."[1]  As set forth more fully in their motion for class certification, both Mannings seek to

be included in a class of plaintiffs referred to as the racial "Targeting Class," while Khadafy also

seeks to be included in a class referred to as the "Pedestrian Stop Subclass."[2]  The racial Targeting

---

[1] Dkt. # 1, at ¶ 1.
[2] Dkt. # 232 at 32, 34.

Class claims are apparently based in part on allegations that the MCSD unlawfully entered Quinnetta's apartment on June 26, 2016, and used excessive force against the couple when questioning them about a nearby attempted burglary which they had witnessed.[3]  The Pedestrian Stop Subclass claim is apparently based in part on allegations that, on February 14, 2017, Khadafy, upon exiting his vehicle, was approached by an MCSD deputy, asked for his identification, and arrested after admitting to driving with a suspended license.[4]  The Mannings allege that the MCSD violated the Fourth and Fourteenth Amendments, and they seek relief under 42 U.S.C. § 1983 and 42 U.S.C. § 2000d of Title VI of the Civil Rights Act of 1964.

2.      Summary judgment should be granted on the Mannings' class-based claims.[5]  Their racial targeting claim fails because they have presented no evidence whatsoever to support their allegation that the actions of the MCSD on either occasion were the result of a top-down policy of intentional race discrimination.  Khadafy's pedestrian stop claim also fails because he offers no evidence to support his allegation that the actions of the MCSD during the February 2017 incident constituted a Fourth Amendment violation, much less one committed as the result of a top-down policy of intentional race discrimination.

## **EXHIBITS**

3.      In support of this motion, defendants rely in part on the following exhibits:

Exhibit 1      Affidavit of Slade Moore;

Exhibit 2      Excerpts from Quinnetta Manning's deposition;

Exhibit 3      Excerpts from Khadafy Mannings's deposition; and

---

[3] Dkt. # 1, at ¶¶ 210-236.

[4] Dkt. # 1 at 237-238; Dkt. # 231-31, at ¶ 4; Dkt. # 232, at 35-36.

[5] Unlike the other plaintiffs, who only seek injunctive relief, the Mannings seek personal injury damages for the June 2016 incident.  *See* Dkt. #1, at ¶¶ 325-337.  The present motion does not seek summary judgment of those personal injury damages claims.

Exhibit 4        Excerpts from Samuel Howard's deposition, including Exhibit 2 to transcript.

Defendants also rely on the memorandum of authorities submitted herewith.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that this Court dismiss the class-based claims of plaintiffs Khadafy Manning and Quinnetta Manning with prejudice pursuant to Fed. R. Civ. P. 56(a).

Respectfully submitted this 13th day of April, 2018.

MADISON COUNTY, MISSISSIPPI and
SHERIFF RANDALL C. TUCKER, IN
HIS OFFICIAL CAPACITY

BY:     s/ James E. Graves, III_____
        Michael B. Wallace (MSB #6904)
        Charles E. Ross (MSB #5683)
        James E. Graves, III (MSB #102252)
        Charles E. Cowan (MSB #104478)
        WISE CARTER CHILD & CARAWAY, P.A.
        Post Office Box 651
        Jackson, Mississippi  39205-0651
        Telephone: 601-968-5534
        Facsimile: 601- 944-7738
        mbw@wisecarter.com
        cer@wisecarter.com
        jeg@wisecarter.com
        cec@wisecarter.com

        and

        T. Russell Nobile (MSB #100682)
        WISE CARTER CHILD & CARAWAY, P.A.
        2510 14th Street, Suite 1125
        Gulfport, Mississippi  39501
        Telephone: 228-867-7141
        Facsimile: 228-867-7142
        trn@wisecarter.com

3

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi  39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi  39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
Telephone: 601-987-5300
lhester@pbhfirm.com

## CERTIFICATE OF SERVICE

I, James E. Graves, III, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 13th day of April, 2018.

*s/ James E. Graves, III*
JAMES E. GRAVES, III

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

LATOYA BROWN, et al.                                          **PLAINTIFFS**

v.                                      **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

MADISON COUNTY, MISSISSIPPI; et al.                          **DEFENDANTS**

## AFFIDAVIT OF SLADE MOORE

STATE OF MISSISSIPPI

COUNTY OF MADISON

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the jurisdiction aforesaid, the within named Slade Moore, who after being by me first duly sworn stated on oath that he has personal knowledge and is competent to testify on the following:

1.      I am a deputy with the Madison County Sheriff's Department ("MCSD") and have held the position of Sergeant since July 1, 2015.

2.      On the morning of June 26, 2016, I, along with other officers, responded to a domestic disturbance call in the Canton Estates Apartments in Madison County, Mississippi.

3.      As a result of the incident, I prepared a supplement to an incident report initially prepared by Deputy James Hall describing my observations and actions that morning. A copy of that incident report is attached to my affidavit as Exhibit A.

4.      I was also asked to prepare a Memo describing my observations and actions that morning at the request of Chief Deputy Jeremy Williams on June 28, 2016. A copy of that Memo is attached to my affidavit as Exhibit B.



EXHIBIT

1

5.     Canton Estates Apartments is not located within the city limits of the City of Canton, and, as a result, the MCSD is the law enforcement agency with primary jurisdiction over the complex.

6.     The two individuals involved in the domestic dispute were Ladarius Thompson and Ashley Morment, who Ashley reported had lived together for 10 years. (Exhibit A). Ashley told me and other MCSD officers that she had broken up with Thompson approximately one month ago, and that Thompson had returned to her apartment earlier that morning and had threatened her and her cousin with a tire tool. (Exhibit A).

7.     After learning of Thompson's actions, Deputy Hall and I began searching the apartment complex and the surrounding area for Thompson. (Exhibit A). Thompson had left his vehicle in the apartment complex, so I suspected that he would return to retrieve his vehicle. (Exhibit A).

8.     While walking around the apartment complex searching for Thompson, I observed Thompson return to Morment's apartment and actually observed him breaking a window out of the apartment. (Exhibit A).

9.     Morment's apartment was on the ground floor underneath an apartment being leased by Quinnetta Manning. (Exhibit A).

10.    While Thompson continued to break the window of Morment's apartment, I observed Quinnetta Manning and a male come out of Quinnetta's apartment and walk down some stairs leading to Morment's apartment. I observed them speaking to Thompson while he took glass from the window and threw it over a fence or gate next to the apartment. (Exhibit A).

11.    Based on my observations of Quinnetta and the male, who I later learned was Khadafy Manning, I determined that both individuals were acting as lookouts for Thompson to

2

alert him when any of the officers who had initially interviewed Ashley Morment that morning might return to her apartment.  (Exhibit A).

12.     After another deputy who had come to the scene pulled into the parking lot of the apartment complex, I observed Thompson, Quinnetta, and Khadafy run up the steps to Quinnetta's apartment.  (Exhibit A).

13.     Approximately one minute later, I observed Thompson exit Quinnetta's apartment, go back downstairs to Morment's apartment, remove more glass from the window, and attempt to enter the apartment through the window.  (Exhibit A).

14.     When Thompson was unsuccessful in entering the apartment through the window, he ran from the scene again.  (Exhibit A).

15.     The officers now at the scene and I tried to chase Thompson, but we were unsuccessful with apprehending him.  (Exhibit A).

16.     The responding officers and I returned to the scene of the crime and knocked on Quinnetta's apartment door and, when Quinnetta opened the door, I entered the apartment and began to question both Quinnetta and Khadafy Manning, who appeared from a back room soon after I had entered the apartment, about Thompson's actions and whereabouts.  (Exhibit B).

