**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all other similarly situated** **PLAINTIFFS**

**v.** **CIVIL ACTION NO. 3:17-cv-347-WHB-LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL C. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities** **DEFENDANTS**

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE CLASS-BASED CLAIMS OF PLAINTIFFS KHADAFY MANNING AND QUINNETTA MANNING**

---

Defendants Madison County, Mississippi, and Sheriff Randall C. Tucker, by and through counsel, file the following Memorandum in support of their motion for summary judgment on the class-based claims of Plaintiffs Khadafy Manning and Quinnetta Manning:

## INTRODUCTION

Khadafy and Quinnetta Manning filed this action along with eight other plaintiffs alleging that the Madison County Sheriff's Department ("MCSD") "implements a **coordinated top-down program** of methodically targeting Black individuals for suspicionless searches and seizures."[1] As set forth more fully in their motion for class certification, both Mannings seek to be included in a class of plaintiffs referred to as the racial "Targeting Class," while Khadafy also seeks to be

---

[1] Dkt. # 1, at ¶ 1.

included in a class referred to as the "Pedestrian Stop Subclass."[2] The racial Targeting Class claims are apparently based in part on allegations that the MCSD unlawfully entered Quinnetta's apartment on June 26, 2016, and used excessive force against the couple when questioning them about a nearby attempted burglary which they had witnessed.[3] The Pedestrian Stop Subclass claim is apparently based in part on allegations that, on February 14, 2017, Khadafy, upon exiting his vehicle, was approached by an MCSD deputy, asked for his identification, and arrested after admitting to driving with a suspended license.[4] The Mannings allege that the MCSD violated the Fourth and Fourteenth Amendments, and they seek relief under 42 U.S.C. § 1983 and 42 U.S.C. § 2000d of Title VI of the Civil Rights Act of 1964.

Summary judgment should be granted on the Mannings' class-based claims.[5] Their racial targeting claim fails because they have presented no evidence whatsoever to support their allegation that the actions of the MCSD on either occasion were the result of a top-down policy of intentional race discrimination. Khadafy's pedestrian stop claim also fails because he offers no evidence to support his allegation that the actions of the MCSD during the February 2017 incident constituted a Fourth Amendment violation, much less one committed as the result of a top-down policy of intentional race discrimination.

---

[2] Dkt. # 232 at 32, 34.

[3] Dkt. # 1, at ¶¶ 210-236.

[4] Dkt. # 1 at 237-238; Dkt. # 231-31, at ¶ 4; Dkt. # 232, at 35-36.

[5] Unlike the other plaintiffs, who only seek injunctive relief, the Mannings seek personal injury damages for the June 2016 incident. *See* Dkt. #1, at ¶¶ 325-337. The present motion does not seek summary judgment of those personal injury damages claims.

## FACTUAL BACKGROUND

### A. The June 2016 incident

During the early morning of June 26, 2016, MCSD Officer Slade Moore,[6] along with other officers, responded to a domestic disturbance call in the Canton Estates apartments in Madison County, Mississippi. (Exhibit 1, ¶ 1). The Canton Estates apartment complex is located in the Canton, Mississippi area, but is not within the city limits of the City of Canton. (Exhibit 1, ¶ 5). As such, the MCSD is the law enforcement agency with primary jurisdiction over the apartment complex.

The two individuals involved in the domestic dispute were Ladarius Thompson and Ashley Morment. (Exhibit 1, ¶6). Ashley reported to Officer Moore that she and Thompson had been boyfriend and girlfriend, had lived together for ten (10) years, but had recently broken up, and that Thompson had just threatened her and her cousin with a tire tool. (Exhibit 1, ¶ 6).

Officer Moore and another officer (Officer Hall) began a search of the area for Thompson. (Exhibit 1, ¶ 7). Thompson had left his vehicle in the apartment complex, so Moore anticipated he would return. (Exhibit 1, ¶ 7). While walking the apartment complex, Officer Moore saw Thompson breaking a window out of the apartment where Ashley Morment lived. (Exhibit 1, ¶ 8). The window was in a ground floor apartment, underneath an apartment leased by Quinnetta Manning. (Exhibit 1, ¶ 9). While Thompson was at the window, Officer Moore saw Quinnetta Manning and Khadafy Manning come out of Quinnetta's apartment and walk down some stairs leading to Morment's apartment. (Exhibit 1, ¶ 10). Officer Moore observed both Quinnetta and Khadafy speaking to Thompson while Thompson removed glass from the broken window and

[6] Officer Moore obtained the rank of Sergeant in July 2015. (**Exhibit 1**, Affidavit of Slade Moore, ¶ 1).

threw it over the fence or gate next to the apartment. (Exhibit 1, ¶ 10). Officer Moore determined that Quinnetta and Khadafy Manning were acting as lookouts for Thompson. (Exhibit 1, ¶ 11).

