# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE BLACKMON;
HERBERT ANTHONY GREEN; KHADAFY
MANNING; QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON; STEVEN
SMITH; BESSIE THOMAS; and BETTY JEAN
WILLIAMS TUCKER, individually and on behalf of a
class of all others similarly situated,

        Plaintiffs,

    v.

MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL S. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities,

        Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**ORAL ARGUMENT
REQUESTED**

## CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

AMERICAN CIVIL LIBERTIES UNION OF
    MISSISSIPPI FOUNDATION
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2610

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT ................................................................................. 7

I.   DEFENDANTS' MOTIONS SHOULD BE DENIED BECAUSE MERITS
     DISCOVERY IS INCOMPLETE ................................................... 9

II.  DEFENDANTS' CHALLENGE TO PLAINTIFFS' EQUAL PROTECTION
     CLAIMS FAILS ...................................................................... 16

     A.   Defendants' Motions Fail To Carry Their Initial Burden Of Production
          Regarding The MCSD's Policy Of Intentional Discrimination ............. 16

     B.   Plaintiffs Have Presented Substantial Evidence Of Defendants'
          Unconstitutional Policing Program ............................................. 18

          1.   Substantial Evidence Demonstrates That The MCSD
               Disproportionately Targets Black Persons ............................... 20

          2.   Disputed Issues Of Material Fact Exist As To Whether The
               MCSD's Policing Program Is Motivated By Racial Discrimination ........ 23

               (a)   Defendants' Use And Endorsement Of Racially-Charged
                     Language ............................................................ 24

               (b)   The MCSD Has Made No Efforts To Remedy Racially
                     Discriminatory Practices ........................................... 27

               (c)   Black Residents Of Madison County Are Routinely Subject
                     To Racial Discrimination By MCSD Personnel ..................... 29

               (d)   The MCSD Has Consistently Failed To Respond To
                     Complaints Or Adequately Train Its Personnel ................... 31

               (e)   Arrest, Citation, And Roadblock Data Also Demonstrates
                     The Existence Of Disputed Issues Of Material Fact
                     Regarding Defendants' Discriminatory Intent .................... 35

III. MATERIAL DISPUTED ISSUES OF FACT EXIST REGARDING THE
     NAMED PLAINTIFFS' ROADBLOCK CLAIMS ................................... 38

     A.   Disputed Issues Of Material Fact Exist As To Whether The MCSD's
          Roadblock Program Violates The Fourth Amendment ...................... 39

1. The MCSD Conducts Roadblocks For Crime Control Purposes ............. 39

2. The Roadblocks Established By The MCSD In Predominantly-Black Areas Of Madison County Lack Reasonable Procedural Safeguards ................................................................................. 42

B. Disputed Issues Of Material Fact Exist Regarding Whether The Roadblock Incidents Complained Of By Plaintiffs Were Caused By Defendants' Unconstitutional Policies .................................................. 46

C. Plaintiffs Did Not "Abandon" Any Roadblock Claims ........................ 50

IV. DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING THE CONSTITUTIONALITY OF DEFENDANTS' PEDESTRIAN STOP POLICIES ........ 54

A. Substantial Evidence Demonstrates That The MCSD Targets Predominantly-Black Areas Of Madison County Via Suspicionless Pedestrian Stops ................................................................................... 54

B. Disputed Issues Of Material Fact Exist Regarding The Pedestrian Stops Experienced By Plaintiffs .................................................................... 56

C. Disputed Issues Of Material Fact Preclude Summary Judgment On Defendants' Theory Of Voluntary Consent ......................................... 60

V. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE HOME ENTRY-RELATED CLAIMS ASSERTED BY LATOYA BROWN, STEVEN SMITH, KHADAFY AND QUINNETTA MANNING, AND LAWRENCE BLACKMON ............................................. 64

A. The Warrantless Entry And Search Of Ms. Brown's And Mr. Smith's Apartment Was Not Justified By Exigent Circumstances .................... 67

1. The Exigent Circumstances Doctrine Is Inapplicable .............. 68

2. The "Emergency Aid" Doctrine Is Inapplicable ...................... 69

B. Defendants Are Not Entitled To Summary Judgment On The Constitutionality Of The MCSD's Severe Abuse Of Mr. & Ms. Manning ......... 71

1. The June 26, 2016 Incident ...................................................... 72

(a) The Underlying Third-Party Domestic Disturbance .................... 72

(b) The MCSD's Harassment And Coercion Of The Mannings ........ 75

2. Sheriff Tucker's Response Demonstrates That The Incident Was Not Simply An Isolated Instance Of Police Misconduct ......................... 79

C.      Disputed Issues Of Material Fact Exist As To Whether The Forced Home
        Entry And Wrongful Detention Of Lawrence Blackmon Violated The
        Fourth Amendment ............................................................................... 83

        1.      Genuine Factual Disputes Exist Regarding Whether The MCSD
                Unconstitutionally Entered Blackmon's Home ......................................... 84

        2.      The Reasonableness Of The MCSD Officers' Mistaken Belief
                Presents Disputed Issues Of Material Fact ............................................ 86

VI.     DEFENDANTS' STANDING ARGUMENTS FAIL ......................................... 88

        A.      Latoya Brown and Steven Smith Have Standing .................................... 89

        B.      Betty Tucker Has Standing ................................................................... 92

        C.      The Five Other Plaintiffs' Uncontested Standing Satisfies Article III's
                Case-Or-Controversy Requirement ....................................................... 94

CONCLUSION ....................................................................................................... 95

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ................................................................................. 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
  568 U.S. 455 (2013) ................................................................................. 11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................... 8

*Anderson v. United Parcel Service, Inc.,*
  2010 WL 4822564 (D. Kan. Nov. 22, 2010) ............................................ 52

*Ashe v. Corley,*
  992 F.2d 540 (5th Cir. 1993) ........................................................... 5, 9, 17

*Bauer v. Texas,*
  341 F.3d 352 (5th Cir. 2003) .................................................................... 90

*Bd. of Cty. Comm'rs of Bryan Cnty. v. Brown,*
  520 U.S. 397 (1997) ................................................................................. 65

*Beatty v. Twp. of Elk,*
  2010 WL 1493118 (D.N.J. Apr. 14, 2010) ............................................... 63

*Berkovitz v. Home Box Office, Inc.,*
  89 F.3d 24 (1st Cir. 1996) ........................................................................ 11

*Blackwell v. Barton,*
  34 F.3d 298 (5th Cir. 1994) ...................................................................... 88

*Bracey v. Herringa,*
  466 F.2d 702 (7th Cir. 1972) .................................................................... 81

*Brown v. Dayton Metro. Hous. Auth.,*
  1993 WL 1367433 (S.D. Ohio Aug. 26, 1993) ........................................ 92

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................. 8, 18

*City of Jackson v. Calcote,*
  910 So. 2d 1103 (Miss. Ct. App. 2005) .................................................... 80

*City of Jackson v. Moore,*
  97 So. 3d 1238 (Miss. Ct. App. 2012) ...................................................... 79

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .................................................................................................. 90

*Collins v. Ainsworth*,
   382 F.3d 529 (5th Cir. 2004) .................................................................................. 40

*Craddock v. Hicks*,
   314 F. Supp. 2d 648 (N.D. Miss. 2003) ................................................................. 87

*Culwell v. City of Fort Worth*,
   468 F.3d 868 (5th Cir. 2006) .................................................................................. 13

*Cummings v. Connell*,
   2000 WL 33599094 (E.D. Cal. Sept. 14, 2000) .................................................... 12

*Davis v. City of New York*,
   902 F. Supp. 2d 405 (S.D.N.Y. 2012) .................................................................... 50

*Delaware v. Prouse*,
   440 U.S. 648 (1979) ................................................................................................ 43

*DeWalt v. Carter*,
   224 F.3d 607 (7th Cir. 2000) .................................................................................. 24

*Dockery v. Hall*,
   No. 3:13-cv-326-WHB-JCG, ECF No. 600, slip op. (S.D. Miss. Feb. 14, 2018) ...................... 8

*Doe v. Abington Friends School*,
   480 F.3d 252 (3d Cir. 2007) ............................................................................ 13, 85

*Douglas v. Stalmach*,
   2017 WL 1100893 (D. Nev. Mar. 21, 2017) ......................................................... 66

*E.E.O.C. v. Exxon Mobil Corp.*,
   344 F. Appx. 868 (5th Cir. 2009) ...................................................................... 9, 12

*E.E.O.C. v. New Mexico*,
   2016 WL 9819540 (D.N.M. Aug. 10, 2016) .......................................................... 13

*Edmond v. City of Indianapolis*,
   531 U.S. 32 (2000) .................................................................................................. 39

*Ee v. Washington County*,
   2010 WL 680940 (D. Or. Feb. 25, 2010) .............................................................. 66

*Fleming v. Hinds Cty*,
   2017 WL 1730971 (S.D. Miss. May 1, 2017) ........................................................ 81

*Florida v. Jardines*,
  569 U.S. 1 (2013) ................................................................................. 93

*Floyd v. City of New York*,
  283 F.R.D. 153 (S.D.N.Y. 2012) ........................................................ 90, 95

*Floyd v. City of New York*,
  813 F. Supp. 2d 417 (S.D.N.Y. 2011) .............................. 23, 27, 35, 49

*Fraire v. City of Arlington*,
  957 F.2d 1268 (5th Cir. 1992) ............................................................ 65

*Fridley v. Horrighs*,
  291 F.3d 867 (6th Cir. 2002) .............................................................. 86

*Gerstein v. Pugh*,
  420 U.S. 103 (1975) ............................................................................ 86

*Grage v. Northern States Power Co.*,
  2014 WL 12610147 (D. Minn. Jan. 3, 2014) ..................................... 11

*Grandstaff v. City of Borger, Texas*,
  767 F.2d 161 (5th Cir. 1985) .............................................................. 82

*Hernandez v. Cremer*,
  913 F.2d 230 (5th Cir. 1990) .................................................. 89, 90, 92, 94

*Hill v. California*,
  401 U.S. 797 (1971) ............................................................................ 88

*Hobart v. City of Stafford*,
  916 F. Supp. 2d 783 (S.D. Tex. 2013) ............................................... 83

*Hogan v. Vandewater*,
  2016 WL 7634430 (S.D.N.Y. Apr. 27, 2016) ..................................... 53

*Hope v. City of Long Beach*,
  2005 WL 6009954 (C.D. Cal. Aug. 15, 2005) .................................... 66

*Hunsberger v. Wood*,
  570 F.3d 546 (4th Cir. 2009) .............................................................. 70

*Ingram v. City of Columbus*,
  185 F.3d 579 (6th Cir. 1999) .............................................................. 88

*INS v. Delgado*,
  466 U.S. 210 (1984) ............................................................................ 60

*Jackson-Hall v. Moss Point Sch. Dist.*,
  2012 WL 1098524 (S.D. Miss. Apr. 2, 2012) ...................................... 93

*James v. City of Dallas*,
  254 F.3d 551 (5th Cir. 2001) ........................................................... 90

*Johnson v. City of Hammond*,
  2016 WL 1244016 (N.D. Ind. Mar. 29, 2016) .................................... 27

*Kirk v. Louisiana*,
  536 U.S. 635 (2002) ........................................................................ 68

*Kurtz v. Kimberly–Clark Corp.*,
  321 F.R.D. 482 (E.D.N.Y. 2017) ................................................... 3, 10

*Ligon v. City of New York*,
  288 F.R.D. 72 (S.D.N.Y. 2013) .................................................. 89, 91

*Lohn v. Morgan Stanley DW, Inc.*,
  652 F. Supp. 2d 812 (S.D. Tex. 2009) .............................................. 93

*Lopez v. City of Dallas*,
  2006 WL 1450520 (N.D. Tex. May 24, 2006) ............................... 17, 18

*Marcel's Tanning Salons, Inc. v. Bennett*,
  2008 WL 2705560 (N.D. Ind. July 10, 2008) ................................... 12

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1967) ........................................................................ 43

*McClain v. Lufkin Indus., Inc.*,
  519 F.3d 264 (5th Cir. 2008) ........................................................... 38

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ........................................................................ 38

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ........................................................... 89

*Michigan State Police v. Sitz*,
  496 U.S. 444 (1990) ........................................................................ 43

*Michigan v. Fisher*,
  558 U.S. 45 (2009) .................................................................... 68, 69

*Miller v. City of Dallas*,
  2002 WL 230834 (N.D. Tex. Feb. 14, 2002) .................................... 19

*Mincey v. Arizona*,
 437 U.S. 385 (1978) .................................................................... 68, 70

*Mobile Telecomms. Techs., LLC v. Blackberry Corp.*,
 2016 WL 6271717 (N.D. Tex. May 6, 2016) ........................................ 85

*Monell v. Dep't of Soc. Servs.*,
 436 U.S. 658 (1978) .......................................................................... 19

*Moore v. City of Jackson*,
 2012 WL 4588066 (S.D. Miss. Oct. 2, 2012) ........................................ 80

*Moore v. Comput. Assoc. Int'l, Inc.*,
 653 F. Supp. 2d 955 (D. Ariz. 2009) .................................................. 53

*Moreau v. Klevenhagen*,
 956 F.2d 516 (5th Cir. 1992) ......................................................... 3, 9, 12

*Motson v. Franklin Covey*,
 2005 WL 1541023 (D.N.J. June 30, 2005) .......................................... 54

*Nguyen v. Louisiana State Board of Cosmetology*,
 236 F. Supp. 3d 947 (M.D. La. 2017) ................................................ 36

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
 875 F.3d 107 (2d Cir. 2017) ............................................................ 17

*Ord v. D.C.*,
 587 F.3d 1136 (D.C. Cir. 2009) ....................................................... 92

*Ortega Melendres v. Arpaio*,
 836 F. Supp.2d 959 (D. Ariz. 2011) ............................................. passim

*Owen v. City of Independence, Mo.*,
 445 U.S. 622 (1980) .......................................................................... 88

*Pappas v. Giuliani*,
 290 F.3d 143 (2d Cir 2002) ................................................................ 2

*Payton v. New York*,
 445 U.S. 573 (1980) .......................................................................... 86

*Petrello v. City of Manchester*,
 2017 WL 3972477 (D.N.H. Sept. 7, 2017) ..................................... 20, 29

*Pratt v. Chicago Housing Auth.*,
 848 F. Supp. 792 (N. D. Ill. 1994) ................................................. 68, 70

*QBE Ins. Corp. v. Legacy Condos at Gulfport Home Owners Ass'n*,
  2009 WL 1844496 (S.D. Miss. June 23, 2009) ...................................................... 13

*Ratliff v. City of Houston*,
  2005 WL 1745468 (S.D. Tex. July 25, 2005) ................................................. 60, 61

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ................................................................................ 95

*Roe v. Cal. Dep't of Developmental Servs.*,
  2017 WL 2311303 (N.D. Cal. May 26, 2017) ...................................................... 24

*Romano v. Howarth*,
  998 F.2d 101 (2d Cir. 1993) ................................................................................. 81

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ................................................................................................ 94

*Santibanes v. City of Tomball, Texas*,
  654 F. Supp. 2d 593 (S.D. Tex. 2009) ................................................................. 83

*Seekamp v. It's Huge, Inc.*,
  2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ........................................................ 10

*Shankle v. Texas City*,
  885 F. Supp. 996 (S.D. Tex. 1995) ...................................................................... 42

*Short v. West*,
  662 F.3d 320 (5th Cir. 2011) ................................................................................ 63

*Smith v. City of Chicago*,
  143 F. Supp. 3d 741 (N.D. Ill. 2015) ................................................................... 31

*Smith v. Town of Clarkson*,
  682 F.2d 1055 (4th Cir. 1982) .............................................................................. 26

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
  2013 WL 12214144 (E.D. Tex. Nov. 25, 2013) .................................................... 10

*Stanbury Law Firm v. I.R.S.*,
  221 F.3d 1059 (8th Cir. 2000) .............................................................................. 93

*Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*,
  882 F.3d 176 (5th Cir. 2018) .................................................................................. 8

*Stone v. City of Wheat Ridge, Colorado*,
  2009 WL 890718 (D. Col. Mar. 31, 2009) ........................................................... 66

*Tamez v. City of San Marcos*,
    118 F.3d 1085 (5th Cir. 1997) ............................................................. 85

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................... 94

*United States v. Berry*,
    670 F.2d 583 (5th Cir. 1982) ............................................................... 63

*United States v. Bowman*,
    496 F.3d 687 (D.C. Cir. 2007) ................................................... 39, 42, 45

*United States v. Brown*,
    230 F. Supp. 3d 513 (M.D. La. 2017) .................................................. 70

*United States v. Davis*,
    270 F.3d 977 (D.C. Cir. 2002) ............................................................. 39

*United States v. Davis*,
    423 F.2d 974 (5th Cir. 1970) ............................................................... 71

*United States v. Dorsey*,
    591 F.2d 922 (D.C. Cir. 1978) ............................................................. 69

*United States v. Green*,
    293 F.3d 855 (5th Cir. 2002) ......................................................... 39, 40

*United States v. Huguenin*,
    154 F.3d 547 (6th Cir. 1998) ............................................................... 40

*United States v. Jaras*,
    86 F.3d 383 (5th Cir. 1996) ................................................................. 76

*United States v. Lewis*,
    381 F. Appx. 376 (5th Cir. 2010) ........................................................ 68

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976) ............................................................................ 44

*United States v. Mask*,
    330 F.3d 330 (5th Cir. 2003) ......................................................... 60, 61

*United States v. Odutayo*,
    406 F.3d 386 (5th Cir. 2005) ............................................................... 61

*United States v. Perez*,
    484 F.3d 735 (5th Cir. 2007) ............................................................... 69

*United States v. Puglisi,*
   723 F.2d 779 (11th Cir. 1984) ................................................................... 63

*United States v. Schultz,*
   818 F. Supp. 1271 (E.D. Wis. 1993) ......................................................... 85

*United States v. Shabazz,*
   993 F.2d 431 (5th Cir. 1993) ..................................................................... 39

*United States v. Shaibu,*
   920 F.2d 1423 (9th Cir. 1990) ................................................................... 76

*United States v. Smith,*
   794 F.3d 681 (7th Cir. 2015) ..................................................................... 63

*United States v. Taylor,*
   624 F.3d 626 (4th Cir. 2010) ..................................................................... 70

*United States v. Toussaint,*
   838 F.3d 503 (5th Cir. 2016) ..................................................................... 69

*United States v. Williams,*
   79 F. Supp. 3d 888 (S.D. Ill. 2015) .......................................................... 87

*United States v. Wilson,*
   2 F.3d 226 (7th Cir. 1993) ......................................................................... 86

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ..................................................................... 20

*Velazquez v. City of Long Beach,*
   793 F.3d 1010 (9th Cir. 2015) ................................................................... 86

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ...................................................... 4, 19, 35, 94

*Vine v. PLS Fin. Servs., Inc.,*
   2018 WL 456031 (W.D. Tex. Jan. 16, 2018) ........................................... 10

*Wayte v. United States,*
   470 U.S. 598 (1985) ................................................................................... 19

*Wesley Health System, LLC v. Forrest County Bd. Of Sup'rs,*
   2013 WL 2244319 (S.D. Miss. May 21, 2013) ........................................ 16

*Whren v. United States,*
   517 U.S. 806 (1996) ................................................................................... 35

*Wichita Falls Office Assoc. v. Banc One Corp.*,
    978 F.2d 915 (5th Cir. 1992) ................................................................ 12, 13, 16

*Williams v. Bramer*,
    180 F.3d 699 (5th Cir. 1999) ................................................................ 24

*Williams v. Kaufman County*,
    352 F.3d 994 (5th Cir. 2003) ................................................................ 24, 64

*Woniewala v. Merck & Co., Inc.*,
    2017 WL 3390367 (E.D. Pa. Aug. 7, 2017) ............................................ 10

*Zeigler v. Town of Kent*,
    258 F. Supp. 2d 49 (D. Conn. 2003) ...................................................... 25

## Statutes, Rules, and Consitutional Provisions

42 U.S.C. § 1983 .................................................................................... 19

42 U.S.C. § 2000d .................................................................................. 19

Fed. R. Civ. P. 1 .................................................................................... 11

Fed. R. Civ. P. 23(a)(2) .......................................................................... 14

Fed. R. Civ. P. 23(a)(4) .......................................................................... 15

Fed. R. Civ. P. 23(c)(1)(A) ...................................................................... 10

Fed. R. Civ. P. 33(b) .............................................................................. 53

Fed. R. Civ. P. 56(a) .............................................................................. 8

Fed. R. Civ. P. 56(d) ........................................................................ passim

L.U. Civ. R. 7(b)(6)(A) ............................................................................ 1

U.S. Const. amend. IV ...................................................................... passim

U.S. Const. amend. XIV .......................................................... 2, 38, 46, 66

U.S. Const. amend. XIV, § 1 ...................................................... 4, 20, 38

U.S. Const. art. III ................................................................................ 94

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas and Betty Jean Williams Tucker ("Plaintiffs" or "Named Plaintiffs") respectfully submit this consolidated memorandum in opposition to the motions for summary judgment (the "Motions") filed by Defendants Madison County, Mississippi and Sheriff Randall Tucker ("Defendants").[1] Pursuant to L.U. Civ. R. 7(b)(6)(A), Plaintiffs request oral argument on Defendants' Motions.

## PRELIMINARY STATEMENT

Plaintiffs filed this class action to seek declaratory and injunctive relief concerning the discriminatory and unconstitutional policies of the Madison County Sheriff's Department ("MCSD"). These unconstitutional policies target Black persons on the basis of their race and subject them to unconstitutional searches and seizures. Plaintiffs' pending Motion for Class Certification (ECF No. 231), which pursuant to the Court's scheduling orders will be fully briefed as of July 2, 2018, seeks certification of a class of Black persons who reside in or travel to Madison County, Mississippi and, as a result, are subject to the MCSD's longstanding policy

---

[1] The Motions addressed by this memorandum are (i) Motion for Summary Judgment as to Individual and Class Based Claims by Plaintiff, Latoya Brown (Mar. 7, 2018, ECF No. 209) (the "Brown Motion"); (ii) Motion for Summary Judgment as to Individual and Class Based Claims by Plaintiff, Steven Smith (Mar. 7, 2018, ECF No. 211) (the "Smith Motion"); (iii) Motion for Summary Judgment as to Individual and Class Based Claims by Plaintiff, Betty Jean Williams Tucker (Mar. 12, 2018, ECF No. 218) (the "Tucker Motion"); (iv) Defendants' Motion for Summary Judgment on the Claims of Plaintiff Bessie Thomas (Mar. 12, 2018, ECF No. 220) (the "Thomas Motion"); (v) Defendants' Motion for Summary Judgment on the Claims of Plaintiff Nicholas Singleton (Mar. 12, 2018, ECF No. 222) (the "Singleton Motion"); (vi) Defendants' Motion for Summary Judgment on the Claims of Plaintiff Lawrence Blackmon (Mar. 14, 2018, ECF No. 228) (the "Blackmon Motion"); and (vii) Defendants' Motion for Summary Judgment on the Class-Based Claims of Plaintiffs Khadafy Manning and Quinnetta Manning (Apr. 13, 2018, ECF No. 256) (the "Manning Motion"). Defendants' accompanying memoranda of law are cited as "Brown Mem. __" [ECF No. 233]; "Smith Mem. __" [ECF No. 234]; "Tucker Mem. __" [ECF No. 219]; "Thomas Mem. __" [ECF No. 221]; "Singleton Mem. __" [ECF No. 223]; "Blackmon Mem. __" [ECF No. 229]; and "Manning Mem. __" [ECF No. 257]. The Affidavit of Scott McDonald filed with the Blackmon Motion is cited as "McDonald Aff. ¶ __" [ECF No. 228-2], and the Affidavit of Slade Moore filed with the Manning Motion is cited herein as "Moore Aff. ¶ __." Declarations cited by Plaintiffs in opposition to the Motions are cited as "[Name] Decl. ¶ __." Deposition testimony is cited as "[Name] Tr. __." The Declaration of Jonathan K. Youngwood, Esq. is cited as "Youngwood Decl. ¶ __."

of stopping and searching Madison County's Black citizens on the basis of their race, in violation of the Fourteenth Amendment to the U.S. Constitution. Plaintiffs also seek certification of two sub-classes. One focuses on the MCSD's use of vehicular roadblocks, and the other on the MCSD's use of suspicionless pedestrian stops. Both violate the Fourth and Fourteenth Amendments.

"The effectiveness of a [law enforcement agency] depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir 2002). "If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired." *Id.* at 146-47. In keeping with these principles, this action seeks to ensure that law enforcement in Madison County is fair and unbiased and is conducted in accordance with the mandates of the Constitution. Defendants' premature summary judgment motions are both substantively and procedurally meritless. As set forth in detail herein, a multitude of disputed issues of material fact exist with respect to each of the Named Plaintiffs' claims, and summary judgment cannot be granted in Defendants' favor.

**The Summary Judgment Motions Are Premature:** As a preliminary matter, Defendants' summary judgment motions should be denied as premature, both under Rule 56(d) of the Federal Rules of Civil Procedure and as a matter of this Court's inherent case management authority. At Defendants' request, in August 2017, the schedule in this action was bifurcated and discovery was staged. Defendants successfully argued to the Court that a case management order should be entered that terminated in the filing of Plaintiffs' class certification motion, and that a

new case management order should be entered after this Court's disposition of the class certification motion. After the Court entered its bifurcated Case Management Order (the "CMO," ECF No. 30), Plaintiffs proceeded to focus discovery on issues relevant to class certification during the class certification discovery period. Plaintiffs directed discovery to issues concerning the MCSD's policies, evidence of which is relevant to the commonality inquiry at the class certification stage. While Plaintiffs diligently pursued discovery of Defendants during the class certification period, such discovery does not constitute the entirety of the discovery necessary to a fair resolution of the complex constitutional claims asserted in this action.

