**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**LATOYA BROWN; LAWRENCE BLACKMON**
**HERBERT ANTHONY GREEN; KHADAFY MANNING;**
**QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS**
**SINGLETON; STEVEN SMITH; BESSIE THOMAS; and**
**BETTY JEAN WILLIAMS TUCKER, individually and on**
**behalf of a class of all other similarly situated,**                    **PLAINTIFFS**

**v.**                                              **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI; SHERIFF**
**RANDALL C. TUCKER, in his official capacity; and**
**MADISON COUNTY SHERIFF'S DEPUTIES JOHN**
**DOES #1 through #6, in their individual capacities,**                  **DEFENDANTS**

---

**DEFENDANTS' MOTION TO STRIKE NEWSPAPER ARTICLES ATTACHED TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**AS INADMISSIBLE HEARSAY**

---

COME NOW Defendants Madison County, Mississippi, and Sheriff Randall C. Tucker ("Defendants"), and respectfully move to strike the newspaper articles attached to Plaintiffs' Motion for Class Certification as Inadmissible Hearsay and would show unto the Court in support thereof the following:

1.      Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker (hereinafter "Plaintiffs") filed a Motion for Class Certification on March 14, 2018 with a supporting Memorandum of Authorities [Doc Nos. 226 and 227] (the "Motion") pursuant to Fed. R. Civ. P. 23(b)(2) seeking certification as representatives of a Class. In support of their Motion, Plaintiffs attach nine newspaper articles (hereinafter collectively the "Articles") to their Motion

[Doc. No. 226].[1] [Exhibits 69-73; 75-76; 80; and 100 to Plaintiffs' Motion]. Through use of the Articles, Plaintiffs seek to establish that the Madison County Sheriff's Department had implemented practices of racial discrimination against African Americans. This Court should strike the Articles proffered by Plaintiffs because they are inadmissible hearsay.

      2.     The Articles attached to Plaintiffs' Motion contain out of court statements offered to establish the truth of the matter asserted in them, and thus are hearsay. *See* Federal Rule of Evidence 801. Plaintiffs have not presented any evidence sufficient to bring the attached articles into any exception to hearsay under the Federal Rules of Evidence.

      The Articles are inadmissible pursuant to Federal Rules of Evidence 801 and 802 and must be excluded by the Court. Therefore Exhibits 69-73, 75-76, 80, and 100 to Plaintiffs' Motion should be stricken.

      3.     In support of this Motion, Defendants are filing a separate Memorandum Brief, which is incorporated herein and Exhibit "A" through "J" listed below:

| | |
|---|---|
| **Exhibit "A":** | Memorandum in Support of Motion for Class Certification with Plaintiffs' references to articles highlighted [Doc. No. 227]; |
| **Exhibit "B":** | *New Supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008); |
| **Exhibit "C":** | *IS System Fair,* THE CLARION LEDGER (July 22, 2007) |
| **Exhibit "D":** | *Roadblocks questioned in Canton*, THE CLARION LEDGER (July 18, 2006); |
| **Exhibit "E":** | *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION LEDGER (Nov. 6, 2007); |
| **Exhibit "F":** | *House panel considers bill to outlaw racial profiling,* THE CLARION LEDGER (Jan. 14, 2009); |

---

[1] *See* Exhibit "A" - Memorandum in Support of Motion for Class Certification at pp. 4-6 and 25 with Plaintiffs' references to articles highlighted [Doc. No. 227]

Exhibit "G":      *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011);

Exhibit "H":      Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff, Y'ALL POLITICS (Jan. 19, 2011);

Exhibit "I":      *Madison Sheriff responds to Jackson councilman's remarks*, THE CLARION LEDGER (Jan. 4, 2016); and

Exhibit "J":      *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015).

WHEREFORE, PREMISES CONSIDERED, this Court should strike the Articles attached to Plaintiffs' Motion.

RESPECTFULLY SUBMITTED this the 8th day of May, 2018.

**MADISON COUNTY, MISSISSIPPI, and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY:      *s/Charles E. Ross*
         Michael B. Wallace (MSB #6904)
         Charles E. Ross (MSB #5683)
         James E. Graves, III (MSB #102252)
         Charles E. Cowan (MSB #104478)
         WISE CARTER CHILD & CARAWAY, P.A.
         Post Office Box 651
         Jackson, Mississippi  39205-0651
         Telephone: 601-968-5534
         Facsimile: 601- 944-7738
         mbw@wisecarter.com
         cer@wisecarter.com
         jeg@wisecarter.com
         cec@wisecarter.com

         AND

         T. Russell Nobile (MSB #100682)
         WISE CARTER CHILD & CARAWAY, P.A.
         2510 14th Street, Suite 1125
         Gulfport, Mississippi  39501
         Telephone: 228-867-7141
         Facsimile: 228-867-7142
         trn@wisecarter.com

3

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi  39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com


Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi  39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
Telephone: 601-987-5300
lhester@pbhfirm.com

## CERTIFICATE OF SERVICE

I, Charles E. Ross, hereby certify that I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will automatically send email notification to all counsel

of record.

THIS the 8th day of May, 2018.

s/Charles E. Ross
CHARLES E. ROSS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>        Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br><br>**ORAL ARGUMENT<br>REQUESTED** |

MEMORANDUM OF LAW IN SUPPORT OF
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

AMERICAN CIVIL LIBERTIES UNION OF
   MISSISSIPPI FOUNDATION
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408

AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2610

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| PRELIMINARY STATEMENT | | | 1 |
| STATEMENT OF FACTS | | | 3 |
| A. | The MCSD's Culture Of Racial Discrimination | | 4 |
| | 1. | The MCSD's Policing Program Under Sheriff Toby Trowbridge | 4 |
| | 2. | The MCSD's Culture Of Discrimination Persists To The Present Day | 5 |
| B. | Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD | | 8 |
| C. | The MCSD's Policing Program | | 10 |
| | 1. | The MCSD Disproportionately Arrests And Cites Black Persons | 10 |
| | 2. | The MCSD Disproportionately Targets Black Communities | 11 |
| | 3. | Roadblocks Are A Key Element Of The MCSD's Policing Program | 14 |
| | | (a) The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods | 14 |
| | | (b) The Primary Purpose Of The Roadblock Program Is Crime Control | 16 |
| | | (c) MCSD Roadblocks Lack Uniform Procedures Or Safeguards | 18 |
| | 4. | Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program | 20 |
| D. | The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program | | 23 |
| | 1. | MCSD Personnel Are Inadequately Trained And Supervised | 24 |
| | 2. | The MCSD Does Not Maintain Complete Or Accurate Records | 26 |
| | 3. | The MCSD Lacks Meaningful Complaint Procedures | 27 |
| ARGUMENT | | | 29 |

I.      PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT ............. 29

II.     PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT ......... 30

        A.      The Targeting Class Satisfies The Commonality Requirement ........................... 32

        B.      The Roadblock Subclass Satisfies The Commonality Requirement .................... 34

        C.      The Pedestrian Stop Subclass Satisfies The Commonality Requirement ........... 35

III.    PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE
        23(a)(3) ...................................................................................................................... 37

IV.     PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE
        INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4) ............................ 40

V.      THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED ..................................... 42

CONCLUSION ........................................................................................................................ 43

## TABLE OF AUTHORITIES

Cases

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 613 (1997) ................................................................................................. 29

*Braggs v. Dunn,*
   317 F.R.D. 634 (M.D. Ala. 2016) ............................................................................ 31

*Brown v. Nucor Corp.,*
   785 F.3d 895 (4th Cir. 2015) .................................................................................... 34

*Choice Inc. of Texas v. Graham,*
   No. 04-cv-1581, 2005 WL 1400408 (E.D. La. June 3, 2005) .................................. 29

*City of Indianapolis v. Edmond,*
   531 U.S. 32 (2000) .............................................................................................. 30, 35

*City of Jackson v. Calcote,*
   910 So. 2d 1103 (Miss. Ct. App. 2005) ..................................................................... 7

*Cole v. City of Memphis,*
   839 F.3d 530 (6th Cir. 2016) .................................................................................... 42

*Collins v. Ainsworth,*
   382 F.3d 529 (5th Cir. 2004) .................................................................................... 35

*Delaware v. Prouse,*
   440 U.S. 648 (1979) .............................................................................................. 18, 35

*Dockery v. Fischer,*
   253 F. Supp. 3d 832 (S.D. Miss. 2015) ........................................................ 31, 37, 40

*Feder v. Electronic Data Systems Corp.,*
   429 F.3d 125 (5th Cir. 2005) .................................................................................... 37

*Floyd v. City of New York,*
   283 F.R.D. 153 (S.D.N.Y. 2012) .............................................................................. 33

*Gratz v. Bollinger,*
   539 U.S. 244 (2003) .................................................................................................... 1

*Groover v. Michelin North America, Inc.,*
   192 F.R.D. 305 (M.D. Ala. 2000) ............................................................................ 41

*Horton v. Goose Creek Independent School District,*
   690 F.2d 470 (5th Cir. 1982) .................................................................................... 41

*In re Deepwater Horizon,*
　　739 F.3d 790 (5th Cir. 2014) ......................................................................... 31, 32

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation,*
　　851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................... 41

*James v. City of Dallas,*
　　254 F.3d 551 (5th Cir. 2001) ................................................................................ 37

*Jones v. Diamond,*
　　519 F.2d 1090 (5th Cir. 1975) ......................................................................... 29, 42

*Lanner v. Wimmer,*
　　662 F.2d 1349 (10th Cir. 1981) ............................................................................ 41

*Lehocky v. Tidel Technologies, Inc.,*
　　220 F.R.D. 491 (S.D. Tex. 2004) .......................................................................... 41

*Lightbourn v. County of El Paso, Texas,*
　　118 F.3d 421 (5th Cir. 1997) ................................................................................ 37

*Ligon v. City of New York,*
　　288 F.R.D. 72 (S.D.N.Y. 2013) ............................................................................ 36

*M.D. v. Perry,*
　　294 F.R.D. 7 (S.D. Tex. 2013) ............................................................................. 43

*Morrow v. Washington,*
　　277 F.R.D. 172 (E.D. Tex. 2011) ............................................... 31, 33, 34, 35, 41

*Mullen v. Treasure Chest Casino,*
　　186 F.3d 620 (5th Cir. 1999) ......................................................................... 29, 30

*ODonnell v. Harris County, Texas,*
　　No. H-16-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017).............................. 42

*Ortega-Melendres v. Arpaio,*
　　836 F. Supp. 2d 959 (D. Ariz. 2011) .................................................................... 33

*Pederson v. Louisiana State University,*
　　213 F.3d 858 (5th Cir. 2000) ................................................................................ 30

*Shankle v. Texas City,*
　　885 F. Supp. 996 (S.D. Tex. 1995) ...................................................................... 35

*Steward v. Janek,*
　　315 F.R.D. 472 (W.D. Tex. 2016) ........................................................................ 40

*Unger v. Amedisys Inc.,*
    401 F.3d 316 (5th Cir. 2005) ............................................................. 40

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ............................................................. 31

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ....................................... 30, 31, 33, 34, 37, 42

**Statutes**

42 U.S.C. § 1983 ............................................................................. 1

42 U.S.C. § 2000d ............................................................................. 1

Fed. R. Civ. P. 23 ............................................................................. 1

Fed. R. Civ. P. 23 Adv. Comm. Notes,
    *reprinted in* 39 F.R.D. 69, 102 (1966) ......................................... 42

Fed. R. Civ. P. 23(a) .......................... 2, 29, 32, 34, 40, 41, 43

Fed. R. Civ. P. 23(a)(1) ..................................................................... 29

Fed. R. Civ. P. 23(a)(2) ................................. 30, 31, 35, 37

Fed. R. Civ. P. 23(a)(3) ..................................................................... 37

Fed. R. Civ. P. 23(a)(4) ............................................................. 41, 42

Fed. R. Civ. P. 23(b)(2) .......................... 2, 3, 29, 32, 34, 42, 43

Fed. R. Civ. P. 23(g) ......................................................................... 43

L.U. Civ. R. 7(b)(6)(A) ....................................................................... 1

U.S. CONST. amend. IV ............................. 1, 2, 16, 32, 34, 35

U.S. CONST. amend. XIV ................................. 1, 2, 31, 32, 34

U.S. CONST. amend. XIV, § 1 ............................. 1, 31, 32, 35

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas and Betty Jean Williams Tucker ("Plaintiffs" or "Named Plaintiffs") respectfully submit this memorandum in support of Plaintiffs' Motion for Class Certification (the "Motion") in this civil rights action brought against defendants Madison County, Mississippi ("Madison County") and Sheriff Randall Tucker, sued herein in his official capacity ("Sheriff Tucker," and with Madison County, "Defendants"). Pursuant to L.U. Civ. R. 7(b)(6)(A), Plaintiffs respectfully request oral argument on this Motion.

## PRELIMINARY STATEMENT

This is a motion for class certification under Federal Rule of Civil Procedure 23. In six months of discovery, Plaintiffs have developed substantial evidence of Defendants' longstanding policy of stopping and searching Madison County's Black citizens on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "Policing Program").[1] The Policing Program is executed by the Madison County Sheriff's Department ("MCSD") at the direction of Sheriff Tucker.

One of the key components of the Policing Program is the disproportionate placement of roadblocks in predominantly Black neighborhoods (the "Roadblock Program"). Such roadblocks are established to further a primary purpose of general crime control in these communities. The Roadblock Program thus runs afoul of both the Fourth and Fourteenth Amendments. Another essential component of the Policing Program is Defendants' policy of suspicionless stops and searches in majority-Black neighborhoods, particularly in the vicinity of the majority-Black

---

[1] In addition to their constitutional claims brought pursuant to 42 U.S.C. § 1983, Plaintiffs also assert a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Conduct that violates the Equal Protection Clause also violates Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.").

apartment complexes located in and around the city of Canton (the "Pedestrian Stop Program").
MCSD deputies routinely stop Black individuals and ask to see their identification when they are
on their way to work, returning to their homes, or walking with friends. The Pedestrian Stop
Program also violates both the Fourth and Fourteenth Amendments.

Pursuant to Rule 23(b)(2), the Named Plaintiffs seek to represent a class of all Black
persons who presently or in the future will reside in or travel through Madison County (the
"Targeting Class") in order to obtain injunctive and declaratory relief to remedy the
constitutional violations caused by the Policing Program. Plaintiffs also seek to represent two
subclasses in order to obtain declaratory and injunctive relief to remedy the constitutional
violations caused by the Roadblock Program and the Pedestrian Stop Program. The first subclass
consists of all Black persons who travel or will travel by car through majority-Black areas of
Madison County. These persons have been or are likely to be stopped at roadblocks established
by the MCSD based on racially discriminatory criteria and/or for purposes of general crime
control (the "Roadblock Subclass"). The second subclass consists of all Black persons who travel
or will travel by foot in Madison County's majority-Black neighborhoods. These persons have
been or are likely to be subject to searches and/or seizures by the MCSD without reasonable
suspicion or probable cause, and/or on the basis of their race (the "Pedestrian Stop Subclass").

Pursuant to Rule 23(a), one or more members of a class may sue as representative parties
if (1) the class is so numerous that joinder of all members is impractical; (2) there are questions
of law or fact common to the class; (3) the claims of the representative parties are typical of the
claims of the class; and (4) the representative parties will fairly and adequately protect the
interests of the class. Plaintiffs meet each of these requirements. Defendants also "ha[ve] acted or
refused to act on grounds that apply generally to the class, so that final injunctive relief or

2

corresponding declarative relief is appropriate respecting the class as a whole," thus satisfying Rule 23(b)(2). Plaintiffs' Motion should therefore be granted.

<u>**STATEMENT OF FACTS**</u>

Madison County, located directly to the north of Jackson, is approximately 57% white and 38% Black. *See* Ex. 62 (Census data), at 62.1. The white population is concentrated in the southern part of the county, including the cities of Madison and Ridgeland. *Id.* 62.2. The Black population is concentrated in the north and west of the county, including the city of Canton, the town of Flora, and the rural areas near Camden and Kearney Park. *Id.* 62.2-62.4; Ex. 1, Ricchetti Rep. Ex. 3. Southeast Ridgeland also has a substantial Black population. *See* Ex. 88, HUD Compl. at 2. Madison County has experienced significant growth in recent decades. Since 1990, its population has nearly doubled, largely due to the growth of the Madison and Ridgeland areas. Ex. 63 (1990 Census data). Madison County is the wealthiest county in Mississippi. Ex. 62.5.

The MCSD is the primary law enforcement agency for Madison County, with jurisdiction throughout the county. Ex. 64, Resp. to Pls.' 1st Set of Reqs. for Admiss., No. 5. Madison, Ridgeland, Canton, and Flora each maintain their own police departments, which share jurisdiction with the MCSD within their city or town limits. *Id.*; Ans. ¶ 9, 62. The MCSD is headed by Sheriff Tucker, who has held the office of Sheriff since 2012. Ex. 24, R. Tucker Tr. 8:3-4. Sheriff Tucker succeeded Sheriff Toby Trowbridge, who held office from 2000 until 2011. Ex. 23, Trowbridge Tr. 12:24. Sheriff Tucker's chief deputy, Jeremy Williams, is responsible for, *inter alia*, personnel and administrative matters. Ex. 65, MC-INT 1-1-3, 2.

