```
 1                  Will Weisenberger
 2            UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                   NORTHERN DIVISION
 4
    LATOYA BROWN; LAWRENCE
 5  BLACKMON; HERBERT ANTHONY
    GREEN; KHADAFY MANNING;
 6  QUINNETTA MANNING; MARVIN
    MCFIELD; NICHOLAS
 7  SINGLETON; STEVEN SMITH;
    BESSIE THOMAS; AND BETTY
 8  JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON
 9  BEHALF OF A CLASS OF ALL
    OTHERS SIMILARLY SITUATED
10                                            PLAINTIFFS
11  VS.         CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
12
    MADISON COUNTY,
13  MISSISSIPPI; SHERIFF
    RANDALL S. TUCKER, IN HIS
14  OFFICIAL CAPACITY; AND
    MADISON COUNTY SHERIFF'S
15  DEPUTIES JOHN DOES #1
    THROUGH #6, IN THEIR
16  INDIVIDUAL CAPACITIES
                                              DEFENDANTS
17
18
19      DEPOSITION OF WILLIAM "WILL" WEISENBERGER
20
     Taken at the instance of the Plaintiffs, at the
21    Hilton Garden Inn at 235 West Capitol Street,
      Jackson, Mississippi, on Tuesday, November 28,
22              2017, beginning at 10:24 a.m.
23
    REPORTED BY:  Robin G. Burwell, CSR #1651
24
                          EXHIBIT "32"
25  JOB NO. 133421
```

Page 30

Will Weisenberger

Q. So would the uniform be similar to what Chief Williams is wearing?
A. Yes.
Q. And so both as a patrol deputy and now as a sergeant, when you're on duty, you're always wearing your uniform?
A. Yes.
Q. Do you have a separate uniform when you perform your duties as constable?
A. Yes.
Q. And do you always firmly separate those two responsibilities, like when you're on duty as the sheriff -- you know, working for the sheriff's department, you wouldn't perform any duties related to your role as constable?
A. Absolutely. Both are completely separated.
Q. So other than vehicular patrols and the foot patrols we've been discussing, what else does the duties of a patrol deputy entail?
A. Monitoring traffic violations for traffic violations, just general patrolling while watching business areas, riding neighborhoods, answering calls. That's about it.

Page 31

Will Weisenberger

Q. And when you say something like "riding neighborhoods," are you just describing vehicular patrols?
A. Yes.
Q. So not like some other further thing?
A. No, it's riding, patrolling. Neighborhoods are way too large to get out and walk.
Q. In your role as patrol deputy, did you ever conduct roadblocks or checkpoints?
A. Yes.
Q. And would you determine to initiate a roadblock or checkpoint or would you be instructed to do so?
    MR. GRAVES: Object to the form.
    You can answer, if you understand.
    THE WITNESS: You've been going back and forth between prior sergeant and sergeant, so at which point in time are you talking about here?
Q. (By Mr. Rethy) Before you were promoted, when you were patrol deputy.
A. Before, it was -- I guess it would be the guys, all the guys on shift. If -- you know, call-depending, if we didn't have a lot of calls

Page 32

Will Weisenberger

going on, we would perform a roadblock.
Q. So you could decide that yourself or amongst?
A. We'd have to check with the supervisor.
Q. But you could initiate it? The supervisor wouldn't necessarily tell you, "Go ahead, do a roadblock"?
A. Correct.
Q. And would you ever conduct a roadblock on your own or would it always be in conjunction with other officers?
A. It would always be with multiple officers.
Q. And what's the reason for that?
A. Safety.
Q. And what areas would you conduct roadblocks in?
A. Any area, any area in the county.
Q. And could you describe how a roadblock would work?
A. How do you mean?
Q. Just generally you decide to -- you or you and other officers decide to initiate a roadblock, what would that consist of?

Page 33

Will Weisenberger

A. Once it's approved, go to the area, make sure the area had adequate space to pull off the shoulder of the road, safe areas for any other vehicles to pull over to the side of the road, lit, things of that nature.
Q. And then how would you make it known to approaching motorists that there was a roadblock in place?
A. Visible blue lights flashing, officers wearing traffic vests at night and daytime.
Q. And how would you conduct the roadblock? When a motorist approaches, what would you do? Would you always stop the car? Would you sometimes stop the car? And then once you stopped the car, how would you interact with the motorists?
    MR. GRAVES: Object to the form. Asked about three questions.
    You can answer, if you understand what he's saying.
    THE WITNESS: Conduct a roadblock, officers are in the road, both lanes of travel are stopped, every vehicle in both directions are stopped. And you make contact and you request

Page 34

Will Weisenberger
driver's license and proof of insurance.
Q. (By Mr. Rethy) You make any contact with passengers?
A. Not unless, you know, there's a further need for it.
Q. And what might be a further need?
A. If speaking to the driver requires a further investigation into -- example, driver's license not being valid or they appear to be impaired, something of that nature.
Q. Are you familiar with something called the NET or NET team?
A. Yes.
Q. What's your understanding of what that is?
A. It's a Neighborhood Enforcement Team, as it stands for. They have multiple functions.
Q. What are those functions?
A. They provide neighborhood -- I guess they're an unmarked patrol-type unit. They provide a little bit more of a detailed patrol, I guess.
Q. Who is on the NET team?
A. Darian Smith and Sam Howard.

