**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**LATOYA BROWN, ET AL.**                                                    **PLAINTIFFS**

**v.**                                        **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI, ET AL.**                            **DEFENDANTS**

---

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi   39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi   39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi   39232
P.O. Box 750
Jackson, Mississippi   39205-0750
Telephone: 601-969-1010
Facsimile:   601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi   39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi   39211
Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF THE CASE ............................................................................... 2

    i.    The complaint ............................................................................... 2

    ii.    The motion for class certification ........................................... 4

    iii.    The material facts ....................................................................... 6

        a.    The named plaintiffs and the proposed class ................ 7

        b.    Defendant Sheriff Randall Tucker and his Department ............................. 7

        c.    Class claims ................................................................. 8

            1.    Alleged intentional racial discrimination ....................... 8

            2.    Alleged unconstitutional checkpoints ........................... 15

            3.    Alleged unconstitutional treatment of pedestrians ....................... 25

ARGUMENT ..................................................................................................... 28

    I.    SUBSTANTIVE FEDERAL LAW SIGNIFICANTLY LIMITS THE CIRCUMSTANCES UNDER WHICH CLAIMS OF INTENTIONAL RACIAL DISCRIMINATION AND UNREASONABLE SEARCHES AND SEIZURES MAY BE ASSERTED. ............................................. 28

    II.    PLAINTIFFS HAVE FAILED PROPERLY TO DEFINE THEIR PROPOSED CLASS AND SUBCLASSES. ......................................... 33

    III.    PLAINTIFFS CANNOT SATISFY ALL FOUR REQUIREMENTS OF RULE 23(a) .................................................................... 37

        A.    There is no showing that anyone has a claim against Sheriff Tucker, much less that they are so numerous that joinder is impracticable. ................................................. 38

        B.    Because there is no significant proof that Sheriff Tucker enforces any unconstitutional policy, and because the proposed common questions do not establish liability, commonality is lacking. .................... 39

i

1.      Sheriff Tucker has no policy of intentional racial discrimination or of conducting checkpoints for general crime control purposes ................................................................40

2.      The common questions are insufficient to establish any liability for any claim..................................................................45

C.      Because no plaintiff has a valid claim, their claims cannot be typical of any class member who does. ....................................................50

D.      However the class may be defined, conflicts of interest prevent plaintiffs from adequately representing it. ..................................................53

IV.     PLAINTIFFS FAIL TO SATISFY RULE 23(b)(2). ............................................60

CONCLUSION..........................................................................................................................63

CERTIFICATE OF SERVICE ...............................................................................................65

# TABLE OF AUTHORITIES

## Cases

*Ahmad v. Old Republic Nat. Title Ins. Co*., 690 F.3d 698 (5th Cir. 2012) ................................. 45

*Alexander v. Sandoval,* 532 U.S. 275 (2001)................................................................. 29

*Alston v. Virginia High School League, Inc.*, 184 F.R.D. 574 (W.D. Va. 1999)............................ 58

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)................................................. 54

*Bailey v. Ryan Stevedoring Co*., 528 F.2d 551 (5th Cir. 1976),
   *cert. denied*, 429 U.S. 1052 (1977) ........................................ 57

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997)................................................. 44

*Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970 (5th Cir. 2000)................................................. 61

*Bowlby v. City of Aberdeen*, 681 F.3d 215 (5th Cir. 2012)................................................. 28

*Brooks v. George County*, 84 F.3d 157 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996) .................. 2

*Castano v. American Tobacco Co*., 84 F.3d 734 (5th Cir. 1996) .................................. 38

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ................................ 13, 18

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)................................... 30, 39, 48, 61

*Coleman v. Byrd*, 2013 WL 820304 (S.D. Miss. Mar. 5, 2013) .................................. 44

*Collins v. Ainsworth*, 177 F. App'x 377 (5th Cir. 2005) ...................................... 33

*Collins v. Ainsworth*, 382 F.3d 529 (5th Cir. 2004)........................................... 48

*Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867 (1984)............................... 55

*Cougle v. County of DeSoto*, 303 F. App'x 164 (5th Cir. 2008) ............................... 32

*Daniels v. City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001)............................ 33, 34

*Davidson v. City of Stafford*, 848 F.3d 384 (5th Cir. 2017)............................ 40, 41, 43

*DeBremaecker v. Short,* 433 F.2d 733 (5th Cir. 1970)..................................... 33, 34, 37

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.),
   *cert. denied*, 135 S. Ct. 754 (2014)........................................ 47, 49

*Delaware v. Prouse*, 440 U.S. 648 (1979) ................................................................... 23

*Dique v. New Jersey State Police*, 603 F.3d 181 (3d Cir. 2010) ................................... 32

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ................................. 30, 37, 49, 61

*Dockery v. Fischer*, 253 F. Supp. 3d 832 (S.D. Miss. 2015) ................................. *passim*

*Florida v. Bostick*, 501 U.S. 429 (1991) ....................................................................... 53

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012) ....................................... 41

*Floyd v. City of New York*, 770 F.3d 1051 (2d Cir. 2014) ........................................... 41

*Forbush v. J.C. Penney Co.,* 994 F.2d 1101 (5th Cir. 1993) .................................... 37, 39

*Forte v. Wal-Mart Stores, Inc.*, 2012 WL 2886711 (S.D. Tex. July 13, 2012) ........... 45

*Fox v. Michigan State Police Dep't*, 173 F. App'x 372 (6th Cir. 2006) ...................... 32

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) ........................................................... 1

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ................................................. *passim*

*Gibson v. Superintendent of New Jersey Department of Law & Public Safety - Division of State Police*, 411 F.3d 427 (3d Cir. 2005), *cert. denied*, 547 U.S. 1035 (2006) ........................................................................... 11, 32, 33

*Harris v. Jackson County*, 684 F. App'x 459 (5th Cir. 2017) .................................... 31

*Heck v. Humphrey*, 512 U.S. 477 (1994) ............................................................. *passim*

*Hopkins v. Lowndes County Sheriff Dep't*, 2014 WL 3799329 (N.D. Miss. Aug. 1, 2014) ........................................................................... 32

*Horton v. Goose Creek Ind. Sch. Dist.*, 590 F.2d 470 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983) ........................................................... 58, 59, 60

*Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 815 (2017) ...................................................................... 41

*Hudson v. Hughes*, 98 F.3d 868 (5th Cir. 1996) ........................................................ 32

*Illinois v. Wardlaw*, 528 U.S. 119 (2000) ................................................................. 31

*INS v. Delgado,* 466 U.S. 210 (1984) ........................................................................ 30

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
    389 U.S. 64 (1967) ................................................................. 63

*John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443 (5th Cir. 2007) ............................... 33

*Jones v. Diamond*, 519 F.2d 1090 (5th Cir. 1975)........................................................ 34

*Kelly v. Harrison County Bd. of Sup'rs*, 2013 WL 5913767
    (S.D. Miss. Oct. 31, 2013)....................................................................... 29

*Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856 (7th Cir. 2004) ................................ 33

*Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002) ............................................. 44

*Lee v. Verizon Communications, Inc.*, 837 F.3d 523 (5th Cir. 2016),
    *cert. denied*, 137 S. Ct. 1374 (2017)............................................................ 47

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................................ 60

*Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013)............................................. 41

*Luiken v. Domino's Pizza, LLC*, 705 F.3d 370 (8th Cir. 2013) .................................... 45

*M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex.), *leave to appeal dismissed*,
    547 F. App'x 543 (5th Cir. 2013)........................................................... *passim*

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012) ........................... *passim*

*Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521 (5th Cir. 2007) ................... 61

*Martin v. F.E. Moran, Inc.*, 2018 WL 1565597 (N.D. Ill. Mar. 30, 2018)................... 42

*Mason v. Biloxi Mun. Sep. Sch. Dist.*, 443 F.2d 1365 (5th Cir. 1971)............................ 1

*Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268 (5th Cir. 2015)................ 44

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)...................................... 55

*McClain v. Lufkin Indus., Inc.*, 519 F.3d 264 (5th Cir.),
    *cert. denied*, 555 U.S. 881 (2008) ............................................................. 55

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ................................................................ 29

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)................................................... 41

*Mendoza v. Bell Helicopter & Textron, Inc.*, 2012 WL 12878157
    (N.D. Tex. Oct. 3, 2012)........................................................................ 42

*Mohamed for A.M. v. Irving Ind. Sch. Dist.*, 252 F. Supp. 3d 602 (N.D. Tex. 2017) ................... 31

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) ................................................ 31

*Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir.) ...................................................... 36

*Morrow v. Washington*, 277 F.R.D. 172 (E.D. Tex. 2011) ...................................... *passim*

*Morrow v. Washington*, 672 F. App'x 351 (5th Cir. 2016) .......................................... 31

*ODonnell v. Harris County*, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) .............................. 34

*Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959 (D. Ariz. 2011) ............................ 41

*Palmer v. Thompson,* 391 F.2d 324 (5th Cir. 1967),
   *aff'd on other grounds*, 403 U.S. 217 (1971) ......................................... 62

*Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio*,
   531 F. App'x 454 (5th Cir.), *cert. denied*, 134 S.Ct. 267 (2013) ......................... 29

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) .................................................... 41

*Pena v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) ............................... 43, 44

*Peters v. City of Biloxi*, 57 F. Supp. 2d 366 (S.D. Miss. 1999) ............................... 44

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009) ............................... 43

*Peterson v. Oklahoma Housing Authority*, 545 F.2d 1270 (10th Cir. 1976) ............................. 59

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002),
   *cert. denied*, 537 U.S. 1110 (2003) ................................................. 31, 43, 44

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir.),
   *cert. denied*, 534 U.S. 820 (2001) ..................................................... 31, 44

*Potts v. Flax*, 313 F.2d 284 (5th Cir. 1963) .............................................................. 37

*Priester v. Lowndes County*, 354 F.3d 414 (5th Cir. 2004) ......................................... 42

*In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012) ...................................................... 34, 63

*Ruiz v. Stewart Assoc., Inc.*, 167 F.R.D. 402 (N.D. Ill. 1996) ....................................... 50

*Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765 (5th Cir. 2017) ................... 63

*Shankle v. Texas City*, 885 F. Supp. 996 (S.D. Tex. 1995) .......................................... 31

*Shook v. Bd. of County Comm'rs,* 543 F.3d 597 (10th Cir. 2008) ................................................ 62

*Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408 (5th Cir. 2017).......................................... 55, 56

*Snyder v. Trepagnier,* 142 F.3d 791 (5th Cir. 1998),
   *cert. dismissed*, 526 U.S. 1083 (1999)......................................................................... 44

*Steagald v. United States*, 451 U.S. 204 (1981)........................................................................ 51

*Stewart v. Winter*, 669 F.2d 328 (5th Cir. 1982)....................................................................... 49

*Stout v. Vincent*, 717 F. App'x 468 (5th Cir. 2018) ........................................................ 28, 29, 48

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001)...................................................................... 42

*Thomas v. Scott County*, 2015 WL 5009715 (S.D. Miss. Aug. 21, 2015).................................. 32

*United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002) ........................................................... 29

*United States v. Bass*, 536 U.S. 862 (2002) ............................................................................. 42

*United States v. Bernacet*, 724 F.3d 269 (2d Cir. 2013) ........................................................... 53

*United States v. Chavez*, 281 F.3d 479 (5th Cir. 2002) ............................................................ 30

*United States v. Cooper*, 43 F.3d 140 (5th Cir. 1995) .............................................................. 53

*United States v. Fordice*, 505 U.S. 717 (1992)........................................................................... 1

*United States v. Green*, 293 F.3d 855 (5th Cir. 2002) .............................................................. 20

*United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015)....................................... *passim*

*United States v. Machuca-Barrera*, 261 F.3d 425 (5th Cir. 2001) .............................................. 53

*United States v. McFayden*, 865 F.2d 1306 (D.C. Cir. 1989)..................................................... 20

*United States v. Price*, 383 U.S. 787 (1966) .............................................................................. 1

*United States v. Pritchard*, 645 F.2d 854 (10th Cir.),
   *cert denied*, 454 U.S. 832 (1981) .............................................................................. 23

*United States v. Ramirez-Gonzalez*, 87 F.3d 712 (5th Cir. 1996)............................................... 20

*United States v. Rideau*, 969 F.2d 1572 (5th Cir. 1992)....................................................... 30, 31

*United States v. Route,* 104 F.3d 59 (5th Cir. 1997)................................................................ 51

*United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993) ............................................................... 53

*United States v. Vandyck-Aleman*, 201 F. App'x 215 (5th Cir. 2006)........................................... 48

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010),
   *cert denied*, 563 U.S. 935 (2011) ...................................................................................... *passim*

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)........................ 3

*Walker v. City of Calhoun*, 682 F. App'x 721 (11th Cir. 2017) .................................................. 63

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................... *passim*

*Warnock v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 1113475
   (S.D. Miss. Mar. 24, 2011) ...................................................................................................... 50

*Watkins v. Recreation & Park Comm'n*, 2013 WL 6834376
   (M.D. La. Dec. 26, 2013) ......................................................................................................... 42

*Wayte v. United States*, 470 U.S. 598 (1985)................................................................................ 29

*White v. McMillin*, 2011 WL 3555766 (S.D. Miss. Aug. 11, 2011) ............................................. 37

*Whren v. United States*, 517 U.S. 806 (1996)................................................................ 29, 31, 61

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) .................................................................................... 32

*Williams v. Bramer*, 180 F.3d 699, *clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999)................. 42

*World Wide Street Preachers Fellowship v. Town of Columbia*,
   591 F.3d 747 (5th Cir. 2009) ................................................................................................... 43

*Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017).................................................................... 61, 62

*Zachery v. Texaco Exploration & Production, Inc.*,
   185 F.R.D. 230 (W.D. Tex. 1999)........................................................................................... 55

**Rules**

Fed. R. Civ. P. 23.................................................................................................................. *passim*

Fed. R. Civ. P. 65........................................................................................................................ 62

L.U. Civ. R. 23............................................................................................................................. 33

**Statutes**

42 U.S.C. § 1983 ................................................................................................... *passim*

42 U.S.C. § 2000d ............................................................................................... *passim*

Miss. Code Ann. § 15-1-49 ........................................................................................ 37

**Other**

Lorie Fridell, *By the Numbers: A Guide for Analyzing Race Data from Vehicle Stops*
   (2004) ................................................................................................................. 16, 18

7B C. Wright, A. Miller, & M. Kane,
   *Federal Practice & Procedure* § 1789 (2d ed. 1986) ............................................. 55

James Wm. Moore *et al.*, Moore's Federal Practice ¶ 23.21 (3d ed.) ....................... 33, 35, 36

During the second half of the twentieth century, federal courts in Mississippi assumed substantial responsibility for the operations of the state penitentiary and local jails, *see*, *e.g.*, *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), the university system, *United States v. Fordice*, 505 U.S. 717 (1992), and countless public school systems, *see*, *e.g.*, *Mason v. Biloxi Mun. Sep. Sch. Dist.*, 443 F.2d 1365 (5th Cir. 1971).   At no point in that long and well documented history did a court ever displace a duly elected sheriff from the power to perform his law enforcement duties. Although our courts can and regularly do redress the deprivation of federal rights by law enforcement officers, acting sometimes with official approval, *United States v. Price*, 383 U.S. 787 (1966), no court has ever created a body of unsworn civilians, with the backing of the contempt power of the court, to "impose binding disciplinary decisions" [Dkt. #1 at 83] upon a sheriff and his deputies.

Plaintiffs, a shrinking collection of residents and former residents of Madison County, begin their effort to negate the authority of the Madison County voters who elected Sheriff Randall C. Tucker with a motion [Dkt. # 231] to certify the class they hope to represent.   That class and its two subclasses consist of "[a]ll Black persons," and no others, who can prove that Sheriff Tucker has violated their federal rights.   [Dkt. # 232 at 32-36].   That may be a tall order, as plaintiffs offer no evidence that any court has ever found that Sheriff Tucker has violated anybody's federal rights.[1]   Indeed, as the pending motions for summary judgment [Dkt. # 209, 211, 218, 220, 222, 228, 256] demonstrate, these eight plaintiffs cannot demonstrate their membership in the class, lacking any evidence that Sheriff Tucker has violated their federal rights.

This Court should end this unprecedented effort before it begins.   The Court cannot certify

---

[1] Similar charges brought by the United States Department of Justice against a North Carolina sheriff were rejected in *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015).

1

a class whose membership cannot be determined absent individual trials for each member. Plaintiffs cannot represent a class to which they do not belong.   Should any plaintiff succeed in proving that Sheriff Tucker deprived him or her of federal rights, this Court can order any remedy that may be appropriate without the burden of class certification, as defendants demonstrated in their motion to deny class certification.   [Dkt. # 237].[2]   Plaintiffs' motion must be overruled.

