## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN, ET AL.                                             PLAINTIFFS

v.                                                    Civ. No. 3:17-cv-347 WHB LRA

MADISON COUNTY, MISSISSIPPI, ET AL.                             DEFENDANTS

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE DECLARATION AND TESTIMONY OF RAHUL GUHA

Pursuant to Federal Rules of Evidence 104, 401, 402, 403, and 1006, Defendants Madison County and Sherriff Randall C. Tucker, in his official capacity, file this Memorandum in Support of their Motion in Limine to Exclude the Declaration and Testimony of Rahul Guha ("Dr. Guha"). Dr. Guha's calculations and statistics are misleading and objectively inaccurate. His report and testimony would do nothing to assist this Court in determining whether the Madison County Sheriff's Department ("MCSD") intentionally discriminates against Black citizens or otherwise treats Black citizens differently than similarly situated Whites.

Courts have roundly rejected Dr. Guha's methods, including especially his use of census benchmarking and raw statistics to infer disparate treatment. Likewise, social scientists who actually research law enforcement and racial profiling issues have repeatedly debunked his methods, as explained in the report of rebuttal expert Dr. Dwight Steward. (Ex. 3, Dr. Steward's Rebuttal Report on Dr. Guha, May 8, 2018, ¶¶ 9, 14, and 19). Though his declaration looks remarkably like a report, Plaintiffs elected to offer Dr. Guha's statistics under Fed. R. Evid. 1006, rather than using Dr. Guha as a sponsoring expert. Whatever the reason for this unconventional proffer, courts have ruled that the presentation of calculations or raw statistics such as these, without testimony from a sponsoring expert, only causes their admission to be more suspect.

I.    BACKGROUND

Plaintiffs commenced this class action litigation on May 8, 2017.  (Dkt. 1).  Plaintiffs assert civil rights violations under 42 U.S.C. §§ 1983 and 2000d, alleging generally that the Madison County Sheriff's Department ("MCSD") engages in unconstitutional policing practices that violate the Fourth and Fourteenth Amendment rights of Black citizens.  Relevant here, Plaintiffs claim that Madison County checkpoints are "designed and placed to target Black individuals for highly intrusive, pretextual, and suspicion[-]less searches and seizures in Madison County's majority-Black towns, residential neighborhoods, and business districts."  (Dkt. 1 ¶4). Dr. Guha provides arrest and citation data, which Plaintiffs seek to introduce in these proceedings.  The tabulations and accompanying exhibits purport to be a summary of evidence relevant evidence.  As set forth below, however, the tabulations in this declaration should be excluded.

A.    Dr. Guha's Declaration Under Fed. R. Evid. 1006.

Plaintiffs produced the unsworn "Summary Declaration of Rahul Guha, Ph.D. Submitted Pursuant to Federal Rules of Evidence 1006." (Ex. 1, Guha Declaration).  Dr. Guha is an economist with the Cornerstone Research Group, where he specializes in labor and antitrust issues.  (Ex 1, Guha Report ¶1; Ex 2, Guha Tr. 10:17-25; 11:1-10).  He has no prior education or training in analyzing law enforcement decisions, i.e., the issues raised in these proceedings.  (Ex 2, Guha Tr. 6:9-17; 8:3-7; 9:11-249:20-24).  He is not knowledgeable about law enforcement techniques. (Ex 2, 42:19-25; 43:1-15).  Plaintiffs have not designated him as an expert in support of their case. (Ex 2, 66:11-25).  In his report and his deposition, Dr. Guha disavowed providing any opinions; however, his calculations necessarily require him to interpret data.  The data that he attempts to summarize necessarily requires an understanding of the criminal justice system, which Dr. Guha admits he lacks. (Ex 3, Steward Report ¶16).

Dr. Guha's declaration is based on his interpretation of three sources of information from Madison County.   First, Dr. Guha prepared "Data Summary 1" calculating several different tabulations based on his interpretation of arrest information contained on the Madison County Jail Docket.   (Ex. 1, Guha Decl. ¶¶3, 8-16).   Second, Dr. Guha prepared "Data Summary 2" by calculating several different tabulations based on his interpretation of citation information from the Madison County Justice Court from January 1, 2012 until December 31, 2017. (Ex. 1, Guha Decl. ¶¶3, 17-26).   Third, Dr. Guha prepared "Data Summary 3" by calculating several different tabulations based on his interpretation of incident reports he purportedly identified.   (Ex 1, ¶¶3, 27-38). The incident report tabulations in Data Summary 3 included three incident-specific tabulations: 1) Arrests from Stops at Roadblocks; 2) Apartment Walkthroughs; and 3) Arrests from Traffic Stops.

