## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

AMERICAN CIVIL LIBERTIES UNION OF
  MISSISSIPPI FOUNDATION
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408

AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2610 ˙

*Attorneys for Plaintiffs*

EXHIBIT A

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

A.   The MCSD's Culture Of Racial Discrimination................................... 4

    1.   The MCSD's Policing Program Under Sheriff Toby Trowbridge.............. 4

    2.   The MCSD's Culture Of Discrimination Persists To The Present Day .................................................................................... 5

B.   Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD ................................................. 8

C.   The MCSD's Policing Program ........................................................... 10

    1.   The MCSD Disproportionately Arrests And Cites Black Persons ........... 10

    2.   The MCSD Disproportionately Targets Black Communities................... 11

    3.   Roadblocks Are A Key Element Of The MCSD's Policing Program.................................................................................. 14

        (a)   The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods..................................... 14

        (b)   The Primary Purpose Of The Roadblock Program Is Crime Control ............................................................ 16

        (c)   MCSD Roadblocks Lack Uniform Procedures Or Safeguards ....................................................................... 18

    4.   Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program ........................................................ 20

D.   The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program ............................................................ 23

    1.   MCSD Personnel Are Inadequately Trained And Supervised................. 24

    2.   The MCSD Does Not Maintain Complete Or Accurate Records............. 26

    3.   The MCSD Lacks Meaningful Complaint Procedures ............................ 27

ARGUMENT ........................................................................................................ 29

Case 3:17-cv-00347-WHB-LRA   Document 227   Filed 03/14/18   Page 3 of 50

I.      PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT ............. 29

II.     PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT......... 30

        A.     The Targeting Class Satisfies The Commonality Requirement............................ 32

        B.     The Roadblock Subclass Satisfies The Commonality Requirement..................... 34

        C.     The Pedestrian Stop Subclass Satisfies The Commonality Requirement............. 35

III.    PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE
        23(a)(3) ........................................................................................................................ 37

IV.     PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE
        INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4)............................. 40

V.      THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED ..................................... 42

CONCLUSION.............................................................................................................................. 43

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 613 (1997).................................................................................. 29

*Braggs v. Dunn,*
    317 F.R.D. 634 (M.D. Ala. 2016)............................................................. 31

*Brown v. Nucor Corp.,*
    785 F.3d 895 (4th Cir. 2015) ..................................................................... 34

*Choice Inc. of Texas v. Graham,*
    No. 04-cv-1581, 2005 WL 1400408 (E.D. La. June 3, 2005) ................................. 29

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000)........................................................................... 30, 35

*City of Jackson v. Calcote,*
    910 So. 2d 1103 (Miss. Ct. App. 2005) ......................................................... 7

*Cole v. City of Memphis,*
    839 F.3d 530 (6th Cir. 2016) ..................................................................... 42

*Collins v. Ainsworth,*
    382 F.3d 529 (5th Cir. 2004) ..................................................................... 35

*Delaware v. Prouse,*
    440 U.S. 648 (1979)........................................................................... 18, 35

*Dockery v. Fischer,*
    253 F. Supp. 3d 832 (S.D. Miss. 2015)............................................... 31, 37, 40

*Feder v. Electronic Data Systems Corp.,*
    429 F.3d 125 (5th Cir. 2005) ..................................................................... 37

*Floyd v. City of New York,*
    283 F.R.D. 153 (S.D.N.Y. 2012) ................................................................. 33

*Gratz v. Bollinger,*
    539 U.S. 244 (2003)................................................................................ 1

*Groover v. Michelin North America, Inc.,*
    192 F.R.D. 305 (M.D. Ala. 2000)............................................................... 41

*Horton v. Goose Creek Independent School District,*
    690 F.2d 470 (5th Cir. 1982) ..................................................................... 41

*In re Deepwater Horizon,*
   739 F.3d 790 (5th Cir. 2014) ................................................................ 31, 32

*In re Heartland Payment Systems, Inc. Customer Data Security Breach Litigation,*
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................ 41

*James v. City of Dallas,*
   254 F.3d 551 (5th Cir. 2001) ................................................................ 37

*Jones v. Diamond,*
   519 F.2d 1090 (5th Cir. 1975) .............................................................. 29, 42

*Lanner v. Wimmer,*
   662 F.2d 1349 (10th Cir. 1981) ............................................................ 41

*Lehocky v. Tidel Technologies, Inc.,*
   220 F.R.D. 491 (S.D. Tex. 2004) ......................................................... 41

*Lightbourn v. County of El Paso, Texas,*
   118 F.3d 421 (5th Cir. 1997) ................................................................ 37

*Ligon v. City of New York,*
   288 F.R.D. 72 (S.D.N.Y. 2013) ........................................................... 36

*M.D. v. Perry,*
   294 F.R.D. 7 (S.D. Tex. 2013) ............................................................. 43

*Morrow v. Washington,*
   277 F.R.D. 172 (E.D. Tex. 2011) ........................................... 31, 33, 34, 35, 41

*Mullen v. Treasure Chest Casino,*
   186 F.3d 620 (5th Cir. 1999) ................................................................ 29, 30

*ODonnell v. Harris County, Texas,*
   No. H-16-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) ............. 42

*Ortega-Melendres v. Arpaio,*
   836 F. Supp. 2d 959 (D. Ariz. 2011) ................................................... 33

*Pederson v. Louisiana State University,*
   213 F.3d 858 (5th Cir. 2000) ................................................................ 30

*Shankle v. Texas City,*
   885 F. Supp. 996 (S.D. Tex. 1995) ...................................................... 35

*Steward v. Janek,*
   315 F.R.D. 472 (W.D. Tex. 2016) ....................................................... 40

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ................................................................. 40

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ................................................................. 31

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................... 30, 31, 33, 34, 37, 42

**Statutes**

42 U.S.C. § 1983 ............................................................................................... 1

42 U.S.C. § 2000d ............................................................................................. 1

Fed. R. Civ. P. 23 .............................................................................................. 1

Fed. R. Civ. P. 23 Adv. Comm. Notes,
    *reprinted in* 39 F.R.D. 69, 102 (1966) ................................................. 42

Fed. R. Civ. P. 23(a) ............................................ 2, 29, 32, 34, 40, 41, 43

Fed. R. Civ. P. 23(a)(1) ................................................................................. 29

Fed. R. Civ. P. 23(a)(2) ..................................................... 30, 31, 35, 37

Fed. R. Civ. P. 23(a)(3) ................................................................................. 37

Fed. R. Civ. P. 23(a)(4) ........................................................................... 41, 42

Fed. R. Civ. P. 23(b)(2) ................................. 2, 3, 29, 32, 34, 42, 43

Fed. R. Civ. P. 23(g) ...................................................................................... 43

L.U. Civ. R. 7(b)(6)(A) .................................................................................... 1

U.S. CONST. amend. IV ................................................ 1, 2, 16, 32, 34, 35

U.S. CONST. amend. XIV ................................................ 1, 2, 31, 32, 34

U.S. CONST. amend. XIV, § 1 ........................................... 1, 31, 32, 35

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas and Betty Jean Williams Tucker ("Plaintiffs" or "Named Plaintiffs") respectfully submit this memorandum in support of Plaintiffs' Motion for Class Certification (the "Motion") in this civil rights action brought against defendants Madison County, Mississippi ("Madison County") and Sheriff Randall Tucker, sued herein in his official capacity ("Sheriff Tucker," and with Madison County, "Defendants"). Pursuant to L.U. Civ. R. 7(b)(6)(A), Plaintiffs respectfully request oral argument on this Motion.

## PRELIMINARY STATEMENT

This is a motion for class certification under Federal Rule of Civil Procedure 23. In six months of discovery, Plaintiffs have developed substantial evidence of Defendants' longstanding policy of stopping and searching Madison County's Black citizens on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "Policing Program").[1] The Policing Program is executed by the Madison County Sheriff's Department ("MCSD") at the direction of Sheriff Tucker.

One of the key components of the Policing Program is the disproportionate placement of roadblocks in predominantly Black neighborhoods (the "Roadblock Program"). Such roadblocks are established to further a primary purpose of general crime control in these communities. The Roadblock Program thus runs afoul of both the Fourth and Fourteenth Amendments. Another essential component of the Policing Program is Defendants' policy of suspicionless stops and searches in majority-Black neighborhoods, particularly in the vicinity of the majority-Black

---

[1] In addition to their constitutional claims brought pursuant to 42 U.S.C. § 1983, Plaintiffs also assert a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Conduct that violates the Equal Protection Clause also violates Title VI. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.").

apartment complexes located in and around the city of Canton (the "Pedestrian Stop Program").
MCSD deputies routinely stop Black individuals and ask to see their identification when they are
on their way to work, returning to their homes, or walking with friends. The Pedestrian Stop
Program also violates both the Fourth and Fourteenth Amendments.

Pursuant to Rule 23(b)(2), the Named Plaintiffs seek to represent a class of all Black
persons who presently or in the future will reside in or travel through Madison County (the
"Targeting Class") in order to obtain injunctive and declaratory relief to remedy the
constitutional violations caused by the Policing Program. Plaintiffs also seek to represent two
subclasses in order to obtain declaratory and injunctive relief to remedy the constitutional
violations caused by the Roadblock Program and the Pedestrian Stop Program. The first subclass
consists of all Black persons who travel or will travel by car through majority-Black areas of
Madison County. These persons have been or are likely to be stopped at roadblocks established
by the MCSD based on racially discriminatory criteria and/or for purposes of general crime
control (the "Roadblock Subclass"). The second subclass consists of all Black persons who travel
or will travel by foot in Madison County's majority-Black neighborhoods. These persons have
been or are likely to be subject to searches and/or seizures by the MCSD without reasonable
suspicion or probable cause, and/or on the basis of their race (the "Pedestrian Stop Subclass").

Pursuant to Rule 23(a), one or more members of a class may sue as representative parties
if (1) the class is so numerous that joinder of all members is impractical; (2) there are questions
of law or fact common to the class; (3) the claims of the representative parties are typical of the
claims of the class; and (4) the representative parties will fairly and adequately protect the
interests of the class. Plaintiffs meet each of these requirements. Defendants also "ha[ve] acted or
refused to act on grounds that apply generally to the class, so that final injunctive relief or

2

corresponding declarative relief is appropriate respecting the class as a whole," thus satisfying

Rule 23(b)(2). Plaintiffs' Motion should therefore be granted.

## STATEMENT OF FACTS

Madison County, located directly to the north of Jackson, is approximately 57% white

and 38% Black. *See* Ex. 62 (Census data), at 62.1. The white population is concentrated in the

southern part of the county, including the cities of Madison and Ridgeland. *Id.* 62.2. The Black

population is concentrated in the north and west of the county, including the city of Canton, the

town of Flora, and the rural areas near Camden and Kearney Park. *Id.* 62.2-62.4; Ex. 1, Ricchetti

Rep. Ex. 3. Southeast Ridgeland also has a substantial Black population. *See* Ex. 88, HUD

Compl. at 2. Madison County has experienced significant growth in recent decades. Since 1990,

its population has nearly doubled, largely due to the growth of the Madison and Ridgeland areas.

Ex. 63 (1990 Census data). Madison County is the wealthiest county in Mississippi. Ex. 62.5.

The MCSD is the primary law enforcement agency for Madison County, with jurisdiction

throughout the county. Ex. 64, Resp. to Pls.' 1st Set of Reqs. for Admiss., No. 5. Madison,

Ridgeland, Canton, and Flora each maintain their own police departments, which share

jurisdiction with the MCSD within their city or town limits. *Id.*; Ans. ¶ 9, 62. The MCSD is

headed by Sheriff Tucker, who has held the office of Sheriff since 2012. Ex. 24, R. Tucker Tr.

8:3-4. Sheriff Tucker succeeded Sheriff Toby Trowbridge, who held office from 2000 until 2011.

Ex. 23, Trowbridge Tr. 12:24. Sheriff Tucker's chief deputy, Jeremy Williams, is responsible

for, *inter alia*, personnel and administrative matters. Ex. 65, MC-INT 1-1-3, 2.

The MCSD currently consists of 71 officers. *See* Ex. 67, MCSD Roster. The largest

division is Patrol, which has general responsibility for patrolling the county, responding to calls,

and making traffic stops. Seven officers are assigned to the MCSD's Narcotics division, which

focuses on drug enforcement, and six to its Criminal Investigations division. *See id.* The

department also includes several officers who focus on warrant service, transportation, and certain other matters, as well as a two-person "Neighborhood Enhancement" or "Neighborhood Enforcement" team, also referred to as the "NET Team," which focuses on the majority-Black housing complexes in the Canton area. *See id.*; *see also* Ex. 68, Mar. 3, 2015 Email.

### A.    The MCSD's Culture Of Racial Discrimination

#### 1.    The MCSD's Policing Program Under Sheriff Toby Trowbridge

For more than eleven years, Sheriff Tucker worked in the MCSD's Narcotics division under Sheriff Toby Trowbridge, including as Captain. Ex. 24, R. Tucker Tr. 82:11-83:10. During Sheriff Trowbridge's administration, Black citizens repeatedly protested the MCSD, in particular its practice of establishing roadblocks primarily in majority-Black areas.[2] For example, in 2006, a group of Canton residents presented a petition bearing 664 signatures to the Madison County Board of Supervisors demanding an end to "frequent roadblocks in the predominantly black neighborhoods" and "racial profiling."[3] In 2007, Karl Banks, a Black member of the Board of Supervisors, stated "there is a real feeling in the community that the department is discriminating against people," and that these concerns were not being addressed.[4] Trowbridge refused to meet with aggrieved Black residents, later testifying that he "felt like everything was going the way it should be." Ex. 23, Trowbridge Tr. 103:8-14. And, in 2009, a panel of the state legislature considered a law prohibiting racial profiling. While the former chiefs of police of Ridgeland and Canton both testified that racial profiling is a significant problem, Sheriff Trowbridge refused to

---

[2] *See, e.g.*, Ex. 69, *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008) (noting that Trowbridge has "been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling"); Ex. 70, *Is system fair?*, THE CLARION-LEDGER (July 22, 2007) (Supervisor Griffin stating that the MCSD was perceived as targeting Black community members).

[3] *See, e.g.*, Ex. 71, *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006).

[4] Ex. 72, Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007).

attend, claiming that legislators were "wasting people's time and money" by debating the bill.[5]

Sheriff Trowbridge testified in this action that, during the time he was Sheriff, MCSD personnel, including himself and now-Sheriff Tucker, used the racial slur "nigger" while on duty. Ex. 23, Trowbridge Tr. 78:6-13, 90:10-91:4. According to Sheriff Trowbridge, MCSD personnel used racial slurs "in passing, maybe in conversation or walking down the hall or walking across a parking lot or whatever." *Id.* 96:24-97:2.[6]

Sheriff Trowbridge never disciplined any deputy for using racial slurs. Ex. 23, Trowbridge Tr. 91:25-92:3. To the contrary, casual racial discrimination was so commonplace and accepted that in 2009, a blatantly racist email entitled "White Pride" circulated among many of the MCSD's most senior members, including Trowbridge's chief deputy and Sheriff Tucker himself. Ex. 74, June 5, 2009 Email. The email, sent exclusively to white officers, contains such lines as, "when I call you Nigger, Kike, Towel head, Sand-nigger, Camel Jockey, Beaner, Gook, or Chink … You call me a racist." *Id.* The email concludes by encouraging the reader to express support for its sentiments by forwarding it along. *Id.* Now-Sheriff Tucker forwarded the email to seven more of his MCSD colleagues and personal contacts. *Id.*; Ex. 24, R. Tucker Tr. 43:11-44:11. During his deposition, Sheriff Tucker acknowledged that the email itself reflected a "racist opinion." Ex. 24, R. Tucker Tr. 63:20-21.

    **2.  The MCSD's Culture Of Discrimination Persists To The Present Day**

When he ran for office, Sheriff Tucker knew of the complaints and protests concerning the MCSD's racially discriminatory policing practices under Sheriff Trowbridge's Administration. *Id.* 104:22-105:7, 280:13-24. Nonetheless, Sheriff Tucker pledged to "maintain

---

[5] Ex. 73, Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, THE CLARION-LEDGER (Jan. 14, 2009).

[6] Sheriff Tucker denies hearing or using racial slurs used at the MCSD. Ex. 24, Tucker Tr. 269:13-21.

the quality of law enforcement that we have under Sheriff Trowbridge," and upon taking office, officially adopted all of Trowbridge's policies.[7] Numerous deputies testified that Tucker did not implement new policies that changed the culture of the MCSD. *See, e.g.*, Ex. 21, Sullivan Tr. 90:16-21; Ex. 12, Flax Tr. 89:6-8; Ex. 28, Wilson Tr. 42:7-23.

Many current MCSD personnel who serve in senior positions in the department also served under Sheriff Trowbridge. *See* Ex. 67, MCSD Roster; Ex. 78, 2011 MCSO Roster-1-2. M/Sgt. Joseph Butler, the individual who first sent the "White Pride" email, is a supervisor in Patrol. Ex. 24, R. Tucker Tr. 42:23-43:10. Other officers to whom Sheriff Tucker forwarded the email currently hold the positions of Master Sergeant in Patrol and Captain of Narcotics. *Id.* at 43:11-44:11. The late Terry Barfield, who served as Captain of Investigations until his death in 2017, used the term "nigger" while on duty. Ex. 23, Trowbridge Tr. 90:16-18, 92:4-7. According to a 2013 memo by the EEOC, Captain Barfield reportedly continued to make racist comments. Ex. 79, EEOC Memo, MC 0037-39 (May 9, 2013) ("I'm sick of these niggers"). Similarly, Will Weisenberger, also a Patrol supervisor, testified that he has used the term "nigger" in the course of his official duties, that other MCSD personnel also use the term while on duty, and that he had never been disciplined for his use of racial slurs. Ex. 26, Weisenberger Tr. 132:2-133:11.

Sheriff Tucker has also made and endorsed racially charged remarks since taking office. For example, in a January 2016 interview regarding a dispute with Kenneth Stokes, a Jackson city councilman, Sheriff Tucker referred to Jackson residents as Mr. Stokes' "thug constituents" and stated that Stokes was "setting his race back by implicating a race issue."[8] Around this same

---

[7] Ex. 75, Lacey McLaughlin, *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011); Ex. 76, *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011); *see also* Ex. 77, Memo from Sheriff Tucker to All Deputies/Employees (Jan. 3, 2012).

[8] Ex. 80, *Madison sheriff responds to Jackson councilman's remarks*, THE CLARION-LEDGER (Jan. 4, 2016), https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/, at 1:50-57, 4:46-50.

6

time, a Madison County resident emailed Sheriff Tucker, "I'm curious if Mr Griffin is related to Kenneth Stokes since their language is similar (dis, dat, dees, and doez)." Ex. 81, Jan. 18, 2016 Email. Sheriff Tucker replied, "I wholeheartedly agree with you on mr griffin." *Id.*[9]

Sheriff Tucker also has hired officers who have been accused of racial discrimination. Sheriff Tucker hired Slade Moore, now a Sergeant in Patrol, even though he had been terminated from his position as an officer in the Jackson Police Department after over 30 complaints had been filed against him.[10] One incident led to a lawsuit in which the City of Jackson was held liable for Moore's use of excessive force.[11] Following his termination, now-Sgt. Moore, who is white, filed a racial discrimination suit in which he claimed he was treated differently than similarly-situated Black officers.[12] Another white patrol deputy hired by Sheriff Tucker had faced allegations that he had "a history of animosity toward African Americans,"[13] and was sued by a Black man for alleged use of excessive force while the deputy was employed by the Hinds County Sheriff's Department.[14] Ex. 22, R. Thompson Tr. 29:6-15. Sheriff Tucker was aware of this excessive force incident, but nevertheless hired the deputy in 2014, *just weeks* after it occurred. *Id.* 37:19-20, 41:8-15; Ex. 24, R. Tucker Tr. 212:5-20.

Since Sheriff Tucker took office, eight Black officers have resigned or been terminated by Sheriff Tucker.[15] Currently, twelve of the MCSD's 71 officers are Black.

---

[9] At his deposition, Supervisor Griffin testified that, in his view, the email from the Madison County resident expressed racist sentiment. Ex. 13, Griffin Tr. 82:22-82:24.

[10] Ex. 82, Memo from Shirlene Anderson, Jackson Chief of Police, to Sgt. Slade Moore (June 15, 2006).

[11] *See City of Jackson v. Calcote*, 910 So. 2d 1103, 1110-11 (Miss. Ct. App. 2005) .

[12] Ex. 83, Compl., *Moore v. City of Jackson*, No. 251-10-592CIV (Hinds Cnty. Circuit Ct., Jul. 19, 2010), ¶¶ 20-21.

[13] Ex. 84, Pl.'s Mem., *Huggins v. Belk Dep't Stores*, No. 4:07-cv-134, 1 (S.D. Miss. Aug. 3, 2008).

[14] Ex. 85, Mod. 2d Am. Compl., *Fleming v. Hinds Cnty.*, No. 3:16-cv-554 (S.D. Miss. Nov. 30, 2016), ¶¶ 14-15.

[15] *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 7; *Compare* Ex. 67, MCSD Roster *with* Ex.

**B.    Black Residents Of Madison County Are Routinely Subject To Racial Discrimination By The MCSD**

Black residents of Madison County regularly encounter racism and discrimination in their interactions with the MCSD. For example, Plaintiff Bessie Thomas testified that when she tried to speak to an MCSD deputy during a roadblock the deputy cut her off and, referring to the cars behind her, said, "I've got all these niggers off the side of this road." Ex. 9, Thomas Tr. 77:3-22. Class member Quincy Smith stated that at a traffic stop, he witnessed a white MCSD deputy tell a Black MCSD deputy that he wasn't "going to help a nigger out" by letting a driver go without a ticket. Ex. 56, Q. Smith Decl. ¶ 14. Class member Montreal Tillman was told by an MCSD deputy that if the deputy had "not taken anger management classes, [he] would drag [Tillman's] black ass up and down the street." Ex. 59, Tillman Decl. ¶ 23. All in all, MCSD deputies treat Black citizens "with no respect. ... The way they talk to you, it's like they look down on you. They are unconcerned about what you tell them." Ex. 9, Thomas Tr. 68:24-69:13; *see also* Ex. 6, Q. Manning Tr. 46:2-22 (MCSD deputy "wasn't talking to me as if I was a person. ... He asked me why the hell did I pull over in this driveway and where is my damn license and registration."). Ex. 61, M. Williams Decl. ¶ 7.

