# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**LATOYA BROWN, ET AL.**                                                 **PLAINTIFFS**

**v.**                                    **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI, ET AL.**                          **DEFENDANTS**

---

### DEFENDANTS' CONSOLIDATED REBUTTAL BRIEF IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT ON CLASS CLAIMS OF ALL PLAINTIFFS

---

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi  39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

Rebecca B. Cowan  (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi   39232
P.O. Box 750
Jackson, Mississippi   39205-0750
Telephone: 601-969-1010
Facsimile:   601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi   39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi   39211
Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................2

    I.      NO PLAINTIFF HAS A VALID CLAIM CONCERNING
            ROADBLOCKS. ..............................................................................2

BETTY TUCKER........................................................................................2

         1.    Tucker now admits that she has no claim for home invasion
              or conduct of the so-called jump-out boys..................................2

         2.    Tucker no longer claims that any roadblock violated the
              Fourteenth Amendment, and she has no evidence that she was
              stopped by a roadblock violating the Fourth Amendment.............3

         3.    Nothing remains of Tucker's claims...........................................5

LAWRENCE BLACKMON ........................................................................5

NICHOLAS SINGLETON ..........................................................................6

         1.    Nicholas Singleton has abandoned his home-entry related claim
              and now only seeks to be included in the Roadblock Subclass. ....6

         2.    Singleton no longer claims that any roadblock violated
              the Fourteenth Amendment, and he has no evidence that he was
              stopped by a roadblock violating the Fourth Amendment.............7

BESSIE THOMAS ....................................................................................8

LATOYA BROWN ..................................................................................10

    II.     NO PLAINTIFF HAS A VALID CLAIM CONCERNING
            PEDESTRIAN STOPS. .................................................................10

LATOYA BROWN ..................................................................................10

STEVEN SMITH......................................................................................12

         1.    All of Smith's claims are moot. ................................................12

         2.    Smith's alleged "pedestrian stop" did not violate the
              Fourth Amendment. ...................................................................15

i

KHADAFY MANNING.......................................................................................16

    1.   Khadafy Manning is barred from raising a constitutional challenge to his alleged "pedestrian stop" because he was convicted of the criminal charges resulting from the allegedly unlawful search and seizure. ..............16

    2.   Manning's pedestrian stop claim, in addition to being barred by his conviction, fails on the merits. ..........................................18

III.    NO PLAINTIFF HAS A CLAIM TO HAVE BEEN INJURED BY RACIAL TARGETING. ......................................................18

QUINNETTA MANNING ...............................................................................19

KHADAFY MANNING...................................................................................20

LATOYA BROWN .........................................................................................21

LAWRENCE BLACKMON .............................................................................24

IV.    THE AFFIDAVIT OF PLAINTIFFS' COUNSEL DOES NOT IDENTIFY ANY DISCOVERY THAT COULD POTENTIALLY CREATE A GENUINE ISSUE OF MATERIAL FACT CONCERNING ANY CLAIM OF ANY PLAINTIFF ON BEHALF OF A CLASS. ..................28

    A.   Plaintiffs fail to show the lack of prior discovery or their need for more. .......................................................29

        1.   Discovery in this case has been extensive and intensive, clearly reaching the merits of plaintiffs' claims and allowing them a full opportunity to gather evidence necessary to respond to defendants' summary judgment motions. ...................29

        2.   Plaintiffs fail to describe with specificity how any of the further discovery they seek will affect the outcome of this Court's rulings on defendants' motions for summary judgment, as required by Rule 56(d)...............................................32

            a.   Plaintiffs ignore the standard to prove entitlement to further discovery under Rule 56(d) ..............................................32

            b.   Plaintiffs' requests fail to meet the standard set by Rule 56(d) ....................................................33

B.   Because the merits of the individual plaintiffs' class claims are closely intertwined with the question of whether they have met the prerequisites of Fed. R. Civ. P. 23, rulings on defendants' summary judgment motions are appropriate now..........................................37

CONCLUSION..................................................................................................40

CERTIFICATE OF SERVICE ...........................................................................42

**LIST OF EXHIBITS**

Exhibit 1, Deposition Excerpts of Nicholas Singleton

Exhibit 2, Deposition Excerpts of Bessie Thomas

Exhibit 3, Certified Madison County Justice Court Case Records

Exhibit 4, Deposition Excerpts of Lawrence Blackmon

Exhibit 5, Plaintiffs' First Request for Production of Documents to Defendants

Exhibit 6, Plaintiffs' Second Set of Requests for Production of Documents to Defendants

NO EXHIBIT 7

Exhibit 8, Plaintiffs' First Set of Interrogatories to Defendants

Exhibit 9, Deposition Excerpts of Darian Smith

Exhibit 10, Deposition Excerpts of James Hall

Exhibit 11, Deposition Excerpts of Rylon Thompson

Exhibit 12, Deposition Excerpts of Sam Howard

Exhibit 13, Deposition Excerpts of Sheriff Randy Tucker

Exhibit 14, Deposition Excerpts of Jason Barnes

Exhibit 15, Deposition Excerpts of Tommy Jones

Exhibit 16, Deposition Excerpts of Scott McDonald

Exhibit 17, Deposition Excerpts of Tommy Squires

Exhibit 18, Deposition Excerpts of Barry Chandler

Exhibit 19, Deposition Excerpts of Quinnetta Manning

Exhibit 20, Deposition Excerpts of Latoya Brown

Exhibit 21, Deposition Excerpts of Brian Loveall

Exhibit 22, Deposition Excerpts of Mark Sandridge

Exhibit 23, Deposition Excerpts of Elton Flax

Exhibit 24, Deposition Excerpts of Jeremy Williams

The eight remaining plaintiffs seek extensive equitable relief, but only equitable relief, on behalf of a class.[1]   Although plaintiffs have not formally withdrawn any aspect of their extensive prayer for injunctive relief on behalf of the class [Dkt. # 1 at 82-85], the claims and issues they wish to pursue have been substantially changed by their motion for certification [Dkt. # 231] and supporting brief [Dkt. # 232].[2]   Instead of seeking to represent a single class requesting a prohibitory injunction against violations of the Fourth and Fourteenth Amendments [Dkt. # 1, Prayer for Relief ¶ B], they have now asked this Court to certify a Roadblock Subclass and a Pedestrian Stop Subclass, as well as a Targeting Class.   [Dkt. # 232 at 32-37].

The facts which plaintiffs now offer to prove on behalf of the class and subclasses differ in significant ways from the 82 pages of allegations in the complaint.   None of the proposed common issues of fact concerning the Roadblock Subclass alleges the intentional racial discrimination necessary to establish a claim under the Equal Protection Clause of the Fourteenth Amendment, *Village of Arlington Heights v. Metro Housing Dev. Corp.*, 429 U.S. 252, 265 (1977), or Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *Alexander v. Sandoval,* 532 U.S. 276, 280 (2001) (holding that Title VI requires proof of intentional discrimination).[3]   They offer to prove on behalf of the Pedestrian Stop Subclass that Sheriff Tucker has policies "of targeting the Apartment Complexes at least in part on the basis of race" and "of conducting searches and

---

[1]   Quinnetta Manning and Khadafy Manning also present individual claims for damages against Sheriff Tucker and Madison County.   The motion for summary judgment filed against the Mannings [Dkt. # 256] does not seek to dismiss their individual damage claims.

[2]   Defendants have already explained the changes between the complaint and the motion in some detail in their brief opposing class certification.   [Dkt. # 266 at 2-6].

[3]   Plaintiffs seek to prove that Sheriff Tucker has a policy "of disproportionately establishing roadblocks in Black communities" [Dkt. # 232 at 35], but disproportionate impact does not violate the Equal Protection Clause.

seizures of Black persons in the vicinity of the Apartment Complexes at least in part on the basis of race."   [Dkt. # 232 at 36].[4]   Plaintiffs do offer to prove several policies in alleged violation of the Fourth Amendment, but none of those factual allegations have anything to do with unreasonable searches of homes or excessive force.

The issue presented by these individual summary judgment motions is not whether plaintiffs can prove any of the eleven policies they assert in support of their certification motion. The question is whether any of those policies, assuming they exist, have caused a deprivation of any plaintiff's federal rights.   That determination must be made with regard to the facts concerning each individual plaintiff.   Because plaintiffs' certification motion classifies the eight plaintiffs into three separate groups of representatives, defendants will address their claims sequentially in the same manner.   Plaintiffs Lawrence Blackmon, Latoya Brown, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker seek to represent a Roadblock Subclass.   Plaintiffs Steven Smith, Latoya Brown, and Khadafy Manning seek to represent a Pedestrian Stop Subclass.   Quinnetta Manning seeks to represent only the Targeting Class, which the other seven plaintiffs also seek to represent.   None of them has a valid class claim.

## ARGUMENT

## I.   NO PLAINTIFF HAS A VALID CLAIM CONCERNING ROADBLOCKS.

### BETTY TUCKER

**1.   Tucker now admits that she has no claim for home invasion or conduct of the so-called jump-out boys.**

In her complaint, Betty Tucker certainly appeared to be asserting a claim concerning the

---

[4] On behalf of the Targeting Class, they assert a substantially identical claim "of conducting searches and seizures of Black persons at least in part on the basis of race."   [Dkt. # 232 at 32].

conduct of plainclothes officers whom she describes as the jump-out boys.   She alleged that on one occasion they searched her friends and family on her property without her consent, and on another occasion, they accosted and searched her grandson.   [Dkt. # 1 ¶¶ 93(d), 293-94].   She now says that she never intended to assert a claim based upon these allegations, but only meant to "provide relevant context and background."   [Dkt. # 261 at 93].   In addition, defendants demonstrated in their original brief that any claim based on these particular incidents is barred by the statute of limitations.   [Dkt. # 219 at 16-19].   Tucker takes no issue with this demonstration, arguing only that her so-called "background evidence . . . is proper even though it does not give rise to a claim that can be directly asserted."   [Dkt. # 261 at 93].   For multiple reasons, then, the parties now agree that Tucker has no claim based on these facts.

> **2.     Tucker no longer claims that any roadblock violated the Fourteenth Amendment, and she has no evidence that she was stopped by a roadblock violating the Fourth Amendment.**

Betty Tucker seeks to represent a Roadblock Subclass asserting that Sheriff Tucker has established policies of conducting roadblocks in violation of the Fourth and Fourteenth Amendments.   [Dkt. # 232 at 34-35].   Whether or not those policies exist, she does not say how those policies have injured her.

Defendants' original brief demonstrated that, during the course of discovery, Tucker abandoned any possible claim that Sheriff Tucker had intentionally discriminated against Blacks by his placement of roadblocks.   [Dkt. # 219 at 10 & n.8].   Tucker spends five pages asserting that she abandoned no such claim [Dkt. # 261 at 50-54], but at no point in her brief on summary judgment or on class certification does she assert any desire to prove intentional racial discrimination, as she must to secure relief under the Equal Protection Clause or Title VI.   Her brief offers only a single footnote to suggest that roadblocks disproportionately occur in Black

3

areas [Dkt. # 261 at 38 n.22], but she does not dispute that she must prove discriminatory intent, not disproportionate impact.   In support of her Fourteenth Amendment claim on behalf of the class, she offers only to prove "a policy or widespread custom or practice of disproportionately establishing roadblocks in Black communities."   [Dkt. # 232 at 35].   Without a showing of discriminatory intent, which she conspicuously does not offer to prove, she has no claim under the Fourteenth Amendment.

Her principal argument is that Sheriff Tucker conducts roadblocks, not for traffic safety purposes, but for crime control purposes, in violation of the Fourth Amendment as interpreted in *Edmond v. City of Indianapolis*, 431 U.S. 32 (2000).   Her Fourth Amendment claim is simply "that she was stopped at three roadblocks in 2016 . . . in her majority-Black neighborhood in Canton."   [Dkt. # 261 at 48].   Defendants' original brief demonstrates that those roadblocks followed procedures permitted under the Fourth Amendment.   [Dkt. # 219 at 8-10].   Not a word of Tucker's brief suggests any error in that analysis.   Sheriff Tucker's deputies did exactly what the Fourth Amendment permits them to do and nothing more.[5]

Tucker seems to suggest, without citation of authority, that the existence of a policy of conducting roadblocks for general crime control purposes would, without more, entitle her to relief.   However, she has offered no evidence that she has been injured by such a policy.   She admits, as she must, that roadblocks may be "established for the proper purpose of 'regulat[ing] drivers for safety reasons.'"   [Dkt. # 261 at 40 (quoting *Collins v. Ainsworth*, 382 F.3d 529, 543-

---

[5]   Tucker contends that the MCSD gives officers discretion to pick and choose which car they stop in violation of the Fourth Amendment, a contention Defendants deny.   Nevertheless, any alleged factual dispute on this issue is immaterial to Tucker's claim because she testified unequivocally that officers stopped "every car" at the roadblocks she encountered.   [Dkt. # 260-10 at 21].

44 (5th Cir. 2004)].   She offers no evidence that the roadblocks at which she claims to have been stopped in 2016 had been conducted for the impermissible purpose condemned by *Edmond*,[6] as opposed to the permissible purposes she concedes to exist.[7]   Because she makes no attempt to prove what sort of roadblock she encountered, she has no claim under the Fourth Amendment.

### 3.      Nothing remains of Tucker's claims.

Tucker now admits she never had a claim for home invasion or harassment by the so-called jump-out boys.   She admits that she does not intend to prove intentional racial discrimination on behalf of a class, and she therefore has no claim under the Fourteenth Amendment against the placement of roadblocks.   She has no evidence that any roadblock she encountered was set up in violation of the Fourth Amendment, and nothing otherwise violative of the Fourth Amendment happened to her.   She has no claim, and her complaint must be dismissed.

## LAWRENCE BLACKMON

Lawrence Blackmon also seeks to represent a Roadblock Subclass [Dkt. # 232 at 34-35], but he, like Betty Tucker, does not say how he has been injured by any alleged policy of conducting

---

[6]  No such problem of proof existed in *Edmond*. "The parties stipulated to the facts concerning the operation of the checkpoints," including the identification of the stop as "a drug checkpoint."   531 U.S. at 35.   There was no dispute that the named plaintiffs "were each stopped at a narcotics checkpoint in late September 1998."   *Id*., at 36.   The only question was whether narcotics checkpoints were unconstitutional.   Here, by contrast, neither the policy nor the causation has been stipulated.   Even if Tucker can prove the existence of a policy, she must prove that she was stopped pursuant to that policy, and she has made no effort to do so.

[7]  Tucker relies on a notice posted in 2012 of checkpoints "to check for Driver's license, warrants and what ever else we encounter."   [Dkt. # 260-78].   She also cites an incident report from 2013 concerning "A SAFETY CHECK POINT . . . TO CHECK FOR OUT STANDING WARRANTS AND OTHER VIOLATIONS."   [Dkt. # 260-57].   Whether or not these acknowledgments of multiple purposes might be sufficient to raise a jury question as to whether general crime control was the principal purpose for those particular checkpoints at the time they were conducted, it is hard to see how they provide sufficient proof of the existence of an official policy in 2016, when Tucker was stopped.

roadblocks in violation of the Fourth and Fourteenth Amendments.   Indeed, Blackmon's own testimony is that that the procedure followed by MCSD officers at every checkpoint where he stopped was "pretty much the same"; a deputy would "come to the window," ask for his "license, maybe [his] registration or . . . insurance or whatever," and would allow him to "pass through" after he showed them the requested documents.   [Dkt. # 228-3 at 146:18-147:1].   As defendants explained in their original brief, this procedure complies with the Fourth Amendment.   [Dkt. # 229 at 9].   Blackmon does not dispute this fact in his response brief.

Further, although Blackmon argues that the MCSD has a policy of conducting roadblocks for crime control purposes, not for traffic safety purposes, he has presented no evidence that he was stopped at such a roadblock.   To the contrary, as stated above, his only evidence is that he was only asked to produce his driver's license and insurance information at every stop, which is consistent with a policy of promoting road safety.

Finally, as explained above, Blackmon, like all of the other plaintiffs, makes no attempt on behalf of the "Roadblock Subclass" to prove intentional racial discrimination, which he must do to obtain relief under the Equal Protection Clause or Title VI.   Accordingly, summary judgment should be granted on his Roadblock Subclass claim.

## NICHOLAS SINGLETON

### 1.    Nicholas Singleton has abandoned his home-entry related claim and now only seeks to be included in the Roadblock Subclass.

Nicholas Singleton initially alleged in his complaint that the MCSD unlawfully entered his home in 2011.   [Dkt. # 1 at ¶¶ 261-63].   Singleton, however, admits that he has no such claim, which would in any event be barred by the applicable three-year statute of limitations.[8]   Instead,

---

[8]   Singleton's claims are governed by the three-year statute of limitations prescribed by Miss. Code

he says he included these allegations only "as context and background evidence."   [Dkt. # 261 at 98 n.64].   Accordingly, these allegations cannot preclude entry of summary judgment against Singleton.

> **2.      Singleton no longer claims that any roadblock violated the Fourteenth Amendment, and he has no evidence that he was stopped by a roadblock violating the Fourth Amendment.**

Summary judgment should be granted on Nicholas Singleton's only remaining claim, on behalf of the Roadblock Subclass.   Like the other Roadblock Subclass representatives, he offers to prove only disproportionate impact, not the intentional discrimination that would violate the Fourteenth Amendment.   [Dkt. # 232 at 33].   Indeed, his own testimony negates proof of even disproportionate impact, conceding that the majority of the roadblocks where he was stopped (*i.e.,* six out of ten) were located in areas he considers race "neutral."   [Dkt. 222-1 at 53:6-24; 55:1-10]

Equally insufficient is his evidence that two of the roadblocks where he was stopped were set up near apartment complexes for general crime prevention purposes, as opposed to traffic safety-related purposes, in violation of *Edmund*.   [Dkt # 261 at 41-42].   The first stop occurred on a public street near a complex Singleton referred to as the "new projects," but he admitted the stop "possibly" occurred more than four years before his deposition, which is outside the statute of limitations,[9]  and the MCSD officer merely "looked at [Singleton's] license and told [him he] could go."   [Dkt. # 221-1 at 44:1-5]; (Exhibit 1, Deposition Excerpts of Nicholas Singleton, Pgs.

---

§ 15-1-49.   *See Walker v. Epps*, 550 F.3d 407, 415 (5th Cir. 2008).

  [9]  The present lawsuit was filed on May 8, 2017, and Singleton's deposition was taken on December 29, 2017.   Thus, Singleton's testimony that the stop possibly occurred more than four years before his deposition means it would have occurred before December 29, 2013, outside the limitations period.

49:20-50:1).   The other stop occurred on a public street near Canton Estates apartments, but Singleton could not remember when it occurred and testified that nothing about it stood out in his memory as being significant or improper.   (Exhibit 1, Singleton, at 48:18-22).   This testimony does not support a contention that the roadblocks were established for any reason other than traffic safety.   To the contrary, checking to make sure Singleton had a valid license is wholly consistent with a policy of conducting roadblocks for traffic safety purposes.

Singleton's contention that any roadblock near Canton Estates was set up for impermissible, non-traffic safety purposes, is also contrary to the undisputed testimony of MCSD officers and the apartment manager for Canton Estates.   MCSD officers uniformly testified that roadblocks at this location were established for the primary purpose of traffic control.   (Dkt. # 267-5 at 161:21-25, 162:2-20; Dkt. # 267-6 at 199:24-25, 200:1-17; Dkt. # 267-3 at 48:19-24). Further, Angela Lyons, the apartment manager of the complex for over nine years, testified that she has asked the MCSD on several occasions to set up checkpoints on the street near the complex to deter drivers from speeding in and out of the complex, a problem she has been fighting for years. (Dkt. # 267-1 at 52:5-25, 53:1-7, 101:24-25, 101:1-21).   Sheriff Tucker recalls Ms. Lyons's traffic complaints and agrees that checkpoints are set up near Canton Estates based on these complaints.   (Dkt. # 267-5 at 162:8-20).   In short, Singleton's allegation that the roadblocks where he was stopped failed to comply with Fourth or Fourteenth Amendment is contrary to the undisputed evidence.   Summary judgment should therefore be granted on his Roadblock Subclass claim, and he should be dismissed from this case with prejudice.

## BESSIE THOMAS

Bessie Thomas initially alleged in her complaint that the MCSD unlawfully entered her home in 2014 to arrest her son.   [Dkt. # 1 ¶ 285].   During discovery, however, she admitted that

8

the incident actually occurred in 2008.   [Dkt. # 220-2 at 38:22-24].   Defendants subsequently

demonstrated in support of summary judgment that this claim is time-barred, and Thomas does not

contest this point in her response.   [Dkt. # 261 at 98 n.64].   She now admits that she never

intended to state a claim but included these allegations only "as context and background."   [*Id.*].

These allegations, then, cannot save Thomas from summary judgment.

Having abandoned her home invasion claim, Bessie Thomas seeks to be included only in

the Roadblock Subclass.   As already demonstrated, the Roadblock Subclass plaintiffs do not seek

to prove intentional discrimination, so she has no Fourteenth Amendment claim.

Furthermore, her offer to prove that the MCSD has a policy of conducting certain

roadblocks for general crime prevention purposes, without more, is insufficient to prove a claim.

She must, at a minimum, present some evidence that the roadblocks *where she was stopped* were

conducted for an impermissible purpose.   By her own admissions, she cannot do so.   It is

undisputed that her car was never searched, she was never arrested, and the only citation she ever

received was for failing to have a child properly restrained, which is unquestionably a traffic safety

violation.   [Dkt # 261 at 47].[10]   These acts are all consistent with a roadblock conducted for

traffic safety purposes.   Moreover, despite her general citation to evidence purporting to show

that some MCSD officers exercised improper discretion at certain roadblocks, she admitted that

officers stopped every car she saw during the roadblocks where she was stopped.   (Exhibit 2,

Deposition Excerpts of Bessie Thomas, 64:23-65:9).

---

[10]  Thomas recounts testimony she gave about the use of a racial epithet by an officer during one
of her stops.   [Dkt. # 261 at 48].   However, as explained in defendants' original brief, this evidence,
without additional evidence of a constitutional violation, does not amount to an equal protection violation.
[Dkt. # 221 at 7 (citing *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999))].   Thomas does not contest
this point.

Having offered no evidence to support her claim that the roadblocks where she was stopped constituted a violation of the Fourth or Fourteenth Amendments, Thomas cannot survive summary judgment.

## LATOYA BROWN

Latoya Brown's Roadblock Subclass claim evidence is also insufficient to defeat summary judgment. Brown recalls being stopped at two roadblocks as a driver and three as a passenger. [Dkt. # 233-1 at 45:7-50:16]. In the two where she was driving, she says an officer asked for her license and cited her for driving without a valid license, which she admitted she did not have. [*Id.* at 45:12-46:25; 47:19-48:23]. Officers made the same request of the drivers in the other three encounters, but in one, also asked Brown, as a passenger, to provide her identification. [Dkt. # *Id.* at 49:1-50:16]. Defendants explained in the original brief that these procedures complied with Fourth Amendment requirements [Dkt. # 233 at 9], and Brown does not argue otherwise.[11] Nor does she prove that any roadblock was established for a purpose forbidden by the Fourth Amendment. Moreover, Brown presents no evidence of intentional racial discrimination, which she must prove to succeed on her Fourteenth Amendment claim. Accordingly, summary judgment should be granted on Brown's Roadblock Subclass claim.

## II.    NO PLAINTIFF HAS A VALID CLAIM CONCERNING PEDESTRIAN STOPS.

### LATOYA BROWN

Brown describes four separate encounters with MCSD officers she claims constituted

---

[11] Brown does not offer to prove that Sheriff Tucker has a policy of requiring passengers to produce identification. [Dkt. # 232 at 34-35]. Absent proof of a policy, she has no claim against Sheriff Tucker, regardless of whether a deputy may have acted improperly.

improper searches or seizures under the Fourth Amendment.   [Dkt. # 261 at 57-58].[12]   She refers

to these encounters as "pedestrian stops" and seeks to represent a class of persons whom she alleges

"have been, or will be, subject to the MCSD's policy of conducting stops, searches and/or seizures of

Black pedestrians in Madison County in the absence of reasonable, articulable suspicion or probable

cause."   [Dkt. # 232 at 36].   In none of the four encounters Brown identifies, however, was she

arrested, searched, or seized.   Instead, during each encounter, deputies simply asked her for her

identification or Social Security number, and, after running it through dispatch, allowed her to

proceed without incident.[13]

As explained in defendants' original brief, these encounters do not amount to searches or

seizures under the Fourth Amendment.   [Dkt. # 233 at 9].   The Fifth Circuit has held that,

"[e]ven when officers have no basis for suspecting a particular individual, they may generally ask

questions of that individual[,] ask to examine the individual's identification[,] and request consent

to search his or her [property] as long as the police do not convey a message that compliance with

their requests is required."   *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (quoting

*Florida v. Bostick*, 501 U.S. 429, 436 (1991)).   Moreover, the Supreme Court has held:

> a person has been 'seized' within the meaning of the Fourth Amendment *only if*, in
> view of all of the circumstances surrounding the incident, a reasonable person
> would have believed that he was not free to leave.   Examples of circumstances that

---

[12]   As defendants demonstrated in their original brief [Dkt. # 233 at 6-8], neither she nor any other pedestrian can prove that any stop took place because of intentional racial discrimination.   As explained in Part III hereafter, plaintiffs certainly have no proof that any action was taken against them because of a racially discriminatory policy established by Sheriff Tucker.

[13]   In the first encounter, a deputy asked Brown for her identification and Social Security number and "permit[ted] her to proceed" after calling in her identification information to dispatch.   [Dkt. # 261 at 57].   In the second, a deputy asked for her identification, ran it through dispatch, and then "allowed [her] and her companions to proceed."   [*Id.*].   In the third, a deputy asked for her name, which he then called in to dispatch and "let her go."   [*Id.*].   In the fourth, deputies patrolling her apartment complex asked for her name and identification and "allowed her to proceed" after running her name through a warrants database.   [Dkt. # 261 at 57-58].

> might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (emphasis added; internal citations omitted).   Because the encounters described by Brown do not involve the type of physical force or threats described by the Supreme Court to constitute a seizure, and because the request by officers for her identification does not amount to a search, Brown cannot prove a Fourth Amendment violation.

Although Brown has claimed after her deposition she did not believe she was free to leave or could refuse to provide her identification to the officers during any of alleged encounters [Dkt. # 260-30 ¶ 9], she has produced no evidence whatsoever of the force or duress necessary to prove that the encounters constituted a seizure under the Fourth Amendment.   None of the alleged encounters involved a threatening presence of several officers, the display of a weapon by an officer, physical contact by an officer or threatening language by an officer.   Thus, as the Supreme Court held in *Mendenhall*, the encounters she describes did not constitute a seizure.   446 U.S. at 555 ("In the absence of some such evidence [of physical force], otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.").

## STEVEN SMITH

### 1.      All of Smith's claims are moot.

Steven Smith, who seeks only prospective equitable relief, has left Mississippi and moved to Dallas, Texas, but contends this Court should find he still has standing because he has

"expressed an intent to return permanently, and has multiple trips planned to Canton in upcoming

months in order to visit his family."   [Dkt. # 261 at 89].   He contends that, under Fifth Circuit

law, all he must establish is a "reasonable expectation" that the unconstitutional conduct may recur.

[Dkt. # 261 at 89 (citing *Hernandez v. Cremer*, 913 F. 2d 230, 233-34 (5th Cir. 1990))].[14]

Asserting that he may again be subject to a pedestrian stop in Madison, his affidavit declares his

plan to return to Madison County "regularly" to visit friends and family and that he plans to "move

back to Mississippi in the future to remain near [his] family."   [Dkt. # 234-1 at 59:11-58:1].[15]

        In order to invoke Article III jurisdiction, plaintiffs seeking injunctive relief must show that

they are in *immediate danger of sustaining some direct injury*.   *Robinson v. City of Chicago*, 868

F.2d 959, 966 (7th Cir. 1989) (emphasis added).   Because injunctions are "forward-looking

remed[ies]," plaintiffs seeking this relief only have standing to sue for an alleged future injury if

"'the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will

---

[14] Plaintiffs suggest that the Fifth Circuit has declined to apply the mootness rule in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), where the plaintiff had been "engaged in activity protected by the Constitution" when confronted by law enforcement.   [Dkt. # 261 at 90 (quoting *Hernandez*, 913 F.2d at 234)].   In that decision by a divided panel, plaintiff was an American citizen who had been improperly denied entry upon returning from Mexico.   *Id.*, at 232.   The right of international travel is protected from the federal government by the Fifth Amendment.   *Kent v. Dulles*, 357 U.S. 116 (1958).   By contrast, there is no dispute that a State may regulate travel within its borders.   Here, Smith was traveling around Canton in defiance of lawful warrants for his arrest.   Besides, while one may not lawfully cross the United States border without encountering law enforcement, people can and do walk around Canton all day without being stopped by sheriff's deputies.   Nothing in *Hernandez* relieves Smith from the obligation imposed by *Lyons* to demonstrate a live dispute.

[15] Although he seeks to represent only the Pedestrian Stop Subclass, Smith's affidavit also states that he has "been stopped at numerous roadblocks conducted by the MCSD."   [Dkt. #226-34 at ¶ 3]. Nowhere in his complaint [Dkt. # 1 ¶¶ 271-81] does Smith allege encounters with roadblocks, nor does he seek certification as a representative of the Roadblock Subclass.   Thus, this Court's standing analysis should be focused on Smith's likelihood of future injury with regard to being stopped as a pedestrian. Even Smith does not claim he will face another home search [Dkt. # 1 ¶¶ 276-81] in a county where he has no home.

occur.'" *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)).   The mere fact that Smith was exposed to alleged illegal conduct in the past "does not in itself show a present case or controversy regarding injunctive relief" necessary to establish standing.   *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974).   What Smith alleges here is a threat of injury, which is "merely conjectural or hypothetical."   *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017).   Smith alleges *when* he visits Madison County he *may* walk the town of Canton or elsewhere in Madison County where he *may* encounter MCSD officers who *may* unlawfully stop him without reasonable suspicion or probable cause.   This string of possibilities based on his non-specific plans of "regularly" visiting the county in conjunction with a plan to move back at some time in the "future," is insufficient to confer Article III standing on Smith to seek the declaratory and injunctive relief he seeks.[16]

Smith alleges one pedestrian stop in 27 years in Canton.   [Dkt. # 1, ¶ 269-71].   The rarity of this event is relevant as explained by the Ninth Circuit in *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1039 (9th Cir. 1999).   There, the Ninth Circuit held that two drivers who were stopped by Border Patrol agents in an allegedly unlawful vehicle stop lacked standing necessary to be entitled to injunctive relief "prescrib[ing] and implement[ing] measures sufficient to prevent resumption of those practices."   The Court held that the drivers lacked a showing of a "real or immediate threat" that they would be harmed again.   *Id*. at 1043-44.   The Court noted that the need to find immediate harm is *especially great* when the plaintiff seeks to "enjoin a state to conduct its business in a particular way."   *Id*. at 1042 (citing U.S. Supreme Court cases).   Thus,

---

[16] As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), the lack of "concrete plans, or even indeed any specification of *when* the someday will be—do not support a finding of the 'actual or imminent' injury that our cases require."   Similarly, Smith's claim that he will move back to Madison County "in the future" should be insufficient to confer standing.

"[i]n the absence of a likelihood of injury to the named plaintiffs, there [was] no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Id*. at 1044.

Similarly, in *Chavez v. Illinois State Police*, the District Court dismissed two of the plaintiffs' claims for prospective relief for lack of standing relating to alleged unconstitutional stops on Illinois highways. No. 94 C 5307, 1999 WL 592187, at *1, *14-15 (N.D. Ill. Aug. 2, 1999). One plaintiff testified he was "confident that [he] would travel to Illinois in the future," but this inchoate statement was insufficient to confer standing for prospective relief by showing a "real and immediate" injury. *Id*. at *14-15. Another plaintiff's claim for prospective relief was dismissed for lack of standing even though he testified he frequently traveled on Illinois highways. *Id*. at *16.

