# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

LATOYA BROWN; LAWRENCE
BLACKMON; HERBERT ANTHONY
GREEN; KHADAFY MANNING;
QUINNETTA MANNING; MARVIN
MCFIELD; NICHOLAS SINGLETON;
STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

       v.

MADISON COUNTY, MISSISSIPPI;
SHERIFF RANDALL S. TUCKER, in his
official capacity; and MADISON COUNTY
SHERIFF'S DEPUTIES JOHN DOES #1
through #6, in their individual capacities,

     Defendants.

Civil Action No.
3:17-cv-00347-WHB-LRA

**ORAL ARGUMENT
REQUESTED**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' AMENDED MOTION TO STRIKE NEWSPAPER ARTICLES ATTACHED TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Quinnetta Manning, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker ("Plaintiffs") respectfully file this Response to the Amended Motion to Strike Newspaper Articles Attached to Plaintiffs' Motion for Class Certification (ECF No. 274, the "Motion") filed by Defendants Madison County, Mississippi and Sheriff Randall Tucker ("Defendants"), and state:

1.    Plaintiffs oppose the Motion and provide that the nine news reports cited by Plaintiffs in their Motion for Class Certification, filed on March 14, 2018 (ECF No. 231), can

and should be considered by the Court on class certification.[1] The Federal Rules of Evidence do not apply strictly at the class certification stage, and accordingly, the News Reports should be considered as evidence in support of Plaintiffs' Motion for Class Certification, regardless of their admissibility. The News Reports provide useful evidence for the Court's consideration in evaluating Plaintiffs' Motion for Class Certification, including, among other points, to show that complaints of racial profiling by the Madison County Sheriff's Department ("MCSD") and Black citizens' protests of the MCSD's racially discriminatory policing practices were widely reported during former Sheriff Toby Trowbridge's administration and that Sheriff Tucker intended to maintain the policies of the former administration.

2.      Moreover, even assuming the Federal Rules of Evidence applied in full at the class certification stage, which they do not, the News Reports are not inadmissible hearsay.

3.      Four of the News Reports are not offered for the truth of the matter asserted, but rather to show that the events described therein (specifically, complaints of racial profiling by the Madison County Sheriff's Department and Black citizens' protests of its racially discriminatory policing practices) were widely reported. *See New supervisors take office Friday*; *Is system fair?*; *Roadblocks questioned in Canton*; *Racial profiling accusations thrown at Madison sheriff in*

---

[1]  The nine news reports are as follows: *New supervisors take office Friday*, Madison County Journal (Jan. 2, 2008) [Mot. for Class Cert. Ex. 69]; *Is system fair?*, The Clarion-Ledger (July 22, 2007) [Mot. for Class Cert. Ex. 70]; *Roadblocks questioned in Canton*, The Clarion-Ledger (July 18, 2006) [Mot. for Class Cert. Ex. 71]; Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, The Clarion-Ledger (Nov. 6, 2007) [Mot. for Class Cert. Ex. 72]; Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, The Clarion-Ledger (Jan. 14, 2009) [Mot. for Class Cert. Ex. 73]; Lacey McLaughlin, *Making Amends*, Jackson Free Press (Aug. 17, 2011) [Mot. for Class Cert. Ex. 75]; *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'all Politics (Jan. 19, 2011) [Mot. for Class Cert. Ex. 76]; *Madison sheriff responds to Jackson councilman's remarks*, The Clarion-Ledger (Jan. 4, 2016), https://www.clarionledger.com/videos/news/local/2016/01/04/78247954/, [Mot. for Class Cert. Ex. 80]; *Q&A with Sheriff Randy Tucker*, Madison County Journal (Jan. 14, 2015) [Mot. for Class Cert. Ex. 100] (collectively, "News Reports").

*board meeting*. Thus, such News Reports are not hearsay and should be considered by the Court in evaluating Plaintiffs' Motion for Class Certification.

4. The other five News Reports cannot be excluded on hearsay grounds because they fall under (i) the admission by party opponent hearsay exception and/or (ii) the residual hearsay exception. *Madison sheriff responds to Jackson councilman's remarks*, which involves a video interview of Defendant Sheriff Tucker, can be considered as an admission by a party-opponent. The remaining four News Reports—*House panel considers bill to outlaw racial profiling*; *Making Amends*; *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*; and *Q&A with Sheriff Randy Tucker*—should be considered under (i) the admission by party opponent hearsay exception as they are offered against Defendants and made by a party in an individual or representative capacity, and (ii) the residual hearsay exception, as they demonstrate sufficient indicia of trustworthiness, have been offered in sufficient advance of trial to put Defendants on notice, are probative evidence of material facts, and the general purposes of the Federal Rules of Evidence would be best served by consideration of the News Reports.

5. Finally, substantial, additional documentary and testimonial evidence exists that corroborates the content underlying the News Reports, which further supports that the Court can and should consider the News Reports in ruling upon Plaintiffs' Motion for Class Certification.

6. In support of this Response, Plaintiffs submit an accompanying Memorandum of Law, which is incorporated herein as if set forth in full, and the exhibits listed below:

  1. **Exhibit 1:** Excerpts from Transcript of Deposition of Toby Trowbridge

  2. **Exhibit 2:** Excerpts from Transcript of Deposition of Paul Griffin

  3. **Exhibit 3:** Excerpts from Transcript of Deposition of Randall Tucker

7.      Pursuant to L.U. Civ. R. 7(b)(6)(A), Plaintiffs respectfully request oral argument on the Motion. Because the issues presented by the Motion overlap with the issues presented by Plaintiffs' pending Motion for Class Certification, Plaintiffs request that argument on the instant Motion should be held jointly with argument on Plaintiffs' Motion for Class Certification.

WHEREFORE, for the reasons set forth herein and in Plaintiffs' Memorandum of Law, the Motion should be denied.

Respectfully submitted this 7th day of June, 2018.

By: */s/ Joshua Tom*
    Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2018, I caused the foregoing **RESPONSE TO DEFENDANTS' AMENDED MOTION TO STRIKE NEWSPAPER ARTICLES ATTACHED TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi 39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
Jason E. Dare (MSB No. 100973)
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
(601) 987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

*/s/ Joshua Tom*
Joshua Tom

EXHIBIT 1

```
 1                   Toby Trowbridge
             UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                    NORTHERN DIVISION
 3

 4   LATOYA BROWN; LAWRENCE BLACKMON;
     HERBERT ANTHONY GREEN; KHADAFY
 5   MANNING; QUINNETTA MANNING; MARVIN
     McFIELD; NICHOLAS SINGLETON;
 6   STEVEN SMITH; BESSIE THOMAS; AND
     BETTY JEAN WILLIAMS TUCKER,
 7   INDIVIDUALLY AND ON BEHALF OF A CLASS
     OF ALL OTHERS SIMILARLY SITUATED        PLAINTIFFS
 8

 9   v.            CIVIL ACTION NO. 3:17-CV-00347-WHB-LRA

10
     MADISON COUNTY, MISSISSIPPI;
11   SHERIFF RANDALL S. TUCKER, IN HIS
     OFFICIAL CAPACITY; AND MADISON COUNTY
12   SHERIFF'S DEPUTIES JOHN DOES #1 THROUGH
     #6, IN THEIR INDIVIDUAL CAPACITIES       DEFENDANTS
13

14
     *****************************************************
15            VIDEOTAPED DEPOSITION OF
            MILTON E. TOBY TROWBRIDGE, JR.
16   *****************************************************

17

18              APPEARANCES NOTED HEREIN

19

20
             DATE:  TUESDAY, FEBRUARY 13, 2018
21              PLACE:  HILTON GARDEN INN
               235 WEST CAPITOL STREET
22              JACKSON, MISSISSIPPI
                  TIME:  9:07 A.M.
23

24   REPORTED BY:  KELLYE S. SHOWS, BCR, CSR, CSR #1290

25   JOB NO: 137863
```

## Page 2

```
 1              Toby Trowbridge
    APPEARANCES:
 2
 3      ISAAC RETHY, ESQ.
    Simpson Thacher & Bartlett
 4  425 Lexington Avenue
    New York, NY 10017
 5
 6      JOSHUA TOM, ESQ.
    ACLU of Mississippi
 7  Post Office Box 2242
    Jackson, MS 39225
 8
           COUNSEL FOR PLAINTIFFS
 9
10
11      CHARLES ROSS, ESQ.
    Wise Carter Child & Caraway
12  600 Heritage Building
    401 East Capitol Street
13  Jackson, MS 39201
14
        REBECCA COWAN, ESQ.
15  Currie Johnson & Myers
    Post Office Box 750
16  Jackson, MS 39205
17      COUNSEL FOR DEFENDANTS
18
19
20      ROBERT PEDERSEN, ESQ.
    Watkins & Eager
21  400 East Capitol Street
    Jackson, MS 39201
22
        COUNSEL FOR MILTON E. TOBY TROWBRIDGE, JR.
23
24
    ALSO PRESENT:  SHERIFF RANDALL S. TUCKER
25           JADE MORGAN
```

## Page 3

```
 1              Toby Trowbridge
 2
                  I N D E X
 3
    Style                    1
 4  Appearances              2
    Index                    3
 5  Examination by Mr. Rethy           5
    Examination by Mr. Pedersen       127
 6  Examination by Mr. Rethy          128
    Certificate of Witness            130
 7  Certificate of Court Reporter     131
 8  EXHIBITS:
 9  Exhibit 1  Policies and Procedures      22
    Exhibit 2  Checkpoint Notice            64
10  Exhibit 3  Policy and Procedure         65
    Exhibit 4  Responses to Plaintiffs' Second
11       Set of Interrogatories          74
    Exhibit 5  White Pride e-mail           76
12  Exhibit 6  3/27/08 News Article         92
    Exhibit 7  11/6/07 News Article         98
13  Exhibit 8  7/22/07 News Article        103
    Exhibit 9  7/18/06 News Article        106
14  Exhibit 10 10/29/07 News Article       111
    Exhibit 11 Response to Plaintiffs' First
15       Set of Interrogatories         115
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              Toby Trowbridge
 2       THE VIDEOGRAPHER:  This is the start of
 3  media label number one, a video recorded deposition
 4  of Toby Trowbridge in the matter of LaToya Brown,
 5  plaintiff, versus Madison County, Mississippi, et al.,
 6  United States District Court in the Southern District
 7  of Mississippi, Civil Action Number 3:17-CV-347-WHB-LRA.
 8  This deposition is being held at the Hilton Garden Inn
 9  Downtown, 235 West Capitol, Jackson, Mississippi, on
10  February 13, 2018, at approximately 9:07 a.m.
11       My named is Eddie Naborn.  I'm a legal
12  video specialist associated with TSG Reporting, Inc.,
13  headquartered at 747 3rd Avenue, New York, New York.
14  The court reporter is Kellye Shows also associated
15  with TSG Reporting.
16       I would ask for attorney introductions on
17  the audio portion, please.
18       MR. RETHY:  My name is Isaac Rethy.  I'm
19  with Simpson Thacher & Bartlett.  I represent the
20  plaintiffs in this action.
21       MR. TOM:  Joshua Tom with the ACLU of
22  Mississippi.  I represent the plaintiffs.
23       MR. ROSS:  Charlie Ross with Wise Carter
24  Law Firm.  I represent the defendants.
25       MS. COWAN:  Becky Cowan, Currie Johnson &
```

