IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

LATOYA BROWN; LAWRENCE BLACKMON
HERBERT ANTHONY GREEN; KHADAFY MANNING;
QUINETTA MANNING; MARVIN MCFIELD; NICHOLAS
SINGLETON; STEVEN SMITH; BESSIE THOMAS; and
BETTY JEAN WILLIAMS TUCKER, individually and on
behalf of a class of all other similarly situated                    **PLAINTIFFS**

v.                                              CIVIL ACTION NO. 3:17-cv-347-WHB-LRA

MADISON COUNTY, MISSISSIPPI; SHERIFF
RANDALL C. TUCKER, in his official capacity; and
MADISON COUNTY SHERIFF'S DEPUTIES JOHN
DOES #1 through #6, in their individual capacities                    **DEFENDANTS**

---

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR AMENDED
MOTION TO STRIKE NEWSPAPER ARTICLES ATTACHED TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AS INADMISSIBLE HEARSAY**

---

Defendants hereby file their reply brief in further support of their [Dkt # 274] Amended

Motion to Strike the Newspaper Articles attached to Plaintiffs' Motion for Class Certification, and

state as follows:

## ARGUMENT

**I.     AT THE CERTIFICATION STAGE PLAINTIFFS MUST OFFER SIGNIFICANT
PROOF THAT SHERIFF TUCKER PRESENTLY EMPLOYS POLICIES OF
INTENTIONAL RACIAL DISCRIMINATION, SO HISTORICAL EVIDENCE IS
INSUFFICIENT TO CARRY THEIR BURDEN.**

Plaintiffs acknowledge that the evidence challenged by defendants is being offered to prove

the racial discrimination essential to their claim.   They claim that the 25 declarations they

submitted offer "probative and corroborative evidence of the Policing Program challenged by

Plaintiffs" [Dkt. # 296 at 2], and they describe that so-called "Program" as a "longstanding policy

of racially profiling and targeting Madison County's Black citizens in violation of the Equal Protection Clause of the Fourteenth Amendment." [Dkt. # 296 at 1]. They claim that the news articles also offer indirect evidence of that constitutional violation by showing that "Black citizens' protests of the MCSD's racially discriminatory policing practices were widely reported during former Sheriff Toby Trowbridge's administration." [Dkt. # 294 at 2].

Plaintiffs likewise recognize that a violation of the Equal Protection Clause can be established only by proof of "invidious discriminatory purpose." [Dkt. # 296 at 22, quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)]. Because the public policy of a Mississippi county regarding law enforcement is established by the elected sheriff, *Brown v. Wilkinson County Sheriff's Dept.*, 2017 WL 1479428 at *7 (S.D. Miss. Apr. 24, 2017), plaintiffs must prove "invidious discriminatory purpose" on the part of Sheriff Tucker. *Village of Arlington Heights*, 429 U.S. at 266. In order to secure class certification, they must now offer "significant proof" of the discrimination they must ultimately prove at trial by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 353 (2011).

Last Monday, the Supreme Court made clear that plaintiffs must carry the burden of proving the intent of current policymakers, not their predecessors. In *Abbott v. Perez*, No. 17-586, 2018 WL 3096311 at*1 (U.S. June 25, 2018), the Court considered whether the Texas Legislature in 2013 had acted with invidious discriminatory intent in adopting redistricting plans. The District Court held that previous redistricting plans, adopted by the Legislature in 2011, had been motivated by intentional racial discrimination. *Id.* Analyzing the subsequent 2013 plan, the District Court found that "the 2011 Legislature's 'discriminatory taint was not removed by the [2013] Legislature's enactment . . . .'" *Id.* at *8, quoting *Perez v. Abbott*, 274 F. Supp. 3d 624, 686 (W.D. Tex. 2017).

2

The Supreme Court found that the 2013 Legislature was under no obligation to expiate the sins of its predecessor.  "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."  *Id*. at *14, quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion).  The Court concluded:

> [T]here can be no doubt about what matters:  It is the intent of the 2013 Legislature. And it was the plaintiffs' burden to overcome the presumption of legislative good faith and to show that the 2013 Legislature acted with invidious intent.

*Id*. at *14.  The Court acknowledged that, in determining present intent, historical evidence may have some relevance, but all of that evidence taken together was found "plainly insufficient to prove that the 2013 Legislature acted in bad faith and engaged in intentional discrimination."  *Id*. at *16 (footnote omitted).

