IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**LATOYA BROWN; et al.**                                                                **PLAINTIFFS**

**v.**                                                   **CIVIL ACTION NO. 3:17-cv-347 WHB LRA**

**MADISON COUNTY, MISSISSIPPI; et al.**                                 **DEFENDANTS**

---

**MOTION TO EXCLUDE PLAINTIFFS' UNTIMELY DESIGNATION
OF NEW EXPERT WITNESS PATRICIA FRONTIERA, PH.D.
[DKT. #302-3; DKT. #304-3; DKT. #307-2]**

---

Defendants, Madison County, Mississippi, and Sheriff Randall C. Tucker, collectively "Defendants," by and through counsel, file the following Motion to Exclude Plaintiffs' Untimely Designation of New Expert Witness Patricia Frontiera, Ph.D. in this matter pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 37.

1. In support of this motion, Defendants adopt the reasons set forth in their separately filed Memorandum in Support of Their Motion to Exclude Plaintiffs' Untimely Designation of New Expert Witness Patricia Frontiera, Ph.D. [Dkt. #302-3; Dkt. #304-3; Dkt. #307-2].

2. Defendants rely upon the following exhibits in support of the instant motion and brief:

**Exhibit "A"**: Dr. Ricchetti Deposition Excerpts

Pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 37, and for all the reasons set forth in the Memorandum in Support of this Motion filed concurrently, Defendants move the Court to exclude Plaintiffs' untimely designation of new expert witness Patricia Frontiera, Ph.D.

This the 30th day of July, 2018.

**MADISON COUNTY, MISSISSIPPI and SHERIFF RANDALL C. TUCKER, IN HIS OFFICIAL CAPACITY**

BY: /s/ Charles E. Cowan

OF COUNSEL:

Michael B. Wallace (MSB #6904)
Charles E. Ross (MSB #5683)
James E. Graves (MSB #102252)
Charles E. Cowan (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
Telephone: 601-968-5534
Facsimile: 601- 944-7738
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com

T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, Mississippi 39501
Telephone: 228-867-7141
Facsimile: 228-867-7142
trn@wisecarter.com

Rebecca B. Cowan (MSB #7735)
CURRIE JOHNSON & MYERS, P.A.
1044 River Oaks Dr.
Jackson, Mississippi 39232
P.O. Box 750
Jackson, Mississippi 39205-0750
Telephone: 601-969-1010
Facsimile: 601-969-5120
bcowan@curriejohnson.com

Katie Bryant Snell (MSB# 103607)
KATIE BRYANT SNELL, PLLC
P.O. Box 3007
Madison, Mississippi 39130-3007
Telephone: 601-460-9800
katie@katiebryantsnell.com

J. Lawson Hester
Jason Edward Dare
PETTIS, BARFIELD & HESTER, P.A.
4450 Old Canton Road, Suite 210
Jackson, Mississippi 39211
Telephone: 601-987-5300
lhester@pbhfirm.com
jdare@pbhfirm.com

## **CERTIFICATE OF SERVICE**

I, Charles E. Cowan, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Joshua Tom, Esq.
American Civil Liberties Union of Mississippi Foundation
233 E. Capitol Street
Jackson, MS 39201
JTom@aclu-ms.org
PWu@aclu-ms.org

Jonathan K. Youngwood, Esq. (*pro hac vice*)
Janet A. Gochman, Esq. (*pro hac vice*)
Isaac Rethy, Esq. (*pro hac vice*)
Nihara K. Choudhri, Esq. (*pro hac vice*)
Kavitha Satya Sivashanker, Esq. (*pro hac vice*)
Brooke Jarrett, Esq. (*pro hac vice*)
Christopher K. Shields, Esq. (*pro hac vice*)
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY  10017
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
kavitha.sivashanker@stblaw.com
bonnie.jarrett@stblaw.com
christopher.shields@stblaw.com

Ezekiel Edwards, Esq. (*pro hac vice*)
Jeffery Robinson, Esq. (*pro hac vice)*
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
eedwards@aclu.org
jrobinson@aclu.org

So, certified this the 30th day of July, 2018.

