### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

LATOYA BROWN; LAWRENCE BLACKMON; HERBERT ANTHONY GREEN; KHADAFY MANNING; QUINNETTA MANNING; MARVIN MCFIELD; NICHOLAS SINGLETON; STEVEN SMITH; BESSIE THOMAS; and BETTY JEAN WILLIAMS TUCKER, individually and on behalf of a class of all others similarly situated,

      Plaintiffs,

        v.

MADISON COUNTY, MISSISSIPPI; SHERIFF RANDALL S. TUCKER, in his official capacity; and MADISON COUNTY SHERIFF'S DEPUTIES JOHN DOES #1 through #6, in their individual capacities,

      Defendants.

**Civil Action No.  17-cv-347 (CWR/LRA)**

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND INDIVIDUAL DAMAGES**

**DEMAND FOR JURY TRIAL**

Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker (the "Class Representative Plaintiffs") bring this First Amended Class Action Complaint ("Amended Complaint") against Defendants Madison County, Mississippi ("Madison County") and Sheriff Randall S. Tucker, in his official capacity ("Sheriff Tucker") on behalf of two classes of similarly situated persons, defined herein.  Plaintiffs Khadafy Manning and Quinnetta Manning also bring claims for damages in their individual capacities against Madison County, Sheriff Tucker, and Madison County Sheriff's Deputies John Does #1 through #6.  All Plaintiffs assert civil rights claims pursuant to 42 U.S.C. §§ 1983 and 2000d.  This Amended Complaint is brought in accordance with the Court's January 4, 2019 Opinion and Order (ECF #340, the "January 4 Order"), which granted Plaintiffs leave to amend.

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT .................................................................. 5

JURISDICTION & VENUE ...................................................................... 12

JURY DEMAND ...................................................................................... 13

PARTIES ................................................................................................. 13

I.      Plaintiffs ................................................................................... 13

II.     Defendants ............................................................................... 15

GENERAL ALLEGATIONS .................................................................... 17

I.      A Brief Overview of Madison County, Mississippi ...................... 17

II.     The MCSD's Policing Program ................................................. 19

        A.      Pretextual and Highly Intrusive Vehicular Roadblocks........ 21

                1.      The Primary Purpose of the MCSD's System of Roadblocks Is to
                        Target Black Motorists for Unreasonable Searches and Seizures ........... 28

        B.      Suspicionless Searches and Seizures of Black Pedestrians ................. 29

        C.      Warrantless and Consentless Searches of the Homes of Black Residents........... 33

III.    Race-Based Statistical Disparities in Policing Outcomes Provide Compelling
        Evidence of the MCSD's Policing Program ..................................... 35

IV.     The MCSD's Policing Program Is Longstanding and Deeply-Entrenched ..................... 39

V.      Sheriff Tucker Has Adopted, Implemented, and Expanded the Policing Program .......... 46

        A.      Sheriff Tucker Has Enacted a Written Roadblock Policy That Sanctions
                Unconstitutional Racially Discriminatory Roadblocks ......................... 47

VI.     Sheriff Tucker Has Been Deliberately Indifferent to the Constitutional Violations
        Caused by the Policing Program ..................................................... 49

        A.      On Information and Belief, Sheriff Tucker Failed to Investigate an MCSD
                Deputy's Claim of Unconstitutional Racially Discriminatory Policing
                Practices ............................................................................ 50

B. Sheriff Tucker Hired a Deputy with a Documented History of Misconduct Involving the Excessive Use of Force ................................................................. 51

C. Sheriff Tucker Has Not Established any Rules or Regulations Prohibiting Racial Bias in Policing .......................................................................................... 51

D. The MCSD Maintains Minimal Data And Does Not Track Racial Disparities In Policing .............................................................................................. 52

VII. The Board of Supervisors Has Been Deliberately Indifferent to the Constitutional Violations Caused by the Policing Program ......................................................... 53

VIII. The Policing Program Has Caused Thousands of Constitutional Violations ................. 55

ALLEGATIONS OF CLASS REPRESENTATIVE PLAINTIFFS ........................................... 56

I. Latoya Brown ..................................................................................................................... 56

A. Pedestrian Stop Class Claims Of Latoya Brown ................................................... 57

B. Roadblock Class Claims Of Latoya Brown ........................................................... 57

II. Lawrence Blackmon ........................................................................................................... 58

A. Roadblock Class Claims Of Lawrence Blackmon ................................................ 58

B. Additional Allegations Of MCSD Misconduct ..................................................... 58

III. Khadafy Manning ............................................................................................................... 60

A. Pedestrian Stop Class Claims Of Khadafy Manning ........................................... 60

IV. Nick Singleton .................................................................................................................... 60

A. Roadblock Class Claims Of Nick Singleton ......................................................... 61

B. Additional Allegations Of MCSD Misconduct ..................................................... 61

V. Steven Smith ....................................................................................................................... 62

A. Pedestrian Stop Class Claims Of Steven Smith .................................................... 62

B. Additional Allegations Of MCSD Misconduct ..................................................... 63

VI. Bessie Thomas .................................................................................................................... 64

A. Roadblock Class Claims of Bessie Thomas ........................................................... 64

B. Additional Allegations Of MCSD Misconduct ..................................................... 64

VII.    Betty Jean Williams Tucker ................................................................................ 65

     A.    Roadblock Class Claims Of Betty Jean Williams Tucker ................................... 65

     B.    Additional Allegations Of MCSD Misconduct.................................................... 66

CLASS ACTION ALLEGATIONS ............................................................................... 67

INDIVIDUAL ALLEGATIONS OF KHADAFY AND QUINNETTA MANNING ................. 71

CAUSES OF ACTION ................................................................................................ 75

I.    FIRST CAUSE OF ACTION ................................................................................ 75

II.    SECOND CAUSE OF ACTION ........................................................................... 77

III.    THIRD CAUSE OF ACTION ............................................................................... 79

IV.    FOURTH CAUSE OF ACTION ........................................................................... 80

V.    FIFTH CAUSE OF ACTION ................................................................................ 81

VI.    SIXTH CAUSE OF ACTION ................................................................................ 81

PRAYER FOR RELIEF ............................................................................................... 82

## PRELIMINARY STATEMENT

1.      The Sheriff's Department of Madison County, Mississippi ("MCSD") implements

a coordinated top-down program of methodically targeting Black individuals for suspicionless

searches and seizures while they are driving their cars, walking in their neighborhoods, or even

just spending time in their own homes (the "Policing Program"). MCSD deputies frequently use

unjustified and excessive force in conducting these searches and seizures.

2.      The MCSD's Policing Program impacts virtually every aspect of Black residents'

lives. Simple daily activities—such as commuting to work, grocery shopping, visiting friends

and family, attending church, or even sitting on the steps outside one's own home—present the

very real possibility of unlawful and humiliating searches and seizures, as well as the attendant

prospect of arrest and jail time for unpaid fines and fees.[1]

3.      As a result, many Black residents of Madison County experience chronic fear and

anxiety, disruptions to their everyday activities, restrictions on travel within their own

neighborhoods and towns, and a tremendous reluctance to contact law enforcement officials for

assistance when necessary. Some Black community members go so far as to avoid leaving their

homes to limit the risk of encountering one of the MCSD's many illegal roadblocks or pedestrian

"checkpoints" described below. In effect, the Policing Program has placed the Black community

of Madison County under a permanent state of siege.

---

[1] Whenever an MCSD deputy stops a Black individual, the deputy typically checks that individual's
identification to determine whether he or she owes outstanding fines to the County. These fines often
stem from traffic violations or other minor infractions. Black individuals are more likely than white
individuals in Madison County to lack the resources to pay these fines, as well as the added court fees, in
full on their scheduled court dates. When an individual fails to pay the required amount, the court will
issue a warrant for his/her arrest to compel collection.

4.     The hallmark tactics of the MCSD's longstanding and deeply-entrenched Policing Program include:

- **Vehicular roadblocks** designed and placed to target Black individuals for highly intrusive, pretextual, and suspicionless searches and seizures in Madison County's majority-Black towns, residential neighborhoods, and business districts; and

- **Pedestrian stops** – including "checkpoints" at the entrances and exits of predominantly-Black housing complexes, and "jump out" patrols, often of plainclothes deputies deployed in unmarked cars – designed to target Black individuals for suspicionless searches and seizures;

The MCSD also relies on a broad range of other methods—including suspicionless traffic stops and warrantless and consentless searches of the homes of Black residents —to target Black community members for illegal searches and seizures.

5.     The MCSD has deployed the unconstitutional racially discriminatory policing tactics described above pursuant to a single overarching policy, custom, and/or practice of systematically conducting unreasonable searches and seizures of persons, homes, cars, and property on the basis of race.

6.     The Policing Program is so persistent and widespread as to practically have the force of law in Madison County.

7.     Like many policing policies, practices, and customs deemed unconstitutional by federal courts and the United States Department of Justice,[2] each of the policing practices conducted pursuant to the MCSD's Policing Program independently violates both the Fourth Amendment's prohibition on unreasonable searches and seizures and the Equal Protection Clause of the Fourteenth Amendment.

---

[2] *See, e.g.,* U.S. Department of Justice, *Investigation of the Baltimore City Police Department* (2016), https://www.justice.gov/crt/file/883296/download; U.S. Department of Justice, *Investigation of the Ferguson Police Department* (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report_1.pdf.

8.      The Policing Program is rooted in Madison County's infamous history of racial animus. The wealthiest county in Mississippi, Madison County is now and has always been acutely racially segregated. Past Madison County Sheriffs have violently opposed racial integration, led white supremacist organizations,[3] and willfully turned a blind eye to racially discriminatory conditions of confinement. These sheriffs used many of the same unconstitutional racially discriminatory policing tactics employed in the Policing Program. For example, during the Civil Rights era, Madison County Sheriff Billy Noble regularly established roadblocks to conduct unconstitutional searches and seizures of Black motorists.

9.      The MCSD's Policing Program has resulted in stark racial disparities in policing outcomes that cannot be explained by alternative non-race-based factors. Although only 38% of Madison County residents are Black,[4] approximately 73% of arrests in Madison County between May and September of 2016 were of Black individuals. Only 23% arrests during this time period were of white individuals, even though Madison County is 57% white.[5] These statistics suggest that the arrest rate for Black individuals is nearly *five times* the arrest rate for white individuals in Madison County.[6]

---

[3] *See, e.g.*, *Officer Memorials*, Sheriff Randy Tucker, http://www.sheriffrandytucker.com/officer-memorials/ (last visited February 4, 2019) (reprinting September 10, 1959 *Madison County Herald* article stating that former Madison County Sheriff Marion F. Simpson "was one of the organizers of the local Citizens Council and remained as one of its most active leaders, also serving on the Executive Committee of the state association of Citizens Councils."). The Citizens Council was formed in opposition to desegregation and "gr[e]w to be the most powerful opponent of civil rights activism in Mississippi." *The Citizens' Council,* AMERICAN RADIOWORKS, http://americanradioworks.publicradio.org/features/mississippi/c1.html (last visited February 4, 2019).

[4] Based on 2010 Census data. See Quickfacts: Madison County, Mississippi, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited February 4, 2019).

[5] Based on 2010 Census data. See Quickfacts: Madison County, Mississippi, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited February 4, 2019).

[6] If the MCSD's arrest rates were proportional to the population, then approximately 38% of arrests would be of Black individuals and approximately 57% of arrests would be of white individuals. The rate

10.      Because the MCSD targets Black communities for roadblocks and suspicionless pedestrian stops, the vast majority of individuals arrested at roadblocks and pedestrian stops in Madison County are Black. Between May and September 2016, 81% of arrests at roadblocks and 82% of arrests at pedestrian stops in Madison County were of Black individuals.

11.      At roadblocks and pedestrian stops, the MCSD overwhelmingly arrests Black individuals. However, white arrestees are 1.4 times more likely than Black arrestees to be charged with driving under the influence of drugs or alcohol. They are 1.1 times more likely to be charged with a drug crime. In contrast, Black arrestees face over 3.2 times the odds for white individuals of being charged only with a petty revenue-generating vehicle infraction, like having a burned out headlight or no seat belt. This data suggests a pattern of population-targeted as opposed to public safety-motivated policing.

12.      Over the years, the MCSD's Policing Program has led to thousands of violations of the Fourth and Fourteenth Amendments of the United States Constitution. The Policing Program is "unquestionably . . . the moving force" behind these constitutional violations within the meaning of the Supreme Court's decision in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694-95 (1978).

13.      Since taking office in January 2012, Sheriff Randall S. Tucker has adopted and implemented the Policing Program in its entirety.

14.      Sheriff Tucker has not only enforced the Policing Program but also expanded its scope. Among other actions, he has enacted or maintained a written roadblock policy that

---

of arrests of Black individuals in Madison County is roughly double this expected percentage (73%, or approximately **2** times the percentage of Madison County's population that is Black). The rate of arrests of white individuals is less than half the expected percentage (23%, or approximately **0.4** times the expected percentage). In other words, the arrest rate for Black individuals is *nearly five* times the arrest rate for white individuals in Madison County.

sanctions unconstitutional racially discriminatory roadblocks. In essence, Sheriff Tucker has empowered MCSD deputies with enhanced authority and implicit encouragement to target the members of Madison County's Black community for unreasonable searches and seizures.

15.     Sheriff Tucker has been deliberately indifferent to the constitutional violations caused by the Policing Program. Among other actions and inactions, he has: (1) on information and belief, failed to investigate a Black MCSD deputy's complaint of racially discriminatory policing practices and the unjustified use of physical force against Black community members; (2) hired a deputy with a documented history of misconduct involving the excessive use of force; (3) chosen *not* to establish any rules or regulations prohibiting racial bias in policing; (4) decided *not* to maintain basic data on the MCSD's policing practices, including the differential impact of the MCSD's policing on Black communities; and (5) failed to establish or maintain objective or reliable procedures for supervision or discipline of deputies, or for investigation of civilian complaints.

16.     For at least a decade, the Madison County Board of Supervisors has known that the MCSD systematically targets the Black community for unreasonable searches and seizures. The Madison County Board of Supervisors has also been aware of a pattern of constitutional violations suffered by the Black residents of Madison County as a direct result of the MCSD's Policing Program.

17.     However, the Madison County Board of Supervisors has been deliberately indifferent to these constitutional violations by failing to investigate the MCSD's racially discriminatory policing practices and/or its pattern of conducting unreasonable searches and seizures, and by failing to require the MCSD to take any actions to: (a) establish policies that prohibit racially discriminatory policing practices and/or unreasonable searches and seizures; (b)

screen, train, and supervise MCSD deputies, employees, and agents to prevent MCSD personnel from employing unconstitutional racially discriminatory policing practices and/or conducting unreasonable searches and seizures; (c) monitor MCSD deputies, employees, and agents to ensure that their policing practices comply with constitutional requirements; and/or (d) discipline MCSD deputies, employees, and agents who employ racially discriminatory policing practices and/or conduct unreasonable searches and seizures.

18.     This policy of inaction by the Madison County Board of Supervisors is the functional equivalent of a decision by Madison County itself to violate the Constitution. By failing to take any steps to investigate or remedy the MCSD's systematic targeting of Black residents for unreasonable searches and seizures, the Board of Supervisors has implicitly sanctioned and endorsed the Policing Program.

19.     Class Representative Plaintiffs Latoya Brown, Lawrence Blackmon, Khadafy Manning, Nicholas Singleton, Steven Smith, Bessie Thomas, and Betty Jean Williams Tucker are among the thousands of victims of Madison County's Policing Program. Most of the Class Representative Plaintiffs have been subjected to the MCSD's unreasonable race-based searches and seizures multiple times in recent months and years. The Class Representative Plaintiffs seek to represent two classes, each consisting of similarly situated Black individuals who have been, are now, or will be subject to two key components of the MCSD's racially discriminatory Policing Program: (i) the MCSD's policy or longstanding practice of establishing roadblocks in the County based on the racial demographics of the surrounding area and/or for purposes of general crime control, rather than traffic safety; and (ii) the MCSD's policy or longstanding practice of conducting suspicionless stops and searches of Black pedestrians.

20.     Class Representative Plaintiffs Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker seek to represent the following class in order to obtain declaratory and injunctive relief with respect to Defendants' policy or longstanding practice of unconstitutional vehicular roadblocks:

> All Black motorists and passengers who since May 2014 have been or will be in the future stopped or detained at a vehicular checkpoint or roadblock instituted by agents of the Madison County Sheriff's Department while traveling in, through, or in the immediate vicinity of the following locations within Madison County, Mississippi: (i) the city of Canton and the adjoining unincorporated area contained within U.S. Census tract No. 305; (ii) the communities of Flora and Kearney Park and surrounding unincorporated areas contained within U.S. Census tract No. 303.02; (iii) the city of Ridgeland; and (iv) the unincorporated areas of Madison County contained within U.S. Census tracts Nos. 309 and 310, including the community of Camden.

21.     Class Representative Plaintiffs Latoya Brown, Steven Smith, and Khadafy Manning seek to represent the following class in order to obtain declaratory and injunctive relief with respect to Defendants' policy or longstanding practice of unconstitutional pedestrian stops:

> All Black persons who since May 2014 have been or will be in the future stopped, detained, questioned, or searched by agents of the Madison County Sheriff's Department in the absence of reasonable, articulable suspicion or probable cause within Madison County, Mississippi while traveling as pedestrians or while present within the curtilages of homes or the grounds or common areas of multi-unit residential complexes or developments.