SLADE MOORE

SWORN TO AND SUBSCRIBED before me, this the 12th day of April, 2018.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

LEEANN H. SANDERS
Commission Expires
March 8, 2020

3

Complete Incident Report



MADISON COUNTY
SO
2941 U.S. Highway
51
Canton, MS 39046
Sheriff Randall
Tucker
601-859-2345

INCIDENT REPORT
SO16009669

HALL, JAMES
3964

Date:      **06/26/16**                         Time: **04:16**
RECV: **04:16**    DISP: **04:17**    ARIV: **04:23**    CLEAR: **07:05**
Offense:      **DISTURBANCE**                UCR Code: **ALL OTHER OFFENSES**

Premise Type: **APT./CONDO COMPLEX**
Address: **388 RICKS DR APT: E**
Forced Entry:    Weapon Type: **UNKNOWN**
Drugs Involved: **N**    Alcohol Involved: **N**    Computer Crime: **N**    Domestic Violence: **N**
Child Abuse: **N**    Senior Citizen: **N**    Illegal Immigration: **N**    Homeless: **N**
Juvenile: **N**    Officer Assault: **N**    Use of Force: **N**
Confidential: **N**

Comments:        **- LADARRIAN THOMPSON (HAS A GUN) – ALTERCATION W/
ASHELY MORME**
**- NT (BLUE SUBURBAN) /SUBJECT RUNNING 801869950**
-
-
-

Investigator Assigned:                                            Status:
Report Supervisors:    **FLAX, ELTON P**            **FLAX, ELTON P**
-------------------------------- **P E R S O N** --------------------------------
Person #: 001                  Status: **CALLER**
Name: **BRITTANY MORMENT**    Race:
Sex:    DOB: **00/00/0000**    Age:    Height:    Weight:    Hair:
Eyes:    F Hair:    Build:    Cmplxn:
Address: , ,
Employment:    Pos:    address:
SSN: **000 - 00 - 0000**    Phone(RES): **76900 - 798 - 3345**    Phone(BUS): **00000 - 000 -
0000**
Confidential:

Person #: 002                  Status: **CALLER**
Name: **BRITTANY MORMENT**    Race: **BLACK**
Sex: **FEMALE**    DOB: **99/99/9999**    Age: **0**    Height: **505**    Weight: **140**    Hair: **BLACK**
Eyes: **BROWN**    F Hair: **NOT APPLICABLE**    Build: **STOCKY**    Cmplxn: **DARK**
Address: , , **MISSISSIPPI**
Employment:    Pos:    address:
SSN: **000 - 00 - 0000**    Phone(RES): **76900 - 798 - 3345**    Phone(BUS): **00000 - 000 -
0000**
Confidential:

Person #: 003            Status: **VICTIM-COMPLAINANT**



EXHIBIT

A

MC - RFP 8 - 184

Complete Incident Report

Name: **ASHLEY ANTOINETTE MORMENT**   Race: **BLACK**
Sex: **FEMALE**   DOB: ▓▓▓▓   Age: **25**   Height: **504**   Weight: **194**   Hair:
**BLACK**
Eyes: **BROWN**   F Hair: **NOT APPLICABLE**   Build: **CHUBBY**   Cmplxn: **BLACK**
Address: **388 RICKS DRIVE APT 3H, CANTON, MISSISSIPPI**
Employment:   Pos:   address:
SSN: ▓▓▓▓   Phone(RES): **76900 - 823 - 5944**   Phone(BUS): **00000 - 000 - 0000**
Confidential:

Person #: **004**   Status: **SUSPECT**
Name: **LADARIUS DANTAYE THOMAS**   Race: **BLACK**
Sex: **MALE**   DOB: ▓▓▓▓   Age: **26**   Height: **506**   Weight: **150**   Hair: **BLACK**
Eyes: **BROWN**   F Hair: **GOATEE**   Build: **MEDIUM**   Cmplxn: **MEDIUM BROWN**
Address: **110 OIL MILL QUARTERS RD, CANTON, MISSISSIPPI**
Employment:   Pos:   address:
SSN: ▓▓▓▓   Phone(RES): **00000 - 000 - 0000**   Phone(BUS): **00000 - 000 - 0000**
Confidential:

Person #: **005**   Status: **WITNESS**
Name: **KHADAFY CHARLIE MANNING**   Race: **BLACK**
Sex: **MALE**   DOB: ▓▓▓▓   Age: **34**   Height: **601**   Weight: **160**   Hair: **BALD**
Eyes: **BROWN**   F Hair: **UNSHAVEN**   Build: **SLIM**   Cmplxn: **DARK**
Address: **388 RICKS DRIVE APT 6G, CANTON, MISSISSIPPI**
Employment:   Pos:   address:
SSN: ▓▓▓▓   Phone(RES): **00000 - 000 - 0000**   Phone(BUS): **00000 - 000 - 0000**
Confidential:

Person #: **006**   Status: **WITNESS**
Name: **QUINETTA KATRICE THOMAS**   Race: **BLACK**
Sex: **FEMALE**   DOB: ▓▓▓▓   Age: **28**   Height: **503**   Weight: **105**   Hair:
**BLACK**
Eyes: **BROWN**   F Hair: **NOT APPLICABLE**   Build: **SLIM**   Cmplxn: **DARK**
Address: **712 KING RANCH RD, CANTON, MISSISSIPPI**
Employment:   Pos:   address:
SSN: ▓▓▓▓   Phone(RES): **00000 - 000 - 0000**   Phone(BUS): **00000 - 000 - 0000**
Confidential:

----------------------------- **P R O P E R T Y** -----------------------------
Property #: **001**   Status: **STOLEN**
Stolen: **06/26/16**   $Value: **450**   Recover: **00/00/00**   $Value: **0**   Damaged/Recvd:
**00/00/00**   $Value:
Name/Make: **ELEMANT**   Quantity: **1**   Type/Model: **H5 G6**   Ser/Marking:
**M0F1M40020487**
Color: **BLACK**   UCR Property: **RADIOS/TVS/VCRS**   *Recovery UCR:
Comments:

Property #: **002**   Status: **STOLEN**

http://192.168.49.252/dcscadw/PRINTPD.pgm?TASK=print&cincn=SO16009669   6/27/2016

**CONFIDENTIAL**   **MC - RFP 8 - 185**

~~Complete Incident Report~~

Stolen: **06/26/16**   $Value: **136**   Recover: **00/00/00**   $Value: **0**   Damaged/Recvd: **00/00/00**   $Value:
Name/Make: **SAMSUNG**   Quantity: **1**   Type/Model: **BLU-RAY/DVD PLA**   Ser/Marking: **0A5G1RBG402973**
Color: **BLACK**   UCR Property: **RADIOS/TVS/VCRS**   *Recovery UCR:
Comments:


Property #: **003**                Status: **STOLEN**
Stolen: **06/26/16**   $Value: **79**   Recover: **00/00/00**   $Value: **0**   Damaged/Recvd: **00/00/00**   $Value:
Name/Make: **LG**   Quantity: **1**   Type/Model: **9 INCH**   Ser/Marking: **UNK**
Color: **BLACK**   UCR Property: **RADIOS/TVS/VCRS**   *Recovery UCR:
Comments:


Property #: **004**                Status: **STOLEN**
Stolen: **06/26/16**   $Value: **79**   Recover: **00/00/00**   $Value: **0**   Damaged/Recvd: **00/00/00**   $Value:
Name/Make: **LG**   Quantity: **1**   Type/Model: **9 INCH**   Ser/Marking: **UNK**
Color: **GRAY**   UCR Property: **RADIOS/TVS/VCRS**   *Recovery UCR:
Comments:


---------------------------------- **V E H I C L E** ----------------------------------
Vehicle #: **001**          Status: **IMPOUNDED**
Year: **1996**   Make: **CHEVROLET**   Model: **SUBURBAN**   Style: **SPORT UTILITY VEHICLE**
VIN/Serial: **1GNFK16RXTJ349639**   Color Top: **BLACK**   Color Bottom: **BLUE**
License Tag - State: **MISSISSIPPI**   number: **MDW 678**   Exp. Yr: **17**
Registered Owner: **YOUNG, JAMES**   Legal Owner: ,
Recovery Location:
Comments:
Additional Comments: **SUSPECT VEHICLE TOWED BY HAYLES**


---------------------------------- **N A R R A T I V E** ----------------------------------

On the morning of Sunday June 26, 2016 I Deputy James Hall SO-45 responded to a disturbance call at 388 Ricks Drive for a Ladarius Thompson subject in a altercation near a blue suburban. As I arrived I noticed two females and a male standing on the corner near building 16. I got out and asked what was going on and Brittney Mermont advised me that the male subject would not let the other female Ashley Mermont go into the residence. I asked the male for his name and date of birth and he gave me Jamel Thompson. This name did not match the name the caller gave to dispatch but I was going to check it anyway. As I began to check the name given to me I looked to my left to check my vehicle and the subject began to flee towards the entrance of the apartment complex. I gave a loud verbal command to stop that he was under arrest and advised dispatch that he had fled on foot and that he had on a white tank top with blue jean shorts that had different colored patches on them. I got into my patrol vehicle to cut him off on the other side of the complex. I did not make contact with the subject so I began to search the Joe Prichard homes property and the surrounding streets before returning to the callers location to get a better idea of what was going on. At this time I was joined by Sgt. Slade Moore SO-8 and we were informed that Thompson and Ashley Mermont had just ended a long relationship. We also learned that the blue suburban (tag #MDW 678) belonged to Ladarius Thomas. a tire tool was found on the

**CONFIDENTIAL**                **MC - RFP 8 - 186**

Complete Incident Report

ground outside of apartment 16 and Brittney Mermont advised us that he was
holding it whenever they returned home A short time after searching the area for
Thompson Sgt. Moore spotted the subject from the adjacent property and notified
units that the suspect was still inside the complex. As I was responding back to
the complex Thompson spotted me and ran and hid again. I left the area and began
to patrol the perimeter around the complex whenever Sgt. Moore began chasing
Thomas towards Ricks Drive. I was near the area so I tried to intercept the
suspect on Ricks drive and he hid in a small wooded area along the apartment
complex fence. A search for Thomas was conducted in the wooded area but he was
not found in the area. At approximately 0600 Sgt. Moore radioed the units that he
saw the Thompson and a group of people breaking the window out of an apartment in
building 6. Thompson broke the glass out of the apartment window and threw them
into the grass on the outside of the fence. Thompson began running toward George
Washington street and at this time did not have on a shirt, but just blue jean
shorts. Deputy Rylon Thompson S0-31 detained an individual in the area that
matched the description of Thompson but he was released after I determined it was
not Thomas. This was the last time Thompson was seen in the area. Sgt. Moore went
to talk to the individuals that were watching Thompson break into apartment 6e
and they agreed to fill out witness statements about what they saw. The witness's
to the break in were Khadafy Manning and Quinetta Thomas. The witness's to the
break in said that he used some type of tire tool to break the glass out.  The
apartment that was broken into Belonged to Ashley Morment and she advised that
nothing was taken. The Blue suburban was towed away from the complex by Hales
towing. Criminal Affidavits for providing false information to a Law Enforcement
Officer, Resisting Arrest and are being filed.