When another deputy pulled into the parking lot of the apartment complex, Thompson, Quinnetta, and Khadafy ran up the steps to Quinnetta's apartment. (Exhibit 1, ¶ 12). Shortly thereafter, Thompson exited the apartment alone, began removing more glass from the broken window, and attempted to enter the apartment through the window. (Exhibit 1, ¶ 13). When Thompson was unsuccessful in entering the apartment through the window, he began to flee. (Exhibit 1, ¶ 15). Moore and the other responding officers gave chase but could not catch him. (Exhibit 1, ¶ 15). Moore and other responding officers then went to Quinnetta's apartment, entered the apartment, and proceeded to interrogate Quinnetta and Khadafy (who appeared from a back room soon after Moore entered) about Thompson's actions, Thompson's whereabouts, and their actions regarding the break-in he had observed in the apartment below. (Exhibit 1, ¶ 16).

The foregoing is based on the affidavit (and attached reports) of Officer Slade Moore. (*See* Exhibit 1). In all material respects, however, Officer Moore's testimony is corroborated by Quinnetta Manning's deposition testimony in this matter. According to Quinnetta Manning, she first heard a noise or commotion downstairs and outside of her upstairs apartment early that morning. (**Exhibit 2**, Deposition of Quinnetta Manning, p. 88). She and Khadafy Manning went down the steps of her apartment and saw Thompson standing by a broken window, throwing the broken glass over a gate. (Exhibit 2, pp. 98-103). The apartment belonged to Ashley Morment. (Exhibit 2, p. 108-109). Thompson said to Quinnetta Manning that "He wanted to get his TV out of the apartment." (Exhibit 2, pp. 95, 110). Quinnetta knew Thompson was breaking in Morment's apartment. (Exhibit 2, p. 113). Apparently noticing the MCSD deputies in the area, Thompson told Quinetta, "The police coming (*sic*)." (Exhibit 2, p. 94-95). The Mannings then

headed back to Mrs. Manning's apartment, which was witnessed by Sergeant Moore. (Exhibit 2, p. 94-95; Exhibit 1, ¶ 12). When Quinnetta and Khadafy returned to Quinnetta's apartment, Thompson followed them and entered her apartment. (Exhibit 2, p. 95). Quinnetta asked him to leave because she "didn't need the police at [her] apartment." (Exhibit 2, p. 94-95). Quinnetta further testified that Officer Moore (and other MCSD deputies) subsequently arrived at her apartment, knocked on the door, entered after she opened it, and proceeded to interrogate her and Khadafy. (Exhibit 2, p. 85). She testified she did not tell the officers that they could not enter her apartment. (Exhibit 2, p. 86).

Khadafy Manning also corroborates Quinnetta's and Officer Moore's testimony. Khadafy confirms that he and Quinnetta came out of Quinnetta's apartment, came down the steps, and watched Thompson at the broken window of Morment's apartment while Thompson was manipulating the window glass. (**Exhibit 3**, Deposition of Khadafy Manning, pp. 103-104). He further confirms that Thompson told him that he (Thompson) and his girlfriend (Morment) had had a fight, that Thompson wanted to get his TV, and that Thompson was going to enter through the broken window to take his TV. (Exhibit 3, p. 111).

Khadafy Manning admitted in his deposition that he does not know whether the officers' actions were racially motivated during the June 16 incident. (Exhibit 3, p. 179). Quinnetta has testified via affidavit that she "believe[s]" that the MCSD's actions were "based at least in part on [the Mannings'] race," (Dkt. #231-32). But, as will be addressed below, her subjective belief is simply not enough to support any racial discrimination claim she makes. The undisputed facts surrounding the incident involving the Mannings clearly show that the incident was an integral part of a domestic violence call received by MCSD officers, which led to their observance of a break-in of the domestic violence victim's apartment, which then led them to further investigate

that break-in. These undisputed facts support only one conclusion—the incident was not racially motivated.

### B. The February 2017 incident

Khadafy also asserts claims based on an incident that occurred on February 14, 2017. The events of that date are detailed in the deposition of MCSD Sergeant Samuel Howard, who testified that he was conducting a foot patrol of the Canton Estates apartment complex when he noticed Khadafy approaching in a car and then "slam[ming] on his brakes and abruptly turn[ing] into a parking space after noticing" Sergeant Howard. (**Exhibit 4**, Deposition of Samuel Howard, pp. 134-136). Sergeant Howard then approached Khadafy after Khadafy exited his vehicle. (*Id.* at 138-139). Sergeant Howard asked Khadafy: "What's going on? [I]t appears you're trying to avoid me." (*Id.* at 139). Khadafy responded: "I am. My driver's license is suspended." (*Id.*). Khadafy was then placed under arrest for violating Miss. Code § 63-1-57—driving with a suspended license.[7] (*Id.* at 141). Sergeant Howard also asked Khadafy if he could search the vehicle, and Khadafy consented. (*Id.* at 143). A bottle containing a colored liquid was found in the car and was suspected to be codeine, but crime lab tests came back negative. (*Id.* at 143-144).