Between March 7, 2018 and April 13, 2018, without consultation with Plaintiffs in advance regarding a schedule, Defendants filed serial summary judgment motions against each of the eight individual Named Plaintiffs in this case. Rather than contending that evidence exists that affirmatively mandates judgment in favor of Defendants on Plaintiffs' claims (such as, for example, the existence of a release), Defendants' summary judgment motions principally challenge the sufficiency of the evidence regarding the merits of the individual Named Plaintiffs' claims, despite the fact that merits discovery has not even begun. Granting summary judgment for Defendants on this incomplete record would be error. *See, e.g.*, *Moreau v. Klevenhagen*, 956 F.2d 516, 523 (5th Cir. 1992) (where discovery had been bifurcated, "the district court 'jumped the gun' when it granted summary judgment in favor of the [defendant] before the [plaintiff] had an opportunity to conduct discovery and present proof of damages"); *Kurtz v. Kimberly–Clark Corp.*, 321 F.R.D. 482, 507-08 (E.D.N.Y. 2017) (deciding plaintiffs' motion for class certification but deferring defendant's summary judgment motion where "[c]lass discovery was prioritized over merits discovery" and "[t]he parties have conducted sufficient discovery for the court to rule on class certification, but not enough to decide summary judgment").

This is particularly true in a complex, fact-dependent case such as this, which raises claims of intentional racial discrimination in violation of the Equal Protection Clause and Title VI of the Civil Rights Act. Resolution of such claims requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Determining whether there is sufficient evidence of discriminatory intent is an inquiry that is ill-suited to resolution based on a paper record, much less the incomplete paper record that exists in this case. Defendants' motions should be denied (or deferred) as premature for this reason alone, and, consistent with the prior scheduling orders entered in this case, this Court should set a schedule, upon resolution of Plaintiffs' motion for class certification, that provides a reasonable schedule for the merits phase of fact discovery; for expert discovery following such fact discovery; and for summary judgment motions thereafter. Such a schedule will ensure that the important civil rights issues presented to the Court by this case are resolved fairly and on a full record.

**The Summary Judgment Motions Are Without Substantive Merit:** For all of the above reasons, this Court can and should deny Defendants' summary judgment motions in full as premature. However, should the Court choose to resolve Defendants' motions on their merits, each motion should be denied.[2]

*First*, each of Defendants' motions—which raise substantially duplicative arguments and rely on many of the same authorities—argues in wholly conclusory fashion that Plaintiffs have presented insufficient evidence of a policy of racial discrimination because the individual Plaintiffs did not prove the existence of such a policy through their own deposition testimony.

---

[2] For the avoidance of doubt, Plaintiffs' response to the merits of Defendants' motions on the current record is not, and should not be seen as, a concession that sufficient discovery has been taken on the merits of any element of any Plaintiff's claims or that the merits of such claims are ripe for adjudication.

Defendants' motions should be denied as to this issue because they fail to carry Defendants' threshold burden of production. A party cannot move for summary judgment by simply asserting in conclusory fashion that its proponent lacks evidence; instead, the movant must substantively engage with the record. *See Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993). Defendants fail to do so, and this presents an independent basis for denying their motions.

*Second*, Defendants are entirely incorrect that no evidence of a policy of intentional discrimination exists. The evidence developed, merely through class certification discovery, demonstrates that (i) the MCSD disproportionately cites and arrests Black persons; (ii) the MCSD disproportionately concentrates its law enforcement efforts on the predominantly-Black areas of the county, including through suspicionless pedestrian stops and unconstitutional crime-control roadblocks; (iii) the MCSD has a longstanding culture of racial discrimination in which the use of racial epithets and other racially-charged language is accepted and tolerated; and (iv) the MCSD makes no efforts to meaningfully address citizen complaints, discipline officers who mistreat members of the public and violate their constitutional rights, or implement any procedures or record-keeping protocols that would potentially mitigate the disparate impact the MCSD's policing policies have on Madison County's Black community. *See* Section II, *infra*. At a minimum, this evidence demonstrates that disputed issues of material fact exist that preclude judgment in favor of Defendants at this juncture. Defendants have failed to come forward with any evidence whatsoever that could foreclose Plaintiffs' entitlement to proceed to merits discovery and then have the viability of their claims assessed fairly and on a full record.

*Third*, the current, incomplete record also presents disputed issues of material fact concerning the constitutionality of the MCSD's vehicular roadblocks. Both testimonial evidence and the expert report of Dr. Bryan Ricchetti demonstrate that the MCSD disproportionately

conducts vehicular roadblocks in predominantly-Black areas of Madison County. Other record evidence—starting with Defendants' Answer and including the deposition testimony of MCSD personnel—indicates that Defendants regularly conduct roadblocks in Black neighborhoods for purposes of crime control. Disputed issues of material fact also exist regarding the procedural propriety of the MCSD's roadblocks. For example, Plaintiffs and other class member witnesses have attested that that MCSD deputies have waved white motorists through roadblocks while stopping Black motorists, and harassed Black motorists and their passengers at roadblocks, including through the use of racial epithets. There is also ample testimony that the MCSD routinely conducts vehicular roadblocks using unmarked cars in unlit areas. The civil rights claims of the Named Plaintiffs who assert roadblock-related claims cannot be resolved in Defendants' favor based on Defendants' self-serving and evidentiarily unsupported assertions that the MCSD's roadblocks survive constitutional scrutiny as simple traffic control measures.

*Fourth*, Defendants' attempted attack on the sufficiency of Plaintiffs' claims regarding the MCSD's policy, custom, or longstanding practice of conducting improper, suspicionless pedestrian stops in majority-Black neighborhoods of Madison County fails for the same reasons. The current record demonstrates that the MCSD has established specific units and details to patrol majority-Black neighborhoods, and that these patrols regularly entail suspicionless seizures of Black pedestrians. Defendants argue that the MCSD's suspicionless pedestrian stops do not implicate the Fourth Amendment because they are nothing more than "consensual" encounters between law enforcement and members of the community. Defendants, however, present no evidence of any affirmative consent to these interactions. Defendants also ignore the highly coercive contexts in which such suspicionless pedestrian stops are made, including the MCSD's interdiction of pedestrians passing through roadblocks set up by MCSD personnel at

the sole entry points to majority-Black apartment complexes, and the MCSD's history—documented through incident reports produced by Defendants during class certification discovery—of treating attempts to avoid or decline interactions with MCSD personnel as sufficient cause to escalate the situation. The voluntariness of any purported implicit consent presents questions of fact that are fundamentally ill-suited to resolution on the current, incomplete paper record.

*Fifth*, Defendants' contention that the home invasions experienced by named Plaintiffs Khadafy Manning, Quinnetta Manning, Lawrence Blackmon, Steven Smith, and Latoya Brown can be disposed of at this time under various Fourth Amendment doctrines ignores record evidence demonstrating material factual disputes regarding the reasonableness of the MCSD's conduct on those occasions. Defendants' vague arguments that no causal nexus exists between these deprivations of Plaintiffs' constitutional rights and any MCSD policy also fail. The evidence developed thus far in class certification discovery demonstrates that genuine factual disputes exist regarding whether the MCSD's discriminatory policies are responsible for the MCSD's violations of Plaintiffs' constitutional rights. In any event, these questions cannot be resolved against Plaintiffs prior to merits discovery and on an incomplete factual record.

*Sixth*, Defendants' challenges to the standing of Plaintiffs Steven Smith, Latoya Brown, and Betty Tucker to assert some or all of their claims fail on their merits. Each Plaintiff's circumstances are more than adequate to establish their standing to seek declaratory and injunctive relief to remedy Defendants' continuing violations of their constitutional rights, and Defendants' arguments to the contrary are largely based on misapprehensions of the record.

For all of these reasons, Defendants' motions for summary judgment should be denied.

## **ARGUMENT**

"Summary judgment is appropriate where there is no genuine dispute of material fact and

the movant is entitled to judgment as a matter of law." *Star Fin. Servs., Inc. v. Cardtronics USA, Inc.*, 882 F.3d 176, 179 (5th Cir. 2018). A "genuine issue" of material fact precluding summary judgment arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Star Fin. Servs.*, 882 F.3d at 179; *see also Anderson* 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are not the functions of a "judge … ruling on a motion for summary judgment. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Opinion and Order, *Dockery v. Hall*, No. 3:13-cv-326-WHB-JCG, ECF No. 600, at 17 (S.D. Miss. Feb. 14, 2018) (Barbour, J.) ("It is improper for the district court to 'resolve factual disputes by weighing conflicting evidence, … since it is the province of the jury to assess the probative value of the evidence.'") (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)). "Summary judgment is also improper where the court merely believes it unlikely that the non-moving party will prevail at trial." *Id.* (quoting *Nat'l Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962)).

The party moving for summary judgment has the burden of showing no "genuine dispute as to any material fact" at the summary judgment stage. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Even when the non-moving party has the ultimate burden of proof at trial, the "party seeking summary judgment always bears the initial responsibility" of identifying the portions of the record which "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (emphasis added). That initial burden of production cannot be satisfied by mere "conclusory statement[s] that the other side has no evidence" to

support its claims. *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993).

Lastly, summary judgment should not be granted where, as here, a court has bifurcated discovery in contemplation of a motion for class certification, and class certification discovery has been prioritized over merits discovery. *See Moreau v. Klevenhagen*, 956 F.2d 516, 523 (5th Cir. 1992) (where discovery had been bifurcated, "the district court 'jumped the gun' when it granted summary judgment in favor of the [defendant] before the [plaintiff] had an opportunity to conduct discovery and present proof of damages"). Granting summary judgment under such circumstances is improper because the nonmoving party is entitled to rely on the scheduling order that bifurcated discovery in developing its litigation strategy and taking discovery. *E.E.O.C. v. Exxon Mobil Corp.*, 344 F. Appx. 868, 871-72 (5th Cir. 2009) (plaintiff "was entitled to rely on the district court's specific order that both parties restrict discovery" to specific issues, so granting summary judgment on other issues was error).

## I.    DEFENDANTS' MOTIONS SHOULD BE DENIED BECAUSE MERITS DISCOVERY IS INCOMPLETE

As a threshold issue, Defendants' motions fail because discovery in this case was bifurcated into two stages—class certification-related discovery and merits discovery—under the Court's August 9, 2017 CMO (ECF No. 30). The CMO provides that scheduling deadlines, including for the completion of merits discovery, "will be determined upon the Court's ruling on the Motion for Class Certification …." *Id.* In keeping with the terms of the CMO, merits discovery has not commenced in this action, and the deadline for its completion will not even be set by the Court until after the Court rules on Plaintiffs' Motion for Class Certification.

Courts routinely recognize that when a bifurcated discovery schedule is entered, including in the class certification context, summary judgment motions brought by defendants before the completion of merits discovery are premature. *Vine v. PLS Fin. Servs., Inc.*, 2018 WL

9

456031, at *3 (W.D. Tex. Jan. 16, 2018) (motion for summary judgment "premature," where discovery thus far had been limited to matters relating to class certification); *Woniewala v. Merck & Co., Inc.*, 2017 WL 3390367, at *4 (E.D. Pa. Aug. 7, 2017) ("Defendants' Motion for Partial Summary Judgment is premature in 'Phase I' because the parties stipulated to a bifurcated discovery plan that included two phases."); *Kurtz v. Kimberly–Clark Corp.*, 321 F.R.D. 482, 507-08 (E.D.N.Y. 2017) (deciding the plaintiffs' motion for class certification but holding the defendant's summary judgment motion in abeyance where "[c]lass discovery was prioritized over merits discovery" and "[t]he parties have conducted sufficient discovery for the court to rule on class certification, but not enough to decide summary judgment"); *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *13 (N.D.N.Y. Mar. 13, 2012) (denying cross-motion for summary judgment as premature in class action).

The reasons for this are straightforward. Bifurcated discovery schedules in class action litigation are imposed for the purpose of facilitating class certification at "an early practicable time" in the litigation. Fed. R. Civ. P. 23(c)(1)(A); *see also St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, 2013 WL 12214144, at *2 (E.D. Tex. Nov. 25, 2013) ("Bifurcated discovery … allows a district court to expedite the certification process"). Indeed, Defendants themselves, in proposing that discovery be bifurcated, argued that "[e]arly filing" of Plaintiffs' motion for class certification could "expedite the resolution of this action," and that "a new CMO should be entered in the event a class is certified." Ex. 53, Defs.' Proposed Case Mgmt. Order § 5. Implicit in this reasoning is that a full discovery record on the merits of the claims at issue is not needed because, at the class certification stage, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

(2013). Defendants also expressly recognized the limited scope of class certification discovery while that discovery was ongoing. For instance, in an October 25, 2017 discovery letter, counsel for Defendants wrote, "I understand that the current focus of discovery is on class certification. For that reason, you may now know little more about the claims of the individual plaintiffs than you knew when you filed your complaint." Ex. 54, Oct. 25, 2017 Letter from Wallace to Youngwood. Similarly, Defendants served responses and objections to document requests that objected to production of a category of records on the basis that it was "not relevant to the issues concerning class certification." Ex. 55, Defs. Response to Pls. First Document Requests, at 2; Ex. 52, Youngwood Decl. ¶ 6.

The purpose of bifurcated discovery would be undermined if summary judgment could be granted as to the merits of plaintiffs' claims based solely on the class certification discovery record. If such tactics were permitted, plaintiffs would be forced to fully develop both their class certification and merits cases during the abbreviated class discovery period. This would nullify the intended benefits of a bifurcated schedule and promote gamesmanship and inefficiency, in contravention of the Federal Rules' requirement that they be "construed … to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Denial of Defendants' premature summary judgment motions is compelled as a matter of basic fairness and due process. Parties are entitled to rely on the scheduling orders issued by district courts, and to develop their litigation strategies accordingly. *See, e.g.*, *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29-30 (1st Cir. 1996) ("[W]hen a court charts a procedural route, lawyers and litigants are entitled to rely on it."); *Grage v. Northern States Power Co.*, 2014 WL 12610147, at *8 (D. Minn. Jan. 3, 2014) ("The parties are entitled to rely on the Court's scheduling orders …"); *Marcel's Tanning Salons, Inc. v. Bennett*, 2008 WL 2705560, at *3

(N.D. Ind. July 10, 2008) ("[J]ust as parties are expected to comply with a court's scheduling order, they are also entitled to rely on those orders."); *Cummings v. Connell*, 2000 WL 33599094, at *1 (E.D. Cal. Sept. 14, 2000) (denying premature summary judgment motion because "plaintiffs were entitled to rely on the pretrial scheduling order"). As the Fifth Circuit has recognized, this is particularly true where a scheduling order bifurcates or phases a case. *Moreau*, 956 F.2d at 523.

In *E.E.O.C. v. Exxon Mobil Corp.*, for example, the Fifth Circuit reversed a district court's grant of summary judgment where discovery had been bifurcated. 344 F. Appx. 868 (5th Cir. 2009). The Court held that even though "the EEOC did not appeal from the district court's scheduling order that bifurcated discovery and pre-trial motions; and the EEOC did not move under Federal Rule of Civil Procedure 56([d]) to continue summary-judgment proceedings pending discovery on issues other than congruity," the "EEOC was entitled to rely on the district court's specific order that both parties restrict discovery" to that issue, so the district court's grant of summary judgment was inappropriate. *Id.* at 871-72. The same reasoning applies here. Given the Court's CMO bifurcating discovery into class certification and merits stages, it would be "inequitable to pull out the rug from under [Plaintiffs]" by now dispensing with merits discovery. *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 920 (5th Cir. 1992).

Denial of Defendants' motions as premature also is required under Fed. R. Civ. P. 56(d). *See generally* Ex. 52, Youngwood Decl. Rule 56(d) authorizes the court to "defer considering [a summary judgment motion] or deny it" where the nonmovant demonstrates, through an affidavit or declaration, that additional discovery is necessary. In the Fifth Circuit, relief under Rule 56(d) is "broadly favored and liberally granted" in order to "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Culwell v. City of Fort Worth*,

468 F.3d 868, 871 (5th Cir. 2006); *QBE Ins. Corp. v. Legacy Condos at Gulfport Home Owners Ass'n*, 2009 WL 1844496, at *2 (S.D. Miss. June 23, 2009) ("Rule 56 presupposes that a party opposing a motion for summary judgment has had an adequate time for discovery"). Even if an early summary judgment motion "superficially seems to be a strong candidate," relief under Rule 56(d) should be granted because "discovery digs subsurface and may unearth facts that tend to support the contrary conclusion." *Doe v. Abington Friends School*, 480 F.3d 252, 259 (3d Cir. 2007).

In the Fifth Circuit, Rule 56(d) motions "should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of evidence." *Wichita Falls*, 978 F.2d at 919 n.4. There is no question that Plaintiffs have diligently pursued discovery during the recently-concluded class certification discovery period. Ex. 52, Youngwood Decl. ¶ 7. Indeed, in her Order granting Plaintiffs' motion for a 30-day extension of the class certification discovery period, Judge Anderson expressly found good cause for the extension on the basis that "no party has been less than diligent in prosecuting its claims or defenses." Jan. 18, 2018 Order, at 1 (ECF No. 169). In compliance with the CMO, Plaintiffs focused their discovery efforts on class certification-related issues, based on the understanding that merits discovery would follow after the Court's ruling on Plaintiffs' Motion for Class Certification. *See* Ex. 52, Youngwood Decl. ¶¶ 8-14. This should suffice to demonstrate Plaintiffs' entitlement to relief under Rule 56(d). *See*, *e.g.*, *E.E.O.C. v. New Mexico*, 2016 WL 9819540, at *2 (D.N.M. Aug. 10, 2016) (granting relief under Rule 56(d), and noting that "[t]he Court finds it odd that [movant] agreed to the Phase I discovery, but then two days later filed the Partial Summary Judgment Motion based on issues to be addressed by the Phase I discovery and subsequently opposes [nonmovant's] request to complete the Phase I discovery before responding to the Partial

13

Summary Judgment Motion.").

In compliance with the CMO, Plaintiffs appropriately concentrated their resources during class certification discovery on the existence and nature of the MCSD's policies, customs and practices— the issue primarily relevant to the core class certification issue of commonality under Fed. R. Civ. P. 23(a)(2). See Ex. 52, Youngwood Decl. ¶¶ 8-14. Because of the limited time allotted for class certification discovery, and in expectation that the Court would issue a new case management order upon resolution of Plaintiffs' entitlement to class certification, Plaintiffs did not take comprehensive written discovery and deposition testimony regarding the merits of the Named Plaintiffs' specific claims concerning the MCSD's deprivations of their constitutional rights. *See id.* ¶¶ 8-9. For example, Plaintiffs did not depose all of the MCSD personnel known to have information relevant to the unconstitutional treatment of Named Plaintiffs during their individual encounters with MCSD personnel, given the merits-based focus of such discovery. *Id.* ¶ 9. Moreover, in deposing the MCSD deputies who had involvement in the Named Plaintiffs' specific incidents alleged in the Complaint, Plaintiffs focused their questioning on issues relevant to class certification. *Id.* Thus, Plaintiffs would recall such witnesses in the merits phase for further questioning on Plaintiffs' specific allegations. *Id.* Such additional discovery is necessary to develop the facts relevant to these incidents.

Plaintiffs also focused their efforts on noticing and taking depositions on issues primarily relevant to class certification, with the understanding that additional depositions focused on merits-based issues would be taken at the appropriate stage of the litigation. *See* Ex. 52 Youngwood Decl. ¶¶ 8-12. The expedited nature of class certification discovery also required Plaintiffs to conduct depositions early during the class certification phase, with Plaintiffs commencing depositions in late October 2017. *See id.* ¶¶ 10-11. Plaintiffs deposed numerous

important witnesses, including Sheriff Tucker and Chief Deputy Williams, before Defendants had substantially completed their document productions. *See id.*[3] Plaintiffs also identified additional witnesses whose testimony would be probative of the issues based on materials produced in later document productions, as well as the deposition testimony of many of Defendants' late-deposed witnesses. *See id.* ¶¶ 10-12. Plaintiffs were constrained in their ability to recall previously-deposed witnesses or notice additional depositions because of the limited time available for class certification discovery. *Id.* Plaintiffs should be afforded the opportunity to depose additional witnesses and further question previously-deposed fact witnesses, with a focus on merits-related issues and with the benefit of full and complete discovery of Defendants. *See id.* ¶¶ 8-12.

At this stage, Plaintiffs have established their ability to fairly and adequately represent the interests of the putative class under Fed. R. Civ. P. 23(a)(4). *See* Mem. of Law in Support of Pls.'

---

[3] For example, on November 22, 2017, Defendants produced a copy of a MCSD Narcotics Unit Case File Cover Sheet from the files of MCSD officers with three pre-filled columns in an otherwise blank form: "arrested" for disposition, "black" for race, and "male" for sex. *See, e.g.,* Ex. 70, Email from J. Mangino, at MC – Emails 217. This document was produced *weeks* after Plaintiffs had deposed Captain Tommy Jones, the head of the MCSD Narcotics Division, without the benefit of such discovery. *See* Not. of Depo. of Tommy Jones (ECF No. 42); Ex. 52, Youngwood Decl. ¶ 11. Similarly, after the Court granted Plaintiffs' opposed request for leave from the Court to serve a subpoena on former Madison County Sheriff Toby Trowbridge, by means other than personal service, on February 13, 2018, Plaintiffs deposed former Sheriff Trowbridge. *See id.* at ¶ 12. Former Sheriff Trowbridge testified that, during the time he was Sheriff, MCSD personnel, including himself and now-Sheriff Tucker, used the racial slur "nigger" while on duty and MCSD personnel used racial slurs "in passing." *See infra.* 25. As the class certification-related discovery deadline was February 16, 2018, Plaintiffs did not have the opportunity to take additional discovery of now-Sheriff Tucker or any other MCSD personnel on former Sheriff Trowbridge's testimony concerning MCSD personnel's use of such racial slurs while on duty. Such additional deposition testimony could elicit facts supporting Defendants' policies and practices of intentional discrimination, which would be highly relevant to any summary judgment determination by this Court. In addition, until former Sheriff Trowbridge's deposition, Plaintiffs were not previously aware of former Chief Deputy Eddie Belvedresi's involvement in putting together the majority (if not all) of the MCSD policies and procedures in place during former Sheriff Trowbridge's administration (and which remained in place during Sheriff Tucker's administration); thus, Plaintiffs also should have the opportunity to depose Mr. Belvedresi. *See, e.g.,* Ex. 23, Trowbridge Tr. 22:23-25:15; Ex. 52, Youngwood Decl. ¶ 12.

15

Mot. for Class Cert. (ECF No. 232) at 40-42. However, the scope of discovery relevant to the merits of Plaintiffs' claims is necessarily different. That Plaintiffs have diligently conducted class certification discovery does not and cannot mean that discovery is complete. *See Kurtz*, 321 F.R.D. at 507 (holding motion for summary judgment in abeyance where "the parties have conducted sufficient discovery for the court to rule on class certification, but not enough to decide summary judgment"); *Wesley Health System, LLC v. Forrest County Bd. Of Sup'rs*, 2013 WL 2244319, at *2 (S.D. Miss. May 21, 2013) (granting plaintiff's Rule 56(d) motion and denying defendants' motion for summary judgment where "[t]he facts of th[e] case are not fully developed, and [p]laintiff should have the opportunity to develop those facts through the use of discovery"). Because the additional discovery that Plaintiffs seek is a direct result of the bifurcated discovery process imposed in this action at Defendants' request, and "is germane to the pending summary judgment motion[s]," *Wichita Falls*, 978 F.2d at 920, the Court should deny Defendants' summary judgment motions under Fed. R. Civ. P. 56(d).

## II.   DEFENDANTS' CHALLENGE TO PLAINTIFFS' EQUAL PROTECTION CLAIMS FAILS

Defendants are not entitled to summary judgment on Plaintiffs' Equal Protection claims. As a threshold issue, Defendants' claim that Plaintiffs have "no evidence" for these claims is so conclusory that it fails to meet their initial burden of production. Defendants' motion also fails on the merits, because class certification discovery has uncovered substantial evidence of Defendants' Policing Policy of profiling Black persons and targeting predominantly-Black communities in Madison County, as well as substantial evidence that this policy has a disparate impact on Black persons and is, at least in part, motivated by discriminatory intent.

### A.   <u>Defendants' Motions Fail To Carry Their Initial Burden Of Production Regarding The MCSD's Policy Of Intentional Discrimination</u>

Defendants move for summary judgment on the grounds that Plaintiffs have failed to

offer evidence of a policy of intentional discrimination. *E.g.*, Thomas Mem. at 2; Blackmon

Mem. at 2. Defendants' motions should be denied for the threshold reason that Defendants have

failed to carry their initial burden of production, which cannot be satisfied by "mere conclusory

statement[s] that the other side has no evidence" to support its claims. *Ashe*, 992 F.2d at 544; *see*

*also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115-16 (2d Cir. 2017)

("[U]nless the moving defendant cites portions of the record that show its entitlement to

judgment, an assertion by the defendant that the plaintiff 'has not produced any evidence,'

without more, does not show that the plaintiff has insufficient evidence. Such a statement fails to

show either that there is no genuine dispute as to any material fact or that the defendant is

entitled to judgment as a matter of law").

      Defendants' motions evince no attempt to engage with the record in this case. Instead,

Defendants simply assert, in conclusory fashion, that Plaintiffs "offer[] no evidence to support

[their] allegation[s]" of a policy of racial discrimination.[4] All Defendants present as support for

this claim is deposition testimony in which Plaintiffs testify that they believe, based on their

personal experience, that the MCSD engages in widespread racial discrimination.[5] Defendants,

ignoring the rest of the record, then proclaim that such subjective belief is insufficient.[6] This

failure to meet their burden of production in this regard justifies denial of Defendants' motions.

      *Lopez v. City of Dallas*, 2006 WL 1450520 (N.D. Tex. May 24, 2006), is instructive. In

*Lopez*, the municipal defendant argued that summary judgment should be granted "because

---

[4] *See, e.g.*, Thomas Mem. 5; Tucker Mem. 7; Blackmon Mem. 9; Brown Mem. 8; Manning Mem. 2; Smith Mem. 10; Singleton Mem. 6.

[5] *See* Brown Mem. 7; Smith Mem. 8-9; Tucker Mem. 10-11; Thomas Mem. 5-6; Singleton Mem. 6; Blackmon Mem. 9; Manning Mem. 7-8.