The MCSD currently consists of 71 officers. *See* Ex. 67, MCSD Roster. The largest division is Patrol, which has general responsibility for patrolling the county, responding to calls, and making traffic stops. Seven officers are assigned to the MCSD's Narcotics division, which focuses on drug enforcement, and six to its Criminal Investigations division. *See id.* The

3

department also includes several officers who focus on warrant service, transportation, and certain other matters, as well as a two-person "Neighborhood Enhancement" or "Neighborhood Enforcement" team, also referred to as the "NET Team," which focuses on the majority-Black housing complexes in the Canton area. *See id.*; *see also* Ex. 68, Mar. 3, 2015 Email.

### A.   The MCSD's Culture Of Racial Discrimination

#### 1.   The MCSD's Policing Program Under Sheriff Toby Trowbridge

For more than eleven years, Sheriff Tucker worked in the MCSD's Narcotics division under Sheriff Toby Trowbridge, including as Captain. Ex. 24, R. Tucker Tr. 82:11-83:10. During Sheriff Trowbridge's administration, Black citizens repeatedly protested the MCSD, in particular its practice of establishing roadblocks primarily in majority-Black areas.[2] For example, in 2006, a group of Canton residents presented a petition bearing 664 signatures to the Madison County Board of Supervisors demanding an end to "frequent roadblocks in the predominantly black neighborhoods" and "racial profiling."[3] In 2007, Karl Banks, a Black member of the Board of Supervisors, stated "there is a real feeling in the community that the department is discriminating against people," and that these concerns were not being addressed.[4] Trowbridge refused to meet with aggrieved Black residents, later testifying that he "felt like everything was going the way it should be." Ex. 23, Trowbridge Tr. 103:8-14. And, in 2009, a panel of the state legislature considered a law prohibiting racial profiling. While the former chiefs of police of Ridgeland and Canton both testified that racial profiling is a significant problem, Sheriff Trowbridge refused to

---

[2] *See, e.g.*, Ex. 69, *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008) (noting that Trowbridge has "been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling"); Ex. 70, *Is system fair?*, THE CLARION-LEDGER (July 22, 2007) (Supervisor Griffin stating that the MCSD was perceived as targeting Black community members).

[3] *See, e.g.*, Ex. 71, *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006).

[4] Ex. 72, Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007).

attend, claiming that legislators were "wasting people's time and money" by debating the bill.[5]

Sheriff Trowbridge testified in this action that, during the time he was Sheriff, MCSD personnel, including himself and now-Sheriff Tucker, used the racial slur "nigger" while on duty. Ex. 23, Trowbridge Tr. 78:6-13, 90:10-91:4. According to Sheriff Trowbridge, MCSD personnel used racial slurs "in passing, maybe in conversation or walking down the hall or walking across a parking lot or whatever." *Id.* 96:24-97:2.[6]

Sheriff Trowbridge never disciplined any deputy for using racial slurs. Ex. 23, Trowbridge Tr. 91:25-92:3. To the contrary, casual racial discrimination was so commonplace and accepted that in 2009, a blatantly racist email entitled "White Pride" circulated among many of the MCSD's most senior members, including Trowbridge's chief deputy and Sheriff Tucker himself. Ex. 74, June 5, 2009 Email. The email, sent exclusively to white officers, contains such lines as, "when I call you Nigger, Kike, Towel head, Sand-nigger, Camel Jockey, Beaner, Gook, or Chink ... You call me a racist." *Id.* The email concludes by encouraging the reader to express support for its sentiments by forwarding it along. *Id.* Now-Sheriff Tucker forwarded the email to seven more of his MCSD colleagues and personal contacts. *Id.*; Ex. 24, R. Tucker Tr. 43:11-44:11. During his deposition, Sheriff Tucker acknowledged that the email itself reflected a "racist opinion." Ex. 24, R. Tucker Tr. 63:20-21.

> **2.    The MCSD's Culture Of Discrimination Persists To The Present Day**

When he ran for office, Sheriff Tucker knew of the complaints and protests concerning the MCSD's racially discriminatory policing practices under Sheriff Trowbridge's Administration. *Id.* 104:22-105:7, 280:13-24. Nonetheless, Sheriff Tucker pledged to "maintain

---

[5] Ex. 73, Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, THE CLARION-LEDGER (Jan. 14, 2009).

[6] Sheriff Tucker denies hearing or using racial slurs used at the MCSD. Ex. 24, Tucker Tr. 269:13-21.

the quality of law enforcement that we have under Sheriff Trowbridge," and upon taking office, officially adopted all of Trowbridge's policies.[7] Numerous deputies testified that Tucker did not implement new policies that changed the culture of the MCSD. *See, e.g.*, Ex. 21, Sullivan Tr. 90:16-21; Ex. 12, Flax Tr. 89:6-8; Ex. 28, Wilson Tr. 42:7-23.

Many current MCSD personnel who serve in senior positions in the department also served under Sheriff Trowbridge. *See* Ex. 67, MCSD Roster; Ex. 78, 2011 MCSO Roster-1-2. M/Sgt. Joseph Butler, the individual who first sent the "White Pride" email, is a supervisor in Patrol. Ex. 24, R. Tucker Tr. 42:23-43:10. Other officers to whom Sheriff Tucker forwarded the email currently hold the positions of Master Sergeant in Patrol and Captain of Narcotics. *Id.* at 43:11-44:11. The late Terry Barfield, who served as Captain of Investigations until his death in 2017, used the term "nigger" while on duty. Ex. 23, Trowbridge Tr. 90:16-18, 92:4-7. According to a 2013 memo by the EEOC, Captain Barfield reportedly continued to make racist comments. Ex. 79, EEOC Memo, MC 0037-39 (May 9, 2013) ("I'm sick of these niggers"). Similarly, Will Weisenberger, also a Patrol supervisor, testified that he has used the term "nigger" in the course of his official duties, that other MCSD personnel also use the term while on duty, and that he had never been disciplined for his use of racial slurs. Ex. 26, Weisenberger Tr. 132:2-133:11.

Sheriff Tucker has also made and endorsed racially charged remarks since taking office. For example, in a January 2016 interview regarding a dispute with Kenneth Stokes, a Jackson city councilman, Sheriff Tucker referred to Jackson residents as Mr. Stokes' "thug constituents" and stated that Stokes was "setting his race back by implicating a race issue."[8] Around this same

---

[7] Ex. 75, Lacey McLaughlin, *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011); Ex. 76, *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011); *see also* Ex. 77, Memo from Sheriff Tucker to All Deputies/Employees (Jan. 3, 2012).

[8] Ex. 80, *Madison sheriff responds to Jackson councilman's remarks*, THE CLARION-LEDGER (Jan. 4, 2016), https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/, at 1:50-57, 4:46-50.

time, a Madison County resident emailed Sheriff Tucker, "I'm curious if Mr Griffin is related to Kenneth Stokes since their language is similar (dis, dat, dees, and doez)." Ex. 81, Jan. 18, 2016 Email. Sheriff Tucker replied, "I wholeheartedly agree with you on mr griffin." *Id.*[9]

Sheriff Tucker also has hired officers who have been accused of racial discrimination. Sheriff Tucker hired Slade Moore, now a Sergeant in Patrol, even though he had been terminated from his position as an officer in the Jackson Police Department after over 30 complaints had been filed against him.[10] One incident led to a lawsuit in which the City of Jackson was held liable for Moore's use of excessive force.[11] Following his termination, now-Sgt. Moore, who is white, filed a racial discrimination suit in which he claimed he was treated differently than similarly-situated Black officers.[12] Another white patrol deputy hired by Sheriff Tucker had faced allegations that he had "a history of animosity toward African Americans,"[13] and was sued by a Black man for alleged use of excessive force while the deputy was employed by the Hinds County Sheriff's Department.[14] Ex. 22, R. Thompson Tr. 29:6-15. Sheriff Tucker was aware of this excessive force incident, but nevertheless hired the deputy in 2014, *just weeks* after it occurred. *Id.* 37:19-20, 41:8-15; Ex. 24, R. Tucker Tr. 212:5-20.

Since Sheriff Tucker took office, eight Black officers have resigned or been terminated by Sheriff Tucker.[15] Currently, twelve of the MCSD's 71 officers are Black.

---

[9] At his deposition, Supervisor Griffin testified that, in his view, the email from the Madison County resident expressed racist sentiment. Ex. 13, Griffin Tr. 82:22-82:24.

[10] Ex. 82, Memo from Shirlene Anderson, Jackson Chief of Police, to Sgt. Slade Moore (June 15, 2006).

[11] *See City of Jackson v. Calcote*, 910 So. 2d 1103, 1110-11 (Miss. Ct. App. 2005) .

[12] Ex. 83, Compl., *Moore v. City of Jackson*, No. 251-10-592CIV (Hinds Cnty. Circuit Ct., Jul. 19, 2010), ¶¶ 20-21.

[13] Ex. 84, Pl.'s Mem., *Huggins v. Belk Dep't Stores*, No. 4:07-cv-134, 1 (S.D. Miss. Aug. 3, 2008).

[14] Ex. 85, Mod. 2d Am. Compl., *Fleming v. Hinds Cnty.*, No. 3:16-cv-554 (S.D. Miss. Nov. 30, 2016), ¶¶ 14-15.

[15] *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 7; *Compare* Ex. 67, MCSD Roster *with* Ex.

**B.**    **Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD**

Black residents of Madison County regularly encounter racism and discrimination in their interactions with the MCSD. For example, Plaintiff Bessie Thomas testified that when she tried to speak to an MCSD deputy during a roadblock the deputy cut her off and, referring to the cars behind her, said, "I've got all these niggers off the side of this road." Ex. 9, Thomas Tr. 77:3-22. Class member Quincy Smith stated that at a traffic stop, he witnessed a white MCSD deputy tell a Black MCSD deputy that he wasn't "going to help a nigger out" by letting a driver go without a ticket. Ex. 56, Q. Smith Decl. ¶ 14. Class member Montreal Tillman was told by an MCSD deputy that if the deputy had "not taken anger management classes, [he] would drag [Tillman's] black ass up and down the street." Ex. 59, Tillman Decl. ¶ 23. All in all, MCSD deputies treat Black citizens "with no respect. ... The way they talk to you, it's like they look down on you. They are unconcerned about what you tell them." Ex. 9, Thomas Tr. 68:24-69:13; *see also* Ex. 6, Q. Manning Tr. 46:2-22 (MCSD deputy "wasn't talking to me as if I was a person. ... He asked me why the hell did I pull over in this driveway and where is my damn license and registration."); Ex. 61, M. Williams Decl. ¶ 7.

Class members have been stereotyped as gang members and drug dealers.[16] The MCSD

---

78, 2011 MCSO Roster-1-2. The roster produced by Defendants appears to exclude most Madison County Detention Center employees, as well as dispatchers and administrative personnel.

[16] Class member Lisa Jones, a 46-year-old woman and mother of three, was asked at a roadblock if her license plate meant she was part of a gang. Her license plate had the letters "B," "A," and "D," which are her children's initials. Ex. 51, L. Jones Decl. ¶¶ 23-24. An MCSD deputy repeatedly referred to class member Terrance Thompson as a "Black dope boy," even though he had no drugs in his possession when he was stopped. Ex. 58, T. Thompson Decl. ¶¶ 12-15. Quincy Smith was stopped at a roadblock at the entrance to his apartment; the MCSD deputy immediately asked "where are the drugs?" Ex. 56, Q. Smith Decl. ¶ 6. *See also* Ex. 53, Mitchell Decl. ¶ 4 ("They always talk to me as though I am a criminal. They immediately start asking about drugs in my car. At one roadblock, the deputy said to me, 'I know you have something.'"); Ex. 42, R. Davis Decl. ¶¶ 7-8 (MCSD deputy repeatedly accused class member Rasheid Davis of "smoking dope" during a roadblock, even after he passed a sobriety test).

routinely stops and harasses Black pedestrians without reasonable suspicion. For example,

Plaintiff Latoya Brown has been stopped numerous times simply walking down the street. Ex. 4,

L. Brown Tr. 50:22-51:9, 53:2-54:10, 74:19-76:9. On each occasion she was compelled to

provide identification so that MCSD personnel could run warrant checks. *Id.* Class member

Delores Smith's son was told he fit a "profile" because he had dreadlocks and wore a hat. Ex. 55,

D. Smith Decl. ¶ 6. Mr. Tillman was stopped while walking in a white neighborhood where his

fiancée lived, and asked whether he we was "plan[ning] on coming around all the time" and if he

had any weapons. Ex. 59, Tillman Decl. ¶¶ 17-20. MCSD deputies also conduct lengthy,

intrusive, and even violent stops of Black motorists.[17]

Black residents know that they are treated differently than white residents. Plaintiff

Lawrence Blackmon was tackled and handcuffed at gunpoint in his own foyer after requesting to

see a warrant before he allowed the MCSD to enter his home. Ex. 3, Blackmon Tr. 73:20-76:5.

He understands that the incident "would not have happened to me if I were a white person." *Id.*

161:19-21. Class members report MCSD roadblocks at which Black drivers have been stopped

and white drivers have been waved through. *See* Ex. 53, Mitchell Decl. ¶ 9; Ex. 48, Hollins Decl.

¶¶ 4-5 (officer stated white drivers were "good people"). Class member Destiny Jones "cannot

believe that if a white family was on the side of the street trying to deal with a very upsetting car

accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail,"

---

[17] For example, in 2016, class member John Spann was pulled over by the MCSD for allegedly "bumping the lines." Ex. 57, Spann Decl. ¶ 12. The officers asked him whether he had outstanding warrants or prior offenses, or whether there were drugs or weapons in his car, and demanded that he search his own car while they watched. *Id.* at ¶¶ 8-10. The search turned up nothing, but it nonetheless took 45 minutes for the deputies to leave the scene. *Id.* ¶¶ 4, 10. Similarly, even though class member Quincy Smith was a passenger, the MCSD required him to take a breathalyzer test. Ex. 56, Q. Smith Decl. ¶ 13. And, in 2012, an MCSD officer believed that he saw Michael Bracey driving without a seatbelt as Mr. Bracey was about to pull into his driveway. Ex. 38, Bracey Decl. ¶¶ 3-10. The officer followed Mr. Bracey onto his property, screamed at him to get on the ground, placed his gun to the back of his head, and handcuffed him. *Id.* The officer then searched Mr. Bracey and his car, and placed him under arrest. *Id.*

like she was after being hit by a drunk driver. Ex. 50, D. Jones Decl. ¶¶ 10-11, 19. When her

mother complained to a Black state trooper who also was at the scene, he acknowledged as

much, telling her, "we all know how they are." Ex. 51, L. Jones Decl. ¶ 27.

C.    **The MCSD's Policing Program**

The MCSD's culture of racism directly impacts how it polices Madison County. For

decades, the MCSD has implemented and enforced an unwritten policy, or longstanding custom

and practice, of racially profiling Black individuals and disproportionately targeting Madison

County's Black communities through roadblocks, pedestrian stops, and other aggressive tactics.

1.    **The MCSD Disproportionately Arrests And Cites Black Persons**

The MCSD's Policing Program has led to stark racial disparities in the MCSD's arrest

and citation rates. While Black individuals represent only 38% of Madison County's population,

Black individuals accounted for over 77% of all arrests made by the MCSD between January 1,

2012 and September 20, 2017, as well as 72% of all citations made by the MCSD between

January 2012 and December 31, 2017. Ex. 2, Guha Decl. ¶¶ 10, 19. Nearly 76% of arrests made

by the MCSD at roadblocks, and 74% of the arrests made by the MCSD at traffic stops, between

January 1, 2012 and September 20, 2017 were of Black individuals. *Id.* ¶¶ 32, 36.

MCSD deputies routinely opt to arrest Black drivers for traffic violations. Black drivers

represented 87% of arrests for driving with a suspended or revoked license; 83% of arrests for no

proof of liability insurance; 83% of arrests for having an expired tag or no tag on a license plate;

and 80% of arrests for improper vehicle equipment for the time period between January 1, 2012

and September 20, 2017. Black drivers also accounted for 94% of arrests for a child restraint

violation; 88% of arrests for a seatbelt violation; almost 85% of arrests for speeding on local

highways; 77% of arrests for turning without a turn signal; and 68% of arrests for careless

driving for the time period between January 1, 2012 and September 20, 2017. *Id.* ¶ 11.

The MCSD's citation statistics reflect a similar pattern. Between January 1, 2012 and December 31, 2017, Black individuals received 94% of citations for child restraint violations; 84% of citations for driving with a suspended license; 77% of citations for no proof of liability insurance; 76% of citations for following another vehicle too closely; 74% of citations for a seatbelt violation; 73% of citations for failure to yield; 71% of citations for improper vehicle equipment; 71% of citations for making an improper turn; and 63% of citations for driving with an improper tag or no tag. *Id.* ¶ 20.

The MCSD's own paperwork confirms that it targets Black citizens for arrest. In the course of discovery, Defendants produced to Plaintiffs templates of forms that deputies fill out in the course of their duties. Defendants produced multiple copies of one such form, the case file cover sheet for the narcotics unit, from the files of two officers. On each, the form is blank, except for three items that appear pre-populated: "black"; "male"; and "arrested." Ex. 86, May 27, 2014 Email, at 217; Ex. 87, MCSD-Officer Documents-01393.