Page 35

Will Weisenberger
Q. You said they're unmarked?
A. Yes.
Q. Do you understand the reason for them being unmarked?
A. I do not.
Q. Do you know who supervises NET team?
A. Sergeant Smith.
Q. Who is also a member?
A. Yes.
Q. Have you ever worked on the NET team?
A. No.
Q. Have you ever worked with them?
A. No.
Q. Do they ever work with patrol?
A. Yes.
Q. Under what circumstances would they work with patrol?
A. Large-scale type calls. Recently, we had a string of auto burglaries inside neighborhoods on the south end of the county. They would come in and assist with patrolling the neighborhood and help with the -- writing reports and things of that nature.
Q. You said the south end of the county.

Page 36

Will Weisenberger
What city or community was it in or around?
A. Gluckstadt.
Q. Are you familiar with the phrase "apartment detail"?
A. Apartment detail, yes.
Q. What's your understanding of what that is?
A. It was just a name given to a detail. Not an official name, just what a lot of guys called it.
Q. So what is a detail?
A. "Detail" could mean anything. A detail could be working -- one man working a private function or a group of guys working the GermanFest, as I said earlier. Detail could be just about anything outside the normal patrol.
Q. So what was the function of the apartment detail?
A. Patrolled the apartment complexes. It provided a little bit more of a constant patrol whereas other deputies were busy answering calls in other areas we didn't -- they could concentrate on more in that area.

Page 37

Will Weisenberger
Q. Is the apartment detail still active?
A. No.
Q. What period of time was it active?
A. Early like 2012 -- no, before then. It was like '09, '10, '11, I think.
Q. Did you ever work on it?
A. Yes.
Q. And what's your understanding of why the apartment detail stopped?
A. I don't know.
Q. Do you know who set up the apartment detail?
A. Previous administration.
Q. Do you conduct -- today, in your role as patrol sergeant, do you conduct roadblocks?
A. Do I?
Q. Yeah.
A. Occasionally, I will.
Q. Do you supervise officers who conduct roadblocks?
A. Yes. I have guys on my shift that do roadblocks or traffic checkpoints.
Q. Do they contact you for approval before doing that?

Will Weisenberger
Q. How about Chief Williams?
A. No, sir.
(Exhibit 19 marked for identification.)
Q. (By Mr. Rethy) This is Exhibit 19. This document is a legal document prepared by counsel for the defendants. The lawyers sitting here and their colleagues. It's the sheriff's department's response to the complaint that we filed in this case.
Does that make sense to you?
A. Yes.
Q. Have you read this document before?
A. I have not.
Q. If you'll turn to page 12. You see the first full paragraph?
A. Yes.
Q. It states: "Sheriff Tucker has also received multiple requests since taking office from the Canton, Mississippi, Police Department, managers in various apartment complexes and housing projects, in predominately Black neighborhoods in both Madison County and the City of Canton, and many businesses asking that the Madison County Sheriff's Department conduct

Will Weisenberger
roadblocks near their neighborhoods and businesses."
A. Okay.
Q. Is it your understanding that that statement is accurate?
A. I would assume. I've not been told. I don't know anything of that statement, but if that's what they say.
Q. Have you ever received a request to conduct a roadblock near an apartment complex?
A. Have I received?
Q. Yeah.
A. No.
Q. Do you understand why a business owner would ask the sheriff's department to conduct roadblocks near their business?
A. As to that particular business owner's reason, no. I don't know why they would ask unless they just want to ward off wrongdoers.
Q. You've conducted roadblocks. Have you ever asked pedestrian walking in the area of the roadblock to stop?
A. If that pedestrian presents himself in the middle of my checkpoint, yes.

Will Weisenberger
Q. So in that case, you would engage with that individual and potentially ask for his identification or conduct a pat down?
A. If it led to that, yes.
Q. I think we're going to go off the record. I may be done, but I want to consult with my colleagues to make sure.
(A short break was taken.)
Q. (By Mr. Rethy) Sir, back on the record. No further questions at this time. Thank you for your time today, sir.
A. Yes, sir.
MR. GRAVES: I only have a few questions, a follow-up basically right where we left off.
EXAMINATION BY MR. GRAVES:
Q. Mr. Rethy asked you about stopping pedestrians coming through safety checkpoints. I think you said something to the effect of, if they were interfering with your business, you may stop them.
MR. RETHY: Objection. I believe that mischaracterizes the testimony.
Q. (By Mr. Graves) Let me ask you: What

Will Weisenberger
situations are you talking about where you might stop a pedestrian coming through a safety checkpoint?
A. If that pedestrian interferes with the business being conducted or the safety of myself or fellow officers or civilians, then, yes, I will make contact with that person. Make a one-on-one interaction with them. I don't want a person walking up in the middle of what I'm doing. They could be, you know, intoxicated. You know, carrying a weapon, have any kind of, you know, harmful intentions of that nature, anything like that. It's just a safety concern. You don't want anybody on top of your business of what you're doing.
Q. If you've got a safety checkpoint, you're not stopping people just walking along the side of the road, are you?
A. No, sir.
MR. RETHY: Objection, leading.
Q. (By Mr. Graves) Are you stopping people along the side of the road?
A. No, sir.
MR. GRAVES: No further questions.