## STATEMENT OF THE CASE

### i.    The complaint

Plaintiffs' 85-page complaint alleged intentional racial discrimination in every aspect of the work of Sheriff Tucker's Department.   "The Sheriff's Department of Madison County, Mississippi ("MCSD") implements a **coordinated top-down program** of methodically targeting Black individuals for suspicionless searches and seizures while they are driving their cars, walking in their neighborhoods, or even just spending time in their own homes (the "Policing Program")." [Dkt. # 1 ¶ 1 (bold face in original)].   The top from whom this alleged Policing Program descends is Sheriff Tucker, who is Madison County's sole policymaker in matters of law enforcement. *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996). Plaintiffs assert their claim of racial discrimination by Sheriff Tucker in two causes of action under 42 U.S.C. § 1983 and a third under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[3]

---

[2]  Because the motion to deny class certification should be granted for lack of necessity, there is no need for this Court to resolve any of the issues plaintiffs present in the instant motion. [Dkt. # 237].

[3]  The complaint's First Cause of Action, under § 1983, alleges Fourth Amendment violations because of unjustified searches "on the basis of their race."   [Dkt. # 1 ¶ 314].   The Second Cause of Action, also under § 1983, alleges violations of the Equal Protection Clause of the Fourteenth Amendment, and the Third Cause of Action alleges intentional racial discrimination under Title VI.   Two of the plaintiffs, Khadafy Manning and Quinnetta Manning, assert three causes of action for damages under § 1983.   Because those three causes of action are not brought on behalf of a class, they have little bearing upon the instant motion for class certification.

Plaintiffs admit that Title VI has the same substantive scope as the Equal Protection Clause [Dkt. # 232 at 1 n.1], so, to obtain any relief against Madison County or Sheriff Tucker, they must prove Sheriff Tucker guilty of intentional racial discrimination.     *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

The complaint presented only a single alleged common question of fact:

> whether the MCSD has a policy, practice, and/or custom of targeting members of the Class for unreasonable searches and seizures on the basis of race in violation of both the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

[Dkt. # 1 ¶ 304].    The Class was to be defined as follows:

> People who (1) are, or who appear to be, Black and those in their company, and (2) were, are, or will be in Madison County, and (3) were, are, or will be, subject to the MCSD's policy, custom, and/or practice of systematically executing unreasonable searches and seizures of persons, homes, cars, and property on the basis of race.

[Dkt. # 1 ¶ 300].    The declaratory judgment sought in ¶ B of the complaint's prayer for relief is consistent with these allegations:

> Issue a class-wide judgment declaring that MCSD's policy, practice, and/or custom of unreasonably searching and seizing persons, homes, cars, and property in the absence of reasonable suspicion or probable cause and on the basis of race, and of using unconstitutionally excessive force in connection with such searches and seizures, including the specific practices alleged herein, violates the Fourth and Fourteenth Amendments to the United States Constitution and Title VI . . . .

[Dkt. # 1 at 82-83].

Just as the complaint alleged intentional racial discrimination in every aspect of Sheriff Tucker's official conduct, so also would the requested injunction fully displace Sheriff Tucker as the final authority in the MCSD.    Paragraph C.ii of the prayer seeks an order:

> Requiring the County to establish an independent civilian complaint review board which will be tasked with reviewing and investigating complaints by the public against the MCSD for abuse of authority, discrimination, and improper use of force, stops and frisks, and searches and seizures; and requiring the County to empower

the civilian complaint review board to investigate MCSD policies and practices to identify systemic problems, subpoena MCSD documents and testimony for investigations, and impose binding disciplinary decisions upon findings that an officer of MCSD has violated civil rights . . . .

[Dkt. # 1 at 83].   Ignoring the legal reality that the only power Madison County has over its Sheriff is to elect a new one, the injunction would mandate "improved policies and programs" [¶ C.iii], "appropriate and adequate supervision" [¶ C.iv], record-keeping "in sufficient detail as to permit supervisory review," presumably by this Court, "for compliance with" federal law [¶ C.v], creation of "a single up-to-date computerized database" [¶ C.vi], acknowledgement of "the role of policing in past and present injustice and discrimination" [¶ C.ix], and the embracing of "a guardian mindset" [¶ C.x], whatever that means.   Like any other injunction, it would be enforced by the contempt power, establishing this Court, and not the elected Sheriff, as the final authority in law enforcement in Madison County.

## ii.    The motion for class certification

By the time discovery closed on February 16, 2018, plaintiffs had examined every incident recorded by the MCSD since Sheriff Randall Tucker took office in January of 2012.   Plaintiffs deposed Sheriff Tucker, his predecessor, two Madison County Supervisors, and nineteen deputies. As a result of this unprecedented inquisition into the operations of a Mississippi law enforcement agency, large portions of plaintiffs' complaint had disappeared by the time they filed their motion for class certification.   [Dkt. # 231].

The motion and supporting brief both restrict and broaden the scope of the complaint in numerous ways, although no amendment to the complaint has been proposed.   [Dkt. # 232 at 32-36].   Instead of a single class, plaintiffs now propose a so-called Targeting Class and two subclasses, the Roadblock Subclass and the Pedestrian Stop Subclass.   Instead of a single

4

common question of fact, the motion lists 11 such questions.   Finally, although the prayer for relief has not been amended, the newly proposed common questions of fact fail to support many aspects of the requested declaratory judgment.

For instance, the complaint seeks a declaratory judgment condemning MCSD's supposed policy "of using unconstitutionally excessive force."   [Dkt. # 1 at 82].   Nothing in the motion presently seeks a finding of unconstitutionally excessive force on behalf of any class.   The complaint seeks a declaration concerning "unreasonably searching and seizing persons, homes, cars, and property," but the motion limits the common questions to persons, abandoning any class claim of improper entries into homes[4]  or searches of cars and other property.[5]   The class and the two subclasses now contain only "Black persons," excluding "those in their company."   [Dkt. # 1 ¶ 300].

In one important sense the claim of the Roadblock Subclass significantly differs from the complaint.   The complaint alleged, "The primary purpose of the MCSD's system of checkpoints is now and has always been to target Black motorists, their passengers, and their vehicles for unreasonable searches and seizures."   [Dkt. # 1 ¶ 76].   That allegation is found nowhere in the common questions presented by the motion.   Instead, the first proposed common question on behalf of the Roadblock Subclass is whether MCSD establishes checkpoints "for the primary purpose of crime control, in contravention of the Fourth Amendment."   [Dkt. # 232 at 34-35].

---

[4]  The separate claims for damages asserted by Khadafy and Quinnetta Manning allege unlawful entry into a home and unreasonable use of force, but no such claims are presently asserted on behalf of a class.   The facts concerning home entries are addressed in the pending summary judgment briefs, but not in this brief, as homes form no part of the class claims.

[5]  The Roadblock Subclass complains of improper stops of "Black motorists and passengers," but no common question contends that cars have been improperly searched.

5

Although the complaint raised crime control as an alternative purpose [Dkt. # 1 ¶ 77], the prayer for relief contains no request for a declaration that MCSD has such a policy.   The abandonment of the racial claim means that the Roadblock Subclass can be justified, if at all, only on the basis of common Fourth Amendment questions.

Although the motion for class certification substantially limits the complaint's allegations on behalf of the class, no limitation has been placed on the prayer for relief.   The class no longer includes persons "subject to the MCSD's policy . . . of systematically executing unreasonable searches . . . of . . . homes" [Dkt. # 1 ¶ 304], but the prayer for relief still seeks relief regarding searches of homes.   [Dkt. # 1 at 83-84, ¶¶ C.iii, C.v.2, C.vii, C.viii].   Although no proposed common issue concerns excessive force, the so-called "independent civilian complaint review board" would still be empowered to "impose binding disciplinary decisions" concerning "improper use of force."   Plaintiffs have made no effort to limit their requested relief to the allegations of improper checkpoints and pedestrian stops that they now actually seek to pursue.

### iii.     The material facts

Before the certification of a class, particularly one alleging invidious discrimination, plaintiffs must offer "'significant proof' that [defendant] 'operated under a general policy of discrimination.'"   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)).   Here, the class and the two subclasses allege intentional racial discrimination, unconstitutional operation of checkpoints, and unconstitutional contact with pedestrians.   The evidence in this record must be evaluated to determine if plaintiffs have presented significant proof supporting any of the issues which they claim to be common to all members of the class and subclasses.   *See Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011) ("[t]o demonstrate commonality, Plaintiffs must have 'significant proof'").

6

#### a.      The named plaintiffs and the proposed class

Of the ten original plaintiffs, two were dismissed for failure to prosecute, and motions for summary judgment are pending against the other eight.    Plaintiffs seek only injunctive relief on behalf of the proposed class, although plaintiffs Khadafy Manning and Quinnetta Manning assert individual claims for damages, which are not addressed by the pending summary judgment motion. Although their class definition is ambiguous, plaintiffs apparently seek to represent all 36,000 Black residents of Madison County, a significant number of whom do not support their claims. The managers of Canton Estates and Canton Family Units, presumably two of the apartment complexes which the named plaintiffs contend to have been unconstitutionally targeted by Sheriff Tucker [Dkt. # 232 at 36], have actively sought the protection of the MCSD both for crime control and traffic safety.    (Exhibit 1, Deposition of Angela Lyons, 68-69; Exhibit 2, Deposition of Perie Freeman, 50).    Residents of these apartment complexes seek and appreciate the MCSD's active presence due to the high crime in the area.    (Exhibit 1, Lyons, 107:5-10; Exhibit 3, Deposition of Darian Smith, 122:1-7).    The evidence also shows that plaintiffs' counsel spent months attempting to recruit Black residents of Madison County to sue Sheriff Tucker.    (Exhibit 4, ACLU Outreach Documents).    They found eight from the Canton area and none from anywhere else in Madison County.

#### b.      Defendant Sheriff Randall Tucker and his Department

In November 2011, Madison County elected Randall Tucker as Sheriff, and he took office on January 1, 2012.    (Exhibit 5, Deposition of Sheriff Tucker, 8:3-4).    The MCSD has approximately seventy (70) sworn officers.    All officers are required to attend the State Law Enforcement Academy (or an equivalent training program), as well as twenty-four (24) hours of continuing training each year, which includes civil rights training and legal updates from the

District Attorney.    (Exhibit 6, Deposition of Jeremy Williams, 17:5-14; 20:5-12; 70:21-25; 71:1-25; 72:1-11; Exhibit 7, Deposition of Jeffrey Waldrop, 124:25; 125:1-10).    Sheriff Tucker, upon election, took steps to improve the relationship between the Black community and the MCSD. (Exhibit 5, Tucker, 8:12-25; 9:1-4; 29:6-22).[6]   He further implemented a structured system of command to insure that his policies are followed.    (Exhibit 5, Tucker, 85:11-19; 185:20-25; 186:1-7; 229:10-18; Exhibit 6, Williams 50:8-25).

### c.    Class claims

### 1.    Alleged intentional racial discrimination

The Targeting Class contends that Sheriff Tucker has established and enforced a policy of intentional racial discrimination in all operations of the MCSD.    To the contrary, Sheriff Tucker's official policy forbids race discrimination:

> Law enforcement officers will remember that he/she are sworn to protect and serve all citizens of this community equally.   Race, color, age, sex, political belief or other interference with equal administration of justice to all citizens within this jurisdiction.

(Exhibit 8, Copy of Policies, 34.1; Exhibit 13, Expert Report of Mark Dunston).[7]   Other MCSD

---

[6] Sheriff Tucker created a Madison County Advisory Group ("the Advisory Board"), inviting members of the Black community to serve on the Board, as well as members of "different ethnic groups, [with] different backgrounds, [and] religious views" to join.   (Exhibit 5, Tucker, 12:5-17:10).   Sheriff Tucker also began mentoring students in some of the predominately Black Madison County Schools, encouraging them to make good choices and educating them how the MCSD operates.   He started a DARE ("Drug Awareness Resistance Education") program for fifth graders focusing on the benefits of avoiding drugs and alcohol.   (Exhibit 5, Tucker, 19:3 – 21:7).   He also started an Explorer program for 14 to 18-year-olds, exposing these students to the basics of law enforcement and motivating them to treat others professionally and fairly.   (Exhibit 5, Tucker, 12:18-25; 22:1-5).   Sheriff Tucker assigned a full-time officer to oversee the DARE program and to visit these schools on a daily basis.   (Exhibit 5, Tucker, 21:9-23:5).

[7] Plaintiffs assert that Sheriff Tucker "officially adopted all of [his predecessor's] policies."   [Dkt. # 232 at 7].   The cited document is found at the beginning of the written policy book and adopts those written policies.   (Exhibit 5, Tucker, 90-94).   At no point did Sheriff Tucker adopt whatever unwritten policies plaintiffs may imagine to exist.   During his time in office, he has revised his predecessor's policies

policies commanding this same non-discriminatory conduct are found in Sections 15.1, 24.1, 27.1, and 38.1 of the MCSD Policies and Procedures.   (*Id.*).   Sheriff Tucker requires his officers to read these policies and abide by them.   (Exhibit 5, Tucker, 110 – 114:1-17; Exhibit 6, Williams, 16:15-25; 17:1-4; 41:24-25; 42:1-20; 141:22-25; 142-147:1-22).   These policies are reinforced at annual meetings of the MCSD, and no MCSD officer testified that these policies are not followed. (Exhibit 6, Williams; 20:15-21; 40: 20-25, 41:1-23).

Despite these explicit policies, plaintiffs still claim that Sheriff Tucker targets Blacks while enforcing the law in Madison County.   To support their position, they rely on two emails, from over 2,000 pages of emails defendants produced (Dkt. # 232:11-12), and one comment Sheriff Tucker made to a newspaper regarding Kenneth Stokes, a Black Alderman for the City of Jackson. (Dkt. # 232:80).   The first email, entitled "White Pride," was received and forwarded by then Deputy Tucker to others on June 4, 2009, two and one-half years before he became Sheriff.   [Dkt. # 231-74].   At the time, there is no question that Deputy Tucker was not an official policymaker of Madison County.   Deputy Tucker received the email from a patrol deputy with the MCSD, not from a superior officer.   (Exhibit 5, Tucker, 42:23-25; 43:1-4).   The email complains of the application of a double standard as it relates to Blacks and other minorities as opposed to Whites, and does not advocate racial discrimination.   [Dkt. # 231-74].   Sheriff Tucker does not remember receiving or forwarding the email, did not comment on the email, and has testified that the contents of the email, which he admits are racial in nature, do not contain any opinions held by him.   (Exhibit 5, Tucker, 42:6-11; 48:14-22; 49:17-25; 52:8-11; 18-25; 53:1-3).

The second email contains a response Sheriff Tucker sent to an email he received from a

---

in 28 different respects.   (Exhibit 14, Response to Interrogatory No. 9).

Madison County resident who compared Paul Griffin, a Black Supervisor of Madison County, to Kenneth Stokes, a Jackson City Councilman who criticized the MCSD.    [Dkt. # 231-81].    The email did not offend Mr. Griffin, and, in fact, he laughed about its contents during his deposition taken in this action and dismissed Sheriff Tucker's response as one made by an elected official who must be careful not to disagree with his constituents.    (Exhibit 9, Deposition of Paul Griffin, 73-83:1-13).

Plaintiffs also claim that Sheriff Tucker expressed racist views while addressing certain comments made by Councilman Stokes to the *Clarion-Ledger*.    [Dkt. # 231-80].    Stokes's comments resulted from a vehicle chase by a Black officer from a neighboring jurisdiction into Stokes's ward.    Stokes held a news conference and actually encouraged residents in his ward, which is predominately Black, "to throw rocks, bricks and bottles" at any law enforcement officer from a different jurisdiction should that officer travel into their ward.    Stokes called these officers "thugs with badges" and claimed that their actions were discriminatory toward his constituents. Sheriff Tucker was asked to comment on Stokes's words and did so by noting that Stokes's comments, not Tucker's, were racist and an insult to the residents of Stokes's ward.    (Exhibit 5, Tucker, 286:6 – 287).    Paul Griffin also feels that Stokes's comments were inappropriate and threatened the safety of law enforcement officers.    (Exhibit 9, Griffin, 75:1-15).

These two emails and one comment in the press are the only statements by Sheriff Tucker which plaintiffs cite to disprove his stated policy forbidding racial discrimination.

Plaintiffs further claim that Sheriff Tucker hired two officers after entering office, Slade Moore and Rylon Thompson, who are alleged to have held racist views by referring to three lawsuits that involved these officers either as a party or as an employee of a party.    [Dkt. # 231-82, 83, & 84].    The lawsuit that resulted in Moore's termination from the City of Jackson Police

10

Department was based on an alleged use of excessive force and was brought by Chad Calcote, who is White. [Dkt. # 231-82]. The lawsuit Moore filed against the City of Jackson was based on reverse discrimination against him because he was White. [Dkt. # 231-83]. One lawsuit filed against Thompson's employer, Belk, was for malicious prosecution, and the other one was for an alleged use of excessive force. Neither involved claims of racial discrimination. [Dkt. # 231-84 & 85].