As discussed more fully herein, Dr. Guha's tabulations are misleading and inaccurate.  For example, Data Summary 1 provides tabulations for arrests by MCSD based on the jail docket. Using this tabulation, Dr. Guha conducts census benchmarking based on *total* population.  (Ex 3, Steward Report ¶¶12 and 23).  This is not insightful, because the population at the Madison County Jail is only comprised of persons at least 18 years of age; the census total population, on the other hand, includes persons 0-17 of age. (*Id.*)[1]   Dr. Guha is comparing one population data set—detainees—that by definition is comprised of adults to another population set that includes the County's infants and children.[2]   Thus, Dr. Guha does not even use the correct population

---

[1]      Generally, the MCSD jail does not hold juvenile detainees.   There are some minor one-off exceptions.   MCSD jail will hold juvenile detainees that are (or will be) charged as adults. (Ex 3, Steward Rep. ¶¶12, 23).

[2]      His use of census benchmarking for driving citations is similarly dubious.  Dr. Guha uses the entire population as a benchmark to show disparity in driving citations.  He does this even though the at-risk population for driving citations excludes anyone 15 and under. See MCA 63-1-9(2)(a) (must be 15 years old to obtain a driver's license). (Ex 3, Steward Rep. ¶¶ 12 and 46).

comparisons while using his incorrect methods.  (Ex 3, Steward Report ¶¶ 19, 20, 26).  This is just one example of how Dr. Guha's tabulations are not well founded.

Following Dr Guha's declaration there are several exhibits and appendices containing charts of his tabulations based on his interpretation of the data.  Because those exhibits are based on his inaccurate and misleading statistics, the Court should exclude them:

1.  Exhibit 1- Summary of Total Arrests, Madison County Sheriff's Department, 2012-2017. This exhibit is based on Dr. Guha's interpretation of arrest data he tabulated in Data Summary 1, which is compiled in Appendix B accompanying his report.

2.  Exhibit 2- Black Percentage of Arrests by Offense Code, Madison County Sheriff's Department, 2012-2017.  This exhibit is based on Dr. Guha's interpretation of arrest data he tabulated in Data Summary 1, which is compiled in Appendix B accompanying his report.

3.  Exhibit 3- Summary of Total Citations, Madison County Sheriff's Department, 2012-2017. This exhibit is based on Dr. Guha's interpretation of citation data he tabulated in Data Summary 2, which is compiled in Appendix C accompanying his report.

4.  Exhibit 4- Black Percentage of Citations by Violation Category, Madison County Sheriff's Department, 2012-2017. This exhibit is based on Dr. Guha's interpretation of citation data he tabulated in Data Summary 2, which is compiled in Appendix C accompanying his report.

5.  Exhibit 5-  Individuals Cited for a Seatbelt Violation Only, Madison County Sheriff's Department, 2012-2017. This exhibit is based on Dr. Guha's interpretation of citation data he tabulated in Data Summary 2, which is compiled in Appendix C accompanying his report.

6.  Exhibit 6- Arrests from Incident Reports Related to Stops at Roadblocks, Madison County Sherriff's Department, 2012-2017.  This is based on Dr. Guha's electronic search and review of incident reports tabulated in Data Summary 3.  The specific incident were reports filtered by Dr. Guha, his staff, and Plaintiffs' counsel.  The specific incident reports are not identified.

7.  Exhibit 7- Arrests from Incident Reports Related to Apartment Walkthroughs, Madison County Sherriff's Department, 2012-2017.  This is based on Dr. Guha's electronic search and review of incident reports tabulated in Data Summary 3.  The specific incident reports were filtered by Dr. Guha, his staff, and Plaintiffs' counsel.  The specific incident reports are not identified.

8. <u>Exhibit 8</u>-  Arrests from Incident Reports Related to Traffic Stops, Madison County Sherriff's Department, 2012-2017.  This is based on Dr. Guha's electronic search and review of incident reports tabulated in Data Summary 3.  The specific incident reports were filtered by Dr. Guha, his staff, and Plaintiffs' counsel.  The specific incident reports are not identified.

9. <u>Exhibit 9</u>- Arrests from Incident Reports Related to Traffic Stops Initiated for a Seatbelt Violation Only, Madison County Sherriff's Department, 2012-2017.  This is based on Dr. Guha's electronic search and review of incident reports tabulated in Data Summary 3.  The specific incident reports were filtered by Dr. Guha, his staff, and Plaintiffs' counsel.  The specific incident reports are not identified.

10. <u>Appendix B</u>- Summary of Arrests by Offense Code, Madison County Sherriff's Department, 2012-2017.

11. <u>Appendix C</u>- Summary of Citations by Violation Category, Madison County Sherriff's Department, 2012-2017.

Most significantly, Dr. Guha admits he cannot say his data shows any policies of the MCSD.  (Ex 2, Guha Tr. 131:11-12).

## II.    ARGUMENT.

### A. Standards For Admissibility

Federal Rule of Evidence 1006 provides for the admission of summaries.  Specifically, it provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. "A necessary precondition to the admission of summary charts is that they accurately reflect the underlying records or testimony, particularly when they are based, in part, on [a party's] factual assumptions.  *U.S. v. Taylor*, 210 F.3d 311, 315–16 (5th Cir. 2000).  Subject to the court's discretion, summary charts are admissible when:

> (1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is

available for cross-examination, and (4) the jury is properly instructed concerning
use of the charts.