Class members have been stereotyped as gang members and drug dealers.[16] The MCSD

---

78, 2011 MCSO Roster-1-2. The roster produced by Defendants appears to exclude most Madison County Detention Center employees, as well as dispatchers and administrative personnel.

[16] Class member Lisa Jones, a 46-year-old woman and mother of three, was asked at a roadblock if her license plate meant she was part of a gang. Her license plate had the letters "B," "A," and "D," which are her children's initials. Ex. 51, L. Jones Decl. ¶¶ 23-24. An MCSD deputy repeatedly referred to class member Terrance Thompson as a "Black dope boy," even though he had no drugs in his possession when he was stopped. Ex. 58, T. Thompson Decl. ¶¶ 12-15. Quincy Smith was stopped at a roadblock at the entrance to his apartment; the MCSD deputy immediately asked "where are the drugs?" Ex. 56, Q. Smith Decl. ¶ 6. *See also* Ex. 53, Mitchell Decl. ¶ 4 ("They always talk to me as though I am a criminal. They immediately start asking about drugs in my car. At one roadblock, the deputy said to me, 'I know you have something.'"); Ex. 42, R. Davis Decl. ¶¶ 7-8 (MCSD deputy repeatedly accused class member Rasheid Davis of "smoking dope" during a roadblock, even after he passed a sobriety test).

routinely stops and harasses Black pedestrians without reasonable suspicion. For example,

Plaintiff Latoya Brown has been stopped numerous times simply walking down the street. Ex. 4,

L. Brown Tr. 50:22-51:9, 53:2-54:10, 74:19-76:9. On each occasion she was compelled to

provide identification so that MCSD personnel could run warrant checks. *Id.* Class member

Delores Smith's son was told he fit a "profile" because he had dreadlocks and wore a hat. Ex. 55,

D. Smith Decl. ¶ 6. Mr. Tillman was stopped while walking in a white neighborhood where his

fiancée lived, and asked whether he we was "plan[ning] on coming around all the time" and if he

had any weapons. Ex. 59, Tillman Decl. ¶¶ 17-20. MCSD deputies also conduct lengthy,

intrusive, and even violent stops of Black motorists.[17]

Black residents know that they are treated differently than white residents. Plaintiff

Lawrence Blackmon was tackled and handcuffed at gunpoint in his own foyer after requesting to

see a warrant before he allowed the MCSD to enter his home. Ex. 3, Blackmon Tr. 73:20-76:5.

He understands that the incident "would not have happened to me if I were a white person." *Id.*

161:19-21. Class members report MCSD roadblocks at which Black drivers have been stopped

and white drivers have been waved through. *See* Ex. 53, Mitchell Decl. ¶ 9; Ex. 48, Hollins Decl.

¶¶ 4-5 (officer stated white drivers were "good people"). Class member Destiny Jones "cannot

believe that if a white family was on the side of the street trying to deal with a very upsetting car

accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail,"

---

[17] For example, in 2016, class member John Spann was pulled over by the MCSD for allegedly "bumping the lines." Ex. 57, Spann Decl. ¶ 12. The officers asked him whether he had outstanding warrants or prior offenses, or whether there were drugs or weapons in his car, and demanded that he search his own car while they watched. *Id.* at ¶¶ 8-10. The search turned up nothing, but it nonetheless took 45 minutes for the deputies to leave the scene. *Id.* ¶¶ 4, 10. Similarly, even though class member Quincy Smith was a passenger, the MCSD required him to take a breathalyzer test. Ex. 56, Q. Smith Decl. ¶ 13. And, in 2012, an MCSD officer believed that he saw Michael Bracey driving without a seatbelt as Mr. Bracey was about to pull into his driveway. Ex. 38, Bracey Decl. ¶¶ 3-10. The officer followed Mr. Bracey onto his property, screamed at him to get on the ground, placed his gun to the back of his head, and handcuffed him. *Id.* The officer then searched Mr. Bracey and his car, and placed him under arrest. *Id.*

9

like she was after being hit by a drunk driver. Ex. 50, D. Jones Decl. ¶¶ 10-11, 19. When her

mother complained to a Black state trooper who also was at the scene, he acknowledged as

much, telling her, "we all know how they are." Ex. 51, L. Jones Decl. ¶ 27.

C.     **The MCSD's Policing Program**

The MCSD's culture of racism directly impacts how it polices Madison County. For

decades, the MCSD has implemented and enforced an unwritten policy, or longstanding custom

and practice, of racially profiling Black individuals and disproportionately targeting Madison

County's Black communities through roadblocks, pedestrian stops, and other aggressive tactics.

1.     **The MCSD Disproportionately Arrests And Cites Black Persons**

The MCSD's Policing Program has led to stark racial disparities in the MCSD's arrest

and citation rates. While Black individuals represent only 38% of Madison County's population,

Black individuals accounted for over 77% of all arrests made by the MCSD between January 1,

2012 and September 20, 2017, as well as 72% of all citations made by the MCSD between

January 2012 and December 31, 2017. Ex. 2, Guha Decl. ¶¶ 10, 19. Nearly 76% of arrests made

by the MCSD at roadblocks, and 74% of the arrests made by the MCSD at traffic stops, between

January 1, 2012 and September 20, 2017 were of Black individuals. *Id.* ¶¶ 32, 36.

MCSD deputies routinely opt to arrest Black drivers for traffic violations. Black drivers

represented 87% of arrests for driving with a suspended or revoked license; 83% of arrests for no

proof of liability insurance; 83% of arrests for having an expired tag or no tag on a license plate;

and 80% of arrests for improper vehicle equipment for the time period between January 1, 2012

and September 20, 2017. Black drivers also accounted for 94% of arrests for a child restraint

violation; 88% of arrests for a seatbelt violation; almost 85% of arrests for speeding on local

highways; 77% of arrests for turning without a turn signal; and 68% of arrests for careless

driving for the time period between January 1, 2012 and September 20, 2017. *Id.* ¶ 11.

The MCSD's citation statistics reflect a similar pattern. Between January 1, 2012 and December 31, 2017, Black individuals received 94% of citations for child restraint violations; 84% of citations for driving with a suspended license; 77% of citations for no proof of liability insurance; 76% of citations for following another vehicle too closely; 74% of citations for a seatbelt violation; 73% of citations for failure to yield; 71% of citations for improper vehicle equipment; 71% of citations for making an improper turn; and 63% of citations for driving with an improper tag or no tag. *Id.* ¶ 20.

The MCSD's own paperwork confirms that it targets Black citizens for arrest. In the course of discovery, Defendants produced to Plaintiffs templates of forms that deputies fill out in the course of their duties. Defendants produced multiple copies of one such form, the case file cover sheet for the narcotics unit, from the files of two officers. On each, the form is blank, except for three items that appear pre-populated: "black"; "male"; and "arrested." Ex. 86, May 27, 2014 Email, at 217; Ex. 87, MCSD-Officer Documents-01393.

### 2.    The MCSD Disproportionately Targets Black Communities

The MCSD implements the Policing Program by disproportionately targeting Madison County's majority-Black communities for roadblocks, traffic and pedestrian stops, and other aggressive law enforcement tactics. The MCSD has jurisdiction over the entirety of Madison County, but primarily operates in Canton, Flora, and the unincorporated areas of the county. Ans. ¶ 9. This is where most of the Black population resides. Ex. 62 at 62.2-62.4 (Census data). Defendants claim they police in Flora and Canton at the request of city police departments, and do not police Madison or Ridgeland except for in "special and/or limited circumstances." Ans. ¶ 48. However, Black residents from Ridgeland regularly encounter MCSD roadblocks at the entrance to their street, in the majority-Black southeast corner of Ridgeland. *See* Ex. 48, Hollins Decl. ¶ 2; Ex. 49, A. Howard Decl. ¶¶ 2-3; Ex. 40, B. Brown Decl. ¶ 2; Ex. 1, Ricchetti Rep. Ex.

11

2; *see also* Ex. 88, HUD Compl., at 2 (describing racial segregation in Ridgeland). The MCSD does not simply police the cities upon request, nor does it uniformly stay out of Ridgeland and Madison. Rather, the MCSD targets its policing where Black people live, work, gather and pray.

The MCSD established an entire unit, the so-called NET Team, to target apartments in majority-Black neighborhoods. The NET Team, originally called the "apartment detail," was created under Sheriff Trowbridge as a rotating unit of plainclothes deputies in unmarked cars, specifically deployed to patrol majority-Black apartment complexes in the Canton area. *See* Ex. 20, D. Smith Tr. 35:18-36:3, 42:22-25, 47:5-24, 65:21-24. The deputies would "patrol the apartments, do apartment walk-throughs, roadblocks, things of that nature." *Id.* 58:7-9. NET Team deputies have a reputation for jumping out of their cars and chasing Black residents. *Id.* 78:2-11; *see also* Ex. 3, L. Blackmon Tr. 129:20-130:2 ("[MCSD deputies] have unmarked cars … they will pull up on you and jump out of the car and search you."). In 2015, Sheriff Tucker made the NET team a full-time, two-man unit. Ex. 20, D. Smith Tr. 41:3-10.[18] Sheriff Tucker or Chief Williams are informed daily of the NET Team's activities. Ex. 20, D. Smith Tr. 85:3-7.

The MCSD targets businesses frequented by Black patrons. *See, e.g.*, Ex. 8, S. Smith Tr. 55:15-56:3 (describing a jump-out incident at Brooklyn Mart, a store adjacent to majority-Black apartment complexes in Canton); Ex. 9, Thomas Tr. 26:9-12 (describing a roadblock at Brooklyn Mart).[19] MCSD deputies also harass Black people where they worship and when they celebrate.

---

[18] The permanent NET team received expanded responsibilities, *see Id.* 90:18-22, but the Canton area apartment complexes have remained a major focus. *See, e.g.*, Ex. 68, Mar. 3, 2015 Email (The permanent NET Team was established as a "special, fulltime, undercover, two-man detail … to help assist the shift deputies and thwart the ongoing violence inside these Canton Apartment Complexes.").

[19] *See also* Ex. 37, Bacon Decl. ¶ 3 ("MCSD also sets up roadblocks down the road from my business both ways so that people can't leave my business without passing through a roadblock."); Ex. 42, R. Davis Decl. ¶¶ 9-10 ("Once the roadblocks go up in Canton people stop coming to my stores. The officers stop people driving to my store, or even just walking. Because people don't want to be harassed they just stay home."); Ex. 53, Mitchell Decl. ¶ 9 (MCSD officers target Black persons patronizing Black businesses, while going as far as escorting home drivers leaving a bar and restaurant frequented by white

Plaintiff Bessie Thomas testified that the MCSD sets up roadblocks outside of her church and the local middle school. Ex. 9, Thomas Tr. 25:21-26:12. Class member Domunique Doss stated that in Flora, the MCSD sets up roadblocks in Black neighborhoods on holidays and when Black residents hold community events or family gatherings. Ex. 45, Doss. Decl. ¶¶ 3-4; *see also* Ex. 10, B. Tucker Tr. 23:11-24:2 (suspicionless search of guests at a holiday barbecue).[20]

MCSD deputies also infringe on Black citizens' constitutional rights inside their homes. In 2016, Plaintiffs Khadafy Manning and Quinnetta Manning were confronted at the door of Ms. Manning's Canton-area apartment by deputies seeking witness statements related to an alleged burglary. Ex. 6, Q. Manning Tr. 85:3-7. The deputies, without a warrant or consent, forced their way inside the home. *Id.* When Mr. Manning told his wife that she was not required to write a statement, a deputy became aggressive, choking Mr. Manning, cursing at him, calling him "Mr. Cripple," and telling the Mannings they could either write statements or go to jail. Ex. 5, K. Manning Tr. 96:2-100:5. The deputy then dragged Mr. Manning down the stairs in his underwear and beat him in the back of a squad car until he agreed to write the statement they wanted. *Id.* Lawrence Blackmon was also subjected to forced entry and excessive force in his home. He woke up one morning to the MCSD banging on his door. Ex. 3, Blackmon Tr. 73:20-77:17. When he asked to see a warrant, the deputies shook some paper by his window, but would not allow him to see it. *Id.* The MCSD began kicking the door until Mr. Blackmon opened it, at which point they entered with guns drawn and placed him in handcuffs. *Id.* Mr. Blackmon

---

people in Flora).

[20] *See also* Ex. 53, Mitchell Decl. ¶ 10 ("When we have gatherings and birthday parties at the community center, the MCSD sets up a roadblock right outside on both directions, so everyone leaving the party has to pass through."); Ex. 37, Bacon Decl. ¶ 2 ("[MCSD] often set[s] up roadblocks [in Camden] when there are events in town, like a local football game."); Ex. 41, Carter Decl. ¶ 5 ("Whenever [the MCSD] get[s] word of Black people gathering together at a celebration or a wedding they set up a roadblock.").

remained cuffed for an extended period of time while they searched his house. *Id.* Mr. Blackmon

testified that he believes the incident was "something that only happens in … the black areas."

*Id.* 115:6-12.

### 3. Roadblocks Are A Key Element Of The MCSD's Policing Program

As part of its overall Policing Program, the MCSD has a policy, or widespread custom or

practice, of conducting roadblocks for purposes of crime control in Black communities.

Substantial record evidence demonstrates the improper purpose behind this Roadblock Program,

as well as its discriminatory application to majority-Black neighborhoods.[21]

### (a) The MCSD Disproportionately Conducts Roadblocks In Majority Black Neighborhoods

The MCSD's policy of conducting roadblocks in Black neighborhoods has been in place

since at least Sheriff Trowbridge's administration, when it was the subject of repeated,

unaddressed protests and civilian complaints. *See supra* at 4. While roadblocks are common in

majority-Black neighborhoods,[22] Plaintiffs testified that they rarely, if ever, see a roadblock in

white areas. *See* Ex. 3, Blackmon Tr. 141:11-142:1 ("[T]his issue with [roadblocks] is, is that

they are disproportionately set up in the predominantly African-American areas of town."); Ex.

10, B. Tucker Tr. 17:4-9; Ex. 4, L. Brown Tr. 82:7-12.[23]

---

[21] The MCSD's policies handbook sets forth (i) a set of "Sobriety Checkpoint Guidelines" which, despite Defendants' contentions to the contrary (*e.g.*, Ans. ¶ 140), are not regularly followed, and (ii) a vague "General Roadblocks" policy which provides blanket authorization for deputies to "conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within th[e] county." Ex. 89, MC-RFP 2-1 at 2-4, § IX(c).

[22] *See* Ex. 7, Singleton Tr. 42:17-23 (stating he has seen more than 20 roadblocks); Ex. 40, B. Brown Decl. ¶ 8 ("When I lived in Canton I believe I drove through more than 100 roadblocks."); Ex. 41, Carter Decl. ¶ 4 ("Last year I went through two roadblocks within thirty minutes."); Ex. 56, Q. Smith Decl. ¶ 2 ("In the last three or four years, I have driven through as many as thirty roadblocks.").

[23] *See also* Ex. 56, Q. Smith Decl. ¶ 2 ("MCSD sets up roadblocks in the Black neighborhoods to target Black people."); Ex. 53, Mitchell Decl. ¶ 9 ("I have never seen a roadblock set up in the white communities."); Ex. 59, Tillman Decl. ¶ 3 (same); Ex. 41, Carter Decl. ¶ 5 (same, regarding Camden); Ex. 37, Bacon Decl. ¶ 7 (same); Ex. 39, A. Brown Decl. ¶ 9 (same, regarding his community in Flora);

Statistical analysis of the MCSD's own data confirms this. The expert report of Bryan
Ricchetti, Ph.D., demonstrates that the MCSD disproportionately conducts roadblocks in
substantially-Black areas of the county. *See* Ex. 1, Ricchetti Rep. ¶¶ 52-53. Dr. Ricchetti has
reviewed the available data on the locations and frequency of roadblocks conducted by the
MCSD and overlaid this data with Census data for Madison County. *Id.* ¶ 38, Ex. 2 (*see* below).

Exhibit 2
*Location of Roadblocks by Census Tract within Madison County (2012–2017)*



In so doing, Dr. Ricchetti has determined that there is a statistically significant and positive
correlation between the percentage of Black residents in a census tract in Madison County and
the rate of roadblocks in that tract. *Id.* § 2.2. He demonstrates that on average, the per capita rate
of roadblocks in substantially Black census tracts is ***nearly double*** that of predominantly white
census tracts. *Id.* ¶ 39, Ex. 3 (*see* below).

---

Ex. 40, B. Brown Decl. ¶ 10 (same, regarding her neighborhood in Ridgeland); Ex. 49, A. Howard Decl. ¶
9 (same); Ex. 43, V. Davis Decl. ¶ 2 (same, regarding her neighborhood in Canton); Ex. 46, Guise Decl. ¶
11 (same); Ex. 47, Harris Decl. ¶ 5 (same); Ex. 60, Wilder Decl. ¶ 4 (same).

Exhibit 3
*Frequency of Roadblocks by Racial Breakdown*



This sizable disparity persists throughout the County even when controlling for other potential

non-racial explanations. *Id.* ¶ 46, Ex. 6. Dr. Ricchetti's analysis strongly suggests that racial bias

animates the disparity in the frequency of roadblocks in predominantly Black communities.[24]

        (b)    <u>The Primary Purpose Of The Roadblock Program Is Crime Control</u>

        Defendants effectively concede that the MCSD establishes roadblocks in majority-Black

neighborhoods to control general crime, a clear violation of the Fourth Amendment. Defendants'

Answer states that Sheriff Tucker has honored "multiple requests" from "managers of various

apartment complexes and housing projects in predominantly Black neighborhoods in both

Madison County and the City of Canton, and many businesses asking that the [MCSD] conduct

---

[24] Dr. Ricchetti's multivariate regression analyses demonstrate that even after accounting for "the fact that communities with a higher percentage of Black residents have, on average, other characteristics that are predictive of traffic behavior, such as higher rates of DUI arrests and traffic arrests and citations, lower income, higher unemployment, and younger populations, … there remains an unexplained difference in the frequency of roadblocks in communities that have a higher percentage of Black residents relative to communities with a higher percentage of white residents." Ex. 1, Ricchetti Rep. § 2.2.

roadblocks near their neighborhoods and businesses." Ans. ¶ 3; *see also* Ex. 90, MC-RFP 10-42(1) (Oct. 31, 2017 request from apartment manager for a "random road block in our area" as a "preventative measure"). Officers have also testified that they set up roadblocks, unprompted by such requests, to detect and deter criminal activity.[25] *See, e.g.*, Ex. 22, R. Thompson Tr. 20:19-21:13 (agreeing that "general crime prevention" is the "primary purpose" of MCSD's roadblocks); Ex. 19, Squires Tr. 171:10-172:4 (deterring crime is "definitely" a purpose of roadblocks); Ex. 17, Moore Tr. 159:2-4 ("Q. Now, with regard to roadblocks, what's the purpose of a roadblock? A. To prevent crime."); Ex. 91, MC-RFP-Inc. Rep. 010886 (MCSD "established a safety checkpoint at [the Canton Estates apartment complex] to check for out standing [sic] warrants and other violations.").[26]

The MCSD's use of roadblocks as a crime control measure is further demonstrated by the involvement of the NET Team and of MCSD narcotics agents in conducting roadblocks. The NET Team has the authority to conduct roadblocks without specific approval from higher authorities. Ex. 20, D. Smith Tr. 48:13-49:3. So do officers in the Narcotics Division. Ex. 16, T. Jones Tr. 232:14-233:4. Unlike Patrol, Narcotics and the NET Team focus on specific aspects of criminal law, not traffic enforcement. NET and Narcotics nonetheless operate roadblocks in Canton's majority-Black neighborhoods, the clear purpose of which is crime control and narcotics interdiction. *Id.* 227:19-24 (testifying that, as Captain of Narcotics, he set up

---

[25] Other MCSD officers testified to different purposes for roadblocks. *See, e.g.*, Ex. 18, Sandridge Tr. 44:3-10 ("The primary interest is to check for seatbelt, child restraints, impaired drivers, and vehicle equipment violations."); Ex. 21, Sullivan Tr. 48:7-14 ("seatbelts, valid driver's license, child safety restraints, drinking and impaired driving").

[26] The general crime control purpose of roadblocks is further evidenced by notices the MCSD has posted regarding upcoming roadblocks, which on numerous occasions have stated that the purpose of the roadblocks is "to check for Driver's license, warrants and what ever else we encounter." *See, e.g.*, Ex. 92, MC B. Davis Laptop 4; Ex. 93, MC T. Chastain Laptop 17.

roadblocks "for a crime deterrent"); Ex. 20, D. Smith Tr. 45:18-46:7 (testifying that the NET

team would employ roadblocks to counter "high crime" in Canton).

(c)   <u>MCSD Roadblocks Lack Uniform Procedures Or Safeguards</u>

MCSD personnel also regularly exercise substantial discretion in conducting roadblocks,

despite the Supreme Court's clear statement that "the unconstrained exercise of discretion" by

officers at roadblocks is unconstitutional. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

Deputies have discretion to waive cars through a checkpoint. Ex. 24, R. Tucker Tr. 129:16-

130:2; Ex. 11, Fish Tr. 54:3-19. Deputies also have complete discretion to decide whether to run

drivers' licenses, even if facially valid. Ex. 24, R. Tucker Tr. 183:3-13; Ex. 25, Waldrop Tr.

45:4-24 (he "may or may not" run a warrant check on a valid license); Ex. 27, Williams Tr.