Simply put, Smith is no longer a resident of Mississippi and his suggestion that there is a threat he will encounter MCSD officers and be subject to a pedestrian stop is too far attenuated to establish Article III standing. His claims that he will move back to Madison County permanently at some point "in the future" and that he will visit Madison County to visit family are insufficient to show the "real and immediate threat of repeated injury" sufficient to confer standing on him for the declaratory and injunctive relief he seeks. *Lyons*, 461 U.S. at 111.

### 2. Smith's alleged "pedestrian stop" did not violate the Fourth Amendment.

Smith's Pedestrian Stop Subclass claim, in addition to being moot, fails on the merits. He relies wholly on an incident that occurred on January 23, 2017, when he was walking by an MCSD officer who asked him to take his hands out of his pocket and to provide his identification. [Dkt. # 261 at 58-59]. According to Smith, these actions amounted to a "suspicionless stop" in violation of

the Fourth Amendment.   [Dkt. # 28 at 58].   As explained in defendants' original summary judgment brief [Dkt. # 234 at 10-12] and above with regard to Latoya Brown, police do not have to have probable cause or reasonable suspicion to approach a person and ask to see his identification.

Smith's only response to this argument is that he felt that he had been seized because he did not believe he could refuse to provide his identification.   [Dkt. # 260-34, ¶9].   Again, like Brown, Smith fails to present any evidence of the type of physical force or threats necessary to convert his encounter to a seizure under *Mendenhall*; the encounter did not involve the threatening presence of several officers, the display of a weapon by an officer, physical contact by an officer or threatening language by an officer.   Thus, summary judgment should be granted on Smith's Pedestrian Stop Subclass claim.   *Mendenhall*, 446 U.S. at 555.

### KHADAFY MANNING

**1.** **Khadafy Manning is barred from raising a constitutional challenge to his alleged "pedestrian stop" because he was convicted of the criminal charges resulting from the allegedly unlawful search and seizure.**

Khadafy Manning seeks to represent the Pedestrian Stop Subclass based entirely on an incident that led to his arrest on February 14, 2017.   [Dkt. # 261 at 59-60].   The undisputed facts are that Manning was approached by MCSD Deputy Samuel Howard and asked to produce his driver's license after he was seen by Howard making an abrupt turn and stop while driving.   This encounter led Deputy Howard to discover that Manning was driving with a suspended license and no proof of insurance, and Manning was arrested.   Manning was subsequently convicted in Madison County Justice Court on one count of driving with a suspended license and one count of driving without proof of insurance.   (Exhibit 3, Certified Madison County Justice Court Case Records).

Manning now claims that the encounter with Deputy Howard constituted an illegal stop in

violation of his Fourth Amendment rights. Manning, having been convicted of the charges brought against him arising from the encounter, cannot assert a claim in this case for the alleged constitutional violation. As the Supreme Court has held, a civil rights claim based on an allegedly unconstitutional conviction or imprisonment is not cognizable unless the conviction has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Manning's conviction in this case has not been so invalidated and, thus, he cannot assert a constitutional challenge to his arrest in this case. *See Conway v. Caldwell Cty. Sheriff's Office*, No. A-14-CA-069-SS, 2015 WL 769744, at *6-7 (W.D. Tex. Feb. 20, 2015) ("Conway's claims relating to his alleged unlawful arrest and inventory of his truck are barred by *Heck* [as a result of his drug possession conviction]. Conway's unlawful seizure claim regarding Deputy McConnell's initial stop of Conway is also barred by *Heck*. If Conway successfully demonstrates his initial seizure and detention by Deputy McConnell violated his Fourth Amendment rights, such a result would imply the invalidity of his drug possession conviction because the drugs would be considered the fruit of a poisonous tree. As such, *Heck* precludes the claim.") *aff'd*, 671 F. App'x 299 (5th Cir. 2016); *Brown v. Town of DeKalb, Miss.*, 519 F. Supp. 2d 635, 638 (S.D. Miss. 2007) ("Defendants correctly argue that Brown's claims based on allegations pertaining to the seizure of his person and the seizure of his property from the safety deposit box, which led to his confession, indisputably question the validity of his subsequent conviction for embezzlement and are consequently barred by *Heck*.").

Accordingly, Khadafy Manning's claim on behalf of a Pedestrian Stop Subclass should be dismissed as a matter of law.

## 2.    Manning's pedestrian stop claim, in addition to being barred by his conviction, fails on the merits.

In addition to being procedurally barred, Manning's Pedestrian Stop Subclass claim fails on the merits.   It is undisputed that Manning was approached by Howard after Manning exited his vehicle and was asked to produce his identification, which he did.   Further, as explained above, this request by itself does not constitute a search or seizure as long as the officer does not convey a message that compliance with his request is required.   *See Cooper*, 43 F.3d at 145 (quoting *Bostick*, 501 U.S. at 436).   Manning, in his response brief, concedes that the test of whether an officer conveyed such message is based "not with the citizen's subjective perception or the officers' subjective intent, but *only* with what the officers' words and actions would have conveyed to a reasonable and innocent person."   [Dkt. # 261 at 60 n.42 (emphasis added) (citing *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003))].   Further, Manning does not dispute that Howard never expressed with his words or actions that Manning was not free to leave or refuse his request.   Instead, Manning argues only that, because he had been allegedly coerced by a different MCSD officer several months earlier, he subjectively believed he had to comply with Howard's request.   [Dkt. # 261 at n.41].   However, as Manning concedes, his subjective belief based on prior alleged conduct by another officer is irrelevant to whether his encounter constituted a seizure under the Fourth Amendment; only Howard's actions and words are relevant.   By Manning's own admission, Howard never told him that his compliance was required.   Accordingly, Manning's stop did not constitute a seizure, much less a violation of the Fourth Amendment, and his Pedestrian Stop Subclass claim fails.

## III.   NO PLAINTIFF HAS A CLAIM TO HAVE BEEN INJURED BY RACIAL TARGETING.

Because no plaintiff has suffered a constitutional injury involving roadblocks or pedestrian

stops, they have no such claims on behalf of themselves individually or a class.   Quinnetta

Manning and her husband Khadafy Manning seek to represent the Targeting Class only by virtue

of an entry into her home, and Brown, Smith and Blackmon also allege unconstitutional entries.

Whether or not any of the three might be entitled to a trial on their individual claims, none of them

has offered to prove anything on behalf of a class.   Manning does not allege that Sheriff Tucker

has a policy of waiting too long to enter a home in cases of hot pursuit.   Brown does not allege

that he has a policy of using searches for missing children as an excuse for unreasonably intrusive

searches.   Blackmon does not allege that he has a policy of arresting the wrong person under a

valid warrant.   None of these allegations, even if true, can support relief on behalf of a class.

The only policy that plaintiffs seek to prove is that everything Sheriff Tucker does is

motivated by intentional discrimination against Blacks.[17]   Even if true, the evidence in the record

establishes that racial policy did not cause the deputies' entries into any of these homes.   Unable

to prove claims for themselves, plaintiffs cannot get relief for a class.   Those same facts show

that Brown and Blackmon suffered no Fourth Amendment violation.   Even if a question exists

concerning hot pursuit or consent regarding Manning, that would support only her individual

damage claim, not a class claim regarding an alleged racial policy that had no effect on her.

### QUINNETTA MANNING

Summary judgment should be granted on Quinnetta Manning's racial Targeting Class

claim.   She has not put forth any evidence to support her claim that a policy of racial profiling

---

[17] Their only proposed question that attempts to state the required allegation of intentional racial discrimination is "[w]hether the MCSD has a policy or widespread custom or practice of conducting searches and seizures of Black persons at least in part on the basis of race."   [Dkt. # 232 at 32].   Even if this generic language were broad enough to cover entries into the houses of Black persons, they do not offer to prove that any entry was caused by such a policy.

caused any injury to her.   To the contrary, the only evidence is that MCSD officers went to her apartment complex, not because Sheriff Tucker told them to target Blacks, but because they received a call for help from Brittany Morment about a domestic dispute between her sister, Ashley Morment, and Ashley's ex-boyfriend, Ladarius Thompson.   [Dkt # 256-1 ¶¶ 2-3, 6-7].   After arriving at the apartment complex, one of the officers (Sergeant Slade Moore) observed Quinnetta and her husband, Khadafy Manning, with Thompson as he attempted to break into Morment's apartment to take a television.   [Dkt # 256-1 ¶ 10].   When Thompson noticed the officers in the area, he told Quinnetta, "The police coming [*sic*]," and the Mannings went into their nearby apartment, which was also witnessed by Sergeant Moore.   [Dkt # 256-2 at 94:21-95:21; Dkt # 256-1 ¶ 12].   Suspecting that the Mannings may have been acting as lookouts for Thompson, MCSD officers went to the apartment to question the Mannings about their involvement in the break-in.   Whether or not the entry was permissible by consent or under the doctrine of hot pursuit, there is no evidence that race was a factor.   The only evidence Manning presents to the contrary is her own stated subjective "belief" that the MCSD's actions were "based at least in part on [the Mannings'] race," which is insufficient to defeat summary judgment.   *Laborde v. City of Houston*, 31 F. App'x 151 (5th Cir. 2001) ("A plaintiff's subjective belief of race discrimination cannot alone establish that he has been a victim of intentional discrimination.") (citing *Ray v. Tandem Computers, Inc.*, 63 F .3d 429, 435 (5th Cir.1995)).

## KHADAFY MANNING

For these same reasons, Khadafy Manning's racial Targeting Class claims should be dismissed.   His claims are based entirely on the home entry discussed above.   Neither Manning presents any evidence in response to the summary judgment motion that the incident was the result of a policy of intentional racial discrimination.   In fact, the new evidence Manning presents on

20

this issue readily admits that he "can't say for certain that the deputy treated me the way that he did that morning because of my race."   [Dkt. # 260-31 ¶ 22].   Absent evidence that a policy of racial discrimination caused the home entry, his claim on behalf of the Targeting Class cannot stand.

## LATOYA BROWN

Brown and Smith[18] seek to represent the racial Targeting Class on the basis of their claim that MCSD officers entered an apartment without a warrant.   [Dkt. # 232 at 37].   The incident took place on Halloween night in 2015 after Brown had given a birthday party for her four-year-old nephew.   [Dkt. # 234-1 at 43:11-44:11].   Their own testimony, however, clearly shows that the search was conducted under emergency or exigent circumstances in compliance with the Fourth Amendment and was not the result of racial profiling.

Brown and Smith both admit that when the officers arrived at the door of the apartment, they immediately stated that they were "searching for a missing child and were searching every unit in the apartment complex."   [Dkt. # 261 at 67].   Consistent with the officers' stated purpose of searching for a missing child, the officers, once inside, asked Brown's daughter to tell them her name, obviously to find out if she was the child for whom they were searching.   [Dkt. # 261 at 67].   Further, although Brown claims that the officers searched drawers too small to contain a toddler, they may have been looking information to confirm that Brown's daughter was in fact her daughter or for other information leading to the missing child, which would have been reasonable under the circumstances.   Whatever relevance those allegations might have to a Fourth

---

[18]   As explained above, all of Smith's claims should be dismissed as moot because he no longer has standing to pursue them.   Further, even if he could bring them, summary judgment should be granted on his racial Targeting Class claim for the same reasons it should be granted on Brown's claims.

Amendment claim, they have no bearing on the Fourteenth Amendment claim she asserts on behalf of the Targeting Class.

Significantly, there is no evidence that the officers who entered the apartment were conducting a criminal investigation. Instead, they were responding to a noncriminal emergency (*i.e.,* a missing child). In such emergencies, the Fourth Amendment permits police to enter a home without a warrant.[19] As recognized by the Supreme Court, as defendants explained in their original memorandum, a police officer's action in attempting to connect a lost child with her parents does not fall into the "rubric of the criminal justice system – a system in which police generally search for evidence of a crime after the fact." *United States v. Taylor,* 624 F.3d 626, 630 (2010) (quoting *United States v. Johnson,* 410 F.3d 137, 144 (4th Cir. 2005)). Instead, the officers' actions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Domborwski,* 413 U.S. 433, 441 (1973).

Plaintiffs argue that the search of Brown's apartment for the missing child in this case does not fall within the "exigent circumstances" or the "emergency aid" exceptions, but the cases they cite [Dkt. # 261 at 67-71] do not support their position.[20] Primarily, plaintiffs incorrectly compare the officers' search in this case with searches associated with the investigation or acquisition of evidence relating to criminal activity. This is simply not the case. Three of the

---

[19] The emergency or exigent circumstances exception applies when three elements are met: (1) there are reasonable grounds to believe than an emergency situation exists and that there is an immediate need for police assistance in order to protect life and property; (2) the primary motivation for the search **is not to make an arrest and/or to seize evidence**; and (3) there is some reasonable basis, approximating probable cause, to associate the emergency with the area or place searched." *Yankton v. Byrd*, 2015 WL 5943096 *7 (S.D. Miss. Oct. 13, 2015) (citing *Baker v. State,* 802 So.2d 77, 79 (Miss. 2010)) (emphasis added).

[20] Defendants have no record of the alleged search ever having occurred. For summary judgment purposes, defendants have addressed the legality of the search under the Fourth Amendment.

cases cited by plaintiffs involved investigations by officers of criminal activities.   The fourth involved an entry and search under the "emergency aid" exception to warrant less entries, which supports defendants' position.

In *Mincey v. Arizona*, 437 U.S. 395 (1978), the police entered and searched the defendant's apartment on two separate occasions.   During their first entry, the police were responding to a reported shooting in the apartment.   They entered the apartment without a warrant and removed all victims of the shooting.   The Court condoned this warrantless entry based on "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency" without ever mentioning the need for probable cause.   *Id.* at 388.   During the second entry, homicide detectives entered the apartment after the victims had been removed and the scene secured.   The Court held that the second entry was illegal because the detectives' entry and search was not based on exigent circumstances.   *Id.* at 392-93.   The entry and search addressed in *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002), also involved police officers' investigating criminal activity while entering the defendant's apartment.   The Court reversed the decision by the Louisiana Court of Appeals that the State did not have to prove that exigent circumstances justified their warrantless entry without addressing those circumstances argued by the State.   The sweeping searches of several apartments in *Pratt v. Chicago Housing Authority*, 848 F. Supp. 792, 793-94 (N.D. Ill. 1994), were based on suspected criminal activity, *e.g.,* random gunfire from building to building, and were performed several days after the officers claimed emergency circumstances justified their searches.   The District Court rejected the Housing Authority's claim that exigent circumstances made the searches legal by holding that "the sweeps took place several days after the shooting activity and in no instance occurred within forty-eight hours after the gunfire."   *Id.* at 795.

23

The facts in *Michigan v. Fisher*, 558 U.S. 45 (2009), actually support defendants' argument that their officers' search of Brown's apartment was legal because it was based on exigent circumstances.   Specifically, the warrantless entry by the officers into Fisher's home was not the result of any criminal investigation; instead, it occurred after officers observed Fisher's home in utter turmoil and blood on the doors of the home.   *Id*. at 45-46.   The Court held that the entry was lawful even though evidence resulting in criminal charges being brought against Fisher was seized, recognizing that the entry fell under the "emergency aid exception" first recognized in *Brigham City v. Stuart,* 547 U.S. 398, 404-406 (2006).   *Id.* at 48-49.

There is no material evidence to suggest that the officers' warrantless entry into Brown's apartment occurred for any reason other than their search for the missing toddler.   Brown admits that (1) the officers told her that this was the reason for their entry and search, (2) that the officers searched other apartments for the child, and (3) that she actually knew the missing child.   [Dkt. # 233-1 at 54:25-56:10].   Accordingly, the search satisfied the emergency aid exception and was not the result of racial profiling.   Brown's racial Targeting Class claim thus fails as a matter of law.

## LAWRENCE BLACKMON

Likewise, summary judgment should be granted on Blackmon's racial targeting claim. Despite the assertions offered in his response, the following facts remain undisputed:

- On the morning of December 8, 2015, Deputy Scott McDonald and Lieutenant Jeff Waldrop of the MCSD went to 320 Martin Luther King Drive to execute an arrest warrant on Blackmon's cousin (and former plaintiff) Herbert Green, who was listed on the arrest warrant as residing at that address.   [Dkt # 229-2 at ¶2].

- Before heading to the residence, McDonald confirmed that 320 Martin Luther King

24

Drive was Green's known address.   [Dkt # 229-2 at ¶3].

- When McDonald and Waldrop arrived at the residence, McDonald knocked on the door, and Blackmon asked, "Who is it?"   [Dkt # 229-2 at ¶4; Dkt. # 229-3 at 74:10-18].   McDonald responded by telling Blackmon to come to the front door.   [Dkt # 229-2 at ¶4; Dkt. # 229-3 at 74:19-21].

- Believing Blackmon to be Green, McDonald told Blackmon through the closed door that he had a warrant for his arrest.   [Dkt # 229-2 at ¶10].   Blackmon came to the front door and, with the door still closed, asked to see the warrant, which McDonald held up to the window.   [Dkt # 229-2 at ¶7; Dkt. # 229-3 at 75:1-8].[21]

- Although Blackmon testified that he could not read the warrant through the window, he never asked whose name was on the warrant, did not tell the deputies at that time that he was not Green.   [Dkt # 229-2 at ¶9; Dkt. # 229-3 at 119:1-120:17].

- After showing Blackmon the warrant through the window, McDonald again asked Blackmon to open the door, and Blackmon again refused to comply.   (Exhibit 4, Deposition Excerpts of Lawrence Blackmon, at 85:13-16).

- Based on Blackmon's failure to cooperate despite being shown a copy of the valid warrant, McDonald believed Blackmon was Green and attempted to make a forced entry into the home.   [Dkt # 229-2 at ¶10; Dkt. # 229-3 at 75:13-25].   Once inside, officers temporarily handcuffed Blackmon until they confirmed he was not Green, and

---

[21]  Blackmon testified that the officer held up a "piece of paper," but he admitted that he could not deny that it was a warrant because he never saw what was on it.   [Dkt. # 229-3 at 115:18-120:17]. McDonald's testimony that what he held up to the window was the arrest warrant is therefore undisputed. Further, although Blackmon testified that he could not read the warrant through the window, it is undisputed that he never asked whose name was on the warrant and did not tell the deputies at that time that he was not Green.   [Dkt. # 229-2 at ¶ 9].

Blackmon was released.   [Dkt. # 229-3 at 76:1-3; Dkt. # 229-3 at 76:1-3; 94:8-14; 95:12].

- Although Green was not at the home on December 8, 2015, when the officers went to execute the warrant, he was arrested by Canton Police on the same arrest warrant at that address approximately one month later.   [Dkt # 229-2 at ¶15].

These facts clearly show that the entry into Blackmon's home was not the result of a policy of racial targeting, but was the result of an arrest warrant, which gave the officers authority to enter the home and execute on the warrant.   *See Steagald v. United States*, 451 U.S. 204, 221 (1981) ("[A]n arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest.").

Blackmon does not dispute (nor could he) that a valid arrest warrant gives police authority to enter a home when they have reason to believe that the subject of the warrant is in the home. *United States v. Route,* 104 F.3d 59, 62 (5th Cir. 1997) ("A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within.").   Further, Blackmon concedes that "[t]he Fourth Amendment is not violated by an arrest based on probable cause, even if the wrong person is arrested, if the arresting officer had a reasonable, good faith belief that he was arresting the correct person."   *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir.1994).   *See also Hill v. California*, 401 U.S. 797, 802 (1971) ("When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.") (internal quotation marks omitted).   Blackmon argues, however, that MCSD officers, even though they had an arrest warrant for Green, had no reason to believe Blackmon was Green and therefore should not have entered the home or temporarily handcuffed him.   This is simply not true.

26

As explained above, the arrest warrant specifically stated that Green "may be found at . . . 320 Martin Luther King Dr. in Canton, MS 39046," and McDonald confirmed that this was Green's known address before going to the home.   Blackmon, by his own admission, repeatedly refused to open the door even after being told by officers that they had an arrest warrant and being shown a copy of the warrant through the window.   Given these facts, McDonald reasonably believed that Blackmon was Green, and no Fourth Amendment violation was committed.

The reasonableness of McDonald's actions are supported by the holdings in *Hill* and *Blackwell*, which defendants cited in their original brief and which plaintiffs make no attempt to distinguish.   In both of those cases, officers actually arrested the wrong person even after being offered the identification of the person they were arresting.   Nevertheless, the Supreme Court in *Hill* and the Fifth Circuit in *Blackwell* both held that the mistaken identity was reasonable and that the arrest did not violate the Fourth Amendment.   *See Hill*, 401 U.S. at 802-04; *Blackwell*, 34 F.3d at 304.   The actions of McDonald in this case are even more reasonable they the officers in those cases because, despite Blackmon's refusal to comply with his requests to open the door even after being shown the warrant, McDonald did not arrest Blackmon but only temporarily handcuffed him until he was to confirm Blackmon's identity.   Once he did, he let Blackmon go.

Furthermore, even if, as Blackmon contends, there exists a question of fact as to whether McDonald's mistaken identity was reasonable, summary judgment should still be granted on Blackmon's claim because there is no evidence whatsoever to prove that McDonald's actions were the result of a policy of intentional racial discrimination.   The *only* evidence is that they were the result of McDonald's legal obligation to execute on a valid arrest warrant sent to him by the Madison County Chancery Court.

27

## IV.   THE AFFIDAVIT OF PLAINTIFFS' COUNSEL DOES NOT IDENTIFY ANY DISCOVERY THAT COULD POTENTIALLY CREATE A GENUINE ISSUE OF MATERIAL FACT CONCERNING ANY CLAIM OF ANY PLAINTIFF ON BEHALF OF A CLASS.

Plaintiffs, realizing the weakness of each of their individual class-based claims in this matter, request that this Court deny defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56(d) based on their alleged inability to obtain discovery necessary to respond to those motions.   This Court entertained identical arguments from plaintiffs when considering their expedited motion for status conference.   [Dkt. # 245].   There, plaintiffs contended that, because discovery had been bifurcated, they had not "focused" on the merits of their individual claims." [Dkt. # 245 at 1-3].   Defendants then responded that they had sought and received discovery concerning plaintiffs' individual claims to see if they were typical of the class [Dkt. # 248 ¶ 6], and plaintiffs also obtained merits-related discovery.   [Dkt. # 248 ¶ 7].

This Court quickly rejected plaintiffs' requested relief, holding that the case management order [Dkt. # 30] did not "bar Defendants from filing dispositive motions" and that the Federal Rules "permit the filing of motions for summary judgment 'at any time until 30 days after the close of all discovery.'"   [Dkt. # 249 at 2 (citing Rule 56(b))].   The Court further reasoned that "the issue of whether the named Plaintiffs have viable claims would likely bear on the issue of whether they could adequately protect the interests of the putative class members as is required to represent a class under [Fed. R. Civ. P.] 23(a)(4)."   [Dkt. # 249 at 2].

Now, plaintiffs move again to defer this Court's ruling on defendants' summary judgment motions, this time invoking Rule 56(d).   Plaintiffs' request ignores the breadth of the discovery they instituted in this case (which included discovery on each of their individual class-based

28

claims).   Plaintiffs have not lacked the opportunity to conduct discovery on the merits of their claims as they would have this Court believe, and they fail to establish that the discovery they claim they need will have any bearing on the merits of their claims.

    **A.  Plaintiffs fail to show the lack of prior discovery or their need for more.**

        **1.  Discovery in this case has been extensive and intensive, clearly reaching the merits of plaintiffs' claims and allowing them a full opportunity to gather evidence necessary to respond to defendants' summary judgment motions.**

Plaintiffs avoid discussing the full breadth of discovery in which they have engaged in this case and all the circumstances in which they *did* gather evidence to support their individual class-based claims.   Despite their claim that such discovery was unavailable to them, they spend 79 pages discussing the evidence they have obtained to counter defendants' summary judgment motions.

The case management order was entered on August 9, 2017.   [Dkt. # 30].   Discovery lasted more than six months, and defendants produced more than 90,000 pages of documents, including every arguably relevant documented report covering any interaction between the MCSD and individuals in Madison County, since Sheriff Tucker took office in 2012.   [Dkt. # 157 at 11]. This included attorney review of more than 85,688 documented incidents of MCSD law enforcement activities and the production of more than 2,114 pages of emails.[22]   [Dkt. # 157 at 12 n.11].   Plaintiffs' counsel deposed 20 officers of the MCSD, including Sheriff Tucker and Chief Deputy Jeremy Williams; apartment managers for the Canton Estates and Canton Family

---

[22]   During the parties' dispute over the wholesale production of unredacted addresses for innocent victims and witnesses in Madison County, defendants' counsel submitted an affidavit describing in detail the magnitude and complexity of defendants' document review and production in this matter.   As of November 3, 2017, defendants had reviewed 77% of the 85,688 potentially relevant reports in this matter, which had required more than 600 hours of attorney time.   [Dkt. # 74-1 ¶ 5].

Units apartment complexes; former sheriff Toby Trowbridge; and two members of the Madison County Board of Supervisors.

Plaintiffs intimate that there remain documents in the possession of the MCSD that might be relevant to their individual class-based claims.   Such is simply not true.   Defendants produced *every* MCSD document reasonably related to each plaintiff, regardless of how old the document was and regardless of its relevancy to the claims in this lawsuit.[23]   Plaintiffs never expressly claim that there are documents remaining in the MCSD's possession relating to plaintiffs' claims that have not been produced.[24]   This likely can be explained, not only by the breadth of plaintiffs' document requests in discovery,[25]  but the fact that plaintiffs requested "[a]ll

---

[23]   This included, *inter alia*: (1) all incident reports involving plaintiffs, regardless of whether they were the subject/arrestee, a victim to a crime, or simply made a call for service; (2) all booking reports of any plaintiff booked into the Madison County Detention Center; and (3) any arrest warrants issued on any plaintiff.

[24]   Plaintiffs do suggest that they might discover "concrete evidence" of the date on which plaintiff Betty Tucker alleges MCSD deputies allegedly entered her backyard and searched residents at a barbecue, but they simultaneously admit that she bases no claim on the incident.   [Dkt. # 261 at 93 n.64].   Even if the date were material, plaintiffs' suggestion that there "might" be better evidence documenting the date of this alleged event is insufficient to carry plaintiffs' burden.   *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1566 (Fed. Cir. 1987) ("Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint.").   Nevertheless, defendants have *no* record of any incident taking place in the last six years at her former address, 112 King Ranch Circle Canton, Mississippi.

[25]   Plaintiffs' document requests were expansive, requesting every type of evidence that could possibly pertain to incidents involving plaintiffs, including: (1) "documents concerning *any* aspect of *any* roadblock/checkpoint;" (2) "[a]ll documents concerning any search;" (3) "[a]ll documents concerning the entry of any MCSD personnel into any home;" (4) "[a]ll documents concerning traffic stops;" (5) "[a]ll documents concerning pedestrian stops."   (Exhibit 5, Plaintiff's First Set of Requests for Production of Documents, at 11-13).   Plaintiffs' definition of document was expansive, having "the broadest meaning possible under the Federal Rules of Civil Procedure" and covering every medium of information conceivable.   (*Id.* at 3-4).   Plaintiffs' second round of document requests covered, *inter alia*,: (1) "[a]ll documents concerning any use of force by or behalf of Defendants;" (2) "all documents concerning any correlation between racial characteristics and the incidence of any particular crime or crime in general;" (3) "[a]ll documents reflecting any opinion, characterization, or discussion of any person or persons on the basis of actual or perceived race, ethnicity or national origin;" (4) "[a]ll documents concerning apartment patrols, apartment details, apartment checkpoints/roadblocks, and/or apartment-walk-throughs; and (5)

30

documents concerning the Plaintiffs and/or any incident described in the Class Action Complaint, including documents sufficient to identify any MCSD personnel having knowledge or information relevant thereto."   (Exhibit 5, at 14).   Plaintiffs' interrogatories likewise reached any potentially relevant information concerning plaintiffs.   Plaintiffs requested defendants to "[i]dentify and describe the bases or justifications for any detention, search, or arrest described in the Complaint with respect to any of the Plaintiffs."   (Exhibit 8, Plaintiffs' First Set of Interrogatories to Defendants, at 11).[26]

Plaintiffs' counsel also spent ample time deposing individual deputies about individual incidents pertaining to plaintiffs.[27]   Furthermore, as defendants' counsel deposed the eight

---

"[a]ll documents, including reports, data, and statistics, concerning all instances in which MCSD personnel checked any person's driver's license or identification for outstanding warrants or for any other data or information connected to the person's driver's license or identification."   (Exhibit 6, Plaintiffs' Second Set of Requests for Production of Documents to Defendants).   This recitation of plaintiffs' document requests represents a small portion of the documents requested.   The Court may review the rest of the document requests in the aforementioned attached exhibits.

[26] Significantly, plaintiffs served their first interrogatories and document requests before the case management order bifurcated discovery.   Their notice of discovery filed with the Clerk [Dkt. # 29] reflects service on August 2, 2017, a week before the entry of the order.   [Dkt. # 30].   Plaintiffs sought evidence related to the merits, and defendants responded.

[27] This included the deposition of Officer Darian Smith, where plaintiffs' counsel questioned him about the circumstances giving rise to the alleged pedestrian stop of Steven Smith.   (Exhibit 9, Deposition Excerpts of Darian Smith, 151:21-25, 152-53, 154:2-9).   Similarly, Darian Smith was deposed about the traffic stop of Khadafy Manning (*Id.* at 155:5-23, 156:2-5).   Plaintiffs' counsel deposed Officer James Hall and Deputy Rylon Thompson about the circumstances of the entry into the home of Khadafy and Quinnetta Manning.   (Exhibit 10, Deposition Excerpts of James Hall, 83:4-25, 84-98, 99:2-10); (Exhibit 11, Deposition Excerpts of Rylon Thompson, 216:25, 217-230).   They deposed Deputy Sam Howard concerning his traffic stop of Khadafy Manning.   (Exhibit 12, Deposition Excerpts of Sam Howard, 134:19-25, 135-143, 144:2-15).   Sheriff Tucker was quizzed about his interactions with Khadafy Manning and the entry into his apartment.   (Exhibit 13, Deposition Excerpts of Sheriff Randy Tucker, 231:16-25, 232:2-12, 233:6-25, 234-247, 262-264).   Deputy Jason Barnes was deposed about an incident involving Steven Smith (Exhibit 14, Deposition Excerpts of Jason Barnes, 105:4-14), while Deputy Tommy Jones was deposed about the incident involving Singleton alleged in the complaint.   (Exhibit 15, Deposition Excerpts of Tommy Jones, 198:8-25, 199-205, 206:2-21).   Deputy Scott McDonald was deposed about his attempt to serve a warrant on former plaintiff Herbert Green, which resulted in the temporary detention of Plaintiff Lawrence Blackmon.   (Exhibit 16, Deposition Excerpts of Scott McDonald, 60:7-25, 61).

plaintiffs regarding the incidents in their complaint, plaintiffs' counsel had the opportunity to elicit whatever facts they wished.   (Exhibit 19, Deposition Excerpts of Quinnetta Manning, 196: 20-25, 197-200; Exhibit 20, Deposition Excerpts of Latoya Brown, 74:14-25, 75-76, 77:1-17).[28] Plaintiffs are hardly "flying blind" as they would have this Court believe.

## 2. Plaintiffs fail to describe with specificity how any of the further discovery they seek will affect the outcome of this Court's rulings on defendants' motions for summary judgment, as required by Rule 56(d).