## Page 5

```
 1              Toby Trowbridge
 2  Myers, representing the defendants.
 3       THE VIDEOGRAPHER:  Will the reporter
 4  administer the oath, please.
 5       MR. PEDERSEN:  Bob Pedersen.
 6       THE VIDEOGRAPHER:  I'm sorry, Mr. Pedersen.
 7       MR. PEDERSEN:  Bob Pedersen with Watkins &
 8  Eager, representing Mr. Trowbridge.
 9       THE VIDEOGRAPHER:  Now, Kellye.
10       MILTON E. TOBY TROWBRIDGE, JR.,
11       having been first duly sworn, was
12       examined and testified as follows:
13            EXAMINATION
14  BY MR. RETHY:
15    Q.  Good morning, Mr. --
16    A.  Good morning.
17    Q.  -- Trowbridge.  Would you state your full
18  name for the record.
19    A.  Milton E. Toby Trowbridge, Jr.
20    Q.  And could you give your current address.
21    A.  You want a P.O. Box or a physical?
22    Q.  Physical.
23    A.  219 Cedar Hill Road, Flora, Mississippi
24  39071.
25    Q.  And you were the sheriff of Madison County
```

Page 94

Toby Trowbridge

```
 1              Toby Trowbridge
 2      Q.   It's maybe the --
 3      A.   Third?
 4      Q.   -- sixth one down.
 5      A.   Sixth?
 6      Q.   It starts with the word "Organizers...."
 7   It's just one line.
 8      A.   I got it, yes, sir.  Okay.
 9      Q.   So what's your understanding of what racial
10   profiling is?
11      A.   Well, to me, racial profiling is whenever
12   you would break the law as to -- what word am I -- you
13   could -- looking for the word, to go against one group
14   and not another one or a couple of groups and not, you
15   know, do an across the board policing or across the
16   board of anything when you start profiling.  And it
17   wouldn't -- whether it be black, blue, green, white,
18   rich or poor, if you single one out you're racial
19   profiling.
20      Q.   When you were sheriff, did the sheriff's
21   office engage in racial profiling?
22      A.   No, sir.
23      Q.   So we earlier talked about complaints that
24   have been made and these protests weren't specifically
25   brought up.  Would you consider these protests to be
```

Page 95

Toby Trowbridge

```
 1   complaints that were made during your tenure?
 2      A.   I hadn't seen them so I can't -- you know,
 3   have you got any of the protests -- I mean,
 4   complaints?
 5      Q.   You mean that you didn't see any document
 6   that contained a written complaint?  Is that what
 7   you're saying?
 8      A.   I'm asking you if you want to show me one
 9   I'll -- I'll look at it, but I -- I -- I don't have
10   any of them.
11      Q.   But you were aware that this was going on
12   at the time?
13          MR. ROSS:  Object to the form.
14      A.   Not racial profiling.
15   BY MR. RETHY:
16      Q.   The protests.  You were aware that the
17   protests were going on?
18      A.   Oh, yes, I was there.  Uh-huh.  I was at
19   the office.
20      Q.   And did you take any action to investigate
21   whether the claims of racial profiling had any merit?
22      A.   No.
23      Q.   Why not?
24      A.   Just because they were protesting and
```

Page 96

Toby Trowbridge

```
 1   marching down the street is no cause for me -- we had
 2   -- any other -- if there were any other letters or
 3   complaint or whatever, you know, me being the chief
 4   law enforcement officer I would have given them to the
 5   chief and he looked into them, and knowing the chief
 6   as I do if there was any discrimination or racial
 7   profiling he would have brought it to my attention and
 8   stopped it.  Mind you, just because a person says
 9   you're racial profiling doesn't mean you're racial
10   profiling.
11      Q.   You testified previously that you had heard
12   Chief Belvedresi use racial slurs.  Right?
13      A.   (Nodded head affirmatively.)
14      Q.   If you could answer --
15      A.   Yes.  I'm sorry.  Yes.
16      Q.   -- audibly.  And would that be any cause
17   for concern about his qualification to investigate
18   complaints of racial profiling?
19      A.   In my opinion, in the way -- and then when
20   you asked me about all of these people if they used
21   it, including myself, none of those were ever pointed
22   directly at a person and called by a name or you --
23   called you out like that.  It was just in passing,
24   maybe in conversation or walking down the hall or
```

Page 97

Toby Trowbridge

```
 1   walking across a parking lot or whatever.  And there
 2   is -- there is nothing that I know of using that
 3   word that's discriminatorily or racially against the
 4   law.  Is there?  Is there?
 5      Q.   We're not talking about whether anyone would
 6   be arrested for using that word.
 7      A.   All right.  I'm just saying that had I felt
 8   like it was pointed point-blank at somebody or they
 9   were called -- if I called you that or something or
10   anybody of that color or whatever, I would have
11   certainly gotten involved in it and done something
12   with it, but in passing when it didn't mean to point
13   at any one person or call somebody out or call
14   somebody on the carpet and it did not discriminate
15   against a person or a group of people, no, I didn't
16   find it very dis -- discriminating at all that I
17   could charge them with any kind of violation, and that
18   included myself.
19      Q.   So you're saying that the fact that --
20      A.   I know I'm the one that's being deposed here,
21   but I asked you a question.
22          MR. PEDERSEN:  You can't -- you can't do that.
23   He asks the questions.  We give the answers.
24      A.   I understand.  I remember a judge telling
```

Page 98

Toby Trowbridge

1       me that one time.
2       BY MR. RETHY:
3           Q.   So you're saying that the fact that Chief
4       Belvedresi used racial slurs as discussed to you didn't
5       give you the cause for concern regarding him being
6       an appropriate person to investigate claims of racial
7       profiling?
8           A.    Just because a person uses slurs or slang
9       or something like that does not mean that they're not
10      a person that would look into both sides of the
11      story, and I can tell you right now that Chief Eddie
12      Belvedresi is the type of person that would take very
13      to heart both sides of every story no matter if they
14      were blue, white, green, rich or poor, wore the
15      uniform, or on the other side of that table, no, sir.
16      And I hired him because he felt basically the same
17      way I did, and there's no -- to be no discrimination.
18      And just because you make a remark doesn't mean that
19      you are a discriminatory person and that you can't do
20      your job right.  And if there's anybody in this room
21      that thinks that they have ever not done the same
22      thing, let them throw that first stone.
23              MR. RETHY:  This document is 7.
24              (EXHIBIT 7 MARKED.)

Page 99

Toby Trowbridge

1           A.   And I going to get to keep all of these
2       or give them back?
3       BY MR. RETHY:
4           Q.   No.  They go to the court reporter.
5           A.   Okay.  (Reviewed document.)  Is there a
6       third page?
7           Q.   Two pages.  It doesn't have anything on it.
8           A.   Okay.
9           Q.   So this is another news article and it's
10      discussing a board of -- events at a board of
11      supervisors meeting.  Do you recall that board of
12      supervisors meeting?
13          A.   I do not recall that one.  I do -- I do
14      recall the one where I was telling you about
15      Patricia, ICE --
16          Q.   Right.
17          A.   -- on that second page.  And I want to add
18      that it says here that ICE claimed that the Madison
19      County Detention Center takes bond from jailed
20      undocumented Latino immigrants but does not let them
21      out.  Okay.  Well, her complaint was that I was
22      stealing money from them, and I explained to you the
23      process of where it went under lock and key.
24              She was ignorant to the fact of how it works

Page 100

Toby Trowbridge

1       and probably, if not all the time -- no, I can't say
2       all the time, but the majority of the time ICE had a
3       hold on -- they were undocumented.  So when they bonded
4       out or bond for the county thing they still had a
5       federal hold on them.  I can't let them go if that's
6       what she's alluding to.
7           Q.   So ICE, you mean Immigration Customs
8       Enforcement --
9           A.   Yeah, I don't what it is now.
10          Q.   -- not Patricia Ice?
11          A.   Yeah.  You understand what I'm saying?
12          Q.   Yes.
13          A.   Even though they bond on our charges or
14      Madison's charges or Canton's charges, they still --
15      a hold is there for ICE.
16          Q.   So the news article also discusses --
17      discusses Mr. Archie being present and discussing
18      issues of supervisors.  Do you recall that aspect of
19      the meeting?
20          A.   I do not.  I -- you know, I don't believe
21      he was at that meeting and I don't recall ever David
22      Archie being in a supervisor meeting.
23          Q.   There's -- on the second page, there's
24      recorded statements by Supervisor Carl Banks and it

Page 101

Toby Trowbridge

1       states, "Banks said he think there's a problem with
2       the perception of the sheriff's department.  The
3       conversation today was about a feeling in the
4       community, Banks said.  I know as an
5       African-American that there's a real feeling in the
6       community that the department is discriminating
7       against people."
8               Do you see that?
9           A.   Yes, sir.
10          Q.   Did you have an understanding at that time
11      that there was that feeling in the community?
12          A.   Well, anytime you're a chief law
13      enforcement officer or just an officer of the law,
14      things are going to be said about you, written about
15      you.  That doesn't mean they're true.  And if you've
16      got the perception that that was true every time
17      that somebody said something you'd end up with ulcers
18      or a heart attack or something else.  I did whatever
19      I thought I could to take care of the people in Madison
20      County and that meant blue, white, green, red, rich
21      or poor evenly across the board.
22              Now, you know, I got along with Carl Banks
23      fine.  He's a -- he's a good man, a supervisor.  Was
24      supervisor for like 28 years.  I don't know if this was

Toby Trowbridge

1
2  after or before we had to arrest his son or not.  You
3  can ask him that.
4       Q.   Do you recall when you arrested his son?
5       A.   I do not.
6       Q.   Are you saying that he might have been
7  making up these statements based on --
8       A.   I don't know.
9       Q.   -- a grudge that he held?
10      A.   I wasn't -- I don't recall him ever saying
11  anything to me.  The board to the best of my knowledge
12  has never ever tried to tell me that I was not doing
13  a good job.
14      Q.   So you say you never discussed any issues
15  regarding racial profiling or discrimination or a
16  perception of racial profiling or discrimination with
17  Carl Banks?
18      A.   Not that I recall.
19      Q.   Towards the bottom of the story it says,
20  "Banks said he routinely fields complaints about the
21  sheriff's department.  He said the sheriff -- the
22  sheriff should work with people to change the
23  department's image.  Communication could help bring
24  about an understanding, he said.  Trowbridge has
25  said that he does not meet with residents to discuss