Here, none of the challenged evidence offers direct proof "about what matters," *id*. at *14, which is the intent of Sheriff Tucker.  Because the proposed class seeks only injunctive relief, plaintiffs must prove that he is employing policies of intentional racial discrimination right now, because a discontinued practice cannot be enjoined.  *City of Los Angeles v. Lyons,* 461 U.S. 95, 105-10 (1983).   Certainly, the conduct of Sheriff Trowbridge years ago (before Sheriff Tucker took office in January 2012) has no probative value unless plaintiffs can introduce evidence tying it to Sheriff Tucker as required by *Fed. R. Evid. 104*.  Even the conduct of Sheriff Tucker's current deputies offers no more than circumstantial, anecdotal evidence of the ultimate issue; there must be proof that the deputies were motivated by Sheriff Tucker's intentionally discriminatory policies, and not their own.

As it examines each piece of challenged evidence, this Court must keep *Abbott* in mind. Taken alone or together, the challenged evidence, even if arguably admissible, cannot begin to establish significant proof of invidious racial discrimination on the part of Sheriff Tucker in the policies by which he enforces the law in Madison County.

## II.      THIS COURT SHOULD APPLY THE FEDERAL RULES OF EVIDENCE TO THE NEWSPAPER ARTICLES.

Contrary to plaintiffs' assertion, this Court should apply the *Federal Rules of Evidence* to the newspaper articles. The Fifth Circuit has held that, in considering whether to certify a class, a "careful certification inquiry is required and findings must be made based on adequate admissible evidence to justify class certification." *Unger v. Amedysis, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (Courts "must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence"). Plaintiffs (in a footnote) argue that *Unger* was a fraud on the market case (which is true), but then provide no reason why the holding is limited to only such cases. [Dkt. # 294 at 8 n.5].  *Unger* itself contains no such limiting language, so it is controlling law and requires plaintiffs to provide admissible evidence in support of their class certification motion.[1]

The district court cases cited by plaintiffs are inapposite and not persuasive. *Steward v. Janek*, 315 F.R.D. 472, 478 (W.D. Tex. 2016), would not preclude application of the *Rules* because that court never considered *Unger,* stated only that the *Rules of Evidence* "at least arguably" did not apply "in full force" at the class certification stage, but then acknowledged in dicta that *Daubert,* a rule of evidence, was likely applicable. Three other cases are distinguishable because the focus in those cases was on *Fed. R. Civ. P. 23(a)* factors (numerosity, commonality, typicality, and adequacy), not the merits, which is the purpose for which plaintiffs offer the articles.  *See Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455 (S.D. Cal. 2012); *Hamilton v. First Am. Title*

---

[1] Other courts have also held that the evidence provided on a motion for class certification must be admissible under the *Federal Rules of Evidence. See Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 544 (D. Idaho 2010)(holding in an unjust enrichment case against a title insurance company that the *Federal Rules of Evidence* applied in deciding a motion to strike made at the class certification stage); *DeRosa v. Mass. Bay Commuter Rail Co.,* 694 F.Supp.2d 87, 95 (D. Mass. 2010)(holding in a Title VII case that plaintiffs were required to present "admissible evidence" in order to certify a class).

*Ins. Co.,* 266 F.R.D. 153 (N.D. Tex. 2010)(vacated *by Hamilton v. First American Title Ins. Co.*, 423 Fed. Appx. 425, (5th Cir. 2011); *Bell v. Addus Healthcare, Inc.*, 2007 WL 3012507, at *2 (W.D. Wash. Oct. 12, 2007). Finally, the court in *Flores v. Anjost Corp.*, 284 F.R.D. 112 (S.D. N.Y. 2012), while acknowledging that courts differ on the issue, applied *Fed. R. Evid. 408* to the evidence proffered by the plaintiffs on the class certification issue.

Here, both class certification and the merits require a showing of intentional race discrimination.[2] Plaintiffs do not pretend that the articles have any relevance to the class certification issues of numerosity, commonality, adequacy, and typicality. Instead, the articles are offered only to provide "significant proof" on the discrimination issue, which is both a class certification issue and a merits issue under the legal theories asserted by plaintiffs.  Because plaintiffs assert claims of intentional racial discrimination against Sheriff Tucker under 42 U.S.C. § 1983 and under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, they must prove that Sheriff Tucker personally and intentionally operates the MCSD on racist policies in order to obtain any relief.