                                              /s/  *Charles E. Cowan*
                                              CHARLES E. COWAN

BRYAN RICCHETTI, PH.D.,  4/6/2018

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                   JACKSON DIVISION


LATOYA BROWN; LAWRENCE          )
BLACKMON; HERBERT ANTHONY       )
GREEN; KHADAFY MANNING;         )
QUINETTA MANNING; MARVIN        )
MCFIELD, NICHOLAS SINGLETON;    )
STEVEN SMITH; BESSIE THOMAS;    )
and BETTY JEAN WILLIAMS         )
TUCKER, individually and on     )
behalf of a class of all        )
other similarly situated,       )
                                )
            Plaintiffs,         )
                                )  Civil Action No.
     -vs-                       ) 3:17-cv-347 WHB LRA
                                )
MADISON COUNTY, MISSISSIPPI;    )
SHERIFF RANDALL S. TUCKER,      )
in his official capacity;       )
and MADISON COUNTY SHERIFF'S    )
DEPUTIES JOHN DOES #1           )
through #6, in their            )
individual capacities,          )
                                )
            Defendants.         )
```

        The deposition of BRYAN RICCHETTI, Ph.D.,

taken before JUNE M. FUNKHOUSER, CSR, RMR, and

Notary Public, pursuant to the Federal Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions, at

181 West Madison Street, 43rd Floor, Chicago,

Illinois, commencing at 9:11 a.m. on April 6, 2018.

# EXHIBIT "A"

```
 1      A    So you get the raw data and then you
 2  write a program to input it into a statistical
 3  package, and then the statistical package would say
 4  calculate the mean of this variable over these
 5  samples, right?  So you sort of have this interface
 6  where you're giving the data instructions and
 7  you're implementing those calculations.
 8      Q    Is that like SAS?
 9      A    SAS is an example.  R.  ArcGIS is
10  something we've used.  So there's various programs.
11      Q    Which one did you-all use here; do you
12  know?
13      A    I believe we used R for a lot of the
14  work, but I'd have to double-check.
15      Q    Did you ever look at any of the raw data?
16      A    Sure.  Yeah.
17      Q    Which sets?
18      A    All the data that I ended up relying on I
19  looked at the underlying, the raw files.
20      Q    But that was after it had been processed,
21  right?
22      A    No, I think I had access to the -- like I
23  remember opening the CAD and seeing, you know, the
24  columns in the CAD, and I think it's got this
25  variable that I don't know what the label is but it
```

 1   tells you, you know, the type of interaction, one
 2   of the values is roadblock and you can filter the
 3   data, so I played with all the data and understood
 4   what it did and things like that.
 5        Q    Did you do the geocoding?
 6        A    No, I personally didn't do the geocoding.
 7        Q    Do you know who in the Madison County
 8   Sheriff's Department makes a decision regarding DUI
 9   unit roadblocks, selecting the location?
10        A    No, I do not know.
11        Q    Do you know the individual that oversees
12   that unit?
13        A    I do not.
14        Q    Just for the record, you didn't talk to
15   that -- either one of those individuals?
16        A    I did not.
17        Q    Did you hear or find out any information
18   or research the background or the factors that they
19   considered?
20        A    You know, to the extent the stuff I
21   relied on, you know, kind of a general
22   understanding that roadblocks are a mechanism for
23   regulating DUIs and unsafe traffic behavior and
24   then, again, statistically I see that very strong
25   relationship.