22.     The defendants in this action are Madison County and Sheriff Tucker, in his official capacity as the policymaking official of the MCSD (together, "Defendants"); as well as Madison County Sheriff's Department Deputies John Does #1 through #6.

23.     Plaintiffs, on behalf of themselves and the members of the classes they seek to certify, seek relief for Defendants' violations of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), the Fourth and Fourteenth

Amendments to the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI").

24.     The Class Representative Plaintiffs seek to represent certified classes for the purpose of obtaining injunctive and declaratory relief only. They seek class-wide judgments declaring that the policies, practices, and/or customs for which each class seeks relief violate the Fourth and Fourteenth Amendments, and class-wide injunctive relief enjoining Defendants from continuing to implement these policies, practices, and/or customs. Unless such declaratory and injunctive relief is obtained, the Class Representative Plaintiffs and class members will continue to face a substantial threat that they will again be subject to the unconstitutional racially discriminatory policing practices described herein.

25.     In addition, Plaintiffs Khadafy Manning and Quinnetta Manning seek compensatory and punitive damages only for themselves, against Defendants and John Does #1 through #6.

26.     Plaintiffs also seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## JURISDICTION & VENUE

27.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000d.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

29.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

30.     This Court is authorized to award attorneys' fees under 42 U.S.C. § 1988(b).

31.     Venue is properly set within the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

32.     Plaintiffs demand trial by jury in this action on each and every one of their claims.

## PARTIES

### I.     Plaintiffs

33.     Plaintiff LATOYA BROWN ("Ms. Brown") is a 29-year-old Black woman who has spent nearly her entire life in Canton, Mississippi. She recently moved to Dallas, Texas, where she lives with named Plaintiff STEVEN SMITH and their four daughters, but maintains strong connections to Madison County and expects to regularly visit and eventually to move back. Ms. Brown is a stay-at-home mother. Ms. Brown asserts claims as a representative of both the Roadblock Class and the Pedestrian Stop Class.

34.     Plaintiff LAWRENCE BLACKMON ("Mr. Blackmon") is a 33-year-old Black man who has resided in Canton, Mississippi since 1998. Mr. Blackmon recently completed a Masters of Law program at George Washington University Law School in Washington D.C., and is now a practicing attorney based out of a Canton office. Mr. Blackmon asserts claims as a representative of the Roadblock Class.

35.     Plaintiff KHADAFY MANNING ("Mr. Manning") is a 37-year-old physically disabled Black man who resides in Canton, Mississippi. He has lived in Canton for over 20 years. Mr. Manning suffers from a painful nerve condition that makes it difficult for him to walk without a cane. He is married to Plaintiff QUINNETTA MANNING, and they are raising three sons together. Mr. Manning volunteers his time as an assistant coach for a youth T-Ball team in Canton. Mr. Manning asserts claims as a representative of the Pedestrian Stop Class. Mr. Manning also brings individual claims for damages.

36.     Plaintiff QUINNETTA MANNING ("Mrs. Manning") is a 31-year-old Black woman who was born and raised in Canton, Mississippi, where she still resides. She is married to

13

named Plaintiff Mr. Manning, and the couple has three young sons together. Mrs. Manning volunteers her time with a youth dance troupe. Ms. Manning solely asserts individual claims for damages.[7]

37.     Plaintiff NICK SINGLETON ("Mr. Singleton") is a 37-year-old Black man who has lived in Canton, Mississippi since 2004. Mr. Singleton works as a field service technician for a telecommunications company. He is the father of two young boys. Mr. Singleton asserts claims as a representative of the Roadblock Class.

38.     Plaintiff STEVEN SMITH ("Mr. Smith") is a 29-year-old Black man who has spent nearly his entire life in Canton, Mississippi. Last year, Mr. Smith moved to Dallas, Texas, where he lives with named Plaintiff Ms. Brown and their four young daughters, but he maintains strong connections to Madison County and expects to regularly visit and eventually to move back. Mr. Smith currently works at a manufacturing facility. Mr. Smith asserts claims as a representative of the Pedestrian Stop Class.

39.     Plaintiff BESSIE THOMAS ("Mrs. Thomas") is a 60-year-old Black woman who has lived in Canton, Mississippi for the past five decades. Mrs. Thomas serves as a minister at two local churches, and she is involved in taking care of her young grandchildren. For three years, Mrs. Thomas operated a corner store in Canton. Ms. Thomas asserts claims as a representative of the Roadblock Class.

40.     Plaintiff BETTY JEAN WILLIAMS TUCKER ("Mrs. Tucker") is a 64-year-old Black woman who was born, raised, and currently resides in Canton, Mississippi. For over a decade, Mrs. Tucker worked as a welder in a Canton manufacturing warehouse. She has five children, twelve grandchildren, and three great grand-children. Mrs. Tucker is among the

---

[7] Ms. Manning's full legal name is Quinnetta Katrice Thomas; Manning is her married name.

longest-lived residents in her Canton neighborhood. Ms. Tucker asserts claims as a representative of the Roadblock Class.

## II.    <u>Defendants</u>

41.    Defendant MADISON COUNTY, MISSISSIPPI is a political subdivision of the State of Mississippi that can sue and be sued in its own name. Upon information and belief, Madison County programs and activities, including programs and activities of the MCSD, receive federal financial assistance.[8] The County and its departments are therefore required under federal law to conduct their programs and activities in a racially and ethnically non-discriminatory manner. The "chief policy making and administrative body" of the County is, and at all times relevant hereto has been, the Madison County Board of Supervisors (the "<u>Board of Supervisors</u>" or the "<u>Board</u>"), which describes itself as "the one body which supervises almost everything that goes on in county government."[9] The Board of Supervisors is comprised of five elected Supervisors, one from each of the five districts in Madison County. For at least a decade, Defendant Madison County has had actual knowledge of a longstanding pattern of constitutional violations inflicted on the Black community by the MCSD pursuant to the Policing Program. By both its action and inaction, Defendant Madison County has either sanctioned, or been deliberately indifferent to, the MCSD's policy of systematically executing unreasonable searches and seizures on the basis of race.

42.    Defendant RANDALL S. TUCKER is, and has been since January 2012, the Sheriff of Madison County, Mississippi. Under Mississippi law, sheriffs "are final policymakers

---

[8] *See, e.g.*, Office of the State Auditor, Mississippi, *Madison County, Mississippi: Audited Financial Statements and Special Reports For the Year Ended September 30, 2015*, at 57 (Schedule of Expenditures of Federal Awards), http://www.osa.ms.gov/documents/counties/2015/15cMadison%20County-cpa.pdf.

[9] *Board of Supervisors*, Madison County, Mississippi, http://madison-co.com/elected-offices/board-of-supervisors (last visited January 30, 2019).

with respect to all law enforcement decisions made within their counties."[10] Sheriff Tucker is

and was responsible for each of the unconstitutional racially discriminatory practices that

comprises the Policing Program. He is either the chief architect of, or has adopted and endorsed,

every one of the illegal policing tactics described herein. Sheriff Tucker is, and has been since

January 2012, responsible for the hiring, screening, training, retention, supervision, discipline,

counseling, and control of the MCSD's deputies, and other personnel who are or were employed

by the MCSD, including the John Doe Defendants named herein. He is sued in his official

capacity.

43.     Defendants JOHN DOES #1 through #6 are, and/or were, at all times relevant

herein, deputies, employees, and agents of the MCSD, a department of Madison County. John

Does #1 through #6 are sued in their individual capacities. Plaintiffs will seek leave to amend to

assert claims against the person(s) named herein as John Does #1 through #6.

44.     At all times relevant herein, John Does #1 through #6 have acted under color of

State law in the course and scope of their duties and functions as agents, employees, and officers

of Madison County in engaging in the actions and inactions described herein. At all times

relevant herein, the Board of Supervisors, Sheriff Tucker, and John Does #1 through #6 have

acted for and on behalf of the County with the power and authority vested in them as officers,

agents, and employees of the County and incidental to the lawful pursuit of their duties as

officers, employees, and agents of the County.

45.     At all times relevant herein, John Does #1 through #6 have violated clearly

established constitutional standards under the Fourth Amendment and the Equal Protection

Clause of the Fourteenth Amendment of which a reasonable person would have known.

---

[10] *Brooks v. George Cty, Miss.*, 84 F.3d 157, 165 (5th Cir. 1996) (citing *Huddleston v. Shirley*, 787 F.
Supp. 109, 112 (N.D. Miss. 1992) and Miss. Code § 19-25-1, *et seq.*).

## GENERAL ALLEGATIONS

### I.    A Brief Overview of Madison County, Mississippi

46.    Madison County is a majority-white county. According to the 2010 census, approximately 58% of Madison County residents are white and 38% are Black.[11] The County is now and has always been acutely racially segregated.



47.    More than a decade ago, now-Chief Judge Carl. E. Stewart of the United States Court of Appeals for the Fifth Circuit acknowledged the "confluence of . . . geography and demography" in Madison County.[12] He stated that the resulting "racial isolation" in Madison County was "foreboding and potentially deleterious."[13] Chief Judge Stewart's description of

---

[11] *Quickfacts: Madison County, Mississippi*, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited February 4, 2019).

[12] *Anderson v. School Bd. of Madison Cty*, 517 F.3d 292, 305 (5th Cir. 2008) (Stewart, J.) (concurring in the majority's affirmance of the district court's grant of the Madison County School District's motion for unitary status).

[13] *Id.*

segregation in Madison County still rings true today. Madison County remains divided into predominantly Black towns, neighborhoods, and business districts and predominantly white towns, neighborhoods, and business districts.

48.   Madison County, located directly to the north of Jackson, is approximately 57% white and 38% Black. The white population is concentrated in the southern part of the county, including the city of Madison (85% white; 10% Black; population 26,000)[14] and portions of the city of Ridgeland (55% white; 36% Black; population 24,000).[15] The Black population is concentrated in the north and west of the county, including the city of Canton (70% Black; 24% white; population 13,000)[16]; the communities of Flora (51% Black; 47% white; population 1,800)[17] and Kearney Park and surrounding unincorporated areas[18]; and the rural area in the north of the County, including the community of Camden.[19] Southeast Ridgeland also has a substantial Black population. Madison County has experienced significant growth in recent decades. Since 1990, its population has nearly doubled, largely due to the growth of the Madison and Ridgeland areas. A map of Madison County prepared by the U.S. Census bureau is attached hereto as Exhibit A.

---

[14] *Quickfacts: Madison City, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/PST045216/2844520 (last visited January 30, 2019).

[15] *Quickfacts: Ridgeland City, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/PST045215/2862520 (last visited January 30, 2019).

[16] *Quickfacts: Canton City, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/PST045215/2811100 (last visited January 30, 2019).

[17] *Flora, Mississippi Population*, CensusViewer, http://censusviewer.com/city/MS/Flora (last visited January 30, 2019).

[18] These unincorporated areas comprise U.S. Census tract No. 303.02.

[19] These unincorporated areas comprise U.S. Census tracts Nos. 309 and 310.

49.     Madison County is the wealthiest county in Mississippi,[20] and its wealth is heavily concentrated among its white citizens. For example, the average household income in the City of Madison is more than double that in Canton ($103,000 vs. $46,000); residents of the City of Madison own the homes in which they live at nearly double the rate of Canton residents (92% vs. 49%); and the poverty rate in the City of Madison is a small fraction of the rate in Canton (3% vs. 25%).[21]

50.     Madison County's pervasive racial segregation has facilitated the MCSD's racially discriminatory policing practices by enabling MCSD deputies to use geographic criteria to isolate and target Black residents of Madison County for unconstitutional searches and seizures.

## II.     The MCSD's Policing Program

51.     For at least two decades, if not longer, the MCSD has implemented a coordinated top-down program of methodically targeting Black individuals for suspicionless searches and seizures.

52.     Pursuant to the Policing Program, the MCSD employs a series of integrated tactics to systematically conduct unreasonable searches and seizures of persons, homes, cars, and property on the basis of race. During the course of these illegal searches and seizures, MCSD deputies routinely detain members of the Black community without probable cause, and often issue citations and make arrests either without legal justification or to recover outstanding fines and fees, typically for minor infractions.

---

[20] *Mississippi Per Capita Income by County 2017*, Mississippi Department of Employment Security, http://mdes.ms.gov/media/8639/pci.pdf (last visited January 30, 2019).

[21] *Quickfacts: Canton City, Mississippi and Madison City, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/table/INC110215/2811100,2844520 (last visited February 4, 2019).

53.     The various unconstitutional racially discriminatory policing practices that comprise the Policing Program range in scope and severity, but they are all conducted pursuant to the MCSD's single overarching policy, custom, and/or practice of systematically conducting unreasonable searches and seizures of persons, homes, cars, and property on the basis of race. This policy, custom, and/or practice is so persistent and widespread as to practically have the force of law in Madison County.

54.     Like many policing policies, practices, and customs deemed unconstitutional by federal courts and the United States Department of Justice,[22] the MCSD's Policing Program combines unlawful methods of searches and seizures in violation of the Fourth Amendment with an impermissible race-based classification in violation of the Equal Protection Clause of the Fourteenth Amendment.

55.     The MCSD's Policing Program also violates the Equal Protection Clause of the Fourteenth Amendment because race-based suspicion is integral to its functioning. The MCSD's Policing Program in fact depends on the use of race to determine which individuals to target for unreasonable searches and seizures in violation of the Fourth Amendment. As such, the MCSD's Policing Program is a government program with an express racial classification; it is subject to, and fails, strict scrutiny.

56.     The most frequently-used illegal policing tactics of the MCSD's Policing Program are described below, and substantiated by the allegations of the Class Representative Plaintiffs in paragraphs 173 through 243 below. In addition, the MCSD also engages in a broad range of

---

[22] *See, e.g.,* U.S. Department of Justice, *Investigation of the Baltimore City Police Department* (2016), https://www.justice.gov/crt/file/883296/download; U.S. Department of Justice, *Investigation of the Ferguson Police Department* (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report_1.pdf.

other unconstitutional racially discriminatory policing practices—including suspicionless traffic stops and suspicionless frisks of pedestrians—that impermissibly target Black community members for unlawful searches and seizures. Taken together, these policing methods have effectively placed the Black community of Madison County under a permanent state of siege.

**A.      Pretextual and Highly Intrusive Vehicular Roadblocks**

57.      The MCSD operates a network of pretextual and highly intrusive vehicular roadblocks concentrated in and around the majority Black cities and neighborhoods of Madison County. These roadblocks are typically located on roadways close to Black homes, employers of Black residents, Black-owned businesses, and civic institutions frequented by the Black community.

58.      Because the MCSD targets Black communities for roadblocks, the vast majority of individuals arrested at Madison County's roadblocks are Black. Almost 81% of  roadblock arrests in Madison County between May and September of 2016 were of Black individuals.



59.     The MCSD maintains a formal written policy (the "General Roadblocks Policy")

that expressly authorizes "[a]ll [d]eputies" to "conduct random roadblocks for all traffic

violations, escapees, or wanted subjects."[23] The General Roadblocks Policy places no restrictions

on how and when MCSD deputies may conduct these roadblocks. Significantly, the General

Roadblocks Policy does not require deputies to use race-neutral criteria when selecting roadblock

locations. A copy of the MCSD's Roadblocks Policy is attached as Exhibit B.

60.     The MCSD regularly establishes roadblocks in Canton, the county seat and the

largest majority-Black city within Madison County. Most of the Canton neighborhoods targeted

for roadblocks are lined by quiet, residential streets, not busy highways or thoroughfares. A map

depicting recent representative roadblock locations appears below.

---

[23] *General Roadblocks, in* POLICY AND PROCEDURE, Office of the Sheriff, Madison County, Mississippi.



61.     The MCSD sometimes sets up more than one vehicular roadblock in the Canton area within a single day; multiple vehicular roadblocks within a single week are not uncommon.

62.     The MCSD often sets up roadblocks in poorly-lit, difficult-to-see locations, and these are often manned by plainclothes MCSD deputies who drive unmarked vehicles. While these deputies may wear tactical body armor over their plain clothes, the deputies are not otherwise identifiable as law enforcement officers.  Such roadblocks are rarely, if ever, located in the predominantly white neighborhoods and business districts of Madison County.

23

63.     In one instance in 2015, a Black individual (the "<u>driver</u>") was stopped at a roadblock by an MCSD deputy who waved him down with a flashlight while standing in the middle of a dark and isolated road. There were no other law enforcement vehicles or any other signs of a roadblock. The driver reported that if he had not been paying close attention, he could have struck the MCSD deputy because the deputy was barely visible. The MCSD deputy asked the driver to get out of the car, even though there was no basis for reasonable suspicion. Only after searching the driver unlawfully did the MCSD deputy permit the driver to proceed.

64.     Often, the MCSD's roadblocks are "roving" in nature. Deputies will sometimes drive away after a short time to set up a roadblock at another location nearby. At other times, plainclothes deputies will park their vehicles in one location and walk to a different street corner to flag down motorists with flashlights.

65.     The MCSD also sets up semi-concealed roadblocks within the parking lots of Madison County's majority-Black housing complexes. These roadblocks are usually located at the sole operational entry and exit to the complexes. A map depicting recent representative roadblock locations appears below. These roadblocks unreasonably violate Black residents' legitimate expectations of privacy in and around their own homes, and unconstitutionally restrict their freedom to leave and return to their homes unimpeded by government intrusion.



66.     Once an MCSD deputy stops a vehicle at a roadblock, the deputy typically requires both the driver of the vehicle and any passengers riding in the vehicle to provide a driver's license or another form of identification. The MCSD deputy usually runs these identifications against police databases to determine whether the detained individuals can be arrested to collect unpaid fines and fees owed to the County.