-------------------------------------- **S U P P L E M E N T** --------------------------------------

Slade Moore 3441
On 6-26-16, I heard a call of a disturbance at 388 Ricks Dr. Deputy Hall
responded to the call and radioed that the suspect was running away from him
shortly after he called on scene. The suspect was identified as Ladarius Thompson
by the victim, Ashley Morment. Other deputies and I searched the area but we did
not locate Ladarius.
I went back to apartment 16A with Deputy Hall to speak to Ashley and her cousin,
Brittney Morment. Ashley stated that her and Ladarius have three children
together and have been together for ten years. Ashley said that she broke things
off with Ladarius about a month ago but Ladarius was not accepting the breakup.
Brittney and Ashley both stated that when they returned home this morning,
Ladarius was in the parking lot waiting on Ashley. Ashley and Brittney pointed to
a tire tool on the ground that they said Ladarius was holding when they arrived
home. Both females said that Ladarius started an argument with Ashley and would
not let her enter Brittney's apartment. Ashley lives in apartment 6E at 388 Ricks
Dr. but was going to spend the night with Brittney because she was scared of
Ladarius. Brittney lives in apartment 16A. Ashley identified a blue suburban in
the parking lot as belonging to Ladarius. The tag, MDW 678 is registered to James
Young but Ashley confirmed that is was Ladarius' vehicle. Ashley even looked
inside the suburban and identified a cell phone as belonging to Ladarius.
Deputy Hall and I left the complex looking for Ladarius in the surrounding area.
I returned to 388 Ricks Dr a few minutes later to see if Ladarius had returned to
his Suburban. I parked on Ricks Dr and entered the complex on foot. While walking
into the complex, I saw Ladarius walking around building 6. I watched as a male
and female exited the apartment above (6F) Ashley's and begin speaking to
Ladarius. Both the male and female, later identified as Khadafy Manning and
Quinnetta Thomas, watched as Ladarius broke the window out of apartment 6E. I
continued watching as Ladarius pulled pieces of glass out of the broken window
and threw them over the fence and into the nearby field. Ladarius, Khadafy, and
Quinnetta all ran up the stairs and into apartment 6G when they saw another
deputy pull through the parking lot. Less than a minute later, Ladarius exited 6G

**CONFIDENTIAL**              **MC - RFP 8 - 187**

Complete Incident Report

and began removing more of the glass form the broken window. Ladarius then placed a door mat over the remaining glass in the window before trying to climb into the apartment through the window. Ladarius was unable to get through the window and was spooked again. He ran to iron fence surrounding the complex. As Ladarius went through a hole in the fence I yelled for him to stop but he fled into the wooded area adjacent to the complex.

We deputies searched for Ladarius a second time in the wooded area but were unable to locate him. When the search was concluded, Deputy Smith and I were walking bear building 16, I spotted Ladarius again. Ladarius saw us deputies and began running away again. Deputy Smith gave chase and Ladarius ran and jumped the fence into Joe Pritchard Homes. Ladarius was last seen running east through Joe Pritchard Homes.

I signed an affidavit on Ladarius Thompson for malicious mischief.*** On 06/26/2016, at approximately 12:11 p.m., I, Deputy Joel Evans, was dispatched to 388 Ricks Dr Apt 6E in reference to a house burglary. Upon arrival, I found that Deputies were dispatched to this address around 04:45 a.m., for a disturbance between Ladarius Thompson and Ashley Morment. Ashley stated to me that when the deputies left her residence after chasing Ladarius on foot, it was around 07:00 a.m. and she left the residence as well. Ashley returned home to find the door kicked in, the door casing broken, a 40 inch Element LED TV(ser# H5G6M0F1M4020487) missing, a Samsung Blu-Ray/DVD Player(ser# 0A5G1RBG402973) missing, and two(2) L.G. nine(9) inch Tablets missing. Ashley stated Ladarius Thompson was, without a doubt, the individual that stole these items from her apartment. It is unknown at this time if the stolen items are mutual property to Ladarius and Ashley or not. Ladaruis and Ashley have a child together. Myself and Deputy James Cannon responded to 110 Oil Mill Quarters Rd in an attempt to located Ladarius(last known address), but did not locate him. No additional information to report at this time.

**CONFIDENTIAL**                    **MC - RFP 8 - 188**

CASE NO. 2016-009669  **VOLUNTARY STATEMENT**  PAGE NO. 1 OF 1

(Not Under Arrest)

DATE 6/26/2016  PLACE 388 Ricks Drive Canton Ms  TIME BEGAN 06:40 AM.

I, the undersigned, Quinetta Thomas , am not under arrest for, nor am I being detained

for any criminal offense concerning the events I am about to make known to. Deputy James Hall SO-45

who has identified himself as being a Madison County Deputy Sheriff. Without being accused or questioned about any criminal offenses regarding the facts I am

about to state, I volunteer the following information of my own free will for whatever purpose it may serve. I am _____ years of age, and I presently live at

Ladarius Thompson broke the window of Ashley
Mixmoot apt and throw the glass over the gate.
I asked him to stop and he stated he was trying
to get his tv out the apt. I heard the him say the
police was out there I came inside the house and called
Ashley mixmoot to come to here home, no one answer
the phone.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct. I further certify that I made no request for the advice or presence of a lawyer before or during any part of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in this statement.

This statement was completed at 06:45 A.M. on the 26th day of June , 20 16

WITNESS: James Hall SO-45

WITNESS: JM SO42

Signature of person giving voluntary statement

**CONFIDENTIAL**    **MC - RFP 8 - 189**

CASE NO. 2016-9669

# VOLUNTARY STATEMENT
## (Not Under Arrest)

PAGE NO. 1 OF 1

DATE 6-26-16    PLACE 388 Ricks Dr    TIME BEGAN 6:50 A.M.

I, the undersigned, Kahdaffy Manning , an not under arrest for, nor am I being detained

for any criminal offense concerning the events I am about to make known to, Dep. Hall 50-45

who has identified himself as being a Madison County Deputy Sheriff. Without being accused or questioned about any criminal offenses regarding the facts I am

about to state, I volunteer the following information of my own free will for whatever purpose it may serve. I am 34 years of age, and I presently live at

I was awaken by knocks at the door and
It was my next door neighbor Baby daddy
he said the He was tiring to break in His
baby house to get his tv out so I went down
the stairs and send him break out the window
of her house.

I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I
certify that the facts contained herein are true and correct. I further certify that I made no request for the advice or presence of a lawyer before or during any part
of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in
this statement.

This statement was completed at 6:55 A.M. on the 26th day of June , 20 16.

WITNESS: _____ 50-45

WITNESS: _____ 5031

Kahdaffy Manning
Signature of person giving voluntary statement

**CONFIDENTIAL**        MC - RFP 8 - 190

# MEMO

To: Chief Jeremy Williams

From: Sgt Slade Moore

Reference: Khadafy Manning

Date: June 28, 2016

This memo is in reference to an incident that occurred in the early morning of June 26, 2016, involving Khadafy Manning at 388 Ricks Dr.

At approximately 0400 on Sunday morning, a call of a disturbance at 388 Ricks Dr was received. Deputy James Hall responded and the suspect fled the scene on foot (16-9669). The search for the suspect led deputies out of the Canton Estates complex.