## LEGAL STANDARD

"The moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by pointing out the absence of evidence supporting the nonmoving party's case." *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (internal quotations omitted). If the moving party meets its burden, "the nonmoving party who has the burden of proof at trial must come forward with summary judgment evidence establishing the existence of a genuine issue;

[7] Violation of § 63-1-57 is a misdemeanor punishable by imprisonment of up to six (6) months.

that evidence must be such that if introduced at trial it would suffice to prevent a directed verdict against the nonmovant." *Id.*

## LEGAL ARGUMENT

### I. NEITHER INCIDENT SUPPORTS THE MANNINGS' RACIAL TARGETING CLASS CLAIMS.

Summary judgment should be granted on the Mannings' racial "Targeting Class" claims. To succeed on their claims under either § 1983 or Title VI, the Mannings must prove intentional race discrimination. *See Alexander v. Sandoval*, 532 U.S. 276, 280 (2001) (holding that Title VI requires proof of intentional discrimination); *Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997) ("In order to state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race."); *Vera v. Tue*, 73 F.3d 604, 609 (5th Cir.1996) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). More specifically, they must prove that the actions of the MCSD were the result of a top-down policy of race discrimination. The Mannings, however, offer no such proof.

To the contrary, the only evidence is that the MCSD's actions in June of 2016 were motivated by Sergeant Moore's having witnessed the Mannings standing with Thompson when he was in the process of committing a home burglary. Indeed, Khadafy himself specifically admitted in his deposition that he does not know whether the officers' actions were racially motivated. (Exhibit 3, p. 179). Moreover, although Quinnetta has testified in an affidavit filed long after the close of discovery that she "believe[s]" that the MCSD's actions were "based at least in part on [the Mannings'] race,"[8] the law is clear that her subjective belief of race discrimination is

[8] [Dkt. # 231-32, at ¶ 5.

insufficient to defeat summary judgment. *Laborde v. City of Houston*, 31 F. App'x 151 (5th Cir. 2001) ("A plaintiff's subjective belief of race discrimination cannot alone establish that he has been a victim of intentional discrimination.") (citing *Ray v. Tandem Computers, Inc.*, 63 F .3d 429, 435 (5th Cir.1995)). In addition, neither Manning suggests that Mr. Manning's arrest in February of 2017 had anything to do with racial discrimination. Thus, summary judgment should be granted on the Mannings' racial targeting-based class claims.

**II. NO INJURY TO THE MANNINGS WAS CAUSED BY ANY POLICY OF MADISON COUNTY.**

The Mannings cannot hold Madison County liable under §1983 under the theory of *respondeat superior*; instead, they must establish that a policy, practice or custom implemented by the County actually caused a violation of their constitutional rights. *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005) (quoting *Piotrowski v. City of* Houston, *237* F.3d 567, 578 (5th Cir. 2001). To prove causation, the Mannings must show that a policy, practice or custom adopted by Madison County was the "moving force" behind the alleged constitutional violation they claim they suffered. *Monell v. Department of Social Services*, 436 U.S. 658, 690-692 (1978); *Hare v. City of Corinth*, 135 F.3d 320 (5th Cir. 1998). To establish "moving force," they must "demonstrate a direct causal link between the [County's] action and the deprivation of [their] federal rights." *Board of County Commissioners of Bryan County, Oklahoma. v. Brown*, 520 U.S. 397, 404 (1997). *See also Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir.1992) ("[A] direct causal connection must exist between the policy and the alleged constitutional deprivation.").

Under § 1983, an official policy is defined as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir). The Mannings have not shown, and cannot identify, any written policy of Madison County applicable to, or which served as, the moving force behind Officer Moore's entry into Quinnetta's apartment on the morning of June 26, 2016. Therefore, to succeed on their claim, they must satisfy the second element of the official policy test set forth above, and they have not done so.