[6] *See* Brown Mem. 8; Smith Mem. 9; Tucker Mem. 11; Thomas Mem. 6-7; Singleton Mem. 6; Blackmon Mem. 7, 9; Manning Mem. 7-8.

'[p]laintiffs have no evidence that the City applied or withheld, with discriminatory intent, federal funds of which they were the intended beneficiaries.'" *Id.* at *11. The court rejected this argument, finding that "instead of presenting a nuanced discussion explaining why [p]laintiffs had no evidence of intentional discrimination, the City simply proclaimed, without pointing to any support, that Plaintiffs had no evidence that the City applied or withheld, with discriminatory intent, federal funds of which they were the intended beneficiaries." *Id.* at *12 (denying City's summary judgment motion where "City did not discharge its initial summary judgment burden").

The same is true here. The "party seeking summary judgment always bears the initial responsibility" of identifying the portions of the record which "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Defendants' conclusory assertions that Plaintiffs "fail to prove" their claims do not rise to the level of a "discussion explaining why Plaintiffs had no evidence of intentional discrimination." *Lopez*, 2006 WL 1450520, at *12. Because Defendants have failed to meet their initial burden of production, this Court need look no further to deny Defendants' motions for summary judgment.

## B.   Plaintiffs Have Presented Substantial Evidence Of Defendants' Unconstitutional Policing Program

Should the Court choose to consider Defendants' motions on their merits, the Court should deny the motions. The evidence developed thus far in class certification discovery—including statistical and anecdotal evidence, as well as testimonial evidence adduced from both Defendants and third parties—demonstrates that the MCSD implements and enforces an unwritten policy, or longstanding custom and practice, of racially profiling Black individuals and disproportionately targeting Madison County's Black communities through roadblocks, pedestrian stops, and other aggressive tactics that deprive Plaintiffs, as well as the members of the class and subclasses Plaintiffs seek to represent, of equal protection of the laws (the "Policing

Program"). *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978) (local government units liable under 42 U.S.C. § 1983 for constitutional deprivations visited pursuant to government's policy, practice or custom). This evidence more than suffices to raise material disputed issues of fact regarding whether Defendants acted with a discriminatory purpose and whether any policy of the MCSD has a disparate impact on Black persons.[7]

A plaintiff challenging law enforcement policies on Equal Protection grounds must show "both that the ... system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Consideration of race need not be the "dominant or primary" purpose of a policy for it to be discriminatory. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Rather "a finder of fact must determine whether a discriminatory purpose was 'a motivating factor' in the policy." *Ortega Melendres v. Arpaio*, 836 F. Supp.2d 959, 986 (D. Ariz. 2011), quoting *Arlington Heights*, 429 U.S. at 266. In *Arlington Heights*, the Supreme Court identified a non-exhaustive list of areas of inquiry where the Court may find evidence of discriminatory intent: (1) discriminatory impact; (2) historical context; (3) the sequence of events leading to the challenged conduct; (4) substantive and procedural departures from norms; and (5) contemporary statements of decisionmakers. 429 U.S. at 266-68.

"Because direct evidence of discriminatory purpose is rarely available, courts must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Miller v. City of Dallas*, 2002 WL 230834, at *3 (N.D. Tex. Feb. 14, 2002) (quoting *Arlington Heights*, 429 U.S. at 266). The Fifth Circuit has recognized that "neutral reasons can and do

---

[7] The same factors are relevant to both Plaintiffs' Equal Protection claims brought via 42 U.S.C. § 1983 and Plaintiffs' claims under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). Plaintiffs therefore address these causes of action jointly herein.

mask racial intent," and that therefore, "[t]o require direct evidence of intent would essentially give [government actors] free rein to racially discriminate … so long as they proffer a seemingly neutral reason for their actions." *Veasey v. Abbott*, 830 F.3d 216, 235-36 (5th Cir. 2016); *see also Petrello v. City of Manchester*, 2017 WL 3972477, at *7 (D.N.H. Sept. 7, 2017) ("In a typical case where a plaintiff tries to establish a police department's custom or practice under *Monell*, there is no documentary evidence, or 'paper trail,' that contains an express directive to the officers to do the very thing which the plaintiff alleges is unconstitutional."). Because of its fact-intensive nature and the credibility determinations it entails, resolution of the question of whether Defendants' policies are motivated, at least in part, by racial intent, "is best conducted by a finder of fact at trial, not by the court at summary judgment." *Ortega-Melendres*, 836 F. Supp. 2d at 988.

As set forth below, the MCSD maintains a policy or custom of profiling Black persons and targeting predominantly-Black communities in Madison County. This policy has a disparate impact on Black persons and is, at least in part, motivated by discriminatory intent. The policy therefore violates the Equal Protection Clause.

### 1. Substantial Evidence Demonstrates That The MCSD Disproportionately Targets Black Persons

The evidence demonstrates that the MCSD polices Madison County in a manner that has a disparate impact on Black persons. While Black persons represent only 38% of Madison County's population, they accounted for over 77% of all arrests made by the MCSD between January 1, 2012 and September 20, 2017, as well as 72% of all citations made by the MCSD between January 2012 and December 31, 2017. Ex. 2, Guha Decl. ¶¶ 10, 13, 19. Nearly 76% of arrests made by the MCSD at roadblocks, and 74% of the arrests made by the MCSD at traffic stops, between January 1, 2012 and September 20, 2017 were of Black individuals. *Id.* ¶¶ 32, 36.

Moreover, while the MCSD has jurisdiction throughout Madison County, Defendants have acknowledged that the MCSD primarily operates in the city of Canton, the town of Flora, and the unincorporated areas of the county. Ans. ¶ 9. This is where most of the Black population in the county resides. Ex. 56 (Census data), at 56.1-56.4; Ex. 1, Ricchetti Rep. Ex. 3. The evidence also shows that the MCSD's policing efforts in the majority-white cities of Madison or Ridgeland, which the MCSD claims to police only in "limited circumstances" (Ans. ¶ 48), includes a special focus on the majority-Black southeast corner of Ridgeland, where the MCSD regularly sets up vehicular roadblocks near the entrances of majority-Black apartment complexes. *See* Ex. 42, Hollins Decl. ¶ 2; Ex. 43, A. Howard Decl. ¶¶ 2-3.

Statistical analysis of the MCSD's self-reported data confirms that the MCSD targets Madison County's Black communities through vehicular roadblocks. The expert report of Bryan Ricchetti, Ph.D., demonstrates that the MCSD disproportionately conducts roadblocks in substantially-Black areas of the county, even when adjusted for factors such as the rate of DUIs and the incidence of traffic violations. *See* Ex. 1, Ricchetti Rep. ¶¶ 52-53. Dr. Ricchetti determined that there is a statistically significant and positive correlation between the percentage of Black residents in a census tract in Madison County and the rate of roadblocks in that tract. *Id.* § 2.2. He found that on average, the per capita rate of roadblocks in substantially Black census tracts is nearly double that of predominantly white census tracts. *Id.* ¶ 39.

This statistical evidence is corroborated by Plaintiffs' testimony that they rarely, if ever, see a roadblock in white areas. *See* Ex. 3, Blackmon Tr. 141:11-142:1 ("[T]his issue with [roadblocks] is, is that they are disproportionately set up in the predominantly African-American areas of town."); Ex. 10, B. Tucker Tr. 17:4-6; Ex. 4, L. Brown Tr. 82:7-12. The MCSD's targeting of Black communities through vehicular roadblocks is also borne out by the long

history of complaints and protests against the MCSD's disproportionate placement of roadblocks in Black neighborhoods, *see infra* 27-29, and by Defendants' own admission that they establish roadblocks near "apartment complexes and housing projects in predominantly Black neighborhoods in both Madison County and the City of Canton," ostensibly in responses to requests from apartment managers and business owners. Ans. ¶ 3; *see also* Ex. 24, R. Tucker Tr. 161:15-20. Indeed, the record is replete with evidence of the MCSD conducting roadblocks at or near the entrances to majority-Black apartment complexes as a crime control measure. *See* Ex. 57, MC-RFP-Inc. Rep. 010886 (MCSD "established a safety checkpoint at [the Canton Estates apartment complex] to check for out standing [sic] warrants and other violations."); Ex. 58, MC-RFP 10-42(1) (Oct. 31, 2017 request from apartment manager for a "random road block in our area" as a "preventative measure"); Ex. 22, R. Thompson Tr. 20:19-21:13 (agreeing that "general crime prevention" is the "primary purpose" of MCSD's roadblocks); Ex. 19, Squires Tr. 171:10-172:4 (deterring crime is "definitely" a purpose of roadblocks); Ex. 16, T. Jones Tr. 210:25-211:12 (roadblocks are set up as a "crime deterrent") Ex. 17, Moore Tr. 159:2-4 ("Q. Now, with regard to roadblocks, what's the purpose of a roadblock? A. To prevent crime.").

Evidence concerning the MCSD's "apartment detail" unit, now known as the "Neighborhood Enforcement" or "Neighborhood Enhancement" team (the "<u>NET Team</u>"), also demonstrates that the MCSD targets Black communities in Madison County. The "apartment detail," was created in 2008 as a rotating unit of plainclothes deputies in unmarked cars, specifically deployed to patrol majority-Black apartment complexes in the Canton area. *See* Ex. 20, D. Smith Tr. 34:22-24, 42:22-25, 47:5-24, 65:21-24. In 2015, it was converted into a full-time unit and given additional responsibilities, but Defendants' records make clear that targeting the apartment complexes remained a priority. *See* Ex. 59, Mar. 3, 2015 Email (The permanent

NET Team was established as a "special, fulltime, undercover, two-man detail ... to help assist the shift deputies and thwart the ongoing violence inside these Canton Apartment Complexes."); Ex. 27, Williams Tr. 257:10-20. The apartment detail, and now the NET Team, conduct special "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits. *See* Ex. 20, D. Smith Tr. 35:25-36:3. On these patrols, MCSD deputies engage in searches and seizures of Black pedestrians without reasonable suspicion or probable cause, including stops of pedestrians who have to pass through MCSD roadblocks to enter or exit their apartment complexes. *See* Section IV, *infra*.

This evidence, taken together, is more than sufficient to demonstrate the existence of disputed issues of material fact regarding whether the MCSD has a policy of racially profiling and targeting Madison County's Black citizens for stops, searches and/or seizures on the basis of their race. *See Floyd v. City of New York*, 813 F. Supp. 2d 417, 447-48 (S.D.N.Y. 2011) (finding, *inter alia*, parties' dispute over "whether, in fact, there is a widespread practice of unconstitutional stops and frisks" presented issue of fact precluding summary judgment).

### 2. Disputed Issues Of Material Fact Exist As To Whether The MCSD's Policing Program Is Motivated By Racial Discrimination

The evidence also demonstrates that disputed issues of material fact exist regarding whether the MCSD's Policing Program is based, at least in part, on impermissible racial considerations. This includes (a) evidence of the use of, and approval of, racial epithets by Defendants and their circulation of materials reflecting racially discriminatory attitudes; (b) evidence of pervasive harassment and discriminatory conduct by MCSD personnel; (c) evidence that Defendants regularly fail to take action in response to complaints of race discrimination; and (d) statistical evidence demonstrating substantial, persistent racial discrepancies in the MCSD's policing practices.

(a)   <u>Defendants' Use And Endorsement Of Racially-Charged Language</u>

The use of racial epithets or racially charged language, or endorsement and dissemination of racially discriminatory materials is highly probative circumstantial evidence of racial animus. The evidence developed by Plaintiffs of Defendants' use and endorsement of racially charged and derogatory statements creates disputed issues of material fact as to whether the disparate impact of the MCSD's policies on Madison County's Black communities is, at least in part, the result of a discriminatory purpose. *See, e.g.*, *DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000) ("[T]he use of racially derogatory language … is strong evidence of racial animus, an essential element of any equal protection claim."); *Roe v. Cal. Dep't of Developmental Servs.*, 2017 WL 2311303, at *10 (N.D. Cal. May 26, 2017) ("[T]he use of epithets may constitute 'strong evidence of racial animus.'"); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("The use of an epithet is therefore strong evidence that a comment or action is racially motivated.").[8]

Sheriff Toby Trowbridge, Sheriff Tucker's predecessor who held office from 2001 until 2012, testified that during his tenure as Sheriff MCSD personnel, including himself and now-Sheriff Tucker, used the racial slur "nigger" while on duty. Ex. 23, Trowbridge Tr. 78:6-13, 90:10-91:4. According to Sheriff Trowbridge, MCSD personnel used racial slurs "in passing, maybe in conversation or walking down the hall or walking across a parking lot or whatever." *Id.*

---

[8] Defendants cite *Bramer* for the proposition that merely hearing a racial epithet, without more, does not deprive a person of equal protection of the laws. *See* Thomas Mem. 7. As both the *Bramer* court and other courts have recognized, however, this in no way indicates that a state actor's use of racial epithets is not important evidence of racial animus. *See Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) (noting that *Bramer* had "impliedly held that racial epithets *that accompany harassment or a violation of established rights* may amount to a separate equal protection violation") (emphasis added); *DeWalt*, 224 F.3d at 612 n.3 (discussing *Bramer* and explaining that "although the use of racially derogatory language, by itself, does not violate the Constitution, it can be quite important evidence of a constitutional violation").

96:24-97:2.[9] Sheriff Trowbridge never disciplined any deputy for using racial slurs. Ex. 23, Trowbridge Tr. 91:25-92:3.

Indeed, casual racial discrimination was so accepted at the MCSD that in 2009, a blatantly racist email entitled "White Pride" circulated among many of the MCSD's most senior members, including Trowbridge's chief deputy and Sheriff Tucker himself. Ex. 60, June 5, 2009 Email. The email, sent exclusively to white officers, contains such lines as, "when I call you Nigger, Kike, Towel head, Sand-nigger, Camel Jockey, Beaner, Gook, or Chink …You call me a racist." *Id.* The email expressly condones police brutality towards Black citizens by stating, "[y]ou rob us, carjack us, and shoot at us. But when a white police officer shoots a black gang member or beats up a black drug dealer running from the law and posing a threat to society, you call him a racist." *Id.* The "White Pride" email is so overtly racist that even Sheriff Trowbridge, who found nothing problematic about his deputies' use of the epithet "nigger," testified that he "didn't condone" such material. Ex. 23, Trowbridge Tr. 79:16-18. Sheriff Tucker's chief deputy similarly testified that the "White Pride" email is "not very ethical." Ex. 27, Williams Tr. 195:15.

The "White Pride" email concludes by encouraging the reader to "BE PROUD TO BE WHITE!" and express support for its sentiments by forwarding it along. Ex. 60, June 5, 2009 Email. Now-Sheriff Tucker followed these instructions by forwarding the email to seven of his MCSD colleagues and personal contacts. *Id.*; Ex. 24, R. Tucker Tr. 43:11-44:11. Courts have relied on similar evidence in determining that summary judgment should be denied in Section 1983 cases involving a policy of racial discrimination. *See, e.g.*, *Ortega-Melendres*, 836 F. Supp.

---

[9] Sheriff Tucker denies hearing or using racial slurs used at the MCSD. Ex. 24, R. Tucker Tr. 269:13-21. The conflict between Sheriff Tucker's testimony and that of his predecessor in office itself creates a factual dispute that this Court cannot resolve on a paper record. In any event, self-serving denials of racial animus are given little weight at the summary judgment stage. *See, e.g.*, *Zeigler v. Town of Kent*, 258 F. Supp. 2d 49, 56 (D. Conn. 2003) (giving little weight to affidavits denying racial motivation because "[i]t is the rare case, indeed, where a defendant would admit to having acted with racial animus").

2d at 986 (finding sheriff's forwarding of racially discriminatory emails within department, and endorsement of racially discriminatory emails from constituents, to be evidence of discriminatory intent supporting denial of defendants' summary judgment motion).

As Paul Griffin, the sole Black member of the Madison County Board of Supervisors, testified, this pervasive climate of racism still exists in Madison County. Ex. 13, Griffin Tr. 62:22-63:3 ("It's racism all around."). The evidence indicates that the racist attitudes reflected in the "White Pride" email still persist among high-ranking MCSD personnel. M/Sgt. Joseph Butler, the individual who first sent the "White Pride" email, is a supervisor in the MCSD's Patrol unit. Ex. 24, R. Tucker Tr. 42:23-43:10. Other officers to whom Sheriff Tucker forwarded the email currently hold the positions of Master Sergeant in Patrol and Captain of Narcotics. *Id.* at 43:11-44:11. The late Terry Barfield, who served as Captain of Investigations until his death in 2017, also used the term "nigger" while on duty. Ex. 23, Trowbridge Tr. 90:16-18, 92:4-7. Similarly, Will Weisenberger, also a Patrol supervisor, testified that he has used the term "nigger" in the course of his official duties, that other MCSD personnel also use the term while on duty, and that he had never been disciplined for his use of racial slurs. Ex. 26, Weisenberger Tr. 132:2-133:11.

Sheriff Tucker has also himself recently made and endorsed racially charged remarks and "'camouflaged' racial expressions," *Smith v. Town of Clarkson*, 682 F.2d 1055, 1063 (4th Cir. 1982), since taking office. For example, in a January 2016 interview regarding a dispute with Kenneth Stokes, a Jackson city councilman, Sheriff Tucker referred to Jackson residents as Mr. Stokes' "thug constituents" and stated that Stokes was "setting his race back by implicating a race issue."[10] Around this same time, a Madison County resident emailed Sheriff Tucker, "I'm

---

[10] Ex. 61, *Madison sheriff responds to Jackson councilman's remarks*, THE CLARION-LEDGER (Jan. 4, 2016), https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/, at 1:50-57, 4:46-50.

curious if Mr Griffin is related to Kenneth Stokes since their language is similar (dis, dat, dees, and doez)." Ex. 62, Jan. 18, 2016 Email. Sheriff Tucker replied, "I wholeheartedly agree with you on mr griffin." *Id.*[11]

(b)    The MCSD Has Made No Efforts To Remedy Racially Discriminatory Practices

Defendants have consistently failed to address complaints regarding their violation of Black residents' constitutional rights, whether raised by community groups or individual citizens. *See Floyd*, 813 F. Supp. 2d at 452-53 (finding that the inadequacy of efforts to reduce the racial disparity of stops amounted to evidence of discriminatory intent); *Johnson v. City of Hammond*, 2016 WL 1244016, at *2 (N.D. Ind. Mar. 29, 2016) (denying motion to dismiss Section 1983 claim where municipality allegedly "authorized its police chief's knowing failure to train his officers not to engage in racial profiling and making false arrests"). Defendants have also failed to take any steps to ensure that MCSD deputies police in a race-neutral manner or to change the MCSD's culture of discrimination..

Sheriff Tucker spent approximately 10 years as the MCSD's Chief of Narcotics while Sheriff Trowbridge was in office. Ex. 24, R. Tucker Tr. 81:22-83:10. During Sheriff Trowbridge's administration, Black citizens repeatedly protested the MCSD, in particular its practice of establishing roadblocks primarily in majority-Black areas.[12] For example, in 2006, a group of Canton residents presented a petition bearing 664 signatures to the Madison County

---

[11] At his deposition, Supervisor Griffin testified that, in his view, the email from the Madison County resident expressed racist sentiment. Ex. 13, Griffin Tr. 82:22-82:24.

[12] *See, e.g.*, Ex. 63, *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008) (noting that Trowbridge has "been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling"); Ex. 64, *Is system fair?*, THE CLARION-LEDGER (July 22, 2007) (Supervisor Griffin stating that the MCSD was perceived as targeting Black community members); Ex. 13, Griffin Tr. 123:22-124:3 (Q: "Do you think that the Concerned Citizens of Canton, their concerns about frequent roadblocks in the predominantly black areas … had merit?" A: "Yes.").

Board of Supervisors demanding an end to "frequent roadblocks in the predominantly black neighborhoods" and "racial profiling."[13] In 2007, Karl Banks, a Black member of the Board of Supervisors, stated "there is a real feeling in the community that the department is discriminating against people," and that these concerns were not being addressed.[14] Trowbridge refused to meet with aggrieved Black residents, later testifying that he "felt like everything was going the way it should be." Ex. 23, Trowbridge Tr. 103:8-14. And, in 2009, a panel of the state legislature considered a law prohibiting racial profiling. While the former chiefs of police of Ridgeland and Canton both testified that racial profiling is a significant problem, Sheriff Trowbridge refused to attend, claiming that legislators were "wasting people's time and money" by debating the bill.[15]

When he ran for office, Sheriff Tucker knew of the complaints and protests concerning the MCSD's racially discriminatory policing practices under Sheriff Trowbridge's administration. Ex. 24, R. Tucker Tr. 104:22-105:7, 280:13-24. Nonetheless, Sheriff Tucker pledged to "maintain the quality of law enforcement that we have under Sheriff Trowbridge," and upon taking office, officially adopted all of Trowbridge's policies.[16] Numerous deputies testified that Tucker did not implement new policies that changed the culture of the MCSD. *See, e.g.*, Ex. 21, Sullivan Tr. 90:16-21; Ex. 12, Flax Tr. 89:6-8; Ex. 28, Wilson Tr. 42:7-23.

---

[13] *See, e.g.*, Ex. 65, *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006); Ex. 13, Griffin Tr. 122:21-125:24.

[14] Ex. 66, Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007); Ex. 13, Griffin Tr. 117:10-118:11.

[15] Ex. 67, Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, THE CLARION-LEDGER (Jan. 14, 2009).

[16] *Id.* 96:7-97:5; Ex. 68, *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011); *see also* Ex. 69, Memorandum from Sheriff Tucker to All Deputies/Employees (Jan. 3, 2012).

(c)     Black Residents Of Madison County Are Routinely Subject To
        Racial Discrimination By MCSD Personnel

While the intent of the policymaker, rather than subordinate officers, is the key inquiry, evidence of a widespread pattern of behavior is probative of whether a policy or custom of discrimination exists for which municipal defendants can be held liable. *See, e.g.*, *Petrello*, 2017 WL 3972477, at *8 (where "incidents were widespread and … involved many different officers," plaintiff had presented evidence of custom or policy to "satisf[y] the threshold test for *Monell* liability"). As discussed below, Black individuals often encounter racial animus while interacting with MCSD personnel. The evidence Plaintiffs have developed regarding this pervasive pattern of misconduct and harassment creates further disputed issues of material fact regarding Defendants' discriminatory purpose.

Plaintiff Bessie Thomas has testified that when she tried to speak to an MCSD deputy during a roadblock the deputy started cursing at her that he didn't "give a damn" about what she had to say and that he didn't want to "hear that damn stuff." He told her "I've got too many other folks over here, all these niggers over here." Ex. 9, Thomas Tr. 68:19-23. Class member Quincy Smith similarly attested that at a traffic stop, he witnessed a white MCSD deputy tell a Black MCSD deputy that he wasn't "going to help a nigger out" by letting a driver go without a ticket. Ex. 48, Q. Smith Decl. ¶ 14. Class member Montreal Tillman was told by an MCSD deputy that if the deputy had "not taken anger management classes, [he] would drag [Tillman's] black ass up and down the street." Ex. 51, Tillman Decl. ¶ 23. Other class members have testified that MCSD deputies have stopped Black drivers at roadblocks while waving white drivers through. *See* Ex. 47, Mitchell Decl. ¶ 9; Ex. 42, Hollins Decl. ¶¶ 4-5 (stating that a MCSD officer explained that he was waving white drivers through a roadblock because they were "good people"). Numerous class members have attested to being stereotyped as gang members and drug dealers by MCSD

personnel.[17] Others testified that they have been subjected to lengthy, intrusive, and even violent

traffic stops.[18] Plaintiff Bessie Thomas testified that MCSD deputies treat Black citizens "with

no respect. ... The way they talk to you, it's like they look down on you. They are unconcerned

about what you tell them." Ex. 9, Thomas Tr. 68:24-69:13; *see also* Ex. 6, Q. Manning Tr. 46:2-

22 (MCSD deputy "wasn't talking to me as if I was a person. ... He asked me why the hell did I

pull over in this driveway and where is my damn license and registration.").

Indeed, the MCSD's own paperwork confirms that it targets Black citizens for arrest. In

the course of discovery, Defendants produced to Plaintiffs templates of forms that deputies fill

out in the course of their duties. Defendants produced copies of one such form, the case file

cover sheet for the narcotics unit, from the files of MCSD officers. The form is blank, except for

three items that appear pre-populated: "black"; "male"; and "arrested." *See* Ex. 70, MC-EMAILS

- 217.

---

[17] Class member Lisa Jones, a 46-year-old woman and mother of three, was asked at a roadblock if her license plate meant she was part of a gang. Her license plate had the letters "B," "A," and "D," which are her children's initials. Ex. 45, L. Jones Decl. ¶¶ 23-24. An MCSD deputy repeatedly referred to class member Terrance Thompson as a "Black dope boy," even though he had no drugs in his possession when he was stopped. Ex. 50, T. Thompson Decl. ¶¶ 12-15. Quincy Smith was stopped at a roadblock at the entrance to his apartment; the MCSD deputy immediately asked "where are the drugs?" Ex. 48, Q. Smith Decl. ¶ 6. *See also* Ex. 47, Mitchell Decl. ¶ 4 ("They always talk to me as though I am a criminal. They immediately start asking about drugs in my car. At one roadblock, the deputy said to me, 'I know you have something.'"); Ex. 41, Davis Decl. ¶¶ 7-8 (MCSD deputy repeatedly accused class member Rasheid Davis of "smoking dope" during a roadblock, even after he passed a sobriety test).