### 2.   The MCSD Disproportionately Targets Black Communities

The MCSD implements the Policing Program by disproportionately targeting Madison County's majority-Black communities for roadblocks, traffic and pedestrian stops, and other aggressive law enforcement tactics. The MCSD has jurisdiction over the entirety of Madison County, but primarily operates in Canton, Flora, and the unincorporated areas of the county. Ans. ¶ 9. This is where most of the Black population resides. Ex. 62 at 62.2-62.4 (Census data). Defendants claim they police in Flora and Canton at the request of city police departments, and do not police Madison or Ridgeland except for in "special and/or limited circumstances." Ans. ¶ 48. However, Black residents from Ridgeland regularly encounter MCSD roadblocks at the entrance to their street, in the majority-Black southeast corner of Ridgeland. *See* Ex. 48, Hollins Decl. ¶ 2; Ex. 49, A. Howard Decl. ¶¶ 2-3; Ex. 40, B. Brown Decl. ¶ 2; Ex. 1, Ricchetti Rep. Ex.

11

2; *see also* Ex. 88, HUD Compl., at 2 (describing racial segregation in Ridgeland). The MCSD does not simply police the cities upon request, nor does it uniformly stay out of Ridgeland and Madison. Rather, the MCSD targets its policing where Black people live, work, gather and pray.

The MCSD established an entire unit, the so-called NET Team, to target apartments in majority-Black neighborhoods. The NET Team, originally called the "apartment detail," was created under Sheriff Trowbridge as a rotating unit of plainclothes deputies in unmarked cars, specifically deployed to patrol majority-Black apartment complexes in the Canton area. *See* Ex. 20, D. Smith Tr. 35:18-36:3, 42:22-25, 47:5-24, 65:21-24. The deputies would "patrol the apartments, do apartment walk-throughs, roadblocks, things of that nature." *Id.* 58:7-9. NET Team deputies have a reputation for jumping out of their cars and chasing Black residents. *Id.* 78:2-11; *see also* Ex. 3, L. Blackmon Tr. 129:20-130:2 ("[MCSD deputies] have unmarked cars … they will pull up on you and jump out of the car and search you."). In 2015, Sheriff Tucker made the NET team a full-time, two-man unit. Ex. 20, D. Smith Tr. 41:3-10.[18] Sheriff Tucker or Chief Williams are informed daily of the NET Team's activities. Ex. 20, D. Smith Tr. 85:3-7.

The MCSD targets businesses frequented by Black patrons. *See, e.g.*, Ex. 8, S. Smith Tr. 55:15-56:3 (describing a jump-out incident at Brooklyn Mart, a store adjacent to majority-Black apartment complexes in Canton); Ex. 9, Thomas Tr. 26:9-12 (describing a roadblock at Brooklyn Mart).[19] MCSD deputies also harass Black people where they worship and when they celebrate.

---

[18] The permanent NET team received expanded responsibilities, *see Id.* 90:18-22, but the Canton area apartment complexes have remained a major focus. *See, e.g.*, Ex. 68, Mar. 3, 2015 Email (The permanent NET Team was established as a "special, fulltime, undercover, two-man detail … to help assist the shift deputies and thwart the ongoing violence inside these Canton Apartment Complexes.").

[19] *See also* Ex. 37, Bacon Decl. ¶ 3 ("MCSD also sets up roadblocks down the road from my business both ways so that people can't leave my business without passing through a roadblock."); Ex. 42, R. Davis Decl. ¶¶ 9-10 ("Once the roadblocks go up in Canton people stop coming to my stores. The officers stop people driving to my store, or even just walking. Because people don't want to be harassed they just stay home."); Ex. 53, Mitchell Decl. ¶ 9 (MCSD officers target Black persons patronizing Black businesses, while going as far as escorting home drivers leaving a bar and restaurant frequented by white

Plaintiff Bessie Thomas testified that the MCSD sets up roadblocks outside of her church and the local middle school. Ex. 9, Thomas Tr. 25:21-26:12. Class member Domunique Doss stated that in Flora, the MCSD sets up roadblocks in Black neighborhoods on holidays and when Black residents hold community events or family gatherings. Ex. 45, Doss. Decl. ¶¶ 3-4; *see also* Ex. 10, B. Tucker Tr. 23:11-24:2 (suspicionless search of guests at a holiday barbecue).[20]

MCSD deputies also infringe on Black citizens' constitutional rights inside their homes. In 2016, Plaintiffs Khadafy Manning and Quinnetta Manning were confronted at the door of Ms. Manning's Canton-area apartment by deputies seeking witness statements related to an alleged burglary. Ex. 6, Q. Manning Tr. 85:3-7. The deputies, without a warrant or consent, forced their way inside the home. *Id.* When Mr. Manning told his wife that she was not required to write a statement, a deputy became aggressive, choking Mr. Manning, cursing at him, calling him "Mr. Cripple," and telling the Mannings they could either write statements or go to jail. Ex. 5, K. Manning Tr. 96:2-100:5. The deputy then dragged Mr. Manning down the stairs in his underwear and beat him in the back of a squad car until he agreed to write the statement they wanted. *Id.* Lawrence Blackmon was also subjected to forced entry and excessive force in his home. He woke up one morning to the MCSD banging on his door. Ex. 3, Blackmon Tr. 73:20-77:17. When he asked to see a warrant, the deputies shook some paper by his window, but would not allow him to see it. *Id.* The MCSD began kicking the door until Mr. Blackmon opened it, at which point they entered with guns drawn and placed him in handcuffs. *Id.* Mr. Blackmon

---

people in Flora).

[20] *See also* Ex. 53, Mitchell Decl. ¶ 10 ("When we have gatherings and birthday parties at the community center, the MCSD sets up a roadblock right outside on both directions, so everyone leaving the party has to pass through."); Ex. 37, Bacon Decl. ¶ 2 ("[MCSD] often set[s] up roadblocks [in Camden] when there are events in town, like a local football game."); Ex. 41, Carter Decl. ¶ 5 ("Whenever [the MCSD] get[s] word of Black people gathering together at a celebration or a wedding they set up a roadblock.").

remained cuffed for an extended period of time while they searched his house. *Id.* Mr. Blackmon

testified that he believes the incident was "something that only happens in … the black areas."

*Id.* 115:6-12.

### 3.   Roadblocks Are A Key Element Of The MCSD's Policing Program

As part of its overall Policing Program, the MCSD has a policy, or widespread custom or

practice, of conducting roadblocks for purposes of crime control in Black communities.

Substantial record evidence demonstrates the improper purpose behind this Roadblock Program,

as well as its discriminatory application to majority-Black neighborhoods.[21]

### (a)   The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods

The MCSD's policy of conducting roadblocks in Black neighborhoods has been in place

since at least Sheriff Trowbridge's administration, when it was the subject of repeated,

unaddressed protests and civilian complaints. *See supra* at 4. While roadblocks are common in

majority-Black neighborhoods,[22] Plaintiffs testified that they rarely, if ever, see a roadblock in

white areas. *See* Ex. 3, Blackmon Tr. 141:11-142:1 ("[T]his issue with [roadblocks] is, is that

they are disproportionately set up in the predominantly African-American areas of town."); Ex.

10, B. Tucker Tr. 17:4-9; Ex. 4, L. Brown Tr. 82:7-12.[23]

---

[21] The MCSD's policies handbook sets forth (i) a set of "Sobriety Checkpoint Guidelines" which, despite Defendants' contentions to the contrary (*e.g.*, Ans. ¶ 140), are not regularly followed, and (ii) a vague "General Roadblocks" policy which provides blanket authorization for deputies to "conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within th[e] county." Ex. 89, MC-RFP 2-1 at 2-4, § IX(c).

[22] *See* Ex. 7, Singleton Tr. 42:17-23 (stating he has seen more than 20 roadblocks); Ex. 40, B. Brown Decl. ¶ 8 ("When I lived in Canton I believe I drove through more than 100 roadblocks."); Ex. 41, Carter Decl. ¶ 4 ("Last year I went through two roadblocks within thirty minutes."); Ex. 56, Q. Smith Decl. ¶ 2 ("In the last three or four years, I have driven through as many as thirty roadblocks.").

[23] *See also* Ex. 56, Q. Smith Decl. ¶ 2 ("MCSD sets up roadblocks in the Black neighborhoods to target Black people."); Ex. 53, Mitchell Decl. ¶ 9 ("I have never seen a roadblock set up in the white communities."); Ex. 59, Tillman Decl. ¶ 3 (same); Ex. 41, Carter Decl. ¶ 5 (same, regarding Camden); Ex. 37, Bacon Decl. ¶ 7 (same); Ex. 39, A. Brown Decl. ¶ 9 (same, regarding his community in Flora);

14

Statistical analysis of the MCSD's own data confirms this. The expert report of Bryan Ricchetti, Ph.D., demonstrates that the MCSD disproportionately conducts roadblocks in substantially-Black areas of the county. *See* Ex. 1, Ricchetti Rep. ¶¶ 52-53. Dr. Ricchetti has reviewed the available data on the locations and frequency of roadblocks conducted by the MCSD and overlaid this data with Census data for Madison County. *Id.* ¶ 38, Ex. 2 (*see* below).

Exhibit 2
*Location of Roadblocks by Census Tract within Madison County (2012–2017)*



In so doing, Dr. Ricchetti has determined that there is a statistically significant and positive correlation between the percentage of Black residents in a census tract in Madison County and the rate of roadblocks in that tract. *Id.* § 2.2. He demonstrates that on average, the per capita rate of roadblocks in substantially Black census tracts is ***nearly double*** that of predominantly white census tracts. *Id.* ¶ 39, Ex. 3 (*see* below).

———————————————

Ex. 40, B. Brown Decl. ¶ 10 (same, regarding her neighborhood in Ridgeland); Ex. 49, A. Howard Decl. ¶ 9 (same); Ex. 43, V. Davis Decl. ¶ 2 (same, regarding her neighborhood in Canton); Ex. 46, Guise Decl. ¶ 11 (same); Ex. 47, Harris Decl. ¶ 5 (same); Ex. 60, Wilder Decl. ¶ 4 (same).

Exhibit 3
*Frequency of Roadblocks by Racial Breakdown*



This sizable disparity persists throughout the County even when controlling for other potential

non-racial explanations. *Id.* ¶ 46, Ex. 6. Dr. Ricchetti's analysis strongly suggests that racial bias

animates the disparity in the frequency of roadblocks in predominantly Black communities.[24]

> (b)   The Primary Purpose Of The Roadblock Program Is Crime Control

Defendants effectively concede that the MCSD establishes roadblocks in majority-Black

neighborhoods to control general crime, a clear violation of the Fourth Amendment. Defendants'

Answer states that Sheriff Tucker has honored "multiple requests" from "managers of various

apartment complexes and housing projects in predominantly Black neighborhoods in both

Madison County and the City of Canton, and many businesses asking that the [MCSD] conduct

---

[24] Dr. Ricchetti's multivariate regression analyses demonstrate that even after accounting for "the fact that communities with a higher percentage of Black residents have, on average, other characteristics that are predictive of traffic behavior, such as higher rates of DUI arrests and traffic arrests and citations, lower income, higher unemployment, and younger populations, … there remains an unexplained difference in the frequency of roadblocks in communities that have a higher percentage of Black residents relative to communities with a higher percentage of white residents." Ex. 1, Ricchetti Rep. § 2.2.

16

roadblocks near their neighborhoods and businesses." Ans. ¶ 3; *see also* Ex. 90, MC-RFP 10-

42(1) (Oct. 31, 2017 request from apartment manager for a "random road block in our area" as a

"preventative measure"). Officers have also testified that they set up roadblocks, unprompted by

such requests, to detect and deter criminal activity.[25] *See, e.g.*, Ex. 22, R. Thompson Tr. 20:19-

21:13 (agreeing that "general crime prevention" is the "primary purpose" of MCSD's

roadblocks); Ex. 19, Squires Tr. 171:10-172:4 (deterring crime is "definitely" a purpose of

roadblocks); Ex. 17, Moore Tr. 159:2-4 ("Q. Now, with regard to roadblocks, what's the purpose

of a roadblock? A. To prevent crime."); Ex. 91, MC-RFP-Inc. Rep. 010886 (MCSD "established

a safety checkpoint at [the Canton Estates apartment complex] to check for out standing [sic]

warrants and other violations.").[26]

  The MCSD's use of roadblocks as a crime control measure is further demonstrated by the

involvement of the NET Team and of MCSD narcotics agents in conducting roadblocks. The

NET Team has the authority to conduct roadblocks without specific approval from higher

authorities. Ex. 20, D. Smith Tr. 48:13-49:3. So do officers in the Narcotics Division. Ex. 16, T.

Jones Tr. 232:14-233:4. Unlike Patrol, Narcotics and the NET Team focus on specific aspects of

criminal law, not traffic enforcement. NET and Narcotics nonetheless operate roadblocks in

Canton's majority-Black neighborhoods, the clear purpose of which is crime control and

narcotics interdiction. *Id.* 227:19-24 (testifying that, as Captain of Narcotics, he set up

---

[25] Other MCSD officers testified to different purposes for roadblocks. *See, e.g.*, Ex. 18, Sandridge Tr. 44:3-10 ("The primary interest is to check for seatbelt, child restraints, impaired drivers, and vehicle equipment violations."); Ex. 21, Sullivan Tr. 48:7-14 ("seatbelts, valid driver's license, child safety restraints, drinking and impaired driving").

[26] The general crime control purpose of roadblocks is further evidenced by notices the MCSD has posted regarding upcoming roadblocks, which on numerous occasions have stated that the purpose of the roadblocks is "to check for Driver's license, warrants and what ever else we encounter." *See, e.g.*, Ex. 92, MC B. Davis Laptop 4; Ex. 93, MC T. Chastain Laptop 17.

roadblocks "for a crime deterrent"); Ex. 20, D. Smith Tr. 45:18-46:7 (testifying that the NET

team would employ roadblocks to counter "high crime" in Canton).

(c)   MCSD Roadblocks Lack Uniform Procedures Or Safeguards

MCSD personnel also regularly exercise substantial discretion in conducting roadblocks,

despite the Supreme Court's clear statement that "the unconstrained exercise of discretion" by

officers at roadblocks is unconstitutional. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

Deputies have discretion to waive cars through a checkpoint. Ex. 24, R. Tucker Tr. 129:16-

130:2; Ex. 11, Fish Tr. 54:3-19. Deputies also have complete discretion to decide whether to run

drivers' licenses, even if facially valid. Ex. 24, R. Tucker Tr. 183:3-13; Ex. 25, Waldrop Tr.

45:4-24 (he "may or may not" run a warrant check on a valid license); Ex. 27, Williams Tr.

218:5-17 (officers have discretion to call in licenses). It is also left to the deputy's discretion

whether to demand passengers' identification or to search the vehicle or its occupants.[27] Khadafy

Manning, for instance, has been searched at least three times as a passenger at an MCSD

roadblock. Ex. 5, K. Manning Tr. 51:3-52:3, 53:1-3; *see also, e.g.*, Ex. 53, Mitchell Decl. ¶ 6

(describing experience of intrusive searches at roadblocks).

MCSD roadblocks also lack reasonable procedural safeguards. MCSD personnel are

authorized to use unmarked cars at roadblocks (*see* Ex. 66, Defs.' Resps. to Pls.' 1st Set of

Interrogs., No. 20), and numerous officers have testified that they have done so. *See, e.g.*, Ex. 25,

Waldrop Tr. 39:21-23; Ex. 20, D. Smith Tr. 66:11-19. Indeed, NET Team leader Darian Smith

testified that he has participated in roadblocks outside the Canton Estates apartment complex

---

[27] Ex. 24, R. Tucker Tr. 184:6-185:7; Ex. 15, S. Howard Tr. 110:21-24 ("Q: And you use your discretion to decide when to check licenses or identifications for passengers? A: Yes, ma'am."); Ex. 11, Fish Tr. 55:15-17 ("Q: What about passengers? Do you ask them for anything? A: It just depends."); Ex. 25, Waldrop Tr. 45:25-46:6 ("Q: Do you give any training on when you may ask for a passenger's identification at a traffic stop? A: No.").

with only unmarked cars as a "deterrent to crime." Ex. 20, D. Smith Tr. 65:25-67:2.

Second, the MCSD does not require its personnel to be in uniforms when conducting roadblocks, thereby compounding the surprise and apprehension caused by the Roadblock Program. While Patrol deputies are usually uniformed, NET team and Narcotics officers wear plain clothes when conducting roadblocks, as well as driving unmarked cars. *E.g.*, *id.* 48:10-12.[28] So do other high-ranking officers. *See* Ex. 25, Waldrop Tr. 39:21-25.

Third, while Sheriff Tucker concedes that a roadblock identified by marked vehicles with flashing lights and uniformed officers is a "best-case scenario," this does not always happen. Ex. 24, R. Tucker Tr. 140:16-141:14. To the contrary, in Black neighborhoods, residents report that roadblocks conducted after dark routinely are entirely unlit, with the exception of the officers' handheld flashlights. Bessie Thomas has driven through roadblocks at night where she did not see flashing lights. Ex. 9, Thomas Tr. 28:5-20; *see also* Ex. 5, K. Manning Tr. 56:16-57:5 (describing stops at roadblocks where officers wave vehicles down with flashlights). So have many other class members.[29] Moreover, the MCSD sets up roadblocks in poorly-lit locations, including dark, rural streets in Black areas, despite relatively little traffic, or parks their cars where they are not visible.[30]

---

[28] Captain Tommy Jones circulated a memorandum dated January 30, 2017 that directs Narcotics officers to wear reflective vests while participating in a roadblock (Ex. 94, MC L. Sanders Main Server 93), but NET personnel continue to conduct roadblocks without wearing reflective vests to identify them, let alone an MCSD uniform. *See* Ex. 20, D. Smith Tr. 149:12-20.