Plaintiffs also refer to allegations made by former Black employees of the MSCD who claimed they were fired because of their race [Dkt. # 232:28], but, plaintiffs fail to give the results of these claims. Robert Gibson's complaint of discriminatory firing was dismissed with prejudice based on his failure to establish a jury issue during summary judgment proceedings. (Exhibit 10, 2/20/2018 Minute Entry by the Court). The claims of race discrimination by Robert Cooper were dismissed on May 13, 2014, after Cooper's attorney withdrew, and Cooper failed to obtain a new attorney. (Exhibit 11, Order Dismissing Plaintiff's Claims in Civil Action No. 3:13-00350-cv-HSO-RHW).

Plaintiffs complain that discretion allows officers to treat Blacks differently,[8] but officer

---

[8] Exhibits 86 and 87 to plaintiffs' Motion for Class Certification [Dkt. #231] do not represent some "template" used by the MCSD to target Blacks. First, the template has nothing to do with stops or arrests. Instead the template is a summary form filled out long after an arrest to summarize cases for the District Attorney to take narcotics cases before a Grand Jury. Further, as explained by Captain Tommy Jones, an officer filling out a Case File Cover Sheet on an individual who has been charged with a narcotics crime must provide detailed information about that individual, and as to some of this information, is allowed to select from drop-down boxes to show the status of the charges against that individual, that individual's race and sex, and whether certain evidence has been collected against that individual, *e.g.,* "yes" or "no." (Exhibit 12, Affidavit of Tommy Jones). If an officer prints the form without filling in any of the blanks like plaintiffs did, the printed version automatically defaults to the first choices found in each drop-down box. (*Id.*). Plaintiffs were unable to discern the fact this form contained drop-down boxes because during discovery they insisted that defendants not produce documents in native file form. Had plaintiffs obtained this electronic document in native file form (*i.e.*, Microsoft Word format), they easily could have discerned the fact these template forms used drop-down boxes.

discretion is a necessary part of being a professional police officer.   (Exhibit 13, Expert Report of Mark Dunston).   Further, Sheriff Tucker has a system in place to monitor for any abuses of discretion by his officers.[9]   First, he has made sure that he hires quality officers through the employment application process.   (Exhibit 5, Tucker, 127:19-25; 128:1-7).   Second, as to both new and existing officers, Sheriff Tucker began requiring these officers' supervisors (which includes Blacks), who are in the best position to observe these officers' daily activities, to report to him or Chief Williams any conduct they considered racially motivated.   Sheriff Tucker established an open-door policy within his office, allowing anyone to come and talk to him about concerns they had about officers displaying racially motivated conduct.   Since implementing these procedures, Sheriff Tucker has not observed or received any complaints of racially discriminatory activities by his officers.   (Exhibit 5, Tucker, 188:6-17; 218:25; 219:1-5).

Chief Deputy Jeremy Williams, Sheriff Tucker's second in command, has followed the same protocol as Sheriff Tucker to ensure that no MCSD officer allows race to be a factor in enforcement.   In addition to asking each officer's shift supervisor to report any suspected conduct in this regard to him, he also listens to radio dispatches by the officers while conducting stops. (Exhibit 6, Williams, 74:8-25; 75:1-21).   According to Chief Williams, race is not a factor that should ever be considered by any MCSD officer exercising his discretion in deciding how to enforce the law.   (Exhibit 6, Williams, 74:8-25; 75:1-21).

Plaintiffs offer two statistical witnesses in an attempt to prove that Sheriff Tucker

---

[9]  Any decisions to discipline, terminate or demote officers are made in accordance with MCSD policies and procedures.   Discipline can include anything from a verbal warning, a written reprimand or a suspension, termination or demotion depending on the offense.   Any disciplinary action is documented in an internal narrative report and/or letter to the employee and placed in the employees' personnel file.   (Exhibit 14, Response to Interrogatory No. 6).

intentionally discriminates on the basis of race in the operation of his Department.

Dr. Rahul Guha, an antitrust economist, purports only to provide unsworn summary statistics under Fed. R. Evid. 1006 [Dkt. # 231-2 ¶ 3] and is not designated as an expert.[10] (Exhibit 15, Deposition of Rahul Guha, 64:24-65:1).   He has no experience in law enforcement matters (Exhibit 15, Guha, 14:6-15:12) and no expertise in law enforcement practices.   (Exhibit 15, Guha, 43:12-15).   Because plaintiffs offer him only as a testifying calculator, he made no effort to familiarize himself with the issues (Exhibit 15, Guha, 96:1-97:7) or with Madison County (Exhibit 15, Guha, 39:22-42:18).   In fact, Dr. Guha believes that speaking to the people who compile the data he analyzed and aggregated would not be "sensible."   (Exhibit 15, Guha, 106:5-107:23).

Because Dr. Guha offers no opinion on the data, plaintiffs apparently believe that the numbers by themselves show that Blacks are treated differently from similarly situated Whites. If so, his data wholly fail because Dr. Guha did not even attempt to control for any other factors to ensure the relevant racial classes are similarly situated.   Indeed, his summaries completely overlook "*the* relevant factor – the basis for [MCSD's] decision to arrest, cite, warn or take no action at all, which are the very actions that the [plaintiffs] contend[] constitute discriminatory policing."   *Johnson*, 122 F. Supp. 3d at 361 (emphasis in original).   "[P]arties may not prove discrimination merely by providing the court with statistical analysis. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated."   *Id*., at 363 (citing *Chavez v. Illinois State Police*, 251 F.3d 612, 638 (7th Cir. 2001)).   Here, they do not.

---

[10] Defendants have filed a motion to limine to strike Dr. Guha's report as being inaccurate and unreliable, and thus not probative.

Moreover, because plaintiffs submit Dr. Guha's declaration pursuant to Rule 1006, they do not even pretend that his statistics control for relevant factors.    Plaintiffs must prove that Sheriff Tucker engages in intentional racial discrimination, but Dr. Guha's calculations do not sort for law enforcement acts involving the exercise of discretion and those that do not.    (Exhibit 35, Expert Report of Dr. Dwight Steward, ¶¶ 30 and 38; Exhibit 13, Dunston Report, 16-18).    For example, his statistics do not separate arrests pursuant to a warrant (non-discretionary) from discretionary arrest (Exhibit 15, Guha, 100:8-9).    (Exhibit 35, Steward Report, ¶ 30 Exhibit 13, Dunston Report, 16-18).    In fact, Guha's calculations seemingly treat an arrest on an outstanding warrant for failure to pay a seatbelt-violation fine as an actual arrest for a seatbelt violation.    (Exhibit 13, Dunston Report, 19).    As pointed out by defendants' expert, Mark Dunston, Dr. Guha's calculations prove nothing more than that the ratio for Black enforcement actions in discretionary matters is roughly the same as in non-discretionary matters, thus indicating no bias in allocation of law enforcement resources or enforcement.    (Exhibit 13, Dunston Report, 17-18).

Dr. Guha's calculations ignore other essential factors necessary to understand arrest or citation data.    First, his data do not account for encounters where the offender pleaded guilty or was convicted.    He counts one arrest with three charges (*e.g.*, speeding, DUI, and drug possession) as three separate arrests. (Exhibit 35, Steward Report, ¶ 44).    He does not account for follow-up arrests after bail, but instead calls such follow-up arrests a separate arrest though they are related to the same original violations.    He further does not account for arrests of minors. (Exhibit 35, Steward Report, ¶ 23).

Dr. Guha's underlying data are not reliable because they were obtained by doing word searches of the more than forty thousand incident reports produced by defendants in discovery. (Exhibit 15, Guha, 165:16-70:10).    Dr. Guha admits that the word search terms were not

14

developed by him or anyone at his firm; instead, they were developed and given to him by plaintiffs' lawyers,[11] and he did no independent inquiry to determine if the word searches would actually identify the relevant incident reports in any particular category (*e.g.*, checkpoints, DUIs, arrests, seatbelt violations).   (*Id.*)   While offering no opinion on this issue, he admits that in some cases he discovered that the word searches did not produce accurate data.   He also admitted the computer scanner could not read many incident reports, though he does not know how many.[12] (*Id.*)

Dr. Guha freely admits he cannot say his data shows a policy of discrimination, and plaintiffs have identified no expert or other testimony to explain how this data shows African Americans to be treated differently from similarly situated whites.   Defendants' expert, Dr. Steward, explains in detail why Dr. Guha's data is inaccurate, and not in any way probative. Thus, Dr. Guha's data is not probative under Rule 401 or 402.

Plaintiffs also rely on unsupported lay opinion that the MCSD treats Blacks and Whites unequally.   The defects in those affidavits are the subject of a separate motion to strike.

## 2.   Alleged unconstitutional checkpoints

The Roadblock Subclass complains about disproportionate placement of checkpoints and

---

[11] Plaintiffs' lawyers, who chose the particular terms, cannot testify as counsel of record, and, regardless, have offered no explanation for their actions.   Thus, there is no basis to believe the word searches were accurate proxies to find the pertinent incident reports.

[12] Dr. Guha's statistics ask the Court to make countless other assumptions.   For example, in calculating arrests for Probation Violation and Parole Violation in Appendix B of his report, Dr. Guha did not consider the numerous studies showing that there is a higher incidence of criminal records for Blacks. (Exhibit 35, Steward Report, ¶¶ 21-22).   Whatever the cause for this statistic, Dr. Guha's summary assumes that the racial distribution of Madison County residents on probation or parole mirrors the racial distribution of all residents in the County.   As Dr. Steward explains in his report, that is not the case. (Exhibit 35, Steward Report, ¶¶ 21-22).   If the population from which one is drawing (*i.e.*, individuals with criminal records) tends to be disproportionately Black, then those arrested from that pool will naturally be disproportionately Black.   That does nothing to prove discriminatory intent.

an alleged policy of conducting checkpoints for the primary purpose of crime control. The placement evidence may also relate to the racial discrimination claim of the Targeting Class.

Plaintiffs submit an unsworn report from purported expert Dr. Bryan Ricchetti setting forth his analysis of checkpoint locations. [Dkt. # 232 at 14-17]. As explained in a contemporaneously filed *Daubert* motion, Dr. Ricchetti's analysis is based upon unsupported assumptions, insufficient facts, or both. (Exhibit 16, Steward Report, ¶¶ 15-23). Although Dr. Ricchetti is the only expert designated by plaintiffs to show that Sheriff Tucker has a policy of intentional racial discrimination, he admits that his analysis does not even address this question. (Exhibit 17, Ricchetti, 216:15-217:14, 226:13-22). While he does find a statistically significant relationship between checkpoints-per-year for census tracts and the Black residential population in those census tracts, he offers no opinion or support on why residential population is a proxy for the racial composition of drivers on the road, much less an affirmative opinion on why this occurs. Further, the very articles he cites to support his position negate this proxy relationship. *See* Lorie Fridell, *By the Numbers: A Guide for Analyzing Race Data from Vehicle Stops* (2004). More importantly, he freely admits that he cannot say his data show that Sheriff Tucker maintains a policy of intentionally discriminating against Blacks (Exhibit 17, Ricchetti, 226:13-22), as plaintiffs must prove.

Notwithstanding the fatal flaws to his data explained in the *Daubert* motion, Dr. Ricchetti's regression analysis [Dkt. # 231-1 ¶¶ 44-53] affirmatively shows that race-neutral DUI enforcement is the predominant factor in determining the rate of checkpoints per census tract. (Exhibit 17, Ricchetti, 225:4-19; Exhibit 16, Steward Report, ¶¶ 73). Despite this showing, he does not consider which tracts contain bars and nightclubs that are open late at night, and thus are frequented by people who have been drinking a lot. (Exhibit 17, Ricchetti, 225:4-19; Exhibit 16, Steward

16

Report, ¶¶ 48-49).   He admits there is a logical correlation between the location of drinking establishments and DUIs, and that it makes sense there would be more checkpoints in areas where there is nightlife.   Significantly, even though Dr. Ricchetti himself does not know where these areas are,[13] his analysis shows that by far the heaviest concentrations of checkpoints are in the Canton area and the Ridgeland/Reservoir area, the only areas of Madison County where bars stay open late at night (and into the morning) and the two areas which the MCSD does emphasize with regard to checkpoint location, given that the primary purpose of checkpoints is DUI enforcement. (Exhibit 18, Declaration of Mark Sandridge, ¶ 8).

In short, Dr. Ricchetti's opinion ignores the biggest driver of checkpoint locations even when his own analysis points him in that very direction. (Exhibit 16, Steward Report, ¶¶ 54-61).

Moreover, his interpretation of the checkpoint data [Dkt. # 231-1 ¶¶ 35-41] fails to support the complaint.   Although plaintiffs allege that Sheriff Tucker conducts "roadblocks in and around the majority Black cities and neighborhoods of Madison County," Dr. Ricchetti conveniently defines "High Black Population Percentage" [Dkt. # 231-1 ¶ 32, Ex. 1] to include areas where Blacks are not a majority.   (Exhibit 16, Steward Report, ¶¶ 17-18, 35-38).   He does so by classifying three heavily populated census tracts as Black when the population is only 46% Black.   When these "Black communities" (with over 50% White people living in them) are moved to the White category, over 300 checkpoints are moved from "White communities" to "Black communities."[14]   As a result, Dr. Ricchetti's data actually show that the majority of the

---

[13]  Dr. Ricchetti knows nothing of Madison County.   He admits he does not know the locations of any roads or highways, any traffic counts, any business centers, the location of any major employers (*e.g.*, Nissan) or even where Ross Barnett Reservoir (and the associated bars in its harbors) are located.   (Exhibit 17, Ricchetti, 99:3-10, 101:5-13)

[14]  Census tracts 301.05, 301.06, and 303.02 are predominantly, but not majority, African

17

MCSD's checkpoints are set up in majority White communities (*i.e.*, census tracts) (when a 50% benchmark is used), and more White people live in census tracts where checkpoints are located than Black people.   (Exhibit 16, Steward Report, ¶¶ 17-18, 35-38).

Dr. Ricchetti also errs in his use of census benchmarking.   Census data provides information on an area's *residents*, not its *drivers*.   (Exhibit 16, Steward Report, ¶¶ 10, 13, 39, 43).   Dr. Ricchetti's analysis substitutes the racial distributions of residents for those of drivers. Drivers are an inherently transient population, and the racial composition of drivers differs from the residential population for a variety of reasons, such as the location of major employers, retail areas, entertainment areas, and recreational areas.   (*See* Fridell at 17).[15]   In fact, as noted, even the authorities cited in Dr. Ricchetti's report reject the use of census data to analyze the driving population: "For a variety of reasons, [census benchmarking] is of no scientific value for purpose of trying to measure racial biasing in policing and, in fact, has very often resulted in misleading and unsupported findings."   (*Id.* at viii).   Where, as here, the expert has made no effort to determine the ratio of Black drivers to White drivers, courts have found no probative value in the analysis.[16]

Indeed, the census data is also unreliable for identifying residents at any particular location. Census tract data by its very nature assumes that the racial distribution of the population is even within in the tract.   That is plainly not the case in Madison County.   For example, Dr. Ricchetti

---

American.

[15]   The Seventh Circuit disregarded similar testimony in a challenge to police practices because it addressed residential population, not the racial distribution of drivers on the highways.   *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001).

[16]   *Chavez*, 251 F.3d at 645; *Johnson*, 122 F. Supp. 3d at 358-59.

estimates that census tract 309 is 69.5% African American.    [Dkt. # 231-1 ¶ 32, Ex. 1].    Census

tract 309 is located in the north-central part of the County, stretching northeast from Canton to the

Ross Barnett Reservoir.    (Exhibit 19, 2010 CENSUS - CENSUS TRACT REFERENCE MAP:

Madison County, MS, available at https://goo.gl/RiLojt (last visited April 23, 2018)).    The racial

distribution of residents within the tract changes dramatically from the largely African American

parts near Canton to the largely white parts near the reservoir, where many checkpoints are located.

(Exhibit 20, Thematic Map of 2010 Census Blocks for African-American Population in Madison

County; Exhibit 16, Steward Report, ¶¶ 44-46; Exhibit 21, Expert Report of William Funderburk,

Ex. 12).    This dramatic shift between White and Black residents further illustrates why Dr.

Ricchetti's failure to conduct any local due diligence regarding how Madison County residents

and visitors live, work, and drive renders his report of little use.

Finally, Dr. Ricchetti fails in the basic task of assigning checkpoints accurately to the

proper census tract (assuming *arguendo* residential population is a legitimate behavior).    As

explained in detail in the affidavits of Mr. Funderburk and Dr. Steward, Dr. Ricchetti, due to his

total lack of law enforcement knowledge, geocoded all roadblocks in the middle of intersections,

as opposed to varying his approaches.    Since census tracts are usually divided by major roads and

intersections, as to many as 36% of the 2,004 roadblocks he used in his analysis cannot be verified

as being in the census tracts in which he put them.    (Exhibit 21, Funderburk Report, ¶ 58).