*United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) (citations omitted).

A summary may include only evidence favoring one party, so long as the witness does not
represent to the jury that he is summarizing all the evidence in the case. *Bishop*, 264 F.3d 535,
547 (5th Cir. 2001). The Fifth Circuit has "made it quite clear that proper use of FRE 1006 requires
that there be supporting evidence that has been presented previously to the jury to establish any
assumptions reflected in the summary." *United States v. Hart*, 295 F.3d 451, 458 (5th Cir. 2002)
(internal quotations and citations omitted). The Fifth Circuit has held that a party "cannot use a
summary chart under FRE 1006 to assume that which it was required to prove [.]" *Id.* at 459 (5th
Cir. 2002)(citations omitted). The *Baines* court warned that a "jury may be unduly impressed by
the apparent authenticity of a [party's] witness' chart computations, as such, rather than by the
truth and accuracy of the underlying facts and figures supporting them." *Baines v. United States*,
426 F.2d 833, 840 (5th Cir. 1970).

Federal Rule of Evidence 104(a) provides that "[t]he court must decide any preliminary
question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so
deciding, the court is not bound by evidence rules, except those on privilege."

Federal Rule of Evidence 401 provides the test for relevance. "Evidence is relevant if: (a)
it has any tendency to make a fact more or less probable than it would be without the evidence;
and (b) the fact is of consequence in determining the action." "Irrelevant evidence is not
admissible." Fed. R. Evid. 402. If evidence is offered for admission depending on whether other
testimony exists, it can only be admitted conditioned on the existence of the other evidence. Fed.
R. Evid. 402.

Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

### B. The Use of Raw Statistical Evidence and Census Benchmarking to Prove Selective Enforcement Has Been Roundly Rejected.

#### 1. *Courts Have Unequivocally Rejected The Statistical Methods Used by Dr. Guha.*

It is important to address the purpose for which Dr. Guha's declaration has been submitted before turning to its inaccurate and misleading findings.  Plaintiffs alleged MCSD engages in selective law enforcement. They contend that Dr. Guha's declaration shows "MCSD's Policing Program has led to stark racial disparities in the MCSD's arrest and citation rates."  (Dkt. 232 - 16).  While Plaintiffs may believe that Dr. Guha's statistics are significant proof under *Walmart v. Dukes,* 564 U.S. 33 (2011), justifying class certification, the applicable substantive law shows otherwise.   In fact, the caselaw dictates that Dr. Guha's statistics and testimony should be excluded under the Federal Rules of Evidence.

Without evidence of similarly situated groups, raw statistics are not proof of discriminatory intent.  *U.S. v. Bass*, 536 U.S. 862 (2002) (involving a claim of selective prosecution).  To support a finding of discrimination, the statistics must show that similarly situated individuals of another race were treated differently than the plaintiffs. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); and *Chavez v. Illinois State Police*, 251 F.3d 612, 638 (7th Cir. 2001) ("Of course, parties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.").

The Middle District of North Carolina recently explained the reason for this strict requirement, rejecting the Department of Justice's use of raw statistics in *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015).   In *Johnson*, DOJ attempted to show disparate post-stop outcomes for Hispanic and non-Hispanics in order to prove that the Alamance County Sherriff's Department targeted Hispanics.   *Id*.   The Court dismissed DOJ's use of these raw statistics to show disparate post-stop outcomes because the measurements failed to consider the most important factor in determining whether a group is similarly situated:   the basis for deputies' "decisions to arrest, cite, warn or take no action at all, which are the very actions the Government contends constitute discriminatory policing."   *Id.* at 361.   The court explained why the statistics did not support DOJ's conclusions:

> The Government must do more than it did here, citing superficial statistical disparities to show discriminatory effect. As the Seventh Circuit cautioned, "Of course, parties may not prove discrimination merely by providing the court with statistical analyses. The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez*, 251 F.3d at 638; *see also Cordi–Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir.2007) ("[The similarly situated] requirement demands more than lip service.... It is inadequate merely to point to [disparities] in a vacuum and leave it to the [defendant] to disprove conclusory allegations that [persons] are similarly situated."); *Olvis*, 97 F.3d at 744 ("The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination." (quoting United States v. Aguilar, 883 F.2d 662, 706 (9th Cir.1989))); *Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1110 (4th Cir.1985) ("[A] conclusion that individuals have received discriminatory disparate treatment may be supported only where the notion of comparability is informed by sound, articulated principles ...."). By only citing differences in post-stop outcomes without also showing that Hispanics were treated dissimilarly from those similarly situated to them, the Government thus fails to demonstrate discriminatory effect under the Fourteenth Amendment. *See Ah Sin*, 198 U.S. at 507–08, 25 S.Ct. 756 (rejecting plaintiff's claim that ordinance was enforced "solely and exclusively against persons of the Chinese race" because it did not allege "that the conditions and practices to which the ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese, as to whom it was not enforced"); *United States v. Bass*, 536 U.S. 862, 863–64, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002) ("[R]aw statistics regarding overall charges say nothing about charges brought against similarly situated

defendants." (emphasis added)); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 492 (7th Cir.2007) ("Statistical evidence is only helpful when the plaintiff faithfully compares one apple to another without being clouded by thoughts of Apple Pie ala Mode or Apple iPods."); *Olvis*, 97 F.3d at 745 ("Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants proves nothing." (emphasis added)); *Cooper v. S. Co.*, 260 F.Supp.2d 1305, 1317 (N.D.Ga.2003) ("While Plaintiff's expert reports an over-all statistical disparity between black and white employees in compensation, Plaintiff's evidence generally fails to compare similarly situated individuals, significantly diminishing the probative value of any disparity."), aff'd, 390 F.3d 695 (11th Cir.2004), overruled on other grounds, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006).