218:5-17 (officers have discretion to call in licenses). It is also left to the deputy's discretion

whether to demand passengers' identification or to search the vehicle or its occupants.[27] Khadafy

Manning, for instance, has been searched at least three times as a passenger at an MCSD

roadblock. Ex. 5, K. Manning Tr. 51:3-52:3, 53:1-3; *see also, e.g.*, Ex. 53, Mitchell Decl. ¶ 6

(describing experience of intrusive searches at roadblocks).

MCSD roadblocks also lack reasonable procedural safeguards. MCSD personnel are

authorized to use unmarked cars at roadblocks (*see* Ex. 66, Defs.' Resps. to Pls.' 1st Set of

Interrogs., No. 20), and numerous officers have testified that they have done so. *See, e.g.*, Ex. 25,

Waldrop Tr. 39:21-23; Ex. 20, D. Smith Tr. 66:11-19. Indeed, NET Team leader Darian Smith

testified that he has participated in roadblocks outside the Canton Estates apartment complex

---

[27] Ex. 24, R. Tucker Tr. 184:6-185:7; Ex. 15, S. Howard Tr. 110:21-24 ("Q: And you use your discretion to decide when to check licenses or identifications for passengers? A: Yes, ma'am."); Ex. 11, Fish Tr. 55:15-17 ("Q: What about passengers? Do you ask them for anything? A: It just depends."); Ex. 25, Waldrop Tr. 45:25-46:6 ("Q: Do you give any training on when you may ask for a passenger's identification at a traffic stop? A: No.").

18

with only unmarked cars as a "deterrent to crime." Ex. 20, D. Smith Tr. 65:25-67:2.

Second, the MCSD does not require its personnel to be in uniforms when conducting roadblocks, thereby compounding the surprise and apprehension caused by the Roadblock Program. While Patrol deputies are usually uniformed, NET team and Narcotics officers wear plain clothes when conducting roadblocks, as well as driving unmarked cars. *E.g.*, *id.* 48:10-12.[28] So do other high-ranking officers. *See* Ex. 25, Waldrop Tr. 39:21-25.

Third, while Sheriff Tucker concedes that a roadblock identified by marked vehicles with flashing lights and uniformed officers is a "best-case scenario," this does not always happen. Ex. 24, R. Tucker Tr. 140:16-141:14. To the contrary, in Black neighborhoods, residents report that roadblocks conducted after dark routinely are entirely unlit, with the exception of the officers' handheld flashlights. Bessie Thomas has driven through roadblocks at night where she did not see flashing lights. Ex. 9, Thomas Tr. 28:5-20; *see also* Ex. 5, K. Manning Tr. 56:16-57:5 (describing stops at roadblocks where officers wave vehicles down with flashlights). So have many other class members.[29] Moreover, the MCSD sets up roadblocks in poorly-lit locations, including dark, rural streets in Black areas, despite relatively little traffic, or parks their cars where they are not visible.[30]

---

[28] Captain Tommy Jones circulated a memorandum dated January 30, 2017 that directs Narcotics officers to wear reflective vests while participating in a roadblock (Ex. 94, MC L. Sanders Main Server 93), but NET personnel continue to conduct roadblocks without wearing reflective vests to identify them, let alone an MCSD uniform. *See* Ex. 20, D. Smith Tr. 149:12-20.

[29] *See also* Ex. 42, R. Davis Decl. ¶ 3 ("A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars."); Ex. 56, Q. Smith Decl. ¶ 3 ("MCSD parks off of the road and turns off all lights on their trucks."); Ex. 41, Carter Decl. ¶ 2 (same); Ex. 39, A. Brown Decl. ¶ 3 (same); Ex. 53, Mitchell Decl. ¶ 3 ("[The MCSD] rarely have their lights on [at a roadblock], but when they do, they only turn on the lights in the back so it is impossible to see the cars until I am already up on the roadblock.").

[30] *See* Ex. 9, B. Thomas Tr. 24:17-22 (cars park off the street, inside apartment complexes and thus are not visible); Ex. 49, A. Howard Decl. ¶¶ 3-4 (on Pine Knoll Road, a roadblock location near a majority-Black apartment complex in Ridgeland, the MCSD parks in parking lots, where they are not visible, and then waves cars down with flashlights); Ex. 40, B. Brown Decl. ¶ 3 (same); Ex. 52, McKay Decl. ¶ 4 ("I

19

####    4.    Suspicionless Pedestrian Stops Are Also A Key Element Of The MCSD's Policing Program

Another significant aspect of the MCSD's Policing Program is the Pedestrian Stop Program, a policy of conducting suspicionless stops of pedestrians in Black neighborhoods and on the grounds of majority-Black apartment complexes. Many such pedestrian stops occur during "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits, while other such stops are conducted in Madison County's Black communities by roving patrols of deputies who stop pedestrians on the street. These stops are typically conducted by teams of plainclothes officers who wear tactical vests and drive unmarked cars, referred to by community members as the "jump out patrol" or the "jump out boys."

The MCSD, as a matter of explicit policy, has conducted special "walkthrough" patrols of majority-Black apartment complexes near or immediately to the west of the Canton city limits since at least 2008, using the "Apartment Detail" or "NET Team." *See* Ex. 20, D. Smith Tr. 34:22-24. At present, the NET Team has primary responsibility for these patrols, but other units, including Patrol and Narcotics, remain involved. *Id.* 35:22-36:9. During these patrols, officers demand that persons they encounter produce their identification,[31] and treat attempts to avoid these interactions as suspicious behavior that itself justifies detention and search.[32] Hundreds of

---

don't know why the MCSD would set up a roadblock on my street. There is very little traffic because so few people drive in this rural area."); Ex. 51, L. Jones Decl. ¶ 26 ("I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen.").

[31] *See, e.g.*, Ex. 15, S. Howard Tr. 160:5-25, 182:2-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:2-12; Ex. 25, Waldrop Tr. 86:24-87:10; Ex. 20, D. Smith Tr. 70:10-26, 128:12-129:4.

[32] *See, e.g.*, Ex. 96 (MC-RFP-Inc. Rep. 040697 (an officer "observed two black males standing be[side] a parked vehicle"; the subjects looked at the officer and "started walking away," so the officer ordered them to stop, gave chase, arrested one, and booked him "on all charges"); MC-RFP-Inc. Rep. 058887 (when an officer "saw four black males standing outside" a building; when the officer drove closer "they began walking away," so the officer stopped them, noticed one was slurring his speech, and subsequently arrested him for public drunkenness); MC-RFP-Inc. Rep. 025721 (when officers saw "several individual[s] loitering" and one "began walking inside of" an apartment, an officer yelled for him to stop,

these patrols have taken place since Sheriff Tucker took office. *See* Ex. 2, Guha Decl. ¶¶ 33-34.

Plaintiff Steven Smith was recently arrested after a suspicionless stop that took place during an apartment walkthrough conducted by the NET Team. On his daughter's birthday in January 2017, while walking from the store to his home to Canton Estates, Mr. Smith and his friend Terrance Thompson, were stopped and instructed to "remove their hands from their pockets" and produce their identifications. *See* Ans. ¶ 89; Ex. 8, S. Smith Tr. 35:3-24. The officers ran Mr. Smith's identification, found outstanding warrants related to old, unresolved traffic citations, and arrested him. *See* Ex. 8, S. Smith Tr. 38:13-16; Ex. 15, S. Howard Tr. 131:14-16. Mr. Smith was also detained during an apartment walkthrough in the fall of 2015. *See* Ex. 95, Smith Resp. to Defs.' 1st Set of Interrogs., No. 4. Two deputies approached and told Mr. Smith to walk with them behind a building. Ex. 4, L. Brown Tr. 70:10-23. The deputies handcuffed Mr. Smith, ran his identification, and then let him go. *Id.* 71:3-5, 71:20-22.

Plaintiff Latoya Brown has also been subjected to suspicionless stops by MCSD personnel. Ms. Brown was stopped in 2014 while walking to the front gate of Canton Estates in order to meet her ride to work when two deputies stopped her, demanded her identification, and ran a warrant check. *Id.* 50:24-51:9. She was also stopped for a warrant check during an apartment walkthrough in 2013. *Id.* 53:2-54:10. On other occasions, Ms. Brown has been stopped for warrant checks when walking past roadblocks set up in front of Canton Estates. *Id.* 74:19-76:9. Plaintiff Khadafy Manning was also stopped in February 2017 by MCSD deputies conducting an apartment walkthrough. Ex. 97, MC-RFP-Inc. Rep. 047927. In his incident report, Sgt. Howard of the NET Team wrote that he stopped Mr. Manning because he believed Mr. Manning was trying to avoid him. *Id.*

---

and then "placed [him] under arrest for failure to comply" after he entered the apartment)).

These incidents are not unique to the Named Plaintiffs. *See, e.g.*, Ex. 44, Day Decl. ¶¶ 2-4 (describing at least ten such stops at his Madison Heights apartment complex). Incident reports produced by Defendants are replete with examples of similar suspicionless stops.[33] In these reports, officers conducting "apartment walkthrus" time and again "come into contact" with Black persons and subsequently arrest them for outstanding warrants. These reports represent only a fraction of many similar incident reports produced by Defendants, which themselves only reflect those stops that resulted in arrests.[34]

The NET Team and other MCSD units also regularly engage in suspicionless stops and searches of Black pedestrians while conducting roving patrols of Madison County's Black neighborhoods in unmarked cars. These patrols are colloquially referred to as the "jump-out patrol" or the "jump out boys." *See* Ex. 20, D. Smith Tr. 79:5-15 ("Jump-out boys" is "the nickname given to the NET team."); Ex. 10, B. Tucker Tr. 32:15-21 (the jump-out boys "are always in the black neighborhoods jumping out."). On one occasion, the jump-out patrol came onto Ms. Tucker's property in the middle of the day during a holiday barbecue and, without

---

[33] *See, e.g.*, Ex. 98 (MC-RFP-Inc. Rep. 032317 (deputies "came in contact" with a Black man and arrested him for outstanding warrants for failure to appear); MC-RFP-Inc. Rep. 007631 (an officer "observed a unidentified black-male [sic] loitering in front of building seven," so the officer identified him, checked for warrants, and then arrested him for an outstanding warrant for littering); MC-RFP-Inc. Rep. 007292 (a deputy "came into contact" with a Black man, found a warrant for no proof of insurance, and arrested him); MC-RFP-Inc. Rep. 004715 (an officer "observed several subjects loitering" so he "stop[ped] to advise the subject[s] to move along," ran a warrant check, and arrested one Black man for two warrants for "failure to appear on a speeding ticket" and "failure to appear on a no proof of insurance"); MC-RFP-Inc. Rep. 025778 (a deputy "observed a black male walking in the area of Canton Gardens Apts." and stopped him "to see if he lived in the Complex"; when the man said "no he was just walking," the officer ran his ID, found outstanding warrants, and arrested him)).

[34] MCSD officers have been unable to articulate any reasonable suspicion to justify the stops that occur when they "come into contact" with Black pedestrians. *See, e.g.*, Ex. 15, S. Howard Tr. 182:24-184:23; Ex. 21, Sullivan Tr. 34:22-35:13, 37:7-12; Ex. 20, D. Smith Tr. 128:12-129:4. Instead, Defendants have attempted to characterize these stops as "consensual." *See, e.g.*, Ex. 15, S. Howard Tr. 117:4-9, 125:8-9, 128:11-13, 139:7-8. This is incorrect. When individuals attempt to avoid these encounters, they are frequently met with pursuit, arrest, and charges for failure to comply. *See supra* note 32.

cause, searched her friends and family; finding nothing, they drove off. Ex. 10, B. Tucker Tr. 23:23-24:2. Another time, Ms. Tucker's grandson was walking to her house, shirtless, to help fix his brother's bike. *Id.* 29:5-20. The jump out patrol drove by, jumped out of their truck, and searched him. *Id.* When they let him go, a deputy said to Ms. Tucker, "next time tell him to put a shirt on." *Id.* Numerous other class members report similar encounters.[35]

> ### D.   The MCSD's Training, Supervision, And Complaint Policies Protect The Policing Program

The MCSD does not train deputies to police in a race-neutral manner, or monitor deputies to prevent racial discrimination. The MCSD does not conduct meaningful investigations of complaints, discipline deputies for unconstitutional policing, or even evaluate deputies' performance in a transparent manner. The MCSD also fails to maintain data or statistics showing the racial breakdown of stops, citations, and arrests conducted by the department. These major process deficiencies are central to the operation of the Policing Program. They insulate Defendants from scrutiny and community oversight, forestall the prevention and remediation of constitutional violations through consensual channels, and enable Defendants to publicly deny the existence of the Policing Program. These deficient training and supervision policies demonstrate, at the very least, a policy of deliberate indifference to the routine violations of the

---

[35] The jump-out patrol has also stopped Terrance Thompson at least twice since 2014 while walking down the street in Canton. Ex. 58, T. Thompson Decl. ¶ 14. On one occasion, in 2014, an unmarked Tahoe pulled up on him and friend while they were walking; the officers jumped out and without explanation put both men in handcuffs and searched them. *Id.* ¶¶ 17-20. After finding nothing, they demanded identification and ran warrant checks. *Id.* Only after the check came back clean did they remove the handcuffs and let the men go. *Id.* Class member Montreal Tillman, also a Canton resident, explained that when he was stopped, the officer "started shouting at me through his window to stop walking. ... .He asked for my license. I felt like I had to give it to him." Ex. 59, Tillman Decl. ¶¶ 12-14. Class member Quincy Smith has been stopped as many as fifteen times by the MCSD while walking. Ex. 56, Q. Smith Decl. ¶ 15. On one occasion, he and three friends were stopped on the street by MCSD deputies and forced to provide social security numbers and submit to a pat down. *Id.* ¶¶ 16-17. Mr. Smith and his friends "were afraid and felt like if [they] said no or walked away there would have been real trouble." *Id.*

constitutional rights of Madison County's Black community.

### 1.    MCSD Personnel Are Inadequately Trained And Supervised

The MCSD does not explicitly train deputies not to use racial slurs or racially derogatory language. Ex. 24, R. Tucker Tr. 112:9-25. Sheriff Tucker and Chief Williams have not discussed the constitutional obligation to police in a race-neutral manner during department-wide meetings. *Id.* 10:24-11:21; Ex. 27, Williams Tr. 22:13-21, 40:20-41:10. The MCSD's training officer, M/Sgt. Jeffery Waldrop, testified that he developed the training curriculum in conjunction with Sheriff Tucker. Ex. 25, Waldrop Tr. 31:10-16. M/Sgt. Waldrop does not provide deputies with any training or testing on any policies regarding racial discrimination. Ex. 25, Waldrop Tr. 30:23-25, 31:8-9.[36] Nor does he train MCSD deputies on (i) how to establish roadblocks; (ii) when deputies may conduct searches at roadblocks and traffic stops; (iii) when deputies may demand that a pedestrian produce his or her identification; or (iv) when they must report a fellow officer's misconduct. Ex. 25, Waldrop Tr. 33:24-36:3, 47:23-25, 49:11-13, 49:22-50:3, 52:14-18.

The MCSD also provides no training or guidelines on how MCSD personnel should exercise their discretion, and many important MCSD functions are performed with minimal, if any, oversight or reporting requirements. *See* Ex. 24, R. Tucker Tr. 183:23-24 ("there is no training about discretion"). For instance, supervising deputies have complete authority to select specific roadblock locations. *Id.* 141:5-8, 143:24-144:2; Ex. 27, Williams Tr. 90:18-91:3. MCSD deputies also have complete discretion to determine whether to make traffic stops for any reason. Ex. 24, R. Tucker Tr. 187:25-188:2.[37]

---

[36] Sheriff Tucker testified that the FBI conducted a civil rights training for detention officers and deputies. Ex. 24, R. Tucker Tr. 85:14-19. Officers did not recall what the training covered. *See, e.g.*, Ex. 15, S. Howard Tr. 77:3-9 ("Q: Okay. Do you recall what you learned during that training? A: No, ma'am.").

[37] *See also* Ex. 64, Defs.' Resp. to Pls.' First Set of Req. for Admis., No. 2 ("Defendants admit that MCSD has no written criteria concerning when MCSD personnel should make a vehicle stop other than complying with existing state and federal laws."); Ex. 109, Defs.' Resp. to Pls.' First Set of Req. for Prod.

Case 3:17-cv-00347-WHB-LRA   Document 227   Filed 03/14/18   Page 31 of 50

Sheriff Tucker also testified that he does nothing to ensure that his deputies are not profiling or targeting Madison County's Black population. Ex. 24, R. Tucker. 218:14-19 ("I don't monitor anybody to see if they're performing in a racially discriminatory manner."), 128:8-16, 135:12-21, 217:19-218:2; *see also* Ex. 27, Williams Tr. 76:3-8, 151:16-24 (no awareness of any attempts to determine whether deputies charge Black persons more severely than white persons). Sheriff Tucker is also steadfastly opposed to the use of technology that would record his deputies' actions. Ex. 99, Jan. 8, 2016 Email (calling a proposed bill that would require the use of body cameras "utterly ridiculous"); *see also* Ex. 100, *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015); Ex. 24, R. Tucker Tr. 175:7-14.[38] Sheriff Tucker claims that he relies on his supervising deputies to report instances of racial discrimination. Ex. 24, R. Tucker Tr. 114:10-18. He could not recall a single instance in the past six years in which a supervising deputy had made such a report. *Id.* 115:6-17, 128:25-129:3.

The MCSD also has no established processes for evaluating deputies' job performances. *Id.* 214:25-215:12; Ex. 27, Williams Tr. 177:21-178:6. In fact, numerous deputies testified that they have never received a performance evaluation of any kind. *See, e.g.*, Ex. 21, Sullivan Tr. 27:11-12; Ex. 14, Hall Tr. 21:22-25; *see also* Ex. 26, Weisenberger Tr. 57:6-11 (neither he nor anyone else conducts performance evaluations of the deputies he supervises). Deputies' performance is instead measured primarily by looking at the *quantity* of their policing, as reflected by metrics such as the number of arrests they make and the number of citations they

---

of Docs., No. 6 ("Defendants have no written policies or training materials regarding MCSD personnel conducting traffic stops.").

[38] Deputies have discretion to decide when to activate their in-vehicle cameras and microphones. Ex. 24, R. Tucker Tr. 180:4-25, 182:22-25. The MCSD also does not train deputies to turn on their in-vehicle cameras when they have a subject in the vehicle, such as when Sgt. Moore restrained Plaintiff Khadafy Manning in Deputy Thompson's vehicle. Ex. 27, Williams Tr. 99:4-12.

issue. Ex. 24, R. Tucker Tr. 215:13-23, 216:17-23; *see also* Ex. 27, Williams Tr. 122:25-124:8

(arrest and citation statistics are "a tool to evaluate performance").

### 2.     The MCSD Does Not Maintain Complete Or Accurate Records

The MCSD does not track citation or arrest rates by race. Ex. 24, R. Tucker Tr. 188:25,

191:16-20; Ex. 27, Williams Tr. 57:20-22, 115:5-9. Sheriff Tucker testified that he has no idea

whether his deputies arrest more Black individuals than white individuals. Ex. 24, R. Tucker Tr.

228:2-11 ("We arrest a lot of criminals. I couldn't tell you what color they are."). Sheriff Tucker

acknowledged that he has access to years of records that he could use to determine arrest rates by

race. *Id.* 26:25-27:12, 223:18-224:14. Yet the MCSD has never compiled such statistics because

he has no interest "whatsoever" in finding out what they would show. *Id.* 224:15-21.

Moreover, the records that do exist are not comprehensive. For instance, deputies are

supposed to complete an incident report with a written narrative every time they make an arrest.

*Id.* 132:3-5, 133:4-6; Ex. 27, Williams Tr. 172:5-13. The evidence demonstrates that deputies

often disregard this policy. Based on a review of dispatch data entries produced by Defendants,

Plaintiffs discovered over 160 instances of arrests in which an MCSD deputy did not prepare an

incident report with a narrative, a finding Defendants did not contest. Ex. 110, Feb. 6, 2018

Email. Plaintiffs have also identified over 300 roadblocks that were not included in the MCSD's

dispatch data, even though all roadblocks should be recorded therein. Ex. 1, Ricchetti Rep. ¶ 38,

n. 23; *see also* Ex. 27, Williams Tr. 235:18-24 (roadblocks should be recorded in dispatch data).

Plaintiffs discovered many such roadblocks by reviewing incident reports which described their

dates and locations in the course of documenting arrests. If no arrests had been made at those

roadblocks, or deputies failed to disclose in incident report narratives that the arrests took place

at a roadblock, the MCSD would have no records that these roadblocks had ever taken place.[39]

### 3. The MCSD Lacks Meaningful Complaint Procedures

Sheriff Tucker has delegated to Chief Williams *sole authority* to review citizen complaints and address personnel matters. *See* Ex. 66, Defs.' Resp. to Pls.' 1st Set of Interrogs., No. 9. The evidence indicates that Chief Williams conducts bare-bones investigations of citizen complaints, and rarely elevates those complaints to Sheriff Tucker's attention. For example, in November 2016, class member Destiny Jones filed a complaint against Sgt. Moore for using excessive force and falsely arresting her at the scene of a car crash caused by a drunk driver. Ex. 101, MC-RFP 8-211-214. Sheriff Tucker did not recall any investigation into her complaint. Ex. 24, R. Tucker Tr. 265:22-266:2, 267:15-18. Chief Williams testified that he recalled "looking into the incident" and determining not to take action, but could not remember if he "did a report or documentation of it." Ex. 27, Williams Tr. 184:10-185:14 *see also* Ex. 17, Moore Tr. 58:21-25. Chief Williams did not contact Ms. Jones. Ex. 50, D. Jones Decl. ¶ 18.