### a. Plaintiffs ignore the standard to prove entitlement to further discovery under Rule 56(d).

Rule 56(d) requires a party to "specifically explain both why it is currently unable to present evidence concerning a genuine issue of fact and how a continuance would enable the party to present such evidence."   *Liquid Drill, Inc. v. U.S. Turnkey Expl., Inc.*, 48 F.3d 927, 930 (5th Cir. 1995).   The party requesting a continuance must "specifically demonstrate[e] *how* postponement of a ruling on the motion will enable [it], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact."   *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) (emphasis added).   It is insufficient for plaintiffs to rely on "vague assertions that discovery will produce needed, but unspecified facts."   *Id*.   *See Sweats Fashions*, 833 F.2d at 1566 ("Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint.").   As

---

They conducted similar questioning of Deputy Tommy Squires and Deputy Barry Chandler to determine what they knew of plaintiffs' individual claims.   (Exhibit 17, Deposition Excerpts of Tommy Squires, 202:9-25, 203:5-19); (Exhibit 18, Deposition Excerpts of Barry Chandler, 167:17-25, 168, 169:2-3).

[28]  It goes without saying that plaintiffs' counsel need not have elicited deposition testimony from plaintiffs during their testimony because they had the ability to supplement the record with their own affidavit testimony in response to defendants' summary judgment motions.   Indeed, that is exactly what they did, submitting seven declarations from the eight remaining plaintiffs.   [Dkt. #261-29, 30, 31, 33, 34, 35, and 36].

explained in *Ball v. Union Carbide Corp.*, 365 F.3d 713, 720-21 (8th Cir. 2004), the facts sought during the Rule 56(d) extension must be outcome determinative.    Simply put, if the moving party cannot show the facts will change result based on the facts already in the record, relief under Rule 56(d) is inappropriate.   *Id.* at 721.   *See Adorno v. Crowley Towing and Transp. Co.*, 443 F.3d 122, 128 (1st Cir. 2006) (stating that the requested discovery must "be capable of influencing the outcome of the motion for summary judgment . . . ") (citations omitted).

Much of the discovery plaintiffs desire involves reconvening the depositions of deputies or deposing new individuals regarding the existence of alleged *class-wide* systemic racial discriminatory policies of the MCSD.   If plaintiffs' own testimony and the full gamut of potentially relevant MCSD documents cannot create genuine issues of material facts with respect to their individual claims on behalf of a class, it is unclear how any further officer testimony would establish those facts.   Discovery regarding any allegations of class-wide and systemic racial discrimination should have already taken place.

### b.  Plaintiffs' requests fail to meet the standard set by Rule 56(d).

The affidavit of Jonathan Youngwood does not attempt to meet the standard described above.   He avoids any detail about what plaintiffs believe that evidence might reveal or how that evidence would support any plaintiff's class-based claims.   Plaintiffs have not demonstrated "how their desired discovery would rebut the points raised in [defendants'] motion[s] for summary judgment."   *Swanson v. Perry*, 69 Fed. App'x 658, 2003 WL 21356036, at *1 n.4 (5th Cir. 2003).

Plaintiffs claim they desire the following additional discovery:

| Plaintiffs Request | Insufficiency |
|---|---|
| Further written discovery and deposition testimony on the stops of certain plaintiffs at roadblocks; further written discovery and | Plaintiffs fail to describe exactly what further written discovery they would request or what facts they believe the deposition testimony will |

| | |
|---|---|
| deposition testimony regarding the searches and seizures of certain plaintiffs in connection with pedestrian stops; and further written discovery and deposition testimony regarding the three entries into homes described in plaintiffs' complaint.   [Dkt. # 260-52 ¶ 8]. | reveal with respect to any stops, search or seizure, or entry into a home.   Such unspecified discovery is the type of speculation that does not warrant a continuance under Rule 56(d).   *Washington*, 901 F.2d at 1285. |
| Depose another MCSD deputy, Corey Mangum, about the entry into the apartment occupied by Khadafy and Quinnetta Manning. [Dkt. # 260-52 ¶ 9]. | Mangum was one of the five officers with information regarding the entry into Khadafy and Quinnetta Manning's apartment; plaintiffs deposed three of the other officers involved. Plaintiffs have ample evidence regarding this incident including all relevant documents, the testimony of both Khadafy and Quinnetta Manning about what transpired, and the deposition testimony of the two main officers, who were asked dozens of questions about the particulars of the complained of incident. (Exhibit 10, Hall, 83:4-25, 84-98, 99:2-10; Exhibit 11, Thompson, 216:25, 217-230). Plaintiffs fail to describe how the deposition of Mangum will assist them in responding to defendants' summary judgment motion on Khadafy and Quinnetta Manning's claims. |
| *Reconvene* the depositions of Lieutenant Jeffrey Waldrop and Deputy Scott McDonald to inquire further about the entry into Lawrence Blackmon's home.   [Dkt. # 260-52 ¶ 9]. | Plaintiffs do not state what they believe further deposition testimony from Lieutenant Waldrop and Deputy McDonald will reveal.   They have all relevant documents, Blackmon's testimony, and Deputy McDonald's testimony regarding the incident.   Deputy McDonald was deposed about his attempt to serve a warrant on former plaintiff Herbert Anthony Green, which resulted in the temporary detention of Blackmon.   (Exhibit 16, McDonald, 60:7-25, 61).   Plaintiffs had full opportunity to depose Lieutenant Waldrop regarding the incident as they did when they deposed Deputy McDonald, but for unexplained reasons failed to do so. |
| *Reconvene* the deposition of Captain Tommy Jones to ask him about "pre-filled" columns in | Plaintiffs fail to explain how discovery regarding this form will assist them in responding to defendants' summary judgment |

| | |
|---|---|
| "an otherwise blank" narcotics investigation form.   [Dkt. # 260-52 ¶ 11]. | motions on plaintiffs' individual claims. Furthermore, as defendants explained in their response to plaintiffs' motion to certify a class, the explanation for this narcotics investigation form could not be more innocuous.   [Dkt. # 268 at 11 n.8].   The blank form had drop-down boxes and when printed off without filling in any boxes, it defaulted to the first choices found in each drop-down box to show the status of the charges against the individual, the individual's gender and race, and whether certain evidence had been collected against the individual.   Whatever light this might shed on the existence of a policy, it sheds none on whether any injury was caused to any plaintiff by such a policy. |
| Depose Eddie Belvedresi, the chief deputy for former Sherriff Toby Trowbridge's prior to Sheriff Tucker becoming Sheriff in 2012, to discuss the origin of MCSD's written policies that Trowbridge testified Belvedresi helped draft.   [Dkt. # 260-52 ¶ 12]. | Plaintiffs could have (and should have) obtained this discovery during the discovery period.   Although plaintiffs claim that they "were not previously aware of" former Chief Deputy Belvedresi's involvement in putting together the majority of the MCSD's written policies" [Dkt. # 261 at 15 n.3], the deposition testimony of other MCSD officers proves otherwise.   Five of the MCSD officers deposed discussed former Chief Belvedresi and his role in the MCSD before Sheriff Tucker became sheriff.   (Exhibit 9, Darian Smith,   22:18-25,   23:2-7;   Exhibit   21, Deposition Excerpts of Brian Loveall, 95:2-14, Exhibit   16,   McDonald,   7:7-13,   50:5-22; Exhibit 17, Squires, 42:8-13, Exhibit 22 Deposition Excerpts of Mark Sandridge, 23:20-25, 24:2-11 131:6-22; Exhibit 23, Deposition Excerpts of Elton Flax, 90:4-19). These deputies' testimony demonstrated Belvedresi's role as the former chief deputy and shows plaintiffs should not have been surprised to learn Belvedresi had a role in policy-making prior to 2012.   In fact, Chief Deputy   Jeremy   Williams   testified   that Belvedresi was chief deputy under Trowbridge when asked about changes in MCSD policies since Sheriff Tucker took office.   (Exhibit 24, |

| | Deposition Excerpts of Jeremy Williams, 21:12-21).   They do not attempt to explain how Belvedresi's intent, whatever it may have been, equates to Sheriff Tucker's intent. Most importantly, they do not explain how any policy caused any constitutional injury to any plaintiff. |
|---|---|
| Obtain additional written discovery and *reconvene* the deposition of Sheriff Tucker following the deposition of former Sheriff Toby Trowbridge.   [Dkt. # 260-52 ¶ 12]. | Plaintiffs fail to establish what another deposition of Sheriff Tucker would reveal or how it would affect the outcome of defendants' summary judgment motions.   Plaintiffs had ample opportunity to obtain as much written discovery and oral deposition testimony as they desired regarding the MCSD's policies and procedures during the six-month discovery period.   They do not explain how any policy caused any injury to any plaintiff. |
| Plaintiffs further claim they "may seek additional written and oral fact discovery concerning issues related to Defendants' discriminatory intent" and that they "may require additional expert discovery" in addition to the expert discovery they have yet to take to date in this case.   [Dkt. # 260-52 ¶¶ 13-14]. | This speculative fishing expedition fails to meet the dictates of Rule 56(d).   *See Washington*, 901 F.2d at 1285.   Only one defendant has an intent that matters, and plaintiffs have exhaustively deposed Sheriff Tucker.   If plaintiffs think they can find an expert who can prove Sheriff Tucker to be a bigot, they should have submitted that report already. |

Plaintiffs fail to meet their burden under Rule 56(d) of *stating expressly* the facts they expect to learn and how that information will materially affect their response to defendants' summary judgment motions.   Plaintiffs' requested discovery relies on "speculation as opposed to identifying specific facts, which are known to exist and are essential to resisting the summary judgment motions."   *Foster v. BNSF Ry. Co.*, Civil No. 4:14-cv-00313-JAJ-SBJ, 2015 WL 12684457, at *1, *5 (S.D. Iowa Nov. 24, 2015).   Plaintiffs' Rule 56(d) request should be denied.

36

**B. Because the merits of the individual plaintiffs' class claims are closely intertwined with the question of whether they have met the prerequisites of Fed. R. Civ. P. 23, rulings on defendants' summary judgment motions are appropriate now.**

This Court has already recognized that the evidence concerning plaintiffs' individual claims necessarily relates to their suitability to represent a class.   [Dkt. # 249 at 2].   Not surprisingly, the evidence produced in discovery relates to both aspects of the case, as defendants interrogated plaintiffs on those facts, and plaintiffs did the same to defendants' witnesses.   The production of merits evidence during class discovery is a common phenomenon, and it should not be ignored.

The instant procedural posture is identical to one found in *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 889 (8th Cir. 2014), where the Court rejected an argument similar to the one made by plaintiffs here.   In *Toben*, the plaintiff had obtained sufficient evidence on the merits of his claims and failed to: (1) describe adequately what facts the discovery he sought might establish; and (2) that those facts actually existed.   *Id*.   At the beginning of the case, the parties had submitted a joint scheduling plan, which provided for "'discovery related to class certification issues' before [the plaintiff's] motion for class certification."   *Id*. at 890.   The plan further stated the "'[p]arties agree that discovery that relates only to merit issues will not occur prior to a decision regarding class certification.'"   *Id*. at 890.   After class discovery in the case ended, the defendant moved for summary judgment contemporaneous with the plaintiff's class certification motion. *Id*. at 893.   The District Court granted summary judgment, and, on appeal, the plaintiff contended that the District Court should have stayed briefing on the summary judgment motion "until after

37

merits discovery," claiming that it obtained insufficient discovery to respond to the car servicer's motion for summary judgment on the merits.   *Id*. at 893-94.

Affirming the District Court's denial of the plaintiff's Rule 56(d) motion, the Eighth Circuit acknowledged the plaintiff had received ample information about the particularities of his claims during the class discovery phase and confirmed "[c]lass discovery had revealed relevant information about [the merits]."   *Id*. at 895.   The Court held that, even if there might be remaining facts to be gathered in discovery pertaining to the merits of the plaintiff's claims, the plaintiff had not established that those facts actually *existed*.   *Id*. (citing *Duffy v. Wolle,* 123 F.3d 1026, 1041 (8th Cir.1997) ("[I]t is well settled that 'Rule 56(d) does not condone a fishing expedition' where a plaintiff merely hopes to uncover some possible evidence of [unlawful conduct]."), *cert. denied*, 523 U.S. 1137 (1998), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011)).   Since the plaintiff failed to identify any documents or specific facts to contradict the ample information already provided to him, the Court held that his 56(d) request was properly denied notwithstanding the District Court's bifurcation of the discovery phases.   *Id*. at 896.

Plaintiffs cite several inapposite cases in support of their contention that bifurcation precludes consideration of defendants' summary judgment motions at this juncture.   [Dkt. # 261 at 9-12].   *Moreau v. Klevenhagen*, 956 F.2d 516, 522 (5th Cir. 1992), involved a bifurcation, but it was a bifurcation of liability and damages phases in the case, not class and merits discovery. The Court acknowledged that the damages question was premature because the parties had not conducted *any discovery whatsoever* on damages.   *Id*. at 523.   *Moreau* differs from the scenario present here because, as discussed above, there has been ample discovery exchanged on the merits

38

of each of the plaintiffs' individual class-based claims.[29]   Beyond that, *Moreau* presented a bifurcation between liability and damages, an issue more easily separable from class certification.

Another Fifth Circuit authority, *E.E.O.C. v. Exxon Mobil Corp.*, 344 Fed. App'x 868 (5th Cir. 2009), is likewise inapposite.   In *Exxon*, the District Court entered an order dictating that "the parties would conduct discovery and present motions on other issues, including the weight of the evidence supporting the FAA regulation's safety rationale, *only 'if the case is not disposed of on the issue of congruence as a matter of law.'*"   *Id*., at 870 (emphasis added).   Nevertheless, in spite of a court order prohibiting such motions, Exxon moved for summary judgment on the issue expressly reserved by the court's order for later determination.

The Fifth Circuit acknowledged that the District Court's order was "specific" in that it included an outright prohibition on the parties' conducting discovery on the restricted issue and limited "summary-judgment motions solely to the issue of congruity."   *Id*. at 872.   Because the District Court had granted summary judgment on an issue it expressly stated it would not consider, "it amounted to a *sua sponte* grant of summary judgment on an issue and on grounds about which it did not give the EEOC proper notice."   *Id*. (citation omitted).   Obviously, the Court's scheduling order in this case [Dkt. # 30] differs greatly from the one at issue in *Exxon*, as it includes no express prohibition on this Court's consideration of the issues raised in defendants' summary judgment motions.   Beyond this, there is no indication that the plaintiff in *Exxon* ever asked for and received discovery on the issue they were barred from discovering.[30]

---

[29]  Plaintiffs also cite *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915 (5th Cir. 1992), a case where the plaintiff was left unable to conduct any discovery whatsoever in order to respond to a defendant's motion for summary judgment.   That case involved a total cut-off of discovery altogether and a plaintiff who never had any opportunity to gather information in support of its claims.   *Id*. at 919.

[30]  *Vine v. PLS Fin. Servs., Inc.*, EP-16-CV-31-PRM, 2018 WL 456031, at *1, *3 (W.D. Tex. Jan.

## CONCLUSION

Plaintiffs know better than anyone else whether and how they were injured, but they have failed to present any evidence to show that any policy of Sheriff Tucker has caused any injury to them.   After thorough discovery from Sheriff Tucker and his staff, there is no reason to believe in the existence of any evidence that would provide the necessary proof of causation.   Summary judgment should be entered dismissing all claims of Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker, as well as dismissing the claims Khadafy Manning and Quinnetta Manning seek to assert on behalf of a class, leaving for further adjudication only the Mannings' Fourth Amendment claims for damages arising out of the entry into their home.

Respectfully submitted this 22nd day of May, 2018.

MADISON COUNTY, MISSISSIPPI and
SHERIFF RANDALL C. TUCKER, IN
HIS OFFICIAL CAPACITY

BY:      s/Michael B. Wallace
         Michael B. Wallace (MSB #6904)
         Charles E. Ross (MSB #5683)
         James E. Graves (MSB #102252)
         Charles E. Cowan (MSB #104478)
         WISE CARTER CHILD & CARAWAY, P.A.
         Post Office Box 651
         Jackson, Mississippi   39205-0651

---

16, 2018), is also not on point.   That case involved a sixty day abbreviated "class" discovery period, far shorter than the time allowed here.   There is no suggestion the plaintiff obtained *any* discovery relating to the merits of his claims, which differs greatly from the broad discovery in the instant case.   Similarly, *Woniewal v. Merck & Co., Inc.*, Civil Action No. 15-3089, 2017 WL 3390367, at *1, *5 (E.D. Pa. Aug. 7, 2017), can be distinguished because it involved a bifurcation of specific issues on the merits of the plaintiffs' claims (causation and liability).   The District Court there noted that the record was not as fully developed as it should be because the plaintiffs needed to take discovery on the issue of liability where, to date, none had taken place.   *Id*. at *5.   *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 507-08 (E.D.N.Y. 2017) can also be distinguished because, there, the parties all encouraged the District Court to "decide the class certification motions before turning to summary judgment," and the parties had conducted insufficient discovery on the merits.

Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi   39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi   39232
P.O. Box 750
Jackson, Mississippi   39205-0750
Telephone: 601-969-1010
Facsimile:   601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi   39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi   39211
Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

41

## <u>CERTIFICATE OF SERVICE</u>

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Joshua Tom, Esq.
Paloma Wu, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
JTom@aclu-ms.org
PWu@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Kavitha Satya Sivashanker, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Jumin Lee, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY   10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
kavitha.sivashanker@stblaw.com
bonnie.jarrett@stblaw.com
christopherjumin.lee@stblaw.com
christopher.shields@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 22nd day of May, 2018.

*s/Michael B. Wallace*
MICHAEL B. WALLACE

LATOYA BROWN VERSUS MADISON COUNTY, MISSISSIPPI, ET AL.
Nicholas Singleton - 12/29/2017

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                      JACKSON DIVISION

 3  LATOYA BROWN; LAWRENCE BLACKMON
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4  QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
 5  BESSIE THOMAS; and BETTY JEAN WILLIAMS
    TUCKER, individually and on behalf of a
 6  class of all other similarly situated,      PLAINTIFFS

 7  VERSUS                CIVIL ACTION NO. 3:17-cv-347 WHB LRA

 8  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, in his
 9  official capacity; and MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1 through #6,
10  in their individual capacities,             DEFENDANTS

11


12


13              DEPOSITION OF NICHOLAS SINGLETON

14              taken on December 29th, 2017,
             commencing at approximately 10:30 a.m.
15    at the Law Offices of Wise, Carter, Child & Caraway
                  401 East Capitol Street
16                      Suite 600
                   Jackson, Mississippi
17


18


19


20


21


22  REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
                  eDeposition Services
23                Post Office Box 14148
                  Jackson, MS 39236
24                (844) 533-DEPO
                  edeposition.com
25
                       EXHIBIT 1
```

1      Q.   Did you actually have a trial on it?

2      A.   No.

3      Q.   How much was the fine?

4      A.   $600, I think.

5      Q.   Were you driving drunk that night?

6      A.   I was tipsy.

7      Q.   What was your blood alcohol content?

8      A.   I want to say it was maybe, what, 2 points over

9  the limit.

10      Q.   So the limit is .08, right?

11      A.   Yes.

12      Q.   So you were .10?

13      A.   Yes.

14      Q.   Any other citations at a roadblock?

15      A.   No.

16      Q.   For the 2006 DUI, were you arrested?

17      A.   Yes.

18      Q.   All right.  For the stop you said at Canton

19  Estates when you were going to see your cousin, anything

20  significant stand out that you remember specifically

21  about that stop?

22      A.   No.

23      Q.   Is that the only time you have been stopped at

24  a roadblock going into Canton Estates?

25      A.   I may have been stopped a couple of different

 1  other times, but I don't remember nothing significant.

 2      Q.   What about when you were stopped -- When was

 3  the stop at the new projects?

 4      A.   I don't have an exact date.

 5      Q.   How many times were you stopped there?

 6      A.   Once that I can remember.

 7      Q.   Same question I asked before:  Was it more than

 8  four years ago?

 9      A.   Possibly.

10      Q.   Anything significant about that that sticks out

11  in your memory?

12      A.   I went through that roadblock and then went

13  through another roadblock right in front of McNeal,

14  which is maybe -- I don't know if it's 500 feet or I

15  don't know the actual distance from the new projects to

16  that stop sign, but the same police officer was at that

17  location.

18      Q.   Who was that police officer, do you know?

19      A.   I don't know.

20      Q.   So tell me what happened.  You got stopped at

21  the projects first?

22      A.   Yes.

23      Q.   Tell me what happened then.

24      A.   They looked at my license and told me I could

25  go, and then I drove around the curve and made it up to

1  the next stop sign.

2      Q.   And then the same thing happened again, they

3  asked for your license again?

4      A.   Uh-huh.

5      Q.   And then they told you that you could go?

6      A.   Yes.

7      Q.   Besides that time when you had the two back to

8  back the same day, do you remember any other roadblocks

9  that you were stopped at, at the new projects?

10     A.   Not that I remember.

11     Q.   What about McNeal?  You said in front of

12 McNeal?

13     A.   Yes.

14     Q.   Any other times that you were stopped at a

15 roadblock in front of McNeal, other than the time we

16 just talked about with the back to back?

17     A.   Not that I remember.

18     Q.   Boyd Street, when were you stopped at Boyd

19 Street?

20     A.   I don't have an exact date.  But Boyd Street

21 has an entrance towards the old projects where they were

22 located at, so they were sitting there.

23     Q.   Were you going to the old projects?

24     A.   No, I was going up the street.

25     Q.   So you were going straight through?

```
 1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                         JACKSON DIVISION

 3   LATOYA BROWN; LAWRENCE BLACKMON
     HERBERT ANTHONY GREEN; KHADAFY MANNING;
 4   QUINETTA MANNING; MARVIN MCFIELD;
     NICHOLAS SINGLETON; STEVEN SMITH;
 5   BESSIE THOMAS; and BETTY JEAN WILLIAMS
     TUCKER, individually and on behalf of a
 6   class of all other similarly situated,        PLAINTIFFS

 7   VERSUS                  CIVIL ACTION NO. 3:17-cv-347 WHB LRA

 8   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER, in his
 9   official capacity; and MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1 through #6,
10   in their individual capacities,               DEFENDANTS

11

12

13                 DEPOSITION OF BESSIE THOMAS

14             taken on December 14th, 2017,
           commencing at approximately 9:00 a.m.
15    at the Law Offices of Wise, Carter, Child & Caraway
                   401 East Capitol Street
16                       Suite 600
                    Jackson, Mississippi

17

18

19

20

21

22   REPORTED BY:  BECKY LYNN LOGAN, RPR, CCR #1750
                     eDeposition Services
23                   Post Office Box 14148
                      Jackson, MS 39236
24                     (844) 533-DEPO
                       edeposition.com
25                       EXHIBIT 2
```

```
 1            MR. GRAVES:  I think she said every roadblock

 2  she has ever been at was a Madison County Sheriff's

 3  Department roadblock.

 4  BY MR. GRAVES:

 5      Q.   Am I right about that?

 6            MS. SIVASHANKER:  Objection to form.  You can

 7  go ahead and answer.

 8      A.   Yes.

 9  BY MR. GRAVES:

10      Q.   And all those times, you knew you were being

11  stopped by Madison County Sheriff's Department, is that

12  right?

13            MS. SIVASHANKER:  Objection to form.

14      A.   I assume that's who they were.

15  BY MR. GRAVES:

16      Q.   You knew they were police officers, though,

17  right?

18            MS. SIVASHANKER:  Objection to form.  Assuming

19  facts not in evidence.

20            MR. GRAVES:  I'm asking her.

21      A.   They were dressed as officers.

22  BY MR. GRAVES:

23      Q.   And at all those roadblocks, they were stopping

24  every car?

25            MS. SIVASHANKER:  Objection to form.
```

```
 1  BY MR. GRAVES:

 2     Q.   Right?

 3     A.   I have no knowledge of whether they stopped

 4  every car.

 5     Q.   All the cars you saw were getting stopped,

 6  though, right?

 7          MS. SIVASHANKER:  Objection to form.  If you

 8  know, you can answer.

 9     A.   Yes.

10  BY MR. GRAVES:

11     Q.   All right.  The third thing you said - and I'm

12  kind of jumping around - you said you're claiming

13  illegal roadblocks and that you want to stop that; you

14  said you want them to home invasions; and then you said

15  you want to stop vulgar language?

16          MS. SIVASHANKER:  Objection.  You're just

17  testifying on the record.  But if you have a question,

18  go ahead and ask it.

19          MR. GRAVES:  This is my question.

20  BY MR. GRAVES:

21     Q.   Vulgar language -- I want to ask you what

22  vulgar language you're talking about?