Toby Trowbridge

1
2  complaints."
3            Is it correct that you would not meet with
4  residents to discuss complaints?
5       A.   No, I'm not going to go into a group of
6  people and just start fending for myself, no.
7       Q.   And why not?
8       A.   Well, I felt like everything was going the
9  way it should be.  You're going to have disgruntled
10  people whether it be in law enforcement or the car
11  business if they don't like the way their car's
12  running or whatever, and for me to just go sit in
13  there and field 20, 30, 40, 50 questions of just
14  throwing them at me left and right, I wasn't going
15  to let it get out of hand like that.  Any complaint
16  that came to the sheriff's office was given to the
17  chief, Belvedresi, to look into.
18           MR. RETHY:  Exhibit 8.
19           (EXHIBIT 8 MARKED.)
20      A.   (Reviewed document.)  All right.
21  BY MR. RETHY:
22      Q.   Look towards the bottom of the first page
23  of Exhibit 8 here.  It's another news article.  It
24  states, "Madison County District 5 supervisor said
25  many people in Madison County are aware that the

Toby Trowbridge

1
2  department is perceived as targeting blacks and have
3  tried to get Trowbridge to meet with concerned
4  citizens."
5            Do you see that?
6       A.   Uh-huh.
7       Q.   Have you ever spoken with -- with Paul
8  Griffin about racial profiling or racial discrimination
9  or the perception of either?
10      A.   Not that I recall.
11      Q.   Do you recall providing any statistics
12  about arrests to media companies or anyone else during
13  this time period?
14      A.   I don't think that I did.  You know, I don't
15  know who would have, other than it could have been
16  Justice Court.  You know, I don't -- I just don't know
17  who did that.
18      Q.   And as a general rule, you didn't keep
19  statistics broken down by race in the department.  Is
20  that right?
21      A.   I did not, no.  It's a good article, though.
22  It lets you know that other cities are doing their job,
23  too.
24      Q.   On the second page, it says, Griffin, the
25  former deputy -- deputy sheriff, says he thinks

Toby Trowbridge

1
2  racial profiling goes on in every department in the
3  country.  It's not something that's just in Madison
4  County, he said.
5            Do you agree with that statement?
6       A.   Well, I don't know how deputy/supervisor
7  Griffin would know that.  It sounds like that's
8  being taken out of context to say that every other
9  department in this country.  What kind of profiling
10  is that?  And I'm not asking you the question.  I'm
11  just making a statement.  We -- we got to just figure
12  out just -- you know, you just don't make statements
13  like that.  He can't back that up, but yet he charges
14  me with racial discrimination.
15      Q.   Do you have any sense of why he would do
16  that?
17      A.   No, I don't.  Unless he's listening to his
18  constituents and he's got to get re-elected.
19      Q.   So do his constituents believe they're
20  being racially profiled?
21      A.   Pardon?
22      Q.   You're saying you think his -- his
23  constituents were telling him that he was racially
24  profiling?
25      A.   I don't know.  I mean, you're telling me.

Toby Trowbridge

1 I didn't talk to Paul about it.
2
3     Q.   Did you do anything to change any of the
4 -- any of the practices that the sheriff's department
5 -- any of the sheriff's department's practices in
6 response to this sort of criticism?
7     A.   No.  We weren't doing anything wrong.
8 The only thing that I know that changed was posting
9 roadblocks or safety checkpoints.
10     Q.   So you're saying that posting the
11 roadblock notices was something that came out of
12 these -- this era and these protests?
13     A.   No.  You have to ask the judge or whoever
14 required us to start doing that.  I'd rather him be the
15 one to point the finger.  And I'm not.
16     Q.   Okay.  I'm just asking --
17     A.   Yes.
18     Q.   -- because you brought it up.
19     A.   Yes, I don't -- I don't recall.  I mean,
20 you'll just have to ask who mandated that we start doing
21 that.  I learned a long time ago not to question the
22 judge.
23         (EXHIBIT 9 MARKED.)
24 BY MR. RETHY:
25     Q.   Exhibit 9 is another news article.

Toby Trowbridge

1
2     A.   (Reviewed document.)  All right.
3     Q.   This news article discusses another board
4 of supervisors meeting and an individual named Laura
5 Elaine Blair presenting a petition where it says had
6 664 signatures asking for an end to frequent
7 roadblocks in the predominantly black neighborhoods,
8 the excessive force, and brutality administered --
9 administered by police officers and racial profiling.
10         Do you recall the meeting that's discussed
11 here?
12     A.   I do not.
13     Q.   Do you recall the petition with 664
14 signatures?
15     A.   No, sir.
16     Q.   Do you have any familiarity with the
17 individual Laura Elaine Blair?
18     A.   No, sir.
19     Q.   It states that you were present at the
20 meeting and you refused to meet with the group and
21 explained that a meeting was a lose/lose situation.
22         Do you see that?  It's on the first page.
23     A.   Right.
24     Q.   Do you recall making that statement?
25     A.   No, I do not.

Toby Trowbridge

1
2     Q.   Do you have an understanding of what you
3 meant by that?
4     A.   That I meant by that?
5     Q.   Yes.
6     A.   Just like I told you previously --
7         MR. RETHY:  Object to the form.  Lack of
8 foundation.  He said he doesn't remember this.
9     A.   I mean, you go in and meet with a group of
10 people and everybody's going to be hollering and
11 carrying on and nothing's going to come out of it.  It
12 just doesn't work.
13 BY MR. RETHY:
14     Q.   And the next paragraph says, "Trowbridge says
15 he's not ending roadblocks because they're useful in
16 nabbing drivers under the influence and those with
17 outstanding warrants and for confiscating illegal
18 drugs; therefore, he said, there's no point to meet."
19         Do you recall making that statement?
20     A.   No, I don't recall it, but if it's -- is
21 it in parentheses?
22     Q.   It's on the first page.
23     A.   The first page.
24     Q.   It's right under the lose/lose paragraph.
25     A.   Well, I don't recall saying that either.

Toby Trowbridge

1
2     Q.   Do you agree with that statement?
3     A.   Well, safety checkpoints are good in a lot
4 of things.  So I don't have -- you know, you just --
5 if you've got drivers under the influence, I can't
6 help it for them.  As long as -- as long as they're
7 over the limit, go to jail.
8     Q.   Do you agree that they're also useful for
9 enforcing outstanding warrants and confiscating
10 illegal drugs?
11         MR. ROSS:  I object to the form.
12     A.   Well, I mean, if you see something there
13 or if there are outstanding warrants, I certainly don't
14 think a man can walk away from it.  Do you?  I'm sorry.
15 I can't ask you any questions.  I see no way for a
16 lawman of any statute to walk away from any outstanding
17 warrant on anybody, black, white, blue, green, rich
18 or poor.  I don't.  Or any illegal drugs.
19 BY MR. RETHY:
20     Q.   Then on the second page towards the end
21 of the article --
22     A.   Yes.
23     Q.   -- this Griffin says he's received
24 numerous complaints alleging verbal abuse as well as
25 in some cases physical abuse at the hands of the

Page 129

1                          Toby Trowbridge

2        A.    Yes, sir, I do.

3        Q.    Who was that?

4        A.    His name was Otha Brown.

5        Q.    Is that the -- the only black officer you

6    heard use that term?

7        A.    I believe so.

8        Q.    Nothing further.

9              THE VIDEOGRAPHER:   Are we done?   Off record.

10   2:54.

11             (DEPOSITION CONCLUDED AT 2:54 P.M.)

12

13

14

15

16

17

18

19

20

21              Toby Trowbridge

22        Subscribed and sworn to before me

23   this 19ᵗʰ day of March , 20l8.

24

25        NOTARY PUBLIC

| | Page 130 |
|---|---|

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5       1. To clarify the record.
 6       2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
                    _____
25
```

| | Page 131 |
|---|---|

```
 1                    Toby Trowbridge
 2            CERTIFICATION OF REPORTER
 3
 4         I, Kellye S. Shows, Court Reporter and
 5    Notary Public for the state of Mississippi, do
 6    hereby certify that the above and foregoing pages
 7    contain a full, true and correct transcript of the
 8    proceedings had in the aforenamed case at the time
 9    and place indicated, which proceedings were recorded
10    by me to the best of my skill and ability.
11         I also certify that I placed the witness
12    under oath to tell the truth and that all answers
13    were given under that oath.
14         I certify that I have no interest,
15    monetary or otherwise, in the outcome of this case.
16
17
18         This the 26th day of February, 2018.
19
20
                    _____
21                  KELLYE S. SHOWS
                    MS CSR #1290
22
23
      My Commission Expires:
24    January 17, 2020
25
```

34 (Pages 130 to 131)

# EXHIBIT 2

Page 1

1

2               IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                      NORTHERN DIVISION

   _____

4   LATOYA BROWN; LAWRENCE

   BLACKMON; HERBERT ANTHONY

5   GREEN; KHADAFY MANNING;

   QUINNETTA MANNING; MARVIN

6   McFIELD; NICHOLAS SINGLETON;

   STEVEN SMITH; BESSIE THOMAS; and

7   BETTY JEAN WILLIAMS TUCKER,

   individually and on behalf of a class

8   of all others similarly situated,

9          PLAINTIFFS,

10  V.                                    CIVIL ACTION NO.

                                         3:17-cv-00347-WHB-LRA

11  MADISON COUNTY, MISSISSIPPI;

   SHERIFF RANDALL S. TUCKER in his

12  official capacity; and MADISON COUNTY

   SHERIFF'S DEPUTIES JOHN DOES #1

13  through #6, in their individual capacities,

14         DEFENDANTS.

   _____

15

16

17             DEPOSITION OF PAUL GRIFFIN

18            WEDNESDAY, JANUARY 10, 2018

19     MADISON COUNTY BUSINESS LEAGUE & FOUNDATION

20            135 MISSISSIPPI PARKWAY

21                 CANTON, MS

22                 4:10 P.M.

23

24      REPORTED BY: DEBORAH H. NELSON, CSR #1256

25      JOB NO.: 136018

## Page 2