Plaintiffs have requested a jury trial in this case, and the jury will not be allowed to hear inadmissible evidence. Since a showing of intentional racial discrimination as a matter of Sheriff Tucker's policy is required for both the class certification issue and the merits of this case, it makes no sense for this Court to consider the newspaper articles at the class certification stage when they

---

[2] *See Wal-Mart Stores, Inc.*, 564 U.S. at 353 (holding that plaintiffs must offer "significant proof" of discrimination before a court can certify a class).  *See also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (holding that Title VI requires proof of intentional discrimination); *Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997) ("In order to state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race.").

must be excluded upon consideration of the merits.[3]  As a result, this Court should follow *Unger*,

and apply the *Federal Rules of Evidence* to the class certification issue in this case.

## III.   THIS COURT SHOULD STRIKE ALL OF THE NEWSPAPER ARTICLES PROFFERED BY PLAINTIFFS BECAUSE THEY ARE IRRELEVANT UNDER FEDERAL RULES OF EVIDENCE 104 AND 401.

Defendants moved to strike all nine newspaper articles[4] as hearsay.  As shown in Part IV

hereafter, they are indisputably hearsay.  Not until plaintiffs filed their opposition was it clear for

what purpose and on what theory the articles were offered.  Part IV addresses the theories of

---

[3] Plaintiffs contend that *Fed. R. Evid. 403*, which excludes evidence when its probative value is outweighed by its prejudicial effect, cannot apply at the certification stage, because the District Judge serves as the finder of fact.  [Dkt. # 296 at 19-21].  However, *Unger* requires that certification be based on admissible evidence, and *Wal-Mart* requires significant proof of discrimination.  Evidence that the jury will never see can hardly provide the admissible proof necessary under those cases.

[4] Articles 1-9 refer to the following:

- Article 1:  *New Supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008) (Doc. 226, Exhibit 69 to Plaintiffs' Motion) (Exhibit "B" to Defendants' Motion to Strike);

- Article 2: *IS System Fair,* THE CLARION LEDGER (July 22, 2007)(Doc. 226, Exhibit 70 to Plaintiffs' Motion) (Exhibit "C" to Defendants' Motion to Strike);

- Article 3: *Roadblocks questioned in Canton*, THE CLARION LEDGER (July 18, 2006) (Doc 226, Exhibit 71 to Plaintiffs' Motion) (Exhibit "D" to Defendants' Motion to Strike);

- Article 4:  *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION LEDGER (Nov. 6, 2007) (Doc 226, Exhibit 72 to Plaintiffs' Motion) (Exhibit "E" to Defendants' Motion to Strike);

- Article 5: *House panel considers bill to outlaw racial profiling,* THE CLARION LEDGER (Jan. 14, 2009) (Doc 226, Exhibit 73 to Plaintiffs' Motion)(Exhibit "F" to Defendants' Motion to Strike);

- Article 6: *Making Amends*, JACKSON FREE PRESS (Aug. 17, 2011)(Exhibit 226-75 to Plaintiffs' Motion) (Exhibit "G" to Defendants' Motion to Strike);

- Article 7: *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS (Jan. 19, 2011)( Doc 226, Exhibit 76 to Plaintiffs' Motion) (Exhibit "H" to Defendants' Motion to Strike);

- Article 8: *Madison Sheriff responds to Jackson councilman's remarks*, THE CLARION LEDGER (Jan. 4, 2016)(Doc 226, Exhibit 80 to Plaintiffs' Motion) (Exhibit "I" to Defendants' Motion to Strike); and

- Article 9: *Q&A with Sheriff Randy Tucker*, MADISON COUNTY JOURNAL (Jan. 14, 2015)(Doc 226, Exhibit 100 to Plaintiffs' Motion) (Exhibit "J" to Defendants' Motion to Strike).

exceptions supposedly supporting their admission.  This Part III establishes that the purpose for which they are offered is clearly irrelevant.

Under *Fed. R. Evid. 402*, only relevant evidence is admissible.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Fed. R. Evid. 401*. "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." *Fed. R. Evid. 104(b)*.

The central issue in this lawsuit is alleged intentional racial discrimination by current Sheriff Randy Tucker, not former Sheriff Toby Trowbridge. Sheriff Trowbridge was the Sheriff of Madison County from 2000 to 2011, and is not a party to this lawsuit. Sheriff Tucker did not take office until January 2012. Articles 1-5 predate 2012 and pertain to alleged racially discriminatory policies by Sheriff Trowbridge in his operation of the MCSD. As plaintiffs admit, "[f]ive of the News Reports concern complaints of discrimination and racial profiling by the MCSD during the tenure of then-Sheriff Trowbridge and Sheriff Trowbridge's response." [Dkt # 294 at 3-5]. However, as *Abbott* makes clear, it is Sheriff Tucker's policies, not Sheriff Trowbridge's policies that are at issue.