```
 1    Sometimes there's addresses.
 2         Q    Most of them were hard street numbered
 3    addresses that you could mail something to?
 4         A    Well, the way we -- the way it works is
 5    we have this software called ArcGIS which is --
 6         Q    I'm very familiar with it.
 7         A    Yeah.  And so that you can merge those on
 8    and get an estimated address.
 9         Q    The problem with ArcGIS, help me out if
10    I'm right here, it needs specific information to
11    give you a geocode?
12         A    So it has a match score, it will tell you
13    how -- you know, whether it can match a specific
14    location.
15         Q    So if ArcGIS was to plant or geocode a
16    roadblock location based on an intersection
17    description, just say Interstate 220 and County
18    Line Road, it would put that geocode square in the
19    middle of the intersection because that's the
20    center line of the two roads, correct?
21              MR. YOUNGWOOD:  Objection; form.
22              THE WITNESS:  It's possible that in some
23    of those situations you would be in a road.
24    BY MR. NOBILE:
25         Q    Who did the geocoding for your analysis?
```

1      A     So, you know, my team working under my
2    supervision used this software, ArcGIS, which
3    ultimately gave us these locations.
4      Q     How did you verify the accuracy of these
5    locations?
6      A     Well, ArcGIS has this match score, and so
7    to the extent it gets a hundred that means it's a
8    perfect match according to ArcGIS and then once it
9    falls below 90 we don't include those records in my
10   analysis.
11     Q     But the perfect match on a street
12   intersection between two intersections or two
13   streets would be in the middle of the intersection?
14     A     It would be assigned to a census tract
15   some way.
16     Q     How do you make that assignment?  Who
17   verified that assignment?  Because if you're doing
18   a roadblock in the middle of County Line Road one
19   half is in one census tract, the other one is in
20   the other census tract.  How did you account for
21   any of that?
22           MR. YOUNGWOOD:  Objection; form.
23           THE WITNESS:  So for the -- where we have
24   an exact address it accounts for it and to the
25   extent the address is imprecise we're removing the

```
 1    analysis to the extent it needed to be switched.
 2         Q    And you plotted, just to be clear,
 3    2,004 -- you believe that you -- well, you geocoded
 4    2,004 roadblocks?
 5         A    Yes.
 6         Q    The ones in footnote 23 is what I keep
 7    going back to.
 8         A    (Witness nods head.)
 9         Q    That's an affirmative nod, right?
10         A    Yes.  Yes.  Sorry.
11         Q    And so when you did your regression
12    analysis you only did a regression analysis on the
13    CAD file, which is 1,697 roadblocks?
14         A    So I -- that was my main analysis in
15    Exhibit 6, and I did those sensitivities that
16    include the other data sources.
17         Q    And so when you do the sensitivities do
18    you recalibrate your findings or is that just
19    confirmation of your findings?
20         A    It's a test of whether my findings would
21    change if you added these extra roadblocks in.  So
22    you kind of rerun the whole model with that new
23    information.
24         Q    And so when you tested it is that --
25    based on the test that's when you decided to add in
```

```
 1       Q    And who verified that score, is that
 2   something that --
 3       A    That's ArcGIS.
 4       Q    Okay.  But, I mean, like who went through
 5   the ArcGIS program, is this someone in --
 6       A    I've looked at those output and my team
 7   as well.
 8       Q    Okay.  Just to be clear, nobody on your
 9   team is a geographer, right?
10       A    Not like in a Ph.D. training sense.
11       Q    Yeah.  I mean, so neither Ms. Chapman or
12   Mr. Russell are geographers, right?
13       A    No.
14       Q    How many were dropped from the CAD data
15   because of no addresses?
16       A    I think it's like maybe 13 percent or
17   something like that.
18       Q    And that's 13 percent of how many?
19   You've got your report there if you need it.
20       A    Yeah, we do that -- when we do it it's a
21   different -- ultimately our roadblocks are
22   roadblocks per day, and the CAD data there's
23   multiple records per roadblock because there might
24   be multiple police officers checking into the
25   roadblock.  So that's on the -- on the broader CAD
```

1     would be in this hypothetical.
2         Q    Well, I mean, I'm talking about your
3     current analysis.
4         A    Yeah.
5         Q    Would it be reliable if 10 percent of the
6     1,697 roadblocks from the 126 observations needed
7     to be reassigned to census tracts?
8         A    I think it would be -- if it were truly
9     the case that there were some number that needed to
10    be reassigned the analysis would be reliable and
11    then you would assess how it changes with this
12    reassignment.  Do you see what I'm saying?
13        Q    But you're talking about methodology, and
14    I'm not talking about running your report again.
15    I'm talking about if it came to pass that 10
16    percent of the -- of the 1,697 roadblocks and the
17    126 observations were found to be misassigned,
18    would that make the current existing analysis as
19    illustrated in Exhibit 6 reliable?
20        A    I'm not trying to be evasive.  It really
21    depends on which ones those are and how they're
22    reassigned.  Then you kind of have to do the test.
23        Q    Okay.  And what test are you talking,
24    sensitivity test?
25        A    Yeah, you would -- you know, let's say it