67.     In the experience of named Plaintiff Mrs. Tucker, who has been repeatedly stopped at the MCSD's roadblocks, MCSD deputies do not follow a standard operating procedure in conducting these roadblocks. MCSD deputies have sometimes asked Mrs. Tucker to produce her driver's license and proof of her insurance, but at other times they have only asked for her license. MCSD deputies have usually taken Mrs. Tucker's license and checked it for unpaid fines, but sometimes the MCSD deputy running the roadblock has just glanced at her license and waved her through.

68.     Traveling through the MCSD's roadblocks can take 10 to 20 minutes per vehicle, even when MCSD deputies do nothing more than check identification. These delays are sometimes compounded when MCSD deputies conduct suspicionless searches of Black motorists, their passengers, and their vehicles during these stops.

69.     The MCSD often fails to provide any advance notice, much less meaningful notice of its roadblocks. For example, a notice of planned roadblocks (the "Roadblock Notice") was made public via posting on social media shortly before the filing of Plaintiffs' initial Complaint. The Roadblock Notice stated that the MCSD "will have" a roadblock "at one or more of" of *dozens* of listed locations between January 19, 2017 and January 22, 2017.[24] The Roadblock Notice was so overbroad that it effectively provided no notice at all. A copy of the Roadblock Notice is attached hereto as Exhibit C.

70.     For members of the Black community, the MCSD's roadblocks are much more than an inconvenience. Passing through these unconstitutionally intrusive roadblocks is fraught

---

[24] The Roadblock Notice refers to "checkpoints" rather than "roadblocks." However, please note the MCSD uses the terms "roadblock" and "checkpoint" interchangeably when referring to the type of roadblocks described herein.

with the potential for harassment, intimidation, demeaning searches, baseless citations, and possibly even arrest and subsequent incarceration.

71.     Black community members therefore go to great lengths to avoid the MCSD's roadblocks. They rely on an informal system of warnings communicated by friends and family through social media, texts, and phone calls. Black individuals often change their travel and personal plans based on the presence of these roadblocks.

72.     For example, one of the Class Representative Plaintiffs in this action, Mrs. Tucker, devotes a great deal of time and effort to finding out the locations of MCSD's roadblocks. She uses phone calling trees, Facebook pages, smart phone apps, and texting lists to get news of the roadblocks. Although Mrs. Tucker has a valid license, registration, and insurance, she frequently rearranges her life to avoid the MCSD's roadblocks, typically by cancelling her plans and not leaving the house to see family or friends.

73.     As of the filing of Plaintiffs' initial complaint, one private Facebook group page that regularly warns of roadblocks in Madison County (the "Facebook Warning Page") had nearly 1,800 members, the vast majority of whom are Black. The Facebook Warning Page featured messages such as "Madison County is pulling people over on bikes and everything" and "Roadblock on maple by the tracks! They got their lights off." According to posts made prior to the filing of Plaintiffs' initial Complaint, the MCSD has set up roadblocks outside of churches, the Madison County Department of Human Services office (which issues food stamps), and fast food restaurants.

74.     Many of the Class Representative Plaintiffs in this action—including Mrs. Manning, Mrs. Tucker, and Mrs. Thomas—have been repeatedly stopped at the MCSD's roadblocks. One of the Class Representative Plaintiffs, Mr. Singleton, was stopped at the

MCSD's roadblocks at least 20 times in the year preceding the filing of Plaintiffs' initial Complaint.

1.   The Primary Purpose of the MCSD's System of Roadblocks Is to Target Black Motorists for Unreasonable Searches and Seizures

75.   Under the Supreme Court's decision in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), the constitutionality of a roadblock turns on its primary purpose. The primary purpose of the MCSD's system of roadblocks is now and has always been to target Black motorists, their passengers, and their vehicles for unreasonable searches and seizures. The MCSD's concentration of roadblocks in predominantly-Black areas, as well as at the entry and exit points of majority-Black apartment complexes, is compelling evidence of this patently unconstitutional primary purpose.

76.   An additional or alternative primary purpose of the MCSD's system of roadblocks is the sort of "general interest in crime control" held unconstitutional in *Edmond*. A notice of roadblock activity promulgated by the MCSD and attached hereto as Exhibit C (the Roadblock Notice) illustrates this impermissible purpose. The Roadblock Notice lists the locations of dozens of potential roadblocks and expressly states that the "purpose" of these roadblocks "will be to check for Driver's licenses, warrants and **whatever else we encounter**" (emphasis added).

77.   On information and belief, MCSD deputies often use roadblock stops as a means of looking for contraband. Deputies regularly question Black motorists and Black passengers at roadblock stops in an effort to gain probable cause for conducting searches based on the individuals' expressions or answers, or the supposed odor of marijuana in the vehicle or on one of the detained individuals.

78.   Another additional or alternative primary purpose of the MCSD's system of roadblocks is to enrich the County by generating municipal revenue through the collection of

28

unpaid fees and fines from the County's disempowered minority populations. This purpose is clearly impermissible under both the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

79.     To the extent that the MCSD attempts to claim that the primary purpose of its roadblocks is to check for valid drivers' licenses and up-to-date vehicle registrations, or for any other traffic safety purpose, any such stated purpose is plainly pretextual. The operation of roadblocks at the entry and exit points of majority-Black apartment complexes in quiet residential neighborhoods, rather than on heavily-trafficked open roadways or locations with a history of traffic hazards, clearly demonstrates that the primary purpose of the MCSD roadblocks is not traffic safety. The absence of such roadblocks in majority-white neighborhoods, where traffic safety is of equal importance, further lays bare the pretextual purpose of the MCSD's roadblocks. Any claimed purpose of traffic safety is also belied by the fact that MCSD deputies regularly require passengers, as well as *pedestrians* passing by roadblocks, to produce identification and submit to searches, as discussed in paragraphs 80 through 89.

**B.     Suspicionless Searches and Seizures of Black Pedestrians**

80.     The MCSD also regularly engages in suspicionless stops of Black persons while traveling as pedestrians or while present within the curtilages of homes or the grounds or common areas of multi-unit residential apartment complexes.

81.     The MCSD does not maintain data regarding stops that do not result in arrests or citations. However, the MCSD's data does indicate that the vast majority of individuals arrested at pedestrian stops in Madison County are Black. Approximately 82% of arrests at pedestrian stops in Madison County between May and September of 2016 were of Black individuals.



82.  One of the MCSD's most flagrantly unconstitutional racially discriminatory policing tactics is its implementation of pedestrian "checkpoints."

83.  Frequently, the MCSD enforces semi-concealed pedestrian "checkpoints" concurrently with vehicular roadblocks at the sole operational entry and exit to majority-Black housing complexes. These "checkpoints" violate Black residents' legitimate expectations of privacy in and around their own homes, and unconstitutionally restrict their freedom to leave and return to their homes unimpeded by government intrusion. In other words, a vehicular roadblock can at any time also serve as a pedestrian "checkpoint." MCSD deputies have discretion to implement such pedestrian "checkpoints" when conducting vehicular roadblocks.

84.  Because the MCSD typically enforces these pedestrian "checkpoints" at the same locations as its vehicular roadblocks, the MCSD's pedestrian "checkpoints" are also concentrated in and around the predominantly Black neighborhoods of Madison County.

85.  On information and belief, MCSD deputies do not establish pedestrian checkpoints in predominantly-white towns, residential neighborhoods or business districts.

86.     Once an MCSD deputy stops a Black pedestrian at a "checkpoint," the deputy typically requires the pedestrian provide a driver's license or another form of identification. The MCSD deputy usually runs the pedestrian's identification against police databases to determine whether the detained individual can be arrested to collect unpaid fines and fees. In addition, MCSD deputies often subject pedestrians passing through these "checkpoints" to demeaning and unconstitutional searches.

87.     On information and belief, the purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to and/or arresting members of the Black community.

88.     For example, in January 2017, one of the Class Representative Plaintiffs in this action—Mr. Smith—was arrested after being detained and illegally searched at a pedestrian "checkpoint" at the entrance to the predominantly-Black affordable housing complex where he resides. Mr. Smith was arrested after a check of his identification revealed that he had outstanding fines and fees.

89.     There is clearly no constitutional basis for MCSD deputies to require Black pedestrians to pass through "checkpoints" as they are coming in and out of their homes or going about their daily activities. Forcing citizens of the United States to "show their papers" in this fashion runs afoul of the law as well as the most basic norms of decency in domestic policing.

90.     The MCSD also engages in systematic illegal searches and seizures of Black pedestrians through "Jump Out" patrols that aim to take Black community members by surprise for suspicionless searches and seizures. These patrols are often conducted by plainclothes MCSD deputies driving unmarked vehicles.

31

91.     The "Jump-Out" deputies often target groups of young Black men walking or riding bicycles together.

92.     On information and belief, the "Jump Out" deputies select their targets purely on the basis of race and without any reasonable suspicion or probable cause; MCSD deputies do not target white residents for "Jump Out" patrols.

93.     When the "Jump Out" deputies encounter their intended targets, the deputies rapidly exit their vehicles and proceed to demand identification and/or conduct unreasonable and extensive searches of every individual.

94.     For example, approximately five years before the filing of Plaintiffs' initial Complaint, named Plaintiff Mrs. Tucker witnessed two "Jump Out" patrol deputies tackle her teenage grandson to the ground. The deputies conducted an aggressive search of her grandson's pockets. They left abruptly after finding nothing. Before the deputies descended upon Mrs. Tucker's grandson, he had been fixing his brother's bicycle in his front yard.

95.     Often, the "Jump Out" deputies handcuff Black individuals while they conduct their searches, and threaten arrest and jail time for failing to comply with their demands. The "Jump Out" deputies also threaten onlookers and passers-by with arrest if they do not immediately leave the scene or return to their homes.

96.     "Jump Out" patrols frequently take place outside of Black-owned businesses, causing customers to flee. On information and belief, the MCSD does not employ "Jump Out" patrols in the vicinity of white-owned businesses.

97.     On information and belief, the MCSD uses these "Jump Out" patrols to deter customers from patronizing Black-owned businesses. The "Jump Out" patrols, together with the

MCSD's other discriminatory policing tactics, have dramatically affected the profitability of Black-owned businesses.

      **C.**      **Warrantless and Consentless Searches of the Homes of Black Residents**

98.      In the course of investigating potential offenses, searching for missing persons, or canvasing for individuals with outstanding arrest warrants, MCSD deputies frequently enter the homes of Black residents of Madison County without search warrants and without consent.

99.      While they are in Black residents' homes, MCSD deputies routinely engage in searches and seizures that further violate the Fourth Amendment. These unconstitutional practices include the detention and restraint of Black individuals not suspected of any wrongdoing, and are often accompanied by the use of force.

100.      The following are illustrative examples of such misconduct:

      a)      In June 2016, six white male MCSD deputies forcibly entered the family home of Mr. and Mrs. Manning, two Plaintiffs in this action. The deputies did not have a search warrant. The deputies attempted to coerce Mr. Manning to write a false witness statement against a neighbor's boyfriend. When Mr. Manning refused, one of the deputies handcuffed him, choked him, and beat him in the back seat of an MCSD law enforcement vehicle.

      b)      In March 2016, two MCSD deputies forcibly entered the home of Mr. Blackmon, one of the Class Representative Plaintiffs in this action. The MCSD deputies claimed they had a warrant for the arrest of one of Mr. Blackmon's relatives, but the deputies refused to provide Mr. Blackmon with an opportunity to review the warrant. One of the deputies forced Mr. Blackmon to the ground at gunpoint, and handcuffed his wrists behind his back. The deputies then proceeded to search Mr. Blackmon's entire residence, ostensibly for the purpose of finding the person named in the warrant. The MCSD deputies searched

inside Mr. Blackmon's dresser drawers and other small closed compartments that could not possibly conceal an adult man.

      c)     In October 2015, MCSD deputies forcibly entered the home of Mr. Smith, a Class Representative Plaintiff in this action. The deputies did not provide Mr. Smith with a search warrant, but they claimed to be looking for a missing person. Without Mr. Smith's consent, the deputies conducted a search of Mr. Smith's home, including examining inside bureau drawers and other small closed compartments that could not reasonably contain a person. One of the deputies even woke up Mr. Smith's daughter, who was only three years old at the time, to ask her if she knew anything about the missing person.

      d)     Several years ago, MCSD deputies stormed into a celebratory barbecue hosted by Mrs. Tucker, one of the Class Representative Plaintiffs in this action, at her home in Canton. Without a warrant or any reason for suspecting criminal activity, the MCSD deputies conducted searches of Mrs. Tucker's guests, including by digging into their pockets. The MCSD deputies also got down on their hands and knees to search Mrs. Tucker's patio. Finding nothing, they left without explanation.

101.    It is common for MCSD deputies to harass Black residents while they are walking on the grounds of their apartment complexes, sitting on their patios, or spending time in their own yards, particularly after the sun has set. MCSD deputies often interrupt Black community members' leisure and family time with demands for identification, intrusive questioning and suspicionless searches. MCSD deputies also regularly instruct Black community members to disperse or return indoors, and threaten arrest and jail time for noncompliance.

102.    The MCSD's unconstitutional policing practices in and around Black community members' homes discourage Black residents from spending time outdoors, and from gathering

outside with friends and family. These tactics effectively impose a "curfew" pursuant to which being outside of one's own home after dark is reason enough to be detained or arrested. The MCSD's hostile and unreasonable approach to policing the Black community violates Black residents' reasonable expectations of privacy in their own homes, and greatly diminishes their sense of personal security.

103.    On information and belief, the MCSD does not engage in these unconstitutional policing practices in the homes, yards, and neighborhoods of Madison County's white residents.

## III.    Race-Based Statistical Disparities in Policing Outcomes Provide Compelling Evidence of the MCSD's Policing Program

104.    The MCSD's Policing Program has resulted in stark racial disparities in policing outcomes that cannot be explained by alternative non-race-based factors.

105.    For example, although only 38% of Madison County residents are Black,[25] approximately 73% of arrests Madison County between May and September of 2016 were of Black individuals. Only *23%* of arrests during this time period were of white individuals, even though Madison County is 57% white.[26] These statistics suggest that the arrest rate for Black individuals is nearly *five times* the arrest rate for white individuals in Madison County.[27]

---

[25] Based on 2010 Census data. See Quickfacts: Madison County, Mississippi, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited February 4, 2019).

[26] Based on 2010 Census data. See Quickfacts: Madison County, Mississippi, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited January 30, 2019).

[27] If the MCSD's arrest rates were proportional to the population, then approximately 38% of arrests would be of Black individuals and approximately 57% of arrests would be of white individuals. The rate of arrests of Black individuals in Madison County is roughly double this expected percentage (73%, or approximately **2** times the percentage of Madison County's population that is Black). The rate of arrests of white individuals is less than half the expected percentage (23%, or approximately **0.4** times the expected percentage). In other words, the arrest rate for Black individuals is *nearly five* times the arrest rate for white individuals in Madison County.



106.    Moreover, a disproportionate number of the MCSD's arrests are made in majority-Black towns. For example, the majority-Black city of Canton represents approximately 14% of Madison County's population, but accounted for nearly 47% of arrests made in Madison County between May and September 2016.



107.     Because the MCSD targets Black communities for roadblocks and suspicionless pedestrian stops, the vast majority of individuals arrested at roadblocks and pedestrian stops in Madison County are Black. Between May and September 2016, 81% of arrests at roadblocks and 82% of arrests at pedestrian stops in Madison County were of Black individuals.



108.     These dramatic racial disparities in policing outcomes have existed for years. A

2014 article in *The Clarion-Ledger* reported that while only 34% of Madison County's

population was Black at the time, 78% of those arrested in Madison County were Black—among the largest disparity of the Mississippi counties cited.[28]

109.    Similarly, an investigation conducted by *USA Today* revealed that the MCSD's 2011-2012 arrest rates were 92.4 per 1000 for Black residents, as opposed to only 15.9 per 1000 for non-Black residents.[29]

110.    These statistical disparities serve as compelling evidence that the MCSD's Policing Program violates the Equal Protection Clause of the Fourteenth Amendment.

**IV.    The MCSD's Policing Program Is Longstanding and Deeply-Entrenched**

111.    The MCSD's Policing Program is a deeply-entrenched policy, custom, and/or practice that has been in existence for years. The program has its roots in Madison County's long history of unconstitutional, racially discriminatory policing practices.

112.    During the Civil Rights era, Madison County Sheriff Billy Noble ("Sheriff Noble") was known for his "infamous road blocks,"[30] and his practice of "often arrest[ing] and jail[ing] black folk because he felt like it."[31]

113.    Billy Noble remained Sheriff through the 1980s. He and other Madison County officials were subject to a consent judgment regarding jail conditions in Madison County, including racially discriminatory practices.[32] Sheriff Noble's successor, Sheriff Jessie Hopkins,

---

[28] Therese Apel, *Mississippi Race, arrest rates examined*, THE CLARION-LEDGER (Nov. 19, 2014), http://www.clarionledger.com/story/news/2014/11/19/race-arrest-rates-examined/19307959/.

[29] Brad Heath, *Racial gap in U.S. arrest rates: 'Staggering disparity'*, USA TODAY (Nov. 18, 2014), http://www.usatoday.com/story/news/nation/2014/11/18/ferguson-black-arrest-rates/19043207/.