After approximately 30 minutes, I parked my patrol vehicle at the old entrance to Canton Estates at Ricks Dr which is now closed to vehicular traffic. I entered the complex on foot hoping to go unnoticed and see if the suspect had returned. As I neared building 7, I saw the suspect breaking out the window of the victim's apartment, 6E. I observed without approaching while notifying other deputies of the suspect's actions. The suspect was taking pieces of broken glass from the window, walking near the perimeter fence, and throwing the glass pieces over the fence. During this time, two occupants of the apartment above (6F) the victim's apartment came outside and walked down the steps. I could hear the male and female talking to the suspect as he broke more of the window but I could not make out what was being said. The male and female from the above apartment stood there for several minutes as the suspect continued to take pieces of the window and throw them over the complex's fence. The male and female were no more than 5-10 feet from the suspect and window while the suspect was removing the glass pieces. The male and female constantly looked toward the parking lot as if they were the look-outs for the suspect. I continued watching the three as one of the responding deputies drove into the parking lot of the complex. As soon as the suspect, male, and female saw the deputy, all three ran up the stairs and into apartment 6F. I notified the responding deputies to back away and stay out of sight. I was hoping that the suspect would come back outside and after less than a minute, he did just that. The suspect returned to the window and began removing more glass but the male and female did not come back outside. The suspect was soon spooked again which led to him run to a hole in the complex's fence where he again fled on foot.

When the suspect could not be located, I returned to Canton Estates' apartment 6F with several other deputies. I knocked on the door and the female that I had seen outside earlier with the suspect opened the door. I stepped inside the apartment and could immediately smell the odor



**CONFIDENTIAL**                    **MC - RFP 8 - 191**

of marijuana. I told the female that I smelled the marijuana but that I was not there for that. Instead, I was there about their involvement with the suspect breaking into apartment 6E. A male appeared from the hallway and I recognized him as the male who had come outside earlier with the female. The female identified herself as Quinetta Thomas and the male identified himself as Khadafy Manning. There was a small child asleep on one couch and a mid to late teenager on another couch in the front room where I was speaking to Quinetta and Khgadafy. There were no lights on in the front room but there was a small amount of light coming from the opened front door and from down the hallway.

I told Quinetta and Khadafy exactly what I had seen them and the suspect do. I asked both of them if they were suspects involved with the burglary, or witnesses to the burglary. I told both of them that if they were suspects, they were going to jail but if they were witnesses they would need to write a statement as to what had happened. At first both Quinetta and Khadafy denied being involved or even being outside when the suspect was breaking the window. I repeated very clearly that I had personally witnessed what they had done and that what I knew was not told to me by another person. Quinetta and Khadafy then became defiant at my accusation. Both began raising their voices arguing that they were not involved. The exchange was getting louder and more out of control. As I further told them specifics of what their actions were, including all three running up the steps at the sight of the deputy driving through the parking lot, Quinetta admitted her presence and agreed to write a witness statement. Khadafy on the other hand, continued being defiant and increasingly belligerent.

I placed handcuffs on Khadafy in an attempt to regain control of the situation. I told Khadafy several more times that I had witnessed his actions and that he was either a suspect in or a witness to the burglary. Khadafy was becoming more and more aggressive in his talking and demeanor. Khadafy then began stating that he had been previously shot and that he was disabled. He started leaning over as if he was no longer able to stand up. I also confronted Khadafy about this claim by repeating to him how I had seen him "run" up the stairs at the sight of the deputy. I told Khadafy that I believed that he was able to stand and walk just fine because of the speed and quickness that he made it up the stairs. There was no limp, no hesitation, and Khadafy had no problems running up the stairs to avoid the approaching deputy. My calling Khadafy out on the inconsistencies of his story, enraged him even more. He said over and over that he had been previously shot and that he was disable. I told Khadafy that he was able to walk and stand up just fine. Khadafy began to pull away from my hold of his arm and yelling more and louder. I then placed my hand under his jaw and applied pressure to his mandible nerve in an attempt gain control of Khadafy. While applying pressure to the mandible nerve, I told Khadafy to "stop!". Khadafy did lower his voice some but continued lean over as if he was unable to stand. I immediately released pressure on Khadafy's mandible nerve when he lowered his voice and began complying somewhat. Khadafy's lowered voice and semi compliance was short lived though.

It became apparent that Khadafy was going to continue to be aggressive and defiant so I made the decision to remove him from the apartment and put him in a patrol. I walked Khadafy out of the apartment. At the top of the stairs, Khadafy saw several residents standing at the bottom of the stairs and immediately started acting as if he could not walk at all. Khadafy began taking more and more weight off of his feet. I was holding his right arm and as he took weight off of his own feet, I was having to hold him up by his right arm which was handcuffed behind his back. Khadafy began yelling as if I was hurting him but it was because he was taking his weight off of himself requiring me to hold him up. All Khadafy had to do was stand up and walk like I had seen him do perfectly fine just an hour before.

I placed Khadafy in the back of a patrol vehicle. Without an audience present, Khadafy stopped being loud, aggressive, and defiant. I tried again talking to Khadafy, this time he was more reasonable. Khadafy then admitted his actions that I had seen him do and asked me if he could still give the written statement. At first I told Khadafy no, it was too late to give a written statement. After shutting the door of the patrol vehicle and talking with the other deputies, I changed my mind and agreed to let Khadafy give a written statement about the suspect breaking into apartment 6E. After giving the written statement, Khadafy was released without charges.

The written statements from Quinetta and Khadafy about the suspect breaking out the window were included with the report on the original disturbance.

**CONFIDENTIAL**                    **MC - RFP 8 - 193**

```
 1    IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
              DISTRICT OF MISSISSIPPI JACKSON DIVISION
 2
      LATOYA BROWN;
 3    LAWRENCE BLACKMON;
      HERBERT ANTHONY GREEN;
 4    KHADAFY MANNING;
      QUINNETTA MANNING; MARVIN MCFIELD;
 5    NICHOLAS SINGLETON; STEVEN SMITH;
      BESSIE THOMAS; and
 6    BETTY JEAN WILLIAMS TUCKER,
      individually and on behalf of a class of all other
 7    similarly situated                    PLAINTIFFS
      v.             CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 8    MADISON COUNTY, MISSISSIPPI;
      SHERIFF RANDALL S. TUCKER,
 9    in his official capacity; and
      MADISON COUNTY SHERIFF'S DEPUTIES
10    JOHN DOES #1 through #6, in their individual
      capacities                            DEFENDANTS
11

12        ********************************************

13                    ORAL DEPOSITION OF

14                    QUINNETTA MANNING

15                    DECEMBER 22, 2017

16                    Volume 1 of 1

17        ********************************************

18        ORAL DEPOSITION OF QUINNETTA MANNING, produced
      as a witness at the instance of the Defendants, and
19    duly sworn, was taken in the above-styled and
      -numbered cause on the 22nd day of December, 2017,
20    before Melinda Bowers, CCR in and for the State of
      Mississippi, reported by machine shorthand, at the
21    offices of Wise, Carter, Child & Caraway, P.A.,  401
      East Capitol Street, in the City of Jackson, State
22    of Mississippi.

23

24

25
```