Although the Mannings refer to other alleged unconstitutional entries into homes or apartments by MCSD personnel in their Complaint, defendants have fully addressed in separately filed summary judgment motions why the claims concerning those other alleged home or apartment entries lack merit as a matter of law. For example, the home and/or yard entry complained of by plaintiff Betty Jean Williams Tucker not only happened more than five years before the Mannings filed their complaint, but Tucker has no claim that the alleged entry violated her constitutional rights. (*see* Dkt. #219, pgs. 7-12). The alleged home invasion described by plaintiff, Bessie Thomas, occurred in 2008, more than eight years before the Mannings' incident, (*see* Dkt. #221, pgs. 3-9). The alleged home invasion described by Nicholas Singleton occurred five years before the Mannings' incident, and, more importantly, Singleton admits that the incident had nothing to do with his race. (*see* Dkt. #223, Pgs. 3-4). The alleged home invasion described by plaintiffs Latoya Brown and Steven Smith involved the performance of law enforcement duties under exigent circumstances according to their own testimony. (*see* Dkt. #233, Pg. 10; Dkt. #234,

Pg. 12). Finally, the home invasion alleged by plaintiff Lawrence Blackmon was based on the officers' possession of a valid arrest warrant for plaintiff, Herbert Green, and occurred only because Blackmon refused to open the door or to identify himself to the officers. (Dkt. #229, Pgs. 5-11). These other alleged home invasions,[9] therefore, and again as a matter of law, cannot establish the "persistent, widespread practice" of MCSD personnel conducting alleged illegal entries into homes as required as required under *Webster, supra.*

Although defendants have denied that Officer Moore and the other officers' entry into Quinnetta's apartment was illegal, it is clear that the Mannings have alleged (at most) an isolated or episodic incident of alleged misconduct by certain subordinate officers, which is insufficient to show the existence of a custom or policy. *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) (citing *Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989), *cert. denied* 493 U.S. 854 (1989)). The same holds true for the Mannings' failure to train and supervise claims against Madison County in their Complaint. (Dkt. #1, Pg. 6, ¶17). *See, e.g.*, *Snyder v. Trepongnier,* 142 F.3d 791, 798-99 (5th Cir. 1998) (proof of more than a single instance of the lack of training or supervision is normally required to prove deliberate indifference to a constitutional right by a policy maker under §1983).[10] The Mannings' claims against Madison County under §1983, therefore, should be dismissed with prejudice as a matter of law.

**III. THE ACTIONS OF THE MCSD ON FEBRUARY 14, 2017, DID NOT VIOLATE THE FOURTH AMENDMENT.**

Summary judgment should also be granted on Mr. Manning's purported Pedestrian Stop Subclass claim arising from the February 14, 2017, incident. Mr. Manning presents no evidence

---

[9] The declarations plaintiffs submitted with their Motion for Class Certification, presumably from other potential class members, do not show that those declarants are complaining of any alleged unconstitutional home entries. (*See* Dkt. # 231-37 through 231-61).

[10] Further, the Mannings have no evidence the involved officers were not properly trained.

supporting his allegation that his encounter with MCSD personnel that day constituted a violation of the Fourth Amendment.

As both the Supreme Court and the Fifth Circuit have held, a Fourth Amendment seizure does not occur when a police officer approaches someone and questions him or asks for his identification. *See Florida v. Bostick*, 501 U.S. 429, 436 (1991); *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995). In the words of the Court, "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual[,] ask to examine the individual's identification[,] and request consent to search his or her [property] as long as the police do not convey a message that compliance with their requests is required." *Cooper*, 43 F.3d at 145 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)).

In this case, it is undisputed that Khadafy: was seen by Sergeant Howard suddenly turning into a parking lot; voluntarily answered Sergeant Howard's questions upon exiting his vehicle; admitted to driving with a suspended license; was asked for and provided his identification; and consented to a search of his car. These actions do not implicate the Fourth Amendment. *Cooper*, 43 F.3d at 145 (finding that no Fourth Amendment "seizure" occurred when the defendant "voluntarily answered the officer's questions, produced his ticket, and consented to a search of his gym bag"). Accordingly, summary judgment should be granted on Khadafy's pedestrian stop claim for failure to prove a Fourth Amendment violation.

## **CONCLUSION**

Neither Manning has a claim of racial discrimination that would entitle them to represent the proposed Targeting Class. Khadafy Manning lacks any constitutional claim necessary for representing the Pedestrian Stop Subclass. For these reasons, summary judgment should be granted on the Mannings' class-based claims in the first three causes of action.

Respectfully submitted this 13th day of April, 2018.

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY: *s/ James E. Graves, III*___________________

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves, III (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi 39232
P.O. Box 750
Jackson, Mississippi 39205-0750
Telephone: 601-969-1010
Facsimile: 601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
Telephone: 601-987-5300
lhester@pbhfirm.com

**CERTIFICATE OF SERVICE**

I, James E. Graves, III, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 13th day of April, 2018.

*s/ James E. Graves, III*
JAMES E. GRAVES, III