[18] For example, in 2016, class member John Spann was pulled over by the MCSD for allegedly "bumping the lines." Ex. 49, Spann Decl. ¶ 12. The officers asked him whether he had outstanding warrants or prior offenses, or whether there were drugs or weapons in his car, and demanded that he search his own car while they watched. *Id.* at ¶¶ 8-10. The search turned up nothing, but it nonetheless took 45 minutes for the deputies to leave the scene. *Id.* ¶¶ 4, 10. Similarly, even though class member Quincy Smith was a passenger, the MCSD required him to take a breathalyzer test. Ex. 48, Q. Smith Decl. ¶ 13. And, in 2012, an MCSD officer believed that he saw Michael Bracey driving without a seatbelt as Mr. Bracey was about to pull into his driveway. Ex. 37, Bracey Decl. ¶¶ 3-10. The officer followed Mr. Bracey onto his property, screamed at him to get on the ground, placed his gun to the back of his head, and handcuffed him. *Id.* The officer then searched Mr. Bracey and his car, and placed him under arrest. *Id.*

(d)     The MCSD Has Consistently Failed To Respond To Complaints
        Or Adequately Train Its Personnel

The evidence demonstrates that the MCSD, under Sheriff Tucker's administration, does

not train deputies to police in a race-neutral manner, or monitor deputies to prevent racial

discrimination. The MCSD does not conduct meaningful investigations of complaints, discipline

deputies for unconstitutional policing, or even evaluate deputies' performance in a transparent

manner. The MCSD also fails to maintain data or statistics showing the racial breakdown of

stops, citations, and arrests conducted by the department. These practices protect and facilitate

the MCSD's Policing Program. *See, e.g.*, *Ortega-Melendres*, 836 F. Supp. 2d at 986 (granting

partial summary judgment on certain plaintiffs' Section 1983 claims where, *inter alia*, the sheriff

acknowledged that his department "provides no training to reduce the risk of racial profiling");

*Smith v. City of Chicago*, 143 F. Supp. 3d 741, 753 (N.D. Ill. 2015) (denying motion to dismiss a

Section 1983 claim where plaintiff alleged that police department failed to train officers on racial

profiling and "failed to properly screen, train, and supervise … officers knowing that such

failures would result in Fourth and Fourteenth Amendment violations").

Sheriff Tucker testified that the MCSD does not explicitly train deputies not to use racial

slurs or racially derogatory language. Ex. 24, R. Tucker Tr. 112:9-25. Sheriff Tucker and Chief

Williams have not discussed the constitutional obligation to police in a race-neutral manner

during department-wide meetings. *Id.* 10:24-11:21; Ex. 27, Williams Tr. 22:13-21, 40:20-41:10.

The MCSD's training officer, M/Sgt. Jeffery Waldrop, testified that he developed the training

curriculum in conjunction with Sheriff Tucker. Ex. 25, Waldrop Tr. 31:10-16. M/Sgt. Waldrop

does not provide deputies with any training or testing on any policies regarding racial

discrimination. *Id*. 30:23-25, 31:8-9.[19] Nor does he train MCSD deputies on (i) how to establish

---

[19] Sheriff Tucker testified that the FBI conducted a civil rights training for detention officers and deputies.

roadblocks; (ii) when deputies may conduct searches at roadblocks and traffic stops; (iii) when

deputies may demand that a pedestrian produce his or her identification; or (iv) when they must

report a fellow officer's misconduct. Ex. 25, Waldrop Tr. 33:24-36:3, 47:23-25, 49:11-13, 49:22-

50:3, 52:14-18. The MCSD also does not provide any guidelines for deputies' exercise of their

discretionary authority. *See* Ex. 24, R. Tucker Tr. 183:23-24 ("there is no training about

discretion").

       Sheriff Tucker further testified that he does nothing to ensure that his deputies are not

profiling or targeting Madison County's Black population. *Id.* 218:14-19 ("I don't monitor

anybody to see if they're performing in a racially discriminatory manner."), 128:8-16, 135:12-21,

217:19-218:2; *see also* Ex. 27, Williams Tr. 76:3-8, 151:16-24. Sheriff Tucker is also steadfastly

opposed to the use of technology that would record his deputies' actions. Ex. 71, Jan. 8, 2016

Email (calling a proposed bill that would require the use of body cameras "utterly ridiculous");

*see also* Ex. 72, *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015);

Ex. 24, R. Tucker Tr. 175:7-14.[20] Sheriff Tucker claims that he relies on his supervising deputies

to report instances of racial discrimination. Ex. 24, R. Tucker Tr. 114:10-18. He could not recall

a single instance in the past six years in which a supervising deputy had made such a report. *Id.*

115:6-17, 128:25-129:3.

       Sheriff Tucker has made no attempt to track the MCSD's citation or arrest rates by race.

*Id.* 188:25 ("I don't prepare statistics with races."), 191:16-20; Ex. 27, Williams Tr. 57:20-22,

---

Ex. 24, R. Tucker Tr. 85:14-19. Officers did not recall what the training covered. *See, e.g.*, Ex. 15, Howard Tr. 77:3-9 ("Q: Okay. Do you recall what you learned during that training? A: No, ma'am.").

[20] Deputies have discretion to decide when to activate their in-vehicle cameras and microphones. Ex. 24, R. Tucker Tr. 180:4-25, 182:22-25. The MCSD also does not train deputies to turn on their in-vehicle cameras when they have a subject in the vehicle, such as when Sgt. Moore restrained Plaintiff Khadafy Manning in Deputy Thompson's vehicle. Ex. 27, Williams Tr. 99:4-12.

115:5-9. Sheriff Tucker testified that he has no idea whether his deputies arrest more Black

individuals than white individuals. Ex. 24, R. Tucker Tr. 228:2-11. Sheriff Tucker acknowledged

that he has access to years of records that he could use to determine arrest rates by race. *Id.*

26:25-27:12, 223:18-224:14. Yet the MCSD has never compiled such statistics because he has

no interest "whatsoever" in finding out what they would show. *Id.* 224:15-21.

Sheriff Tucker also has no established processes in place for evaluating deputies' job

performances. *Id.* 214:25-215:12; Ex. 27, Williams Tr. 177:21-178:6. Numerous deputies

testified that they have never received a performance evaluation of any kind. *See, e.g.*, Ex. 21,

Sullivan Tr. 27:11-12; Ex. 14, Hall Tr. 21:22-25; *see also* Ex. 26, Weisenberger Tr. 57:6-11

(neither he nor anyone else conducts performance evaluations of the deputies he supervises).

Deputies' performance is instead measured primarily by looking at the *quantity* of their policing,

as reflected by metrics such as the number of arrests they make and the number of citations they

issue. Ex. 24, R. Tucker Tr. 215:13-23, 216:17-23; *see also* Ex. 27, Williams Tr. 122:25-124:8

(arrest and citation statistics are "a tool to evaluate performance").

Sheriff Tucker also pays little attention to complaints of deputy misconduct. He has

delegated to Chief Williams *sole authority* to review citizen complaints and address personnel

matters. *See* Ex. 73, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 9. The evidence indicates that

Chief Williams conducts bare-bones investigations of citizen complaints, and rarely elevates

those complaints to Sheriff Tucker's attention. For example, in November 2016, class member

Destiny Jones filed a complaint against Sgt. Moore for using excessive force and falsely

arresting her at the scene of a car crash caused by a drunk driver. Ex. 74, MC-RFP 8-211-214;

Ex. 24, R. Tucker Tr. 266:7-267:19. Sheriff Tucker did not recall any investigation into her

complaint. Ex. 24, R. Tucker Tr. 265:22-266:2, 267:15-18. Chief Williams testified that he

recalled "looking into the incident" and determining not to take action, but could not remember if he "did a report or documentation of it." Ex. 27, Williams Tr. 184:10-185:14; *see also* Ex. 17, Moore Tr. 58:21-25. Chief Williams did not contact Ms. Jones. Ex. 44, D. Jones Decl. ¶ 18. Chief Williams' investigation of the June 2016 incident involving Plaintiffs Khadafy and Quinnetta Manning was even more limited. On June 26, 2016, Chief Williams learned that the Mannings claimed that a MCSD deputy had handcuffed, choked, and beaten Mr. Manning. *See* Ex. 75, MC-RFP-8-182-183. Chief Williams asked Sgt. Moore to prepare a supplemental report setting forth his account of the events, but he never questioned Moore about the incident. Ex. 17, Moore Tr. 47:4-20. At no point did Chief Williams reach out to Mr. or Ms. Manning. Ex. 27, Williams Tr. 182:21-183:6. At the conclusion of this cursory investigation, Chief Williams determined not to take any action. *Id.* 184:4-9; *see also* Ex. 24, R. Tucker Tr. 72:9-14.[21]

When allegations of racial discrimination have been brought to Sheriff Tucker's attention, he has failed to conduct meaningful investigations. For example, in June 2013, a former Madison County Detention Center officer claimed that he had been "subject to racial jokes [and] racial remarks" by his supervisor. Ex. 76, Compl., *Cooper v. Tucker*, No. 3:13-cv-350 HTW-LRA (S.D. Miss. June 7, 2013), at ¶ 7. Sheriff Tucker did not commission an investigation into these claims. Ex. 24, R. Tucker Tr. 276:12-17. And, in March 2015, Sheriff Tucker received a notarized letter from a Black couple, stating that Deputy Brad Sullivan drew his gun on the couple and their five year old daughter and stated "I've got you niggers now." Ex. 77, MC-RFP-8-29. The letter complained of "systematic racism" and requested a "thorough

---

[21] Sheriff Tucker testified that he believed Chief Williams' investigation was adequate, and that Sgt. Moore had not violated any MCSD policies or procedures. Ex. 24, R. Tucker Tr. 243:4-7, 244:17-21. He testified that it was appropriate for Sgt. Moore to give the Mannings the "choice" of either providing witness statements or sleeping on a concrete floor in jail, *id.* at 239:20-241:21, incorrectly insisting that Mississippi law criminalizes witnesses' failure to report crimes. *Id.* at 235:10-15, 249:23-250:4, 264:5-18.

investigation." *Id.* at MC-RFP-8-29-30. Sheriff Tucker attempted to call the complainant, but did not reach him; he then delegated the matter to Chief Williams. Ex. 24, R. Tucker Tr. 268:6-269:8. Sheriff Tucker testified that Sullivan represented to Chief Williams that he did not use the term "niggers," and "that was the extent" of the inquiry. *Id.* 268:24-269:12.

        (e)    <u>Arrest, Citation, And Roadblock Data Also Demonstrates The Existence Of Disputed Issues Of Material Fact Regarding Defendants' Discriminatory Intent</u>

Finally, the record contains evidence of the numbers of citations and arrests of Black persons effectuated by the MCSD between the years 2012 and 2017, as well as evidence of the locations of the MCSD's roadblocks within Madison County during that same period. The substantial disparities reflected in this data, as self-reported by Defendants, provides further evidence of discriminatory intent. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). Courts recognize that such evidence of racial disparities can be probative of discriminatory purpose as well as disparate impact. *See Floyd v. City of New York*, 813 F. Supp. 2d at 452-53 ("For an Equal Protection claim, discriminatory purpose may be proven by statistics alone."); *see also Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than other than race, emerges from the effect of state action."); *Ortega-Melendres*, 836 F. Supp. 2d at 986 ("Frequent stops of minorities can serve as evidence of a discriminatory policy").

Even where statistical evidence is not alone adequate as to establish discriminatory purpose standing alone, such evidence, together with other circumstantial evidence of discriminatory intent, suffices to defeat a summary judgment motion. *See Floyd*, 813 F. Supp. 2d at 452-53 (finding that even though plaintiffs' "statistical evidence … is likely not strong enough to show discriminatory purpose standing alone," it sufficed to defeat summary judgment where

"plaintiffs have presented other proof in addition to the statistical evidence-namely, the inadequacy of the City's efforts to take remedial steps to reduce the racial disparity of stops").

*Nguyen v. Louisiana State Board of Cosmetology*, 236 F. Supp. 3d 947, 955 (M.D. La. 2017), is instructive. In *Nguyen*, the court was presented with a class of individuals of Vietnamese heritage who were owners of salons subject to regulation by the Louisiana State Board of Cosmetology ("LSBC"). Despite only owning 9% of the salons, the Vietnamese-owned salons payed between 80.1% and 91% of all the fines imposed by the LSBC over three years. *Id.* Defendants moved for summary judgment on plaintiffs' equal protection claims, and the court denied the motion, finding that the disparities were sufficiently stark that the plaintiffs could reasonably prevail at trial even if they "produce[d] no further evidence of racially discriminatory intent." *Id.* The court also rejected the defendants' arguments that the percentages of fines imposed on Vietnamese-owned salons should be viewed in terms of manicuring salons only, rather than all salons regulated by the LSBC, holding that the question of the proper comparison was a "genuine issue for trial" not properly resolved on summary judgment. *Id.* at 955-56.

This case also presents vast racial disparities in arrest and citation rates. While Black individuals represent only 38% of Madison County's population, Black individuals accounted for over 77% of all arrests made by the MCSD between January 1, 2012 and September 20, 2017, as well as 72% of all citations made by the MCSD between January 2012 and December 31, 2017. Ex. 2, Guha Decl. ¶¶ 10, 19. Nearly 76% of arrests made by the MCSD at roadblocks, and 74% of the arrests made by the MCSD at traffic stops, between January 1, 2012 and September 20, 2017 were of Black individuals. *Id.* ¶¶ 32, 36. Specifically, Black drivers represented 87% of arrests for driving with a suspended or revoked license; 83% of arrests for no proof of liability insurance; 83% of arrests for having an expired tag or no tag on a license plate; and 80% of

arrests for improper vehicle equipment for the time period between January 1, 2012 and September 20, 2017. Black drivers also accounted for 94% of arrests for a child restraint violation; 88% of arrests for a seatbelt violation; almost 85% of arrests for speeding on local highways; 77% of arrests for turning without a turn signal; and 68% of arrests for careless driving for the time period between January 1, 2012 and September 20, 2017. *Id.* ¶ 11.

The MCSD's citation statistics reflect a similar pattern. Between January 1, 2012 and December 31, 2017, Black individuals received 94% of citations for child restraint violations; 84% of citations for driving with a suspended license; 77% of citations for no proof of liability insurance; 76% of citations for following another vehicle too closely; 74% of citations for a seatbelt violation; 73% of citations for failure to yield; 71% of citations for improper vehicle equipment; 71% of citations for making an improper turn; and 63% of citations for driving with an improper tag or no tag. *Id.* ¶ 20.

The expert report of Bryan Ricchetti, Ph.D., also demonstrates that the MCSD disproportionately conducts roadblocks in substantially-Black areas of the county. *See* Ex. 1, Ricchetti Rep. ¶¶ 52-53. Dr. Ricchetti has reviewed the available data on the locations and frequency of roadblocks conducted by the MCSD and overlaid this data with Census data for Madison County. *Id.* ¶ 38, Ex. 2. In so doing, Dr. Ricchetti has determined that there is a statistically significant and positive correlation between the percentage of Black residents in a census tract in Madison County and the rate of roadblocks in that tract, even when adjusted for factors such as DUI violations and traffic citations. *Id.* § 2.2. He demonstrates that on average, the per capita rate of roadblocks in substantially Black census tracts is ***nearly double*** that of predominantly white census tracts. *Id.* ¶ 39, Ex. 3. This sizable disparity persists throughout the County even when controlling for other potential non-racial explanations. *Id.* ¶ 46, Ex. 6. Dr.

Ricchetti's analysis strongly suggests that racial bias animates the disparity in the frequency of roadblocks in predominantly Black communities.[22]

## III.   MATERIAL DISPUTED ISSUES OF FACT EXIST REGARDING THE NAMED PLAINTIFFS' ROADBLOCK CLAIMS

Defendants challenge the claims of the five Plaintiffs who have asserted causes of action under the Fourth and Fourteenth Amendments concerning the MCSD's policy or custom of disproportionately conducting vehicular roadblocks in predominantly-Black areas of Madison County (the "Roadblock Program").[23] Defendants' arguments that the MCSD's roadblocks pass muster as traffic safety measures ignore the substantial evidence that the MCSD conducts procedurally flawed roadblocks in predominantly-Black areas of Madison County for purposes of general crime control that are impermissible under settled Fourth Amendment law. Defendants' arguments that the MCSD's roadblocks do not implicate the Fourteenth Amendment ignore the evidence of racial discrimination discussed in Section II, *supra*, including the statistical evidence presented by Dr. Ricchetti that the MCSD consistently establishes roadblocks disproportionately in predominantly-Black areas of the County. This sustained pattern of racially-motivated targeting or selective enforcement violates Plaintiffs' rights under the Equal Protection Clause.

---

[22] Dr. Ricchetti's multivariate regression analyses demonstrate that even after accounting for "the fact that communities with a higher percentage of Black residents have, on average, other characteristics that are predictive of traffic behavior, such as higher rates of DUI arrests and traffic arrests and citations, lower income, higher unemployment, and younger populations, … there remains an unexplained difference in the frequency of roadblocks in communities that have a higher percentage of Black residents relative to communities with a higher percentage of white residents." *Id.* § 2.2. Courts routinely accept multivariate regressions as a reliable statistical methodology to prove racial discrimination in civil rights cases. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 293, 327-28 (1987) ("[T]his Court has accepted statistics in the form of multiple-regression analysis to prove" violations of civil rights); *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 280 (5th Cir. 2008).

[23] *See* Brown Mem. 9; Blackmon Mem. 8-9; Tucker Mem. 8-10; Thomas Mem. 5-7; Singleton Mem. 5-6.

A.   **Disputed Issues Of Material Fact Exist As To Whether The MCSD's Roadblock Program Violates The Fourth Amendment**

1.   **The MCSD Conducts Roadblocks For Crime Control Purposes**

Roadblock programs that have the primary purpose of general crime control violate the Fourth Amendment. *See Edmond v. City of Indianapolis*, 531 U.S. 32, 44 (2000). Defendants' motions assert, without citation to any record evidence, that Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment roadblock claims because "discretionless stops designed to check a driver's license and registration are permissible." *E.g.*, Thomas Mem. 6, quoting *United States v. Green*, 293 F.3d 855, 858 (5th Cir. 2002).[24] The Court cannot, however, rely on Defendants' proffered statements alone in determining the programmatic purpose of MCSD's roadblocks. *Edmond*, 531 U.S. at 45 (rejecting city's contention that "where the government articulates and pursues a legitimate interest for a suspicionless stop, courts should not look behind that interest to determine whether the government's 'primary purpose' is valid"). Rather, the Court must conduct its own evidentiary inquiry into the actual programmatic purpose of the challenged roadblocks. *United States v. Davis*, 270 F.3d 977, 981 (D.C. Cir. 2002) (holding that district court had erred in relying on the testimony of a police officer to conclude that the purpose of a roadblock was traffic safety, and remanding to district court to consider additional evidence concerning the primary purpose of a roadblock); *United States v. Bowman*, 496 F.3d 687, 102-04 (D.C. Cir. 2007) (holding that district court's finding that primary purpose of roadblock was traffic safety, as opposed to crime control, was not supported by sufficient evidence, and remanding for further "evidentiary proceedings and factual findings" to determine

---

[24] *United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993), also cited by Defendants (*e.g.*, B. Thomas Mem. 6) is inapposite. *Shabazz* did not concern "discretionless" traffic checkpoints, but rather the searches permitted during the detainment of an individual motorist who was observed speeding by the police officer. *See Shabazz*, 993 F.2d at 433, 435 ("Appellants do not argue … that the initial stop of their vehicle for speeding was improper.").

the programmatic purpose of the roadblocks); *United States v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998) (court "must determine the actual purpose" of the roadblock, which "does not necessarily pass constitutional muster simply because one of its alleged purposes was to detect intoxicated drivers").[25]

Indeed, the Fifth Circuit has held that roadblocks that superficially are established for the proper purpose of "regulat[ing] drivers for safety reasons" are nonetheless constitutionally unsound where they are in fact established for a different, improper programmatic purpose. *Collins v. Ainsworth*, 382 F.3d 529, 543-44 (5th Cir. 2004) (affirming denial of summary judgment despite sheriff's "claims the checkpoints were set up to advance general highway safety" because, "[t]aking Plaintiffs' summary judgment evidence as true, the record indicates that [the sheriff] was pursuing" a different, improper "programmatic purpose … when he set up and conducted the checkpoints").[26]

The record contains substantial evidence, including Defendants' own testimony, that the MCSD has a policy or custom of conducting roadblocks for crime control purposes in predominantly-Black neighborhoods as one facet of the MCSD's overall Policing Program. *See, e.g.*, Ex. 20, D. Smith Tr. 45:18-46:7 (testifying that the NET team would employ roadblocks to

---

[25] Defendants' primary authority, *U.S. v. Green*, in fact confirms that the Court should undertake its own inquiry. The Fifth Circuit noted in *Green* that "while roving patrols do not pass muster, discretionless stops *designed* to check a driver's license and registration" can be permissible, and that the court must first "determin[e] the validity of the programmatic purpose" of the roadblock. *Green*, 293 F.3d at 857-58. *Green* provides Defendants scant support, as there is ample evidence in this case suggesting other programmatic purposes. *Id.* at 858 n.17 ("In looking to the programmatic purpose, [courts] consider all the available evidence in order to determine the relevant primary purpose.") (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001)).

[26] Additionally, that individual stops may have been relatively brief and not overly intrusive does not cure the constitutional violation where roadblocks are set up for an improper purpose. *Id.* at 544 (finding that even "though the intrusion on most individuals stopped at the checkpoints appears to have been brief and not severe … in light of the improper programmatic goal and effect," plaintiffs had sufficiently alleged that sheriff's roadblock program violated motorists' Fourth Amendment rights).

counter "high crime" in Canton); Ex. 22, R. Thompson Tr. 20:19-21:13 (agreeing that "general crime prevention" is the "primary purpose" of MCSD's roadblocks); Ex. 19, Squires Tr. 171:10-172:4 (deterring crime is "definitely" a purpose of roadblocks); Ex. 16, T. Jones Tr. 211:2-12 (roadblocks are set up as a "crime deterrent"); Ex. 17, Moore Tr. 159:2-4 ("Q. Now, with regard to roadblocks, what's the purpose of a roadblock? A. To prevent crime."). This includes setting up roadblocks for the purpose of checking for outstanding warrants. *See* Ex. 57, MC-RFP-Inc. Rep. 010886 (incident report stating that MCSD "established a safety checkpoint at [Canton Estates] to check for out standing [sic] warrants and other violations."); *see also* Ex. 78, MC B. Davis Laptop 4 (MCSD notice regarding upcoming roadblocks, specifying the purpose of the roadblocks is "to check for Driver's license, warrants and what ever else we encounter."); Ex. 24, R. Tucker Tr. 158:9-20.[27] This evidence, which suggests an impermissible programmatic purpose behind the MCSD's roadblocks and is discussed in further detail below, precludes summary judgment. *Ainsworth*, 382 F.3d at 544.

A key feature of Defendants' Roadblock Program is the establishment of roadblocks at or near the entrances to majority-Black apartment complexes. Indeed, Defendants' Answer states that Sheriff Tucker has honored "multiple requests" from "managers of various apartment complexes and housing projects in predominantly Black neighborhoods in both Madison County and the City of Canton, and many businesses asking that the [MCSD] conduct roadblocks near their neighborhoods and businesses." Ans. ¶ 3; *see also* Ex. 24, R. Tucker Tr. 161:15-20; Ex. 58, MC-RFP 10-42(1) (Oct. 31, 2017 request from manager of Canton Estates for a "random road

---

[27] There are, however, other MCSD personnel who have testified to varying purposes for roadblocks. *See, e.g.*, Ex. 18, Sandridge Tr. 44:3-10 ("The primary interest is to check for seatbelt, child restraints, impaired drivers, and vehicle equipment violations."). This further indicates that an issue of fact exists as to the nature and purpose of the roadblocks that the MCSD establishes in predominantly-Black areas of Madison County.

block in our area" as a "preventative measure"). Plaintiffs and class members have attested to

numerous instances of roadblocks conducted at or near the entrances to majority-Black

apartment complexes throughout Madison County, including apartment complexes in Canton,

Flora, and Ridgeland. *See* Ex. 7, Singleton Tr. 43:1-4; Ex. 42, Hollins Decl. ¶ 2; Ex. 43, A.

Howard Decl. ¶¶ 2-3; Ex. 39, B. Brown Decl. ¶ 2. Courts have specifically disapproved

roadblocks established at the entrances to apartment complexes. *See, e.g.*, *Shankle v. Texas City*,

885 F. Supp. 996, 1003-05 (S.D. Tex. 1995) (roadblocks located at each of the entrances to

subdivision with high crime rates violated Fourth Amendment).

The MCSD's use of roadblocks as a crime control measure is further demonstrated by the

involvement of the NET Team and of MCSD narcotics agents in conducting roadblocks. The

NET Team has the authority to conduct roadblocks without specific approval from higher

authorities. Ex. 20, D. Smith Tr. 48:13-49:3. So do officers in the Narcotics Division. Ex. 16, T.

Jones Tr. 232:14-233:4. Narcotics and the NET Team focus on criminal law enforcement, not

traffic enforcement. NET and Narcotics nonetheless operate roadblocks in Canton's majority-

Black neighborhoods, the clear purpose of which is crime control and narcotics interdiction. *Id.*

227:19-24 (testifying that, as Captain of Narcotics, he set up roadblocks "for a crime deterrent");

Ex. 20, D. Smith Tr. 45:18-46:7 (testifying that the NET team would employ roadblocks to

counter "high crime" in Canton).

### 2.     The Roadblocks Established By The MCSD In Predominantly-Black Areas Of Madison County Lack Reasonable Procedural Safeguards

Disputed issues of material fact also exist as to whether the MCSD conducts roadblocks

in the uniform, procedurally sound manner required under Fourth Amendment law. *See Bowman*,

496 F.3d at 692  (To "pass constitutional scrutiny, traffic safety checkpoints "must be part of

some systematic procedure that strictly limits the discretionary authority of police officers.");

*Michigan State Police v. Sitz*, 496 U.S. 444, 452 (1990) (in assessing the reasonableness of a roadblock, courts must consider "the fear and surprise engendered in law-abiding motorists by the nature of the stop."); *see generally Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1967) (The "basic purpose" of Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.") (citation omitted).