[29] *See also* Ex. 42, R. Davis Decl. ¶ 3 ("A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars."); Ex. 56, Q. Smith Decl. ¶ 3 ("MCSD parks off of the road and turns off all lights on their trucks."); Ex. 41, Carter Decl. ¶ 2 (same); Ex. 39, A. Brown Decl. ¶ 3 (same); Ex. 53, Mitchell Decl. ¶ 3 ("[The MCSD] rarely have their lights on [at a roadblock], but when they do, they only turn on the lights in the back so it is impossible to see the cars until I am already up on the roadblock.").

[30] *See* Ex. 9, B. Thomas Tr. 24:17-22 (cars park off the street, inside apartment complexes and thus are not visible); Ex. 49, A. Howard Decl. ¶¶ 3-4 (on Pine Knoll Road, a roadblock location near a majority-Black apartment complex in Ridgeland, the MCSD parks in parking lots, where they are not visible, and then waves cars down with flashlights); Ex. 40, B. Brown Decl. ¶ 3 (same); Ex. 52, McKay Decl. ¶ 4 ("I

4.      **Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program**

Another significant aspect of the MCSD's Policing Program is the Pedestrian Stop Program, a policy of conducting suspicionless stops of pedestrians in Black neighborhoods and on the grounds of majority-Black apartment complexes. Many such pedestrian stops occur during "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits, while other such stops are conducted in Madison County's Black communities by roving patrols of deputies who stop pedestrians on the street. These stops are typically conducted by teams of plainclothes officers who wear tactical vests and drive unmarked cars, referred to by community members as the "jump out patrol" or the "jump out boys."

The MCSD, as a matter of explicit policy, has conducted special "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits since at least 2008, using the "Apartment Detail" or "NET Team." *See* Ex. 20, D. Smith Tr. 34:22-24. At present, the NET Team has primary responsibility for these patrols, but other units, including Patrol and Narcotics, remain involved. *Id.* 35:22-36:9. During these patrols, officers demand that persons they encounter produce their identification,[31] and treat attempts to avoid these interactions as suspicious behavior that itself justifies detention and search.[32] Hundreds of

---

don't know why the MCSD would set up a roadblock on my street. There is very little traffic because so few people drive in this rural area."); Ex. 51, L. Jones Decl. ¶ 26 ("I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen.").

[31] *See, e.g.*, Ex. 15, S. Howard Tr. 160:5-25, 182:2-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:2-12; Ex. 25, Waldrop Tr. 86:24-87:10; Ex. 20, D. Smith Tr. 70:10-25, 128:12-129:4.

[32] *See, e.g.*, Ex. 96 (MC-RFP-Inc. Rep. 040697 (an officer "observed two black males standing be[side] a parked vehicle"; the subjects looked at the officer and "started walking away," so the officer ordered them to stop, gave chase, arrested one, and booked him "on all charges"); MC-RFP-Inc. Rep. 058887 (when an officer "saw four black males standing outside" a building; when the officer drove closer "they began walking away," so the officer stopped them, noticed one was slurring his speech, and subsequently arrested him for public drunkenness); MC-RFP-Inc. Rep. 025721 (when officers saw "several individual[s] loitering" and one "began walking inside of" an apartment, an officer yelled for him to stop,

these patrols have taken place since Sheriff Tucker took office. *See* Ex. 2, Guha Decl. ¶¶ 33-34.

Plaintiff Steven Smith was recently arrested after a suspicionless stop that took place during an apartment walkthrough conducted by the NET Team. On his daughter's birthday in January 2017, while walking from the store to his home to Canton Estates, Mr. Smith and his friend Terrance Thompson, were stopped and instructed to "remove their hands from their pockets" and produce their identifications. *See* Ans. ¶ 89; Ex. 8, S. Smith Tr. 35:3-24. The officers ran Mr. Smith's identification, found outstanding warrants related to old, unresolved traffic citations, and arrested him. *See* Ex. 8, S. Smith Tr. 38:13-16; Ex. 15, S. Howard Tr. 131:14-16. Mr. Smith was also detained during an apartment walkthrough in the fall of 2015. *See* Ex. 95, Smith Resp. to Defs.' 1st Set of Interrogs., No. 4. Two deputies approached and told Mr. Smith to walk with them behind a building. Ex. 4, L. Brown Tr. 70:10-23. The deputies handcuffed Mr. Smith, ran his identification, and then let him go. *Id.* 71:3-5, 71:20-22.

Plaintiff Latoya Brown has also been subjected to suspicionless stops by MCSD personnel. Ms. Brown was stopped in 2014 while walking to the front gate of Canton Estates in order to meet her ride to work when two deputies stopped her, demanded her identification, and ran a warrant check. *Id.* 50:24-51:9. She was also stopped for a warrant check during an apartment walkthrough in 2013. *Id.* 53:2-54:10. On other occasions, Ms. Brown has been stopped for warrant checks when walking past roadblocks set up in front of Canton Estates. *Id.* 74:19-76:9. Plaintiff Khadafy Manning was also stopped in February 2017 by MCSD deputies conducting an apartment walkthrough. Ex. 97, MC-RFP-Inc. Rep. 047927. In his incident report, Sgt. Howard of the NET Team wrote that he stopped Mr. Manning because he believed Mr. Manning was trying to avoid him. *Id.*

---

and then "placed [him] under arrest for failure to comply" after he entered the apartment)).

These incidents are not unique to the Named Plaintiffs. *See, e.g.*, Ex. 44, Day Decl. ¶¶ 2-4 (describing at least ten such stops at his Madison Heights apartment complex). Incident reports produced by Defendants are replete with examples of similar suspicionless stops.[33] In these reports, officers conducting "apartment walkthrus" time and again "come into contact" with Black persons and subsequently arrest them for outstanding warrants. These reports represent only a fraction of many similar incident reports produced by Defendants, which themselves only reflect those stops that resulted in arrests.[34]

The NET Team and other MCSD units also regularly engage in suspicionless stops and searches of Black pedestrians while conducting roving patrols of Madison County's Black neighborhoods in unmarked cars. These patrols are colloquially referred to as the "jump-out patrol" or the "jump out boys." *See* Ex. 20, D. Smith Tr. 79:5-15 ("Jump-out boys" is "the nickname given to the NET team."); Ex. 10, B. Tucker Tr. 32:15-21 (the jump-out boys "are always in the black neighborhoods jumping out."). On one occasion, the jump-out patrol came onto Ms. Tucker's property in the middle of the day during a holiday barbecue and, without

---

[33] *See, e.g.*, Ex. 98 (MC-RFP-Inc. Rep. 032317 (deputies "came in contact" with a Black man and arrested him for outstanding warrants for failure to appear); MC-RFP-Inc. Rep. 007631 (an officer "observed a unidentified black-male [sic] loitering in front of building seven," so the officer identified him, checked for warrants, and then arrested him for an outstanding warrant for littering); MC-RFP-Inc. Rep. 007292 (a deputy "came into contact" with a Black man, found a warrant for no proof of insurance, and arrested him); MC-RFP-Inc. Rep. 004715 (an officer "observed several subjects loitering" so he "stop[ped] to advise the subject[s] to move along," ran a warrant check, and arrested one Black man for two warrants for "failure to appear on a speeding ticket" and "failure to appear on a no proof of insurance"); MC-RFP-Inc. Rep. 025778 (a deputy "observed a black male walking in the area of Canton Gardens Apts." and stopped him "to see if he lived in the Complex"; when the man said "no he was just walking," the officer ran his ID, found outstanding warrants, and arrested him)).

[34] MCSD officers have been unable to articulate any reasonable suspicion to justify the stops that occur when they "come into contact" with Black pedestrians. *See, e.g.*, Ex. 15, S. Howard Tr. 182:24-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:7-12; Ex. 20, D. Smith Tr. 128:12-129:4. Instead, Defendants have attempted to characterize these stops as "consensual." *See, e.g.*, Ex. 15, S. Howard Tr. 117:4-9, 125:8-9, 128:11-13, 139:7-8. This is incorrect. When individuals attempt to avoid these encounters, they are frequently met with pursuit, arrest, and charges for failure to comply. *See supra* note 32.

cause, searched her friends and family; finding nothing, they drove off. Ex. 10, B. Tucker Tr. 23:23-24:2. Another time, Ms. Tucker's grandson was walking to her house, shirtless, to help fix his brother's bike. *Id.* 29:5-20. The jump out patrol drove by, jumped out of their truck, and searched him. *Id.* When they let him go, a deputy said to Ms. Tucker, "next time tell him to put a shirt on." *Id.* Numerous other class members report similar encounters.[35]

###    D.    The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program

The MCSD does not train deputies to police in a race-neutral manner, or monitor deputies to prevent racial discrimination. The MCSD does not conduct meaningful investigations of complaints, discipline deputies for unconstitutional policing, or even evaluate deputies' performance in a transparent manner. The MCSD also fails to maintain data or statistics showing the racial breakdown of stops, citations, and arrests conducted by the department. These major process deficiencies are central to the operation of the Policing Program. They insulate Defendants from scrutiny and community oversight, forestall the prevention and remediation of constitutional violations through consensual channels, and enable Defendants to publicly deny the existence of the Policing Program. These deficient training and supervision policies demonstrate, at the very least, a policy of deliberate indifference to the routine violations of the

---

[35] The jump-out patrol has also stopped Terrance Thompson at least twice since 2014 while walking down the street in Canton. Ex. 58, T. Thompson Decl. ¶ 11. On one occasion, in 2014, an unmarked Tahoe pulled up on him and friend while they were walking; the officers jumped out and without explanation put both men in handcuffs and searched them. *Id.* ¶¶ 17-20. After finding nothing, they demanded identification and ran warrant checks. *Id.* Only after the check came back clean did they remove the handcuffs and let the men go. *Id.* Class member Montreal Tillman, also a Canton resident, explained that when he was stopped, the officer "started shouting at me through his window to stop walking. ... .He asked for my license. I felt like I had to give it to him." Ex. 59, Tillman Decl. ¶¶ 12-14. Class member Quincy Smith has been stopped as many as fifteen times by the MCSD while walking. Ex. 56, Q. Smith Decl. ¶ 15. On one occasion, he and three friends were stopped on the street by MCSD deputies and forced to provide social security numbers and submit to a pat down. *Id.* ¶¶ 16-17. Mr. Smith and his friends "were afraid and felt like if [they] said no or walked away there would have been real trouble." *Id.*

constitutional rights of Madison County's Black community.

### 1.    MCSD Personnel Are Inadequately Trained And Supervised

The MCSD does not explicitly train deputies not to use racial slurs or racially derogatory language. Ex. 24, R. Tucker Tr. 112:9-25. Sheriff Tucker and Chief Williams have not discussed the constitutional obligation to police in a race-neutral manner during department-wide meetings. *Id.* 10:24-11:21; Ex. 27, Williams Tr. 22:13-21, 40:20-41:10. The MCSD's training officer, M/Sgt. Jeffery Waldrop, testified that he developed the training curriculum in conjunction with Sheriff Tucker. Ex. 25, Waldrop Tr. 31:10-16. M/Sgt. Waldrop does not provide deputies with any training or testing on any policies regarding racial discrimination. Ex. 25, Waldrop Tr. 30:23-25, 31:8-9.[36] Nor does he train MCSD deputies on (i) how to establish roadblocks; (ii) when deputies may conduct searches at roadblocks and traffic stops; (iii) when deputies may demand that a pedestrian produce his or her identification; or (iv) when they must report a fellow officer's misconduct. Ex. 25, Waldrop Tr. 33:24-36:3, 47:23-25, 49:11-13, 49:22-50:3, 52:14-18.

The MCSD also provides no training or guidelines on how MCSD personnel should exercise their discretion, and many important MCSD functions are performed with minimal, if any, oversight or reporting requirements. *See* Ex. 24, R. Tucker Tr. 183:23-24 ("there is no training about discretion"). For instance, supervising deputies have complete authority to select specific roadblock locations. *Id.* 141:5-8, 143:24-144:2; Ex. 27, Williams Tr. 90:18-91:3. MCSD deputies also have complete discretion to determine whether to make traffic stops for any reason. Ex. 24, R. Tucker Tr. 187:25-188:2.[37]

---

[36] Sheriff Tucker testified that the FBI conducted a civil rights training for detention officers and deputies. Ex. 24, R. Tucker Tr. 85:14-19. Officers did not recall what the training covered. *See, e.g.*, Ex. 15, S. Howard Tr. 77:3-9 ("Q: Okay. Do you recall what you learned during that training? A: No, ma'am.").

[37] *See also* Ex. 64, Defs.' Resp. to Pls.' First Set of Req. for Admis., No. 2 ("Defendants admit that MCSD has no written criteria concerning when MCSD personnel should make a vehicle stop other than complying with existing state and federal laws."); Ex. 109, Defs.' Resp. to Pls.' First Set of Req. for Prod.

24

Sheriff Tucker also testified that he does nothing to ensure that his deputies are not profiling or targeting Madison County's Black population. Ex. 24, R. Tucker. 218:14-19 ("I don't monitor anybody to see if they're performing in a racially discriminatory manner."), 128:8-16, 135:12-21, 217:19-218:2; *see also* Ex. 27, Williams Tr. 76:3-8, 151:16-24 (no awareness of any attempts to determine whether deputies charge Black persons more severely than white persons). Sheriff Tucker is also steadfastly opposed to the use of technology that would record his deputies' actions. Ex. 99, Jan. 8, 2016 Email (calling a proposed bill that would require the use of body cameras "utterly ridiculous"); *see also* Ex. 100, *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015); Ex. 24, R. Tucker Tr. 175:7-14.[38] Sheriff Tucker claims that he relies on his supervising deputies to report instances of racial discrimination. Ex. 24, R. Tucker Tr. 114:10-18. He could not recall a single instance in the past six years in which a supervising deputy had made such a report. *Id.* 115:6-17, 128:25-129:3.

The MCSD also has no established processes for evaluating deputies' job performances. *Id.* 214:25-215:12; Ex. 27, Williams Tr. 177:21-178:6. In fact, numerous deputies testified that they have never received a performance evaluation of any kind. *See, e.g.*, Ex. 21, Sullivan Tr. 27:11-12; Ex. 14, Hall Tr. 21:22-25; *see also* Ex. 26, Weisenberger Tr. 57:6-11 (neither he nor anyone else conducts performance evaluations of the deputies he supervises). Deputies' performance is instead measured primarily by looking at the *quantity* of their policing, as reflected by metrics such as the number of arrests they make and the number of citations they

---

of Docs., No. 6 ("Defendants have no written policies or training materials regarding MCSD personnel conducting traffic stops.").

[38] Deputies have discretion to decide when to activate their in-vehicle cameras and microphones. Ex. 24, R. Tucker Tr. 180:4-25, 182:22-25. The MCSD also does not train deputies to turn on their in-vehicle cameras when they have a subject in the vehicle, such as when Sgt. Moore restrained Plaintiff Khadafy Manning in Deputy Thompson's vehicle. Ex. 27, Williams Tr. 99:4-12.

issue. Ex. 24, R. Tucker Tr. 215:13-23, 216:17-23; *see also* Ex. 27, Williams Tr. 122:25-124:8

(arrest and citation statistics are "a tool to evaluate performance").

### 2.     The MCSD Does Not Maintain Complete Or Accurate Records

The MCSD does not track citation or arrest rates by race. Ex. 24, R. Tucker Tr. 188:25,

191:16-20; Ex. 27, Williams Tr. 57:20-22, 115:5-9. Sheriff Tucker testified that he has no idea

whether his deputies arrest more Black individuals than white individuals. Ex. 24, R. Tucker Tr.

228:2-11 ("We arrest a lot of criminals. I couldn't tell you what color they are."). Sheriff Tucker

acknowledged that he has access to years of records that he could use to determine arrest rates by

race. *Id.* 26:25-27:12, 223:18-224:14. Yet the MCSD has never compiled such statistics because

he has no interest "whatsoever" in finding out what they would show. *Id.* 224:15-21.

Moreover, the records that do exist are not comprehensive. For instance, deputies are

supposed to complete an incident report with a written narrative every time they make an arrest.

*Id.* 132:3-5, 133:4-6; Ex. 27, Williams Tr. 172:5-13. The evidence demonstrates that deputies

often disregard this policy. Based on a review of dispatch data entries produced by Defendants,

Plaintiffs discovered over 160 instances of arrests in which an MCSD deputy did not prepare an

incident report with a narrative, a finding Defendants did not contest. Ex. 110, Feb. 6, 2018

Email. Plaintiffs have also identified over 300 roadblocks that were not included in the MCSD's

dispatch data, even though all roadblocks should be recorded therein. Ex. 1, Ricchetti Rep. ¶ 38,

n. 23; *see also* Ex. 27, Williams Tr. 235:18-24 (roadblocks should be recorded in dispatch data).

Plaintiffs discovered many such roadblocks by reviewing incident reports which described their

dates and locations in the course of documenting arrests. If no arrests had been made at those

roadblocks, or deputies failed to disclose in incident report narratives that the arrests took place

at a roadblock, the MCSD would have no records that these roadblocks had ever taken place.[39]

### 3.   The MCSD Lacks Meaningful Complaint Procedures

Sheriff Tucker has delegated to Chief Williams *sole authority* to review citizen

complaints and address personnel matters. *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs.,

No. 9. The evidence indicates that Chief Williams conducts bare-bones investigations of citizen

complaints, and rarely elevates those complaints to Sheriff Tucker's attention. For example, in

November 2016, class member Destiny Jones filed a complaint against Sgt. Moore for using

excessive force and falsely arresting her at the scene of a car crash caused by a drunk driver. Ex.