Plaintiffs' factual evidence of improper purpose is as faulty as their expert opinion.    In

fact, all checkpoints in Madison County are conducted for traffic safety, *i.e.,* to enforce safety laws,

and the only crime targeted in a checkpoint is traffic crime.    (Exhibit 5, Tucker, 144:1-2; Exhibit

6, Williams, 91:4-9; Exhibit 22, Deposition of Josh Fish, 21:23-25).    As stated by Chief Williams

in his deposition taken in this action, "[c]heckpoints are done for traffic purposes.    They're not

done for — I mean, traffic — you say crime.   Traffic crime is a crime."   (Exhibit 6, Williams, 46:16-19).[17]

There is no difference whatsoever in a "sobriety checkpoint" and a patrol "checkpoint" conducted by the MCSD.   (Exhibit 5, Tucker, 142:19-22; Exhibit 6, Williams, 85:22-25; 86:1-3, 20-25; 87:1-7, Exhibit 24, Deposition of James Hall, 34:1-13; Exhibit 25, Deposition of Sam Howard, 64:11-23; 49:17-25; 50:1-4; 64:17-23; Exhibit 26, Deposition of Tommy Jones, 211:13-24; Exhibit 3, Smith, 148:14-19; Exhibit 27, Deposition of Rylon Thompson, 24:22-25; 110:9-19). The location of a checkpoint is determined solely by volume of traffic, the MCSD's receipt of traffic complaints in an area, and the likelihood of encountering impaired drivers.   (Exhibit 6, Williams, 91:4-9; Exhibit 28, Deposition of Todd Wilson, 104:5-13; Exhibit 18, Sandridge Declaration, ¶ 4).   The location of both sobriety and safety checkpoints is never determined by the type of residents who live in the area; instead, it is dependent solely on the kind of drivers anticipated on a particular road or highway.   (Exhibit 18, Sandridge Declaration, ¶ 12).

By far, most checkpoints are located in areas where bars stay open late at night.   (Exhibit 18, Sandridge Declaration, ¶ 8).   This is because a primary purpose of checkpoints is to enforce DUI laws.   (*Id.*).   The MCSD has a unit of specially designated and trained DUI officers, who come on duty until 8:00 p.m., and usually work to 4:00 a.m., and place special emphasis on the

---

[17]  This does not mean the visibility of law enforcement at a checkpoint will not incidentally deter general crime in an area.   *See United States v. Green*, 293 F.3d 855, 862 (5th Cir. 2002) (recognizing that inevitably a constitutionally permissible roadblock would, *inter alia*, deter "individuals from driving while unlicensed").   *United States v. Ramirez-Gonzalez*, 87 F.3d 712, 714 (5th Cir. 1996) (noting that the Supreme Court has approved temporary checkpoints "to deter and detect drunk drivers").   This is true of all law enforcement activity.   If that were enough to render a checkpoint violative of the Constitution, no checkpoint could ever be conducted.   *United States v. McFayden*, 865 F.2d 1306, 1312 (D.C. Cir. 1989) (holding the fact that fact constitutionally permissible checkpoint "may have [had] a 'halo' or 'spin-off' effect of deterring drug sellers and buyers from trafficking in areas where roadblock was posted did not make an otherwise legitimate checkpoint unlawful.").

12:00 p.m. time period and the 2:00 a.m. time period when bars close.   (Exhibit 18, Sandridge Declaration, ¶ 8).   They also assist patrol officers at patrol initiated checkpoints.   (*Id.,* ¶3).

MCSD officers will most likely come into contact with impaired drivers in the southern part of Madison County around Ridgeland, the Ross Barnett Reservoir, and the associated harbor area where restaurants sell alcohol, bars and night clubs stay open after midnight, and fast food restaurants remain open all night.   (Ex. 16, Steward Report, ¶¶ 48-52; Exhibit 18, Sandridge Declaration, ¶¶ 8-9).   These areas also include streets and roads located in Canton, where several nightclubs are located, and on highways leading out of Canton, where additional nightclubs are located.   These are the only three areas of Madison County where there are bars that stay open late at night, and where checkpoints are more concentrated.[18]

Plaintiffs complain that some checkpoints conducted by the MCSD are located outside the entrances to certain apartment complexes in Madison County, *e.g.,* Canton Estates Apartments, for the sole purpose of checking for warrants and arresting Black drivers and passengers who reside there.   The testimony plaintiffs have obtained from both MCSD officers and the manager of Canton Estates, Angela Lyons, however, contradicts this claim.   The officers uniformly state these checkpoints are for traffic control.   (Exhibit 5, Tucker, 161:21-25, 162:2-20; Exhibit 6, Williams, 199:24-25, 200:1-17; Exhibit 3, Smith, 48:19-24).   Ms. Lyons, who has been the apartment manager of Canton Estates for over nine years, agrees.   In fact, she has asked for MCSD on several occasions to set up checkpoints on the street outside her apartment complex to

---

[18] As a matter of policy, Sheriff Tucker has also instructed that checkpoints be conducted in all other areas of the county.   This is in fact corroborated by the report of plaintiffs' own expert, which shows the highest concentration of checkpoints in the three areas mentioned above, while a lesser amount of checkpoints are spread out over the county.   [Dkt. # 231-1 ¶ 38, Ex. 2].

deter drivers from speeding through her complex parking lot, a recurring problem that creates a danger for children and other residents.   (Exhibit 1, Lyons, 52:5-25, 53:1-7, 101:24-25, 101:1-21; Exhibit 5, Tucker, 162:8-20).   Before calling the MCSD for help, she repeatedly asks the drivers to slow down.   If drivers continue to drive recklessly and speed, she reports the problem to the MCSD and asks that checkpoints be conducted to address these traffic problems.   (Exhibit 1, Lyons, 52:5-25; 53:1-19).   Sheriff Tucker recalls Ms. Lyons's traffic complaints and agrees that checkpoints are set up near Canton Estates based on these complaints.   (Exhibit 5, Tucker, 162:8-20).   Sheriff Tucker denies that any checkpoint is conducted near Canton Estates because of other complaints made by Ms. Lyons such as loitering and criminal activities.   Instead, he has confirmed that complaints of this nature are handled by a special team of MCSD officers, called the Neighborhood Enforcement Team ("NET"), that patrol the complexes by car and sometimes by foot.   The NET team does not take a law enforcement action without reasonable suspicion or probable cause.   (Exhibit 5, Tucker, 162:21-25; 163:1-12).[19]

---

[19] Though there is no legal requirement to do so, the MCSD (as a result of a local Judge's suggestion) has posted the locations of their checkpoints for several years through notices placed on the front door of the Madison County Justice Court building.   (Exhibit 5, Tucker, 148:10-20; Exhibit 29, Deposition of Mark Sandridge, 97:5 – 98:6).   Although past notices stated that checkpoints were being conducted to check for "[d]river's license, warrants and whatever else we encounter," or to "check all vehicles for the following: Equipment violations, child restraint, if applicable, seat belt use, valid driver's license, active warrants, and any other violations we may observe," each MCSD officer asked about the purpose of a MCSD checkpoint during his deposition taken in this action has testified unequivocally that no MCSD checkpoints are set up to check for outstanding warrants.   (Exhibit 6, Williams, 48:1-15; Exhibit 29, Sandridge, 129:8-15; Exhibit, 30, Deposition of Brad Sullivan, 48:19-25; 49:1-2; Exhibit 31, Deposition of Brian Loveall, 97:22-25; 98:1-4; Exhibit 23, Deposition of Jason Barnes, 77:17-19; Exhibit 27, Thompson, 109:3-6).   Further, Chief Williams testified that if a MCSD officer sets up a checkpoint solely for the purpose of finding individuals with outstanding warrants, that officer would face disciplinary action by the Department.   (Exhibit 6, Williams, 48:1-15).   While the language in the older checkpoint notices may be "poor choice of words," (Exhibit 6, Williams, 206:9-21, 208:7-12, 214:1-9), the language is actually not inaccurate since an officer who encounters a driver with an invalid or expired driver's license during a checkpoint will run that driver's identification through dispatch and may discover that there is an outstanding warrant for his arrest.   (Exhibit 5, Tucker, 132:1-2; Exhibit 6, Williams, 213:21-25, 214:1-9).

Without any evidence concerning proper law enforcement practices, plaintiffs claim there are no sufficient procedural safeguards at checkpoints.   The overwhelming evidence shows otherwise.   MCSD checkpoints are set up on both sides of a road or highway.   (Exhibit 30, Sullivan, 64:3-6; Exhibit 32, Deposition of Will Weisenberger, 33:12-25).   Each vehicle going through these checkpoints is stopped unless traffic is backed up or all officers are busy investigating drivers who they have pulled over.   Then they will wave traffic through the checkpoint until the problem no longer exists.   (Exhibit 5, Tucker, 129:4-15; Exhibit 29, Sandridge, 16:7-10; Exhibit 27, Thompson, 113:19-25; 114:1-17; Exhibit 30, Sullivan, 63:3-23).[20] When a driver comes through a MCSD checkpoint, he is asked to show the MCSD officer his driver's license, proof of insurance, and the officer usually inspects the vehicle's tag to see if it is current.   (Exhibit 5, Tucker, 292:5-21; Exhibit 6, Williams, 47:18-25; Exhibit 27, Thompson, 107:6-22; Exhibit 32, Weisenberger, 33:12-25; 34:1-2; Exhibit 30, Sullivan, 43:15-16).   If a driver's license is current, he has proof of insurance, and his tag is current, that driver normally is waved through the checkpoint without incident.   (Exhibit 5, Tucker, 292:5-21; Exhibit 6, Williams, 217:9-23; Exhibit 27, Thompson, 107:6-22).   If the driver does not have a valid license, insurance card, and tag, or if other indicia of a violation are noted, the driver will likely be detained until a further investigation can be done.   If that investigation reveals a traffic violation, crime or a record of an outstanding warrant through a call to dispatch, the driver (and sometimes passengers)

---

[20]   Out of the 20 MCSD officers who were deposed by plaintiffs, only one narcotics officer, Josh Fish, testified that he did not stop every car that passes through a checkpoint.   (Exhibit 22, Fish, 53:14-25; 54:12).   Contrary to plaintiffs' claim that Sheriff Tucker testified that his officers have discretion to wave drivers through a checkpoint [Dkt. # 232 at 24], Sheriff Tucker testified just the opposite -- that his officers must stop every **vehicle** and check **each** driver's license, unless of course, traffic backs up unduly. (Exhibit 5, Tucker, 129:10-15).   "[A]llowing all stopped cars through when traffic became congested was also reasonable and, in our view, non-violative of the rule in [*Delaware v.*] *Prouse*[, 440 U.S. 648 (1979)]." *United States v. Pritchard*, 645 F.2d 854, 857 (10th Cir.), *cert denied*, 454 U.S. 832 (1981).

may be arrested or given a citation.   (Exhibit 18, Sandridge Declaration, ¶ 5).   A call to dispatch to check on a driver's license normally takes a matter of 30 seconds to one minute.   (Exhibit 6, Williams, 250:5-16; 251:22-25; 252:1-10).

Blue lights must be activated at each checkpoint.[21]   (Exhibit 5, Tucker, 140:16-17; Exhibit 6, Williams, 94:10-19; Exhibit 29, Sandridge, 109:6-17; 126:17-23; 140:14-21; Exhibit 27, Thompson, 145:9-22; Exhibit 32, Weisenberger, 33:7-11; Exhibit 30, Sullivan, 62:5-8; Exhibit 24, Hall, 31:2-12).   Further, all MCSD officers are required to wear fluorescent safety vests, clothing identifying them as MCSD officers, and use flashlights during each checkpoint.   (Exhibit 5, Tucker, 140:16-20; Exhibit 6, Williams, 104:17-224; Exhibit 29, Sandridge, 109:6-10; Exhibit 27, Thompson, 184:4-12; Exhibit 32, Weisenberger, 33:7-11; Exhibit 30, Sullivan, 63:6-13; Exhibit 27, Thompson, 146:13-16; Exhibit 29, Sandridge, 105:23-25; 106:1-6; Exhibit 27, Thompson, 107:6-16).

It is not the policy of the MCSD to ask for any identification from a passenger of a vehicle going through a checkpoint unless an officer has reasonable suspicion or probable cause to question the passenger.   (Exhibit 6, Williams, 218:22-25; 219:1-25; 220:1-25; 221:1-4; Exhibit 29, Sandridge, 106:21-23; Exhibit 27, Thompson, 112:24-25; 113:1-18).[22]   A MCSD officer,

---

[21] While most MCSD checkpoints include the presence of a marked vehicle, there are rare occasions when a marked vehicle is unavailable and only unmarked vehicles are used.   (Exhibit 5, Tucker, 165:7-25; 166:1-10).   For example, the NET sometimes sets up its checkpoints with unmarked vehicles, (Exhibit 3, Smith, 66:4-10), but, as with marked vehicles, it is the policy of the MCSD that these vehicles' blue lights must be operating so that they are clearly visible to motorists.   (Exhibit 6, Williams, 254:8-22, 255:1-5; Exhibit 25, Howard, 106:19-25; 107:1-10; Exhibit 3, Smith, 66:1-25; 67:1-8).

[22] Only one out the 20 MCSD officers who gave deposition testimony in this action testified that he asked passengers for their identification without the presence of reasonable suspicion or probable cause. However, that officer, Sam Howard, testified that if the passenger refused to provide him with any identification, he could do nothing to compel the passenger to do anything else.   (Exhibit 25, Howard, 107:15-25; 108:1-25; 109:1-5).   Although Howard's actions may not be consistent with MCSD policies, they are not unlawful under the Fourth Amendment.   Further, contrary to plaintiffs' claims that Officer

however, can ask for a passenger's identification when he or she arrests a driver who is impaired or who has no valid driver's license since the passenger is expected to drive the vehicle away from the checkpoint.   (Exhibit 32, Weisenberger, 34:3-11; Exhibit 30, Sullivan, 43:20-25; 44:1-9; Exhibit 24, Hall, 40:21-25; 41:1-16, 24-25; 42:1-15; 43:24-25; 44:1-25).

Often times during a checkpoint, a MCSD officer may encounter a vehicle that gives him reasonable suspicion or probable cause to ask the driver to pull the vehicle over to the side of the road so that he can question the driver and his passengers and possibly search the vehicle.   So long as the officer has reasonable suspicion to detain the driver and/or occupants or to search the vehicle, *e.g.,* he smells marijuana coming from the vehicle or he sees marijuana in plain sight, the officer can pursue his suspicions under existing MCSD policies.   (Exhibit 6, Williams, 255:6-13; 221:1-25; 222:1-12; Exhibit 27, Thompson, 259:17-25; 260:1-25: 261:1-2; Exhibit 31, Loveall, 99:21-25; Exhibit 23, Barnes, 77:20-25; 78:1-15).     MCSD officers receive training on probable cause while attending the Police Academy, and, additionally, through classes conducted by the Madison County District Attorney's office, and through various other training sessions offered to them during the year.   (Exhibit 5, Tucker, 185:12-25; 186:1-7).

### 3.    Alleged unconstitutional treatment of pedestrians

It is generally the policy of the MCSD not to stop pedestrians who walk through checkpoints.   (Exhibit 6, Williams, 230:23-25; 231:1-5; Exhibit 29, Sandridge, 106:11-15; Exhibit 32, Weisenberger, 136:25; 137:1-23; Exhibit 25, Howard, 64:24-25; 65:1-11).   Officers

---

Josh Fish's testified that "it depends" whether he asks a passenger for identification, Fish testified as did other MCSD officers that if a driver does not have a valid driver's license or he smells alcohol on the driver's breath, he will ask the passenger for identification to "make sure the passenger can drive the vehicle if they can."   Fish also testified that he would ask a passenger for identification if he smelled marijuana in the vehicle or saw evidence of any other crime, *i.e.,* reasonable suspicion or probable cause existed. (Exhibit 22, Fish, 55:15-25; 56:1-7).

will stop a pedestrian if it appears that the pedestrian is impaired or is interfering with the officer's safety at the checkpoint.   (Exhibit 32, Weisenberger, 136:25; 137:1-23; Exhibit 23, Barnes, 90:16-22).   Further, the NET sometimes stops pedestrians at checkpoints after receiving complaints from apartment managers in Madison County that non-residents are entering their apartment complexes at night on foot, walking through the apartment complexes, causing property damage, and committing crimes such as stealing and assaulting residents.   (Exhibit 3, Smith, 67:12-25, 69:9-24).   This activity is based on sound law enforcement techniques, not race. (Exhibit 13, Dunston Report, 9).

Sheriff Tucker or other members of the MCSD are frequently asked by Angela Lyons, as well as other apartment managers in Madison County, to deploy the NET team to their complexes to address problems they experience with individuals loitering or committing criminal activities on their property.   (Exhibit 5, Tucker, 161:15-25, 162, 163:2-6).   The apartment complexes are high crime areas.   (Exhibit 3, Smith, 92:5-10).   Because these apartment complexes are posted as "no loitering zones" by the owners, they are covered under Madison County's no loitering ordinance, which allows MCSD officials to patrol these complexes and remove any loiterers. (Exhibit 5, Tucker, 163:7-12).   Significantly, these patrols by the MCSD form the basis of most, if not all, the complaints plaintiffs make in regard to the MCSD's stopping of pedestrians in majority Black areas of Madison County.