*Johnson*, 122 F. Supp. 3d 272, 363–64 (M.D.N.C. 2015).[3]  Where statistics are used on the basis of a presumption that violations are committed proportionately by all races, the Supreme Court has rejected this presumption as "at war" with unchallenged statistics.  *Armstrong*, 517 U.S. at 470 (holding that any presumption that all races commit all types of crimes at the same rate is fundamentally flawed).

Unlike other selective enforcement cases, where plaintiffs rely on experts to introduce raw statistics, Plaintiffs elected not to do that here.  Dr. Guha, who by his own admission has no formal training or experience analyzing law enforcement actions, is not designated as an expert by Plaintiffs.  (Ex 2, Guha Tr. 42:19-25; 64:24-25; and 66:11-25).  Rather, Plaintiffs offer Dr. Guha as witness for the sole purpose to evaluate and to interpret law enforcement data and to provide statistics on the same.  This unconventional approach further limits evidentiary value of Dr. Guha's summaries.  Unlike cases where designated expert sponsor and opines on why raw statistics support their claims of disparate treatment, Plaintiffs do not even pretend to explain why their raw statistics prove that Black citizens are treated differently than similarly situated groups in Madison County.  Dr. Guha does not attempt to explain how his statistics prove disparate treatment, and

---

[3]   As the court noted, DOJ's Civil Rights Division admitted during the *Johnson* trial that U.S. Census data is unreliable to use as a benchmark and leads to erroneous results. *Johnson*, 122 F. Supp. 3d at 359.

Plaintiffs have offered no other evidence for an expert to "tie in" Dr. Guha's declaration with justification for why it supports Plaintiffs' claims. Therefore, it is irrelevant. *See* Fed. R. Evid. 104(b). No inference can be drawn from Dr. Guha's calculations as to the alleged disparate treatment.

Plaintiffs, through Dr. Guha's declaration, ask this Court to assume that "White" and "Black" are similarly situated groups that can be compared to prove racial disparities. These assumptions fail for a myriad of reasons. Like *Johnson* discussed above, Plaintiffs proposed evidence erroneously focuses on outcomes without any concern for the officer's basis for each decision (i.e., his or her discretion). Like *Armstrong*, Plaintiffs assume that the racial distribution arrestees mirrors the racial distribution of all census residents in Madison County. Neither Dr. Guha nor Plaintiffs offer a statistical basis to demonstrate that White citizens and Black citizens commit the same crimes at the same rate. In fact, as Dr. Steward explains, there are well-documented disparities in arrests and citation rates that have nothing to do with racial profiling. (Ex 3, Steward Report ¶¶21-23). Further, Dr. Guha's raw statistics ask the Court to assume that the racial composition of the population being policed by MCSD or at risk of being arrested is the same as Madison County's overall residential population. (Ex 3, Steward Report ¶¶ 20 and 25). It is not true: minors are not housed at the MCSD jail, and persons under the age of 15 do not drive. Miss. Code Ann. § 63-1-92(2)(a). Thus, Dr. Guha's statistics have no probative value. Rather than providing significant proof of racial profiling, Dr. Guha's declaration illustrates the lack of proof Plaintiffs have to support their claims.

2. *Social Scientists Have Rejected Dr. Guha's Methodology.*

Not only have courts rejected Dr. Guha's methodology, but social scientists researching law enforcement targeting and racial profiling have too. (Ex 3, Steward Report ¶¶09, 14, and 19).

Dr. Guha's methodology has been so widely rejected by courts and social scientist that it is impossible to believe that he and Plaintiffs are unaware of this fact.  This may explain Plaintiffs' decision not to designate Dr. Guha as an expert to sponsor his statistics.  As one of the authorities cited by Dr. Ricchetti explained:

> The primary reason for using US Census data to form the benchmark is that it is inexpensive, quick, and readily available. A number of studies attempting to assess racial bias in police behavior use population data from the census, some rely on estimates at local area levels like neighborhood census tracts (see Parker and Stults in this volume). However, for the reasons previously listed, benchmarking with census data does not help us isolate the effect of racial bias from differential exposure and differential offending. Even refinements to the residential census, such as focusing on subpopulations likeliest to be involved in crime (e.g., men or driving age young adults) are not likely to eliminate differences in the exposure of officers to criminal suspects or provide a good approximation of the population at risk for official police action. Fridell summarized the problem with using the census as a benchmark with regard to offender exposure by noting that, "this method does not address the alternative hypothesis that racial/ethnic groups are not equivalent in the nature and extent of their . . . law-violating behavior" (p. 106, emphasis in original).