Chief Williams' investigation of the June 2016 incident involving Plaintiffs Khadafy and Quinnetta Manning was even more limited. On June 26, 2016, Chief Williams learned that the Mannings claimed that a MCSD deputy had handcuffed, choked, and beaten Mr. Manning. *See* Ex. 104 MC-RFP-8-182-183. Chief Williams asked Sgt. Moore to prepare a supplemental report setting forth his account of the events, but he never questioned Moore about the incident. Ex. 17,

---

[39] At least two class members have reported being arrested at roadblocks that appear neither in the MCSD's dispatch data nor in the incident report narratives for the arrests. *Compare* Ex. 54, E. Pate Decl. ¶ 2 (reporting a roadblock on Livingston Vernon Road on June 9, 2015) *with* Ex. 102, MC-RFP-Inc. Rep. 020907 (incident report for "paper service – warrant" on June 9, 2015, which states "I came in contact with Earnest L. Pate on Livingston Vernon Rd. near Hwy 22," but does not disclose the roadblock.); *compare* Ex. 56, Q. Smith Decl. ¶ 8 (reporting a roadblock on May 3, 2015 on George Washington and Welsh) *with* Ex. 103, MC-RFP-Inc. Rep. 020065 (Incident report for "paper service warrant" on May 3, 2015, which states "deputies came in contact with Quincy Smith on George Washington Str near Welsh Str.," but fails to mention a roadblock.).

Moore Tr. 47:4-20. At no point did Chief Williams reach out to Mr. or Mrs. Manning. Ex. 27, Williams Tr. 182:21-183:6. At the conclusion of this cursory investigation, Chief Williams determined not to take any action. *Id.* 184:4-9; *see also* Ex. 24, R. Tucker Tr. 72:9-14.[40]

When allegations of racial discrimination have been brought to Sheriff Tucker's attention, he has failed to conduct meaningful investigations. For example, in February 2013, then-Deputy Robert L. Gibson, who is Black, allegedly shared with a supervisor his "concerns about racially discriminatory [policing practices] that affected both the employees and the community," including white officers using excessive force and beating [B]lack individuals," and "setting up roadblocks primarily in the minority neighborhoods." Ex. 105, Compl., *Gibson v. Madison County*, No. 3:16-cv-633 HTW-LRA (S.D. Miss. Aug. 15, 2016), ¶ 37. Sheriff Tucker at no point commissioned an investigation into Mr. Gibson's allegations of racially discriminatory policing practices. Ex. 106, R. Tucker Tr. (*Gibson*) 71:10-15. Similarly, in June 2013, a former Madison County Detention Center officer claimed that he had been "subject to racial jokes [and] racial remarks" by his supervisor. Ex. 107, Compl., *Cooper v. Tucker*, No. 3:13-cv-350 HTW-LRA (S.D. Miss. June 7, 2013), at ¶ 7. Sheriff Tucker did not commission an investigation into these claims either. Ex. 24, R. Tucker Tr. 276:12-17. And, in March 2015, Sheriff Tucker received a notarized letter from a Black couple, stating that Deputy Brad Sullivan drew his gun on the couple and their five year old daughter and stated "I've got you niggers now." Ex. 108, MC-RFP-8-29. The letter complained of "systematic racism" and requested a "thorough investigation." *Id.* at MC-RFP-8-29-30. Sheriff Tucker attempted to call the

---

[40] Sheriff Tucker testified that he believed Chief Williams' investigation was adequate, and that Sgt. Moore had not violated any MCSD policies or procedures. Ex. 24, R. Tucker Tr. 243:4-7, 244:17-21. He testified that it was appropriate for Sgt. Moore to give the Mannings the "choice" of either providing witness statements or sleeping on a concrete floor in jail, *id.* at 239:20-241:21, incorrectly insisting that Mississippi law criminalizes witnesses' failure to report crimes. *Id.* at 235:10-15, 249:23-250:4, 264:5-18.

complainant, but did not reach him; he then delegated the matter to Chief Williams. Ex. 24, R.

Tucker Tr. 268:6-269-8. Sheriff Tucker testified that Sullivan represented to Chief Williams that

he did not use the term "niggers," and "that was the extent" of the inquiry. *Id.* 268:24-269:12.

## ARGUMENT

"Rule 23(a) states four threshold requirements applicable to all class actions." *Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Plaintiffs must establish "(1) numerosity (a

'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of

law or fact common to the class'); (3) typicality (named parties' claims or defenses are 'typical

… of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately

protect the interests of the class')." *Id.* (quoting Fed. R. Civ. P. 23(a)). The Fifth Circuit has

emphasized that "Rule 23(a) must be read liberally in the context of civil rights suits," especially

when, as here, "the class action falls under Rule 23(b)(2)." *Jones v. Diamond*, 519 F.2d 1090,

1099 (5th Cir. 1975). Plaintiffs' proposed class and subclasses meet each of these requirements.

## I.      PLAINTIFFS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT

For a class to be certified, it must be so numerous that joinder is impracticable. Fed. R.

Civ. P. 23(a)(1). A class of 100 to 150 members "generally satisfies the numerosity

requirement." *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999). When a class

seeks only injunctive relief, even a relatively small class will satisfy numerosity, as "the benefits

to be gained not only inure to the benefit of the known class but will benefit a future class of

indeterminate size." *Choice Inc. of Texas v. Graham*, No. 04-cv-1581, 2005 WL 1400408, at *2-

3 (E.D. La. June 3, 2005).

The proposed class easily satisfies the numerosity requirement. It includes all Black

persons who reside in or travel through Madison County and who are, as a result, subject to the

MCSD's Policing Program. There are over 36,000 Black residents of Madison County. *See* Ex.

29

62, (Census Data). This number is more than sufficient. The two proposed subclasses also readily satisfy the numerosity requirement. The Roadblocks Subclass includes all Black persons who are stopped at roadblocks established by the MCSD for crime control purposes. Since 2012, the MCSD has established over 2,000 roadblocks.[41] Ex. 1, Ricchetti Rep. ¶ 38. The Pedestrian Stop Subclass covers Black pedestrians in Madison County, including the hundreds, if not thousands of residents of and visitors to the specifically-targeted Canton area apartments.

Moreover, both the proposed class and subclasses include unknown individuals who may in the future reside in and/or travel through Madison County. "[T]he fact that the class includes unknown, unnamed future members … weighs in favor of certification." *Pederson v. La. St. Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000). And certain class members may be hesitant to assert claims for fear of retaliation. *See, e.g., Mullen*, 186 F.3d at 624.[42] In light of all these factors, the proposed class and subclasses satisfy the numerosity requirement.

## II.   PLAINTIFFS SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT

The commonality requirement of Rule 23(a)(2) requires that there must be one or more questions of law or fact common to the class, such that a "determination of [the] truth or falsity" of that question "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality requires "merely a single common contention that enables the class action 'to

---

[41] Incident reports indicate that at least 956 arrests of Black persons have occurred at MCSD roadblocks since January 1, 2012. *See* Ex. 2, Guha Decl. Ex. 6. By comparison, the class that was certified in *City of Indianapolis v. Edmond* consisted of motorists who had been or would be subjected to the Indianapolis police department's drug interdiction roadblock program, which comprised six total roadblocks that resulted in 104 total arrests. 531 U.S. 32, 34-35 (2000).

[42] For example, Defendants stated in their Answer that they found it "ironic" that Plaintiff Latoya Brown had filed suit in light of her having allegedly contacted the MCSD in the past for police assistance, and proceeded to detail the nature of those alleged calls. *See* Ans. ¶ 185. Other potential class members have good reason to fear that attempts to assert claims regarding MCSD's Policing Program may expose them to retaliation or embarrassment.

30

generate common *answers* apt to drive the resolution of the litigation.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

To satisfy Rule 23(a)(2), plaintiffs must "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury." *Dockery v. Fischer*, 253 F. Supp. 3d 832, 846 (S.D. Miss. 2015). Such a policy or practice "need not be formal or officially-adopted." *Id.* "Absent official sanction, a policy can be identified on the basis of custom or consistent practice" or "based on the defendant's deliberate indifference." *Id.* at 847. "[F]ailure to act can also constitute a policy or practice." *Id.* at 848. The commonality requirement can be met by identifying a "general policy of discrimination." *Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011); *see also Wal-Mart*, 564 U.S. at 350 (a quintessential "common contention" is "the assertion of discriminatory bias on the part of the same supervisor"). For class certification purposes, plaintiffs need only demonstrate that "the policies and practices they challenge are common, not (yet) that the common policies and practices are unconstitutional." *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016); *accord Morrow*, 277 F.R.D. at 184. And, to the extent that Plaintiffs are required to provide evidence of discriminatory intent at the class certification stage, such intent can be shown using circumstantial evidence. *See Veasey v. Abbott*, 830 F.3d 216, 235-36 (5th Cir. 2016) ("neutral reasons can and do mask racial intent").

Under these standards, the proposed class and two subclasses satisfy the commonality requirement. The Fourteenth Amendment claims of the proposed Targeting Class present common questions, including whether the MCSD has a policy of targeting Black communities and racially profiling Black individuals, and whether this policy violates the Equal Protection Clause. The claims of the Roadblock Subclass turn on the common question of whether the MCSD has a policy, custom, or consistent practice of conducting roadblocks in majority-Black

areas of Madison County for purposes of crime control, and whether the roadblocks carried out

pursuant to this policy are consistent with the requirements of the Fourth and Fourteenth

Amendments. The claims of the Pedestrian Stop Subclass turn on whether the MCSD has a

policy, custom, or consistent practice of engaging in searches and seizures of Black persons in

Madison County in the absence of individualized reasonable suspicion, and if so, whether the

searches and seizures carried out pursuant to this policy are consistent with the requirements of

the Fourth and Fourteenth Amendments.

A.    **The Targeting Class Satisfies The Commonality Requirement**

Plaintiffs seek to certify the following class (the "Targeting Class") for declaratory and

injunctive relief under Rule 23(a) and 23(b)(2):

> All Black persons who have been, or will be, subjected to the MCSD's policy
> and/or widespread custom or practice of racially profiling and targeting Black
> persons for stops, searches, and/or seizures on the basis of their race in violation
> of the Equal Protection Clause of the Fourteenth Amendment.

While the Fifth Circuit requires only a "single common question" for commonality

purposes, *Deepwater Horizon*, 739 F.3d at 811, the claims of the Targeting Class raise numerous

common questions of law or fact, including the following:

- Whether the MCSD has a policy or widespread custom or practice of racially profiling Black persons in Madison County;

- Whether the MCSD has a policy or widespread custom or practice of disproportionately targeting majority-Black communities;

- Whether the MCSD has a policy or widespread custom or practice of conducting searches and seizures of Black persons at least in part on the basis of race;

- Whether the MCSD has a policy or widespread custom or practice of failing to train officers adequately to prevent racial targeting and profiling; and

- Whether the MCSD has a policy or widespread custom or practice of failing to monitor officers adequately to prevent racial targeting and profiling.

Several post-*Wal-Mart* courts have found commonality where plaintiffs have alleged and

32

presented evidence of an unwritten policy of racial profiling by a law enforcement agency.[43]

Plaintiffs' evidence of Defendants' Policing Program is consistent with the evidence presented in these in post-*Wal-Mart* profiling cases. In *Ortega-Melendres*, 836 F. Supp. 2d at 986-87, plaintiffs provided evidence that Sheriff Arpaio had made "public statements that a fact finder could interpret as endorsing racial profiling" against individuals of Hispanic descent, as well as evidence of a culture of discrimination against Hispanic individuals, including Sheriff Arpaio having forwarded a racially discriminatory email. Here, Plaintiffs have provided evidence of public and private statements by Sheriff Tucker that indicate racial animus. Plaintiffs have also presented evidence of a culture of discrimination, including testimony by current and former MCSD personnel regarding the use of racial epithets by Sheriff Tucker and his deputies. In *Morrow*, plaintiffs "provided anecdotal evidence that the stops of class representatives" were "based … on racial profiling." 277 F.R.D. at 193. Here, Plaintiffs have provided extensive anecdotal evidence by more than 33 named Plaintiffs and class members of racial profiling at roadblocks, traffic stops, and pedestrian stops. *See generally*, Ex. 29 through 61. And, in *Floyd*, plaintiffs presented expert testimony that racial composition of a census tract "is a statistically significant, strong and robust predictor of NYPD stop-and-frisk patterns even after controlling for" relevant confounding factors. 283 F.R.D. at 168. Here, Plaintiffs present analogous expert testimony on the MCSD's disproportionate concentration of roadblocks in majority-Black communities, one of the most significant components of its Policing Program.[44] *See supra* at 16.

---

[43] *See, e.g.*, *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (commonality met through evidence of "a policy of racial profiling, in violation of the Fourteenth Amendment"); *Morrow*, 277 F.R.D. at 192 (commonality met through evidence of a "city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property"); *Floyd v. City of New York*, 283 F.R.D. 153, 159, 173-75 (S.D.N.Y. 2012) (commonality met through evidence that police department "engaged in a policy and/or practice of unlawfully stopping and frisking [Black and Latino] people").

[44] In determining whether the commonality requirement is satisfied with respect to an alleged policy of

Viewed in its entirety, Plaintiffs' evidence provides "significant proof" of Defendants' policy of racially profiling and targeting Black individuals. *Wal-Mart*, 564 U.S. at 353. Because the claims of the Targeting Class turn on common questions concerning this policy, this Court should find the commonality requirement satisfied as to the Targeting Class.

**B.    The Roadblock Subclass Satisfies The Commonality Requirement**

Plaintiffs Lawrence Blackmon, Latoya Brown, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker also seek to certify the following subclass (the "Roadblock Subclass") for declaratory and injunctive relief under Fed R. Civ. P. 23(a) and 23(b)(2):

> All Black motorists and passengers who have been, or will be, subject to the MCSD's policy of disproportionately conducting roadblocks in majority-Black neighborhoods for general crime control purposes and without appropriate procedural safeguards, in violation of the Fourth and Fourteenth Amendments.

Plaintiffs have been illegally stopped and searched at roadblocks conducted by the MCSD under the Roadblock Program, and seek relief on behalf of all similarly-situated individuals who have been or will be stopped at similar unconstitutional roadblocks.[45] Plaintiffs, like other members of the proposed Roadblock Subclass, have been and continue to be subjected to the Roadblock Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Roadblock Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks in Black communities in Madison County, including roadblocks at or near the entrances of majority-Black apartment complexes, for the primary purpose of crime

---

discrimination, courts do not require "perfect" statistical evidence. *See, e.g., Morrow*, 277 F.R.D. at 192 (finding the commonality requirement satisfied even though "the statistical evidence presented by Plaintiff is not perfect"). In particular, courts permit the use of "less precise" data when a defendant has not retained "the primary evidence in a discrimination case." *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2015). Here, Defendants have no data on the race of persons stopped but not arrested or cited.

[45] *See* Ex. 4, L. Brown Tr. 45:12-21, 48:19-50:13; Ex. 3, Blackmon Tr. 144:4-11; Ex. 7, N. Singleton Tr. 41:23-45:7; Ex. 9, Thomas Tr. 25:21-26:20; Ex. 10, B. Tucker Tr. 19:2-18.

control, in contravention of the Fourth Amendment;

- Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks with inadequate procedural safeguards, in contravention of the Fourth Amendment; and

- Whether the MCSD has a policy or widespread custom or practice of disproportionately establishing roadblocks in Black communities in Madison County on a racially discriminatory basis, in violation of the Equal Protection Clause.

It is well-established that roadblock programs that have the primary purpose of general crime control violate the Fourth Amendment. *See Edmond*, 531 U.S. at 44; *Prouse*, 440 U.S. at 659 n.18. Thus, the use of roadblocks for crime prevention in purportedly "high crime" apartment complexes or subdivisions is unconstitutional. *See, e.g.*, *Shankle v. Texas City*, 885 F. Supp. 996, 1003-04 (S.D. Tex. 1995) (roadblocks located at each of the entrances to subdivision with high crime rates violated Fourth Amendment).[46] Many courts have certified classes in civil rights class actions asserting claims under the Fourth Amendment and/or the Equal Protection Clause with respect to an alleged policy, or widespread custom or practice, of unconstitutional traffic stops, including checkpoints and roadblocks. *See, e.g.*, *Edmond*, 531 U.S. at 36 (affirming injunctive relief granted to certified class of motorists who had been subjected to city's drug interdiction checkpoints); *Morrow*, 277 F.R.D. at 202 (certifying class of racial minority motorists alleging they were subjected to discriminatory traffic stop program). The Roadblock Subclass therefore satisfies the commonality requirement of Rule 23(a)(2).

### C.    The Pedestrian Stop Subclass Satisfies The Commonality Requirement

Finally, Plaintiffs Steven Smith, Latoya Brown, and Khadafy Manning seek to certify the

---

[46] Any contentions by Defendants that they do not conduct roadblocks for purposes of crime control are irrelevant to the limited inquiry into the merits that is permissible at the class certification stage. *See, e.g.*, *Collins v. Ainsworth*, 382 F.3d 529, 543-44 (5th Cir. 2004) ("Though Ainsworth claims the checkpoints were set up to advance general highway safety, and the checkpoints may have been facially valid pursuant to Mississippi law …, Plaintiffs have put forth material evidence that shows another programmatic purpose which was advanced by Sheriff Ainsworth.").

following subclass (the "<u>Pedestrian Stop Subclass</u>") for declaratory and injunctive relief:

> All Black persons who have been, or will be, subject to the MCSD's policy of conducting stops, searches and/or seizures of Black pedestrians in Madison County in the absence of reasonable, articulable suspicion or probable cause.

These Plaintiffs have been illegally stopped by the MCSD under the Pedestrian Stop Program, and seek relief on behalf of all similarly-situated individuals.[47] Plaintiffs, like other members of the proposed Pedestrian Stop Subclass, have been and continue to be subjected to the Pedestrian Stop Program, and the affirmative class-wide injunctive relief they seek against the program will benefit all members of the subclass. At least the following common questions of law or fact are central to the claims of the Pedestrian Stop Subclass Plaintiffs seek to certify:

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons present in the vicinity of the Apartment Complexes in the absence of reasonable, articulable suspicion, or probable cause;

- Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons in the vicinity of the Apartment Complexes at least in part on the basis of race and/or ethnicity; and

- Whether the MCSD has a policy, or longstanding custom or practice of targeting the Apartment Complexes at least in part on the basis of race.

The MCSD's policies, customs, and practices concerning the Pedestrian Stop Program, including the creation and implementation of the Apartment Detail and the NET Team, were promulgated by the highest level of MCSD's leadership, disseminated to rank-and-file officers through meetings, instructions, and directives, and implemented pursuant to a hierarchical supervisory structure. *See supra* at 12. Therefore, the injuries derived from the Pedestrian Stop Program are substantially similar across the Subclass and implicate common issues of proof. *See, e.g., Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (commonality satisfied in

---

[47] *See* Ex. 8, S. Smith Tr. 34:16-35:4, 38:13-16; Ex. 4, L. Brown Tr. 50:24-51:9, 53:2-54:10, 74:19-76:9; Ex. 97, MC-RFP-Inc. Rep. 047927 (K. Manning incident report).

case involving a program of "unjustified *Terry* stops, not supported by reasonable suspicion, occurring outdoors in the vicinity of [certain apartment] buildings"). Consequently, the claims of the Subclass turn on common questions of law and fact that will establish Defendants' liability, and the commonality requirement of Rule 23(a)(2) is satisfied. *See Wal-Mart*, 564 U.S. at 350.

## III.   PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT OF RULE 23(a)(3)

To satisfy the typicality requirement, the claims or defenses of the representative parties must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test for typicality … is not demanding." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997); *see also James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) ("If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."). As long as there is similarity in the underlying legal theories, the fact that one or more of the Named Plaintiffs' claims may be subject to a unique defense does not defeat typicality. *See, e.g.*, *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting claim that "the presence of an arguable unique defense necessarily destroys typicality"). As a practical matter, "'[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'" *Wal-Mart*, 564 U.S. at 349 n.5. Therefore, once commonality is shown, as it has been here, typicality often "will follow as a matter of course." *Dockery*, 253 F. Supp. 3d at 850.

**Plaintiff Latoya Brown** is a resident of Canton, Mississippi, where she has lived most of her life. Ex. 30, L. Brown Decl. ¶ 2. In the last three years, Ms. Brown has been subjected to several suspicionless pedestrian stops by the MCSD. *Id.* ¶ 3; Compl. ¶¶ 83-87. Each time she was forced to provide identification and wait for the deputies to check for warrants before she could proceed. Ex. 4, L. Brown Tr. 50:22-52:3, 75:20-76:9. The MCSD also entered and searched the home Ms. Brown then shared with Plaintiff Steven Smith without a warrant and without permission. Ex. 30, L. Brown Decl. ¶ 4; Compl. ¶¶ 276-81. Ms. Brown remains at risk of

being subjected to these suspicionless, race-based searches and seizures in the future.

**Plaintiff Lawrence Blackmon** currently resides in Washington, D.C. Ex. 29, Blackmon Decl. ¶ 2. In the coming months he will return to Canton, where he has lived most of his life, to begin his law career. *Id.*; Compl. ¶ 191. In 2015, MCSD personnel forced their way into Mr. Blackmon's home after he requested to see a warrant before allowing them in. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 194-96. The officers handcuffed Mr. Blackmon at gunpoint and searched his home. Ex. 29, Blackmon Decl. ¶ 3; Compl. ¶ 196-97. Mr. Blackmon has also been subjected to numerous MCSD roadblocks. Ex. 29, Blackmon Decl. ¶ 4; Compl. ¶ 201. Upon his return to Canton, Mr. Blackmon will be at risk of further suspicionless, race-based searches and seizures.