23     A.   Profanity.

24     Q.   Who has used profanity?

25     A.   The officer.
```

MADISON COUNTY JUSTICE COURT

CASE RECORD OF STATE VERSUS MANNING KHADATY

CASE: MSO00-129239   CHARGE DRIVING W/SUSPEND LIC

COURT DATE:   8/09/2017

MANNING KHADATY


AFFIANT/WITNESS:   HOWARD SAM DEPUTY

ATTORNEY FOR DEF:

BOND:   500.00   CASH AT JAIL #27616   JAIL RCPT#
APPEAL BOND:


========================================================================
========================================================================

O R D E R

DEFENDANT IS FOUND:   GUILTY

SENTENCE:




FINE $   387.50           COSTS $   112.50   TOTAL $   500.00

SO ORDERED, THIS THE   9th   DAY OF AUGUST   , 2017.

JUDGE   2
JUSTICE COURT JUDGE

CASE: MSO00129239   VIOLATION DATE: 2/14/2017   DATE CLOSED:   8/09/2017

I CERTIFY THIS TO BE A TRUE AND CORRECT COPY OF THE RECORDS OF THE
MADISON COUNTY JUSTICE COURT. THIS THE 15th DAY OF MAY    , 2018.

CLERK/J.C.C.

**EXHIBIT 3**

MADISON COUNTY JUSTICE COURT

CASE RECORD OF STATE VERSUS MANNING KHADATY

CASE: MSO00-129240   CHARGE NO PROOF LIABILITY INSURANCE

COURT DATE:   8/09/2017

MANNING KHADATY


AFFIANT/WITNESS:  HOWARD SAM DEPUTY

ATTORNEY FOR DEF:

BOND:    650.00  CASH AT JAIL #27616   JAIL RCPT#
APPEAL BOND:


====================================================================
====================================================================

O R D E R

DEFENDANT IS FOUND:  GUILTY

SENTENCE:




FINE $   537.50            COSTS $   112.50    TOTAL $     650.00

SO ORDERED, THIS THE  9th  DAY OF AUGUST   , 2017.

JUDGE    2
JUSTICE COURT JUDGE

CASE: MSO00129240   VIOLATION DATE:  2/14/2017   DATE CLOSED:  8/09/2017

I CERTIFY THIS TO BE A TRUE AND CORRECT COPY OF THE RECORDS OF THE
MADISON COUNTY JUSTICE COURT.  THIS THE 15th DAY OF MAY   , 2018

CLERK/D.C.

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2             JACKSON DIVISION

3

  LATOYA BROWN; LAWRENCE BLACKMON;
4  HERBERT ANTHONY GREEN; KHADAFY MANNING;
  QUINETTA MANNING; MARVIN MCFIELD;
5  NICHOLAS SINGLETON; STEVEN SMITH;
  BESSIE THOMAS; and BETTY JEAN
6  WILLIAMS TUCKER, individually and on
  behalf of a class of all others
7  similarly situated               PLAINTIFFS

8

  V.           CIVIL ACTION NO. 3:17-cv-347 WHB LRA
9

10 MADISON COUNTY, MISSISSIPPI;
  SHERIFF RANDALL S. TUCKER,
11 in his official capacity; and
  MADISON COUNTY SHERIFF'S DEPUTIES
12 JOHN DOES #1 through #6,
  in their individual capacities     DEFENDANTS
13

14    **************************************************

15

16        DEPOSITION OF LAWRENCE BLACKMON

17

     **************************************************
18

19      DATE:  THURSDAY, JANUARY 11, 2018
      PLACE:   WISE, CARTER, CHILD & CARAWAY
20         401 EAST CAPITOL STREET
         JACKSON, MISSISSIPPI
21         TIME:  9:30 a.m.

22

23

24         BETHANY CAMMACK
      Certified Shorthand Reporter
25      Mississippi CSR No. 1526
        **EXHIBIT 4**



LAWRENCE BLACKMON                                    January 11, 2018
LATOYA BROWN V. MADISON COUNTY, MISSISSIPPI                        85

1       Q.     From the dining room window?

2       A.     Uh-huh (affirmative response).

3       Q.     And you're saying from that distance and

4    with him waving it, you couldn't read it?

5       A.     It wasn't -- I could not read it, no.  And

6    he didn't intend for me to read it, apparently.

7       Q.     Did he tell you -- but he told you he had

8    a warrant?

9       A.     He didn't even tell me that he had one.

10   He just dangled paper.

11      Q.     Did he say who the warrant was for?

12      A.     He didn't say anything.

13      Q.     And -- all right.  So initially when he

14   said, "Open the door or we're going to kick it in,"

15   you said you initially weren't going to open it?

16      A.     Correct.

17      Q.     And when did you decide to open it?

18      A.     Once they kicked the door.

19      Q.     So they kicked it once, or --

20      A.     Yeah, they kicked it once.

21      Q.     And it didn't open then?

22      A.     No.

23      Q.     But you decided to open it yourself at

24   that point?

25      A.     Correct.  Because I didn't want them to



# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

      v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFFS' FIRST SET OF
REQUESTS FOR PRODUCTION
OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs, by and

through their attorneys, propound the following requests for the production of documents

(individually, a "Request," and collectively the "Requests") to Defendants Madison County,

Mississippi and Sheriff Randall S. Tucker, in his official capacity.

## DEFINITIONS

The following definitions apply to these Requests and shall have the following meanings

and rules of construction, unless the context requires otherwise. Nothing set forth below is

intended to narrow the scope of discovery permitted by the Federal Rules of Civil Procedure, and

the definitions and Requests should be read as broadly as permitted by those rules.

**EXHIBIT 5**

1.      The term "Answer" means the "Answer and Affirmative Defenses of Defendants, Madison County, Mississippi and Sheriff Randall C. Tucker, In His Official Capacity" filed in this action and dated June 29, 2017.

2.      The term "Class Action Complaint" means the Complaint filed in this action and dated May 8, 2017.

3.      The term "communication" means any oral, written, electronic, or other exchange or transmittal of words, thoughts, information, ideas or opinions to another person or entity, however made. The term "communications" shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, tape or video recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

4.      The term "complaint" means any expression of disagreement or dissatisfaction, in any format, by any person, including MCSD personnel, in connection with any policy, custom, practice, action, and/or inaction of or by Defendants, including the types of complaints described in Section 17, entitled *Investigations: Internal Affairs*, of the MCSD's POLICIES AND PROCEDURES.

5.      The term "concerning" means discussing, addressing, relating to, regarding, referring to, describing, evidencing, consisting of, or constituting.

6.      The phrase "custom and/or practice" means any formal or informal custom, practice, advice, suggestion, course of conduct, and/or pattern of activity that is expressly or implicitly issued, published, promulgated by, approved of, enforced, implemented, carried out and/or engaged in by Defendants.  The phrase "custom and/or practice" includes but is not

limited to any custom or practice which Defendants may believe or contend constitutes a

"custom" or a "practice" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)

and its progeny.

7.     The term "Defendants" refers to Sheriff Randall Tucker, in his official capacity,

and to Madison County, Mississippi, and includes, but is not limited to, any predecessors or

successors, and any board members, supervisors, agents, attorneys, representatives, employees,

and/or other persons acting on behalf of Sheriff Tucker and/or Madison County, Mississippi.

The term "Defendants" includes the MCSD and all MCSD personnel, as defined below.

8.     The term "document" shall have the broadest meaning possible under the Federal

Rules of Civil Procedure and shall include, but not be limited to, any written, recorded, or

graphic material of any kind, whether prepared by you or by any other person, that is in your

possession, custody, or control. The term "document" includes communications (as defined

above); training materials (as defined below); MVR recordings (as defined below); computer-

aided dispatch ("CAD") reports; incident reports; 911 logs; records of radio traffic involving

MCSD personnel; arrest reports and/or records; Uniform Crime Reports; data, information,

statistics, or any other information submitted to the Federal Bureau of Investigation's Uniform

Crime Reporting Program; any other reports; any other summaries; any other audio or video

recordings; agreements; contracts; letters; telegrams; memoranda; records; instructions;

specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints;

diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they

resulted in a final document; minutes of meetings, conferences, and telephone or other

conversations or communications; invoices; purchase orders; recordings; published or

unpublished speeches or articles; publications; transcripts of telephone conversations; phone

mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "document" also include but is not limited to (i) all drafts of a document and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original (ii) electronically stored data in its original digital format from which information can be obtained either directly or by translation through detection devices or readers (any such document is to be produced in a reasonably legible and usable form); and (iii) information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), in its original digital format, together with instructions and all other materials necessary to use or interpret such data compilations.

9.     The terms "enter," "entrance," and "entry" refer to any instance in which MCSD personnel enter any home for any purpose, regardless of whether any person in the home expressly or implicitly consents to the entry, and to the act of engaging in any of the foregoing conduct.

10.     The term "home" means any place of residence, including any house or apartment, and the curtilage thereof.

11.     The phrase "in connection with" means discussing, addressing, relating to, referring to, during the course of, and incident to.

12.     The term "MCSD" refers to the Madison County Sheriff's Department, and includes any predecessors or successors, as well as any current or former sheriffs, deputy sheriffs, agents, attorneys, representatives, employees and/or other persons acting on the MCSD's behalf.  Any or all of the foregoing persons are also referred to herein as "MCSD

personal." As used herein, any reference to any actions or omissions by MCSD personnel refers to actions or omissions committed by such persons under color of law.

13.     The term "motorist" means any person, in such person's capacity as driver or operator of any motor vehicle.

14.     The term "MVR recording" means any mobile video/audio recording described in Section 36, entitled *Mobile Video/Audio Recording Equipment*, of the MCSD's POLICIES AND PROCEDURES.

15.     The term "passenger" means any person, in such person's capacity as passenger in any motor vehicle.

16.     The term "pedestrian" means any person engaged in any activity outside of a home, excluding any motorist or passenger (as defined above) but including any person in such person's capacity as driver, operator, or passenger of any vehicle or conveyance other than a motor vehicle.

17.     The term "pedestrian checkpoint" means any installation, barricade, checkpoint, roadblock and/or other police presence in connection with which MCSD personnel stop any or all pedestrians for any purpose, regardless of whether any such installation, barricade, checkpoint, roadblock and/or other police presence is specifically or formally designated as a "roadblock" or "checkpoint." The term "pedestrian checkpoint" includes any vehicular roadblock or any sobriety checkpoint (each as defined below ) at which MCSD personnel stop any or all pedestrians, in addition to motor vehicles.

18.     The term "person" means any natural person of any age or gender, as well as any corporation, company, partnership, joint venture, firm, association, proprietorship, agency,

board, authority, commission, office or other business or legal entity, whether private or governmental.

19.     The term "Plaintiffs" refers to the named plaintiffs in the Class Action Complaint (Latoya Brown, Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker).

20.     The term "policy" means all formal and informal policies, rules, regulations, guidelines, procedures, restrictions and limitations that are published or promulgated by, or expressly or implicitly approved of and/or enforced by any or all Defendants.  This term includes but is not limited to any policy which Defendants may believe or contend constitutes a "policy" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.

21.     The term "racial profiling" means the policy, custom, practice or action of identifying, selecting or targeting persons for any policing activity, including searches, based in whole or in part on the person's actual or apparent race, ethnicity, and/or national origin, or on factors or attributes that correlate with or may be a proxy for race, ethnicity, and/or national origin.

22.     The term "roadblock/checkpoint" refers collectively to pedestrian checkpoints, vehicular roadblocks, and sobriety checkpoints.

23.     The term "search" means any instance in which MCSD personnel frisk, pat down, and/or otherwise search any person or such person's effects or belongings for any purpose, regardless of whether the person expressly or implicitly consents to the search, and the act of engaging in any of the foregoing conduct.  The term "search" should be construed broadly, and

includes but is not limited to searches which Defendants may believe or contend implicate any or all of the protections of the Fourth Amendment to the United States Constitution.

24.     The term "Section" followed by any numerical identifier (for example, "Section 15") refers to the corresponding section of the MCSD's POLICIES AND PROCEDURES.

25.     The term "sobriety checkpoint" means any vehicular checkpoint or vehicular roadblock that is subject to the MCSD's SOBRIETY CHECKPOINT GUIDELINES (other than a "General Roadblock" described in and subject to Procedure IX).

26.     The term "stop" means any instance in which MCSD personnel impede, detain, seize, or arrest any pedestrian, motorist, or passenger, including any instance in which MCSD personnel request identification or other information, or otherwise initiate any interaction with any pedestrian (a "pedestrian stop") or with any motorist or passenger (a "traffic stop"), including but not limited to investigative stops or field interrogations, and the act of engaging in any of the foregoing conduct.  These terms should be construed broadly, and include but are not limited to those actions or interactions which Defendants may believe or contend implicate any or all of the protections of the Fourth Amendment to the United States Constitution.

27.     The term "training materials" means any written, recorded, or graphic material of any kind that provides instruction, guidance, advice, and/or suggestions for MCSD personnel. The term "training materials" encompasses materials created by Defendants as well as materials in Defendants' possession, custody or control.

28.     The term "vehicular roadblock" means any installation, barricade, checkpoint, roadblock and/or other police presence in connection with which MCSD personnel stop any or all motor vehicles for any purpose (other than a "sobriety checkpoint," as defined below), regardless of whether any such installation, barricade, checkpoint, roadblock and/or other police

presence is specifically or formally designated by the MCSD as a "roadblock" or "checkpoint." The term "vehicular roadblock" includes but is not limited to any "general roadblock" described in and subject to Procedure IX, entitled *General Roadblocks*, of the MCSD's SOBRIETY CHECKPOINT GUIDELINES.

29.     The term "you" or "your" means and/or refers to Defendants, both individually and collectively.

## INSTRUCTIONS AND RULES OF CONSTRUCTION

1.     These instructions and rules of construction shall apply in interpreting the scope of the above definitions and these instructions and rules of construction, as well as the individual Requests below.

2.     You are required to produce every document requested in your possession, custody or control. Without limitation on the definition of the term "control," a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person.

3.     In the event you object to any Request set forth below on the grounds that the Request is overbroad for any reason, you should respond to the Request as narrowed in a way that renders it not overbroad in your opinion, and state the extent to which you have narrowed that Request for purposes of your response.

4.     In the event you object to any Request set forth below on the grounds that the Request or any term contained therein is vague, unclear, or ambiguous in any respect, you should (i) identify and explain the specific terms or phrases you believe to be vague, unclear, or ambiguous; (ii) respond to the Request as you reasonably interpret it; and (iii) specify and explain your interpretation of the Request.

8

5.      These Requests shall be deemed to be continuing so as to require supplemental productions as you obtain additional documents between the time of the initial production hereunder and the time of trial in this action.

6.      These Requests require production of copies of original documents in the same form and in the same order as they are kept in the usual course of business. The titles or other descriptions on the boxes, file folders, bindings or other containers in which responsive documents are kept are to be copied and reproduced in addition to the documents themselves.

7.      If a document has been produced by another party to this action, in any other action brought by any Plaintiff, or in response to any Public Records Requests served by counsel for Plaintiffs, you must still produce your copy of the same document, even if the two documents are identical.

8.      Notwithstanding the assertion of any objections, any purportedly privileged documents containing non-privileged material must be disclosed, with the purportedly privileged portion redacted. A redaction log shall be produced contemporaneously with the document responsive to these Requests enumerating the categories of redacted information, as required for the assertion of any other claim of privilege.

9.      If a document requested herein was formerly in your possession, custody, or control and has been transferred, lost, or destroyed, you shall submit in lieu of each document a written statement indicating whether the document: (i) was lost or is missing; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others; or (iv) otherwise has been disposed of. In each instance explain the circumstance of such disposition, and state the approximate date thereof.

10.     The words "or," "and," "all," "every," "any," "each," "one or more," "including" and similar words of guidance are intended as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope. The word "including" shall not be used to limit any general category or description that precedes it and shall be construed to mean "including but not limited to." The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the Request.

11.     Whenever necessary to bring within the scope of these Requests any information that otherwise might be construed to be outside the scope, (i) the present tense shall include the past tense and future tense, the past tense shall include the present tense and future tense, and the future tense shall include the past tense and present tense; (ii) references to the singular shall include the plural, and vice versa; and (iii) reference to any gender shall also include any other gender.

12.     These Requests are intended to elicit as much information as possible concerning the issues raised in the Class Action Complaint. To the extent any Request could be interpreted in more than one way, you should employ the interpretation of the Request most likely to encompass and elicit the greatest amount of information possible.

## **DOCUMENT REQUESTS**

1.      All documents, including organizational charts, concerning the MCSD's jurisdiction, organization, structure, reporting lines, and divisions, including all documents concerning the divisions and task forces identified at

http://www.sheriffrandytucker.com/divisions, and their respective roles and responsibilities, and all documents concerning the scope of the MCSD's jurisdiction and authority over each municipality and unincorporated area in Madison County and the resources dedicated by the MCSD to policing each separate municipality and unincorporated area.

2.      All documents, including training materials and communications, concerning Defendants' policies, customs and/or practices in connection with vehicular roadblocks, sobriety checkpoints, and/or pedestrian checkpoints, including, with respect to any of the foregoing which are purportedly conducted under the policies and procedures governing sobriety checkpoints, all documents concerning, reflecting, or constituting:

(a)      "educational material" that has been or will be used by MCSD personnel in connection with a sobriety checkpoint, as described in Procedure III(A) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES;

(b)      "relevant data" used in selecting sites for sobriety checkpoints, as described in Procedure II(3) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES;

(c)      notices of sobriety checkpoints as described in Procedure VI(2) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES; and

(d)      "[a]fter action reports" as described in Procedure VIII(1) of the MCSD's SOBRIETY CHECKPOINT GUIDELINES.

3.      All documents concerning any aspect of any roadblock/checkpoint, including any document requesting approval for or reporting on any aspect of a roadblock/checkpoint; any document concerning the basis for instituting or operating any roadblock/checkpoint at any particular location; any public notice or similar document concerning any roadblock/checkpoint; any document concerning the operation of any roadblock/checkpoint; any document concerning

any stop or search associated therewith; any document containing or referencing any statistics or data concerning roadblocks/checkpoints or any stops or searches associated therewith; any MVR recordings; any communications with any MCSD personnel concerning any roadblock/checkpoint; and any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent these documents make any reference to any roadblock/checkpoint.

4.      All documents concerning any search, including all documents concerning Defendants' policies, customs and/or practices concerning any search and any training materials and communications related thereto; any document requesting approval for or reporting on any aspect of any search; any statistics or data concerning searches; any MVR recordings; any communications with any MCSD personnel concerning any roadblock/checkpoint; and any documents concerning work/hour logs, duty assignments, and/or the daily work schedule for any MCSD personnel to the extent these documents make any reference to any search.

5.      All documents concerning the entry of any MCSD personnel into any home, including all documents concerning Defendants' policies, customs and/or practices concerning the entry of MCSD personnel into any home and any training materials and communications related thereto; any document prepared or submitted by any MCSD personnel requesting approval for or reporting on any aspect of any such entry; any related statistics or data; any MVR recordings; and any communications with any MCSD personnel concerning any such entry.

6.      All documents concerning traffic stops, including all documents concerning Defendants' policies, customs and/or practices concerning traffic stops and any training materials or communications related thereto; any document prepared or submitted by any MCSD personnel requesting approval for or reporting on any aspect of a traffic stop; any statistics or

data concerning traffic stops; any MVR recordings; any communications with any MCSD

personnel concerning any traffic stop; and any documents concerning work/hour logs, duty

assignments, and/or the daily work schedule for any MCSD personnel to the extent these

documents make any reference to any traffic stop.

7.      All documents concerning pedestrian stops, including all documents concerning

Defendants' policies, customs and/or practices concerning pedestrian stops and any training

materials or communications related thereto; any document prepared or submitted by any MCSD

personnel requesting approval for or reporting on any aspect of any pedestrian stop; any statistics

or data concerning pedestrian stops; any MVR recordings; any communications with any MCSD

personnel concerning any pedestrian stop; any documents concerning work/hour logs, duty

assignments, and/or the daily work schedule for any MCSD personnel to the extent that these

documents make any reference to any pedestrian stop; and all documents, including training

materials and communications, concerning any sweep, dragnet, or other similar program or

operation, including programs and operations conducted by the MCSD's "Narcotics Task

Force," including the "spontaneous sweep-type efforts" described at

http://www.sheriffrandytucker.com/divisions/narcotics/.

8.      All documents concerning any internal or external complaints or statements by

any person (including members of the public, current or former MCSD personnel or other agents

or employees of Defendants) concerning any of Defendants' policies, customs and/or practices,

including all documents concerning complaints made or brought in connection with

roadblocks/checkpoints, searches, entries, stops, or use of force; all documents concerning,

reflecting, or alleging racial discrimination, racial profiling, or other racial animus; and all

documents concerning any disciplinary or other personnel actions taken by Defendants in connection with any of the foregoing issues.

9.    All documents concerning the Plaintiffs and/or any incident described in the Class Action Complaint, including documents sufficient to identify any MCSD personnel having knowledge or information relevant thereto.

10.    To the extent not encompassed by the foregoing Requests, all other documents on which Defendants intend to rely in connection with this action, including the documents referenced or relied upon in Defendants' Answer, for example, all documents concerning Defendants' contentions in paragraphs 1, 3, 4, 8, 9, 10, 11, 15, 16, 46, 48, 62, 63, 70, 89, 93, 112, 140, 161, 163, 166, 167, 185, 210, 214, 237, 251, and 263.

Dated: August 2, 2017

By: */s/ Joshua Tom*_____
    Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Yukiu Chan (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Paloma Wu (*pro hac vice*)
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
PWu@aclu-ms.org
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice*)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated, | Civil Action No. 3:17-cv-00347-WHB-LRA |
| Plaintiffs, | **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| v. | |
| MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities, | |
| Defendants. | |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs, by and through their attorneys, propound the following requests for the production of documents (individually, a "Request," and collectively the "Requests") to Defendants Madison County, Mississippi and Sheriff Randall S. Tucker, in his official capacity.

## DEFINITIONS

The following definitions apply to these Requests and shall have the following meanings and rules of construction, unless the context requires otherwise. Nothing set forth below is intended to narrow the scope of discovery permitted by the Federal Rules of Civil Procedure, and the definitions and Requests should be read as broadly as permitted by those rules.

**EXHIBIT 6**

1.      The term "apartment" means any multi-unit housing facility and any public or private housing development or complex, regardless of how the units or buildings are situated or arranged, as well as any individual unit or home in any such housing facility, development, or complex.

2.      The term "Board of Supervisors" refers to the Board of Supervisors of Madison County, Mississippi, and includes, but is not limited to, any or all individual members of the Board of Supervisors, any predecessors or successors, and any agents, attorneys, representatives, employees, and/or other persons acting or purporting to act on behalf of the Board of Supervisors of Madison County, Mississippi.

3.      The term "communication" means any oral, written, electronic, or other exchange or transmittal of words, thoughts, information, ideas or opinions to another person or entity, however made.  The term "communications" shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, text messages, tape or video recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

4.      The term "complaint" means any expression of disagreement or dissatisfaction, in any format, by any person, including MCSD personnel (as defined below), in connection with any policy, custom, practice, action and/or inaction of or by you (as defined below) and/or any current or former MCSD deputy or employee, including within any performance evaluations, reviews, referrals, or processes in any personnel file.

5.      The term "concerning" means discussing, addressing, relating to, regarding, referring to, describing, evidencing, consisting of, or constituting.

6.      The term "Defendants" refers to Sheriff Randall Tucker, in his official capacity, and to Madison County, Mississippi, and includes, but is not limited to, any predecessors or successors, and any board members, supervisors, agents, attorneys, representatives, employees, and/or other persons acting or purporting to act on behalf of Sheriff Tucker and/or Madison County, Mississippi.  The term "Defendants" includes the MCSD and all MCSD personnel, as defined below.

7.      The term "disciplinary action" means any adverse action taken by the MCSD as to any of its employees in connection with any misconduct and/or failure to follow the policies, practices, and/or procedures of the MCSD, including but not limited to (i) warnings; (ii) negative documentation in an employee's personnel file; (iii) progressive discipline or performance improvement plans; (iv) suspensions; (v) withholding of compensation and/or salary; (vi) demotions; and/or (vii) informal recommendations for behavioral changes, even if not connected to any specific disciplinary action or system.

8.      The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, any written, recorded, or graphic material of any kind, whether prepared by you or by any other person, that is in your possession, custody, or control.  The term "document" includes communications (as defined above); training materials (as defined below); MVR recordings; computer-aided dispatch ("CAD") reports; incident reports; 911 logs; records of radio traffic involving MCSD personnel; arrest reports and/or records; Uniform Crime Reports; data, information, statistics, or any other information submitted to the Federal Bureau of Investigation's Uniform Crime Reporting Program; any other reports; any other summaries; any other audio or video recordings; agreements; contracts; letters; telegrams; memoranda; records; instructions; specifications; notes;

notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs;

photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final

document; minutes of meetings, conferences, and telephone or other conversations or

communications; invoices; purchase orders; recordings; published or unpublished speeches or

articles; publications; transcripts of telephone conversations; voicemail; electronic-mail; text

messages; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and

computer print-outs. The term "document" also includes but is not limited to: (i) all drafts of a

document and all copies that differ in any respect from the original, including any notation,

underlining, marking, or information not on the original; (ii) electronically stored data in its

original digital format from which information can be obtained either directly or by translation

through detection devices or readers (any such document is to be produced in a reasonably

legible and usable form); and (iii) information stored in, or accessible through, computer or other

information retrieval systems (including any computer archives or back-up systems), in its

original digital format, together with instructions and all other materials necessary to use or

interpret such data compilations.

   9.  The phrase "in connection with" means discussing, addressing, relating to,

referring to, during the course of, and incident to.

   10.  The term "MCSD" refers to the Madison County Sheriff's Department, and

includes any predecessors or successors, as well as any current or former sheriffs, deputy

sheriffs, agents, attorneys, representatives, employees and/or other persons acting or purporting

to act on the MCSD's behalf, including but not limited to: (i) all current or former employees or

agents of Defendants identified in Defendants' Initial Disclosures, and (ii) all current or former

employees or agents of Defendants identified in Defendants' initial production in response to

Plaintiffs' First Request for Production of Documents.  Any or all of the foregoing persons are also referred to herein as "MCSD personnel."  As used herein, any reference to any actions or omissions by MCSD personnel refers to actions or omissions committed by such persons under color of law.

11.     The term "person" means any natural person of any age or gender, as well as any corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office or other business or legal entity, whether private or governmental.

12.     The term "Plaintiffs" refers to the named plaintiffs in the operative Complaint filed in this action (Latoya Brown, Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker).

13.     The term "policy" means all formal and informal policies, rules, regulations, guidelines, procedures, restrictions and limitations that are published or promulgated by, or expressly or implicitly approved of and/or enforced by any or all Defendants.  This term includes but is not limited to any policy which Defendants may believe or contend constitutes a "policy" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.

14.     The term "training materials" means any written, recorded, or graphic material of any kind that provides instruction, guidance, advice, and/or suggestions for MCSD personnel. The term "training materials" encompasses materials created by Defendants as well as materials in Defendants' possession, custody or control.

15.     The term "you" or "your" means and/or refers to Defendants, both individually and collectively.

## INSTRUCTIONS AND RULES OF CONSTRUCTION

1.      These instructions and rules of construction shall apply in interpreting the scope of the above definitions and these instructions and rules of construction, as well as the individual Requests below.

2.      You are required to produce every document requested in your possession, custody or control.  Without limitation on the definition of the term "control," a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person.

3.      In the event you object to any Request set forth below on the grounds that the Request is overbroad for any reason, you should respond to the Request as narrowed in a way that renders it not overbroad in your opinion, and state the extent to which you have narrowed that Request for purposes of your response.

4.      In the event you object to any Request set forth below on the grounds that the Request or any term contained therein is vague, unclear, or ambiguous in any respect, you should (i) identify and explain the specific terms or phrases you believe to be vague, unclear, or ambiguous; (ii) respond to the Request as you reasonably interpret it; and (iii) specify and explain your interpretation of the Request.

5.      These Requests shall be deemed to be continuing so as to require supplemental productions as you obtain additional documents between the time of the initial production hereunder and the time of trial in this action.

6.      These Requests require production of copies of original documents in the same form and in the same order as they are kept in the usual course of business.  The titles or other

descriptions on the boxes, file folders, bindings or other containers in which responsive documents are kept are to be copied and reproduced in addition to the documents themselves.

7.     If a document has been produced by another party to this action, in any other action brought by any Plaintiff, or in response to any Public Records Requests served by counsel for Plaintiffs, you must still produce your copy of the same document, even if the two documents are identical.

8.     If any document is withheld under any claim of privilege, including without limitation, the work product doctrine, attorney-client privilege, and/or any joint-defense or common interest privilege, you shall furnish a list attached to your response: (a) identifying any such document; (b) identifying the date of the document; (c) identifying the names of its author(s) or preparer(s); (d) identifying the name of each person who received the document, including, for any communications, anyone who was Cc'd or Bcc'd; (e) identifying the subject matter of the document; (f) identifying the type of privilege asserted; and (g) identifying the basis for the assertion of privilege.

9.     Notwithstanding the assertion of any objections, any purportedly privileged documents containing non-privileged material must be disclosed, with the purportedly privileged portion redacted.  A redaction log shall be produced contemporaneously with the document responsive to these Requests enumerating the categories of redacted information, as required for the assertion of any other claim of privilege.

10.     If a document requested herein was formerly in your possession, custody, or control and has been transferred, lost, or destroyed, you shall submit in lieu of each document a written statement indicating whether the document: (i) was lost or is missing; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily, to others; or (iv) otherwise has

been disposed of.  In each instance explain the circumstance of such disposition, and state the approximate date thereof.

11.     The words "or," "and," "all," "every," "any," "each," "one or more," "including" and similar words of guidance are intended as such, and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.  The word "including" shall not be used to limit any general category or description that precedes it and shall be construed to mean "including but not limited to."  The words "all," "every," "any," "each," and "one or more" shall include each other whenever possible to expand, not restrict, the scope of the Request.

12.     Whenever necessary to bring within the scope of these Requests any information that otherwise might be construed to be outside the scope, (i) the present tense shall include the past tense and future tense, the past tense shall include the present tense and future tense, and the future tense shall include the past tense and present tense; (ii) references to the singular shall include the plural, and vice versa; and (iii) reference to any gender shall also include any other gender.

13.     These Requests are intended to elicit as much information as possible concerning the issues raised in the operative Complaint filed in this action.  To the extent any Request could be interpreted in more than one way, you should employ the interpretation of the Request most likely to encompass and elicit the greatest amount of information possible.

14.     To the extent any documents responsive to these Requests are also responsive to Plaintiffs' First Set of Requests for Production of Documents (the "First RFPs"), such documents

should be produced in response to the First RFPs.  In no event should these Requests be used by Defendants as a means of or justification for delay in production of any document responsive to the First RFPs.

## DOCUMENT REQUESTS

11.     All documents concerning policies, procedures, or guidelines for filing, retaining, or destroying any documents.

12.     All documents concerning any use of force by or on behalf of Defendants.

13.     Personnel files concerning all current or former MCSD personnel dated between 2012 and the present, including any employment evaluations, reviews, records of disciplinary actions, referrals for disciplinary action, and/or complaints contained in such files.

14.     All affidavits submitted to the Madison County Justice Court by or on behalf of Defendants in connection with any arrest between 2012 and the present.

15.     All documents, including policies and training materials, concerning Defendants' use or deployment of (i) unmarked vehicles or undercover vehicles, and/or (ii) plainclothes or undercover personnel, including the types of plainclothes and/or non-standard uniforms that may be worn by such personnel, when plainclothes and/or nonstandard uniforms may be worn by such personnel, and the permissible reasons for which MCSD personnel may wear plainclothes and/or nonstandard uniforms.

16.     All communications between any MCSD personnel and any current or former members of the Board of Supervisors.

17.     All documents generated or received by the Board of Supervisors, including any meeting minutes or any audio or video recordings concerning the MCSD, including the budget of the MCSD and any complaints concerning the MCSD or MCSD personnel.

9

18.     All documents concerning the use of race as a factor in connection with any of the MCSD's policies, customs, and/or practices, including all documents concerning any correlation between racial characteristics and the incidence of any particular crime or crime in general.

19.     All documents reflecting any opinion, characterization, or discussion of any person or persons on the basis of actual or perceived race, ethnicity or national origin.

20.     All emails and other documents sent to or from the email address MCCAG@SheriffRandyTucker.com.

21.     All documents concerning apartment patrols, apartment details, apartment checkpoints/roadblocks, and/or apartment walk-throughs.

22.     All documents concerning the MCSD's custom, policy, and/or practice of focusing on any specific geographic region or municipality, whether incorporated or unincorporated, and/or political subpart of Madison County for any reason.

23.     All documents concerning the jump-out detail, street crimes unit, NET Team, Neighborhood Enhancement Team, or similar or analogous unit, detail, patrol or team, including its team members, reporting structure, and policies, practices and procedures.

24.     All agreements, understandings or requests between or from the MCSD and any person, company or entity, whether private or governmental, to police a certain area or location, including but not limited to general requests for continuing assistance of the type referenced in the documents produced by Defendants at RFP 10-26 to 10-45, but excluding routine calls to MCSD from the public for help via emergency or non-emergency numbers.

25.     All documents concerning "saturation details," as that term is used in the document produced by Defendants at RFP 2-47, and all documents concerning "saturation patrols," as that term is used in the document produced by Defendants at RFP 2-48.

26.    All documents concerning minimum, recommended, or suggested daily, weekly, monthly, or yearly requirements, targets, or quotas (whether in terms of a total number or a dollar value) for tickets issued, arrests made, contraband seized, and/or property seized by MCSD deputies and other MCSD employees.  This Request encompasses all documents concerning the consequences for failing to meet these requirements, targets, or quotas, as well as any incentives (including but not limited to compensation, bonuses, promotions, earned time off, favorable work shifts and favorable assignments) in connection with meeting or exceeding the aforementioned requirements, targets, or quotas.  This Request also encompasses all documents concerning "stat sheets," including documents concerning how those "stat sheets" are used for purposes of employee evaluations and/or employment-related decisions and what crimes are and are not tracked in "stat sheets."

27.    All documents, including policies, guidelines, training materials and communications, concerning the circumstances under which MCSD personnel may (i) request a person's identification; (ii) run a person's name or other personally-identifying information against any database, including any database containing information regarding outstanding warrants; or (iii) exercise any discretion in connection with issuing a warning or ticket, and/or making an arrest with respect to any offense.

28.    All documents, including reports, data, and statistics, concerning all instances in which any MCSD personnel checked any person's driver's license or identification for outstanding warrants or for any other data or information connected to the person's driver's license or identification, whether by querying dispatch, checking the person's identification against any database, or by any other means.

Dated: September 22, 2017

By: /s/ Joshua Tom
    Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*
forthcoming)
Nihara K. Choudhri (*pro hac vice*)
Yukiu Chan (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
monica.chan@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Paloma Wu (*pro hac vice*)
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
PWu@aclu-ms.org
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice* forthcoming)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

      Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**PLAINTIFFS' FIRST SET OF
INTERROGATORIES**

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs, by and through their attorneys, hereby submit the following interrogatories (each an "Interrogatory," and collectively the "Interrogatories") to be answered separately and fully in writing under oath by You, within thirty (30) days, in accordance with the definitions and instructions set forth below.

## DEFINITIONS

      1.     Unless otherwise defined, all words and phrases used herein shall be accorded their ordinary meaning.

      2.     The term "Answer" means the "Answer and Affirmative Defenses of Defendants, Madison County, Mississippi and Sheriff Randall C. Tucker, In His Official Capacity" filed in this action and dated June 29, 2017.

**EXHIBIT 8**

3.      The term "Board of Supervisors" refers to the Board of Supervisors of Madison County, Mississippi, and includes, but is not limited to, any or all individual members of the Board of Supervisors of Madison County, Mississippi, any predecessors or successors, and any agents, attorneys, representatives, employees, and/or other persons acting or purporting to act on behalf of the Board of Supervisors of Madison County, Mississippi.