```
 1
 2   APPEARANCES:
 3
 4
 5
 6
 7
 8       JOSHUA TOM, ESQUIRE
         ACLU of Mississippi
         P.O. Box 2242
 9       Jackson, MS 39225
10
         COUNSEL FOR PLAINTIFFS
11
12
13
14       JAMES GRAVES III, ESQUIRE
         MICHAEL WALLACE, ESQUIRE
         Wise Carter Child & Caraway
15       600 Heritage Building
         401 East Capitol Street
16       Jackson, MS 39201
17
18
19       REBECCA COWAN, ESQUIRE
         Currie Johnson & Myers
20       P.O. Box 750
         Jackson, MS 39205
21
22       COUNSEL FOR DEFENDANTS
23
24
25
```

## Page 3

```
 1
 2
 3           KATHERINE SNELL, ESQUIRE
             Katie Bryant Snell
 4           741 Avignon Drive
             Ridgeland, MS 39157
 5
 6           COUNSEL FOR MADISON COUNTY
 7
 8
 9
10   ALSO PRESENT:
11   J. Lawson Hester, Esquire
12   Chief Deputy Jeremy Williams
13   Jade Morgan
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2               I N D E X
 3
```
Style and Appearances..............................1
Examination by Mr. Tom.............................4
Examination by Mr. Graves........................131
Further Examination by Mr. Tom...................134
Further Examination by Mr. Graves................134
Court Reporter's Certificate.....................136
Deponent's Certificate...........................137
```
10
11
12               EXHIBITS
```
Exhibit 1 - Article from The Clarion-Ledger..........34
Exhibit 2 - 2018 DUI Grant...........................45
Exhibit 3 - News Article from The Clarion-Ledger.....68
              1/5/2016
Exhibit 4 - E-mail chain from Frank Halford..........73
Exhibit 5 - E-mail 2/25/16 from Tony Greer...........84
Exhibit 6 - 5/10/17 News Article - Madison Journal...86
Exhibit 7 - Clarion-Ledger News Article - 7/22/07...109
Exhibit 8 - News article concerning using radar.....119
Exhibit 9 - Roadblocks questioned - Article.........122

## Page 5