Articles 1-5 have no connection whatsoever to Sheriff Tucker and cannot show any racially intentionally discriminatory policies or practices imposed by Sheriff Tucker since he took office in January 2012.  Since Sheriff Trowbridge no longer sets law enforcement policy for Madison County, what happened under him is irrelevant under *Rule 401,* nor can the articles be admitted

under *Rule 104* because plaintiffs have not connected them to Sheriff Tucker.[5]  Specifically, plaintiffs have provided no evidence that Sheriff Tucker read Articles 1-5 or otherwise knew about alleged racist policies under Sheriff Trowbridge.

 Likewise, Articles 6 and 7 are irrelevant and inadmissible under *Rules 104* and *401* because any pledge Sheriff Tucker may have made to maintain the same quality of law enforcement as under Sheriff Trowbridge cannot show intentional racial discrimination by Sheriff Tucker absent non-existent proof that he knew of the purported intentionally racially discriminatory policies from the Trowbridge administration.

Article 8 also is irrelevant under *Rules 104* and *401* because plaintiffs do not explain how Sheriff Tucker's  criticism of Councilman Stokes and the thuggish behavior of his constituents has any tendency to show that Sheriff Tucker implemented intentionally racially discriminatory policies towards Black people in operating the MCSD, as is required for admission under *Rule 401*.  Article 9 is likewise irrelevant under *Rules 104* and *401* because any opposition by Sheriff Tucker to State-mandated use of police body cameras likewise does not show that he implemented an intentionally racially discriminatory policy towards Black people.

In short, all nine articles are inadmissible under *Rule 401* because they provide no evidence that Sheriff Tucker implemented an intentionally racially discriminatory policy towards Black people. For this reason, the Articles are not admissible, probative evidence and must be stricken by the Court.

## IV.    THIS COURT SHOULD STRIKE THE ARTICLES BECAUSE THEY ARE INADMISSIBLE HEARSAY AND DO NOT MEET ANY EXCEPTION TO THE HEARSAY RULES.

---

[5] Sheriff Tucker testified he was not aware of any complaints of racial profiling or unconstitutional policing practices against Sheriff Trowbridge, and he had not read the articles in question.  *See* Exhibit "A"- excerpts from Tucker Dep. at 101:12-15, 103:22-24, and 104:4-5.

Hearsay is an out of court statement offered to prove the truth of the matter asserted in the statement. *Fed. R. Evid. 801*. Hearsay is inadmissible unless it meets an exception set forth in the *Federal Rules of Evidence*, a federal statute, or other rules prescribed by the Supreme Court. *Fed. R. Evid. 802*. Because the statements set forth in Articles 1-9 are out of court statements offered to establish the truth of the matter asserted in them, they are hearsay and are not admissible unless they come within a hearsay exception. *Fed. R. Evid. 801*.[6]

Plaintiffs have not established that Articles 1-5[7] are admissible under any specific exception to hearsay under the *Federal Rules of Evidence* or otherwise.[8] Nevertheless, plaintiffs contend that this Court should consider these newspaper articles under the residual hearsay exception set forth in *Fed. R. Evid. 807*.[9] However, the Fifth Circuit has made clear that the residual hearsay exception is to be "used only rarely, in truly exceptional cases." *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000). ("[T]he proponent of the statement bears a heavy burden to

---

[6] Even if plaintiffs are not offering Articles 1-4 for their truth as they contend, these Articles are irrelevant under *Rules 401* and *104* for the reasons explained in Part III, *supra*, because plaintiffs cannot show that Sheriff Tucker read them or knew about alleged racist policies under Sheriff Trowbridge.

[7] Defendants acknowledge that Articles 6-9 may be excepted from the hearsay rules under *Rule 801(d)*, given that Sheriff Tucker is a party opponent in this case and was asked about his alleged statements during his deposition. Exhibit "A" at 95:10 to 98:14, 224:23 to 226:7, and 286:17 to 287:4.  However, plaintiffs do not need the hearsay articles since they have actual testimony. The articles, thus, are duplicative evidence.

[8] Plaintiffs also argue that Sheriff Trowbridge's statements in Article 5 are subject to the party opponent exception to the hearsay rules. [Dkt. # 294]  However, Sheriff Trowbridge is not a party so he cannot be a "party opponent" as defined by *Rule 801(d)(2)*.