```
 1   were the case that there were some number of
 2   roadblocks that should be in one tract that aren't,
 3   then you would reassign them and you would look at
 4   the analysis.  It might be you get the same general
 5   conclusions.
 6        Q   Until that's done you can't say that your
 7   p-values and analysis are accurate?
 8            MR. YOUNGWOOD:  Objection to form.
 9            THE WITNESS:  You know, you have to check
10   to see if there was an issue.  If there was an
11   issue and it was a small amount of data it could
12   have no effect on the p-values.
13                So it really -- the assumption I guess
14   right now would be that whatever is going on there,
15   if it is going on, if it's uncorrelated with the
16   race variable then it wouldn't have an effect on
17   that variable.
18   BY MR. NOBILE:
19        Q   But you can't say today if it's reliable
20   because you can't say for certain where the
21   roadblocks are, correct?
22        A   I think whether it's reliable, again,
23   depends on how things -- to the extent of whether
24   there is a problem and even if there was a problem
25   how correlated it is with the Black population
```

```
 1    variable.
 2         Q    Okay.
 3         A    So I can't -- yeah.
 4         Q    Well, why don't I take that in parts
 5    then.  Why don't I take that question in parts.
 6              You can't say today that the
 7    roadblocks were geocoded reliably for your
 8    analysis?
 9              MR. YOUNGWOOD:  Objection to form.
10              THE WITNESS:  My understanding is they
11    were coded using ArcGIS and I just need to
12    understand whether there's this boundary issue
13    you're discussing.  I just want to double-check
14    that.
15    BY MR. NOBILE:
16         Q    But, again, I want to make sure we're
17    clear for the record.  I'm not just talking about a
18    boundary issue.  I'm talking about a location of
19    the roadblock issue, too, because even if you do go
20    into it and figure out where the boundaries are of
21    the census tract you still need to figure out where
22    the roadblock occurred.  Do you agree?
23         A    I'd have to -- I'd have to consider that.
24         Q    Which approach?  Yeah, roadblocks, which
25    approach that they occur on the census tract on the
```

1  road.  Does that make sense?  I'm clarifying that I
2  mean where they are regarding the road approach on
3  the census tract as illustrated here on Exhibit 8.
4      A   Again, I think it's just you could take
5  the -- there's data in the record that indicates
6  the location of the roadblocks and you would just
7  check whether the longitude and latitude of that is
8  in or is not in a given census tract.
9      Q   Okay.  If you recall I gave you earlier
10 the Fridell study on vehicle stops, right?  And I
11 think it's marked as exhibit -- what exhibit is it?
12     A   5.
13     Q   5, the By the Numbers analysis.  You have
14 it there in front of you, and I'm going to read a
15 section from it.
16     A   Can you just give me the page?
17     Q   Yeah.  From the foreword, page viii.  8.
18     A   The pages -- oh, from the foreword.
19     Q   The very beginning, yeah.
20     A   I got you.  viii.  8.  Sorry.
21     Q   That's all right.
22     A   viii?
23     Q   Yeah.  I'm taking the full paragraph,
24 last full paragraph on we'll just call it page 8 of
25 the foreword, and beginning of the sentence it