[30] Hunter Gray, *Ghosts of Madison County (Mississippi)*, BEARWITHOUTBORDERS (Oct. 7, 2011), https://lists.mayfirst.org/pipermail/bearwithoutborders/2011-October/004854.html.

[31] Socrates Garrett, *My Mississippi History*, MISSISSIPPI LINK (April 27, 2006), 2006 WLNR 27688973.

[32] *See, e.g.*, *Cooper v. Noble*, 33 F.3d 540 (5th Cir. 1994).

was held in contempt for violations of this consent judgment,[33] and complaints regarding the MCSD's racially discriminatory practices in connection with its management of the Madison County Detention Center have continued to the present day.[34]

114.    Sheriff Tucker's immediate predecessor, Toby Trowbridge ("Sheriff Trowbridge"), served as the Sheriff of Madison County from 1999 until 2011. Sheriff Trowbridge was one of the key architects and most ardent enforcers of the Policing Program. Under his leadership, the MCSD executed thousands of unreasonable searches and seizures of Black motorists, pedestrians, homes, and vehicles.

115.    Sheriff Trowbridge's unconstitutional, racially discriminatory policing practices were widely known throughout Madison County.

116.    In 2004, the community activist group Citizens Against Racial Profiling spoke out against Sheriff Trowbridge's racial profiling and targeting of Black community members in Madison County.[35]

117.    In 2006, a group of Canton residents ("Concerned Citizens of Canton") presented the Madison County Board of Supervisors with a petition bearing 664 signatures demanding an end to "frequent roadblocks in the predominantly black neighborhoods," "the excessive force and brutality administered by police officers," and "racial profiling."[36]

---

[33] *See id*. at 545.

[34] *See, e.g.*, *Letter Regarding Federal Inmates in Madison County Detention Center*, FEDERAL PUBLIC DEFENDER, NORTHERN AND SOUTHERN DISTRICTS OF MISSISSIPPI (April 11, 2008), http://ms.fd.org/index_files/index_files/Madison%20Jail%20letter.pdf.

[35] Adam Lynch, *Crossing the Line?*, JACKSON FREE PRESS (Sept. 8, 2004), http://www.jacksonfreepress.com/news/2004/sep/08/crossing-the-line/.

[36] *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006) (2006 WLNR 25321982).

118.    In July 2006, Canton resident Lauren Elaine attended a Madison County Board of Supervisors meeting on behalf of the Concerned Citizens of Canton. Sheriff Trowbridge was present at the meeting, but he refused to meet with representatives from the Concerned Citizens of Canton. Sheriff Trowbridge denied the use of racial profiling, and stated that the MCSD would continue using roadblocks as a policing practice.

119.    On information and belief, the Madison County Board of Supervisors took no action to investigate or address the Concerned Citizens of Canton's claims. However, for a period of time after the petition was submitted, there was a noticeable decrease in roadblocks in Canton, but a corresponding uptick in Flora roadblocks.[37]

120.    According to a July 2007 article in *The Clarion-Ledger*, District 5 Supervisor Paul Griffin ("Supervisor Griffin"), who is Black, said that many people in Madison County were aware that the MCSD was perceived as targeting Black community members, and had tried to get Sheriff Trowbridge to meet with his critics.[38] However, Supervisor Griffin stated that "[t]here is a limit to what the Board of Supervisors can do because the [S]heriff is elected by the people to do his job."[39]

121.    In October 2007, a group of Flora residents ("Concerned Citizens II of Flora") claimed to have video evidence demonstrating that that the MCSD had been setting up roadblocks in predominantly Black neighborhoods, such as Magnolia Heights, while not doing

---

[37] Elizabeth Crisp, *Flora group targets Madison Co. deputies*, THE CLARION-LEDGER (October 29, 2007) 2007 WLNR 27805955.

[38] *Is system fair?*, THE CLARION-LEDGER (July 22, 2007) (2007 WLNR 27765629).

[39] *Id.*

the same in predominantly white neighborhoods.[40] The group demanded documentation concerning Sheriff Trowbridge's roadblock policies and practices. Sheriff Trowbridge refused either to provide any such documentation or to meet with representatives of the Concerned Citizens II of Flora.[41]

122.    According to a January 2008 article in the *Madison County Journal*, Sheriff Trowbridge "generally receive[d] very high marks from [the Madison County Board of Supervisors]."[42] The article noted that Sheriff Trowbridge has "been the subject of complaints from African-Americans living in Canton and Flora who say he practices racial profiling."

123.    In November 2007, Sheriff Trowbridge denied charges of racial profiling at a meeting of the Madison County Board of Supervisors.[43] Three white members of the Board of Supervisors expressed their support for Sheriff Trowbridge during the meeting. However, former District 4 Supervisor Karl Banks ("Supervisor Banks"), who is Black, expressed his disappointment at the way the Board of Supervisors had addressed the issue of racial profiling. Then-Supervisor Banks stated that he routinely fielded complaints about the MCSD, and said that Sheriff Trowbridge should work with people to change the department's image. "The conversation today was about a feeling in the community. . . . I know, as an African American,

---

[40] *Muslim group could enter the fray in Flora*, MADISON COUNTY JOURNAL (Oct. 25, 2007), http://www.onlinemadison.com/Content/NEWS/Local-News/Article/Muslim-group-could-enter-the-fray-in-Flora/1/1/19402.

[41] *Id.*

[42] *New supervisors take office Friday*, MADISON COUNTY JOURNAL (Jan. 2, 2008), http://www.onlinemadison.com/Content/Default/Local-News/Article/New-supervisors-take-office-Friday/-3/1/19701.

[43] Elizabeth Crisp, *Racial profiling accusations thrown at Madison sheriff in board meeting*, THE CLARION-LEDGER (Nov. 6, 2007), 2007 WLNR 27805274.

that there is a real feeling in the community that the [Sheriff's] department is discriminating against people."[44]

124.    None of the minutes for the Board of Supervisors' meetings reference claims or discussions of racial profiling.[45] However, minutes from the November 19, 2007 Board of Supervisors meeting indicates that the Board authorized Sheriff Trowbridge to use $50,000 in grant funds for "public safety checkpoints."[46] Because the MCSD uses the terms "roadblock" and "checkpoint" interchangeably, these "public safety checkpoints" may have encompassed the racially discriminatory roadblocks described herein.

125.    *The Clarion Ledger* reported that of the 92 official MCSD roadblocks conducted in 2007, many were set up in areas that have higher concentrations of Black or Hispanic residents.[47] The *Clarion Ledger* also reported that more roadblocks were conducted in Canton and in unincorporated areas north of Canton than in any other area in 2007, and that roadblocks were often conducted in the same places multiple times throughout the year.[48]

126.    In 2008, a number of civil liberties groups, including the American Civil Liberties Union, the Mississippi Immigrant Rights Alliance, and Citizens Against Racial Profiling, called

---

[44] *Id.*

[45] The Madison County Government's website contains a functionality that allows the user to search an electronic archive of the Board of Supervisors' meeting minutes by keyword. Keyword-searching this archive revealed no references to "racial profiling" or synonymous terms in the Board of Supervisors' meeting minutes. *See* Board Minutes: Searching Minutes by Keyword, MADISON COUNTY MISSISSIPPI, http://www.madison-co.com/elected-offices/board-of-supervisors/board-minutes.php?search_type=keyword.

[46] *Minutes of the Board of Supervisors of Madison County, Mississippi* (November 19, 2007), http://www.madison-co.com/images/admin/pdfs/465_47418_Minutes_11-19-07_(Final).pdf.

[47] Elizabeth Crisp, *A show of frustration*, THE CLARION-LEDGER (March 28, 2008) (2008 WLNR 26594510).

[48] *Id.*

for the resignation of Sheriff Trowbridge for unfairly targeting Blacks and Latinos through racial profiling and roadblocks.[49] Once again, Sheriff Trowbridge denied engaging in racial profiling and refused to meet with his critics.[50]

127.    On March 27, 2008, protestors conducted a march in opposition to Sheriff Trowbridge's racial profiling practices.[51] Protest organizer David Archie issued a press release stating that: "Over the years since the election of Toby Trowbridge as sheriff of Madison County, numerous individuals have brought forth claims of harassment, intimidation, discrimination and outright brutality by the Madison County sheriff's department. . . . Racial profiling and deputy misconduct are widespread and well known."[52]

128.    In 2009, Sheriff Trowbridge expressed his opposition to a proposed bill to outlaw racial profiling in Mississippi. However, the police chiefs of two Madison County cities, Canton and Ridgeland, both testified that racial profiling is a problem in Mississippi.[53] The Canton police chief is Black; the Ridgeland police chief is white.

129.    From 2000 until January 2012, current Madison County Sheriff Tucker served as an MCSD deputy under Sheriff Trowbridge. In 2002, Sheriff Tucker became Captain of the MCSD's Narcotics Division. Then-Deputy Tucker had full knowledge of the Policing Program,

---

[49] Julie Straw, *Groups Accuse Sheriff of Racial Profiling,* WS NEWS NOW, http://www.msnewsnow.com/Global/story.asp?S=8068507. *See also* Julie Straw, *Civil Liberties Groups Want Madison County Sheriff Gone,* AMERICANS FOR LEGAL IMMIGRATION PAC (March 26, 2008), https://www.alipac.us/f12/ms-civil-liberties-groups-want-madison-county-sheriff-gone-102656-print/.

[50] WS NEWS NOW, *infra* note 44.

[51] Adam Lynch, *Canton Police Arrest Protesters*, JACKSON FREE PRESS (March 27, 2008), http://www.jacksonfreepress.com/news/2008/mar/27/canton-police-arrest-protesters/.

[52] *Id.*

[53] Elizabeth Crisp, *House panel considers bill to outlaw racial profiling*, THE CLARION-LEDGER (Jan. 14, 2009) (2009 WLNR 19779141).

and he personally implemented many of the unconstitutional racially discriminatory policing practices that comprise the Policing Program.

130.    For example, in approximately 2011, then-Deputy Tucker and other MCSD deputies stormed into the home of named Plaintiff Mr. Singleton just minutes after Deputy Tucker personally delivered a package to Mr. Singleton's home. The package was addressed to a relative who did not reside with Mr. Singleton and was not at Mr. Singleton's home at the time. Mr. Singleton's brother-in-law, who was at Mr. Singleton's home, picked up the package and brought it inside. As soon as he did so, Tucker and his team barged into Mr. Singleton's home. They forced Mr. Singleton, his brother-in-law, and his sister to lay on the floor while they searched Mr. Singleton's home. Mr. Singleton's three-year-old son was present in the home at the time. When Mr. Singleton's sister asked then-Deputy Tucker whether they had a search warrant, Tucker pointed to the box and said: "I don't need a search warrant. That box is my search warrant."

131.    In 2011, then-Deputy Tucker ran for Sheriff. During his campaign, then-Deputy Tucker stated that he "want[ed] to maintain the quality of law enforcement that we have under Sheriff Trowbridge."[54] He also said: "[a]s Madison County Sheriff, I will continue the high level of law enforcement and justice Madison County residents expect and have enjoyed under Sheriff Toby Trowbridge."[55] On information and belief, these statements were coded promises to continue the Policing Program.

---

[54] Lacey McLaughlin, *Making Amends*, JACKSON FREE PRESS, (Aug. 17, 2011), http://www.jacksonfreepress.com/news/2011/aug/17/making-amends/.

[55] *Madison County Sheriff's Deputy Captain Randy Tucker to Run for Madison County Sheriff*, Y'ALL POLITICS, Jan. 19, 2011, http://www.yallpolitics.com/index.php/yp/post/madison_county_sheriffs_deputy_captain_randy_tucker_to_run_for_madison_coun/.

45

132.    On November 8, 2011, then-Deputy Tucker was elected Sheriff of Madison County. He took office in January 2012.

**V.    <u>Sheriff Tucker Has Adopted, Implemented, and Expanded the Policing Program</u>**

133.    Upon taking office, Sheriff Tucker immediately adopted the Policing Program in its entirety. In a memo to all MCSD deputies and employees dated January 3, 2012, Sheriff Tucker stated that "[t]he policies and procedures under the administration of Sheriff Toby Trowbridge shall remain in place and effective as the policies and procedures for the administration of Sheriff Randy Tucker."[56]

134.    Since then, Sheriff Tucker has not only implemented the Policing Program but expanded its scope by, among other actions, enacting or maintaining a written roadblock policy that sanctions unconstitutional racially discriminatory roadblocks.

135.    In essence, Sheriff Tucker has empowered MCSD deputies with enhanced authority and implicit encouragement to target the members of Madison County's Black community for unreasonable searches and seizures.

136.    One of the Class Representative Plaintiffs in this action, Mr. Blackmon, reports that the MCSD's deputies have become even more disrespectful towards Black community members since Tucker became Sheriff. According to Mr. Blackmon, MCSD deputies now "terrorize the community like a gang would."

---

[56] Memo from Sheriff Tucker to all MCSD deputies and employees (Jan. 3, 2012). The memo stated that "[v]ariations to these policies and procedures may be made at the discretion of the Sheriff." As discussed herein, Sheriff Tucker subsequently changed a few of Sheriff Trowbridge's policies and procedures. On information and belief, these changes were made to implement, enforce, and expand the Policing Program.

A.     **Sheriff Tucker Has Enacted a Written Roadblock Policy That Sanctions Unconstitutional Racially Discriminatory Roadblocks**

137.    Sheriff Tucker has enacted or maintained a written policy (the General Roadblocks Policy) that expressly allows MCSD deputies to "conduct random roadblocks" without specifying any restrictions on how and when MCSD deputies may conduct these roadblocks.[57]

138.    The General Roadblocks Policy fails to set forth any "explicit, neutral limitations on the conduct of individual officers" as required under Supreme Court precedent.[58] Notably, the policy does not require MCSD deputies to use race-neutral criteria in selecting locations for roadblocks.

139.    In its entirety, the General Roadblocks Policy is only three sentences long. One of these sentences clarifies that the procedural safeguards that govern sobriety checkpoints (see below) do not apply to roadblocks. The complete text of the General Roadblocks Policy is as follows:

a.      *This section allows officers to conduct random roadblocks for all traffic violations, escapees or wanted subjects.*

b.      *The requirements of this section shall not be confused with the policy set out above on the methods to be used for sobriety checkpoints.*

c.      *All Deputies may conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within this county.*

140.    In stark contrast to his bare-bones General Roadblocks Policy, Sheriff Tucker's policy on "sobriety checkpoints" (the "Sobriety Checkpoint Policy") is carefully-crafted and

---

[57] *General Roadblocks, in* POLICY AND PROCEDURE, Office of the Sheriff, Madison County, Mississippi, attached hereto as Exhibit B.

[58] *City of Indianapolis v. Edmond*, 531 U.S. 32, 49 (2000) (quoting *Brown v. Texas*, 443 U.S. 47 (1979)).

establishes clear limits on the authority of MCSD deputies to establish such checkpoints. Among other procedural safeguards, the Sobriety Checkpoint Policy requires MCSD deputies to:

- "[s]atisfy federal, state and local requirements" in establishing and conducting sobriety checkpoints;

- "[c]onduct [sobriety] checkpoints with a minimal amount of intrusion or motorist inconvenience";

- use "[s]pecial care" to "warn approaching motorist[s] of the sobriety checkpoint";

- specify objective criteria for selecting which motorists to stop at any given sobriety checkpoint; and

- specify the "dialogue and educational material to be used by [sobriety] checkpoint [p]ersonnel."[59]

A copy of this Sobriety Checkpoint Policy is attached as Exhibit D.

141.    On information and belief, Sheriff Tucker's different approaches to sobriety checkpoints and "general" roadblocks reflect his racially discriminatory approach to policing the residents of Madison County. The Sobriety Checkpoint Policy is designed to protect the rights of white residents of Madison County, who may be stopped at sobriety checkpoints but who almost never encounter general roadblocks. The General Roadblocks Policy, on the other hand, is structured to give MCSD deputies complete authority to establish roadblocks targeting Black residents as and when they see fit.

142.    Under color of this unconstitutionally vague and permissive General Roadblock Policy, and with the tacit support of Sheriff Tucker, MCSD deputies regularly establish illegal roadblocks to harass Black individuals in Madison County with unconstitutional searches and seizures.

---

[59] *Sobriety Checkpoint Guidelines, in* POLICY AND PROCEDURE, Office of the Sheriff, Madison County, Mississippi.

143.     To the extent Defendants contend that the General Roadblocks Policy is constitutional, which it is plainly not, the MCSD has a pattern or practice of noncompliance with its own policy. As discussed herein, the MCSD conducts roadblocks for impermissible purposes unrelated to the need to "check for traffic violations, escapees, or wanted subjects."

144.     Insofar as Defendants claim that the roadblocks complained of herein are established pursuant to the Sobriety Checkpoint Policy, the MCSD has a pattern and practice of noncompliance with this policy as well.

## VI.     Sheriff Tucker Has Been Deliberately Indifferent to the Constitutional Violations Caused by the Policing Program

145.     Sheriff Tucker has long known of the constitutional violations suffered by the Black residents of Madison County as a result of the Policing Program. On information and belief, these harms are in fact the intended purpose and result of Sheriff Tucker's own policies, practices, and customs.

146.     Sheriff Tucker has been deliberately indifferent to the constitutional violations caused by the Policing Program. Among other actions and inactions, he has: (1) on information and belief, failed to investigate a Black MCSD deputy's complaint of racially discriminatory policing practices and the unjustified use of physical force against Black community members; (2) hired a deputy with a documented history of misconduct involving the excessive use of force; (3) chosen not to establish any rules or regulations prohibiting racial bias in policing; (4) decided not to maintain basic data on the MCSD's policing practices, including the differential impact of the MCSD's policing on Black communities; and (5) failed to establish or maintain objective or reliable procedures for supervision or discipline of deputies, or for investigation of civilian complaints..