EXHIBIT
2

```
 1        Q    Okay.  Tell me what happened from your
 2   perspective.
 3        A    Several officers stormed into my home in
 4   the middle of the morning and demanded that me and
 5   Khadafy write a false witness statement against
 6   Ladarius Thompson and if we didn't that we would be
 7   fined -- would be jailed.
 8        Q    Okay.  Now, what time did this occur?
 9        A    I'm not sure.
10        Q    Was it daylight or night?
11        A    It was like early morning.
12        Q    Was this -- was it nighttime or was it
13   daytime?
14             MS. GOCHMAN:  Objection.  Asked and
15        answered.
16        A    Day.
17   BY MR. ROSS:
18        Q    Okay.  And how many officers were there?
19        A    I think six.
20        Q    Okay.  Did they knock on your door when
21   they came to your apartment?
22        A    Yes.
23        Q    Did they ask if they could come in?
24        A    No.
25        Q    They didn't ask at all?
```

```
 1        A    No.

 2        Q    Who answered the door?

 3        A    I did.

 4        Q    Okay.  Did you invite them in?

 5        A    No.

 6        Q    Did you tell them they could not come in?

 7        A    No.

 8        Q    Did you object to them coming in?

 9             MS. GOCHMAN:  Objection to form.

10        A    No.

11   BY MR. ROSS:

12        Q    Okay.  How many officers actually came

13   into your apartment?

14        A    I'm not sure.

15        Q    Okay.  And when they got into the

16   department [sic], what happened then?

17             MS. GOCHMAN:  Objection to form.

18        A    One of the officers began to ask us what

19   happened with Ladarius and I stated I didn't

20   understand what he was talking about.  And he said

21   he seen us run up the stairs.  And I told him we

22   didn't -- no, we couldn't have ran up the stairs

23   because Khadafy cannot run.  And he stated, "I seen

24   all three of you run up here."  And I was telling

25   him, no, sir, we did not run up the stairs.  And he
```

```
 1    that morning?

 2        A    No.

 3        Q    Did you and Khadafy -- you just said, I

 4    think, that you and Khadafy had come up the stairs,

 5    right, before --

 6        A    Yes.

 7        Q    -- the police got there.  What were y'all

 8    downstairs for?

 9        A    We were standing outside.

10        Q    And why were you --

11        A    I heard Ladarius, and it was nighttime

12    during that time.

13        Q    And why were you downstairs?

14        A    I heard Ladarius outside at the window and

15    I went down and asked him why was he at her window

16    and to step away from her window, and he said he

17    wanted to get his TV.  And I said, "Well, I'm going

18    to call Ashley."  And we went back in.

19        Q    Who is Ashley?

20        A    His girlfriend.  My kids' aunt -- aunt.

21        Q    Okay.  Had -- so you went downstairs.  Why

22    did you go downstairs again?

23        A    Because I heard Ladarius outside.

24        Q    Okay.  And did Khadafy go with you?

25        A    Yes.
```

```
 1        A    Yes.

 2        Q    Okay.  And the reason you went downstairs

 3   is you heard something?

 4        A    Yes.

 5        Q    What did you hear?

 6        A    I just heard someone chattering at the

 7   window.

 8        Q    Okay.  So you heard somebody beating on

 9   the window?

10        A    Chattering.

11             MS. GOCHMAN:   Objection to form.

12   BY MR. ROSS:

13        Q    Chattering?

14        A    Talking.

15        Q    Okay.  When you got downstairs, was

16   anybody with Ladarius?

17        A    No.

18        Q    Do you know who he was -- was it Ladarius

19   doing the chattering?  Do you know?

20        A    Maybe to hisself.  I'm not sure.

21        Q    Okay.  So you get downstairs and Ladarius

22   is by the window and Khadafy is with you; is that

23   correct?

24        A    Yes.

25        Q    And tell me exactly what you said to
```

```
 1     Ladarius and he said to you.
 2          A    "Step away from Ashley's window," and "I'm
 3     about to call Ashley."  And he said he was about to
 4     get his TV.
 5          Q    Okay.
 6          A    And I said, "Well, I'm about to call her."
 7     I went in.  He said -- I -- by the time I got to my
 8     door, I hear him say, "The police coming."  We was
 9     already making it in.  Maybe 20, 30 minutes later,
10     he came and knocked on the door.  I asked him to
11     leave.
12          Q    Did he come in?
13          A    He stood at the door.
14          Q    Did he come into your apartment?
15          A    Yes.
16          Q    Even though you had asked him to leave?
17          A    When he came in, I asked him to leave.
18          Q    Okay.  Did he leave?
19          A    Yes.
20          Q    Where did he go?  Do you know?
21          A    I'm not sure.
22          Q    Why did you ask him to leave?
23          A    Because I had kids and I didn't need the
24     police at my apartment.  Due to my landlord, I
25     didn't need any issues or anything.
```

```
 1        Q    Deputy James Hall, S.O., hyphen, and I
 2   can't read the rest of it, is that your handwriting?
 3        A    No.
 4        Q    Okay.  The narrative, is that your
 5   handwriting?
 6        A    Yes.
 7        Q    Would you read it for me, please.
 8        A    "Ladarius Thompson broke the window of
 9   Ashley Morment's apartment and threw the glass over
10   the gate.  I asked him to stop and he stated he was
11   trying to get his TV out the apartment.  I heard him
12   say the police was out there.  I came inside the
13   house and called Ashley to come to her home.  No one
14   answered the phone."
15        Q    Okay.  Now, according to your statement,
16   there was broken glass; right?
17        A    Yes.
18        Q    Okay.  Does that refresh your memory that
19   there in actuality was broken glass?
20        A    Yes.
21             MS. GOCHMAN:  Objection to form.
22   BY MR. ROSS:
23        Q    Okay.  And he was throwing the glass over
24   the gate, right, according to your statement?
25        A    Yes.
```

```
 1        Q     Is that accurate?

 2        A     Yes.

 3        Q     Okay.  And he told you he was trying to

 4   get the TV out of the apartment; is that correct?

 5        A     Yes.

 6              MS. GOCHMAN:  Objection to form.

 7   BY MR. ROSS:

 8        Q     Okay.  Ashley Morment, which is referred

 9   to in your statement, tell me again how you know

10   her.

11        A     My kids' aunt.

12        Q     Your kids' aunt.  Does she still live in

13   Canton Estate?

14        A     To my knowledge.

15        Q     Okay.  When you say your kids' aunt, --

16        A     My oldest two.

17        Q     Your oldest two?

18        A     Yes.

19        Q     Okay.  And we'll make this confidential

20   but who is the father of your oldest two kids?

21        A     Michael Morment.

22        Q     Does he live in Canton Estates?

23        A     No.

24        Q     Have you talked to him about this lawsuit?

25        A     No.
```

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Quinnetta Manning - 12/22/2017                                    Page 100

```
 1        Q     Have you talked to Ashley Morment about
 2   this lawsuit?
 3        A     No.
 4        Q     Did you talk to her about this incident
 5   other than making the phone call to her or -- well,
 6   strike that.
 7                    Your statement, which is Exhibit --
 8                MS. COWAN:  Six.
 9   BY MR. ROSS:
10        Q     -- 6, says that no one answered the phone
11   when you tried to call her; is that correct?
12        A     Yes.
13        Q     Did you talk to her later about this
14   incident?
15        A     Yes.
16        Q     When -- how much later did you talk to
17   her?
18        A     That morning.
19        Q     Okay.  And what did you tell her?
20        A     I asked her to tell the police officers
21   that Khadafy had nothing to do with her apartment.
22   By the time, they were dragging him downstairs.
23        Q     Okay.  Now, did she ever contact the
24   police?
25        A     They was outside.
```

```
 1        Q    Oh, so you talked to him -- talked to her
 2   while the police were still there?
 3        A    Yes.
 4        Q    Did she talk to the police?
 5        A    She was talking -- she was trying.
 6        Q    Okay.  Did you hear what she said?
 7        A    No.
 8        Q    Do you know if she ever talked to the
 9   police after the police left about this incident?
10        A    No.
11        Q    Did she press charges against Ladarius
12   Thompson?
13        A    Not sure.
14        Q    Does -- and I may have asked you this.
15   Does she still live in Canton Estates?
16        A    Not sure.  To my knowledge.
17        Q    I'm sorry?
18        A    To my knowledge.
19        Q    Okay.  Was she living there when you last
20   lived there?
21        A    Yes.
22        Q    In the same apartment that --
23        A    Yes.
24        Q    Okay.  When you initially heard something,
25   did you hear glass breaking?
```

```
 1        A    No.

 2             MR. ROSS:  Let's mark this as the next

 3        exhibit.

 4                  (Exhibit 7 was marked.)

 5   BY MR. ROSS:

 6        Q    With regard to Exhibit 6, where did you

 7   write this statement?

 8        A    Where?

 9        Q    Yes.

10        A    At home.

11        Q    Where were you when you wrote this

12   statement?

13        A    Balcony.

14        Q    On the balcony?

15        A    Yes.

16        Q    Okay.  Your statement refers to seeing

17   broken glass.  Well, I'm sorry.  Your statement

18   says, "Ladarius Thompson broke the window of Ashley

19   Morment."  This is Exhibit 6, if you want to look at

20   it.  Did you see him break the glass?

21        A    No.

22        Q    What did you see when you got downstairs?

23        A    Him grabbing glass from the top pulling it

24   down, tossing it.

25        Q    Okay.  You previously testified that you
```

```
 1    didn't see any broken glass.  Are you changing --
 2    why are you changing your testimony?
 3              MS. GOCHMAN:  Objection to form.
 4         That's --
 5    BY MR. ROSS:
 6         Q    You can answer.
 7              MS. GOCHMAN:  -- a mischaracterization.
 8    BY MR. ROSS:
 9         Q    You can answer.
10         A    Could you repeat that?
11         Q    You previously testified you didn't see
12    any broken glass, that he just said he was going to
13    get his TV.  Why did you change your testimony?
14              MS. GOCHMAN:  Objection to form.
15         A    If I'm not mistaken, --
16              MS. GOCHMAN:  It mischaracterizes her
17         testimony.
18         A    -- I heard you say, "Did he break the
19    glass?"
20    BY MR. ROSS:
21         Q    Okay.  When you got downstairs, there was
22    broken glass; right?
23         A    Yes.
24         Q    And he was trying to take the glass --
25    pull the broken glass from the window; is that
```