The Supreme Court has clearly stated that "the unconstrained exercise of discretion" by officers at roadblocks is unconstitutional. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). MCSD personnel nonetheless regularly exercise substantial discretion in conducting roadblocks. Sheriff Tucker and other MCSD personnel have testified that officers have discretion to select which cars to stop at roadblocks. Ex. 24, R. Tucker Tr. 129:16-130:2; Ex. 11, Fish Tr. 54:3-19 ("Q: [Are there a]ny other times when you've decided not to stop every vehicle [at a roadblock]? A: Plenty of times. … Q: How would you make that decision? A: Just wave them through. It doesn't matter."). Deputies also have complete discretion to decide whether to run drivers' licenses, even if facially valid. Ex. 24, R. Tucker Tr. 183:3-13; Ex. 25, Waldrop Tr. 45:4-24 (he "may or may not" run a warrant check on a valid license); Ex. 27, Williams Tr. 218:5-17 (officers have discretion to call in licenses). It is also left to the deputy's discretion whether to demand passengers' identification or to search the vehicle or its occupants.[28] Khadafy Manning, for instance, has been searched at least three times as a passenger at an MCSD roadblock. Ex. 5, K. Manning Tr. 51:3-52:3, 53:1-3; *see also, e.g.*, Ex. 47, Mitchell Decl. ¶ 6 (describing experience of intrusive searches at roadblocks).

---

[28] Ex. 24, R. Tucker Tr. 184:6-185:7; Ex. 15, S. Howard Tr. 110:21-24 ("Q: And you use your discretion to decide when to check licenses or identifications for passengers? A: Yes, ma'am."); Ex. 11, Fish Tr. 55:15-17 ("Q: What about passengers? Do you ask them for anything? A: It just depends."); Ex. 25, Waldrop Tr. 45:25-46:6 ("Q: Do you give any training on when you may ask for a passenger's identification at a traffic stop? A: No.").

MCSD roadblocks also lack reasonable procedural safeguards. MCSD personnel are authorized to use unmarked cars at roadblocks (*see* Ex. 73, Defs.' Resps. to Pls.' 1st Set of Interrogs., No. 20), and numerous officers have testified that they have done so. *See, e.g.*, Ex. 25, Waldrop Tr. 39:21-23; Ex. 20, D. Smith Tr. 66:11-19. Indeed, NET Team leader Darian Smith testified that he has participated in roadblocks outside the Canton Estates apartment complex with only unmarked cars as a "deterrent to crime." Ex. 20, D. Smith Tr. 65:25-67:2. The MCSD does not require its personnel to be in uniforms when conducting roadblocks, thereby compounding the surprise and apprehension caused by the Roadblock Program. While Patrol deputies are usually uniformed, NET Team and Narcotics officers wear plain clothes and drive unmarked cars when conducting roadblocks. *E.g.*, *id.* 48:10-12.[29] So do other high-ranking officers. *See* Ex. 25, Waldrop Tr. 39:21-25. The presence of unmarked cars and plainclothes officers increases the intrusion associated with a roadblock, rendering it less defensible under the Fourth Amendment. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976) (a motorist is "less likely to be frightened or annoyed by the intrusion" where he or she "can see that other vehicles are being stopped, … [and] visible signs of the officers' authority").

In addition, in Black neighborhoods, residents report that roadblocks conducted after dark routinely are entirely unlit, with the exception of the officers' handheld flashlights. Bessie Thomas has driven through roadblocks at night where she did not see flashing lights. Ex. 9, Thomas Tr. 28:5-20; *see also* Ex. 5, K. Manning Tr. 56:16-57:5 (describing stops at roadblocks where officers wave vehicles down with flashlights). So have many other class members. *See*

---

[29] Captain Tommy Jones circulated a memorandum dated January 30, 2017 that directs Narcotics officers to wear reflective vests while participating in a roadblock (Ex. 79, MC L. Sanders Main Server 93), but NET personnel continue to conduct roadblocks without wearing reflective vests to identify them, let alone an MCSD uniform. *See* Ex. 20, D. Smith Tr. 149:12-20.

also Ex. 41, Davis Decl. ¶ 3 ("A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars."); Ex. 48, Q. Smith Decl. ¶ 3 ("MCSD parks off of the road and turns off all lights on their trucks."); Ex. 40, Carter Decl. ¶ 2 (same); Ex. 38, A. Brown Decl. ¶ 3 (same); Ex. 47, Mitchell Decl. ¶ 3 ("[The MCSD] rarely have their lights on [at a roadblock], but when they do, they only turn on the lights in the back so it is impossible to see the cars until I am already up on the roadblock."). M/Sgt. Josh Fish, a MCSD narcotics agent, corroborated this, testifying that one method of flagging down motorists at roadblocks is to "wave [a flashlight] back and forth." Ex. 11, Fish Tr. 55:83-10.

Class members have also attested that the MCSD sets up roadblocks in poorly-lit locations, including dark, rural streets in Black areas, despite relatively little traffic, or parks their cars where they are not visible. *See* Ex. 9, Thomas Tr. 24:17-22 (cars park off the street, inside apartment complexes and thus are not visible); Ex. 43, A. Howard Decl. ¶¶ 3-4 (on Pine Knoll Road, a roadblock location near a majority-Black apartment complex in Ridgeland, the MCSD parks in parking lots, where they are not visible, and then waves cars down with flashlights); Ex. 39, B. Brown Decl. ¶ 3 (same); Ex. 46, McKay Decl. ¶ 4 ("I don't know why the MCSD would set up a roadblock on my street. There is very little traffic because so few people drive in this rural area."); Ex. 45, L. Jones Decl. ¶ 26 ("I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen."). This is yet another factor demonstrating disputed issues of material fact as to the constitutionality of the challenged roadblocks. *See, e.g.*, *Bowman*, 496 F.3d at 692 (explaining that license and registration checkpoints must be "clearly visible" in order "to pass constitutional scrutiny").

**B.    Disputed Issues Of Material Fact Exist Regarding Whether The Roadblock Incidents Complained Of By Plaintiffs Were Caused By Defendants' Unconstitutional Policies**

As discussed above, Plaintiffs have set forth considerable evidence to support their claims that their civil rights were violated by the MCSD when they passed through MCSD roadblocks. Plaintiffs have provided evidence that the MCSD establishes procedurally flawed roadblocks for general crime control purposes rather than traffic enforcement, in violation of the Fourth Amendment. Plaintiffs have also provided evidence of the MCSD's policies of disproportionately establishing vehicular roadblocks in predominantly Black areas of Madison County. Such evidence includes the report of Dr. Ricchetti, who finds that the per capita rate of roadblocks in substantially Black census tracts is nearly double that of predominantly white census tracts *See* Ex. 1, Ricchetti Report ¶ 39. In addition to the substantial racial disparities uncovered through analysis of Defendants' own data, Plaintiffs have provided other significant evidence of Defendants' discriminatory purpose. *See supra* Section II. Plaintiffs have thus presented evidence showing both that the MCSD's roadblock program violates Plaintiffs' Fourth Amendment rights and that it violates their Fourteenth Amendment rights to equal protection of the laws.

As set forth below, each of the five relevant Named Plaintiffs has been a victim of the MCSD's roadblock program, and has suffered Fourth and Fourteenth Amendment injuries as a result.

1.    **Plaintiff Latoya Brown** has been stopped at roadblocks in the three years preceding the filing of the Complaint, including roadblocks near majority-Black apartment complexes in Canton. Ex. 4, L. Brown Tr. 45:24-47:18. She has testified she was a passenger at three separate roadblocks and was nonetheless required to provide her identification to the MCSD deputy manning the roadblock. *Id.* 48:25-50:5. One roadblock was at the entrance to the

majority-Black apartment complex, Canton Estates, where she was living at the time. *Id.* 49:15-50:5. Another was at the entrance to a different majority-Black apartment complex nearby called Joe Prichard Homes. Ex. 30, L. Brown Decl.¶ 12. Ms. Brown has also testified that she was stopped at two roadblocks and required to show her identification when she was a pedestrian. Ex. 4, L. Brown Tr. 74:19-77:5. The roadblocks were set up to stop cars, but the deputies stopped Ms. Brown and checked her identification even though she was on foot. *Id.* One roadblock was, again, at the entrance to Canton Estates and the other was on Ricks Drive in Canton. *Id.* Ms. Brown has also seen roadblocks set up on Walnut Street, May Street, Boyd Street, King Ranch Road, and in front of 390 Ricks Drive, another majority-Black apartment complex in Canton. *Id.* 80:16-83:11. As a current Canton resident, Ms. Brown remains at risk of being subject to further unconstitutional MCSD roadblocks in the future. Ex. 30, L. Brown Decl. ¶ 19.

2.      **Plaintiff Bessie Thomas** also testified that she has been stopped at numerous roadblocks within the three years preceding the filing of the Complaint, all of which were located in the majority-Black community on the west side Canton. Ex. 9, Thomas Tr. 25:21-26:20, 28:22-29:12. She has been stopped at roadblocks outside of Mt. Levi Baptist Church, 1008 West Fulton Street in Canton, where Ms. Thomas serves as a minister; on Highway 22 in Canton; on two different locations on King Ranch Road; in front of Nichols Middle School on Mase Street in Canton; in front of Brooklyn Mart (a convenience store at the intersection of Boyd Street and George Washington Avenue in Canton near Joe Prichard Homes); and on Martin Luther King Drive and James Street. *Id.* 26:9-12. At the roadblock outside of her church, the MCSD deputy manning the roadblock saw that Ms. Thomas had a child in the car but no child seat. Ms. Thomas tried to explain that the child was not in a car seat because she had just picked up the child and her mother as a favor after seeing them walking along the road. Ex. 35, Thomas Decl. ¶¶ 5-6.

The deputy, however, cursed at her, telling her he didn't "give a damn" and that "I've got all these niggers off the side of the road," and issued her a citation. Ex. 9, Thomas Tr. 77:3-11. As a current Canton resident, Ms. Thomas remains at risk of being subject to further unconstitutional MCSD roadblocks in the future. Ex. 35, Thomas Decl. ¶ 9.

3.     **Plaintiff Betty Tucker** has testified that she was stopped at three roadblocks in 2016. The roadblocks were set up in her majority-Black neighborhood in Canton, on Adeline Street, Martin Luther King Drive, King Ranch Road, and Highway 22. Ex. 10, B. Tucker Tr. 19:2-18. At one stop, Ms. Tucker was driving home with her young granddaughters; even though Ms. Tucker provided the deputy with her license and insurance, the deputy proceeded to check around Ms. Tucker's car with a flashlight and shined his flashlight into the children's eyes, scaring them. Ex. 36, B. Tucker Decl. ¶ 7. Ms. Tucker continues to reside in Canton. As a current Canton resident, Ms. Tucker remains at risk of being subject to further unconstitutional MCSD roadblocks in the future. *Id*. ¶ 14.

4.     **Plaintiff Nicholas Singleton** has been stopped at more than 20 roadblocks in the last several years. Ex. 33, Singleton Decl. ¶ 4. Several of these have been in his majority-Black neighborhood in Canton. These include roadblocks located at the entrance to Canton Estates; at the entrance of Canton Garden Apartments, another majority-Black housing complex Mr. Singleton refers to as the "new projects"; around McNeal Elementary School, located near the intersection of Lutz Avenue and Dr. M.L.K. Jr. Drive; and on King Ranch Road, Boyd Street and Kingston Place. Mr. Singleton has also been stopped at MCSD roadblocks on Highway 16, Highway 43, Highway 51 and Highway 17. Ex. 7, Singleton Tr. 43:1-7, 44:4-5, 45:1-7. In Mr. Singleton's experience, the MCSD sets up roadblocks in Black community in Madison County on darkened streets, often without any lights and sometimes multiple times in one day. Ex. 33,

Singleton Decl. ¶ 5. For example, Mr. Singleton testified that on one occasion, he was stopped at a roadblock set up in front of McNeal Elementary School, and then stopped again at a roadblock some 500 feet down the road. *See* Ex. 7, Singleton Tr. 49:12-17. By contrast, when roadblocks are set up in more "neutral" locations—*i.e.* areas where white residents also drive, such as the roadblocks located on state highways,—the roadblocks are well-marked and well-lit. *See id.* 55:1-10; Ex. 33, Singleton Decl. ¶ 6. As a current Canton resident, Mr. Singleton remains at risk of being subject to further MCSD roadblocks in the future. *Id.* ¶ 7.

5.     **Plaintiff Lawrence Blackmon** has been stopped at three MCSD roadblocks within the last four years. Ex. 3, Blackmon Tr. 144:4-145:1; Ex. 29, Blackmon Decl. ¶ 14. Two of the roadblocks were at the same intersection on Martin Luther King Drive in Canton. Ex. 3, Blackmon Tr. 144:10-20. At least one of the roadblocks was in the dark: the MCSD patrol car's emergency lights were not engaged and the deputy was standing in the road, using a flashlight to signal drivers to stop. Ex. 29, Blackmon Decl. ¶ 15. Mr. Blackmon is moving back to Canton in the coming months from Washington D.C.—where he was living to complete an L.L.M. degree—and therefore is at a substantial risk of being subject to further MCSD roadblocks in the future. *Id.* ¶ 16.

Where, as here, Plaintiffs have presented evidence that the incidents that undergird his or her claims occurred in the context of county-wide racial disparities and are consistent with the challenged law enforcement policy, fact issues preclude granting summary judgment in favor of Defendants. *See Floyd*, 813 F. Supp. 2d at 446 (denying defendants' summary judgment motion with respect to Equal Protection claim where individual's stop "occurred in the context of citywide racial disparities in stop-and-frisk patterns unexplainable by chance, crime patterns, or officer deployment patterns"); *Davis v. City of New York*, 902 F. Supp. 2d 405, 430 (S.D.N.Y.

2012) ("If the plaintiff can raise an issue of fact regarding 'the NYPD's practice of wrongfully stopping and detaining African–Americans,' then evidence that the stop was unlawful and was "in line with" that policy will be enough to survive summary judgment."). Whether the roadblock stops experienced by the relevant Named Plaintiffs were the result of Defendants' challenged policies, and whether roadblocks conducted pursuant to those policies violate the Constitution, present issues of fact that cannot now be resolved in Defendants' favor.

### C.    Plaintiffs Did Not "Abandon" Any Roadblock Claims

Finally, Defendants argue that certain Named Plaintiffs "abandoned" their race discrimination claims arising from the MCSD's Roadblock Program, seemingly on the basis that these Plaintiffs' responses and objections ("R&Os") to a contention interrogatory posed by Defendants were not phrased in the terms that Defendants apparently expected.[30] This argument is meritless.

Contrary to Defendants' contentions, Plaintiffs' R&Os quite specifically explain that Plaintiffs are challenging MCSD policies, customs, and/or practices related to racially discriminatory roadblocks. Each Plaintiff's initial Supplemental Responses And Objections To Defendants' First Set Of Interrogatories (the "First Supplemental R&Os") specifically asserted, in response to Defendants' Eighth Interrogatory, that "policies and procedures of Defendants … that constitute a policy sanctioning or encouraging unreasonable searches and seizures or racial discrimination include, but are not limited to," *inter alia*, (i) the "policy and/or procedure

---

[30] *See* Brown Mem. 7 n.24, Smith Mem. 8 n.31, Blackmon Mem. 2 n.3, Thomas Mem. 2 n.2, Singleton Mem. 2 n.1, and B. Tucker Mem. 10 n.8. As a preliminary matter, Defendants mischaracterize Plaintiffs' roadblock-related claims. For example, Defendants argue that Lawrence Blackmon "abandoned his claim that the MCSD only sets up checkpoints in predominantly Black neighborhoods." Blackmon Mem. 2 n.3. But neither Blackmon nor any other Plaintiff has brought a claim alleging that MCSD "only" conducts traffic checkpoints and/or roadblocks in predominantly Black neighborhoods. The paragraphs of the Complaint cited by Defendants in purported support of their argument reflect that Plaintiffs allege that the roadblocks disproportionately occur in Black neighborhoods. *See, e.g.*, Compl. ¶¶ 4, 203, 267, 288.

embodied in the [MCSD's] General Roadblocks Policy"; (ii) the "policy and/or procedure of 'conducting roadblocks … near neighborhoods and businesses' in "predominantly Black neighborhoods in both Madison County and the City of Canton' for the purpose of general crime control"; (iii) the "policy and/or procedure of concentrating its resources on majority-Black cities and unincorporated areas of Madison County"; and (iv) the "policy and/or procedure of engaging in systematic racial profiling."[31] Subsequently, each Plaintiff served further Supplemental Responses and Objections to this same contention interrogatory, which further identified, as challenged policies, that (i) the MCSD disproportionately conducts traffic stops in majority-Black areas on the basis of race; (ii) the MCSD conducts "roving roadblocks"; (iii) that the MCSD conducts roadblocks without appropriate procedural safeguards; (iv) that the MCSD conducts roadblocks for the purpose of checking for outstanding warrants; and (v) that the MCSD discriminatorily stops Black pedestrians in the vicinity of roadblocks.[32] These responses more than suffice to give Defendants fair notice of Plaintiffs' challenge to their policies, customs, and/or practices related to racially discriminatory roadblocks and preclude any contention that such claims have been abandoned.[33]

---

[31] See Ex. 80, Pl. Latoya Brown's First Supplemental R&O; Ex. 81, Pl. Lawrence Blackmon's First Supplemental R&O; Ex. 82, Pl. Khadafy Manning's First Supplemental R&O; Ex. 83, Pl. Quinnetta Manning's First Supplemental R&O; Ex. 84, Pl. Nick Singleton's First Supplemental R&O; Ex. 85, Pl. Steven Smith's First Supplemental R&O; Ex. 86, Pl. Bessie Thomas's First Supplemental R&O; Ex. 87, Pl. Betty Jean William Tucker's First Supplemental R&O.

[32] See Blackmon Motion, Exhibit 1 at 3-6; Tucker Motion, Exhibit 2 at 3-6; Thomas Motion, Exhibit 3 at 3-6; Singleton Motion, Exhibit 2 at 3-6; Brown Motion Exhibit 2 at 4-5 (ECF No. 233-2); Smith Motion, Exhibit 2 at 4-6 (ECF No. 234-2).

[33] In making their "abandonment" argument, Defendants cite solely to Plaintiffs' subsequent set of supplemental R&Os, and ignore the First Supplemental R&Os. See, e.g., Tucker Mem. 3 n.3. It is unclear whether this was intentional or an oversight on the part of Defendants, but each Plaintiff's later R&Os clearly state that they "supplement the Responses and Objections previously served by Plaintiff" and that the supplemental information provided in response to the contention interrogatory at issue was "in addition to the information previously provided by Plaintiff in response to this interrogatory." See Blackmon Motion, Ex. 1 at 1, 3; Tucker Motion, Ex. 2 at 1, 3; Thomas Motion, Ex. 3 at 1, 3; Singleton

Defendants' "abandonment" argument also ignores Plaintiffs' objections to Defendants' interrogatories. Each Named Plaintiff then also expressly qualified his or her response to Defendants' contention interrogatory with language indicating the challenged policies "include, **but are not limited to**" those listed, and explained that preparation of the case was still ongoing at the time the interrogatories were answered, and that each "Plaintiff reserves all rights … to clarify or refine Plaintiff's characterizations of the above-mentioned policies and/or procedures."[34] Each Plaintiff also specifically objected to Defendants' Interrogatory No. 8 as "vague, overbroad, and unduly burdensome," and noted that "[a]ny information provided by Plaintiff in response to this Interrogatory is provided subject to and without waiver of these objections and qualifications."[35] To the extent that Defendants are now claiming "abandonment" because Plaintiffs' R&Os fall short of some unspecified standard of precision or specificity, any such purported requirement was properly and timely objected to and cannot now justify the relief Defendants seek, as Plaintiffs were only required to respond to the interrogatory at issue to the extent it was not objectionable. *Cf. Anderson v. United Parcel Service, Inc.*, 2010 WL 4822564, at *3 (D. Kan. Nov. 22, 2010) (a responding party should "answer an overly broad or unduly burdensome interrogatory *to the extent it is not objectionable*") (emphasis added).

Even if Plaintiffs' existing interrogatory responses were somehow insufficiently specific with respect to Plaintiffs' Equal Protection claims concerning the MCSD's roadblocks—and for the reasons set forth above, they were not—Defendants' contention that this would warrant the

---

Motion, Ex. 2 at 1, 3; Brown Motion, Ex. 2 at 1, 3 (ECF No. 233-2); Smith Motion, Ex. 2 at 4-6 (ECF No. 234-2).

[34] *See* Blackmon Motion, Ex. 1 at 3; Tucker Motion, Ex. 2 at 3; Thomas Motion, Ex. 3 at 3; Singleton Motion, Ex. 2 at 3; Brown Motion, Ex. 2 at 4; Smith Motion, Ex. 2 at 4

[35] *See, e.g.*, Blackmon Motion, Ex. 1 at 3; Tucker Motion, Ex. 2 at 3; Thomas Motion, Ex. 3 at 3; Singleton Motion, Ex. 2 at 3; Brown Motion, Ex. 2 at 3; Smith Motion, Ex. 2 at 3.

extreme remedy of dismissal of Plaintiffs' claims *before the commencement of merits discovery* is baseless, and fundamentally "misapprehends the purpose of an interrogatory." *Moore v. Comput. Assoc. Int'l, Inc.*, 653 F. Supp. 2d 955, 962 n.4 (D. Ariz. 2009) (rejecting defendants' argument that plaintiff was precluded from subsequently raising argument it did not include in response to defendant's contention interrogatory). Indeed, such a result would directly contravene the Federal Rules. *See* Fed. R. Civ. P. 33(b), Advisory Committee notes (1970) ("Although in exceptional circumstances reliance on an answer [to an interrogatory] may cause such prejudice that the court will hold the answering party bound to his answer ... the interrogating party will ordinarily not be entitled to rely on the unchanging character of the answers he receives and cannot base prejudice on such reliance."). If Plaintiffs' R&Os were somehow insufficient, and that insufficiency somehow prejudiced Defendants, the proper approach would instead be to require Plaintiffs to serve amended R&Os and, if necessary, reopen discovery to cure any prejudice.

Defendants cite no case law in support of their "abandonment" argument and make no effort at showing *any* prejudice, much less how this an "exceptional" circumstance in which Defendants were so prejudiced by Plaintiffs' interrogatory responses that Defendants' roadblocks claims should be dismissed. *See Hogan v. Vandewater*, 2016 WL 7634430, at *8 (S.D.N.Y. Apr. 27, 2016) (denying defendant's motion to preclude evidence concerning particular incidents not included in plaintiff's interrogatory responses where defendant "has failed to demonstrate any harm or prejudice has resulted from the alleged discovery violation."); *Moore*, 653 F. Supp. 2d at 962 n.4 ("Without a specific argument why Plaintiff's initial and supplemental answers to the contention interrogatories were so incomplete as to prejudice Defendant and warrant an exception to the rule, … Plaintiff will not be so limited."); *Motson v. Franklin Covey*, 2005 WL

1541023, at *3 (D.N.J. June 30, 2005) (denying summary judgment because plaintiff "does not explain why [defendant's] failure to answer its interrogatories … particularly in light of [defendant's] objection to those interrogatories—now entitles him to summary judgment as to those claims."), *amended on other grounds*, 2005 WL 2777554 (D.N.J. Oct. 24, 2005). Defendants' motion for summary judgment on the basis of abandonment should be denied.

## IV.   DISPUTED ISSUES OF MATERIAL FACT EXIST REGARDING THE CONSTITUTIONALITY OF DEFENDANTS' PEDESTRIAN STOP POLICIES

Named Plaintiffs Steven Smith, Latoya Brown, and Khadafy Manning bring claims arising from the MCSD's policy of conducting suspicionless stops of Black pedestrians. Substantial evidence supports Plaintiffs' contention that these incidents resulted from Defendants' policies of racially profiling and/or targeting Madison County's Black communities. Defendants claim that each of the pedestrian stops at issue were mere "consensual encounters" between Plaintiffs and law enforcement personnel that do not implicate Fourth Amendment protections. *E.g.*, Manning Mem. 11. This argument fails; substantial evidence supports a finding that, due to the highly coercive nature and context of each of the challenged stops, a reasonable person would not have felt free to decline or disregard the MCSD's directives. Defendants are thus not entitled to summary judgment on this basis.

### A.   Substantial Evidence Demonstrates That The MCSD Targets Predominantly-Black Areas Of Madison County Via Suspicionless Pedestrian Stops

Substantial evidence demonstrates that the MCSD unconstitutionally targets Black persons for suspicionless searches and seizures. It is undisputed that, since Sheriff Trowbridge's tenure and continuing to the present, the MCSD conducts special "apartment walkthrough" patrols to police majority-Black apartment complexes. *See* Ex. 20, D. Smith Tr. 34:7-35:2; Ex. 23, Trowbridge 34:9-22, 39:5-16. The MCSD has even established specialized units and details

54

to conduct these patrols. *See* Ex. 23, Trowbridge Tr. 34:9-22, 39:5-16; *see also* Ex. 59, Mar. 3, 2015 Email. The unit with primary responsibility for conducting these patrols is now known as the NET Team. Ex. 20, D. Smith Tr. 34:7-35:17; Ex. 15, S. Howard Tr. 9:8-13, 37:4-38:23.[36] The MCSD's own records demonstrate that during these patrols, MCSD deputies routinely conduct stops of Black persons present at or around the apartment complexes, demand that those individuals present their identifications, and, among other things, run the identifications through dispatch to identify outstanding warrants. Defendants' records of these stops—which almost uniformly capture only stops in which a subject is actually arrested—rarely, if ever, identify any basis for conducting these stops.[37] Hundreds of these patrols have taken place since Sheriff Tucker took office. *See* Ex. 2, Guha Decl. ¶¶ 33-34. Sheriff Tucker or Chief Williams are informed daily of the NET Team's activities. Ex. 20, D. Smith Tr. 85:3-7.

Substantial evidence also exists regarding the MCSD's policy of conducting suspicionless searches and seizures of Black pedestrians during roving patrols of Black neighborhoods in unmarked cars.[38] These patrols are colloquially referred to as the "jump-out

---

[36] The NET Team has primary responsibility for the patrols of the Canton area apartment complexes, other MCSD units, including Patrol and Narcotics, also patrol the apartment complexes. Ex. 20, D. Smith Tr. 35:22-36:9.