101, MC-RFP 8-211-214. Sheriff Tucker did not recall any investigation into her complaint. Ex.

24, R. Tucker Tr. 265:22-266:2, 267:15-18. Chief Williams testified that he recalled "looking

into the incident" and determining not to take action, but could not remember if he "did a report

or documentation of it." Ex. 27, Williams Tr. 184:10-185:14 *see also* Ex. 17, Moore Tr. 58:21-

25. Chief Williams did not contact Ms. Jones. Ex. 50, D. Jones Decl. ¶ 18.

Chief Williams' investigation of the June 2016 incident involving Plaintiffs Khadafy and

Quinnetta Manning was even more limited. On June 26, 2016, Chief Williams learned that the

Mannings claimed that a MCSD deputy had handcuffed, choked, and beaten Mr. Manning. *See*

Ex. 104 MC-RFP-8-182-183. Chief Williams asked Sgt. Moore to prepare a supplemental report

setting forth his account of the events, but he never questioned Moore about the incident. Ex. 17,

---

[39] At least two class members have reported being arrested at roadblocks that appear neither in the MCSD's dispatch data nor in the incident report narratives for the arrests. *Compare* Ex. 54, E. Pate Decl. ¶ 2 (reporting a roadblock on Livingston Vernon Road on June 9, 2015) *with* Ex. 102, MC-RFP-Inc. Rep. 020907 (incident report for "paper service – warrant" on June 9, 2015, which states "I came in contact with Earnest L. Pate on Livingston Vernon Rd. near Hwy 22," but does not disclose the roadblock.); *compare* Ex. 56, Q. Smith Decl. ¶ 8 (reporting a roadblock on May 3, 2015 on George Washington and Welsh) *with* Ex. 103, MC-RFP-Inc. Rep. 020065 (Incident report for "paper service warrant" on May 3, 2015, which states "deputies came in contact with Quincy Smith on George Washington Str near Welsh Str.," but fails to mention a roadblock.).

Moore Tr. 47:4-20. At no point did Chief Williams reach out to Mr. or Mrs. Manning. Ex. 27,

Williams Tr. 182:21-183:6. At the conclusion of this cursory investigation, Chief Williams

determined not to take any action. *Id.* 184:4-9; *see also* Ex. 24, R. Tucker Tr. 72:9-14.[40]

When allegations of racial discrimination have been brought to Sheriff Tucker's

attention, he has failed to conduct meaningful investigations. For example, in February 2013,

then-Deputy Robert L. Gibson, who is Black, allegedly shared with a supervisor his "concerns

about racially discriminatory [policing practices] that affected both the employees and the

community," including white officers using excessive force and beating [B]lack individuals,"

and "setting up roadblocks primarily in the minority neighborhoods." Ex. 105, Compl., *Gibson v.*

*Madison County*, No. 3:16-cv-633 HTW-LRA (S.D. Miss. Aug. 15, 2016), ¶ 37. Sheriff Tucker

at no point commissioned an investigation into Mr. Gibson's allegations of racially

discriminatory policing practices. Ex. 106, R. Tucker Tr. (*Gibson*) 71:10-15. Similarly, in June

2013, a former Madison County Detention Center officer claimed that he had been "subject to

racial jokes [and] racial remarks" by his supervisor. Ex. 107, Compl., *Cooper v. Tucker*, No.

3:13-cv-350 HTW-LRA (S.D. Miss. June 7, 2013), at ¶ 7. Sheriff Tucker did not commission an

investigation into these claims either. Ex. 24, R. Tucker Tr. 276:12-17. And, in March 2015,

Sheriff Tucker received a notarized letter from a Black couple, stating that Deputy Brad Sullivan

drew his gun on the couple and their five year old daughter and stated "I've got you niggers

now." Ex. 108, MC-RFP-8-29. The letter complained of "systematic racism" and requested a

"thorough investigation." *Id.* at MC-RFP-8-29-30. Sheriff Tucker attempted to call the

---

[40] Sheriff Tucker testified that he believed Chief Williams' investigation was adequate, and that Sgt.
Moore had not violated any MCSD policies or procedures. Ex. 24, R. Tucker Tr. 243:4-7, 244:17-21. He
testified that it was appropriate for Sgt. Moore to give the Mannings the "choice" of either providing
witness statements or sleeping on a concrete floor in jail, *id.* at 239:20-241:21, incorrectly insisting that
Mississippi law criminalizes witnesses' failure to report crimes. *Id.* at 235:10-15, 249:23-250:4, 264:5-18.

complainant, but did not reach him; he then delegated the matter to Chief Williams. Ex. 24, R. Tucker Tr. 268:6-269-8. Sheriff Tucker testified that Sullivan represented to Chief Williams that he did not use the term "niggers," and "that was the extent" of the inquiry. *Id.* 268:24-269:12.

## ARGUMENT

"Rule 23(a) states four threshold requirements applicable to all class actions." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Plaintiffs must establish "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses are 'typical … of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Id.* (quoting Fed. R. Civ. P. 23(a)). The Fifth Circuit has emphasized that "Rule 23(a) must be read liberally in the context of civil rights suits," especially when, as here, "the class action falls under Rule 23(b)(2)." *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975). Plaintiffs' proposed class and subclasses meet each of these requirements.

## I.   PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT

For a class to be certified, it must be so numerous that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). A class of 100 to 150 members "generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999). When a class seeks only injunctive relief, even a relatively small class will satisfy numerosity, as "the benefits to be gained not only inure to the benefit of the known class but will benefit a future class of indeterminate size." *Choice Inc. of Texas v. Graham*, No. 04-cv-1581, 2005 WL 1400408, at *2-3 (E.D. La. June 3, 2005).

The proposed class easily satisfies the numerosity requirement. It includes all Black persons who reside in or travel through Madison County and who are, as a result, subject to the MCSD's Policing Program. There are over 36,000 Black residents of Madison County. *See* Ex.

62, (Census Data). This number is more than sufficient. The two proposed subclasses also readily satisfy the numerosity requirement. The Roadblocks Subclass includes all Black persons who are stopped at roadblocks established by the MCSD for crime control purposes. Since 2012, the MCSD has established over 2,000 roadblocks.[41] Ex. 1, Ricchetti Rep. ¶ 38. The Pedestrian Stop Subclass covers Black pedestrians in Madison County, including the hundreds, if not thousands of residents of and visitors to the specifically-targeted Canton area apartments.

Moreover, both the proposed class and subclasses include unknown individuals who may in the future reside in and/or travel through Madison County. "[T]he fact that the class includes unknown, unnamed future members … weighs in favor of certification." *Pederson v. La. St. Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000). And certain class members may be hesitant to assert claims for fear of retaliation. *See, e.g., Mullen*, 186 F.3d at 624.[42] In light of all these factors, the proposed class and subclasses satisfy the numerosity requirement.

## II.   PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT

The commonality requirement of Rule 23(a)(2) requires that there must be one or more questions of law or fact common to the class, such that a "determination of [the] truth or falsity" of that question "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality requires "merely a single common contention that enables the class action 'to

---

[41] Incident reports indicate that at least 956 arrests of Black persons have occurred at MCSD roadblocks since January 1, 2012. *See* Ex. 2, Guha Decl. Ex. 6. By comparison, the class that was certified in *City of Indianapolis v. Edmond* consisted of motorists who had been or would be subjected to the Indianapolis police department's drug interdiction roadblock program, which comprised six total roadblocks that resulted in 104 total arrests. 531 U.S. 32, 34-35 (2000).

[42] For example, Defendants stated in their Answer that they found it "ironic" that Plaintiff Latoya Brown had filed suit in light of her having allegedly contacted the MCSD in the past for police assistance, and proceeded to detail the nature of those alleged calls. *See* Ans. ¶ 185. Other potential class members have good reason to fear that attempts to assert claims regarding MCSD's Policing Program may expose them to retaliation or embarrassment.

generate common *answers* apt to drive the resolution of the litigation.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

To satisfy Rule 23(a)(2), plaintiffs must "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury." *Dockery v. Fischer*, 253 F. Supp. 3d 832, 846 (S.D. Miss. 2015). Such a policy or practice "need not be formal or officially-adopted." *Id.* "Absent official sanction, a policy can be identified on the basis of custom or consistent practice" or "based on the defendant's deliberate indifference." *Id.* at 847. "[F]ailure to act can also constitute a policy or practice." *Id.* at 848. The commonality requirement can be met by identifying a "general policy of discrimination." *Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011); *see also Wal-Mart*, 564 U.S. at 350 (a quintessential "common contention" is "the assertion of discriminatory bias on the part of the same supervisor"). For class certification purposes, plaintiffs need only demonstrate that "the policies and practices they challenge are common, not (yet) that the common policies and practices are unconstitutional." *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016); *accord Morrow*, 277 F.R.D. at 184. And, to the extent that Plaintiffs are required to provide evidence of discriminatory intent at the class certification stage, such intent can be shown using circumstantial evidence. *See Veasey v. Abbott*, 830 F.3d 216, 235-36 (5th Cir. 2016) ("neutral reasons can and do mask racial intent").

Under these standards, the proposed class and two subclasses satisfy the commonality requirement. The Fourteenth Amendment claims of the proposed Targeting Class present common questions, including whether the MCSD has a policy of targeting Black communities and racially profiling Black individuals, and whether this policy violates the Equal Protection Clause. The claims of the Roadblock Subclass turn on the common question of whether the MCSD has a policy, custom, or consistent practice of conducting roadblocks in majority-Black

31

areas of Madison County for purposes of crime control, and whether the roadblocks carried out

pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth

Amendments. The claims of the Pedestrian Stop Subclass turn on whether the MCSD has a

policy, custom, or consistent practice of engaging in searches and seizures of Black persons in

Madison County in the absence of individualized reasonable suspicion, and if so, whether the

searches and seizures carried out pursuant to this policy are consistent with the requirements of

the Fourth and Fourteenth Amendments.

### A.    The Targeting Class Satisfies The Commonality Requirement

Plaintiffs seek to certify the following class (the "Targeting Class") for declaratory and

injunctive relief under Rule 23(a) and 23(b)(2):

> All Black persons who have been, or will be, subjected to the MCSD's policy
> and/or widespread custom or practice of racially profiling and targeting Black
> persons for stops, searches, and/or seizures on the basis of their race in violation
> of the Equal Protection Clause of the Fourteenth Amendment.

While the Fifth Circuit requires only a "single common question" for commonality

purposes, *Deepwater Horizon*, 739 F.3d at 811, the claims of the Targeting Class raise numerous

common questions of law or fact, including the following:

- Whether the MCSD has a policy or widespread custom or practice of racially profiling Black persons in Madison County;

- Whether the MCSD has a policy or widespread custom or practice of disproportionately targeting majority-Black communities;

- Whether the MCSD has a policy or widespread custom or practice of conducting searches and seizures of Black persons at least in part on the basis of race;

- Whether the MCSD has a policy or widespread custom or practice of failing to train officers adequately to prevent racial targeting and profiling; and

- Whether the MCSD has a policy or widespread custom or practice of failing to monitor officers adequately to prevent racial targeting and profiling.

Several post-*Wal-Mart* courts have found commonality where plaintiffs have alleged and

32

presented evidence of an unwritten policy of racial profiling by a law enforcement agency.[43]
Plaintiffs' evidence of Defendants' Policing Program is consistent with the evidence presented in
these in post-*Wal-Mart* profiling cases. In *Ortega-Melendres*, 836 F. Supp. 2d at 986-87,
plaintiffs provided evidence that Sheriff Arpaio had made "public statements that a fact finder
could interpret as endorsing racial profiling" against individuals of Hispanic descent, as well as
evidence of a culture of discrimination against Hispanic individuals, including Sheriff Arpaio
having forwarded a racially discriminatory email. Here, Plaintiffs have provided evidence of
public and private statements by Sheriff Tucker that indicate racial animus. Plaintiffs have also
presented evidence of a culture of discrimination, including testimony by current and former
MCSD personnel regarding the use of racial epithets by Sheriff Tucker and his deputies. In
*Morrow*, plaintiffs "provided anecdotal evidence that the stops of class representatives" were
"based ... on racial profiling." 277 F.R.D. at 193. Here, Plaintiffs have provided extensive
anecdotal evidence by more than 33 named Plaintiffs and class members of racial profiling at
roadblocks, traffic stops, and pedestrian stops. *See generally*, Ex. 29 through 61. And, in *Floyd*,
plaintiffs presented expert testimony that racial composition of a census tract "is a statistically
significant, strong and robust predictor of NYPD stop-and-frisk patterns even after controlling
for" relevant confounding factors. 283 F.R.D. at 168. Here, Plaintiffs present analogous expert
testimony on the MCSD's disproportionate concentration of roadblocks in majority-Black
communities, one of the most significant components of its Policing Program.[44] *See supra* at 16.

---

[43] *See, e.g., Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (commonality met
through evidence of "a policy of racial profiling, in violation of the Fourteenth Amendment"); *Morrow*,
277 F.R.D. at 192 (commonality met through evidence of a "city-wide policy in Tenaha of targeting racial
and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting
illegal searches and seizures of their property"); *Floyd v. City of New York*, 283 F.R.D. 153, 159, 173-75
(S.D.N.Y. 2012) (commonality met through evidence that police department "engaged in a policy and/or
practice of unlawfully stopping and frisking [Black and Latino] people").

[44] In determining whether the commonality requirement is satisfied with respect to an alleged policy of

Viewed in its entirety, Plaintiffs' evidence provides "significant proof" of Defendants' policy of racially profiling and targeting Black individuals. *Wal-Mart*, 564 U.S. at 353. Because the claims of the Targeting Class turn on common questions concerning this policy, this Court should find the commonality requirement satisfied as to the Targeting Class.

### B.   The Roadblock Subclass Satisfies The Commonality Requirement

Plaintiffs Lawrence Blackmon, Latoya Brown, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker also seek to certify the following subclass (the "Roadblock Subclass") for declaratory and injunctive relief under Fed R. Civ. P. 23(a) and 23(b)(2):

> All Black motorists and passengers who have been, or will be, subject to the MCSD's policy of disproportionately conducting roadblocks in majority-Black neighborhoods for general crime control purposes and without appropriate procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

Plaintiffs have been illegally stopped and searched at roadblocks conducted by the MCSD under the Roadblock Program, and seek relief on behalf of all similarly-situated individuals who have been or will be stopped at similar unconstitutional roadblocks.[45] Plaintiffs, like other members of the proposed Roadblock Subclass, have been and continue to be subjected to the Roadblock Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Roadblock Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks in Black communities in Madison County, including roadblocks at or near the entrances of majority-Black apartment complexes, for the primary purpose of crime

---

discrimination, courts do not require "perfect" statistical evidence. *See, e.g., Morrow*, 277 F.R.D. at 192 (finding the commonality requirement satisfied even though "the statistical evidence presented by Plaintiff is not perfect"). In particular, courts permit the use of "less precise" data when a defendant has not retained "the primary evidence in a discrimination case." *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2015). Here, Defendants have no data on the race of persons stopped but not arrested or cited.

[45] *See* Ex. 4, L. Brown Tr. 45:12-21, 48:19-50:13; Ex. 3, Blackmon Tr. 144:4-11; Ex. 7, N. Singleton Tr. 41:23-45:7; Ex. 9, Thomas Tr. 25:21-26:20; Ex. 10, B. Tucker Tr. 19:2-18.

control, in contravention of the Fourth Amendment;

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks with inadequate procedural safeguards, in contravention of the Fourth Amendment; and

- Whether the MCSD has a policy or widespread custom or practice of disproportionately establishing roadblocks in Black communities in Madison County on a racially discriminatory basis, in violation of the Equal Protection Clause.

It is well-established that roadblock programs that have the primary purpose of general crime control violate the Fourth Amendment. *See Edmond*, 531 U.S. at 44; *Prouse*, 440 U.S. at 659 n.18. Thus, the use of roadblocks for crime prevention in purportedly "high crime" apartment complexes or subdivisions is unconstitutional. *See, e.g., Shankle v. Texas City*, 885 F. Supp. 996, 1003-04 (S.D. Tex. 1995) (roadblocks located at each of the entrances to subdivision with high crime rates violated Fourth Amendment).[46] Many courts have certified classes in civil rights class actions asserting claims under the Fourth Amendment and/or the Equal Protection Clause with respect to an alleged policy, or widespread custom or practice, of unconstitutional traffic stops, including checkpoints and roadblocks. *See, e.g., Edmond*, 531 U.S. at 36 (affirming injunctive relief granted to certified class of motorists who had been subjected to city's drug interdiction checkpoints); *Morrow*, 277 F.R.D. at 202 (certifying class of racial minority motorists alleging they were subjected to discriminatory traffic stop program). The Roadblock Subclass therefore satisfies the commonality requirement of Rule 23(a)(2).

### C.   The Pedestrian Stop Subclass Satisfies The Commonality Requirement

Finally, Plaintiffs Steven Smith, Latoya Brown, and Khadafy Manning seek to certify the

---

[46] Any contentions by Defendants that they do not conduct roadblocks for purposes of crime control are irrelevant to the limited inquiry into the merits that is permissible at the class certification stage. *See, e.g., Collins v. Ainsworth*, 382 F.3d 529, 543-44 (5th Cir. 2004) ("Though Ainsworth claims the checkpoints were set up to advance general highway safety, and the checkpoints may have been facially valid pursuant to Mississippi law …, Plaintiffs have put forth material evidence that shows another programmatic purpose which was advanced by Sheriff Ainsworth.").

following subclass (the "<u>Pedestrian Stop Subclass</u>") for declaratory and injunctive relief:

> All Black persons who have been, or will be, subject to the MCSD's policy of conducting stops, searches and/or seizures of Black pedestrians in Madison County in the absence of reasonable, articulable suspicion or probable cause.