Once called, the MCSD always sends officers to help.   (Exhibit 1, Lyons, 37:19-25; 38:1-25; 39:1-25).   When MCSD officers respond, they let Ms. Lyons know they have arrived and discuss the problem with her.   These officers then report back to her on what they have found. In addition to responding to Ms. Lyons' complaints, the MCSD patrols Canton Estates on a random basis.   (Exhibit 1, Lyons, 41:1-25; 68:1-23).

Not only does Ms. Lyons convey her own complaints to the MCSD, but she also receives and conveys complaints made by her tenants.    Although she asks the tenants to call the MCSD themselves, they have told her they are afraid of retaliation from people they have reported because of past experience.    The MCSD patrols Canton Estates approximately every two weeks to make sure its residents are safe.    According to Ms. Lyons, when these officers do patrol, they deter crime and unwanted guests.    (Exhibit 1, Lyons, 42:11-25; 42:1-25; 44:1-6; 45:1-5; 68:1-25; 69:1-18).    Ms. Lyons has never heard any complaints from her residents about the presence of MCSD officers on the premises of Canton Estates.    (Exhibit 1, Lyons, 113:21-25; 127:18-25; 128:1-4).

Another apartment manager who has called the MCSD many times to complain of loitering within her complex is Perie Freeman, the manager of Canton Family Units, an apartment complex located next to Canton Estates Apartments.    When any of her tenants call her with a complaint of criminal activity within the complex, Ms. Freeman calls the MCSD on their behalf.    She also calls to report people loitering or standing around inside her complex approximately once every two or three months.    (Exhibit 2, Freeman, 23:12-25; 24:1-25; 25:1-25).    Ms. Freeman observes MCSD officers patrolling Canton Family Units every week, which makes her and her tenants feel safe.    Each time she has requested MCSD officers to drive through her complex on other occasions, they have done so.    She sometimes sees the MCSD officials driving through the apartment complex on her surveillance cameras set up on the property.    The MCSD officials drive cars, utility vehicles, and a truck.    The utility vehicles or SUVs are marked, as well as the cars. Like Ms. Lyons, Ms. Freeman has never received any complaints about the MCSD.    (Exhibit 2, Freeman, 76:21-25; 77:1-19; 78:2-22).

During these apartment patrols, as well as other patrols throughout the County, it is the policy of the MCSD that an officer can stop a pedestrian and ask them for their identification if

27

they have reasonable suspicion or probable cause to believe they are engaged in criminal activity.

(Exhibit 6, Williams, 243:1-6).    These MCSD officers understand that they must have reasonable

suspicion or probable cause before stopping a pedestrian for questioning.    (Exhibit 30, Sullivan,

74:10-12; Exhibit 3, Smith, 79:19-25; 80:1-25; 81:1-22; Exhibit 23, Barnes, 43:11-25; 44:1-11;

Exhibit 26, Jones, 187:22-25; 188:1-25; 189:1-25).

## ARGUMENT

## I.    SUBSTANTIVE FEDERAL LAW SIGNIFICANTLY LIMITS THE CIRCUMSTANCES UNDER WHICH CLAIMS OF INTENTIONAL RACIAL DISCRIMINATION AND UNREASONABLE SEARCHES AND SEIZURES MAY BE ASSERTED.

Under Fed. R. Civ. P. 23(a)(2), a class may not be certified unless "there are questions of

law or fact common to the class."    To make that determination, this Court must consider the

substantive federal law on which plaintiffs rely.    Their principal claim, set forth in the Second

and Third Causes of Action, remains that Sheriff Tucker has engaged in intentional racial

discrimination in violation of Title VI and the Equal Protection Clause of the Fourteenth

Amendment, enforced under § 1983.    They now also contend that MCSD conducts checkpoints

"for the primary purpose of crime control" and "with inadequate procedural safeguards" [Dkt.

# 232 at 34-35], an apparent Fourth Amendment claim asserted under § 1983 in the First Cause of

Action.

"To state a claim of racial discrimination under the Equal Protection Clause and section

1983, the plaintiff must allege and prove that [she] received treatment different from that received

by similarly situated individuals and that the unequal treatment stemmed from a discriminatory

intent."   *Stout v. Vincent*, 717 F. App'x 468, 471-72 (5th Cir. 2018) (quoting *Bowlby v. City of

Aberdeen*, 681 F.3d 215, 227 (5th Cir. 2012) (internal quotation marks omitted)).    A plaintiff's

28

subjective belief of discrimination cannot be the basis for an equal protection claim.   *Stout*, 717 F. App'x at 472.

Discriminatory intent or purpose "implies more than … intent as awareness of consequences."   *Wayte v. United States*, 470 U.S. 598, 610 (1985) (citations and internal quotations omitted).   It instead "implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."   *Id.*   Competent statistical data may be used in selective enforcement cases, but they "normally must present a '*stark*' pattern to be accepted as the sole proof of discriminatory intent under the Constitution," *McCleskey v. Kemp*, 481 U.S. 279, 293–94 (1987) (citations omitted) (emphasis added), and "alone rarely establish an equal protection violation." *United States v. Barlow*, 310 F.3d 1007, 1011 (7th Cir. 2002), *cert. denied*, 538 U.S. 1066 (2005).

As plaintiff admits, Title VI also requires proof of intentional racial discrimination.   [Dkt. # 232 at 1 n.1].   "To prevail on a claim for relief under Title VI, a private litigant must prove: (1) that the defendant engaged in *intentional* discrimination based on race, color, or national origin; and (2) that the defendant received federal financial assistance."   *Kelly v. Harrison County Bd. of Sup'rs*, 2013 WL 5913767, at *3 (S.D. Miss. Oct. 31, 2013) (quoting *Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir.), *cert. denied*, 134 S.Ct. 267 (2013) (citing 42 U.S.C. § 2000d; *Alexander v. Sandoval,* 532 U.S. 275, 280 (2001))).

The First Cause of Action seeks relief under § 1983 for violations of the Fourth Amendment on the theory that class members suffered unreasonable searches and seizures "on the basis of their race" [Dkt. # 1 ¶ 314], but "selective enforcement of the law based on . . . race" violates the Fourteenth Amendment, not the Fourth.   *Wren v. United States*, 517 U.S. 806, 813 (1996).   Thus, plaintiffs must prove intentional discrimination, as they must under their other two

causes of action.  Plaintiffs still seek to prove that particular claim on behalf of the Targeting Class.  [Dkt. # 232 at 32].  While it is not entirely clear, plaintiffs now seem to suggest that the Pedestrian Stop Subclass has been subjected to searches and seizures "in the absence of reasonable, articulable suspicion, or probable cause," without reference to unconstitutional racial discrimination.  [Dkt. # 232 at 36].  Plaintiffs also allege that the Roadblock Subclass has been subjected to checkpoints undertaken "for the primary purpose of crime control," which, if proven, would be forbidden by the Fourth Amendment under *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), even in the absence of racial discrimination.

Absent proof of the primary purpose disapproved by *Edmond* for checkpoints, the Fourth Amendment permits all sorts of stops under many circumstances.   "Not every encounter between a citizen and a police officer implicates the Fourth Amendment."  *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002) (citing *INS v. Delgado,* 466 U.S. 210, 215 (1984)).  By way of example, "police questioning, by itself, does not fall within the ambit of Fourth Amendment protections," but "may ripen into a seizure requiring reasonable suspicion or probable cause if an officer, by means of physical force or show of authority, restrains the liberty of a person."  *Chavez*, 281 F.3d at 483.  Probable cause "depends on the totality of the circumstances" and "is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citations and internal quotations omitted).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Id*.  It "is not a high bar."  *Id.*  More than a quarter of a century ago, the Fifth Circuit recognized that a person's presence in a "high crime area" is one of the circumstances that can be considered under the Fourth Amendment.  *United States v. Rideau*, 969

30

F.2d 1572, 1574 (5th Cir. 1992) (*en banc*).[23]   *Accord*, *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000).   "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."   *Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016) (quoting *Wren*, 517 U.S. at 813).

Because plaintiffs assert their constitutional claims under § 1983 against Madison County and its Sheriff, it is not enough to prove that a deputy may have acted improperly.   "Municipal liability under § 1983 requires a plaintiff to prove: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'"   *Harris v. Jackson County*, 684 F. App'x 459, 463 (5th Cir. 2017) (quoting *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010), *cert denied*, 563 U.S. 935 (2011); *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002), *cert. denied*, 537 U.S. 1110 (2003)).   "[I]solated unconstitutional actions by municipal employees will almost never trigger liability," which is why the courts have "roundly rejected municipal liability based on a theory of *respondeat superior*."   *Harris*, 684 F. App'x at 463 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 534 U.S. 820 (2001)).   *See generally Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).   Instead, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."   *Harris*, 684 F. App'x at 463 (quoting *Piotrowski*, 237 F.3d at 578).[24]

---

[23]   In *Shankle v. Texas City*, 885 F. Supp. 996 (S.D. Tex. 1995), on which plaintiffs rely [Dkt. # 232 at 35], Judge Kent ignored *Rideau* in resolving a motion to dismiss for failure to state a claim. Certainly, he made no suggestion that high crime is irrelevant to the use of checkpoints.

[24]   Just as *Monell* forbids vicarious liability under § 1983, so too does Title VI require conscious responsibility by the policymaker for intentional racial discrimination.   *Mohamed for A.M. v. Irving Ind.*

Finally, federal law generally precludes convicted criminals from asserting a civil claim that their federal rights were violated by official conduct leading to the conviction. *Heck v. Humphrey*, 512 U.S. 477 (1994).   If the maintenance of a civil rights action pursuant to § 1983 would necessarily imply the invalidity of a plaintiff's related criminal conviction, plea, or criminal sentence from which the civil rights claim would purportedly arise, the civil claim is barred by *Heck*.   *See Cougle v. County of DeSoto*, 303 F. App'x 164, 165 (5th Cir. 2008).   A plaintiff in such instance must establish that her conviction and resulting sentence has been overturned or expunged.   If a plaintiff's conviction and sentence are a valid sentence and conviction within the meaning of *Heck*, that plaintiff's civil claim arising from the same factual elements constitutes an impermissible collateral attack on the valid criminal proceedings and sentence and is barred. *Hudson v. Hughes*, 98 F.3d 868, 872-73 (5th Cir. 1996).   *See also Thomas v. Scott County*, 2015 WL 5009715, at *5 (S.D. Miss. Aug. 21, 2015).   Most importantly for purposes of this case, a convict's claim is "barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief)."   *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

The preclusive effect of *Heck* is equally applicable to claims regarding probable cause determinations pursuant to the Fourth Amendment, *see Hopkins v. Lowndes County Sheriff Dep't*, 2014 WL 3799329, at *3 (N.D. Miss. Aug. 1, 2014), as it is to unlawful search claims under the Fourth Amendment, *see Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 377-78 (6th Cir. 2006), and selective enforcement claims under the Fourteenth Amendment, *see Dique v. New Jersey State Police*, 603 F.3d 181, 187 (3d Cir. 2010) (citing *Gibson v. Superintendent of New Jersey Department of Law & Public Safety - Division of State Police*, 411 F.3d 427, 441 (3d Cir.

---

*Sch. Dist.*, 252 F. Supp. 3d 602, 626-28 (N.D. Tex. 2017).

2005), *cert. denied*, 547 U.S. 1035 (2006) ("[A] successful claim of selective enforcement under the Fourteenth Amendment Equal Protection Clause would have necessarily invalidated Gibson's conviction.")); *Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 862 (7th Cir. 2004).    The Fifth Circuit has approved dismissal of a claim for injunctive relief brought by plaintiffs convicted as a result of a challenged checkpoint.    *Collins v. Ainsworth*, 177 F. App'x 377 (5th Cir. 2005).

## II.    PLAINTIFFS HAVE FAILED PROPERLY TO DEFINE THEIR PROPOSED CLASS AND SUBCLASSES.

Plaintiffs seek class certification pursuant to Rule 23(b)(2), under which they bear the burden of proving that all necessary elements and requirements are satisfied.    *Dockery v. Fischer*, 253 F. Supp. 3d 832, 845 (S.D. Miss. 2015) (citing *Wal-Mart*, 564 U.S. at 350-51).    Plaintiffs likewise have the burden "of defining all relevant classes and subclasses."    L.U. CIV. R. 23.

"[T]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite" of a Rule 23(b)(2) class.    *Morrow*, 277 F.R.D. at 187 (citing *John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443, 445 n.3 (5th Cir. 2007) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable") (quoting *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir. 1970)).    Accordingly, plaintiffs have the burden of clearly defining all relevant classes and subclasses "so that it is administratively feasible for the Court to determine whether a particular individual is a member."    *Morrow*, 277 F.R.D. at 187 (citing *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001)) (further citations omitted).    "A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class."    *Morrow*, 277 F.R.D. at 187 (quoting James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE ¶ 23.21[3][c] (3d ed. 2007).

Plaintiffs assert in a single sentence [Dkt. # 232 at 42 n.50] that the Fifth Circuit does not require that membership in a class under Rule 23(b)(2) be presently ascertainable.   The language in *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975), obviously cannot be construed so broadly, because the Court did not overturn *DeBremaecker*, in which the Court had disapproved a Rule 23(b)(2) class for insufficient specificity.   In *Jones*, involving "all past, present and future inmates of the Jackson County jail," 519 F.2d at 1093, all members were not "presently" ascertainable, but members could immediately be ascertained as soon as they checked into the jail.[25]   In *DeBremaecker*, the Court found that a class composed of Texas residents "active in the 'peace movement' who have been harassed and intimidated" did "not constitute an adequately defined or clearly ascertainable class."   433 F.2d at 734.   More recently, membership in the class approved in *In re Rodriguez*, 695 F.3d 360, 366 (5th Cir. 2012), could be determined from defendant's "own readily accessed and comprehensive AS-400 database."   All of these Fifth Circuit cases are consistent with the declaration in *Morrow* that it must be "administratively feasible" to determine whether any individual, present or future, is a member of the class.   277 F.R.D. at 187 (citing *Daniels*, 198 F.R.D. at 214).[26]

Plaintiffs make no effort to explain how it is "administratively feasible" to determine membership in their proposed class and subclasses, which are:

Targeting Class

All Black persons who have been, or will be, subjected to the MCSD's policy

---

[25]   Even so, the Fifth Circuit left certification to the Court's discretion, noting that the jail held only 48 inmates at the time of filing.   *Id*., at 1100 & n.18.

[26]   In *ODonnell v. Harris County*, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017), upon which plaintiffs also rely, another Texas District Court questioned whether the Fifth Circuit requires ascertainability.   Despite that speculation, the Court narrowed the proposed class to individuals "who are readily ascertainable from Harris County's records."   *Id*., at *4.

and/or widespread custom or practice of racially profiling and targeting Black persons for stops, searches, and/or seizures on the basis of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.

[Dkt. # 232 at 38].

Roadblock Subclass

All Black motorists and passengers who have been, or will be, subject to the MCSD's policy of disproportionately conducting roadblocks in majority-Black neighborhoods for general crime control purposes and without appropriate procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

[Dkt. # 232 at 40].

Pedestrian Stop Subclass

All Black persons who have been, or will be, subject to the MCSD's policy of conducting stops, searches and/or seizures of Black pedestrians in Madison County in the absence of reasonable, articulable suspicion or probable cause.

[Dkt. # 232 at 42].

The definitions of the class and the subclasses contain multiple undefined terms. Plaintiffs offer no generally accepted judicial definition of "racially profiling and targeting." The term "majority-Black neighborhoods" is imprecise. Plaintiffs' expert analyzed the 21 census tracts into which Madison County is divided, but census tract is by no means synonymous with neighborhood, as that term is ordinarily used. Most importantly, plaintiffs do not explain whether "subject to the MCSD's policy" limits the class to those "Black persons" who have actually suffered a constitutional violation. If so, then the class definition fails because this Court "must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class." *Morrow*, 277 F.R.D. at 187 (quoting MOORE'S ¶ 23.21[3][c] (3d ed. 2007)). If not, then a class of "[a]ll Black persons" includes thousands of members who have no putative claim against Sheriff Tucker. "A precise class definition is necessary to identify

35

properly 'those entitled to relief . . . .'" *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir.), *cert denied*, 543 U.S. 870 (2004) (quoting MOORE'S ¶ 23.21[6] at 23-62.2 (3d ed. 2003)).[27]

Plaintiffs' motion and supporting brief contain hints in each direction, but provide no clarity. After describing class membership as consisting "of all persons similarly situated," plaintiffs claim to be "Black persons who have suffered, and remain at risk of suffering, deprivations of their civil rights protected by the United States Constitution." [Dkt. # 231 at 1, 2]. This certainly seems to indicate that actual deprivation of constitutional rights is a requirement for membership in the class. On the other hand, plaintiffs go on to describe the Targeting Class as "all Black persons who presently or in the future will reside in or travel through Madison County" [Dkt. # 231 at 3], without reference to any constitutional violation. Similarly, they describe the two subclasses as "all Black persons who travel or will travel by car through majority-Black areas of Madison County" and "all Black persons who travel or will travel by foot in Madison County's majority-Black neighborhoods." [Dkt. # 231 at 3]. By contrast, plaintiffs' brief says that "[t]he Roadblocks Subclass includes all Black persons who are stopped at roadblocks established by the MCSD for crime control purposes." [Dkt. # 232 at 30].[28] That more limited definition would require this Court to determine whether a particular roadblock was illegal before it could determine whether a motorist stopped by the MCSD was a member of the subclass.