> Census estimates provide only the racial distribution of residents and not how these numbers vary by time of day, business attractors such as shopping centers, daily traffic patterns involving commuters, etc. It is quite conceivable that the residential population in many neighborhoods has little resemblance to the patterns of people on the street during the day or night. Even if refinements in the census to the neighborhood or age-prone population at risk for police involvement could give a racially unbiased estimate of the population at risk for police contact, the differences between the residential population and the population at different times of the day and street segments are likely to overwhelm such an estimate.

(Ex. 5, Ridgeway, Greg, and John MacDonald, "*Methods for Assessing Racially Biased Policing*," Race, Ethnicity, and Policing: New and Essential Readings, Infrastructure, Safety, and Environment, NYU Press, 2010, p. 5).

As fully explained by Dr. Steward in his rebuttal report, the use of census benchmarking has been roundly rejected and, thus, it is not a generally accepted method for evaluating racial targeting (Exhibit 3, Steward Report ¶¶9, 14, 16, 19, 20 46, 51,).  The methodology used by Dr.

Guha is actually "generally acknowledged to be flawed." (Ex 3 ¶20).   Dr. Guha's method for tabulating arrest and citation data does not account for all the socio-economic factors that are highly relevant to analyzing police decisions.[4]   (*Id.* ¶¶ 22, 30, 31, and 34).   Ultimately, Dr. Guha makes no attempt to create a census benchmark that accounts for socio-economic factors or any other generally acknowledged non-racial factors. (Ex 3, Steward Report ¶24).   The abundant literature in this area of research is clear:  citation and arrest statistics must be compared to the population at risk for arrest or citation, not the general population, in order to have any probative value.  (Ex 3, Steward Report ¶¶ 20, 25, 26, and 51).   Because his method does not represent the at-risk population (*Id.* ¶25), Dr. Guha's analysis is ultimately not probative or helpful to the court. (*Id.* ¶¶46-51)

**C.   Census Benchmarking With or Without A Sponsoring Witness Is Regularly Excluded Under the Federal Rules of Evidence.**

Plaintiffs made the strategic decision to disclose Dr. Guha, a professional statistician, as a non-designated expert to testify regarding his tabulations of law enforcement statistics.  *See* Fed. R. Evid. 1006.  Dr. Guha, who was not disclosed as a potential witness until after discovery closed and then only at the expert designation deadline, intends to testify about his analysis using debunked methods.   Defendants can only speculate as to the reasoning behind this strategy. Regardless, Dr. Guha, under the guise of Fed. R. Evid. 1006, seeks to introduce law enforcement statistics that would otherwise be excluded under applicable substantive law and this Court's *Daubert* gate-keeping responsibilities.   Courts have rejected this approach in other civil rights cases.

---

[4]      Dr. Steward's significant experience evaluating law enforcement and racial profiling data is detailed in paragraphs 1 through 7 of his rebuttal report.  (Ex. 3, Steward's Rep. ¶¶1-7).  He has been retained in several policing matters and cases on behalf of both policing agencies and advocacy groups, including the ACLU.  (*Id.*).

For example, the Western District of Virginia expressed concerns regarding plaintiffs' effort to introduce statistical evidence without a sponsoring expert. *Johnson v. Holmes*, No. 3:16-CV-00016, 2018 WL 1404410 (W.D. Va. Mar. 19, 2018). In *Holmes*, a selective enforcement case, plaintiffs sought to introduce statistical evidence regarding defendant officer's citation and arrest rates of Black citizens. *Id.* The Court ultimately excluded the evidence under Rules 401 and 403, citing in part the plaintiffs' decision to offer the evidence without a sponsoring expert. The district court explained:

> In sum, Plaintiffs' statistical evidence has little if any relevance to the discriminatory effect element because it lacks any information about Holmes' actions against similarly situated individuals of a different race. Even if the statistics had some relevance, the absence of an expert to provide a meaningful explanation of them, their apples-to-oranges comparison of citations/arrests to search warrant, and their failure to account for possible disparities in officer assignments create an extremely high risk that the jury would be confused or mislead by them, or that Holmes would suffer unfair prejudice from their admission. The balance thus tips to their exclusion.

*Johnson v. Holmes*, No. 3:16-CV-00016, 2018 WL 1404410, at *7.

The court in *Holmes* relied, in part, on *Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989). In *Williams*, the Fourth Circuit affirmed the trial court's decision under Rule 403 to exclude statistical evidence plaintiffs sought to introduce without a sponsoring expert witness. *Id.* at 455. Like the instant Plaintiffs, the plaintiffs in *Williams* sought to introduce statistical evidence of different employment-based population data without a sponsoring expert. *Id.* at 455, n1. The Fourth Circuit affirmed the exclusion under Fed. R. Evid. 403, holding that "[w]ithout expert testimony, the limited probative value of the evidence was plainly outweighed by the possibility it might mislead or confuse the jury." *Id.* (citations omitted).