**Plaintiff Khadafy Manning** is a resident of Canton, Mississippi, where he has lived for many years. Ex. 31, K. Manning Decl. ¶ 2. Mr. Manning was forced to write a false witness statement after MCSD deputies entered his wife's home without a warrant and subjected him to an unlawful seizure and the use of excessive force. *Id.* ¶ 3; Compl. ¶ 211. Mr. Manning was arrested last year in Canton Estates after a NET Team officer conducting a foot patrol stopped Mr. Manning because he believed he was avoiding him. Ex. 31, K. Manning Decl. ¶ 4; Ex. 97, MC-RFP Inc. 047927. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Quinnetta Manning** is a lifelong resident of Canton, Mississippi. Ex. 32, Q. Manning Decl. ¶ 2. Ms. Manning was also forced to write a false witness statement after the MCSD deputies entered her home without a warrant and threatened her and beat her husband. *Id.* ¶ 3; Compl. ¶ 211. As a current Canton resident, Mr. Manning remains at risk of being subject to further race-based searches and seizures in the future.

**Plaintiff Nicholas Singleton** is a resident of Canton, Mississippi. Ex. 33, Singleton Decl.

¶ 2. Mr. Singleton has been stopped at more than 20 roadblocks in recent years, several of which occurred within the last four years. *Id.* ¶ 3; Compl. ¶ 265. As a current Canton resident, Mr. Singleton remains at risk of being subject to further MCSD roadblocks in the future.

**Plaintiff Steven Smith** is a longtime resident of Canton who recently moved to Dallas, Texas, where he recently moved to start a new job. Ex. 34, S. Smith Decl. ¶ 2. Much of his family lives in Madison County and he expects to travel back to Madison County regularly and eventually move back. *Id.* Mr. Smith has been subjected to numerous suspicionless pedestrian stops by the MCSD, including a stop for a warrant check in January 2017 as he was walking onto the grounds of his former home. *Id.* ¶ 3; Compl. ¶¶ 271-73. With Ms. Brown, he was also the victim of a warrantless home search. Ex. 34, S. Smith Decl. ¶ 5; Compl. ¶¶ 276-81. Because Mr. Smith continues to travel to Madison County to visit his family and intends to move back permanently in the future, Mr. Smith remains at risk of being subject to the MCSD's unconstitutional and suspicionless stops and searches in the future.

**Plaintiff Bessie Thomas** is a resident of Canton, Mississippi, where she has lived for over 50 years. Ex. 35, B. Thomas Decl. ¶ 2. While Ms. Thomas attempts to avoid the MCSD's roadblocks, she has been stopped at numerous roadblocks, including at least one in the last three years that was located outside her church and resulted in a citation. *Id.* ¶ 3; Compl. ¶ 287; Ex. 9, B. Thomas Tr. 28:22-29:12. As a current Canton resident, Ms. Thomas remains at risk of being subject to further unconstitutional MCSD roadblocks in the future.

**Plaintiff Betty Jean Williams Tucker** is a long-time resident of Canton, Mississippi, where she was born and raised. Ex. 36, B. Tucker Decl. ¶ 2. Ms. Tucker has been stopped at numerous roadblocks, at least two in the last two years. *Id.* ¶ 3; Compl. ¶ 296; Ex. 10, B. Tucker Tr. at 19:23-20:6. As a current Canton resident, Ms. Tucker remains at risk of being subject to

39

further unconstitutional MCSD roadblocks in the future.

The claims of the Named Plaintiffs are typical of those of Class and the Subclasses. All Named Plaintiffs have claims typical of the Class, as they have been, and likely again will be, victims of Defendants' unconstitutional Policing Program. Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker have claims typical of the Roadblock Subclass, as they have been stopped at MCSD roadblocks and are at risk of being stopped again in the future. Steven Smith, Latoya Brown, and Khadafy Manning have claims typical of the Pedestrian Stop Subclass, as they have been and remain at risk of being subject to suspicionless, race-based pedestrian stops. Regardless of any differences in the details of each Named Plaintiff's claims, the claims of the Named Plaintiffs share a common underlying legal theory and thus satisfy the typicality requirement.

## IV.   PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF THE CLASS, AS REQUIRED BY RULE 23(a)(4)

The final requirement of Rule 23(a) is also satisfied, because the "class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). In analyzing this requirement, courts consider "the zeal and competence of the representatives' counsel and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Dockery*, 253 F. Supp. 3d at 850.

With respect to the adequacy of the Named Plaintiffs, the standard "is not exacting; it is sufficient that the class representatives have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Steward v. Janek*, 315 F.R.D. 472, 490 (W.D. Tex. 2016). Here, each named Plaintiff has declared his or her understanding of the responsibilities of a class representative, as

well as his or her willingness to prosecute this litigation.[48] Further, all named Plaintiffs have sat

for depositions, responded to multiple sets of interrogatories, and continue to be actively engaged

with counsel in prosecuting this action. *Id.* This easily satisfies the adequacy requirement.

Further, no conflict of interest exists between the named Plaintiffs and the proposed

classes. "A sufficient alignment of interests" exists for Rule 23(a)(4) purposes if "all class

members are united in asserting a common right." *Lehocky v. Tidel Technologies, Inc.*, 220

F.R.D. 491, 502-03 (S.D. Tex. 2004). Here, the named Plaintiffs assert the same injury as the

unnamed class members. *See In re Heartland Pmt. Sys., Inc. Customer Data Sec. Breach Litig.*,

851 F. Supp. 2d 1040, 1056 (S.D. Tex. 2012). Each Named Plaintiff is a Black person who

presently resides in, travels frequently to, and/or has a principal place of residence in Madison

County, and each Named Plaintiff has been subjected to, and remains at risk that he or she again

will be subjected to, the MCSD's Policing Program. *See supra* 38-40. Accordingly, each named

Plaintiff and all unnamed class members will derive the same benefit from the injunctive and

declaratory relief sought in this action with respect to the MCSD's Policing Program.[49]

Finally, Plaintiffs are represented by experienced and qualified counsel who have been

and will continue to vigorously and diligently prosecute this action on behalf of the proposed

---

[48] Ex. 30, L. Brown Decl. ¶ 7-8; Ex. 29, L. Blackmon Decl. ¶ 7-8; Ex. 31, K. Manning Decl. ¶¶ 7-8; Ex. 32, Q. Manning Decl. ¶¶ 7-8; Ex. 33, N. Singleton Decl. ¶¶ 6-7; Ex. 34, S. Smith Decl. ¶¶ 8-9, Ex. 35, B. Thomas Decl. ¶¶ 6-7; Ex. 36, B. Tucker Decl. ¶¶ 7-8.

[49] That unnamed class members have sought or might in the future seek the assistance of the MCSD, or the hypothetical possibility that one or more class members could support the conduct challenged herein, does not create a conflict between Plaintiffs and unnamed class members. *See Morrow*, 277 F.R.D. at 195. Plaintiffs only seek relief with respect to policies, customs, and practices that violate the Constitution. In any event, potential diversity of opinion within a class is not a basis for denying certification. *See, e.g., Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 486 (5th Cir. 1982) ("[I]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so."); *Groover v. Michelin North Am., Inc.*, 192 F.R.D. 305, 306 (M.D. Ala. 2000) ("The fact that some class members … would prefer to … leave violations of their rights, if violations exist, unremedied is not dispositive under Rule 23(a)."); *Lanner v. Wimmer*, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal if some members of the class might prefer not to have violations of their rights remedied.").

41

classes: namely, the American Civil Liberties Union of Mississippi, the American Civil Liberties Union Foundation, and Simpson Thacher & Bartlett LLP. Counsel for Plaintiffs have the resources, expertise, and experience to prosecute this action. *See generally* Ex. 111, Youngwood Decl.; Ex. 112, Tom Decl.; Ex. 113, Edwards Decl. Counsel for Plaintiffs further know of no conflicts among members of the classes or between the attorneys and members of the classes. Named Plaintiffs and their counsel therefore meet the requirements of Rule 23(a)(4).

## V.   THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED

This case fits squarely within Rule 23(b)(2), which authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Certification is proper under Rule 23(b)(2) where, as here, a class seeks "an indivisible injunction benefiting all its members at once." *Wal-Mart*, 564 U.S. at 362. Rule 23(b)(2) was designed as a vehicle for challenging discrimination and fostering institutional reform. *See* Fed. R. Civ. P. 23 Adv. Comm. Notes, *reprinted in* 39 F.R.D. 69, 102 (1966). Thus, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture." *Wal-Mart*, 564 U.S. at 361.[50]

Plaintiffs' claims are clearly susceptible to common specific relief so that final injunctive relief would be appropriate for the class as a whole. "The Court need not, at this stage, determine what remedy Plaintiffs [will] be entitled to if they prevail[] on the merits of their claim." *M.D. v.*

---

[50] Because Plaintiffs seek to certify the proposed class and subclasses pursuant to Rule 23(b)(2), "it is not necessary that the members of [each] class be so clearly identified that any member can be presently ascertained." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *see also ODonnell v. Harris County, Texas*, No. H-16-1414, 2017 WL 1542457, at *3 (S.D. Tex. Apr. 28, 2017) ("[T]he strict ascertainability requirements for a proposed damages class action do not apply to a Rule 23(b)(2) class seeking prospective relief under the Fifth Circuit's standard for civil rights litigation."); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

*Perry*, 294 F.R.D. 7, 47 (S.D. Tex. 2013). "Rather, the Court must determine that the Plaintiffs' claim is one that is susceptible to common, specific relief." *Id.* Plaintiffs do not request individualized relief, but instead seek to require Defendants to reform their policies to conform to the requirements of the Constitution. Thus, the same final injunctive and declaratory relief would be appropriate for all members of the class and for all members of the two subclasses on the issues relevant to each subclass. The requirements of Rule 23(b)(2) are therefore satisfied.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court find that Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b)(2); certify the designated class and subclasses; and, pursuant to Fed. R. Civ. P. 23(g), appoint current counsel for Plaintiffs as class counsel.

Dated: March 14, 2018

By:     /s/ Joshua Tom
           Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Christopher Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

43

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2018, I caused the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com

Jaden Jackson

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**PLAINTIFFS' SUPPLEMENTAL INITIAL DISCLOSURES** |

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and (e), Plaintiffs Latoya Brown, Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker (collectively, "Plaintiffs") submit the following supplemental initial disclosures.

**I.      Supplemental Initial Disclosure Qualifications**

These supplemental initial disclosures are made upon information presently known to Plaintiffs and without prejudice to Plaintiffs' right to produce during discovery or at trial such data, information or documents as are: (a) subsequently discovered; (b) subsequently determined to be relevant for any purpose; or (c) subsequently determined to have been omitted from this

EXHIBIT B

and any supplemental disclosure statements.  By making these disclosures, Plaintiffs do not

represent that they are identifying every document, tangible thing, or witness that may be

relevant to the issues in this lawsuit, or on which Plaintiffs may rely in support of their claims or

defenses.  Nor does the inclusion of the individuals below indicate Plaintiffs' intent to call such

individuals as witnesses.  Nor do Plaintiffs waive their rights to object to the disclosure of any

person, document, or thing on the basis of any applicable privilege, the work product doctrine,

relevancy, competency, materiality, undue burden, hearsay, or any other valid objection in

response to any discovery request or proceeding in this case. Further, Plaintiffs reserve all rights

to present at trial or other hearing in this matter additional witnesses and evidence not presently

identified or encompassed by these disclosures, and to present any rebuttal or impeachment

evidence they deem appropriate.

II.     **Supplemental Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) and (e)**

  A. **The name and, if known, the address and telephone number of each
individual likely to have discoverable information—along with the subjects
of that information—that the disclosing party may use to support its claims
or defenses, unless the use would be solely for impeachment (Fed. R. Civ. P.
26(a)(1)(A)(i))**

Pursuant to Federal Rules of Civil Procedure 26(a)(1)(A)(i) and 26(e), Plaintiffs identify

the following individuals (exclusive of expert witnesses and attorneys, but inclusive of

individuals previously disclosed by Plaintiffs) as persons currently known to Plaintiffs who are

likely to have discoverable information that Plaintiffs may use to support their claims.

1. Eugene Adams
 Chinn Drive, Canton, MS

 Mr. Adams has knowledge of the 2013 home search incident described in Khadafy
 Manning's Response to Interrogatory No. 2 in his Responses and Objections to
 Defendants' First Set of Interrogatories.

2.    James Bacon
       121 Bacon Cove
       Camden, MS  39045

       Mr. Bacon has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

3.    Amanda Boone
       Canton, MS

       Ms. Boone has knowledge of a roadblock described in Steven Smith's Response to
       Interrogatory No. 3 in his Responses and Objections to Defendants' First Set of
       Interrogatories.

4.    Michael Bracy
       108 Lincoln Street
       Flora, MS  39071

       Mr. Bracy has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

5.    Deputy William Brock
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Brock has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

6.    Anthony Brown
       118 Compress Street
       Flora, MS  39071

       Mr. Brown has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

7.    Bysheba Brown
       107 Pine Knoll Drive, Apt. 107
       Ridgeland, MS  39157

       Ms. Brown has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

8.      Deputy Joseph Butler
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Butler has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

9.      Willie Carter
        160 Hargon Road
        Camden, MS  39045

        Mr. Carter has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

10.     Deputy Barry Chandler
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Chandler has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

11.     Deputy Michael Chapman
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Chapman has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

12.     Deputy Taylor Chastain
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Chastain has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

13.     Bam Clark

        Mr. Clark has knowledge of the "jump out" incident described in Quinnetta Manning's
        Response to Interrogatory No. 5 in her Responses and Objections to Defendants' First
        Set of Interrogatories.

14.    Deputy Trey Curtis
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Curtis has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

15.    Veronica Davis
       388 Ricks Drive, Apt. 14B
       Canton, MS  39046

       Ms. Davis has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

16.    Domunique Doss
       6811 Old Canton Road
       Ridgeland, MS  39157

       Mr. Doss has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

17.    Deputy George Elliott
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Elliott has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

18.    Darryl Evans
       Canton, MS

       Mr. Evans has knowledge of the incident described in paragraphs 93(b) and 192-200 of
       the Complaint.

19.    Deputy Josh Fish
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Fish has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

20.    Deputy Elton Flax
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Flax has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

21.    Undrea Guise
       388 Ricks Drive, Apt. 1H
       Canton, MS 39046

       Ms. Guise has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

22.    Deputy James Hall
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Hall has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.  Deputy Hall also has knowledge of the June 26,
       2016 incident described in paragraphs 212-235 of the Complaint.

23.    Kenneth Harris
       219 Pine Grove Road
       Canton, MS 39046

       Mr. Harris has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

24.    Lester Hollins
       3919 Skyview Drive
       Jackson, MS 39213

       Mr. Hollins has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

25.    Antonio Howard
       107 Pine Knoll Drive, Apt. 107
       Ridgeland, MS 39157

       Mr. Howard has knowledge of the unconstitutional policing policies, customs, and
       practices challenged by Plaintiffs.

26.    Deputy Samuel Howard
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Howard has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

27.    Kendrell Jackson

       Mr. Jackson has knowledge of the 2013 home search incident described in Khadafy
       Manning's Response to Interrogatory No. 2 in his Responses and Objections to
       Defendants' First Set of Interrogatories.

28.    Deputy Albert Jones
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Jones has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

29.    Deputy Tommy Jones
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Jones has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

30.    Deputy James Knight
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Knight has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

31.    Deputy Richard Ladnier
       2941 U.S. Highway 51
       Canton, MS 39046

       Deputy Ladnier has knowledge of the unconstitutional policing policies, customs
       and practices challenged by Plaintiffs.

32.     Deputy Brian Loveall
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Loveall has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

33.     Deputy Joseph Mangino
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Mangino has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

34.     Tierra Parker

        Ms. Parker has knowledge of the "jump out" incident described in Khadafy Manning's
        Response to Interrogatory No. 5 in his Responses and Objections to Defendants' First
        Set of Interrogatories.

35.     Deputy David Redd
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Redd has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.  Deputy Redd also has knowledge of the June
        26, 2016 incident described in paragraphs 212-235 of the Complaint.

36.     Deputy Mark Sandridge
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Sandridge has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

37.     Deputy Connor Smith
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Smith has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.  Deputy Smith also has knowledge of the June
        26, 2016 incident described in paragraphs 212-235 of the Complaint.

38.     Deputy Darian Smith
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Smith has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

39.     John Spann
        500 Avalon Way
        Brandon, MS  30947

        Mr. Spann has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

40.     Randy Speidle

        Mr. Speidle has knowledge of the incident described in paragraphs 89 and 271-275 of
        the Complaint.

41.     Deputy Tommy Squires
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Squires has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

42.     Deputy Bradley Sullivan
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Sullivan has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

43.     Angela Taylor
        224 N. West Street
        Canton, MS 39046

        Ms. Taylor has knowledge of Sheriff Tucker's personal involvement in the
        implementation of the unconstitutional policing policies, customs, and practices
        challenged by Plaintiffs, as described in paragraphs 131 and 263 of the Complaint.

44.     Floyd Taylor
        224 N. West Street
        Canton, MS 39046

        Mr. Taylor has knowledge of Sheriff Tucker's personal involvement in the
        implementation of the unconstitutional policing policies, customs, and practices
        challenged by Plaintiffs, as described in paragraphs 131 and 263 of the Complaint.

45.     Terrance Thompson
        Canton, MS

        Mr. Thompson has knowledge of the incidents described in paragraphs 89, 101(a), 206-
        209, and 271-275 of the Complaint.

46.     Deputy Jeffrey Waldrup
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Waldrup has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

47.     Deputy Will Weisenberger
        2941 U.S. Highway 51
        Canton, MS 39046

        Deputy Weisenberger has knowledge of the unconstitutional policing policies, customs
        and practices challenged by Plaintiffs.

48.     Christian Wells

        Mr. Wells has knowledge of a roadblock described in Herbert Green's Response to
        Interrogatory No. 3 in his Responses and Objections to Defendants' First Set of
        Interrogatories.

49.     Earline Wilder
        388 Ricks Drive, Apt. 5A
        Canton, MS  39046

        Ms. Wilder has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

50.    Rodriguez Williams

Mr. Williams has knowledge of a roadblock described in Herbert Green's Response to Interrogatory No. 3 in his Responses and Objections to Defendants' First Set of Interrogatories.

51.    Shaqueria Williams

Ms. Williams has knowledge of the June 26, 2016 incident described in paragraphs 93(a), 211-236, and 326-329 of the Complaint.

52.    Deputy Todd Wilson
       2941 U.S. Highway 51
       Canton, MS 39046

Deputy Wilson has knowledge of the unconstitutional policing policies, customs and practices challenged by Plaintiffs.

53.    Deputy Cline Wyman
       2941 U.S. Highway 51
       Canton, MS 39046

Deputy Wyman has knowledge of the unconstitutional policing policies, customs and practices challenged by Plaintiffs.

11

Dated: December 28, 2017

By: */s/ Joshua Tom*_____
     Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Yukiu Chan (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

**From:** Rethy, Isaac [mailto:IRethy@stblaw.com]
**Sent:** Friday, December 29, 2017 5:24 PM
**To:** Charles Cowan <cec@wisecarter.com>; Youngwood, Jonathan <jyoungwood@stblaw.com>
**Cc:** Joshua Tom <JTom@aclu-ms.org>; jrobinson@aclu.org; Gochman, Janet A. <jgochman@stblaw.com>; Sivashanker, Kavitha <Kavitha.Sivashanker@stblaw.com>; Choudhri, Nihara K <NChoudhri@stblaw.com>; Jarrett, Bonnie <Bonnie.Jarrett@stblaw.com>; eedwards@aclu.org; Mike Wallace <mbw@wisecarter.com>; Russell Nobile <trn@wisecarter.com>; Charlie Ross <cer@wisecarter.com>; bcowan@curriejohnson.com; Katie Snell <Katie@katiebryantsnell.com>
**Subject:** RE: Brown, et al. v. Madison County, et al.

Counsel,

On behalf of Plaintiffs in the above-referenced action, please find at the link, https://stblaw.sharefile.com/d-s2eff306a06f44c28, documents bearing Bates numbers PL-MCSD 0000043 – PL-MCSD 0000073. We are producing these documents in response to Defendants' Second Set Requests for Production to Plaintiffs ("Second Requests for Production"), dated November 22, 2017, subject to and without waiver of Plaintiffs'

EXHIBIT "C"

1

responses and objections to the Second Requests for Production. The password for these files will be provided separately by email.

These documents are being produced in accordance with the Stipulated Protective Order, so ordered by the Court in the above-captioned action on September 6, 2017 (the "Protective Order"), and any documents designated as "Confidential" shall be treated in accordance with the Protective Order.

By producing these documents, Plaintiffs do not intend to waive any applicable privilege or protection. Accordingly, any inadvertent production of any privileged information does not preclude the subsequent assertion of a claim of attorney-client privilege, work product protection, or any other applicable privilege or protection in the future with respect to this or any other information.

We continue to reserve all of Plaintiffs' rights in connection with the Second Requests for Production. Please feel free to contact me if you have any questions.

Isaac Rethy
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-3869
irethy@stblaw.com

**From:** Charles Cowan [mailto:cec@wisecarter.com]
**Sent:** Friday, December 29, 2017 3:47 PM
**To:** Youngwood, Jonathan <jyoungwood@stblaw.com>
**Cc:** Joshua Tom <JTom@aclu-ms.org>; jrobinson@aclu.org; Gochman, Janet A. <jgochman@stblaw.com>; Sivashanker, Kavitha <Kavitha.Sivashanker@stblaw.com>; Choudhri, Nihara K <NChoudhri@stblaw.com>; Jarrett, Bonnie <Bonnie.Jarrett@stblaw.com>; eedwards@aclu.org; Rethy, Isaac <IRethy@stblaw.com>; Mike Wallace <mbw@wisecarter.com>; Russell Nobile <trn@wisecarter.com>; Charlie Ross <cer@wisecarter.com>; bcowan@curriejohnson.com; Katie Snell <Katie@katiebryantsnell.com>; Charles Cowan <cec@wisecarter.com>
**Subject:** Brown, et al. v. Madison County, et al. [EXT]

Good afternoon Jonathan,

   I write regarding Defendants' Second Set of Interrogatories and Second Requests for Production, which were served on November 22, 2017. On Friday, December 22 2017, Plaintiffs served their responses to those discovery requests. Those responses repeatedly reference documents that will be produced, but to date, Defendants have not received any of the referenced documents. Please apprise us of when Defendants can expect to receive Plaintiffs' production of documents relating to those discovery requests.