4.      The term "communication" means any oral, written, electronic, or other exchange or transmittal of words, thoughts, information, ideas or opinions to another person or entity, however made.  The term "communications" shall include, without limitation, printed, typed, handwritten, or other readable documents, correspondence, memoranda, reports, contracts, drafts (both initial and subsequent), computer discs or transmissions, e-mails, instant messages, text messages, tape or video recordings, voicemails, diaries, log books, minutes, notes, studies, surveys and forecasts, and any and all copies thereof.

5.      The term "complaint" means any expression of disagreement or dissatisfaction, in any format, by any person, including MCSD personnel (as defined below), in connection with any policy, custom, practice, action, and/or inaction of or by Defendants (as defined below), including (i) the types of complaints described in Section 17, entitled *Investigations: Internal Affairs*, of the MCSD's POLICIES AND PROCEDURES; and (ii) complaints included within any performance evaluations, reviews, referrals, or processes in any personnel file.

6.      The term "concerning" means discussing, addressing, relating to, regarding, referring to, describing, evidencing, consisting of, or constituting.

7.      The terms "Defendants," "You," or "Your" refer to Sheriff Randall Tucker, in his official capacity, and to Madison County, Mississippi, and include, but are not limited to, any predecessors or successors, and any board members, supervisors, agents, attorneys, representatives, employees, and/or other persons acting or purporting to act on behalf of Sheriff

Tucker and/or Madison County, Mississippi.  The term "Defendants" includes the MCSD and all MCSD personnel, as defined below.

8.     The term "document" shall have the broadest meaning possible under the Federal Rules of Civil Procedure and shall include, but not be limited to, any written, recorded, or graphic material of any kind, whether prepared by You or by any other person, that is in Your possession, custody, or control.  The term "document" includes communications (as defined above); training materials; MVR recordings; computer-aided dispatch ("CAD") reports; incident reports; 911 logs; records of radio traffic involving MCSD personnel; arrest reports and/or records; Uniform Crime Reports; data, information, statistics, or any other information submitted to the Federal Bureau of Investigation's Uniform Crime Reporting Program; any other reports; any other summaries; any other audio or video recordings; agreements; contracts; letters; telegrams; memoranda; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; voicemail; electronic-mail; text messages; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "document" also includes but is not limited to: (i) all drafts of a document and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original; (ii) electronically stored data in its original digital format from which information can be obtained either directly or by translation through detection devices or readers (any such document is to be produced in a reasonably legible and usable form); and (iii) information stored in, or accessible through, computer or other information retrieval systems

(including any computer archives or back-up systems), in its original digital format, together with instructions and all other materials necessary to use or interpret such data compilations.

9.      The phrase "in connection with" means discussing, addressing, relating to, referring to, during the course of, and incident to.

10.      The term "MCSD" refers to the Madison County Sheriff's Department, and includes any predecessors or successors, as well as any current or former sheriffs, deputy sheriffs, agents, attorneys, representatives, employees and/or other persons acting or purporting to act on the MCSD's behalf, including but not limited to (i) all current or former employees or agents of Defendants identified in Defendants' Initial Disclosures, and (ii) all current or former employees or agents of Defendants identified in Defendants' initial production in response to Plaintiffs' First Request for Production of Documents.  Any or all of the foregoing persons are also referred to herein as "MCSD personnel."  As used herein, any reference to any actions or omissions by MCSD personnel refers to actions or omissions committed by such persons under color of law.

11.      The term "person" means any natural person of any age or gender, as well as any corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office or other business or legal entity, whether private or governmental.

12.      The term "Plaintiffs" refers to the named plaintiffs in the operative Complaint filed in this action (Latoya Brown, Lawrence Blackmon, Herbert Anthony Green, Khadafy Manning, Quinnetta Manning, Marvin McField, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker).

13.      The term "policy" means all formal and informal policies, rules, regulations, guidelines, procedures, restrictions and limitations that are published or promulgated by, or expressly or implicitly approved of and/or enforced by any or all Defendants.  This term includes

but is not limited to any policy which Defendants may believe or contend constitutes a "policy"

under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.

14.     The term "roadblock/checkpoint" means any installation, barricade, checkpoint,

roadblock and/or other police presence in connection with which MCSD personnel stop any or

all motor vehicles and/or any or all persons passing by on foot or bicycle, for any purpose,

including sobriety checkpoints and safety checkpoints, regardless of whether any such

installation, barricade, checkpoint, roadblock and/or other police presence is specifically or

formally designated by the MCSD as a "roadblock" or "checkpoint."  The term

"roadblock/checkpoint" also includes any police presence at which (a) marked or unmarked

MCSD vehicles are parked or stopped at any location on public or private property, including

roadsides, intersections, or parking lots, and (b) MCSD deputies on foot, near or around the

aforementioned parked or stopped MCSD vehicles, flag down, by any means, any or all vehicles,

pedestrians, or bicyclists passing by.

15.     To bring within the scope of these requests all information that might otherwise

be construed to be outside of their scope, the following rules of construction apply: (a) the word

"including" shall be read to mean including without limitation; (b) the present tense shall be

construed to include the past tense and vice versa; (c) the use of the singular form of any word

includes the plural and vice versa; (d) the terms "any," "all," and "each" shall be read to mean

any, all, each, and every; (e) the connections "and" and "or" shall be construed either

disjunctively or conjunctively as necessary to bring within the scope of the request all responses

and documents that might otherwise be construed to be outside its scope; and (f) the terms

"between" and "among" shall be construed as "between" or "among" as necessary to bring

within the scope of the request all responses and documents that might otherwise be construed to

be outside its scope.

## INSTRUCTIONS

1.      The answers to these Interrogatories shall include all information in Your possession, custody, or control, including that held by Your agents, employees, representatives, or any other person over which You have control.

2.      Each Interrogatory, including any subparts, shall be answered separately, completely, and fully.  If You are unable to respond to any Interrogatory in full after exercising due diligence to secure the requested information, answer to the fullest extent possible.

3.      If any Interrogatory is objected to in whole or in part, specify all grounds on which such objection rests.  You should clearly indicate to which part of an Interrogatory any objection is directed and respond to the remaining parts of the Interrogatory to which You do not object.

4.      If You object to any Interrogatory, whether in whole or in part, on the grounds that the information sought therein is privileged or confidential, state the following:  (a) identify the privileged information; (b) identify the persons who received the privileged information and/or the persons present during the privileged communication; (c) identify the persons who made the privileged communication; (d) identify the general subject matter of the privileged information; and (e) state the basis for Your claim of privilege with respect to such information.

5.      The Interrogatories set forth herein are to be deemed continuing so as to require supplemental responses in accordance with the Federal Rules of Civil Procedure; whenever additional information is obtained or becomes known to You, it shall be supplied in writing under oath as though expressly requested by separate Interrogatories.

6.      Defendants reserve the right to serve supplemental and additional interrogatories.

## **INTERROGATORIES**

1.      For all persons identified on the document produced by Defendants at RFP 1-2 to 1-3, provide a narrative description of each person's role and responsibilities within the MCSD, including his/her immediate and indirect supervisor(s) and any person(s) whom such person directly or indirectly supervises, and his/her assignment to any unit, department, team, task force, working group, or similar subdivision of the MCSD.

2.      Identify, define and explain the meaning of any and all codes used by the MCSD, including radio and signal codes and abbreviations (including disposition codes) in CAD reports, activity reports, "stat" sheets, incident reports and any other MCSD documents.

3.      Identify and describe all units, departments, teams, task forces, working groups, or similar subdivisions of the MCSD that existed at any time between 2007 and the present, including formation date, date of dissolution, purpose, responsibilities, and how it is staffed, supervised, and operated.

4.      Describe the manner(s) in which the MCSD "utilizes patrols known as the 'NET' or Neighborhood Enhancement Team," including the criteria used in determining whether, when, and how the Neighborhood Enhancement Team is "disbursed at night in neighborhoods to combat crimes…" and "used in apartment complexes and on streets and highways…," as stated in paragraph 4 of Defendants' Answer.

5.      Identify and describe all instances, from 2012 to the present, in which Defendants have utilized or deployed the Neighborhood Enhancement Team.

6.      Describe the criteria employed by Defendants in reviewing personnel and in making any hiring, disciplinary, firing, promotion, or demotion decisions with respect to MCSD personnel.

7.      Identify by name, title, and responsibilities all current or former MCSD personnel who are or appear to be Black between 2007 and the present.  For all such personnel whose

employment was terminated or who otherwise separated from service with the MCSD, describe the circumstances of their termination or separation.

8.      Identify and describe any unwritten or oral policies, procedures, or guidelines that Defendants contend are maintained by the MCSD.

9.      Identify and describe all changes and/or variations, whether formal, informal, written, or unwritten, made by Sheriff Tucker to the policies and procedures in place under Sheriff Toby Trowbridge.

10.     Identify and describe all instances of actual or alleged racial discrimination towards any individual or group of people by MCSD personnel.

11.     Identify and describe all instances of actual or alleged use of excessive, unlawful, unconstitutional, or otherwise wrongful use of physical force by any MCSD personnel.

12.     Identify and describe all instances in which any current or former MCSD personnel were arrested, cited, detained, sued, or charged in connection with any civil or criminal offense, regardless of whether the arrest, citation, detention, suit or charge arose out of the individual's performance of his or her duties as a current or former employee of the MCSD. This Interrogatory encompasses instances that predate any individual's employment with the MCSD to the extent that Defendants have now or at any point had knowledge of any such arrest, citation, detention, suit or charge.

13.     Identify and describe every database or other recordkeeping system employed by the MCSD at any time from 2012 through the present, including (i) the purposes and function of any such database or recordkeeping system, and (ii) whether the database or recordkeeping tracks the race, ethnicity, and/or national origin of any person identified therein.

14.     Identify and describe (a) every database, whether local, county, state, federal or privately-run, that is accessed or checked when the MCSD runs a background check in the course of its law enforcement duties; and (b) whether the MCSD keeps logs or records of these

checks, including who ran the checks, when the checks were run, where the checks were run, on whom the checks were run, and the results of any such checks.

15.     Identify and describe all reports or records, including CAD reports and citation data, that MCSD personnel are required to prepare to memorialize any type of law enforcement encounter, including (i) the method or form used to prepare any such report or record; (ii) whether there is any review process for such reports/records, and if so, who reviews them; (iii) the circumstances under which the report or record must be completed, including whether an incident report must be prepared for every traffic stop based on a violation of the law, such as a seatbelt violation or improper vehicle equipment, regardless of whether the stop results in a citation or an arrest; and (iv) the document retention policy for any such report or record.

16.     Identify and describe every oral or written request made by any person or organization (whether incorporated or unincorporated) in Madison County, Mississippi, including managers of apartment complexes, municipal police departments, business owners, and schools, for assistance of any type from the MCSD, as stated in paragraphs 3 and 210 of Defendants' Answer, including the date, the identity of the individual requestor and his or her institutional affiliation, the specific nature of the assistance requested, and any action taken by the MCSD in response to such request.

17.     Explain and describe the policing activity that MCSD performs in response to the requests that Defendants produced in RFPs 10-26 to 10-45, including the tactics, policies, procedures and practices used when interacting with individuals at these locations.

18.     Identify every action taken by Defendants "to ensure that the Black community has input into the daily operations of the Madison County Sheriff's Department" and/or to "communicate and coordinate with" the Black community "regarding the services of the Madison County Sheriff['s] Department," as stated in paragraphs 8 and 112 of Defendants' Answer.

19.     Identify the author of the MCSD's General Roadblocks Policy and describe the circumstances in which roadblocks/checkpoints have been conducted pursuant to the General Roadblocks Policy.  To the extent Defendants contend that the General Roadblocks Policy is inoperative, identify any directive superseding or negating the General Roadblocks Policy and explain why the General Roadblocks Policy nonetheless remains part of the MCSD's POLICIES AND PROCEDURES.

20.     Identify and describe any roadblock/checkpoint at which: (i) MSCD personnel used one or more unmarked vehicles; (ii) any or all MCSD personnel present at the roadblock/checkpoint wore plainclothes and/or clothing other than a complete uniform; and/or (iii) MCSD personnel did not employ emergency and/or overhead lighting.

21.     Identify every roadblock/checkpoint conducted in conjunction or cooperation with, at the request of, or with the assistance of, any other governmental or law enforcement agency.  For each such roadblock/checkpoint, identify the time, date, location, and the name of the relevant agency.

22.     Describe in detail any requirement, policy, or practice concerning advance public notice provided by the MCSD for roadblocks/checkpoints.  To the extent that such requirements, policies, or practices differ depending on the nature, purpose, or location of the roadblock/checkpoint, separately specify the requirement, policy, or practice applicable to each type of roadblock/checkpoint.

23.     Identify all criteria used for selecting locations for roadblocks/checkpoints, and the relevant weight placed on each criterion.  To the extent that these criteria differ depending on the purpose for which the roadblock/checkpoint is established, separately specify the criteria for selecting locations for each type of roadblock/checkpoint.

24.     Identify and describe any means by which MCSD tracks or measures roadblock/checkpoint activity, including tracking based on: (i) the number of

roadblocks/checkpoints conducted in any given time period; (ii) the number of vehicles, pedestrians, or bicyclists stopped; (iii) the number of searches conducted; (iv) the number of search warrants issued; (v) the number, type, and/or value of contraband found; (vi) the amount of time spent by any or all MCSD personnel at any or all roadblocks/checkpoints; and (vii) the number of arrests made and/or or citations issued by MCSD personnel.  This includes any tracking or measuring of roadblock/checkpoint activity as part of the MCSD's monitoring and/or enforcement of targets and quotas, as well as the MCSD's general statistics-gathering and/or productivity-tracking efforts.

25.     Identify and describe the bases or justifications for any detention, search, or arrest described in the Complaint with respect to any of the Plaintiffs.

26.     Identify and describe every complaint and/or petition of any kind made to the Board of Supervisors or any individual member of the Board of Supervisors concerning the MCSD, including the date of the complaint/petition, the name of the individual or entity making the complaint/filing the petition, the substance of the complaint/petition, a list of any documents concerning the complaint/petition, and a description of any actions taken by the Board of Supervisors or the MCSD in response.

27.     Identify all current or former MCSD personnel who received and/or reviewed any complaint by any person or entity concerning any of the customs, policies, and/or practices alleged in the Complaint, including any actual or alleged incident of racial discrimination or profiling, any traffic stop, any pedestrian stop, any search, any entry into any home, any use of physical force, and any roadblock/checkpoint.

28.     Identify and describe any practices, policies, and/or procedures for determining when MCSD deputies respond to an incident that is within the jurisdiction of a municipal police department within Madison County, Mississippi.

11

Dated: September 22, 2017

                                                By:  /s/ Joshua Tom
                                                     Joshua Tom

SIMPSON THACHER & BARTLETT LLP          AMERICAN CIVIL LIBERTIES UNION
Jonathan K. Youngwood (*pro hac vice*)  OF MISSISSIPPI FOUNDATION
Janet A. Gochman (*pro hac vice*)       Paloma Wu (*pro hac vice*)
Isaac Rethy (*pro hac vice*)            Joshua Tom (Miss. Bar No. 105392)
Kavitha S. Sivashanker (*pro hac vice*  233 East Capitol Street
forthcoming)                            Jackson, MS 39201
Nihara K. Choudhri (*pro hac vice*)     (601) 354-3408
Yukiu Chan (*pro hac vice*)             PWu@aclu-ms.org
425 Lexington Avenue                    JTom@aclu-ms.org
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com                     AMERICAN CIVIL LIBERTIES UNION
kavitha.sivashanker@stblaw.com          FOUNDATION
irethy@stblaw.com                       Ezekiel Edwards (*pro hac vice* forthcoming)
nchoudhri@stblaw.com                    Jeffery Robinson (*pro hac vice* forthcoming)
monica.chan@stblaw.com                  125 Broad Street
                                        New York, NY 10004
                                        (212) 549-2610
                                        eedwards@aclu.org
                                        jrobinson@aclu.org

                                        *Attorneys for Plaintiffs*

1               DARIAN SMITH

2          UNITED STATES DISTRICT COURT

      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3            NORTHERN DIVISION

4

  LATOYA BROWN; LAWRENCE

5  BLACKMON; HERBERT ANTHONY

  GREEN; KHADAFY MANNING;

6  QUINNETTA MANNING; MARVIN

  McFIELD; NICHOLAS SINGLETON;

7  STEVEN SMITH; BESSIE THOMAS; and

  BETTY JEAN WILLIAMS TUCKER,

8  individually and on behalf of a class

  of all others similarly situated,    PLAINTIFFS

9

10  V.        CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA

11  MADISON COUNTY, MISSISSIPPI;

  SHERIFF RANDALL S. TUCKER in his

12  official capacity; and MADISON COUNTY

  SHERIFF'S DEPUTIES JOHN DOES #1

13  through #6, in their individual capacities,

14               DEFENDANTS

15

16     ************************************************

17          DEPOSITION OF DARIAN SMITH

18     ************************************************

19         APPEARANCES NOTED HEREIN

20

21      DATE: WEDNESDAY, NOVEMBER 29, 2017

        PLACE: HILTON GARDEN INN

22        WEST CAPITOL Street

          Jackson, MS

23        TIME:  1:52 P.M.

24  Job No: 133422

25     REPORTED BY: DEBORAH H. NELSON    **EXHIBIT 9**

                        DARIAN SMITH

1

2      Q      Now, do you have to -- besides those, have

3   you ever been arrested or convicted of any crimes?

4      A      No.

5      Q      And so for this one, did you plead guilty

6   or take that to trial?

7      A      Which one?

8      Q      The college one.

9      A      The public drunk?  I just paid my fine and

10  I went about -- I never went to court at all on.

11      The second one, I pled no contest because I had

12  to report back for training camp two days after what

13  would have been the court date.  So I pled no

14  contest.

15      Q      Did you have to ever spend any time in

16  jail for either one of those two?

17      A      No.  No.

18      Q      Now, so on your application with the

19  sheriff, did you have to disclose those, as well?

20      A      Yes.  Yes.

21      Q      And did -- when you were getting hired at

22  the sheriff, who did you interview with?

23      A      Chief Belvedresi.

24      Q      Did you interview with the sheriff, as

25  well?

1                      DARIAN SMITH

2       A     I interviewed with Chief Belvedresi, and

3  then when they told me I got the job, I met with

4  Sheriff Trowbridge.

5       Q     Did they discuss those prior arrests and

6  convictions that we just talked about?

7       A     They did.

8       Q     What did they say about that?

9       A     I was put -- I think probation is six

10  months when you start at the sheriff's office.  I

11  was put on a year's extended probation.  Told pretty

12  much any incident like that would result in

13  termination.

14      Q     Uh-huh.  So as Master Sergeant of NET,

15  what are your day-to-day responsibilities?

16      A     We don't have one singular -- uh --

17  carry-out operation or thing we're assigned to.  We

18  go to areas where crime is trending up -- where

19  there may be burglaries, robberies, narcotics

20  activity, things like that.  We assist

21  investigations with surveillance in locating

22  criminals or people that are involved in their

23  criminal cases.

24      We assist the Warrants Division by serving

25  warrants throughout the county and the City of

1                      DARIAN SMITH

2       A    I have.

3       Q    What would you do if somebody drives up to

4  a roadblock and then doesn't want to go in it and so

5  they turn around and park in front of the roadblock?

6       A    If they park in front of the roadblock,

7  they're blocking the street so we can make contact.

8       Q    What if there's like a place to park like,

9  you know, on Pine Knoll Road you set up in the

10  parking lot, so what if somebody --

11      A    If there's no traffic violation, there's

12  really nothing you can do.

13      Q    Have the roadblocks that you have set

14  up -- uh -- have they changed over time?

15      A    As far as?

16      Q    From Sheriff Trowbridge to Tucker?  Like

17  the policies or procedures or how you set up a

18  roadblock?

19      A    Not that I'm aware of.

20           (Exhibit 11 marked for the record)

21      Q    This will be Exhibit 11.  So this is an

22  incident report; right?

23      A    It appears to be.

24      Q    And if you'd look on page two, the very

25  last sentence, EOR Darian Smith, SO 47?

1                          DARIAN SMITH

2        A     Correct.

3        Q     Did you write this one?

4        A     Correct.

5        Q     And this is the incident that we were

6   talking about before, right, where the -- uh -- two

7   subjects were walking near 388 Ricks?

8        A     Correct.

9        Q     And we have already discussed this; right?

10       A     Correct.

11       Q     So let's see.  I'm going to start sort of

12   in the center here, towards the top.  "While

13   deputies were on the property, contact was made with

14   Steven Smith and Terrence Thompson near the

15   entrance.  For officers' safety, both subjects were

16   advised to take their hands out of their pockets.

17   This time Thompson stated that he had a pistol in

18   the inner pocket of his coat.  Deputy Howard secured

19   the gun."  Uh -- et cetera.  So let's just talk

20   about that part.  So go over with me just what

21   happened there.

22       A      We conducted an apartment walk-through.

23   We had information that people who did not live on

24   the property were cutting through or walking through

25   the property, committing crimes -- crimes of

1                     DARIAN SMITH

2   violence, crimes against persons, crimes against

3   property during certain hours.

4        As we were coming out, as I recall they were

5   walking into the apartments.  They had their hands

6   in their pockets.  We told them to take their hands

7   out.  Sergeant Howard told them to take their hands

8   out of their pockets.  At which time Thompson freely

9   admitted he had a pistol concealed in his inner

10  jacket.

11       At that time, Sergeant Howard secured the

12  weapon and walked over to the other side of the

13  street with Thompson, and I walked to the other side

14  of the street with Smith.  What was his name?

15  Smith.

16       Q    So is that a common -- why did you ask

17  them to take their hands out of their pockets?

18       A    For officers' safety.

19       Q    Is that like a menacing, having hands in

20  pockets, is that like an unsafe --

21       A    I don't know what is in your pocket when

22  you approach me.  You could have a gun or a knife,

23  anything.

24       Q    So we're on like Capitol Street currently,

25  so if I'm walking down Capitol Street with my hands

1                           DARIAN SMITH

2    in my pockets, is that, I mean, any officer could

3    tell me to take my hands out of my pockets, and if I

4    didn't, I would be arrested?

5         A    Is that's an area of high crime where

6    shootings are taking place, gun activity is taking

7    place, and they have information of certain crimes

8    being committed at certain times, yes, they can tell

9    you to take your hands out of your pockets.

10        Q    You can put this one aside.

11             (Exhibit 12 marked for the record)

12        Q    So this will be Exhibit 12.  So this looks

13   to actually be, even though it's one exhibit, this

14   looks to be two documents.  This looks to be the

15   intake report at the Madison County Detention

16   Center, which is the first two pages, and then the

17   third and fourth page are incident report from the

18   sheriff's department; is that right?

19        A    Correct.

20        Q    So let's go to the fourth page.

21        A    All right.

22        Q    So you're at the end, EOR Darian Smith,

23   SO-47.  Does that mean you wrote this supplement

24   data?

25        A    Correct.

1                          JAMES HALL
2                  UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                        NORTHERN DIVISION
4

    LATOYA BROWN; LAWRENCE BLACKMON;
5   HERBERT ANTHONY GREEN; KHADAFY
    MANNING; QUINNETTA MANNING; MARVIN
6   MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; AND
7   BETTY JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON BEHALF OF A CLASS
8   OF ALL OTHERS SIMILARLY SITUATED          PLAINTIFFS
9
10  V.              CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11

    MADISON COUNTY, MISSISSIPPI;
12  SHERIFF RANDALL S. TUCKER, IN HIS
    OFFICIAL CAPACITY; AND MADISON COUNTY
13  SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
    #6, IN THEIR INDIVIDUAL CAPACITIES          DEFENDANTS
14
15                  DEPOSITION OF JAMES HALL
16

            Taken at the instance of the Plaintiffs on
17                 Monday, December 4, 2017,
                   Jackson, Mississippi,
18               beginning at 1:20 p.m.
19
20
21
22
23                    **EXHIBIT 10**
24  JOB NO: 133423
25  REPORTED BY:  Tamara Hartwig Fulgham, CSR, BCR

1                        JAMES HALL

2   deposition?

3        A    Yes.

4        Q    Do you need to read the narrative again

5   before I ask you questions?  Because then I'm going to

6   ask you about this event.

7        A    Sure.  Out loud or just...

8        Q    No.  No.  Just -- just so you -- we're on

9   the same page.

10       A    (Reading.)  All right.

11       Q    Do you remember this incident?

12       A    Yes.

13       Q    So under -- on page -- the third page of

14   this exhibit, under narrative.  This is your

15   narrative, right?

16       A    Correct.

17       Q    So turn to the next -- next page.  It ought

18   to be Page 4 of Exhibit 11.  So towards the bottom

19   here of your narrative, it says Sergeant Moore went to

20   talk to the individual that were watching Thompson

21   break into apartment 6E and they agreed to fill out

22   witness statements about what they saw.  The witnesses

23   at the break-in were Khadafy Manning and Quinnetta

24   Thomas.  The witnesses to the break-in said that he

25   used some type of tire tool to break the glass out.

1                          JAMES HALL

2          Did you see Khadafy Manning and Quinnetta

3   Thomas witness this witness?

4      A    No.

5      Q    Did they agree to fill out witness

6   statements to you?

7      A    Quinn -- Quinnetta Thomas, I talked to her.

8   She agreed.

9      Q    Where did Quinnetta Thomas agree to fill out

10  a witness statement?

11          MR. GRAVES:  You mean, like where was she?

12      A    On the --

13          MR. GRAVES:  -- physically?

14      A    -- witness -- oh.  Physically?

15  BY MR. TOM:

16      Q    Uh-huh.

17      A    We were on the balcony outside the

18  apartment.

19      Q    Did you ever go inside -- so was Quinnetta

20  Thomas in her own apartment, do you know?  You don't

21  know?

22      A    No.

23      Q    Did you ever go inside --

24      A    I don't know.

25      Q    -- her apartment during this incident?

1                        JAMES HALL

2      A    For a brief period of time.

3      Q    And how long is a brief period of time?

4      A    3 to 4 seconds.

5      Q    And which apartment was that?

6      A    I don't know the number.

7      Q    Look down at the bottom here of the same

8  page, and this is Slade Moore's supplement.  Look at

9  the last sentence.  Ladarius, Khadafy, and Quinnetta

10 all ran up the stairs and into apartment 6G --

11     A    Okay.

12     Q    -- when they saw another deputy pull through

13 the parking lot.  Is this the apartment you went into,

14 6G, do you know?

15     A    I -- I can't say that they ran into 6G.  I

16 don't recall looking at the door number.

17     Q    Was the apartment that you went into

18 upstairs or downstairs?

19     A    It was upstairs.

20     Q    And then so you were in for 3 or 4 seconds,

21 and then what happened?

22     A    I came back out.

23     Q    And then where did you go after you came

24 back out?

25     A    To try to finish up with the statement that

1                    JAMES HALL

2    Quinnetta was giving me.

3         Q    Did you see -- was -- did -- was Sergeant

4    Moore in this apartment?

5         A    Yes.

6         Q    And how long had Sergeant Moore been in the

7    apartment before you briefly went in?

8         A    I don't know.

9         Q    Did you see Sergeant Moore go into the

10   apartment?

11        A    I didn't see him enter the apartment.

12        Q    So that means -- so Sergeant Moore was

13   already in the apartment when you went into the

14   apartment briefly?

15        A    Yes.

16        Q    And where did you -- you said Quinnetta

17   Thomas gave you the witness statement.  Was that

18   on -- right outside her -- the apartment door?

19        A    It was on the balcony in between the two

20   doors.  There's two doors on the top of the

21   apartments.

22        Q    And what did Quinnetta Thomas tell you when

23   she was giving this statement -- witness statement?

24        A    Like, what did she write down on the

25   statement?

JAMES HALL

1

2    Q    Did she -- did she -- was it a written thing

3    or did she say it verbally?  I'm not sure how -- what

4    happened?

5    A    You know, if she was giving a statement

6    verbally, I would not be able to accurately tell you

7    what was being said.

8    Q    Do you remember if she told you verbally or

9    if she wrote something down?

10    A    She -- she wrote it down.

11    Q    And she wrote it down right in front of you?

12    A    Yes.

13    Q    Did Khadafy Manning write a statement in

14    front of you?

15    A    Yes.

16    Q    And -- and where was that?  Where did that

17    happen?

18    A    That happened down by the patrol vehicle.

19    Q    Was that your patrol vehicle?

20    A    I don't know.  There was three or four of

21    them there.

22    Q    So how did -- explain was -- Khadafy Manning

23    inside this apartment?

24    A    When he gave his statement?

25    Q    No.  Like when -- the apartment that you

1                         JAMES HALL

2    were standing outside of --

3         A    Uh-huh.

4         Q    -- on the -- on the landing, the apartment

5    that you said you briefly went into for 3 or 4

6    seconds, was Khadafy Manning inside that apartment?

7         A    Yes.

8         Q    And Quinnetta Thomas was in that apartment

9    as well, right?

10        A    She was outside on the balcony with me.

11        Q    When you came -- when you came up, Quinnetta

12   was outside?

13        A    Yes.

14        Q    Did you see Khadafy come out of this

15   apartment?

16        A    Yes.

17        Q    So tell me -- tell me about his exit.

18        A    He came out with his handcuffs behind his

19   back.

20        Q    Uh-huh.

21        A    And walked down the stairs.

22        Q    And he just walked down by himself?

23        A    Yes.

24        Q    Could you hear what was going on inside the

25   apartment as you were standing outside of it?

1                        JAMES HALL

2      A     I just heard a bunch of yelling.

3      Q     Who was yelling?  Any idea?

4      A     Like I said, I heard a bunch of yelling.  I

5  couldn't -- I couldn't tell you who was yelling.

6      Q     So how long were you on the little landing

7  between the two apartments?

8      A     I -- I can't accurately give you a time, but

9  I would -- I would estimate five to ten minutes.

10      Q     And what were you doing during that time?

11      A     Getting a witness statement from

12  Quinnetta --

13      Q     Anything else?

14      A     No.

15      Q     Who else was -- what other deputies were at

16  this incident?

17      A     I can't recall every deputy.

18      Q     Yeah.  Just tell me what --

19      A     I'm trying --

20      Q     -- tell me what you remember.

21      A     -- trying to look to see if I see a name.  I

22  remember Rylon Thompson was there also.  I can't

23  remember -- are you talking about like the call or who

24  was up on the landing?

25      Q     Who was on the landing or in the apartment?

JAMES HALL

1

2    A    I know I was in the landing.  Sergeant Moore

3  was in the apartment.  And as far as Deputy Thompson,

4  I can't recall his position at the time.

5    Q    Do you remember the total number of deputies

6  that were either in the apartment or on the landing?

7          MR. GRAVES:  At the time he was taking the

8  statement?

9  BY MR. TOM:

10    Q    During this incident.

11    A    During the statement incident?  Like --

12    Q    That --

13    A    -- during the statement or the -- whenever

14  we were up there...

15    Q    It would -- did the number of deputies

16  change between when you were on the -- on the landing?

17    A    Yes.  There was constant deputies back and

18  forth.

19    Q    Uh-huh.

20    A    That's why it's hard to keep track.

21    Q    I see.  So tell me about how Quinnetta

22  Thomas came to write this witness statement to you.

23    A    Sergeant Moore told me to go up there and

24  get a statement from the female that was -- I guess

25  witnessed the Thompson subject breaking into an

JAMES HALL

1
2  apartment, and it doesn't say how I identified her in
3  the narrative, but I probably said something like
4  did -- did anybody see what happened?  And she would
5  have said I did.  And I said can I get you to write a
6  statement for me.

7      Q    So you said that Sergeant Moore instructed
8  you to get a statement from Quinnetta Thomas?

9      A    Uh-huh.

10     Q    Is that true?  And where -- is that true?

11     A    Yes.

12     Q    Where was Sergeant Moore when he instructed
13 you to do that?

14     A    I can't remember.

15     Q    Was he inside the apartment?

16     A    I can't remember, because I was only in the
17 apartment for 3 to 4 seconds.  It -- he probably told
18 me over the radio.  I didn't see the actual breaking
19 of the window.

20     Q    Uh-huh.

21     A    I was probably 2- or 300 yards away riding
22 around in my vehicle.

23     Q    Uh-huh.  But you said when you came up to
24 the landing, Sergeant --

25     A    Uh-huh.

                         JAMES HALL

1

2    Q    -- Moore was already in the apartment --

3    A    Yes.

4    Q    -- is that right?

5    A    Yes.

6    Q    So --

7    A    He was already there whenever I -- I

8  was -- I was probably the -- I don't know.  It's hard

9  to tell what number deputy I was when I got there

10 because I was -- had to travel around.  And it was my

11 primary call so I was the one going to take a

12 statement.  And he said go get this statement from

13 these two people or people.  That's the only ones I

14 can identify.

15   Q    So I just want to make this clear, so

16 I -- when I read it later, it makes sense to me.

17   A    Yeah.  Uh-huh.

18   Q    Sergeant Moore is already in the apartment

19 when you were on the landing; is that right?

20   A    Yes.

21   Q    And when you are getting this witness

22 statement from Quinnetta Thomas, Sergeant Moore is

23 still in the apartment?

24   A    Yes.

25   Q    So he radioed to you -- is what you

                              JAMES HALL

1

2  said -- is how he told you to take a statement from

3  Quinnetta Thomas or --

4      A    I said I can't remember if he told me in

5  person or radio or what.

6      Q    But he told you that while you were still on

7  the landing or if you were down the stairs?

8      A    No.  If I was on the landing getting a

9  statement, he would have already told me.

10     Q    So you were down the stairs.  He -- he

11 radioed or somehow told you to come get a statement,

12 then you walked up the stairs?

13     A    Yes.  After -- after a few minutes, after I

14 traveled around, parked my vehicle and walked around

15 there.

16     Q    And do you remember Quinnetta Thomas writing

17 something in front of you?

18     A    Yes.

19     Q    Did she say anything to you?

20          MR. GRAVES:  Objection; asked and answer.

21 I'll allow him to answer one more time.

22 BY MR. TOM:

23     Q    Go ahead.

24     A    If I -- if she said anything, I can't

25 remember.

Page 94

                          JAMES HALL
1
2       Q     And so you said that Khadafy manning walked
3  out of the apartment in handcuffs and down the steps
4  by himself --
5       A     Yes.
6       Q     -- is that right?  And what happened after
7  that, once he got to bottom of the steps?
8       A     Once he got to the bottom of the steps, he
9  walked around the building toward the patrol cars.
10      Q     Uh-huh.  And then what happened?
11      A     He sat in the back of one of the patrol cars
12 with the door open.  Sergeant Moore was talking to
13 him.
14      Q     So was -- when -- from the time that Khadafy
15 left the apartment till when he got into the patrol
16 car, was Sergeant Moore with him or was he -- who was
17 with Khadafy from --
18      A     I remember --
19      Q     -- the apartment to the --
20      A     -- I remember myself and I think Deputy
21 Thompson maybe walking behind him toward the -- I'm
22 sorry.  I can't -- I can't tell you accurately who was
23 walking behind Khadafy manning with me.
24      Q     You were --
25      A     I just --

1                    JAMES HALL

2     Q    -- walking behind Khadafy Manning?

3     A    Yes.

4     Q    From the time that he went down the stairs

5 until he got into the police car, you were walking

6 behind him?

7     A    Yes.

8     Q    And tell me about when he sat in the car.

9     A    He was sitting in the car and Sergeant Moore

10 came over and started talking to him.  I don't know

11 what was said.

12     Q    Did they shut the door?  Did they --

13     A    No.

14     Q    Did the -- as Khadafy Manning was sitting in

15 the car, the door was open the whole time?

16     A    Yes, it was.

17     Q    And where was Sergeant Moore when he was

18 talking with Khadafy Manning?

19     A    He was standing outside the door.

20     Q    And how close were you to this conversation?

21     A    I was nowhere near it.  After I -- after he

22 got to the car and then I got my clipboard and went

23 back and got Quinnetta to sign her statement.

24     Q    So you didn't hear anything that they said?

25     A    No.

1                          JAMES HALL

2        Q     What was the nature of -- did you -- did

3   you -- were they, like, calmly talking or, like, what

4   was the nature of --

5        A     When?

6        Q     -- of -- in the car with Moore and --

7        A     I don't know.  I was around on the other

8   side of the apartment building trying to find

9   Quinnetta so she could sign her statement.

10       Q     And Khadafy Manning also -- also signed a

11  witness -- a written statement, correct?

12       A     Yes.

13       Q     And when was that?

14       A     That was whenever I returned back to the

15  vehicles, after I found Quinnetta.

16       Q     So you found Quinnetta?

17       A     Got her to sign.

18       Q     And then what happened after that?

19       A     Well, I got -- got done with her, came back

20  around to the vehicles.

21       Q     And so where was Quinnetta when she signed

22  her statement?

23       A     I -- I can't remember.  It -- it had to have

24  been somewhere around the apartment, because all I

25  remember is going back around the building --

1                          JAMES HALL

2        Q     Uh-huh.

3        A     -- and seeing the glass on the ground and

4     stuff.

5        Q     So Quinnetta signed.  You go back to the car

6     and --

7        A     Uh-huh.

8        Q     -- Khadafy Manning is there?

9        A     Yes.

10        Q     And then what happened after that?

11        A     He gave a statement.  It was written on a

12     piece of paper.  I -- I witnessed him write it --

13        Q     Uh-huh.

14        A     -- so...

15        Q     So he was uncuffed at this time?

16        A     Yes.

17        Q     Was he standing up or was he sitting in the

18     car?

19        A     He was just -- I can't remember if he was

20     sitting in the car, but I think he was just around the

21     door area probably with his -- sitting on the seat,

22     writing like that.

23        Q     Uh-huh.  Do you remember any other deputies

24     that were around the car when you first walked up and

25     saw Sergeant Moore talking with Khadafy Manning, but

1                        JAMES HALL

2    before you went to go talk with Quinnetta Manning?

3        A    No, I don't -- I don't remember who was all

4    around.  Like I said, there was a bunch of moving

5    parts.

6        Q    So when you walked back to -- and Khadafy

7    Manning signed the witness statement, were there any

8    other deputies there besides you?

9        A    Like I said, I -- I can't remember who all

10   was where at the time.

11       Q    Was Sergeant Moore still there?

12       A    He had walked off whenever I was getting a

13   statement.  I don't know where he went.

14       Q    So you walked up and Khadafy Manning was

15   already writing a statement or you handed him a piece

16   of paper to write the statement?

17       A    No.  I handed him a piece of paper.

18       Q    And so you handed him the piece of paper.

19   He's starting -- and he just -- did you say anything

20   to him?

21       A    I -- I can't remember what I said to him.

22       Q    Did he say anything to you?

23       A    I can't recall what he said.  He obviously

24   had to say something for me to be writing his

25   statement.

                          JAMES HALL

1

2     Q     Uh-huh.  And then he wrote it and what

3   happened after that?

4     A     After that, he walked back around to

5   his -- around the building.  I don't know where he

6   went from there.  I -- I had to go ahead and try to

7   finish -- finish up the report, because it was

8   six o'clock in the morning and I was about to get off.

9   So I left and probably went to the sheriff's office to

10  write it.

11          MR. TOM:  I'll mark this as Exhibit 12.

12  This is a memo from Sergeant Slade Moore to Chief

13  Jeremy Williams, reference Khadafy Manning, date

14  June 26 -- I'm sorry -- June 28th, 2016, Bates stamp

15  MC-RFP 8 - 191.

16          (Exhibit 12 marked for identification and

17          attached hereto.)

18    A     All right.

19  BY MR. TOM:

20    Q     Is this the same incident that we were just

21  talking about with Khadafy and Quinnetta -- Khadafy

22  Manning and Quinnetta Thomas?

23    A     Yes.

24    Q     So in the incident report about Khadafy

25  Manning and Quinnetta Thomas, it's dated June 26th,