```
 1              PAUL GRIFFIN
 2              PAUL GRIFFIN,
 3   after having first been duly sworn by the court
 4   reporter, was examined and testified under oath as
 5   follows:
 6   EXAMINATION BY MR. TOM:
 7       Q   Good afternoon, Supervisor Griffin.  My
 8   name is Joshua Tom.
 9       A   All right, sir.
10       Q   I work with the ACLU of Mississippi, and I
11   represent the plaintiffs in the case, Brown versus
12   Madison County.  Please state your full name for the
13   record.
14       A   Paul Edward Griffin.
15       Q   Have you ever been deposed before?
16       A   Yes.
17       Q   How many times?
18       A   Once or twice.
19       Q   Can you tell me about the first time that
20   you were deposed?
21       A   It was on some economic development
22   lawsuit or something dealing with the county.  It's
23   been so long ago, I can't exactly tell you what it
24   was.
25       Q   And was this during your tenure as a Board
```

PAUL GRIFFIN

1
2  second or third page of this manual that I, and this
3  is a paraphrase, I, Sheriff Randall Tucker, adopt
4  all of Sheriff Trowbridge's policies and procedures.
5      A   Uh-huh.
6      Q   And --
7          MR. GRAVES:  I'm going to object to
8          that.  That's a mischaracterization of
9          what he said, but --
10         MR. TOM:  It's a paraphrase.
11         MR. GRAVES:  And I'm objecting to the
12         paraphrasing of what he said.
13     Q   (Mr. Tom)  Do you have any reason to
14  believe that, based on your experience in Madison
15  County, that Sheriff Tucker has different policies
16  and procedures than Sheriff Trowbridge?
17         MR. GRAVES:  And I object to, one,
18         mischaracterization of what he said.  I'm
19         also going to object to the asked and
20         answered.  He already said that he doesn't
21         know about the differences in the
22         policies.
23     A   Uh -- the sheriff makes up his own policy.
24  So if Towbridge (sic) had some and Randy adopted
25  them, that's their policy.  The Board of Supervisors

PAUL GRIFFIN

1
2  didn't make it up.
3      Q   So you said before that you had had
4  complaints from citizens of Madison County about
5  roadblocks under Sheriff Trowbridge; right?
6      A   Uh-huh.
7      Q   Do you have any reason to believe that
8  Sheriff Tucker has changed the roadblock policy that
9  was under Sheriff Trowbridge?
10         MR. GRAVES:  And we object to that as
11         asked and answered.  He already said
12         Sheriff Tucker has them all over the
13         county.  I know it's been awhile, but he
14         already said that.
15     A   Yeah.  Policy -- roadblock policies, I
16  don't know.  Do you have a -- I haven't read his
17  policies to know he have a policy on roadblocks.
18  Roadblocks is taught in the State Academy.  You have
19  to look up their policy to know what the policy of
20  roadblocks are.
21     Q   (Mr. Tom)  So you have no basis to say
22  that Sheriff Tucker is doing roadblocks differently
23  than Sheriff Trowbridge; right?
24         MR. GRAVES:  Object to the form.
25     A   No, I don't know any difference, but I'm

PAUL GRIFFIN

1
2  not out there.  I'm not a deputy, and I'm not out
3  there.
4      Q   (Mr. Tom)  And the fact that somebody
5  hasn't complained about a roadblock under
6  Sheriff Tucker doesn't mean that he's not doing
7  roadblocks; right?
8      A   I'd have to agree.
9      Q   Now, does the sheriff's department ever
10  provide any documents or statistics to the Board of
11  Supervisors?
12     A   No, none I recall.
13     Q   Now, have you ever heard anyone at the
14  sheriff's department that works for the sheriff's
15  department use a racially or a racial slur?
16     A   No, I haven't heard it.
17     Q   Now, when you had those complaints against
18  Sheriff Trowbridge about the roadblocks, did you
19  have concerns about racial profiling under
20  Sheriff Trowbridge?
21     A   Yes.
22     Q   And what were those concerns?
23     A   Racial profiling.
24     Q   And do you think that Sheriff Trowbridge
25  racially profiled residents of Madison County?

PAUL GRIFFIN

1
2      A   I can't say that Sheriff Towbridge (sic)
3  racially profiled.  He might not even know what was
4  going on.  I don't think the sheriff did, but he
5  might not have even knew it was going on, if it was
6  going on.
7      Q   You said he did know or did not know?
8      A   He could not have known, not have known it
9  was going on.  Madison County is a big county, if it
10  was going on.
11         (Exhibit 7 marked for the record)
12     Q   (Mr. Tom)  This will be 7, please.
13  Exhibit 7.  Now, Exhibit 7, Mr. Griffin, is an
14  article from the The Clarion-Ledger dated
15  July 22, 2007.  (PAUSE)  Feel free to read the
16  second page.  I'm only going to ask you about the
17  first page though.
18     A   Okay.  All right.
19     Q   So do you see your quote down here?
20     A   Yes.
21     Q   "Madison County District 5 Supervisor,
22  Paul Griffin said, 'Many people in Madison County
23  are aware that the department,' which is talking
24  about the sheriff's department, 'is perceived as
25  targeting blacks, and I have tried to get Trowbridge

Page 114

PAUL GRIFFIN

again.

Q   (Mr. Tom)  You said that the sheriff's department may not be policing areas with white people.

A   Okay.

Q   And that could account for this discrepancy in DUI arrests.  Isn't that what you said?

A   Yeah.  Yeah.

Q   And so in your experience as a law enforcement deputy with the sheriff's department, did the sheriff's department police black and Hispanic areas more than white areas?

A   Uh -- no, they did not.

Q   So if they did not police black and Hispanic areas more than white areas, what do you think the explanation for this discrepancy in DUI arrests is?

A   I don't know.

Q   Do you think it has to do with racial profiling?

A   Uh -- I'm not -- I can't get in no deputy's mind, so I can't say.

Q   In your law enforcement experience, what

Page 115

PAUL GRIFFIN

would be the reasons beyond racial profiling that would explain this discrepancy in DUI arrests?

MR. GRAVES:  Object to the form.

A   I don't know none.  Show don't.

Q   (Mr. Tom)  Can't think of one?

A   Not more than profiling, no.

Q   So do you remember in 2006 when a group of Canton residents, they called themselves Concerned Citizens of Canton, presented the Madison County Board of Supervisors with a petition bearing 664 signatures, demanding the end of frequent roadblocks in the predominantly black areas, excessive force and brutality administered by police officers in racial profiling?

A   Yeah, I remember that.

Q   And did you think that those concerns had merit?

A   Yes, I think they did.

Q   And do you remember in July 2006, Canton resident Laura Elaine attended a Madison County Board of Supervisors meeting on behalf of the concerned citizens of Canton?  Sheriff Trowbridge was at this meeting, but he refused to meet with representatives from the Concerned Citizens of

Page 116

PAUL GRIFFIN

Canton.

Sheriff Trowbridge denied using racial profiling and stated that the Madison County Sheriff's Department would continue using roadblocks as a policing practice.  Do you remember this board meeting?

A   Yes.

Q   So Sheriff Trowbridge did know about these concerns about racial profiling; right?

MR. GRAVES:  Objection.  Asked and answered.

A   It looks like he do.  He was in that meeting, and he chose not to meet with that group or that leader.

Q   (Mr. Tom)  So the answer to my question is yes?

A   Yes.

Q   So what did you do to try to get Sheriff Trowbridge to meet with the Concerned Citizens of Canton?

A   It wasn't much for me to do when he in open meeting saying he wasn't going to meet with them.

Q   So do you remember a group of residents

Page 117

PAUL GRIFFIN

from Flora in October 2007, called Concerned Citizens II of Flora that complained about roadblocks in Flora?

A   I want to say I do.  Now, I don't want to get these meetings confused, but I would say yes.

Q   And did you think that the concern, the Concerned Citizens II of Flora concerns had merit?

A   Uh -- yes.

Q   So in a November 2007 board meeting, Sheriff Trowbridge denied charges of racial profiling.  At this meeting, former District 4 Supervisor, Karl Banks, expressed his disappointment at the way that the Board of Supervisors had addressed the issue of racial profiling.

Supervisor Banks stated that he routinely fielded complaints about the Madison County Sheriff's Department and said that Sheriff Trowbridge should work with people to change the department's image. He's quoted, that's Karl Banks is quoted as saying, "The conversation today was about a feeling in the community.  I know, as an African-American, that there's a real feeling in the community that the department," speaking of the sheriff's department, "is discriminating against

30 (Pages 114 to 117)

PAUL GRIFFIN

1
2  people."
3      Do you remember that?
4      A   Yes.
5      Q   And do you agree with Mr. Banks that
6  there's a feeling in the community about racial
7  discrimination?
8          MR. GRAVES:  Are you talking about
9      back in 2007?
10         MR. TOM:  Yes.
11     A   Yes.
12     Q   (Mr. Tom)  So do you have any reason why
13  the board minutes don't reference any of these
14  complaints about racial profiling?
15         MR. GRAVES:  Objection.  Asked and
16     answered.  He already said unless they
17     voted on something, it wouldn't be in the
18     board meeting.
19     A   It wasn't voted on.  It wasn't voted on.
20     Q   (Mr. Tom)  Do you remember in 2009 there
21  was a bill that was proposed in Mississippi to
22  outlaw racial profiling?
23     A   No, I don't remember that.
24     Q   So do you remember a bill in 2004 to use,
25  for law enforcement agencies to use radar equipment?

PAUL GRIFFIN

1
2      A   That was presented?
3      Q   Yes.
4      A   To the State or to Madison County?
5      Q   It was to the State.
6      A   Yes.
7      Q   And at this time do you know if a law has
8  ever been passed allowing law enforcement agencies
9  in Mississippi to use radar?
10     A   In -- uh -- deputy sheriff, or who are you
11  talking about using radar?
12     Q   Any law enforcement agency in Mississippi?
13     A   Yeah, the city police and MHP, they can
14  use radar.
15     Q   So city police can?
16     A   Yeah, with a certain amount of population.
17         (Exhibit 8 marked for the record)
18     Q   (Mr. Tom)  This will be Exhibit 8.  So you
19  don't need to read this article.  I'll read the
20  sections that I'm curious about.  So this is an
21  article from March 7, 2004, and it's about the radar
22  equipment that I just talked about.
23     A   Uh-huh.
24     Q   And Sheriff Trowbridge says, "It never got
25  passed, and I don't think it ever will."  Do you

PAUL GRIFFIN

1
2  have any idea why radar is politically unpopular?
3      A   Uh --
4      Q   Why would a bill such as this never be
5  passed?
6      A   I ain't going to say it would never be
7  passed, but the reason why is because -- just my
8  opinion -- there's elected officials, local elected
9  officials concerned that local people would get
10  tickets, and it will fall back on the local
11  officials instead of the State, if they were to let
12  radar come in.
13     Q   So it says down here that the Madison
14  County Board of Supervisors refused to pass a
15  resolution supporting radar legislation.
16     A   Uh-huh.
17     Q   "Board Vice Chairman, Paul Griffin, voted
18  against the resolution, citing fears that radar
19  would be used to racially, in racial profiling of
20  drivers."
21     How would radar be used to racially profile
22  drivers?
23     A   Uh -- just from -- uh -- the only way I
24  can speak is from my law enforcement experience.  If
25  you work a certain area, that's -- that's the people

PAUL GRIFFIN

1
2  you're going to catch is the local people.  So if
3  you work in Ridgeland, you're going to catch local
4  folks, and local folks are going to be the one that
5  live right there in Ridgeland.
6      If you work in Camden or Canton, you're going
7  to catch local folks there.  If that explains what
8  you're asking.
9      Q   And so what you're saying is that a radar
10  gun gives a law enforcement officer indisputable
11  reason to stop someone if the person is going over
12  the speed limit?
13     A   Yeah, it do give them reason to stop them
14  if they're going over the speed limit, yes.
15     Q   And so if you're using radar in a black
16  community --
17     A   You're going to catch black folks.
18     Q   And is that what your concerns are?
19     A   Yes.
20     Q   Do you know if the sheriff's department
21  ever got the ability to use radar?
22     A   No.
23     Q   That is you don't know or they did not get
24  it?
25     A   They did not.

PAUL GRIFFIN

1
2     Q   So they don't use radar?
3     A   No.  That's probably 80 out of 82 counties
4  don't use.
5     Q   So Sheriff Trowbridge at the bottom says,
6  responding to your concerns, "I thought radar was to
7  detect speed, not race."
8        What does he have wrong there?
9     A   What he got wrong?
10    Q   Yeah.
11    A   What I just told you.  You can -- you can
12 get race by working the race area.  If you work the
13 white area, you're going to catch white folks.  If
14 you work black folks, you're going to catch black
15 folks.  If you work the Hispanic area, you're going
16 to catch Hispanics.
17       MR. TOM:  You guys want to take a
18    break?  I've got maybe 30 more minutes.
19       (BRIEF RECESS)
20       (Exhibit 9 marked for the record)
21    Q   (Mr. Tom)  All right, Mr Griffin, this
22 will be Exhibit 9.  We've already talked about this.
23 This is about Concerned Citizens of Canton, and
24 the, when they presented 664 signatures to the Board
25 of Supervisors.  Do you remember when we talked

PAUL GRIFFIN

1
2  about that?
3     A   Uh-huh.
4     Q   This is a Clarion-Ledger article about
5  that event.  And, before, you said you thought that
6  the Concerned Citizens of Canton, their concerns had
7  merit; right?
8     A   Yes.
9     Q   So let's -- this is what they specifically
10 said.  In the second paragraph, it says, "The group
11 she leads called Concerned Citizens of Canton,
12 Mississippi, have gathered 664 signatures asking for
13 an end to frequent roadblocks in the predominantly
14 black neighborhoods, excessive force and brutality
15 administered by police officers and racial
16 profiling."
17       So if you look towards -- uh -- three
18 paragraphs down it says, "The majority of
19 complaints" -- speaking of these complaints that I
20 just listed -- "are directed at the Madison County
21 Sheriff's Department, Blair said."
22       So, let's go by these one-by-one.  Do you think
23 that the Concerned Citizens of Canton, their
24 concerns about frequent roadblocks in the
25 predominantly black areas when this article -- uh --

PAUL GRIFFIN

1
2  at this time, do you think that that had merit?
3     A   Yes.
4     Q   Do you think that the excessive force and
5  brutality administered by police officers had merit?
6     A   I can't say.  I wasn't there on that
7  issue.
8     Q   And it says "and racial profiling."  Do
9  you think that has merit?
10       MR. GRAVES:  Are you talking about at
11    the time?
12       MR. TOM:  As it relates to this
13    particular complaint, yes, and this
14    article.
15    A   I would say that that group thought so,
16 so, yes, I would say I thought it had a little
17 merit.
18    Q   (Mr. Tom)  Now, turn to the second page,
19 please?  And if you look on the, you're quoted here,
20 District 5 Supervisor Paul Griffin.  "Griffin said
21 he's received numerous complaints alleging verbal
22 abuse, as well as some cases of physical abuse at
23 the hands of the sheriff's department."
24       Do you remember these complaints?
25    A   Uh -- I can't say that I do.

PAUL GRIFFIN

1
2     Q   Do you have any reason to believe that
3  what you said here was wrong?
4     A   No.
5     Q   So and you say, "When he served under a
6  previous sheriff, he said he witnessed abuse."  And
7  this is under -- uh -- what sheriff did you work
8  under again?
9     A   Jessie Hopkins.
10    Q   Hopkins.  So what kind of abuse are you
11 talking about here?
12    A   Uh -- I guess you would call what would be
13 physical abuse.
14    Q   Excessive force?
15    A   No, I wouldn't call it that.  Uh -- there
16 was a guy being chased, and he ran out in the field,
17 and the deputy put a lot of mud on the violator's
18 face after he caught him.  That's the type.  It
19 wasn't no reason for him to do that.
20    Q   Do you remember what the violator had done
21 or what he was --
22    A   I don't know what the initial charge was,
23 but he was -- he was running from the police at that
24 time. I don't know what the initial charge was.
25    Q   So we've talked before -- this is going

32  (Pages 122 to 125)

Page 134

PAUL GRIFFIN

1
2   Q   Are you aware of any policy in the
3   Madison County Sheriff's Department that says that
4   any type of policing practices should be conducted
5   based on race?
6   A   No.
7       MR. GRAVES:  No further questions.
8       MR. TOM:  I just have one more
9   question.
10  FURTHER EXAMINATION BY MR. TOM:
11  Q   Are you aware of any policies with the
12  Madison County Sheriff's Department that would
13  ensure that racial profiling does not happen?
14  A   No.  And because I --
15      MR. GRAVES:  Go ahead.
16  A   Well, the Board of Supervisors didn't put
17  the sheriff's policies together.  The sheriff's
18  policy is the sheriff's policy.
19  FURTHER EXAMINATION BY MR. GRAVES:
20  Q   And so this is my last follow-up question
21  to that.  So and if I'm hearing you right, that just
22  means you're saying you don't know one way or the
23  other whether there is or not?
24  ///
25

---

Page 135

PAUL GRIFFIN

1
2   A   No, sure don't.
3       MR. GRAVES:  No further questions.
4       (Deposition concluded at
5   approximately 7:50 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 136

CERTIFICATE OF COURT REPORTER

1
2
3
4       I, DEBORAH H. NELSON, Court Reporter and Notary
5   Public for the State of Mississippi, do hereby
6   certify that the above and foregoing pages
7   contain a full, true, and correct transcript of the
8   proceedings had in the forenamed cause at the time
9   and place indicated, which proceedings were recorded
10  by me to the best of my skill and ability.
11      I also certify that I placed the witness under
12  oath to tell the truth and that all answers were given
13  under that oath.
14      I certify that I have no interest, monetary or
15  otherwise, in the outcome of this case.
16      Witness my signature and seal this the 23rd day
17  of January, 2018.
18
19
20
21
22      _____
23          DEBORAH H. NELSON, CSR 1256
24  My Commission Expires:
25  March 6, 2018

---

Page 137

CERTIFICATE OF DEPONENT

1
2
3       I, PAUL GRIFFIN, certify that I have
4   examined the foregoing pages as to the correctness
5   thereof, and that after reading said pages, I find
6   them to contain a full and true transcript of the
7   testimony as given by me on WEDNESDAY, JANUARY 10,
8   2018 except for the list of corrections, if any,
9   attached on a separate sheet with the page number,
10  line number and the desired correction/change.
11      Witness my hand, this the _____ day of
12  _____, 2018.
13
          _____
14              PAUL GRIFFIN
15              CERTIFICATE
16      Subscribed and sworn to before me, this the
17  _____ day of _____, 2018.
18
19  MY COMMISSION EXPIRES:  _____
20
21      _____       NOTARY PUBLIC
22
23
24
25

35 (Pages 134 to 137)

Page 138

1          ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No. Now Reads    Should Read  Reason
6    ___ ___ _____    _____  _____
7    ___ ___ _____    _____  _____
8    ___ ___ _____    _____  _____
9    ___ ___ _____    _____  _____
10   ___ ___ _____    _____  _____
11   ___ ___ _____    _____  _____
12   ___ ___ _____    _____  _____
13   ___ ___ _____    _____  _____
14   ___ ___ _____    _____  _____
15   ___ ___ _____    _____  _____
16   ___ ___ _____    _____  _____
17   ___ ___ _____    _____  _____
18   ___ ___ _____    _____  _____
19   ___ ___ _____    _____  _____
20
21          _____
            Signature of Deponent
22
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2018.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____

EXHIBIT 3

1          RANDALL TUCKER
2     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3              NORTHERN DIVISION
4  LATOYA BROWN; LAWRENCE
   BLACKMON; HERBERT ANTHONY
5  GREEN; KHADAFY MANNING;
   QUINNETTA MANNING; MARVIN
6  McFIELD; NICHOLAS SINGLETON;
   STEVEN SMITH; BESSIE THOMAS; and
7  BETTY JEAN WILLIAMS TUCKER,
   individually and on behalf of a class
8  of all others similarly situated,          PLAINTIFFS
9
10 V.          CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11 MADISON COUNTY, MISSISSIPPI;
   SHERIFF RANDALL S. TUCKER in his
12 official capacity; and MADISON COUNTY
   SHERIFF'S DEPUTIES JOHN DOES #1
13 through #6, in their individual capacities,
14                                      DEFENDANTS
15
16    ***********************************************
17    VIDEOTAPED DEPOSITION OF SHERIFF RANDALL TUCKER
18    ***********************************************
19            APPEARANCES NOTED HEREIN
20
         DATE: THURSDAY, DECEMBER 21, 2017
21           PLACE: HILTON GARDEN INN
              WEST CAPITOL STREET
22                Jackson, MS
              TIME:  9:00 A.M.
23
24       REPORTED BY: DEBORAH H. NELSON
                  CSR #1256
25  JOB NO. 133425

Page 2