[9] *Rule 807* provides that a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in *Rules 803* or *804*:

      (1) the statement has equivalent circumstantial guarantees of trustworthiness;
      (2) it is offered as evidence of a material fact;
      (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
      (4) admitting it will best serve the purposes of these rules and the interests of justice.

*Fed. Rule. Evid. 807.*

come forward with indicia of both trustworthiness and probative force.")   As discussed in Part III, *infra*, because Articles 1-5 pertain to complaints of discrimination and racial profiling by the MCSD during the tenure of former Sheriff Trowbridge and have nothing to do with Sheriff Tucker, plaintiffs cannot meet their heavy burden of demonstrating that Articles 1-5 are probative of the central issue in this case - *i.e.,* whether Sheriff Tucker implemented an intentionally racially discriminatory policy against Blacks.

Plaintiffs rely solely on *Hicks v. Charles Pfizer & Co., Inc.*, 466 F.Supp.2d 799 (E.D. Tex. 2005), in support of their argument that the residual hearsay exception should be applied. [Dkt # 294 at 12].   *Hicks* is clearly distinguishable.   In *Hicks*, plaintiff offered four newspaper articles to show that the defendant had manufactured a vaccine in the 1960s which allegedly led to the plaintiff developing cancer in 2001.   *Id.* at 804. The newspaper articles corroborated each other and were the only known existing link between the defendant and the vaccine, given that defendant did not maintain records going back 40 years.   *Id.* at 804, 808. The court determined that the articles met the trustworthiness requirement of *Rule 807* because (1) at the time the statements were made, it was implausible that those providing the information could have anticipated that their statements would be proffered as evidence in a lawsuit, and (2) several independent newspaper articles identified the defendant as the manufacturer, which corroborated their credibility.   *Id.* at 808-09.

Unlike *Hicks*, Articles 1-5 are not the only available source of evidence in this case. Plaintiffs do not argue that Sheriff Tucker read Articles 1-5.   Plaintiffs could have deposed the authors of the Articles and the individuals who purportedly made the statements set forth in the Articles, given that Articles 1-5 were published only 10-12 years ago.   Plaintiffs did not.   For these reasons, *Hicks* is inapplicable.

Plaintiffs' arguments are contrary to the other overwhelming case law in the Fifth Circuit. The Fifth Circuit and courts therein consistently characterize and exclude newspaper articles as "classic, inadmissible hearsay." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). *See also Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 378 (5th Cir. 2004) (affirming federal district court's grant of motion *in limine* to exclude newspaper articles as "rank hearsay")(abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)); *Merrill v. Southern Methodist Univ.*, 806 F.2d 600, 610 n.10 (5th Cir. 1986) ("Merrill's brief in this Court has attached to it copies of two newspaper articles .... [t]hey are obviously inadmissible hearsay… and should not have been attached to counsel's brief."); *Dallas County v. Commercial Union Assurance Co.,* 286 F.2d 388, 392 (5th Cir. 1961) ("a newspaper article is hearsay, and in almost all circumstances is inadmissible"); *Kean v. Clark*, 56 F.Supp.2d 719, 724 n.6 (S.D. Miss. 1999) (holding newspaper articles containing quotes from state official was properly excluded as inadmissible hearsay). Because Articles 1-5 are inadmissible hearsay and do not meet any exception to the hearsay rules, they must be stricken by the Court.

## CONCLUSION

For these reasons, this Court should grant defendants' motion to strike, and exclude the Articles submitted by plaintiffs.

Respectfully submitted this 2nd day of July, 2018.

> MADISON COUNTY, MISSISSIPPI, and
> SHERIFF RANDALL C. TUCKER, IN
> HIS OFFICIAL CAPACITY
>
> BY:   *s/ Michael B. Wallace*
> Michael B. Wallace (MSB #6904)
> Charles E. Ross (MSB #5683)
> James E. Graves, III (MSB #102252)
> Charles E. Cowan (MSB #104478)
> WISE CARTER CHILD & CARAWAY, P.A.

Post Office Box 651
Jackson, Mississippi  39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

and

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi  39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

OF COUNSEL:

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi  39232
P.O. Box 750
Jackson, Mississippi  39205-0750
Telephone: 601-969-1010
Facsimile:  601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi  39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
Telephone: 601-987-5300
lhester@pbhfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 2nd day of July, 2018.