A.  **On Information and Belief, Sheriff Tucker Failed to Investigate an MCSD Deputy's Claim of Unconstitutional Racially Discriminatory Policing Practices**

147.  In or around February 2013, one of Sheriff Tucker's own deputies, Robert Gibson, raised concerns about the MCSD's pattern of targeting the Black residents of Madison County for searches and seizures at roadblocks, as well as the MCSD's unjustified use of physical force against Black community members.

148.  On information and belief, Sheriff Tucker failed to conduct any investigation into Mr. Gibson's claims of unconstitutional racially discriminatory policing practices. Instead, Sheriff Tucker terminated Mr. Gibson's employment in February 2013.

149.  In August 2016, Mr. Gibson filed suit against the MCSD asserting claims of racial discrimination and retaliation.[60]

150.  According to the complaint, Mr. Gibson specifically expressed his "concerns about racially discriminatory practices that affected both the [MCSD] employees and the community." Mr. Gibson addressed what he found to be a pattern of "white officers using excessive force and beating black individuals" as well as the MCSD's practice of "setting up roadblocks primarily in the minority neighborhoods."[61]

---

[60] Jimmie E. Gates, *Former Madison deputy files discrimination lawsuit*, THE CLARION-LEDGER, (Aug. 31, 2016), http://www.clarionledger.com/story/news/2016/08/31/former-madison-deputy-files-discrimination-lawsuit/89650260/; *see also* Second Amended Complaint, *Gibson v. Madison County* at ¶¶ 37-39, No. 16 Civ. 633 (S.D. Miss. Oct. 25, 2016).

[61] *See* Second Amended Complaint, *Gibson v. Madison County* at ¶¶ 37-39, No. 16 Civ. 633 (S.D. Miss. Oct. 25, 2016). Mr. Gibson's suit was brought following a determination by the Equal Employment Opportunity Commission that "the evidence obtained in the investigation established reasonable cause to believe that [Mr. Gibson] was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended"; that "[c]reditable evidence disclosed that the [MCSD's] promotional policy and practices were not uniformly applied to both races and were subjective at best"; and that "[t]he evidence also showed that shortly after [Mr. Gibson's] protest, he was singled out for criticism and discharged." *See id.* at Ex. B (EEOC Determination).

**B.**     **Sheriff Tucker Hired a Deputy with a Documented History of Misconduct Involving the Excessive Use of Force**

151.    Sheriff Tucker not only fails to screen his deputies, but he has on at least one occasion intentionally hired a deputy with a documented history of misconduct involving the excessive use of force.

152.    In 1997, Slade Moore, an officer with the Jackson Police Department, shoved an arrestee's face into a concrete floor, pressed his fingers into the arrestee's eyes, and rolled the arrestee's face back and forth across the concrete floor.[62]

153.    The arrestee subsequently sued the City of Jackson. The Mississippi Court of Appeals held that the City of Jackson was not immune from suit because of the egregious and unreasonable nature of Deputy Moore's conduct, and awarded the arrestee $25,000 in damages.[63]

154.    The Jackson Police Department fired Moore for his "use of excessive force in arresting" the plaintiff, as well as his "history of using excessive force in making arrests."[64]

155.    Despite Moore's record of misconduct, Sheriff Tucker hired Moore as an MCSD deputy. Deputy Moore continues to serve as a member of the MCSD's force.

156.    On information and belief, Deputy Moore has played an integral role in implementing the MCSD's Policing Program.

**C.**     **Sheriff Tucker Has Not Established any Rules or Regulations Prohibiting Racial Bias in Policing**

157.    For years, Sheriff Tucker and the MCSD have fielded complaints of racial profiling.

---

[62] *City of Jackson v. Calcote*, 910 So.2d 1103, 1107-1108 (Miss. Ct. App. 2005).

[63] *Calcote*, 910 So.2d at 1107-1108, 1113.

[64] *City of Jackson v. Moore*, 97 So. 3d 1238, 1239-40 (Miss. Ct. App. 2012).

158.    Nevertheless, Sheriff Tucker has failed to establish any rules or regulations prohibiting racial bias in policing.[65]

159.    Sheriff Tucker does not train his deputies to avoid racial bias in their policing practices; to the contrary, the Policing Program authorizes MCSD personnel to target Black community members.

### D.    The MCSD Maintains Minimal Data And Does Not Track Racial Disparities In Policing

160.    Sheriff Tucker fails to maintain adequate data on the MCSD's policing practices[66] or aggregated crime statistics for municipalities in Madison County.[67]

161.    Sheriff Tucker does not require MCSD deputies to keep records of the number of individuals stopped at roadblocks, the number of arrests made at each roadblock, or the race, gender, and/or age of each individual stopped and/or arrested at each roadblock.[68]

---

[65] *See* ACLU Public Records Request (Sept. 15, 2016) (requesting "[a]ll policies, protocols, or training material describing how to address issues of racial bias in policing."); *see also* Letter from Sheriff Tucker to the ACLU (Oct. 31, 2016) (stating that "[n]o public records exist in response to this subparagraph [requesting such policies].").

[66] *See* ACLU Public Records Request (Sept. 15, 2016) (requesting data on the MCSD's roadblocks, traffic stops, and stop and frisk searches); *see also* Letter from Sheriff Tucker to the ACLU (Oct. 31, 2016).

[67] *See* ACLU Public Records Request (Mar. 3, 2017) (requesting, *inter alia*, "[a]ll records regarding Madison County crime rates, including but not limited to . . . the locations (including cities or neighborhood[s]) considered to be high crime areas"); *see also* Letter from Sheriff Tucker to the ACLU (March 14, 2017) (stating that the "only records the Madison County Sheriff's Department has regarding crime rates or crime statistics" are the Uniform Crime Reports as submitted to the Federal Bureau of Investigation).

[68] Letter from Sheriff Tucker to the ACLU (Oct. 31, 2016) (stating that "[n]o public records exist" with respect to the MCSD's roadblocks and/or checkpoints documenting their number, frequency, location, and/or duration; the number of stops initiated; the race, gender, and/or age of each individual stopped; the race, gender, and/or age of each individual whose driver's license was run against the MCSD's databases; the number of searches resulting in citations, and the reasons for these citations; the race, gender, and/or age of each individual cited; the number of arrests made and for what charges; or the race, gender, and/or age of each individual arrested.).

162.    Sheriff Tucker also does not require MCSD deputies to document the race of persons stopped or searched as pedestrians or at traffic stops.[69] Moreover, Sheriff Tucker does not track aggregated crime statistics by town or neighborhood.[70] For example, Sheriff Tucker does not maintain statistics on the number of arrests made in majority-Black Canton as compared to majority-white Madison in any given time period.

163.    On information and belief, Sheriff Tucker has chosen not to keep such data, statistics and records because they would collectively provide unmistakable proof of the existence and widespread implementation of the MCSD's Policing Program.

## VII.    The Board of Supervisors Has Been Deliberately Indifferent to the Constitutional Violations Caused by the Policing Program

164.    The Board of Supervisors serves as "the chief policy making and administrative body" of Madison County. By its own description, the Board of Supervisors is "the one body which supervises almost everything that goes on in county government."[71]

165.    The Board of Supervisors is comprised of five elected Supervisors, one from each of the five districts in Madison County. "[T]ogether the members set policy" for Madison County and "are expected to look after the good of the county as a whole."[72]

---

[69] Letter from Sheriff Tucker to the ACLU (Oct. 31, 2016) (stating that "[n]o public records exist" with respect to traffic stops conducted; traffic tickets issued at these stops; traffic stops which resulted in the search of the driver's vehicle; traffic stop searches which resulted in the recovery of contraband; and/or traffic stops which resulted in arrests.); *see also id.* (stating that "[n]o public records exist" with respect to stops, frisks, and/or searches conducted by MCSD deputies, including the race, gender, and/or age of the individual(s) stopped; the basis for the stop; whether any search was conducted and the basis for the search; and/or whether the stop resulted in an arrest or citation, and the basis for this arrest or citation).

[70] *See supra* note 65.

[71] Board of Supervisors, Madison County, Mississippi, http://madison-co.com/elected-offices/board-of-supervisors.

[72] *Id.*

166.    For at least a decade, the Madison County Board of Supervisors has known that the MCSD systematically targets the Black community for unreasonable searches and seizures:

a)    In 2006, the Concerned Citizens of Canton presented the Board of Supervisors with a petition bearing 664 signatures demanding an end to "frequent roadblocks in the predominantly black neighborhoods," "the excessive force and brutality administered by police officers," and "racial profiling."[73]

b)    In July 2006, representatives of the Concerned Citizens of Canton attended a Board of Supervisors meeting to raise these concerns. Sheriff Trowbridge was present at the meeting but refused to meet with the Concerned Citizens of Canton. Significantly, Sheriff Trowbridge stated that the MCSD would not end the use of roadblocks. [74]

c)    In November 2007, Sheriff Trowbridge addressed charges of racial profiling during a Board of Supervisors meeting.[75] He claimed that the MCSD did not engage in racial profiling.[76]

167.    The Board of Supervisors is also presumed to have knowledge of the allegations of Mr. Gibson's complaint, and the commonly-known harms suffered by the Black residents of Madison County as a result of these practices.[77]

168.    Although the Board of Supervisors has been aware of a pattern of constitutional violations suffered by the Black residents of Madison County, the Board of Supervisors has been

---

[73] Sylvain Metz, *Roadblocks questioned in Canton*, THE CLARION-LEDGER (July 18, 2006), 2006 WLNR 25321982.

[74] *Id.*

[75] "Madison sheriff denies racial discrimination charges during supervisors' meeting," AP Alert (November 6, 2007).

[76] Crisp, *supra* note 43.

[77] *See supra* ¶¶ 147 through 150.

deliberately indifferent to these violations. The Board of Supervisors has failed to investigate the MCSD's racially discriminatory policing practices and/or its pattern of conducting unreasonable searches and seizures, and has also failed to require the MCSD to take any actions to: (a) establish policies that prohibit racially discriminatory policing practices and/or unreasonable searches and seizures; (b) screen, train, and supervise MCSD deputies, employees, and agents to prevent MCSD personnel from employing unconstitutional racially discriminatory policing practices and/or conducting unreasonable searches and seizures; (c) monitor MCSD deputies, employees, and agents to ensure that their policing practices comply with constitutional requirements; and/or (d) discipline MCSD deputies, employees, and agents who employ racially discriminatory policing practices and/or conduct unreasonable searches and seizures.

169.    This "policy of inaction" by the Madison County Board of Supervisors is the functional equivalent of a decision by Madison County itself to violate the Constitution. By failing to take any steps to investigate or remedy the MCSD's systematic targeting of Black residents for unreasonable searches and seizures, the Board of Supervisors has implicitly sanctioned and endorsed the Policing Program.

**VIII.   The Policing Program Has Caused Thousands of Constitutional Violations**

170.    The MCSD's systematic targeting of Black community members for unreasonable searches and seizures has resulted in thousands of violations of the Fourth and Fourteenth Amendments of the United States Constitution. The Policing Program is "unquestionably . . . the moving force" behind these constitutional violations within the meaning of the Supreme Court's decision in *Monell,* 436 U.S. 658.

171.    Sheriff Tucker has adopted, enforced, and expanded the Policing Program. Madison County, by and through its Board of Supervisors, has been deliberately indifferent to the pattern of constitutional violations that the Policing Program has caused. There can be no

question that the Policing Program is the official—but unwritten—policy, practice, and/or custom of both Sheriff Tucker and Madison County.

172.    Without the declaratory and injunctive relief sought herein, thousands of Black individuals in Madison County will continue to be subjected to unconstitutional racially discriminatory policing practices pursuant to the Policing Program.

## ALLEGATIONS OF CLASS REPRESENTATIVE PLAINTIFFS

173.    Each of the Class Representative Plaintiffs has suffered egregious constitutional violations as a direct result of the MCSD's Policing Program. Most of the Class Representative Plaintiffs have been targeted by the MCSD for unreasonable race-based searches and seizures at multiple times and in multiple ways.

174.    The events described below demonstrate that the Policing Program is pervasive, widespread, and has the force of law. These events also illustrate the extremely high likelihood that the Class Representative Plaintiffs will be subject to unreasonable race-based searches and seizures by the MCSD in the future.

175.    Class Representative Plaintiffs assert, however, that only those events occurring on May 8, 2014 or later entitle them to legal and equitable relief.

I.      **Latoya Brown**

176.    Ms. Brown is a 29-year-old Black woman who has spent nearly her entire life in Canton, Mississippi. In November 2018, she moved to Dallas, Texas where she lives with named Plaintiff Steven Smith and their four daughters. Ms. Brown intends to make regular visits to Madison County because her mother, siblings, and nieces and nephew all live in Canton, and she intends to ultimately move back. Ms. Brown is currently a stay-at-home mother.

177.    On or after May 8, 2014, Ms. Brown was stopped repeatedly at the MCSD's pedestrian "checkpoints" and roadblocks. She was also once detained during a suspicionless

56

pedestrian stop. Ms. Brown brings claims as a representative of both the Roadblock Class and the Pedestrian Stop Class.

### A. Pedestrian Stop Class Claims Of Latoya Brown

178. Ms. Brown has been detained at the MCSD's pedestrian "checkpoints" while entering and exiting her own home on at least three occasions since May 8, 2014. The "checkpoints" have typically been located at the only access point to her housing complex.

179. Each time Ms. Brown has been stopped, she has been required to provide the MCSD deputy with her identification.

180. In the summer of 2014, an MCSD deputy detained Ms. Brown while she was walking on the sidewalk in or around the predominantly-Black affordable housing complex where she resides. Ms. Brown was on her way to work at the time.

181. The MCSD deputy had no reasonable suspicion, but demanded to see Ms. Brown's identification and find out where she was going.

182. The deputy detained Ms. Brown for approximately ten minutes before allowing her to proceed.

183. Ms. Brown is at risk that the MCSD's deputies will again stop her without reasonable suspicion at a pedestrian "checkpoint" or on the street.

### B. Roadblock Class Claims Of Latoya Brown

184. On or after May 8, 2014, Ms. Brown was stopped at the MCSD's roadblocks multiple times while she was a passenger in someone else's vehicle.

185. At each roadblock stop, Ms. Brown has been required to provide the MCSD deputy with her identification.

186. Ms. Brown is at risk that the MCSD's deputies will again stop her at a roadblock in violation of her Fourth and Fourteenth Amendment rights.

## II.    Lawrence Blackmon

187.    Mr. Blackmon is a 33-year-old Black man who has resided in Canton, Mississippi since 1998. Mr. Blackmon recently completed a Masters of Law program at George Washington University Law School in Washington D.C., and is now a practicing attorney based out of a Canton office.

188.    Mr. Blackmon brings claims as a representative of the Roadblock Class.

### A.    Roadblock Class Claims Of Lawrence Blackmon

189.    On or after May 8, 2014, Mr. Blackmon was stopped at roadblocks multiple times near his home in Canton.

190.    In Mr. Blackmon's experience, MCSD deputies sometimes stop all vehicles passing through a roadblock. At other times, MCSD deputies only stop certain vehicles.

191.    Mr. Blackmon travels frequently throughout Canton, which is divided by railroad tracks. On one-side of the tracks is the impoverished and majority-Black section of Canton; on the other side is the more affluent section of Canton where most of Canton's white citizens live. Mr. Blackmon has never seen a roadblock on the "other side of the tracks" in Canton.

192.    As a Canton resident, Mr. Blackmon is at risk that the MCSD's deputies will again stop him at a roadblock in violation of his Fourth and Fourteenth Amendment rights.

### B.    Additional Allegations Of MCSD Misconduct

193.    In addition to the incidents described above, Mr. Blackmon has been held at gunpoint by MCSD deputies while they conducted a search of his home.

194.    In late 2015, Mr. Blackmon was at his home in Canton when he heard a banging at the front door. He opened the door to find two MCSD deputies who claimed to have a warrant for the arrest of one of Mr. Blackmon's relatives. Mr. Blackmon's cousin was not in the house at the time.

195.     Mr. Blackmon asked the deputies to show him the warrant. When the deputies refused to provide him with an opportunity to review the warrant, Mr. Blackmon did not allow the deputies to enter.

196.     The MCSD deputies then began kicking on the door and shouted that if Mr. Blackmon did not let them in, they would break down the door. Concerned that the MCSD deputies would damage the house, Mr. Blackmon opened the door. The door is still dented from the deputies' efforts to kick it in.

197.     The two MCSD deputies entered Mr. Blackmon's home with their weapons drawn. One deputy immediately pointed his gun at Mr. Blackmon, forced Mr. Blackmon to the ground, and handcuffed his wrists behind his back.

198.     The MCSD deputies then proceeded to search Mr. Blackmon's entire residence, ostensibly for the purpose of finding Mr. Blackmon's relative. The MCSD deputies searched inside dresser drawers and other closed compartments that could not possibly conceal an adult man.

199.     Finding nothing, the deputies attempted to uncuff Mr. Blackmon. However, they could not release him because they did not have the correct key for the handcuffs. The deputies then had to call another deputy to locate the key. Mr. Blackmon remained handcuffed for an additional fifteen minutes until the deputies obtained the proper key to unlock the handcuffs.