1        Q     And this was in June.  So I assume your
2    air conditioner would have been working; right?
3        A     Yes.
4        Q     Okay.  And if your air conditioner is
5    working, you wouldn't have the windows of your
6    apartment open, would you?
7        A     No.
8              MS. GOCHMAN:  Objection to form.
9    BY MR. ROSS:
10       Q     And you had the door closed; right?
11       A     Yes.
12       Q     And Ladarius was downstairs; is that
13   correct?
14       A     Correct.
15       Q     And was Ms. Morment's apartment building
16   the same one as yours or was it a different
17   apartment building?
18             MS. GOCHMAN:  Objection to form.  Do you
19        mean apartment?
20   BY MR. ROSS:
21       Q     Was Ms. Darius's [sic] apartment in the
22   same building as the building your apartment was in
23   or a different building?
24       A     Same building.
25       Q     Okay.  And does her apartment adjoin your

```
 1    apartment?

 2         A    It's directly downstairs.

 3         Q    Okay.  So in your apartment upstairs, the

 4    chattering was loud enough to where you could hear

 5    it from downstairs?

 6         A    Yes.

 7         Q    Could it have been glass breaking?

 8         A    No.

 9         Q    Let me show you Exhibit 7.  Do you

10    recognize the narrative on Exhibit 7 as the

11    handwriting of Khadafy Manning?

12         A    Uh-huh.

13         Q    I'm sorry?

14         A    Yes.

15         Q    Okay.  Do you recognize his signature on

16    the bottom of Exhibit 7?

17         A    Could you repeat that?

18         Q    Do you recognize the signature on the

19    bottom of Exhibit 7 --

20         A    Yes.

21         Q    -- as being Khadafy Manning's?  Okay.

22    Would you read into the record the narrative of

23    Exhibit 7.

24         A    "I was awakened by knocks at the door and

25    it was my next-door neighbor's baby daddy.  He said
```

 1    he was fixing to break in his baby house to get his

 2    TV out, so I went downstairs and seen him break out

 3    the window of her house."

 4         Q    Okay.  Who is baby daddy?  Do you know?

 5         A    Ladarius.

 6         Q    Okay.  Do you remember Ladarius -- well,

 7    Khadafy Manning wrote, "I was awaked by knocks at

 8    the door."  Do you remember Ladarius coming to your

 9    apartment that morning and knocking on the door?

10         A    No.

11         Q    It says, "It was my next-door neighbor

12    baby daddy."  You do know that -- I mean, baby daddy

13    is Ladarius; right?

14              MS. GOCHMAN:  Objection to form.

15         A    Yes.

16    BY MR. ROSS:

17         Q    Okay.  "He said he was fixing to break in

18    his baby house to get his TV out."  Did you hear

19    Ladarius say that to Khadafy?

20         A    Yes.

21         Q    Okay.  So he must have come upstairs to

22    your apartment because you -- well, strike that.

23              Where did -- where did you hear

24    Ladarius say that to Khadafy?

25         A    When we both was outside in the stairway.

```
 1    BY MR. ROSS:

 2         Q    Okay.  So you knew he was going to break

 3    in the house?

 4              MS. GOCHMAN:  Objection to form.

 5         A    That's what he told me.

 6    BY MR. ROSS:

 7         Q    Okay.  And he had not broken in the house

 8    yet; right?

 9         A    I hadn't seen it.

10         Q    Okay.  But then after that, you saw broken

11    glass; right?

12         A    Yes.

13         Q    Did you go back in the house or did you

14    stay out there -- in between the time you heard him

15    say he was going to break in and you saw the broken

16    glass, did you stay out there on the stairs?

17         A    When he grabbed the first piece, tossed

18    it, we went in.

19         Q    Okay.  But when he said he was going to

20    break in the house, had he broken the window at that

21    point?

22              MS. GOCHMAN:  Objection to form.

23         A    He didn't break --

24              MS. GOCHMAN:  Objection.

25         A    He -- the window was already broken.
```

```
 1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                          JACKSON DIVISION

 3    LATOYA BROWN; LAWRENCE BLACKMON;
      HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4    QUINETTA MANNING; MARVIN MCFIELD;
      NICHOLAS SINGLETON; STEVEN SMITH;
 5    BESSIE THOMAS; and BETTY JEAN
      WILLIAMS TUCKER, individually and on
 6    behalf of a class of all others
      similarly situated                       PLAINTIFFS
 7
      VS.              CIVIL ACTION NO. 3:17-cv-347 WHB LRA
 8

 9    MADISON COUNTY, MISSISSIPPI;
      SHERIFF RANDALL S. TUCKER,
10    in his official capacity; and
      MADISON COUNTY SHERIFF'S DEPUTIES
11    JOHN DOES #1 through #6,
      in their individual capacities          DEFENDANTS
12
      **********************************************************
13
              VIDEOTAPED DEPOSITION OF KHADAFY MANNING
14
      **********************************************************
15
                    (APPEARANCES NOTED HEREIN)
16
                     TAKEN AT THE OFFICES OF:
17              WISE, CARTER, CHILD & CARAWAY
                     401 EAST CAPITOL STREET
18                     JACKSON, MISSISSIPPI

19
                     MONDAY, JANUARY 8, 2018
20               AT APPROXIMATELY 8:57 A.M.

21


22    REPORTED BY:

23             TAMMY MCDANIEL-BAGNATO, #1910

24
                        EXHIBIT
25                         3
```



1   morning or late night, I was outside the

2   house with him, me, my wife.  And he was by

3   their building.  Me and my wife was on the

4   stairs.

5       Q.  Okay.  So this is after he came to

6   your -- Quinnetta's apartment.  You were

7   outside and -- with Quinnetta and he was out

8   there also?

9       A.  At some point in time, yeah.

10      Q.  What was he doing out there?

11      A.  He was going on, rambling and

12  talking and -- talking loud and stuff,

13  walking back and forth, you know, just

14  talking outside his head.  But he wasn't

15  breaking in that house.

16      Q.  Okay.

17      A.  He lived there.  He was waiting on

18  Ashley to get there.

19      Q.  Was the window -- was he standing by

20  a window?

21      A.  Yeah.

22      Q.  Was the window broken?

23      A.  Yeah, the window had been broken

24  for -- for quite some time, for some -- over

25  really -- over 10 to 15 days perhaps.



1          Q.   Okay.   And was he taking glass out

2     of the window?

3          A.   Yeah, I seen him mess with some

4     glass in the window.   Yes.

5          Q.   Okay.   And was he doing that so that

6     he could go in the window into the --

7     Ashley's place?

8          A.   I don't know why he was doing it.   I

9     know he didn't go in there.

10          Q.   Okay.   The -- your statement says,

11     "He said he was fixing to break into his baby

12     house to get his TV."   Are you denying now

13     that he said that?

14          A.   Yes, I'm denying it.

15          Q.   Okay.   The statement says -- first

16     it says that "He was fixing to break into

17     this baby house to get his TV, so I went

18     downstairs and seen him break out the window

19     of her house."   Are you saying that's not

20     true?

21          A.   I'm saying that's not true because

22     the window was already broken.

23          Q.   Okay.   Well, why did you write it?

24          A.   Because I was getting beat, and he

25     was like, "You're going to give a statement."



1   you?

2        A.   That him and his old lady got into

3   it.  And I remember him saying something

4   about the TV.

5        Q.   Okay.  And his old lady is Ashley

6   Morment, right?

7        A.   Yes.

8        Q.   And they had had a fight, right?

9        A.   So -- from his word, they said they

10  had a verbal altercation.  I don't know if

11  they had a physical altercation.

12       Q.   Okay.  And he wanted to get his TV,

13  right?  He told you that?

14       A.   He -- yes, he told me he wanted to

15  get a TV --

16       Q.   Okay.

17       A.   -- his TV out the house.  Yes.

18       Q.   Okay.  And he was going to go in the

19  broken window, right?

20            MR. RETHY:  Objection.

21       A.   He didn't tell me that.  I don't

22  remember exactly what words he used, what --

23  how he was going to get the TV.  I don't -- I

24  can't recall every word piece by piece.  And

25  I can't say yes and I can't say no, he said



1    diary?

2         A.   No.

3         Q.   Regarding the incident in the

4    apartment on June 26, 2016, do you think the

5    officers -- do you think race had anything

6    do -- to do with it, or do you just -- in

7    opinion, was -- the officers didn't treat --

8    didn't treat you right?

9              MR. RETHY:   Object to form.

10        A.   It could have been racially.  I --

11   it could have been racially.  I -- I don't

12   know if they racist or not.  I just know the

13   incident, it could have been racist, it

14   couldn't have been racist.  I just know I

15   wasn't treated fairly, and I know we don't

16   smoke weed for -- for a fact or allow no weed

17   to be her house.  So that was a lie.

18             So it -- the whole incident started

19   off with a lie just for they gain, which is

20   to get statements.  That was their whole

21   thing, was to get statements, and I had to

22   get choked and beat to get a statement.