[37] *See* Ex. 88, MC-RFP-Inc. Rep. 025778 (a deputy "observed a black male walking in the area of Canton Gardens Apts." and stopped him "to see if he lived in the Complex"; when the man said "no he was just walking," the officer ran his ID, found outstanding warrants, and arrested him); Ex. 89, MC-RFP-Inc. Rep. 007292 (a deputy "came into contact" with a Black man, found a warrant, and arrested him).

[38] For instance, class member Quincy Smith and three friends were stopped while walking on the street by MCSD deputies and forced to provide social security numbers and submit to a pat down. Ex. 48, Q. Smith Decl. ¶¶ 16-17. Mr. Smith and his friends "were afraid and felt like if [they] said no or walked away there would have been real trouble." *Id.* Montreal Tillman, also a Canton resident, explained that when he was stopped while walking down the street, the officer "started shouting at me through his window to stop walking. ... He asked for my license. I felt like I had to give it to him." Ex. 51, Tillman Decl. ¶¶ 12-14. The jump-out patrol has also stopped Terrance Thompson at least twice since 2014 while walking down the street in Canton. Ex. 50, T. Thompson Decl. ¶ 11. On one occasion, in 2014, an unmarked Tahoe pulled up on him and friend while they were walking; the officers jumped out and without explanation put both men in handcuffs and searched them. *Id.* ¶¶ 17-19. After finding nothing, they demanded

patrol" or the "jump out boys." *See* Ex. 20, D. Smith Tr. 79:5-15; Ex. 10, B. Tucker Tr. 32:15-21

(MCSD deputies "are always in the black neighborhoods jumping out."). Defendants have

previously denied that "jump out" patrols exist, or that the MCSD has a policy and/or practice of

conducting such patrols. *See, e.g.*, Ans. ¶ 4. MCSD personnel, however, have testified to the

existence of these "jump out" patrols, and explained that they are conducted by the NET Team

and apartment detail. Ex. 20, D. Smith Tr. 79:5-15 ("[J]ump-out boys" is "the nickname given to

the NET team."); Ex. 27, Williams Tr. 243:15-244:25.

There is also evidence of Defendants conducting stops of pedestrians in the vicinity of

MCSD roadblocks in predominantly-Black areas of Madison County. *See* Ex. 4, L. Brown Tr.

74:19-77:5. These stops, which are not justified by traffic safety considerations, are the product

of the MCSD's Policing Program, and lack any possible constitutional justification.

### B.   Disputed Issues Of Material Fact Exist Regarding The Pedestrian Stops Experienced By Plaintiffs

The evidence demonstrates that Plaintiffs Latoya Brown, Steven Smith, and Khadafy

Manning have all been subjected to pedestrian stops by the MCSD, typically near or within the

grounds of majority-Black apartment complexes, and often in conjunction with roadblocks or

apartment walk-through patrols conducted by the NET Team or apartment detail. The NET Team

and its predecessor, the apartment detail, were specifically authorized and/or ratified by Sheriff

Tucker, who remains fully apprised of these programs. Nothing in the record suggests, and

Defendants do not contend, that these stops were isolated, idiosyncratic incidents, rather than the

direct result of Defendants' policing policies. As such, it is clear that, at a minimum, disputed

issues of material fact preclude summary judgment in favor of Defendants on these claims.

---

identification and ran warrant checks. *Id.* ¶ 18. Only after the check came back clean did they remove the
handcuffs and let the men go. *Id.* ¶ 20.

Plaintiff Latoya Brown has been subjected to numerous pedestrian stops. She has been stopped twice as a pedestrian while passing through a MCSD vehicular roadblock. The first time, at the entrance to Canton Estates, she was stopped on her way home from the store. *Id.* 45:22-46:5 Because she was passing through a roadblock situated at the sole entrance to her home, there was no way for Ms. Brown to avoid the MCSD. Ex. 30, L. Brown Decl. ¶¶ 6, 8. A deputy manning the roadblock demanded her identification, which she did not have. Ex. 4, L. Brown Tr. 75:1-9. The deputy then demanded her social security number; after she provided it, the deputy called it in on his radio, and only after dispatch advised the deputy she was clear of warrants did the deputy permit her to proceed. Ex. 30, L. Brown Decl. ¶ 6. On another occasion, Ms. Brown came upon a roadblock while walking home on Ricks Drive with her cousin and children. A deputy at the roadblock again demanded that they produce identification, called their information in to dispatch, and only allowed Ms. Brown and her companions to proceed once dispatch confirmed that they had no active warrants. *Id.* ¶ 7. On both occasions, when the MCSD directed her to stop and give her identification, she felt that she was required to comply. She did not feel that she was free to ignore the deputies and keep walking past them or to refuse to provide her identification. *Id.* ¶ 9.

Ms. Brown has also been stopped by deputies conducting walk-throughs of Canton Estates. On one occasion, she was standing on the back of her step-father's truck, which was parked in the apartment complex. Ex. 4, L. Brown Tr. 53:10-54:10. An MCSD deputy walked up to her and demanded her identification. He did not provide a reason. She gave it to him and he ran her name. Ms. Brown testified that after he ran her name, the deputy "let her go"; she did not feel free to refuse to comply or walk away until he let her do so. *Id.*; Ex. 30, L. Brown Decl. ¶ 15. On another occasion, Ms. Brown was walking to the entrance of Canton Estates to meet her

ride to work. Deputies who were patrolling the complex stopped her and demanded her identification. Ex. 4, L. Brown Tr. 50:23-51:9. She complied, and once they ran her name for warrants they allowed her to proceed. *Id.*

Plaintiff Steven Smith has also been subjected to the MCSD's unconstitutional suspicionless stops. On the night of January 23, 2017, Steven Smith and his friend Terrance Thompson were walking from the store back to Mr. Smith's apartment in Canton Estates. Ex. 8, S. Smith Tr. 34:3-24. As the two men reached the entrance of Canton Estates, they saw that two MCSD deputies—identified through discovery as the two full-time members of the MCSD's NET Team—were at the entrance to the complex. *Id.* 34:16-24. The only way into the complex is through a single gate at the street entrance, so Mr. Smith and Mr. Thompson had to pass by the deputies in order to get home. *Id.* 34:21-35:4. Mr. Smith and Mr. Thompson approached the gate where the deputies were standing. They did not intend to stop or speak with the deputies. *Id.* As they started to walk in, one deputy directed the two men to take their hands out of their pockets; it was a chilly winter night, but they complied. *Id.* 35:3-24. The deputies then asked to see the two men's identifications. Mr. Smith was too afraid to reach for his license; he told the deputy where the license was and the deputy pulled it out of his pocket and inspected it. *Id.* 35:17-24; Ex. 34, S. Smith Decl. ¶ 8. Mr. Smith did have a warrant for an unpaid traffic ticket he had received when stopped at another roadblock at that very same place. Ex. 8, S. Smith Tr. 38:13-16.

The two NET Team officers who detained and arrested Mr. Smith themselves provide different explanations of this stop. M/Sgt. Darian Smith testified that he stopped and questioned Plaintiff Steven Smith and his friend based on reports that "non-residents [of Canton Estates] were walking through the apartments at certain hours, committing certain crimes," reports which

M/Sgt. Smith contended gave the MCSD "every right to stop and investigate" any pedestrian walking into Canton Estates in the evening to "find out if they [have] legitimate business in those apartments." Ex. 20, D. Smith Tr. 69:18-24. M/Sgt. Smith subsequently confirmed his belief that receiving reports of criminal activity or disorderly conduct at an apartment complex gave rise to reasonable suspicion to detain any person entering the apartment complex.[39] Consistent with this, M/Sgt. Smith's subsequent report of the incident categorized it as arising from a stop of a "suspicious person." *See* Ex. 15, Howard Tr. 118:20-119:3. Sgt. Howard, on the other hand, testified that he did not "know why 'suspicious person'" was recorded on the incident report, and that Mr. Smith and his friend "were not stopped. It was a consensual encounter." *Id.* 125:3-9.

Plaintiff Khadafy Manning has also been subjected to the MCSD's unconstitutional pedestrian stop program. Mr. Manning was stopped by Sgt. Howard of the NET Team on February 14, 2017, while Sgt. Howard was conducting a foot patrol of Canton Estates.[40] Ex. 15, S. Howard Tr. 136:6-7. Deputy Howard asked to see Mr. Manning's identification. *Id.* 139:14-24. Deputy Howard testified that the request for identification was "just a consensual encounter. *Id.* 139:7-8. According to Deputy Howard's testimony, Mr. Manning not only freely handed over his identification but also volunteered that his driver's license was suspended. *Id.* 139:7-24. Deputy Howard testified that at the end of this "very cordial" encounter, he arrested Mr. Manning, searched his car, and transported him to the Madison County Detention Center for

---

[39] *See* Ex. 20, D. Smith Tr. 83:15-84:2 (Q: "[D]oes the fact that anybody is walking through that apartment complex give you reasonable suspicion or probable cause to approach them and think that a crime is being committed? A: I would say with the specific information we had and the specific hours, people walking into the apartments, they were inside the apartments doing to walk through and witness somebody come off the street, through the gate, into the apartment complex, yes, we have the right to stop them and see what they're doing.").

[40] According to Deputy Howard's testimony, Mr. Manning was in his vehicle at the time he was approached. *Id.* S. Howard Tr. 137: 9-16. But Mr. Manning has attested that he was standing outside of the vehicle at the time Deputy Howard approached him. Ex. 31, K. Manning Decl. ¶ 24.

driving with a suspended license. *Id.* 140:5-8, 141:16-20. Defendants contend that Sgt. Howard's version of the events is "undisputed." Manning Mem. 11. Defendants, however, failed to question Mr. Manning about this incident at his deposition, and in his declaration submitted herewith, Mr. Manning attests that Sgt. Howard demanded to see his identification, and that Mr. Manning believed that he had no choice but to comply. Ex. 31, K. Manning Decl. ¶ 25.[41]

### C.   Disputed Issues Of Material Fact Preclude Summary Judgment On Defendants' Theory Of Voluntary Consent

It is well established that an individual has been seized for Fourth Amendment purposes if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (citing *INS v. Delgado*, 466 U.S. 210 (1984)).[42] The test requires an "objective analysis, focusing on the officers and the setting." *Ratliff v. City of Houston,* 2005 WL 1745468, at *8 (S.D. Tex. July 25, 2005). Even Defendants acknowledge that an encounter with police is not consensual if the civilian would not feel free to either terminate the encounter or disregard the questioning. Brown Mem. 9; Smith Mem 11. Defendants nonetheless seek summary judgment by arguing that the Named Plaintiffs "obviously consented" because they "did not turn around and walk away." L. Brown Mem. 11; *accord* S. Smith Mem. 11-12; Manning Mem. 11. This argument is meritless. The circumstances of these incidents strongly demonstrate their coercive nature, and in

---

[41] Mr. Manning's belief was reasonable given the circumstances. Several months earlier, he had suffered a brutal assault at the hands of an MCSD deputy for refusing to provide a false witness statement for a break-in he did not see. K. Manning Decl. ¶ 6-22. Moreover, before demanding to see Mr. Manning's identification, Deputy Howard indicated that the MCSD was aware that Mr. Manning had initiated an inquiry into the June 26, 2016 incident, and suggested that Mr. Manning would face repercussions as a result. *Id.* ¶¶ 24-25. Finally, Deputy Howard did in fact restrain Mr. Manning during the encounter and ultimately arrested him. *Id.* ¶ 26. These disputed questions of fact preclude summary judgment at this stage.

[42] This 'reasonable person' standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person. *Mask*, 330 F.3d at 336.

any event, the questions of voluntary consent posed by Defendants' theory clearly raise fact issues not suitable for resolution at the summary judgment stage.

A seizure occurs for purposes of the Fourth Amendment where a law enforcement officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. *Mask*, 330 F.3d at 336 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). If an individual has been seized, the officer conducting the seizure generally must be able to articulate reasonable suspicion or probable cause. *Id.* In general, any restraint on a person amounting to a Fourth Amendment seizure is invalid unless justified by probable cause. *See United States v. Odutayo*, 406 F.3d 386, 390-91 (5th Cir. 2005). And, it is "only in very limited circumstances" that a stop and search need not be justified by an individualized reasonable suspicion. *See Ratliff*, 2005 WL 1745468 at *9 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 41 (2000) (general interest in crime control not a valid basis for police to implement "regime of suspicionless stops")). Where a law enforcement agency detains people without reasonable suspicion that they have violated essential elements of a criminal law, "exposure to that policy is both itself an ongoing harm and evidence that there is 'sufficient likelihood' that Plaintiff's rights will be violated again" such that injunctive relief is appropriate. *Ortega-Melendres*, 836 F. Supp. 2d at 979.

Defendants do not contend that summary judgment should be granted because the undisputed facts demonstrate that the MCSD deputies had reasonable suspicion or probable cause to initiate the incidents at issue. Instead, Defendants argue that these incidents were not constitutional violations because the Plaintiffs' failure to expressly resist the officers' demands rendered the incidents consensual and thus outside the scope of Fourth Amendment protections. *See* Brown Mem. 9. However, each of the Plaintiffs have attested that they felt compelled to

comply with the officers' commands. Ex. 30, L. Brown Decl. ¶ 3; Ex. 34, S. Smith Decl. ¶¶ 11,

16; Ex. 31, K. Manning Decl. ¶¶ 3-5. Substantial evidence exists to suggest that their subjective

experiences of coercion were objectively reasonable under the circumstances.

The evidence indicates that MCSD deputies conducting "apartment walkthrough" patrols

treat efforts to avoid interactions with deputies as suspicious activity that itself warrants pursuing

and detaining the subject. *See, e.g.*, Ex. 90, MC-RFP-Inc. Rep. 040697 (an officer "observed two

black males standing be[side] a parked vehicle"; the subjects looked at the officer and "started

walking away," so the officer ordered them to stop, gave chase, arrested one, and booked him

"on all charges"), Ex. 90, MC-RFP-Inc. Rep. 058887 (when an officer "saw four black males

standing outside" a building; when the officer drove closer "they began walking away," so the

officer stopped them, noticed one was slurring his speech, and subsequently arrested him for

public drunkenness), Ex. 90, MC-RFP-Inc. Rep. 025721 (when officers saw "several

individual[s] loitering" and one "began walking inside of" an apartment, an officer yelled for

him to stop, and then "placed [him] under arrest for failure to comply" after he entered the

apartment). Similarly, Sgt. Howard wrote in the incident report regarding Mr. Manning's

February 2017 arrest that he stopped Mr. Manning because he believed Mr. Manning was trying

to avoid him. Ex. 91, MC-RFP-Inc. Rep. 047927. Moreover, the evidence also indicates that

these pedestrian stops, including the pedestrian stops of Plaintiffs, often occur when pedestrians

walk past MCSD officers conducting a roadblock, or stationed at or near the entrance to an

apartment complex. *See, e.g.* Ex. 4, L. Brown Tr. 45:22-46:5; Ex. 8, S. Smith Tr. 34:3-24.

At a minimum, in light of this context, disputed issues of material fact exist as to whether

a reasonable person walking past an active roadblock would feel free to disregard or decline an

officer's command to stop and present identification, or whether the context of the roadblock

constituted, as it did to Ms. Brown, a sufficient display of the MCSD's coercive authority to indicate that compliance was required. The same holds true for whether the resident of an apartment complex, such as Mr. Smith, would have felt free to disregard the directions of officers who interposed themselves between the public road and his home and who began the encounter not by asking questions but rather by directing Mr. Smith to "take [his] hands out of [his] pockets." Ex. 8, S. Smith Tr. 35:3-24. Courts recognize that such shows of law enforcement authority suffice to negate the voluntariness of consent. *See United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982) (reaffirming that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance"); *United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015) (officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option, as "[c]ommon sense dictates" that no reasonable person would feel free to walk through armed officers blocking their path); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) ("Blocking a citizen's path or impeding his progress is an indicator that a seizure has occurred."). This fact-intensive issue cannot be resolved on summary judgment, and Defendants' motions must be denied on this issue as well. *See Short v. West*, 662 F.3d 320, 325-26 (5th Cir. 2011) (genuine issue of material fact as to whether plaintiff was detained and apprehended without reasonable suspicion precluded summary judgment for defendant sheriff); *Beatty v. Twp. of Elk*, 2010 WL 1493118, at *5 (D.N.J. Apr. 14, 2010) (denying summary judgment genuine issue of material fact existed in § 1983 action as to whether officers' encounter with individual was consensual or constituted a seizure).

## V.   DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE HOME ENTRY-RELATED CLAIMS ASSERTED BY LATOYA BROWN, STEVEN SMITH, KHADAFY AND QUINNETTA MANNING, AND LAWRENCE BLACKMON

The MCSD's overall policy of unconstitutionally targeting and profiling Black persons in Madison County is not executed solely through the roadblock and pedestrian stop policies addressed above. It is also implemented through other forms of aggressive policing of Black communities that cause other constitutional harms. Plaintiffs Khadafy Manning, Quinnetta Manning, Latoya Brown, Steven Smith, and Lawrence Blackmon have all suffered Fourth Amendment harms during separate encounters with the MCSD in which MCSD deputies entered their homes without cause or consent and subjected them and their property to unreasonable searches and seizures. None of these incidents resulted in any Plaintiff being arrested or charged; instead, each of the Plaintiffs was victimized as a result of the MCSD's policy or custom of selective and disproportionate targeting of Black persons and communities in Madison County for stops, searches, and/or seizures. Because these Plaintiffs' Fourth Amendment rights were violated as a result of the MCSD's Policing Program, these violations also give rise to a claim against Defendants for deprivation of the equal protection of the laws. *See, e.g.*, *Kaufman County*, 352 F.3d at 1013 (racial motivation or animus coupled with "harassment or a violation of established rights" may constitute a separate equal protection violation).

Defendants' Motions argue that the undisputed facts demonstrate that Latoya Brown, Steven Smith, and Lawrence Blackmon suffered no deprivation of their Fourth Amendment rights. Brown Mem. 10; Smith Mem. 12; Blackmon Mem. 5-6. Defendants also argue that Plaintiffs' municipal liability claims fail because Plaintiffs have not sufficiently demonstrated the existence of a specific MCSD policy authorizing unconstitutional invasions of Black Madison

County residents' homes.[43] Manning Mem. 9; Blackmon Mem. 7. Defendants' argument mischaracterizes the MCSD policy at issue. These claims do not concern a policy specific to home invasions; instead, they concern the MCSD's overall Policing Program, pursuant to which the MCSD disproportionately targets Madison County's Black communities for selective and aggressive enforcement of criminal and traffic laws. The incidents at issue are not aberrations, but rather involve the MCSD acting in accordance with its standard operating procedures with respect to Madison County's Black community. This stands in contrast to the cases relied on by Defendants in the Manning Motion, in which the plaintiffs had alleged that the defendant municipalities lacked a specific policy to protect them from the harms they allegedly suffered. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1280 (5th Cir. 1992) (plaintiff shot by officer while trying to run the officer over alleged that city lacked policy prohibiting officers from placing themselves in front of an ongoing vehicle when the utilization of force is a likely outcome); *Bd. of Cty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410-411 (1997) (plaintiff did not challenge municipal hiring policy itself as unconstitutional, but rather for remote downstream constitutional violations that allegedly occurred as a result of the allegedly negligent hiring of an officer).

Here, by contrast, considerable evidence demonstrates that Plaintiffs were deprived of the equal protection of the laws as a result of the Policing Program, which authorized the MCSD to use disproportionate force and disregard well-established Fourth Amendment protections in addressing the situations at issue, *i.e.*, serving a warrant for unpaid child support on a third party (Lawrence Blackmon); responding to a third-party domestic disturbance call (Khadafy and

---

[43] Defendants do not clearly raise this argument with respect to Mr. Smith's and Ms. Brown's Equal Protection claim. Smith Mem. 7-9; Brown Mem. 6-8.

Quinnetta Manning; and investigating an unrelated missing persons case (Latoya Brown and Steven Smith). Importantly, in none of these cases were Plaintiffs arrested or charged with any crime; rather, these Plaintiffs—like the Plaintiffs and plaintiff class members stopped at the MCSD's discriminatory and suspicionless roadblocks and pedestrian stops—were innocent civilians who suffered harm at the hands of the MCSD because they were Black persons living in predominantly-Black neighborhoods of Madison County. The question of Defendants' liability under the Fourteenth Amendment for these harms presents, at a minimum, disputed issues of material fact. *See, e.g.*, *Hope v. City of Long Beach*, 2005 WL 6009954, at *8 (C.D. Cal. Aug. 15, 2005) (denying summary judgment on a selective enforcement claim because "the municipal policy is not merely the moving force behind the constitutional violation, it is the constitutional violation"); *Douglas v. Stalmach*, 2017 WL 1100893, at *3 (D. Nev. Mar. 21, 2017) (denying summary judgment where there were facts "sufficient to impose potential liability on [defendants] for a policy or practice that may have been a direct causal factor" in the constitutional violation); *Stone v. City of Wheat Ridge, Colorado*, 2009 WL 890718, at *10 (D. Col. Mar. 31, 2009) (denying summary judgment where there was "a genuine issue of material fact as to whether there was a continuing, persistent, and widespread custom of discriminatory practices that was a moving force behind the alleged discrimination"); *Ee v. Washington County*, 2010 WL 680940, at *5 (D. Or. Feb. 25, 2010) (denying summary judgment because there was a "question of material fact regarding whether defendants' actions were a moving force" in the alleged violation).

For the reasons discussed below, none of the incidents at issue can be justified under Fourth Amendment law. Because Plaintiffs have raised genuine factual disputes as to whether Plaintiffs suffered constitutional harm as a result of Defendants' unconstitutional Policing

Program, Defendants' motions for summary judgment regarding these incidents must be denied.

### A.   The Warrantless Entry And Search Of Ms. Brown's And Mr. Smith's Apartment Was Not Justified By Exigent Circumstances

Defendants seek summary judgment on claims brought by Latoya Brown and Steven Smith concerning a nighttime warrantless home entry and search by the MCSD. *See* L. Brown Mem. 10; Smith Mem. 12. Deputies came to their apartment door at approximately midnight, stating that they were searching for a missing child and were searching every unit in the apartment complex. Ex. 4, L. Brown Tr. 54:13-55:12. Mr. Smith opened the door while Ms. Brown dressed; as it was midnight, they both had been asleep. *Id*. Mr. Smith expressly declined to consent to the deputies' entry into his home, but they nonetheless pushed past him and entered the apartment. Smith Mem. 12; Ex. 8, S. Smith Tr. 42:22-43:16. Once inside, the deputies searched the apartment. Ex. 4, L. Brown Tr. 54:13-55:12. They woke up Mr. Smith and Ms. Brown's young daughter and asked her for her name, and also "look[ed] through drawers and stuff" in Ms. Brown's apartment. *Id.* 55:1-19. These kitchen cupboards and drawers were "too small for a child" to hide in. Ex. 30, L. Brown Decl. ¶ 18.[44] The officers then left. Ex. 4, L. Brown Tr. 55:18-19.

"[A]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 589-90 (1980). Because of this, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. Defendants attempt to demonstrate that this warrantless home entry and search was justified by the "exigent circumstances" doctrine and the

---

[44] Defendants mischaracterize this testimony, claiming (without citing any specific testimony) that Ms. Brown "admits that … the deputies only looked in areas where a child could hide." Brown Mem. 10. No such admission exists; it appears that Defendants are simply speculating that the drawers the officers searched were large enough to contain a child. As Ms. Brown explains in her declaration, this speculation is factually incorrect. *See* Ex. 30, L. Brown Decl. ¶ 18.

"emergency aid" doctrine. *See* Brown Mem. 10; Smith Mem. 12. The exigent circumstances doctrine is plainly inapplicable, and, at a minimum, disputed issues of material fact prevent a determination that the emergency aid doctrine justifies this warrantless home entry and search.

### 1.   The Exigent Circumstances Doctrine Is Inapplicable

In *Mincey v. Arizona*, the Supreme Court carved out a narrow exception to the warrant requirement for "emergency situation[s] demanding immediate action ... to protect or preserve life or avoid serious injury." 437 U.S. 385, 392 (1978). Whether a warrantless search falls under this exigent circumstances exception is a fact-intensive inquiry, and a party seeking to claim the exception must present specific circumstances that taken together, "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *See Michigan v. Fisher*, 558 U.S. 45, 47-48 (2009). The Court explicitly rejected the contention that warrantless searches connected to certain serious crimes can be categorically justified under the exigent circumstances exception regardless of attendant circumstances. *Mincey*, 437 U.S. at 393.

For a home entry by law enforcement to be justified under this exception, "police officers need … probable cause *plus* exigent circumstances." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (emphasis added). Thus, Defendants misstate the law when they claim that "exigent circumstances … remov[ed] their actions from any scrutiny under the Fourth Amendment." Smith Mem. 12. Exigent circumstances is an exception to the warrant requirement, not to the requirement of probable cause. *See, e.g.*, *United States v. Lewis*, 381 F. Appx. 376, 380 (5th Cir. 2010) ("[B]oth probable cause and exigent circumstances" are required to justify a warrantless home entry.); *Pratt v. Chicago Housing Auth.*, 848 F. Supp. 792, 795 (N. D. Ill. 1994) ("[E]ven when they exist, exigent circumstances do not erase the additional prerequisite of probable cause.").

Defendants, however, expressly concede the *absence* of probable cause, contending that

"the deputies did not single out [Mr. Smith's and Ms. Brown's] apartment while searching" and instead "intended to search every apartment." Smith Mem. 12. It is well-settled that "police officers, before they constitutionally may search a separate residential unit within an apartment building, must have probable cause to do so that is specifically related to that unit." *United States v. Dorsey*, 591 F.2d 922, 928 (D.C. Cir. 1978); *see also United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007) ("[W]hen a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit.") (quoting *United States v. Butler*, 71 F.3d 243, 249 (7th Cir. 1995)). Thus, far from showing that the undisputed facts demonstrate the applicability of the exigent circumstances doctrine, Defendants' papers expressly concede that no probable cause existed for this warrantless search, rendering the exigent circumstances doctrine inapplicable.