These Plaintiffs have been illegally stopped by the MCSD under the Pedestrian Stop Program, and seek relief on behalf of all similarly-situated individuals.[47] Plaintiffs, like other members of the proposed Pedestrian Stop Subclass, have been and continue to be subjected to the Pedestrian Stop Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Pedestrian Stop Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons present in the vicinity of the Apartment Complexes in the absence of reasonable, articulable suspicion, or probable cause;

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons in the vicinity of the Apartment Complexes at least in part on the basis of race and/or ethnicity; and

- Whether the MCSD has a policy, or longstanding custom or practice of targeting the Apartment Complexes at least in part on the basis of race.

The MCSD's policies, customs, and practices concerning the Pedestrian Stop Program, including the creation and implementation of the Apartment Detail and the NET Team, were promulgated by the highest level of MCSD's leadership, disseminated to rank-and-file officers through meetings, instructions, and directives, and implemented pursuant to a hierarchical supervisory structure. *See supra* at 12. Therefore, the injuries derived from the Pedestrian Stop Program are substantially similar across the Subclass and implicate common issues of proof. *See, e.g.*, *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (commonality satisfied in

---

[47] *See* Ex. 8, S. Smith Tr. 34:16-35:4, 38:13-16; Ex. 4, L. Brown Tr. 50:24-51:9, 53:2-54:10, 74:19-76:9; Ex. 97, MC-RFP-Inc. Rep. 047927 (K. Manning incident report).

case involving a program of "unjustified *Terry* stops, not supported by reasonable suspicion, occurring outdoors in the vicinity of [certain apartment] buildings"). Consequently, the claims of the Subclass turn on common questions of law and fact that will establish Defendants' liability, and the commonality requirement of Rule 23(a)(2) is satisfied. *See Wal-Mart*, 564 U.S. at 350.

## III.   PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE 23(a)(3)

To satisfy the typicality requirement, the claims or defenses of the representative parties must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test for typicality ... is not demanding." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997); *see also James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."). As long as there is similarity in the underlying legal theories, the fact that one or more of the Named Plaintiffs' claims may be subject to a unique defense does not defeat typicality. *See, e.g., Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting claim that "the presence of an arguable unique defense necessarily destroys typicality"). As a practical matter, "'[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" *Wal-Mart*, 564 U.S. at 349 n.5. Therefore, once commonality is shown, as it has been here, typicality often "will follow as a matter of course." *Dockery*, 253 F. Supp. 3d at 850.

**Plaintiff Latoya Brown** is a resident of Canton, Mississippi, where she has lived most of her life. Ex. 30, L. Brown Decl. ¶ 2. In the last three years, Ms. Brown has been subjected to several suspicionless pedestrian stops by the MCSD. *Id.* ¶ 3; Compl. ¶¶ 83-87. Each time she was forced to provide identification and wait for the deputies to check for warrants before she could proceed. Ex. 4, L. Brown Tr. 50:22-52:3, 75:20-76:9. The MCSD also entered and searched the home Ms. Brown then shared with Plaintiff Steven Smith without a warrant and without permission. Ex. 30, L. Brown Decl. ¶ 4; Compl. ¶¶ 276-81. Ms. Brown remains at risk of

being subjected to these suspicionless, race-based searches and seizures in the future.

**Plaintiff Lawrence Blackmon** currently resides in Washington, D.C. Ex. 29, Blackmon Decl. ¶ 2. In the coming months he will return to Canton, where he has lived most of his life, to begin his law career. *Id.*; Compl. ¶ 191. In 2015, MCSD personnel forced their way into Mr. Blackmon's home after he requested to see a warrant before allowing them in. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 194-96. The officers handcuffed Mr. Blackmon at gunpoint and searched his home. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 196-97. Mr. Blackmon has also been subjected to numerous MCSD roadblocks. Ex. 29, Blackmon Decl. ¶ 4; Compl. ¶ 201. Upon his return to Canton, Mr. Blackmon will be at risk of further suspicionless, race-based searches and seizures.

**Plaintiff Khadafy Manning** is a resident of Canton, Mississippi, where he has lived for many years. Ex. 31, K. Manning Decl. ¶ 2. Mr. Manning was forced to write a false witness statement after MCSD deputies entered his wife's home without a warrant and subjected him to an unlawful seizure and the use of excessive force. *Id.* ¶ 3; Compl. ¶ 211. Mr. Manning was arrested last year in Canton Estates after a NET Team officer conducting a foot patrol stopped Mr. Manning because he believed he was avoiding him. Ex. 31, K. Manning Decl. ¶ 4; Ex. 97, MC-RFP Inc. 047927. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Quinnetta Manning** is a lifelong resident of Canton, Mississippi. Ex. 32, Q. Manning Decl. ¶ 2. Ms. Manning was also forced to write a false witness statement after the MCSD deputies entered her home without a warrant and threatened her and beat her husband. *Id.* ¶ 3; Compl. ¶ 211. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Nicholas Singleton** is a resident of Canton, Mississippi. Ex. 33, Singleton Decl.

¶ 2. Mr. Singleton has been stopped at more than 20 roadblocks in recent years, several of which occurred within the last four years. *Id.* ¶ 3; Compl. ¶ 265. As a current Canton resident, Mr. Singleton remains at risk of being subject to further MCSD roadblocks in the future.

**Plaintiff Steven Smith** is a longtime resident of Canton who recently moved to Dallas, Texas, where he recently moved to start a new job. Ex. 34, S. Smith Decl. ¶ 2. Much of his family lives in Madison County and he expects to travel back to Madison County regularly and eventually move back. *Id.* Mr. Smith has been subjected to numerous suspicionless pedestrian stops by the MCSD, including a stop for a warrant check in January 2017 as he was walking onto the grounds of his former home. *Id.* ¶ 3; Compl. ¶¶ 271-73. With Ms. Brown, he was also the victim of a warrantless home search. Ex. 34, S. Smith Decl. ¶ 5; Compl. ¶¶ 276-81. Because Mr. Smith continues to travel to Madison County to visit his family and intends to move back permanently in the future, Mr. Smith remains at risk of being subject to the MCSD's unconstitutional and suspicionless stops and searches in the future.

**Plaintiff Bessie Thomas** is a resident of Canton, Mississippi, where she has lived for over 50 years. Ex. 35, B. Thomas Decl. ¶ 2. While Ms. Thomas attempts to avoid the MCSD's roadblocks, she has been stopped at numerous roadblocks, including at least one in the last three years that was located outside her church and resulted in a citation. *Id.* ¶ 3; Compl. ¶ 287; Ex. 9, B. Thomas Tr. 28:22-29:12. As a current Canton resident, Ms. Thomas remains at risk of being subject to further unconstitutional MCSD roadblocks in the future.

**Plaintiff Betty Jean Williams Tucker** is a long-time resident of Canton, Mississippi, where she was born and raised. Ex. 36, B. Tucker Decl. ¶ 2. Ms. Tucker has been stopped at numerous roadblocks, at least two in the last two years. *Id.* ¶ 3; Compl. ¶ 296; Ex. 10, B. Tucker Tr. at 19:23-20:6. As a current Canton resident, Ms. Tucker remains at risk of being subject to

further unconstitutional MCSD roadblocks in the future.

The claims of the Named Plaintiffs are typical of those of Class and the Subclasses. All Named Plaintiffs have claims typical of the Class, as they have been, and likely again will be, victims of Defendants' unconstitutional Policing Program. Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker have claims typical of the Roadblock Subclass, as they have been stopped at MCSD roadblocks and are at risk of being stopped again in the future. Steven Smith, Latoya Brown, and Khadafy Manning have claims typical of the Pedestrian Stop Subclass, as they have been and remain at risk of being subject to suspicionless, race-based pedestrian stops. Regardless of any differences in the details of each Named Plaintiff's claims, the claims of the Named Plaintiffs share a common underlying legal theory and thus satisfy the typicality requirement.

## IV. PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4)

The final requirement of Rule 23(a) is also satisfied, because the "class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). In analyzing this requirement, courts consider "the zeal and competence of the representatives' counsel and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Dockery*, 253 F. Supp. 3d at 850.

With respect to the adequacy of the Named Plaintiffs, the standard "is not exacting; it is sufficient that the class representatives have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Steward v. Janek*, 315 F.R.D. 472, 490 (W.D. Tex. 2016). Here, each named Plaintiff has declared his or her understanding of the responsibilities of a class representative, as

well as his or her willingness to prosecute this litigation.[48] Further, all named Plaintiffs have sat

for depositions, responded to multiple sets of interrogatories, and continue to be actively engaged

with counsel in prosecuting this action. *Id.* This easily satisfies the adequacy requirement.

Further, no conflict of interest exists between the named Plaintiffs and the proposed

classes. "A sufficient alignment of interests" exists for Rule 23(a)(4) purposes if "all class

members are united in asserting a common right." *Lehocky v. Tidel Technologies, Inc.*, 220

F.R.D. 491, 502-03 (S.D. Tex. 2004). Here, the named Plaintiffs assert the same injury as the

unnamed class members. *See In re Heartland Pmt. Sys., Inc. Customer Data Sec. Breach Litig.*,

851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012). Each Named Plaintiff is a Black person who

presently resides in, travels frequently to, and/or has a principal place of residence in Madison

County, and each Named Plaintiff has been subjected to, and remains at risk that he or she again

will be subjected to, the MCSD's Policing Program. *See supra* 38-40. Accordingly, each named

Plaintiff and all unnamed class members will derive the same benefit from the injunctive and

declaratory relief sought in this action with respect to the MCSD's Policing Program.[49]

Finally, Plaintiffs are represented by experienced and qualified counsel who have been

and will continue to vigorously and diligently prosecute this action on behalf of the proposed

---

[48] Ex. 30, L. Brown Decl. ¶ 7-8; Ex. 29, L. Blackmon Decl. ¶ 7-8; Ex. 31, K. Manning Decl. ¶¶ 7-8; Ex. 32, Q. Manning Decl. ¶¶ 7-8; Ex. 33, N. Singleton Decl. ¶ 6-7; Ex. 34, S. Smith Decl. ¶¶ 8-9, Ex. 35, B. Thomas Decl. ¶¶ 6-7; Ex. 36, B. Tucker Decl. ¶¶ 7-8.

[49] That unnamed class members have sought or might in the future seek the assistance of the MCSD, or the hypothetical possibility that one or more class members could support the conduct challenged herein, does not create a conflict between Plaintiffs and unnamed class members. *See Morrow*, 277 F.R.D. at 195. Plaintiffs only seek relief with respect to policies, customs, and practices that violate the Constitution. In any event, potential diversity of opinion within a class is not a basis for denying certification. *See, e.g., Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 486 (5th Cir. 1982) ("[I]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so."); *Groover v. Michelin North Am., Inc.*, 192 F.R.D. 305, 306 (M.D. Ala. 2000) ("The fact that some class members … would prefer to … leave violations of their rights, if violations exist, unremedied is not dispositive under Rule 23(a)."); *Lanner v. Wimmer*, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal if some members of the class might prefer not to have violations of their rights remedied.").

classes: namely, the American Civil Liberties Union of Mississippi, the American Civil Liberties Union Foundation, and Simpson Thacher & Bartlett LLP. Counsel for Plaintiffs have the resources, expertise, and experience to prosecute this action. *See generally* Ex. 111, Youngwood Decl.; Ex. 112, Tom Decl.; Ex. 113, Edwards Decl. Counsel for Plaintiffs further know of no conflicts among members of the classes or between the attorneys and members of the classes. Named Plaintiffs and their counsel therefore meet the requirements of Rule 23(a)(4).

## V.    THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED

This case fits squarely within Rule 23(b)(2), which authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Certification is proper under Rule 23(b)(2) where, as here, a class seeks "an indivisible injunction benefiting all its members at once." *Wal-Mart*, 564 U.S. at 362. Rule 23(b)(2) was designed as a vehicle for challenging discrimination and fostering institutional reform. *See* Fed. R. Civ. P. 23 Adv. Comm. Notes, *reprinted in* 39 F.R.D. 69, 102 (1966). Thus, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture." *Wal-Mart*, 564 U.S. at 361.[50]

Plaintiffs' claims are clearly susceptible to common specific relief so that final injunctive relief would be appropriate for the class as a whole. "The Court need not, at this stage, determine what remedy Plaintiffs [will] be entitled to if they prevail[] on the merits of their claim." *M.D. v.*

---

[50] Because Plaintiffs seek to certify the proposed class and subclasses pursuant to Rule 23(b)(2), "it is not necessary that the members of [each] class be so clearly identified that any member can be presently ascertained." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *see also ODonnell v. Harris County, Texas*, No. H-16-1414, 2017 WL 1542457, at *3 (S.D. Tex. Apr. 28, 2017) ("[T]he strict ascertainability requirements for a proposed damages class action do not apply to a Rule 23(b)(2) class seeking prospective relief under the Fifth Circuit's standard for civil rights litigation."); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

*Perry*, 294 F.R.D. 7, 47 (S.D. Tex. 2013). "Rather, the Court must determine that the Plaintiffs'

claim is one that is susceptible to common, specific relief." *Id.* Plaintiffs do not request

individualized relief, but instead seek to require Defendants to reform their policies to conform

to the requirements of the Constitution. Thus, the same final injunctive and declaratory relief

would be appropriate for all members of the class and for all members of the two subclasses on

the issues relevant to each subclass. The requirements of Rule 23(b)(2) are therefore satisfied.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court find that Plaintiffs satisfy the

requirements of Fed. R. Civ. P. 23(a) and 23(b)(2); certify the designated class and subclasses;

and, pursuant to Fed. R. Civ. P. 23(g), appoint current counsel for Plaintiffs as class counsel.

Dated: March 14, 2018

By:   /s/ Joshua Tom
Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Christopher Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

43

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, I caused the foregoing **MEMORANDUM OF**

**LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** to be electronically filed

with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com

Jaden Jackson

# EXHIBIT 69





Home | Sign-up for Email Updates | RSS Feed | Submit News

NEWS   EDITORIAL   SPORTS   OBITUARIES   CONTACT US   ABOUT US   CLASSIFIEDS   LIFESTYLES   MAGAZINE   ADVERTISING   CIRCULA



Search



## New supervisors take office Friday

Byline info is not available

Wednesday, January 2, 2008 11:00 PM

When the new Board of Supervisors is sworn in on Friday, Jan. 4 at 10 a.m., they will be grappling with several key issues remaining from the previous term from 2004 through 2007.

Some of these policy areas include road maintenance, new transportation infrastructure, and the county's continuing economic development.

The goal will be to manage residential and commercial growth and transportation needs in one of the fastest-growing counties in the state. The county's tax value grew 4.1 percent in 2007.

"We have to reach out and plan for future growth," said John Bell Crosby, the new District 1 Supervisor, during an October speech.

The biggest ongoing issue for the county is improving the road infrastructure. In addition to the dozens of dirt roads in the county that supervisors have pledged to pave by 2014, officials are continuing to prepare for new road projects.

Some of the major ongoing projects include Reunion Parkway connecting U.S. Highway 51 to Mississippi 463 north of Madison, the widening of Gluckstadt Road west of Interstate 55, and the construction of Calhoun Station Parkway connecting Church Road to Gluckstadt Road.

Supervisors will be entering the third year of a four-year, $100 million transportation plan that calls for $50 million in borrowing. So far, the county has borrowed $29.5 million as part of that plan, although some of those funds went to refinancing previous debt from the Mississippi Development Bank.

Some other roads high on the priority list included Yandell Road, residential streets in Annandale that may require $5 million in repair work, and Highland Colony Parkway.

The supervisors agreed to partner with Ridgeland and Madison for studying the condition of the Parkway, and a major renovation could be in store for the seven miles of road within the two municipalities.

Supervisors also continue to lobby for improvements to the Gluckstadt Interchange with I-55, although Central District Transportation Commissioner Dick Hall last reported that work on the project may not begin until 2014.

The biggest infrastructure project, however, remains the Reunion Parkway interchange with I-55. With a price tag last reported at approximately $38 million, there is still uncertainty as to how the county will pay for it.

The county has received $6 million for the project from the state Department of Transportation, and continues to lobby Congress for federal funds.

Crosby has previously stated that the county should expect more road bonds in the future to pay for new construction projects.

One of the major goals of new road projects is to handle new growth, and the county has taken recent measures to ensure that new residential developments meet certain standards.

After a lengthy dispute over the Eastview subdivision in Gluckstadt, the supervisors oversaw an increase in the minimum home size. The developers agreed to make 75 percent of the lots at least 1,800 square feet.

This 1,800-square-foot standard was also used in the Oak Field subdivision in Gluckstadt, after developers initially requested a 1,300-square-foot minimum for homes.

Supervisors appear reluctant so far, however, to become more deeply involved in subdivision ordinance enforcement disputes as the city of Madison has done.

While Madison has given its Municipal Court the power to rule on ordinance violations, turning such disagreements into criminal cases, the county has not taken the parallel step of allowing Justice Court to consider such matters.

Another major project facing the supervisors early in 2008 will be the fate of a possible $19.5 million jail expansion.

The board is expected to decide in the spring if 209 beds will be added to the jail. A $4.1 million juvenile justice center with 50 beds and a juvenile court is also up for consideration.

Website de
SEO, digital
marketing.