---

[27] The Fifth Circuit found the definition in that case sufficient due to "an adequate description of the proposed class" in the certification motion. 365 F.3d at 414. As noted immediately hereafter, plaintiffs' motion provides no such precision.

[28] *Morrow*, on which plaintiffs rely, limited the class to those "stopped" by defendants, 277 F.R.D. at 189, but plaintiffs' definition contains no such limitation.

Whatever definition plaintiffs choose, their problem is insoluble.   "All Black persons" in Madison County have not been deprived of their federal rights by Sheriff Tucker and therefore have no claim that would entitle them to inclusion in this class.[29]   Even among those who may have suffered a constitutional violation, many have no enforceable claims.[30]   Those who were convicted are barred from relief by *Heck*.   Those whose contact with the MCSD happened more than three years before the filing of this complaint are barred by the applicable statute of limitations, Miss. Code Ann. § 15-1-49.   *White v. McMillin*, 2011 WL 3555766 at *4 (S.D. Miss. Aug. 11, 2011).   Moreover, any individual claiming to have been stopped in violation of the Fourth Amendment must carry the burden of making a demonstration that "depends on the totality of the circumstances."   *See Wesby*, 138 S. Ct. at 586.   This Court would have to resolve all of those issues to determine membership in the class or subclasses.

Plaintiffs' claim for class certification falls at the first hurdle.   Membership in the class is not "adequately defined and clearly ascertainable."   *DeBremaecker*, 433 F.2d at 734.   The motion must be overruled.

## III.   PLAINTIFFS CANNOT SATISFY ALL FOUR REQUIREMENTS OF RULE 23(a).

"For a lawsuit to proceed as a class action, all of the requirements of Rule 23(a) . . . must be satisfied."   *Dockery*, 253 F. Supp. 3d at 846 (citations omitted).   The Rule 23(a) requirements are:

---

[29]   Although all Black schoolchildren are injured by the maintenance of segregated schools, *Potts v. Flax*, 313 F.2d 284, 288-89 & nn.4-5 (5th Cir. 1963), plaintiffs cite no authority suggesting that all Black residents of Madison County are injured by any alleged policy of Sheriff Tucker.

[30]   "To certify a class under Rule 23, plaintiffs must show they are members of the class."   *Morrow*, 277 F.R.D. at 188 (citing *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1105 (5th Cir. 1993)).   Plaintiffs are Black, but, as the summary judgment motions show, they have no claim.

(1)     the class is so numerous that joinder of all members is impracticable [numerosity];

(2)     there are questions of law or fact common to the class [commonality];

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4)     the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a).   "[T]he district court must conduct a 'rigorous analysis' of all of the requirements for certification under Rule 23, *see Castano v. American Tobacco Co*., 84 F.3d 734, 740 (5th Cir. 1996)."   *Dockery*, 253 F. Supp. 3d at 845 (citing *Falcon*, 457 U.S. at 161).   *See also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 838 (5th Cir. 2012).   "Plaintiffs bear the burden of proving that those requirements are satisfied."   *Dockery*, 253 F. Supp. 3d at 845.

A.     **There is no showing that anyone has a claim against Sheriff Tucker, much less that they are so numerous that joinder is impracticable.**

Plaintiffs' showing of numerosity depends upon the proper definition of their class and subclasses.   They claim that the Targeting Class "includes all Black persons who reside in or travel through Madison County," and they observe that "[t]here are over 36,000 Black residents of Madison County."   [Dkt. #232 at 29].   Should this Court certify a class of 36,000 members, none of whom has been shown to have a claim against Sheriff Tucker, numerosity, at least, would be satisfied.   If, however, membership in the class and subclasses is limited to those whose rights are actually violated, no showing of numerosity has been made.

For instance, plaintiffs' brief describes the Roadblocks Subclass as including "all Black persons who are stopped at roadblocks established by the MCSD for crime control purposes," and they allege that "at least 956 arrests of Black persons have occurred at MCSD roadblocks since January 1, 2012."   [Dkt. # 232 at 30 & n.41].   If all 956 arrestees were members of a class, there

would be no possibility of disputing numerosity.   However, any person stopped before May 8, 2014, is barred from relief by the statute of limitations.   Of the remaining arrestees, any who were convicted are barred by *Heck*.   It is plaintiffs' burden to prove that the remaining arrestees with potentially valid claims are too numerous to permit joinder, but they have not proven that any such persons exist.[31]

As discussed in Part II above, the lack of clarity is inherent in the definitions of the class and both subclasses.   If the definitions include only those persons whose federal rights are violated, then plaintiffs have failed to show numerosity. There is no demonstration that, after application of *Heck* and the statute of limitations, any class members remain.   The certification motion must fail for failure to demonstrate numerosity.

**B.     Because there is no significant proof that Sheriff Tucker enforces any unconstitutional policy, and because the proposed common questions do not establish liability, commonality is lacking.**

As noted by this Court in *Dockery*, "[c]ommonality … is the most complex part of Rule 23(a) analysis," and "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Dockery*, 253 F. Supp. 3d at 846 (quoting *Wal-Mart*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 148)).   "It is not enough that class members suffer the same type of injury or have been subject to a violation of the same law."  *Id.*   Nor, after *Wal-Mart* is it sufficient to show that the proposed class establishes that "there is at least one issue whose resolution *will affect all or a significant number of the putative class members*."   *Perry*, 675 F.3d at 840 (quoting *Forbush*, 994 F.2d at 1106) (emphasis in original).   "Rather, Rule 23(a)(2) requires that all of the class members' claims depend on a common issue of law or fact whose resolution 'will *resolve* an issue

---

[31]  It avails plaintiffs nothing to assert that a class of 104 arrestees was certified in *Edmond*, 531 U.S. at 34-35 [Dkt. # 232 at 30 n.41], because the parties stipulated to certification in that case.   *Id.*, at 36.

that *is central to the validity* of each one of the [class member's] claims in one stroke.'" *Perry*, 675 F.3d at 840 (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis added by *Perry*). Just as plaintiffs in *Wal-Mart* "wish[ed] to sue about literally millions of employment decisions at once," 564 U.S. at 352, these plaintiffs wish to sue about thousands of law enforcement decisions at once. The Court must probe "behind the pleadings," *Perry*, 675 F.3d at 840 (quoting *Falcon*, 457 U.S. at 160), where it is generally alleged that the defendant engaged "in a *pattern or practice* of discrimination," to determine whether an "examination of all the class member's claims for relief will produce a common answer to the crucial [merits] question *why was I disfavored.*" *Perry*, 675 F.3d at 840-41 (quoting *Wal-Mart*, 564 U.S. at 352) (emphasis in original).

Commonality is a two-prong test, in which plaintiffs must have "significant proof," *Morrow*, 277 F.R.D. at 192, of the existence of "a common policy or practice, possibly an implicit one, that is the alleged source of the harm to class members, ***and*** that there are common questions of law or fact that will be dispositive of the class members' claim." *Dockery*, 253 F. Supp. 3d at 849 (emphasis added) (quoting *M.D.*, 294 F.R.D. at 28-29).

### 1. Sheriff Tucker has no policy of intentional racial discrimination or of conducting checkpoints for general crime control purposes.

Local government liability for a "custom, policy or practice" requires proof of "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Harris*, 684 F. App'x at 463 (quoting *Valle*, 613 F.2d at 541-42). *See also Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017). "In 'rare circumstances,' a single unconstitutional action may be sufficient to impose municipal liability 'if undertaken by the municipal official or entity possessing "final policymaking authority" for the action in

question.'"  *Id.* (quoting *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 815 (2017)).   "An unconstitutional policy may be found when a policymaker performs the specific act that forms the basis of the § 1983 claim."   *Davidson*, 848 F.3d at 395 (citing, *inter alia*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).   Here, of course, Sheriff Tucker is charged with establishing a policy of intentional racial discrimination.   There is, however, no significant proof of any such policy.[32]   He denies it, and no member of his staff claims to follow such a policy.   To the contrary, all evidence shows that deputies are instructed to treat all people equally, as Sheriff Tucker's policy manual requires.   (Exhibit 5, Tucker, 110-14; 1-17; Exhibit 6, Williams, 16:15-25;  17:1-4;  41:24-25;  141:22-25;  142-47;  1-22).[33]   Plaintiffs' only expert admitted he did not find such a policy.   (Exhibit 17, Ricchetti, 226:24-27:5).

The defects in plaintiffs' statistical evidence are thoroughly described in the factual discussion at the outset of this brief.   Even if that evidence were sufficient to demonstrate a

---

[32] Plaintiffs seek to excuse the lack of significant proof of discrimination by complaining that defendants "have no data on the race of persons stopped but not arrested or cited."   [Dkt. # 232 at 34 n.44]. They suggest this fact should lessen their evidentiary burden, but in *Morrow*, on which they rely, defendants "failed to collect racial profiling information that they were required by law to collect and report."   277 F.R.D. at 185.   Here, plaintiffs do not suggest that Sheriff Tucker has failed to comply with any legal requirement.

[33] In the three cases on which plaintiffs rely, the significant proof was that the law enforcement defendants admitted the existence of the policy later found to be discriminatory, and no appellate court approved the finding of commonality.   In *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011), the sheriff's department "publicly stated that it may stop persons based solely on a belief that they are not legally present in the country," and on appeal defendants did "not challenge the district court's class certification itself."   *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012).   In *Morrow*, a constable "testified that he understood that the goal of the intradiction program was to stop as many people as possible for traffic violations to look for other criminal activity, primarily narcotics trafficking."   277 F.R.D. at 178.   No appeal was taken from the class certification.   In *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012), it was declared "indisputable that the NYPD has an enormous stop and frisk program," *id.*, at 162, and Commissioner Kelly swore "that stops serve as a deterrent for criminal activity."   *Id.*, at 163 n.40.   After the Court of Appeals ordered the recusal of the District Judge, *Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013), the newly-elected mayor dismissed the appeal.   *Floyd v. City of New York*, 770 F.3d 1051 (2d Cir. 2014).

disparate racial impact from Sheriff Tucker's administration of his office,[34] plaintiffs cite no authority to suggest that such evidence alone can constitute significant proof under *Wal-Mart*. Plaintiffs assert that some deputies have used racial epithets in the past [Dkt. # 232 at 6], but they offer no competent evidence of any such events since Sheriff Tucker took office, nor do they attribute any such comments to Sheriff Tucker himself.[35]   They do complain of an email entitled "White Pride," which Sheriff Tucker received and forwarded in 2009, during the tenure of his predecessor.   The email itself, which on its face complains of the supposed application of double standards to Whites and minorities, was apparently widely circulated and introduced into evidence in other cases, none of which found it sufficient to support a finding of racial discrimination. *Martin v. F.E. Moran, Inc*., 2018 WL 1565597 at *19 (N.D. Ill. Mar. 30, 2018); *Watkins v. Recreation & Park Comm'n*, 2013 WL 6834376 at *13 (M.D. La. Dec. 26, 2013); *Mendoza v. Bell Helicopter & Textron, Inc*., 2012 WL 12878157 at *2 (N.D. Tex. Oct. 3, 2012).   In a second email, Sheriff Tucker indicated sympathy with a constituent's criticism of Supervisor Paul Griffin, who is Black and who testified he regarded the email as an understandable response to a voter. (Exhibit 9, Griffin, 73-83:1-13).   Although defendants produced thousands of emails, plaintiffs

---

[34]   Such proof must establish that minorities "were treated more harshly than [non-minorities] *for similar offenses*."   *Johnson*, 122 F. Supp. 3d at 361 (emphasis in original).   "[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*."   *United States v. Bass*, 536 U.S. 862, 864 (2002) (emphasis in original).   Plaintiffs present no evidence that white motorists are not questioned at checkpoints or that white pedestrians are not questioned in high crime areas. "To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"   *Priester v. Lowndes County*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).

[35]   "[A]n officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."   *Williams v. Bramer*, 180 F.3d 699, 706, *clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999).

find no other evidence of racism in any of them.[36]  This record presents no proof, much less significant proof, of intentional racial discrimination by Sheriff Tucker in the conduct of his office.

Where the final policymaker does not actually engage in the challenged police activity – in this case, for instance, where Sheriff Tucker was not present at the challenged stops, searches, seizures, and arrests which form the basis of the Fourth Amendment claim – the activity does not amount to "the type of 'rare circumstance' in which this court may find that the [local government] had a policy of [committing an unconstitutional act]."  *Davidson*, 848 F.3d at 395.  Approval or ratification of a subordinate's decision by a final policymaker, which plaintiffs do not allege, can be the basis for local government liability, but only in "extreme factual situations."  *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 854 (5th Cir. 2009), *cert. denied*, 562 U.S. 827 (2010); *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009)).  "[A] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality."  *Davidson*, 848 F.3d at 395 (quoting *Peterson*, 588 F.3d at 848).  To the extent that plaintiffs allege a "widespread-practice" of committing unconstitutional violations, the Fifth Circuit has rejected such claims "for failure to demonstrate a pattern of similar incidents."  *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 n.14 (5th Cir. 2018) (citing *Peterson*, 588 F.3d at 851 ("holding 27 similar incidents insufficient to establish a pattern of unconstitutional conduct by city police"); *Pineda*, 291 F.3d at 329-31 ("same for eleven such incidents")).

Without citation to authority, plaintiffs accuse Sheriff Tucker of "deliberate indifference

---

[36]  In *Johnson*, the evidence revealed multiple "reprehensible" emails and multiple uses of racial epithets, 122 F. Supp. 3d at 371, but the Court found the evidence insufficient to establish intentional racial discrimination.

to the routine violations of the constitutional rights of Madison County's Black community."
[Dkt. # 232 at 23-24].[37]   Presumably, plaintiffs refer to Fourth Amendment violations, as Sheriff
Tucker cannot possibly have been "deliberately indifferent" to his own intentional racial
discrimination, which plaintiffs allege that he has committed.   "Deliberate indifference is an
objective standard which encompasses 'not only what the policymaker actually knew but what he
should have known, given the facts and circumstances surrounding the official policy and its
impact on the plaintiff's rights.'"   *Coleman v. Byrd*, 2013 WL 820304, at *3 (S.D. Miss. Mar. 5,
2013) (quoting *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002)).   This Court has
observed that a plaintiff "bears an 'extremely heavy burden' in establishing both the [local
policymaker's] deliberate indifference and a causal link between the alleged custom and the
alleged constitutional violation."   *Coleman*, 2013 WL 820304, at *3 (quoting *Peters v. City of
Biloxi*, 57 F. Supp. 2d 366, 376) (S.D. Miss. 1999), and citing *Snyder v. Trepagnier,* 142 F.3d 791,
798 (5th Cir. 1998) *cert. dismissed*, 526 U.S. 1083 (1999)); *Piotrowski*, 237 F.3d at 580 (stating
that "these two requirements 'must not be diluted'")).   "Even a showing of heightened negligence
is insufficient to show the deliberate indifference needed to prove municipal liability."   *Mason v.
Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (citing *Piotrowski*, 237 F.3d
at 579 (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 407 (1997)) ("A showing of
simple or even heightened negligence will not suffice.")).   Since plaintiffs have not come close to
identifying even the number of Fourth Amendment violations found insufficient in *Pena* and
*Pineda*, they lack significant proof that Sheriff Tucker has established by deliberate indifference a

---

[37]   In contract, defendants have designated Mark Dunston as an expert witness to testify
that Sheriff Tucker has not been deliberately indifferent.   (Exhibit 13, Expert Report of Mark
Dunston). Chief Dunston is the only expert designated in these proceedings to testify about law
enforcement practices.

policy of committing unconstitutional stops, searches, seizures, and arrests.

> **2.    The common questions are insufficient to establish any liability for any claim.**

In *Dockery*, this Court quoted extensively from *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex.),

*leave to appeal dismissed*, 547 F. App'x 543 (5th Cir. 2013), in explaining the commonality

requirement:

> In short, the common questions identified must be dispositive of the claims.  If
> they are not -- if, for instance, after the common questions are answered one way
> or another individualized inquiries to determine liability would be needed -- then
> commonality has not been established.   *Ahmad v. Old Republic Nat. Title Ins. Co*.,
> 690 F.3d 698, 704 (5th Cir. 2012); *see also Luiken* [*v. Domino's Pizza, LLC*], 705
> F.3d [370] at 377 (8th Cir. 2013)]; *Forte v. Wal-Mart Stores, Inc*., 2012 WL
> 2886711, at *2 (S.D. Tex. July 13, 2012). . . .
>
> The Fifth Circuit emphasized this requirement in its *MD* decision.   *MD* [*ex
> rel. Stukenberg v. Perry*], 675 F.3d [832] at 837, 841 [(5th Cir. 2012)].   Similarly,
> the Fifth Circuit held that the potential defenses against the plaintiffs' claims should
> also be considered as they may undermine the dispositive, "one stroke" nature of
> the proposed common question.   *Id*., at 843-44 . . . .