### D. Dr. Guha's Statistics Are Objectively Inaccurate and Misleading.

Even if census benchmarking were an accepted method of showing selective enforcement, which it is not, Dr. Guha's statistics are inaccurate and misleading because he lacks experience in the issues raised by Plaintiffs' claims, and failed to conduct any due diligence.  Dr. Guha fundamentally lacks an understanding of the data he reviewed and the statistics he calculated.  He has no experience analyzing law enforcement data. (Ex 2, Guha Tr. 42:19-25; 43:1-5; Ex. 4, Dunston Report p. 17).  He affirmatively chose not to familiarize himself with the underlying data or context.  (Ex. 2, Guha Tr. 56:19).  He simply took the data, as is, and performed the calculations requested by Plaintiffs' counsel. (Ex 2, Guha Tr. 73:23; 89:7-9). The combination of his lack of experience and lack of due diligence resulted in a declaration that is hopelessly inaccurate and misleading.   His statistics are clearly designed to create the impression that Blacks are disproportionately arrested and cited by MCSD. (Ex 3, Steward Report  ¶¶18 and 52).

To compile law enforcement statistics, the witness must understand what is going on with the data. (Ex 3, Steward Report ¶16; Ex 4, Dunston Report p. 17).  A thorough understanding of the data is required before tabulations can be constructed, let alone interpreted.  (Ex. 3, Steward Report ¶ 25; Ex. 4, Dunston Report p.17).  As Dr. Steward explained, law enforcement records are not standardized. (Ex. 3, Steward Report ¶ 25).  Each jurisdiction compiles and maintains records based on the unique state and county laws and processes.  (Ex. 3, Steward Report ¶¶ 25-26).  Madison County is no different.  The U.S. Department of Justice has entire division of lawyers and statisticians that specialize in identifying and prosecuting this type of discrimination.[5]  There are entire social science disciplines devoted to trying to develop models for identifying law enforcement abuses.  Yet, Plaintiffs contend, apparently, that no expertise is needed to calculate law enforcement statistics that purport to prove discrimination.     Plaintiffs cannot reasonably

---

[5]     Civil Rights Division, United States Department of Justice.  *See* https://www.justice.gov/crt (last visited May 8, 2018).

argue that experience and expertise is not needed to calculate statistics while at the same presenting

Dr. Guha, an antitrust economist, as a non-expert for calculating law enforcement statistics.[6]

Putting aside the issue of his lack of expertise, there are other problems with Dr. Guha's tabulations. Dr. Guha took all the data he analyzed at face value (Ex. 3, Steward Report ¶¶ 11 and 25) and did not attempt to evaluate the underlying data. (*Id.*, ¶¶ 9 and 25; Ex. 4, Dunston Report p. 17). He did not look at the underlying administrative and judicial process to understand how data is compiled as individuals move through the justice system. (Ex. 3, Steward Report ¶ 11; Ex 2, 108:18 – 115:13). He did not look into the underlying factors that might influence the data. (*Id.*, ¶25). He was indifferent to how MCSD and Madison County courts compile and maintain records. This renders his calculations inaccurate and unreliable.

1. *Select Examples of How Dr. Guha's Statistics Are Misleading and Inaccurate*.

There are numerous examples of how Dr. Guha's statistics and census benchmarking provide misleading and inaccurate calculations. First, Dr. Guha double-counted arrests throughout his tabulations. (Ex 3, Steward Report ¶¶44-45; Ex 4, Dunston Report p. 18). He did not recognize that one individual may be booked into the jail several times for the same arrest. (Ex 2, 110:21 – 115:13). For example, an individual arrested for assault will be booked into the jail following his initial arrest, and then he will usually bond out. (Ex 4, Dunston Report p. 18). If the grand jury subsequently indicts him, the circuit court will issue a warrant and he or she will be arrested again for the same crime. (*Id.*). Certainly, the MCSD is not responsible for the second arrest when in fact it was the grand jury's decision to have that individual arrested again. This can happen several times as an individual moves through the justice system while charges against him or her are processed from initial arrest to verdict. (*Id.*). Even the number of arrests and bonds may vary, too,

---

[6]     Plaintiffs in essence contend they do not need an expert to calculate these statistics. Yet, they still obtained the services of a professional statistician to present statistics any layman, they claim, can prepare.

depending on one's access to counsel. Dr. Guha's calculations, however, attribute 100% of these arrests to MCSD. (Ex 3, Steward Report ¶¶ 44-45; Ex 4, Dunston Report pp. 18-19). His failure to investigate the basics of how the local criminal justice system operates is a stunning failure and emphasizes the limits of his expertise in law enforcement.[7]

Next, Dr. Guha's statistics wholly ignore the difference between discretionary and non-discretionary arrests. (Ex. 4, Dunston Report p. 16-17). For example, his Data Summary 1, which is presented in Appendix B to his report, tabulates arrests to infer that MCSD officers intentionally target Black citizens while they carry out their duties. However, because the different codes fail to identify discretionary and non-discretionary arrests, his tabulations have no probative value regarding whether MCSD targets Black citizens. (Ex. 4, Dunston Report p.16). Remarkably, Dr. Guha does not even think that identifying discretionary and non-discretionary acts is something he should have considered while preparing his report. (*Id.*; Ex 2, Guha Tr. 100:8-9; 158:6; 162:3; Ex 3, Steward Rep ¶25). This shows his fundamental lack of understanding of the work of the MCSD.