Best regards,

Charles E. Cowan
*Attorney*
Post Office Box 651
Jackson, MS 39205-0651

2

600 Heritage Building
401 East Capitol St.
Jackson, MS 39201
P: 601-968-5514
F: 601-968-5519
E: cec@wisecarter.com
www.wisecarter.com





The preceding e-mail is privileged and confidential and is intended only for the named addressee.  If you received this message in error, please delete it and notify the sender by return e-mail or by phone at the numbers noted above.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>     Plaintiffs,<br><br>        v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>     Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF JAMES BACON** |

I, JAMES BACON, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is James Bacon. I am a 58-year-old Black man. I live in Camden, Mississippi. I have had a convenience store in Camden for 17 years.

2.      Madison County Sheriff's Department sets up roadblocks in Camden two to three times a month. They often set up roadblocks when there are events in town, like a local football game.

3.      MCSD also sets up roadblocks down the road from my business both ways so that people can't leave my business without passing through a roadblock.

PL-MCSD 0000043

2

4.      Two or three years ago I drove through a roadblock on Highway 51 and Morgan Road.  The officers asked for my ID and registration.  After running my driver's license, they told me they had a warrant for me.  I explained that they must be wrong, but they arrested me anyway.

5.      I paid about $1,400 to get out of jail.

6.      I later found out they had arrested me for a crime allegedly committed by my son.  But my son had died three years earlier.  And while he and I had the same name, we have different birthdays.  I do not know why they would have told me there was a warrant for my arrest based on my driver's license.

7.      I believe that the MCSD sets up roadblocks in my community because the residents are majority Black.  They interfere with my business and our community when we gather together because we are black.

I declare under penalty of perjury that the statements above are true and correct.

_____                    _10·24·17_____

                                                                          Date

PL-MCSD 0000044

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF MICHAEL
BRACY**

I, MICHAEL BRACEY, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.     My name is Michael Bracey. I am a 53-year-old Black man. I live in Kearney

Park, Mississippi. I have lived here since I was five years old. I was formerly employed as a

truck driver.

    2.     In March 2012, around 11:30 p.m., I was driving home from my neighbor's house

four houses down the street. I drove around the block and stopped at the stop sign, waiting to

make a right turn onto my street.

10/21/17 2:16 PM

PL-MCSD 0000045

2

3.      At that time, an officer from the Madison County Sheriff's Department drove past me, driving the opposite direction. I made my turn, pulled onto my property, and drove behind my house where I always park my car.

4.      As I was getting out of my car, I saw the same officer pull onto my property, over my grass and behind my house. He jumped out of his car, pulled out his gun, and started screaming and cursing at me to get down onto the ground.

5.      I lay down on the ground on my stomach and he continued to yell at me. He put handcuffs on me. He put his knee on my back and placed his gun against the back of my head. I feared for my life.

6.      I tried to explain to him that this was my house that I had pulled into. He made so much noise that the preacher who lived across the street came over to see what was happening and try to help me.

7.      The officer proceeded to search me and search my car. He arrested me.

8.      When I asked the officer why he was arresting me, he told me that I was driving without a seatbelt. He also told me that I was evading the police.

9.      The officer then tried to drive me to the Madison County Detention Center. But, because he was driving so quickly he drove off the driveway and got stuck in a ditch on my lawn. He then called for backup and a tow truck. Eventually I was taken to MCDC.

10.     I know that I was wearing my seatbelt. I also was not evading the police – I was pulling into my driveway. I believe he came after me because I am black.

11.     It took me two years of going to court to fight these false charges.

10/21/17 2:16 PM

3

12.    I don't drive much anymore because I am afraid of the MCSD and what could happen if they pull me over again.  I am afraid they will target me again.  I no longer can work as a truck driver.  Whenever I see an MCSD officer I am shaking nervous.


I declare under penalty of perjury that the statements above are true and correct.

_____                          10/2/17
                                                  Date

10/21/17 2:16 PM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF ANTHONY
BROWN**

I, ANTHONY BROWN, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

     1.     My name is Anthony Brown, Sr. I am a 43-year-old Black man. I live in

Kearney Park, Mississippi. I have lived here all my life.

     2.     In 2014, around 9:30 p.m., I was driving home from my grandmother's house and

I was stopped at a Madison County Sheriff's Department roadblock.

     3.     The officer had parked his car off the side of the road and turned off the lights.

He signaled to me to pull over with a flashlight.

2

4.      I provided the officer with my license and registration, but he directed me to step out of the car.

5.      He searched me.  He then searched my entire truck.

6.      I was pulled over for more than 30 minutes.  After he searched me and my car he told me he believed I smelled like marijuana and someone else would need to drive home.

7.      The MCSD regularly sets up roadblocks at the entrance of the Magnolia Heights community in Kearney Park.  Recently, there have been roadblocks set up more than once a week.

8.      I believe I was stopped without good cause and subjected to discriminatory treatment on the basis of my race.

9.      I believe that the MCSD sets up its roadblocks in my community because the residents are Black.

I declare under penalty of perjury that the statements above are true and correct.

_____                    10/21/2017
                                                    Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF BYSHEBA
BROWN**

I, BYSHEBA BROWN, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Bysheba Brown. I am a 28-year-old Black woman. I live in
Ridgeland, Mississippi in the Pine Knoll neighborhood. I grew up in Canton, Mississippi.

    2.    Since moving to Ridgeland I have seen around five roadblocks at the entrance to
my neighborhood while I was driving.

    3.    Madison County Sheriff's Department comes to my neighborhood with as many
as four cars. They park in the parking lots to the left and right of the entrance and turn off all
their lights. Then one or two officers stand in the street.

10/25/17 7:22 PM

PL-MCSD 0000050

2

4.      The officers look like pedestrians until they start waving their flashlights to signal cars to stop.

5.      Each time I have been stopped the officers have shone their flashlights around the inside of my car and then asked for my license.  I gave them my license and they let me pass through.

6.      In the time I have lived in Ridgeland I have only seen roadblocks on Pine Knoll street.

7.      I don't believe the officers had any reason to stop me.  I believe they set up roadblocks on Pine Knoll because they know that is the entrance to a community where Black people live.

8.      When I lived in Canton I believe I drove through more than 100 roadblocks.  I don't believe the officers had any reason to stop me.

9.      At one stop, as I looked through my purse for my license, the officer who stopped me rifled through my purse himself, and pulled out a ziploc bag of makeup and inspected it.

10.     I believe the MCSD engages in discriminatory policing toward black people.  In Canton and Ridgeland MCSD only sets up roadblocks in Black neighborhoods.


I declare under penalty of perjury that the statements above are true and correct.

_Syphrena Bin_                          10 - 25 - 2017
                                        Date

PL-MCSD 0000051

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF WILLIE
CARTER**

I, WILLIE CARTER, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is William Carter. I am a 69-year-old Black man. I have lived in
Camden since 1957.

    2.    Madison County Sheriff's Department sets up roadblocks in Camden more than
once a month. They pull off on the side of the road and turn off all their lights. Then once the
driver is coming into the intersection MCSD pulls you over with a flashlight.

    3.    I have been stopped at roadblocks in Camden six times. Each time I was asked for
my license, registration, and proof of insurance.

2

4.      Last year I went through two roadblocks within thirty minutes.

5.      I think they set up roadblocks in Camden because they are targeting a black area. Whenever they get word of Black people gathering together at a celebration or a wedding they set up a roadblock.

6.      Even though I am licensed and have all the correct documents I am always concerned about running into a roadblock.  I drive less because I don't want to be stopped at a roadblock.

I declare under penalty of perjury that the statements above are true and correct.

_____                    10 2817
                                                                                           Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF RASHEID DAVIS**

I, RASHEID DAVIS, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is Rasheid Davis. I am a 40-year-old Black man. I have been a business owner in Canton for 8 years. I have a barber shop, a boutique, and a restaurant.

2.     I have seen almost 40 roadblocks set up by the Madison County Sheriff's Department in the last year. Sometimes there are roadblocks up in Canton every night.

3.     A typical roadblock is at least four officers with cars pulled over to the side of the road with the lights off. Then the officers stand in the middle of the road and shine their flashlights into drivers' cars.

PL-MCSD 0000054

2

4.    In the last year I have passed through about five roadblocks.

5.    Two weeks ago I was stopped at roadblock on my way home from work. I gave the officer my license but I couldn't find my insurance card immediately. The officer wouldn't give me any time to look.

6.    Instead, he directed me to get out the car and started searching around in my car. He patted me down.

7.    The officer kept insisting that I smoke, even though I repeatedly told him that I do not. He gave me a sobriety test, which I passed.

8.    I asked if I could leave or what else I needed to do to be able to go home. He told me to stop "smoking dope." I think he said that to me because I am black.

9.    The roadblocks also hurt my businesses.

10.    Once the roadblocks go up in Canton people stop coming to my stores. The officers stop people driving to my store, or even just walking. Because people don't want to be harassed they just stay home.

11.    I believe the MCSD engages in discriminatory policing. I have been stopped for no cause, harassed and roadblocks, and had my businesses harmed because I am a black man and I work in a black neighborhood.

I declare under penalty of perjury that the statements above are true and correct.

_____                        10/24/17
                                                                              Date

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF VERONICA
DAVIS**

I, VERONICA DAVIS, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

     1.     My name is Veronica Davis. I am 37-year-old a Black woman. I live in Canton
Estates in Canton, Mississippi with my four children.

     2.     The Madison County Sheriff Department regularly sets up roadblocks at the
entrance to my neighborhood. I believe they set up the roadblocks in Canton Estates because the
people who live here are Black.

PL-MCSD 0000056

2

3.    In 2014, I was stopped by two officers at a roadblock when I was driving home with my daughter. The officers had no justification to stop me. I believe I was the subject of discriminatory policing by the MCSD.

4.    I did not have my license, but I handed one of the officers my Mississippi state ID.

5.    While I was pulled over, another driver drove through the roadblock without stopping. Both of the officers then got in their car and drove after that driver. They took my ID with them. I was never given a ticket or a summons.

6.    A year later, six uniformed MCSD officers came to my door and told me they had a warrant to arrest me. I didn't understand why. They told me it was for failure to pay a ticket for driving without a license or insurance.

7.    I spent three days away from my children in jail until my sister was able to pay the money for the tickets so I could come home.


I declare under penalty of perjury that the statements above are true and correct.

Oct 22, 2017

Date

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF
DOMUNIQUE DOSS**

I, DOMUNIQUE DOSS, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Domunique Doss. I am a 31-year-old Black man. I live in Jackson,
Mississippi.

    2.    My grandparents have lived in Flora for 60 years. I travel to Madison County to
visit them. Sometimes as often as three times a day.

    3.    The Madison County Sheriff's Department regularly sets up roadblocks outside of
the Black community in Flora. They frequently set up on the weekends. They also set up on
holidays or when there are events like birthday parties.

10/25/17 11:14 AM

PL-MCSD 0000058

2

4.      When people have parties or family gatherings at the volunteer community center, the officers frequent set up roadblocks to harass the people coming and going from these events.

5.      On numerous occasions I have missed family gatherings because I did not want to have to pass through a roadblock.

6.      I have been stopped twice at the MCSD roadblocks, in 2010 and 2012.  On both occasions I was asked for my driver's license but didn't have it in the car.

7.      I was then directed to get out of my car and was searched.  The officer searched in my clothes and my pants pockets and even asked me to take off my shoes.  He also searched in my car.

8.      I don't believe the officer had any reason to stop me.  I believe I was only stopped because I was black.

I declare under penalty of perjury that the statements above are true and correct.

10/25/2017
Date

10/25/17 11:14 AM

PL-MCSD 0000059

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF UNDREA
GUISE**

I, UNDREA GUISE, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

     1.     My name is Undrea Guise. I am a Black woman. I live in Canton Estates in

Canton, Mississippi.

     2.     In September 2016, the Madison County Sheriff's Department set up a roadblock

around 9 a.m. with three or four officers on North Liberty by the Fire Department.

     3.     The officers directed me to stop and asked me for my license and insurance.

Because I didn't have insurance I was issued a ticket with a very large fine.

     4.     I do not believe the officers had any reason to stop me.

PL-MCSD 0000060

2

5.       I live near the entrance of Canton Estates.  I have seen the MCSD set up roadblocks at the entrance of the community sometimes as often as once a week.

6.       I also have seen MCSD officers driving in unmarked vehicles and jumping out and stopping Black drivers.

7.       Because of the roadblocks and the jump out patrol I am afraid to drive and I don't leave my house as often as I would like.

8.       The two times I have called the MCSD for help, they have refused to help me.

9.       I called the MCSD because my car was broken into and my radio was stolen. They would not write up a police report.

10.      Another time I called the MCSD because a man threatened to kill me and wrote threats on my door.  Again, they said they wouldn't help me.

11.      I believe that the MCSD sets up its roadblocks in my community because the residents are Black.  However, when the residents need help the MCSD is absent.

I declare under penalty of perjury that the statements above are true and correct.

_Andrea Snow_ _____          _10/22/17_ _____

                                              Date

PL-MCSD 0000061

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF KENNETH
HARRIS**

I, KENNETH HARRIS, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Kenneth Harris.  I am a 38-year-old Black man.  I have lived in
Canton, Mississippi about 12 years

    2.    I have seen countless roadblocks in the time I have lived in Canton.  In the last
year I have been stopped six roadblocks.  Even though I had my license on me, I was directed to
exit my vehicle and the officer searched me.

    3.    On more than one occasion they stopped me and searched me with four-year-old
child in the backseat.

4.    These stops last as long as 45 minutes.

5.    I do not believe the officers had any cause to stop me.  I believe they set up the roadblocks in Canton to stop and harass Black people.

6.    I have two cars that I drive.  However, when I drive my older-model car I am frequently pulled over.  The officer asks me where I am going, and asks for my license.  I have often asked why I am being pulled over and the officer has always refused to answer.

7.    I don't believe the officers have any cause to stop me.  I believe that the MCSD targets me when I am driving because they think that my older car means that I am poor and black.

I declare under penalty of perjury that the statements above are true and correct.

_Kenneth Harris_

_10/24/17_

Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF LESTER
HOLLINS**

I, LESTER HOLLINS, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

     1.     My name is Lester Hollins. I am a 32-year-old Black man. I live in Ridgeland,

Mississippi in the Pine Knoll community. I have lived in Ridgeland for four years.

     2.     In four years I have seen countless Madison County Sheriff's Department

roadblocks at the entrance to the community. Pine Knoll is a majority Black community.

     3.     Typically, two or three officers pull their cars over to the side of the road after

dark. They then stand in the middle of the street and stop cars that are entering the community.

They then lean into the car and ask for identification.

PL-MCSD 0000064

2

4.    While stopped at a roadblock, I have seen officers stop Black drivers and let white drivers continue through without stopping.

5.    On one occasion I asked the MCSD officer why he was stopping Black drivers and waving through white drivers and he told me that the white drivers were "good people."

6.    On more than five occasions I have been told to pull my car over to the side of the road.  On each occasion I was directed to exit my car. Officers searched my person, reaching inside my clothes and inside my pockets.  They also searched the inside of my car and inside of my trunk.

7.    I believe that I was stopped and searched without suspicion and for no reason other than I was a Black driver.

8.    The MCSD continues to set up roadblocks around my community and I fear I will be targeted again for searches.

I declare under penalty of perjury that the statements above are true and correct.

10|21|17
Date

PL-MCSD 0000065

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF ANTONIO
HOWARD**

I, ANTONIO HOWARD, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Antonio Howard. I am a 26-year-old Black man. I have lived in
Ridgeland for 13 years. I went to Ridgeland High School. I live in the Northbrook apartment
complex off Pine Knoll Street.

    2.    Northbrook apartments, along with Bay Meadows apartments and the homes in
the Country Club neighborhood are only accessed by Pine Knoll Street. I believe this is the only
predominately black neighborhood in Ridgeland.

2

3.      Madison County Sheriff's Department sets up a roadblock at the entrance to the neighborhood, at the beginning of Pine Knoll Street. They set up the roadblocks as often as every weekend.

4.      Typically, two officers will park off the road in the carwash parking lot or on in the parking lot on the other side of the street and turn off their lights. Then they will wave cars down with a flashlight, look in the car with the flashlight and then and ask for license and insurance. The officers also searched my car.

5.      I have been stopped at the roadblock on Pine Knoll while I was driving close to ten times. Each time I have been stopped I have been directed to exit my car and an officer has patted me down and searched me.

6.      On one occasion I was driving my mother's car. I think that because the officer thought it was a nice car he asked me who it belonged to. He then searched it.

7.      On two occasions after running my license I was arrested. Once for driving without a license and once because I had failed to appear in court for a traffic ticket.

8.      I have also been stopped at roadblocks as a passenger. The officers have asked me for my identification at those stops as well.

9.      I believe they are stopping people at the entrance to my neighborhood because this is a black neighborhood.

10.     In all the years I have lived and driven in Ridgeland, I have never seen a roadblock set up by MCSD anywhere but at the entrance to my neighborhood.

3

11.      I don't believe they had any reason to stop me as I was driving to or from my

house.


I declare under penalty of perjury that the statements above are true and correct.


_Antonus Howard_                                      _11/25/17_

                                                                      Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF JOHN SPANN** |

I, JOHN SPANN, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     My name is John Spann. I am a 27-year-old Black man. I live in Flowood, Mississippi.

2.     For 3 years, I lived in Gluckstadt, a community in Madison County. I moved to Flowood in 2016, but many of my mother and friends still live in Gluckstadt. As a result, I travel to Madison County on a regular basis.

3.     I take great care to appear respectable when I travel – often wearing dress clothes and bow tie. I also try to keep a low profile by driving a car that is modest and clean.

2

4.      In the summer of 2016, I was stopped by the Madison County Sheriff's Department while I was driving home from visiting my grandmother in Gluckstadt. The stop lasted over 45 minutes. The two officers at the stop never explained to me why I was stopped and searched.

5.      First, the officer asked me if I had been drinking. I responded that I had not and offered to take a sobriety test. The officer declined.

6.      The officer then took my license and insurance and returned to his patrol car.

7.      I told the officer that my insurance was on my back seat and offered to get it. He told me to stay where I was. Instead, without asking, his partner opened my back door and retrieved it himself.

8.      The officer started to return to his car, but turned back to ask if I had a record of any kind like a warrant or priors. He then asked if I had any drugs or weapons. I responded that I did not. I could not understand what even prompted him to ask me. I believe he was profiling me because I am black.

9.      When he returned to my car the officer demanded that I perform a search of my own car for him. I was extremely uncomfortable throughout the entire interaction. He directed me to uncover a plate of home-made food I was bringing home from my grandmother's house and show him what was on the plate. He also directed me to show him what was underneath a baseball cap in my passenger seat.

10.     Finding nothing, he repeatedly asked me if I was drinking or had any weapons.

11.     I do not believe the officer had any reason to stop me or instruct me to search my car.

PL-MCSD 0000070

3

12.     When the stop was over the officer told me I was a "good sport" and drove away. He did not write a ticket for any traffic violation. I asked him why I was stopped and he told me I was "bumping the lines." I know I was not.

13.     I believe I was stopped for no reason and subjected to discriminatory treatment because my race. I am concerned that I will again be subjected to targeting and discrimination by the MCSD on the basis of my race while traveling in Madison County in the future.

I declare under penalty of perjury that the statements above are true and correct.

_____                    10/22/2017
                                                                                Date

PL-MCSD 0000071

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF EARLINE
WILDER**

I, EARLINE WILDER, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

    1.    My name is Earline Wilder. I am 41-year-old a Black woman. I live in Canton

Estates in Canton, Mississippi.

    2.    The Madison County Sheriff's Department regularly sets up roadblocks at the

entrance the Canton Estates. Because the roadblocks are at the entrance, residents can't enter or

exit the community without passing through the roadblock.

PL-MCSD 0000072

2

3.      They set up the roadblocks in the mornings and in the evenings when people are leaving for and coming home from work.  Sometimes the roadblocks are set up multiple times in a week.

4.      I believe they set up roadblocks in Canton Estates because the residents are Black.

5.      I have been stopped at the roadblocks twice.  I the MCSD officers had no reason to stop me.  I was only stopped because I was driving into Canton Estates.  Everyone I saw enter before and after me was stopped as well.

6.      The MCSD officers also have a jump out patrol that drives recklessly around my community and puts our children in danger.  I have witnessed them speeding on the grass around our homes where children are out playing.

7.      As a result, I have to keep my children and grandchildren inside when the MCSD is in my neighborhood because I fear they will be hurt.


I declare under penalty of perjury that the statements above are true and correct.

_Earlene M. Webber_                                        _10/22/17_
                                                                        Date

PL-MCSD 0000073

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

          v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFFS' SECOND
SUPPLEMENTAL INITIAL
DISCLOSURES**

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and (e), Plaintiffs Latoya Brown,

Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin

McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker

(collectively, "Plaintiffs") submit the following supplemental initial disclosures.

## I.   Supplemental Initial Disclosure Qualifications

These supplemental initial disclosures are made upon information presently known to

Plaintiffs and without prejudice to Plaintiffs' right to produce during discovery or at trial such

data, information, or documents as are: (a) subsequently discovered; (b) subsequently determined

to be relevant for any purpose; or (c) subsequently determined to have been omitted from this

and any supplemental disclosure statements.  By making these disclosures, Plaintiffs do not

represent that they are identifying every document, tangible thing, or witness that may be

relevant to the issues in this lawsuit, or on which Plaintiffs may rely in support of their claims or

defenses.  Nor does the inclusion of the individuals below indicate Plaintiffs' intent to call such

individuals as witnesses.  Nor do Plaintiffs waive their rights to object to the disclosure of any

person, document, or thing on the basis of any applicable privilege, the work product doctrine,

relevancy, competency, materiality, undue burden, hearsay, or any other valid objection in

response to any discovery request or proceeding in this case.  Further, Plaintiffs reserve all rights

to present at trial or other hearing in this matter additional witnesses and evidence not presently

identified or encompassed by these disclosures, and to present any rebuttal or impeachment

evidence they deem appropriate.