```
 1                    RYLON THOMPSON
 2          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                    NORTHERN DIVISION
 4   LATOYA BROWN; LAWRENCE
     BLACKMON; HERBERT ANTHONY
 5   GREEN; KHADAFY MANNING;
     QUINNETTA MANNING; MARVIN
 6   MCFIELD; NICHOLAS SINGLETON;
     STEVEN SMITH; BESSIE THOMAS; and
 7   BETTY JEAN WILLIAMS TUCKER,
     individually and on behalf of a class
 8   of all others similarly situated        PLAINTIFFS
 9   VERSUS         CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
10   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER, in his
11   official capacity; and MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1
12   through #6, in their individual
     capacities                            DEFENDANTS
13
14   ****************************************************
                  DEPOSITION OF RYLON THOMPSON
15   ****************************************************
16
                  APPEARANCES NOTED HEREIN
17
18           TAKEN AT INSTANCE OF:  PLAINTIFFS
              DATE:  OCTOBER 24, 2017
19           PLACE:  HILTON GARDEN INN-JACKSON
                 235 WEST CAPITOL STREET
20               JACKSON, MISSISSIPPI
                  TIME:  8:56 A.M.
21
     REPORTED BY:  CONNIE CHASTAIN, RMR
22               CSR No. 1025
23
24
25   JOB NO:  132676            EXHIBIT 11
```

                    RYLON THOMPSON

1

2    A.   That's correct.

3    Q.   Other than that, it's to your discretion

4  where in the county you set up checkpoints?

5    A.   That's correct.

6    Q.   And so if you wanted to set up a checkpoint

7  in Madison, you would be free to do so?

8    A.   Absolutely.

9    Q.   And have you done so?

10    A.   Last week.

11    Q.   Where in Madison last week?

12    A.   On Rice Road at Wright's Mill Drive.

13    Q.   And that was a sobriety based checkpoint?

14    A.   Just a safety checkpoint.

15    Q.   How'd you select the location?

16    A.   As I said earlier, there are a number of

17  different factors that we take into consideration

18  whenever deciding the location of these checkpoints.

19    Q.   And you'd be free to set up a checkpoint in

20  Ridgeland, too.  In fact, you've told me that you've

21  done so?

22    A.   That's correct.

23    Q.   Okay.

24    A.   As a matter of fact, earlier that night.

25    Q.   Are you aware that two of the plaintiffs in

RYLON THOMPSON

1
2  this action are Khadafy and Quinnetta Manning?

3       A.   I wasn't familiar with Quinnetta, but I

4  have heard the name Khadafy.

5       Q.   And who do you understand Mr. Manning,

6  Mr. Khadafy Manning to be?

7       A.   An individual that has filed a suit against

8  the Madison County Sheriff's Department.

9       Q.   Have you ever met him?

10      A.   I believe so.

11      Q.   When was that?

12      A.   There was an incident, I don't recall the

13  exact date, at the apartment complex located at 388

14  Ricks Drive.

15      Q.   Is that June 26, 2016?

16      A.   That sounds about right.

17      Q.   What was your involvement in that incident?

18      A.   During the point wherein -- to clarify,

19  during the point when Khadafy Manning was involved?

20      Q.   Yeah, you've said you met Mr. Manning

21  before.  I'm asking you to give me details of your

22  recollection of meeting Mr. Manning.

23      A.   We were in the area looking for a suspect

24  that was trying to break into an apartment.  This

25  incident, the reported attempted break-in was

RYLON THOMPSON

1

2  reported by Sergeant Slade Moore and the suspect fit

3  the description of a suspect that ran away from

4  Deputy James Hall earlier in that evening.

5          And Sergeant Moore and I were trying to

6  apprehend the individual when he tried to break into

7  a window into an apartment.  At which point in time

8  the individual fled on foot and we stayed in the

9  area for a long period of time trying to find him.

10     Q.    Was this individual Mr. Thomas?

11     A.    I don't remember the guy's name.

12              (Exhibit 22 was marked.)

13  MR. YOUNGWOOD:

14     Q.    Let me give you what's been marked as

15  Exhibit 22.  Take a look through it.  My first

16  question to you is does this refresh your

17  recollection of the individual you're referring to

18  is LaDarrian Thomas?

19     A.    Yes.  I mean, as I said, I don't recall the

20  specific name that was given.  I was just basically

21  told -- given a description of what the person

22  looked like and what he was wearing that morning.

23     Q.    And the person being the person you were

24  looking for who broke in?

25     A.    Who ran away from Deputy Hall while he was

1                          RYLON THOMPSON

2    dealing with the individual on a disturbance

3    complaint.  And then the individual that ran away

4    from myself and Sergeant Moore as we were trying to

5    apprehend him in an apartment complex.

6        Q.   Okay.  That individual was not Mr. Manning;

7    right?

8        A.   I don't believe so.

9        Q.   Okay.  So where -- at what point in the

10   event do you come into contact with Mr. Manning?

11       A.   The first time I remember seeing

12   Mr. Manning was later that morning after Sergeant

13   Moore was having an encounter with him, basically

14   seeing if he had any information as to the

15   whereabouts of the individual that we saw -- excuse

16   me, that Sergeant Moore saw trying to break into an

17   apartment.

18       Q.   And where -- so where did you first see

19   Mr. Manning -- and by morning, you're --

20       A.   It was already daylight.

21       Q.   This is very early morning; right?

22       A.   That's correct.

23       Q.   Okay.

24       A.   Yeah, we looked for him all night pretty

25   much.

RYLON THOMPSON

1

2    Q.   Right.   But how did it come about that you

3    ended up in the vicinity of Mr. Manning, he wasn't

4    the man you were looking for?

5    A.   It was reported by Sergeant Moore that

6    whenever he witnessed Mr. -- the suspect trying to

7    get into an apartment that there were male and

8    female present and that they all ultimately ended up

9    scattering and that's when we gave chase to the

10   suspect from the initial complaint.

11        And it's my understanding that Sergeant

12   Moore went to talk to him about the incident to get

13   more information.

14   Q.   Went to talk to Mr. Manning?

15   A.   That's correct.

16   Q.   Why did he believe Mr. Manning -- you don't

17   know what he believed.   Why were you told that he

18   was going to Mr. Manning?

19        MR. ROSS:   If you were.

20   A.   I was not told.

21   MR. YOUNGWOOD:

22   Q.   But you accompanied him to see Mr. Manning?

23   A.   No.

24   Q.   No, okay.   So when did you first see

25   Mr. Manning?

RYLON THOMPSON

1

2    A.    In the apartment complex that morning.

3    Q.    In the place where you understood him to be

4  residing, or at least that's where he was located?

5    A.    I don't know where he was residing.

6    Q.    Let me ask it this way:   In an apartment or

7  outside of an apartment?

8    A.    Outside of an apartment.

9    Q.    Outside of an apartment, okay.   So what was

10  he -- what did you observe?   Tell me exactly what

11  you first saw when you first saw Mr. Manning.

12    A.    He was walking to the vehicle with Sergeant

13  Moore and they walked out to the vehicle.   Sergeant

14  Moore sat him in the back seat of my patrol car on

15  the driver's side and asked if I had a witness

16  statement.

17          As I said earlier, I keep miscellaneous

18  forms in my vehicle and I provided Sergeant Moore

19  with a witness statement and he was asking

20  Mr. Manning to complete a witness statement.

21    Q.    So you gave him a blank form?

22    A.    That's correct.

23    Q.    Okay.   That -- and so first you observed

24  Mr. Manning as he's walking to the car with Sergeant

25  Moore, the car being Sergeant Moore's car?

RYLON THOMPSON

1

2    A.    Just all of our vehicles are parked in the

3    parking lot.  They were walking toward our vehicles.

4    Q.    And is Mr. Manning walking of his own

5    freewill?

6    A.    Yes.

7    Q.    Has he been restrained in any way?

8    A.    I don't remember if he had handcuffs on or

9    not.

10   Q.    So he might have had handcuffs on?

11   A.    I don't remember if he was restrained.

12   Q.    Okay.  Did you understand him to be under

13   arrest?

14   A.    I don't remember.

15   Q.    Okay.  I'm just curious, I asked if he was

16   walking on his own freewill and you said you weren't

17   sure if he had handcuffs on.  If I was handcuffed

18   and walking, would you think that was under my own

19   freewill?

20   A.    Can we replay the question because I

21   initially understood you to ask the question if he

22   was walking under his own freewill and I said yes,

23   he was out walking under his own freewill.

24        And then you asked a second question, if I

25   understood you correctly, was he restrained.

1                        RYLON THOMPSON

2       Q.   Yes, that's correct.   And you said he was

3   possibly handcuffed.

4       A.   Well, you asked if he was restrained and I

5   said I don't remember if he had handcuffs on or not.

6       Q.   Okay.   You don't know if he was under

7   arrest?

8       A.   I don't know.

9       Q.   Do you know why he was walking to the car?

10      A.   I don't know.

11      Q.   Did he appear to be injured?

12      A.   No.

13      Q.   How did he appear?   How would you have

14  described his appearance?

15      A.   I don't remember much about his general

16  appearance that morning.   Just walked to the car.   I

17  didn't notice anything abnormal about it.

18      Q.   Okay.   And what happened when he got to the

19  car?

20      A.   Whenever they got closer to the car I could

21  tell that he was -- had some sort of disagreement

22  with Sergeant Moore about something, I don't

23  remember what exactly they were disagreeing about,

24  but that's all I remember about that besides him

25  being seated in the vehicle.

RYLON THOMPSON

1

2      Q.    Sorry, he was seated into a vehicle?

3      A.    That's correct.

4      Q.    Whose vehicle?

5      A.    My vehicle.

6      Q.    So he was put in the back seat of your

7   vehicle?

8      A.    Yes, but the door was never shut and he was

9   just asked to sit in the vehicle.

10      Q.    Mr. Manning requested to be seated in a

11   police car?

12      A.    I don't recall him requesting that.

13      Q.    I'm sorry, you just said he asked to be

14   seated in the vehicle.

15      A.    No, I said he was asked to sit in the

16   vehicle.

17      Q.    Oh, he was instructed by a police officer

18   to sit in the vehicle?

19      A.    Yes.

20      Q.    Okay.  Did you hear him speak at all while

21   he was seated in the vehicle?

22      A.    I don't remember.

23      Q.    Did anyone speak to him?

24      A.    I don't remember.

25      Q.    Was Mr. Manning shoved into the vehicle?

Page 225

1                      RYLON THOMPSON

2        A.    No.

3        Q.    Were any hands put on him as he got into

4    the vehicle?

5        A.    No.

6        Q.    At any point did you see an officer touch

7    Mr. Manning?

8        A.    No.

9        Q.    Once he was inside the vehicle, did you

10   observe one of the other officers hit Mr. Manning

11   repeatedly with their fists?

12       A.    No.

13       Q.    Did you see them strike him multiple times

14   in the chest with a hard black object?

15       A.    No.

16       Q.    Did Mr. Manning appear to be uncomfortable?

17       A.    Not that I recall.

18       Q.    Did he appear to be in pain?

19       A.    No.

20       Q.    Was he crying?

21       A.    Not that I recall.

22       Q.    Was he weeping in some way?

23       A.    Not that I recall.

24       Q.    Did you hear one of the deputies tell

25   Mr. Manning that his wife would be better off if he

1                    RYLON THOMPSON

2  was dead?

3       A.   No.

4       Q.   Did you say such things to Mr. Manning?

5       A.   No.

6       Q.   Did you speak to him at all?

7       A.   I don't recall.

8       Q.   You don't -- so you might have spoken to

9  him?

10      A.   I don't remember saying anything to him.

11      Q.   Are you certain that no deputy spoke to

12 him?

13      A.   No.

14      Q.   So it's possible they did?

15      A.   It's possible.

16      Q.   Okay.  Is it possible that one of them said

17 that his wife would be better off with him dead?

18           MR. ROSS:  Objection.  He said he doesn't

19 know what was said to Mr. Manning.

20 MR. YOUNGWOOD:

21      Q.   That's possible; right?  You can answer.

22      A.   It's possible that anything could have been

23 said.

24      Q.   Well, is it possible that you're just not

25 remembering that Mr. Manning was hit repeatedly with

1                        RYLON THOMPSON

2   fists by one of the officers?

3        A.   I would have noticed if that happened.

4        Q.   Were you watching at all times?

5        A.   I was within several feet of Mr. Manning at

6   all times while he was seated in my patrol unit.

7        Q.   So if Mr. Manning were to testify that he

8   was hit repeatedly with fists by an officer, you'd

9   say he was lying?

10       A.   Absolutely.

11       Q.   Was he wearing pants?

12       A.   I don't remember.

13       Q.   Wouldn't you have remembered if somebody

14   was wearing pants or not wearing pants?

15       A.   I don't remember if he was wearing pants or

16   shorts.  I'm quite positive I would remember if he

17   had been wearing only his underwear, but I don't

18   remember what kind of garments he had on.

19       Q.   Okay.  And -- but you don't -- what you

20   don't remember is whether he was handcuffed or not?

21       A.   I don't remember that.

22       Q.   Wouldn't you tend to remember if somebody

23   was handcuffed or not?

24       A.   I wasn't dealing with him directly.  I just

25   came to the scene after officers were -- had already

1                          RYLON THOMPSON
2   called out that they were talking to individuals in
3   the apartment complex and I just stood by my vehicle
4   until I saw them walking toward our vehicles.
5           I was -- like I said, I was in no way
6   associating myself with the interaction with
7   Mr. Manning, so it's not something that I would have
8   conducted an incident report on or remember any
9   outstanding information.
10      Q.   You wouldn't have remembered somebody being
11  handcuffed in their underwear being walked to a
12  police car?
13      A.   I'm pretty sure I would remember if he was
14  in his underwear.
15      Q.   If he says he was in his underwear, he's
16  lying about that, too?
17      A.   Yes.
18      Q.   Okay.
19      A.   Pretty positive.
20      Q.   And if he says he was crying, he's lying
21  about that?
22      A.   I don't remember if he was crying or not.
23      Q.   So that -- you're not sure if that would be
24  a lie.  And if he says he was told that his wife
25  would be better off with him dead, he's lying about

                        RYLON THOMPSON

1   that?

2        A.   I can't say for sure.

3        Q.   Okay.  He might have been told that?

4        A.   As I said earlier, he could have been told

5   any numerous things.

6        Q.   How did the incident end?

7        A.   I don't remember the -- any conversation

8   that might have been taking place, but I don't

9   recall Mr. Manning being placed under arrest for any

10  reason and all deputies ended up leaving the

11  apartment complex.

12       Q.   But he, at some point, was seated in your

13  car?

14       A.   That's correct.

15       Q.   You said with the door open?

16       A.   That's correct.

17       Q.   So at some point he left your car?

18       A.   Yes.

19       Q.   What led to him leaving your car?

20       A.   I don't remember.

21       Q.   How long was he in your car?

22       A.   Just a matter of minutes.

23       Q.   Did he write a statement while in your car?

24       A.   I don't remember if anything was written on

1                   RYLON THOMPSON

2  the statement.  I remember that he was presented

3  with the witness statement form.  I don't recall

4  anything that was written.  As I said, I was not

5  there dealing directly with him.  And while he was

6  seated in my car I was standing at the rear of the

7  car talking with the other deputies.

8      Q.   Was the camera on?

9      A.   Not at that I recall.

10     Q.   Why didn't you turn the camera on?

11     A.   As I said earlier, I was not directly

12  involved in this incident, so there was -- there

13  appeared to be no reason for me to be recording the

14  incident.

15     Q.   But he was in your car so he -- no other

16  camera could have captured him; right?

17     A.   I don't remember the exact position that

18  other vehicles were positioned at this time, so I

19  can't really answer that.

20     Q.   Did you not turn on the camera because the

21  man had been beaten?

22     A.   That's --

23     MR. ROSS:  I object to the form.  He said

24  he wasn't beaten.  You're assuming facts

25  inconsistent with his testimony.