```
1              RANDALL TUCKER
2
3    APPEARANCES:
4
5         JONATHAN YOUNGWOOD, ESQUIRE
          JANICE GOCHMAN, ESQUIRE
          Simpson Thacher & Bartlett
6         425 Lexington Avenue
          New York, NY  10017
7
8
9         JOSHUA TOM, ESQUIRE
          JENNIFER RILEY COLLINS, ESQUIRE
10        American Civil Liberties Union of MS
          233 East Capitol Street
11        Jackson, MS  39201
12
13
14        COUNSEL FOR PLAINTIFFS
15
16        CHARLES ROSS, ESQUIRE.
          MICHAEL WALLACE, ESQUIRE
          Wise Carter Child & Caraway
17        401 East Capitol Street
          Jackson, MS  39201
18
19
20
21        REBECCA COWAN, ESQUIRE
          Currie Johnson & Myers
22        Post Office Box 750
          Jackson, MS  39205
23
24
25        COUNSEL FOR THE DEFENDANT
```

Page 3

```
1              RANDALL TUCKER
2
3
4    VIDEOGRAPHER:  Eddie Nabors
5
6
7    ALSO PRESENT:
8    Ms. Jade Morgan
9    Chief Jeremy Williams
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              RANDALL TUCKER
2              I N D E X
```
```
3    Style and Appearances...............................1
4    Examination by Mr. Youngblood.......................6
5    Examination by Mr. Ross...........................288
6    Further Examination by Mr. Youngblood.............297
7    Court Reporter's Certificate......................302
8    Deponent's Certificate............................303
9
10
11             EXHIBITS
12   Exh.  1 - Transcript of Robert Gibson case..........31
13   Exh.  2 - Answer by Defendants 6/17.................36
14   Exh.  3 - Response to Interrogatories...............37
15   Exh.  4 - Response to Request for Admission........38
16   Exh.  5 - E-mail....................................42
17   Exh.  6 - Rylan Thompson's testimony...............66
18   Exh.  7 - Bates Number 1182 - e-mail...............70
19   Exh.  8 - Bates Number 955 - e-mail................70
20   Exh.  9 - MC e-mails 375-376.......................74
21   Exh. 10 - Policies and Procedures of the Sheriff....89
22   Exh. 11 - Jackson Free Press Release...............95
23   Exh. 12 - Randy Tucker Press Release...............97
24   Exh. 13 - Complaint...............................100
25   Exh. 14 - Sobriety Checkpoint Guidelines..........141
```

Page 5