*s/Michael B. Wallace*       
MICHAEL B. WALLACE

Page 1

1                      RANDALL TUCKER
2            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                      NORTHERN DIVISION
4    LATOYA BROWN; LAWRENCE
     BLACKMON; HERBERT ANTHONY
5    GREEN; KHADAFY MANNING;
     QUINNETTA MANNING; MARVIN
6    McFIELD; NICHOLAS SINGLETON;
     STEVEN SMITH; BESSIE THOMAS; and
7    BETTY JEAN WILLIAMS TUCKER,
     individually and on behalf of a class
8    of all others similarly situated,        PLAINTIFFS
9
10   V.           CIVIL ACTION NO. 3:17-cv-00347-WHB-LRA
11   MADISON COUNTY, MISSISSIPPI;
     SHERIFF RANDALL S. TUCKER in his
12   official capacity; and MADISON COUNTY
     SHERIFF'S DEPUTIES JOHN DOES #1
13   through #6, in their individual capacities,
14                                    DEFENDANTS
15
16      ************************************************
17      VIDEOTAPED DEPOSITION OF SHERIFF RANDALL TUCKER
18      ************************************************
19             APPEARANCES NOTED HEREIN
20
             DATE: THURSDAY, DECEMBER 21, 2017
21           PLACE: HILTON GARDEN INN
                WEST CAPITOL STREET
22                Jackson, MS
               TIME:  9:00 A.M.
23
24      REPORTED BY: DEBORAH H. NELSON
                CSR #1256
25   JOB NO. 133425

Exhibit "A"

1                    RANDALL TUCKER

2              MR. ROSS:  I object to the form.

3         Very broad and --

4    A    Can you repeat that question?  I'm not

5  sure I understand it.

6    Q    (Mr. Youngwood)  Let me show you an

7  updated document.

8    A    Okay.  All right.

9              (Exhibit 11 marked for the record)

10   Q    Let me give you Exhibit 11, sir.  This is

11 a printout we obtained off the Internet from the

12 Jackson Free Press back from August 2011.

13   A    Okay.

14   Q    If you -- do you recall this article?

15   A    No, it's my first time seeing it.

16   Q    Okay.  Well, if you'd turn to the second

17 page, sir, you'll see there's a reference to you.

18   A    Yeah.

19   Q    Have you seen this page before?

20   A    Not to my knowledge.  Not that I recall.

21   Q    You don't recall answering questions for

22 the Jackson Free Press in connection with your

23 campaign for sheriff?

24   A    I may have answered questions, but I have

25 never seen this page is what you asked me.

1                     RANDALL TUCKER

2      Q    Okay.  Well, do you recall -- you said you

3  may have.  Do you believe you answered questions

4  asked to you by the Jackson Free Press in 2011, in

5  connection with your campaign?

6      A    I don't recall that.

7      Q    Why don't you take a look, if you could,

8  sir, under the heading "Why Do You Want to Run for

9  Sheriff?"

10     A    Yes.

11     Q    And the words below it say you want to

12  maintain quality of law enforcement that we have

13  under Sheriff Trowbridge.  Do you see that sentence?

14     A    I do.

15          MR. ROSS:  I'd ask the witness to be

16          given just a few seconds to read.

17          MR. YOUNGWOOD:  Sure.  Absolutely!

18     Q    (Mr. Youngwood)  Take your time.

19     A    (PAUSE)  I've read that statement.

20     Q    Okay.  Do you believe that's a statement

21  you gave to the Jackson Free Press back in 2011?

22          MR. ROSS:  Objection.  Asked and

23          answered.

24     A    I don't recall making the statement.

25     Q    (Mr. Youngwood)  Would it be a true

1                    RANDALL TUCKER

2    statement on, as of August 2011, was it your desire

3    to maintain the quality of law enforcement that we

4    have under Sheriff Trowbridge?

5        A    Yes.

6        Q    And if I could give you now what I'll mark

7    as Exhibit 12, sir.

8                    (Exhibit 12 marked for the record)

9        A    Do you mind if I move that?  I'm just

10   trying to keep them in order so I can go back to

11   them.

12       Q    Yeah, you're going to be better than me at

13   that today.  So this is Exhibit 12, sir.  I'll tell

14   you that on the top is just this past Sunday's date

15   which reflects the date we printed this.  But if you

16   can take a look at this and if you'll look on the

17   second page, you'll see it says "Randy Tucker Press

18   Release, 1/18/11," and it says "posted January 19,

19   2011, 4:32 P.M."