200.     Eventually, the deputies uncuffed Mr. Blackmon and left his home.

201.     Mr. Blackmon does not assert claims arising from the incident described immediately above. Instead, Mr. Blackmon brings the claims set forth in paragraphs 189 through 192 above on behalf of the Roadblock Class. However, the events described immediately above

illustrate the high likelihood that Mr. Blackmon will be subject to unreasonable race-based searches and seizures by the MCSD in the future.

**III.   Khadafy Manning**

202.    Khadafy Manning lives in Canton, Mississippi. Mr. Manning is 37 years old. He suffers from a painful nerve condition that makes it difficult for him to walk without a cane.

203.    Mr. Manning brings claims as a representative of the Pedestrian Stop Class. In addition, Mr. Manning brings individual claims for damages in connection with Defendants' egregious violations of his constitutional rights, as set forth in paragraphs 256 through 280 below.

**A.    Pedestrian Stop Class Claims Of Khadafy Manning**

204.    On February 14, 2017, a deputy threatened Mr. Manning while Mr. Manning was talking with a neighbor in the parking lot of his family's apartment complex. The deputy told Mr. Manning that he "knew" Mr. Manning had been "causing trouble" by "having people come around here asking questions."

205.    The deputy handcuffed Mr. Manning and restrained him in the backseat of the deputy's vehicle. The deputy then searched Mr. Manning's vehicle, which was parked in the lot. Finding nothing objectionable in the vehicle, the deputy charged Mr. Manning with driving while his license was suspended.

**IV.   Nick Singleton**

206.    Nick Singleton is a 37-year-old Black man who has lived in Canton, Mississippi since 2004. Mr. Singleton works as a field service technician for a telecommunications company. He is the father of two young boys.

207.    Mr. Singleton brings claims as a representative of the Roadblock Class.

60

A. **Roadblock Class Claims Of Nick Singleton**

208. Mr. Singleton lives on a quiet residential street in a majority-Black neighborhood in Canton. MCSD deputies regularly establish roadblocks on the intersection right outside of his home, particularly on holidays.

209. In the year preceding the filing of Plaintiffs' initial Complaint, Mr. Singleton was stopped at the MCSD's roadblocks a minimum of 20 times. He has been detained at dozens of roadblocks without reasonable suspicion since May 8, 2014.

210. On numerous occasions he has seen MCSD deputies set up a roadblock at one location and then move it down the street to a different corner. Mr. Singleton has often been required to show his license and insurance to the same MCSD deputy twice in the same day while driving through these "roving" roadblocks.

211. Mr. Singleton often spends time in majority-white areas of Madison County. He has never seen a roadblock in these predominantly white neighborhoods.

212. Mr. Singleton is at risk that the MCSD's deputies will again stop him at a roadblock in violation of his Fourth and Fourteenth Amendment rights.

B. **Additional Allegations Of MCSD Misconduct**

213. In addition to the incidents described above, in approximately 2011, Mr. Singleton was subjected to a warrantless and consentless home search by then-Deputy Tucker and other MCSD deputies just minutes after Deputy Tucker personally delivered a package to Mr. Singleton's home. The package was addressed to a relative who did not reside with Mr. Singleton. As soon as Mr. Singleton's brother-in-law picked up the package and brought it inside, a team of MCSD deputies—including then-Deputy Tucker—stormed into Mr. Singleton's home. They forced Mr. Singleton, his brother-in-law, and his sister to lay on the floor while they searched the family home. Mr. Singleton's son, who was then only three years old, was present

61

in the home at the time. When Mr. Singleton's sister asked then-Deputy Tucker whether they had a search warrant, Tucker pointed to the box and said: "I don't need a search warrant. That box is my search warrant."

214.    The events described immediately above exemplify Defendants' pervasive culture of civil rights violations and illustrate the high likelihood that Mr. Singleton will be subject to unreasonable race-based searches and seizures by the MCSD in the future. However, Mr. Singleton does not assert claims arising from this incident. Instead, Mr. Singleton brings the claims set forth in paragraphs 208 through 212 above on behalf of the Roadblock Class.

**V.      Steven Smith**

215.    Mr. Smith is a 29-year-old Black man who has spent nearly his entire life in Canton, Mississippi. Last year he moved to Dallas, Texas where he lives with named Plaintiff Latoya Brown and their four young daughters. Since moving to Dallas, Mr. Smith has continued to travel back to Madison County. He intends to continue to do so regularly to visit family and friends and eventually move back. Mr. Smith currently works at a manufacturing facility.

216.    In 2017, Mr. Smith was arrested and incarcerated following a suspicionless stop at a pedestrian "checkpoint" outside of his own apartment complex. He brings claims as a representative of the Pedestrian Stop Class.

**A.      Pedestrian Stop Class Claims Of Steven Smith**

217.    In January 2017, Mr. Smith was stopped at a pedestrian "checkpoint" as he was walking into the predominantly-Black affordable housing complex where he resides.

218.    The MCSD deputies demanded to see Mr. Smith's identification, and searched his person. On information and belief, the deputies had no reasonable suspicion or probable cause to search him.

219.    Mr. Smith was arrested after a check of his identification revealed that he had overdue fines and court fees. Because he could not afford to pay the County, Mr. Smith was subsequently incarcerated for 29 days at the Madison County Detention Center.

220.    During this time, Mr. Smith could not go to work. The lost income was an economic hardship for his family, particularly because his partner, named Plaintiff Ms. Brown, is a stay-at-home mother who cares for their young daughters.

221.    Mr. Smith is at risk that the MCSD's deputies will again stop him at a pedestrian "checkpoint" without reasonable suspicion.

**B.    Additional Allegations Of MCSD Misconduct**

222.    In addition to the incident described above, Mr. Smith has also been subject to a warrantless and suspicionless search of his home by the MCSD.

223.    On the evening of October 31, 2015, two MCSD deputies came to Mr. Smith's door after midnight and demanded to be let inside. The deputies claimed they were searching for a missing person, but they did not provide Mr. Smith with a warrant. Mr. Smith told the deputies that they did not have his permission to enter his home. Over Mr. Smith's objections, the deputies pushed right past Mr. Smith and proceeded to search his apartment. The deputies conducted a thorough search of Mr. Smith's home, including examining inside bureau drawers and other small closed compartments that could not reasonably contain a person. One of the deputies even woke up Mr. Smith's daughter, who was only three years old at the time, to ask her if she knew anything about the missing person.

224.    Mr. Smith does not assert claims arising from the incident described immediately above. Instead, Mr. Smith brings the claims set forth in paragraphs 217 through 221 above on behalf of the Pedestrian Stop Class. However, the events described immediately above illustrate

the high likelihood that Mr. Smith will be subject to unreasonable race-based searches and seizures by the MCSD in the future.

**VI.**   **Bessie Thomas**

225.   Mrs. Thomas is a 60-year-old Black woman who has lived in Canton, Mississippi for the last five decades. Mrs. Thomas serves as a minister at two local churches, and she is involved in taking care of her young grandchildren. For three years, Mrs. Thomas operated a corner store in Canton.

226.   Ms. Thomas brings claims as a representative of the Roadblock Class.

**A.**   **Roadblock Class Claims of Bessie Thomas**

227.   On or after May 8, 2014, Mrs. Thomas has been detained at roadblocks in Canton a number of times.

228.   In Mrs. Thomas's experience, "the roadblocks end where the white people start" at the east end of Canton. Mrs. Thomas has frequently encountered roadblocks on King Ranch Road, a predominantly-Black area.

229.   Mrs. Thomas feels demeaned and degraded every time she has to pass through a roadblock because she believes that this is something only Black residents of Madison County are forced to do.

230.   Mrs. Thomas is at risk that the MCSD's deputies will again stop her at a roadblock in violation of her Fourth and Fourteenth Amendment rights.

**B.**   **Additional Allegations Of MCSD Misconduct**

231.   In Mrs. Thomas's experience, MCSD deputies inflict violence rather than protect Black community members from violence. On several occasions, Mrs. Thomas called the MCSD for help after break-ins at her corner store in which thieves took almost all of her inventory. Following a break-in that took place in October 2016, one MCSD deputy told Mrs. Thomas: "If

they break in, just shoot them." Mrs. Thomas ultimately had no choice but to shut down the store later that year.

232.    In addition, several years ago, Mrs. Thomas was sitting outside her home, under the carport, when two MCSD deputies pulled in, ran right past her and began kicking in the door to the carport, which was unlocked. Mrs. Thomas attempted to ask the deputies why they were there, but they continued to kick in the door until the door frame split apart and the door opened. The MCSD deputies then barged into Mrs. Thomas's home and arrested her son. The deputies never showed Mrs. Thomas a warrant.

233.    The entire length of the frame of Mrs. Thomas's carport door still remains cracked as a result of the MCSD's forcible entry, despite attempts to repair it.

234.    Ms. Thomas does not assert claims arising from the incidents described immediately above. Instead, Ms. Thomas brings the claims set forth in paragraphs 227 through 230 above on behalf of the Roadblock Class. The events described immediately above, however, are illustrative of the MCSD's pervasive pattern of civil rights violations against Madison County's Black community.

**VII.    Betty Jean Williams Tucker**

235.    Mrs. Tucker is a 64-year-old Black woman who was born, raised, and currently resides in Canton, Mississippi. For over a decade, Mrs. Tucker worked as a welder in a Canton manufacturing warehouse. She has five children, twelve grandchildren, and three great grand-children. Mrs. Tucker is among the longest-lived residents in her Canton neighborhood.

236.    Ms. Thomas brings claims as a representative of the Roadblock Class.

**A.    Roadblock Class Claims Of Betty Jean Williams Tucker**

237.    Mrs. Tucker has a valid license, registration, and insurance. Nevertheless, because of her prior experiences with the MCSD, she devotes a great deal of time and effort to finding

65

out the locations of the MCSD's roadblocks through phone calling trees, Facebook pages, smart phone apps, and texting lists. Mrs. Tucker often rearranges her life to avoid the MCSD's roadblocks, typically by cancelling her plans and not leaving the house to see family or friends.

238.    Despite these extensive efforts, Mrs. Tucker was still subjected to two roadblock stops between approximately May 2015 and May 2017. During both stops, Mrs. Tucker was required to provide her license and her passengers were required to provide their identifications before the deputies allowed Mrs. Tucker and her passengers to proceed. Each stop delayed her by approximately ten minutes.

239.    In Mrs. Tucker's decades of living and traveling in Madison County, she has rarely—if ever—seen a roadblock in a predominantly-white neighborhood. She has also found that roadblocks typically take place on low-traffic streets where accidents rarely occur. She has also observed a pattern of increased roadblock activity during major events in the Black community, such as Martin Luther King Jr. weekend. Mrs. Tucker feels that the MCSD's roadblocks have become more frequent since Randy Tucker became Sheriff.

240.    Mrs. Tucker is at risk that the MCSD's deputies will again stop her at a roadblock in violation of her Fourth and Fourteenth Amendment rights.

**B.    Additional Allegations Of MCSD Misconduct**

241.    In addition to the incidents described above, several years ago, Mrs. Tucker was hosting a celebratory barbeque when two plainclothes deputies pulled up in an unmarked vehicle. Without a warrant or Mrs. Tucker's consent, the deputies walked right into Mrs. Tucker's yard and began searching every person at the party, right down to the contents of their pockets. Finding nothing, the MCSD deputies also got down on their hands and knees to search Mrs. Tucker's patio. They eventually left without any explanation.

242.     Also several years ago, Mrs. Tucker was in her front yard when she saw a "Jump Out" patrol target her teenage grandson, who lived across the street. Her grandson had been fixing his brother's bicycle in his own front yard. It was a hot day, and her grandson was shirtless. All of a sudden, an unmarked truck went speeding towards Mrs. Tucker's grandson, and out jumped two white plainclothes deputies. The deputies tackled her grandson to the ground and began aggressively searching through his pockets. Petrified, Mrs. Tucker shouted to the deputies that he was her grandson and asked what he had done wrong. The deputies abruptly got up after finding nothing in her grandson's pockets. As they went back to their truck, one of the deputies said to Mrs. Tucker: "Tell your grandson to wear a shirt next time."

243.     Ms. Tucker does not assert claims arising from the incidents described immediately above. Instead, Ms. Tucker brings the claims set forth in paragraphs 237 through 240 above on behalf of the Roadblock Class. The events described immediately above, however, are illustrative of the MCSD's pervasive pattern of civil rights violations against Madison County's Black community.

## CLASS ACTION ALLEGATIONS

244.     The Class Representative Plaintiffs seek to bring this action on their own behalf and on behalf of two classes of those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

245.     Class Representative Plaintiffs Latoya Brown, Lawrence Blackmon, Nicholas Singleton, Bessie Thomas, and Betty Jean Williams Tucker seek to represent the following class in order to obtain declaratory and injunctive relief with respect to Defendants' policy or longstanding practice of unconstitutional vehicular roadblocks:

> All Black motorists and passengers who since May 2014 have been
> or will be in the future stopped or detained at a vehicular
> checkpoint or roadblock instituted by agents of the Madison

County Sheriff's Department while traveling in, through, or in the immediate vicinity of the following locations within Madison County, Mississippi: (i) the city of Canton and the adjoining unincorporated area contained within U.S. Census tract No. 305; (ii) the communities of Flora and Kearney Park and surrounding unincorporated areas contained within U.S. Census tract No. 303.02; (iii) the city of Ridgeland; and (iv) the unincorporated areas of Madison County contained within U.S. Census tracts Nos. 309 and 310, including the community of Camden (the "Roadblock Class").

246.    Class Representative Plaintiffs Latoya Brown, Steven Smith, and Khadafy Manning seek to represent the following class in order to obtain declaratory and injunctive relief with respect to Defendants' policy or longstanding practice of unconstitutional pedestrian stops:

All Black persons who since May 2014 have been or will be in the future stopped, detained, questioned, or searched by agents of the Madison County Sheriff's Department in the absence of reasonable, articulable suspicion or probable cause within Madison County, Mississippi while traveling as pedestrians or while present within the curtilages of homes or the grounds or common areas of multi-unit residential complexes or developments (the "Pedestrian Stop Class").

247.    The Roadblock Class and the Pedestrian Stop Class meet all of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure. In addition, both classes are defined by objective criteria and thus satisfy the implied requirement of ascertainability, as set forth in the Court's January 4 Order.

248.    The members of the Roadblock Class and the Pedestrian Stop Class are so numerous as to render joinder impracticable. As of the 2010 census, over 36,000 Black persons reside in Madison County.[78] The unlawful law enforcement activities described herein, and the resulting violations of Black individuals' constitutional rights, have occurred, and will continue

---

[78] *Quickfacts: Madison County, Mississippi*, U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045216/28089,28 (last visited February 4, 2019).

to occur, on a routine basis and for the foreseeable future unless such conduct is enjoined by this Court.

249.    In addition, joinder is impracticable because, upon information and belief, many members of the Class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Class members who have been victimized by Defendants' unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by Defendants and their agents. There is no appropriate avenue for protection of the Class members' constitutional rights other than a class action.

250.    At least the following common questions of law or fact are central to the claims of the Roadblock Class:

(a)    Whether the MCSD has a policy or widespread custom or practice of disproportionately establishing roadblocks in specific locations based on the racial composition of the surrounding area, in violation of the Equal Protection Clause;

(b)    Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks for the primary purpose of crime control, in contravention of the Fourth Amendment; and

(c)    Whether the MCSD has a policy or widespread custom or practice of establishing roadblocks with inadequate procedural safeguards, in contravention of the Fourth Amendment.

251.    At least the following common questions of law or fact are central to the claims of the Pedestrian Stop Class Plaintiffs seek to certify:

      (a)     Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons in the absence of reasonable, articulable suspicion, or probable cause;

      (b)     Whether the MCSD has a policy, or longstanding custom or practice of conducting searches and seizures of Black persons on the basis of race; and

      (c)     Whether the MCSD's policy or longstanding custom or practice of targeting predominantly-Black apartment complexes is motivated by racial bias or animus.

252.    The legal theories under which the Class Representative Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the Roadblock Class and the Pedestrian Stop Class will rely, and the harms suffered by the Class Representative Plaintiffs are typical of the harms suffered by members Roadblock Class and the Pedestrian Stop Class.

253.    The Class Representative Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff Class, and will fairly and adequately protect the interests of the Class. The Class Representative Plaintiffs are all current or former Black residents of Madison County or nearby areas who continue to reside in, have their permanent place of residence in, travel to and in, and/or intend in the near future to reside in, Madison County. As long as the MCSD continues to implement the policies, practices, and/or customs described herein, the Class Representative Plaintiffs will remain at substantial risk of suffering constitutional violations as a result of the conduct of MCSD personnel. Plaintiffs Khadafy Manning and Quinnetta Manning are seeking compensatory and punitive damages only on an individual basis.

254. The Class Representative Plaintiffs are represented by the American Civil Liberties Union of Mississippi, the American Civil Liberties Union Foundation, and by the law firm Simpson Thacher & Bartlett LLP. Counsel for the Plaintiffs have the resources, expertise, and experience to prosecute this action. Counsel for the Plaintiffs know of no conflicts among members of the Class or between the attorneys and members of the Class.

255. The Roadblock Class and the Pedestrian Stop Class should each be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the two classes, thereby making class-wide declaratory and injunctive relief appropriate with respect to each class.