23   BY MS. ROSS:

24        Q.   Okay.  Now, we discussed the lawsuit

25   that you have against Canton Estates, and



1                    Samuel Howard
2             UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4

     LATOYA BROWN; LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN; KHADAFY
5    MANNING; QUINNETTA MANNING; MARVIN
     MCFIELD; NICHOLAS SINGLETON;
6    STEVEN SMITH; BESSIE THOMAS; AND
     BETTY JEAN WILLIAMS TUCKER,
7    INDIVIDUALLY AND ON BEHALF OF A CLASS
8    OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
9

     VERSUS        CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10

11   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER, IN HIS
12   OFFICIAL CAPACITY; AND MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13   #6, IN THEIR INDIVIDUAL CAPACITIES      DEFENDANTS
     **************************************************
14        DEPOSITION OF DEPUTY SAMUEL HOWARD
15   **************************************************
16              APPEARANCES NOTED HEREIN
17
18              DATE: OCTOBER 25, 2017
19   PLACE: HILTON GARDEN INN JACKSON DOWNTOWN
                235 WEST CAPITOL STREET
                JACKSON, MISSISSIPPI
20                 TIME: 1:25 P.M.
21
     REPORTED BY: TODD J. DAVIS
22              BCR, CSR #1406, RPR
23
24
25   JOB NO. 132678

EXHIBIT

4

1                    Samuel Howard

2        Q.   Well, except they ended up being

3    arrested, so for them there was some harm.  But...

4             Okay.  Let's move on.  I'm going to

5    show you another exhibit that we'll mark as Howard

6    Exhibit 2.  It's tab 53.

7             (Exhibit No. 2 was marked for

8             identification.)

9    BY MS. GOCHMAN:

10       Q.   Yeah.  That's for you.

11       A.   Okay.

12       Q.   Just -- you can take a moment to look it

13   over.

14       A.   (Witness reviewing document.)  Yes,

15   ma'am.

16       Q.   Do you recognize this document?

17       A.   Yes, ma'am.

18       Q.   Okay.

19            MS. GOCHMAN:  And I should say for the

20            record it's an incident report Bates stamped

21            MCRFP9-10 through 9-11.

22   BY MS. GOCHMAN:

23       Q.   Do you recall this incident?

24       A.   Yes, ma'am.

25       Q.   And let me ask you:  Is this a document

1                    Samuel Howard

2    you reviewed in preparing for today's deposition?

3         A.    Yes.

4         Q.    Okay.  It says that you were conducting

5    a walk-through at Canton Estates apartments; is

6    that right?

7         A.    Yes.

8         Q.    And you recall doing that?

9         A.    Yes.

10        Q.    So you were on foot?

11        A.    Yes.

12        Q.    Okay.  And it says that you saw a 2013

13   Chevrolet sedan make an abrupt turn into a parking

14   space, leading you to believe the driver was

15   trying to avoid you; is that right?

16        A.    Yes, ma'am.

17        Q.    Okay.  Let me ask you:  If you're on

18   foot, would it -- I'm trying to understand why a

19   car would try to avoid you.

20              Were you pulling cars over?

21        A.    No, ma'am.  So I'm conducting a

22   walk-through of the apartment.  I'm clearly -- I'm

23   clearly marked as a -- as a --

24        Q.    Uh-huh (affirmative response).

25        A.    -- deputy of the sheriff's office.

1                    Samuel Howard

2        Q.    Uh-huh (affirmative response).

3        A.    So it's apparent that I'm an officer of

4   the law, right?

5        Q.    Uh-huh (affirmative response).

6        A.    And so as I'm making a foot patrol of

7   that apartment complex, a vehicle's heading toward

8   my direction, sees me, and makes a -- you know,

9   slams on his brakes and abruptly turns into a

10  parking spot after noticing it was me.  But his

11  behavior was not -- his driving behavior did not

12  consist of that before he saw me.

13       Q.    Would it be your -- or has it been your

14  practice to, when you're on foot, stop a vehicle,

15  stop a vehicle as you're walking?

16       A.    I didn't stop it.  No, ma'am.

17       Q.    So was there any reason for the driver

18  of that vehicle to suspect that you might pull him

19  over?  Were you pulling over other cars?

20       A.    I don't know what he was suspecting.

21       Q.    But you hadn't -- you weren't in the

22  process of pulling cars over?

23       A.    No, ma'am.

24       Q.    Okay.  Where was your car parked at the

25  time?

1                    Samuel Howard

2        A.    I don't recall.

3        Q.    Do you think you were near your car?

4        A.    I don't recall.

5        Q.    Did your car have a -- its blue lights

6    on at the time?

7        A.    This was not a vehicle safety

8    checkpoint.  It was a walk-through.

9        Q.    And it says you approached the vehicle

10   and asked the driver to identity himself.

11              Do you see that?

12       A.    Yes, ma'am.

13       Q.    Did you know who -- the driver was

14   Khadafy Manning; is that right?

15       A.    Not at the -- I didn't know the vehicle,

16   but I knew of him after encountering him.

17       Q.    Let me just clarify that.

18              When you -- when you went to the

19   car, did you know him?  Did you know who he was at

20   that time?

21       A.    After reviewing his driver's license, I

22   recalled that I knew who he was.

23       Q.    And how did you know him?

24       A.    He was a -- he's a known drug offender

25   who's been convicted multiple times through our

1                    Samuel Howard

2   Circuit Court for narcotics violations, one.  And,

3   two, he was -- he was shot a couple of years ago

4   in the apartment complex, and I was responsible --

5   or one of the units responsible for, you know,

6   arriving for that call for service.

7        Q.   When he was shot?

8        A.   Yes.

9        Q.   Okay.  At the time, were you aware that

10  he was working with lawyers, including the ACLU,

11  regarding the practices of the sheriff's

12  department?

13       A.   No, ma'am.

14       Q.   And did you say anything to him about

15  that at the time?

16       A.   No, ma'am.

17       Q.   And the reason that you -- can you tell

18  me the reason you approached the vehicle and asked

19  for his identification?

20       A.   Right.  Ms. Gochman, I thought I

21  explained.

22                    I was walking.  His driving

23  behavior was normal.  Then when I -- when I got to

24  the sidewalk or was walking on the sidewalk, it

25  appeared to me that he then observed me, quickly

1                          Samuel Howard

2    slammed on brakes, and pulled into a parking place

3    and started trying to exit the vehicle.  So that

4    alerted -- alarmed me.  No one else driving

5    through this apartment complex has done that.  Why

6    would this particular driver?

7                    So just a consensual encounter was

8    made.  I walk over there and ask Mr. Manning,

9    Mr. Manning, what's going on?  Why -- it appears

10   you're trying to avoid me.  And he clearly states,

11   which I document word for word, I am.  My driver's

12   license is suspended.  So he was aware that he did

13   not have current driver's license.

14        Q.   You said this was consensual, so if he

15   had -- I assume you asked him to identify himself.

16   You didn't --

17        A.   Right.

18        Q.   Did you recognize him, or did you ask

19   for --

20        A.   No, ma'am.  I recognized him after

21   reviewing his driver's license.

22        Q.   After reviewing.  So he gave you his

23   identification?

24        A.   Yes, ma'am.

25        Q.   Is this an instance where he could have

1                    Samuel Howard

2    said no and just gotten out of the car and walked

3    away?

4         A.    Sure.

5         Q.    So it was all consensual?

6         A.    I believe so.

7         Q.    So you wouldn't say that --

8         A.    And it was very cordial, too.

9         Q.    So you wouldn't say that you had --

10   would you say you had reasonable suspicion or

11   probable cause to stop --

12        A.    I had reasonable suspicion to believe

13   that a crime has or may be committed due to his

14   driving behavior and his -- the -- his mannerisms,

15   unlike the -- that were completely different than

16   all the other motorists that passed us in the

17   apartment complex.

18        Q.    But you wouldn't consider this a stop.

19               You considered this a consensual

20   encounter, right?

21        A.    I don't know how I would define it.

22        Q.    Well, I guess it goes to -- you said

23   with consensual encounters, if someone wants to

24   say no, they can.

25        A.    Yes.

1                    Samuel Howard
2        Q.   But if it's a -- if you have probable
3    cause or reasonable suspicion to stop someone, can
4    they still say no?
5        A.   If I have probable cause to stop
6    someone --
7        Q.   Yeah.  If you have -- if you believe a
8    crime is being committed --
9        A.   Yes.
10        Q.   -- then they -- can they say no to you
11    then?
12        A.   No, ma'am.  They can.  Yes, they can.
13    Sure.  They can say no.
14        Q.   And walk away with no repercussions?
15        A.   No, ma'am.
16        Q.   All right.  It says you arrested Manning
17    and transported him back to MCDC.
18        A.   Yes, ma'am.
19        Q.   Correct?
20             And is this an instance where
21    you -- you could have -- I don't believe that
22    there was a warrant.  There's no reference to a
23    warrant; is that right?
24        A.   Not that I recall.
25        Q.   Okay.  So is this an instance where you

Samuel Howard

1

2    could have given him a citation or a -- or a

3    warning instead of arresting him?