### 2.    The "Emergency Aid" Doctrine Is Inapplicable

Defendants' motions also appear to be invoking the "emergency aid" doctrine, albeit not by name. This doctrine holds that warrantless entries are consistent with the Fourth Amendment where officers have "an objectively reasonable basis for believing that a person within [the dwelling] is in need of immediate aid." *Fisher*, 558 U.S. at 47. In evaluating an assertion that the "emergency aid" doctrine justifies a warrantless home entry, courts must determine "whether there was an objectively reasonable basis for identifying an emergency" and "whether the officer who engaged in conduct without a warrant acted reasonably." *United States v. Toussaint*, 838 F.3d 503, 509 (5th Cir. 2016). Defendants' apparent contention that the emergency aid doctrine, if applicable, "remov[es] [the deputies'] actions from any scrutiny under the Fourth Amendment" (Smith Mem. 12) is meritless, because "[t]he existence of an emergency cannot, by itself, immunize the conduct of the officer from scrutiny." *Toussaint*, 838 F.3d at 509.

Here, the evidence, as characterized by Defendants, shows that MCSD deputies,

ostensibly in search of a missing child, indiscriminately entered and searched numerous units in

an apartment complex at or around midnight, notwithstanding residents' lack of consent to this

nighttime entry and search. The emergency aid doctrine does not authorize this sort of overbroad

search. Instead, as Defendants' cases themselves demonstrate, the emergency aid doctrine

applies where officers possess specific facts giving rise to an objectively reasonable belief that

entry into a specific dwelling is necessary in light of emergency circumstances. *See United States

v. Taylor*, 624 F.3d 626, 632 (4th Cir. 2010) (officers believed that a four-year old child's parents

may be incapacitated, because the child had wandered from her home without supervision and

yelling at the home's door produced no response); *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir.

2009) (deputies believed that vandals had broken into a house where a minor girl was home

alone). As discussed above, the Fourth Amendment analysis for residents of apartment

complexes is determined on a unit-by-unit basis. *Cf.*, *e.g.*, *Pratt*, 848 F. Supp. at 795-96 ("Search

warrants are invalid if they authorize searches of multiple units in an apartment building or hotel,

without probable cause to support the search of each of the units."). To Plaintiffs' knowledge, no

court has extended the emergency aid doctrine so as to authorize or justify warrantless nighttime

searches of every dwelling in an entire apartment complex, subdivision, or neighborhood,

whether to search for missing persons or otherwise.

 In any event, the officers' search of Ms. Brown's and Mr. Smith's kitchen drawers and

cupboards cannot be justified under the emergency aid doctrine. "[A] warrantless search must be

'strictly circumscribed by the exigencies which justify its initiation." *Mincey*, 437 U.S. at 393.

Thus, even assuming the officers were justified in entering the apartment to search for a missing

child (they were not), this initial justification would not extent to any further search of the

premises. *See United States v. Brown*, 230 F. Supp. 513, 529 (M.D. La. 2017) ("If the need to

render emergency aid justifies the warrantless entry into a home, for example, police cannot continue to search a residence after the injured person has been tended to."); *United States v. Davis*, 423 F.2d 974, 980 (5th Cir. 1970) (holding that the emergency-aid exception did not justify a home search conducted after an injured person was removed from the scene because "the emergency ceased to exist when the ambulance departed"). At a minimum, it cannot be said that a reasonable finder of fact could not reach the conclusion that such an indiscriminate, invasive warrantless search exceeded the bounds of reasonableness under the Fourth Amendment.

**B.     Defendants Are Not Entitled To Summary Judgment On The Constitutionality Of The MCSD's Severe Abuse Of Mr. & Ms. Manning**

Defendants next seek summary judgment on the "class-based claims" of Khadafy and Quinnetta Manning. Manning Mem. 2.[45] Defendants do not argue that the MCSD's conduct in connection with the June 26, 2016 warrantless entry into Ms. Manning's apartment and subsequent harassment of the Mannings (the "June 26, 2016 Incident") complied with the Fourth Amendment. Instead, Defendants contend that Plaintiffs have presented no evidence that the MCSD's actions were the result of the MCSD's Policing Program because Plaintiffs have not demonstrated a "persistent, widespread practice of MCSD personnel conducting alleged illegal entries into homes." *Id.* at 10.

Defendants' discussion of the June 26, 2016 Incident is flawed. So is Defendants' argument that the Mannings' class-based claims fail for lack of proof of a specific MCSD policy authorizing illegal home entries. As discussed above, a genuine factual dispute exists as to whether this incident was caused by Defendants' Policing Program, as opposed to being—as

---

[45] Defendants do not seek summary judgment with respect to the Mannings' damages claims. *See* Manning Mem. 2 n.1.

71

Defendants contend—"an isolated or episodic incident of alleged misconduct by certain subordinate officers." Manning Mem. 10. Sheriff Tucker's failure to take any meaningful action in response to the June 26, 2016 Incident, particularly in light of the extensive history of misconduct by the responsible officer (Sgt. Slade Moore) further reinforces that factual disputes preclude judgment in favor of Defendants on the Mannings' class-based claims at this early stage of this litigation.

### 1.    The June 26, 2016 Incident

The June 26, 2016 Incident was precipitated by a domestic disturbance call involving a recently separated couple who lived near Ms. Manning's apartment in Canton Estates. After several MCSD officers failed to apprehend the suspect, they returned to Canton Estates, stormed into Ms. Manning's apartment, subjected Mr. Manning to unlawful detention and serious verbal and physical abuse, and coerced Mr. and Ms. Manning to write inaccurate witness statements.

### (a)    The Underlying Third-Party Domestic Disturbance

The June 26, 2016 Incident began in the pre-dawn hours of Sunday, June 26, 2016, when Deputy James Hall responded to a domestic disturbance call at Canton Estates concerning an alleged altercation between Ladarius Thompson and Ashley Morment, who had recently separated after a ten year-long relationship. Ex. 92, MC – RFP 9-3-7, at 9-5-6. When Deputy Hall arrived, he found Mr. Thompson, Ms. Morment, and Ms. Morment's cousin standing together at the corner. *Id.* at 9-5. Deputy Hall asked Mr. Thompson his name. As Deputy Hall began to run the name Mr. Thompson provided against the MCSD's databases, Mr. Thompson allegedly "began to flee towards the entrance of the apartment complex." *Id.* at 9-5-6. Deputy Hall did not run after Mr. Thompson but instead called dispatch and drove off in an attempt to "cut [Mr. Thompson] off on the other side of the complex." *Id.* at 9-6.

Nothing in the incident report indicates that Mr. Thompson posed an immediate and

serious threat to anyone. Nevertheless, at least four MCSD deputies, including Sgt. Slade Moore, participated in a lengthy and unsuccessful search of Canton Estates for Mr. Thompson. *Id.*

At approximately 6 a.m., Sgt. Moore radioed that he saw Mr. Thompson walking around the building where Ms. Morment resides. *Id.* Sgt. Moore reported that he watched from afar and took no action as Mr. Thompson allegedly "broke the window out of apartment 6E." *Id.*; Manning Mot. Ex. 4 (ECF 256-1) at Ex. B ("Moore Mem.") at 8-191 ("I saw the suspect breaking out the window of the victim's apartment … I observed without approaching.").[46] Sgt. Moore "continued watching as [Mr. Thompson] pulled pieces of glass out of the broken window and threw them over the fence and into the nearby field." Ex. 92, MC – RFP 9-3-7 at 9-6.

Ms. Manning testified that she and Mr. Manning, who was staying at her apartment overnight, went downstairs that morning after hearing Mr. Thompson in the vicinity of Ms. Morment's apartment, which was located downstairs from Ms. Manning's. Ex. 6, Q. Manning Tr. 94:2-20. She and Mr. Manning found Mr. Thompson standing near Ms. Morment's window, touching the broken glass. *Id.* 89:1-3, 98:23-99:2, 102:22-24, 103:21-104:2; Ex. 5, K. Manning Tr. 103:19-21, 104:3-4. Both Mr. and Ms. Manning testified that Mr. Thompson wanted to get his television out of Ms. Morment's apartment. Ex. 6, Q. Manning Tr. 110:17-20, 112:15-113:5; Ex. 5, K. Manning Tr. 111:12-17. However, Mr. and Ms. Manning did not see Mr. Thompson break the window on the morning of June 26, 2016. Ex. 5, K. Manning Tr. 104:15-22; Ex. 6, Q. Manning Tr. 89:4-8, 96:11-13. Both Mr. and Ms. Manning testified that the window had been broken well before the June 26, 2016 Incident.[47] Neither Mr. nor Ms. Manning testified that they

---

[46] There is no evidence that any other deputy witnessed Mr. Thompson allegedly breaking the window of Ms. Morment's apartment. *See, e.g.*, Ex. 14, Hall Tr. 91:18-19 ("I didn't see the actual breaking of the window.").

[47] Ex. 5, K. Manning Tr. 103:22-25 ("the window had been broken for –for quite some time … over 10 to 15 days perhaps"), 116:15-16 ("I remember passing by numerous days seeing that broken window"); Ex.

saw Mr. Thompson break into Ms. Morment's apartment.[48]

Ms. Manning testified that she told Mr. Thompson to "step away" from Ms. Morment's window, and said she was going upstairs to call Ms. Morment. Ex. 6, Q. Manning Tr. 88:14-18. She and Mr. Manning then returned upstairs to Ms. Manning's apartment. *Id.* 96:14-20. At some point after she went inside her apartment, Ms. Manning heard Mr. Thompson say that the police were coming. *Id.* 95:7-8. Mr. Thompson came to Ms. Manning's door, but Ms. Manning asked him to leave, explaining that she did not want Mr. Thompson in her home if the police were looking for him because she has children and she didn't want to run into issues with her landlord. *Id.* 95:8-25. Mr. Thompson immediately left. *Id.* 95:14-19. This is consistent with Sgt. Moore's account that Mr. Thompson returned downstairs "[l]ess than a minute" after going up to Ms. Manning's apartment. Ex. 92, MC – RFP 9-3-7 at 9-7.

Sgt. Moore's version of events differs in certain respects. According to Sgt. Moore, Mr. and Ms. Manning came outside while Mr. Thompson was allegedly in the process of breaking Ms. Morment's window. Moore Mem. 8-191. Sgt. Moore contends that Mr. and Ms. Manning were acting as "look-outs" for Mr. Thompson. *Id.*; Moore Aff. ¶ 11. He reported that the three "ran up the stairs" together when they suspected that a deputy might be nearby. Ex. 92, MC – RFP 9-3-7 at 9-6. Sgt. Moore's claim that Mr. Manning "ran up the stairs" is not credible, as Mr.

---

6, Q. Manning Tr. 197:13-14 ("The window was already busted maybe three or four weeks prior to the incident.").

[48] *See* Ex. 5, K. Manning Tr. 111:18-21 ("Q: And he was going to go in the broken window, right? … A: He didn't tell me that."); Ex. 6, Q. Manning Tr. 89:11-13 ("Q: Okay. And he was going to go through the window? A: He didn't tell me that."). Defendants claim that "Quinnetta knew Thompson was breaking in Morment's apartment." Manning Mem. 4 (citing Q. Manning Tr. 113). While Ms. Manning testified that Mr. Thompson told her that he intended to break into the apartment to recover some of his possessions, she did not testify that Mr. Thompson was in the process of breaking into Ms. Morment's apartment when she saw him. In fact, Ms. Manning specifically testified that she "hadn't seen" Mr. Thompson break into Ms. Morment's apartment. Ex. 6, Q. Manning Tr. 113:7-9.

Manning is the victim of a shooting that left him with a serious spinal injury.[49] As a result of this injury, Mr. Manning walks with a cane and needs daily assistance getting dressed. He could not physically have run up the stairs.[50]

Sgt. Moore reports that after leaving Ms. Manning's apartment, Mr. Thompson "began removing more of the glass [from] the broken window" and then allegedly "placed a door mat over the remaining glass in the window before trying to climb into the apartment through the window." Ex. 92, MC-RFP 9-3-7 at 9-7. Sgt. Moore continued to do nothing to stop Mr. Thompson from allegedly breaking into Ms. Morment's apartment. *Id.* Mr. Thompson was reportedly "unable to get through the window" and, according to Sgt. Moore, became "spooked." *Id.* Mr. Thompson then allegedly ran away and "went through a hole in the fence" surrounding the complex. *Id.* Once again, a lengthy and unsuccessful search for Mr. Thompson ensued.[51] Sgt. Moore reportedly "signed an affidavit on Ladarius Thompson for malicious mischief." *Id.* While Mr. Thompson has been subsequently arrested and incarcerated in Madison County on unrelated charges, Defendants have produced no records indicating that Ms. Morment ever pressed charges against Mr. Thompson for the events that occurred that day, or that Mr. Thompson has ever been arrested for malicious mischief or burglary in relation to the incident.

(b)     The MCSD's Harassment And Coercion Of The Mannings

After Mr. Thompson's alleged escape, Sgt. Moore went to Ms. Manning's home to

---

[49] Sgt. Moore is aware of Mr. Manning's injuries because he was one of the deputies who responded to the shooting. *See* Ex. 93, MC-RFP 10-593.

[50] *See* Ex. 31, K. Manning Decl. ¶ 4 ("I cannot walk properly without a cane. I also have some difficulty…getting dressed."); Ex. 6, Q. Manning Tr. 86:21-23 ("And I told him … no, we couldn't have ran up the stairs, because Khadafy cannot run.").

[51] *See* Ex. 92, MC-RFP 9-3-7 at 9-7 ("We deputies searched for Ladarius a second time in the wooded area but were unable to locate him."); Thompson Tr. 218:7-9 ("the individual fled on foot and we stayed in the area for a long period of time trying to find him"), 219:24-25 ("we looked for him all night pretty much").

demand that she and Mr. Manning provide witness statements against Mr. Thompson. Moore

Mem. 191-92. Sgt. Moore's incident report omits the unlawful nature of his entry into Ms.

Manning's home or the violent and coercive process through which he elicited the Mannings'

witness statements.

It is undisputed that Sgt. Moore did not have a warrant to enter Ms. Manning's apartment.

His memo makes no mention of a warrant or of consent to his entry. *See id.* 8-191-93. Instead,

Sgt. Moore reported that he "stepped inside the apartment and could immediately smell the odor

of marijuana." *Id.* 8-191-92. Mr. Manning testified that neither he nor Ms. Manning smokes

marijuana. Ex. 5, K. Manning Tr. 129:18-22. Ms. Manning testified that she did not give Sgt.

Moore permission to enter her home. *See* Ex. 6, Q. Manning Tr. 85:23-86:5 ("Did they ask if

they could come in? A: No. Q; They didn't ask at all? A: No. Q: Who answered the door? A: I

did. Q: Okay. Did you invite them in? A: No."). She instead testified that Sgt. Moore and the

other officers "stormed into" her apartment. *Id.* 85:3-7.

Defendants note that Ms. Manning "did not tell the officers that they could not enter" her

home. Manning Mem. 5; *see also* Ex. 6, Q. Manning Tr. 86:6-7. But such acquiescence does not

constitute consent, much less demonstrate the absence of disputed material facts as to such

consent.[52] The Fifth Circuit has made it clear that an individual's "mere acquiescence to a show

of lawful authority is insufficient to establish voluntary consent." *United States v. Jaras*, 86 F.3d

383, 389-90 (5th Cir. 1996); *see also, e.g.*, *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir.

1990) ("There is no contention that the police expressly or impliedly asked consent to enter nor

---

[52] Significantly, Defendants do not argue that Ms. Manning's failure to object to the officers' entry actually constituted consent, or cite any case law to this effect. And Sgt. Moore's affidavit merely states that "when [Ms. Manning] opened the door, I entered the apartment and began to question both Quinnetta and Khadafy Manning." Moore Aff. ¶ 16. It does not state that Sgt. Moore sought or received consent to enter. The affidavit also is conspicuously silent as to what transpired after he entered the apartment.

that [the individual] expressly granted or refused entry. It is one thing to infer consent from actions responding to a police request. It is quite another to sanction the police walking in to a person's home without stopping at the door to ask permission.").

Sgt. Moore admits that he told Mr. and Ms. Manning that they could either provide statements attesting to Mr. Thompson's alleged burglary, or he would take them to jail as suspects themselves. Moore Mem. 8-192 ("I told both of them that if they were suspects, they were going to jail but if they were witnesses they would need to write a statement as to what had happened."). This is consistent with the Mannings' testimony. Ex. 6, Q. Manning Tr. 107:9-12; Ex. 5, K. Manning Tr. 96:10-18. Both Mr. and Ms. Manning denied any involvement in Mr. Thompson's alleged burglary, and, according to Sgt. Moore, "began raising their voices arguing that they were not involved." Moore Mem. 8-192. Sgt. Moore responded by handcuffing Mr. Manning and grabbing him by the neck. *Id.* ("I placed handcuffs on Khadafy in an attempt to regain control of the situation. … I then placed my hand under his jaw and applied pressure to his mandible nerve in an attempt to gain control of Khadafy."); Ex. 5, K. Manning Tr. 96:21-97:1 ("He cussed me out … and proceeded to put me in handcuffs. And once in handcuffs, …he [ ] grabbed me by the windpipe and was talking at me.").

Mr. Manning pleaded with Sgt. Moore that he was disabled and could not walk properly. Moore Memo 8-192 ("He began stating that he had been previously shot and that he was disabled."). Sgt. Moore nevertheless forcibly removed Mr. Manning from Ms. Manning's apartment. *Id.* at 8-193 ("I made the decision to remove him from the apartment"). Mr. Manning testified that Sgt. Moore dragged him out of apartment and down the stairs while he was still handcuffed. Ex. 5, K. Manning Tr. 97:9-23 (Sgt. Moore "said he was going to take my butt to jail. I remember…being drug down the stairs, handled roughly going down the stairs while I was

in handcuffs. … I didn't see no need for excessive force that way with a crippled man."). Sgt. Moore would not even permit Mr. Manning to get his cane or his pants first. *Id.* 97:14-15 ("they wouldn't allow me to get my cane. I was in my boxers."). Mr. Manning heard the officers call him "Mr. Cripple" as Sgt. Moore pulled him out of the apartment. *Id.* 98:3-11 ("And they were like, 'Mr. Cripple going to jail.'").

Sgt. Moore placed Mr. Manning in the back of Deputy Rylon Thompson's patrol vehicle. Moore Memo 8-193 ("I placed [him] in the back of a patrol vehicle."); Ex. 22, R. Thompson Tr. 221:13-16 ("Sergeant Moore sat [Mr. Manning] in the back of my patrol car on the driver's side"). Mr. Manning testified that Sgt. Moore repeatedly hit him in the head and the chest with his fists and with an object of some type. Ex. 5, K. Manning Tr. 98:12-22 ("he hit me upside the head … He hit me in my chest."), 105:22-24 ("And when I … went to tell him … the truth of what went on, that's when I get hit with an object"), 107:5-17. Sgt. Moore denies using force against Mr. Manning while he was confined in the patrol vehicle. Ex. 17, Moore Tr. 133:21-23. His memorandum simply reports that Mr. Manning immediately "stopped being loud, aggressive, and defiant." Moore Mem. 8-193. There is no video evidence of what took place because Deputy Thompson's in-vehicle camera was not activated. Ex. 22, Thompson Tr. 230:8-14.

It was not until Mr. Manning agreed to write the false witness statement Sgt. Moore demanded that the beating stopped and he was released from the patrol car. Ex. 5, K. Manning Tr. 106:5-6 ("And once I said the right thing, that's when the beating stopped."); Moore Memo 8-193 ("I …agreed to let Khadafy give a written statement about the suspect breaking into apartment 6E. After giving the written statement, Khadafy was released without charges."). When Sgt. Moore released Mr. Manning from the patrol car, he said, "I heard you did get shot.

78

… [Y]ou should have did …your wife a favor and just died that night." Ex. 5, K. Manning Tr. 99:4-12.

Both Mr. and Ms. Manning have consistently maintained that the statements they provided to Sgt. Moore were written under extreme duress, on threat of imprisonment. *See, e.g.*, *id.* 104:23-105:14 ("I didn't want to go to jail. My wife didn't want to go to jail. So I wrote what I knew he wanted … That's why I wrote it."); Ex. 6, Q. Manning Tr. 107:3-15 ("The option was either write the statement or go to jail. So I wrote the statement. I wrote what he asked me to write, that I [had] seen Ladarius pull his hand through the window and break the window, which was not true.").

### 2. Sheriff Tucker's Response Demonstrates That The Incident Was Not Simply An Isolated Instance Of Police Misconduct

Defendants contend that the June 26, 2016 Incident was "(at most) an isolated or episodic incident of alleged misconduct by certain subordinate officers." Manning Mem. 10. But the reaction to the June 26, 2016 Incident by Sheriff Tucker and Chief Williams suggests that there was nothing particularly unusual about what happened to the Mannings. Disputed issues of material fact thus exist, as also detailed in Section II.B.2(d) above, that Sheriff Tucker was deliberately indifferent, and took no action to monitor, train, or discipline his deputies, to prevent further foreseeable constitutional violations.

Sgt. Moore has an extensive history as a subject of civilian complaints, including complaints with racial dimensions. Prior to joining the MCSD, Sgt. Moore was terminated from his position as an officer in the Jackson Police Department after several complaints had been filed against him. *See City of Jackson v. Moore*, 97 So. 3d 1238, 1241 (Miss. Ct. App. 2012) ("Suffice it to say, Officer Moore's case involves more than a single act of negligence."). The Mississippi Court of Appeals held the City of Jackson liable for his use of excessive force

against an arrestee, *City of Jackson v. Calcote*, 910 So. 2d 1103, 1103, 1113 (Miss. Ct. App. 2005). Following his termination, Sgt. Moore sued the Jackson Police Department for reverse racial discrimination, contending that he was treated differently than similarly-situated Black officers. *See Moore v. City of Jackson*, 2012 WL 4588066, at *3 (S.D. Miss. Oct. 2, 2012).

Several months after the June 26, 2016 Incident, Sgt. Moore badly mistreated class member Destiny Jones after her vehicle was hit by a drunk driver. A state trooper had asked Ms. Jones to exit her vehicle in order to provide a statement, but Sgt. Moore told her to stay in the car. Ex. 45, L. Jones Decl. ¶ 11. Faced with "competing instructions from different officers," Ms. Jones was unsure whose orders to follow. *Id.* ¶ 12. Once again, Sgt. Moore responded to perceived insubordination with disproportionate force. He dragged Ms. Jones out of her car and arrested her. *Id.* ¶ 11. Sgt. Moore twisted Ms. Jones' arms in an "extremely forceful" manner. *Id.* He arrested Ms. Jones, and it took a full day for her family to get her out of jail. *Id.* ¶ 16. Ms. Jones has attested that Sgt. Moore treated her in this manner because of her race. *Id.* ¶ 19 ("I think I was only treated this way because I am Black. I cannot believe that if a white family was on the side of the street trying to deal with a very upsetting car accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail.").

Both Sheriff Tucker and Chief Williams learned about the June 26, 2016 Incident on the day it occurred. Ex. 85, MC-RFP 8-182. Chief Williams was specifically informed by a reporter that the Mannings "alleged an unknown deputy choked Khadafey [*sic*] Manning while in handcuffs." *Id.* Chief Williams asked Sgt. Moore to prepare a report setting forth his account of the events. Ex. 17, Moore Tr. 47:8-47:14. Two days later, Sgt. Moore submitted a memorandum setting forth numerous alleged details that were not included in his section of the incident

report.[53] Moore Mem. 8-191-93.

Chief Williams never questioned Moore about the incident, nor did he speak to the other deputies involved in the Manning incident. Ex. 17, Moore Tr. 47:8-20; Ex. 27, Williams Tr. 183:7-183:21. Chief Williams also did not question Deputy Thompson about his recollection of the events, even though Sgt. Moore had restrained Mr. Manning in Deputy Thompson's vehicle. Ex. 22, R. Thompson Tr. 233:23-234:9. At no point did Chief Williams speak with Mr. or Ms. Manning to understand what had happened that day. Ex. 27, Williams Tr. 182:21-183:6.

Notwithstanding the seriousness of the Mannings' claims, Chief Williams did not discuss the incident with Sheriff Tucker (or if he did, the conversation was not memorable enough for Sheriff Tucker to recall it). Ex. 24, R. Tucker Tr. 237:13-23; 244:3-8. Sheriff Tucker himself never questioned Sgt. Moore about the Manning incident. *Id.* 244:9-12. At the conclusion of this cursory investigation, Chief Williams determined that no discipline was warranted against any of the officers involved in the Manning incident. Ex. 27, Williams Tr. 184:4-9; *see also* Ex. 24, R. Tucker Tr. 72:9-14.

During his deposition, Sheriff Tucker testified that he believed Chief Williams' investigation into the Manning incident was adequate. Ex. 24, R. Tucker Tr. 244:17-21. Sheriff Tucker maintained that Sgt. Moore had not violated any MCSD policies or procedures. *Id.*

---

[53] The Court should place no weight on Sgt. Moore's memorandum, which was created at a time and under circumstances where Sgt. Moore had every incentive to defend his actions. *See Bracey v. Herringa*, 466 F.2d 702, 705 (7th Cir. 1972) (finding that it was "error for the district court to accept in support of the defendants' motion for summary judgment prison records which included the self-serving statements of the defendants themselves as well as statements of other prison guards who were subject to possible Civil Rights liability. This kind of record lacks reliability and trustworthiness."); *Fleming v. Hinds Cty*, 2017 WL 1730971, at *2 (S.D. Miss. May 1, 2017) (holding that MCSD Deputy Rylon Thompson could not rely on a police report he authored in support of his motion for summary judgment in an excessive force action, and denying Deputy Thompson's motion for summary judgment); *see generally Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993) (district court should not have admitted progress notes prepared by a corrections officer because there was "a dark cloud hovering over this particular business record: the officer's motive to fudge the truth of what really happened").