LEARN MORE

If construction is officially approved in the spring, the expansion should take about three years to complete.

While Sheriff Toby Trowbridge generally receives very high marks from the supervisors, he has been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling.

⟨    ALL

Most recently, the Concerned Citizens of Flora II demanded that Trowbridge engage in more dialogue with residents about his law enforcement practices. A Jackson-based group threatened late in the year to lead a boycott of county businesses.

It is unclear if the disagreements between Trowbridge and these residents have been satisfactorily resolved.

|        |                  |          |                  |             |            |           |      |
|--------|------------------|----------|------------------|-------------|------------|-----------|------|
| SPORTS | NEWCOMER'S GUIDE | ABOUT US | CHURCH DIRECTORY | CIRCULATION | PAY MY BILL | ADVERTISING | LIFE |

Home | Sign-up for Email Updates | RSS Feed | Submit News

**Copyright 2016 The Madison County Publishing Co. Inc.**

Software © 1998-2018 **1up! Software**, All Rights Reserved

# EXHIBIT 70

# NewsRoom

7/22/07 Clarion-Ledger (Jackson, Miss.) A1
2007 WLNR 27765629

Clarion-Ledger, The (Jackson, MS)
Copyright © 2007 Gannett

July 22, 2007

Section: Main

IS system fair?

July 22, 2007

nicklaus.lovelady@jackson.gannett.com

The Madison County Sheriff's Department led the metro area in DUI arrests in 2006, and most of those arrested were black and between 28 and 39 years old.

nicklaus.lovelady@jackson.gannett.com

Statistics obtained by The Clarion-Ledger through an open records request also show Jackson police were next in the number of DUI arrests, followed by the Hinds County Sheriff's Department, and the Brandon and Flowood police departments.

While the statistics confirm that MadisonCounty is a force in DUI enforcement, the department has been accused by some of racial profiling.

Sheriff Toby Trowbridge did not return repeated calls seeking comment for this story. Earlier this year, when his officers were honored as being among the state's top DUI enforcers, Trowbridge said he did not think drunken driving was being taken seriously enough by many people.

Flowood Police Chief JohnnyDeWitt wants it to be known that his department doesn't tolerate drinking and driving. "Anyone who drinks and drives needs to be worried about coming through Flowood,"DeWitt said.

But getting stopped by the MadisonCounty Sheriff's Department worries bus driver Domonic Marshall of Edwards the most.

"I stay away from there after dark," said Marshall, who is black. "If you have one beer and you get pulled over, that will mess up your whole life."

Madison County District 5 Supervisor Paul Griffin said many people in Madison County are aware that the department is perceived as targeting blacks and have tried to get Trowbridge to meet with concerned citizens.

"There is a limit to what the Board of Supervisors can do because the sheriff is elected by the people to do his job," Griffin said.

Griffin, a former deputy sheriff, said he thinks racial profiling goes on in every department in the country. "It's not something that's just in Madison County," he said.

Trowbridge has denied his department engages in racial profiling. He has said he enforces the law no matter what color a person is. Responding to criticism in 2004, he said, "There is no racial profiling, just criminal profiling."

Of the 1,215 arrested by the Madison County Sheriff'sDepartment in 2006, 591 were black, 536 were white, 84 were Hispanic and 4 were of another race.

Since 2005, the number of blacks and Hispanics arrested on DUI charges by the Madison County Sheriff'sDepartment is 1,381 out of a total of 2,331, or about 60 percent.

Blacks and Hispanics make up about 40 percent of the population of the county, according to the 2005 U.S. Census.

Compared to other predominantly white jurisdictions, blacks and Hispanics arrested on DUI charges totaled 45 percent in Clinton, 25 percent in Ridgeland and 15 percent in the city of Madison.

Several local law enforcement agencies, including the Brandon Police Department and the Madison and Rankin county sheriff's departments, have officers dedicated to DUI enforcement. The officers generally are funded by a grant through the Mississippi Division of Public Safety Planning.

Earlier this year, the Rankin County Sheriff's Department received a $56,000 state grant to funda DUI officer for the first time.

In 2006, prior to the DUI officer, the department had 37 DUI arrests. In the seven months since the officer has come on, the county's arrests are now 67.

Walter Higgs of Clinton has been arrested twice on DUI charges, once in Clinton and once in Byram.

"Everywhere in Rankin County is tough, but I think Clinton and Hinds County are the toughest," Higgs said. "In Clinton, they lock you up and make you serve out your time if you don't pay your fine right there in court."

Clinton reported 120 DUI arrests in 2005 and 124 in 2006. So far this year, it has had 37.

"We have a reputation that our Police Department runs a tight ship, and it passes on to the people in the community," Clinton Police Chief Don Byington said.

The Jackson Police Department showed the biggest drop in DUI arrests, going from 710 in 2005 to 429 in 2006, according to the statistics. The number so far this year is 214. A shortage of officers was one reason cited by officials.The department has about 435 officers.Police officials have acknowledged the need for about 200 more.

"I would also like to think that the decrease is a reflection that our proactive programs are starting to work," JPD Lt. Jesse Robinson said.

According to the Mississippi chapter for Mothers Against Drunk Driving, of the 911 traffic fatalities in the state, 346 were alcohol-related last year.

Regardless of in what city or county a person receives a DUI, officers must be trained effectively to get a conviction in court, Clinton Police Sgt. Creston Berch said. "Everybody knows DUI is one of the most contested things in court because of the consequences it carries," said Berch. "A person loses their license for a period of time, and they stand a chance of losing their job."

To comment on this story, call Nicklaus Lovelady at (601) 961-7239.

---- Index References ----

Company: CLARION CO LTD

News Subject: (Population Demographics (1PO77); Criminal Law (1CR79); Police (1PO98); Crime (1CR87); Minority & Ethnic Groups (1MI43); Automobile Crime (1AU99); Forecasts (1FO11); Legal (1LE33); Social Issues (1SO05))

Region: (U.S. Southeast Region (1SO88); USA (1US73); North America (1NO39); Americas (1AM92); Mississippi (1MI74))

Language: EN

Other Indexing: (Don Byington; Hillary Clinton; Walter Higgs; Toby Trowbridge; Domonic Marshall; Creston Berch; Jesse Robinson)

Edition: Metro

Word Count: 799

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 71

## NewsRoom

7/18/06 Clarion-Ledger (Jackson, Miss.) B1
2006 WLNR 25321982

Clarion-Ledger, The (Jackson, MS)
Copyright © 2006 Gannett

July 18, 2006

Section: State/Metro

Roadblocks questioned in Canton

July 18, 2006

smetz@clarionledger.com

CANTON - Tired of the roadblocks around her Canton neighborhood and the badgering she and her neighbors allege they endure from law enforcement authorities, Laura Elaine Blair came to the Madison County Board of Supervisors on Monday seeking help.

smetz@clarionledger.com

Blair and the group she leads called "Concerned Citizens of Canton, MS" have gathered 664 signatures asking for an end to "frequent roadblocks in the predominantly black neighborhoods," "the excessive force and brutality administered by police officers" and "racial profiling."

She asked that her group be granted meetings with law enforcement to discuss their concerns.

Canton Police Chief Robert Winn, who was not present at the supervisor's meeting, could not be reached for comment. Blair said afterward she plans to meet with Winn about the group's concerns.

But the majority of complaints are directed at the Madison County Sheriff's Department, Blair said.

Sheriff Toby Trowbridge, who was present at the meeting, refused to meet with the group and later explained a meeting was a "lose-lose" situation.

Trowbridge said he's not ending roadblocks because they are useful in nabbing drivers under the influence and those with outstanding warrants and for confiscating illegal drugs. Therefore, he said, there's no point to meet.

Trowbridge also denied that his office engaged in racial profiling, noting that the majority of people caught in roadblocks were white and the typical arrest was a white female on a DUI charge.

"I will enforce the law, no matter what color (they are)," Trowbridge said.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                        1

Blair and fellow Canton resident Brenda Grice said they've seen as many as five roadblocks around their neighborhood referred to as the "old projects" around George Washington Avenue, formerly known as Lutz Street.

And the officers are rude, Grice said. "It's the way they talk to you."

Grice, 44, said her 17-year-old daughter was threatened with arrest for not having her driver's license when the daughter drove down the street to an aunt's house. Grice said she had to walk down to the house to get the license and ride back with her frightened daughter.

Responding, Trowbridge said state law mandates drivers have a valid license on their person when they operate a motor vehicle. "It's a (ticketing) offense," he said.

Blair said afterward that her organization will begin document-ing complaints.

"You can always get bad apples in any bunch," said District 5 Supervisor Paul Griffin, who was a deputy sheriff for 15 years before his election as supervisor in 2000.

Griffin said he's received numerous complaints alleging verbal abuse as well as some cases of physical abuse at the hands of the Sheriff's Department. When he served under a previous sheriff, he said he witnessed abuse.

Trowbridge took offense to Griffin's remarks.


---- Index References ----

News Subject: (Crime (1CR87); Criminal Law (1CR79); Civil Rights Law (1CI34); Social Issues (1SO05); Minority & Ethnic Groups (1MI43); Automobile Crime (1AU99); Legal (1LE33); Police (1PO98); Race Relations (1RA49))


Language: EN

Other Indexing: (Toby Trowbridge; Brenda Grice; Robert Winn; Laura Elaine Blair)

Edition: Metro

Word Count: 454

---

End of Document                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 72

**News**Room

11/6/07 Clarion-Ledger (Jackson, Miss.) B1
2007 WLNR 27805274

Clarion-Ledger, The (Jackson, MS)
Copyright © 2007 Gannett

November 6, 2007

Section: State/Metro

Racial profiling accusations thrown at Madison sheriff in board meeting

November 6, 2007

elizabeth.crisp@clarionledger.com

CANTON - Several people accused the Madison County Sheriff's Department of racial discrimination during the supervisors' meeting on Monday, but Sheriff Toby Trowbridge insisted it isn't so.

elizabeth.crisp@clarionledger.com

"I hate that they feel that way about me, but it's just not true," Trowbridge said outside the supervisors' meeting room at the Circuit Courthouse. The allegations are "totally unfounded," he said.

Jackson resident David Archie told supervisors that he believes the department treats African Americans unfairly through racial profiling, intimidation and a disproportional use of roadblocks in predominantly black areas.

"There's a real issue here that needs to be dealt with," said Archie, who hosts a local talk radio show.

In 2004, Archie accused Madison County deputies of illegally stopping people and ordering Breathalyzer tests without probable cause after he was arrested and charged with driving under the influence. The charge eventually was dropped, and he started a group called Citizens Against Racial Profiling.

At the meeting Monday, Archie called for Trowbridge's resignation and said he is planning a boycott of Madison County businesses.

"If you are going to be sheriff, then you need to understand all people, not just Caucasians, not just Republicans, but all people," Archie said. "(Trowbridge is) not concerned about other folks."

Archie was joined by Bill Chandler and Patricia Ice of the Mississippi Immigrants Rights Alliance, state Rep. Erik Fleming, D-Clinton, and Bolton resident Annie Green.

**Racial profiling accusations thrown at Madison sheriff, Chism, 2007 WLNR 27805824**

Ice claimed that the Madison County Detention Center takes bond money from jailed undocumented Latino immigrants but does not let them out. "There have been several attorneys complain about this," she said. "That is stealing, and it's fraud."

Trowbridge did not address any of the allegations during the meeting, but three of the county's supervisors who are white voiced their support for the sheriff.

Near the end of the meeting, District 2 Supervisor Tim Johnson thanked Trowbridge for his service. "The sheriff's job is to protect the citizens, and you do a great job," he said.

Board president and District 3 Supervisor Andy Taggart echoed Johnson's remarks, and District 1 Supervisor Doug Jones wished Trowbridge luck in today's election.

District 4 Supervisor Karl Banks, who is black, said he was disappointed with the way the issue was handled during the meeting. "I think that the people who were there were expecting to get more from the conversation," Banks said. "With the obvious support from some board members for the sheriff regardless of these concerns, it kind of shut down the possibility of anything being accomplished."

Banks said he thinks there is a problem with the perception of the Sheriff's Department.

"The conversation today was about a feeling in the community," Banks said. "I know, as an African American, that there is a real feeling in the community that the department is discriminating against people."

Fleming also expressed concern about public perception.

"We have some great things that are happening in Madison County, but we don't want some segments of the population to feel like they can't participate," he said.

Banks said he routinely fields complaints about the Sheriff's Department. He said the sheriff should work with people to change the department's image.

"Communication could help bring about an understanding," he said.

Trowbridge has said he does not meet with residents to discuss complaints.

.

To comment on this story, call Elizabeth Crisp at (601)942-9019.

---- Index References ----

News Subject: (Race Relations (1RA49); Police (1PO98); Minority & Ethnic Groups (1MI43); Legal (1LE33); Social Issues (1SO05); Civil Rights Law (1CI34))

Region: (U.S. Southeast Region (1SO88); Mississippi (1MI74); USA (1US73); Americas (1AM92); North America (1NO39))

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Racial profiling accusations thrown at Madison sheriff in..., 2007 WLNR 27809274

Language: EN

Other Indexing: (Patricia Ice; Erik Fleming; Annie Green; Bill Chandler; Toby Trowbridge; David Archie)

Edition: Metro

Word Count: 558

End of Document                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 73

House panel considers bill to outlaw racial profiling, 2009 WLNR 19779141

**News**Room

1/14/09 Clarion-Ledger (Jackson, Miss.) A1
2009 WLNR 19779141

Clarion-Ledger, The (Jackson, MS)
Copyright © 2009 Gannett

January 14, 2009

Section: Main

House panel considers bill to outlaw racial profiling

January 14, 2009

•Some say police target minorities for shakedowns, beatings

By Elizabeth Crisp

elizabeth.crisp@clarionledger.com

elizabeth.crisp@clarionledger.com

Several Mississippians told a state House panel Tuesday they had been victims of racial profiling and asked legislators to toughen laws against the practice.

Two metro-area police chiefs testified they believe racial profiling is occurring in the state, while Jackson's chief questioned the need for legislators' involvement.

"A lot of folks think just because they've not experienced it, it doesn't exist," said House Judiciary B Committee chairman Willie Bailey, D-Greenville.

For Jernel Winters, it was being pulled over for "careless driving,"which led to a pat-down search and a request to go through his car, he said.

Officers found nothing, he said, and the careless driving charge was dropped. "It really hurt me that they did that because Idon't fool with nobody or drugs or anything," said Winters, a Flora resident.

Otis Ashford of Moss Point told lawmakers he believes he was beaten and shocked with a stun gun for being black in the wrong place at the wrong time.

"They were looking for a guy who had broken into a house about a mile away," his wife, Rosa, said.

Proposed legislation by the ACLU prompted the hearing. The draft legislation would fine officers who commit acts of racial profiling and would require that law enforcement agencies collect race and gender data when arrests are made.

The goal, ACLU of Mississippi director Nsombi Lambright said, is to make sure officers aren't basing stops solely on race.

"Racial profiling is (a subject)that we at the ACLUwork on on a daily basis," she said. "Incidents happen all across the state."

Mississippi is one of about 25 states with no law on racial profiling. Others have laws that define the practice, and some mandate that law enforcement keep traffic stop records that include the race of those who are stopped and searched by police.

State Rep. John Moore, R-Brandon, raised several questions about whether a law would hinder police. If police have a description of a suspect, they have to stop people who fit that profile, he said.

"If it were me, I would want them doing whatever is necessary to catch the guy,"he said.

With local law enforcement holding considerable influence at the Capitol, the move for a law on racial profiling likely will face a tough fight.

Jackson Police Chief Malcolm McMillin, who's also the Hinds County sheriff, testified during the hearing that he did not see a need for a law. "Each case has to be judged by its own circumstances,"he said.

Madison County Sheriff Toby Trowbridge, who did not attend the hearing, also was critical of the proposal.

"(The legislators) are wasting people's time and money,"said Trowbridge, whose department has faced allegations of racial profiling in recent years.

The U.S. Supreme Court has ruled that profiling is unconstitutional, so Trowbridge said there's no need for a state law on the matter.

"It's already against the law,"he said.

As for Winters' allegations that a Madison County deputy intimidated him in Flora last year, Trowbridge said,"There are two sides to every story."

Ridgeland Police Chief Jimmy Houston, who is white, and Canton Police Chief Robert Winn, who is black, both testified they believe racial profiling is a problem in Mississippi.

"We can't deny the fact that it's happening,"said Winn, whose own department faced allegations of profiling in 2004 when an officer was accused of shaking down Hispanic residents for money. The officer eventually pleaded guilty to extortion.

Houston said he has conducted two officer investigations in the past six months related to profiling. "The last one has resulted in the dismissal of a young officer,"he said.

A total of 10 people, including law enforcement officials, testified at the hearing.

Bailey said he expects state Rep. Joe Gardner, D-Batesville, will sponsor the House legislation. Gardner could not be reached for comment.

State Sen. Johnnie Walls Jr., D-Greenville, already has filed a bill to prohibit racial profiling and provide penalties. Lawmakers have until Monday to introduce bills.

Trowbridge said he thinks state legislators should focus their efforts on matters such as improving education and increasing law enforcement pay.

"They also need to start worrying about the things they can do to help us save lives,"he said.

To comment on this story, call Elizabeth Crisp at (601)961-7303.