*Dockery*, 253 F. Supp. 3d at 849 (quoting *M.D.*, 294 F.R.D. at 28 (brackets added by *Dockery*)).

The *Dockery* plaintiffs, as here, requested only declaratory and injunctive relief under Rule

23(b)(2).   It is particularly important under Rule 23(b)(2) that "the common questions identified

must be dispositive of the claims," *id*., because plaintiffs seek only a single trial resulting in a

single injunction.   The express language of Rule 23(b)(2) requires "that final injunctive relief . . .

is appropriate respecting the class as a whole."   While proof of the facts peculiar to individuals

might be appropriate in determining a damage award, evidence peculiar to an individual by

definition cannot support an injunction "appropriate respecting the class as a whole."   *See

Dockery*, 253 F. Supp. 3d at 856 (relief must "not require that the Court adjudicate the individual

class members' needs or circumstances").   Resolution of the common questions must, without

45

more, justify the common injunction.

Each of the eleven proposed common questions for the class and two subclasses seeks a factual determination of whether Sheriff Tucker has established a particular policy.[38]  As already noted, proof of a policy is a required element of plaintiffs' claims, *Valle*, 613 F.3d at 541, but more must be shown.   To establish a claim, each plaintiff must also establish "a constitutional violation whose 'moving force' is that policy or custom."   *Id*., at 541-42.   No common question proposes to establish causation and constitutional injury on behalf of any plaintiff, much less of any defined

---

[38]  Targeting Class
Whether the MCSD has a policy or widespread custom or practice of racially profiling Black persons in Madison County.
Whether the MCSD has a policy or widespread custom or practice of disproportionately targeting majority-Black communities.
Whether the MCSD has a policy or widespread custom or practice of conducting searches and seizures of Black persons at least in part on the basis of race.
Whether the MCSD has a policy or widespread custom or practice of failing to train officers adequately to prevent racial targeting and profiling.
Whether the MCSD has a policy or widespread custom or practice of failing to monitor officers adequately to prevent racial targeting and profiling.
[Dkt. # 232 at 32].
Roadblock Subclass
Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks in Black communities in Madison County, including roadblocks at or near the entrances of majority-Black apartment complexes, for the primary purpose of crime control, in contravention of the Fourth Amendment.
Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks with inadequate procedural safeguards, in contravention of the Fourth Amendment.
Whether the MCSD has a policy or widespread custom or practice of disproportionately establishing roadblocks in Black communities in Madison County on a racially discriminatory basis, in violation of the Equal Protection Clause.
[Dkt. # 232 at 34-35].
Pedestrian Stop Subclass
Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons present in the vicinity of the Apartment Complexes in the absence of reasonable, articulable suspicion, or probable cause.
Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons present in the vicinity of the Apartment Complexes at least in part on the basis of race and/or ethnicity.
Whether the MCSD has a policy, or longstanding custom or practice of targeting the Apartment Complexes at least in part on the basis of race.
[Dkt. # 232 at 36].

class.[39]  *Cf. Lee v. Verizon Communications, Inc.*, 837 F.3d 523, 530 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017) (holding, in a class action, statutory violations not to be actionable absent proof of concrete injury).   Absent such proof of concrete injury, no relief, and certainly no classwide injunctive relief, can be authorized.

Moreover, there are at least two affirmative defenses which "undermine the dispositive, 'one stroke' nature of the proposed common questions."   *Dockery*, 253 F. Supp. 3d at 849 (quoting *M.D.*, 294 F.R.D. at 28).   Plaintiffs have made no effort to exclude from the definitions of the class and subclasses those persons barred by the statute of limitations.   No solution exists for the *Heck* defect.   Those convicted of an offense have already failed to prove the constitutional violation required by *Valle*.   Even those who have not been convicted must prove that any injury was caused by the policy, and not something else.   The Mannings, for instance, in order to recover against Madison County, must show that their alleged injuries were caused by a policy, not by the fact that they were observed in the company of a burglar at the time and place of the burglary.

---

[39]  Plaintiffs wisely do not rely on *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir.), *cert. denied*, 135 S. Ct. 754 (2014), to argue that they need not prove causation of a constitutional injury.   In that case, brought to seek damages under Rule 23(b)(3), the defendant argued lack of standing under Article III because the settlement agreement was being administered in a fashion which compensated class members "that have suffered no injury."   *Id.*, at 799.   The Fifth Circuit confirmed that "the elements of Article III standing do indeed include both an injury in fact and a causal connection to the defendant's conduct."   *Id.* The majority found that "the class definition include[s] only persons and entities who can allege causation and injury in accordance with Article III," *id.*, at 802, and that the common questions supporting certification of the class included defendant's "injurious conduct" so as to "demonstrate that the class members claimed to have suffered the 'same injury' in the sense that *Wal-Mart* used this phrase."   *Id.*, at 812 (quoting 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157)).   The defendant's lament that the settlement was being administered in such a way as to award damages to uninjured individuals did not undermine jurisdiction or certification, but was merely "a question of interpreting the Settlement Agreement and applying it to each individual claim."   *Deepwater Horizon*, 739 F.3d at 808.   Here, of course, there is no settlement, and the majority in *Deepwater Horizon* recognized that, "had the class in this case been certified under Rule 23 for further proceedings on the merits rather than for settlement, the district court might ultimately have had occasion to apply a stricter evidentiary standard."   *Id.*, at 806.

Not only are the proposed common issues taken together insufficient to establish liability, but individually they fail to "resolve an issue that is central to the validity of each one of the claims." *Dockery*, 253 F. Supp. 3d at 849 (quoting *M.D.*, 294 F.R.D. at 28 (quoting *Wal-Mart*, 564 U.S. at 350)).   For instance, while "racial profiling," an undefined term, may be relevant to some claims, it will not resolve a single one, much less each of them.   The Equal Protection Clause and Title VI prohibit only intentional racial discrimination by Sheriff Tucker.   Proof of "disproportionately targeting" or "disproportionately establishing roadblocks," without more, will not resolve a claim of intentional racial discrimination.[40]   The final two proposed common questions on behalf of the Targeting Class concern Sheriff Tucker's alleged policies concerning training and monitoring, without any reference at all to intentional racial discrimination. Plaintiffs cite no case holding that the Equal Protection Clause imposes upon law enforcement agencies any obligation of training or monitoring, particularly one unconnected to intentional racial discrimination.   Similarly, plaintiffs make no demonstration that the Fourth Amendment in any way condemns "roadblocks with inadequate procedural safeguards," as included in one of the proposed common questions for the Roadblock Subclass.[41]   Finally, with regard to the Pedestrian

---

[40] By contrast, those proposed common questions which require a determination that Sheriff Tucker has established a policy to act "at least in part on the basis of race" would require the necessary finding of racial discrimination.   That finding is necessary, although not sufficient, to establish plaintiffs' Second and Third Causes of Action.   In determining whether discriminatory intent inflicts a constitutional injury, the Fifth Circuit in unpublished decisions has considered but not resolved whether racial animus must be the actor's "sole motivating factor."   *Compare Stout*, 717 F. App'x at 471 n.6 *with United States v. Vandyck-Aleman*, 201 F. App'x 215, 218 (5th Cir. 2006).

[41] It is true, of course, that *Edmond* prohibits checkpoints "for the primary purpose of crime control," as stated in another common question for the Roadblock Subclass.   Here, significant proof of such a policy is obviously lacking, since plaintiffs' own expert found that checkpoint locations most closely correlate with arrests for driving under the influence of alcohol.   [Dkt. # 231-1 ¶¶ 44-53]; (Exhibit 17, Ricchetti, 225:10-14; Exhibit 16, Steward, ¶¶ 54-61).   In *Collins v. Ainsworth*, 382 F.3d 529 (5th Cir. 2004), on which plaintiffs rely [Dkt. # 232 at 35 n.46], the Fifth Circuit approved the entry of summary judgment against plaintiffs on whether the "actual programmatic purpose of the checkpoint was to detect

Stop Subclass, even the existence of a policy of conducting searches and seizures "in the absence of reasonable, articulable suspicion, or probable cause" would not establish that any such policy had ever caused a search of any individual, nor that any such search was unreasonable, because, as explained in Part I, probable cause "depends on the totality of the circumstances." *Wesby*, 138 S. Ct. at 586.[42]   Without such an analysis in each individual case, plaintiffs cannot establish a constitutional violation, much less one "whose 'moving force' is that policy or custom." *Valle*, 613 F.3d 541-42.[43]   Plaintiffs' assertion that "the claims of the [Pedestrian Stop] Subclass turn on common questions of law and fact that will establish defendants' liability" [Dkt. # 232 at 37] is simply false.

While it is true, as plaintiffs emphasize [Dkt. # 232 at 32], that certification requires only a "single common question," *Deepwater Horizon*, 769 F.3d at 811 (quoting *Wal-Mart*, 564 U.S. at 359 (citations and alterations omitted)), that one question must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Deepwater Horizon*, 769 F.3d at 810 (quoting *Wal-Mart*, 564 at 350).   Here, the proposed common questions, taken individually or together, do not resolve any claim.   Commonality is therefore lacking.

---

evidence of ordinary criminal behavior." *Id*. at 543.   Certainly, the evidence in this case fails to reach the level of significant proof, as *Wal-Mart* requires.   Even if such a policy could be proven, no proposed common question offers to prove the necessary elements of causation or constitutional injury.

[42] Eighth Amendment prison cases also depend on the totality of circumstances in each facility. A proposed class action against all Mississippi county jails was disapproved because there was "no way in which the resolution of the ultimate issue concerning one jail would have any effect on the resolution of the issue concerning any other jail." *Stewart v. Winter*, 669 F.2d 328, 336 (5th Cir. 1982).

[43] Where, as under the Fourth Amendment, a putative class member's claim "requires individual analysis, then it is not clear how a 'classwide proceeding' on the claims have the 'capacity … to generate common answers apt to drive the resolution of the litigation.'"   *Perry*, 675 F.3d at 843 (quoting *Wal-Mart*, 564 U.S. at 351 (citation omitted)).

**C.    Because no plaintiff has a valid claim, their claims cannot be typical of any class member who does.**

The requirements of typicality and commonality "overlap" significantly.  *Dockery*, 253 F. Supp. 3d at 849.   "Typicality requires a showing that the claims of the named plaintiffs are in fact those asserted as the common class claims.   In this sense, typicality is commonality addressed from the perspective of the named plaintiffs."  *Id.* at 850 (quoting *M.D.*, 294 F.R.D. at 29).   In its analysis of typicality, the Court should also consider whether any proposed class or subclass or "common questions" are overly broad, since "if proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims."  *Warnock v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 1113475, at *9 (S.D. Miss. Mar. 24, 2011) (quoting *Ruiz v. Stewart Assoc., Inc.*, 167 F.R.D. 402, 405 (N.D. Ill. 1996)).

As already demonstrated in Part III.B.2, proof of the supposed illegal policies will not establish defendants' liability to anyone.   At the very least, class members would have to prove an injury and its causation by the policy, as opposed to something else.   It is not a violation of any provision of the Constitution to arrest a person holding a bloody knife and standing over a dead body, regardless of what policies a local government may pursue.

Here, even if unconstitutional policies may exist, all eight plaintiffs fail to prove any right to relief for various reasons.   For some of them, the undisputed facts do not describe a constitutional violation of any kind.   For others, any claims they might have had have been extinguished by the statute of limitations.   These factors, set out in the pending summary judgment motions, are briefly described hereafter.

Latoya Brown, Steven Smith, Lawrence Blackmon, Khadafy Manning, and Quinnetta

50

Manning all seek to be included in the racial Targeting Class, which they allege to present the "common question" of "whether the MCSD has a policy of targeting Black communities and racially profiling Black individuals."   [Dkt # 232 at 31].

Brown and Smith seek to be included in this class based on their allegation that the MCSD entered their apartment in October 2015 without a warrant.   The evidence, however, does not support such a claim.   Brown's and Smith's own testimony shows that entry into their home was legal and involved exigent circumstances in which MCSD deputies were searching the apartment complex for a missing child.   Thus, contrary to the plaintiffs' allegations, there was no violation of the Fourth Amendment, and there is certainly no evidence that Brown or Smith was targeted because of race.

Likewise, Blackmon seeks to be included in the Targeting Class, alleging that MCSD personnel unlawfully entered his home because of his race in December 2015, but his claims are also contrary to the facts.   The undisputed evidence clearly shows that the entry into the home was conducted pursuant to an in-hand arrest warrant for Blackmon's cousin (and former plaintiff) Herbert Green, who was listed on the arrest warrant as residing at that address.[44]   [Dkt # 229-2]. The entry was thus not the result of a policy of targeting Black communities and racially profiling Black individuals; it was the result of an arrest warrant, which gave the officers authority to enter the home and execute on the warrant.   *See Steagald v. United States*, 451 U.S. 204, 221 (1981) ("[A]n arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest."); *United States v. Route,* 104 F.3d 59, 62 (5th Cir. 1997) ("A valid arrest warrant carries with it the

---

[44]   Although Green was not at home when the MCSD officers went into the home, he was arrested by Canton Police at that same address approximately one month later on the same arrest warrant.   [Dkt # 229-2].

implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within.").

Khadafy and Quinnetta Manning similarly seek to be included in the racial Targeting Class based on an alleged unlawful home entry in June 2016, but again, the facts to do not support their claim of racial targeting.   The undisputed evidence is that the MCSD officers went to the apartment complex, not because they were racially profiling, but because they received a call for help from Brittany Morment about a domestic dispute between her sister, Ashley Morment, and Ashley's ex-boyfriend, Ladarius Thompson.   [Dkt # 256-1].   After the officers arrived at the apartment complex, one of them (Sergeant Slade Moore) observed the Mannings with Thompson as he attempted to break into Morment's apartment to take a television.    [Dkt # 256-1 at ¶ 10]. When Thompson noticed the officers in the area, he told Quinnetta, "The police coming [*sic*]," and the Mannings went into their nearby apartment, which was also witnessed by Sergeant Moore. [Dkt # 256-2 at 94-95; Dkt # 256-1 at ¶ 12].    Suspecting that the Mannings may have been acting as lookouts for Thompson, MCSD officers went the apartment to question the Mannings about their involvement in the break-in.    Race was not a factor.[45]

In short, although Brown, Smith, Blackmon, and the Mannings contend that their claims present the common question of racial discrimination, there is no evidence that any of their claims involves racial profiling.   Officers, by Brown's and Smith's own admission, entered their home in search of a missing child; officers legally entered Blackmon's home to execute an arrest warrant; and officers were responding to a domestic dispute call for service when they noticed the Mannings acting

---

[45]  Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker initially made allegations of unlawful home entries or searches, but their claims based on these allegations are time barred and have been abandoned.   [Dkt. # 261 at 93 n.64].

as potential accomplices to a break in.    The claims of racial profiling have no merit.

Brown, Smith, and Khadafy Manning additionally seek to be included in the Pedestrian Stop Subclass because they allege that they have been stopped by MCSD personnel and asked to provide identification.    As both the Supreme Court and the Fifth Circuit have held, these allegations do not amount to a constitutional violation.    *See United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)) ("Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual[,] ask to examine the individual's identification[,] and request consent to search his or her [property] as long as the police do not convey a message that compliance with their requests is required.").    Police do not have to have probable cause or reasonable suspicion to ask for a person's identification.    *Id.*

Likewise, Blackmon, Brown, Singleton, Thomas, and Tucker seek to be included in a Roadblock Subclass even though they have identified no Fourth Amendment violation.    They all admit that the policy followed by the MCSD at each of the roadblocks was that an officer would stop every car, ask for identification, and would allow them to pass unless a traffic violation was found.    This process has been sanctioned by the Fifth Circuit and does not violate the Fourth Amendment.    *United States v. Machuca-Barrera*, 261 F.3d 425 (5th Cir. 2001) (roadblock); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) (speeding stop).    *Accord*, *United States v. Bernacet*, 724 F.3d 269 (2d Cir. 2013) (warrant check at roadblock).

### D.    However the class may be defined, conflicts of interest prevent plaintiffs from adequately representing it.

Adequacy of representation "encompasses class representatives, their counsel, and the relationship between the two."    *Dockery*, 253 F. Supp. 3d at 850 (citations and internal quotations

omitted).   In determining the adequacy of representation prong, the Court is to consider issues

such as "the zeal and competence of the representatives' counsel, *id*. (citations and internal

quotations omitted), "the willingness and ability of the representatives to take an active role in and

control the litigation and to protect the interests of absentees," *id*. (citations and internal quotations

omitted), and "conflicts of interest between named parties and the class they seek to represent,"

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule

23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to

represent.").   To meet the adequacy prong, "a class representative must be part of the class and

possess the same interest and suffer the same injury as the class members."   *Id*. at 625-26 (citations

and internal quotations omitted).