A common example of non-discretionary arrests are warrant-based arrests. (Ex. 3, Dr. Steward Report, ¶¶27-31; Ex. 4, Duntson Report pp. 16-19). If a MCSD officer encounters an individual with an outstanding warrant, he or she is obligated to arrest that individual. (Ex 4, p. 18). A mandatory arrest for a warrant is, therefore, clearly not discretionary and certainly does not actually reflect the officer's discretion. (Ex. 3, Steward Report ¶¶27-30; Ex 4, Dunston Report pp. 16-19). It is generally accepted that arrests where the officer has little or no discretion in making the arrests, provides no insight determining racial targeting. (Ex 3, Steward Report ¶39; Ex. 4, Dunston Report pp. 16-17). In this regard, Dr. Guha, treats all arrests as fungible.[8] (*Id.,* ¶39).

---

[7]      Dr. Guha similarly double counts citations. (Ex 3, ¶44).

[8]      For example, Dr. Guha's tabulations assume that an arrest for seatbelt violation is the same as an arrest on a warrant for failure to pay a seatbelt violation fine. The former is discretionary; the latter is not. (Ex. 4, Duntson Rep. pp. 16-19).

Whether he knowingly ignored this obvious consideration or did not realize the error, his arrest tabulations provide no insight into the allegations at issue here.  (Ex 3, Steward Report ¶39).

Notwithstanding that his tabulations fail to account for non-discretionary arrests, the arrest categories Dr. Guha compiled are completely inappropriate and uninformative.  (Ex 3, Steward Report ¶¶ 20 and 22).  It is widely known that criminality and demographics of individuals at risk of being arrested differs from the census demographics of all individuals who live in a certain area. (¶¶20, 25, 26, 51).  For example, Black citizens are significantly more likely than Whites to be on probation, parole, or to have been incarcerated.  (*Id.,* ¶22).  Similarly, Black citizens are more likely than White citizens to have been either a victim or perpetrator in a crime.  (*Id.,* ¶22). Whatever the cause for these statistics, they mean the pool of individuals at risk for being arrested for parole and probation violations in Madison County should skew towards Black citizens relative to census population.  (*Id.,* ¶¶22-23).  Dr. Guha refused to recognize this at his deposition.  (Ex 2, Guha Tr. 135:1-13).  These statistical realities, whatever their root cause, influence the pool of individuals at risk of being arrested by MCSD.  (Ex 3, Steward Report ¶¶20-23, 26, and 51).

Dr. Guha's census benchmarking does not even account for the basic fact that the MCSD's jail docket that he analyzed excludes information on juvenile arrestees.  (*Id.*, ¶23).  Global Census comparisons do not make it "more or less probable" that MCSD targets Black citizens since such comparisons do not even consider the relevant population at risk of law enforcement actions.  Fed. R. Evid. 401.  Further, rote census benchmarking shows how the risk that his testimony will unfairly prejudice Defendants and confuse the issues substantially outweighs its probative value. Fed. R. Evid. 403.

Calls for service also influence the population at risk of being arrested and cited.  The data reviewed by Dr. Guha shows a pattern of disproportionately higher number of calls for service in

areas of the County with a high population of Black citizens.  (Ex 3, Steward Report ¶ 42).  For example, census tract 309 is an area that has a high proportion of Black citizens and for which the MCSD receives a disproportionate number of calls.  (Ex 3, ¶ 41).  It is axiomatic that an area that has a disproportionately higher number of calls for service to police may lead to a higher level of arrests and citations that result from those calls. (*Id.,* ¶ 42).  This is clearly a factor that may skew the racial distribution of arrests and another example of a non-racial factor that Dr. Guha wholly ignored in compiling his statistics.

Finally, the usefulness of Dr. Guha's statistics is further undermined by the sheer inaccuracy of the arrest tabulations and summaries.  (Ex 3, Steward Report ¶ 35-37).   His fundamental lack of knowledge, in some situations, attributed someone's arrest to an incorrect citation.  (*Id.*, ¶35; Ex. 4, Dunston Report p.17).  For example, Appendix C shows that 88 Black citizens were cited for "Improper Turn/Turning without a Turn Signal."  (Ex. 3, Steward Report ¶ 35).  His tabulation in Appendix B showed that MCSD must have arrested all 88 individuals.  (*Id.,* ¶ 35).  A closer examination of the underlying data shows that *none* of the individuals arrested were actually arrested for improper lane usage.  (*Id.,* ¶36-37).  The actual reasons for arrests varied, with some involving possession of a stolen firearm and other possession of a controlled substance. (*Id.,* ¶37).  Regardless, the arrests were non-discretionary, contrary to what Dr. Guha's chart suggests.  This is but one example of how his testimony will unfairly prejudice Defendants and confuse the issues.