**II.    Supplemental Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) and (e)**

      **A.    The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment (Fed. R. Civ. P. 26(a)(1)(A)(i))**

Pursuant to Federal Rules of Civil Procedure 26(a)(1)(A)(i) and 26(e), Plaintiffs identify

the following individuals (exclusive of expert witnesses and attorneys, but inclusive of

individuals previously disclosed by Plaintiffs) as persons currently known to Plaintiffs who are

likely to have discoverable information that Plaintiffs may use to support their claims.

1.    Demario Day
      707 Mace Street
      Apt. C-30
      Canton, MS  39046

      Mr. Day has knowledge of the unconstitutional policing policies, customs, and
      practices challenged by Plaintiffs.

2.      Archie McKay
        1213 Cauthen Road
        Camden, MS  39045

        Mr. McKay has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

3.      Antonio Mitchell
        3008 Center Street
        Flora, MS  39071

        Mr. Mitchell has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

4.      Ernest Pate, Jr.
        117 Compress Street
        Flora, MS  39071

        Mr. Pate has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

5.      Delores Smith
        326 Rocky Road
        Camden, MS  39045

        Ms. Smith has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

6.      Quincy Smith
        264 A Avenue
        Philadelphia, MS  39350

        Mr. Smith has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

7.      Terrance Thompson
        380 Boyd Street
        Canton, MS  39046

        Mr. Thompson has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

8.    Montreal Tillman
      834B West North Street
      Canton, MS  39046

      Mr. Tillman has knowledge of the unconstitutional policing policies, customs, and
      practices challenged by Plaintiffs.

Dated: February 7, 2018

By: */s/ Joshua Tom*
    Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

**From:** Sivashanker, Kavitha [mailto:Kavitha.Sivashanker@stblaw.com]
**Sent:** Wednesday, February 07, 2018 8:11 PM
**To:** James Graves <jeg@wisecarter.com>; Charles Cowan <cec@wisecarter.com>; Mike Wallace <mbw@wisecarter.com>; Russell Nobile <trn@wisecarter.com>; Charlie Ross <cer@wisecarter.com>; bcowan@curriejohnson.com; Katie Snell <Katie@katiebryantsnell.com>
**Cc:** Joshua Tom <JTom@aclu-ms.org>; jrobinson@aclu.org; eedwards@aclu.org; Youngwood, Jonathan <jyoungwood@stblaw.com>; Gochman, Janet A. <jgochman@stblaw.com>; Rethy, Isaac <IRethy@stblaw.com>; Choudhri, Nihara K <NChoudhri@stblaw.com>; Jarrett, Bonnie <Bonnie.Jarrett@stblaw.com>
**Subject:** Latoya Brown, et al. v. Madison County, MS, et al., No. 3:17-cv-347 WHB LRA

Counsel,

On behalf of Plaintiffs in the above-referenced action, please find attached Plaintiffs' Second Supplemental Initial Disclosures.

In addition, please find enclosed at the following link, https://stblaw.sharefile.com/d-sb8b7eae7d754e6b9, documents bearing Bates numbers PL-MCSD 0000074 – PL MCSD 0000098.  We are producing these documents to supplement our

EXHIBIT "E"

response to Defendants' Second Set of Requests for Production to Plaintiffs ("Second Requests for Production"), dated November 22, 2017, subject to and without waiver of Plaintiffs' responses and objections to the Second Requests for Production.  The password for these files will be provided separately by email.

The documents are produced in accordance with the Stipulated Protective Order, so-ordered by the Court in the above-captioned action on September 6, 2017 (the "Protective Order"), and any documents designated as "Confidential" shall be treated in accordance with the Protective Order.

By producing these documents, Plaintiffs do not intend to waive any applicable privilege or protection.  Accordingly, any inadvertent production of any privileged information does not preclude the subsequent assertion of a claim of attorney-client, work product, or any other applicable privilege or protection in the future with respect to this or any other information.

We continue to reserve all of Plaintiffs' rights in connection with the Second Requests for Production.  Please feel free to contact me if you have any questions.

Best,
Kavitha

_____

Kavitha Sivashanker
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-2197
kavitha.sivashanker@stblaw.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF DEMARIO DAY**

I, Delores Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    My name is Demario Day. I am a 26-year-old Black man. I live in the Madison Heights apartment complex. I have lived here since the 6th grade.

2.    I have been stopped by the MCSD jump out patrol more than ten times.

3.    The MCSD drives into my apartment complex in unmarked cars. When they see young people outside they ask for our driver's licenses. If I don't have my driver's license they ask me for my social security number.

4.    Then, they check every one for outstanding warrants. Because I don't have any, they just leave.

PL-MCSD 0000074

2

5.    I don't know why they are asking for my driver's license.  I am not driving and I'm not doing anything illegal.  I am simply standing outside my apartment.

6.    They are intimidating.  I don't want to give them my license or social security number, but I feel that I am required to.  I fear what would happen to me if I refused or walked away .

7.    I think the MCSD patrols Madison Heights because this is where black people live.  I believe MCSD targets, harasses, and discriminates against Black people.

Demaris Day

2/6/18
Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,<br><br>    Defendants. | Civil Action No.<br>3:17-cv-00347-WHB-LRA<br><br>**DECLARATION OF ARCHIE MCKAY** |

I, Archie McKay, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Archie McKay. I am a 52 year old Black man. I have lived in Camden, Mississippi since I was six years old.

2.      I live on a long road off of Highway 43. Only nine or ten families live on my entire six-mile road.

3.      About 6 months ago, I was driving from my house, and I came upon an MCSD roadblock set up at the end of my street. Because of the way their cars were parked, I couldn't see the roadblock until I was already being stopped by the officer. The officer checked my license and let me go.

2

4.      I don't know why the MCSD would set up a roadblock on my street.  There is very little traffic because so few people drive in this rural area.

5.      In April 2015, I was stopped at a roadblock at Highway 43 and Goodloe Road. The officer told me I had a warrant, arrested me, and took me to the Madison County Detention Center.

6.      The arrest was a mistake, they actually had papers for my son for trespassing. However, I still had to go to jail and pay $1,400 in order to leave.  Because I was arrested on a Saturday, I had to stay in jail until Monday.  Eventually, after going to court, a judge dismissed the trespassing charge.


_Archie B. McKay_                                    _2/4/18_

                                                     Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

DECLARATION OF ANTONIO
MITCHELL

I, Antonio Mitchell, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

    1.    My name is Antonio Mitchell. I am 29-year-old Black man. I live in the

Magnolia Heights neighborhood in Flora, Mississippi. I have lived in Flora since 1997.

    2.    In the last three years I have been stopped at roadblocks at the entrance to my

neighborhood about 10 times. I have been stopped three or four times in the last year.

    3.    When the MCSD sets up a roadblock, the officers park their cars – sometimes

marked, sometimes unmarked – off to the side of the road. They rarely have their lights on, but

when they do, they only turn on the lights in the back so it is impossible to see the cars until I am

already up on the roadblock.

2

4.      At the roadblocks, the deputies ask for license and insurance.  They always talk to me as though I am a criminal.  They immediately start asking about drugs in my car.  At one roadblock, the deputy said to me, "I know you have something."

5.      At two roadblocks in the last year, I had a passenger in my car at the roadblock. They asked that person for their license as well.

6.      During at least half of the roadblocks I have been through, the officers have directed me to get out of my car, searched my person, and asked to search my car as well.  When they search me, I have to take off any layers, they put their hands in my pockets, open my pants up, search around my genitals, and in my socks and shoes.  All of this happens on the side of the road in my neighborhood.  It is humiliating.

7.      Every time they have asked to search my car, I have said no.  However, the deputies have threatened to Taser me, pull me out of my car, and arrest me for my refusal to allow them to search.  After being threatened, I just let them search.  One time, a deputy ignored when I said "no," and just started searching my car anyway.

8.      Two years ago, I was stopped and searched at a roadblock on my way home from the hospital where I had taken my infant son because he was very sick.  I had just dropped him off back home when I came into the roadblock.  I was covered in my son's vomit, I was distraught, and they insisted on searching me and my car anyway.

9.      I believe they set up these roadblocks to harass and intimidate Black people.  I have seen roadblocks set up where they stop every single Black person, and then waive the white people through.  In the town of Flora, I have seen them stop Black pedestrians and drivers leaving stores, while they escort white drivers from the Blue Rooster (a restaurant frequented by white people) home.  I have never seen a roadblock set up in the white communities.

3

10.     When we have gatherings and birthday parties at the community center, the MCSD sets up a roadblock right outside on both directions, so everyone leaving the party has to pass through.

11.     It is well known in my community when the MCSD sets up roadblocks. I am a licensed and insured driver, but on the evenings the MCSD is out, I try to not even leave my house. However, it isn't always possible to avoid their roadblocks. I am certain I will be stopped again. And, I think it is unfair that I have to take such precautions to avoid being mistreated by the MCSD.

12.     I have also been stopped by the jump out patrol. Last year, I was driving my mother's car into town to get gas with two friends. As I was exiting my neighborhood, a red Dodge Charger with deeply tinted windows started following us. The car followed us for miles – all the way into town, waited while we got gas, and all the way back to my neighborhood.

13.     As we drove back into Magnolia Heights, the Charger lights turned on. Two deputies jumped out of the car. They came up to the car and immediately started yelling at us and threatening us. They ran our licenses, but nothing came back. So, they called backup.

14.     Another unmarked car and a marked car arrived. Then the MCSD told us they wanted permission to search the car. As with the roadblocks, I told them they did not have my consent. They pulled me and my two friends out of the car. They threatened to Taser us. They threatened to bring me to jail. I was never told why I was pulled over or why they wanted to search me. But, I felt forced to give consent, so I did. They then spent an hour searching my mom's car. When they were finished there were papers everywhere, floor mats thrown out on the ground – the car was a mess. They found nothing, so they drove away.

4

I declare under penalty of perjury that the statements above are true and correct.

*Avrie Mitchell*                                   2, 5, 18

                                                        Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

     v,

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF DELORES
SMITH**

I, Delores Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

     1.    My name is Delores Smith.  I am a 56 year old Black woman.  I have lived in Camden nearly my whole life.

     2.    I believe that the Madison County Sheriff's Department targets the black community, particularly the young black men in the county, for harassment.

     3.    The MCSD officers are disrespectful, and often scary.

     4.    In 2015, I was driving in Canton, Mississippi, when a white MCSD officer in an undercover truck started driving very close to my car.  Eventually he pulled me over.

PL-MCSD 0000082

2

5.     He came up to my window and began screaming and cursing at me for not pulling over sooner.  I was shaken up for days.

6.     I fear for my young sons.  A year ago he came home and told me that he was driving and was pulled over by an MCSD officer.  When he asked the officer why he was pulled over, the officer told him he fit a profile because he has dreadlocks and was wearing a hat.

7.     The MCSD sets up roadblocks in my community.  They pull off to the side of the road and stand in the road to pull people over.

8.     Even though I am a licensed and insured driver, I still spend time trying to figure out where the MCSD is so I can avoid them.  I try not to leave my house when I know they are out setting up roadblocks.

_Delonis Smith_

_2-4-18_
Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF QUINCY
SMITH**

I, Quincy Smith, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

      1.     My name is Quincy Smith. I am 29 years old. I am a Black man. I grew up in

Canton, Mississippi. I currently live in Philadephia, Mississippi. I travel to Madison County to

see my family and my children.

      2.     In the last three or four years, I have driven through as many as thirty roadblocks.

The MCSD sets up roadblocks in the Black neighborhoods to target Black people

      3.     The MCSD parks off of the road and turns off all lights on their trucks. Then they

stand in the road with flashlights.

2

4.      They also set up roadblocks in the apartment complexes with their lights off. I have seen them sitting at the gates in Canton estates. When I lived at Marbella Estates, the MCSD set up roadblocks at both the entrance and the exit at the same time. I could not come or go from my home without passing through a roadblock.

5.      At least half of the times I have driven through a roadblock, the MCSD officer has not even asked me for my license or insurance. He just asks for my social security number and runs it for warrants.

6.      In 2014, I was stopped at a roadblock as I drove into my apartment in Marbella Estates. The officer didn't ask me for my license or social, he just asked me "where are the drugs?" I was frustrated that he was targeting me as a drug dealer. I don't do drugs, he only asked me that because I am black. I told him "I don't know where drugs are, you're the one looking for them." He directed me to get out of my car. I complied.

7.      He told me I was being smart with him and that he was going to take me to jail. He never told me why I was being arrested. He didn't even know my name until I was taken the MCDC. Once I was at the MCSD, they discovered unpaid fines and booked me.

8.      On May 3, 2015, I was stopped at roadblock on George Washington and Welsh. The MCSD had two trucks pulled over to the side. It was dark out and all the lights were off. As I drove up to them, the officers stepped into the road with flashlights.

9.      The officer asked me for my social security number. I gave it to him. He arrested me for unpaid fines.

10.      I tried to explain that the fines were my brother's and were under the wrong name. No one would listen to me or try to help me. I didn't want to miss work, so I just paid the fines and went home.

3

11.     I was even stopped at a roadblock when I was on a bicycle. Around 2014, I was riding into Canton Estates. The MCSD had set up a roadblock at the entrance. The officer told me to get off my bike and demanded my social security number. I didn't want to give it to him, but I felt that if I said "no," they would arrest me for failure to comply. They arrested me for unpaid fines.

12.     The MCSD also harasses Black people at traffic stops. Every time I have been a passenger in a car that is stopped, the MCSD has asked me for my license.

13.     In early 2016, I was riding as a passenger when my friend was pulled over. The MCSD asked for my social security number. When nothing came back, he insisted I take a breathalyzer test. I do not know to this day why I had to give him my information and take a test if I wasn't driving.

14.     Several years earlier, I was a passenger when my friend was stopped at a traffic stop. Both of us were asked for identification. The Black MCSD officer who pulled us over said to his white colleague that he was going to let us go. The white MCSD officer replied, "I'm not going to help a nigger out." Then, the white officer wrote my friend tickets.

15.     I have also been stopped as many as fifteen times by the MCSD when I was on foot and been required to give my social security number.

16.     Several years ago, I was walking three friends on Welsh Street when two MCSD cars pulled up on us. They demanded all of our social security numbers. We were afraid and felt like if we said no or walked away there would have been real trouble. After they ran our social security numbers and found nothing they put us up against the car and searched us. An officer patted me up and down, put his hands in my pockets, and searched inside my wallet.

PL-MCSD 0000086

4

17.     I asked why they stopped us and searched us and they told me we looked like we were fixing to do something.  I know that he meant we were just Black males walking. Just being Black makes us suspicious.

18.     I have known to be afraid of the MCSD since I was a child.  When I was about 11 years old Sheriff Tucker and several other deputies came to my apartment to arrest my step-father.  I watched Tucker handcuff my step-father.  Once he was in handcuffs Tucker punched him in the face and threw him on the ground.  Tucker then turned to me and told me that this was part of the job, it was protocol, and I better not deal drugs.


I declare under penalty of perjury that the statements above are true and correct.


Quinay Smith                              02/07/2018
                                                              Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

    Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF TERRANCE
THOMPSON**

I, Terrance Thompson, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Terrance Thompson.  I am a 24-year-old Black man.  I have lived in
Canton, Mississippi for most of my life.

    2.    In January 2017, I was walking with my friend Steven Smith.  We were both
stopped by three plainclothes MCSD deputies at a "checkpoint" at the entrance to the
predominantly-Black affordable housing complex, Canton Estates, where Mr. Smith lives.

2

3.      The officers were standing right at the gate at the entrance to Canton Estates. Their cars were parked inside of the gates.  They appeared to be conducting a roadblock.  They were stopping and checking every car as it drove in.

4.      It was a cold night, so we were walking with our hands in our pockets.  The officers demanded we take our hands out and we complied.  At that point, I hoped that we would just pass through.

5.      Instead, the officers began to search us.  They did not tell us why.  Prior to searching me, the deputy asked whether either I was carrying a weapon. I told them I was carrying an appropriately registered handgun that I had a license to use. I also told the deputies where they could find the handgun on my person.

6.      One of the deputies retrieved the handgun, checked its serial number, confirmed that it belonged to me, and returned it to me.

7.      The MCSD deputies also demanded to see my identification and ran my name for warrants.  Finding nothing, I was told I was free to go.

8.      However, a second deputy who was arresting my friend Steven for an outstanding warrant, asked the deputy why he wasn't arresting me. The deputy told him my gun was clean and appropriately registered, and that I had no outstanding warrants. But the second deputy instructed him to arrest me for concealed weapon.  He did.

9.      I asked the deputy for his badge information, but he refused to give it to me.

10.      I was then taken to Madison County Detention Center, where I spent nearly a full day in jail. Because I didn't have the money to defend myself, I pleaded guilty to the charges.

11.      I have also been stopped at least twice by the jump out patrol since 2014.

3

12.      On one occasion, in 2015, I was walking with a Black male friend when an unmarked MCSD vehicle drove close to us. A plainclothes MCSD deputy rapidly exited the vehicle and stopped us both.

13.      The MCSD deputy proceeded to search us both.  I don't believe he had any legitimate reason to do so.  He told me I was stopped because I looked like a "Black dope boy."

14.      I had just received a refund of my college tuition, so I was carrying some cash in my pocket.  When the deputy found the cash, he deputy demanded to know how I got it.  I tried to explain to him about the refund.

15.      He kept referring to me as a "Black dope boy" and told me he was going to "get some of that dope boy money."

16.      He eventually released us.

17.      On another occasion, in 2014, I was walking with a Black male friend near my house when an unmarked Tahoe pulled up on us.  Two MCSD officers jumped out of the car and immediately put us in handcuffs.

18.      Without any explanation, they began searching us.  Finding nothing, they demanded I give them my social security number so they could run my name for warrants.

19.      I complied and gave them the number.  I was handcuffed.  I did not feel that I had any choice.

20.      When nothing came back on the warrant check, they allowed me to leave.

4

21.     I am certain I will be stopped again at a checkpoint and by the jump out patrol.  I feel that I, and the rest of the Black community, are targeted for unfair and discriminatory policing by the MCSD.  When I am in Canton, I am always in danger of them jumping out on me or stopping me without reason.


I declare under penalty of perjury that the statements above are true and correct.


_____                    2-5-18
                                                                        Date

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

     v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF MONTREAL
TILLMAN**

I, Montreal Tillman, declare the following under penalty of perjury pursuant to 28 U.S.C. §

1746:

     1.     My name is Montreal Tillman.  I am a 29-year-old Black man.  I have lived in

Madison County since 2008.  I live in Canton.

     2.     I have seen more than twenty roadblocks in the time I have lived in Canton.  The

MCSD sets up roadblocks in the areas where Black people drive and walk.  From my apartment I

could see the MCSD set up roadblocks in Canton Estates and Joe Pritchard.

2

3. I have spent a great deal of time in the white neighborhood in Canton because it is where my fiancé lived. I have never seen a roadblock in the white neighborhood. I believe the MCSD sets them only in Black neighborhoods to target Black people.

4. In the past three years, I have driven through more than five roadblocks.

5. A typical roadblock is like the one I experienced one night, about three years ago. I went through a roadblock set up by MCSD in the industrial area of Canton. There were no blue lights on. I realized I was at a roadblock when a deputy jumped out at me with a flashlight. He waved the flashlight for me to pull over. He ran my license and checked my insurance and let me go.

6. On two occasions in the last three years, I was a passenger in a car that went through a roadblock.

7. On the first occasion, I was on my way work. The MCSD officer asked for my identification and ran my license. Nothing came back. Then, for no reason at all, he asked me "where are the drugs?" I told him there are none and he let us go.

8. The second time, I was coming home from work. There were no lights on at the roadblock. The driver and I didn't see the roadblock until an officer stepped out in the street with his flashlight. Again the officer asked for my license. I complied.

9. The officer ran my license and found nothing. He then returned to the car and asked me to get out so he could search me. I felt scared. I did not feel like I could say no.

10. I got out of the car and patted me down, and went into my pockets. He also searched the entire car. He kept asking whether there was anything illegal. He found nothing and he let us leave.

3

11.     I do not understand why the MCSD asked for my license when I was not driving.
The first time, I even asked the officer why he was asking for my license if I was the passenger.
He told me he needed to identify me to check for warrants.

12.     The MCSD has even stopped me and asked for my license when I was walking.

13.     On one occasion, in 2015, I was walking home to Joe Pritchard.  The MCSD
officer who stopped me was driving in an unmarked vehicle.  At first he started shouting at me
through his window to stop walking.  Then he jumped out of his car.  I was afraid.  My heart was
pounding.

14.     He asked me who I was, where I was going, or if I had any illegal drugs or
warrants.  He asked for my license.  I felt like I had to give it to him.  He ran my name and
nothing came back.

15.     Then he told me to put my hands on the back of his truck so he could search me.
He patted down my entire body and checked the insides of my pockets.  I was right outside my
house in my own neighborhood.  I was, and still am, incredibly embarrassed.  I was treated like a
criminal in front of my friends and neighbors.

16.     After about ten or fifteen minutes, he let go.

17.     On another occasion, in 2015, I was walking to on Barfield Street in Canton,
Mississippi.  The neighborhood was a white neighborhood where my fiancé was living.

18.     An MCSD officer saw me walking and jumped out of the car.  He started asking
me what I was doing in that neighborhood and who I knew in that neighborhood.  I tried to
explain that I was walking to my fiancé's house.  But, he was extremely aggressive.  He acted
mad that I would be in that neighborhood.  He insisted he had never seen me there before.  He
asked me again who I knew there.

4

19.     After questioning me for about five minutes he asked for my license.  After being interrogated by an angry officer, I knew I had to give it to him.  He ran it, found nothing, and then went back to asking me more questions.  He asked me whether I plan on coming around all the time and whether I have drugs or weapons.