```
                                                   Page 1
 1                   Samuel Howard
 2            UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 3                  NORTHERN DIVISION
 4

    LATOYA BROWN; LAWRENCE BLACKMON;
 5  HERBERT ANTHONY GREEN; KHADAFY
    MANNING; QUINNETTA MANNING; MARVIN
 6  MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; AND
 7  BETTY JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON BEHALF OF A CLASS
 8  OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
 9
    VERSUS        CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10
11  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER, IN HIS
12  OFFICIAL CAPACITY; AND MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13  #6, IN THEIR INDIVIDUAL CAPACITIES     DEFENDANTS
    *************************************************
14        DEPOSITION OF DEPUTY SAMUEL HOWARD
15  *************************************************
16            APPEARANCES NOTED HEREIN
17
18            DATE: OCTOBER 25, 2017
       PLACE: HILTON GARDEN INN JACKSON DOWNTOWN
19            235 WEST CAPITOL STREET
              JACKSON, MISSISSIPPI
20              TIME: 1:25 P.M.
21
    REPORTED BY: TODD J. DAVIS
22             BCR, CSR #1406, RPR
23
24
25  JOB NO. 132678        EXHIBIT 12
```

Page 134

Samuel Howard

1

2    Q.   Well, except they ended up being

3 arrested, so for them there was some harm.  But...

4          Okay.  Let's move on.  I'm going to

5 show you another exhibit that we'll mark as Howard

6 Exhibit 2.  It's tab 53.

7          (Exhibit No. 2 was marked for

8          identification.)

9 BY MS. GOCHMAN:

10   Q.   Yeah.  That's for you.

11   A.   Okay.

12   Q.   Just -- you can take a moment to look it

13 over.

14   A.   (Witness reviewing document.)  Yes,

15 ma'am.

16   Q.   Do you recognize this document?

17   A.   Yes, ma'am.

18   Q.   Okay.

19        MS. GOCHMAN:  And I should say for the

20        record it's an incident report Bates stamped

21        MCRFP9-10 through 9-11.

22 BY MS. GOCHMAN:

23   Q.   Do you recall this incident?

24   A.   Yes, ma'am.

25   Q.   And let me ask you:  Is this a document

1                          Samuel Howard

2     you reviewed in preparing for today's deposition?

3          A.    Yes.

4          Q.    Okay.  It says that you were conducting

5     a walk-through at Canton Estates apartments; is

6     that right?

7          A.    Yes.

8          Q.    And you recall doing that?

9          A.    Yes.

10         Q.    So you were on foot?

11         A.    Yes.

12         Q.    Okay.  And it says that you saw a 2013

13    Chevrolet sedan make an abrupt turn into a parking

14    space, leading you to believe the driver was

15    trying to avoid you; is that right?

16         A.    Yes, ma'am.

17         Q.    Okay.  Let me ask you:  If you're on

18    foot, would it -- I'm trying to understand why a

19    car would try to avoid you.

20               Were you pulling cars over?

21         A.    No, ma'am.  So I'm conducting a

22    walk-through of the apartment.  I'm clearly -- I'm

23    clearly marked as a -- as a --

24         Q.    Uh-huh (affirmative response).

25         A.    -- deputy of the sheriff's office.

1                    Samuel Howard

2       Q.    Uh-huh (affirmative response).

3       A.    So it's apparent that I'm an officer of

4    the law, right?

5       Q.    Uh-huh (affirmative response).

6       A.    And so as I'm making a foot patrol of

7    that apartment complex, a vehicle's heading toward

8    my direction, sees me, and makes a -- you know,

9    slams on his brakes and abruptly turns into a

10   parking spot after noticing it was me.  But his

11   behavior was not -- his driving behavior did not

12   consist of that before he saw me.

13      Q.    Would it be your -- or has it been your

14   practice to, when you're on foot, stop a vehicle,

15   stop a vehicle as you're walking?

16      A.    I didn't stop it.  No, ma'am.

17      Q.    So was there any reason for the driver

18   of that vehicle to suspect that you might pull him

19   over?  Were you pulling over other cars?

20      A.    I don't know what he was suspecting.

21      Q.    But you hadn't -- you weren't in the

22   process of pulling cars over?

23      A.    No, ma'am.

24      Q.    Okay.  Where was your car parked at the

25   time?

1                      Samuel Howard

2        A.    I don't recall.

3        Q.    Do you think you were near your car?

4        A.    I don't recall.

5        Q.    Did your car have a -- its blue lights

6   on at the time?

7        A.    This was not a vehicle safety

8   checkpoint.  It was a walk-through.

9        Q.    And it says you approached the vehicle

10  and asked the driver to identity himself.

11                  Do you see that?

12       A.    Yes, ma'am.

13       Q.    Did you know who -- the driver was

14  Khadafy Manning; is that right?

15       A.    Not at the -- I didn't know the vehicle,

16  but I knew of him after encountering him.

17       Q.    Let me just clarify that.

18                  When you -- when you went to the

19  car, did you know him?  Did you know who he was at

20  that time?

21       A.    After reviewing his driver's license, I

22  recalled that I knew who he was.

23       Q.    And how did you know him?

24       A.    He was a -- he's a known drug offender

25  who's been convicted multiple times through our

Samuel Howard

1  Circuit Court for narcotics violations, one.  And,

2  two, he was -- he was shot a couple of years ago

3  in the apartment complex, and I was responsible --

4  or one of the units responsible for, you know,

5  arriving for that call for service.

6  Q.   When he was shot?

7  A.   Yes.

8  Q.   Okay.  At the time, were you aware that

9  he was working with lawyers, including the ACLU,

10  regarding the practices of the sheriff's

11  department?

12  A.   No, ma'am.

13  Q.   And did you say anything to him about

14  that at the time?

15  A.   No, ma'am.

16  Q.   And the reason that you -- can you tell

17  me the reason you approached the vehicle and asked

18  for his identification?

19  A.   Right.  Ms. Gochman, I thought I

20  explained.

21          I was walking.  His driving

22  behavior was normal.  Then when I -- when I got to

23  the sidewalk or was walking on the sidewalk, it

24  appeared to me that he then observed me, quickly

Samuel Howard

1

2  slammed on brakes, and pulled into a parking place

3  and started trying to exit the vehicle.  So that

4  alerted -- alarmed me.  No one else driving

5  through this apartment complex has done that.  Why

6  would this particular driver?

7          So just a consensual encounter was

8  made.  I walk over there and ask Mr. Manning,

9  Mr. Manning, what's going on?  Why -- it appears

10  you're trying to avoid me.  And he clearly states,

11  which I document word for word, I am.  My driver's

12  license is suspended.  So he was aware that he did

13  not have current driver's license.

14      Q.   You said this was consensual, so if he

15  had -- I assume you asked him to identify himself.

16  You didn't --

17      A.   Right.

18      Q.   Did you recognize him, or did you ask

19  for --

20      A.   No, ma'am.  I recognized him after

21  reviewing his driver's license.

22      Q.   After reviewing.  So he gave you his

23  identification?

24      A.   Yes, ma'am.

25      Q.   Is this an instance where he could have

Page 140

1                          Samuel Howard

2       said no and just gotten out of the car and walked

3       away?

4            A.    Sure.

5            Q.    So it was all consensual?

6            A.    I believe so.

7            Q.    So you wouldn't say that --

8            A.    And it was very cordial, too.

9            Q.    So you wouldn't say that you had --

10      would you say you had reasonable suspicion or

11      probable cause to stop --

12           A.    I had reasonable suspicion to believe

13      that a crime has or may be committed due to his

14      driving behavior and his -- the -- his mannerisms,

15      unlike the -- that were completely different than

16      all the other motorists that passed us in the

17      apartment complex.

18           Q.    But you wouldn't consider this a stop.

19                 You considered this a consensual

20      encounter, right?

21           A.    I don't know how I would define it.

22           Q.    Well, I guess it goes to -- you said

23      with consensual encounters, if someone wants to

24      say no, they can.

25           A.    Yes.

Page 141

1                     Samuel Howard

2        Q.   But if it's a -- if you have probable

3    cause or reasonable suspicion to stop someone, can

4    they still say no?

5        A.   If I have probable cause to stop

6    someone --

7        Q.   Yeah.  If you have -- if you believe a

8    crime is being committed --

9        A.   Yes.

10       Q.   -- then they -- can they say no to you

11   then?

12       A.   No, ma'am.  They can.  Yes, they can.

13   Sure.  They can say no.

14       Q.   And walk away with no repercussions?

15       A.   No, ma'am.

16       Q.   All right.  It says you arrested Manning

17   and transported him back to MCDC.

18       A.   Yes, ma'am.

19       Q.   Correct?

20            And is this an instance where

21   you -- you could have -- I don't believe that

22   there was a warrant.  There's no reference to a

23   warrant; is that right?

24       A.   Not that I recall.

25       Q.   Okay.  So is this an instance where you

Page 142

1                      Samuel Howard

2      could have given him a citation or a -- or a

3      warning instead of arresting him?

4           A.   Yes, ma'am.

5           Q.   But you chose to arrest him.

6                     That was your discretion?

7           A.   Yes, ma'am.

8           Q.   Okay.  I'm going to just turn you back

9      to the incident --

10          A.   Okay.

11          Q.   -- report you have in front of you.

12     There's a reference to finding a Jolly Rancher

13     soda bottle --

14          A.   Yes, ma'am.

15          Q.   -- containing a red liquid and that it

16     was being tested in the Crime Lab.

17          A.   Yes, ma'am.

18          Q.   Do you see that?

19                    And do you know what the results of

20     the test was?

21          A.   Yes.

22          Q.   Okay.  And what were the results?

23          A.   It showed no illegal narcotics.

24          Q.   So it was red soda or whatever, Jolly

25     Rancher --

Page 143

Samuel Howard

1

2     A.    I don't know what it was.

3     Q.    But it was -- okay.  Can you tell me

4   what made a soda bottle seem suspicious?  I mean,

5   it says Jolly Rancher soda --

6     A.    Yes, ma'am.

7     Q.    -- containing a red liquid.  I

8   personally have never seen this kind of soda, but

9   I know Jolly Ranchers are often red or purple, so

10  I would assume it would be that color typically?

11    A.    Yes, ma'am.  So, first, he's a known

12  drug offender.  He's got an extensive criminal

13  history with narcotics.  A thing that we're seeing

14  a lot on the streets these days are -- is a

15  codeine, a liquid codeine.  And so people can

16  conceal that codeine in a Jolly Rancher by

17  changing the color of it and making it appear it's

18  the same liquid substance that's in that

19  particular plastic bottle.

20            So in this particular incident, I

21  believe I asked him for a consensual search:  May

22  I please conduct a search of your vehicle?  And he

23  gladly agreed to it.  So during the search of the

24  vehicle, my boss, Master Sergeant Smith,

25  discovered that liquid substance.  And just to

Page 144

Samuel Howard

1
2  confirm that it -- and please note, he was not

3  charged with possession of a narcotic.

4        Q.   Right.  And, in fact, there was no --

5        A.   Even though it appeared to be that

6  narcotic, we did not charge him.  So we sent it

7  off to the Crime Lab to confirm whether it was or

8  was not before we ever brought charges or

9  considered bring charges against him for that

10  substance that we believed was liquid codeine.

11        Q.   And since it wasn't, he was not charged?

12        A.   No, ma'am.

13        Q.   And, in fact, there was no contraband at

14  all found in his car; is that right?

15        A.   Not that -- no, ma'am.

16        Q.   Okay.  Just ask you in terms of the NET

17  team responsibility.  We've talked a lot about

18  apartment walk-throughs.

19             But does the NET team also patrol

20  neighborhoods?

21        A.   Yes, ma'am.

22        Q.   Okay.  And which neighborhoods does the

23  NET team patrol?

24        A.   Ma'am, there's a lot of neighborhoods in

25  Madison County.  I just mentioned here just

1                    RANDALL TUCKER

2         IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                 NORTHERN DIVISION

4 LATOYA BROWN; LAWRENCE

  BLACKMON; HERBERT ANTHONY

5 GREEN; KHADAFY MANNING;

  QUINNETTA MANNING; MARVIN

6 McFIELD; NICHOLAS SINGLETON;

  STEVEN SMITH; BESSIE THOMAS; and

7 BETTY JEAN WILLIAMS TUCKER,

  individually and on behalf of a class

8 of all others similarly situated,       PLAINTIFFS

9

10 V.            CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA

11 MADISON COUNTY, MISSISSIPPI;

  SHERIFF RANDALL S. TUCKER in his

12 official capacity; and MADISON COUNTY

  SHERIFF'S DEPUTIES JOHN DOES #1

13 through #6, in their individual capacities,

14                       DEFENDANTS

15

16     ***********************************************

17    VIDEOTAPED DEPOSITION OF SHERIFF RANDALL TUCKER

18     ***********************************************

19              APPEARANCES NOTED HEREIN

20

        DATE: THURSDAY, DECEMBER 21, 2017

21          PLACE: HILTON GARDEN INN

          WEST CAPITOL STREET

22             Jackson, MS

         TIME: 9:00 A.M.

23

24       REPORTED BY: DEBORAH H. NELSON

          CSR #1256

25 JOB NO. 133425          **EXHIBIT 13**

1          RANDALL TUCKER

2     Q    What have you -- other than the two you

3 mentioned this morning, who has been suspended or

4 fired as a result of --

5     A    Robert Gibson was terminated.

6     Q    Okay.

7     A    And, again, I can't sit here and recall.

8 I don't have the personnel files in front of me, but

9 there have been some deputies that's been suspended

10 and/or terminated, for that matter.

11     Q    Any others you can recall, sir?

12     A    I can't recall them, sitting here.

13     Q    Okay.  And following his dismissal,

14 Mr. Gibson sued the department; correct?

15     A    Yes.

16     Q    Do you know who Khadafy Manning is?

17     A    Yes, I do.

18     Q    Who is Mr. Manning?

19     A    He's Khadafy Manning.

20     Q    Okay.  Have you ever met him?

21     A    Yes.

22     Q    In what context have you met him?

23     A    We met professionally back when I was the

24 chief of the narcotics division.

25     Q    Okay.

Page 232

1                    RANDALL TUCKER

2        A    He's been arrested numerous times.  And

3   convicted, for that matter.

4        Q    Okay.  Tell me when you recall arresting

5   Mr. Manning.

6        A    I can't give you specific dates.  I've

7   been in law enforcement an awful long time.  I can

8   tell you that during my tenure in narcotics with the

9   Madison County Sheriff's Department, he was arrested

10  multiple times on drug charges.

11       Q    And which of those was he convicted of?

12       A    I don't have them here in front of me.

13       Q    Being convicted of a drug charge doesn't

14  take away your constitutional rights?

15       A    No.  Well, let me back up.  I think there

16  is some.  You may lose your right to possess

17  firearms.

18       Q    Okay.  Any other rights that you think

19  might be a --

20       A    There were certain crimes that took away

21  your right to vote.

22       Q    Correct.  In Mississippi.  Anything else?

23  Any other -- how about your Fourth Amendment Rights?

24  Do you think those are affected by a criminal

25  history?

RANDALL TUCKER

1

2      A     No, I don't think you lose your right

3   against an illegal search and seizure, no.

4      Q     Or the Fourteenth Amendment?

5      A     Absolutely not.

6      Q     You're aware of an incident that took

7   place regarding or in connection with Mr. Manning in

8   the summer of 2016; correct?

9      A     Yes.

10     Q     What do you know of that incident?

11     A     Just as a broad overview, an officer

12  observed Mr. Manning and his wife and another

13  individual committing felony of breaking and

14  entering.  And he pursued them up to, upstairs to

15  their apartment when Khadafy and his wife ran

16  upstairs, he pursued them and went into their house

17  in hot pursuit, and, ultimately, confronted them

18  about the incident.

19     Q     So they observed Mr. Manning and his wife

20  commit a crime?

21     A     Yes.

22     Q     What crime did Mr. Manning --

23     A     They were accessory to burglary.

24     Q     What does that mean, accessory to

25  burglary?

Page 234

1                    RANDALL TUCKER

2       A    Right.

3       Q    What does that mean?  I don't know what

4  that means.

5       A    A party to.  Involved with.

6       Q    Whose burglary did they assist?

7       A    I don't remember the young man's name.

8       Q    Okay.  And how do you know -- what causes

9  you to believe that they were an accessory to

10  burglary?

11       A    The state statute on failure to report an

12  offense, and they didn't do that.  And they, I

13  believe, assisted with a mat or a towel or some type

14  to keep the man that was breaking into the house

15  from cutting his arm or -- to me that's helping.

16       Q    You believe they helped the perpetrator,

17  I'm sorry, do what with his arm?  I'm not

18  understanding what you're saying how they helped the

19  perpetrator.

20       A    Handed him something to lay across the

21  window to keep from cutting his arm.

22       Q    Okay.

23       A    Is that your question?

24       Q    That is my question, yes.

25       A    Okay.

Page 235

RANDALL TUCKER

1

2       Q    Give me one minute.  (PAUSE)  And who told

3  you that they gave the suspect something with

4  respect to his arm?

5       A    I don't recall who told me or where I read

6  it, and it's possible I may have two incidents

7  confused.  I mean, he may -- maybe they watched for

8  him while he carried off glass or what-have-you.  I

9  don't have the offense report here in front of me.

10      Q    Okay.  And then you, also, believe that

11 they were an accessory to burglary because they did

12 not report the burglary?

13      A    Right.  In the state of Mississippi, it's

14 a law that if you witness a crime, you're supposed

15 to report it.

16      Q    So if one of your officers witnesses

17 somebody driving without a seatbelt and he fails to

18 report it, he or she is committing a crime?

19      A    No.

20      Q    Okay.  But the Khadafys, I'm sorry, the

21 Mannings, if they were to witness a crime and not

22 report it, they would be violating the law?

23      A    Yeah.

24      Q    Okay.  You're aware that there was an

25 altercation inside the apartment in which

1                      RANDALL TUCKER

2   Mr. Manning and his wife were located that night?

3        A    What do you mean by "altercation"?

4        Q    Officers went into their apartment?

5        A    Correct.

6        Q    Do you know why they went into the

7   apartment?

8        A    They were pursuing them for being involved

9   in what had transpired downstairs, yes.

10        Q    Okay, and, again, the involvement was

11   giving something to the person whose arm was used to

12   break into a house or an apartment and not reporting

13   it?

14        A    Anything they did to assist, whether it be

15   a lookout or hand him something or give him

16   guidance, they would be involved in that, yes.

17        Q    Which of those did Mr. Manning and his

18   wife do?

19        A    I don't have the report here in front of

20   me.

21             MR. ROSS:  I was going to say I

22             object.  He doesn't have the report and

23             doesn't have first-hand knowledge.

24        Q    (Mr. Youngwood)  Well, I'm asking what you

25   were told.  Did somebody tell you that they assisted

1          RANDALL TUCKER

2  or gave them guidance or helped him plan an escape

3  route or any of the things you just listed?

4          MR. ROSS:  Counsel, why don't you

5          give him the incident report if you're

6          want him to --

7          MR. YOUNGWOOD:  Because I'm asking

8          his knowledge.  He is a named defendant in

9          this case.

10          MS. ROSS:  To the extent you know,

11          but if you don't know, you don't know.

12  A    I don't know without reviewing the report.

13  Q    (Mr. Youngwood)  One moment, please.  Did

14  anyone tell you, sir, independent of any written

15  report, and I will show you the reports in a moment,

16  did anyone tell you orally what happened that

17  evening?

18  A    I don't recall that, no.

19  Q    So you have never had any discussions with

20  anyone regarding, in your department regarding what

21  happened with Mr. Manning and his wife that evening?

22  A    I can't say that either.  It's very

23  possible I did.  I just told you I don't recall it.

24  Q    Okay.  You're aware that there are

25  allegations regarding that evening in the complaint

1                    RANDALL TUCKER

2    in this case; correct?

3         A    Yes.

4         Q    And you have read the complaint in this

5    case; correct?

6         A    Yes.

7         Q    And you have read that section of the

8    complaint?

9         A    Yes.

10        Q    Okay.  And prior to the complaint being

11   filed, you're aware that there was a, you learned

12   that there was a video of a portion of the events of

13   that evening?

14        A    I don't remember at what point, but I

15   became aware there was a video at some point, yes.

16        Q    Okay.  And that video and that -- uh --

17   the events of that night led to an inquiry led by

18   Chief Williams regarding that evening; correct?

19        A    I don't know that it was necessarily that

20   video or other, or circumstances, you could ask him

21   that, but I'm aware of a video.

22        Q    Okay, have you seen the video?

23        A    Yes, I have.

24        Q    Okay.  All the way through?

25        A    I have seen the whole one.  Not a clip.

1                    RANDALL TUCKER

2    Narrated.

3         Q    Okay.  So you have seen the whole video?

4         A    Yes.

5         Q    And you -- did you take any disciplinary

6    action regarding the officers involved in that

7    incident, based on that video?

8         A    No.

9         Q    Did you see any inappropriate behavior in

10   that video?

11        A    No.

12        Q    It's acceptable for your officers to call

13   people a cripple?

14                    MR. ROSS:  Object to the form.

15        A    I don't know that he called anybody a

16   cripple.

17        Q    (Mr. Youngwood)  Okay.  You've watched the

18   video though; correct?

19        A    I have.  Yeah.

20        Q    Okay.  And is it acceptable for your

21   officers to tell citizens that they have a choice of

22   being a witness or a suspect in connection with an

23   event?  Is that an acceptable thing for them to say?

24        A    They can explain the law to them.  I don't

25   know that anybody said that.

1                     RANDALL TUCKER

2        Q    Okay.  But you have watched the video?

3        A    I have.

4        Q    Okay.  And is it acceptable for your

5   officers to tell individuals that if they don't

6   cooperate, they'll have to sleep on concrete?

7        A    Well, I guess if there is no room in the

8   jail, they would sleep on concrete.  Ultimately,

9   everything down there is on concrete, so that would

10  be a true statement.

11       Q    So that is acceptable to you?

12       A    Yes.

13       Q    Is it acceptable for officers to use the

14  word "horseshit" when interviewing citizens?

15            MR. ROSS:  Objection.  No context.

16       Q    (Mr. Youngwood)  Is that an acceptable

17  term for your officers to use?

18       A    I would prefer they didn't cuss at all,

19  but, you know, each situation is unique.

20       Q    So that's not a violation of any of the

21  ethical or other policy provisions you and I

22  reviewed this morning?

23       A    Saying horseshit?

24       Q    Yes, sir.

25       A    No, it's not a violation.

1                    RANDALL TUCKER

2      Q    Okay.  How about calling people cripple.

3  Is that a violation?

4                MR. ROSS:  Objection.  No context.

5                Each situation is different.

6      A    I don't know that anybody called anybody

7  crippled.

8      Q    (Mr. Youngwood)  Okay.  And is it

9  acceptable to you to tell a witness to an alleged

10  crime that they can either put it down on paper or

11  they're just as guilty as the perpetrator and the

12  person has to go to jail?

13     A    I think it's perfectly acceptable to

14  explain to someone their options.

15     Q    And a legitimate option is either you give

16  a witness statement or you go to jail?

17                MR. ROSS:  Object to the form.  No

18                context.

19     A    I don't know what you mean by a legitimate

20  option.  Options are options.  I don't know that

21  there's an illegitimate option.

22     Q    (Mr. Youngwood)  In your view, under the

23  policies and practices of your department, it's

24  acceptable to give the citizen a choice of being

25  arrested and put in jail if they will not give a

1                        RANDALL TUCKER

2      witness statement?

3           A     I think each situation is unique.  Like I

4      have told you before, in this instance, I don't

5      think he did anything wrong.

6           Q     Who didn't do anything wrong?

7           A     I'm assuming you're referring to Slade

8      Moore.  He was the officer.  That's who we're

9      talking about; right?

10          Q     We're talking about any officers at the

11     scene, but --

12          A     Okay.

13          Q     -- if you -- so you don't think Slade

14     Moore did anything wrong?

15          A     I do not.

16          Q     And his actions that night were consistent

17     with the policies and practices of your department?

18          A     I didn't say that.

19          Q     Well, I'm asking you.  Were his actions

20     that night consistent with the policies and

21     practices of your department?

22          A     I didn't say that.  I don't think that his

23     actions necessarily reflect everybody in the

24     department.  I don't know that the policy and

25     procedure prevents him from what he said or did.

Page 243

RANDALL TUCKER

1

2     Q     Let me try again, sir.

3     A     Okay.

4     Q     Did anything he did that night, to your

5  knowledge, violate any policy and procedure of your

6  department?

7     A     No.

8     Q     And he has not been disciplined in any

9  way; correct?

10    A     No, sir.

11              (Exhibit 26 marked for the record)

12    Q     Let me give you what's been marked as

13  Exhibit 22.  I'm sorry, that's the wrong exhibit.

14  26.  Do you know if you have seen this before, sir?

15  Take a minute to look at it.

16    A     This appears to be a narrative prepared by

17  my Chief Deputy Jeremy Williams and an incident

18  report reflecting that, the incident with Mr.

19  Manning.

20    Q     Okay.  Have you seen these documents

21  before, sir?

22              MR. YOUNGWOOD:  Just for the record,

23              they're Bates stamped MC-RFP-8-182 through

24              193.

25    A     I'm sure I have at some point.  I mean, I

                         RANDALL TUCKER

1    don't know at what point, but yeah.

2        Q     (Mr. Youngwood)  Did you then discuss this

3    incident with Mr. Williams?

4        A     Yes, I'm sure I did.  We discuss just

5    about everything.

6        Q     Tell me the nature of that discussion.

7        A     I don't recall the nature of it.

8        Q     Did you discuss this incident with

9    Slade Moore?

10       A     I don't think that I did.  I think

11   probably Chief Williams did that.

12       Q     Other than your attorneys, have you

13   discussed this incident with anyone other than

14   Mr. Williams?

15       A     Not that I recall, no, sir.

16       Q     Okay.  Do you believe that the

17   investigation Chief Williams conducted into this

18   matter was sufficient?

19       A     I have every confidence, and, yes, I would

20   say it was.

21       Q     I take it you had not seen the video at

22   the time that you first saw this report, which is

23   Exhibit 26?

24       A     I think I testified that I have seen it,

<pre>
                         RANDALL TUCKER
1
2  but I don't know at what point I saw it.
3     Q    Have you seen it more than once?
4     A    I don't know that I have.  It's possible,
5  yes, but I can't testify 100 percent to that.
6     Q    Okay.  And are you aware that the officers
7  choked Mr. Manning that night?
8            MR. ROSS:  Object to the form.
9     A    No, I'm not aware of that.
10    Q    (Mr. Youngwood)  Okay.  Are you aware that
11  they handcuffed him?
12    A    I think at some point they did.
13    Q    And do you know why they handcuffed him?
14    A    I think he was going to jail.
15    Q    What was he going to jail for?
16    A    Being an accessory to burglary.
17    Q    And the accessory to burglary was based on
18  what, to your knowledge?  You now have the report in
19  front of you.
20    A    I'll have to read the report.
21    Q    Go for it.
22    A    (PAUSE)  Okay.
23    Q    So why was he being brought to jail?
24    A    I don't know the officer's
25  train-of-thought, but, from the report, one thing
</pre>

Page 246

RANDALL TUCKER

1
2   stands out to me, they were standing there with him
3   and discussing or talking with him while he was
4   breaking out the window and carting off the glass,
5   and then allowed him to go, run upstairs, he ran
6   upstairs with Quintetta (sic) and Kenyatta into the
7   apartment, so the first thing, when they saw the
8   deputy, so one of the first things that would come
9   to my mind that they would be aiding and abetting by
10  allowing or helping him or concealing his position
11  from authorities, for one.  Uh -- the fact that
12  they're there as lookouts would be another.  That's,
13  in my eyes, aiding in a way.
14       Q    Sir, where does it say that they were
15  lookouts?
16       A    I didn't say that they were there.  I said
17  if they were there and they ran with him.  I said I
18  don't know the officer's train of thought.
19       Q    So you don't know why they were taking him
20  to jail?
21       A    No, we'd have to ask Slade Moore that.
22       Q    Okay.  And nothing in this report tells
23  you why they were taking them to jail?
24       A    I didn't see anything as a reason he took
25  him into custody.

RANDALL TUCKER

1

2      Q    You don't see any reason why he took him

3   into custody?

4      A    I said I don't see anything in here as to

5   why he took him into custody.

6      Q    Well, is there some report -- this

7   includes an incident report and a write-up by Chief

8   Williams and a three-page letter or memo by

9   Slade Moore.  Is there other material we should look

10  at to try and to determine why Mr. Manning was being

11  taken to jail?

12     A    Well, his confession right here.

13     Q    His confession?

14     A    Yeah.  He said he knocked on the door.  He

15  was -- uh -- I don't remember the young man's name

16  right now because it's on the other page.  He had

17  knowledge that the man was fixing to break in his

18  baby's girl's house to get a TV out, and he went

19  with him.  So he had knowledge of what was going to

20  happen when he went downstairs.  And that's his

21  words, not mine.

22     Q    I see.  And do you think it's possible

23  Mr. Manning was under some threats from your

24  officers at the time he wrote this?

25     A    No, I don't.

1                    RANDALL TUCKER

2    question.

3         Q    Do you view any of the statements by the

4    officer coercive?

5         A    No.

6         Q    So these are acceptable ways to

7    interrogate a witness?

8         A    No, what he should have done was gone on

9    and taken him to jail and gotten a statement from

10   him there.

11        Q    Do you know if Mr. --

12        A    Due to his condition, he allowed him to

13   give a statement at the scene.

14        Q    I'm sorry, "due to his condition."  What

15   condition is that?

16        A    You sit here and listen to him talking

17   about being cripple.

18        Q    And why do you believe he allowed him to

19   do it at the scene because of his physical

20   condition?

21        A    He's sitting there explaining it to him.

22             (ATTORNEY CONTINUES TO PLAY TAPE)

23        Q    The officer just said, Mr. Manning just

24   said, "What do I do?"

25             And the officer responded, "You're going to

Page 263

1                        RANDALL TUCKER

2   jail.  I'm tired of fooling with you.  I don't want

3   to fool with you no more.  You don't want to act

4   right."

5        Is that exchange a violation of the policies

6   and procedures of the Madison County Sheriff's

7   Department?

8        A    No.

9                 MR. ROSS:  And I object because it's

10               indecipherable what came before that or

11               even after that or even if counsel is

12               repeating it correctly.  But subject to

13               that, you can answer it.

14       A    No.

15       Q    (Mr. Youngwood)  Not a violation?

16       A    No.

17                 (ATTORNEY CONTINUES TO PLAY TAPE)

18       Q    The tape concluded.  At the end of it, the

19   scene shifts and it seems to be moving.  The officer

20   says to Mr. Manning's wife, "You going to finish

21   this or you gone go, too."

22       Mr. Manning responds, "Man, please, man, I have

23   been shot five times in the spinal cord, man,

24   please, please, ouch!"  Is there anything about that

25   exchange cause you to believe that the policies and

Page 264

1                       RANDALL TUCKER

2   procedures of the Madison County Police Department

3   were violated in connection with this incident?

4       A    No.

5       Q    And I'll ask you one more time, sir, what

6   law do you believe Mr. Manning was violating by

7   failing to voluntarily give a witness statement?

8       A    By failing to give a witness statement?  I

9   don't know that he violated a law.

10      Q    Well, you said earlier that it was your

11  understanding that he became an accessory to

12  burglary by refusing to report the crime?

13      A    Okay.

14      Q    That was your testimony?

15      A    Yes.

16      Q    And what is that violation in the State of

17  Mississippi?

18      A    I told you don't know the State statute.

19      Q    And if you're wrong on that, sir, that

20  there's no law that requires such reporting, would

21  that change your analysis of this tape?

22      A    No, not a bit.

23      Q    So it's perfectly acceptable for an

24  officer to give somebody a choice between submitting

25  a statement or going to jail?

1                          JASON BARNES
2                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                        NORTHERN DIVISION
4      LATOYA BROWN; LAWRENCE
       BLACKMON; HERBERT ANTHONY
5      GREEN; KHADAFY MANNING;
       QUINNETTA MANNING; MARVIN
6      McFIELD; NICHOLAS SINGLETON;
       STEVEN SMITH; BESSIE THOMAS; and
7      BETTY JEAN WILLIAMS TUCKER,
       individually and on behalf of a class
8      of all others similarly situated,        PLAINTIFFS
9
10     V.              CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11     MADISON COUNTY, MISSISSIPPI;
       SHERIFF RANDALL S. TUCKER in his
12     official capacity; and MADISON COUNTY
       SHERIFF'S DEPUTIES JOHN DOES #1
13     through #6, in their individual capacities,
14                                      DEFENDANTS
15
16        ************************************************
17                 DEPOSITION OF JASON BARNES
18        ************************************************
19                 APPEARANCES NOTED HEREIN
20
                DATE: WEDNESDAY, FEBRUARY 7, 2018
21               PLACE: HILTON GARDEN INN
                  WEST CAPITOL STREET
22                   Jackson, MS
                  TIME:  2:00 P.M.
23
24          REPORTED BY: DEBORAH H. NELSON
                    CSR #1256
                                          **EXHIBIT 14**
25     Job No: 137169

1                         JASON BARNES

2                    (OFF RECORD BRIEFLY)

3                    (Exhibit 13 marked for the record)

4       Q    Do you recognize this incident?

5       A    No, sir.

6       Q    To the best of your knowledge, were you

7    present at this incident?

8       A    To the best of my knowledge, I would say

9    not likely.  This was in January.  It occurred

10   during the evening hours, and I would have been off

11   duty at that time.

12      Q    Do you know Steven Smith?

13      A    It don't ring a bell.  Is this a -- not

14   off the top of my head, no, sir.

15      Q    So would you normally be off duty during

16   these hours?

17      A    Yes, sir, in January of last year, my

18   hours were from seven in the morning until three in

19   the afternoon.  This incident occurred at just after

20   eight o'clock.

21      Q    Have you ever been arrested?

22      A    Myself?

23      Q    Yes, sir.

24      A    Yes, sir.

25      Q    May I ask when?

1                    Tommy Jones
2              UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
9

   VERSUS     CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10

11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER, IN HIS
12 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13 #6, IN THEIR INDIVIDUAL CAPACITIES    DEFENDANTS
   **************************************************
14        DEPOSITION OF CAPTAIN TOMMY JONES
15 **************************************************
16             APPEARANCES NOTED HEREIN
17
18             DATE: NOVEMBER 1, 2017
                 PLACE: MARRIOTT
19             200 EAST AMITE STREET
                JACKSON, MISSISSIPPI
20                TIME: 8:59 a.m.
21

   REPORTED BY: TODD J. DAVIS
22             BCR, CSR #1406, RPR
23
24
                              **EXHIBIT 15**
25 Job No. 133052

1            Tommy Jones

2       mark -- I think we're at Exhibit 5, which is

3       Defendants' Initial Disclosures in this

4       action.

5            (Exhibit No. 5 marked for

6            identification.)

7  BY MS. SIVASHANKER:

8       Q.   Captain, I'm just going to hand you this

9  document, okay?  And have you seen this document

10 before?

11      A.   Briefly.

12      Q.   And do you know what this document is?

13 Can you explain?

14      A.   It says it's from the United States

15 District Court of Southern District of

16 Mississippi, Northern Division.  Several names

17 listed on it.  And versus the Madison County

18 Sheriff's Office, Sheriff Randall Tucker, and

19 Deputy John Does 1 through 6.

20           MR. ROSS:  Have you seen this document

21      or just seen that style?

22      A.   No.  I've just seen this style.  I have

23 not seen this document right here.

24 BY MS. SIVASHANKER:

25      Q.   Okay.  Just to clarify for the record,

1          Tommy Jones

2  so you haven't seen this particular document

3  before?

4       A.   No, ma'am.

5       Q.   And --

6       A.   The one you just handed me?

7       Q.   Yes.   Correct.

8       A.   Not until you handed it to me.

9       Q.   Just to give you some explanation, this

10  document is Initial Disclosures provided by

11  Defendants to Plaintiffs in connection with this

12  action.   Understand that you haven't seen it

13  previously.

14             If you turn to the second page of

15  this document, do you see that there's a section

16  that's says "Captain Tommy Jones"?

17       A.   I do.

18       Q.   And do you see that there's a statement

19  underneath it that says "has knowledge of

20  controlled drop by postal employee of a package at

21  address where Nicholas Singleton lived"?

22       A.   I see that.

23       Q.   And understanding you haven't seen this

24  document previously, does that refresh your

25  recollection as to do you recall this incident

                    Tommy Jones

1

2   that's mentioned here?

3       A.   Briefly.

4       Q.   And could you tell me what you recall

5   about that incident?

6       A.   Well, one, I wasn't the captain when it

7   occurred.

8       Q.   And what was your rank at the time?

9       A.   I don't remember exactly what my rank

10  was in 2011.  Narcotics agent.

11      Q.   I'm sorry.  Just to confirm, this

12  incident occurred in 2011?

13      A.   Yes.

14      Q.   Do you recall what month in 2011?

15      A.   I do not.

16      Q.   And can you please tell me what you

17  recall about this incident?

18      A.   A controlled delivery was made by the

19  postal inspector.

20      Q.   And just to back up a little bit, what

21  is a controlled delivery?

22      A.   When the postal people intercept a

23  package that contains a controlled substance or

24  something illegal.

25      Q.   And when the postal office intercepts

1                        Tommy Jones

2      the package, is that something the narcotics

3      division would tell them to do?

4           A.   No, ma'am.

5           Q.   And so how would you learn about the

6      fact that there might be potential substances in

7      that delivery?  Would the post office inform your

8      division?

9           A.   The post office would contact us.

10          Q.   And when it says controlled drop, is --

11     can you explain exactly what that means just

12     generally in terms of your experience in the

13     narcotics division?

14          A.   I've never used the term "controlled

15     drop," so I can't tell you what -- what that

16     means.

17          Q.   And in terms of when it says "controlled

18     drop by a postal employee," I understand that you

19     said you wouldn't use the term "controlled drop."

20               Do you have any understanding of

21     what that would entail?

22          A.   A controlled delivery.

23          Q.   And how would you describe a controlled

24     delivery?

25          A.   When they intercept a package, and they

1                    Tommy Jones

2   deliver that package -- they successfully deliver

3   it.

4        Q.   And when you say "successfully deliver

5   it," do you mean to the person it was addressed

6   to, the package?

7        A.   Not necessarily the person it was

8   addressed to, but the residence it was addressed

9   to.

10       Q.   And so a successful delivery would

11  include it being delivered to the address listed,

12  I'm assuming, on the package?

13       A.   That's correct.

14       Q.   And when it says here you have knowledge

15  of that controlled drop, can you please explain

16  what your knowledge of that controlled drop is?

17       A.   I don't know what this means because,

18  like I said, this is the first time I've ever read

19  it.  So I don't know exactly what it means "I have

20  knowledge."

21       Q.   Do you have knowledge of a controlled

22  delivery involving an address where Nicholas

23  Singleton lived?

24       A.   A little bit.

25       Q.   Can you tell me what that knowledge is?

1                    Tommy Jones

2       A.    I remember we was contacted by the

3   postal service in reference to a controlled

4   delivery at an address -- I don't necessarily know

5   if Nicholas Singleton was on the package or not --

6   went to an address, and the package was delivered.

7       Q.    And do you recall if you were present at

8   the residence at the time when the package

9   delivered?

10      A.    When it was delivered, no, ma'am.

11      Q.    Do you recall if there were any deputies

12  with the Madison County Sheriff's Department

13  present when the package was delivered?

14      A.    I wouldn't believe there would be while

15  it was being delivered, no, ma'am.

16      Q.    And do you recall, after the package was

17  delivered, if anything happened involving your

18  department?

19      A.    I would imagine the residence would have

20  been secured, and the evidence would have been

21  recovered.

22      Q.    And were you involved at all in securing

23  the residence?

24      A.    I don't recall.

25      Q.    And do you recall if you were involved

1                    Tommy Jones

2    in receiving any -- or securing any of the

3    evidence involved?

4         A.   I don't recall.

5         Q.   And do you recall if any other deputies

6    with the Madison County Sheriff's Department may

7    have been involved with this incident?

8         A.   One.

9         Q.   And who -- which deputy was that?

10        A.   At that particular point, he was not a

11   lieutenant, but it's Trey Curtis.

12        Q.   And do you recall what Trey Curtis' rank

13   was at the time?

14        A.   I do not.

15        Q.   And was Trey Curtis in the narcotics

16   division at the time?

17        A.   He was.

18        Q.   And other than Deputy Curtis, was there

19   anyone else you recall being involved with this

20   incident?

21        A.   I do not.

22        Q.   And do you recall at all how this

23   incident was resolved in the end?

24        A.   I do not.

25        Q.   And are you -- or the name Nicholas

1            Tommy Jones

2   Singleton, do you know -- are you familiar with

3   that name?

4        A.   I mean, I see the name, but I -- as far

5   as familiar with him, no, ma'am, I'm not.

6        Q.   And do you have any understanding or

7   knowledge of who Nicholas Singleton might be?

8        A.   No.

9        Q.   And have you had any interactions with

10  Nicholas Singleton, to your recollection, outside

11  of this incident?

12       A.   Not that I'm aware of.

13       Q.   And do you know if there was any sort of

14  incident report written in connection with this

15  incident?

16       A.   Not by me.

17       Q.   Do you know if anyone else in the

18  department would have written an incident report?

19       A.   I don't know.

20       Q.   And do you recall if anyone was arrested

21  in connection with this incident?

22       A.   Yes, ma'am.

23       Q.   Who was arrested?

24       A.   I believe it was Nicholas Singleton.

25       Q.   And do you recall what he was charged

Tommy Jones

1  with?

2      A.   By me, possession of a controlled

3  substance.

4      Q.   And do you recall what the controlled

5  substance was?

6      A.   I do not right off.

7      Q.   And if you recall, I think at the very

8  beginning when we were speaking in this

9  deposition, you had mentioned meeting with counsel

10  and having to review an affidavit.

11     A.   Yes, ma'am.

12     Q.   Do you recall if that affidavit was

13  related this incident we're talking about now?

14     A.   It does.

15     Q.   And in terms of seeing that affidavit,

16  did it contain any information that we haven't

17  already spoken about regarding your recollection

18  of that incident?

19     A.   No, ma'am.  Other than I couldn't

20  remember the name on that incident we first

21  discussed, but that's the name on it.

22     Q.   And in terms of reviewing that

23  affidavit, was there any other information that we

24  haven't already discussed regarding the details of

1                    SCOTT MCDONALD

2            UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                  NORTHERN DIVISION

4

    LATOYA BROWN; LAWRENCE BLACKMON;

5    HERBERT ANTHONY GREEN; KHADAFY

    MANNING; QUINNETTA MANNING; MARVIN

6    MCFIELD; NICHOLAS SINGLETON;

    STEVEN SMITH; BESSIE THOMAS; AND

7    BETTY JEAN WILLIAMS TUCKER,

    INDIVIDUALLY AND ON BEHALF OF A CLASS

8    OF ALL OTHERS SIMILARLY SITUATED          PLAINTIFFS,

9

10    V.            CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA

11

    MADISON COUNTY, MISSISSIPPI;

12    SHERIFF RANDALL S. TUCKER, IN HIS

    OFFICIAL CAPACITY; AND MADISON COUNTY

13    SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH

    #6, IN THEIR INDIVIDUAL CAPACITIES          DEFENDANTS.

14

15            DEPOSITION OF SCOTT MCDONALD

16

        Taken at the instance of the Plaintiffs on

17            Thursday, February 8, 2018,

        at the Marriott, Jackson, Mississippi,

18            beginning at 12:35 p.m.

19

20

21

    (Appearances noted herein.)

22

23

24    REPORTED BY:  Tamara Hartwig Fulgham, CSR, BCR

25    Job Number:   137177        **EXHIBIT 16**

SCOTT MCDONALD

1

2    Q     What would you consider the general area?

3    A     Like if he's underneath the bed, I might

4   do a sweep of the room, but I'm not going through

5   drawers and looking under pillow cases and that kind

6   of stuff.

7    Q     So towards the beginning of the

8   deposition, you mentioned that you reviewed a

9   document related to an attempt to serve a warrant on

10  a person named Herbert Green?

11   A     I don't think I've seen that.

12   Q     Right.  But you said that you reviewed it

13  with your lawyers.

14   A     Yes.

15   Q     Do you recall what other officer or

16  officers were present then?

17   A     There was probably up to ten of us total

18  there.

19   Q     From the outset of the incident?

20   A     It was me and Jeff Waldrop initially,

21  followed by some Canton PD units and some additional

22  sheriff department officers.

23   Q     Was Sheriff Tucker there?

24   A     No.

25   Q     What was the -- do you recall why that

SCOTT MCDONALD

1
2  number of officers showed up to that incident?

3      A    We announced on the radio we were making

4  entry, and people just show up to back officers.

5      Q    So that would have been within the city of

6  Canton?

7      A    Yes.

8      Q    Would Canton PD show up if it was outside

9  the city limits?

10     A    I -- I'm not sure if they would or not.

11     Q    Is it a -- is it common for -- for that

12 many officers to show up for you making entry?

13     A    No.

14     Q    Were there any special circumstances that

15 led to there being so many officers involved there?

16     A    No.

17     Q    When you -- when you make a -- when you

18 say make an entry, is that terminology for making,

19 like, a forced entry going into the house without

20 being -- without -- you know, when someone refuses

21 to open the door?  Just --

22     A    No.

23     Q    -- any kind --

24     A    That's just making entry, walking into the

25 house.

1                    TOMMY SQUIRES
2               UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                    NORTHERN DIVISION
4

    LATOYA BROWN; LAWRENCE BLACKMON;
5   HERBERT ANTHONY GREEN; KHADAFY
    MANNING; QUINNETTA MANNING; MARVIN
6   MCFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; AND
7   BETTY JEAN WILLIAMS TUCKER,
    INDIVIDUALLY AND ON BEHALF OF A CLASS
8   OF ALL OTHERS SIMILARLY SIUTATTED        PLAINTIFFS
9
10  V.            CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11

    MADISON COUNTY, MISSISSIPPI;
12  SHERIFF RANDALL S. TUCKER, IN HIS
    OFFICIAL CAPACITY; AND MADISON COUNTY
13  SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
    #6, IN THEIR INDIVIDUAL CAPACITIES       DEFENDANTS
14
15                DEPOSITION OF TOMMY SQUIRES
16
           Taken at the instance of the Plaintiffs on
17                Monday, December 4, 2017,
                  Jackson, Mississippi,
18                 beginning at 8 a.m.
19
20
21
22
23
                                **EXHIBIT 17**
24  JOB NO: 133423
25  REPORTED BY:  Tamara Hartwig Fulgham, CSR, BCR

TOMMY SQUIRES

1

2    Q    And have you ever been charged with any sort

3  of criminal offense?

4    A    No, ma'am.

5    Q    And before you started working at the MCSD,

6  did you know anyone working there?

7    A    Yes, ma'am.

8    Q    Who did you know?

9    A    Quite a few deputies.  And the sheriff.  The

10 prior chief.

11   Q    When you say the "prior chief," who was the

12 prior chief?

13   A    Eddie Bell.

14   Q    You mentioned that you also knew Sheriff

15 Tucker before you applied.  How did you know Sheriff

16 Tucker previously?

17   A    We went to school together, grew up

18 together.  I knew his father.

19   Q    When you went to school together, does that

20 mean you went to high school together?

21   A    Yes, ma'am.

22   Q    And have you stayed in touch during after

23 you went to high school together?

24   A    No, ma'am.

25   Q    Since you've been with the MCSD, do you ever

1                    TOMMY SQUIRES

2    Madison County?

3         A    Sheriff Tucker has never told me where or

4    where we cannot set up a safety checkpoint.

5         Q    In the six years you've been with the MCSD,

6    have you noticed any change in terms of the scope of

7    locations that checkpoints are set up at?

8         A    No.

9         Q    I'm going to now just check through a few

10   names of individuals and you can tell me if you don't

11   recognize them, just say no and we'll move on.

12        A    Okay.

13        Q    But I'm just going to go through them.  And

14   just for some reference for these, these are the

15   plaintiffs in this action.

16        A    Yes, ma'am.

17        Q    Are you familiar with the Latoya Brown?

18        A    No.

19        Q    What about the name Lawrence Blackmon?

20        A    No, ma'am.

21        Q    Herbert Anthony Green?

22        A    No, ma'am.

23        Q    Khadafy Manning?

24        A    I've heard the name before.

25        Q    And what have you heard about the name?

1                          TOMMY SQUIRES

2        A    Just if I'm -- is he the one that was

3   killed?  I'm not so sure.  I mean, I've heard his name

4   before, and I don't -- I don't remember why.

5        Q    Have you ever had any direct interactions

6   with Khadafy Manning?

7        A    No, ma'am.  It's just an unusual name.

8        Q    Are you familiar Quinnetta Manning?

9        A    No, ma'am.

10       Q    Marvin McField?

11       A    No, ma'am.

12       Q    Nicholas Singleton?

13       A    No, ma'am.

14       Q    Steven Smith?

15       A    No, ma'am.

16       Q    Bessie Thomas?

17       A    No, ma'am.

18       Q    And Betty Jean Williams Tucker?

19       A    No, ma'am.

20       Q    Do you know if Sheriff Tucker or the

21  department tracks any of your statistics in terms of

22  arrests or other things you might issue?

23       A    I personally do not know whether they do or

24  not.  I'm sure they do.  Every law enforcement agency

25  has to have statistics.  They have to have statistics

1                    Barry Chandler
2             UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                   NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
9

   VERSUS      CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10

11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER, IN HIS
12 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
13 #6, IN THEIR INDIVIDUAL CAPACITIES    DEFENDANTS
   **************************************************
14           DEPOSITION OF BARRY CHANDLER
15 **************************************************
16           APPEARANCES NOTED HEREIN
17
18           DATE: NOVEMBER 1, 2017
                PLACE: MARRIOTT
19           200 EAST AMITE STREET
                JACKSON, MISSISSIPPI
20              TIME: 2:30 p.m.
21

   REPORTED BY: TODD J. DAVIS
22            BCR, CSR #1406, RPR
23
24
25  Job No. 133052          **EXHIBIT 18**

1                    Barry Chandler

2    a safety vest.  Our vehicles are always blue

3    lights activated.  Traffic cones.

4        Q.   And are those all things that were

5    policies that were in place when you entered the

6    MCSD?

7        A.   To my knowledge.

8        Q.   I'm just going to run through quickly a

9    few names, just to see if you're familiar with

10   these individuals.

11       A.   Okay.

12       Q.   And if you're not, you can just tell me

13   no --

14       A.   Okay.

15       Q.   -- and we'll just move on to the next

16   name.

17                 Have you ever had any interactions

18   with LaToya Brown?

19       A.   Not to my knowledge.

20       Q.   And have you ever had any interactions

21   with Lawrence Blackmon?

22       A.   No.

23       Q.   And have you ever had any interactions

24   with Herbert Anthony Green?

25       A.   Not to my knowledge.

1                     Barry Chandler

2        Q.   And have you ever had any interactions

3   with Khadafy Manning?

4        A.   I know the name.

5        Q.   And how do you know the name?

6        A.   I don't remember.  I know the name.

7        Q.   And do you recall if you've ever had any

8   direct interactions with Khadafy Manning?

9        A.   Not that I'm aware of.

10       Q.   And have you ever had any interactions

11  with Quinnetta Manning?

12       A.   Not that I'm aware of.

13       Q.   What about Marvin McField?

14       A.   No.  Not that I'm aware of.

15       Q.   And have you had any interactions with

16  Nicholas Singleton?

17       A.   Not that I'm aware.

18       Q.   And how about Steven Smith?

19       A.   Not that I'm aware.

20       Q.   What about Bessie Thomas?

21       A.   Not that I'm aware of.

22       Q.   And how about Betty Jean Williams

23  Tucker?  That's a longer one.

24       A.   Yeah.  Let's try that again.

25       Q.   I'm going to say it one more time.

1                        Barry Chandler

2    Betty Jean Williams Tucker.

3         A.    Not that I'm aware of.

4         Q.    And to your knowledge, do you know if

5    your supervisor would track any of your

6    statistics, for example, number of arrests when

7    you were a deputy at the MCSD?

8         A.    Give me the question again.

9         Q.    When you were a deputy at the MCSD, to

10   your knowledge, do you know if your supervisor at

11   the department tracked, for example, any of your

12   statistics as an officer?

13        A.    We do a monthly activity report.

14        Q.    And other than that monthly activity

15   report, was there anything else that would track

16   kind of what you would do on a day-to-day basis?

17        A.    Not that I'm aware of.

18        Q.    And during the time that you were with

19   the MCSD, did your supervisor or anyone else ever

20   speak with you about a need to, for example,

21   increase your numbers in any particular area?

22        A.    No.

23        Q.    And did you ever feel any pressure,

24   while you were at the department, to increase your

25   numbers or the number of arrests that you were

1  IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
        DISTRICT OF MISSISSIPPI JACKSON DIVISION
2
   LATOYA BROWN;
3  LAWRENCE BLACKMON;
   HERBERT ANTHONY GREEN;
4  KHADAFY MANNING;
   QUINNETTA MANNING; MARVIN MCFIELD;
5  NICHOLAS SINGLETON; STEVEN SMITH;
   BESSIE THOMAS; and
6  BETTY JEAN WILLIAMS TUCKER,
   individually and on behalf of a class of all other
7  similarly situated                    PLAINTIFFS
   v.             CIVIL ACTION NO. 3:17-cv-347 WHB LRA
8  MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER,
9  in his official capacity; and
   MADISON COUNTY SHERIFF'S DEPUTIES
10  JOHN DOES #1 through #6, in their individual
   capacities                       DEFENDANTS
11

12     ****************************************

13            ORAL DEPOSITION OF

14            QUINNETTA MANNING

15            DECEMBER 22, 2017

16             Volume 1 of 1

17     ****************************************

18     ORAL DEPOSITION OF QUINNETTA MANNING, produced
   as a witness at the instance of the Defendants, and
19  duly sworn, was taken in the above-styled and
   -numbered cause on the 22nd day of December, 2017,
20  before Melinda Bowers, CCR in and for the State of
   Mississippi, reported by machine shorthand, at the
21  offices of Wise, Carter, Child & Caraway, P.A.,  401
   East Capitol Street, in the City of Jackson, State
22  of Mississippi.

23

24

25

**EXHIBIT 19**