```
1              RANDALL TUCKER
```
```
2    Exh. 15 - Notice of Checkpoints...................153
3    Exh. 16 - Notice of Checkpoint...................158
4    Exh. 17 - Notice of Checkpoint - 2013.............158
5    Exh. 18 - Incident Report.........................159
6    Exh. 19 - Letter from Angela Lyons 10/31/17........163
7    Exh. 20 - Chief Deputy Williams' notes.............166
8    Exh. 21 - Bates Number 1343-1399 MC emails.........170
9    Exh. 22 - Brief of the City of Jakson..............204
10   Exh. 23 - Decision by Court of Appeals.............207
11   Exh. 24 - Memo from Shirlene Anderson to S. Moore..210
12   Exh. 25 - Interview with the Madison Co. Journal...224
13   Exh. 26 - narrative by Chief Williams - Manning....243
14   Exh. 27 - Memo from S. McCarty - affidavit.........266
15   Exh. 28 - Bates No. Mc RFP 8 29 through 8 81.......267
16   Exh. 29 - Complaint - Cooper vs. Tucker............275
17   Exh. 30 -Investigational Report of Chief Williams..276
18   Exh. 31 -MC email 264 - from Susan McCarty.........278
19   Exh. 32 -FB Posting - Tucker WLBT - 8/2/15.........283
20   Exh. 33 -FB posting - 8/27/16 - screen-shot........284
21
22
23
24
25
```

RANDALL TUCKER

1  of or mandatory use of safety or bulletproof vests
2  used to apply to certain individuals and officers
3  certain units.  We have made that mandatory for
4  everybody -- uh -- the wearing of traffic safety
5  vests -- uh -- used to apply to the guys on the DUI
6  grant.  Now, it applies to every deputy.  I mean,
7  off of the top of my head, I can't necessarily think
8  of anymore.
9      Q   Okay.  And sitting here today, are there
10  any policies or procedures that you plan to change?
11      A   No.
12      Q   Okay.  You campaigned, in part, back in
13  2011, on a promise to seek to effectively continue
14  the policies and procedures of Sheriff Trowbridge;
15  is that fair to say?
16      A   No, that's not fair to say.  I didn't say
17  I would continue his policy and procedures, which I
18  said I would campaign on the basis of continuing
19  professional, good professional law enforcement.
20      Q   Okay.
21      A   You wanted to maintain quality of law
22  enforcement that the county had under Sheriff
23  Trowbridge.  Would that be a fair summary of your
24  campaign statements?

RANDALL TUCKER

1      MR. ROSS:  I object to the form.
2  Very broad and --
3      A   Can you repeat that question?  I'm not
4  sure I understand it.
5      Q   (Mr. Youngwood)  Let me show you an
6  updated document.
7      A   Okay.  All right.
8          (Exhibit 11 marked for the record)
9      Q   Let me give you Exhibit 11, sir.  This is
10  a printout we obtained off the Internet from the
11  Jackson Free Press back from August 2011.
12      A   Okay.
13      Q   If you -- do you recall this article?
14      A   No, it's my first time seeing it.
15      Q   Okay.  Well, if you'd turn to the second
16  page, sir, you'll see there's a reference to you.
17      A   Yeah.
18      Q   Have you seen this page before?
19      A   Not to my knowledge.  Not that I recall.
20      Q   You don't recall answering questions for
21  the Jackson Free Press in connection with your
22  campaign for sheriff?
23      A   I may have answered questions, but I have
24  never seen this page is what you asked me.

RANDALL TUCKER

1      Q   Okay.  Well, do you recall -- you said you
2  may have.  Do you believe you answered questions
3  asked to you by the Jackson Free Press in 2011, in
4  connection with your campaign?
5      A   I don't recall that.
6      Q   Why don't you take a look, if you could,
7  sir, under the heading "Why Do You Want to Run for
8  Sheriff?"
9      A   Yes.
10      Q   And the words below it say you want to
11  maintain quality of law enforcement that we have
12  under Sheriff Trowbridge.  Do you see that sentence?
13      A   I do.
14      MR. ROSS:  I'd ask the witness to be
15  given just a few seconds to read.
16      MR. YOUNGWOOD:  Sure.  Absolutely!
17      Q   (Mr. Youngwood)  Take your time.
18      A   (PAUSE)  I've read that statement.
19      Q   Okay.  Do you believe that's a statement
20  you gave to the Jackson Free Press back in 2011?
21      MR. ROSS:  Objection.  Asked and
22  answered.
23      A   I don't recall making the statement.
24      Q   (Mr. Youngwood)  Would it be a true

RANDALL TUCKER

1  statement on, as of August 2011, was it your desire
2  to maintain the quality of law enforcement that we
3  have under Sheriff Trowbridge?
4      A   Yes.
5      Q   And if I could give you now what I'll mark
6  as Exhibit 12, sir.
7          (Exhibit 12 marked for the record)
8      A   Do you mind if I move that?  I'm just
9  trying to keep them in order so I can go back to
10  them.
11      Q   Yeah, you're going to be better than me at
12  that today.  So this is Exhibit 12, sir.  I'll tell
13  you that on the top is just this past Sunday's date
14  which reflects the date we printed this.  But if you
15  can take a look at this and if you'll look on the
16  second page, you'll see it says "Randy Tucker Press
17  Release, 1/18/11," and it says "posted January 19,
18  2011, 4:32 P.M."
19      Let me know if you recognize this document as a
20  press release that you issued in connection with
21  your campaign for sheriff back in January 2011.
22      A   I put out a lot of press releases, and I
23  don't recall this specific one, but I'm not
24  disputing that this --

Page 98

RANDALL TUCKER

1
2      Q   Okay.  The sentence that I want to refer
3   you to is in the second paragraph of it, where the
4   document reads "As Madison County Sheriff, I will
5   continue the high level of law enforcement and
6   justice Madison County residents expect and have
7   enjoyed under Sheriff Toby Trowbridge."
8      Do you see that?
9      A   I do.
10     Q   And do you believe that's a statement you
11  made in January 2011?
12     A   Uh -- I don't recall making the statement,
13  but if it's part of the release that I -- if it is,
14  in fact, a release that I did, yes.
15     Q   Okay.  Well --
16     A   It says, "My campaign for sheriff will be
17  about maintaining professionalism, integrity, and
18  high quality of law enforcement in Madison County."
19  That's what I just telling you.
20     Q   And the words you just referred to by
21  "maintaining," you're referring to maintaining the
22  levels of professionalism, integrity, and high
23  quality that were in place under Sheriff Trowbridge;
24  correct?
25     A   Yes.

Page 99

RANDALL TUCKER

1
2      Q   All right.  And that was, in fact, the
3   intent of your campaign; correct?
4          MR. ROSS:  Object to the form.  It's
5      very broad.
6      A   The intent of my campaign was not to
7   emulate Toby Trowbridge, if that's what you're
8   asking me.  The intent of my campaign was to get
9   elected and provide professional law enforcement to
10  Madison County on a continuing basis.
11     Q   (Mr. Youngwood)  And by your -- uh -- and
12  part of your campaign promises were to maintain the
13  level of professional integrity and high quality of
14  law enforcement in place under Sheriff, that were in
15  place under Sheriff Trowbridge; correct?
16     A   Yes, he had some very good qualities.
17     Q   Did he have some bad qualities?
18     A   Everyone does.  Everyone has good and bad.
19     Q   Well, as sheriff, as sheriff, what, what
20  undesirable qualities did you see?
21     A   Well, I think --
22          MR. ROSS:  I object to the form.
23      Very broad.  I don't see any relevance to
24      this.  Talking about personal qualities?
25          MR. YOUNGWOOD:  No, as sheriff.  As

Page 100

RANDALL TUCKER

1
2   carrying out his professional duties.
3          MR. ROSS:  You can answer to the best
4      of your knowledge.
5      A   In my opinion, he wasn't around enough to
6   help his chief deputy with the day-to-day operations
7   of the department.
8      Q   (Mr. Youngwood)  Anything else?
9      A   Not off of the top of my head, no.
10     Q   By "not around enough," what do you mean?
11     A   He was out of the office a lot.
12     Q   Out of the office as -- strike that.  I'll
13  give you what we'll mark as Exhibit 13, sir.
14         (Exhibit 13 marked for the record)
15     Q   This is a copy of the complaint in this
16  action.  I take it from your earlier testimony you
17  have previously read this document?
18     A   I have.
19     Q   I'd like to refer you to page 36 of the
20  document, and on page 36 there begins a
21  section titled, a section for "The MSCD's Policing
22  Program is longstanding and deeply entrenched."  Do
23  you see that?
24     A   Yes, I see that.
25     Q   Okay.  And is this a section of the

Page 101

RANDALL TUCKER

1
2   complaint you previously reviewed?
3      A   Yes.
4      Q   Okay.  I'd like to refer you forward a bit
5   to some paragraphs that concern Sheriff Trowbridge
6   that begin on paragraph 115.  Paragraph 116,
7   "Sheriff Trowbridge's unconstitutional, racially
8   discriminatory policing practices were widely known
9   throughout Madison County."  Do you agree with that
10  statement?
11     A   No.  I think that's someone's opinion.
12     Q   Okay.  Were you aware of unconstitutional
13  policing practices carried out by Sheriff
14  Trowbridge?
15     A   No.
16     Q   If you'll go to paragraph 118, it talks
17  about "a group of Canton residents bringing a
18  petition to the attention of the Madison County
19  Board of Supervisors with 664 signatures, demanding
20  end of frequent roadblocks in the predominantly
21  black neighborhoods, the excessive force and
22  brutally administrated, and brutality administrated
23  by police officers and racial profiling."  Do you
24  see that?
25     A   I see that.

Page 170

RANDALL TUCKER

1   importance of an election year at this meeting?
2   
3        A   I do not.
4            (Exhibit 21 marked for the record)
5        Q   I'll give you what's marked as Exhibit 21,
6   sir.  It's the Bates Number MC e-mails 1343 to 1388.
7   The top of it, at least, are some e-mails on which
8   you are on.  Just take a moment to look at them, and
9   then I'll ask you my question.
10       A   You want me to look at each one of these
11  individually?  Is that what you're saying?
12       Q   No, I think I'm going to direct you to the
13  first two pages and -- OR really just the first,
14  maybe the first two pages.
15       A   I'm sorry, you said three pages?
16       Q   Two pages.
17       A   Two pages?  Okay, I've read them.
18       Q   Do you recall this e-mail exchange?
19       A   Yeah, vaguely, I do.
20       Q   What do you recall about it?
21       A   I don't necessarily recall the content.  I
22  remember these or I can see that these are e-mails
23  from Trey Bobinger to me where he sent me some --
24  uh -- proposed -- uh -- I don't what the correct
25  term is, bills or legislation being proposed by the

Page 171

RANDALL TUCKER

1   
2   ACLU.
3        Q   And who is Mr. Bobinger?
4        A   He's a lobbyist for the Mississippi
5   Sheriff's Association.
6        Q   And he writes to you on January 8, 2016,
7   at 4:35 P.M.: "Sheriff, I received this e-mail from
8   the representative of the ACLU today, contains three
9   bills they are going to have introduced in the
10  current legislative session.  Please review.  I know
11  you are going to be all for them!!"  And then in
12  parentheses the word "crazy!"  Do you see that?
13       A   I do.
14       Q   And your response was, "I've read these."
15  Is that correct?  You read them before writing this
16  e-mail?
17       A   That's what it says.
18       Q   Well, do you believe it to be true?
19       A   I have no reason to lie.
20       Q   "And all are utterly ridiculous."  Do you
21  see that?
22       A   Absolutely, I see it.
23       Q   What did you find ridiculous about them?
24       A   Well, without having them here in front of
25  me to reread and refresh my memory of what they

Page 172

RANDALL TUCKER

1   
2   contain, I couldn't tell you.  I'm sure if I thought
3   they were ridiculous, I thought they were
4   ridiculous.
5        Q   Okay.  Well, I believe the bills are
6   actually attached to the e-mail at 1345.
7        A   Okay.
8        Q   Take a look and look at whatever it is you
9   need to look at.  We can go one at a time if you
10  want.  I'd like to know what you thought was
11  ridiculous about them.
12           MR. ROSS:  Can we go off the record
13       while he's reading.
14           (OFF RECORD BRIEFLY)
15       A   (WITNESS EXAMINES REPORT)
16       Q   (Mr. Youngwood)  Go ahead, Mr. Tucker.
17  Sheriff Tucker.
18           VIDEOGRAPHER:  One second, please.
19       Back on the record.
20       Q   (Mr. Youngwood)  We went off the record at
21  some point, but let's just let the record reflect
22  that Sheriff Tucker has been reviewing the document
23  during the break.  By my account, he began reviewing
24  the document at 1:51 P.M., and it is now 1:58.  And
25  Sheriff Tucker, there is a question.

Page 173

RANDALL TUCKER

1   
2        A   And the question was, was this part of
3   what you wanted me to review, or was it just this
4   first one?
5        Q   Well, whatever you need to review to
6   answer my question, which is what led you to write
7   that "I've read all of these."  I'm sorry, I
8   misspoke, "I've read these and all are utterly
9   ridiculous."
10       So whatever you need to review, whatever you
11  reviewed in 2016 to come to that statement, to allow
12  you to make that statement, I'd ask for you to
13  review and then tell me the basis for the statement.
14           MR. ROSS:  And let the record reflect
15       that Exhibit 21 is two pages of e-mails
16       and then 42 pages of consisting of three
17       separate legislative bills.  And so if you
18       want him to take the time to read all of
19       them, take as much time.  If you want --
20       if he's going to read it and he needs to
21       read all of it, he should take the time
22       that he needs.
23       A   That was actually my question.  Was there
24  a specific area or --
25       Q   (Mr. Youngwood)  Well --

RANDALL TUCKER

1
2       A   I can address the body camera one first
3   and then go to the next one.  However you want me to
4   do it.
5       Q   Well, let me make sure.  If you look back
6   on the first page of the exhibit, you received this