20       Let me know if you recognize this document as a

21   press release that you issued in connection with

22   your campaign for sheriff back in January 2011.

23       A    I put out a lot of press releases, and I

24   don't recall this specific one, but I'm not

25   disputing that this --

Page 98

1          RANDALL TUCKER

2     Q    Okay.  The sentence that I want to refer

3  you to is in the second paragraph of it, where the

4  document reads "As Madison County Sheriff, I will

5  continue the high level of law enforcement and

6  justice Madison County residents expect and have

7  enjoyed under Sheriff Toby Trowbridge."

8     Do you see that?

9     A    I do.

10    Q    And do you believe that's a statement you

11 made in January 2011?

12    A    Uh -- I don't recall making the statement,

13 but if it's part of the release that I -- if it is,

14 in fact, a release that I did, yes.

15    Q    Okay.  Well --

16    A    It says, "My campaign for sheriff will be

17 about maintaining professionalism, integrity, and

18 high quality of law enforcement in Madison County."

19 That's what I just telling you.

20    Q    And the words you just referred to by

21 "maintaining," you're referring to maintaining the

22 levels of professionalism, integrity, and high

23 quality that were in place under Sheriff Trowbridge;

24 correct?

25    A    Yes.

Page 101

                    RANDALL TUCKER

1

2  complaint you previously reviewed?

3      A    Yes.

4      Q    Okay.  I'd like to refer you forward a bit

5  to some paragraphs that concern Sheriff Trowbridge

6  that begin on paragraph 115.  Paragraph 116,

7  "Sheriff Trowbridge's unconstitutional, racially

8  discriminatory policing practices were widely known

9  throughout Madison County."  Do you agree with that

10  statement?

11      A    No.  I think that's someone's opinion.

12      Q    Okay.  Were you aware of unconstitutional

13  policing practices carried out by Sheriff

14  Trowbridge?

15      A    No.

16      Q    If you'll go to paragraph 118, it talks

17  about "a group of Canton residents bringing a

18  petition to the attention of the Madison County

19  Board of Supervisors with 664 signatures, demanding

20  end of frequent roadblocks in the predominantly

21  black neighborhoods, the excessive force and

22  brutally administrated, and brutality administrated

23  by police officers and racial profiling."  Do you

24  see that?

25      A    I see that.

1               RANDALL TUCKER

2      Q    Did you have an understanding as to what

3  message they were seeking to convey by making this

4  march?

5      A    No, I didn't participate in that.  I was

6  over the narcotics unit.

7      Q    Were you aware that there were complaints

8  raised in 2006 regarding frequent roadblocks in

9  predominantly black neighborhoods?

10     A    I'm aware that there were complaints of

11 roadblocks all over Madison County.

12     Q    In 2006?

13     A    Yes.

14     Q    What was the nature of the complaints that

15 you were aware of in 2006?

16     A    They're always going to have somebody

17 unhappy if they have to sit at a roadblock.  I don't

18 know the nature of any complaint.  I know there were

19 some complaints made about roadblocks back then, but

20 I couldn't tell you who made them or where they were

21 generated from.

22     Q    Were you aware of complaints regarding

23 racial profiling?

24     A    No, I was not.

25     Q    The Clarion-Ledger, is that a newspaper

RANDALL TUCKER

1

2   you read?

3        A     No.  I do not read it.

4        Q     What newspapers do you read?

5        A     I don't read newspapers.

6        Q     Okay.  How do you get your news?

7        A     Occasionally, I watch it on the

8   television, but I generally try to form my own

9   opinion.  I don't base it off of what the news

10  opinion is.

11       Q     Well, how do you get your facts that serve

12  as the basis for your opinion?

13       A     I investigate if I want to know something

14  before I give an opinion.  I don't just blurt it

15  out.

16       Q     Okay.  How do you learn about news and

17  facts within Madison County?

18             MR. ROSS:  Object to the form.

19             Broad.

20       A     Can you be more specific?  I don't know

21  what news or facts you're referring to.

22       Q     (Mr. Youngwood)  Well, we can focus on

23  what we have been discussing, paragraph 118 of the

24  complaint.  You said you were aware of a march.  You

25  said you were aware of complaints about roadblocks.

Page 224

                    RANDALL TUCKER

1   box on that report; right?

2        A    Right.

3        Q    And you could use those reports to

4   generate statistics regarding the race of people

5   arrested under your, by your department and under

6   your supervision; correct?