## INDIVIDUAL ALLEGATIONS OF KHADAFY AND QUINNETTA MANNING

256. In June 2016, six MCSD deputies stormed into the Manning family's home demanding that they execute false witness statements. One of the MCSD deputies severely beat Mr. Manning and threatened him with jail time for his refusal to write a statement. A few months ago, Mr. Manning was falsely arrested by an MCSD deputy in retaliation for Mr. Manning's efforts to seek legal redress for the injuries he suffered during the June 2016 incident. These events are described in further detail below.

257. On June 26, 2016, at approximately 7 am in the morning, Mrs. Manning heard a loud banging on her front door. Mrs. Manning asked who was at the door at least twice before she heard a male voice answer that it was "the police."

258. Mrs. Manning opened the door slightly and saw six white male MCSD deputies standing at her doorstep. She asked the deputies what questions they had for her. MCSD Deputy John Doe #1 ("Deputy #1") asked, with no basis or justification: "Oh, y'all smoking weed in there?" Mrs. Manning responded that she did not smoke marijuana or use other illegal drugs.

71

Disregarding her response, Deputy #1 pushed past Mrs. Manning and barged into the Mannings'

home without any mention of a search warrant. The other deputies followed.

259.     None of the deputies inquired about or searched for illegal drugs once they were

inside the Mannings' family home.

260.     The Mannings' three sons—the youngest of whom was then only five years old—

were all at home that morning, as was the Mannings' eighteen-year-old niece.

261.     Upon entering the Manning family's home, Deputy #1 shouted: "I know y'all

seen what went on downstairs, so are you going to be witnesses or are you going to be suspects?"

262.     Mrs. Manning surmised that Deputy #1 was referring to a dispute between her

neighbor and her neighbor's boyfriend (the "boyfriend") that had taken place earlier that

morning. Mrs. Manning realized that the deputies were trying to find a basis for charging the

boyfriend with a property crime—even though Mrs. Manning had not witnessed any such crime.

263.     Deputy #1 demanded that Mrs. Manning write a witness statement confirming

that she had seen the boyfriend reach his hand through the broken window of her neighbor's

apartment. Mrs. Manning attempted to tell the deputy that she had only seen the boyfriend

removing pieces of broken glass from her neighbor's apartment window. Mrs. Manning told

Deputy #1 that she had not seen the boyfriend reach his hand through the broken window.

264.     Deputy #1 told Mrs. Manning that he "knew" she had seen the boyfriend reaching

into her neighbor's window, and told Mrs. Manning to "stop lying to us." The deputy repeatedly

told Mrs. Manning that she could either write the witness statement he demanded, or she could

be treated as a suspect herself.

265.     At around this time, Mr. Manning—who had just woken up—hobbled out of his

bedroom wearing only his underwear. Mr. Manning told his wife that she did not have to provide

the deputies with the false witness statement they requested. Mr. Manning told the deputies that he "knew his rights."

266.    The deputies then flew into a rage. One of the MCSD deputies ("Deputy #2") grabbed Mrs. Manning by the arm, while Deputy #1 dragged Mr. Manning across the room and put him in handcuffs. Deputy #1 started cursing at Mr. Manning, and told him that he had "smart ass mouth." Deputy #1 then proceeded to choke Mr. Manning with both of his hands. Terrified, Mrs. Manning began recording the incident on her cellular phone.

267.    When Deputy #1 finally stopped choking Mr. Manning, he started to shout that he would jail the Mannings if they refused to write the witness statements he wanted.

268.    The Mannings tried to tell Deputy #1 that Mr. Manning is physically disabled. From that point forward, Deputy #1 referred to Mr. Manning as "Crip" or "Mr. Cripple."

269.    Deputy #1 then demanded to see identification for Mr. Manning, who was still in handcuffs. (Mrs. Manning was also compelled to provide her identification to one of the deputies during the incident.) When Mrs. Manning went to her bedroom to get Mr. Manning's identification, she left her phone on the counter. One of the deputies ("Deputy #3") then stood in front of the counter to prevent Mrs. Manning from retrieving her phone.

270.    Deputy #1 informed Mrs. Manning that if she did not write the witness statement he requested, he would jail Mr. Manning and set his bond at $50,000—a sum that the Mannings would never be able to pay. A petrified Mrs. Manning finally said that she would write whatever witness statement the deputies wanted.

271.    Deputy #1 then told Mrs. Manning that he was going to take her husband to jail anyway, and started hauling Mr. Manning towards the front door. Mrs. Manning pleaded with Deputy #1 to at least allow her to give Mr. Manning his cane, pants, and shoes, since her

husband was still wearing nothing but his underpants. Deputy #1 refused, and told Mrs. Manning that there was no need for clothes since Mr. Manning would get a jumpsuit at jail.

272.    As Deputy #1 headed out of the doorway with Mr. Manning in tow, Mrs. Manning managed to grab her cellphone from the counter and begin recording the incident again. One of the deputies knocked the phone out of Mrs. Manning's hand, and a third deputy physically blocked Mrs. Manning from following Deputy #1 outside.

273.    Several of the Mannings' neighbors heard the commotion and rushed outside to see what was happening. These neighbors shouted to Deputy #1 that Mr. Manning could not move as quickly as he was being dragged due to his disability. The Mannings' neighbors also tried to tell Deputy #1 that Mr. Manning had no involvement with that morning's burglary. Deputy #1 ignored the neighbors and shoved Mr. Manning into his vehicle.

274.    Mr. Manning was humiliated that his neighbors saw him being forcibly taken out of his family's home while wearing only his underwear.

275.    One of the deputies who was still in the Manning family home asked Deputy #1 what he should do with Mrs. Manning. Deputy #1 said that Mrs. Manning could either "write a statement or go to County." Knowing that she could not leave her children alone, with both of their parents in jail, Mrs. Manning scribbled out the witness statement the deputies demanded. She can hardly remember what she wrote.

276.    Once Mr. Manning was inside the deputy's vehicle, Deputy #1 hit Mr. Manning's head repeatedly with his fists, and struck him multiple times in the chest with a hard, black object that Mr. Manning could not identify. Mr. Manning was in so much pain that he finally agreed, while weeping, to write a witness statement incriminating the boyfriend. Still, Deputy #1

continued beating Mr. Manning. Deputy #1 told Mr. Manning that his wife would be better off with him dead.

277.    Finally, after what seemed like an eternity to Mr. Manning, Deputy #1 uncuffed him. Mr. Manning then wrote a statement with his hands shaking and tears rolling down his face. Only when the statement was complete did Deputy #1 release Mr. Manning, who then stumbled barefoot in his underwear back into his home as his neighbors watched.

278.    Mr. Manning's face was swollen and bruised from the assault, and his wrists were cut and black and blue from the tight handcuffs. He went to the hospital to seek medical treatment the following day. Hospital records show that Mr. Manning suffered both a sprained wrist and chest contusions.

279.    Mr. Manning continues to feel deep shame at his inability to protect his family, as well as his public humiliation in full view of his neighbors. He still experiences intense feelings of sadness and depression about the incident.

280.    Mrs. Manning was extremely shaken up by the incident. She is very scared of what might happen the next time she is stopped at one of the many roadblocks and "checkpoints" that the MCSD regularly sets up in and around her neighborhood.

## CAUSES OF ACTION

### I.    FIRST CAUSE OF ACTION

**(Claims of Class Representative Plaintiffs and Class Members Pursuant to
42 U.S.C. § 1983 Against Defendants for Violations of the Fourth Amendment)**

281.    Plaintiffs repeat and re-allege paragraphs 1 through 280 above as if fully set forth herein.

282.    Defendants Sheriff Tucker and the County have implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of conducting unreasonable

searches and seizures of members of the Roadblock Class and the Pedestrian Stop Class in the absence of reasonable suspicion and/or probable cause. These constitutional abuses are at times accompanied by the use of excessive force.

283.    The MCSD's constitutional abuses and violations were and are directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the County and Sheriff Tucker, including: (a) the failure to adequately and properly screen, train, and supervise MCSD personnel; (b) the failure to adequately and properly monitor and discipline MCSD personnel; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the MCSD's practice of conducting unconstitutional searches and seizures.

284.    Each of the Defendants has acted with deliberate indifference to the Fourth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class. As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class have been violated. By acting under color of state law to deprive the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class of their rights under the Fourth Amendment, Defendants have violated 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

285.    The MCSD targets individuals for suspicionless and otherwise unjustified detentions, frisks, searches, and arrests in areas where Plaintiffs reside and/or visit. Thus, a real and immediate threat exists that the Fourth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class will be

violated by MCSD personnel in the immediate future. Moreover, because Defendants' policies, practices, and/or customs subject the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class to suspicionless and otherwise unjustified detentions, frisks, searches, and arrests without any reasonable, articulable suspicion of criminality, and on the basis of their race, the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class cannot alter their behavior to avoid future violations of their constitutional and civil rights by the MCSD.

286.    The Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the MCSD's policy, practice, and/or custom of conducting unreasonable searches and seizures of their persons, vehicles, and property as described herein.

## II.    SECOND CAUSE OF ACTION

### (Claims of Class Representative Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983 Against Defendants for Violations of the Equal Protection Clause)

287.    Plaintiffs repeat and re-allege paragraphs 1 through 286 above as if fully set forth herein.

288.    Defendants Sheriff Tucker and the County have implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of establishing roadblocks in the County based on the racial demographics of the surrounding area, and thereby disproportionately and discriminatorily targeting Black persons who reside in or travel through these areas of Madison County.  In addition, Defendants Sheriff Tucker and the County have implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of conducting stops and searches of Black pedestrians based on their race.  These policies, practices, and/or customs

violates the Equal Protection Clause of the Fourteenth Amendment. The MCSD's constitutional abuses and violations were and are directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the County and Sheriff Tucker, including: (a) the failure to adequately and properly screen, train, and supervise MCSD personnel; (b) the failure to adequately and properly monitor and discipline MCSD personnel; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the MCSD's use of racial profiling.

289.    Each of the Defendants has acted with deliberate indifference to the Fourteenth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class. As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourteenth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class have been violated. By acting under color of state law to deprive the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class of their rights under the Fourteenth Amendment, Defendants have violated 42 U.S.C. § 1983.

290.    The MCSD targets Black persons in areas where the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class reside and/or visit. As a result, a real and immediate threat exists that the Fourteenth Amendment rights of the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class will be violated by MCSD personnel in the immediate future. Moreover, because Defendants' policies, practices, and/or customs subject the Class Representative Plaintiffs and other members of the Roadblock Class and the Pedestrian Stop Class to unreasonable detentions, frisks, searches, and arrests without any reasonable, articulable suspicion of criminality, and on

the basis of their race, the Class Representative Plaintiffs and other members of the Roadblock

Class and the Pedestrian Stop Class cannot alter their behavior to avoid future violations of their

constitutional and civil rights by the MCSD.

291.    The Class Representative Plaintiffs and other members of the Roadblock Class

and the Pedestrian Stop Class have no adequate remedy at law and will suffer serious and

irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the

MCSD's policies, practices, and/or customs of racially discriminatory roadblocks and pedestrian

stops as described herein.

## III.    THIRD CAUSE OF ACTION

**(Claims of Class Representative Plaintiffs and Class Members Pursuant to Title VI
of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, Against the County)**

292.    Plaintiffs repeat and re-allege paragraphs 1 through 291 above as if fully set forth

herein.

293.    The law enforcement activities described in this Complaint have been funded, in

part, with federal funds.

294.    Discrimination based on race in law enforcement activities and other conduct

described herein is prohibited under 42 U.S.C. § 2000(d), et seq. The acts and conduct of the

Defendants complained of herein were motivated by racial animus, and were intended to

discriminate on the basis of race and/or had a disparate impact on minorities, namely Black

residents of and visitors to the County.

295.    As a direct and proximate cause of the above mentioned acts, the Class

Representative Plaintiffs and members of the Roadblock Class and the Pedestrian Stop Class

have suffered injuries and damages and have been deprived of their rights under the Civil Rights

Act. Without appropriate injunctive relief, these violations will continue to occur.

IV.     **FOURTH CAUSE OF ACTION**

**(Individual Claims of Khadafy Manning Pursuant to
42 U.S.C. § 1983 Against John Does #1 through #6)**

296.     Plaintiffs repeat and re-allege paragraphs 1 through 295 above as if fully set forth herein.

297.     The conduct of John Does #1 through #6 on June 26, 2016 in unlawfully and forcibly entering Mr. Manning's home; unlawfully seizing, handcuffing, choking, dragging, and beating Mr. Manning; and unlawfully compelling Mr. Manning to write a false witness statement under threat of criminal punishment, was conduct performed entirely under color of law, absent reasonable suspicion of criminality or other constitutionally-required grounds, and on the basis of Mr. Manning's race. The warrantless and consentless entry into the home of; the seizure, which amounted to an arrest of; and the compelled execution of a false witness statement by, Plaintiff Khadafy Manning by John Does #1 through #6 were carried out using unjustified and unconstitutionally excessive force.

298.     As a direct and proximate result of such acts, John Does #1 through #6 deprived Mr. Manning of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

299.     As a direct and proximate result of those constitutional abuses, Mr. Manning has suffered, and will continue to suffer, physical, mental, and emotional pain and suffering, mental anguish, embarrassment, and humiliation.

300.     The acts of John Does #1-#6 were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiff Khadafy Manning to an award of punitive damages.

## V.   FIFTH CAUSE OF ACTION

### (Individual Claims of Quinnetta Manning Pursuant to 42 U.S.C. § 1983 Against John Does #1 through #6)

301.   Plaintiffs repeat and re-allege paragraphs 1 through 300 above as if fully set forth herein.

302.   The conduct of John Does #1 through #6 on June 26, 2016 in unlawfully and forcibly entering Mrs. Manning's home, unlawfully detaining Mrs. Manning, and unlawfully compelling Mrs. Manning to write a false witness statement under threat of criminal punishment, was conduct performed entirely under color of law, absent reasonable suspicion of criminality or other constitutionally-required grounds, and on the basis of Mrs. Manning's race. The seizure, which amounted to an arrest, of Plaintiff Quinnetta Manning by John Does #1 through #6 was carried out using excessive and disproportionate force.

303.   As a direct and proximate result of such acts, John Does #1 through #6 deprived Mrs. Manning of her Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

304.   As a direct and proximate result of those constitutional abuses, Mrs. Manning has suffered, and will continue to suffer, physical, mental, and emotional pain and suffering, mental anguish, and crippling fear of law enforcement.

305.   The acts of John Does #1 through #6 were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiff Quinnetta Manning to an award of punitive damages.

## VI.   SIXTH CAUSE OF ACTION

### (Individual Claims of Khadafy Manning and Quinnetta Manning Pursuant to 42 U.S.C. § 1983 Against the County)

306.   Plaintiffs repeat and re-allege paragraphs 1 through 305 as if fully set forth herein.

307.    Defendant Madison County has directly and proximately caused the MCSD's policy, practice, and/or custom of conducting unreasonable searches and seizures on the basis of race, including by devising, implementing, enforcing, adopting, sanctioning, and ratifying a policy, practice, and/or custom of (a) failing to adequately and properly screen, train, and supervise MCSD personnel; (b) failing to adequately and properly monitor and discipline MCSD personnel; and (c) overtly and tacitly encouraging and sanctioning, and failing to rectify the MCSD's constitutional abuses.

308.    As a direct and proximate result of the aforesaid acts and omissions, Defendant Madison County has deprived Plaintiffs Khadafy Manning and Quinnetta Manning of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE,** the Class Representative Plaintiffs and other members of the classes they seek to represent pray that the Court will:

A.    Issue an order certifying as classes pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure the Roadblock Class and the Pedestrian Stop Class, with the relevant Class Representative Plaintiffs as representatives of each class;

B.    Issue class-wide judgments declaring that:

    i.    Defendants' policy or longstanding practice of establishing vehicular roadblocks based on the racial demographics of the surrounding area violates the rights of the Roadblock Class set forth in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act;

    ii.    Defendants' policy or longstanding practice of establishing vehicular roadblocks for general criminal law enforcement purposes violates the rights of the Roadblock Class set forth in the Fourth Amendment to the United States Constitution;

    iii.    Defendants' policy or longstanding practice of establishing vehicular roadblocks without appropriate procedural safeguards

violates the rights of the Roadblock Class set forth in the Fourth Amendment to the United States Constitution;

iv. Defendants' policy or longstanding practice of conducting stops and searches of Black persons on the basis of their race violates the rights of the Pedestrian Stop Class set forth in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act; and

v. Defendants' policy or longstanding practice of conducting stops and searches of Black persons in the absence of reasonable suspicion violates the rights of the Pedestrian Stop Class set forth in the Fourth Amendment to the United States Constitution.