4         A.   Yes, ma'am.

5         Q.   But you chose to arrest him.

6              That was your discretion?

7         A.   Yes, ma'am.

8         Q.   Okay.  I'm going to just turn you back

9    to the incident --

10        A.   Okay.

11        Q.   -- report you have in front of you.

12   There's a reference to finding a Jolly Rancher

13   soda bottle --

14        A.   Yes, ma'am.

15        Q.   -- containing a red liquid and that it

16   was being tested in the Crime Lab.

17        A.   Yes, ma'am.

18        Q.   Do you see that?

19             And do you know what the results of

20   the test was?

21        A.   Yes.

22        Q.   Okay.  And what were the results?

23        A.   It showed no illegal narcotics.

24        Q.   So it was red soda or whatever, Jolly

25   Rancher --

1                    Samuel Howard

2      A.    I don't know what it was.

3      Q.    But it was -- okay.  Can you tell me

4  what made a soda bottle seem suspicious?  I mean,

5  it says Jolly Rancher soda --

6      A.    Yes, ma'am.

7      Q.    -- containing a red liquid.  I

8  personally have never seen this kind of soda, but

9  I know Jolly Ranchers are often red or purple, so

10 I would assume it would be that color typically?

11     A.    Yes, ma'am.  So, first, he's a known

12 drug offender.  He's got an extensive criminal

13 history with narcotics.  A thing that we're seeing

14 a lot on the streets these days are -- is a

15 codeine, a liquid codeine.  And so people can

16 conceal that codeine in a Jolly Rancher by

17 changing the color of it and making it appear it's

18 the same liquid substance that's in that

19 particular plastic bottle.

20              So in this particular incident, I

21 believe I asked him for a consensual search:  May

22 I please conduct a search of your vehicle?  And he

23 gladly agreed to it.  So during the search of the

24 vehicle, my boss, Master Sergeant Smith,

25 discovered that liquid substance.  And just to

Page 144

1                        Samuel Howard
2    confirm that it -- and please note, he was not
3    charged with possession of a narcotic.
4         Q.   Right.  And, in fact, there was no --
5         A.   Even though it appeared to be that
6    narcotic, we did not charge him.  So we sent it
7    off to the Crime Lab to confirm whether it was or
8    was not before we ever brought charges or
9    considered bring charges against him for that
10   substance that we believed was liquid codeine.
11        Q.   And since it wasn't, he was not charged?
12        A.   No, ma'am.
13        Q.   And, in fact, there was no contraband at
14   all found in his car; is that right?
15        A.   Not that -- no, ma'am.
16        Q.   Okay.  Just ask you in terms of the NET
17   team responsibility.  We've talked a lot about
18   apartment walk-throughs.
19                  But does the NET team also patrol
20   neighborhoods?
21        A.   Yes, ma'am.
22        Q.   Okay.  And which neighborhoods does the
23   NET team patrol?
24        A.   Ma'am, there's a lot of neighborhoods in
25   Madison County.  I just mentioned here just



MADISON COUNTY SO
2941 U.S. Highway 51
Canton, MS 39046
Sheriff Randall Tucker
601-859-2345

## INCIDENT REPORT

| Incident Number | Report Date | Report Time | Day of Week | Primary Officer |
|---|---|---|---|---|
| SO17002404 | 02/14/17 | 10:31 | TUESDAY | ID# 3786  HOWARD, SAMUEL M |

| Received | Dispatched | Arrived | Cleared | Occurred Between the Dates/Times Of: |
|---|---|---|---|---|
| 10:31 | 10:31 | 10:31 | 11:05 | 02/14/17  10:31   and:  02/14/17  10:31 |

| Address (House No, Dir, Street) | City | Address (Bldg, Unit, Apt) |
|---|---|---|
| NOT ON FILE | CANTON, MS | Bldg:    Apt: |

| Premise Type | Zone/Beat | Grid/Tract | Subdivision |
|---|---|---|---|
| APT./CONDO COMPLEX | 10-6 AT THE SO | | |

| Original Offense Description | Actual Offense Description | Weapons Involved |
|---|---|---|
| PAPER SERVICE-WARRANT | TRAFFIC OFFENSES | UNKNOWN |

| UCR Description | Attempt/Completed | Forced Entry | Call Disposition |
|---|---|---|---|
| ALL OTHER OFFENSES | C | | ARREST MADE |

| Additional Offenses | UCR Descriptions |
|---|---|
| | |

**Additional Information/Comments**
IN CUSD 10:30 802068028(MANNING,KHADAFY)

| Investigator Assigned | Status of the Incident |
|---|---|
| | |

| Supervisor #1 | Supervisor #2 |
|---|---|
| FLAX, ELTON P | FLAX, ELTON P |

## PERSONS INVOLVED

| Person No 001 | Involvement ARREST | If Victim, Relationship to Offender (if applicable) | Confidential |
|---|---|---|---|

| Name | Race | Gender | HGT | WGT | Date of Birth |
|---|---|---|---|---|---|
| KHADAFY CHARLIE MANNING | B | M | 601 | 160 | � |

| Age Then 35 | Age Today 035 | Hair BLACK | Eyes BROWN | Complexion DARK | Build SLIM | Facial Hair UNSHAVEN |
|---|---|---|---|---|---|---|

| Social Security | Address | Telephone |
|---|---|---|
| ▬ | 388 RICKS DRIVE  CANTON  MS | 00000 - 000 - 0000 |

| Employment | Work Address | Work Telephone 00000 - 000 - 0000 |
|---|---|---|

| Occupation | Driver's License MS802068028 |
|---|---|

## PROPERTY INVOLVED

| Article No 001 | Property Involvement EVIDENCE | Make UNK LIQUID | Model NA | Serial Number NA |
|---|---|---|---|---|

| Quanity 1 | Color CLEAR/RED | In House Description CONTROLLED SUBS | UCR Description DRUGS-UNKNOWN TYPE O |
|---|---|---|---|

| Date / Value Stolen 00/00/00  $0 | Date / Value Recovered 00/00/00  $0 | Date / Value Damaged/Received 02/14/17  $ |
|---|---|---|

| Comments |
|---|

## VEHICLES INVOLVED

**MC - RFP 9 - 10**

| Vehicle No | Vehicle Involvement | Year | Make | Model | Style |
|---|---|---|---|---|---|
| 001 | SUSPECT | 2013 | CHEVROLET | CZT | SEDAN 4 DO |

| Serial Number | Color (Top and Bottom) | | | Plate | Expires |
|---|---|---|---|---|---|
| 1G1PK5SB4D7187673 | SILVER  SILVER | | | MS  MDQ035 | 17 |

| Registered Owner | Legal Owner |
|---|---|
| EMMA WILLIAMS | |

| Comments |
|---|
| |

| Addl Comments |
|---|
| VEHICLE WAS LEFT ON PROPERTY AND KEYS TURNED OVER TO MGMT. |

### NARRATIVE DATA

On Tuesday 14, 2017 at approximately 1001 hrs. I, Sgt. Sam Howard (SO-32), was conducting a walk-through of Canton Estates Apt.'s located at 388 Ricks Drive, Canton, MS. I have been personally requested by management to conduct walk-throughs due to numerous incidents of gambling, narcotics usage and selling, consumption of alcohol in public, and gang activity.

During this time, I observed a 2013 Chevrolet sedan make an abrupt turn into a parking space leading me to believe the driver was trying to avoid me. I approached the vehicle and identified the driver as Khadafy Charlie Manning. I asked Manning why he was attempting to avoid me and he stated "my driver's license is suspended".    At this time, I arrested Manning and transported him to MCDC.

I charged Manning with DWLS (Citation #129239) and NPOLI (Citation #129240). The vehicle was secured on scene at owners request and the keys were left with apartment manager.

### SUPPLEMENT DATA

ON 02/14/2017 REPORTING DEPUTY WAS ASSISTING SGT. SAM HOWARD ARREST KHADAFY MANNING FOR TRAFFIC VIOLATIONS. SGT. HOWARD ASKED MANNING IF THERE WAS ANY WEAPONS OR ILLEGAL SUBSTANCES IN THE CAR. MANNING STATED THERE WERE NOT AND GAVE VERBAL CONSENT TO SEARCH THE VEHICLE. REPORTING DEPUTY RECOVERED A 20 OUNCE JOLLY RANCHER SODA BOTTLE CONTAINING A RED LIQUID. THIS WAS RECOVERED FROM THE TRUNK OF THE VEHICLE MANNING WAS DRIVING HIDDEN UNDER A PIECE OF CLOTH IN A BLACK PLASTIC BAG. THE SODA BOTTLE IS BELIEVED TO CONTAIN A CONTROLLED SUBSTANCE AND WILL BE SENT TO THE CRIME LAB FOR VERIFICATION. MANNING WAS ONLY CHARGED AT THIS TIME WITH TRAFFIC VIOLATIONS PENDING LAB RESULTS FROM THE MISSISSIPPI STATE CRIME LAB. E.O.R. DARIAN SMITH S.O.47