243:4-7. He testified that it was "acceptable" for Sgt. Moore to give the Mannings the choice of either providing witness statements or sleeping on a concrete floor in jail. *Id.* 239:20-241:21 ("I think it's perfectly acceptable to explain to someone their options."); 261:5-17 ("You can go to jail or not? Yes, I think that's a great option."). He also saw nothing "wrong" with Sgt. Moore threatening the Mannings that they would be subject to a "fifty-thousand dollar bond for burglary." *Id.* 251:3-252:6. Sheriff Tucker even testified that it was not a violation of MCSD policies for Sgt. Moore to call Mr. Manning a "Cripple." *Id.* 252:20-253:15 (Sgt. Moore's use of the term was not a violation because Mr. Manning "characterized himself" as a "Cripple" "by saying he couldn't run up the stairs").[54]

Sheriff Tucker's official policies "may be inferred from his conduct after the events" of June 26, 2016. *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985). "If prior policy had been violated" during these incidents, then one "would expect to see a different reaction" by Sheriff Tucker. *Id.* Since the June 26, 2016 Incident "obtained so little attention and action by" Sheriff Tucker, a factfinder could "conclude that [this] was accepted as the way things are done and have been done" at the MCSD. *Id.* Summary judgment on the Mannings' class claims in connection with the June 26, 2016 Incident is not warranted, as at a minimum there are disputed issues of material fact as to whether the June 26, 2016 incident was a result of the

---

[54] Sheriff Tucker's response to the June 26, 2016 Incident is in line with the way he has handled other complaints of deputy misconduct. For example, in November 2016, class member Destiny Jones filed a complaint against Sgt. Moore for using excessive force and falsely arresting her at the scene of a car crash caused by a drunk driver. Ex. 74, MC-RFP 8-211-214. Sheriff Tucker did not recall any investigation into her complaint. Ex. 24, R. Tucker Tr. 265:22-266:2, 267:15-18. Chief Williams testified that he recalled "looking into the incident" and determining not to take action, but could not remember if he "did a report or documentation of it." Ex. 27, Williams Tr. 184:10-185:14 *see also* Ex. 17, Moore Tr. 58:21-25. Chief Williams did not contact Ms. Jones. Ex. 44, D. Jones Decl. ¶ 18. Once again, Sheriff Tucker did not reprimand or discipline Sgt. Moore in any way.

Policing Program.[55]

### C.    Disputed Issues Of Material Fact Exist As To Whether The Forced Home Entry And Wrongful Detention Of Lawrence Blackmon Violated The Fourth Amendment

Lawrence Blackmon has presented evidence that he was subjected to a forced home entry and wrongful detention by the MCSD. Mr. Blackmon has testified that, on or about December 8, 2015, while he was living at his grandmother's house, he was awakened by loud knocking and shouting by people at the door of the house. Ex. 3, Blackmon Tr. 74:10-23. He looked out the window next to the door, and saw that it was MCSD deputies, demanding to be let in. *Id.* 74:19-23. When Mr. Blackmon asked to see a warrant, the deputies shook a piece of paper by the window, but would not allow Mr. Blackmon to see it. *Id.* 75:4-12. The deputies threatened to kick down the door, which they then began doing, damaging the door of the house. *Id.* 75:13-23. As soon as Mr. Blackmon let the deputies inside to prevent them from further damaging his grandmother's front door, the deputies pointed their guns at Mr. Blackmon, and handcuffed him. *Id.* 75:24-76:5. The deputies claimed to be looking for a relative of Mr. Blackmon. *Id.* 76:6-9. Despite Mr. Blackmon's efforts to identify himself, he was left in handcuffs while the MCSD officers searched the house.[56] *Id.* at 76:23-77:13. No warrant was ever shown to Mr. Blackmon, and he was eventually released from the handcuffs after the officers thoroughly searched his home. *Id.*

---

[55] *See, e.g.*, *Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 797 (S.D. Tex. 2013) (denying summary judgment on a § 1983 claim where "a factfinder could interpret [the policymaker's] unusual investigation of the incident and [the policymaker's] decision not to even discuss the incident [with the officer involved in the incident at issue] as indicative of ratification" of the incident); *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 615 (S.D. Tex. 2009) (denying summary judgment on a § 1983 claim where there was no evidence that the officer "was ever disciplined, reprimanded or subjected to any adverse employment action as a result of the incident" and reasoning that "[e]vidence of this nature tends to imply that the [municipality] may have affirmatively acquiesced in, adopted and/or sanctioned [his] conduct.").

[56] Officer McDonald states in his affidavit that Mr. Blackmon refused to identify himself. McDonald Aff. ¶ 9. Mr. Blackmon has testified that he gave his name. Ex. 3, L. Blackmon Tr. 76:6-9.

The underlying circumstances that precipitated this incident are emblematic of Defendants' Policing Program. Defendants aver that Mr. Green's arrest warrant was for outstanding child support payments, issued by the Chancery Court of Madison County. McDonald Aff. ¶ 2. The warrant was not for a violent crime or a felony, nor does Mr. McDonald testify that he had reason to believe that Mr. Green was armed and dangerous. Mr. Green allegedly had failed to pay his child support as ordered by the Chancery Court. It strains credulity to assert that it was reasonable for officers to kick down the door of a home and point their guns at the occupants once inside in order to effectuate the arrest of a non-violent suspect who allegedly had outstanding child support payments. As a result of Defendants' discriminatory Policing Program, however, Mr. Blackmon's encounter with the MCSD resulted in yet another Fourth Amendment violation.

In their summary judgment motion directed at Mr. Blackmon's claims, Defendants primarily argue that the MCSD's forced entry and wrongful detention of Mr. Blackmon were constitutionally permissible because the MCSD personnel involved acted reasonably, albeit mistakenly, in so doing. *See* Blackmon Mem. 6. As discussed below, whether such MCSD personnel acted reasonably raises factual issues that cannot be resolved on the current, incomplete paper record. Summary judgment must be denied here as well.

### 1. Genuine Factual Disputes Exist Regarding Whether The MCSD Unconstitutionally Entered Blackmon's Home

Summary judgment is improper on a Fourth Amendment claim where the law enforcement agent and the detained individual offer factually competing accounts of the encounter that allegedly violated the Fourth Amendment. *Ortega-Melendres*, 836 F. Supp. 2d at 984-985 (summary judgment inappropriate where "[t]he parties offer drastically different versions of the stop, each supported by deposition testimony."). Defendants argue that summary

judgment should be granted in their favor with respect to Mr. Blackmon's claims regarding the

December 2015 incident, asserting in conclusory fashion that "there is no evidence of a Fourth

Amendment violation." Blackmon Mem. 5. This argument fails.

Defendants assert in conclusory fashion that MCSD deputies had obtained a valid warrant

for Mr. Green's arrest, and seem to imply that the warrant, which was never displayed to Mr.

Blackmon on the date of the home invasion, somehow insulated their conduct from constitutional

scrutiny. *Id.* But there was no warrant for Mr. Blackmon's arrest, and warrantless entries into the

home are presumptively unreasonable. *See, e.g.*, *Tamez v. City of San Marcos*, 118 F.3d 1085,

1093 (5th Cir. 1997). Moreover, Defendants only now, in filing their motion, have put forward

what they allege to be the warrant that allegedly justified their entry into the residence. *See*

McDonald Aff., Ex. A. This document was never produced to Plaintiffs, and Defendants cannot

obtain early summary judgment in reliance on a document Defendants failed to produce in

discovery. *See Abington Friends School.*, 480 F.3d at 257 ("If discovery is incomplete in any

way material to a pending summary judgment motion, a district court is justified in not granting

the motion"); *Mobile Telecomms. Techs., LLC v. Blackberry Corp.*, 2016 WL 6271717, at *4

(N.D. Tex. May 6, 2016) ("BlackBerry's excuses notwithstanding, Exhibit 17 was not previously

produced to MTel in discovery and may not be used by BlackBerry in support of its motion for

summary judgment.").

Even assuming the warrant was validly issued and was in the possession of the MCSD

deputies on December 8, 2015 (something Plaintiffs do not concede), material issues of fact

nonetheless exist as to whether the forced entry of Mr. Blackmon's home and the deputies'

subsequent detention of Mr. Blackmon were unconstitutional. *United States v. Schultz*, 818 F.

Supp. 1271, 1274 (E.D. Wis. 1993) (arrest warrant does not give officer *carte blanche* powers

when executing the warrant in suspect's home). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and to properly execute an arrest warrant inside a dwelling, an officer entering the dwelling where the suspect lives must have reason to believe the suspect is at home. *Payton v. New York,* 445 U.S. 573, 585, 603 (1980). Mr. Blackmon testified that Mr. Green had not lived at 320 Martin Luther King Dr. for several months prior to the December 8, 2015 incident. Ex. 3, Blackmon Tr. 120:20-23. Disputed issues of material fact thus preclude summary judgment on the issue of whether it was reasonable to believe that Mr. Green was home at the time they entered the home.

### 2.  The Reasonableness Of The MCSD Officers' Mistaken Belief Presents Disputed Issues Of Material Fact

The MCSD did not have a warrant for Lawrence Blackmon's arrest, yet deputies admit that they put him in handcuffs and detained him. *See United States v. Wilson*, 2 F.3d 226, 231 (7th Cir. 1993) ("There can be little question that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody[.]"). A warrantless arrest violates a citizen's constitutional rights unless the arresting officer has probable cause to believe that the individual has committed a crime. *Gerstein v. Pugh*, 420 U.S. 103, 111-112 (1975). Whether probable cause exists is generally a question for a jury. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1026-1027 (9th Cir. 2015) (issue of whether police officer had probable cause to arrest suspect for resisting police officer was for jury in suspect's § 1983 unlawful arrest action); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.").

Defendants concede that they mistakenly detained Mr. Blackmon, and that they did not have a warrant to arrest him. Blackmon Mem. 6. This mistake does not protect the MCSD from

Fourth Amendment scrutiny, as it is well-established that a mistake in executing an arrest warrant can constitute a violation of the Fourth Amendment. *See United States v. Williams*, 79 F. Supp. 3d 888, 904 (S.D. Ill. 2015). To justify the MCSD deputies' conduct, Defendants argue that the MCSD deputies' detainment of Mr. Blackmon complied with the Fourth Amendment because Officer McDonald allegedly ***reasonably*** mistook Blackmon for Green. Blackmon Mem. 6 (citing *Hill v. California*, 401 U.S. 797, 802 (1971) ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.")). This explanation comes up short, however, as genuine factual disputes exist as to whether the MCSD deputies *reasonably* believed that they were arresting Mr. Green rather than Mr. Blackmon (or any other individual).

Mr. Blackmon and the involved MCSD officers have offered materially differing accounts of the incident. For instance, Mr. Blackmon testified that he asked to see the purported warrant when he heard the officers knocking on the door, and that when he told them he could not see the paper, they began kicking the door, at which point he opened the door, only to have the officers point their guns at him. Ex. 3, Blackmon Tr. 74:19-76:5. Officer McDonald, meanwhile, testified that Blackmon slammed the door in the officers' face after he initially opened the door in response to their queries. McDonald Aff. ¶ 5. Nor has there been any testimony or evidence presented by Defendants indicating that Mr. Blackmon and Mr. Green have sufficiently similar appearances such that it would be reasonable for an officer to believe that Mr. Blackmon was Mr. Green. *See Craddock v. Hicks*, 314 F. Supp. 2d 648, 653-54 (N.D. Miss. 2003) (granting summary judgment in favor of mistakenly arrested plaintiff bringing § 1983 claim where officer's "failing to verify her identity was not an objectively reasonable mistake" and there was "no indication that [plaintiff and suspect] looked at all similar").

Summary judgment is inappropriate where such questions as to the reasonableness of the officers' mistaken belief persist. *See Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999) (district court's grant of summary judgment in favor of arresting officer was "erroneous" where "a genuine issue of fact existed as to whether the officer's mistake [regarding suspect's identity] was a reasonable one"); *Ortega-Melendres*, 836 F. Supp. 2d at 983 (summary judgment inappropriate where certain material facts that would resolve the question of reasonableness of officer's belief regarding suspect are currently still in dispute). Defendants' authorities were not summary judgment decisions concerning constitutional violations, but rather were decided by a fact-finder or concerned qualified immunity, something not at issue here.[57] *Hill v. California*, 401 U.S. 797, 802 (1971) (affirming trial court's ruling on officers' reasonableness in believing that individual was subject of warrant); *Blackwell v. Barton*, 34 F.3d 298, 302-03 (5th Cir. 1994) (noting that officer may be entitled to qualified immunity defense against damages claim even if he may have violated individual's constitutional rights). Disputed issues of material fact exist in the record, and the fact finder must weigh the competing evidence as to the reasonableness of the MCSD officers' unjustified detention of Mr. Blackmon.

## VI.   DEFENDANTS' STANDING ARGUMENTS FAIL

Defendants do not challenge the standing of named plaintiffs Khadafy Manning, Quinnetta Manning, Nicholas Singleton, or Bessie Thomas. Defendants assert that named plaintiffs Steven Smith and Latoya Brown lack standing, seemingly because at the time of those two plaintiffs' depositions, they had moved to Georgia (something that is no longer the case). Defendants also challenge Betty Jean Williams Tucker's standing to pursue claims based on her

---

[57] The moving defendants here—Madison County, Mississippi, and Sheriff Tucker, sued solely in his official capacity—are not entitled to qualified immunity. *See, e.g.*, *Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980).

having witnessed unconstitutional searches and seizures of third parties. Ms. Tucker does not, however, purport to assert claims regarding searches and seizures of third parties, so Defendants' attacks on her standing should be rejected as unnecessary.

### A.    Latoya Brown and Steven Smith Have Standing

The MCSD repeatedly violated Latoya Brown and Steven Smith's constitutional rights by stopping them without suspicion, pursuant to a racially discriminatory, suspicionless-stop policy that still exists to this day. Latoya Brown and Steven Smith now seek to end that discriminatory policy, and their standing ought not be defeated because they moved out-of-state temporarily—Latoya Brown again lives in Canton, Mississippi; Steven Smith has expressed his intent to return permanently, and has multiple trips already planned to Canton in upcoming months in order to visit his family. Ex. 30, L. Brown Decl ¶ 4; Ex. 34, S. Smith Decl. ¶¶ 4-5.

Under Fifth Circuit law, a "reasonable expectation" that the unconstitutional conduct may recur is sufficient to confer standing to seek injunctive relief. *Hernandez v. Cremer*, 913 F.2d 230, 233-34 (5th Cir. 1990). Ms. Brown's and Mr. Smith's claims all arise from encounters with the MCSD—stops at vehicular roadblocks; pedestrian stops; and a suspicionless, warrantless entry into their shared apartment—that Defendants expressly disclaim were based on any reasonable suspicion or probable cause. *See* Ex. 30, L. Brown Decl ¶ 10; Ex. 34, S. Smith Decl. 9. Where plaintiffs challenge such suspicionless law enforcement activity, courts do not hesitate to find that they possess standing to seek forward-looking relief. *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013) (plaintiffs had standing to enjoin suspicionless stops around private apartment buildings); *Ortega-Melendres*, 836 F. Supp. 2d at 987-88, aff'd sub nom. *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (Latino motorists had standing to enjoin suspicionless vehicle stops predicated on racial profiling). As the Fifth Circuit explained in *Hernandez*, while courts are reluctant to "assume that the party seeking relief will repeat the type

of misconduct that would once again place him or her at risk of that injury … no such reluctance [ ] is warranted" where a plaintiff "was not engaged in any form of misconduct" but was nonetheless subjected to unlawful governmental conduct. 913 F.2d at 234-35.

In Defendants' primary authority, *City of Los Angeles v. Lyons*, the plaintiff was found to lack standing to seek forward-looking relief because he was not likely to "again be stopped … by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." 461 U.S. 95, 105 (1983). As courts have repeatedly recognized, challenges to government policies that are applied to persons engaged in lawful activity do not present comparable concerns. *See, e.g.*, *Hernandez*, 913 F.2d at 234 ("We find a critical factual distinction between *Lyons* and the instant case which dictate a different result. Hernandez (unlike Lyons) was engaged in an activity protected by the Constitution."); *Floyd v. City of New York*, 283 F.R.D. 153, 169-170 (S.D.N.Y. 2012) ("[U]nlike … in *Lyons*, [t]he risk of injury is not based on a string of unlikely contingencies: ... Ourlicht was stopped and frisked while going about his daily life—walking down the sidewalk, sitting on a bench, [and] getting into a car.").[58]

Latoya Brown and Steven Smith have shown a likelihood of future injury. Latoya Brown was stopped no fewer than four separate times, each time without suspicion. She was stopped while talking on her cell phone, while sitting outside her apartment, while walking by the gates of her own apartment complex (to meet her ride to work), and while walking by a roadblock set

---

[58] Defendants' other authorities are factually inapposite and of little relevance to this motion. *James v. City of Dallas* involved plaintiffs who were found to lack standing to enjoin a city's alleged policy of disproportionately demolishing repairable, "single-family houses in minority census districts" because they did not own and did not "demonstrate[] that they will purchase or occupy a repairable single-family home in a black census tract in the near future." 254 F.3d 551, 565-66 (5th Cir. 2001). In *Bauer v. Texas*, the plaintiff could not obtain declaratory relief disapproving of a judge's handling of her guardianship proceedings because "there are currently no state guardianship proceedings relating to her" and the matter had been transferred to a different judge. 341 F.3d 352, 358 (5th Cir. 2003).

up in front of her apartment.[59] Steven Smith was stopped while walking home from the grocery store with a friend, and again while sitting outside his apartment with his girlfriend.[60] Mr. Brown and Ms. Smith was also subject to a suspicionless, warrantless, midnight forcible entry and search of their shared apartment.[61] The frequency of these incidents, as well as the extensive evidence presented by Plaintiffs that these incidents were the result of MCSD policy, more than suffice to establish a reasonable expectation that the unconstitutional conduct will recur. *Ligon v. City of New York*, 288 F.R.D. at 81 ("[T]he frequency of alleged injuries inflicted by the practice at issue here creates a likelihood of future injury sufficient to address any standing concerns."); *Ortega-Melendres* 836 F. Supp. 2d at 987 ( ("If such a policy [of racial profiling] exists, it presents a 'sufficient likelihood' that the named Plaintiffs will suffer ongoing harm.").[62]

Finally, Defendants argue that Ms. Brown and Mr. Smith lack standing because they no longer reside in Mississippi. Brown Mem. 12-13; Smith Mem. 13-14. This argument also fails. First, as Plaintiffs informed Defendants in supplemental interrogatory responses served nearly a month before Defendants filed their motion, Latoya Brown has moved back to, and currently resides in, Canton, Mississippi. Ex. 94, Pl. Latoya Brown's 2nd Supp. Resps. and Objs. to Defs.' 1st Set of Interrogatories No. 1(a); *see also* Ex. 30, L. Brown Decl. ¶ 3.

Second, Steven Smith currently lives in Dallas, Texas, but has deep and longstanding

---

[59] Ex. 4, L. Brown Tr. 50:24-51:9; 53:2-54:10; 74:19-76:9.

[60] Ex. 8, S. Smith Tr. 34:2:35-24; Ex. 4, L. Brown Tr. 70:10-23.

[61] Ex. 34, S. Smith Decl. ¶¶ 11-12.

[62] In *Lyons*, by contrast, the plaintiff "did not assert that there was a pattern and practice of applying chokeholds without provocation or, if [he] did state such a claim, the Court found it was not supported by the record." *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 564-65 (D. Md. 1999). The Supreme Court specifically noted that in *Lyons* that there was no "evidence showing a pattern of police behavior that ... would permit the application of the control holds on a suspect that was not offering, or threatening to offer, physical resistance." 461 U.S. at 110 n.9.

connections to Madison County, where he was born and spent most of his life. He not only plans to return in the near term to visit his family, but also intends to permanently reside in Madison County once he is financially able to do so. Ex. 34, S. Smith Decl. ¶¶ 4-5. Mr. Smith's longtime girlfriend, Plaintiff Latoya Brown, lives in Canton along with their daughter. *Id.* Ms. Brown and Mr. Smith are expecting another child, and Mr. Smith will be returning to Madison County and staying for an extended period of time when the child is born in summer 2018. *Id.* Mr. Smith will also be returning to Madison County in June of this year to spend Father's Day with his child with Latoya, as well as his other two children, one of whom lives in Canton and the other who in Jackson, Mississippi. *Id.*

The unconstitutional policies challenged by Plaintiffs impact both residents of and visitors to Madison County, and the depth of Steven Smith's connections to Madison County suffice to give him standing to seek declaratory and injunctive relief against the MCSD's violations of his constitutional rights. *See, e.g.*, *Hernandez*, 913 F.2d at 234 (likelihood of future injury shown when "Hernandez testified that he would like to return to Mexico, but did not 'want to run the risk of something like this happening again'"); *Ord v. D.C.*, 587 F.3d 1136, 1143 (D.C. Cir. 2009) ("Moreover, Ord's request for relief—a declaratory judgment and an injunction prohibiting the District of Columbia from enforcing its firearms laws against him—makes sense only if he actually intends to return to D.C. while armed to service his clients. We thus conclude that Ord has standing to bring his preenforcement claim."); *Brown v. Dayton Metro. Hous. Auth.*, No. C-3-93-037, 1993 WL 1367433, at *7 (S.D. Ohio Aug. 26, 1993) (nonresident plaintiff had standing where "visits to family members are a regular part of his life").

### B.   Betty Tucker Has Standing

Defendants argue that Betty Tucker has no standing to challenge the searches and seizure of her barbecue guests and her grandson. Tucker Mem. 12-15. Ms. Tucker never purported to

assert such claims on behalf of these nonparties. Instead, the searches and seizures of these nonparties were described in the Complaint because they provide relevant context and background regarding the impact of Defendants' unconstitutional conduct on Ms. Tucker and her community.[63] Such background evidence is probative of Defendants' unconstitutional policies, and presentation of such allegations in Plaintiffs' Complaint, and development of such evidence in discovery is proper even though it does not give rise to a claim that can be directly asserted by Ms. Tucker. *See, e.g.*, *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (a complaint may properly include allegations that "provide[ ] important context and background," regardless of whether the plaintiff can directly seek relief based on those facts); *Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 825 (S.D. Tex. 2009) (agreeing that "evidence of discriminatory acts that fall outside of the limitations period are relevant and may be used as background evidence"); *Jackson-Hall v. Moss Point Sch. Dist.*, 2012 WL 1098524, at *5 (S.D. Miss. Apr. 2, 2012) (same).[64]

      Importantly, Defendants do not challenge Betty Tucker's standing to enjoin the MCSD's

---

[63] Defendants focus on the guests and ignore Ms. Tucker's own constitutional injury from the unlawful search of her own premises at her barbeque, but there can be no dispute that a resident has standing to challenge a search of her home and, as here, its curtilage. *Florida v. Jardines*, 569 U.S. 1, 5-6 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred. … [T]he curtilage of the house … enjoys protection as part of the home itself.").

[64] Defendants argue that neither Bessie Thomas nor Nick Singleton may not bring claims regarding the MCSD's entry of their homes, arguing that each incident occurred outside the relevant statute of limitations period. Thomas Mem. 2; Singleton Mem. 2. Plaintiffs, however, have only presented those incidents as context and background evidence, and do not assert claims concerning these incidents. Defendants' statute of limitations challenges are therefore moot. Defendants also argue that Betty Tucker's claims arising from the barbeque incident should be dismissed as untimely because Ms. Tucker answered in her December 2017 deposition that the barbeque incident "probably" occurred "more than five years ago." Tucker Mem. 4 n.2, 8. This equivocal testimony does not warrant granting early summary judgment to Defendants regarding this claim, particularly on the affirmative defense of statute of limitations, on which Defendants bear the burden of proof. Instead, Plaintiffs should be permitted to take merits discovery to attempt to locate concrete evidence of the date on which this incident occurred.

unconstitutional roadblock policies. And Ms. Tucker has standing, as there is a "reasonable

expectation" that she will exercise her right to travel on public thoroughfares again and be

subjected to a roadblock. *Hernandez*, 913 F.2d at 234-35 (reasonable expectation of international

travel and possibility of being again denied re-entry established standing); *Ortega-Melendres*,

836 F. Supp. 2d at 985-86 (plaintiffs involved in racially discriminatory traffic stops had

standing to challenge the traffic stop policy).

C.    **The Five Other Plaintiffs' Uncontested Standing Satisfies Article III's Case-
      Or-Controversy Requirement**

Under Article III of the Constitution, federal courts possess jurisdiction over cases and

controversies arising under federal law, and it is well-established that for there to be a justifiable

"case" or "controversy," there must be there must be *at least* one Plaintiff with standing. But, it

is also well established that an Article III case or controversy exists *so long as* at least one

Plaintiff has standing to bring a claim. *See Rumsfeld v. Forum for Acad. & Institutional Rights,

Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to

satisfy Article III's case-or-controversy requirement."); *Arlington Heights*, 429 U.S. at 263-64

(standing exists since "we have at least one individual plaintiff who has demonstrated standing").

Here, Defendants challenge the standing of only three Plaintiffs, and the remaining five

named Plaintiffs, whose standing is unchallenged, seek the same forms of injunctive relief and

independently satisfy the case or controversy requirement. This Court thus need not reach

Defendants' standing arguments, because when one plaintiff has standing to seek an injunction,

all Plaintiffs may do so. *Rumsfeld*, 547 U.S. at 52 n.2; *Arlington Heights*, 429 U.S. at 263-64;

*Texas v. United States*, 809 F.3d 134, 150-51, 155 (5th Cir. 2015), *as revised* (Nov. 25, 2015)

(Plaintiffs had standing to seek injunctive relief because "at least one state—Texas—has satisfied

the first standing requirement" and "one party with standing is sufficient to satisfy Article III's

case-or-controversy requirement."); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 n.11 (5th Cir. 2008) ("'[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"); *Floyd*, 283 F.R.D. at 169 (the "simplest way to address defendants' concern is by noting … [that another] plaintiff … indisputably does have standing and that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'").

## CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment should be denied under Fed. R. Civ. P. 56(d). In the alternative, the Motions should be denied on their merits.

Dated: May 1, 2018

By: ___/s/ Joshua Tom_____
Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Christopher Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2018, I caused the foregoing **CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
Jason E. Dare (MSB No. 100973)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

*/s/ Joshua Tom*
Joshua Tom