---- Index References ----

News Subject: (Government (1GO80); Minority & Ethnic Groups (1MI43); Race Relations (1RA49); Civil Rights Law (1CI34); Legislation (1LE97); Legal (1LE33); Social Issues (1SO05); Police (1PO98))

Region: (U.S. Southeast Region (1SO88); USA (1US73); South Carolina (1SO63); Mississippi (1MI74); Alabama (1AL90); U.S. Southwest Region (1SO89); North America (1NO39); Americas (1AM92); Texas (1TE14))

Language: EN

Other Indexing: (Robert Winn; Otis Ashford; Jimmy Houston; Joe Gardner; Johnnie Walls Jr.; Rosa; John Moore; Malcolm McMillin; Nsombi Lambright; Toby Trowbridge; Willie Bailey)

Edition: Metro

Word Count: 738

End of Document                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT 75



## Making Amends

By Lacey McLaughlin                                                         Wednesday, August 17, 2011 3:37 p.m. CDT

0



Courtesy Jimmy Houston

Former Ridgeland Police Chief
Jimmy Houston wants to be the
next Madison County Sheriff.

The Aug. 2 Republican primary for Madison County sheriff was a fierce race with five candidates vying for the post. Madison County Sheriff Toby Trowbridge will retire this year. One of the candidates, Mark Sandridge, caught the most media attention this spring after his campaign portrayed Jackson in a negative light. His campaign tactic may have backfired; he received only 11 percent of the vote.

The two candidates with the most primary votes, Jimmy Houston and Randy Tucker, will compete in a run-off election Aug. 23. The winner will face Democratic candidate Ted Smith in the Nov. 8 general election.

### Jimmy Houston

Former Ridgeland Police Chief Jimmy Houston began his career in law enforcement in 1973 as a Jackson Police Department officer. In 1999 he left JPD to serve as Flowood police chief until 2000 when he became director of the Department of Public Safety. In 2002, he became Ridgeland's police chief. He retired earlier this year. The 59-year-old cites his experience and the relationships he has with area law enforcement as his advantages in the race. Visit his website (http://www.jimmyhoustonforsheriff.com) for more information.

**How did you work with JPD when you were chief?**

The Precinct 4 commander and I did stake outs together. Up until we changed radio systems, we had radios that talked to each other. Jackson is trying right now to come online so we can get back to that.

**How much of your resources did you allocate to County Line Road when you were Ridgeland's chief?**

If you are talking about accidents, County Line Road is one of the biggest areas between Ridgewood Road and I-55 that lead our cities on accidents. Did I put people there? Absolutely. Why did I do it? Because people were running red lights, blocking intersections and having a lot of wrecks.

**Why do you want to be Madison County sheriff?**

I want to take what Jimmy Houston accomplishes to the sheriff's department. I want to make it county wide instead of just city wide. I am a leader. I recognize leadership. I want to take the department to the next level through training, technology and efficient budgeting.

**There is a perception from some people in Hinds County that if you drive into Madison County with Hinds County tags it's likely you are going to get pulled over. Is that true?**

A lot of times perception is reality, but that was another sheriff candidate's feelings. With the technology that we have in Ridgeland, a complaint of that it's easy to check. All I have to do is pull up the computer, take a look at the video and see why the officer stops them. The Ridgeland Police Department also has a stringent racial-profiling policy that is adhered to and checked when there is a complaint.

☒ Courtesy Randy Tucker

### Randy Tucker

Randy Tucker calls Madison County home. His immediate and extended family live in the county, and he calls himself a dedicated citizen. The 41-year-old graduated from the Mississippi Law Enforcement Officers Training Academy in 1994. He began his career working at the Madison County Sheriff Detention Center. In 2000, he moved the Madison County Sheriff's Department and, in 2002, received a promotion to serve as chief officer of the narcotics division. Visit http://www.tuckerforsheriff.com for more.

**Why do you want to run for sheriff?**

We want to maintain the quality of law enforcement that we have under Sheriff Trowbridge. These men and women in this department have gotten behind me and think I am the man for the job. I want to do the job not only for them but for Madison County.

**How will you work with other metro-area law enforcement?**
It's vital for all of law enforcement to work together. We are outnumbered by criminals as it is. Our neighboring law enforcement entities such as the Jackson Police Department, Hinds County and Yazoo or Holmes—we have to have a good working relationship with them. Crime is going to go over the county lines.

**How are you already working the different counties?**
If you have got a suspect that has left your jurisdiction, in say, Madison County and gone into Hinds County, you need a representative from that department or jurisdiction to accompany you and make a lawful arrest. Drug deals, for example, that we have done a million times over the last few years spill over to other jurisdictions.

**Your former opponent's ads insinuated that crime stops at County Line Road. What do you think about that?**
I don't agree that crime stops at any boundary, imaginary or visible. I think the population level of Hinds County has overwhelmed their law enforcement. But it's not their fault. Anytime you have a metropolitan area, the crime is going to be higher because there is a more dense population.

*To read more candidate interviews and more political news, visit http://www.jfppolitics.com and follow @jfppolitics on Twitter.*

Facebook      Twitter      LinkedIn      Email      CleanPrint      More

## More like this story

Sheriff: Man Fatally Shoots Defendant Waiting at Courthouse
Stokes Comments Spark AG Charges, Fundraising in Madison County
The JFP Interview With Tyrone Lewis
Officials: Madison County Courthouse Shooting Suspect 'Peacefully' Taken Into Custody
Crossing the Line?

## More stories by this author

Lots of Mouths to Feed
The Lone Democrat
Bennie Hopkins
Farish to Face More Delays Without Financing
Second Chances

## Comments

Use the comment form below to begin a discussion about this content.

## Jackson Free Press Comment Policy

"Disagree agreeably." Don't insult others, no slurs, stay on topic.
Please read our Comment Policy before commenting.



0 Comments    Jackson Free Press                                          Login ⌄

♡ Recommend    ⤴ Share                                          Sort by Oldest ⌄

Start the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ⑦

Name

Be the first to comment.

✉ Subscribe    ✪ Add Disqus to your siteAdd DisqusAdd    🔒 Privacy

| | |
|---|---|
| Sections | News, Opinion, Arts, Music, Events, Life+Style, Food+Drink, Sports |
| Events | Events Calendar, Submit an Event |
| Media | Photos, Galleries, Videos, Audio, Documents |
| Advertise | In the JFP, Classifieds, Email the Publisher |
| Jobs | At the JFP |

© Jackson Free Press, Inc.
User agreement and privacy statement.
phone: 601-362-6121 (ext 11 sales, ext 16 editorial, ext 17 publisher)
fax: 601-510-9019
125 S. Congress St. #1324 * Jackson, MS * 39201

# EXHIBIT 76

Yall Politics | Madison County Sheriff's Deputy Captain Randy... Case 3:17-cv-00347-WHB-RA   Document 226-76   Filed 03/14/18   Page 2 of 4 http://yallpolitics.com/index.php/yp/post/madison_county_sheri...

# Y'allPolitics       Wednesday, March 7, 2018

## Madison County Sheriff's Deputy Captain Randy Tucker To Run for Madison County Sheriff

Madison County Sheriff's Deputy Captain Randy Tucker To Run for Madison County Sheriff

Randall "Randy" Tucker of Gluckstadt announced today that he will be a candidate for Madison County Sheriff in November.

"My campaign for Sheriff will be about maintaining the professionalism, integrity and high quality of law enforcement in Madison County. I believe the Sheriff's Department should vigorously protect the citizens of the county and enforce the laws of Mississippi, with no exceptions," stated Tucker. He added, "As Madison County Sheriff, I will continue the high level of law enforcement and justice Madison County residents expect and have enjoyed under Sheriff Toby Trowbridge."

"As a husband, father, longtime law enforcement officer and current Captain in the Madison County Sheriff's Department, I know and understand that integrity and justice go hand-in-hand," stated Tucker. "I am proud of Madison County and proud that it is a place where people feel safe and want to raise their families."

Randy Tucker has been a sworn law enforcement officer for 17 years, having graduated from the Mississippi Law Enforcement Officers Training Academy in 1994. He first worked for the Madison County Sheriff's Detention Center under Sheriff Hopkins and was then employed by the Canton Police Department, where he was a patrolman before being assigned to the Narcotics Division where he was promoted to supervisor. In 2000, Tucker returned to the Madison County Sheriff's Department, assigned to the Narcotics Division and in 2002 was promoted to chief officer of the Narcotics Division, where he currently serves as Captain.

As a law enforcement officer, Tucker has received formal, specialized training and graduated from courses in Undercover Investigations, Narcotics Investigations, Criminal Patrol, Clandestine Methamphetamine Labs, Violent Street Gang Investigations, Crisis / Hostage Negotiations and Management, First Line Supervisor, Advanced Supervisor and Asset Seizure and Forfeiture.

The Narcotics Division under Tucker, recently received the highest award from the Organized Crime Drug Enforcement Task Force (OCDETF) in Ashville, North Carolina, for their work on a cocaine investigation, earning them the award for the Southeastern Case of the



**YallPolitics**

A Twitter list by @MSyallpolitics

YallPolitics Public Twitter Feed

**MSPublicBroadcasting** ✔
@MPBOnline

Right now on #ThinkRadio: NPRFreshAir. On #MusicRadio: ExploringMusic Listen Live: goo.gl/tvdwzS

♡          17m

**Geoffrey Pender** ✔
@GeoffPender

House is killing its own strike all amendments, and any other amendments that come up, this afternoon #msleg

♡          17m

**Geoffrey Pender** ✔
@GeoffPender

Someone needs to test what's in the water coolers in the state House today #msleg

♡          19m

**MPB News** ✔
@MPBNews

Sen. Hopson says option of arming school

Case 3:17-cv-00347-WHB-LRA   Document 226-76   Filed 03/14/18   Page 3 of 4

Yall Politics | Madison County Sheriff's Deputy Captain Randy...        http://yallpolitics.com/index.php?/yp/post/madison_county_sheri...

Year.

During his career in law enforcement in Madison County, Tucker has received Outstanding Narcotics Agents awards, Officer of the Month awards, served as Mentor for the National Guard Youth Challenge Program, served on the Madison Ridgeland Youth Club Baseball Board and spoken at numerous schools and functions such as Lions Clubs and the Madison Ridgeland Rotary Club.

Tucker, 41, grew up in Madison County where he and his family currently reside. He is a graduate of Madison Ridgeland High School. Tucker has been married to the former Michelle Gainey of Canton for eighteen years and has two children: Stephen and Kyle. Tucker and his family are long-time members of Grace Chapel in Madison.

Randy Tucker Press Release
1/18/11

**Posted January 19, 2011 - 4:32 pm**



YallPolitics.Com now uses Facebook for comments. Log into Facebook to comment here.



Case 3:17-cv-00347-WHB-LRA   Document 226-76   Filed 03/14/18   Page 4 of 4

**0 Comments**                              Sort by   Newest ◦

  Add a comment...

f Facebook Comments Plugin

©2005-2018 Jackson New Media, Inc. All rights reserved. Contact us at editor at yallpolitics.com

# EXHIBIT 80

*Madison sheriff responds to Jackson councilman's remarks*,
THE CLARION-LEDGER (Jan. 4, 2016)

Video available at:
https://www.clarionledger.com/videos/news/local/2016/01/04/78247954

# EXHIBIT 100

# Q&A with Sheriff Randy Tucker

Wednesday, January 14, 2015 12:00 PM

Madison County Sheriff Randy Tucker sat down for a one-on-one with the Journal to discuss everything from his stance on legalizing marijuana to the terrorist attack in Paris last week that ended with over a dozen dead.

Prior to his election as sheriff in 2011, Tucker served as a narcotics investigator for 20 years with the sheriff's department. In December, his department made 22 drug arrests in one of many investigative stings.

MS: Explain the drug situation in Madison County. Are there kingpins or more low-level dealers?

RT: I think our version of kingpin differs from what they would look at on a federal level. A kingpin to Madison County is somebody who has a tri-county reach, distributing several pounds of marijuana or a pound or more of cocaine each month. I'd classify the (local activity) as street level dealers and the occasional mid-level man.

MS: What's the biggest problem right now?

RT: Our biggest problem right now is homegrown - it's prescription drugs. Prescription drugs, they're not a chosen addiction like marijuana, cocaine or heroin. Eighty-ninety percent of prescription drug addicts are that way because of an involuntary addiction. Just kind of involuntary and subconsciously hooked on it. Most of those addictions started out innocently and legally.

MS: How does that progress into people buying them on the street illegally?

RT: I think the prescription drug abusers are more prevalent in the middle-to-upper class areas. They can afford healthcare readily. That's how those start, with going to the doctor and insurance paying. Then it progresses into an addiction. They have to go outside those means to find someone that provides them, and that's generally associated with lower income areas.

MS: You've said in previous interviews you do not agree with legalization of marijuana as seen in other states. With a ballot initiative underway in Mississippi to legalize marijuana, what are your thoughts on this?

RT: The push is coming and I know that. I don't think the general public views what law enforcement or doctors see in people that abuse drugs like marijuana. A lot of people think it's a recreational drug. I've heard it all, at the end of the day I've seen it over a 20-year period. I can't think of one life it's affected in a positive manner, but I can think of thousands of instances where its been a negative effect on someone's life. It's a drug that begins a downward spiral. I don't think there's any way you can ever regulate it. I've seen the stats from Colorado. For every pro they can present to you I can give you a con. They're trying to justify a means with an end.

MS: Where are we with the war on drugs? Some say that we've already lost it.

RT: I don't know that we've lost it. It's a depressing war. The fact that you put the same people in jail over and over and they're back out before you can get through the paperwork. I think it's incumbent for every jurisdiction to do as much as they can to combat it. We need to try to keep our head above water. I don't think justifying one drug is the means to survive the drug war.

MS: What's the next big thing when it comes to drugs and what are you looking out for?

RT: The synthetic drug - synthetic marijuana or spice, LSD 25I. The laws as they are set up right now govern certain parts of a drug, like marijuana is THC. Chemists now are learning they can create these synthetic drugs. It's a big struggle for the legislature to identify the compounds creating the illegal drug and try to add to the uniformed controlled substance statute.

MS: What about drug education? DARE is there for young children, but how to we educate the teenagers,

when they're at the age when they begin experimenting?

RT: Education starts at home. Parenting has really gotten away from what it was when I grew up. I don't parent the way my parents did. The value that you want to instill in the kids is still the same, but it has evolved to the point where we don't want to hurt kids feelings. You can't discipline them, can't paddle them. There was a winner and a loser and now everybody's a winner. I think we've really got to back up and put the value back in personal hygiene and accountability back home. I think church numbers are down. We need to get people back in the church.

MS: Shifting gears, you are the chief law enforcement officer of the county. What's your biggest fear each day?

RT: I don't know that I could say there would be one incident. There's so many things that go through my head everyday that could happen. There's so much loss of life in law enforcement nowadays. I dread the day I have to tell a wife or husband, spouse or child their parent is not coming home. I dread the fact law enforcement in today's society is disrespected based on a certain number of events that are not factually commented on.

I do dread an active shooter scenario because that's a "nobody's gonna win" situation.

MS: Do you instantly worry if your phone rings at 11 o'clock at night?

RT: If I'm asleep. I don't sleep much. I worry every day. You worry about those incidents. It's not just one, you play scenarios over in your head, anything tragic that can happen. Myra Lewis. I think about her every single night before I go to sleep. I wonder where she is. When I wake up I talk to our investigators, tell them what I thought about, it's just one of those things.

MS: Do you think you'll ever find out what happened? (Two-year-old went missing in Camden in March and police continue to search for evidence of her whereabouts).

RT: Yes, at some point we will. I hope it's today. I wish the phone would ring right now. I don't know which way it's gonna go. I'm an optimist, I believe she's out there waiting to be found.

MS: You just touched on this, disrespect to law enforcement. There's a sentiment going on right now across the country. Two officers were killed in New York City a few weeks back. Do you think there needs to be a discussion on the national level?

RT: First off, I think to ambush anybody whether it's a citizen law enforcement officer, is a cowardly thing to do. Beyond that I would submit that each individual, each individual incident has a set of circumstances unique to that own incident. I don't know that there are any greater number of incidents happening today than there were 10 years ago. There are a few isolated incidents that have brought more extension and exposure to those incidents.

Citizen reactions - good or bad situations - have always happened. Is every officer always right in every incident, no.

Is every incident the fault of a citizen, no. But at the same time I would say that officers are trained. I have a hard time believing they would go out and single out people purposefully to violate their rights and mistreat them.

MS: Does your department have body cameras or plans to introduce them in the future?

RT: We do not. We have recently, as late as this year, installed a camera in every vehicle we have. We have cameras as well as backseat cameras for detention purposes. We've talked about...the body cams. That's one of those deals - are you gonna scrutinize every little thing a guy does or girl does based on a few bad apples? If you've got to stand there with your thumb on them constantly I'd rather not need them. The people we hire go through a rigorous process. We don't hire anybody off the street. I put my faith and belief in them or I wouldn't hire them.

MS: Are people more violent in your opinion today, compared to a few years ago?

RT: Absolutely! People are frustrated economically, frustrated morally. People are frustrated with what's going on, what's being perceived in the public eye. A lot of conclusions are being jumped to without facts.

MS: With what happened recently in Paris, is that a threat you take seriously, even here in the heart of Mississippi?

RT: I think anybody that doesn't take it seriously is naive. No community is immune to an incident like that. Go back to fears. I fear something just like that. It can happen anywhere. You really rely on the fact you've hired the best possible candidates for your jobs and trained them properly and given them equipment. You can prepare all day and you're not gonna be prepared. You can be more prepared than you were yesterday but you're not gonna ever be fully prepared for something like that.

How can you be prepared for chaos - you can't.