Defendants do not dispute that plaintiffs' counsel reach the level of adequacy.   The real

problem precluding a finding of adequacy is conflicts of interest between named plaintiffs and

members of the proposed class and subclasses.   The first conflict derives from their willingness

to abandon damages claims which class members might wish to assert.   The second is that they

do not really assert class interests at all, but only individual grievances.

Plaintiffs allege in their brief that they "do not request individualized relief, but instead

seek to require Defendants to reform their policies to conform to the requirements of the

Constitution."   [Dkt # 232 at 49].[46]   Presumably, this is because the Supreme Court in *Wal-Mart*

held that "claims for *individualized* relief," like most damage claims, cannot be asserted under

Rule 23(b)(2).   564 U.S. at 360 (emphasis in original).   However, Khadafy Manning and

Quinnetta Manning seek an award of compensatory damages against the County and punitive

---

[46] If the Constitution requires the relief plaintiffs seek, then this Court can order it without
certifying a class, as defendants demonstrate in their motion to deny class certification.   [Dkt. # 237].

damages against John Does #1 through #6.   Plaintiffs' disavowal of any individual right to damages for the class, coupled with the Mannings' specific claims for compensatory and punitive damages, shows their specific conflict of interest with the class.

In *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264 (5th Cir.), *cert. denied*, 555 U.S. 881 (2008), the Fifth Circuit affirmed a District Court's denial of class certification in which the plaintiffs disavowed monetary damages in order to obtain a Rule 23(b)(2) certification.   The Court explained:

> Motivated by *Zachery v. Texaco Exploration & Production, Inc.,* 185 F.R.D. 230 (W.D. Tex. 1999), the district court expressed concern about the plaintiffs' disavowal of monetary damages. In *Zachery,* the putative class representatives also dropped their demand for compensatory and punitive damages in order to achieve Rule 23(b)(2) certification. *Id.* at 233. As a result, class members would not have had the right to opt out of the class and might be barred from bringing individual damage claims. *Id.* at 243 (citing *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867 … (1984)). Noting this serious conflict of interest, the court refused to impose upon the class members the decision by named plaintiffs to forfeit the compensatory and punitive damages claim. *Id.* at 244-45. We agree with *Zachery* and with the district court's conclusion here that if the price of a Rule 23(b)(2) disparate treatment class both limits individual opt outs and sacrifices class members' rights to avail themselves of significant legal remedies, it is too high a price to impose. There was no error, much less abuse of discretion, in this certification denial.

*Id*. at 283.

The risk observed by the *McClain* Court stems from the application of *res judicata* to the class members' future claims for monetary damages.   As a general premise, "[a] court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action."   *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 413 (5th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396 (1996) (Ginsburg, J., concurring in part and dissenting in part) (citing 7B C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 1789 at 245 (2d ed. 1986))).   "Courts have inconsistently applied claim

preclusion to class actions," and "have … refused to certify class actions because of perceived risk of down the line preclusion."   *Slade*, 856 F.3d at 413-14.[47]

The Mannings' pursuit of compensatory and punitive damages on their own behalf puts them in an even more peculiar situation.   As with all plaintiffs, proof of all of the supposed common issues will not suffice to impose monetary liability on anybody.   Moreover, the Mannings can lose on every one of the common issues and still recover compensatory and punitive damages against the individual deputies, as no proof of a policy is necessary to impose liability on individuals acting under cover of state law.   The Mannings have little incentive zealously to pursue the policy claims asserted on behalf of the class when they can collect substantial damages without it.

In addition, the peculiar circumstances of this case draw a stark contrast between these eight plaintiffs and the class they supposedly represent.   Activity by the MCSD in Black neighborhoods is perceived by many residents as a welcome provision of protection.   The managers of Canton Estates and Canton Family Units, presumably two of the undefined "Apartment Complexes" that plaintiffs criticize Sheriff Tucker for "targeting" [Dkt. # 232 at 36], actively seek protection and appreciate the efforts of Sheriff Tucker and his deputies.   (Exhibit 1, Lyons, 68, 69; Exhibit 2, Freeman, 50).   The managers report that most residents welcome the

---

[47] Plaintiffs in *Morrow* were permitted to represent a class only for purposes of declaratory and injunctive relief after the Court excluded Fourth Amendment issues from the class claims.  The Court concluded that the remaining claims for intentional discrimination under the Fourteenth Amendment "should not foreclose an individual lawsuit for damages based on the individual circumstances of a particular stop."  277 F.R.D. at 204.   While this language is less than clear, it excludes the possibility of damages for the racial discrimination supposedly inherent in every stop.   The Court seemed to be saying that, whichever way it might rule on the Fourteenth Amendment claims of the class, individual damage suits for Fourth Amendment violations could still go forward.   Here, of course, plaintiffs seek certification of Fourth Amendment claims.   Denial of those claims on the merits could bar all class members from pursuing damages.

MCSD's presence and frequently seek assistance because of the high frequency of crime in the area.   (Exhibit 1, Lyons, 107:5-10; Exhibit 3, Smith, 122:1-7).[48]   An injunction to patrol those areas in exactly the same fashion as, for instance, low-crime areas like Annandale or Lake Caroline, would not necessarily be welcomed by most members of the class.

Moreover, the record reveals an extensive effort by plaintiffs' lawyers over the better part of a year to recruit plaintiffs from the Black community.   Plaintiffs' document production shows the publicity they transmitted in the area, and their interrogatory answers describe their efforts at door-to-door recruitment.   (Exhibit 4, ACLU Outreach Documents; Exhibit 34, Plaintiff Brown Int. Responses).   It is telling that they found only eight persons willing to proceed with this action, and those persons have highly questionable claims.

The Fifth Circuit has recognized the distinction between a true class action and individual claims sought to be imposed upon a class.   In *Bailey v. Ryan Stevedoring Co*., 528 F.2d 551 (5th Cir. 1976), *cert. denied*, 429 U.S. 1052 (1977), the Court reviewed the claim of a single longshoreman to force the merger of the White union and the Black union in Baton Rouge.   The plaintiff had two supporters from the Black union, but 204 of its 230 members submitted a petition opposing the claim.   The Fifth Circuit affirmed the denial of class certification, finding "no reversible error pertaining to the district court's ruling on appellant's attempt to make a class action out of a grievance which is clearly individual in nature."   528 F.2d at 554.   It is noteworthy that the Court so ruled notwithstanding the claim of discrimination against an entire race.   Indeed, the Court ordered the entry of a "permanent injunction against the continued operation of segregated

---

[48] Remarkably, Khadafy Manning is suing the proprietors of Canton Estates for failing to provide him with the protection they knew he needed in such a high crime area.   (Exhibit 33, Manning Amended Complaint).   It is hard to imagine how he can adequately pursue the claim of the class that Canton Estates does not need the MCSD to provide such protection.

locals." *Id*., at 557.   It simply recognized that claim as belonging to a single individual plaintiff, and not a class consisting of Black longshoremen who did not wish to join him.

In another case instigated by the ACLU, the District Court declined to certify a class of female high school athletes because of disagreements within the class.   *Alston v. Virginia High School League, Inc.*, 184 F.R.D. 574 (W.D. Va. 1999).   "Even in the context of class actions alleging discrimination on the basis of sex or gender, the typicality and adequacy requirements must still be met with something more than a mere allegation of across-the-board discrimination." *Id*., at 578.   The Court noted that "[t]he 'across-the-board' theory for class certification has been rejected by the Supreme Court" in *Falcon*.   *Id*. at 578.   The Court found "unrebutted evidence of a conflict of interests between the named plaintiffs and other members of the class."   *Id*., at 579.   "A majority of female public school athletes surveyed expressed a desire to preserve the status quo, meaning that most would not favor the injunctive relief sought by plaintiffs."   *Id*. The Court also rejected a proposed subclass, reporting that plaintiffs had solicited participants at one school, with the result that "[a]t least half of the nineteen or twenty girls whose parents were approached declined to join the lawsuit."   *Id*., at 581.   Because "[p]laintiffs have the burden of showing . . . that the interests of all members of the proposed class . . . are not in conflict with their own," the Court found the unrebutted evidence sufficient to deny certification.   *Id*.

Plaintiffs, recognizing their lack of support within the Black community, rely on *Horton v. Goose Creek Ind. Sch. Dist*., 590 F.2d 470 (5th Cir. 1982), *cert. denied*, 463 U.S. 1207 (1983), to support their assertion that "potential diversity of opinion within a class is not a basis for denying certification."   [Dkt. # 232 at 41 n. 49].   Of course, *Horton* said no such thing.   *Horton* acknowledged "good authority for denying class certification on the basis of significant disagreement within the class."   *Id*., at 485.   It simply found that a district court could instead

58

employ procedures that "might increase the protection of the absentees."   *Id.*, at 487.   On that set of facts, the Court found that absentees had been adequately protected.   Certainly, the Fifth Circuit itself eliminated the risk of uncertainty as it resolved the constitutional claim and certified the class at the same time.   *Id.*, at 488.   Even so, it declined to certify the class on any matter other than liability, recognizing that "[t]here may also be disagreement among class members over appropriate relief."   *Id.*, at 488 n.33.

*Horton* does not say that a racial class should always be certified notwithstanding antagonism among members of the class, nor could it have done so in light of *Falcon*.[49] Importantly, in *Horton*, "the defendant ha[d] offered no proof of disagreement."   690 F.2d at 485. That was a crucial point, as the Fifth Circuit distinguished, without disapproving, *Peterson v. Oklahoma Housing Authority*, 545 F.2d 1270 (10th Cir. 1976).   In that case, "many of the tenants in a low-rent housing project had executed leases containing the security deposit provision that was the subject of the suit, and the defendant presented evidence that many of them thought that the security deposit would benefit members of the proposed class."   *Horton*, 690 F.2d at 485. Here, too, defendants have presented evidence that residents of the apartment complexes believe that they benefit from what plaintiffs disparage as the "Policing Program."   Nothing in *Horton* requires this Court to compel those residents to be represented by these plaintiffs, with whom they manifestly disagree.

The true significance of *Horton* for this case is that it should preclude class representation in any aspect of the formulation of relief.   Here, where many class members plainly support

---

[49] *Falcon* is not even mentioned in *Horton*, which is not surprising in light of the fact that it was not decided until after the rendition of the original panel opinion in *Horton*.   *Horton v. Goose Creek Ind. Sch. Dist.*, 677 F.2d 471 (5th Cir. 1982).

Sheriff Tucker's efforts to protect them and their communities, it is an understatement to predict "disagreement among class members over appropriate relief."   *Id.*, at 488 n.33.   Should this Court enjoin Sheriff Tucker from patrolling certain "Apartment Complexes" or from checking for drunk drivers on the roads between the Reservoir and Jackson, what should happen instead?   The so-called "independent civilian complaint review board" will have authority to "impose binding disciplinary decisions" on deputies who patrol the wrong neighborhoods or set checkpoints in the wrong place.   Those class members who wish their neighborhoods to be protected have no representation from these plaintiffs.

Law enforcement decisions should be made by trained law enforcement officers, with ultimate input and control from the people they protect.   If citizens of Madison County think Sheriff Tucker pays too much attention to Canton Estates, they can vote for a candidate who promises to protect Annandale instead.   If they are offended by checkpoints to detect drunk drivers, they can vote for a candidate who promises to devote his resources to stock fraud instead.   What they cannot do is to secure a judgment from this Court that the Constitution mandates a particular allocation of resources and a particular pattern of conduct.   Those are political questions, not judicial ones.   Our courts grant relief to those who suffer constitutional injury, but "it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."   *Perry*, 675 F.3d at 841 n.3 (quoting *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996)).

Plaintiffs' irresolvable conflicts with the class they seek to certify render them inadequate representatives.

## IV.    PLAINTIFFS FAIL TO SATISFY RULE 23(b)(2).

The following three "components" are required pursuant to Rule 23(b)(2):

1.      "[C]lass members must have been harmed in essentially the same way." *Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 524 (5th Cir. 2007).

2.      "[I]njunctive relief must predominate over monetary damage claims." *Id.*

3.      "[T]he injunctive relief must be specific."  *Dockery*, 253 F. Supp. 3d at 851 (quoting *M.D.*, 294 F.RD. at 30 (citing *Maldonado,* 493 F.3d at 524)).

Regarding the second point, plaintiffs have disavowed any claim for monetary damages on behalf of the class.

The Fifth Circuit has long required proof under Rule 23(b)(2) "of a uniform policy allegedly applied against the plaintiffs, not simply diverse acts in various circumstances."  *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000).[50]  *Maldonado* has refined the first prong of the test to focus on uniformity of harm, as well as policy.   For instance, in a prison case under the Eighth Amendment, "[a]ll inmates . . . are subject to the *same* policy on climate control . . , and all are (allegedly) harmed in essentially the *same* way."  *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017) (emphasis in original).   That is far from the case here.

As explained in Part I above, very little is uniform about the operation of the Fourth Amendment.   Earlier this year, the Supreme Court made clear that probable cause "is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules."  *Wesby*, 138 S. Ct. at 586 (internal quotation omitted).   Moreover, the Fourth Amendment, like Title VII, "can be violated in many ways."  *Wal-Mart*, 564 U.S. at 350.   Finally, as *Whren* teaches, improper purpose will not violate the Fourth Amendment where probable cause exists.   517 U.S. at 812-13.   Thus, a driver stopped at a roadblock conducted for the primary purpose of crime control, contrary to *Edmond*, has no claim if he was driving with a broken headlight.   Here, plaintiffs and class

---

[50] Part III.B.1 above demonstrates that there is no significant proof of any policy.

members relying on the Fourth Amendment may not have been injured at all, much less in the same way.

A policy of intentional racial discrimination, if proven, might be uniformly applied, but not inflict uniform injury, or any injury.   The law in this regard has not changed since the Fifth Circuit addressed the obviously unconstitutional segregation of the Jackson City Jail in *Palmer v. Thompson,* 391 F.2d 324, 326-29 (5th Cir. 1967), *aff'd on other grounds*, 403 U.S. 217 (1971). Persons who could not show that they had been or would be confined could not represent or join the class.   "All members of the particular race are not automatically members of the deprived class simply because they are of the same race as the members of the class."   391 F.2d at 328.   Here, too, not all Black residents of Madison County have been injured by any policy, even if its existence could be proven.

As to the third prong of Rule 23(b)(2) – "injunctive relief must be specific" – plaintiffs argue only that they "seek to require Defendants to reform their policies to conform to the requirements of the Constitution."   [Dkt. # 232 at 43].   While it is true that "Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage," *Yates*, 868 F.3d at 368, "Plaintiffs must make an 'effort to give content to what it would mean [to require Defendants to reform their policies to conform to the requirements of the Constitution]' so that 'final injunctive relief may be crafted to describe in reasonable detail the acts required.'" *Perry*, 675 F.3d at 848 (quoting *Shook v. Bd. of County Comm'rs,* 543 F.3d 597, 605-06 (10th Cir. 2008).   Plaintiffs fail to provide any "reasonable detail" of acts that are capable of being enjoined.

Any injunction simply requiring defendants to comply with the Constitution or to modify its written policies or customs and practices to comply with the Constitution would violate the specificity requirement of Fed. R. Civ. P. 65 and would be an "unenforceable 'obey the law'

62

injunction." *Walker v. City of Calhoun*, 682 F. App'x 721, 724 (11th Cir. 2017) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 69 (1967)) (finding that court order directing city to "implement post-arrest procedures that comply with the Constitution" violates Rule 65, as any order "to 'comply with the Constitution' is the archetypical and unenforceable 'obey the law' injunction."). *See also Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784-85 (5th Cir. 2017) ("'[I]njunctions are problematic when they order a defendant to obey the law but do not simultaneously indicate what law the defendant needs to obey.' . . . They are not problematic when they order a defendant to obey a specific law." (quoting *Rodriguez*, 695 F.3d at 369)).

Not only does the requested injunction fail to tell Sheriff Tucker what to do, it fails to tell the "independent civilian complaint review board" what to do. It authorizes that board to make binding decisions without the slightest guidance on how to make them. Every such unrestrained decision would be subject to enforcement by contempt proceedings in this Court. Rule 65 cannot authorize such an unconstrained delegation of this Court's authority.

## CONCLUSION

Premised on the foregoing, plaintiffs' claims do not meet the requirements of Rule 23, and defendants respectfully request that this Court deny their motion for class certification.

Respectfully submitted this 8th day of May, 2018.

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY:   *s/Michael B. Wallace*
Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)

63

Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi   39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi   39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi   39232
P.O. Box 750
Jackson, Mississippi   39205-0750
Telephone: 601-969-1010
Facsimile:   601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi   39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi   39211

64

Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

## CERTIFICATE OF SERVICE

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Joshua Tom, Esq.
Paloma Wu, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
JTom@aclu-ms.org
PWu@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Kavitha Satya Sivashanker, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Jumin Lee, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY    10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
kavitha.sivashanker@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com
christopher.shields@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org

65

jrobinson@aclu.org

So, certified this the 8th day of May, 2018.

<u>s/ Michael B. Wallace</u>
MICHAEL B. WALLACE

66