Defendants found similar problems with Dr. Guha's findings interpretation of the incident reports purportedly summarized in his Exhibit 9. (Ex. 1, Guha Report Ex. 9 p.22; Ex. 4, Dunston Report p.17).  Dr. Guha claims that Exhibit 9 summarizes traffics stops for seatbelt violations, that resulted in the arrests of 92 Black citizens.  (*Id.*; Ex. 2, Guha Tr. 146:17-25).  Following Dr. Guha's

deposition, Defendants' law enforcement and policing expert reviewed the arrests identified by Plaintiffs as being part of Dr. Guha's summary in Exhibit 9. (Ex.  6, Letter from Kavitha Sivashanker to T. Russell Nobile, May 2, 2018; Ex 4, Dunston Report p 18).  Based on his review, Mr. Dunston explained:

> "As is often the case in law enforcement incidents, the reason for the arrest has little or nothing to do with the initial reason for the encounter. In the Exhibit 9 incident reports, I read numerous drug related arrests, drivers arrested for not possessing a driver's license, outstanding warrants and people wanted by the Mississippi Department of Corrections (MDOC)."

(Ex 4, Dunston Report p. 17). Thus, the MCSD did not arrest 92 Black citizens for seatbelt citations, as the exhibit suggests.

Finally, Dr. Guha conducted several searches of electronic versions of incident reports using terms provided by Plaintiffs' counsel. (Ex. 1, Guha Report ¶¶ 28-30; Ex. 2, Guha Tr. 165:16-70:15).  Dr. Guha did this in preparation for his summaries.  Dr. Guha admitted that he did not do any analysis of whether these were appropriate search terms for the categories being searched. (*Id.*; Ex. 3, Steward Report ¶37). Nor did not verify the proposed search terms. (*Id.*)  He was unable to provide any information at his deposition or subsequent inquiries about the error inherent to his method of searching. (Ex 2, Guha Tr. 165:16-70:15).  Ultimately, he has not been able to verify the universe of reports that the computer was unable to search (Ex.  6, Letter from Kavitha Sivashanker to T. Russell Nobile, May 2, 2018.).

### E. Dr. Guha's Declaration Provides Overt Expert Analysis Despite Plaintiffs' Failure to Designate Him As an Expert.

Despite his claim to the contrary, Dr. Guha clearly provides analysis in his declaration.  (Ex 1, ¶¶ 9 and 17).  His summaries are designed to give the impression that Black citizens are disproportionately arrested.  (Ex 3, Steward Report ¶¶ 9, 18, and 52).  Plaintiffs' unorthodox decision not to have Dr. Guha as a sponsoring expert does not change the fact that his declaration

is rife with analysis.  (Ex. 3, Steward Report ¶¶ 9, 12, and 17). For example, the "Per Capital

Ration of Black to Non-Black" column in Appendices B and C requires explanation and is not,

contrary to Dr. Guha's claims, something that a lay person can understand.   (Ex 1, Guha Report

pp. 24-36; Ex. 2, Guha Tr. 148:2-57:20).  As discussed above, even with the benefit of a sponsoring

expert, courts repeatedly rejected the type of raw statistics the Dr. Guha tabulated.  *See Johnson*,

122 F. Supp. 3d 272; *Chavez*, 251 F.3d 612; and *Armstrong*, 517 U.S. 456.

## CONCLUSION

Defendants respectfully request an order from this Court to exclude the declaration and

disallow all testimony from Dr. Guha.  His statistics are inaccurate, misleading, and based on

flawed methodology that has been roundly rejected by courts.

Respectfully submitted this 8th  day of May, 2018.

> **MADISON COUNTY, MISSISSIPPI and
> SHERIFF RANDALL C. TUCKER, IN
> HIS OFFICIAL CAPACITY**
>
> BY:     *s/ Russ Nobile*
> T. Russell Nobile (MSB #100682)
> WISE CARTER CHILD & CARAWAY, P.A.
> 2510 14th Street, Suite 1125
> Gulfport, Mississippi  39501
> Telephone: 228-867-7141
> Facsimile: 228-867-7142
> trn@wisecarter.com
>
> **and**
>
> Michael B. Wallace (MSB #6904)
> Charles E. Ross (MSB #5683)
> James E. Graves (MSB #102252)
> Charles E. Cowan (MSB #104478)
> WISE CARTER CHILD & CARAWAY, P.A.
> Post Office Box 651
> Jackson, Mississippi  39205-0651
> Telephone: 601-968-5534

Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi  39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi  39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, Russ Nobile, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Joshua Tom, Esq.
Paloma Wu, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
JTom@aclu-ms.org
PWu@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Kavitha Satya Sivashanker, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Jumin Lee, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY  10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
kavitha.sivashanker@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com
christopher.shields@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 8th day of May, 2018.

*s/ T. Russell Nobile*

22