20.     Then, he told me to put my hands on the back of the car and he searched me.  He humiliated me in plain view of everyone.  He found nothing and let me go.

21.     I feel like he targeted me because I was a Black person in a white neighborhood and that meant I must be up to no good or doing something illegal.  It made me feel angry, stressed, and mostly sad, that I somehow didn't belong because of what I look like.

22.     I have been mistreated by the MCSD at even the most routine traffic stops.  In 2014, an MCSD officer pulled me over after I made a left turn at a stop sign on King Ranch Road.  I had fully stopped, looked both ways, and decided it was safe to make the turn.

23.     Rather than writing me a ticket, the MCSD officer escalated the situation.  I asked the officer why he had stopped me, and he told me to "shut the fuck up."  He told me that if he had "not taken anger management classes, [he] would drag my black ass up and down the street."

24.     He asked me whether I had drugs in the car.  I told him I did not.  He asked if he could search the car.  Again, I felt required to give my consent, so I told him he could.  He directed my then girlfriend to step out of the vehicle, searched me, and searched my car.

25.     He found nothing.  It wasn't until he gave me the ticket for careless driving that he told me he stopped me because I made the left turn too fast.

26.     The officer made it clear from the very words that he said the he was stopping me and harassing me because I am black.

5

I declare under penalty of perjury that the statements above are true and correct.

_Montreal Tillman_                          _Feb-5-18_

                                           Date

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

       Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

       Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF EARNEST
PATE, JR.**

I, Earnest Pate, Jr., declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. My name is Earnest Pate. I am a 46 year old black man. I live in Magnolia Heights in Flora. I grew up here, and I moved back 4 years ago.

2. On June 9, 2015, I was driving with my Black male friend around 3pm in the evening, when we came upon a roadblock on Livingston Vernon Rd.

3. The MCSD deputy initially asked the driver for his license and insurance and I thought we would then be free to continue on our way home. However, the officer then walked around the car to the passenger side window and asked me to get out of the car.

4. Once I got out of the car he began searching me. He patted down my body and stuck his hands in my pockets. He didn't find anything. Then he asked me for my license.

5. I was confused about why all this was happening. I wasn't driving the car. I certainly wasn't doing anything illegal. I didn't understand why he needed my license or how he could legally be demanding it and searching me.

PL-MCSD 00000097

2

6.  But, the MCSD has a reputation for picking on Black people. People in the Black communities know that we have to do whatever they say. I complied with the officer even though it didn't feel right. I was afraid to do otherwise.

7.  I tried to explain to the deputy that I was a law abiding citizen, a government employee, and that my relative was with the MCSD. He began cursing and yelling at me that he didn't care.

8.  He ran my license and told me I had a warrant for a bad check. He taunted me and laughed at me and told me he was looking forward to taking me to jail.

9.  The check was my ex-wife's, it had her signature on it.

10. More recently, in fall 2017, I had a very stressful experience where an MCSD officer in a marked car followed me close on my car for miles as I drove to work. He followed me all the way onto the property of my job.

11. I told my supervisor about it, and he told me "that's just how they are."

12. The MCSD targets the Black community in Flora. They set up roadblocks and mistreat Black people. I believe that I was treated with such disrespect at the roadblock where I was arrested because I am Black. In fact, I believe they only asked for my license – even though I was a passenger – because I am black.

I declare under penalty of perjury that the statements above are true and correct.

_____                    2/5/18
                                              Date

From: Sivashanker, Kavitha [Kavitha.Sivashanker@stblaw.com]
Sent: Tuesday, February 13, 2018 6:47 PM
To: James Graves; Charles Cowan; Mike Wallace; Russell Nobile; Charlie Ross; Becky Cowan; Katie Snell
Cc: Joshua Tom; jrobinson@aclu.org; eedwards@aclu.org; Youngwood, Jonathan; Gochman, Janet A.; Rethy, Isaac; Choudhri, Nihara K; Jarrett, Bonnie
Subject: Latoya Brown, et al. v. Madison County, MS, et al., No. 3:17-cv-347 WHB LRA

Counsel,

On behalf of Plaintiffs in the above-referenced action, please find attached Plaintiffs' Third Supplemental Initial Disclosures.

In addition, please find enclosed at the following link, https://stblaw.sharefile.com/d-s206ec0ce95945c8b, documents bearing Bates numbers PL-MCSD 00000099 to PL-MCSD 00000111.  We are producing these documents to supplement our response to Defendants' Second Set of Requests for Production to Plaintiffs ("Second Requests for Production"), dated November 22, 2017, subject to and without waiver of Plaintiffs' responses and objections to the Second Requests for Production.  The password for these files will be provided separately by email.

The documents are produced in accordance with the Stipulated Protective Order, so-ordered by the Court in the above-captioned action on September 6, 2017 (the "Protective Order"), and any documents designated as "Confidential" shall be treated in accordance with the Protective Order.

By producing these documents, Plaintiffs do not intend to waive any applicable privilege or protection.  Accordingly, any inadvertent production of any privileged information does not preclude the subsequent assertion of a claim of attorney-client, work product, or any other applicable privilege or protection in the future with respect to this or any other information.

We continue to reserve all of Plaintiffs' rights in connection with the Second Requests for Production.  Please feel free to contact me if you have any questions.

Best,
Kavitha

1

EXHIBIT F

_____

Kavitha Sivashanker
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

T: +1-212-455-2197
kavitha.sivashanker@stblaw.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFFS' THIRD
SUPPLEMENTAL INITIAL
DISCLOSURES**

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and (e), Plaintiffs Latoya Brown,

Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin

McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker

(collectively, "Plaintiffs") submit the following supplemental initial disclosures.

## I.    <u>Supplemental Initial Disclosure Qualifications</u>

These supplemental initial disclosures are made upon information presently known to

Plaintiffs and without prejudice to Plaintiffs' right to produce during discovery or at trial such

data, information, or documents as are: (a) subsequently discovered; (b) subsequently determined

to be relevant for any purpose; or (c) subsequently determined to have been omitted from this

and any supplemental disclosure statements. By making these disclosures, Plaintiffs do not represent that they are identifying every document, tangible thing, or witness that may be relevant to the issues in this lawsuit, or on which Plaintiffs may rely in support of their claims or defenses. Nor does the inclusion of the individuals below indicate Plaintiffs' intent to call such individuals as witnesses. Nor do Plaintiffs waive their rights to object to the disclosure of any person, document, or thing on the basis of any applicable privilege, the work product doctrine, relevancy, competency, materiality, undue burden, hearsay, or any other valid objection in response to any discovery request or proceeding in this case. Further, Plaintiffs reserve all rights to present at trial or other hearing in this matter additional witnesses and evidence not presently identified or encompassed by these disclosures, and to present any rebuttal or impeachment evidence they deem appropriate.

II.   **Supplemental Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) and (e)**

   A.   **The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment (Fed. R. Civ. P. 26(a)(1)(A)(i))**

Pursuant to Federal Rules of Civil Procedure 26(a)(1)(A)(i) and 26(e), Plaintiffs identify the following individuals (exclusive of expert witnesses and attorneys, but inclusive of individuals previously disclosed by Plaintiffs) as persons currently known to Plaintiffs who are likely to have discoverable information that Plaintiffs may use to support their claims.

1.   Destiny Jones
     12660 Jupiter Road
     Apt. 1312
     Dallas, TX  75238

     Ms. Jones has knowledge of the unconstitutional policing policies, customs, and practices challenged by Plaintiffs.

2.      Lisa Lewis Jones
        107 Way Circle
        Canton, MS  39046

        Ms. Jones has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

3.      Michelle Williams
        3101 Avenue F
        Apt. B
        Fort Pierce, FL  34947

        Ms. Williams has knowledge of the unconstitutional policing policies, customs, and
        practices challenged by Plaintiffs.

Dated: February 13, 2018

By: <u>/s/ Joshua Tom</u><br>
    Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Jumin Lee (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, <br><br> Defendants. | Civil Action No. 3:17-cv-00347-WHB-LRA <br><br><br> **DECLARATION OF DESTINY JONES** |

I, Destiny Jones, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Destiny Jones.  I am 24 years old.   I am a Black woman.  I was born and raised in Canton, Mississippi.  I recently moved to Dallas, Texas, but my family still lives in Canton.

2.      I was mistreated by the MCSD.  When I complained, I wasn't taken seriously.  To my knowledge there was no investigation, and ultimately, nothing happened.  The officers I interacted with are dangerous and scary.  I am afraid that when I am back in Madison County visiting I will be hurt by them again.

2

3.      In 2016, my brother Aaron lost a wheel while driving on Highway 55. He called 9-1-1 and my husband, John, for help. A state trooper arrived, and the three called for a tow truck.

4.      The tow truck took a long time to arrive, so I came to the scene of the accident so John could leave and go to work. However, before John left, a drunk driver hit our cars. We were standing right there, so the driver nearly hit us as well. My car went down into a ravine off the road.

5.      It was very frightening. I called my mom because I wanted her there to help me. With our cars damaged, there was no way to get home.

6.      Over the next hour, we helped get the drunk driver and his passenger out of the car. We waited for the tow truck and my mom. I believe because the accident was causing traffic, the MCSD also showed up at the scene.

7.      Before the MCSD arrived, everything was friendly and relaxed. We had calmed down from a scary accident and were dealing with the tow truck. The tow truck driver asked me to pay him in advance, so I began to walk to my car to get a credit card.

8.      As I was walking to my car, the MCSD arrived, and a deputy began screaming and cursing at me not to walk to my car, but also to get off the street and get in my car and wait. I tried to explain that it was my car down in the ravine smoking and that I couldn't get in my car to sit. I also tried to explain I needed my card from my car. He just kept yelling.

9.      Finally, my mom told me to just get in her car and wait while the officers figured out what they wanted me to do. I got in her car and waited. The deputy yelled at my mom that he was going to arrest me. I began to cry.

PL-MCSD 00000100

3

10.     Then, the state trooper came over to the car and asked me to get out of the car so I could give him my statement about what happened with the drunk driver. I told him I was afraid and confused. On the one hand he was asking me to get out, but I also had this MCSD officer yelling at me and threatening me if I got out of the car. It was extremely overwhelming.

11.     The state trooper opened the door of the car and I kept crying. Then the MCSD officer dragged me out of the car and arrested me. He was extremely forceful – yanking and twisting my arms. I told him he was hurting me, but he didn't care.

12.     I couldn't understand why I was being arrested. All I was doing was crying and trying to comply with competing instructions from different officers. But, the officer told me, "I'm taking your ass to jail." My mom begged them to release me and let me go home.

13.     My husband John tried to help me. He tried to intervene to get them to stop roughing me up so badly.

14.     The MCSD officer walked me over and stood me in front of a MCSD car.

15.     Once I was at the car, I turned around and saw that three MCSD officers had tackled John. The MCSD officer who had taken me to the car said, "turn back around or I'll put your face in the pavement." Then he took me and threw me in the back of his car.

16.     It took my family a day to get me out of jail.

17.     After the incident, I filed a complaint with the MCSD. I thought it was important that the officers' supervisors be aware of the way I was treated.

18.     I went to the courthouse and filed a complaint there. No one took my complaint seriously. No one ever called or got in contact with me or my husband (or my mother or brother) to find out what happened or investigate. On the day I was told to come to court, the whole thing took just a few minutes. I was laughed at and my complaint was dismissed.

19.     I think I was only treated this way because I am Black.  I cannot believe that if a white family was on the side of the street trying to deal with a very upsetting car accident, that they would be screamed and cursed at, roughed up and arrested, and taken to jail.

20.     The MCSD treats the people in the Black community different then the people in the white community.  And, clearly based on how I was treated, they don't train their officers to deal with people appropriately and with respect.

I declare under penalty of perjury that the statements above are true and correct.

_____                                        2/7/18
                                                                                      _____
                                                                                                Date

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

DECLARATION OF LISA LEWIS
JONES

I, Lisa Lewis Jones, declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

    1.     My name is Lisa Lewis Jones. I am 46 years old. I am a Black woman. I have lived in Canton, Mississippi for my entire life.

    2.     I had an extremely upsetting experience with MCSD on Highway 55 with my son, daughter, son-in-law, and brother.

    3.     In 2016, my son, Aaron was driving on the highway when his wheel came off.

    4.     As I understand it, he pulled over to the side of the road. He called his brother-in-law, John, for help. He also called the police. A state trooper arrived to help him. The group

PL-MCSD 00000103

waited on the tow truck.  Because the tow truck was taking a long time, my daughter, Destiny, arrived to wait with my son so her husband, John, could go back to work.

5.      Then, a drunk driver ran into the entire group.  The drunk driver hit the state trooper's car, John's car, and Destiny's car.  Destiny's car rolled over into the ravine.

6.      My children called me and told me what happened.  I drove to the highway to wait with them and take care of them.

7.      The tow truck driver told Destiny he needed to be pre-paid for the whole group of cars.  As she went to the tow truck to pay the driver.  An MCSD officer who had recently arrived started screaming and cursing at us to get in our cars and wait.

8.      Destiny tried to explain to the MCSD officer that she was walking to the car to pay the tow truck but he kept screaming and cursing to get in her car.  She tried to explain she couldn't get in her car because it was in the ravine, but he wouldn't stop yelling.  So, I told Destiny to just wait in my car with me while the officers figured out what they wanted us to do.

9.      Destiny started to cry.  She was extremely shaken by the car accident and the officer screaming at her.

10.     The MCSD officer then came up to the my car and told Destiny he was going to arrest her.  He never told us why.  I begged the officer to just let me take her home.  But he just kept cursing at me and screaming at me that "she is going to jail."

11.     Then, the state trooper came over to the car and politely asked Destiny to get out of the car so he could take her statement.  She was crying, but she was trying to explain that she didn't know whose directions to follow: the state trooper asking her to get out, or the MCSD officer screaming at her to stay in the car.  The state trooper opened her door for her to get out and the MCSD officer ran around the car and grabbed her and arrested her.

3

12.    I started to cry and beg the officer to let her stay.

13.    Her husband John, who was in the car behind us, saw the MCSD officer handling Destiny in a rough way and came toward her to try to get the officer to calm down and explain he was hurting her.

14.    The other MCSD deputies on the scene then tackled John. I watched them press John's head into the ground, one officer had his knee on John's neck. I was terrified.

15.    The MCSD took Destiny and John to jail.

16.    It took the entire next day to get Destiny out of jail. It took even longer to get John out.

17.    The entire experience was surreal. None of my children have a criminal record. The officer arrested Destiny simply because she was crying and upset having watched everyone she loved almost get killed by a drunk driver.

18.    I think the officer reacted in this way because my family is Black.

19.    Over my 46 years I have witnessed the MCSD target and mistreat the Black community.

20.    In my experience, they set up the roadblocks in Black neighborhoods at the beginning of the month, when people are receiving money.

21.    I have been stopped at least six times in the last three years. I am frequently stopped at the exit off of the interstate on my way home from work. The exit is the one used by the Black residents of Canton.

22.    On one occasion I was stopped at a roadblock. I gave the MCSD officer my license and proof of insurance. Even though my documents were in order, he told me to pull over. I waited on the side of the road for him for 20 minutes. Finally, he came over.

23.     He asked me, "why does your tag say that – what does that mean?" I realized that he was upset because my license plate contains the letters "B," "A," and "D," my children's initials: Brian, Aaron, and Destiny. I use their initials on all sorts of things, like my email address.

24.     He asked if it was some sort of gang affiliation. I was insulted. I am a mother of three grown children. I have worked at my job for over 20 years. I am certainly not a member of some gang. He only asked me that because I am Black.

25.     I was scared by his anger as I tried to explain. Finally he allowed me to leave.

26.     I was also stopped at a roadblock on the road up to my home. I found this strange, because I live on a small road in the County, where there is very little traffic. In fact, I am one of the few people who live on my street who isn't a senior citizen.

27.     It makes me sad and afraid to watch them mistreat my family and my neighbors. During the scene on Highway 55, I asked the state trooper if he could do something. I asked him why this was happening. The state trooper, who was black, told me that we should all just be quiet. About the MCSD, he said to me, "we all know how they are."

I declare under penalty of perjury that the statements above are true and correct.

_Lisa Jones_                          2-9-18
                                       Date

PL-MCSD 00000106

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

     v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**DECLARATION OF MICHELLE
WILLIAMS**

I, Michelle Williams, declare the following under penalty of perjury pursuant to 28 U.S.C. §
1746:

    1.    My name is Michelle Williams. I am 31 years old. I am a Black woman. I live
in Fort Pierce, Florida.

    2.    In April 2015, I was living in Oxford, Mississippi. I was a full-time law student at
University of Mississippi School of Law. I was finishing my third year. I was also seven
months pregnant.

    3.    My husband and I own a piece of land in Port Gibson, Mississippi. In order to get
from Oxford to Port Gibson, we had to drive through Madison County.

PL-MCSD 00000107

2

4.      Late at night on April 12, 2015, we were driving home to Oxford from Port Gibson. I was driving, my husband was in the front seat, and my 11-month-old daughter was in the back seat.

5.      We were driving a brand new car, so we did not yet have a tag on the car. But we had all of the necessary information with us.

6.      We pulled off of I-55 in Madison County to get gas and some food. As soon as we pulled back onto the highway, a MCSD car started to follow us. As soon as we left the lit area around the exit, the MCSD officer turned on his lights signaling me to pull over. It was very dark and we were the only car on the road.

7.      I was already scared of the Madison County Sheriff's Department. Several months earlier there had been a presentation at my law school which included information on the vast levels of racism in the city of Madison and the Madison County Sheriff's Department. I was warned to be very careful when driving through Madison County and was wary of the MCSD.

8.      This was also at a time when almost every night on the news I would see that Black people, particularly Black men, were being killed during seemingly routine interactions with police officers. Just the night before, I remember seeing on the news that a man was killed during a traffic stop.

9.      I was scared for my safety. I was even more scared for my husband and my child.

10.     I immediately slowed down and put on my hazard lights to indicate to the officer that I saw him. I called dispatch to ask them to get in touch with the officer and tell him I was afraid to pull over on a dark, empty road, but that I would pull over at the next lighted area. Dispatch agreed.

PL-MCSD 00000108

3

11.     When dispatch came back on the phone with me, however, he told me that the officer had told him the next lighted area was in Memphis, Tennessee.

12.     I had driven this road many times before and I knew this was not true.

13.     The officer sped up beside and was shining a flashlight in my car. This made us even more afraid.

14.     I asked my husband if he would feel comfortable if I pulled over and he was terrified as well. He said no.

15.     I then gave dispatch all of my information: my name, social security number, my driver's license number, my address. He told me I would receive a ticket in the mail.

16.     I was relieved by this result and agreed to look out for, and promptly respond to, the ticket. The officer pulled away and we continued back to Oxford.

17.     Two days later the Oxford Police department showed up to arrest me for the incident in Madison County. I was extremely embarrassed because my husband was in the Oxford Police Academy at that time. But I was also completely confused – I had been told I would be receiving a ticket in the mail, I couldn't understand how this had transformed into my arrest.

18.     The Oxford Police brought me to their jail to hold me until the MCSD arrived to take me to Madison County. Oxford Police called three times to the MCSD telling them to come pick me up, but they did not show up. During the last phone call they said they told the MCSD they were going to let me go home if the MCSD didn't arrive shortly.

19.     The MCSD finally showed up very late at night. All told, I waited almost five or six hours for them in Oxford.

PL-MCSD 00000109

20.     They drove me to the Madison County Detention Center.  The judge made it extremely difficult for me to get bail.  Even though I had no criminal history, a husband at home with an infant missing work, and was seven months pregnant, I spent three nights in jail.

21.     When I went before the judge, I was charged with resisting arrest, despite there being no attempt at an arrest.  I was also charged with failure to stop, speeding, and not having a tag.

22.     I plead guilty to speeding.  I showed proof of tag, and that charge was dismissed.

23.     I did not plead guilty to resisting arrest or failure to stop.  I tried to explain to the judge that I wanted to stop, but too afraid to stop on an empty dark road.

24.     The judge, who was white, told me my concern was unwarranted.  She told me she knew the officer and "he's a big teddy bear."  She found me guilty.

25.     This is the same officer who followed me until it was dark, lied about how far it was until the next lighted area, drove around my car in menacing way, shined a flashlight in my face, and misled me to believe I would receive a ticket in the mail just to turn around and have me arrested.  I do not believe this man is a teddy bear.

26.     I did not have any money to appeal.

27.     In May 2015, I graduated from law school.  After graduation, I applied to take the Mississippi Bar.

28.     In order to take the bar, I first had to sit for a character and fitness exam.  During the interview with the Character and Fitness Committee, I was asked questions about what happened on that night in April 2015 with the MCSD.  I answered their questions honestly.  I told them I was trying to comply and I was afraid.

5

29.     Ultimately, the committee decided I was not allowed to sit for the bar exam. They told me I had showed a lack of respect for law enforcement.

30.     I had thirty days to appeal to a court, but I couldn't afford it.

31.     This one incident with the MCSD essentially ruined my life. I have wanted to be a lawyer since I was nine years old. Despite having no money, I worked hard to get into law school, and even harder to graduate. My family was so supportive and excited for me that I was following my dreams.

32.     Yet, I was denied a chance to take the bar. I fell into a state of depression. I felt like I wasn't doing my part to support my husband and my children. I had gotten so far, and I let my family down.

33.     We ultimately moved to Florida, where my mom lived, just a few months ago. My hope was I could take the Florida bar, having been denied my opportunity in Mississippi. My mom was going to take care of my children while I studied. Sadly, just a month ago, my mom passed away.

34.     I don't know what I am going to do or where we are going to live now. We still have property in Mississippi, but travelling back to Mississippi, or visiting my law school, means I may have to drive through Madison County again. I am afraid of what may happen to me.


I declare under penalty of perjury that the statements above are true and correct.

_Michelle Williams_                                    2/12/18
                                                        Date