```
 1        A     (Witness complying.)

 2        Q     Okay.  Paragraph 1 of Exhibit 9 says that

 3   Khadafy Manning is an adult resident in the City of

 4   Canton, County of Madison, State of Mississippi,

 5   residing at 712 King Ranch Road, Canton, Mississippi

 6   39046.  712 King Ranch Road is where your mother

 7   lives; right?

 8        A     Yes.

 9        Q     Okay.  And did he, in fact, reside with

10   her?

11        A     At one point.

12        Q     For how long?

13        A     Not sure.

14        Q     Okay.

15              MR. ROSS:  Anything else?

16              That's all the questions we have.

17              MS. GOCHMAN:  I have a few questions.

18                        EXAMINATION

19   BY MS. GOCHMAN:

20        Q     I'm going to ask you some questions about

21   the incident that occurred on June 26th, 2016 that

22   Mr. Ross had asked you about.  Did Ladarius Thompson

23   and Ashley Morment have children together?

24        A     Yes.

25        Q     How many kids?
```

```
 1        A      Three.

 2        Q      Okay.  And in the summer of 2016, was it

 3   your understanding that Ladarius Thompson and Ashley

 4   Morment lived together?

 5        A      Yes.

 6        Q      Okay.  You had testified that Ladarius

 7   Thompson did not break the window of the apartment

 8   that he lived in with Ashley Morment; is that

 9   correct?

10        A      Yes.

11        Q      Okay.  And how did you know that he didn't

12   break the window?

13        A      The window was already busted maybe three

14   or four weeks prior to the incident.

15        Q      Okay.  You also testified about Ladarius

16   Thompson speaking about getting his TV.  Do you

17   remember that?

18        A      Uh-huh.

19        Q      Okay.  And if you look at Exhibit 7 that

20   you were given, if you want to turn to that, --

21        A      (Witness complying.)

22        Q      -- this is a statement that was given by

23   Khadafy; correct?

24        A      Yes.

25        Q      Okay.  And this statement says that -- if
```

1    you look at the third line of the statement, it

2    says, "He said he was fixing to break in his baby

3    house to get his TV."  Do you see that?

4         A    Yes.

5         Q    Okay.  Is that what Ladarius Thompson told

6    you?

7         A    No.

8         Q    Okay.  And what did he tell you?

9         A    He was going to get his TV.

10        Q    Okay.  So he didn't say that he was fixing

11   to break into his baby house?

12        A    No, because he stayed there.

13        Q    Okay.  When you say stayed there, do you

14   mean he lived there?

15        A    Yes.

16        Q    Okay.  When the police entered your

17   apartment the morning of June 26th, were you scared?

18        A    When they entered my home, it was -- when

19   I opened the door, it was six -- it was about six

20   police officers at the door, uniforms and guns.  And

21   the only people there was me, Khadafy, my niece and

22   my three boys in the back room.  And them coming in,

23   forcing they way in, demanding, telling me what I

24   need to do, what I better do, or else I'm going to

25   jail.  Yes, I was terrified.

1        Q     Okay.

2        A     So the only thing that I could think of to

3    do is write the statement.  It was either write the

4    statement or I was going to go to jail.  He said we

5    was going to get a $50,000 bond.  If both of us in

6    jail for a $50,000 bond, that's $100,000.

7        Q     Okay.

8        A     Nobody got that type of money.  So, yes, I

9    wrote the statement.  I agreed with anything that he

10   was saying so that he can get out the house.  And I

11   was telling Khadafy to calm down, don't say anything

12   to them, just listen to them, write the statement

13   and let them leave.  By that point, that's when the

14   officer got mad and grabbed Khadafy by the windpipe

15   of his neck, and that's when I began to record.

16       Q     And after the incident, how -- how did you

17   feel after the incident?  So I'm talking about after

18   the police had left and after Khadafy and you were

19   back in your apartment.

20       A     I couldn't watch my kids.  My youngest

21   son, he's six, he wouldn't stay at the house with

22   me.  He stayed at my momma house for a week.  He was

23   scared to come back to the house.  He said the

24   police were going to come and get him.

25       Q     Okay.  And were you upset after the

```
 1    incident?

 2        A    It wasn't so much as being upset; it just

 3    was being scared.

 4        Q    You were scared.  Okay.  And were you

 5    afraid that the police would come back?  Take a

 6    moment.

 7        A    Yeah.

 8        Q    Okay.  And are you still afraid of the

 9    police from that incident?

10        A    Sometimes.

11        Q    Okay.

12             MS. GOCHMAN:  I have no more questions.

13             MR. ROSS:  Give me just a second.

14                 (A short break was taken.)

15             MR. ROSS:  On the record.

16                      REEXAMINATION

17    BY MR. ROSS:

18        Q    In light of your counsel's questions, I

19    have a few more questions.

20                 Go to Exhibit 6, your statement.

21        A    (Witness complying.)

22        Q    Before we talk about your statement, I

23    believe your former testimony was, at least in part,

24    that you told Ladarius Thompson to stop; right?

25        A    Uh-huh.  To leave her window alone.
```

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                       JACKSON DIVISION

3   LATOYA BROWN; LAWRENCE BLACKMON;
    HERBERT ANTHONY GREEN; KHADAFY MANNING;
4   QUINETTA MANNING; MARVIN MCFIELD;
    NICHOLAS SINGLETON; STEVEN SMITH;
5   BESSIE THOMAS; and BETTY JEAN
    WILLIAMS TUCKER, individually and on
6   behalf of a class of all others
    similarly situated                            PLAINTIFFS
7
    VS.                  CIVIL ACTION NO. 3:17-cv-347 WHB LRA
8

9   MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER,
10  in his official capacity; and
    MADISON COUNTY SHERIFF'S DEPUTIES
11  JOHN DOES #1 through #6,
    in their individual capacities                DEFENDANTS
12
    ***********************************************************
13
                  DEPOSITION OF LATOYA BROWN
14
    ***********************************************************
15
                 (APPEARANCES NOTED HEREIN)
16
                   TAKEN AT THE OFFICES OF:
17             WISE, CARTER, CHILD & CARAWAY
                 401 EAST CAPITOL STREET
18                  JACKSON, MISSISSIPPI

19
                  TUESDAY, JANUARY 9, 2018
20             AT APPROXIMATELY 10:59 A.M.

21

22  REPORTED BY:

23            TAMMY MCDANIEL-BAGNATO, #1910

24

25                     **EXHIBIT 20**



```
 1              THE WITNESS:  Well, I can breathe.

 2              MS. COWAN:  I don't know.  Your

 3         attorneys might have some questions for you

 4         after.  We'll just have to wait.

 5              MR. RETHY:  Okay.  Give us a second.

 6              MS. COWAN:  Yeah.  You want us to

 7         leave?

 8              MR. RETHY:  We can leave.

 9              MS. COWAN:  Okay.

10                      - - -

11            (OFF THE RECORD AT 12:10 P.M.)

12           (BACK ON THE RECORD AT 12:15 P.M.)

13                      - - -

14              (CROSS-EXAMINATION)

15    BY MS. JARRETT:

16         Q.  Ms. Brown, I'm just going to ask you

17    a couple questions, okay?

18         A.  Yes, ma'am.

19         Q.  Have you ever been through a

20    pedestrian checkpoint?

21         A.  Yes.

22         Q.  When?

23         A.  When I was walking from the store.

24         Q.  And where was the checkpoint setup?

25         A.  In front of Canton Estates.
```



1    Q.   Did the officers -- what happened at

2  the checkpoint?  Did the officers ask for

3  your identification?

4    A.   Yes, but I didn't have it on me.

5    Q.   So then what happened?

6    A.   They asked for my Social Security

7  Number and they wrote it down.

8    Q.   And then?

9    A.   They ran my name.

10    Q.   Have you been through a pedestrian

11  checkpoint another time?

12    A.   Possibly, I'm not sure.

13    Q.   Have you ever seen pedestrian

14  checkpoints outside of the park where you

15  take your children?

16    A.   Yes, that's on Ricks Drive.

17    Q.   Okay.  Have you been through a

18  pedestrian checkpoint there?

19    A.   Yes, I was with my cousin.

20    Q.   And what happened?

21    A.   They asked for me and his

22  identification.

23    Q.   Did you have it?

24    A.   Yes.  And I showed it to him, I

25  showed my ID to him and my cousin did also.



1        Q.  And what did the officer do with

2    your identification?

3        A.  They ran our names.

4        Q.  When you say they ran your names,

5    what do you mean?

6        A.  They did it on the walkie-talkie to

7    the dispatcher.

8        Q.  And then did you leave?

9        A.  Yes.

10       Q.  Have you ever been through any other

11   pedestrian checkpoints?

12       A.  Not that I can recall.

13       Q.  Do you ever come into pedestrian

14   checkpoints when you are -- where does your

15   mom live?

16       A.  She lives on Walnut.

17       Q.  Have you ever run into pedestrian

18   checkpoints going to or from your mom's

19   house?

20       A.  No.

21       Q.  And when you say pedestrian

22   checkpoint, what does that mean to you?

23       A.  That if I'm walking through a

24   roadblock and I get stopped, then asked for

25   identification.



1     Q.  Earlier Ms. Cowen asked you if you'd

2  ever been stopped at a roadblock while you

3  were on foot.  Have you ever been stopped at

4  a roadblock while you were on foot?

5     A.  Yes.

6     Q.  Ms. Brown, do you think that the

7  Madison County Sheriff's Department treats

8  the black residents of Madison County

9  differently than the white residents of

10  Madison County?

11          MS. COWAN:  Object to the form.

12     Leading.

13          MS. JARRETT:  You can answer.

14     A.  Yes.

15  BY MS. JARRETT:

16     Q.  Okay.

17          MS. JARRETT:  Thank you.

18          MS. COWAN:  I just have a couple of

19     follow up questions.

20                - - -

21          (REDIRECT EXAMINATION)

22  BY MS. COWAN:

23     Q.  You were asked what a pedestrian

24  checkpoint is, I believe I heard your

25  testimony and you say that is a roadblock



1                           BRIAN LOVEALL
2               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                           NORTHERN DIVISION
4   LATOYA BROWN; LAWRENCE
    BLACKMON; HERBERT ANTHONY
5   GREEN; KHADAFY MANNING;
    QUINNETTA MANNING; MARVIN
6   McFIELD; NICHOLAS SINGLETON;
    STEVEN SMITH; BESSIE THOMAS; and
7   BETTY JEAN WILLIAMS TUCKER,
    individually and on behalf of a class
8   of all others similarly situated,        PLAINTIFFS
9
10  V.              CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11  MADISON COUNTY, MISSISSIPPI;
    SHERIFF RANDALL S. TUCKER in his
12  official capacity; and MADISON COUNTY
    SHERIFF'S DEPUTIES JOHN DOES #1
13  through #6, in their individual capacities,
14                                      DEFENDANTS
15
16      ************************************************
17                 DEPOSITION OF BRIAN LOVEALL
18      ************************************************
19                 APPEARANCES NOTED HEREIN
20
            DATE: WEDNESDAY, FEBRUARY 7, 2018
21               PLACE: HILTON GARDEN INN
                  WEST CAPITOL STREET
22                   Jackson, MS
                  TIME:  9:00 A.M.
23
24          REPORTED BY: DEBORAH H. NELSON
                  CSR #1256
25   Job No: 137169        **EXHIBIT 21**

BRIAN LOVEALL

1

2     A     Just one, to my knowledge.

3     Q     What was the nature of that?

4     A     I went to a call at 707 Mace.  There was a

5  disturbance call.  There were no visible signs of a

6  disturbance.  Just verbal.  We had the suspect

7  though.  One of the individuals leave.  The

8  individual refused to leave.  Another officer placed

9  him under arrest.  I took him to jail.  And another

10 officer and me had a dispute, not verbally loud or

11 physical.  Just talked back and forth.  And we were

12 reprimanded.

13    Q     Who reprimanded you?

14    A     Chief Belvedresi.

15    Q     Do you recall what year this would have

16 been?

17    A     No, sir.

18    Q     Do you have a sense of whether you,

19 whether most of the people you arrest are

20 African-American?

21    A     I cannot confirm that or -- no, sir.

22    Q     So you're saying you don't know one way or

23 the other?

24    A     No, sir.

25              MR. RETHY:  Let's go off record for a

Page 1

1                        Mark Sandridge
2                UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                      NORTHERN DIVISION
4
5   LATOYA BROWN; LAWRENCE BLACKMON;
    HERBERT ANTHONY GREEN; KHADAFY
6   MANNING; QUINNETTA MANNING; MARVIN
    McFIELD; NICHOLAS SINGLETON;
7   STEVEN SMITH; BESSIE THOMAS; AND
    BETTY JEAN WILLIAMS TUCKER,
8   INDIVIDUALLY AND ON BEHALF OF A CLASS
    OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
9
10  v.              CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
11
    MADISON COUNTY, MISSISSIPPI;
12  SHERIFF RANDALL S. TUCKER; IN HIS
    OFFICIAL CAPACITY; AND MADISON COUNTY
13  SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
    #6, IN THEIR INDIVIDUAL CAPACITIES       DEFENDANTS
14
15
    ****************************************************
16               DEPOSITION OF MARK SANDRIDGE
    ****************************************************
17
18               APPEARANCES NOTED HEREIN
19
20          DATE:  TUESDAY, NOVEMBER 14, 2017
                   PLACE:  MARRIOTT
21               200 EAST AMITE STREET
                 JACKSON, MISSISSIPPI
22                TIME:  9:00 A.M.
23
24  REPORTED BY:  KELLYE S. SHOWS, BCR, CSR
                  CSR #1290          **EXHIBIT 22**
25  JOB NO. 133401

Page 23

1                       Mark Sandridge

2        Q.    So approximately when did you shift over

3   to doing just administration?

4        A.    When Sheriff Tucker was elected.

5        Q.    So you haven't done active patrolling since

6   2012?

7        A.    I mean, not really.  I get called out

8   sometimes on bad accidents and things where there may

9   be suspicion of an impaired driver but I'm not

10  actively out there on the street patrolling.

11       Q.    The grant money that you mentioned, has

12  the sheriff's department always had that grant money

13  since 2009 or did it obtain that grant money at a

14  certain point within that period?

15       A.    We had it when I first came here for a

16  couple of years and then we stopped doing the grant,

17  and then we started back when Sheriff Tucker was

18  elected.  I believe we started back in the middle of

19  2013, I think.

20       Q.    Do you recall why you stopped?

21       A.    Yes, sir.

22       Q.    Why was that?

23       A.    There were conditions being put upon the

24  shoulders of our undersheriff at the time, Eddie

25  Belvedresi, and the demands that DPS was making he

1                          Mark Sandridge

2    just thought were ridiculous and cumbersome and he

3    just decided that we're not going to do it anymore.

4         Q.    Do you recall what those demands were?

5         A.    I don't know.

6         Q.    So what's your understanding of the

7    conditions that are imposed in order to get the grant

8    money?

9               MR. ROSS:   At the present time?

10   BY MR. RETHY:

11        Q.    At the present time.

12        A.    Can you be more specific.

13        Q.    So you mentioned that there are conditions

14   imposed to get the grant money.  Are there so many

15   conditions that it's hard to just describe them all

16   or is that what you're getting at?

17        A.    There are several.  Without that

18   documentation in front of me I would -- it would be

19   difficult.

20        Q.    Do you have a sense of what the most

21   important ones are?

22        A.    You have to be a full-time officer.  You

23   know, another one is you can't, you know -- I can't

24   think of another one.  Without that documentation it

25   would be difficult for me to answer.

1                        Mark Sandridge

2    BY MR. RETHY:

3         Q.    So here's Exhibit 21.  Are you familiar with

4    this document?

5         A.    It was one of my reports, yes.

6         Q.    So what is this?  It's called a DUI form.

7    What is it?

8         A.    When I came to this department and started

9    doing a high volume -- making a high volume of DUI

10   arrests, I went to the chief deputy at the time who

11   was Eddie Belvedresi and I asked if I could have

12   permission to use this form to gather data for

13   testimony purposes in court, and he looked over it

14   and approved it and said that he liked it and thought

15   it was okay, because a lot of the information that I

16   was gathering and a lot of the things that I was

17   reporting to was very repetitive.  Like I'm typing

18   out the question that I asked, and it's the same

19   question I ask every time.  So it's such a high volume

20   of information it made it easier for me and it made

21   it easier to testify in court rather than looking at

22   a long, tiny narrative.

23        Q.    So is this a form you still use?

24        A.    I do when I make a DUI arrest which is very

25   rare.

1            ELTON FLAX, JR.
2          UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3              NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE
5  BLACKMON; HERBERT ANTHONY
   GREEN; KHADAFY MANNING;
6  QUINNETTA MANNING; MARVIN
   McFIELD; NICHOLAS SINGLETON;
7  STEVEN SMITH; BESSIE THOMAS; and
   BETTY JEAN WILLIAMS TUCKER,
8  individually and on behalf of a class
   of all others similarly situated,      PLAINTIFFS
9
10 V.          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                              DEFENDANTS
15    ************************************************
16          DEPOSITION OF ELTON FLAX, JR.
17    ************************************************
18          APPEARANCES NOTED HEREIN
19
20       DATE: WEDNESDAY, NOVEMBER 15, 2017
           PLACE: MARRIOTT HOTEL
21              Amite Street
                Jackson, MS
22           TIME:  1:15 P.M.
23
24       REPORTED BY: DEBORAH H. NELSON
                CSR #1256
25  Job No. 133402        **EXHIBIT 23**

Page 90

1                    ELTON FLAX, JR.

2    Trowbridge?

3         A    Under Sheriff Tucker, yes.

4         Q    Who was the chief then?

5         A    Jeremy Williams.  Chief Williams.

6         Q    Is the chief under Tucker?

7         A    Yes.

8         Q    And who was the chief under Trowbridge?

9         A    Eddie Trow -- I mean, Eddie Belvedresi.

10        Q    So that's the principal change you can

11   think of in terms of the Trowbridge administration

12   and the Tucker administration?

13        A    No, it's -- like I said, the morale is

14   more higher.  You know, you knows what to expect

15   when you come to work.  You know, you do your job,

16   you don't have anybody, you know, on you about one

17   minute why you do this, and the next minute why

18   you're not doing this.  So that's what I mean.  Less

19   stress.

20        Q    Right, and you're saying that came -- that

21   stress was largely a function of the prior chief?

22        A    Yes.  That's my point of view.

23        Q    Okay.

24             MR. RETHY:  All right, go off the

25             record.  I might not have anything more,

1        Chief Deputy Jeremy Williams
2           UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                NORTHERN DIVISION
4

   LATOYA BROWN; LAWRENCE BLACKMON;
5  HERBERT ANTHONY GREEN; KHADAFY
   MANNING; QUINNETTA MANNING; MARVIN
6  MCFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; AND
7  BETTY JEAN WILLIAMS TUCKER,
   INDIVIDUALLY AND ON BEHALF OF A CLASS
8  OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS,
9  V.     CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA
10 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER, IN HIS
11 OFFICIAL CAPACITY; AND MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
12 #6, IN THEIR INDIVIDUAL CAPACITIES     DEFENDANTS.
13

       ************************************************
14

              VIDEO DEPOSITION OF
15        CHIEF DEPUTY JEREMY WILLIAMS
16     ************************************************
17

            APPEARANCES NOTED HEREIN
18
19            MONDAY, DECEMBER 11, 2017
                HILTON GARDEN INN
20          235 WEST CAPITOL STREET
                JACKSON, MISSISSIPPI
21                  8:13 A.M.
22
23
24                       **EXHIBIT 24**
25  Job No: 133424

1          Chief Deputy Jeremy Williams

2    past six years.

3         Q    Okay.  Is that a change in policy,

4    speaking about the Constitution at these

5    meetings?

6         A    Yes, sir.  I mean, I think if I get up

7    at every meeting and I'm the one saying it then,

8    yes, sir.

9         Q    Okay.  Because you weren't the chief

10   deputy before you became the chief deputy?

11        A    Yes, sir.

12        Q    Okay.  Other than you -- well, you

13   would go to those meetings prior to becoming

14   chief deputy.

15        A    Yes,

16        Q    All right.  And who was chief deputy

17   then?

18        A    Eddie Belvadressi.

19        Q    And would he address issues related to

20   the United States Constitution?

21        A    I don't recall.

22        Q    So other than you speaking at these

23   monthly meetings regarding the United States

24   Constitution, are you aware of any other changes

25   in policies or practices since Sheriff Tucker