7   e-mail from Mr. Bob Bobinger at 4:35 P.M.; correct?
8       A   Yes, that's what it says.
9       Q   And you responded using your iPhone at
10  4:40 P.M., five minutes later.  Do I read that
11  correctly?
12      A   Yes.
13      Q   Okay.  So did you open the attachments?
14      A   Yes.
15      Q   Between 4:35 and 4:40?
16      A   Yes.
17      Q   And you spent up to five minutes reviewing
18  them; correct?
19      A   Yes.
20      Q   And you have now had them in front of you
21  for nine minutes, not on an iPhone but in hard copy.
22  So do you need more time today to review them than
23  you needed in 2016 to come to the conclusion that
24  they are utterly ridiculous?
25      A   I'm sorry, by my e-mail you probably

RANDALL TUCKER

1
2   didn't understand him sending them was not the
3   first time I had seen them.
4       Q   Okay.
5       A   So, no, I'm not a speed reader.  I didn't
6   read them in four or five minutes.
7       Q   Why don't we go with the first one.  Why
8   don't you tell me what about it you found to be
9   utterly ridiculous?
10      A   I think the body cameras are an extreme
11  burden to law enforcement in that they can cause an
12  officer to hesitate when action needs to be taken at
13  the scene of an incident or at the time of a
14  criminal offense.  I think it unduly burdens a
15  department to try to figure out a way to manage to
16  store data for that length of time.  That's an
17  exuberant cost I don't know if you're familiar with.
18  I'm not necessarily greatly familiar with it,
19  myself, but according to our IT Department, it would
20  be a significant expense.
21      And at the time this was being proposed, there
22  were some pilot programs up in the northern part of
23  the United States that we were waiting to get the
24  results of, some of which turned them back in saying
25  that they didn't want to participate.  And it opens

RANDALL TUCKER

1
2   up, I mean it labels a department or it saddles a
3   department with all manner of new policy and
4   procedure and opens them up to extensive lawsuit
5   based on the fact that they suggests that every
6   department should wear body cameras, basically, was
7   the gist of the bill.
8       Q   Can you see any good that would come with
9   having officers wear body cameras, sir?
10      A   I don't know about body cameras, but
11  there's good comes from cameras.  Obviously, that's
12  the reason that my administration put them in every
13  vehicle that we patrol with.
14      Q   We'll get to the vehicles in a moment, but
15  would you agree with me that if the officers were
16  wearing body cameras, it would be easier to track
17  whether or not an officer behaved in any police
18  misconduct?
19      A   I can't answer that.  We haven't done
20  that.
21      Q   Okay, and, well, you haven't done it, but
22  you concluded the bill was ridiculous; right?
23      A   I think it is ridiculous.  That's my
24  opinion.
25      Q   All right.  And would you agree with me

RANDALL TUCKER

1
2   that body cameras might assist in preventing
3   officers from acting in an impermissible racially
4   discriminatory manner?
5           MR. ROSS:  Object to the form.
6       Absolutely no context to your question.
7       A   I have professional officers.  They're
8   screened.  I don't believe they act inappropriately
9   in any rate.  I don't agree with your assessment.
10      Q   (Mr. Youngwood)  Okay.  Why don't we go,
11  skip the second of the bills and go to the third,
12  the one that's described in the PDF or in the first
13  page of the exhibits -- "oral advisement, written
14  consent part of search of a vehicle or person."
15  See if you can find that in the attachments.  Take a
16  review and --
17          MR. ROSS:  What page is that on?
18          MR. YOUNGWOOD:  Well, he's the one
19      who reviewed them a year ago or almost
20      two.
21      Q   (Mr. Youngwood)  I'm going to let you tell
22  me what you need to review to tell me why you found
23  the third of these three bills utterly ridiculous.
24      A   Can you tell me a page, or do you just
25  want me to just sit here and figure out what you're

Page 282

RANDALL TUCKER

1
2  about racially discriminatory practices?
3      A   I understand that's his claim.
4      Q   Have you discussed that with Lieutenant
5  Sandridge?
6      A   With my attorneys.
7      Q   Leave it outside of the attorneys have you
8  discussed it with him?
9      A   No.
10     Q   Did you have any conversations with
11 Mr. Gibson prior to his dismissal from the
12 department regarding racial issues?
13     A   No, he never came to me with a racial
14 issue.
15     Q   Are you aware of him coming to anyone in
16 the department with a racial issue prior to his
17 dismissal?
18     A   No, I'm not aware that he ever approached
19 anyone.
20     Q   Okay.  I'm sorry, do you have a Facebook
21 account?
22     A   I do.
23     Q   And at least some of your postings you
24 have made public?
25     A   It's very possible.  I don't know.  I'm

Page 283

RANDALL TUCKER

1
2  not a real guru with it.
3      Q   Neither am I, sir.  I'm going to give you
4  one or two postings that we were able to obtain, you
5  know, showing something from the Internet.
6      A   Okay.
7      Q   I'll represent to you they come from your
8  Facebook account.  This is Exhibit 32.  It doesn't
9  have a Bates number or anything.  It says on the top
10 of it "Randy Tucker, Sher. WLBT 3 on your side
11 photo, August 2, 2015."
12     I believe the way it works, sir, is the top of
13 the page is something you posted; at the bottom, may
14 be responses that certain people made to it.  Do you
15 see that?
16     A   I see that I shared WLBT 3's photo.
17     Q   And what is WLBT 3?
18     A   It's a local TV station.
19     Q   Okay.  And why did you share this photo?
20     A   I can't say for sure, but I'm sure it's in
21 reference to an officer being shot.
22     Q   There are certain comments written below.
23 One by Lisa Potter.  Do you know who that is?
24     A   I do not.
25     Q   Okay.  Bernie Higginbotham, Jr., do you

Page 284

RANDALL TUCKER

1
2  know who that is?
3      A   I do not.
4      Q   John Mag-ee?  Do you know who that is?
5      A   That's John Ma-gee, yes, I know him.
6      Q   Okay.  Who is he?
7      A   He's a high school friend I went to school
8  with.
9      Q   And Andy Divine?  Do you know who that is?
10     A   I do.  I know Andy Divine.
11     Q   Okay.  Do you recall these postings being
12 made regarding your posting?
13     A   No, it's not uncommon that I would share
14 something like that, and I'd probably never go back
15 and review any comments, so no, I don't recall
16 them.
17     Q   You can put that aside.
18         (Exhibit 33 marked for the record)
19     Q   I'm going to give you what I've marked as
20 Exhibit 33.  This is another screen-shot from what
21 we understand to be your Facebook page.  And I
22 should have asked you on the prior one, 31, which
23 maybe you could flip back to for one moment.  Have I
24 described it to you, but would you agree with me,
25 sir, that this appears to be from your Facebook

Page 285

RANDALL TUCKER

1
2  page?  30 -- I'm sorry.  32.  I'm
3  confusing the record.  I apologize.  32, which is
4  the screen-shot of, it's August 2, 2015.  Let's
5  identify it that way.
6      A   Yes.
7      Q   And this appears to be from your Facebook
8  page and something you shared?
9      A   Yes.
10     Q   Okay.  And 33, which is, again, something
11 we pulled off the Internet, August 27, 2016.  Would
12 this also be something you shared on your Facebook
13 page?
14     A   It's very possible, and, yes, it appears,
15 yes.
16     Q   Okay.  I want to ask you who Lisa Williams
17 is, sir?
18     A   Uh -- I don't know how to describe her,
19 other than she's Lisa Williams.  She's a lady that
20 lives in Gluckstadt.
21     Q   A friend of yours or an acquaintance of
22 yours?
23     A   I mean I know her, but, no, we're not
24 friends.
25     Q   Okay.  And then Linda Brady Fitzgerald.

Page 286

RANDALL TUCKER

1
2  Is that somebody you know?
3      A  I have no idea who that is.
4      Q  And Michael Herndon?
5      A  No, sir.
6      Q  Okay, you can put that to the side.  There
7  was an incident in January 2016, when Councilman
8  Kenneth Stokes made some statements that got your
9  attention.  Do you recall that?
10     A  Yes, sir, I do.
11     Q  Okay, and he said something about throwing
12 rocks and bricks on, presumably, police officers;
13 correct?
14     A  Yes.
15     Q  And you, obviously, took offense to that?
16     A  I did.
17     Q  Okay.  In a video interview set, sir, with
18 The Clarion-Ledger, do you recall telling them that
19 Stokes is setting his race back by implicating a
20 race issue?
21     A  I don't recall saying it, but if that's,
22 if it's on video, it is what it is.
23     Q  Okay.  Would you -- I can show you that
24 video if it's helpful, but if --
25     A  I'm not disputing it.

Page 287

RANDALL TUCKER

1
2      Q  -- do you have any reason to believe you
3  didn't say that, sir?
4      A  No, I'm not disputing it.  If -- his
5  intentions, you know, that was my analysis of what
6  he was doing.
7      Q  Okay.  And what -- why would that have
8  been your analysis?  In what way would an individual
9  setting his race back by implicating a race issue?
10     A  He was basically trying to get his very
11 much I guess probably close to a hundred percent
12 constituency to attack police officers, not
13 necessarily white officers, but all officers from
14 different agencies that came through his
15 jurisdiction lawfully.
16     Q  How did that put his race back, sir?
17     A  He made it a race issue.
18     Q  He's black; is that right?
19     A  Yes, he's black.  He made it into a racial
20 issue.  Those were his words, not mine.
21     Q  Well, and the words "he's putting his race
22 back," those were your words, not his?
23     A  That's correct.
24     Q  And you stand by them?
25     A  I do.

Page 288

RANDALL TUCKER

1
2      Q  Okay.
3          MR. YOUNGWOOD:  Why don't we go off
4      the record for a couple of minutes.  I may
5      be finished.  If I'm not finished, I have
6      just a few minutes left.
7          VIDEOGRAPHER:  Off the record.  4:45.
8          (BRIEF RECESS)
9          VIDEOGRAPHER:  Back on record.  4:58.
10         MR. YOUNGWOOD:  I want to just read
11     into the record the Bates number of the
12     video of the incident involving
13     Mr. Manning that we played earlier in the
14     afternoon.  It was produced by us as
15     PLMCSD 0000020.  And, obviously, I have
16     tried to read portions of it and to mark
17     where I was questioning the witness, but
18     the tape stands for itself.  It says
19     whatever it says.
20         And with that, for now, Sheriff
21     Tucker I'll hand the questioning over to
22     your counsel.
23 EXAMINATION BY MR. ROSS:
24     Q  Sheriff Tucker, just a few questions.
25 Would you look at Exhibit 3, please, which are

Page 289

RANDALL TUCKER

1
2  Defendant's Interrogatory Responses?
3      A  Okay.
4      Q  And go to page 8, please.  Okay, on page
5  8, Interrogatory Number 9 reads, "Identify and
6  describe all changes or variations with a formal or
7  informal, written or unwritten made by Sheriff
8  Tucker to the policies and procedures in place under
9  Sheriff Toby Trowbridge."
10     And then there are responses A through Z, and
11 then AA and BB on pages 8, 9 and 10; is that
12 correct?
13     A  Yes.
14     Q  Okay.  Is that a more complete list of the
15 changes that you made at the Madison County
16 Sheriff's Department from what was in place under
17 Sheriff Toby Trowbridge that you could remember
18 during your direct examination?
19     A  Yes.
20     Q  Okay.
21         MR. ROSS:  Let's go off the record.
22         VIDEOGRAPHER:  Off record.
23         (OFF RECORD BRIEFLY)
24         VIDEOGRAPHER:  Back on record.
25     Q  (Mr. Ross) Okay, counsel-opposite asked

Page 302

1      RANDALL TUCKER

2

3      CERTIFICATE OF COURT REPORTER

4

5      I, DEBORAH H. NELSON, Court Reporter and Notary

6   Public for the State of Mississippi, do hereby

7   certify that the above and foregoing pages

8   contain a full, true, and correct transcript of the

9   proceedings had in the forenamed cause at the time

10  and place indicated, which proceedings were recorded

11  by me to the best of my skill and ability.

12      I also certify that I placed the witness under

13  oath to tell the truth and that all answers were given

14  under that oath.

15      I certify that I have no interest, monetary or

16  otherwise, in the outcome of this case.

17      Witness my signature and seal this the 4th day of

18  January, 2018.

19

20

21

22

23      _____

24      DEBORAH H. NELSON, CSR 1256

25

---

Page 303

1      RANDALL TUCKER

2   March 6, 2018

3      CERTIFICATE OF DEPONENT

4      I, SHERIFF RANDALL TUCKER, certify that I

5   have examined the foregoing pages as to the

6   correctness thereof, and that after reading said

7   pages, I find them to contain a full and true

8   transcript of the testimony as given by me on

9   THURSDAY, DECEMBER 21, 2017, except for the list of

10  corrections, if any, attached on a separate sheet with

11  the page number, line number and the desired

12  correction/change.

13      Witness my hand, this the        day of

14         , 2018.

15

16      _____

17      SHERIFF RANDALL TUCKER

18      CERTIFICATE

19  Subscribed and sworn to before me, this the

20  _____ day of _____, 2018.

21

22  MY COMMISSION EXPIRES:        _____

23  _____        NOTARY PUBLIC

24

25

---

Page 304

1      ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg. No. Now Reads   Should Read  Reason

6   ___ ___ _____   _____   _____

7   ___ ___ _____   _____   _____

8   ___ ___ _____   _____   _____

9   ___ ___ _____   _____   _____

10  ___ ___ _____   _____   _____

11  ___ ___ _____   _____   _____

12  ___ ___ _____   _____   _____

13  ___ ___ _____   _____   _____

14  ___ ___ _____   _____   _____

15  ___ ___ _____   _____   _____

16  ___ ___ _____   _____   _____

17  ___ ___ _____   _____   _____

18  ___ ___ _____   _____   _____

19  ___ ___ _____   _____   _____

20

21      _____

22      Signature of Deponent

23  SUBSCRIBED AND SWORN BEFORE ME

    THIS ____ DAY OF _____, 2018.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____