7        A    I think you could, yeah.

8        Q    So --

9        A    You can do it with a docket book, too.

10       Q    What does that mean, "with a docket book"?

11       A    There's a docket book at every jail

12  facility that when somebody is booked in, it goes

13  into a public document.

14       Q    Okay.  And have you ever done such an

15  analysis?

16       A    No, I have not.

17       Q    Given the context of this lawsuit, do you

18  have any curiosity as to what that analysis would

19  show?

20       A    None, whatsoever.

21            (Exhibit 25 marked for the record)

22       Q    I've marked this as 25, sir.  Do you

23  recall engaging in an interview with The Madison

24  County Journal in January 2015?

RANDALL TUCKER

1

2    A    I don't dispute that I did.  I don't

3    necessarily recall, but I don't dispute it, no.

4    Q    Okay.  Have you seen this interview

5    before?

6    A    I don't know that I have read it, no.

7    Q    Would you go to the second page, sir?

8    There's a question about body cameras.  It says MS,

9    which is the reporter, I believe.  And then RT,

10   which is you.

11   The question is: "Does your department have

12   body cameras or plans to introduce them in the

13   future?"

14   "We do not.  We have recently as of late this

15   year sought a camera in every vehicle.  We have

16   cameras as well as back-seat cameras for detention

17   purposes.  We have talked about the body cams.

18   That's one of those deals where you're going to

19   scrutinize every little thing a guy does or a girl

20   does, based on a few bad apples.  If you've got to

21   stand there with your thumb on them constantly, I'd

22   rather not need them.  The people we hire go through

23   a rigorous process.  We don't hire anybody off the

24   street.  I put my faith and belief in them, or I

25   wouldn't hire them."  Do you see that?

1                    RANDALL TUCKER

2         A    Yes.

3         Q    Do you believe those are the words you

4    gave in response to that question?

5         A    Again, I don't recall this.  This is the

6    first time I have read it, but I don't disagree with

7    it.

8         Q    Okay.  I want to just ask you about the

9    middle of it.  "Are you going to scrutinize every

10   little thing a guy does or a girl does based on a

11   few bad apples?"  What did you mean by that.

12        A    I mean, I think there's bad apples in the

13   every profession that there are, whether, you know,

14   they're in my department or other departments or

15   what have you.

16        I mean, if you're going to sit there and have

17   to worry about what every member of your department

18   is doing, you know, you need to hire quality people,

19   and that's what we do.  That's the reason we go

20   through the process we go through.  I don't want one

21   of those bad apples in my department.

22        Q    Are you aware of any bad apples in your

23   department?

24        A    No, I'm not.

25        Q    Sir, just going back briefly to the data

                         RANDALL TUCKER

1

2    Is that somebody you know?

3         A    I have no idea who that is.

4         Q    And Michael Herndon?

5         A    No, sir.

6         Q    Okay, you can put that to the side.  There

7    was an incident in January 2016, when Councilman

8    Kenneth Stokes made some statements that got your

9    attention.  Do you recall that?

10        A    Yes, sir, I do.

11        Q    Okay, and he said something about throwing

12   rocks and bricks on, presumably, police officers;

13   correct?

14        A    Yes.

15        Q    And you, obviously, took offense to that?

16        A    I did.

17        Q    Okay.  In a video interview set, sir, with

18   The Clarion-Ledger, do you recall telling them that

19   Stokes is setting his race back by implicating a

20   race issue?

21        A    I don't recall saying it, but if that's,

22   if it's on video, it is what it is.

23        Q    Okay.  Would you -- I can show you that

24   video if it's helpful, but if --

25        A    I'm not disputing it.

Page 287

1                          RANDALL TUCKER

2          Q    -- do you have any reason to believe you

3    didn't say that, sir?

4          A    No, I'm not disputing it.  If -- his

5    intentions, you know, that was my analysis of what

6    he was doing.

7          Q    Okay.  And what -- why would that have

8    been your analysis?  In what way would an individual

9    setting his race back by implicating a race issue?

10         A    He was basically trying to get his very

11   much I guess probably close to a hundred percent

12   constituency to attack police officers, not

13   necessarily white officers, but all officers from

14   different agencies that came through his

15   jurisdiction lawfully.

16         Q    How did that put his race back, sir?

17         A    He made it a race issue.

18         Q    He's black; is that right?

19         A    Yes, he's black.  He made it into a racial

20   issue.  Those were his words, not mine.

21         Q    Well, but the words "he's putting his race

22   back," those were your words, not his?

23         A    That's correct.

24         Q    And you stand by them?

25         A    I do.