C. Issue an order for the following injunctive relief:

i. Enjoining Defendants from continuing their policy or longstanding practice of establishing vehicular roadblocks based on the racial demographics of the surrounding area;

ii. Enjoining Defendants from continuing their policy or longstanding practice of establishing vehicular roadblocks for general criminal law enforcement purposes;

iii. Enjoining Defendants from continuing their policy or longstanding practice of establishing vehicular roadblocks without appropriate procedural safeguards;

iv. Enjoining Defendants from continuing their policy or longstanding practice of conducting stops and searches of Black persons on the basis of their race;

v. Enjoining Defendants from continuing their policy or longstanding practice of conducting stops and searches of Black persons in the absence of reasonable suspicion;

vi. Requiring Defendants to establish an independent civilian complaint review board which will be tasked with reviewing and investigating complaints by the public against the MCSD; and requiring Defendants to empower the civilian complaint review board to investigate MCSD policies and practices to identify systemic problems, subpoena MCSD documents and testimony for investigations, and impose binding disciplinary decisions upon findings that an officer of the MCSD has violated civil rights;

vii. Requiring Defendants to institute and implement improved written policies, procedures, and training programs that are designed to

eliminate the MCSD's unconstitutional policing policies and practices;

viii.    Requiring Defendants to deploy MCSD personnel with appropriate and adequate supervision;

ix.    Requiring Defendants to implement appropriate measures to ensure that MCSD deputies document:

    1.   all roadblocks and checkpoints, including the location of each roadblock and checkpoint and the number, race, and gender of each individual(s) stopped;

    2.   all stops, frisks, and searches, including the basis for and the location of each stop, frisk, and search, and the number, race, and gender of each individual stopped, frisked, and/or searched; and

    3.   all citations and arrests, including the date, location, and circumstances under which the citation was issued and/or the arrest made, the basis and/or charge for the arrest/citation, and the race and gender of each individual cited or arrested,

in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

x.    Requiring Defendants to implement appropriate measures to ensure that documentation of all vehicular stops and pedestrian stops and/or frisks is retained in a single, up-to-date computerized database;

xi.    Requiring Defendants to make publicly available, on a semiannual basis, data on all roadblocks, checkpoints, stops, frisks, and searches, conducted by the MCSD, including the locations of each roadblock, checkpoint, stop, frisk and/or search and the race, ethnicity, and gender of each individual stopped and/or searched, as well as the purpose of the roadblocks/checkpoints and the reasons for stops, frisks, and searches;

xii.    Requiring Defendants to monitor and audit MCSD policies, practices, and customs to ensure that all roadblocks, checkpoints, stops, frisks, and searches, comport with constitutional and statutory requirements, including by, among other things, periodically reviewing forms documenting roadblocks, checkpoints, stops, frisks, and searches, and analyzing data on roadblocks, checkpoints, stops, frisks, and searches;

|     |     |
| --- | --- |
| xiii. | Requiring Defendants to acknowledge the role of policing in past and present injustice and discrimination and how it is a hurdle to the promotion of community trust; and |

|     |     |
| --- | --- |
| xiv. | Requiring Defendants to embrace a guardian mindset to build public trust and legitimacy by adopting procedural justice as the guiding principle for internal and external policies and practices to guide their interactions with the citizens they serve. |

D.    Award Plaintiffs Khadafy Manning and Quinnetta Manning compensatory damages against John Does #1 through #6 and against the County in amounts that are fair, just, and reasonable, to be determined at trial;

E.    Award Plaintiffs Khadafy Manning and Quinnetta Manning punitive damages against John Does #1 through #6 to the extent that their liability is based on reprehensible actions and/or inaction undertaken in their individual capacities, in amounts that are fair, just, and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

F.    Award all Plaintiffs, including the members of the Class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

G.    Award all Plaintiffs, including the members of the Class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

H.    Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.


Dated: February 4, 2019


_____
*/s/ Joshua Tom*
Joshua Tom

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*)
Janet A. Gochman (*pro hac vice*)
Isaac Rethy (*pro hac vice*)
Kavitha S. Sivashanker (*pro hac vice*)
Nihara K. Choudhri (*pro hac vice*)
Christopher K. Shields (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
Joshua Tom (Miss. Bar No. 105392)
233 East Capitol Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
kavitha.sivashanker@stblaw.com
nchoudhri@stblaw.com
christopher.shields@stblaw.com
bonnie.jarrett@stblaw.com

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Ezekiel Edwards (*pro hac vice*)
Jeffery Robinson (*pro hac vice* forthcoming)
125 Broad Street
New York, NY 10004
(212) 549-2610
eedwards@aclu.org
jrobinson@aclu.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2019, I caused the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND INDIVIDUAL DAMAGES** to be electronically filed with the Clerk of the Court using the CM/ECF system, through which copies have been served to:

WISE CARTER CHILD & CARAWAY, P.A.
Michael B. Wallace (Miss. Bar No. 6904)
Charles E. Ross (Miss. Bar No. 5683)
James E. Graves (Miss. Bar No. 102252)
Charles E. Cowan (Miss. Bar No. 104478)
T. Russell Nobile (Miss. Bar No. 100682)
Post Office Box 651
Jackson, MS 39205
(601) 968-5534
mbw@wisecarter.com
cer@wisecarter.com
jeg@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

CURRIE JOHNSON & MYERS, P.A.
Rebecca B. Cowan (Miss. Bar No. 7735)
P.O. Box 750
Jackson, MS 39205
(601) 969-1010
bcowan@curriejohnson.com

KATIE BRYANT SNELL, PLLC
Katie Bryant Snell (Miss. Bar No. 103607)
P.O. Box 3007
Madison, Mississippi  39130-3007
(601) 460-9800
Katie@katiebryantsnell.com

PETTIS, BARFIELD & HESTER, P.A.
J. Lawson Hester (Miss. Bar No. 2394)
4450 Old Canton Road, Suite 210
Jackson, Mississippi  39211
(601) 987-5300
lhester@pbhfirm.com

*/s/ Joshua Tom*
Joshua Tom

# Exhibit A

# 2010 CENSUS - CENSUS TRACT REFERENCE MAP: Madison County, MS

310
309
304
305
306
307
308
303.02
303.01
302.04
302.03
302.02
302.01
302.05
302.06
301.01
301.04
301.07
301.05
301.06
301.08
Pickens 57200
Yazoo City 81520
Bentonia 05380
Kearney Park 37190
Flora 24940
Canton 11100
Madison 44520
Ridgeland 62520
Jackson 36000
Clinton 14420
Bolton 07540
Flowood 25100
Pelahatchie 56200
Ross Barnett Reservoir
Lk Hico
HOLMES 051
YAZOO 163
ATTALA 007
MADISON 089
LEAKE 079
SCOTT 123
RANKIN 121
HINDS 049

## LEGEND

| SYMBOL DESCRIPTION | LABEL STYLE |
|---|---|
| Federal American Indian Reservation | L'ANSE RES 1880 |
| Off-Reservation Trust Land, Hawaiian Home Land | T1880 |
| Oklahoma Tribal Statistical Area, Alaska Native Village Statistical Area, Tribal Designated Statistical Area | KAW OTSA 5340 |
| State American Indian Reservation | Tama Res 4125 |
| State Designated Tribal Statistical Area | Lumbee STSA 9815 |
| Alaska Native Regional Corporation | NANA ANRC 52120 |
| State (or statistically equivalent entity) | NEW YORK 36 |
| County (or statistically equivalent entity) | ERIE 029 |
| Minor Civil Division (MCD)[1,2] | Bristol town 07485 |
| Consolidated City | MILFORD 47500 |
| Incorporated Place[1,3] | Davis 18100 |
| Census Designated Place (CDP)[3] | Incline Village 35100 |
| Census Tract | 33.07 |

| DESCRIPTION | SYMBOL | DESCRIPTION | SYMBOL |
|---|---|---|---|
| Interstate | | Water Body | Pleasant Lake |
| U.S. Highway | | Swamp or Marsh | Okefenokee Swamp |
| State Highway | | Glacier | Bering Glacier |
| Other Road | Marsh Ln | Military | Fort Belvoir |
| 4WD Trail, Stairway, Alley, Walkway, or Ferry | | National or State Park, Forest, or Recreation Area | Yosemite NP |
| Railroad | Southern RR | Inset Area | A |
| Pipeline or Power Line | | Outside Subject Area | |
| Ridge or Fence | | | |
| Property Line | | | |
| Nonvisible Boundary or Feature Not Elsewhere Classified | | | |

Where state, county, and/or MCD boundaries coincide, the map shows the boundary symbol for only the highest-ranking of these boundaries.

1 A ' ° ' following an MCD name denotes a false MCD. A ' ° ' following a place name indicates that a false MCD exists with the same name and FIPS code as the place; the false MCD label is not shown.

2 MCD boundaries are shown in the following states in which MCDs have functioning governments: Connecticut, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Wisconsin.

3 Place label color correlates to the place fill color.

Location of County within State

All legal boundaries and names are as of January 1, 2010. The boundaries shown on this map are for Census Bureau statistical data collection and tabulation purposes only; their depiction and designation for statistical purposes does not constitute a determination of jurisdictional authority or rights of ownership or entitlement.

Geographic Vintage: 2010 Census (reference date: January 1, 2010)
Data Source: U.S. Census Bureau's MAF/TIGER database (TAB10ST28)
Map Created by Geography Division: November 25, 2010

U.S. DEPARTMENT OF COMMERCE Economics and Statistics Administration U.S. Census Bureau

Projection: Albers Equal Area Conic
Datum: NAD 83
Spheroid: GRS 80
1st Standard Parallel: 30 57 15
2nd Standard Parallel: 34 11 14
Central Meridian: -89 52 02
Latitude of Projection's Origin: 30 08 45
False Easting: 0
False Northing: 0

0 2 4 6 8 10 Kilometers
0 1 2 3 4 5 Miles
The plotted map scale is 1:97817

USCENSUSBUREAU

PARENT SHEET 1

Total Sheets: 1
- Index Sheets: 0
- Parent Sheets: 1
- Inset Sheets: 0

NAME: Madison County (089)
ENTITY TYPE: County or statistically equivalent entity
ST: Mississippi (28)

2010 CENSUS TRACT REF MAP (PARENT)
205028089001

# Exhibit B

Policy and Procedure
Page 4

VII.   CONTINGENCY PLANNING

Any deviation from the predetermined guidelines must thoroughly document the reason for the deviation. (i.e. traffic backing up, intermittent inclement weather.)

VIII.   DATA COLLECTION AND EVALUATION

To monitor and ensure standardization and consistency of the sobriety checkpoint program a systematic method of data collection will be incorporated.

1.   After action report may include, but is not limited to:

      a.   Time, date, and location of the sobriety checkpoint.
      b.   Weather conditions.
      c.   Number of vehicles passing through sobriety checkpoint.
      d.   Average time delay to motorists.
      e.   Predetermined order of selecting motorists.
      f.   Number and types of arrests.
      g.   Number of motorists detained for field sobriety testing.
      h.   Identification of unusual incidents such as safety problems/other concerns.

IX.   GENERAL ROADBLOCKS

      a.   This section allows officers to conduct random roadblocks for all traffic violations, escapees or wanted subjects.

      b.   The requirements of this section shall not be confused with the policy set out above on the methods to be used for sobriety checkpoints.

      c.   All Deputies may conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within this county.

# Exhibit C

# NOTICE

The Madison County Sheriff's Department will have a checkpoint at one or more of the following locations. The purpose of the checkpoint will be to check for Driver's license, warrants and what ever else we encounter.

These checkpoints will begin on
January 19, 2017 at 6:00 p.m. and end on January 22, 2017 at 4:00 a.m.

Ridgewood Rd. @ Highway 51
Spillway Road @ / near Breakers Lane
William Blvd @ Old Canton Rd
Rice Rd. @ The Pointe Apartments
Highway 463 @ Park Place Dr.
W. County Line Rd. @ N. Livingston Rd.
Rice Rd. @ Beezey Hill Rd
N. Livingston Rd @ Mary Miles Rd.
Stumpbridge Rd @ Sharon Rd.
HWY 43 @ Sharon Rd.
Highway 22 @ Harris Rd.
Yandell Rd. @ Clarkdell Rd.
Steed Rd. @ Richardson Rd
Hwy 16 W. @ Hwy 51
Hwy 16 W. @ Old Yazoo City Rd
Yandell Rd. @ Bainbridge Rd.
Highway 43 @ Cotton Blossom
G. Washington @ Dr. MLK, Jr. Dr
Nissan Dr. @ Highway 51
Robinson Springs Rd. @ Pocahontas Rd
Highway 51. @ Corrections Dr.
Canton Estates @ West North
Boyd St. @ W. North St.
W County Line Rd @ Highland Colony Pkwy
Harbour Pointe Xing @ Old Canton Rd.
Hwy 16 W @/near Davis Crossing Rd.

Highway 16W @ Green Acres Rd.
Hoy Rd. @ N. Old Canton Rd.
Highway 463 @ Reunion Pkwy.
Old Canton Rd. @ Ridgecrest Dr.
Main St. @ First St.
Glickstadt Rd. @ Catlett Rd.
Natchez Trace Parkway @ Hwy 43
Livingston Vernon Rd. @ Highway 49
Kearney Park Rd. @ Middle Rd.
Natchez Trace Parkway @ Overlook Park
Harbor Dr. @ Lake Harbour Rd
Rice Rd. @ Post Rd.
Yandell Ave. @ Dobson Dr.
E. County Line Rd. @ Old Canton Rd.
Livingston Vernon Rd. @ Kearney Park
Highway 16 E. @ Avendale
Canton Parkway @ Highway 43
Natchez Trace @ Ratliff Ferry
Highway 43 @ Goodloe Rd.
I-220 @ County Line
King Ranch Dr. @ Foley Ave.
Rice Rd @ Pear Orchard
W. North @ 388 Ricks Dr.
W. Peace St @ Plummer Dr.
S. Wheatley St @ Towncenter Blvd.

Posted by: Deputy Rylon Thompson

Exhibit D

**POLICY AND PROCEDURE**

<u>SOBRIETY CHECKPOINT GUIDELINES</u>

I.  **PURPOSE**

The purpose of this policy is to provide guidelines for the physical construction and operation of a sobriety checkpoint in order to maximize the deterrent effect and increase the perception of "risk of apprehension" of motorists who would operate a vehicle while impaired by alcohol or other drugs.

II.  **POLICY**

It shall be the policy of this department to implement a sobriety checkpoint program. This will be done as part of a comprehensive enforcement program. To ensure standardization of this program a clear and concise set of written guidelines has been developed governing procedure on how checkpoint will be operated within this Department.

To implement this policy this agency must:

1.  Satisfy federal, state and local legal requirements.

2.  Conduct checkpoints with a minimal amount of intrusion or motorist inconvenience.

3.  Assure the safety of the general public as well as law enforcement officers involved.

4.  Provide for an objective site selection process based on relevant data.

Policy and Procedure
Page 2

<blockquote>

5.      Officer selection should be based on experience and training.  Operational procedure will be covered during a briefing period prior to each sobriety checkpoint.

</blockquote>

III.     DEPARTMENTAL GUIDELINES

<blockquote>

A.  Be approved by the Sheriff or the Chief Deputy or designee prior to commencement of the sobriety checkpoint.

B.  Specify the method for selecting motorists to be contacted, e.g., every vehicle, every fifth vehicle, etc. to ensure objectivity.

C.  Provide for an operational briefing of personnel prior to each checkpoint.  At this time designate assignments and respective duties.

D.  Specify dialogue and educational material to be used by checkpoint Personnel.

E.  Provide for the removal of vehicles to the predetermined area when further investigation is required.

</blockquote>

IV.     PROCEDURES

<blockquote>

A.  Site Selection

The department must be able to objectively outline criteria utilized in the site selection process:

1.  Alcohol/Drug related traffic experiences.

    a.    Unusual incidence of alcohol/drug related crashes.

    b.    Alcohol/drug impaired driving violations.

    c.    Unusual number of night- time single vehicle crashes.

    d.    Any other documented alcohol/drug related vehicular Incidents.

</blockquote>

Policy and Procedure
Page 3

    2.   Select locations which permit the safe flow of traffic through the checkpoint.

        a.    Consideration should be given to posted speed limits, traffic volume and visibility.

        b.    Ensure sufficient adjoining space is available to pull vehicles off the traveled portion of the roadway.

        c.    Consider other conditions that may pose a hazard.

        d.    The site should have maximum visibility from each direction and sufficient illumination.

## V.    PERSONNEL

    1.  A sworn, uniformed officer will be assigned to provide on-scene supervision of the sobriety checkpoint.

    2.  The sobriety checkpoint will be staffed by a sufficient number of uniformed personnel to assure a safe and efficient operation.

## VI.    MOTORISTS WARNINGS/ SAFETY METHODS

    1.  Special care is required to warn approaching motorist of the sobriety checkpoint.

    2.  Notice of sobriety checkpoints will be posted at the Justice Court Bldg. on the day of the checkpoint.

    3.  Basic equipment may include, but is not limited to:

        a.    Warning signs placed in advance of the checkpoint.
        b.    Flares, fugues, or similar devices.
        c.    Safety cones or similar devices.
        d.    Marked patrol vehicles.

    4.  The use, placement and types of traffic control devices must comply with federal, state, or local transportation codes.

Policy and Procedure
Page 4

VII.   CONTINGENCY PLANNING

Any deviation from the predetermined guidelines must thoroughly document the reason for the deviation.  (i.e. traffic backing up, intermittent inclement weather.)

VIII.   DATA COLLECTION AND EVALUATION

To monitor and ensure standardization and consistency of the sobriety checkpoint program a systematic method of data collection will be incorporated.

1.   After action report may include, but is not limited to:

    a.   Time, date, and location of the sobriety checkpoint.
    b.   Weather conditions.
    c.   Number of vehicles passing through sobriety checkpoint.
    d.   Average time delay to motorists.
    e.   Predetermined order of selecting motorists.
    f.   Number and types of arrests.
    g.   Number of motorists detained for field sobriety testing.
    h.   Identification of unusual incidents such as safety problems/other concerns.

IX.   GENERAL ROADBLOCKS

    a.   This section allows officers to conduct random roadblocks for all traffic violations, escapees or wanted subjects.

    b.   The requirements of this section shall not be confused with the policy set out above on the methods to be used for sobriety checkpoints.

    c.   All Deputies may conduct general roadblocks when necessary to check for traffic violations, escapees, or wanted subjects upon the public streets, highways and right-of-ways within this county.